**ORAL ARGUMENT NOT YET SCHEDULED**
No. 22-1081 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

———————————

STATE OF OHIO, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN
HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY ECONOMY, ET AL.,
*Intervenors.*

———————————

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0257)

———————————

## INITIAL BRIEF FOR PRIVATE PETITIONERS

———————————

ERIC D. MCARTHUR
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical
Manufacturers, Domestic
Energy Producers Alliance,
Energy Marketers of
America, and National
Association of Convenience
Stores*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable
Fuels Company, LLC*

(Additional counsel listed on
the following page)

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES,
PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, IMC, Inc.,
Illinois Corn Growers Association,
Kansas Corn Growers Association,
Michigan Corn Growers
Association, Missouri Corn
Growers Association, and Valero
Renewable Fuels Company, LLC*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC  20036
matthew.morrison@pillsburylaw.com

*Counsel for Iowa Soybean
Association, Minnesota Soybean
Growers Association, South Dakota
Soybean Association, and Diamond
Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Diamond Alternative
Energy, LLC, and Valero Renewable
Fuels Company, LLC*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28, petitioners American Fuel & Petrochemical Manufacturers, Clean Fuels Development Coalition, Diamond Alternative Energy, LLC, Domestic Energy Producers Alliance, Energy Marketers of America, ICM, Inc., Illinois Corn Growers Association, Iowa Soybean Association, Kansas Corn Growers Association, Michigan Corn Growers Association, Minnesota Soybean Growers Association, Missouri Corn Growers Association, National Association of Convenience Stores, South Dakota Soybean Association, and Valero Renewable Fuels Company, LLC respectfully submit this Certificate as to Parties, Rulings, and Related Cases.

**A.    Parties**

All parties, intervenors, and amici appearing in this Court are listed in the brief of the State petitioners.

**B.    Rulings Under Review**

Under review is the final action of the Administrator of the United States Environmental Protection Agency, entitled *California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice*

*of Decision*, published in the Federal Register at 87 Fed. Reg. 14,332 (Mar. 14, 2022).

**C.      Related Cases**

Three consolidated cases in the U.S. Court of Appeals for the District of Columbia Circuit involve challenges to the same agency action challenged here: *Iowa Soybean Assn.* v. *EPA*, No. 22-1083; *Am. Fuel & Petrochemical Mfrs.* v. *EPA*, No. 22-1084; and *Clean Fuels Dev. Coal.* v. *EPA*, No. 22-1085.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, petitioners American Fuel & Petrochemical Manufacturers, Clean Fuels Development Coalition, Diamond Alternative Energy, LLC, Domestic Energy Producers Alliance, Energy Marketers of America, ICM, Inc., Illinois Corn Growers Association, Iowa Soybean Association, Kansas Corn Growers Association, Michigan Corn Growers Association, Minnesota Soybean Growers Association, Missouri Corn Growers Association, National Association of Convenience Stores, South Dakota Soybean Association, and Valero Renewable Fuels Company, LLC hereby make the following disclosures:

**American Fuel & Petrochemical Manufacturers** is a national trade association that represents American refining and petrochemical companies. The Association has no parent corporation, and no publicly held corporation has a 10% or greater ownership in it.

**Clean Fuels Development Coalition** is a business league organization established in a manner consistent with Section 501(c)(6) of the Internal Revenue Code.   Established in 1988, the Coalition works with auto, agriculture, and biofuel interests in support of a broad range of energy and

iv

environmental programs.  It has no parent companies, and no publicly held company has a 10% or greater ownership interest in the Coalition.

**Diamond Alternative Energy, LLC**, is a Delaware limited liability company.  It is a wholly owned direct subsidiary of Valero Energy Corporation.

**Domestic Energy Producers Alliance** is a nonprofit, nonstock corporation organized under the laws of the state of Oklahoma.  The Alliance has no parent corporation, and no publicly held company owns 10 percent or more of its stock.

**Energy Marketers of America** is a federation of 47 state and regional trade associations representing energy marketers throughout the United States.  It is incorporated under the laws of the Commonwealth of Virginia, has no parent corporation, and no publicly held corporation has a 10% or greater ownership in it.

**ICM, Inc.** is a Kansas corporation that is a global leader in developing biorefining capabilities, especially for the production of ethanol.  It is a wholly owned subsidiary of ICM Holdings, Inc., and no publicly held company has a 10% or greater ownership interest in ICM Holdings, Inc.

**Illinois Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Iowa Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers and supporters of the agriculture and soybean industries. It operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Iowa Soybean Association does not have a parent company, it has no privately or publicly held ownership interests, and no publicly held company has ownership interest in it.

**Kansas Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**Michigan Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**The Minnesota Soybean Growers Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers, their supporters, and members of soybean industries. It

operates for the purpose of promoting the general commercial, legislative, and other common interests of its members. The Minnesota Soybean Growers Association is a not-for-profit corporation that is not a subsidiary of any corporation and that does not have any stock which can be owned by a publicly held corporation.

**Missouri Corn Growers Association** is an agricultural organization. It has no parent companies, and no publicly held company has a 10% or greater ownership interest in it.

**National Association of Convenience Stores** is an international trade association that represents both the convenience and fuel retailing industries with more than 1,300 retail and 1,600 supplier company members. The United States convenience industry has more than 148,000 stores across the country and had more than $705 billion in sales in 2021. The Association has no parent corporation, and no publicly held corporation has a 10% or greater ownership interest in it.

**The South Dakota Soybean Association** is a non-profit trade association within the meaning of D.C. Circuit Rule 26.1(b). Its members are soybean farmers, their supporters and members of soybean industries. It operates for the purpose of promoting the general commercial, legislative, and

other common interests of its members.   The South Dakota Soybean Association is a not-for-profit corporation, is not a subsidiary of any corporation, and does not have any stock which can be owned by a publicly held corporation.

**Valero Renewable Fuels Company, LLC,** a Texas limited liability company, is a wholly owned direct subsidiary of Valero Energy Corporation, a Delaware corporation whose common stock is publicly traded on the New York Stock Exchange under the ticker symbol VLO.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 4

STATEMENT OF THE ISSUE ................................................................ 5

STATUTES AND REGULATIONS ......................................................... 5

STATEMENT OF THE CASE ................................................................. 5

I.   Statutory Background ............................................................... 5

II.  Regulatory Background ............................................................. 8

     A.   The 2013 California Waiver ............................................. 9

     B.   The Waiver Withdrawal ................................................. 11

     C.   The Challenged Action ................................................... 11

SUMMARY OF ARGUMENT ................................................................ 14

STANDING ........................................................................................... 16

STANDARD OF REVIEW ..................................................................... 17

ARGUMENT ........................................................................................ 18

I.   EPA Exceeded Its Statutory Authority In Reinstating A Waiver
     For California To Set Emission Standards Meant To Address
     Global Climate Change ........................................................... 18

     A.   Section 209(b) Cannot Be Read To Upset The Federal-
          State Balance And Permit California To Dictate The
          Direction Of Industries And Energy Markets .............. 19

     B.   Global Climate Change Is Not A "Compelling And
          Extraordinary Condition" Under Section 209(b)(1)(B) ... 27

1. California's conditions are "extraordinary" only if California suffers a distinct, localized problem ..................27

2. California's conditions related to global climate change are not "extraordinary" ............................................33

3. EPA's counterarguments lack merit ....................................34

C. California Does Not "Need" Its Own Emission Standards To "Meet" Climate-Change Conditions That The Standards Will Not Meaningfully Address ....................................38

1. The requirement that California "need" separate standards to "meet" conditions requires that the standards have some meaningful effect ..............................38

2. EPA cannot rely on an "aggregate" approach to avoid applying the statutory waiver criteria ......................44

3. EPA cannot justify a waiver for standards addressing global climate change by pointing to incidental impacts on local criteria pollution ......................50

D. Even If Section 209(b) Were Ambiguous, It Should Be Construed Narrowly To Avoid Serious Constitutional Problems ........................................................................53

II. The Waiver Reinstatement Cannot Be Affirmed Based On EPA's Narrow View Of Its Reconsideration Authority......................................55

A. EPA's Analysis Of Its Reconsideration Authority Is Intertwined With The Merits Of Its Statutory Arguments.........56

B. EPA Properly Exercised Its Inherent Authority To Reconsider Its Earlier Waiver ........................................................58

CONCLUSION................................................................64

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AFGE, Local 2953* v. *FLRA*,
730 F.2d 1534 (D.C. Cir. 1984)....................................................45

*Airlines for Am.* v. *TSA*,
780 F.3d 409 (D.C. Cir. 2015)......................................................17

*Allina Health Servs.* v. *Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014)....................................................56

*Am. Fuel & Petrochemical Mfrs.* v. *EPA*,
3 F.4th 373 (D.C. Cir. 2021) .......................................................17

*Am. Methyl Corp.* v. *EPA.*,
749 F.2d 826 (D.C. Cir. 1984)................................................58, 61

*Am. Trucking Assoc.* v. *Frisco Trans. Co.*,
358 U.S. 133 (1958).....................................................................60

*Americans for Clean Energy* v. *EPA*,
864 F.3d 691 (D.C. Cir. 2017) (*ACE*) .........................................26

*AT&T* v. *Iowa Utils. Bd.*,
525 U.S. 366 (1999).....................................................................40

*Atascadero State Hosp.* v. *Scanlon*,
473 U.S. 234 (1985).....................................................................20

*Bailey* v. *United States*,
516 U.S. 137 (1995).....................................................................30

*Belville Min. Co.* v. *United States*,
999 F.2d 989 (6th Cir. 1993)........................................................59

*Bolln* v. *Nebraska*,
176 U.S. 83 (1900).......................................................................53

*Bond* v. *United States*,
572 U.S. 844 (2014).....................................................................20

*Brown* v. *NHTSA*,
673 F.2d 544 (D.C. Cir. 1982)......................................................47

*Brown* v. *State of La.*,
383 U.S. 131 (1966)........................................................................29

*Carlson* v. *Postal Regul. Comm'n*,
938 F.3d 337 (2019) .....................................................................57

*Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984)......................................................................59

*City of New York* v. *Chevron Corp.*,
993 F.3d 81 (2d Cir. 2021) ...........................................................21

*ConocoPhillips Co.* v. *EPA*,
612 F.3d 822 (5th Cir. 2010).........................................................62

*Dietrich* v. *Tarleton*,
473 F.2d 177 (D.C. Cir. 1972)........................................................56

*Encino Motorcars, LLC* v. *Navarro*,
579 U.S. 211 (2016)......................................................................63

*Engine Mfrs. Ass'n* v. *S. Coast Air Quality Mgmt. Dist.*,
498 F.3d 1031 (9th Cir. 2007)........................................................37

*Engine Mfrs. Ass'n* v. *S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004)......................................................................51

*FCC* v. *Fox Television Stations*,
556 U.S. 502 (2009)......................................................................63

*FDA* v. *Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)......................................................................22

*Ford Motor Co.* v. *EPA*,
606 F.2d 1293 (D.C. Cir. 1979).......................................................32

*Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)........................................................................50

*Gonzales* v. *Oregon*,
546 U.S. 243 (2006)......................................................................22

*Gregory* v. *Ashcroft*,
501 U.S. 452 (1991)..................................................................20, 21

*GTE Serv. Corp.* v. *FCC*,
205 F.3d 416 (D.C. Cir. 2000).........................................................39

*Gun South, Inc.* v. *Brady*,
   877 F.2d 858 (11th Cir. 1989)................................................59

*HollyFrontier Cheyenne Ref., LLC* v. *Renewable Fuels Ass'n*,
   141 S. Ct. 2172 (2021)...................................................26

