# In the United States Court of Appeals for the District of Columbia Circuit

STATE OF OHIO, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY ECONOMY, ET AL.,
*Intervenors.*

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0257)

## PRIVATE PETITIONERS' ADDENDUM OF STATUTES AND STANDING DECLARATIONS

ERIC D. MCARTHUR
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel & Petrochemical Manufacturers, Domestic Energy Producers Alliance, Energy Marketers of America, and National Association of Convenience Stores*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels Company, LLC*

(Additional counsel listed on the following page)

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES,
PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, IMC, Inc.,
Illinois Corn Growers Association,
Kansas Corn Growers Association,
Michigan Corn Growers
Association, Missouri Corn
Growers Association, and Valero
Renewable Fuels Company, LLC*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC 20036
matthew.morrison@pillsburylaw.com

*Counsel for Iowa Soybean
Association, Minnesota Soybean
Growers Association, South Dakota
Soybean Association, and Diamond
Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Diamond Alternative
Energy, LLC, and Valero Renewable
Fuels Company, LLC*

**TABLE OF CONTENTS**

Page

PRIMARY STATUTES AND REGULATIONS ...............................................1

    A.    42 U.S.C. § 7543: ...............................................................1

    B.    42 U.S.C. § 7545(c)(4)(B): ...............................................5

    C.    49 U.S.C. § 32919(a): ......................................................6

STANDING DECLARATIONS .....................................................................7

    A.    Chris Bambury, Vice President of Bambury, Inc., Board Member of the National Association of Convenience Stores ....................................................................... Add 4

    B.    Dave Loos, Director of Biofuels and Research of the Illinois Corn Growers Association .......................................... Add 4

    C.    Deepak Garg, Vice President of the Fuels Regulatory and Planning, and HSE Assurance Division servicing Valero Renewable Fuels Company, LLC and Diamond Alternative Energy, LLC ........................................................................ Add 8

    D.    Erin Graziosi, President of Robinson Oil Company, a Member of the National Association of Convenience Stores and California Fuels and Convenience Alliance ..................... Add 5

    E.    Jennifer M. Swenton, Director of Optimization Planning and Economics division for Valero Renewable Fules Company, LLC ................................................................ Add 8

    F.    James E. Zook, Executive Director of the Michigan Corn Growers Association ............................................................. Add 4

    G.    Josh Roe, Vice President of Market Development and Policy of the Kansas Corn Growers Association .................... Add 4

    H.    Kirk Leeds, CEO of the Iowa Soybean Association .............. Add 4

I.     Lane Howard, Associate Director of Market Development of the Missouri Corn Growers Association ............................ Add 4

J.     Rock Zierman, CEO of the California Independent Petroleum Association, a Member of the Domestic Energy Producers Alliance ................................................................ Add 4

K.    Susan W. Grissom, Chief Industry Analyst for the American Fuel & Petrochemical Manufacturers ................... Add 5

L.    Trecia Canty, Senior Vice President, General Counsel and Secretary for PBF Energy, a Member of the American Fuel & Petrochemical Manufacturers ...................................... Add 4

M.   Trevor Hinz, Director of Government and Industry Relations of ICM, Inc ................................................................ Add 4

N.    Varish Goyal, CEO of Au Energy, a Member of the National Association of Convenience Stores .......................... Add 4

# PRIMARY STATUTES AND REGULATIONS

**A.** **Section 209 of the Clean Air Act, 42 U.S.C. § 7543, provides:**

(a) Prohibition

No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

(b) Waiver

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

(2) If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of paragraph (1).

(3) In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal standards for purposes of this subchapter.

(c) Certification of vehicle parts or engine parts

Whenever a regulation with respect to any motor vehicle part or motor vehicle engine part is in effect under section 7541(a)(2) of this title, no State or political subdivision thereof shall adopt or attempt to enforce any standard or any requirement of certification, inspection, or approval which relates to motor vehicle emissions and is applicable to the same aspect of such part. The preceding sentence shall not apply in the case of a State with respect to which a waiver is in effect under subsection (b).

(d) Control, regulation, or restrictions on registered or licensed motor vehicles

Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.

(e) Nonroad engines or vehicles

(1) Prohibition on certain State standards No State or any political subdivision thereof shall adopt or attempt to enforce any standard or other requirement relating to the control of emissions from either of the following new nonroad engines or nonroad vehicles subject to regulation under this chapter—

   (A) New engines which are used in construction equipment or vehicles or used in farm equipment or vehicles and which are smaller than 175 horsepower.

   (B) New locomotives or new engines used in locomotives.

Subsection (b) shall not apply for purposes of this paragraph.

(2) Other nonroad engines or vehicles

(A) In the case of any nonroad vehicles or engines other than those referred to in subparagraph (A) or (B) of paragraph (1), the Administrator shall, after notice and opportunity for public hearing, authorize California to adopt and enforce standards and other requirements relating to the control of emissions from such vehicles or engines if California determines that California standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such authorization shall be granted if the Administrator finds that—

(i) the determination of California is arbitrary and capricious,

(ii) California does not need such California standards to meet compelling and extraordinary conditions, or

(iii) California standards and accompanying enforcement procedures are not consistent with this section.

(B) Any State other than California which has plan provisions approved under part D of subchapter I may adopt and enforce, after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines (other than those referred to in subparagraph (A) or (B) of paragraph (1)) and take such other actions as are referred to in subparagraph (A) of this paragraph respecting such vehicles or engines if—

(i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards authorized by the Administrator under subparagraph (A), and

(ii) California and such State adopt such standards at least 2 years before commencement of the period for which the standards take effect.

The Administrator shall issue regulations to implement this subsection.

**B.     42 U.S.C. § 7545(c)(4)(B):**

(B) Any State for which application of section 209(a) has at any time been waived under section 209(b) may at any time prescribe and enforce, for the purpose of motor vehicle emission control, a control or prohibition respecting any fuel or fuel additive.

**C.    49 U.S.C. § 32919(a) (part of the Energy Policy and Conservation Act of 1975):**

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF OHIO, ET AL., | |
| Petitioners, | |
| v. | |
| ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY, | Case No. 22-1081 and consolidated cases |
| Respondent, | |
| ADVANCED ENERGY ECONOMY, ET AL., | |
| Intervenors. | |

**<u>DECLARATION OF CHRIS BAMBURY</u>**

I, Chris Bambury, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Vice President of Bambury, Inc. ("Bambury"), a family-owned and operated business in California. Bambury is a fourth-generation operated company that just celebrated 100 years since it was established. For 50 years it operated towing and auto repair services, but recently ceased those operations due to profitability challenges. We've

1

DocuSign Envelope ID: FE834828-723C-4D41-BDCF-C05685C40ABA

operated a foodservice (deli) business for over 30 years, but it has struggled through COVID.

2. Bambury is a member of the National Association of Convenience Stores ("NACS"), and I currently serve on the Board of Directors of NACS. I am also the Senior Vice President of the California Fuels and Convenience Alliance ("CFCA"), which is the state association that represents independently owned convenience store operators and fuel marketers. While CFCA is not formally affiliated with NACS, the two organizations collaborate and share resources to stay on top of federal, state, and local issues, such as EPA's decision to grant California a waiver for its greenhouse-gas standards and its zero-emission-vehicle mandate.

3. Bambury owns and operates three retail convenience stores in Sonoma, California, two of which have fueling stations. These stores and our fuel are branded under the name BONNEAU, after our founders August and Catherine Bonneau, my great grandparents. We currently employ 32 employees between three locations. Bambury does not own or operate any stores or fueling stations outside of California.

