ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1081

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF OHIO, STATE OF ALABAMA, STATE OF ARKANSAS, STATE
OF GEORGIA, STATE OF INDIANA, STATE OF KANSAS, STATE OF
KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF
MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF
OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF TEXAS, STATE
OF UTAH and STATE OF WEST VIRGINIA,
*Petitioners*,

*v.*

U.S. ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN, in his official capacity as Administrator of the
U.S. Environmental Protection Agency,
*Respondents*.

_____

On Petition for Review of a Final Agency Action of
the U.S. Environmental Protection Agency

_____

**BRIEF OF AMICUS CURIAE WESTERN STATES TRUCKING
ASSOCIATION, INC. IN SUPPORT OF
PETITIONERS STATE OF OHIO, ET AL.**

THEODORE HADZI-ANTICH
ROBERT HENNEKE
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Telephone: (512) 472-2700
Facsimile: (512) 472-2728

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

A.    **Parties and Amici.** All parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioners.

B.    **Ruling Under Review.**   An accurate reference to the ruling under review at issue appears in the Brief for Petitioners.

C.    **Related Cases.**    The only related cases of which counsel are aware are identified in the Brief of Petitioners.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH

**DISCLOUSRE STATEMENT PURSUANT TO CIRCUIT RULE 26.1**

Western States Trucking Association, Inc. ("WSTA") is a nonprofit California trade association representing the interests of thousands of members involved in a variety of businesses throughout California and in several other states. WSTA has no parent companies. No publicly traded corporation has a 10% or greater ownership in WSTA.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH

## STATEMENT REGARDING CONSENT TO FILE

Amicus filed its intent to participate as *amicus curiae* on October 21, 2022, after contacting all parties to this suit on October 12, 2022. As of October 27, 2022, the following parties have consented to this filing:

- State of Ohio, State of Alabama, State of Arkansas, State of Georgia, State of Indiana, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah, State of West Virginia (22-1081 Petitioners)

- Competitive Enterprise Institute, Domestic Energy Producers Alliance, Anthony Kreucher, Walter M. Kreucher, James Leedy and Marc Scribner (22-1032 Petitioners)

- Iowa Soybean Association, The Minnesota Soybean Growers Association, South Dakota Soybean Association, Diamond Alternative Energy, LLC (22-1083 Petitioners)

- American Fuel & Petrochemical Manufacturers, Domestic Energy Producers Alliance, Energy Marketers of America, National Association of Convenience Stores (22-1084 Petitioners)

- Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Kansas Corn Growers Association, Michigan Corn Growers

Association, Missouri Corn Growers Association, and Valero Renewable Fuels Company, LLC (22-1085 Petitioners)

- Environmental Protection Agency, Michael S. Regan (Respondents)

- Commonwealth of Massachusetts, Commonwealth of Pennsylvania, District of Columbia, State of California, State of Colorado, State of Connecticut, State of Delaware, State of Hawaii, State of Illinois, State of Maine, State of Maryland, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of New York, State of North Carolina, State of Oregon, State of Rhode Island, State of Vermont, State of Washington (State Respondent-Intervenors)

- Center for Biological Diversity, Clean Air Council, Conservation Law Foundation, Environmental Defense Fund, Environmental Law & Policy Center, National Parks Conservation Association, Natural Resources Defense Council, Public Citizen, Sierra Club, and Union of Concerned Scientists (NGO Respondent-Intervenors)

- American Honda Motor Co., Inc., BMW of North America, LLC, Ford Motor Company, Volkswagen Group of America, Inc., Volvo Car USA LLC (Auto Manufacturer Respondent-Intervenors)

- National Coalition for Advanced Transportation (Transport Respondent-Intervenors)

- Advanced Energy Economy, Calpine Corporation, National Grid USA, New York Power Authority, Power Companies Climate Coalition (Energy Respondent-Intervenors)

The following parties have not yet responded:

- City of Los Angeles, City of New York (Municipal Respondent-Intervenors)

/s/Theodore Hadzi-Antich
THEODORE HADZI-ANTICH

# CERTIFICATE REGARDING SEPARATE AMICUS BRIEF

Pursuant to Circuit Rule 29(d), amicus certifies that a separate brief is necessary to provide the unique perspective of the trucking industry in California on the issue of the mandated legal standard by which the United States Environmental Protection Agency reviews California requests for waivers from federal preemption for mobile source emissions standards under the Clean Air Act.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH

# GLOSSARY OF ABBREVIATIONS

APA ............................................................... Administrative Procedure Act

CAA ..................................................................................... Clean Air Act

CARB ..................................................... California Air Resources Board

EPA ..................................................... Environmental Protection Agency

WSTA ..................................... Western States Trucking Association, Inc.

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, & RELATED CASES ....................... ii

DISCLOSURE STATEMENT PURSUANT TO CIRCUIT RULE 26.1 .............. iii

STATEMENT REGARDING CONSENT TO FILE AND SEPARATE BRIEFING ................................................................................................. iv

CERTIFICATE REGARDING SEPARATE AMICUS BRIEF ........................... vii

GLOSSARY OF ABBREVIATIONS ................................................. viii

TABLE OF AUTHORITIES .......................................................... xi

IDENTITY AND INTEREST OF *AMICUS* ........................................ xiv

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ....... xv

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

ARGUMENT .............................................................................. 1

I.   EPA'S REINTERPRETATION OF SECTION 209(b)(1)(B) IS CONSTITUTIONALLY IMPERMISSIBLE AND INCONSISTENT WITH THE AMENDMENT HISTORY OF THE CLEAN AIR ACT ..................................................................... 1

