ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1081 and consolidated cases

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

State of Ohio, et al.,
*Petitioners,*

v.

Environmental Protection Agency and Michael S. Regan, in his official capacity, as Administrator of the U.S. Environmental Protection Agency
*Respondents.*

---

On Petition for Review of Action by the U.S. Environmental Protection Agency

---

## CORRECTED PROOF BRIEF OF PETITIONERS THE STATES OF OHIO, ALABAMA, ARKANSAS, GEORGIA, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TEXAS, UTAH, AND WEST VIRGINIA

---

DAVE YOST
Attorney General of Ohio

BENJAMIN M. FLOWERS
Ohio Solicitor General
MICHAEL HENDERSHOT
Principal Deputy Solicitor General
SYLVIA MAY MAILMAN
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614-466-8980
614-466-5087 fax
bflowers@ohioattorneygeneral.gov

*Counsel for State of Ohio*

*(Additional counsel listed after signature block)*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici.

*Petitioners* in Case No. 22-1081 are the State of Ohio, State of Alabama, State of Arkansas, State of Georgia, State of Indiana, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah, and State of West Virginia.

*Petitioners* in consolidated Case No. 22-1083 are Diamond Alternative Energy, LLC, Iowa Soybean Association, South Dakota Soybean Association, and the Minnesota Soybean Growers Association.

*Petitioners* in consolidated Case No. 22-1084 are American Fuel & Petrochemical Manufacturers, Domestic Energy Producers Alliance, Energy Marketers of America, and National Association of Convenience Stores.

*Petitioners* in consolidated Case No. 22-1085 are Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Kansas Corn Growers

i

Association, Michigan Corn Growers Association, Missouri Corn Growers Association, and Valero Renewable Fuels Company, LLC.

*Respondents* are the U.S. Environmental Protection Agency and Michael S. Regan in his official capacity as Administrator of the U.S. Environmental Protection Agency.

*Movant-Intervenors* on behalf of respondents are Ford Motor Company, Volkswagen Group of America, Inc., American Honda Motor Co., Inc., BMW of North America, LLC, Volvo Car USA LLC, New York Power Authority, National Grid USA, Calpine Corporation, Advanced Energy Economy, Power Companies Climate Coalition, National Coalition for Advanced Transportation, State of Washington, District of Columbia, State of New Jersey, State of Maine, State of Hawaii, State of Illinois, State of Maryland, State of Colorado, State of Nevada, State of New York, State of Connecticut, State of Vermont, State of Rhode Island, State of North Carolina, State of California, State of New Mexico, State of Minnesota, State of Delaware, State of Oregon, City of New York, Commonwealth of Pennsylvania, Commonwealth of Massachusetts, City of Los Angeles, Clean Air Council, Natural Resources Defense Council, Public Citizen, Center for Biological Diversity, Environmental Defense Fund, Sierra Club, National Parks Conservation Association, Union

of Concerned Scientists, Conservation Law Foundation, and Environmental Law and Policy Center.

The Western States Trucking Association notified counsel it intends to file an *amicus* brief in support of Petitioners.  The States consented to this filing.

**B. Rulings Under Review.** The agency action under review is:

*California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14332 (Mar. 14, 2022).

**C. Related Cases.**

The U.S. Court of Appeals for the District of Columbia has consolidated three cases that challenged the same agency action that is challenged here.  *Iowa Soybean Assn. v. EPA*, No. 22-1083; *Am. Fuel & Petrochemical Mfrs. v. EPA*, No. 22-1084; *Clean Fuels Dev. Coal. v. EPA*, No. 22-1085.

Challenges to an earlier rule in which the EPA, alongside the National Highway Traffic Safety Administration, revoked the waiver that the EPA now grants were consolidated and remain pending before this Court.  *See Union of Concerned Scientists v. NHTSA*, No. 19-1230.

s/ *Benjamin M. Flowers*
BENJAMIN M. FLOWERS

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... i

TABLE OF CONTENTS .......................................................................iv

TABLE OF AUTHORITIES ................................................................v

GLOSSARY ........................................................................................xii

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION....................................................... 2

STATEMENT OF THE ISSUES...........................................................3

STATUTES AND REGULATIONS...................................................... 4

STATEMENT ......................................................................................5

STANDARD OF REVIEW ................................................................ 11

SUMMARY OF THE ARGUMENT ................................................. 11

STANDING........................................................................................14

ARGUMENT.....................................................................................16

    I.    Section 209(b)(1) of the Clean Air Act, on which the EPA relied to issue the challenged waiver, is unconstitutional. ...................................16

        A.    The Constitution, and Supreme Court precedent interpreting it, establish the principle that States have equal sovereignty.................17

        B.    The Clean Air Act violates the equal-sovereignty doctrine by allowing California to exercise sovereign authority that the Act withdraws from every other State. .................................................. 28

    II.    The waiver must be set aside under the Administrative Procedure Act because it is not in accordance with the Energy Policy and Conservation Act. .................................................................................33

CONCLUSION.................................................................................. 42

CERTIFICATE OF COMPLIANCE...................................................47

CERTIFICATE OF SERVICE........................................................... 48

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Alaska v. USDA*,
    17 F.4th 1224 (D.C. Cir. 2021) ........................................................ 16

*Am. Auto. Mfrs. Ass'n v. Cahill*,
    152 F.3d 196 (2d Cir. 1998) ............................................................... 5

*Arizona v. United States*,
    567 U.S. 387 (2012) ......................................................................... 21

*Belmont Mun. Light Dep't v. FERC*,
    38 F.4th 173 (D.C. Cir. 2022) ......................................................... 14

*Bond v. United States*,
    564 U.S. 211 (2011) ........................................................................ 22

*Case v. Toftus*,
    39 F. 730 (C.C.D. Or. 1889) ........................................................... 23

*City of New York v. Chevron Corp.*,
    993 F.3d 81 (2d Cir. 2021) ......................................................... 30, 31

*Coyle v. Smith*,
    221 U.S. 559 (1911) ................................................ 17, 21, 23, 26, 29

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ........................................................................ 21

*Ctr. for Biological Diversity v. EPA*,
    722 F.3d 401 (D.C. Cir. 2013) ........................................................ 31

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ..................................................................... 14

*Edye v. Robertson* (*The Head Money Cases*),
    112 U.S. 580 (1884) ........................................................................ 25

\* Authorities chiefly relied upon are marked with an asterisk.

*FMC Corp. v. Holliday*,
   498 U.S. 52 (1990) ........................................................... 35

*Franchise Tax Bd. v. Hyatt*,
   136 S. Ct. 1277 (2016) ..................................................... 17

*Franchise Tax Bd. v. Hyatt*,
   139 S. Ct. 1485 (2019) ............................................... 11, 17

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ......................................................... 20

*Gamble v. United States*,
   139 S. Ct. 1960 (2019) ..................................................... 18

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) ......................................... 16

*\*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
   508 F. Supp. 2d 295 (D. Vt. 2007) ........................ 39, 40, 41

*Hemp Indus. Ass'n v. DEA*,
   36 F.4th 278 (D.C. Cir. 2022) ......................................... 14

*INS* v. *Chadha*,
   462 U.S. 919 (1983) ......................................................... 20

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) ..................................................... 39

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ......................................................... 31

*McCulloch v. Maryland*,
   4 Wheat. 316 (1819) .................................................. 12, 28

*Metro. Taxicab Bd. of Trade v. City of New York*,
   615 F.3d 152 (2nd Cir. 2010) ......................................... 35

\* Authorities chiefly relied upon are marked with an asterisk.

*Morrison v. Olson*,
    487 U.S. 654 (1988) ...........................................................................20

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*,
    627 F.2d 1095 (D.C. Cir. 1979)........................................................39

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ..............................................11, 12, 17, 18, 21

*New York v. United States*,
    505 U.S. 144 (1992)..........................................................................21

\*Nw. Austin Mun. Util. Dist. No. One v. Holder,
    557 U.S. 193 (2009).........................................................................24

*Ophir v. City of Bos.*,
    647 F. Supp. 2d 86 (D. Mass. 2009) ..............................................35

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987) ...........................................................................34

*Pollard v. Hagan*,
    44 U.S. 212 (1845) ...........................................................................23

*Rowe v. N.H. Motor Transport Ass'n*,
    552 U.S. 364 (2008) ........................................................................35

*Schooner Exchange v. McFaddon*,
    7 Cranch 116 (1812) .......................................................................12

*Sec'y of Agric. v. Cent. Roig Ref. Co.*,
    338 U.S. 604 (1950) ........................................................................26

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ....................................................................20

\*Shelby Cnty. v. Holder,
    570 U.S. 529 (2013)..................................................23, 24, 25, 29

\* Authorities chiefly relied upon are marked with an asterisk.

