ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1081 and consolidated cases

_____

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

STATE OF OHIO, ET AL.,

*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY, ET AL.

*Respondents.*

_____

On Petition for Review of Action by the Environmental Protection Agency

_____

**BRIEF OF ADMINISTRATIVE LAW PROFESSORS AS *AMICI CURIAE*
IN SUPPORT OF RESPONDENTS**

David R. Baake
Baake Law, LLC
2131 N. Main Street
Las Cruces, NM 88001
Telephone: (575) 343-2782
david@baakelaw.com

*Counsel for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici**.  All parties, *amici*, and intervenors appearing in this case are listed in Petitioners' opening briefs, except for the following *amici curiae*: (1) South Coast Air Quality Management District, (2) California Climate Scientists David Dickinson Ackerly, et al., (3) American Thoracic Society, et al., and (4) Senator Tom Carper and Representative Frank Pallone, Jr.

**B. Rulings under Review.**  These cases seek review of the final action of the Administrator of the Environmental Protection Agency ("EPA"), entitled California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice, 87 Fed. Reg. 14,332 (Mar. 14, 2022) (the "Restoration Decision").

**C. Related Cases.**  The only related cases of which counsel are aware are identified in Petitioners' opening briefs.

## STATEMENT REGARDING SEPARATE BRIEFING, AUTHORSHIP, AND MONETARY CONTRIBUTIONS

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(a)(4)(E).  Counsel for Petitioners, Respondents, and Intervenors consent to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2).

*Amici* are aware that other *amici curiae* intend to file briefs in support of Respondent.  Pursuant to Circuit Rule 29(d), counsel for *amici* certifies that a separate brief is necessary.  Given the significant differences in the memberships of *amici* and the other groups, the distinct interests the members of *amici* and the other groups have in this case, and the distinct issues they intend to brief, it is impracticable to collaborate in a single brief.  *Amici* believe that the Court will benefit from the presentation of these multiple perspectives.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............2

STATEMENT REGARDING SEPARATE BRIEFING, AUTHORSHIP, AND
MONETARY CONTRIBUTIONS...........................................................................3

TABLE OF CONTENTS..................................................................................4

TABLE OF AUTHORITIES .............................................................................5

GLOSSARY OF ACRONYMS AND ABBREVIATIONS....................................8

STATEMENT OF INTEREST ..........................................................................9

INTRODUCTION AND SUMMARY OF ARGUMENT .....................................10

ARGUMENT ...............................................................................................12

    A.    Congress Did Not Authorize EPA to Reconsider Preemption Waivers. ....12

        1.    Section 209(b) Does Not Authorize EPA to Reconsider Waivers..........13

        2.    The Broader Statutory Context is Inconsistent with the Reconsideration
Authority Claimed by EPA in 2019...................................................................15

        3.    The Legislative History Does Not Suggest That EPA is Authorized to
Reconsider Waivers. ........................................................................................18

        4.    The Withdrawal Decision Was a Departure from the Agency's Past
Practice.............................................................................................................20

    B.    EPA Lacked "Inherent Authority" to Reconsider the Waiver. ...................23

    C.    Because the Withdrawal Decision Was Unauthorized, the Restoration
Decision Must Be Upheld..................................................................................28

CONCLUSION ............................................................................................30

BIOGRAPHIES OF *AMICI* ADMINISTRATIVE LAW PROFESSORS ............31

CERTIFICATES OF SERVICE AND COMPLIANCE .........................................32

# TABLE OF AUTHORITIES

## CASES

*Albertson v. FCC,* 182 F.2d 397 (D.C. Cir. 1950)...................................................24

*Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628 (D.C. Cir. 2019) ....................18

*\*Am. Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984)........... 10, 12, 16, 24, 28

*Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453 (D.C. Cir. 2013)............17

*Bartlik v. U.S. Dep't of Lab.*, 34 F.3d 365 (6th Cir. 1994)......................................23

*Belville Min. Co. v. United States*, 999 F.2d 989 (6th Cir. 1993)............................27

*Braniff Airways, Inc. v. Civ. Aeronautics Bd.*, 379 F.2d 453 (D.C. Cir. 1967).......29

*Chapman v. El Paso Nat. Gas Co.*, 204 F.2d 46 (D.C. Cir. 1953)....... 12, 25, 26, 28

*Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984).............................................26

*\*Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316 (1961).. 10, 11, 13, 15, 23, 28

*Cochnower v. United States*, 248 U.S. 405 (1919).................................................14

*Consol. Rail Corp. v. Surface Transp. Bd.*, 93 F.3d 793 (D.C. Cir. 1996).............25

*CTS Corp. v. Waldburger*, 573 U.S. 1 (2014) .......................................................18

*Ford Motor Co. v. EPA*, 606 F.2d 1293 (D.C. Cir. 1979) ................................ 11, 14

*Gorbach v. Reno*, 219 F.3d 1087 (9th Cir. 2000) ............................................ 14, 22

*Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989).......................................27

*Hirschey v. FERC*, 701 F.2d 215 (D.C. Cir. 1983).......................................... 12, 28