*Int'l Paper Co.* v. *FERC*,
   737 F.2d 1159 (D.C. Cir. 1984).........................................60

*Ivy Sports Med., LLC* v. *Burwell*,
   767 F.3d 81 (D.C. Cir. 2014)...........................................58

*Lamie* v. *U.S. Trustee*,
   540 U.S. 526 (2004).......................................................28

*Mazaleski* v. *Treusdell*,
   562 F.2d 701 (D.C. Cir. 1977)..........................................60

*Michigan* v. *EPA*,
   576 U.S. 743 (2015).......................................................41

*Motor Equip. Mfrs. Ass'n, Inc.* v. *EPA*,
   627 F.2d 1095 (D.C. Cir. 1979)..................................6, 18, 48

*Motor Vehicle Mfrs. Ass'n* v. *N.Y. State Dep't of Envtl.
Conservation*,
   17 F.3d 521 (2d Cir. 1994) .........................................5, 18

*Nat'l Meat Ass'n* v. *Harris*,
   565 U.S. 452 (2012).......................................................51

*National Cable & Telecomms. Ass'n* v. *Brand X Internet
Servs.*,
   545 U.S. 967 (2005).......................................................59

*New Jersey* v. *EPA*,
   517 F.3d 574 (D.C. Cir. 2008).........................................58

*Nw. Austin Mun. Util. Dist. No. One* v. *Holder*,
   557 U.S. 193 (2009).......................................................53

*PPG Indus., Inc.* v. *United States*,
   52 F.3d 363 (D.C. Cir. 1995)...........................................58

*Ranbaxy Lab'ys, Ltd.* v. *Burwell*,
   82 F. Supp. 3d 159 (D.D.C. 2015) ...................................58

xiii

*Ratzlaf* v. *United States*,
510 U.S. 135 (1994).................................................................39

*Russello* v. *United States*,
464 U.S. 16 (1983)...................................................................48

*Solid Waste Agency of N. Cook Cnty.* v. *U.S. Army Corps of Engineers*,
531 U.S. 159 (2001)....................................................21, 37, 53

*Tanzin* v. *Tanvir*,
141 S. Ct. 486 (2020)...............................................................28

*Texas* v. *EPA*,
No. 22-1031 (D.C. Cir. Feb. 28, 2022).....................................25

*TRW Inc.* v. *Andrews*,
534 U.S. 19 (2001)..............................................................41, 46

*U.S. Forest Serv.* v. *Cowpasture River Pres. Ass'n*,
140 S. Ct. 1837 (2020).............................................................20

*United States* v. *Bass*,
404 U.S. 336 (1971).................................................................20

*United States* v. *Davis*,
139 S. Ct. 2319 (2019).............................................................53

*United States* v. *Texas*,
339 U.S. 707 (1950).................................................................55

*United States* v. *Winston*,
2021 WL 2592959 (D.D.C. June 24, 2021)..............................28

*Utility Air Regul. Grp.* v. *EPA*,
573 U.S. 302 (2014)................................................22, 23, 27, 54

*West Virginia* v. *EPA*,
142 S. Ct. 2587 (2022)..........................19, 22, 23, 24, 27, 52

**Statutes**

5 U.S.C. § 706(2) ..............................................................18, 58

42 U.S.C. § 7410..........................................................................5

42 U.S.C. § 7543......................2, 5, 6, 7, 18, 19, 27, 28, 43, 45, 46, 47

42 U.S.C. § 7507.....................................................................7, 30

42 U.S.C. § 7521 ................................................................46

42 U.S.C. § 7545 ................................................................36

42 U.S.C. § 7586 ................................................................37

42 U.S.C. § 7607 ..................................................................4

42 U.S.C. § 13212 ..............................................................36

49 U.S.C. § 32902 ........................................................45, 25

49 U.S.C. § 32919 ........................................................25, 37

Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. § 2
(2019) ...........................................................................25

## Regulations

38 Fed. Reg. 10,235 (Apr. 26, 1973) .....................................8

43 Fed. Reg. 998 (Jan. 5, 1978) ..........................................61

47 Fed. Reg. 7,306 (Feb. 18, 1982) ......................................61

49 Fed. Reg. 18,887 (May 3, 1984) ........................................6

59 Fed. Reg. 48,557 (Sept. 22, 1994) .....................................8

73 Fed. Reg. 12,156 (Mar. 6, 2008) ...............................3, 9, 30

74 Fed. Reg. 32,744 (July 8, 2009) ...............................3, 9, 61

78 Fed. Reg. 2,112 (Jan. 9, 2013) .................................3, 9, 10

83 Fed. Reg. 42,986 (Aug. 24, 2018) ...............................25, 34

84 Fed. Reg. 51,310 (Sept. 27, 2019)... 4, 7, 9, 11, 13, 19, 30, 31, 32, 33, 34, 37, 38, 41, 42, 44, 45, 46, 47, 50, 52, 63

86 Fed. Reg. 7,037, 7,037 (Jan. 25, 2021) ...........................12

86 Fed. Reg. 43,583, 43,583 (Aug. 10, 2021)......................2, 12

87 Fed. Reg. 14,332 (Mar. 14, 2022) 4, 10, 12, 13, 19, 33, 34, 35, 36, 40, 43, 44, 49, 50, 51, 52, 54, 55, 57, 59, 62

Cal. Code Regs. § 1962.4(b)...............................................10

Cal. EO-N-79-20 (Sept. 23, 2020) https://www.gov.ca.gov/wp-
content/uploads/2020/09/9.23.20-EO-N-79-20-Climate.pdf.....................12

**Other Authorities**

*American Heritage Dictionary* (1969).......................................28, 39

California Air Resources Board, *Low-Emission Vehicle Greenhouse Gas Program*, https://ww2.arb.ca.gov/our-work/programs/advanced-clean-cars-program/lev-program/low-emission-vehicle-greenhouse-gas ...........................................8

Coral Davenport, et al., *California to Ban the Sale of New Gasoline Cars*, N.Y. Times (Aug. 24, 2022) ...............................................24

Daniel Bress, *Administrative Reconsideration*, 91 Va. L. Rev. 1737 (2005) ......................................................................59

EPA, *Denial of Petitions to Establish National Ambient Air Quality Standards for Greenhouse Gases* (Jan. 19, 2021)......................31

H.R. Rep. No. 90-728 (1967)........................................................6, 32

*Public Hearing to Consider the Proposed Advanced Clean Cars II Regulations* 12 (Apr. 12, 2022), https://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/a ccii/isor.pdf.......................................................................10

S. Rep. No. 90-403 (1967)..........................................7, 29, 32, 40, 63

*Webster's New International Dictionary* (3d ed. 1961) .........................28, 39

# GLOSSARY

EPA                U.S. Environmental Protection Agency

EPCA               Energy Policy and Conservation Act of 1975

NHTSA              National Highway Traffic Safety Administration

RFS                Renewable Fuel Standard

# INTRODUCTION

In recent years, Congress has grappled with how best to address global climate change.  It has embraced some regulatory approaches but not others, it has authorized federal agencies to take some actions but not others, and it has preempted States from regulating in some areas but not others.  It has made difficult policy judgments about when and how to limit greenhouse-gas emissions, and when and how to regulate industries and spur economic growth. At no point, however, has Congress mandated a wholesale shift in the Nation's vehicle fleet from traditional vehicles to electric vehicles—a shift that would fundamentally transform the automobile industry, the oil and gas and petrochemical industries, motor-fuel retailing, the electric grid, and thousands of related manufacturing businesses and supply chains.

Nevertheless, the Environmental Protection Agency (EPA) and the National Highway Traffic Safety Administration (NHTSA), in close coordination with the State of California, have embarked on a concerted effort to force electrification of the Nation's vehicle fleet.  EPA and NHTSA have promulgated their own regulations—subject to separate challenges pending before this Court—that are designed to achieve a goal Congress never set: "that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-

emission vehicles." *Executive Order on Strengthening American Leadership in Clean Cars and Trucks*, 86 Fed. Reg. 43,583, 43,583 (Aug. 10, 2021).  EPA and NHTSA hope to achieve that *ultra vires* goal in part by embracing aggressive state-law standards enacted by California.  EPA has purported to authorize those state standards by invoking an ill-fitting Clean Air Act provision that affords California a narrow waiver of federal preemption of state motor-vehicle emission standards.

That provision—Section 209 of the Clean Air Act—reflects Congress's determination that regulating emissions from new motor vehicles is generally the responsibility of the federal government.  Section 209(a) broadly preempts States from adopting "any standard relating to" new motor-vehicle emissions. 42 U.S.C. § 7543(a).  But when Congress enacted Section 209(a) in 1967, California's southern coastal cities faced an acute smog problem that national vehicle emission standards were unlikely to resolve.  In response, Congress authorized EPA to grant California—and only California—a limited preemption waiver governed by carefully specified criteria.  *Id.* § 7543(b)(1). Congress required California to demonstrate, among other things, that it "need[s]" its own emission standards "to meet compelling and extraordinary conditions."  *Id.* § 7543(b)(1)(B).

For decades, EPA exercised its authority under Section 209(b) to grant California waivers for emission standards designed to address the State's unique *local* pollution problems.  In 2005, however, California for the first time sought a waiver to establish its own emission standards not for local pollutants but for greenhouse gases that it determined contribute to global climate change.  EPA denied the waiver, concluding that Section 209(b) does not authorize California to tackle diffuse national and international problems, but instead covers "air pollution problems [that] have their basic cause, and therefore their solution, locally in California."  73 Fed. Reg. 12,156, 12,163 (Mar. 6, 2008).

After a change in presidential administration, EPA flip-flopped.  It reconsidered its denial and granted a greenhouse-gas waiver to California. 74 Fed. Reg. 32,744 (July 8, 2009).  It followed up in 2013, granting California another waiver for the standards at issue here:  greenhouse-gas emission standards and a zero-emission-vehicle mandate, both of which California has trumpeted as addressing global climate change.  78 Fed. Reg. 2,112 (Jan. 9, 2013).  In 2019, EPA reconsidered and withdrew the 2013 waiver, once again explaining that standards aimed at global climate change fall outside Section 209(b)'s narrow exception to federal preemption and that, in any event,

California did not "need" its standards because they would not meaningfully address global climate change.  84 Fed. Reg. 51,310 (Sept. 27, 2019).  Most recently, EPA flipped again, rescinding the 2019 withdrawal.  87 Fed. Reg. 14,332 (Mar. 14, 2022).

EPA got it right the first time (and again in 2019).  Section 209(b) does not authorize a waiver for California emission standards addressing global climate change.  Congress afforded California a targeted exemption from an otherwise uniform national regulatory scheme so that California could continue to address its local pollution conditions.  Congress did not, and could not, authorize California, alone among the 50 States, to assume a role as a junior-varsity EPA and attempt to solve national and international issues like climate change.  Any mandate to shift the Nation's automobile fleet to electric vehicles in an effort to address global climate change must come from Congress—not from federal agencies, and certainly not from a single State.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review EPA's action noticed at 87 Fed. Reg. 14,332 (March 14, 2022).  EPA's action was "final action taken" under the Clean Air Act, and petitioners timely petitioned for

review on May 13, 2022, "within sixty days from the date notice of such …
action … appear[ed] in the Federal Register."

## STATEMENT OF THE ISSUE

Whether EPA unlawfully reinstated the preemption waiver, which had
been withdrawn by EPA in 2019, for California's motor-vehicle greenhouse-
gas emission standards and zero-emission-vehicle mandate.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the Addendum.