4. Approximately 85% of Bambury's revenue comes from fuel sales. The other 15% comes from the sale of beverages, snacks, tobacco, lotto, and other convenience-store items.

5. I am generally familiar with California's regulations limiting vehicular greenhouse-gas emissions and mandating zero-emission vehicles. I am also aware that earlier this year the federal government reinstated a waiver that permits the State to implement these standards.

6. I understand that California's greenhouse-gas standards and zero-emission-vehicle mandate reduce the demand for fuel in California by requiring automakers to deliver vehicles for sale in California that are more fuel efficient, as well as a minimum percentage of zero-emission vehicles, such as electric vehicles, that do not run on conventional fuels.

7. Reducing the demand for fuel harms Bambury financially. Drivers of low- and zero-emission vehicles have less of a need, or no need at all, to stop at our gas stations to refuel. As a result, our locations that offer fueling sell less fuel, directly harming Bambury's bottom line.

8. In addition, because customers at those locations come through our stores and make retail purchases when they stop to refuel, our retail sales suffer when drivers refuel less often.

9. Although Bambury recently installed four electric-vehicle chargers at its stores, revenue from these charging stations will not replace our lost revenue from fuel and retail sales. Because most electric-vehicle drivers are able to recharge at home or at work, each charging station averages one to two charges every other day, and zero charges on other days. By comparison, each of our fueling positions averages over 100 patrons per day. The charging stations are not a significant source of revenue, and I do not anticipate that they will become a significant source in the future.

10. For these reasons, the waiver allowing California to implement its greenhouse-gas emission standards and zero-emission-vehicle mandate harms Bambury financially.

Dated: 10/19/2022

DocuSigned by:

Chris Bambury

DF941EBB5F94488...

Chris Bambury

4

**IN THE UNITED STATES COURT OF APPEALS FOR THE DIS-TRICT OF COLUMBIA CIRCUIT**

STATE OF OHIO, et al.,

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondent.*

No. 22-1081 (and consolidated cases)

**DECLARATION OF DAVE LOOS OF ILLINOIS CORN GROWERS AS-SOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Dave Loos, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Director of Biofuels and Research of the Illinois Corn Grow-ers Association, a nonprofit trade association based in Illinois with a membership of 5,000 corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2. I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.     Illinois is one of the nation's leading corn producing states, with a net production of more than 2 billion bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.     The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5.     Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator. In California, over the last decade the use of ethanol has resulted in 26.9 metric tons of GHG emission savings.

6.     The United States Environmental Protection Agency promulgated a final agency action entitled *California State Motor Vehicle Pollution Control*

*Standards; Advanced Clean Car Program; Reconsideration of a Previous With-drawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022) ("Waiver Restoration"). This decision purports to reinstate a waiver of Clean Air Act preemption to California (and, by extension, to some seventeen other states that have opted to copy California's regulations) to impose its own greenhouse gas emissions standards for new automobiles as well to impose a zero-emissions vehicle sales quota.

7. As California explained in its original waiver request, California's regulations will reduce emissions through "'reductions in fuel production.'" 87 Fed. Reg. 14,364 (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16). Economic harm from these rules is not speculative. Indeed, California estimated "substantial reductions in demand for gasoline—exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030." Cal. Air Resources Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider the "LEV III" Amendments to the California Greenhouse Gas and Criteria Pollutant Exhaust Emission Standards* 201 (Dec. 7, 2011). By reducing total gasoline consumption, if gasoline remains at the current 10% ethanol blend level, ethanol demand destruction will also result.

8. While these standards are in effect, they will drive down demand for ethanol, not only in California but also in states that have adopted California's

standards: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

9. This demand destruction harms the Illinois Corn Growers Association and its members by decreasing demand for the corn they grow, particularly in California and in states that have adopted California's standards. According to the U.S. Energy Information Administration, California consumes 10% of the nation's fuel ethanol supply, which is about seven times more than ethanol plants operating within the State can produce. *See* U.S. Energy Information Administration, *California State Energy Profile* (Oct. 20, 2022), https://www.eia.gov/state/print.php?sid=CA.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. All these injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 22, 2022

_____
Dave Loos

4

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| |
|---|
| STATE OF OHIO, et al., |
| *Petition-* |
| ers, |
| v. |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., |
| *Respondents.* |

No. 22-1081 (and consolidated cases)

**DECLARATION OF DEEPAK GARG**

I, Deepak Garg, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.     I am a Vice President leading the Fuels Regulatory and Planning and HSE Assurance division servicing Valero Renewable Fuels Company, LLC ("Valero Renewables") and Diamond Alternative Energy, LLC ("Diamond Alternative"). I am responsible for a wide range of compliance and business matters relating to Valero Renewables and Diamond Alternative's production and sale of renewable fuels such as ethanol and renewable diesel. My responsibilities include analyzing market and economic impacts of regulatory and statutory changes on the

1

liquid fuels production industry, including the impacts on renewable fuels.

2. I have extensive experience in ensuring the Valero family of companies' cost-effective compliance with the requirements of the federal Renewable Fuel Standard, which requires so-called "obligated parties" to blend certain percentages of renewable fuels into transportation fuels or to purchase an equivalent number of "Renewable Identification Numbers" credits, or RINs, to meet an EPA-specified Renewable Volume Obligation ("RVO").

3. In addition, I have extensive experience with California's Low Carbon Fuel Standard ("LCFS") program. The LCFS is designed to reduce greenhouse gas emissions by setting a carbon intensity ("CI") benchmark for transportation fuels consumed in the State, which decreases over time. Under this program, each fuel is assigned a CI value based on a model produced by the California Air Resources Board ("CARB"). The CI value is intended to represent the GHG emissions associated with the feedstocks from which the fuel was produced, the fuel production and distribution activities, and the use of the finished fuel. Fuels below the benchmark generate LCFS credits, while fuels above the benchmark generate deficits. The lower the fuel's CI score compared to the benchmark, the greater number of credits generated. Each producer or importer of fuel must demonstrate that the overall mix of fuels it supplies for use in California meets the CI benchmarks for each

2

compliance period. A producer or importer with a fuel mix that is above the CI benchmark must purchase LCFS credits sufficient to meet the CI benchmark.

4. I am generally aware of EPA's decision to waive federal preemption for regulations issued by the State of California under its Advanced Clean Cars I ("ACC I") program. It is my understanding that the State of California has found that both the Lower Emission Vehicle regulations and the Zero-Emission Vehicle regulations in the ACC I program reduce demand for liquid transportation fuels within the State. As I understand it, the Zero-Emission Vehicle regulations require automakers in the State to sell a minimum percentage of so-called "zero-emission vehicles," such as electric vehicles, each year (up to 22% for large manufacturers in model year 2025). 78 Fed. Reg. 2111, 2114, 2119 (Jan. 9, 2013). These electric vehicles displace new internal combustion engine vehicles in the State that are powered by gasoline, diesel, and renewable fuels.

5. As a result, the ACC I program causes financial injury to Valero Renewables and Diamond Alternative, which produce ethanol and renewable diesel, respectively, for sale in the State of California, along with valuable LCFS credits and RINs.

6. Valero Renewables is an independent ethanol producer owning and operating 12 ethanol plants with a combined production capacity of around 1.6 billion

3

gallons per year.

7. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage and net greenhouse gas ("GHG") emissions. Across California, as in most of the United States, refiners add ethanol to gasoline to raise its octane rating to a level suitable for use in most vehicles, with the result that approximately 10% of the final product consists of ethanol, and to meet federal renewable mandates. Over the past decade, the use of ethanol in California has 26.9 million metric tons of GHG emission savings. Erin Voegele, *California ethanol producers ask Feinstein to withdraw bill*, Ethanol Producer (Aug. 3, 2021), shorturl.at/cnwM9.