     A.   The Clean Air Act Strikes A Delicate Constitutional Balance Between Mobile Source Emissions Controls and Interstate Commerce, Limiting EPA's Authority to Grant Waivers to California ...................................................................... 2

     B.   The Amendment History of Section 209(b)(1)(B) Drives the Conclusion That the "Needs" Test Must Be Applied on a Standard-By-Standard Basis ......................................... 7

          1.   The Air Quality Act of 1967 .................................... 7

          2.   The Clean Air Act Amendments of 1977 ................... 9

3. The Clean Air Act Amendments of 1990 ................................12

II. THE PLAIN MEANING OF THE STATUTORY TEXT REQUIRES EPA TO CONSIDER EACH STANDARD INDIVIDUALLY UNDER THE NEEDS TEST ..........................................13

A. EPA's Reinterpretation of the Term "Standards" As Used in Sections 209(b)(1)(B) Is Contrary to the Plain Meaning of the Statutory Text .........................................................................13

1. The term "standards" is not the textual equivalent of "standards, in the aggregate" ......................................13

2. If, as EPA contends, the term "standards" means the same as the term "standards, in the aggregate," then the statute's "in the aggregate" language is surplusage ..................18

3. The rule of the last antecedent prevents the term "in the aggregate" from modifying the term "such California standards" ..............................................................22

B. The Statutory Function and Operation of the Waiver Provision Indicates that Each Wavier Application Must be Evaluated Individually ......................................................................23

C. "Standards" in the Plural Is of No Significance in the Context of the Clean Air Act ..............................................................24

CONCLUSION ...................................................................................27

CERTIFICATE OF COMPLIANCE .......................................................29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF AUTHORITIES

*Cases:*

*Adamo Wrecking Co. v. United States*,
    434 U.S. 275 (1978).......................................................................6

*Ali v. Fed. Bureau of Prisons*,
    522 U.S. 214 (2008)..............................................................19, 21

*Barnhart v. Thomas*,
    540 U.S. 20 (2003)......................................................................22

*Bates v. United States*,
    522 U.S. 23 (1997).................................................................15, 21

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*,
    563 F. Supp. 2d 1158 (E.D. Cal. 2008) ......................................17

*Dolan v. Postal Service*,
    546 U.S. 481 (2006)..............................................................25, 26

*Duncan v. Walker*,
    533 U.S. 167 (2001)....................................................................18

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
    541 U.S. 246 (2004)......................................................................6

*Engine Mfrs. Ass'n v. United States EPA*,
    88 F.3d 1075 (D.C. Cir. 1996)...............................................3, 4, 6

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    120 S. Ct. 1291 (U.S. 2000) ........................................5, 19, 25, 26

*Ford Motor Co. v. Envtl. Protec. Agency*,
    606 F.2d 1293 (D.C. Cir. 1979)..................................................20

*FTC v. Mandel Brothers, Inc.*,
    359 U.S. 385 (1959).............................................................21, 24

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995).................................................................21, 24

*King v. St. Vincent's Hospital*,
    502 U.S. 215 (1991).................................................................24, 25

*Lockhart v. US*,
    136 S. Ct. 958 (2015)......................................................................22

*\*Motor and Equip. Mfrs. Ass'n, Inc. v. Environmental Protection Agency*,
    627 F.2d 1095 (D.C. Cir. 1979).....................................2, 3, 6, 9, 17

*Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. New York State
    Dep't of Envtl. Conservation*,
    17 F.3d 521 (2d Cir. 1994) .......................................................4, 19

*N.W. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009)........................................................................3, 4

*Resolution Trust Corp. v. Bayside Developers*,
    43 F.3d 1230 (9th Cir. 1995) .......................................................17

*Russello v. United States*,
    464 U.S. 16 (1983)............................................................................21

*United States v. Louisiana*,
    363 U.S. 1 (1960)................................................................................5

*U.S. v. Mensache*,
    348 U.S. 528 (1955)........................................................................18

*Util. Air Reg. Group v. E.P.A.*,
    134 S. Ct. 2427 ..................................................................................5

**Statutes and Other Authorities:**

1 U.S.C. § 1 ...............................................................................24, 27

42 U.S.C. § 7521(j)(1) ....................................................................26

42 U.S.C. § 7543(e)(2)(B) ...........................................................................26

42 U.S.C. § 7583(d) ....................................................................................26

74 Fed. Reg. ................................................................................................21

87 Fed. Reg. 14332 (March 14, 2022) ...........................................1, 5, 23

Pub. L. No. 89-272, 79 Stat. 992 (Oct. 20, 1965)....................................7

Pub. L. No. 90-148, 81 Stat. 485 (Nov. 21, 1967)..............................8, 19

Pub. L. No. 95-95, 91 Stat. 685 (Aug. 7, 1977)....................................10

H.R. Rep. No. 194, 95th Cong. 1st Sess. 302 (1977) ...........................11

Senate Report on Air Quality of 1967, S. Rep. No. 403,
    90th Cong., 1st Sess. 32 (1967) ...........................................6, 9, 25

## IDENTITY AND INTEREST OF *AMICUS*

WSTA is a nonprofit California trade association representing the interests of thousands of members involved in a variety of businesses throughout California and in several other states. WSTA has a keen interest in this case, which centers on the Environmental Protection Agency's ("EPA's") new interpretation of Clean Air Act's provisions governing federal preemption of mobile source emissions standards and the criteria for waivers from such preemption standards applicable to California.