*South Carolina v. Katzenbach*,
 383 U.S. 301 (1966) ........................................................................ 24

*Spann v. Colonial Vill., Inc.*,
 899 F.2d 24 (D.C. Cir. 1990) ......................................................... 14

*Or. ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*,
 429 U.S. 363 (1977) ........................................................................ 23

*Stearns v. Minnesota*,
 179 U.S. 223 (1900) ................................................................. 12, 23

*Stern v. Marshall*,
 564 U.S. 462 (2011) ........................................................................ 20

*Texas v. White*,
 7 Wall. 700 (1869) .................................................................. 22, 28

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*,
 928 F.3d 42 (D.C. Cir. 2019) ................................................. 14, 15

*United States v. Morrison*,
 529 U.S. 598 (2000) ........................................................................ 19

*United States v. Texas*,
 339 U.S. 707 (1950) ................................................................. 23, 26

*Virginia v. West Virginia*,
 246 U.S. 565 (1918) ........................................................................ 17

*State ex rel. Webber v. Felton*,
 77 Ohio St. 554 (1908) .................................................................. 25

## Statutes, Rules, and Constitutional Provisions

U.S. Const., amend. 13 §2 ...................................................................... 19

U.S. Const., amend. 14, §5 ..................................................................... 19

U.S. Const., amend. 15, §2 .............................................................. 19, 24

\* Authorities chiefly relied upon are marked with an asterisk.

U.S. Const., amend. 19 ...........................................................................19

U.S. Const., amend. 24, §2 ....................................................................19

U.S. Const., amend. 26, §2 ....................................................................19

U.S. Const., art. I, §8 ............................................................................18

U.S. Const., art. I, §10 ..........................................................................18

U.S. Const., art. VI ...............................................................................18

49 C.F.R. §1.95 .......................................................................................7

71 Fed. Reg. 17,566 (Apr. 6, 2006) ......................................................36

73 Fed. Reg. 12,156 (Mar. 6, 2008) .......................................................6

74 Fed. Reg. 32,744 (July 8, 2009) ........................................................7

75 Fed. Reg. 25,324 (May 7, 2010) ............................................. 7, 8, 36

77 Fed. Reg. 62,624 (Oct. 15, 2012) ......................................................7

78 Fed. Reg. 2,112 (Jan. 9, 2013) ..........................................................8

83 Fed. Reg. 42,986 (Aug. 24, 2018) ............................................. 7, 14

84 Fed. Reg. 51,310 (Sept. 27, 2019) ........................................8, 32, 37

85 Fed. Reg. 24,174 (Apr. 30, 2020)....................................................34

86 Fed. Reg. 22,421 (April 28, 2021)......................................................9

86 Fed. Reg. 25,980 (May 12, 2021) .......................................................9

86 Fed. Reg. 74,236 (Dec. 29, 2021)....................................................10

87 Fed. Reg. 14,332 (Mar. 14, 2022)............................2, 10, 32, 33, 38, 39

5 U.S.C. §706 ...............................................................11, 17, 33, 38, 39

42 U.S.C. §7507..........................................................................................5

* Authorities chiefly relied upon are marked with an asterisk.

42 U.S.C. §7521 ....................................................................................... 5

42 U.S.C. §7543 .................................................................................... 1, 5

42 U.S.C. §7607 ....................................................................................... 2

49 U.S.C. §§32901–19 ........................................................................... 7

49 U.S.C. §32901 .................................................................................. 37

49 U.S.C. §32902 ........................................................................... 6, 7, 34

49 U.S.C. §32904 .................................................................................. 37

49 U.S.C. §32905 .................................................................................. 38

49 U.S.C. §32919 ....................................................................... 6, 13, 34, 38

Cal. Code Regs., tit. 13, §§1900–62, Register 2005, No. 37 (September
    16, 2005) ................................................................................. 6, 35, 37

*Energy Policy and Conservation Act of 1975 ..... 1, 3, 6, 13, 33, 34, 35, 36, 37, 38, 40

**Other Authorities**

Advanced Clean Cars Summary, California Air Resources Board ........................... 8

*Anthony Bellia, Jr. & Bradford R. Clark, *The International Law
    Origins of American Federalism*, 120 Colum. L. Rev. 835 (2020) .12, 18, 19, 20, 29

Br. of Intervenors, Doc. No. 1862459, *Union of Concerned Scientists v.
    NHTSA*, No. 19-1230 (D.C. Cir. Sept. 21, 2020) ............................... 9

Brian Cooley, *America's new weight problem: Electric cars*, CNET (Jan.
    28, 2022) .................................................................................... 15

*Causes of Climate Change*, U.S. Environmental Protection Agency ................. 31

*Climate Change and Social Vulnerability in the United States*, EPA
    (Sept. 2021) .............................................................................. 32

 *"Electric Vehicle" label*, U.S. Department of Energy ............................... 38

* Authorities chiefly relied upon are marked with an asterisk.

x

Gov. Br., Doc. No. 1860684, *Union of Concerned Scientists v. NHTSA*, *et al.*, No. 19-1230 (D.C. Cir. Sept. 9, 2020) ...................................................36

Hearst Autos Research, *What is MPGe?*, Car and Driver.......................................38

Juliet Eilpern and Brandy Davis, *Major Automakers Strike Climate Deal with California, Rebuffing Trump on Proposed Mileage Freeze*, Washington Post (July 25, 2019) .........................................................29

*Low-Emission Vehicle Greenhouse Gas Program*, California Air Resources Board ...........................................................................6

Order, Doc. No. 1884115, *Union of Concerned Scientists v. NHTSA*, No. 19-1230 (D.C. Cir. Feb. 8, 2021)....................................................10

*Overview of Greenhouse Gases*, U.S. Environmental Protection Agency..................31

S. Rep. No. 91-1196, 32 (June 30, 1970) ..............................................5

Sonia Sotomayor de Noonan, Note, *Statehood and the Equal Footing Doctrine: The Case for Puerto Rican Seabed Rights*, 88 Yale L.J. 825 (1979)..............................................................................22

Thomas Colby, *In Defense of the Equal Sovereignty Principle*, 65 Duke L. J. 1087 (2016) ...................................................................25

\* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

EPA:  Environmental Protection Agency

NHTSA:  National Highway Traffic Safety Administration

## INTRODUCTION

The Clean Air Act allows the EPA to give California—and only California—a waiver.  That waiver allows California—and only California—to set vehicle-emission standards more stringent than those imposed by the federal government.  *See* 42 U.S.C. §7543(b)(1).  This case asks whether the agency acted lawfully when it reinstated a previously withdrawn waiver.  It did not, for at least two reasons.  *First*, the Clean Air Act provision under which the EPA reinstated the waiver is unconstitutional—it unlawfully leaves California with sovereign authority that the Act takes from every other State.  *Second*, the waiver is unlawful because it allows California to enforce state laws that the Energy Policy and Conservation Act of 1975 preempts.

The waiver is unlawful, and this Court should set it aside.

## STATEMENT OF JURISDICTION

This case presents a challenge to the EPA's reinstatement of a previously withdrawn waiver allowing California to set vehicle-emission standards more stringent than those imposed by federal law. *See California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022). The EPA took the challenged action on March 14, 2022. Ohio and the other petitioner States timely filed this challenge on May 12, 2022. This Court has jurisdiction under 42 U.S.C. §7607(b)(1).

## STATEMENT OF THE ISSUES

**1.** Are §209(b)(1) of the Clean Air Act and the waiver that the EPA issued pursuant to that section unconstitutional under the equal-sovereignty-of-the-states doctrine?