*HTH Corp. v. NLRB*, 823 F.3d 668 (D.C. Cir. 2016)............................................23

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*, 839 F.2d 795 (D.C. Cir. 1988)......20

*Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156 (6th Cir. 1980) .........................13

*Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977)..................................... 12, 24

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095 (D.C. Cir. 1979) .... 19, 22

*NRDC v. Nuclear Reg. Comm'n*, 666 F.2d 595 (D.C. Cir. 1981) ..........................17

*National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005) .................................................................................................................26

*North Dakota v. United States*, 460 U.S. 300 (1983) .............................................16

*Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775 (1st Cir. 1988) ...........................20

*S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006) ..............22

*Shannon v. United States*, 512 U.S. 573 (1994) ......................................................19

*Union Elec. Co. v. EPA*, 515 F.2d 206 (8th Cir. 1975) ...........................................17

\**United States v. Seatrain Lines*, 329 U.S. 424 (1947) ........................ 24, 25, 26, 28

*Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985) .......................................20

**STATUTES**

42 U.S.C. § 7401(a)(3).............................................................................................18

42 U.S.C. § 7407(a) .................................................................................................18

42 U.S.C. § 7407(d)(3)(A)........................................................................................15

42 U.S.C. § 7408(a)(1)..............................................................................................15

42 U.S.C. § 7409(d) ..................................................................................................15

42 U.S.C. § 7410(k)(6).............................................................................................. 11, 14

42 U.S.C. § 7411(b)(1)(B) ........................................................................................15

42 U.S.C. § 7412(b)(2)..............................................................................................15

42 U.S.C. § 7416......................................................................................................18

42 U.S.C. § 7507 ...................................................................................................... 15, 22

42 U.S.C. § 7521(a)(1)...................................................................15

42 U.S.C. § 7543(b)(1)...................................................... 11, 12, 13

42 U.S.C. § 7543(b)(3)........................................................ 15, 22

42 U.S.C. § 7607(b)(1)..................................................................17

42 U.S.C. § 7607(d)(7)(B) .............................................. 11, 14

42 U.S.C. § 7661a(i) ....................................................................15

## FEDERAL REGISTER MATERIALS

43 Fed. Reg. 998 (Jan 5, 1978) ..................................................20

47 Fed. Reg. 7306 (Feb. 18, 1982) ...........................................20

74 Fed. Reg. 32,744 (July 8, 2009).............................................12

78 Fed. Reg. 2112 (Jan. 9, 2013) ...............................................9

84 Fed. Reg. 51,310 (Sept. 27, 2019) ........................... 7, 9, 18, 22, 24

87 Fed. Reg. 14,332 (Mar. 14, 2022).......................... 7, 9, 20, 28

## OTHER AUTHORITIES

Daniel Bress, *Administrative Reconsideration*, 91 VA. L. REV. 1737 (2005) .. 22, 25

# GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms

and abbreviations used in this brief:

| | |
|---|---|
| Br. | Brief of Private Petitioners |
| EPA | Environmental Protection Agency |
| Withdrawal Decision | 84 Fed. Reg. 51,310 (Sept. 27, 2019) |
| Restoration Decision | 87 Fed. Reg. 14,332 (Mar. 14, 2022) |

## STATEMENT OF INTEREST

*Amici curiae* are professors of law who teach and write in the field of administrative law.  Their expertise in administrative law gives them a unique perspective on one of the key issues in this case: namely, whether EPA has "inherent authority" to reconsider an adjudicative order granting California's application for a preemption waiver under Section 209(b) of the Clean Air Act, notwithstanding the absence of any statutory provision authorizing the agency to convene such a proceeding.  *Amici* agree that federal agencies like EPA lack "inherent authority" to reconsider adjudicative decisions that have become final and unreviewable under the relevant statutory scheme.  Rather, any authority to reconsider such a decision must be derived from the statute.  Because the Clean Air Act does not authorize EPA to reconsider prior waiver grants, EPA's 2019 action purporting to withdraw a six-year-old waiver was unlawful.  The Withdrawal Decision was appropriately rescinded on the basis of this legal error.

The professors who join this brief as *amici curiae* are listed in Appendix A. These professors' titles and university affiliations are provided for identification purposes only.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In 2013, EPA granted the State of California a waiver under Section 209(b) of the Clean Air Act, allowing the state to enforce a suite of regulations designed to reduce motor vehicle emissions. *See* 78 Fed. Reg. 2112 (Jan. 9, 2013). In 2019, EPA purported to withdraw that six-year-old waiver, notwithstanding the admitted "absence of explicit [statutory] language" authorizing it to do so, based on the assertion that it had "inherent authority" to reconsider its prior decision. *See* 84 Fed. Reg at 51,331 (the "Withdrawal Decision"). In 2022, EPA recognized it had exceeded its "limited" reconsideration authority by reopening the waiver in 2019, and that this error constituted an "independent basis" for rescinding the Withdrawal Decision. *See* 87 Fed. Reg. at 14,344 (the "Restoration Decision").