## STATEMENT OF THE CASE

### I.     Statutory Background

Title II of the Clean Air Act makes the federal government responsible
for regulating emissions from new motor vehicles.  42 U.S.C. § 7410.  To
effectuate federal control, Section 209(a) broadly prohibits States from
"adopt[ing] or attempt[ing] to enforce any standard relating to the control of
emissions from new motor vehicles." *Id.* § 7543(a).  That preemption provision
is the "cornerstone of Title II." *Motor Vehicle Mfrs. Ass'n* v. *N.Y. State Dep't
of Envtl. Conservation*, 17 F.3d 521, 526 (2d Cir. 1994).  It prevents "an

anarchic patchwork of federal and state regulatory programs." *Motor Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (*MEMA*).

Congress authorized only one exception to Section 209(a)'s broad preemption provision: Section 209(b), which allows EPA to "waive application of" Section 209(a) for California, under certain statutorily defined circumstances. 42 U.S.C. § 7543(b).[1] In the 1960s, Congress was not contemplating the impact of greenhouse-gas emissions, much less electrification of the nation's vehicles. It instead granted California this special status because the State faced "unique problems" with criteria pollutants, *i.e.*, ground-level ozone, carbon monoxide, sulfur dioxide, nitrogen dioxide, and fine particulate matter. H.R. Rep. No. 90-728, at 22 (1967). In particular, the State's atypical "geography and prevailing wind patterns," together with an unusually large concentration of vehicles, made smog a more persistent problem in California than elsewhere. 49 Fed. Reg. 18,887, 18890 (May 3, 1984) (citing 113 Cong. Rec. 30,948 (Nov. 2, 1967)); *see* H.R. Rep. No. 90-728, at 22. Congress therefore empowered California to "set more

---

[1] Section 209(b) does not mention California by name, referring instead to "any State" that had adopted specified standards "prior to March 30, 1966." 42 U.S.C. § 7543(b). But as Congress knew, California was the only state that met this historical criterion and "is thus the only state eligible for a waiver." *MEMA*, 627 F.2d at 1101 n.1.

stringent standards to meet [these] peculiar local conditions." S. Rep. No. 90-403, at 33 (1967).

EPA, however, may grant a waiver only in limited circumstances. California must "determine[] that [its own] State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(b)(1). In addition, notwithstanding California's determination, EPA must deny a waiver if it "finds that":

(A)    the determination of the State is arbitrary and capricious,

(B)    [California] does not need such State standards to meet compelling and extraordinary conditions, or

(C)    such State standards and accompanying enforcement procedures are not consistent with [Section 202(a)] of this title.

*Id.*

In 1977, Congress amended the Act—adding what is commonly known as Section 177—to permit "any State" to "adopt and enforce" California standards "for which a waiver has been granted," if the State "has plan provisions approved under" Title I. 42 U.S.C. § 7507. The referenced "plan provisions" are state programs designed to attain EPA's national ambient air-quality standards, which target criteria pollutants such as carbon monoxide and ozone. 84 Fed. Reg. at 51,330. Congress thus contemplated that the

standards California would adopt under Section 209(b) could help other States attain and maintain national ambient air-quality standards.

## II.    Regulatory Background

California for many years acted consistently with Section 209(b)'s history and text.  The State sought waivers for standards that addressed its local air-quality conditions by regulating criteria pollutants.  *See, e.g.*, 38 Fed. Reg. 10,235, 10,318-19 (Apr. 26, 1973) (standards for carbon monoxide and nitrogen oxides); 59 Fed. Reg. 48,557, 48,626 (Sept. 22, 1994) (standards for carbon monoxide, nitrogen oxides, and particulate matter).

In 2005, however, California broke new ground by seeking approval of a "landmark" regulation designed to "control greenhouse-gas emissions from new passenger vehicles."  California Air Resources Board, *Low-Emission Vehicle Greenhouse Gas Program*, https://ww2.arb.ca.gov/our-work/programs/advanced-clean-cars-program/lev-program/low-emissionvehicle-greenhouse-gas.  Since that time, California has attempted to transform Section 209(b) into a tool for regulating global climate change and promoting the State's "green" technology industry.

In 2008, EPA denied California's first application for a waiver for greenhouse-gas emission standards.  EPA "recognize[d] that global climate

8

change is a serious challenge," but determined that Section 209(b)(1)(B) is best read as permitting California to address "local or regional" pollution, not global issues like climate change. 73 Fed. Reg. at 12,156, 12,156 n.27. A year later, following a change in presidential administration, EPA reversed course, granting California a waiver for its greenhouse-gas standards. 74 Fed. Reg. at 32,744.

### A.     The 2013 California Waiver

In 2012, California introduced new vehicle-emissions standards known as the "Advanced Clean Cars" program. The program covers vehicles from model years 2015 through 2025, and has three components that would be preempted absent a waiver. In 2013, EPA granted California a waiver for those standards. 78 Fed. Reg. at 2,112.

As relevant here, the Advanced Clean Cars program sets greenhouse-gas standards for light-duty vehicles that are similar but not identical to the greenhouse-gas standards set by EPA in 2012. 78 Fed. Reg. at 2,137. Notably, California did not actually believe that it needed its own greenhouse-gas standards, because it initially agreed to deem compliance with EPA's regulations to be compliance with California's. *Id.* at 2,138. It eliminated that option in 2018. *See* 84 Fed. Reg. at 51,311.

9

California also enacted a zero-emission-vehicle mandate, which requires automakers to sell a minimum percentage of zero-emission vehicles each year (up to 22% for large manufacturers in model year 2025).[2] 78 Fed. Reg. at 2,114, 2,119.  The mandate, California asserted in its waiver application, was adopted to help the State reduce greenhouse-gas emissions and "maintain California as the central location for moving advanced, low greenhouse gas … technology vehicles from the demonstration phase to commercialization."  R-7 at 2.

To date, 17 States and the District of Columbia have adopted California's greenhouse-gas emission standards, its zero-emission-vehicle mandate, or both, under Section 177.  These jurisdictions and California are home to over 140 million people and account for "more than 40 percent of the U.S. new car market."  87 Fed. Reg. at 14,358.  And more disruption is ahead:  California recently approved "Advanced Clean Cars II" standards, which are not at issue here but which will ban new gasoline-powered cars and require "100-percent electrification by 2035."  California Air Resources Board, *Public Hearing to*

---

[2]    The California Air Resources Board defines a "zero-emission-vehicle" as one that "produce[s] zero exhaust emissions of any criteria pollutant (or precursor pollutant) or greenhouse gas ... under any possible operational modes or conditions."  13 Cal. Code Regs. § 1962.4(b).  Such vehicles include battery-electric, hydrogen-fuel-cell, and plug-in hybrid electric vehicles.

*Consider the Proposed Advanced Clean Cars II Regulations* 12 (Apr. 12, 2022), http://ww2.arb.ca.gov/sites/default/files/barcu/regact/2022/accii/isor. pdf.

## B.    The Waiver Withdrawal

In 2019, EPA withdrew the waiver for California's greenhouse-gas standards and zero-emission-vehicle mandate.  84 Fed. Reg. at 51,310.  As it had in denying California's 2008 waiver application, EPA concluded that the phrase "compelling and extraordinary conditions" in Section 209(b)(1)(B) refers to California's local pollution conditions, not conditions associated with global climate change.  *Id.* at 51,339-44.  Alternatively, EPA determined that California did not "need" its greenhouse-gas standards or zero-emission-vehicle mandate to "meet" climate-change conditions because the standards "will not meaningfully address" those conditions.  *Id.* at 51,349.  EPA found that the standards "would result in an *indistinguishable* change in global temperatures" and "likely *no change* in temperatures or physical impacts resulting from anthropogenic climate change in California."  *Id.* at 51,341 (emphasis added).

## C.    The Challenged Action

On his first day in office, President Biden signed Executive Order 13,990, directing EPA to consider "suspending, revising, or rescinding" its

withdrawal of California's waiver. *Executive Order on Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*, 86 Fed. Reg. 7,037, 7,037 (Jan. 25, 2021). While EPA was reconsidering the waiver, President Biden issued a second executive order, announcing "the policy of [the] Administration" to achieve the "goal that 50 percent of all new passenger cars and light trucks sold in 2030 be zero-emission vehicles"—a policy never enacted by Congress. 86 Fed. Reg. 43,583, 43,583 (Aug. 10, 2021). President Biden directed EPA to "coordinate the agency's activities" with California. *Id.* at 43,584. Just a few months before, California Governor Gavin Newsom had issued an executive order calling for *100 percent* of in-state sales of new passenger cars and trucks to be zero-emission vehicles by 2035. Cal. EO-N-79-20, (Sept. 23, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/09/ 9.23.20-EO-N-79-20-Climate.pdf.

In 2022, EPA reinstated California's waiver. 87 Fed. Reg. at 14,332. Rejecting the interpretation it had initially adopted in 2008 and again in 2019, EPA concluded that Section 209(b)(1)(B) authorizes waivers for California standards aimed at solving global climate change. *Id.* at 14,358-62. Although EPA did not retract its prior finding that the State's standards would have no meaningful impact on climate-change conditions in California, EPA

12

determined that California "need[s]" its greenhouse-gas standards and zero-emission-vehicle mandate to "meet" those conditions because the standards could potentially "whittle away at them over time." *Id.* at 14,366. EPA also concluded that reinstatement of the waiver was justified because California needs its motor-vehicle program to address its criteria-pollution problems, even if the specific standards at issue in this case were created to solve other problems. *Id.* at 14,362-64. Indeed, California's waiver application did not claim that its greenhouse-gas standards would address criteria pollution and stated that its zero-emission-vehicle mandate had no criteria-emissions benefit. *See* 84 Fed. Reg. at 51,337; R-7 at 15.

In addition, EPA raised a procedural justification for reinstating the waiver. EPA claimed that its inherent authority to revisit prior waiver grants is "narrow" and may be exercised only to correct a clerical or factual error or to account for changed factual circumstances. 87 Fed. Reg. at 14,348. Thus, according to EPA, it had exceeded its authority in 2019 by withdrawing the waiver to correct a legal error in the interpretation of Section 209(b)(1)(B)—a legal error that it no longer perceived anyway. *Id.* at 14,350.

13

## SUMMARY OF ARGUMENT

I.     EPA lacks authority under Section 209(b) to grant a waiver to California for emission standards aimed at global climate change.

A.     Construing Section 209(b) to authorize California to regulate a global issue like climate change would radically alter the traditional federal-state balance and would raise issues of vast political and economic significance. EPA must therefore identify a clear statement from Congress authorizing such a waiver.  There is no such clear statement in the Clean Air Act.  Indeed, the Act is clear that it does *not* permit California to have its own state standards for national and international problems like climate change.

B.     Section 209(b) precludes a waiver for California vehicle standards aimed at global climate change for two independent reasons.  First, climate change is not an "extraordinary" condition within the meaning of Section 209(b)(1)(B).  The Clean Air Act's text, structure, and history make clear that the term "extraordinary" refers to unique local conditions in California that result from local emissions and local pollution concentrations.  Global climate change does not qualify.  California's greenhouse-gas emissions leave the State and diffuse into worldwide emissions, and any climate-change conditions that result are not localized conditions peculiar to California.

14

Second, California does not "need" its own emission standards to "meet" global climate-change conditions that those emission standards will not meaningfully address. The plain statutory text commands that California's standards must do *something* to address the conditions they target. In 2019, however, EPA found that California's standards would likely have *no effect* on conditions in California related to climate change. Here, EPA did not disturb that finding, nor did it explain how California could possibly "need" standards to "meet" climate-change conditions in California when those standards will make no meaningful difference.