8. California is a substantial part of Valero Renewables' ethanol market. According to the U.S. Energy Information Administration ("EIA"), California is the second largest consumer of motor gasoline among the 50 states. The State also accounts for 10% of the nation's fuel ethanol demand, which is about seven times more than ethanol plants operating within the State can currently produce. EIA, California State Energy Profile, https://www.eia.gov/state/print.php?sid=CA (last visited Oct. 20, 2022). In other words, much of the ethanol consumed in the State of California is imported from producers like Valero Renewables. In fact, in 2021,

4

Valero Renewables imported more than 10.5 million gallons of ethanol into the State of California. It is anticipated that ethanol imports from Valero Renewables will be substantially greater in 2022, as Valero's ethanol production has been altered to manufacture a lower carbon intensity product specifically designed to go to California. Gasoline demand destruction in California would undermine the substantial economic investment in this project by Valero Renewables.

9. Diamond Alternative is a part owner of the Diamond Green Diesel renewable diesel production facility in St. Charles Parish, Louisiana. Diamond Green Diesel currently produces over 700 million gallons of renewable diesel per year at its St. Charles production facility, making it America's largest renewable diesel plant, and is expected to produce over 1.2 billion gallons of renewable diesel per year once its newly-constructed production facility in Port Arthur, Texas begins production later this year or early next year.

10. Renewable diesel is made from sustainable low-carbon feedstocks, such as used cooking oil, inedible animal fats derived from processing meat fats, soy bean oil, and inedible corn oil. Its chemical composition is nearly identical to that of petroleum-based diesel, making it a "drop-in" fuel that can be stored, distributed, and used interchangeably with petroleum-derived diesel, but its production results in up to 80% fewer greenhouse gas emissions for the finished fuel.

11. Even more so than ethanol, California plays an enormous role in driving demand for renewable diesel. According to the EIA, California accounts for almost all of the renewable diesel consumed in the United States. EIA, California State Energy Profile, https://www.eia.gov/state/print.php?sid=CA (last visited Oct. 20, 2022). Currently, approximately 65% of the renewable diesel produced by the DGD St. Charles facility is sold into California.

12. The ACC I program also impacts revenues Valero Renewables and Diamond Alternative obtain through their participation in the LCFS and RFS programs.

13. Ethanol produced by Valero Renewables and renewable diesel produced by Diamond Alternative have CI scores that are lower than traditional petroleum-based transportation fuels. Therefore, these fuels generate LCFS credits that have significant monetary value and are an important part of the business planning and economics for the renewable fuels facilities, as they generate hundreds of millions of dollars in revenue annually. Both Valero Renewables and Diamond Alternative rely on credit revenue to provide a return on investment, and decreased demand for renewable fuels in the State would undermine these expectations. By way of example, the economics underlying the significant investment in the Port Arthur renewable diesel facility were driven, in large part, by the expectation of LCFS credit values.

6

14. Likewise, Valero Renewables and Diamond Alternative rely on revenue from RIN sales. As demand for liquid transportation fuels decreases in the State, so do the RIN revenues these businesses generate.

\* \* \*

15. These economic impacts are not speculative. Indeed, as California asserted in its original waiver request, the ACC I program aims to reduce emissions through "reductions in fuel production." 87 Fed. Reg. 14,332, 14,364 (Mar. 14, 2022) (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16). This would, in turn, result in depressed demand for liquid fuels, including the demand for the ethanol that Valero Renewables produces and imports into the State and the renewable diesel that Diamond Green Diesel manufactures and imports into the State. R-7041 (CARB, LEV Initial Statement of Reasons at 201, 199 (2012)); R-8158 at 68, 70 (CARB, ZEV Initial Statement of Reasons (2012)) (recognizing that "oil and gas industry, fuel providers, and service stations are likely to be" the industries "most adversely affected" by California's regulations and the resulting "substantial reductions in demand for gasoline" in California.").

16. All these injuries would be substantially ameliorated if EPA's decision were set aside.

7

Dated: October 24, 2022

_____

Deepak Garg

DocuSign Envelope ID: 5B156E05-D5E7-4BE2-88A5-9B9698259A4C

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF OHIO, ET AL., <br><br>                  Petitioners, <br><br>     v. <br><br> ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY, <br><br>                  Respondent, <br><br> ADVANCED ENERGY ECONOMY, ET AL., <br><br>                  Intervenors. | Case No. 22-1081 and consolidated cases |

## DECLARATION OF ERIN GRAZIOSI

I, Erin Graziosi, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the President of Robinson Oil Corporation ("Robinson Oil"), a fourth-generation family business headquartered in Santa Clara County, California. We own and operate fueling stations and convenience stores; operate five fuel trucks that deliver to our stations only; and also run our own wholesale fuel and maintenance departments for the benefit

1

DocuSign Envelope ID: 5B156E05-D5E7-4BE2-88A5-9B9698259A4C

of our retail stores, as well as a commercial fueling department that markets fleet cards.

2. Robinson Oil is a member of the National Association of Convenience Stores ("NACS"). In addition, I currently serve as the President of the California Fuels and Convenience Alliance ("CFCA"), which is our California state association that represents the needs of independent wholesalers, retail marketers, and transporters of fuel, as well as retail convenience stores. Most of our members are small-business owners, many of which are family-owned and multi-generational. CFCA partners with NACS regularly on issues that affect our membership.

3. Robinson Oil owns and operates 36 unbranded fueling stations with convenience stores of various sizes in Northern California, with three more in the building or permit stages. The convenience stores operate under the brand name Rotten Robbie, each of which has 4 to 20 employees. Overall we have about 300 employees. Robinson Oil does not own or operate any fueling stations or stores outside of California.

4. The bulk of Robinson Oil's revenue—over 70%—comes from fuel sales. As described below, with diminishing fuel sales, I believe we

2

would also have fewer customers coming into our stores, which would reduce the store purchases that make up another portion of our revenue.

5. I am generally familiar with California's standards regulating vehicular greenhouse-gas emissions and mandating zero-emission vehicles. I am also aware that earlier this year the federal government reinstated a waiver that permits the State to implement these standards.

6. I understand that California's greenhouse-gas standards and zero-emission-vehicle mandate reduce the demand for fuel in California by requiring automakers to deliver vehicles for sale in California that are more fuel efficient, as well as a minimum percentage of zero-emission vehicles, such as electric vehicles, that do not run on conventional fuels.

7. Reducing the demand for fuel harms Robinson Oil financially. Drivers of low- and zero-emission vehicles have less of a need, or no need at all, to stop at our gas stations to refuel. As a result, our fueling stations sell less fuel, directly harming the company's bottom line.

8. In addition, because customers come through our stores and make retail purchases primarily when they stop to refuel, our retail sales suffer when drivers refuel less often.

DocuSign Envelope ID: 5B156E05-D5E7-4BE2-88A5-9B9698259A4C

9. I anticipate broader impacts on my business as revenue declines. For example, declining revenue from fuel reduces the resale value of fueling-station properties, as well as fuel sellers' ability to access capital to operate and grow a business.

10. Although one Rotten Robbie location now has electric-vehicle charging stations, revenue from these charging stations and any we might install in the future cannot replace our lost revenue from fuel and retail sales. Because most electric-vehicle drivers are able to recharge at home or at work, each of our charging stations averages only 1.5 patrons per day, compared to an average of 400 fueling transactions a day.