EPA's new interpretation, which is constitutionally impermissible and contrary to the plain text and amendment history of the CAA, directly injures WSTA's members because it makes it substantially easier for EPA to grant California waiver applications for mobile source emissions standards that are more stringent than the corresponding federal standards, thereby subjecting WSTA's members to expensive retrofitting requirements for their trucks each time EPA grants such a waiver application. This will be economically devastating to the owners and operators of California-based trucks. WSTA seeks to participate as amicus in order to inform the Court of those adverse economic impacts and to provide argument regarding the manner in which EPA's new interpretation is constitutionally impermissible, contrary to the plain text of the Clean Air Act, and inconsistent with its legislative amendment history.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No party's counsel authored this brief in whole or in part. Nor did any party or party's counsel, or any other person other than amicus, contribute money that was intended to fund preparing or submitting this brief.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH

**INTRODUCTION AND SUMMARY OF ARGUMENT**

EPA's Rule at issue here, *California State Motor Vehicle Pollution Control Standards, Advance Clean Car Program, Reconsideration of a Previous Withdrawal of a Waiver Preemption; Notice of Decision*, 87 Fed. Reg. 14332 (March 14, 2022) (the "Advance Clean Car Reconsideration"), is a substantive retraction of a previous withdrawal of a California waiver grant issued by EPA under Section 209(b)(1)(B) of the Clean Air Act ("CAA" or the "Act") and at the same time is a final interpretive rule of Section 209(b)(1)(B) that rescinds EPA's prior interpretation (the "SAFE 1 Rule"). EPA's new interpretation is (1) constitutionally impermissible, (2) inconsistent with the CAA's amendment history, and (3) contrary to the plain meaning of the Act.

**ARGUMENT**

**I.  EPA'S REINTERPRETATION OF SECTION 209(b)(1)(B) IS CONSTITUTIONALLY IMPERMISSBLE AND INCONSISTENT WITH THE AMENDMENT HISTORY OF THE CLEAN AIR ACT.**

By singling out California for special treatment, the California wavier provision of the Clean Air Act departs from the fundamental constitutional principle of equal sovereignty among states, requiring that the waiver provision be interpreted so as to minimize the disparate treatment. Furthermore, with an understanding of the Congressional policy decisions underlying the statutory text, a close reading of the provision's language reveals that EPA's interpretation violates both the rule

against surplusage and the doctrine of last antecedent, while at the same time impermissibly conflating two distinct decision making criteria that Congress intended to function independently of each other.

A.     **The Clean Air Act Strikes A Delicate Constitutional Balance Between Mobile Source Emissions Controls and Interstate Commerce, Limiting EPA's Authority to Grant Waivers to California.**

The CAA was enacted by Congress to protect human health and welfare from the adverse impacts of air emissions. *Motor and Equip. Mfrs. Ass'n, Inc. v. Environmental Protection Agency*, 627 F.2d 1095, 1118 n. 47 (D.C. Cir. 1979) ("*MEMA I*"). At the same time, by preempting state regulation of emissions from mobile sources, the Act requires EPA to establish uniform, national emissions controls for such sources, to ensure that interstate commerce is not unduly burdened as a result of potentially conflicting state emissions standards. *Id*. at 1109. California is provided with a special dispensation in the statutory scheme due to its geography and topography, which can trap emissions in certain localities. *See* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (committee recognized California's "unique problems" with regard to localized air pollution). Thus, with regard to mobile source emissions controls in California, Congress made a policy judgment to strike a balance between the interests of health protection and interstate commerce.

The key statutory text is set forth in Section 209(b)(1)(B), which provides that EPA may authorize California to adopt standards for engines and vehicles, but that

"no such authorization shall be granted if [EPA] finds that . . . California does not need such California standards to meet compelling and extraordinary circumstances." Importantly, California must apply for waivers from federal mobile source standards on a case-by-case basis. *MEMA I,* 627 F.2d at 1111; *Engine Mfrs. Ass'n v. United States EPA*, 88 F.3d 1075, 1090 (D.C. Cir. 1996).

To avoid constitutional issues, statutes that treat one state or jurisdiction differently from others are construed so as to minimize the differences in treatment. "[A] departure from the fundamental principle of equal sovereignty [among the states] requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem it targets." *N.W. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). In *N.W. Austin*, the Supreme Court was asked to determine whether the bailout provision of the Voting Rights Act applied to a certain municipal entity seeking protection. The Court refused to defer to the federal government's interpretation, noting that the Voting Rights Act created a constitutional tension by treating some states differently from others, and that, accordingly, the statute should be read to avoid such tension, to the extent possible. The Court concluded that the government's interpretation did not adequately address the constitutional tension. *Id*. at 206-11. In reaching its decision, the Court looked carefully at the statutory text of Section 4(b), as well as its statutory history—

particularly the history of that section's amendments.  *Id*. at 210.  ("[A]fter the 1982 amendments, the government's position is untenable.")

As in *N.W. Austin,* the waiver provisions at issue create a constitutional anomaly, whereby one state, California, is treated differently than the others under the CAA's mobile source provisions.  California's special position harms other states in two ways: (1) it gives California an outsize role in determining future federal emission regimes since it is the only state that can act as a laboratory; and (2) differing emissions standards harm the flow of interstate commerce by limiting the degree to which (a) existing vehicles can move interstate into California without first complying with California's distinct requirements and (b) engine manufacturers can build to one national standard.  *See Engine Mfrs. Ass'n*, 88 F.3d at 1079 (stating that federal preemption necessary because motor vehicles "readily move across state boundaries," and subjecting them to potentially 50 different sets of state emissions requirements raises the specter of "an anarchic patchwork" of regulation that could threaten both interstate commerce and the automobile manufacturing industry); *See also, Motor Vehicles Mfrs. Ass'n of the United States, Inc. v. New York State Dep't of Envtl. Conservation*, 17 F.3d 521, 526 (2d Cir. 1994) (federal preemption of state motor vehicle emissions standards is "cornerstone" of Title II of the CAA).  The waiver provision cuts across the grain of federal preemption by allowing California to impact interstate commerce in a unique way not available to other states.  Such

impacts on interstate commerce can have substantial economic and political significance.