**2.** Is the reissuance of California's waiver contrary to law, and thus invalid under the Administrative Procedure Act, because it allows California to enforce state emission standards preempted by the Energy Policy and Conservation Act of 1975?

## STATUTES AND REGULATIONS

The statutes relevant to this case are included in the addendum filed with this brief.

## STATEMENT

**1.** Two federal statutory schemes govern carbon-dioxide emissions from motor vehicles.

First, the Clean Air Act. The Act requires the EPA Administrator to prescribe "standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. §7521(a)(1). Section 209 preempts the States from setting emission standards for new cars and new engines. §7543(a); *see also* §7543(e)(2)(A).

The Act makes two exceptions to its preemptive scope. *First*, §209(b)(1) allows the EPA to give California—and only California—a waiver allowing that State to set emission standards more stringent than the federal standards. §7543(b)(1); S. Rep. No. 91-1196, 32 (June 30, 1970). *Second*, the Act allows States, in some circumstances, to adopt emission standards "identical to the California standards." 42 U.S.C. §7507(1); *see also* §7543(e)(2)(B)(i). Thus, "the 49 other states" may depart from the federal standard if and only if they adopt "a standard identical to an existing California standard." *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 201 (2d Cir. 1998).

5

Now consider the Energy Policy and Conservation Act of 1975. This law requires the Department of Transportation, through the National Highway Traffic Safety Administration (NHTSA), to set national fuel-economy standards for new vehicles. Those standards "shall be the maximum feasible average fuel economy level that the Secretary [of Transportation] decides the manufacturers can achieve in that model year." 49 U.S.C. §32902(a). The Act contains a preemption provision that forbids States from regulating anything within its scope:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. §32919(a). This provision, unlike §209 of the Clean Air Act, contains no California-specific carveout.

**2.** California first adopted greenhouse-gas regulations pertaining to vehicles in 2005. Cal. Code Regs., tit. 13, §§1900–62, Register 2005, No. 37 (September 16, 2005) pp.193–236.2(e). Shortly thereafter, it asked for a preemption waiver under the Clean Air Act. *See Low-Emission Vehicle Greenhouse Gas Program*, California Air Resources Board, https://perma.cc/6U33-4XMH; *California State Motor Vehicle Pollution Control Standards; Notice of Decision Denying a Waiver*, 73 Fed. Reg. 12,156 (Mar. 6, 2008). The EPA initially denied the waiver. *Id*. But it soon reconsidered

6

and issued a waiver allowing California to set standards related to fuel economy. *California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver*, 74 Fed. Reg. 32,744 (July 8, 2009).

Soon afterwards, the EPA issued two sets of *federal* greenhouse-gas-emission standards. The standards, among other things, limited carbon-dioxide emissions for light-duty vehicles. *Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards; Final Rule*, 75 Fed. Reg. 25,324 (May 7, 2010); *2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards*, 77 Fed. Reg. 62,624 (Oct. 15, 2012). Carbon-dioxide emissions and fuel economy go hand-in-hand: the more fuel a vehicle burns, the more carbon dioxide it emits. Indeed, compliance with the fuel-economy standards is measured primarily by carbon-dioxide emission rates. *See The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks*, 83 Fed. Reg. 42,986, 43,234 (Aug. 24, 2018). Because the Energy Policy and Conservation Act gives NHTSA exclusive authority to regulate "fuel economy," *see* 49 U.S.C. §§32901–19; *see also* §32902(a); 49 C.F.R. §1.95(a), (j), the EPA issued its emission standards through joint rulemakings with NHTSA. The agencies explained that they needed to work together because

> the relationship between improving fuel economy and reducing $CO_2$ tailpipe emissions is a very direct and close one. The amount of those

7

> CO$_2$ emissions is essentially constant per gallon combusted of a given type of fuel. Thus, the more fuel efficient a vehicle is, the less fuel it burns to travel a given distance. The less fuel it burns, the less CO$_2$ it emits in traveling that distance.

75 Fed. Reg. at 25,327.

**3.** In 2012, California adopted its Advanced Clean Car regulations. Those regulations comprise two programs relevant here: the Low Emission Vehicle program, and the Zero Emission Vehicle program. The first consists of regulations that, applied to model years 2017 through 2025, were designed to reduce carbon-dioxide emissions by approximately 34 percent. Advanced Clean Cars Summary, California Air Resources Board at 5, https://perma.cc/8282-HLBL. The second requires manufacturers to ensure that, by 2025, about 15 percent or more of their California sales consisted of zero-emission vehicles and plug-in hybrids. *Id.* at 13.

Because both programs set emission standards more stringent than those set by federal law, California needed a Clean Air Act waiver. It sought a waiver in June 2012. The EPA issued a waiver for both programs. *California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver*, 78 Fed. Reg. 2,112 (Jan. 9, 2013).

**4.** The agency withdrew that waiver in 2019. At the same time, NHTSA concluded that California's regulations were preempted by the Energy Policy and Conservation Act. *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One*

8

*National Program*, 84 Fed. Reg. 51,310, 51,338, 51,350 (Sept. 27, 2019).  California

and others challenged the joint rule.  Ohio, along with another group of States, inter-

vened to defend the EPA's withdrawal decision on the ground that the Constitution

compelled it.  They argued that §209(b) violates the Constitution by allowing Cali-

fornia alone to regulate new-car emission standards, making any waiver issued under

that section unenforceable.  *See* Br. of Intervenors, Doc. No. 1862459, *Union of Con-

cerned Scientists v. NHTSA*, No. 19-1230 (D.C. Cir. Sept. 21, 2020).

 The case remains pending because the future of the 2019 withdrawal is now

uncertain.  After the EPA withdrew California's waiver, it received petitions for re-

consideration.  *See Reconsideration of a Previous Withdrawal of a Waiver of Preemption;

Opportunity for Public Hearing and Public Comment*, 86 Fed. Reg. 22,421, 22,427–28

(April 28, 2021).  Soon after President Biden took office, the EPA purported to ac-

cept those invitations and posted an opportunity to comment on its 2019 action.  *Id.*

at 22,421.  At the same time, NHTSA issued a notice of proposed rulemaking to

rescind NHTSA's regulations concerning whether federal law preempted the Zero

Emission Vehicle and Low Emission Vehicle programs.  *Corporate Average Fuel Econ-

omy (CAFE) Preemption*, 86 Fed. Reg. 25,980 (May 12, 2021).  Both the EPA and

NHTSA asked this Court to stay the litigation challenging the 2019 actions pending

their reconsideration. This Court granted their request. Order, Doc. No. 1884115, *Union of Concerned Scientists v. NHTSA*, No. 19-1230 (D.C. Cir. Feb. 8, 2021).

After receiving comments, the EPA and NHTSA rescinded their 2019 actions. *See Corporate Average Fuel Economy (CAFE) Preemption*, 86 Fed. Reg. 74,236 (Dec. 29, 2021) (NHTSA); *Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14,332 (Mar. 14, 2022) (EPA). Most relevant here, the EPA fully reinstituted the 2013 waiver for California's Advanced Clean Car program. It gave three reasons. First, the agency claimed it lacked authority in 2019 to reconsider the 2013 decision. Second, the agency claimed that its 2019 withdrawal too-strictly applied the statutory test governing California's entitlement to a waiver. Finally, the EPA determined that, in 2019, it improperly considered NHTSA's determination that the Energy Policy and Conservation Act preempted California's Advanced Clean Car program. 87 Fed. Reg. at 14,332–35.

During the comment period, the States submitted comments warning the EPA that reinstituting the waiver would present equal-sovereignty issues. The EPA dismissed these concerns, claiming that "the constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver requests." 87 Fed. Reg. at 14,377.

## STANDARD OF REVIEW

The Administrative Procedure Act directs this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. §706(2)(A)–(B).

## SUMMARY OF THE ARGUMENT

The reissued waiver is "not in accordance with law" and "contrary to constitutional right [or] power." *Id.* The Court must set it aside.

**I.** The EPA issued California's waiver under a statute—§209(b) of the Clean Air Act—that is unconstitutional under the equal-sovereignty doctrine. Accordingly, the waiver is "not in accordance with law" and "contrary to constitutional right" and "power."