EPA's current position is the correct one: the agency lacked authority to reconsider the waiver in 2019, and the Withdrawal Decision was appropriately rescinded for that reason alone. As a creature of statute, EPA can "reconsider[]" a prior adjudicative decision *only* when "Congress has said it can." *Civ. Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 321–22 (1961). Where an agency exceeds its authority by reopening a decision that Congress intended to remain settled, the agency's action is appropriately set aside based on that error. *See, e.g.*, *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 840 (D.C. Cir. 1984).

10

The text, structure, and history of the Clean Air Act show that Congress intended a waiver, once granted, to become settled law on which states and private parties could rely. The statute provides that EPA "shall" grant California's application for a preemption waiver except in narrowly defined circumstances. 42 U.S.C. § 7543(b)(1). This provision "does not provide for any probing substantive review of the California standards by federal officials" even in the first instance. *See Ford Motor Co. v. EPA*, 606 F.2d 1293, 1301 (D.C. Cir. 1979). Nothing in the text even *hints* that EPA is authorized to revisit a decision granting a waiver that has become final. Nor can this omission be ascribed to congressional inadvertence, given that the Clean Air Act is replete with provisions that specifically authorize EPA to reconsider, modify, or revisit otherwise final actions. *See, e.g.*, 42 U.S.C. §§ 7410(k)(6); 7607(d)(7)(B). The broader statutory context— including the fact that Congress specifically invited other states to rely on California's standards in complying with their own obligations under the Clean Air Act—is further evidence that Congress intended waivers to become settled law.

In 2019, EPA attempted to support its unprecedented decision to revoke a six-year-old waiver by relying on an expansive conception of its own "inherent authority" to reconsider. It is doubtful that this doctrine can be reconciled with Supreme Court precedent. *See Delta Air Lines*, 367 U.S. at 334 (holding that "agencies may [not] expand their powers of reconsideration without a solid

11

foundation in the language of the statute").  But even assuming that agencies have some inherent authority to reconsider, the Withdrawal Decision far exceeded the boundaries of that authority, by purporting to reopen a six-year-old decision that had engendered significant reliance based solely on changed legal and policy positions.  *See Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (reconsideration must occur within a "reasonable time" of the initial decision, typically "measured in weeks, not years"); *Chapman v. El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953) (an adjudicatory decision "may not be repudiated for the sole purpose of applying some quirk or change in administrative policy").

In 2019, EPA acted unlawfully in seeking to "wrest a standardless and open[-]ended revocation authority from a silent statute," *Am. Methyl*, 749 F.2d at 837, ignoring the "strong interest in repose" that exists "under any regime of legal rules," *Hirschey v. FERC*, 701 F.2d 215, 220 (D.C. Cir. 1983), and upsetting significant reliance interests that Congress intended for waiver decisions to engender.  Because EPA had no business reopening the waiver, the Withdrawal Decision was unlawful, and EPA's action rescinding it must be sustained.

## ARGUMENT

### A. Congress Did Not Authorize EPA to Reconsider Preemption Waivers.

An order granting a waiver under Section 209(b) of the Clean Air Act is unquestionably an adjudicative decision.  *See* 42 U.S.C. § 7543(b)(1) (providing

that a waiver decision shall be made after "notice and *opportunity for public hearing*") (emphasis added); *see also* 74 Fed. Reg. 32,744, 32,781 (July 8, 2009) ("EPA's waiver proceedings and actions under section 209(b)(1) are informal adjudications."). Accordingly, a decision granting a waiver is subject to reconsideration only where Congress so authorized. *See Delta Air Lines*, 367 U.S. at 321–22; *Marshall v. Monroe & Sons, Inc.*, 615 F.2d 1156, 1158 (6th Cir. 1980) ("The critical determination that must be made in questions of administrative reconsideration is the extent to which Congress afforded the agency the power of reconsideration."). The text, structure, and history of the Clean Air Act foreclose any suggestion that Congress intended for EPA to have authority to reconsider a previously granted waiver on the basis of changed legal or policy views.

1. *Section 209(b) Does Not Authorize EPA to Reconsider Waivers.*

In enacting Section 209(b), Congress granted EPA extremely limited authority to review California's waiver application in the first instance and provided no mechanism for revisiting a waiver once issued. The statute provides that EPA "*shall . . . waive application of this section*" to California except in narrowly defined circumstances. 42 U.S.C. § 7543(b)(1) (emphasis added). This provision "does not provide for any probing substantive review of the California standards by federal officials" even in the first instance. *See Ford*, 606 F.2d at

1301.  And nothing in the statutory text even *hints* that EPA is authorized to revisit a waiver decision once it has become final.

EPA's limited authority to deny a waiver application, thereby preventing new emission standards from taking effect in the first place, cannot be read to imply the greater power to *withdraw* a waiver, thereby preempting the ongoing enforcement of laws adopted years prior.  After all, "[t]here is no general principle that what one can do, one can undo."  *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000) (*en banc*) (rejecting Attorney General's argument that "the power to denaturalize is 'inherent'" in statutory grant of "the power to naturalize"); *see also Cochnower v. United States*, 248 U.S. 405, 407–08 (1919) (statute delegating authority to "increase and fix" compensation did not impliedly delegate the "opposite power" to decrease compensation).