C.    Even if the statute were ambiguous on both points, any ambiguity requires a narrow construction of Section 209(b), rather than one that raises serious constitutional questions about the equal sovereignty of States. The Constitution does not permit the federal government to give a single State the authority to regulate national and international issues, while prohibiting every other State from enacting its own regulations on those subjects. At the very least, Section 209(b) should be construed to avoid that serious constitutional question.

II.    EPA's waiver-reinstatement decision also cannot be sustained based on the agency's novel and cramped view of its reconsideration authority.

EPA's analysis of its reconsideration authority is intertwined with its erroneous reading of the statute and thus does not supply an independent basis for its decision. In any event, an agency has inherent authority to reconsider a decision premised on an incorrect reading of a statute, and nothing in the Clean Air Act provides otherwise. EPA properly exercised its inherent reconsideration authority when it withdrew California's waiver in 2019.

## STANDING

Petitioners include entities that produce or sell liquid fuels and the raw materials used to produce them, along with associations whose members include such entities. By design, California's greenhouse-gas standards and zero-emission-vehicle mandate reduce the demand for liquid fuels and their raw materials by forcing automakers to sell vehicles that use significantly less liquid fuel or no liquid fuel at all. As shown in the accompanying declarations, depressing the demand for those fuels injures petitioners and petitioners' members financially. California itself found that the "oil and gas industry, fuel providers, and service stations are likely to be" the industries "most adversely affected" by California's Advanced Clean Cars program and the resulting "substantial reductions in demand for gasoline" in California. R-7941 at 201;

*see id.* at 199; R-8158 at 68, 70.  This economic injury to petitioners and petitioners' members constitutes injury-in-fact under Article III.  That injury is caused by the challenged regulatory action, and this Court can redress that injury by setting aside the action.  *See, e.g.*, *Am. Fuel & Petrochemical Mfrs.* v. *EPA*, 3 F.4th 373, 379-80 (D.C. Cir. 2021); *Airlines for Am.* v. *TSA*, 780 F.3d 409, 410-411 (D.C. Cir. 2015).

The petitioners that are membership associations also have associational standing to challenge EPA's decision.  *See Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-343 (1977).  Their members have standing to sue in their own right, for the reasons described.  The interests petitioners seek to protect are germane to their organizational purposes, which include safeguarding the viability of their members' businesses.  And neither the claims asserted nor the relief requested requires the participation of individual members.

## STANDARD OF REVIEW

This Court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or

"in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)-(C).

## ARGUMENT

**I.    EPA Exceeded Its Statutory Authority In Reinstating A Waiver For California To Set Emission Standards Meant To Address Global Climate Change.**

To prevent "an anarchic patchwork of federal and state regulatory programs," the Clean Air Act establishes federal control over motor-vehicle emission standards.  *MEMA*, 627 F.2d at 1109.  It does so through Section 209(a)'s broad preemption provision, which provides that "[n]o State … shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles."  42 U.S.C. § 7543(a).  Because of California's "unique Los Angeles smog problem," however, Section 209(b) authorizes EPA to grant California a waiver to promulgate its own motor-vehicle emission standards in certain circumstances.  *N.Y. Dep't Envtl. Conservation*, 17 F.3d at 526.

The Clean Air Act minimizes unnecessary deviation from the national regulatory effort by permitting a waiver only if California's proposed standards meet three criteria.  *See* 42 U.S.C. § 7543(b)(1).  Most relevant to this case is the second criterion:  California must "need" its separate standards

18

"to meet compelling and extraordinary conditions." *Id.* § 7543(b)(1)(B). California cannot satisfy that criterion here. Section 209(b) does not authorize EPA to lift preemption for California emission standards meant to target global climate change, particularly where EPA found that those standards will not "meaningfully address global air pollution problems." 84 Fed. Reg. at 51,342. EPA's contrary reading of the statute is incorrect, and would render Section 209(b) unconstitutional or at a minimum raise a serious constitutional question.

## A. Section 209(b) Cannot Be Read To Upset The Federal-State Balance And Permit California To Dictate The Direction Of Industries And Energy Markets.

"[O]ur law is full of clear-statement rules." *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2625 (2022) (Gorsuch, J., concurring). Two of them—one respecting our constitutional system of federalism, the other preventing agencies from overstepping their statutory bounds—preclude EPA's current reading of Section 209(b). Notably, EPA has never claimed a clear mandate to approve California's climate-change related standards, asserting only that it has the "better" reading of the statute. 87 Fed. Reg. at 14,367. As explained below, not even that is correct. But at a minimum, Congress did not enact "exceedingly clear language" that would permit EPA to delegate to a single

19

State authority to address global climate change in ways that would upend the transportation and energy sectors.  *U.S. Forest Serv.* v. *Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-50 (2020).

1.    Congress must be "unmistakably clear in the language of the statute" if it "intends to alter the 'usual constitutional balance between the States and the Federal government.'"  *Gregory* v. *Ashcroft*, 501 U.S. 452, 460-461 (1991) (quoting *Atascadero State Hosp.* v. *Scanlon*, 473 U.S. 234, 242 (1985)).  Courts apply that "background principl[e] of construction" in a variety of contexts implicating "the relationship between the Federal Government and the States."  *Bond* v. *United States*, 572 U.S. 844, 857-858 (2014); *see, e.g.*, *Gregory*, 501 U.S. at 461 (federal preemption); *Atascadero*, 473 U.S. at 243 (state sovereign immunity).

Applying that federalism-based clear-statement rule, the Supreme Court has repeatedly rejected "broad" or "expansive" readings of statutes in favor of narrower ones when the sweeping reading would "significantly chang[e] the federal-state balance."  *United States* v. *Bass*, 404 U.S. 336, 349-50 (1971).  That cautious approach "assures that the legislature has in fact faced, and intended to bring into issue, the[se] critical matters." *Id.* at 349. And it avoids constitutional questions by eschewing constructions that reach

20

the "outer limits of Congress' power." *Solid Waste Agency of N. Cook Cnty.* v. *U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001) (*SWANC*); *see* Part I.D, *infra*.

The federalism clear-statement rule applies with full force here. Construing Section 209(b) to authorize EPA to grant California a special dispensation, denied to all other States, to overhaul the *national* vehicle and fuel industries in order to tackle *global* climate change would radically depart from the "usual constitutional balance of federal and state powers." *Gregory*, 501 U.S. at 460. The "usual constitutional balance" is that Congress either leaves state authority intact; preempts it uniformly, without playing favorites; or occasionally distinguishes among States based on truly local differences. It is one thing for Congress to allow California a unique exemption to tackle truly localized issues, like smog in Los Angeles. It is quite another for Congress to give a single State the vast authority to target an inherently global phenomenon like climate change. *See City of New York* v. *Chevron Corp.*, 993 F.3d 81, 85-86, 93 (2d Cir. 2021) ("Global warming presents a uniquely international problem of national concern" and "is therefore not well-suited to the application of state law."). To grant that type of novel and unprecedented authority, EPA must identify clear congressional authorization.

21

2.     The major-questions doctrine also dictates that this Court should demand clarity from Congress before endorsing EPA's expansive interpretation of Section 209(b).  Under that doctrine, courts "expect Congress to speak clearly if it wishes to assign to an agency decisions of 'vast economic and political significance.' " *Utility Air Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014) (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)); *see West Virginia*, 142 S. Ct. at 2605.  "[T]he major questions doctrine" and the "federalism canon" "often travel together." *West Virginia*, 142 S. Ct. at 2621 (Gorsuch, J., concurring); *cf. Gonzales* v. *Oregon*, 546 U.S. 243, 267, 275 (2006) (questioning that Congress granted "broad and unusual authority through an implicit delegation," and finding no "far-reaching intent to alter the federal-state balance").  The two principles travel together here, and are mutually reinforcing.

The authority to determine whether and how motor-vehicle emissions should be limited to address global climate change "falls comfortably within the class of authorizations that [courts] have been reluctant to read into ambiguous statutory text." *Utility Air*, 573 U.S. at 324.  The Supreme Court " 'typically greet[s]' assertions of 'extravagant statutory power over the national economy' with 'skepticism,' " particularly where that power is being

wielded to combat phenomena of global cause and effect, such as greenhouse-gas emissions. *West Virginia*, 142 S. Ct. at 2609 (quoting *Utility Air*, 573 U.S. at 324).

In *West Virginia*, the Supreme Court indicated that the major-questions doctrine applies where an agency claims that a statutory provision "empowers it to substantially restructure the American energy market." 142 S. Ct. at 2610. Here, EPA asserts the authority to allow California to substantially restructure the American automobile market, petroleum industry, agricultural sectors, and the electric grid, at enormous cost and risk. For model years 2018 to 2025, "California projected compliance costs in California alone … 'to be approximately $10.5 billion.' " R-224 at 14. That figure actually understates the problem because it accounts only for the costs specific to the vehicle industry in California, and ignores the substantial costs imposed on the petrochemical industry nationwide and the "significant investments needed to improve the electricity grid capacity" that would be required to achieve California's goals. R-140 at 10.

The costs and effects of California's standards will not be limited to California. Under Section 177, other States can adopt California's standards, meaning that California's standards may well dictate the future of the

automobile and energy industries.  To date, 17 States and the District of Columbia, representing more than 40% of the vehicle market, have embraced California's current standards as their own.  *See supra* p. 10.  California has touted the dramatic import of its regulations:  its governor lauded recent rules passed in the wake of the waiver reinstatement as "one of the most significant steps to the elimination of the tailpipe as we know it."  Coral Davenport, et al., *California to Ban the Sale of New Gasoline Cars*, N.Y. Times (Aug. 24, 2022), http://www.nytimes.com/2022/08/24/climate/california-gascarsemissions.html.

*West Virginia* also observed that the major-questions doctrine applies where an agency asserts authority "to adopt a regulatory program that Congress ha[s] conspicuously and repeatedly declined to enact itself."  142 S. Ct. at 2610.  Congress has repeatedly confronted questions involving greenhouse-gas emissions from motor vehicles and related electric-vehicle mandates.  At every turn, it has declined to give free-ranging authority on these complex national issues even to *federal regulators*, let alone a single *State*.  For example, Congress expressly prohibited NHTSA from mandating electric vehicles in setting fuel-economy standards.  *See* 49 U.S.C. § 32902(h)(1).  And Congress has repeatedly considered and rejected legislation authorizing EPA to establish an electric-vehicle mandate.  *See, e.g.*,

24

Zero-Emission Vehicles Act of 2019, H.R. 2764, 116th Cong. § 2 (2019); *see also Texas* v. *EPA*, No. 22-1031 (D.C. Cir. Feb. 28, 2022).  Congress has never—in 1967 or at any time since—silently authorized California to address global climate change by forcing manufacturers to produce electric vehicles instead of traditional vehicles.

Other federal statutes confirm that Congress has pervasively regulated in this area and would have spoken clearly before authorizing California to undermine federal policy.  First, the Energy Policy and Conservation Act (EPCA) instructs NHTSA to set "average fuel economy standards" nationwide.  49 U.S.C. § 32902.  Because "[o]ne of Congress' objectives in EPCA was to create a national fuel economy standard," 83 Fed. Reg. 42,986, 43,233 (Aug. 24, 2018), EPCA expressly preempts state or local regulations "*related to* fuel economy standards or average fuel economy standards for automobiles," 49 U.S.C. § 32919(a) (emphasis added).  As the State petitioners have shown, California's greenhouse-gas standards and zero-emission-vehicle mandate are "related to fuel economy standards," and are therefore preempted by EPCA.  *See* Ohio Br. at 33-41.  And even if EPCA does not expressly preempt California's standards, Congress's demonstrated

preference for a national approach in this area underscores the need for a clear statement authorizing California's waiver here.