11. Further, because there is only a single provider of electricity in my area, I am not able to purchase the electricity for these charging stations at a competitive price and therefore cannot offer competitively priced electricity to my customers. By contrast, I can purchase fuel from multiple sources to competitively price my fuel offerings to customers.

12. The charging stations are therefore not a significant source of revenue. In fact, I anticipate that it will take over 10 years to pay back the investment made in installing the charging stations.

4

13. For these reasons, the waiver allowing California to implement its greenhouse-gas emission standards and zero-emission-vehicle mandate harms Robinson Oil financially.

Dated: 10/17/2022

DocuSigned by:

*Erin Graziosi*

DF941EBB5F94488...

Erin Graziosi

5

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF OHIO, et al.,<br><br>*Petitioners,*<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Respondents.* | No. 22-1081 (and consolidated cases) |

### DECLARATION OF JENNIFER M. SWENTON

I, Jennifer M. Swenton, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Director of Optimization & Planning in the Optimization Planning and Economics division for Valero. In this role, I am responsible for a wide range of planning and economic business matters regarding Valero's operating strategies for its West Coast, Mid-Continent, and North Atlantic refinery assets. My responsibilities include management oversight of the planning and economics teams for these Valero assets, and through my background, I also have significant technical and operational experience from several of Valero's refineries.

2. I am generally aware of EPA's decision to waive federal preemption for regulations issued by the State of California under its Advanced Clean Cars I ("ACC I") program. It is my understanding that the State of California has found that both the Lower Emission Vehicle regulations and the Zero-Emission Vehicle regulations in the ACC I program reduce demand for liquid transportation fuels within the State. As I understand it, the Zero-Emission Vehicle regulations require automakers in the State to sell a minimum percentage of so-called "zero-

emission vehicles," such as electric vehicles, each year (up to 22% for large manufacturers in model year 2025). 78 Fed. Reg. 2111, 2114, 2119 (Jan. 9, 2013). These "zero-emission vehicles" displace new internal combustion engine vehicles in the State that are powered by gasoline, diesel, and renewable fuels.

3. As a result of this projected displacement, the ACC I program will cause financial injury to Valero's refining business segment and, in particular, its West Coast operations, which would otherwise not occur in the absence of ACC I.

A. **Valero's Overall Business Strategy**

4. Unlike some other refining companies, Valero does not explore for or produce crude, i.e., it does not drill for oil. Instead, it purchases crude from third parties.

5. Valero also does not operate any retail motor fuel stations. It sells motor fuel (i.e., gasoline and diesel) at the wholesale and bulk sale levels. Valero sells motor fuels at the wholesale level under several different channels of trade, including unbranded contract, unbranded "spot," and branded motor fuel sales. Bulk sales are made to clear the remaining refined product length from Valero's refineries to manage inventories.

B. **West Coast Refineries and Refining Practices**

6. There are two Valero refineries on the West Coast, and both are in California. The Valero Benicia refinery is located in Benicia (in the San Francisco Bay Area), and its Wilmington refinery is located in Wilmington (in the greater Los Angeles area). Both refineries make gasoline, diesel, jet fuel, and other petroleum products. Benicia's refined products are mostly sold in Northern California and some limited amounts in Nevada. Wilmington's refined products are typically sold in Southern California, but it also supplies some limited amounts into the Nevada and Arizona markets.

7. Most of the gasoline that the Wilmington and Benicia refineries produce is California Reformulated Gasoline Blendstock for Oxygenate Blending ("CARBOB"), which is a special RBOB formula mandated for use in the State of California. Most other states in the United States use Reformulated Blendstock for Oxygenate Blending ("RBOB") or Conventional Blendstock for Oxygenate Blending ("CBOB"), which are the two base gasoline stocks that get mixed with ethanol at the terminal racks in other states. CARBOB is considered to be a "boutique fuel," meaning it is a specialized fuel formulation that is unique to a particular market by virtue of local laws. Compared to CBOB and RBOB, CARBOB is more expensive and complicated to produce because it requires more processing steps. For this reason, most refineries outside of California do not produce it.

8. Valero's California refineries must maintain a relatively high operating rate to remain stable, so they cannot run at low turndown rates.

9. Another major consideration for Valero's West Coast refinery operations is the logistical limitations of the availability of pipeline capacity.

10. Valero's movement of a small portion of finished product from California to another locale (such as with its production of AZRBOB for the Phoenix market) is a planned event driven primarily by existing contractual obligations for supplying gasoline to a market that is connected to California via pipeline. The Benicia and Wilmington refineries generally operate independently of the other Valero refineries. In addition, both of Valero's West Coast refineries supply CBOB to the Nevada area via third party pipelines. However, this volume is typically only a small percent of the gasoline produced in both refineries. This volume sold on pipeline is based on product demand and margins, but is limited based on line space up to the pipeline capacities.

11. Like most refineries, Valero's Wilmington and Benicia refineries have finite storage capacities. Because of this, Valero does not have the ability to store significant volumes of gasoline blendstocks and/or significantly increase volumes of different grades of finished gasoline (CARBOB, AZRBOB, CBOB, RBOB).

12. Valero sells the majority of its CARBOB production at the rack. A rack is a distribution terminal that refiners send their gasoline to via pipeline; customers (e.g., distributors and jobbers) purchase their product at the rack by the tanker truck load. Whatever product Valero does not sell at the racks, it must sell on the bulk market to ensure that it has available space for products coming out of the refinery. Due to its limited ability to store excess inventory of CARBOB production, Valero maintains a buffer with its tankage to avoid reaching maximum inventory capacity, which it refers to as "containment." Reaching maximum capacity would require shutting down a refinery or reducing its output because there would be no place for finished product to go.

13. The West Coast has a comparatively limited spot market in part because there is not enough equipment (e.g., pipes, terminal hookups, storage tanks etc.) to move and store products efficiently and timely, and there are major logistical constraints at West Coast dock facilities. This lack of available equipment and docking facilities constrain Valero's ability to move gasoline and other petroleum products into, out of, and/or throughout California. For instance, there are a limited number of barge windows for moving product and blending components, so the barges have to compete for berth space.

14. Moreover, the Jones Act, which requires that goods shipped between U.S. ports be transported on ships that are built, owned, and operated by United States citizens or permanent residents, limits Valero's ability to transport supplies domestically by water.

Because there are a small number of Jones Act compliant barges, they are always in high demand and significantly more expensive to use than non-Jones Act vessels.

15. Valero's Wilmington refinery operates one barge dock where gasoline blendstocks can be brought into the refinery. However, finished gasoline and/or blendstocks cannot be shipped out of the refinery due to logistical and permitting constraints. This barge dock is typically used for moving distillates and other intermediates. Valero's Wilmington refinery utilizes third-party docks (berths) for feedstock deliveries. Similarly, Valero's Benicia refinery is not well-equipped for exporting product to other markets because of logistical limitations. This is partly because the refinery is located relatively far inland, presenting intervening shoals that ships and barges must navigate (therefore limiting vessel size). The Benicia refinery also has limited dock space that it balances between crude, intermediates, and products. Thus, it is rare for Valero to export gasoline outside California from either of its West Coast refineries.

## C.    Reduction in California Fuel Demand

16. A significant reduction in California's gasoline demand, as contemplated by the ACC I program, will detrimentally impact Valero's business and, in particular, its West Coast operations. More specifically, the reduction in demand for CARBOB and diesel attributable to the projected market share increase of electric and hydrogen fuel cell vehicles will result in the need for California refineries to operate at lower capacities and/or to move additional gasoline and/or gasoline components to other markets. The former option naturally has a direct impact on the profitability and long-term viability of such refineries, while the latter is limited to logistical constraints and economic margins. These economic impacts are not speculative. Indeed, as California asserted in its original waiver request, the ACC I program aims to reduce emissions

through "reductions in fuel production." 87 Fed. Reg. 14,332, 14,364 (Mar. 14, 2022) (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16).