Congress would not leave the implementation and interpretation of such an important cornerstone statutory provision solely, or even substantially, to agency discretion. *See Util. Air Reg. Group v. E.P.A.*, 134 S. Ct. 2427, 2444 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance."); *see also, Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 120 S. Ct. 1291, 1315 (U.S. 2000) ("[I]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion."). This Court should ensure that EPA's interpretation of the waiver provisions does not disturb the delicate balance Congress established between the needs of all states in the free flow of interstate commerce against the needs of one particular state, California, in protecting the health and welfare of its residents. *See United States v. Louisiana,* 363 U.S. 1, 16 (1960) (referring to the historic tradition that states enjoy "equal sovereignty").

EPA takes the position that California's "need" for any particular emissions standards refers not to the need for the specific standards for which a waiver application is made, but rather, to the need for California to have its own motor vehicle air emissions program "as a whole." *See* 87 Fed. Reg. at 14333, 14350,

14353, 14355. That broad interpretation is at odds with the "equal sovereignty" principle articulated in *N.W. Austin* and *Louisiana*, as well as the "clear statement" principle articulated in *Util. Air Reg. Group* and *Brown & Williamson*. It is also contrary to the actual language and plain meaning of the statute and its amendment history.

Section 209(b)(1)(B) mandates that the EPA withhold its approval of waiver applications if California does not need particular air emission standards to meet "compelling and extraordinary conditions" in the state. "Congress intended the word 'standards' in section 209 to mean quantitative levels of emissions." *MEMA I*, 627 F.2d at 1112-13 (citing Senate Report on Air Quality of 1967, S. Rep. No. 403, 90th Cong., 1st Sess. 32 (1967)). There is no indication in the legislative or amendment history that by using the term "standards" Congress really meant "mobile source program as a whole." As stated by the Supreme Court with specific reference to Section 209 of the Clean Air Act, "a standard is a standard" and not something else.[1] *Engine Mfrs. Ass'n. v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 254 (2004). The origin, evolution, and current form of Section 209(b)(1)(B) is crucial to the issue of how far EPA should be permitted to bend the actual statutory text.

---

[1] The Supreme Court has construed the term "standards" as used in Section 209 to "denote . . . numerical emissions levels with which vehicles or engines must comply." *Engine Mfrs.*, 541 U.S. at 254. *See Adamo Wrecking Co. v. United States*, 434 U.S. 275, 286 (1978) ("standard" means a quantifiable level of emissions to be attained by the use of techniques, controls, and technology).

**B.    The Amendment History of Section 209(b)(1)(B) Drives the Conclusion That the "Needs" Test Must Be Applied on a Standard-By-Standard Basis.**

An understanding of the policy choices Congress made in enacting the current version of the waiver provision is essential to understanding the statutory language.

### 1.    The Air Quality Act of 1967

The original Clean Air Act did not contain a preemption provision for motor vehicles.  *See* Pub. L. No. 89-272, 79 Stat. 992 (Oct. 20, 1965).  In 1967, Congress enacted the "Air Quality Act of 1967," which amended the Clean Air Act so as to include: (1) a provision explicitly preempting state emission standards for new motor vehicles, (2) a recognition that California had certain "compelling and extraordinary" conditions that could require the state to promulgate new motor vehicle emissions standards that differed from the federal ones, and (3) a provision authorizing California to request waivers from federal preemption on a case-by-case basis when California could make a showing that it needed a particular emission standard to meet its "compelling and extraordinary conditions."  In relevant part, the text of then-Section 208 reads:

> (a)    No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this title. . . .

> (b)    The Secretary shall, after notice and opportunity for public hearing, waive application of this section *to any State which has adopted standards* (other than crankcase emission

> standards), *for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966,* unless he finds that such State does not require standards *more stringent than applicable Federal standards* to meet *compelling and extraordinary conditions*, or that such State standards and accompanying enforcement procedures are not consistent with section 202(a) of this title.

Pub. L. No. 90-148, 81 Stat. 485 (Nov. 21, 1967). (Emphasis added). The only state that had new motor vehicle standards in place prior to March 30, 1966, was California.

Thus, from its beginning, the waiver provision applied solely to specific "standards" that California may require based on compelling and extraordinary conditions in the state. Congress authorized EPA's predecessor to grant waivers from federal preemption but only when EPA found that California required "standards more stringent than applicable Federal standards." Had Congress wanted to apply the waiver provision to California's need for a separate motor vehicles emissions program as a whole, it could have used the term "program" rather than the term "standards" in the amendments, but it did not. Rather, Congress made the policy determination that, because of California's "extraordinary and compelling conditions," California could have the option of promulgating its own motor vehicle emissions standards on a case-by-case basis. Having made that overarching policy decision, Congress delegated to EPA's predecessor the authority to determine

whether California requires or, more precisely, "does not require" the particular emissions standards for which waiver from federal preemption is sought.

In the 1967 amendments, Congress recognized that California's conditions are "sufficiently different from the Nation as a whole to justify standards . . . [that] *may, from time to time*, need to be more stringent than national standards." S. Rep. No. 90-403 at 33 (1967) (emphasis added). Thus, Congress intended that "from time to time" California could submit waiver applications based on "compelling and extraordinary circumstances" that "may . . . need to be more stringent than national standards" and that EPA would deny such periodic waiver applications if it found that California "does not require" any particular standards for which a waiver application is made.