Although the equal-sovereignty doctrine is "not spelled out in the Constitution," it is "nevertheless implicit in its structure and supported by historical practice." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1492–93 (2019). When the States declared their independence, each "claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all … Acts and Things which Independent States may of right do.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018) (quoting Declaration of Independence ¶32). One indispensable

feature of sovereignty was *equal* sovereignty.  Anthony J. Bellia, Jr. & Bradford R. Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. 835, 935–40 (2020); *see also Schooner Exchange v. McFaddon*, 7 Cranch 116, 137 (1812).  No one could have conceived of "a 'State' with fewer sovereign rights than another 'State.'"  Bellia & Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. at 937–38.

When the People ratified the original Constitution, they limited the States' sovereignty in some respects.  *Murphy*, 138 S. Ct. at 1475.  But the States retained all sovereignty not surrendered in the Constitution itself.  Because the original Constitution nowhere strips the States of their *equal* sovereignty, the States retained it.  So Congress, when it acts pursuant to its enumerated powers, is bound to observe the States' equal sovereignty.  Thus, laws passed pursuant to Congress's Article I powers violate the Constitution if they withdraw sovereign authority from some States but not others.  *Cf. Stearns v. Minnesota*, 179 U.S. 223, 244–45 (1900).

It follows that §209(b) violates the Constitution.  Section 209(b) empowers the EPA to let California set new-vehicle-emission standards.  But that provision forbids the EPA from letting any other State do the same.  That violates the equal-sovereignty doctrine.  The power to make law is a "sovereign power."  *McCulloch v. Maryland*, 4 Wheat. 316, 409 (1819).  By allowing California to retain that piece of its

12

sovereign authority that federal law strips from every other State, §209(b) runs afoul of the Constitution.

Because the EPA's waiver decision rests on an unconstitutional statute, it is invalid. The violation is especially stark in this case because the waiver permits California alone to regulate an issue—climate change—that is global in scale. Even assuming that the equal-sovereignty doctrine permits Congress to give California alone the power to regulate matters of unique importance to California, Congress cannot empower California alone to regulate a global problem like climate change.

**II.** The waiver is contrary to law, and thus invalid under the Administrative Procedure Act, for another reason as well. The Energy Policy and Conservation Act prohibits States from "adopt[ing] or enforc[ing] a law or regulation related to fuel economy standards." 49 U.S.C. §32919(a). California's Low Emission Vehicle and Zero Emission Vehicle programs both require auto manufacturers to reduce or eliminate carbon emissions, and the only way to do so is to improve fuel economy or eliminate the use of fuel. Accordingly, both programs are "related to" fuel economy and thus preempted. Because the waiver allows California to implement federally preempted regulations, the waiver is not in accordance with law and must be set aside.

13

## STANDING

The States have Article III standing to sue. "To establish Article III standing, Petitioners must satisfy a familiar three-part test: (1) an injury in fact; (2) fairly traceable to the challenged agency action; (3) that will likely be redressed by a favorable decision." *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (internal quotation marks omitted). The injury in fact must be "both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278 (D.C. Cir. 2022) (internal quotation marks omitted). Monetary injuries—for example, compelled expenditures or predictable losses of funds—qualify. *See, e.g.*, *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). So do impairments of constitutional privileges. *See, e.g.*, *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 55 (D.C. Cir. 2019).

***Injury in fact.*** The States have suffered both monetary and constitutional injuries in fact.

Start with the monetary harm. The EPA previously recognized that the now-reinstated waiver will increase the cost of vehicles nationwide. That is because manufacturers must increase the cost of conventional vehicles nationwide to offset the cost of meeting California's requirements. *See* 83 Fed. Reg. at 42,999, 43,084–85;

*see also Comments of the American Fuel & Petrochemical Manufacturers* at 17–18, Docket No. EPA-HQ-OAR-2018-0283 (Joint App'x ____). The States are submitting an expert declaration on this point. *See* Zycher Decl. ¶¶12–22 (Add.41–47). They are also submitting evidence that they purchase conventional vehicles. *See* Add.6–36. Combined, this shows that the States will be harmed by the challenged waiver: they must either forego replacing outdated vehicles or else spend more to purchase new vehicles. Further, a greater shift to electric vehicles will cause the States to generate less fuel-tax revenue, shrinking the funding available for road maintenance and reducing the quality of state services even without factoring in the increased stress on the roads caused by heavier electric vehicles. *See* Zycher Decl. ¶¶29–31 (Add.51–52); Brian Cooley, *America's new weight problem: Electric cars*, CNET (Jan. 28, 2022), https://perma.cc/Q847-XMKR. Moreover, an increase in the number of electric vehicles will add stress to, and require additional investments in, the States' electrical grids. *See* Zycher Decl. ¶¶7, 32–33 (Add.39, 53–54).

The States have also sustained a constitutional injury. The waiver was issued pursuant to a statute—§209(b)(1) of the Clean Air Act—that contravenes the States' constitutional right to equal sovereignty. The loss of a "constitutionally protected … interest … qualif[ies] as a concrete, particularized, and actual injury in fact." *Data Breach*, 928 F.3d at 55.

*Traceability and redressability.*  The States' injuries are fairly traceable to the but-for cause of their injury: the waiver.  And their injuries are redressable because a judgment setting aside the waiver would eliminate the source of their injuries.  To the extent there is any doubt on this score, the Court should resolve it in the States' favor.  States "have greater leeway in showing standing given the 'special solicitude' they receive for matters involving their 'quasi-sovereign interests.'"  *Alaska v. USDA*, 17 F.4th 1224, 1230 (D.C. Cir. 2021) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)).  More precisely, courts will relax the traceability and redressability requirements if:  (1) the State asserts a quasi-sovereign interest; and (2) "Congress afforded 'a concomitant procedural right to challenge'" the action in question.  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 182 (D.C. Cir. 2019) (quoting *Massachusetts*, 549 U.S. at 520).  Here, the States assert a sovereign interest in defending their equal sovereignty and a statutory right to challenge agency rulemaking as violative of federal law.  Thus, they are entitled to special solicitude.

## ARGUMENT

## I.    Section 209(b)(1) of the Clean Air Act, on which the EPA relied to issue the challenged waiver, is unconstitutional.

The EPA relied on §209(b) of the Clean Air Act when it issued its preemption waiver to California.  Because that statute is unconstitutional, the EPA's waiver is

contrary to law and to constitutional right and power.  §706(2)(A)–(B).  It must be set aside.

### A. The Constitution, and Supreme Court precedent interpreting it, establish the principle that States have equal sovereignty.

The United States of America "was and is a union of States, equal in power, dignity, and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself." *Coyle v. Smith*, 221 U.S. 559, 567 (1911).  This "'constitutional equality' among the States," *Franchise Tax Bd. v. Hyatt*, 136 S. Ct. 1277, 1283 (2016) (citation omitted), derives from the Constitution's text and structure.  The principle is so deeply embedded in our constitutional order that the Supreme Court treats the States' sovereign equality as a "truism." *Virginia v. West Virginia*, 246 U.S. 565, 593 (1918).

**1.** The equal-sovereignty of the States, while "not spelled out in the Constitution," is "nevertheless implicit in its structure and supported by historical practice." *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019).

When the States declared their independence from Britain, "they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all … Acts and Things which Independent States may of right do.'" *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018) (quoting Declaration of Independence ¶32).  One key aspect of the sovereignty possessed by the States was their

"equal sovereignty." Bellia & Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. at 935. The "law of nations" clearly established that "'Free and Independent States' were entitled to the 'perfect equality and absolute independence of sovereigns.'" *Id.* at 937 (quoting *Schooner Exchange v. McFaddon*, 7 Cranch 116, 137 (1812)). "The notion of a 'State' with fewer sovereign rights than another 'State' was unknown to the law of nations." *Id.* at 937–38. And the States would have understood themselves to possess this fundamental aspect of sovereignty.