It would be particularly inappropriate to construe Section 209(b) to provide EPA with implicit authority to reconsider waiver decisions because the Clean Air Act is replete with provisions that specifically authorize EPA to reconsider, modify, or revisit otherwise final actions, including actions conferring authority upon a state.  *See, e.g.*, 42 U.S.C. §§ 7410(k)(6) (authorizing EPA to revise any action related to a state implementation plan, area designation, classification, or reclassification "[w]henever" EPA determines the action "was in error"); 7607(d)(7)(B) (providing that EPA "shall convene a proceeding for

14

reconsideration" upon receiving a petition "within the time specified for judicial review"); 42 U.S.C. § 7661a(i) (authorizing EPA to revoke a state's authority to implement the Title V permitting program).[1]  Given that "Congress has been anything but inattentive to" the question of EPA's authority to revisit prior decisions, *cf. Delta Air Lines*, 367 U.S. at 322, Congress' failure to provide EPA with authority to reconsider a waiver decision must reflect a deliberate decision.

### 2.  *The Broader Statutory Context is Inconsistent with the Reconsideration Authority Claimed by EPA in 2019.*

The broader statutory context shows that Congress intended for a waiver, once granted, to become settled law on which states and regulated parties could rely.  Significantly, Congress specifically invited other states to rely on California's standards in complying with their obligations under the Clean Air Act or pursuing other pollution reduction goals, authorizing states to adopt and enforce California's standards, without any intervening action by EPA, as soon as "a waiver has been granted" to California.  42 U.S.C. § 7507.  Congress also invited the regulated industry to rely on waiver decisions.  *See id.*, § 7543(b)(3) (once a

---

[1] *See also* 42 U.S.C. §§ 7407(d)(3)(A) (authorizing EPA to revise area designations "at any time"); 7408(a)(1) (authorizing EPA to revise the list of criteria pollutants); 7409(d) (requiring EPA to review and revise national ambient air quality standards); 7411(b)(1)(B) (requiring EPA to review and revise new source performance standards); 7412(b)(2) (requiring EPA to review and revise the list of hazardous air pollutants); 7521(a)(1) (requiring EPA to review and revise motor vehicle emission standards).

waiver has been granted, a manufacturer's compliance with California's standards

"shall be treated as compliance with applicable Federal standards").  Courts are

particularly hesitant to allow agencies to reopen final decisions where it is clear

from the statutory scheme that Congress intended to allow third parties to rely on

those decisions.  *See, e.g.*, *Am. Methyl*, 749 F.2d at 839–40 (where Congress

intended for regulated parties to invest in alternative fuels in reliance on EPA

waivers, it could not have intended to grant EPA authority to revoke those

waivers); *cf. North Dakota v. United States*, 460 U.S. 300, 313–14 (1983) (where it

was foreseeable that federal government would expend resources in reliance on

state's consent to federal wetland acquisition, Congress could not have intended to

allow states to revoke their consent).[2]

Congress further sought to promote regulatory stability by providing a

limited, 60-day window to challenge the legality of Clean Air Act decisions, such

as whether to grant a waiver under Section 209(b).  Section 307(b)(1) of the Act

---

[2] The fact that Congress intended for states and private parties to rely on waiver decisions is relevant to the *legal question* of whether Congress conferred reconsideration authority upon EPA in the first place.  There is a separate *factual* question in this case: namely, whether the Withdrawal Decision was arbitrary and capricious insofar as it upset the significant reliance interests actually engendered by the 2013 waiver without adequate explanation.  *See* Brief of Federal Respondents at 55–57.  While *amici* agree with EPA that the Withdrawal Decision was arbitrary and capricious, the Court need not reach this issue if it agrees with *amici* that EPA had no authority to reconsider the waiver in the first place.

16

generally requires parties to challenge EPA actions within 60 days after notice of the action appears in the Federal Register. *See* 42 U.S.C. § 7607(b)(1). This provision represents "Congress' careful effort to force potential litigants to bring challenges" to agency actions "at the outset." *Am. Rd. & Transp. Builders Ass'n v. EPA*, 705 F.3d 453, 458 (D.C. Cir. 2013) (cleaned up). Time limits like this one "serve[] the important purpose of imparting finality into the administrative process, thereby conserving administrative resources and protecting the reliance interests" of individuals impacted by the regulation. *NRDC v. Nuclear Reg. Comm'n*, 666 F.2d 595, 602 (D.C. Cir. 1981). Allowing EPA to reconsider a waiver based on a changed legal interpretation—long after the period for seeking judicial review of its *original* interpretation has expired—would undermine the reliance and efficiency interests that Congress intended to promote when it enacted Section 307(b)(1).[3]