Second, Congress has enacted a Renewable Fuel Standard (RFS) mandating the production of "clean renewable fuels" in order to "move the United States toward greater energy independence and security." *Americans for Clean Energy* v. *EPA*, 864 F.3d 691, 697 (D.C. Cir. 2017) (*ACE*) (quoting Pub. L. No. 110-140, 121 Stat. 1492 (2007)). The RFS requires EPA to calculate "nationwide [renewable fuel] volume mandates" each year, starting with 4 billion gallons of renewable fuel in 2006 and increasing to 36 billion gallons in 2022. *HollyFrontier Cheyenne Ref., LLC* v. *Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2175 (2021).

In the RFS, Congress specifically sought to decrease greenhouse-gas emissions from the transportation sector by introducing increasing amounts of renewable fuels into the national supply. *See ACE*, 864 F.3d at 696. It is implausible that Congress would have authorized California to take a competing approach to greenhouse-gas emissions by mandating electrification, when that approach puts severe pressure on regulated entities' ability to comply with the RFS by eliminating vehicles that use liquid renewable fuels.

\*    \*    \*

EPA cannot demonstrate a "'clear congressional authorization' to regulate in th[e] manner" that it chose. *West Virginia*, 142 S. Ct. at 2614 (quoting *Utility Air*, 573 U.S. at 324). Because Congress did not unmistakably authorize EPA to radically reorder the division of power among the States by appointing California as a co-regulator of greenhouse-gas emissions from vehicles, EPA's reinstatement of the waiver was unlawful.

### B. Global Climate Change Is Not A "Compelling And Extraordinary Condition" Under Section 209(b)(1)(B).

The Clean Air Act does not just fail to clearly authorize EPA's waiver here; it forecloses the grant of a waiver to California in these circumstances. EPA must find that California "need[s]" its own standards "to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b)(1)(B). The Act's text, structure, and history demonstrate that the phrase "compelling and extraordinary conditions" refers to California's distinctive *local* pollution problems; it does not encompass the causes or effects of *global* climate change.

#### 1. California's conditions are "extraordinary" only if California suffers a distinct, localized problem.

Under the ordinary meaning of the terms "compelling" and "extraordinary," California may deviate from uniform federal emission standards only if it faces a pollution problem that is both significant and

distinctive.  Climate-change related risks may be "compelling" conditions, but they are not "extraordinary" ones, as the term is used in Section 209(b).

a.     Section 209(b)'s plain text controls here.  *See Lamie* v. *U.S. Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain" courts must "enforce it according to its terms.").  To prevent the needless unraveling of Title II's national regulatory framework, Congress carefully constrained California's unique ability to impose its own emission standards.  Among other limits, California must face "compelling and extraordinary conditions."  42 U.S.C. § 7543(b)(1)(B).

The statute does not define either "compelling" or "extraordinary," so "we turn to the phrase's plain meaning at the time of enactment."  *Tanzin* v. *Tanvir*, 141 S. Ct. 486, 491 (2020).  A condition is "compelling" if it is "force[ful]" or "hold[s] one's attention."  *Webster's New International Dictionary* 463 (3d ed. 1961).  And a condition is "extraordinary" if it is "most unusual" or "far from common."  *Id.* at 807; *see American Heritage Dictionary* 486 (1969) ("Beyond what is ordinary, usual, or commonplace."); *United States* v. *Winston*, 2021 WL 2592959, at *6 (D.D.C. June 24, 2021) (defining extraordinary in the context of a sentence reduction for "extraordinary and compelling reasons" as "very exceptional").

28

California must satisfy both requirements to be eligible for a waiver. *See Brown* v. *State of La.*, 383 U.S. 131, 138 (1966) (explaining that where a statute is phrased in the conjunctive both terms must be met). It must target "compelling" conditions, meaning that California's pollution problems must be serious; it cannot deviate from the uniform national framework to address minor pollution concerns. And California must target "extraordinary" conditions, meaning that its pollution problems must be exceptional; it cannot deviate from the uniform national framework to address conditions similarly prevailing in other States. *See* S. Rep. No. 90-403, at 33 (referring to conditions that are "sufficiently different from the Nation as a whole to justify" state-specific treatment).

The latter point is critical here. The term "extraordinary" in Section 209(b) means "most unusual" *as compared to other States*, not as compared to other pollution problems. First, Section 209(b) is an exception from uniform federal regulation. It may make sense to allow a State to act independently when it faces conditions unique to that State, but it would make little sense to waive preemption when a broadly shared condition is especially serious. Indeed, the opposite is true: the more serious a national or international problem is, the more appropriate it is for the federal government to be

29

responsible.  Second, "extraordinary" must have content that "compelling" does not share.  *See Bailey* v. *United States*, 516 U.S. 137, 146 (1995) ("Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").  If "extraordinary" meant "unusual" in terms of the problem's magnitude, it would be redundant of "compelling."

b.    Statutory context reinforces that reading.  As discussed below, California must "need" separate standards to "meet" the conditions it faces. *See* Part I.C, *infra*.  Those surrounding terms make clear that Section 209(b) contemplates conditions that "have their basic cause, and therefore their solution, locally in California," 73 Fed. Reg. at 12,163—not global conditions that California-specific motor-vehicle standards could not meaningfully affect.

A related provision, Section 177, also strongly indicates that Section 209(b)(1)(B) refers to conditions caused by "pollutants that affect local or regional air quality and not those relating to global air pollution." 84 Fed. Reg. at 51,351.  Section 177 authorizes other States to adopt California's standards if the State "has plan provisions approved under this part."  42 U.S.C. § 7507. "[T]his part" is Part D of the Act, which addresses "[p]lan requirements for nonattainment areas"; the referenced "plan provisions" are state plans to attain EPA's national ambient air-quality standards, which address the six

30

criteria pollutants that cause smog, and other local pollution problems. 84 Fed. Reg. at 51,350. Congress thus plainly contemplated that the standards California would adopt under Section 209(b)—and the standards that other States might embrace as their own—would help States attain and maintain local ambient air-quality standards within their respective borders.

California's mandates are different in kind. EPA has set no ambient air-quality standards for greenhouse gases, because those gases mix evenly throughout the global atmosphere rather than concentrating locally to affect ambient air quality. As EPA recently explained, "the Clean Air Act's [air-quality standard] regime would make no sense applied to [greenhouse gases]" because that regime "has no relevance to a global air pollutant … that is dispersed around the world." Andrew R. Wheeler, Administrator of the EPA, *Denial of Petitions to Establish National Ambient Air Quality Standards for Greenhouse Gases* 9 (Jan. 19, 2021).

Moreover, a narrow reading of Section 209(b) respects Congress's general preference throughout Title II for a uniform national approach to regulating emissions from new motor vehicles. Congress struck a balance between the need for national uniformity and giving California latitude to address certain extraordinary local problems. But EPA would blast a hole in

31

Title II's careful division of federal and state authority, allowing California to assume a role in setting national climate policy that Congress has never delegated to any State—and, indeed, that Congress denied even to EPA itself. *See supra* pp. 7, 24.

     c.     Section 209(b)'s history confirms that Congress did not enact the waiver program to allow California to regulate global climate change. As this Court has recognized, "clearly the intent" of the waiver provision was to "focus on *local* air quality problems … that may differ substantially from those in other parts of the nation." *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1303 (D.C. Cir. 1979) (emphasis added). Congress sought only to empower California to "set more stringent standards to meet peculiar local conditions." S. Rep. No. 90-403, at 33; *see* 84 Fed. Reg. at 51,342. And Congress identified those "peculiar" circumstances: California's "unique problems" resulting from local emissions and pollution concentrations interacting with the State's distinctive "climate and topography." H.R. Rep. No. 90-728, at 22. In particular, Congress sought to allow California to address "the acute susceptibility of the Los Angeles basin to concentrations of smog," and "frequent thermal inversions along the coast." R-224 at 8. Congress thus found that California's special exemption from an otherwise uniform national program was justified

by *local* conditions with *local* causes and effects. The unique "susceptibility of the Los Angeles basin to concentrations of smog" might make California's problems "extraordinary"; the State's concerns about climate change do not.

> **2. California's conditions related to global climate change are not "extraordinary."**

California's greenhouse-gas emissions "bear no particular relation" to "California-specific circumstances" like the thermal inversions resulting from local geography and wind patterns that Congress specifically identified when enacting Section 209. 84 Fed. Reg. at 51,341, 51,343. In its waiver decision, EPA stated that "California is particularly impacted by climate change," pointing to its potential to experience "fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat." 87 Fed. Reg. at 14,363. But as EPA previously acknowledged, "[m]any parts of the United States, especially western States, may have issues related to drinking water … and wildfires, and effects on agriculture; these occurrences are by no means limited to California." 84 Fed. Reg. at 51,348. As a result, "California is not worse-positioned in relation to certain other areas of the U.S., and indeed is estimated to be better-positioned, particularly as regards the Southeast region of the country." *Id.* at 51,348 n.278. So "while effects related to climate change in California could be substantial, they are not sufficiently different from the

conditions in the nation as a whole to justify separate State standards." *Id.* at 51,344; *see id.* at 51,342-43, 51,343 n.265; 83 Fed. Reg. at 43,248-50.

Even if California could establish that it suffered from materially distinct climate-change impacts, global climate change would still not be a condition covered under Section 209(b). Greenhouse gases remain outside the sorts of conditions that Congress created the waiver process to address—that is, "localized pollutants that can affect California's local climate, or that are problematic due to California's specific topography." 84 Fed. Reg. at 51,340.

### 3.   EPA's counterarguments lack merit.

In defending its sweeping interpretation of "compelling and extraordinary conditions," EPA misconstrues the Act's text and history.

a.   EPA barely attempts to parse the term "extraordinary" or to assign it a meaning distinct from "compelling." *See* 87 Fed. Reg. at 14,357 & n.222. Instead, EPA contends that "words like 'peculiar' and 'unique'" cannot be used to "define 'extraordinary and compelling,'" because they "appear nowhere in the text." *Id.* at 14,357; *see id.* at 14,359. But Congress did not need to use the words "peculiar" or "unique" because it used a synonym: "extraordinary." The question is whether, in context, Congress used the term "extraordinary" to mean peculiar or unique *to California.* And EPA

elsewhere acknowledges that very meaning of "extraordinary," emphasizing that the phrase "compelling and extraordinary conditions" encompasses California-specific conditions, including its "geographical and climatic conditions (like thermal inversions)." *Id.* at 14,365, 14,354 n.191.