17. As stated above, Valero's California refineries must operate at or above a minimum operating threshold. A significant reduction in domestic market demand in California thus risks potential refinery shutdowns and even permanent closures. In this regard, one need only consider the impact of the COVID-19 pandemic on the West Coast refining sector, which experienced negative financial margins and multiple third-party refinery closures due to the reduction in gasoline demand. However, even if operating capacity is maintained at or above the minimum operating threshold, any reduction in the California market's demand would negatively impact the profitability of Valero's California refineries, which are currently operating at close to maximum capacity (outside of required maintenance events) post-COVID as a result of normal or near-normal market demand and a reduced market supply of CARBOB stemming from third-party California refinery closures.

18. In theory, the impacts of such reduction in demand can be mitigated to some extent through exports out of California, but such mitigation efforts come with increased costs and capacity limitations. In this regard, gasoline sales from Valero's California refineries to neighboring states may be possible through the existing third-party pipelines to Arizona and Nevada markets. However, as explained above, there are additional costs associated with such pipeline use, as well as scheduling and forecasting complications, including competition with other California refiners for limited throughput capacity. An increased emphasis on exports also introduces the added logistical and planning complexities and expenses associated with balancing a gradual decrease in CARBOB production with an increasing production of other blendstocks, particularly as domestic demand decreases yet nevertheless experiences occasional

changes in the market—e.g., seasonal demands and refinery turnarounds or closures. Moreover, Nevada is one of the Section 177 States, and is, therefore, expected to face similar domestic market demand reductions as California if the subject preemption waiver is not invalidated.

19. Exporting gasoline to Latin America or other markets via the shipping industry likewise requires the incurrence of additional transportation costs and is limited by dock, vessel, and permitting constraints as described above. To the extent capital investment might improve such constraints and allow for increased gasoline movements, that would nevertheless require significant expenditures by both Valero and third parties over whom Valero has no control, and would depend on business analyses and forecasts to justify said investment. Such exports would also require California refineries to compete with barrels from the Gulf Coast, the Far East, and Europe, which have lower operating and feedstock costs, and are therefore better equipped to compete in such markets. Additionally, California is one of the most expensive operating environments for refineries, and it is not at all clear these refineries would be competitive in the markets for conventional gasoline blends.

20. In short, the subject preemption waiver for California's ACC I program is projected by California and EPA to force a rapid expansion of the new vehicle market share for electric vehicles and a corresponding reduction in California liquid fuel demand. Such a reduction in demand will negatively impact Valero's business operations and profitability as described herein.

21. All these injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 24, 2022

Jennifer M. Swenton

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

|  |  |
|---|---|
| STATE OF OHIO, et al.,<br><br>*Petitioner,*<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,<br><br>*Respondent.* | No. 22-1081 (and consolidated cases) |

**DECLARATION OF JAMES E ZOOK OF MICHIGAN CORN GROWERS ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, James E. Zook, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.　I am the Executive Director of the Michigan Corn Growers Association, a nonprofit trade association based in Michigan with a membership of approximately 1,400 corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.　I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3.      Michigan is one of the nation's leading corn producing states, with a net production of around 350 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4.      The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5.      Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator. In California, over the last decade the use of ethanol has resulted in 26.9 metric tons of GHG emission savings.

6.      The United States Environmental Protection Agency promulgated a final agency action entitled *California State Motor Vehicle Pollution Control Standards;*

*Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022) ("Waiver Restoration"). This decision purports to reinstate a waiver of Clean Air Act preemption to California (and, by extension, to some seventeen other states that have opted to copy California's regulations) to impose its own greenhouse gas emissions standards for new automobiles as well to impose a zero-emissions vehicle sales quota.

7.     As California explained in its original waiver request, California's regulations will reduce emissions through "'reductions in fuel production.'" 87 Fed. Reg. 14,364 (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16). Economic harm from these rules is not speculative. Indeed, California estimated "substantial reductions in demand for gasoline—exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030." Cal. Air Resources Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider the "LEV III" Amendments to the California Greenhouse Gas and Criteria Pollutant Exhaust Emission Standards* 201 (Dec. 7, 2011). By reducing total gasoline consumption, if gasoline remains at the current 10% ethanol blend level, ethanol demand destruction will also result.

8.     While these standards are in effect, they will drive down demand for ethanol, not only in California but also in states that have adopted California's

standards: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

9. This demand destruction harms the Michigan Corn Growers Association and its members by decreasing demand for the corn they grow, particularly in California and in states that have adopted California's standards. According to the U.S. Energy Information Administration, California consumes 10% of the nation's fuel ethanol supply, which is about seven times more than ethanol plants operating within the State can produce. *See* U.S. Energy Information Administration, *California State Energy Profile* (Oct. 20, 2022), https://www.eia.gov/state/print.php?sid=CA.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. These injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 22, 2022

James E. Zook

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF OHIO, et al., *Petitioner,* v. U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., *Respondent.* | No. 22-1081 (and consolidated cases) |

**DECLARATION OF JOSH ROE OF KANSAS CORN GROWERS ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Josh Roe, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.     I am the Vice President of Market Development and Policy of the Kansas Corn Growers Association, a nonprofit trade association based in Kansas with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.     I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3. Kansas is one of the nation's leading corn producing states, with a net production of around 800 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4. The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator. In California, over the last decade the use of ethanol has resulted in 26.9 metric tons of GHG emission savings.

6. The United States Environmental Protection Agency promulgated a final agency action entitled *California State Motor Vehicle Pollution Control*

2

*Standards; Advanced Clean Car Program; Reconsideration of a Previous With-drawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022) ("Waiver Restoration"). This decision purports to reinstate a waiver of Clean Air Act preemption to California (and, by extension, to some seventeen other states that have opted to copy California's regulations) to impose its own greenhouse gas emissions standards for new automobiles as well to impose a zero-emissions vehicle sales quota.

7.      As California explained in its original waiver request, California's regulations will reduce emissions through "'reductions in fuel production.'" 87 Fed. Reg. 14,364 (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16). Economic harm from these rules is not speculative. Indeed, California estimated "substantial reductions in demand for gasoline—exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030." Cal. Air Resources Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider the "LEV III" Amendments to the California Greenhouse Gas and Criteria Pollutant Exhaust Emission Standards* 201 (Dec. 7, 2011). By reducing total gasoline consumption, if gasoline remains at the current 10% ethanol blend level, ethanol demand destruction will also result.

8.      While these standards are in effect, they will drive down demand for ethanol, not only in California but also in states that have adopted California's

3

standards: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

9. This demand destruction harms the Kansas Corn Growers Association and its members by decreasing demand for the corn they grow, particularly in California and in states that have adopted California's standards. According to the U.S. Energy Information Administration, California consumes 10% of the nation's fuel ethanol supply, which is about seven times more than ethanol plants operating within the State can produce. *See* U.S. Energy Information Administration, *California State Energy Profile* (Oct. 20, 2022), https://www.eia.gov/state/print.php?sid=CA.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. These injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 22, 2022

_____
Josh Roe

4

| | |
|---|---|
| STATE OF OHIO, ET AL.,<br><br>Petitioners,<br><br>v.<br><br>ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>Respondent. | Case No. 22-1081<br>and consolidated cases |

## DECLARATION OF KIRK LEEDS

1. My name is Kirk Leeds. I am over 18 years of age and am competent to give this Declaration. This Declaration is based on personal knowledge. I am submitting this Declaration on behalf of the Petitioners' opening brief in the above-captioned matter.