## 2. The Clean Air Act Amendments of 1977

Ten years after the 1967 preemption provision was enacted, the "more stringent" requirement proved unworkable, because the same technologies that would reduce some emissions would also increase others. To deal with this technological anomaly, in 1977 Congress replaced the requirement that *each* standard be more stringent with the more flexible "Protectiveness Test," and at the same time counterbalanced that test by adding a separate "Needs Test" that addresses the national interest in the free flow of interstate commerce. *MEMA I,* 627 F.2d 1095, 1110 (D.C. Cir. 1979).

In relevant part, the 1977 Amendments to the waiver provision set forth in Section 209(b)(1)(B) reads:

> (1) The Administrator shall . . . waive application of this section to any State which has adopted standards . . . for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, *in the aggregate, at least as protective of public health and welfare* as applicable Federal standards. *No such waiver shall be granted* if the Administrator finds that . . . (B) such State does *not need* such State standards to meet *compelling and extraordinary condition* . . . .

Clean Air Act Amendments of 1977, § 207, Pub. L. No. 95-95, 91 Stat. 685 (Aug. 7, 1977) (emphasis added). Thus, the 1977 Amendments did away with the 1967 requirement that each California standard be "more stringent" than the corresponding federal standard and created *two* separate tests with differing purposes: (a) the Protectiveness Test, which is designed to ensure California has the ability to adequately protect its residents' health; and (b) the Needs Test, which is designed to ensure that California's mobile source emission regime does not unnecessarily burden interstate commerce.

To meet the Protectiveness Test under the 1977 amendments, the waiver application need only show that California has made a determination that its mobile source emissions standards "in the aggregate" will be as protective of health and welfare as applicable federal standards. Once EPA satisfies itself that California has in fact made such a determination, EPA's inquiry stops under the Protectiveness

Test. On the other hand, under the Needs Test EPA is prohibited from approving the waiver application if California "does not need" such standards. Accordingly, California is required to affirmatively demonstrate to EPA that it needs the preferred state-specific standards to meet "compelling and extraordinary conditions." Thus, Congress provided California substantial latitude with respect to guarding its own citizens' health while limiting its ability to adopt standards that would burden interstate commerce without an explicit showing of "compelling and extraordinary conditions" necessitating the standards for which a waiver is sought. Significantly, in describing the change made in the waiver provision in 1977, the House Report observes that California may need to have specific "quantitative" standards that differ from the federal ones. H.R. Rep. No. 294, 95th Cong. 1st Sess. 302 (1977). As set forth in more detail in Section II, *infra,* there is no indication that, by using the term "standards," Congress intended to delegate to EPA the authority to determine whether California needed its own "program," as Congress itself had already made that policy decision.

Thus, the Protectiveness Test applies to the issue of whether the California standards "in the aggregate" are at least as protective of human health and the environment as the federal standards are in the aggregate. The separate Needs Test focuses on whether California needs the *particular* standards for which waiver is sought, based upon "compelling and extraordinary conditions" in the state.

### 3. The Clean Air Act Amendments of 1990

By its own terms, Section 209(b) is limited to new motor vehicles and engines used on roads. In 1990 that the Clean Air Act was amended to cover nonroad vehicles and engines, both new and existing, in a new Subsection 209(e), incorporating the same standard for waivers from federal preemption for nonroad vehicles and engines. "Under the new act, as under current law, States with nonattainment areas may adopt California vehicle *emissions performance standards if a waiver has been granted under section 209 for those standards*." Extended Remarks of Mr. Symms on Passage of S. 1630, Nov. 2, 1990, 6 Environment and Natural Resources Policy Division, Library of Congress, A Legislative History of the Clean Air Act Amendments of 1990, 10726 (1998) (Emphasis added). Again, waiver grants apply to "those standards" for which a waiver application is made.

In sum, the amendment history of the Clean Air Act's California waiver provisions shows that Congress intended the Needs Test set forth in Sections 209(b)(1)(B) (for on-road vehicles) and 209(e)(2)(A)(ii) (for nonroad vehicles) to apply to whether there was a need for the particular quantitative emissions standards for which a waiver application is made. On the other hand, the Protectiveness Test focuses on whether California's standards are as stringent as EPA's standards "in the aggregate." While EPA tries to conflate the two tests, in fact each test addresses a different issue and sets forth different criteria.

## II. THE PLAIN MEANING OF THE STATUTORY TEXT REQUIRES EPA TO CONSIDER EACH STANDARD INDIVIDUALLY UNDER THE NEEDS TEST

With an understanding of the policy decisions Congress made in amending the waiver provisions in 1977 and 1990, it is evident that EPA's reinterpretation of the term "standards" in the Needs Test is unsupportable, given a careful reading of the statutory text and applying traditional cannons of statutory construction. EPA's reinterpretation is impermissible because (1) it renders the "in the aggregate" language of the 1977 amendments redundant and (2) contradicts the rule of the last antecedent, which holds that a limiting phrase should only be read as modifying the noun or phrase it directly follows. Applying those traditional rules of construction to the statutory text results in the term "in the aggregate" modifying "standards" *only* in the Protectiveness Test and not in the more remote Needs Test. Accordingly, the relevant inquiry under the Needs Test is whether the specific "standards" for which each waiver application is made are needed to address compelling and extraordinary circumstances unique to California.