Years later, in 1789, the Framers "split the atom of sovereignty," dividing sovereign authority between the States and the federal government. *Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019) (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)). This division of authority "limited … the sovereign powers of the States." *Murphy*, 138 S. Ct. at 1475. For example, the Framers gave the federal government exclusive authority over some matters, *see* U.S. Const., art. I, §8, cl.4, restricted state authority over others, *id.*, art. I, §10, and made validly enacted federal laws "the supreme Law of the Land," *id.*, art. VI, cl.2. But these changes did not abolish the States' sovereignty; to the contrary, the States "retained 'a residuary and inviolable sovereignty.'" *Murphy*, 138 S. Ct. at 1475 (quoting The Federalist No. 39, p.245 (James Madison) (Clinton Rossiter ed., 1961)). The Tenth Amendment

confirms as much, by preserving for the States and the People all powers not expressly surrendered in the Constitution.

One key aspect of the States' retained sovereignty included the longstanding notion of "equal sovereignty." Bellia & Clark, *International Law Origins*, 120 Colum. L. Rev. at 935–38. While the Constitution limited the States' sovereignty in some ways, it nowhere took from the States their sovereign equality. Thus, the States retained that equality. *Id*. at 937–38. The fact that the States called themselves "States" confirms the point. "By using the term 'States,' the Constitution recognized the traditional sovereign rights of the States minus only those rights that they expressly surrendered in the document.'" *Id*. at 938. The right to sovereign equality is not among the rights surrendered.

The States' sovereign equality remained complete until the Civil War Amendments. The Thirteenth, Fourteenth, and Fifteenth Amendments all permit Congress to enforce their guarantees by "appropriate" legislation. U.S. Const., amend. 13, §2; amend. 14, §5; amend. 15, §2; *see also* amends. 19; 24 §2; 26 §2. Appropriate legislation might entail limiting the sovereign authority of only the States found to be acting in violation of a particular amendment. *See United States v. Morrison*, 529 U.S. 598, 626–27 (2000). "Thus, by adopting these Amendments, the States expressly … compromised their right to equal sovereignty with regard to enforcement of the

19

prohibitions set forth in the Amendments." Bellia & Clark, *International Law Origins*, 120 Colum. L. Rev. at 938. But the States did not otherwise compromise their equal sovereignty—the Amendments do not address, and so do not alter, the States' equal sovereignty in contexts unrelated to the prohibitions and guarantees of these amendments.

This background principle of equal sovereignty accords with the "separation of powers," which the Framers viewed "as the absolutely central guarantee of a just Government." *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting). The separation of powers depends as much on "preventing the diffusion" of power as it does on stopping the centralization of power. *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991). After all, to avoid "a gradual concentration" of governmental authority in one level or branch of government, The Federalist No. 51, p.349 (James Madison) (Jacob Cooke ed., 1961), each level and branch of government must retain the power the Constitution assigns to it. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2202–03 (2020); *Stern v. Marshall*, 564 U.S. 462, 483 (2011); *INS* v. *Chadha*, 462 U.S. 919, 946 (1983).

The equal-sovereignty doctrine helps preserve the constitutional balance. When Congress unequally limits the States' sovereignty—when it allows some States but not others to exercise some aspect of sovereign authority—it reorders the

20

constitutional division of power among the States.  Imagine a law allowing some States, but not others, to boycott Israel.  *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 (2000).  Or a law permitting just one State to enact and enforce immigration laws.  *Cf. Arizona v. United States*, 567 U.S. 387, 394 (2012).  It is one thing for Congress to enact preemptive laws, which necessarily limit state sovereignty; the federal government clearly has the power to do that.  It is quite another thing for Congress to limit state sovereignty on a selective basis.  When Congress picks favorites, it regulates the States *as States*.  "[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992); *see also Murphy*, 138 S. Ct. at 1476.  And when the federal government exercises such authority anyway, it aggrandizes its own power and the power of the favored States while weakening the power of the disfavored States.  Allowing Congress to reorder power that the Constitution gives equally to each State contradicts any sensible understanding of the separation of powers.

Beyond protecting the separation of powers, the "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle*, 221 U.S. at 580.  As one distinguished commentator recognized early in her legal career, equal sovereignty "rests on concepts of

21

federalism." Sonia Sotomayor de Noonan, Note, *Statehood and the Equal Footing Doctrine: The Case for Puerto Rican Seabed Rights*, 88 Yale L.J. 825, 835 (1979). "The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States." *Texas v. White*, 7 Wall. 700, 725 (1869). If the States' sovereign authority—the core of its statehood—could be reduced unequally, then the States would be in no relevant sense "indestructible." Instead, they would be subject to diminution when more politically powerful States win limits on sister States' authority. In addition to undermining "the integrity, dignity, and residual sovereignty of the States," *Bond v. United States*, 564 U.S. 211, 221 (2011), political rent-seeking of that sort would undermine a key virtue of federalism: making government "more responsive by putting the States in competition for a mobile citizenry." *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)). Competition between the States gives all States incentive to make policy attractive to the People. The virtue of competition would be seriously hampered if the States could compete by harming their rivals rather than by improving themselves.

**2.** Supreme Court precedent confirms that the equal-sovereignty principle limits Congress's power to unequally burden the States' sovereign authority.

The Supreme Court long ago recognized that every State, as a matter of "the constitution" and "laws" of admission is "admitted into the union on an equal

footing with the original states." *Pollard v. Hagan*, 44 U.S. 212, 229 (1845). "[N]o compact" can "diminish or enlarge" the rights a State has, as a State, when it enters the Union. *Id.* Put differently, "a State admitted into the Union enters therein in full equality with all the others, and such equality may forbid any agreement or compact limiting or qualifying political rights and obligations." *Stearns v. Minnesota*, 179 U.S. 223, 245 (1900); *Coyle*, 221 U.S. at 568. This precludes any arrangement in which one State is admitted on less-favorable terms than any other. *See Or. ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378 (1977). Conversely, it bars any State from being admitted on terms *more* favorable than those extended to its predecessors. *United States v. Texas*, 339 U.S. 707, 717 (1950). Each State has the right, "under the constitution, to have and enjoy the same measure of local or self government, and to be admitted to an equal participation in the maintenance, administration, and conduct of the common or national government." *Case v. Toftus*, 39 F. 730, 731–32 (C.C.D. Or. 1889).

The States' equality upon admission would not matter much if Congress could vitiate it after admission. Therefore, caselaw treats the right to equal sover-eignty as surviving admission to the Union. *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013). *Shelby County* involved challenges to the Voting Rights Act, which required some States, but not others, to receive federal permission before amending their

election laws. *Id*. at 544–45. The Court held unconstitutional Section 4 of the Voting Rights Act, which contained the formula used to decide which States needed federal preclearance before changing their election laws. The Court held that the law exceeded Congress's authority under the Fifteenth Amendment, which empowers Congress to pass "appropriate legislation" enforcing the Amendment's prohibition on denying or abridging the right to vote based on race. U.S. Const., amend. 15, §2. The Court determined that, in deciding whether such legislation was "appropriate," courts must consult the background principle of equal sovereignty. When legislation departs from that principle—as Section 4 did, by unequally limiting the States' power to adopt and enforce election laws—it will be upheld as "appropriate legislation" only if the disparate treatment is justified. *Shelby Cnty.*, 570 U.S. at 544–45, 552; *accord Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). Because the federal government failed to justify Section 4, Congress had no authority to enact that provision. *Shelby Cnty.*, 570 U.S. at 551–55.

*Shelby County* shows just how strong the equal-sovereignty principle is. Again, the Fifteenth Amendment *allows* Congress to single out some States for less-favorable treatment of their sovereign authority. *See South Carolina v. Katzenbach*, 383 U.S. 301, 329 (1966); *Shelby Cnty.*, 570 U.S. at 551–55. Still, in light of the background presumption of equal sovereignty, Fifteenth Amendment legislation departing from

24

the equal-sovereignty baseline is "appropriate" only if the need for such differential treatment is solidly grounded in evidence. *Shelby Cnty.*, 570 U.S. at 554. If the equal-sovereignty principle retains some strength even in contexts where the States have surrendered their entitlement to complete sovereign equality, it necessarily retains all its strength in contexts where the States *have not* surrendered their entitlement to sovereign equality.