_____

[3] By contrast, allowing EPA to reconsider a waiver decision based on new factual circumstances would arguably be consistent with the statute, given that Congress specifically contemplated that otherwise unreviewable decisions might be reopened in these cases. *See* 42 U.S.C. § 7607(b)(1) (providing for judicial review after the initial 60-day window if a petition "is based solely on grounds arising after such sixtieth day"); *Union Elec. Co. v. EPA*, 515 U.S. 206, 219 (8th Cir. 1975) ("significant new information . . . related to the protection of the public health or environmental quality" could be an "after-arising" grounds within the meaning of Section 307(b)(1)) (citing S. Rep. No. 1196 (1970)), *aff'd*, 427 U.S. 246 (1976); *cf. Alon Ref. Krotz Springs, Inc. v. EPA*, 936 F.3d 628, 646 (D.C. Cir.

Finally, the Clean Air Act's repeated emphasis on the need to preserve state authority to reduce air pollution militates against the idea that Congress intended to allow EPA to upend state planning efforts by withdrawing a prior waiver and re-imposing a preemption regime. The Act repeatedly emphasizes that states shall have the "primary responsibility" in reducing air pollution, and includes a general savings clause that protects state regulations unless "otherwise provided." *See* 42 U.S.C. §§ 7401(a)(3); 7407(a); 7416. Where a statute contains a general savings clause, courts refuse to find preemption absent evidence that this was Congress' clear and manifest purpose. *See CTS Corp. v. Waldburger*, 573 U.S. 1, 19 (2014). Because Congress did not clearly authorize EPA to reimpose a preemption regime previously waived, it would be improper to imply such an authority.

### 3. *The Legislative History Does Not Suggest That EPA is Authorized to Reconsider Waivers.*

In arguing for a broader understanding of EPA's reconsideration authority, the Withdrawal Decision cited a snippet of legislative history predating the creation of the EPA and the promulgation of the modern Clean Air Act. Specifically, EPA cited the Senate Report on the 1967 Clean Air Act Amendments, which stated that the Secretary of Health, Education, and Welfare could withdraw

---

2019) ("an intervening statute, regulation, or judicial decision" may constitute an after-arising ground).

a waiver if "'the State of California no longer complies with the conditions of the waiver.'"  84 Fed. Reg. at 51,332 (quoting S. Rep. No. 50-403, at 34 (1967)).

The Withdrawal Decision's reliance on this statement was mistaken for several reasons.  First, as explained, there is no statutory text authorizing EPA to withdraw a waiver previously granted under Section 209(b), and "courts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point."  *Shannon v. United States*, 512 U.S. 573, 584 (1994) (cleaned up).  Second, whatever force the statement in the 1967 Senate Report might otherwise have had is vitiated by the 1977 amendments to Section 209(b)(1).  Those amendments circumscribed EPA's already limited authority, expanded California's discretion in the waiver process, and invited other states to implement California's standards.  *See generally Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1110 (D.C. Cir. 1979) ("Congress had an opportunity to restrict the waiver provision in making the 1977 amendments, and it instead elected to expand California's flexibility to adopt a complete program of motor vehicle emissions control.").  In light of these amendments, the statements in the 1967 Senate Report no longer serve as an accurate guide to understanding how Congress intended EPA to perform its limited role under Section 209(b).

Finally, even taken at face value, the 1967 Senate Report provides no support for EPA's action in 2019.  The Report identifies one particular situation

that might warrant the withdrawal of a waiver: where California "no longer complies with the conditions of the waiver."[4]  In its Withdrawal Decision, EPA did not assert that California was failing to comply with the conditions of the 2013 waiver (e.g., that it was failing to enforce its emission standards).  Thus, even if it were appropriate to find reconsideration authority based on this snippet of legislative history, the Withdrawal Decision was still patently unlawful.

### 4.  The Withdrawal Decision Was a Departure from the Agency's Past Practice.

Petitioners argue that the Withdrawal Decision was consistent with the agency's "well-established historical practice" of allowing reconsideration of waiver decisions.  Br. at 61–62.  This argument is wrongheaded, for two reasons.  First, past administrative practice—even if well-established—cannot control if it is inconsistent with the statute.  *See, e.g.*, *Kokechik Fishermen's Ass'n v. Sec'y of Com.*, 839 F.2d 795, 802–03 (D.C. Cir. 1988).  As explained, it is clear from the text, structure, and history of the Clean Air Act that Congress did not intend for EPA to have authority to reconsider a Section 209(b) waiver based on changed

---

[4] This language arguably suggests that EPA has some authority to *enforce* the terms of a waiver if California is not taking the promised action to reduce pollution.  Just as courts have ongoing authority to enforce their orders even after the time to modify the judgment has expired, *see, e.g.*, *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 781–82 (1st Cir. 1988); *Waffenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985), EPA arguably has ongoing authority to enforce waiver grants even though it cannot reconsider them.

legal or policy views.  No amount of administrative precedent could authorize reconsideration in these circumstances.