EPA further contends that Section 209(b) permits waivers for anything preempted under Section 209(a), and notes that Section 209(a) preempts state greenhouse-gas standards. 87 Fed. Reg. at 14,359-60. But Sections 209(a) and (b) are not identical in scope. That is the point of the three conditions in Section 209(b): standards preempted under Section 209(a) are not eligible for a waiver when, among other things, they are not "need[ed] … to meet compelling and extraordinary conditions." EPA's interpretation simply reads out the limiting criteria in Section 209(b).

b.     Pointing to legislative history, EPA asserts that Congress intended "to allow California to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology." 87 Fed. Reg. at 14,341 & n.70. California's pioneering efforts may inform why there is a waiver process at all. They do not, however, justify a waiver in the absence of "compelling and extraordinary conditions." If Congress had wanted to give California free rein to experiment with motor-

vehicle emission standards, untethered to whether California's standards are needed to meet "compelling and extraordinary conditions" in the State, it would have granted California a blanket preemption exemption, as it did for California's fuel regulations. *See* 42 U.S.C. § 7545(c)(4)(B). It did not, and this Court should give meaning to Congress's choice to adopt a more limited exemption here.

c.     Lacking support in the Act's text or history, EPA retreats to claiming that Congress has acquiesced in EPA's view, because "Congress has cited California's [greenhouse-gas] standards and [zero-emission-vehicle] sales mandate in subsequent legislation." 87 Fed. Reg. at 14,360. The provisions EPA relies on, however, do not refer to Section 209, let alone establish that Section 209 authorizes a waiver for California emission standards and forced electrification aimed at global climate change. One provision requires EPA to "take into account the most stringent standards for vehicle greenhouse gas emissions" in identifying vehicles to prioritize for federal procurement. 42 U.S.C. § 13212(f)(3)(B). The other permits States to provide credits for the purchase of "clean fuel" for "centrally fueled fleets" under standards established by EPA that "conform as closely as possible to

standards … established by … California" for low-emission vehicles. 42 U.S.C. § 7586(f)(4).

These two provisions are consistent with petitioners' reading of Section 209(b). California, like any State, is free to set greenhouse-gas emission standards for *state-owned* fleets. *See Engine Mfrs. Ass'n* v. *S. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1050 (9th Cir. 2007) (holding that Section 209(a) does not preempt state emission standards for government-owned fleets); *see also* 49 U.S.C. § 32919(c) (similar exemption from EPCA preemption). Thus, these provisions concerning state and federal procurement of their own vehicles, 84 Fed. Reg. at 51,322, say nothing about the scope of Section 209(b), which affects vehicle sales to individual citizens. The procurement provisions certainly do not provide the "overwhelming evidence of [congressional] acquiescence" required to "replace the plain text and original understanding of a statute with an … agency interpretation." *SWANC*, 531 U.S. at 169 n.5.

37

### C. California Does Not "Need" Its Own Emission Standards To "Meet" Climate-Change Conditions That The Standards Will Not Meaningfully Address.

Even if California's conditions related to global climate change were "extraordinary" within the statute's meaning, EPA still could not grant a waiver because California does not "need" its greenhouse-gas standards and zero-emission-vehicle mandate to "meet" those conditions. *See* 84 Fed. Reg. at 51,349. To the contrary, as EPA explained in withdrawing the waiver in 2019, California's standards "will not meaningfully address global air pollution problems of the sort associated with [greenhouse-gas] emissions." *Id.* Indeed, EPA previously found that the waiver "would result in an *indistinguishable* change in global temperatures" and "likely *no change* in temperatures or physical impacts resulting from anthropogenic climate change in California." *Id.* at 51,341 (emphases added). Critically, in reinstating the waiver, EPA did not disturb these findings about the futility of California's standards.

### 1. The requirement that California "need" separate standards to "meet" conditions requires that the standards have some meaningful effect.

A Section 209(b) waiver is not needed and therefore not permitted if a California-specific emission standard would not appreciably affect the

conditions that supposedly warrant it.  That accords with the ordinary meaning of the statutory terms "need" and "meet."

a.    The verb "need" means to "be *necessary*."  *Webster's New International Dictionary* 1512 (3d ed. 1961) (emphasis added).  And the term "necessary" ordinarily means "essential; indispensible."  *American Heritage Dictionary* 878 (1969).  In all events, terms of necessity "must be construed in a fashion that is consistent with the[ir] ordinary and fair meaning … so as to limit 'necessary' to that which is required to achieve a desired goal."  *GTE Ser*v. *Corp.* v. *FCC*, 205 F.3d 416, 423 (D.C. Cir. 2000).

The verb "meet" means "[t]o satisfy (a demand, need, obligation)" *American Heritage Dictionary* 816 (1969).  Consistent with its ordinary meaning, Congress used forms of the verb "meet" at least 50 times in Title II to mean "to satisfy."  *See, e.g.*, 42 U.S.C. §§ 7514(a), 7545(c)(4)(C)(ii)(III), 7545(g)(2), 7545(o)(4)(A).  The same word has the same meaning here.  *See Ratzlaf* v. *United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").

Putting the terms together, and reading them in the context of Section 209(b) as a whole, two things are clear.  First, California must "need"—*i.e.*,

require as essential or very important—standards that differ from federal standards. That, of course, was why Congress created the waiver authority: "California ha[d] demonstrated compelling and extraordinary circumstances sufficiently different from the Nation as a whole to justify standards on automobile emissions which may, from time to time, *need* [to] be more stringent than national standards." S. Rep. No. 90-403, at 33 (emphasis added). Second, California's standards must meaningfully address the conditions giving rise to California's need for separate standards. At a minimum, if the State's standards have *no impact* on those conditions, then they cannot be said to be even helpful, let alone necessary, essential, or indispensable, to "meet" the conditions the State faces.

As the Supreme Court has explained, agencies must "apply *some* limiting standard" where a statute requires that an agency action be "necessary." *AT&T* v. *Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999). That limiting standard is particularly important here. EPA determined that the "costs" of imposing California's standards are not "legally pertinent" to its waiver determination. 87 Fed. Reg. at 14,342. If California's standards are warranted *whatever the costs*—a dubious proposition on its own—then surely they should at least be necessary to achieving their stated goals. "One would not say that

40

it is even rational, never mind" *necessary*, "to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits." *Michigan* v. *EPA*, 576 U.S. 743, 752 (2015). Likewise, if California's standards do not appreciably affect the conditions it has identified, no one would say that California "need[s]" its standards to "meet" those conditions.

Section 209(b)(1)(B)'s text plainly insists on more progress than none at all to justify a waiver. If Congress had wanted to authorize a waiver based solely on "compelling and extraordinary conditions," without a further showing that California's standards are "need[ed]" to "meet" those conditions, it could easily have omitted the latter terms and directed EPA to deny a waiver only if "such State does not face compelling and extraordinary conditions." But Congress required a showing that California "need[s]" its standards to "meet" the conditions it identifies, and that additional requirement must be given effect. *See TRW Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001) ("It is this Court's duty to give effect, if possible, to every clause and word of a statute.") (internal quotation marks omitted).

b. In reinstating California's waiver, EPA effectively erased the "need" to "meet" requirement from the statute. EPA had previously found that California's standards would not decrease global greenhouse-gas

41

emissions or have a meaningful impact on climate change. 84 Fed. Reg. at 51,341, 51,358. In reinstating the waiver, EPA did not disturb those findings or confront arguments about the environmental impact of electric vehicles. Under its expansive view of its statutory authority, it did not need to.

Commenters had raised a host of arguments about electric vehicles' impact on overall emissions. For example, some commenters contended that electric vehicles "cause criteria pollutant and [greenhouse-gas] emissions and environmental impacts throughout their lifecycle, including from minerals mining, component production, assembly, electricity generation, and other processes." R-140 at 1 n.2. Other commenters observed that electric vehicles "have higher non-exhaust wear and tear particle matter emissions than gasoline cars because they are heavier," and those emissions may "offset" the benefits of non-exhaust-emitting engines. R-224 at 39. And EPA itself had predicted that the presence of lower-emitting vehicles in California and the Section 177 States would "likely be offset" by higher-emitting vehicles that manufacturers could produce elsewhere, as a consequence of national fleetwide-averaging rules. 84 Fed. Reg. at 51,358; *see id.* at 51,352-51,353; R-224 at 33-34.

Rather than tackling those questions about the possible inefficacy of California's standards, EPA asserted that there is "no basis" to require a waiver request to "independently solve a pollution problem." 87 Fed. Reg. at 14,366. It invoked the Supreme Court's prediction that regulators will likely "whittle away" at climate change "over time." *Id.* (quoting *Massachusetts* v. *EPA*, 549 U.S. 497, 524 (2007)). True enough, Section 209(b) does not require that California's standards solve the entire climate-change problem. It does, however, require a showing that the standards would do at least *something* to meaningfully ameliorate the conditions at which they are targeted. EPA may not simply assume that California's standards will make a marginal but somehow necessary difference over an indefinite period. The statute requires EPA to "*find*[]" that California "need[s]" its standards to "meet" climate-change conditions. 42 U.S.C. § 7543(b)(1) (emphasis added).

EPA could not make that finding even if it had tried. California has all but admitted that it does not "need" separate standards. Until 2018, California offered a "deemed-to-comply" option, under which it permitted automakers to comply with EPA's standards in lieu of California's. Thus, for many years, California's own conduct made clear that the State did not "need" its own standards to combat climate change. Even now, although California claims it

43

needs its own standards, it has never shown that those standards will meaningfully address global climate change. And EPA did not say otherwise in restoring the waiver. As noted, EPA did not disturb its earlier finding that the waiver "would result in an *indistinguishable* change in global temperatures" and "likely *no change* in temperatures or physical impacts resulting from anthropogenic climate change in California." 84 Fed. Reg. at 51,341 (emphases added).

### 2. EPA cannot rely on an "aggregate" approach to avoid applying the statutory waiver criteria.

Unable to show that California "need[s]" its greenhouse-gas standards and zero-emission-vehicle mandate to "meet" climate-change conditions, EPA contends that such a demonstration is irrelevant. According to EPA, the only question relevant to EPA's waiver decision is whether California needs *a separate motor-vehicle program* at all—not whether it needs the specific standards outlined in a particular waiver application. *See* 87 Fed. Reg. at 14,335. Put differently, under EPA's "whole program" approach, so long as the State needs *any* "separate motor vehicle emission program," for any pollutant, it does not matter if it needs *these* emission standards. That is wrong.

a.      As an initial matter, this Court need not address EPA's whole-program approach.  Even if that approach allowed EPA to avoid a "need[s] to meet" analysis for each new criteria-pollutant standard, it cannot justify a preemption waiver for standards outside Section 209(b)'s scope.  Section 209(b) categorically forbids a waiver for standards aimed at global conditions because such conditions do not "fall within the scope of the 'compelling and extraordinary conditions' encompassed by the [statute's] terms." 84 Fed. Reg. at 51,349.  And EPA cannot use its authority to waive preemption for standards aimed at California's local pollution problems "as a bootstrap to overcome [an] explicit limitatio[n] established by Congress." *AFGE, Local 2953* v. *FLRA*, 730 F.2d 1534, 1538-1539 (D.C. Cir. 1984).

b.      In any event, EPA's whole-program argument fails on its own terms.  As the agency previously acknowledged, Section 209(b)(1)(B) does not refer to California's need for "any" standards or for its own "program." 84 Fed. Reg. at 51,342.  It refers to "such State standards"—that is, the previously described "standards … for the control of emissions from new motor vehicles" that California "has adopted" and for which it is presently seeking a waiver.  42 U.S.C. § 7543(b)(1).  That language cannot be read to encompass California's general need for its own emission program.  Rather, it

45

refers to the specific waiver request, and requires EPA to assess California's need for the particular standards for which it seeks a waiver.

Moreover, EPA's whole-program approach would render Section 209(b)'s "need[s] … to meet" requirement meaningless. Because California "long ago established a 'need' to have *some form* of its own vehicle emissions program," 84 Fed. Reg. at 51,339, EPA would conclude that Section 209(b)(1)(B) has been satisfied for any and all standards California seeks to put into place. Section 209(b)(1)(B) is not a blank check. Just because California needs a separate emission standard for say, smog, does not mean that the Clean Air Act now empowers it to enact any other emission standards it desires, targeted at any other pollutant—no matter how unrelated, disruptive, or ineffectual those standards may be. EPA may not construe an important statutory limitation like Section 209(b)(1)(B) into "superflu[ity], void[ness], or insignifican[ce]." *TRW Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted).