2. I have been a member of the Iowa Soybean Association ("Association") for 33 years. I am currently the Association's Chief Executive Officer. The Association is a non-profit, nonpartisan advocacy organization that represents the interests of the state's soybean industry.

3. Bio-based diesel is produced in the United States and can either be blended with traditional petroleum diesel or used as a direct substitution. Engines

burning bio-based diesel can emit fewer pollutants than engines burning petroleum diesel, and compared to petroleum diesel, bio-based diesel reduces carbon dioxide emissions on average by 74% when considering the entire lifecycle.

4. Most of the bio-based diesel in the United States is made from soybean oil, and around 30% of the soybean oil produced in the United States is used to produce bio-based diesel.

5. In March of 2022, EPA issued a Notice of Decision on its reconsideration of its previous withdrawal of a waiver for California's Advanced Clean Car Program, reinstating the waiver and allowing California to implement its light-duty vehicle greenhouse gas emission standards and zero emission vehicles requirements. Such programs are aimed at reducing the proportion of liquid fuels in California's transportation fuel mix.

6. The amount of bio-based diesel consumed in California has been steadily increasing since 2012, to up to over 400,000,000 gallons per quarter in recent years. In Quarter 1 of 2022, soy-based bio-based diesel comprised roughly 19% of all bio-based diesel consumed in California. *See* Figure 1.



**Figure 1.** California Air Resources Board, LCFS Data Dashboard, *available at* https://ww2.arb.ca.gov/resources/documents/lcfs-data-dashboard/.

7. Many of the states that will be adopting California's emissions standards under Section 177 of the Clean Air Act are also currently consuming large amounts of renewable fuels. Oregon, for example, has consumed almost 35,000,000 gallons of bio-based diesel and renewable diesel in Quarter 1 of 2022. *See* Figure 2.



**Figure 2.** Oregon Clean Fuels Program, Quarterly Data Summaries, *available at* https://www.oregon.gov/deq/ghgp/cfp/Pages/Quarterly-Data-Summaries.aspx.

8. California's greenhouse gas emissions standards and zero emission vehicle mandate will reduce the demand for all liquid fuels, including bio-based diesel, which will in turn reduce the demand for the feedstocks used to produce renewable fuels, such as soybeans.

9. A reduced demand for bio-based diesel would result in great economic harm to the Association's members, as it would undermine their ability to sell soybeans at a profit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

Date: October 24, 2022                    Respectfully submitted,

Kirk Leeds

*Chief Executive Officer for the Iowa Soybean Association*

4

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF OHIO, et al.,

        *Petitioner,*

    v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

        *Respondent.*

No. 22-1081 (and consolidated cases)

**DECLARATION OF LANE HOWARD OF MISSOURI CORN GROWERS ASSOCIATION IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Lane Howard, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1.    I am the Associate Director of Market Development of the Missouri Corn Growers Association, a nonprofit trade association based in Missouri with a membership of corn farmers, as well as their supporters and members of corn farming-related industries. We operate to promote the general commercial, legislative, and other common interests of our members.

2.    I am familiar with all aspects of the Association's work and with the market for corn and products, such as ethanol, that are made using the corn grown by our members.

1

3. Missouri is one of the nation's leading corn producing states, with a net production of around 550 million bushels of corn. The majority of this corn is used as a feedstock for ethanol production.

4. The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

5. Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline in part to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator. In California, over the last decade the use of ethanol has resulted in 26.9 metric tons of GHG emission savings.

6. The United States Environmental Protection Agency promulgated a final agency action entitled *California State Motor Vehicle Pollution Control*

*Standards; Advanced Clean Car Program; Reconsideration of a Previous With-drawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022) ("Waiver Restoration"). This decision purports to reinstate a waiver of Clean Air Act preemption to California (and, by extension, to some seventeen other states that have opted to copy California's regulations) to impose its own greenhouse gas emissions standards for new automobiles as well to impose a zero-emissions vehicle sales quota.

7.     As California explained in its original waiver request, California's regulations will reduce emissions through "'reductions in fuel production.'" 87 Fed. Reg. 14,364 (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16). Economic harm from these rules is not speculative. Indeed, California estimated "substantial reductions in demand for gasoline—exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030." Cal. Air Resources Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider the "LEV III" Amendments to the California Greenhouse Gas and Criteria Pollutant Exhaust Emission Standards* 201 (Dec. 7, 2011). By reducing total gasoline consumption, if gasoline remains at the current 10% ethanol blend level, ethanol demand destruction will also result.

8.     While these standards are in effect, they will drive down demand for ethanol, not only in California but also in states that have adopted California's

standards: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

9. This demand destruction harms the Missouri Corn Growers Association and its members by decreasing demand for the corn they grow, particularly in California and in states that have adopted California's standards. According to the U.S. Energy Information Administration, California consumes 10% of the nation's fuel ethanol supply, which is about seven times more than ethanol plants operating within the State can produce. *See* U.S. Energy Information Administration, *California State Energy Profile* (Oct. 20, 2022), https://www.eia.gov/state/print.php?sid=CA.

10. These financial harms affect our members and also redound to the Association itself, which will lose funding it uses to pursue its mission of advocating for the interests of its members.

11. These injuries would be substantially ameliorated if EPA's decision were set aside.

Dated: October 22, 2022

_____
Lane Howard

4

DocuSign Envelope ID: 71953570-0454-4809-98BE-BDA0199F457F

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF OHIO, ET AL.,

          Petitioners,

    v.

ENVIRONMENTAL PROTECTION AGENCY
AND MICHAEL S. REGAN, IN HIS OFFICIAL
CAPACITY AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION
AGENCY,

          Respondent,

ADVANCED ENERGY ECONOMY, ET AL.,

          Intervenors.

Case No. 22-1081
and consolidated
cases

## <u>DECLARATION OF ROCK ZIERMAN</u>

I, Rock Zierman, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Chief Executive Officer of the California Independent Petroleum Association ("CIPA"). CIPA is a member of the Domestic Energy Producers Alliance.

2. CIPA is a non-profit, non-partisan trade association representing approximately 300 independent crude oil and natural gas

1

producers, royalty owners, and service and supply companies operating in California. Our members represent approximately 70% of California's total crude oil production.

3.     Because there are no pipelines that carry the crude oil that is produced in California to locations outside of the State nor is there export capacity by waterborne vessels, 100% of the crude oil produced by our members is sold within California.

4.     I am generally familiar with California's standards regulating vehicular greenhouse-gas emissions and mandating zero-emission vehicles. I am also aware that earlier this year the federal government reinstated a waiver that permits the State to implement these standards.

5.     I understand that California's greenhouse-gas standards and zero-emission-vehicle mandate reduce the demand for fuel in California by requiring automakers to deliver vehicles for sale in California that are more fuel efficient, as well as a minimum percentage of zero-emission vehicles, such as electric vehicles, that do not run on conventional fuels.

6.     Reducing the demand for fuel harms CIPA financially. Drivers of low- and zero-emission vehicles have less of a need, or no need at all, to use liquid fuels. With more of those vehicles on the road, drivers

2

will soon demand less fuel, wholesalers and retail locations will need less fuel from refineries, and, in turn, refineries will purchase less crude oil from CIPA's members. In short, when the demand for fuel decreases in California, so does the demand for the crude oil our members produce.