### A. EPA's Reinterpretation of the Term "Standards" As Used in Sections 209(b)(1)(B) Is Contrary to the Plain Meaning of the Statutory Text

#### 1. The term "standards" is not the textual equivalent of "standards, in the aggregate"

The term "such California standards," as used in Sections 209(b)(1) and 209(e)(2)(A)(ii), does not refer to the entire California mobile source emissions

program, because the term "program" is not used even once in Section 209.  Nor has it ever been used in Section 209's legislative predecessors.

Furthermore, the term "in the aggregate" appears in Section 209 only as part of a separate sentence addressing the Protectiveness Test, and is set off by commas, evidencing that the term refers solely to the Protectiveness Test established in that sentence:

> [T]he Administrator shall . . . authorize California to adopt and enforce standards and other requirements . . . if California determines that California standards will be, *in the aggregate*, at least as protective of public health and welfare as applicable Federal standards.

(Emphasis added).  On the other hand, the Needs Test appears in a subsequent sentence, embedded in a clause that is prefaced by proscriptive language that does not appear in the Protectiveness Test:

> *No such authorization shall be granted* if the Administrator finds that:
> (i) . . .
> (ii) California does not need such California standards to meet compelling and extraordinary condition.

(Emphasis added).

The "in the aggregate" language appearing in the sentence establishing the Protectiveness Test is independent of and does not modify the language in the separate sentence establishing the Needs Test, as is made clear by three specific textual details showing that the term "standards" cannot be read to equate to "standards in the aggregate."  First, the outcome of the Protectiveness Test depends

on whether *California* makes a protectiveness finding, while the outcome of the needs test depends on whether *EPA* makes a needs finding. Thus, not only are the *findings* different but they must be made by different entities. Accordingly, the language modifying the Protectiveness Test finding should not be conflated with language addressing the Needs Test finding, which contains no such modifying language. *See Bates v. United States*, 522 U.S. 23, 29–30 (1997) ("[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Second, the language in the sentence establishing the Protectiveness Test *affirmatively mandates* that EPA approve the waiver application if California makes the requisite protectiveness finding, while the language in the sentence establishing the Needs Test *expressly prohibits* EPA from granting a waiver application unless EPA makes the requisite needs finding. Thus, the Protectiveness Test is drafted to broaden the likelihood of granting a waiver, while the Needs Test is drafted to narrow the likelihood of granting a waiver. In enacting the 1977 Amendments, Congress engaged in a legislative trade-off. Any California standard that was less stringent than its corresponding federal standard could be approved if all the California standards, "in the aggregate," were at least as stringent as all the federal standards in the aggregate. On the other hand, Congress prohibited EPA from

approving any waiver application if California did not have a need for the emissions standards set forth in the application based upon "extraordinary and compelling conditions" in the state. The two different tests were intended to address entirely different issues, and Congress gave greater authority to EPA to approve waivers under the Protectiveness Test, but lesser authority to approve waivers under the separate and grammatically independent Needs Test.

Third, the sentence establishing the Protectiveness Test applies to both "standards and *other requirements*" (emphasis added), while the sentence establishing the needs test refers only to "standards," further evidencing that the sentence establishing the Protectiveness Test was drafted to address California's regulatory efforts holistically. On the other hand, to ensure that California did not abuse the privilege of veering from a uniform national system governing emissions from motor vehicles, Congress insisted that EPA deny a waiver application if it found under the Needs Test that California did not need a particular emissions standard to meet "compelling and extraordinary conditions" in the state.

Accordingly, the fact that Congress chose in 1977 to insert the "in the aggregate" language into the Protectiveness Test but not into the Needs Test shows that the modifier is intended to apply to the former but not to the latter, and nothing in the CAA suggests otherwise. "In statutory interpretation, . . . the plain language of a statute [must be given effect] unless 'literal application of a statute will produce

a result demonstrably at odds with the intentions of its drafters.'" *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 563 F. Supp. 2d 1158, 1163 (E.D. Cal. 2008) (quoting *Resolution Trust Corp. v. Bayside Developers*, 43 F.3d 1230, 1236 (9th Cir. 1995)).  Referring to similar differences in the language Congress chose to include or exclude from the Clean Air Act, the D.C. Circuit observed, "Congress was certainly capable of adding the phrase 'accompanying enforcement procedures' wherever the word 'standards' appeared if it desired the statutory findings to apply to both.  We see no reason to assume that its failure to do so is attributable to sloppy draftsmanship." *Motor & Equipment Mfrs.*, 627 F.2d at 1113.  Just as Congress intentionally inserted the phrase "accompanying enforcement procedures" to modify some terms and not others, Congress intentionally inserted the modifying phrase "in the aggregate" in the Protectiveness Test and not in the Needs Test.

The line drawn by Congress is eminently sensible.  Section 209 gives California discretion to enforce a portfolio of standards that collectively maximizes overall "protectiveness" by allowing some individual standards to be more stringent than the federal ones, while allowing other standards to be less stringent.  That flexibility afforded to California is balanced by a requirement that EPA confirm that each component of the portfolio is actually "needed" to protect the health and welfare of California residents.  This gives California leeway to enact a "mix" of emission standards that furthers its interests, yet ensures that EPA protects the

national interest in the mobility of motor vehicles against California imposing regulations that do not address California's local needs. Other aspects of the statutory text further clarify the meaning.

> ## 2. If, as EPA contends, the term "standards" means the same as the term "standards, in the aggregate," then the statute's "in the aggregate" language is surplusage.