**3.** Before moving on to the doctrine's application here, it is critical to emphasize the doctrine's limits. The Constitution guarantees "equal sovereignty, not … equal treatment in all respects." Thomas Colby, *In Defense of the Equal Sovereignty Principle*, 65 Duke L. J. 1087, 1149 (2016) (emphasis omitted). To demand that every law benefit everyone and everything equally "would make legislation impossible, and would be as wise as to try to shut off the gentle rain from heaven because every man does not get the same quantity of water." *State ex rel. Webber v. Felton*, 77 Ohio St. 554, 572 (1908). "Perfect uniformity and perfect equality … is a baseless dream." *Edye v. Robertson* (*The Head Money Cases*), 112 U.S. 580, 595 (1884). Congress frequently treats States differently in unremarkable ways, such as when it locates naval bases in States with coastlines or directs funding to projects in particular States. States located in areas prone to natural disasters gain more from federal laws

25

empowering and enriching FEMA. States that sit atop oil fields bear the brunt and reap the benefit of federal energy policies. And so on.

Such laws create no equal-sovereignty issues. The equal-sovereignty doctrine demands "parity" only "as respects political standing and sovereignty." *Texas*, 339 U.S. at 716. Congress may not unequally limit or expand the States' "political and sovereign power," *id*. at 719, and must instead adhere to the principle that no State is "less or greater … in dignity or power" than another, *Coyle*, 221 U.S. at 566. Disparate limitations on the States' sovereignty thus violate the equal-sovereignty doctrine. Disparate treatment *unrelated to sovereign authority*, however, does not. That means "Congress may devise … national policy with due regard for the varying and fluctuating interests of different regions." *Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 616 (1950). Congress may, in other words, pass legislation that expressly or implicitly favors some States over others, as long as it does not give some States favorable treatment with respect to the amount of sovereign authority they are permitted to exercise. Only disparate treatment of sovereign authority implicates the equal-sovereignty principle.

Further, Congress *arguably* complies with the equal-sovereignty doctrine when it empowers only a single State (or a single subset of States) to regulate a matter of unique concern to that State (or that subset of States). The reason is this: when

Congress empowers a single State to regulate an issue of unique concern to that State, it treats the States equally in a sense.  To illustrate, suppose Congress passed a law regulating mining and forbidding the States from imposing more-stringent regulations.  Now suppose the law allows States to impose more-stringent restrictions with respect to the extraction of a particular mineral. That law would create no equal-sovereignty problems—it unambiguously treats all States identically.  The same would likely be true if the law gave regulatory authority to every State with deposits of that mineral.  And it would likely remain true if the mineral were present in just one State.  Could Congress expressly give just that State the power to regulate the mineral's extraction?  The answer is presumably "yes."  That is because the difference between the state-specific version and the version applicable to all States would be purely formal.  The two laws would empower exactly the same States to regulate the mineral's extraction.

As this hypothetical shows, federal laws giving States authority over matters of unique concern to those States likely pass constitutional muster.  But as this brief discusses in greater detail below, the Court need not even resolve that issue here: *even if* Congress can empower States to regulate state-specific concerns, the EPA's waiver applies §209(b) to a situation in which California has no unique interest.

**B.    The Clean Air Act violates the equal-sovereignty doctrine by allowing California to exercise sovereign authority that the Act withdraws from every other State.**

**1.** Section 209(a), by preempting state laws setting emission standards for new cars, limits the States' sovereign authority.  After all, the "power of giving the law on any subject whatever, is a sovereign power."  *McCulloch v. Maryland*, 4 Wheat. 316, 409 (1819).  Since the States would have the power to regulate new-car emissions but for §209(a), that provision limits state sovereignty.

The fact that §209(a) limits state sovereignty creates no equal-sovereignty problem.  But the fact that §209(b)(1) limits state sovereignty unequally does.  Again, §209(b)(1) allows California, and only California, to obtain a federal waiver that permits it to set new-car emission standards.  While other States may adopt those same standards, California alone may set them.  Thus, California alone retains some of its "sovereign power" to "giv[e] the law" in this area.  *McCulloch*, 4 Wheat. at 409.

Section 209(b) violates the equal-sovereignty doctrine by allowing California to exercise sovereign authority that §209(a) takes from every other State.  The law effects an "extension of the sovereignty of [California] into a domain of political and sovereign power of the United States from which the other States have been excluded."  *Texas*, 339 U.S. at 719–20.  This unequal treatment is unconstitutional.  Congress passed §209 under its Commerce Clause authority.  And the States, in

28

ratifying the Commerce Clause, did not "compromise[] their right to equal sovereignty," Bellia & Clark, *International Law Origins*, 120 Colum. L. Rev. at 938, as they did with later amendments, *see Shelby Cnty.*, 570 U.S. at 551–55. Thus, the Commerce Clause provides no basis for disrupting the States' retained right to equal sovereignty.

Section 209's unconstitutionality is not a mere technicality. The unequal treatment undermines the federalist system by making California "greater … in dignity or power" than the other States. *Coyle*, 221 U.S. at 566. The law gives California alone a stick that it can use to win concessions and deals. For example, after the federal government proposed new, moderate emission standards, several car manufacturers held "secret negotiations" with California to secure desired treatment under California's regulations. Juliet Eilpern and Brandy Davis, *Major Automakers Strike Climate Deal with California, Rebuffing Trump on Proposed Mileage Freeze*, Washington Post (July 25, 2019), https://perma.cc/5FXC-FJPR. These manufacturers met with California because only California had the power to seriously help or hinder their businesses: the Golden State, and *only* that State, can adopt standards that manufacturers must either implement nationwide or find a way to implement in California-regulated States, either way at potentially significant cost. A

federal law giving one State special power to regulate a major national industry con-tradicts the notion of a Union of sovereign States.

**2.**  At the very least, §209(b) is unconstitutional in its application to the chal-lenged waiver.  While one could perhaps understand the equal-sovereignty doctrine to permit laws empowering only some States to regulate issues that only those States face, *see above* 26–27, §209(b) is not that sort of law—particularly in its application to this case.

As an initial matter, even accepting this narrower version of the equal-sover-eignty doctrine, §209(b) is unconstitutional in all its applications.  Instead of allowing all States with a unique environmental concern to seek a waiver, it accords special treatment to a category of States defined to forever include only California and to forever exclude all other States, without regard to whether other States face their own localized environmental concerns.

But even if §209(b) could be justified as addressing a state-specific concern with respect to clean air, that justification will not suffice here.  The challenged waiver allows California to regulate greenhouse gases as part of the State's effort to curb climate change.  But the causes and effects of climate change are "global," not state-specific, in nature. *City of New York v. Chevron Corp.*, 993 F.3d 81, 88 (2d Cir. 2021).  Even assuming §209(b) is constitutional in its application to waivers that

allow California to address California-specific issues, it is unconstitutional in its application here because climate change is not an acute California problem.

According to the EPA, carbon dioxide and other greenhouse gases produced by human activity "changed the earth's climate." *Causes of Climate Change*, U.S. Environmental Protection Agency, https://perma.cc/WR4F-TFDP. Also according to the EPA, greenhouse gases "remain in the atmosphere long enough to become well mixed, meaning that the amount that is measured in the atmosphere is roughly the same all over the world, regardless of the source of the emissions." *Overview of Greenhouse Gases*, U.S. Environmental Protection Agency, https://perma.cc/5777-TJRN.

This makes climate change "a global problem," *New York*, 993 F.3d at 88 (2d Cir. 2021), "harmful to humanity at large." *Massachusetts*, 549 U.S. at 541 (Roberts, C.J., dissenting) (quoting *Massachusetts v. EPA*, 415 F.3d 50, 60 (D.C. Cir. 2005) (Sentelle, J., dissenting in part and concurring in the judgment)). The "task of dealing with" all this requires action "at the national and international level." *Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 415 (D.C. Cir. 2013) (Kavanaugh, J., concurring). This means that the risks associated with climate change are not of unique or special concern for California. If greenhouse-gas emissions cause global temperatures to rise, the effects will be felt the world over. And in 2019, the EPA agreed.