Second, the Withdrawal Decision was not consistent with the agency's prior practice; it was instead a radical departure from that practice.  As EPA explained in the Restoration Action, "in almost fifty years of administering the California waiver program the Agency had never withdrawn any waiver prior to" the 2019 action.  87 Fed. Reg. at 14,352.  In arguing otherwise, Petitioners cite (Br. at 61) two instances where EPA revisited a waiver in light of subsequent actions by California that made the previously-approved regulations more stringent.[5]  In each case, EPA affirmed the prior waiver after conducting a *new* hearing to consider *new* evidence as to whether the *updated* regulations remained consistent with the statutory waiver criteria.[6]  These actions provide no support for the idea that EPA

---

[5] *See* 43 Fed. Reg. 998, 999 (Jan 5, 1978) (reconsidering waiver "only with regard to those portions of California's motorcycle program affected by California's subsequent actions"); 47 Fed. Reg. 7306, 7307 (Feb. 18, 1982) (reconsidering waiver decision for fill-pipe and fuel tank opening specifications because, after the waiver, California "made a number of changes in the schedule for achieving full compliance with the specifications" that called their feasibility into question).

[6] *See* 43 Fed. Reg. at 1001–02 (finding that manufacturers had not shown that they would be unable to comply with the accelerated compliance schedule included in the updated regulations, and granting waiver as to updated regulations); 47 Fed. Reg. at 7307–09 (affirming prior waiver decision because, *inter alia*, "no evidence was presented at the hearing or in supplemental submissions to indicate that the motorcycle industry would be unable" to comply with the updated standards).

is allowed to reconsider a waiver, absent any change to California's regulations, based solely on a change in EPA's legal or policy views.

Petitioners also argue that EPA's decision in 2009 to reconsider the prior *denial* of a waiver is precedent for the 2019 action. Br. at 61–62. But, just as there is "[t]here is no general principle that what one can do, one can undo," *Gorbach*, 219 F.3d at 1095, there is no reason EPA must have the same freedom to revoke a waiver as it has to reconsider a waiver denial. In fact, many provisions of the Clean Air Act create a "one-way ratchet" in favor of cleaner air. *See S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 900 (D.C. Cir. 2006) (noting that the Act "reflects Congress's intent that air quality should be improved until safe and never allowed to retreat thereafter", and citing numerous provisions that restrict EPA's ability to relax emission controls once imposed). Given that Congress intended "to grant California the broadest possible discretion" in reducing vehicle emissions, *Motor & Equip. Mfrs. Ass'n*, 627 F.2d at 1128, it is fully consistent with the Act to allow California to petition for reconsideration of a waiver denial while preventing EPA from reopening a waiver that has been granted.[7]

…

---

[7] A further distinction is that Congress specifically invited states and regulated parties to rely on a prior waiver grant. *See* 42 U.S.C. §§ 7507, 7543(b)(3). No provision invites any party to rely on a prior waiver denial.

22

**B. EPA Lacked "Inherent Authority" to Reconsider the Waiver.**

Lacking textual evidence that Congress intended to authorize EPA to reconsider waivers previously granted under Section 209(b), the Withdrawal Decision relied heavily on federal court of appeals cases purporting to recognize "inherent reconsideration authority." *See* 84 Fed. Reg. at 51,333. These cases rest on a shaky doctrinal foundation, but even assuming they are good law, they could not have justified the Withdrawal Decision.

The doctrine of "inherent authority" is in serious tension with the principle that federal agencies are creatures of statutes with no inherent powers to speak of. *See, e.g.*, *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016). As scholars and courts have noted, the doctrine also appears irreconcilable with Supreme Court precedent.[8] The most relevant case is *Delta Air Lines*, which arose out of the Civil Aeronautics Board's decision to modify a certificate of public convenience and necessity in response to a motion for reconsideration. *See* 367 U.S. at 317–21. The Court found that Congress had not authorized the Board to modify a certificate

---

[8] *See* Daniel Bress, *Administrative Reconsideration*, 91 VA. L. REV. 1737, 1775–78, 1793 (2005) (arguing that inherent reconsideration authority is likely incompatible with Supreme Court precedent, including *Delta Air Lines*); *Bartlik v. U.S. Dep't of Lab.*, 34 F.3d 365, 369 & n.3 (6th Cir. 1994) ("From the principle that an agency's power of reconsideration must be firmly rooted in statutory language it necessarily follows that an agency has no inherent authority of reconsideration"), *rev'd en banc on other grounds*, 62 F.3d 163 (6th Cir. 1995).

in response to a motion for reconsideration, *see id.* at 321–25, and that the weight of authority cut against the proposition that "agencies may expand their powers of reconsideration without a solid foundation in the language of the statute". *Id.* at 334. Because the Court found that the Board's action could not be justified by the statutory text or by any notions of inherent authority, the Court reversed. *See id.*; *see also United States v. Seatrain Lines*, 329 U.S. 424, 432–33 (1947) (setting aside an action purporting to reopen a common carrier certificate, explaining: "The certificate, when finally granted . . . is not subject to revocation in whole or in part *except as specifically authorized by Congress*.") (emphasis added).