EPA's reading also conflicts with the settled interpretation of the identical phrase "such State standards" in a neighboring subsection. Section 209(b)(1)(C) requires EPA to consider whether "such State standards" comply with Section 202(a), which in turn guarantees that manufacturers have

46

sufficient lead time to meet the standards, given "the requisite technology" and the "cost of compliance." 42 U.S.C. § 7521(a)(2); *see id.* § 7543(b)(1)(C). EPA's current, whole-program interpretation of the phrase "such State standards" in subsection (B) would be incoherent in subsection (C). Different aspects of emission programs require different technologies, have different costs, and are enforced on different timelines. EPA has accordingly read "such State standards" in subsection (C) to require review of the specific standards proposed in a waiver request. *See* 84 Fed. Reg. at 51,332. If that is the correct meaning of the phrase in subsection (C), then the same phrase should have the same meaning in subsection (B). *See Brown* v. *NHTSA*, 673 F.2d 544, 546 n.5 (D.C. Cir. 1982) ("[W]hen the same phrase is used in the same section of an act more than once, and the meaning is clear as used in one place, it will be construed to have the same meaning in [the other].") (quoting *United States* v. *Nunez*, 573 F.2d 769, 771 (2d Cir. 1978)).

c.     EPA primarily seeks to justify its whole-program approach by pointing to Section 209(b)(1). Section 209(b)(1) requires that California "determin[e] that the State standards will be, *in the aggregate*, at least as protective" as federal standards. 42 U.S.C. § 7543(b)(1) (emphasis added). EPA then has a corresponding duty to determine that California's aggregate

47

protectiveness finding is not "arbitrary and capricious." *Id.* § 7543(b)(1)(A). But EPA's aggregate "protective[ness]" review under subsection (A) does not justify an aggregate "need" determination under subsection (B), or an aggregate "lead-time" determination under subsection (C). To the contrary, Congress's choice to include "in the aggregate" in one provision—and to omit it in subsections (B) and (C)—shows that Congress permitted an aggregate assessment in one place but not the others. *See Russello* v. *United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally.") (internal quotation marks omitted).

The history of Section 209(b) confirms the distinction between subsections (A) and (B). The original 1967 waiver provision indisputably required EPA to evaluate the particular standards for which California sought a waiver. *See MEMA*, 627 F.2d at 1110 n.32. A decade later, Congress added the "in the aggregate" language to subsection (b)(1), and by incorporation to subsection (A), to fix a specific problem. California needed more stringent limits for nitrogen oxides than EPA had imposed, but technological constraints prevented California from increasing its nitrogen-oxide limits without loosening its (inversely related) carbon-monoxide limits. *See id.*

48

Congress solved this conundrum by permitting California's standards to be at least as *protective* "in the aggregate." *Id.* (discussing Pub. L. No. 95-95, § 207). That amendment allowed potential increases in one pollutant to be offset by more critical decreases of another pollutant. It did nothing to change the default that California must need the particular standards in the requested waiver to meet compelling and extraordinary conditions.

EPA also invokes its past practice, contending that, "[w]ith two noted exceptions"—*i.e.*, the 2008 denial of California's first greenhouse-gas waiver request and the 2019 withdrawal—it has "consider[ed] whether California needs a separate motor vehicle emission program as compared to the specific standards in the waiver request." 87 Fed. Reg. at 14,354. Of course, no amount of prior agency practice can supplant the statute's plain meaning. Regardless, as EPA's caveat makes clear, its practice has not been consistent. And when it has embraced a whole-program approach, that has never mattered: to avoid commenters' concerns about EPA's obvious statutory misreading, "EPA's practice has been to nevertheless … determine whether California needs th[e] *individual* standards to meet compelling and extraordinary conditions." *Id.* at 14,337 (emphasis added).

49

### 3. EPA cannot justify a waiver for standards addressing global climate change by pointing to incidental impacts on local criteria pollution.

In a last-ditch effort, EPA seeks to justify reinstating California's waiver for its greenhouse-gas and zero-emission-vehicle regulations based on their purported incidental effects on California's local pollution conditions. *See* 87 Fed. Reg. at 14,363-67. This argument also fails.

a. California's avowed purpose in seeking a waiver for its greenhouse-gas and zero-emission-vehicle regulations was to address global climate change. California proclaimed in its waiver application that its standards represented a "historic" effort to control "greenhouse gas … emissions and their consequent effect on global warming." R-5 at 1. Standards aimed at that preempted purpose fall outside Section 209(b)'s scope and do not become waiver-eligible just because they have some ancillary impact on local conditions. *See Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 104-108 (1992) ("[A] law directed at workplace safety is not saved from pre-emption simply because the State can demonstrate some additional effect outside of the workplace.").

Consistent with its stated objective, moreover, California's application did not claim that its greenhouse-gas standards would help with local pollution

problems. *See* 84 Fed. Reg. at 51,337. And California "expressly disclaimed criteria pollutant benefits from the [zero-emission-vehicle] program," presenting that program to EPA "solely as a [greenhouse-gas] compliance strategy." *Id.* at 51,337 & n.252. California stated bluntly: "There is *no criteria emissions benefit* from" its zero-emission-vehicle proposal "in terms of vehicle … emissions." R-7 at 15 (emphasis added). EPA cannot now rewrite California's application in a transparent effort to satisfy Section 209(b)(1)(B). *See* 84 Fed. Reg at 51,349 n.284; *cf. Engine Mfrs. Ass'n* v. *S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 254-255 (2004) (holding that emission standards cannot avoid preemption under Section 209(a) by purporting to regulate sales rather than manufacturing); *Nat'l Meat Ass'n* v. *Harris*, 565 U.S. 452, 464 (2012) (stating that California "ma[d]e a mockery of [a] preemption provision" by "framing" plainly preempted production regulations as sales regulations).

b.    In any event, EPA's determination that California "need[s]" its greenhouse-gas standards and zero-emission-vehicle mandate to address local pollution is unsupported. EPA relied principally on the "logical link" between ozone pollution and greenhouse gases—namely, that ozone levels are "exacerbate[d]" by higher temperatures caused by global warming. 87 Fed. Reg. at 14,363-64. But EPA's *logical* link is no basis for a waiver because the

*factual* link between California's standards and lower temperatures is missing. As explained earlier, EPA previously found that the State's rules would produce "likely no change" to climate-change conditions—including rising temperatures—in California. 84 Fed. Reg. at 51,341. Moreover, EPA failed to address commenters' concerns that California's standards would "make its ozone problems *worse*" by raising vehicle prices and causing consumers to "keep[] their older (dirtier) vehicles longer." R-224 at 45; *see* R-140 at 18 & n.112.

Instead, EPA pointed to evidence purporting to show that California's standards would address upstream stationary-source criteria pollution. *See* 87 Fed. Reg. at 14,364 & n.305. But California can regulate stationary sources directly and therefore does not "need" its own motor-vehicle regulations to address such emissions. *See West Virginia*, 142 S. Ct. at 2600-2602 (describing statutory framework for stationary sources). And even if those upstream impacts could be the basis for a waiver, the asserted reductions are "trivial" and "would have no discernible effect" on California's air quality, as commenters demonstrated and EPA did not dispute. *See* R-224 at 39-40.

**D.      Even If Section 209(b) Were Ambiguous, It Should Be Construed Narrowly To Avoid Serious Constitutional Problems.**

If there were any doubt about the scope of Section 209(b), this Court should reject EPA's construction in order to avoid serious constitutional problems.  As the State petitioners have shown, construing Section 209(b) to permit California, alone among the States, to enact standards targeting global climate change would violate the "fundamental principle of equality of the states under the Constitution."  *Bolln* v. *Nebraska*, 176 U.S. 83, 89 (1900). Neither the causes nor the effects of climate change are "*local* evils" peculiar to California that support giving the State the unique ability to redress them. *Nw. Austin Mun. Util. Dist. No. One* v. *Holder*, 557 U.S. 193, 203 (2009) (emphasis added) (quoting *South Carolina* v. *Katzenbach*, 383 U. S. 301, 328-329 (1966)).

At a minimum, the equal-sovereignty question is a serious one.  Because Section 209(b) is at best ambiguous for EPA, this Court should construe it to avoid that difficult constitutional question.  *See United States* v. *Davis*, 139 S. Ct. 2319, 2332 n.6 (2019) (courts must "interpret ambiguous statutes to avoid rendering them unconstitutional" and "to avoid the need even to address serious questions about their constitutionality"); *see also SWANC*, 531 U.S. at

173 (rejecting deference for interpretation that "raise[d] serious constitutional problems"); *Utility Air*, 573 U.S. at 310-311, 327 (declining, in part because of concerns about "the Constitution's separation of powers," to read the Clean Air Act to authorize an "unprecedented expansion of EPA authority that would have a profound effect on virtually every sector of the economy").

EPA's contrary arguments miss the mark. First, EPA observes that Section 177 allows other States to follow California's lead. 87 Fed. Reg. at 14,360. That option, however, does not "undermin[e] the notion that the regulatory scheme treats California in an extraordinary manner." *Id*. If anything, it *strengthens* California's unique regulatory power vis-à-vis other States by allowing California alone to shape national industries, in ways that may burden those States that decline *not* to opt-in to California's standards. *See* R-125 at 9 ("[T]he vehicles available to Ohioans [will] not [be] governed by Ohio's standards or the Federal government's standards, but rather by California's standards.").

Second, EPA notes that Section 209(b) does not "impose any burden on any state." 87 Fed. Reg. at 14,360. That is both untrue and irrelevant. It is untrue because Section 209 *does* significantly burden the 49 States that are subject to severe economic harms and disruption from California's regulatory

54

schemes.  And it is irrelevant because the equal-sovereignty doctrine also prohibits unequal benefits—for instance, the "extension of the sovereignty of a State into a domain … from which the other States have been excluded." *United States* v. *Texas*, 339 U.S. 707, 719-720 (1950).

Finally, EPA points to federalism.  But federalism does not mean that just one State gets "to be a laboratory for innovation," 87 Fed. Reg. at 14,360, while other States have no room to experiment—at least where the unequal treatment relates to a shared national concern.

## II.    The Waiver Reinstatement Cannot Be Affirmed Based On EPA's Narrow View Of Its Reconsideration Authority.

EPA cannot shield its decision from this Court's scrutiny by relying on the agency's 14 years of vacillating on the permissibility of waivers aimed at climate change.  Without questioning the propriety of its 2009 reconsideration of an earlier waiver *denial*, EPA now contends that its 2019 reconsideration of an earlier waiver *grant* was improper.  In particular, EPA contends for the first time that, "in the context of reconsidering a waiver grant," the agency's reconsideration authority can be exercised only to "address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria … have changed so significantly that the propriety of the waiver grant is called into doubt."  87 Fed. Reg. at 14,344.

This Court should reject EPA's procedural contention for two reasons. First, EPA's cramped view of its own reconsideration authority was not an independent ground for reinstating the waiver. Second, even if it were, EPA's current view is wrong. The Clean Air Act's text, agency practice, and common sense establish that EPA possesses inherent authority to reconsider a prior waiver determination when it believes the waiver rests on an incorrect understanding of the law.