7. Because the only consumers of our members' crude oil products are in California, a significant reduction in fuel sales in the State would significantly harm those members' bottom lines. Our members could not avoid financial harm by selling crude oil outside of California.

8. Nor could our members avoid financial harm by shifting their sales to producers of other products made from crude oil, such as plastics. As demand for liquid fuel decreases, the price of crude oil decreases and our members lose revenue because they must sell their crude oil at lower prices.

9. Financial harm to CIPA's members harms CIPA financially. Two-thirds of our budget comes from member dues and the other one-third comes from sponsorships from those same members. When our member businesses are hurting financially, CIPA collects less from those members in the form of dues and sponsorships.

DocuSign Envelope ID: 71953570-0454-4809-98BE-BDA0199F457F

10. For these reasons, the waiver allowing California to implement its greenhouse-gas emission standards and zero-emission-vehicle mandate harms CIPA financially.

Dated: October 21, 2022

DocuSigned by:

Rock Zierman

4002E862165A4D0...

Rock Zierman

4

DocuSign Envelope ID: 3F54B144-5A3F-46E5-B433-61DDB152D4E2

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF OHIO, ET AL., | |
| Petitioners, | |
| v. | |
| ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY, | Case No. 22-1081 and consolidated cases |
| Respondent, | |
| ADVANCED ENERGY ECONOMY, ET AL., | |
| Intervenors. | |

## DECLARATION OF SUSAN W. GRISSOM

I, Susan W. Grissom, declare under penalty of perjury that the following is true and correct, to the best of my knowledge:

1.    I am the Chief Industry Analyst for American Fuel & Petrochemical Manufacturers ("AFPM"), responsible for analyzing market and economic impacts of regulatory and statutory changes on the refining and petrochemical manufacturing industries. I have extensive experience analyzing and directing the analysis of energy markets.

2.    AFPM is a national trade association representing nearly all American refining and petrochemical companies. Our 25 refining company members own and operate 86% of U.S. domestic petroleum refining capacity. These companies provide jobs, contribute to economic and national security, and enable the production of products used by families and businesses throughout the United States.

3.    The refining industry supports nearly 1.8 million jobs in 42 States, plus the District of Columbia. In California, for example, the refining industry supports more than 81,000 jobs; contributes more than $28 billion to the State's economy, accounting for 1.0% of the State's GDP; generates $5.1 billion in state and local tax revenue; and generates another $222 million in federal tax revenue. All told, the refining industry contributes more than $305 billion to the United States economy.

4.    Earlier this year, EPA reinstated a Clean Air Act waiver for California's regulations limiting tailpipe $CO_2$ emissions and mandating zero-emission-vehicle sales. The $CO_2$ emission limits require the sale of vehicles that use less gasoline and diesel fuel. *See* 84 Fed. Reg. 51,310 51,315 (Sept. 27, 2019) ("[A]lmost all technologically feasible reduction of tailpipe emissions of carbon dioxide is achievable through improving the

2

fuel economy levels of the vehicles in question."); 83 Fed. Reg. 42,986, 43,236 (Aug. 24, 2018) ("Improving fuel economy is the only feasible method of achieving full compliance."). And the zero-emission-vehicle mandate requires the sale of vehicles that use no liquid fuel at all.

5. These regulations depress the demand for petroleum fuels in California and thereby harm AFPM's member companies—such as Marathon Oil, PBF Energy, Phillips 66, and Valero Energy—that operate refineries in California and produce petroleum fuels for sale in California. A refining company's bottom line depends on the market's demand for petroleum transportation fuel. AFPM's members suffer economic injury, therefore, when California imposes tailpipe $CO_2$ emission restrictions that result in vehicles using less fuel per mile or forces consumers to buy vehicles that do not operate on gasoline or diesel fuel.

6. These economic harms are not speculative. California itself estimated that its regulations would cause "substantial reductions in demand for gasoline—exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030." Cal. Air Resources Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to*

3

*Consider the "LEV III" Amendments to the California Greenhouse Gas and Criteria Pollutant Exhaust Emission Standards* 201 (Dec. 7, 2011).

7. Nor are the harms limited to California. Pursuant to Section 177 of the Clean Air Act, 17 other States—Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington—and the District of Columbia have adopted California's $CO_2$ emission restrictions and/or its zero-emission-vehicle mandate. As a result, the demand for gasoline and diesel fuel will be depressed not just in California, but in each of these States as well.

8. For example, in recently promulgating regulations adopting California's $CO_2$ emission restrictions and zero-emission-vehicle mandate, the Minnesota Pollution Control Agency estimated that the regulations would cause "a reduction of approximately 700 million gallons of gasoline purchased by Minnesotans" over the first 10 years of implementation. Minn. Pollution Control Agency, *Statement of Need and Reasonableness, Proposed Revisions to Minnesota Rules, chapter 7023, Adopting Vehicle Greenhouse Gas Emissions Standards* 65 (Dec. 2020). Similar demand depression undoubtedly occurs in the other Section 177 States.

4

9.    The reduced demand for gasoline and diesel fuels caused by California's waiver results in lost sales for AFPM member companies and requires them to expend resources changing feedstock and product slates, diverting fuel to other markets, and remedying supply-chain distortions.

10.    For these reasons, EPA's reinstatement of California's waiver financially injures AFPM's member companies that produce gasoline and diesel fuels for sale in California and the Section 177 States.

Dated: _____

10/21/2022

_____

Susan W. Grissom

DocuSign Envelope ID: CB2076D9-6D45-429E-A68D-4D0468F13F4C

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| STATE OF OHIO, ET AL., | |
| Petitioners, | |
| v. | |
| ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY, | Case No. 22-1081 and consolidated cases |
| Respondent, | |
| ADVANCED ENERGY ECONOMY, ET AL., | |
| Intervenors. | |

**<u>DECLARATION OF TRECIA CANTY</u>**

I, Trecia Canty, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Senior Vice President, General Counsel and Secretary for PBF Energy ("PBF"). PBF is a member of the American Fuel and Petrochemical Manufacturers.

2. PBF currently owns and operates six oil refineries and related assets in the United States with a combined processing capacity of

1

approximately 1,000,000 barrels per day, two of which are located in California. PBF acquired its first California refinery located in Torrance, California in 2016 and it has a nameplate crude capacity of 166,000 barrels per day ("Torrance Refinery"). Our newest refinery, located in Martinez, California ("Martinez Refinery"), was acquired by PBF in 2020 and has a nameplate crude capacity of 157,000 barrels per day.

3. The Torrance Refinery and the Martinez Refinery each produce liquid transportation fuels, such as diesel and gasoline, that are primarily sold within the State of California.

4. I am generally familiar with the State of California's standards regulating vehicular greenhouse-gas emissions and mandating zero-emission vehicles. I am also aware that earlier this year the federal government reinstated a waiver that permits the State to implement these standards.

5. I understand that California's greenhouse-gas standards and zero-emission-vehicle mandate will reduce the demand for fuel in California by, among other things, requiring a minimum percentage of zero-emission vehicles, such as electric vehicles, that do not run on conventional fuels.

2

6. Drivers of low- and zero-emission vehicles have less of a need, or no need at all, to use the fuels we produce at the Torrance Refinery and the Martinez Refinery. The mandate requiring more low-and zero-emission vehicles on the road will result in drivers in California purchasing less fuel and, in turn, the wholesalers and retail locations that we supply in California will purchase less fuel from PBF, resulting in financial harm to our company.