If "standards" in the Needs Test means "standards, in the aggregate," then the 1977 amendments of Section 209 that included the term "in the aggregate" as part of the Protectiveness Test would be surplusage. Although the term "standards" appears in both the Needs Test and the Protectiveness Test, Congress attached the modifier only to the Protectiveness Test, while the term "standards," stands alone in the Needs Test, without the modifier. If Congress had intended the term "standards" to mean all the California standards collectively, rather than the specific standards for which a waiver application is made, there would have been no need to add the "in the aggregate" language to the Protectiveness Test, making the term mere surplusage. Courts must "give effect, if possible, to every clause and word of a statute." *U.S. v. Menasche*, 348 U.S. 528, 538-39 (1955). An interpretation that renders a term meaningless surplusage should be avoided. *Duncan v. Walker*, 533 U.S. 167, 174 (2001). That is especially so when the term occupies a "pivotal [] place in the statutory scheme." *Id*. Certainly the determination of whether EPA must apply the Needs Test on a case-by-case basis or on the basis of the need for the

mobile source program "as a whole" is pivotal to the balance struck by Congress in Section 209 with regard to the interests of all of the states in the free flow of interstate commerce and the interests of California in regulating the health and safety of its residents. *See Motor Vehicles,* 17 F.3d at 526 (federal preemption is "cornerstone" of Title II of CAA).

Amendments to statutes are generally viewed in the context of the statute prior to their adoption, to determine whether an interpretation would render the amendment surplusage. *See, e.g., Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 221-22 (2008) (looking to amendment history to determine meaning of statute.)[2] Prior to its amendment in 1977, the CAA waiver provision provided that:

> The Administrator shall…waive application of this section to [California] . . . unless he finds that [California] . . . does *not require standards more stringent than applicable Federal standards*....

Clean Air Act. Pub. L. No. 90-148, 81 Stat. 485 (Nov. 21, 1967) (emphasis added). Under this language, each California emission standard had to be equally stringent or more stringent than the federal standard. For example, California's carbon

---

[2]    *See also Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 120 S. Ct. 1291, 1306 (U.S. 2000) ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. The classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statue.")

monoxide emissions standards, as well as its NOx standards, had to match or exceed the corresponding federal standards.

The 1977 amendment changed this provision to allow California to adopt a lower standard for a given pollutant, provided that California's emissions "standards" would be, "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." Thus, under the then-new Protectiveness Test, California would no longer have to justify each individual standard against its corresponding federal standard, provided that California's standards, taken together, were just as protective as the federal standards.

California took advantage of this new leeway in its first waiver application after the 1977 amendments took effect. In 1979, California proposed a "NOx standard [for 1983 and subsequent years that was] 0.4 grams per mile while the comparable federal *standard* [was] 1.0 grams per mile." *Ford Motor Co. v. Envtl. Protec. Agency*, 606 F.2d 1293, 1306 n. 38 (D.C. Cir. 1979) (emphasis added). The proposed "California carbon monoxide *standard* for 1983 [was] 7.0 grams per mile while the federal *standard* [was] 3.4 grams per mile." *Id*. (emphasis added). EPA approved the waiver. The DC Circuit noted that this loosening of the standard-by-standard approach was "precisely what Congress anticipated" when it adopted the aggregation principle for the Protectiveness Test. *Id*. at 1306.

Under EPA's understanding of "standards," however, the 1977 amendments were wholly unnecessary. If the term "standards" means standards "as a whole" or "emissions program," then aggregation was possible prior to the 1977 amendment. But in 1977 Congress disagreed, by adding the modifier "in the aggregate" to the sentence establishing the Protectiveness Test. By contrast, the term "standards" was used in the sentence establishing the Needs Test *without* the modifier. The term "standards," standing alone, must mean the same thing in both the Protectiveness Test and the Needs Test unless something in the statute itself requires otherwise. Nothing in the CAA requires otherwise. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (A court must interpret the statute "as a symmetrical and coherent regulatory scheme,"); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (The proper interpretation of a statute must "fit, if possible, all parts into a harmonious whole."). Accordingly, a careful reading of the text, as informed by the amendment history, shows that the term "in the aggregate" does not modify the term "standards" in the Needs Test. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 221-22 (2008) ("[T]he amendment . . . is relevant because our construction of [related provisions] must, to the extent possible, ensure that the statutory scheme is coherent and consistent."); *see also, Bates v. United States*, 522 U.S. 23, 29–30 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act,

it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

3.    **The rule of the last antecedent prevents the term "in the aggregate" from modifying the term "such California standards."**

In addition to rendering the "in the aggregate" language of the 1977 amendments surplusage, EPA's reinterpretation violates the rule of the last antecedent. "A limiting clause or phrase… should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (reversing lower court because its decision was "contrary to the grammatical 'rule of last antecedent.'"). "[I]n the aggregate" only appears in the Protectiveness Test, and it appears immediately after the phrase "standards." Therefore, "in the aggregate" can modify only the immediately preceding word "standards" in the Protectiveness Test and not the subsequent and more remote term "standards" in the Needs Test. Accordingly, under the rule of "last antecedent" the term "standards" in the Needs Test should be construed without reference to the modifier "in the aggregate," which appears only in the separate and preceding sentence setting forth the Protectiveness Test.

The statutory construction principle of the last antecedent should be followed where, as here, the statutory text, context, and amendment history support its application. *See Lockhart v. US*, 136 S. Ct. 958, 963 (2015) ("[H]ere the

interpretation urged by the rule of the last antecedent is not overcome by other indicia of meaning.  To the contrary, [the provision's] context fortifies the meaning that principle commands.").