31

It recognized that greenhouse gases emitted from California vehicles do not remain in California. Instead, they "become one part of the global pool of GHG emissions that affect the atmosphere globally and are distributed throughout the world, resulting in basically a uniform global atmospheric concentration." 84 Fed. Reg. at 51,331. The EPA explained that giving California a "waiver would result in an indistinguishable change in global temperatures," and "likely no change in temperatures or physical impacts resulting from anthropogenic climate change in California." *Id*. at 51,341.

The EPA now says, without evidence, that "California is particularly impacted by climate change." 87 Fed. Reg. at 14,363. But that is absurd. California may experience effects of climate change. But there is no evidence California will suffer effects that are worse—in magnitude or in kind—than those experienced by the other forty-nine States. Temperature changes, according to the EPA, are projected to be greater in the Northeast. *See Climate Change and Social Vulnerability in the United States* 12, EPA (Sept. 2021), https://perma.cc/5VAE-9VLG. Sea level rise is projected to more greatly affect New York, Houston, and Philadelphia than coastal California cities. *Id*. at 14. Changes in particulate matter in the air will more likely affect the Southeast. *Id*. at 22. The bottom line: "Climate change affects all Americans." *Id*. at 4. None of this is to diminish California's interest in slowing

climate change.  But the EPA has provided no reason to believe that the risk posed to California is unique from the risk posed to other States.

In sum, whatever one might make of §209(b) in other applications, the equal sovereignty of the States forbids Congress from giving California alone the power to regulate a global risk faced by every State in the country and by every nation on Earth.

*

Section 209(b) violates the Constitution, and so does the waiver that the EPA reissued through the challenged rule.  Because that waiver rests on an unconstitutional statute, it is "not in accordance with law" and "contrary to constitutional right" and "power."  5 U.S.C. §706(2)(A)–(B).  Thus, even though "the constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver requests," 87 Fed. Reg. at 14,377, the Administrative Procedure Act requires this Court to set aside the waiver.

## II. The waiver must be set aside under the Administrative Procedure Act because it is not in accordance with the Energy Policy and Conservation Act.

The Court should set aside the waiver under the Administrative Procedure Act *even if* it rejects the States' equal-sovereignty argument.  The reason?  The waiver is "not in accordance with law," 5 U.S.C. §706(2)(A), because it permits California to enforce regulations that federal law preempts.

33

**1.** The Energy Policy and Conservation Act of 1975 created a system whereby the federal government announces "corporate average fuel economy" standards for auto manufacturers to meet. *See The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks*, 85 Fed. Reg. 24,174, 24,213 (Apr. 30, 2020). The Act commands the Department of Transportation, through NHTSA, to set these standards for new fleets of passenger automobiles. *Id.* The standards must be set at the "maximum feasible" level—the lowest level of emissions that can be practically attained. *Id.* And NHTSA must consider competing factors: (1) technological feasibility; (2) economic practicability; (3) the effect of other motor-vehicle standards on fuel economy; and (4) the United States' need to conserve energy. 49 U.S.C. §32902(f).

In addition to empowering the federal government to regulate fuel economy, the Act expressly preempts all fifty States from doing the same:

> When an average fuel economy standard prescribed under th[e] chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation *related to* fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. §32919(a) (emphasis added).

"Related to" preemption clauses, like this one, are "deliberately expansive," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987), and "conspicuous for [their]

34

breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990). State requirements "relate to" matters of federal regulation when they have a "connection with," or even just contain a "reference to," the regulated topic. *Rowe v. N.H. Motor Transport Ass'n*, 552 U.S. 364, 370 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). For example, because municipal regulations draw distinctions based on fuel efficiency when they incentivize the use of hybrid taxis, such regulations can "relate to" fuel efficiency and be preempted. *See, e.g.*, *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157–58 (2nd Cir. 2010); *Ophir v. City of Bos.*, 647 F. Supp. 2d 86, 94 (D. Mass. 2009).

**2.** The Low Emission Vehicle program and the Zero Emission Vehicle program both comprise regulations "related to" fuel economy—regulations that the Energy Policy and Conservation Act preempts.

***Low Emission Vehicle regulations.*** The Low Emission Vehicle regulations require vehicles to emit fewer grams of carbon dioxide per mile. Cal. Code Regs. tit.13 §1961.3. They thus "relate to"—they have an indisputable "connection with"—fuel consumption. *Rowe*, 552 U.S. at 371 (quotation omitted). After all, there is a direct, mathematical relationship between combustion of gasoline and the amount of carbon dioxide a vehicle emits. The more gasoline a vehicle burns to travel a mile, the more carbon dioxide it emits. So the only way to reduce emission levels from

gasoline-powered vehicles is to improve the vehicle's fuel economy.  This means California's regulation of emission levels demands improved fuel economy.  And because the regulations relate to fuel economy, the Energy Policy and Conservation Act preempts them.

All this comports with the position that the federal government had consistently taken for years in the past.  In a 2006 rule finalizing corporate-average-fuel-economy standards, NHTSA said that a "State requirement limiting $CO_2$ emissions" would be preempted "because it [would have] the direct effect of regulating fuel consumption." *Average Fuel Economy Standards for Light Trucks Model Years 2008–2011*, 71 Fed. Reg. 17,566, 17,654 (Apr. 6, 2006).  And in 2010, both the EPA and NHTSA acknowledged that "the relationship between improving fuel economy and reducing $CO_2$ tailpipe emissions is a very direct and close one." 75 Fed. Reg. at 25,327.  Both agencies have stressed the linkage in past briefing to this Court, calling fuel-economy standards and carbon-emission regulations "unquestionably more than 'related to' each other." Gov. Br., Doc. No. 1860684 at 40, *Union of Concerned Scientists v. NHTSA, et al.*, No. 19-1230 (D.C. Cir. Sept. 9, 2020).

***Zero Emission Vehicle regulations.***  California's Zero Emission Vehicle program consists of regulations requiring manufacturers to produce and deliver for sale a certain number of "vehicles that produce zero exhaust emissions of any criteria

pollutant (or precursor pollutant) or greenhouse gas, excluding emissions from air conditioning systems." Cal. Code Regs. tit.13 §1962.2(a). The only way to eliminate tailpipe carbon-dioxide emissions is to eliminate the use of fossil fuel. *See* 84 Fed. Reg. at 51,320. Therefore, California's regulations necessarily affect—they necessarily "relate to"—the fuel economy achieved by a manufacturer's fleet, as well as a manufacturer's strategy to comply with applicable standards. *Id.* California's mandate has "just as" "direct and substantial [an] impact on corporate average fuel economy as regulations that explicitly eliminate carbon dioxide emissions." *Id.* Therefore, these regulations "relate to" fuel-economy standards and are preempted by the Energy Policy and Conservation Act.

Indeed, the Act defines "fuel economy" in a manner that plainly brings state laws requiring zero-emission vehicles within the preemption clause's scope. "[F]uel economy" means "the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used." 49 U.S.C. §32901(a)(11). The Act defines "alternative fuel[s]" to include electricity and hydrogen. §32901(a)(1). And it directs: "If a manufacturer manufactures an electric vehicle, the [EPA] shall include in the calculation of average fuel economy ... equivalent petroleum based fuel economy values determined by the Secretary of Energy for various classes of electric vehicles." §32904(2)(B). "[T]he fuel economy" for

37

zero-emission vehicles "shall be based on the fuel content of the alternative fuel used to operate the automobile." §32905(a).  The EPA calculates fuel economy for electric vehicles in terms of miles per gallon equivalent, or MPGe.  *See "Electric Vehicle" label*, U.S. Department of Energy, https://www.fueleconomy.gov/feg/Find.do?action=bt1; *see also* Hearst Autos Research, *What is MPGe?*, Car and Driver, https://perma.cc/3BKV-R6KX (last visited May 31, 2022).  Because the Act measures the "fuel economy" of zero-emission vehicles—and includes those numbers in fleet calculations—a state law that requires a greater number of electric vehicles within each manufacturer's fleet "relate[s] to fuel economy standards," 49 U.S.C. §32919(a), and is thus preempted by the Energy Policy and Conservation Act.

**3.**  Because the waiver allows California to enforce regulations that federal law prohibits, the waiver is "not in accordance with law," "contrary to constitutional right," and must be set aside.  5 U.S.C. §706(2)(A)–(B).  The Final Rule hints at two counterarguments, but neither is availing.

*First*, the EPA protests that "[c]onsideration of preemption under EPCA is beyond the statutorily prescribed criteria for EPA" to account for when deciding whether to issue a waiver under Section 209 of the Clean Air Act.  87 Fed. Reg. at 14,368.  As an initial matter, the EPA's failure to consider the Energy Policy and Conservation Act once commenters brought it to the agency's attention was

arbitrary and capricious, which is reason enough to set aside the waiver. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2384 (2020). Regardless, assuming the Agency could ignore the legality of the waiver request, *see Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1114–15 (D.C. Cir. 1979), the Administrative Procedure Act requires *courts* to set aside agency actions that contravene the law. 5 U.S.C. §706(2)(A). The waiver, as just explained, contravenes the law.

*Second*, the EPA referred to "[r]elevant judicial precedent[s]" that "appear to call into question whether California's GHG standards and ZEV sales mandates are indeed preempted under EPCA." 87 Fed. Reg. at 14372. In support of this proposition, the EPA cited *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295 (D. Vt. 2007)—a wrongly decided, non-binding case—along with another district-court decision relying upon *Green Mountain*. 87 Fed. Reg. at 14,372 n.409. *Green Mountain* held that, once the EPA grants a waiver to California, California's standards transform into *federal* fuel-economy standards. Because federal law cannot preempt federal law, the court reasoned, the Act does not preempt standards approved by an EPA waiver. 508 F. Supp. 2d at 347.

The problem with this argument is that the issuance of a waiver *does not* transform state standards into federal standards. In concluding otherwise, *Green*

*Mountain* misinterpreted Section 502(d) of the Energy Policy and Conservation Act. When Congress passed the Act and ordered NHTSA to set fuel-economy standards, it recognized that NHTSA would not be able to do so immediately. So the Act directly set fuel-economy standards for model years 1978 through 1980. §502(a). Section 502(d)(1) invited "[a]ny manufacturer" to "apply to the Secretary for modification of an average fuel economy standard" during those years. In deciding whether to grant modifications, the Secretary had to consider the reduction in fuel economy caused by "the application of … Federal standards." §502(d)(3)(C)(i). And the Act defined "Federal standards," *for this narrow purpose*, to include California emission standards enforceable because of a Clean Air Act waiver. §502(d)(3)(D)(i).

*Green Mountain* latched on to this definition. "It seems," the court declared, "beyond serious dispute … that once EPA issues a waiver for a California emissions standard, it becomes a motor vehicle standard of the government, with the same stature as a federal regulation." 508 F. Supp. 2d at 347. This simply ignores the fact that, while the Act treated California standards as federal standards for three model years, it no longer does. Today, California standards are California standards, not federal standards.

One final point on *Green Mountain*. That court held, in the alternative, that the Energy Policy and Conservation Act preempts *only* laws that expressly set fuel-

economy standards. *Id*. at 353–54. That alternative holding denies "related to" the broad scope it is owed, *see above* 33–35, and is therefore wrong.

In sum, *Green Mountain* is non-binding and wrongly decided. It ought to be ignored.

## CONCLUSION

The Court should invalidate the waiver the EPA issued to California.

November 2, 2022                    Respectfully submitted,

STEVE MARSHALL
Attorney General of Alabama

*/s/ Edmund G. LaCour Jr. (BMF per authority)*
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8400 fax
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*


DAVE YOST
Attorney General of Ohio

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS
Ohio Solicitor General
MICHAEL HENDERSHOT
Chief Deputy Solicitor General
SYLVIA MAY MAILMAN
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
(614) 466-5087 fax
benjamin.flowers@ohioago.gov

*Counsel for State of Ohio*


LESLIE RUTLEDGE
Attorney General of Arkansas

*/s/Nicholas J. Bronni (BMF per authority)*
NICHOLAS J. BRONNI
Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*


CHRISTOPHER M. CARR
Attorney General of Georgia

*/s/ Stephen J. Petrany (BMF per authority)*
STEPHEN J. PETRANY
Solicitor General
Georgia Department of Law
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

42

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ Thomas M. Fisher (BMF per authority)*
THOMAS M. FISHER
Solicitor General
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204-2770
(317) 232-6255
Tom.Fisher@atg.in.gov

*Counsel for State of Indiana*


DANIEL CAMERON
Attorney General of Kentucky

*/s/ Matthew F. Kuhn (BMF per authority)*
MATTHEW F. KUHN
Solicitor General
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5400
Matt.Kuhn@ky.gov

*Counsel for State of Kentucky*


DEREK SCHMIDT
Attorney General of Kansas

*/s/ Jeffrey A. Chanay (BMF per authority)*
JEFFREY A. CHANAY
Chief Deputy Attorney General
120 S.W. 10th Avenue, 3rd Floor
Topeka, KS 66612
(785) 368-8435
(785) 291-3767 fax
jeff.chanay@ag.ks.gov

*Counsel for State of Kansas*


JEFF LANDRY
Attorney General of Louisiana

*/s/ Elizabeth B. Murrill (BMF per authority)*
ELIZABETH B. MURRILL
Solicitor General
J. SCOTT ST. JOHN
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

*/s/ Justin L. Matheny (BMF per authority)*
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ERIC S. SCHMITT
Attorney General of Missouri

*/s/ D. John Sauer (BMF per authority)*
D. JOHN SAUER
Solicitor General
JEFF P. JOHNSON
Deputy Solicitor General
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
(573) 751-8870
(573) 751-0774 fax
John.Sauer@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ David M.S. Dewhirst (BMF per authority)*
DAVID M.S. DEWHIRST
Solicitor General
KATHLEEN L. SMITHGALL
Assistant Solicitor General
Montana Department of Justice
215 N Sanders St
Helena, MT 59601
(406) 444-2026
David.Dewhirst@mt.gov
Kathleen.Smithgall@mt.gov

*Counsel for State of Montana*

DOUGLAS J. PETERSON
Attorney General of Nebraska

*/s/ James A. Campbell (BMF per authority)*
JAMES A. CAMPBELL
Solicitor General
JUSTIN D. LAVENE
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
justin.lavene@nebraska.gov

*Counsel for State of Nebraska*

JOHN M. O'CONNOR
Attorney General of Oklahoma

*/s/ Bryan Cleveland (BMF per authority)*
BRYAN CLEVELAND
Deputy Solicitor General
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
bryan.cleveland@oag.ok.gov

*Counsel for State of Oklahoma*


KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Judd E. Stone II (BMF per authority)*
JUDD E. STONE II
Solicitor General
RYAN S. BAASCH
Assistant Solicitor General
KATIE B. HOBSON
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700
(512) 474-2697 fax
Ryan.Baasch@oag.texas.gov
Katie.Hobson@oag.texas.gov

*Counsel for State of Texas*

ALAN WILSON
Attorney General of South Carolina

*/s/ James Emory Smith, Jr. (BMF per authority)*
JAMES EMORY SMITH
Deputy Solicitor General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, SC 29211
(803)734-3680
esmith@scag.gov

*Counsel for State of South Carolina*


SEAN D. REYES
Attorney General of Utah

*/s/ Melissa A. Holyoak (BMF per authority)*
MELISSA A. HOLYOAK
Utah Solicitor General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0260
melissaholyoak@agutah.gov

*Counsel for State of Utah*

PATRICK MORRISEY
Attorney General of West Virginia

*/s/ Lindsay S. See (BMF per authority)*
LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Senior Deputy Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(682) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for State of West Virginia*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed R. App. P. 32(f) and (g), I hereby certify that the foregoing complies with the Court's May 20, 2020 Order because it contains 8,448 words, excluding exempted portions, according to the count of Microsoft Word.

I further certify that the motion complies with Fed. R. App. P. 27(d)(1)(E), 32(a)(5) and (6) because it has been prepared in 14-point Equity Font.

/s/ *Benjamin M. Flowers*
BENJAMIN M. FLOWERS
*Counsel for State of Ohio*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 2, 2022, I caused the foregoing to be electrically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

/s/ *Benjamin M. Flowers*
BENJAMIN M. FLOWERS
*Counsel for State of Ohio*

48