While there is serious reason to doubt whether the cases recognizing "inherent reconsideration authority" are good law, there is no need to resolve that question here. That is because the Withdrawal Decision went far beyond the outer boundaries of that doctrine. Cases that have upheld the exercise of inherent reconsideration authority have recognized two important limits to that authority. First, the agency must reconsider within a "reasonable time" of the initial determination, which is typically "measured in weeks, not years." *Mazaleski*, 562 F.2d at 720; *see also Am. Methyl,* 749 F.2d at 835 ("We have held that agencies have an inherent power to correct their mistakes by reconsidering their decisions within the period available for taking an appeal"); *Albertson v. FCC,* 182 F.2d 397, 399 (D.C. Cir. 1950) ("in the absence of any specific limitation," reconsideration

24

available "within the period for taking an appeal"). Second, the agency is

generally limited to correcting factual mistakes or "ministerial errors," and

precluded from making significant substantive changes simply "because the

wisdom of [the prior] decisions appears doubtful." *Consol. Rail Corp. v. Surface*

*Transp. Bd.*, 93 F.3d 793, 801 (D.C. Cir. 1996) (quoting *Am. Trucking Ass'ns, Inc.*

*v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958)); *see also Seatrain*, 329 U.S. at

425–29 (agency could not rely on inherent authority to retroactively apply a more

restrictive understanding of the statutory term "water carrier" that would have

deprived certificate holder of the right to carry goods between the ports it served);

*Chapman,* 204 F.2d at 53–54 (an adjudicatory decision "may not be repudiated for

the sole purpose of applying some quirk or change in administrative policy").

The Withdrawal Decision unquestionably exceeded both of these limits.

First, the withdrawal came six years after the waiver became final. Petitioners

have not cited any case that allowed an agency to reconsider a decision such a long

time after the decision became final.

Second, the withdrawal was, on its face, based only on a change in the

agency's legal and policy views. In 2019, EPA did not claim that the 2013 waiver

was issued due to "ministerial error" or that changed factual circumstances

required it to revisit the waiver. Instead, the agency asserted that the waiver should

be withdrawn based on (1) a separate action taken by NHTSA, purporting to

25

preempt California's standards, 84 Fed. Reg. at 51,338, and (2) EPA's new interpretation of Section 209(b)(1)(B), which required a "particularized nexus" between California's asserted need for its vehicular emission standards and local pollution problems. *See id.* at 51,339 (explaining that EPA is adopting a new interpretation of the statute that "departs in major respects from the interpretation applied in . . . the 2013 waiver grant"). In other words, EPA sought to reopen a long-settled adjudication in order to apply a change in administrative policy, something the caselaw specifically forbids. *See Seatrain*, 329 U.S. at 429; *Chapman,* 204 F.2d at 53–54.

In arguing that it was permissible for EPA to reconsider based on a changed legal interpretation, Petitioners rely (Br. at 59) on *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984), and *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*., 545 U.S. 967 (2005). Petitioners' reliance on these cases is misplaced. Both *Chevron* and *Brand X* involved agencies' authority to reconsider their legal interpretations when taking *prospective* action; neither suggested that an agency would have authority to reopen a settled adjudication to impose a new legal view. Petitioners' reliance (Br. at 59) on the Bress article is even more puzzling, given the author's conclusion that agencies should *not* be permitted to reopen final decisions to correct legal errors. *See* 91 Va. L. Rev. at 1755 (noting that there are "reasons to question whether courts should recognize in agencies the inherent

power to reconsider legal errors"); *see also id.* at 1793 (urging courts to abandon the inherent authority doctrine more generally).

Finally, neither *Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989), nor *Belville Min. Co. v. United States*, 999 F.2d 989 (6th Cir. 1993), supports Petitioners' contention (Br. at 59) that courts "frequently" allow agencies to reconsider based on "changed legal position." *Gun South* held that the Bureau of Alcohol, Tobacco and Firearms had implied authority under the Gun Control Act to suspend certain permits allowing a company to import firearms pending a review of whether those permits had been erroneously granted. 877 F.2d at 862. In reaching this conclusion, the court relied heavily on the purpose and legislative history of the Gun Control Act, which showed that Congress intended the agency to have broad discretion in prohibiting illegal guns from reaching the country. *See id.* at 862–63. This case did not involve a change in the agency's legal views at all; it instead recognized a limited power to review a *factual* determination in the context of a particular statute that conferred great agency discretion to prevent gun violence. *Belville* is even further removed; it allowed an agency to reconsider an action due to blatant procedural defects in the underlying proceeding. *See* 999 F.2d at 998 (finding "no evidence" that agency was "attempting to change existing policy rather than to correct" procedural deficiencies).

…

**C. Because the Withdrawal Decision Was Unauthorized, the Restoration Decision Must Be Upheld.**

As a creature of statute, EPA can reconsider a prior adjudicative decision only when Congress has said it can. *See Delta Air Lines*, 367 U.S. at 321–22. Where an agency exceeds its authority by reopening a decision that Congress intended to remain settled, the agency's action is appropriately set aside on that basis alone. *See, e.g.*, *Seatrain*, 329 U.S. at 432–33; *Am. Methyl*, 749 F.2d at 840; *Hirschey*, 701 F.2d at 216; *Chapman*, 204 F.2d at 53–54. Courts will set aside an unlawful attempt to reconsider a final adjudicative order even where the agency's action might be sound as a matter of policy, and even where the agency might be able to achieve its goal through some other procedural vehicle. *See, e.g.*, *Am. Methyl*, 749 F.2d at 840 (setting aside EPA action that revoked a waiver allowing introduction of fuel additive into the market, but remanding to allow EPA to consider restricting the additive through prospective regulation).

As explained, the text, structure, and history of the Clean Air Act foreclose any suggestion that Congress authorized EPA to reconsider a prior waiver grant on the basis of a changed legal or policy views. In 2019, EPA acted unlawfully in seeking to "wrest a standardless and open[-]ended revocation authority from a silent statute", *Am. Methyl*, 749 F.2d at 837, ignoring the "strong interest in repose" that exists "under any regime of legal rules," *Hirschey*, 701 F.2d at 220, and upsetting significant reliance interests that Congress intended for waiver

28

decisions to engender.  Because EPA had no business reopening the waiver decision, the Withdrawal Decision was unlawful, and the Restoration Decision must be sustained.

Petitioners contend (Br. at 56) that EPA's finding that it had lacked authority for the Withdrawal Decision is not an independent ground for the Restoration Decision, because that finding is allegedly "intertwined" with EPA's view of the merits of the 2019 action.  That is incorrect.  Because EPA had no authority to reconsider the waiver in 2019, the Withdrawal Decision was unlawful, and EPA was compelled to set it aside.  EPA correctly determined that the need to fix this error was an "independent basis" to rescind the Withdrawal Decision.  87 Fed. Reg. at 14,344.[9]  The Court should sustain the Restoration Decision on this basis.

---

[9]   While Petitioners speculate that EPA's "view on the merits . . . drove its decision" (Br. at 57), "it is not the function of the court to probe the mental processes of administrative officers[.]"  *Braniff Airways, Inc. v. Civ. Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967) (cleaned up).

## CONCLUSION

For the foregoing reasons, this Court should deny the petitions.

Respectfully submitted this 20th day of January 2023,

/s/ David R. Baake

David R. Baake
Baake Law, LLC
2131 N. Main Street
Las Cruces, NM 88001
Telephone: (575) 343-2782
david@baakelaw.com

*Counsel for Amici Curiae*

# APPENDIX A

## BIOGRAPHIES OF *AMICI* ADMINISTRATIVE LAW PROFESSORS

**Todd Aagaard** is Professor of Law at the Villanova University Charles Widger School of Law.  His teaching and research interests include administrative law, environmental law, energy law, and property.

**William Boyd** is Professor of Law, Michael J. Klein Chair in Law, and the Faculty Co-Director of the Emmett Institute on Climate Change and the Environment at the UCLA School of Law.  His primary research and teaching interests are in energy law and regulation, climate change law and policy, and environmental law.

**Alejandro E. Camacho** is the Chancellor's Professor of Law, Associate Dean for Faculty Research and Development, and Faculty Director of the Center for Land, Environment, and Natural Resources at the University of California, Irvine School of Law.  His scholarship focuses on regulation in the areas of natural resources and public lands law, pollution control law, and land use regulation.

**Robin Craig** is the Robert C. Packard Trustee Chair in Law at the USC Gould School of Law.  Her research addresses a variety of issues in environmental law, and she teaches environmental law, water law, ocean and coastal law, toxic torts, and civil procedure.

**Robert Glicksman** is the J. B. and Maurice C. Shapiro Professor of Environmental Law at the George Washington University Law School.  His areas of expertise include environmental, natural resources, administrative, and property law.

**Bruce Huber** is Professor of Law at the University of Notre Dame Law School. He teaches and conducts research in the areas of environmental law, natural resources law, property, and energy law.

**Sanne Knudsen** is the Stimson Bullitt Endowed Professor of Environmental Law at the University of Washington School of Law.  Her scholarship focuses on how environmental laws and tort liability frameworks can reduce or redress long-term and multiple-stressor environmental harms.  She teaches natural resources law, environmental law, administrative law, and civil procedure.

**David Owen** is the Harry D. Sunderland Professor Law at the University of California College of the Law, San Francisco.  He teaches courses and researches in the fields of environmental, water, land use, energy, and administrative law.

31

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with Federal Rule of Appellate Procedure 32(g) along with the Court's scheduling Order because it contains less than 6,500 words and was prepared using 14-point font of a proportionally spaced typeface.

/s/ David R. Baake

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2023, I electronically filed the foregoing brief with the Clerk of the Court of the U.S. Court of Appeals for the D.C. Circuit by using the CM/ECF system, which caused all case participants who are registered CM/ECF users to be served electronically.

/s/ David R. Baake