## A. EPA's Analysis Of Its Reconsideration Authority Is Intertwined With The Merits Of Its Statutory Arguments.

EPA's analysis of its reconsideration authority does not independently support its decision because that analysis is intertwined with EPA's erroneous interpretation of Section 209(b). "When a decision of a government agency is put on several grounds, and one or more is invalid, a reviewing court must appraise whether the invalid ground may not have infected the entire decision." *Dietrich* v. *Tarleton*, 473 F.2d 177, 179 (D.C. Cir. 1972); *cf. Allina Health Servs.* v. *Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (procedural deficiency created "enough uncertainty as to its possible [e]ffect [*sic*] on the agency's disposition" that vacatur was appropriate) (internal quotations omitted).

Here, EPA's erroneous statutory analysis "infected" its procedural objections. EPA's lengthy statutory-interpretation analysis indicates that the agency's view on the merits, not its procedural objection to reconsideration, drove its decision. As EPA explained, it believed the 2019 reconsideration reflected both a "flawed statutory interpretation" and a "misapplication of the facts under that interpretation." 87 Fed. Reg. at 14,352. EPA likewise indicated that reconsideration would be appropriate if "conditions related to the waiver criteria" had changed such that "the propriety of the waiver grant is called into doubt." *Id.* at 14,350. And EPA stated that it "should not be exercising authority to reconsider prior *valid* waivers that present no factual errors based on different statutory interpretations." *Id.* at 14,351 (emphasis added). EPA's reconsideration analysis thus cannot reasonably be isolated from its simultaneous conclusion that the statutory interpretation underlying the 2013 waiver *had* been valid.

As a result, if this Court agrees that the waiver exceeds EPA's statutory authority, EPA's reinstatement of that waiver must be set aside, notwithstanding the agency's procedural objections to reconsideration. *Cf. Carlson* v. *Postal Regul. Comm'n*, 938 F.3d 337, 351 (2019) (even a lawful aspect of an agency action must be vacated unless the agency "would have

57

adopted the same disposition" if the unlawful "portion were subtracted").  At

the very least, the Court should vacate and remand for EPA to reevaluate its

reconsideration analysis in light of the correct interpretation of Section 209(b).

*See PPG Indus., Inc.* v. *United States*, 52 F.3d 363, 365-366 (D.C. Cir. 1995)

(remanding decision that "rested on an incorrect legal standard").

### B.    EPA Properly Exercised Its Inherent Authority To Reconsider Its Earlier Waiver.

In all events, EPA's unduly narrow view of its reconsideration authority

is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance

with the law."  5 U.S.C. § 706(2)(A).

1.    In the absence of statutory language to the contrary, agencies are

assumed to possess implied or inherent authority to revisit their prior

decisions.  *See Ivy Sports Med., LLC* v. *Burwell*, 767 F.3d 81, 86 (D.C. Cir.

2014).  There are occasional exceptions, when Congress speaks clearly and

"limit[s] an agency's discretion to reverse itself."  *New Jersey* v. *EPA*, 517 F.3d

574, 583 (D.C. Cir. 2008); *see Am. Methyl Corp.* v. *EPA*, 749 F.2d 826, 835 (D.C.

Cir. 1984).    But if Congress does not provide "an exclusive statutory

mechanism" for reconsideration, the agency has "the inherent authority to

revisit its own decisions"—including its own legal determinations—because

"the power to reconsider is inherent in the power to decide."  *Ranbaxy Lab'ys,*

*Ltd.* v. *Burwell*, 82 F. Supp. 3d 159, 194 (D.D.C. 2015) (quoting *Ivy Sports*, 767 F.3d at 86).

EPA's inherent reconsideration authority includes the ability to rescind a waiver that was premised on an erroneous statutory interpretation. As the Supreme Court has explained, "[a]n initial agency interpretation" of the statute it administers "is not instantly carved in stone." *Chevron, U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 863 (1984). Rather, administrative agencies *"must* consider varying interpretations … on a continuing basis." *National Cable & Telecomms. Ass'n* v. *Brand X Internet Servs.*, 545 U.S. 967, 981-982 (2005) (quoting *Chevron, U.S.A., Inc.*, 467 U.S. at 863-864) (emphasis added). Courts have thus frequently held that an agency's changed legal position—in particular its view that a prior decision was based on an erroneous reading of the law—is a proper ground for reconsideration. *See, e.g.*, *Gun South, Inc.* v. *Brady*, 877 F.2d 858, 859-862 (11th Cir. 1989); *Belville Min. Co.* v. *United States,* 999 F.2d 989, 998 (6th Cir. 1993); Daniel Bress, *Administrative Reconsideration*, 91 Va. L. Rev. 1737, 1753 (2005) ("[R]econsideration is said to be available because the agency relied on a legal position that it no longer considers proper.").

EPA nevertheless concluded that its waiver-reconsideration authority is limited to "clerical or factual error" or changed "factual circumstances." 87 Fed. Reg. at 14,349-50. But it gave no explanation for distinguishing between these grounds and legal error. And its limitation would turn the traditional understanding of an agency's inherent authority on its head. A "ministerial" or "clerical error" rule applies even when Congress has spelled out, with specificity, the extent of an agency's reconsideration authority. The agency still retains the power to revisit that decision to correct erroneous facts or clerical errors. *Int'l Paper Co.* v. *FERC*, 737 F.2d 1159, 1164, 1166 (D.C. Cir. 1984) (Bork, J.); *see Am. Trucking Assoc.* v. *Frisco Trans. Co.*, 358 U.S. 133, 145 (1958). But if Congress has *not* expressly limited an agency's reconsideration authority, the agency's inherent authority extends beyond ministerial or clerical errors.

Absent a statutory command otherwise, the only limit on an agency's inherent reconsideration authority is that the agency must reconsider "within a reasonable period of time." *Mazaleski* v. *Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). That limit, however, applies most naturally where the agency adjudicates private parties' rights or where the reconsideration decision "will have retroactive effect." *Id.* Here, Congress's design allows reconsideration

whenever circumstances make it appropriate.  EPA does not dispute that an extended reconsideration period is appropriate when reconsidering a waiver decision for future model years.  Indeed, EPA's 2022 reconsideration of its 2019 decision occurred over two-and-a-half years later.  That makes sense because the Section 209(b) waiver process is effectively an ongoing proceeding that requires a lengthy notice-and-comment period each time.  So timing is no barrier to reconsideration in this statutory context.

2.      EPA's "past administrative practice" supports the traditional understanding of its inherent reconsideration authority.  *Am. Methyl Corp.*, 749 F.2d at 838-839.  EPA has previously reconsidered its waiver decisions. *See* 43 Fed. Reg. 998 (Jan. 5, 1978) (grant of reconsideration); 47 Fed. Reg. 7,306 (Feb. 18, 1982) (reconsidering and affirming grant of waiver).  And those reconsiderations have sometimes been premised on a changed statutory interpretation.  74 Fed. Reg. at 32,747 (reconsidering waiver denial based on prior "misinterpretation" of the waiver factors).  The agency's well-established historical practice undermines its sudden discovery of a severely cabined reconsideration authority.

EPA also failed to reconcile its position here with its 2009 reconsideration of its original waiver denial.  Section 209(b) should not be read

as a one-way ratchet under which EPA has broad power to reconsider only the *denial* of a waiver but not the *grant* of one.  That approach has no basis in the statute and would carve out an ever-growing set of a single State's regulations from a federal preemption provision.  It would also lead to absurd results. For example, even if this Court or the Supreme Court were to reject EPA's interpretation of the waiver criteria, EPA could not revisit a waiver decision resting on that erroneous interpretation.  *But see ConocoPhillips Co.* v. *EPA*, 612 F.3d 822, 832 (5th Cir. 2010) (remanding for reconsideration in light of Supreme Court decision interpreting relevant statute based on agency's "inherent authority to reconsider").  The agency's flawed reading would be forever embedded in national climate policy—so long as the error favored less preemption rather than more.  That cannot be right.

3.    EPA's other attempts to defend its cramped view of its reconsideration authority also lack merit.  First, EPA suggests that its reconsideration authority "is constrained by the three waiver criteria." 87 Fed. Reg. at 14,334.  Although EPA can certainly reconsider a waiver if California no longer meets the waiver requirements, that may be true either because the facts on the ground have changed or because the agency has changed its position on the *meaning* of the waiver criteria.

62

EPA asserts that legislative history supports its position. *Id.* at 14,348. But the Senate Report it cites declared that "[i]mplicit in this provision is the right of the [Administrator] to withdraw the waiver *at any time* [if] … California no longer complies with the conditions of the waiver." *Id.* (quoting S. Rep. No. 90-403, at 34 (emphasis added)). The Senate Report drew no line between failure to comply with the conditions of a waiver because of a factual change versus a legal one.

Finally, EPA implies that reliance interests foreclosed withdrawing the waiver. *See id.* at 14,344. Reliance interests are of lesser concern where, as here, an agency reconsideration reduces regulatory obligations and thereby provides affected parties with *more* flexibility rather than less. Regardless, reliance is not a flat bar to reconsideration, but rather a factor the agency must address. *See Encino Motorcars, LLC* v. *Navarro*, 579 U.S. 211, 221-222 (2016); *FCC* v. *Fox Television Stations*, 556 U.S. 502, 515 (2009). And EPA's 2019 decision included a detailed analysis of the reliance interests that might have attached to the waiver and reasonably explained why they did not preclude reconsideration. *See* 84 Fed. Reg. at 51,334-37.

## CONCLUSION

For the foregoing reasons, the Court should set aside EPA's action rescinding the withdrawal of California's preemption waiver.

OCTOBER 24, 2022                        Respectfully submitted,

                                        s/ Jeffrey B. Wall

ERIC D. MCARTHUR                        JEFFREY B. WALL
SIDLEY AUSTIN LLP                       MORGAN L. RATNER
1501 K Street NW                        SULLIVAN & CROMWELL LLP
Washington, DC 20005                    1700 New York Avenue, NW
(202) 736-8000                          Washington, DC  20006-5215
emcarthur@sidley.com                    (202) 956-7500
                                        wallj@sullcrom.com
*Counsel for American Fuel &*
*Petrochemical Manufacturers,*          *Counsel for Valero Renewable*
*Domestic Energy Producers*             *Fuels Company, LLC*
*Alliance, Energy Marketers of*
*America, and National*                 MATTHEW W. MORRISON
*Association of Convenience*            PILLSBURY WINTHROP SHAW
*Stores*                                PITTMAN LLP
                                        1200 Seventeenth Street NW
C. BOYDEN GRAY                          Washington, DC  20036
JONATHAN BERRY                          matthew.morrison@
MICHAEL B. BUSCHBACHER                  pillsburylaw.com
BOYDEN GRAY & ASSOCIATES,
PLLC                                    *Counsel for Iowa Soybean*
801 17th Street NW, Suite 350           *Association, Minnesota Soybean*
Washington, DC  20006                   *Growers Association, South*
(317) 513-0622                          *Dakota Soybean Association,*
buschbacher@boydengrayassoci            *and Diamond Alternative*
ates.com                                *Energy, LLC*

*Counsel for Clean Fuels*
*Development Coalition, IMC,*

64

*Inc., Illinois Corn Growers
Association, Kansas Corn
Growers Association, Michigan
Corn Growers Association,
Missouri Corn Growers
Association, and Valero
Renewable Fuels, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com
*Counsel for Valero Renewable
Fuels Company, LLC and
Diamond Alternative Energy,
LLC*

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's September 20, 2020 Order because it contains 12,538 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

OCTOBER 24, 2022

## CERTIFICATE OF SERVICE

I hereby certify that, on this 24th day of October, 2022, I electronically filed the foregoing Final Brief for Petitioners with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

s/ Jeffrey B. Wall
JEFFREY B. WALL

OCTOBER 24, 2022