7. Because the primary consumers of the products produced by the Torrance Refinery and the Martinez Refinery are in California, a reduction in fuel sales within California would directly harm the economic viability of those operations which would, in turn, adversely impact the company's financial position.

8. PBF could not avoid financial harm by selling more of its gasoline, diesel and other products outside of California. To the extent that the company would be able to sell those products outside of California, it would not be able to do so without incurring significant additional costs that it does not incur today, including operational, transportation and storage costs.

DocuSign Envelope ID: CB2076D9-6D45-429E-A68D-4D0468F13F4C

9. For these reasons, the waiver allowing California to implement its greenhouse-gas emission standards and zero-emission-vehicle mandate harms PBF financially.

Dated: 10/21/2022

DocuSigned by:

*Trecia Canty*

9DA86422FC944EA...

Trecia Canty

**IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

STATE OF OHIO, et al.,

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondent.*

No. 22-1081 (and consolidated cases)

**DECLARATION OF TREVOR HINZ OF ICM, INC. IN SUPPORT OF PETITIONERS' OPENING BRIEF**

I, Trevor Hinz, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the Director of Government and Industry Relations of ICM, Inc. ("ICM"), a Kansas corporation that is a global leader in developing biorefining capabilities, especially for the production of ethanol. Plants using ICM technology collectively produce 8.8 billion gallons annually. No other company serves more ethanol producers in the world. For over 25 years, we have been advancing the biofuel industry, protecting the environment, while helping American farmers and businesses enrich their communities and drive value back into U.S. agriculture. Today we offer a range of products and services designed to maximize productivi-

1

ty, diversify revenue, and yield valuable feed co-products.

2.     I am familiar with all aspects of ICM's work and with the market for ethanol that is produced by our customers and service clients.

3.     The ethanol industry supports over 400,000 jobs in more than 25 states. Ethanol contributes more than $52 billion to the national GDP and profitably processed more than 5.1 billion bushels of corn in 2021.

4.     Ethanol is the second-largest component of the fuel that powers the United States' vehicle fleet. Ethanol provides a low carbon source of energy and octane rating—the measure of a fuel to resist "knocking" in an engine—reducing vehicles' fuel usage, net greenhouse gas emissions, and the emission of toxic chemicals such as benzene. Across most of the United States, refiners add 10% ethanol to gasoline to raise its octane rating to a level suitable for use in most vehicles. In 2021 alone the use of ethanol reduced greenhouse gas emissions by more than 50 million metric tons, equivalent to the savings of turning off 126 natural gas-fired power plants. *See* EPA, *Greenhouse Gas Equivalencies Calculator* (Oct. 11, 2022), https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator. In California, over the last decade the use of ethanol has resulted in 26.9 metric tons of GHG emission savings.

5.     The United States Environmental Protection Agency took a final agency action entitled *California State Motor Vehicle Pollution Control Standards;*

*Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022) ("Waiver Restoration"). This decision purports to reinstate a waiver of Clean Air Act preemption to California (and, by extension, to some seventeen other states that have opted to copy California's regulations) to impose its own greenhouse gas emissions standards for new automobiles as well to impose a zero-emissions vehicle sales quota.

6. As California explained in its original waiver request, California's regulations will reduce emissions through "'reductions in fuel production.'" 87 Fed. Reg. 14,364 (quoting 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 at 16). Economic harm from these rules is not speculative. Indeed, California estimated "substantial reductions in demand for gasoline—exceeding $1 billion beginning in 2020 and increasing to over $10 billion in 2030." Cal. Air Resources Bd., *Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider the "LEV III" Amendments to the California Greenhouse Gas and Criteria Pollutant Exhaust Emission Standards* 201 (Dec. 7, 2011). By reducing total gasoline consumption, if gasoline remains at the current 10% ethanol blend level, ethanol demand destruction will also result.

7. While these standards are in effect, they will drive down demand for ethanol, not only in California but also in states that have adopted California's

3

standards: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Nevada, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and the District of Columbia.

8.    Because ICM provides the technology and services necessary for the production of ethanol, a decrease in ethanol demand necessarily means a destruction in demand of our technologies and services. Thus, California's standards act to the financial detriment of ICM as well as other ethanol producers and stakeholders.

9.    These injuries would be substantially ameliorated if EPA's decision were set aside.


Dated: October 24, 2022

Trevor Hinz

4

DocuSign Envelope ID: 9B05A75A-13E8-445E-A53D-F4990EBB8379

**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| |
|---|
| STATE OF OHIO, ET AL., |
| |
|                     Petitioners, |
| |
|      v. |
| |
| ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S. ENVIRONMENTAL PROTECTION AGENCY, |
| |
|                     Respondent, |
| |
| ADVANCED ENERGY ECONOMY, ET AL., |
| |
|                     Intervenors. |

Case No. 22-1081 and consolidated cases

## <u>DECLARATION OF VARISH GOYAL</u>

I, Varish Goyal, declare under penalty of perjury that the following is true and correct to the best of my knowledge:

1. I am the CEO of Au Energy, a family-owned and operated business located in California. Au Energy is a member of the National Association of Convenience Stores.

2. Au Energy owns and operates 135 retail convenience stores under various brand names. All of our stores sell gasoline. These stores

1

are all located in California, primarily in the Bay Area but also throughout Southern California. Au Energy does not do business outside of California.

3. In 2021, 89% of Au Energy's total revenue came from fuel sales. The remaining 11% came from convenience store sales and our car washes. Across our stores, we sell between 250 and 300 million gallons of fuel per year.

4. I am generally familiar with California's standards regulating vehicular greenhouse-gas emissions and mandating zero-emission vehicles. I am also aware that earlier this year the federal government reinstated a waiver that permits the State to implement these standards.

5. I understand that California's greenhouse-gas standards and zero-emission-vehicle mandate reduce the demand for fuel in California by requiring automakers to deliver vehicles for sale in California that are more fuel efficient, as well as a minimum percentage of zero-emission vehicles, such as electric vehicles, that do not run on conventional fuels.

6. Reducing the demand for fuel harms Au Energy financially. Drivers of low- and zero-emission vehicles have less of a need, or no need

DocuSign Envelope ID: 9B05A75A-13E8-445E-A53D-F4990EBB8379

at all, to stop at our gas stations to refuel. As a result, our locations that offer fueling sell less fuel, directly harming Au Energy's bottom line.

7. In addition, because customers come through our stores and make retail purchases primarily when they stop to refuel, our retail sales at our convenience stores suffer when drivers refuel less often. For the same reason, our car-wash revenue will decrease as fewer customers stop to refuel.

8. Because so much of Au Energy's revenue derives from fuel sales, a significant reduction in fuel sales would force Au Energy to downsize significantly, including by reducing its workforce of 1,500 employees.

9. Although Au Energy is in the process of installing an electric-vehicle charging site at one of its locations, revenue from this site or others we may install in the future cannot replace our lost revenue from fuel and retail sales. Because most electric-vehicle drivers are able to recharge at home or at work, I expect these charging sites to service very few cars per day. Au Energy also leases land to another company to operate hydrogen fueling stations at seven of our locations. Because demand for hydrogen fuel is very low, these stations service only about 40

3

DocuSign Envelope ID: 9B05A75A-13E8-445E-A53D-F4990EBB8379

cars per day, and revenue from hydrogen fueling also cannot replace the revenue Au Energy will lose from reduced fuel and retail sales.

10. For these reasons, the waiver allowing California to implement its greenhouse-gas emission standards and zero-emission-vehicle mandate harms Au Energy financially.

Dated: 10/18/2022

DocuSigned by:

Varish Goyal

DF941EBB5F94488...

Varish Goyal

4