**B.     The Statutory Function and Operation of the Waiver Provision Indicates that Each Waiver Application Must be Evaluated Individually.**

The function and operation of the waiver provision further undercuts EPA's reinterpretation.   EPA reinterprets the Needs Test as an inquiry into whether California needs its emissions program as a whole.  87 Fed. Reg. at 14355.  That interpretation is in tension with the fact that the test is triggered each time California adopts a new standard.  If EPA were required to evaluate the need for California's emission program as a whole, there would be no need for EPA to waive federal preemption every time California wanted to enforce a new set of mobile source emissions standards.  Congress determined that "from time to time," as California became aware of a need to promulgate certain emissions standards different from the federal ones, it would apply to EPA for waivers.  Nothing in the Act suggests that Congress delegated to EPA the policy decision of whether California needed its own mobile source program as a whole.  Congress itself had already made that decision.

Further,  EPA's interpretation  is  inconsistent  with  the  last  part  of  the Subsections 209(b)(1)(B), which allow other states to adopt "standards" identical to

those approved for California. In other words, other states need not adopt California's program "as a whole" but may pick-and-choose which EPA-approved standards to adopt. The word "standards" should be assigned the same meaning in both places. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (A court must interpret the statute "as a symmetrical and coherent regulatory scheme,"); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (The proper interpretation of a statute must "fit, if possible, all parts into an harmonious whole."). Thus, the statute's operation and structure drives the required inquiry under the Needs Test: whether each new emissions regulation setting forth new standards is needed to meet "compelling and extraordinary circumstances.

### C. "Standards" in the Plural Is of No Significance in the Context of the Clean Air Act

Obviously, the term "standards" is the plural of the word "standard." Congress addressed the meaning of the singular vs. plural by providing that the plural form includes the singular and vice versa. 1 U.S.C. § 1 ("In determining the meaning of any act of Congress, unless the context indicates otherwise - words importing the singular include and apply to several persons, parties or things; *words importing the plural include the singular*"). (Emphasis added). Accordingly, there is no particular magic in Congress's use of the plural "standards" in the Needs Test.

Moreover, a single word in a statute must not be read in isolation but instead is defined by reference to its statutory context. *See King v. St. Vincent's Hospital,*

502 U.S. 215, 221(1991) ("[T]he meaning of statutory language, plain or not, depends on context"); *Dolan v. Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis"); *Brown & Williamson Tobacco Corp*., 120 S. Ct. at 1300-01 (The "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.).

The term "standards" appears in the plural because, from the very beginning in 1967, Congress recognized that California's "compelling and extraordinary circumstances" are "sufficiently different from the Nation as a whole to *justify* standards . . . [that] may, *from time to tim*e, need to be more stringent than national standards." S. Rep. No. 90-403 at 33 (1967) (emphasis added). Congress thus required California to "justify" specific standards "from time to time" in waiver applications submitted to EPA. The periodic nature of the application process generated the use of the term "standards" in the plural, because Congress contemplated that the waiver process would not be conducted just once but, rather, "from time to time" when California wanted to promulgate and enforce new mobile source emissions standards. *Id.*

Moreover, the use of the plural term "standards" to refer to a single air emission regulation is common throughout the CAA. For example, the CAA

commands the Administrator promulgate "*standards* which provide that emissions of *carbon monoxide* from a manufacturer's vehicles . . . may not exceed, in the case of light-duty vehicles, 10.0 grams per mile, and in the case of light-duty trucks, a level comparable in stringency to the standard applicable to light-duty vehicles."  42 U.S.C. § 7521(j)(1) (emphasis added).  Even though this provision applies only to carbon monoxide emissions within a particular temperature range, the plural is employed because a single regulation governing carbon monoxide emissions is itself comprised of more than one emissions "standard" for carbon dioxide emissions (one for light-duty trucks and another for other light-duty vehicles).  *See also id.* at § 7583(d), governing emissions of a single pollutant applicable to various circumstances ("the standards . . . shall require that vehicle exhaust emissions of NMOG not exceed the levels (expressed in grams per mile) specified in the tables below:").  Thus, the use of the plural is consistent with the CAA's typical description of a single regulation that does more than just one thing.  *See Dolan v. Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis").

This plural usage can also be seen in the portion of the Act's waiver provision that allows other states to adopt "standards" that are "identical…to the California standards," such as set forth in 42 U.S.C. § 7543(e)(2)(B).  Even though "standards"

is in the plural, it is clear that other states need not adopt all of the California standards, but may adopt some while rejecting others.

Given the clarity resulting from the traditional cannon of construction regarding the doctrine of last antecedent and the rule against surplusage, coupled with the fact that traditional usage under the CAA recognizes that the term "standards" includes requirements set forth in a single regulation, this Court should not read the term "standards" in a manner that contradicts the explicit congressional guidance laid out in 1 U.S.C. § 1 that the usage of the plural includes the singular. *See* 42 U.S.C. § 7543(e)(2)(B). Accordingly, any reliance by EPA on the use of the plural form "standards" in Section 209 of the Act should be rejected.

## CONCLUSION

For the foregoing reasons, this Court should vacate and remand EPA's Reconsideration of the SAFE 1 Interpretation of Section 209(b)(1)(B) of the Clean Air Act.

DATE: October 27, 2022, Respectfully submitted,

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH
CA Bar No. 264663
tha@texaspolicy.com
ROBERT HENNEKE
TX Bar No. 24046058
rhenneke@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701

Telephone:  (512) 472-2700
Facsimile:  (512) 472-2728

*Counsel for Western States Trucking Association, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6,443 words excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in proportionally spaced typeface using Times New Roman in 14-point font.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2022, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the D.C. Circuit by using the CM/ECF system. All participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH