**ORAL ARGUMENT NOT YET SCHEDULED**

No. 22-1081 and consolidated cases

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————————

STATE OF OHIO, ET AL.,

*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN,
IN HIS OFFICIAL CAPACITY, AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION AGENCY,

*Respondents.*

———————————————

On Petition for Review of Action by the
U.S. Environmental Protection Agency

———————————————

**BRIEF OF PROFESSOR LEAH M. LITMAN AS *AMICUS CURIAE*
IN SUPPORT OF RESPONDENTS**

———————————————

Kevin K. Russell
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
Telephone: (202) 362-0636
Facsimile: (866) 574-2033
krussell@goldsteinrussell.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *amicus curiae* Professor Leah M. Litman hereby certifies as follows:

**(A)   Parties and *Amici*.**  Except for the following, all parties, intervenors, and *amici* appearing before the district court and in this Court thus far are listed in the Corrected Proof Brief of the State of Ohio et al. and the Initial Brief of Respondents: *amici curiae* California Climate Scientists; Senator Tom Carper and Representative Frank Pallone, Jr.; the American Thoracic Society, American Medical Association, American Association for Respiratory Care, American College of Occupational and Environmental Medicine, American College of Physicians, American College of Chest Physicians, National League for Nursing, American Public Health Association, American Academy of Pediatrics, and Academic Pediatric Association; and *amicus curiae* who submits this brief.

**(B)   Rulings Under Review.**  Reference to the ruling at issue appears in the Brief for the State of Ohio et al.

**(C)   Related Cases.**  The case on review was not previously before this Court or any other court. Counsel is not aware of any related case pending before this Court or any court.

# RULE 29(d) CERTIFICATION

Pursuant to D.C. Circuit Rule 29(d), counsel for *amicus* states that a separate *amicus* brief was necessary because the brief seeks to convey the results of Prof. Litman's scholarship on a single issue raised in the case by the State petitioners, namely the nature and scope of the equal footing doctrine. To counsel's knowledge, no other party or *amici* has filed a brief addressing this scholarship, and it would have been impractical to attempt to include the specific arguments raised in this brief in a joint *amicus* brief with other parties raising different arguments on different aspects of the case.

January 20, 2023                    /s/ Kevin K. Russell

                                   Kevin K. Russell

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................. i

RULE 29(d) CERTIFICATION ................................................. ii

TABLE OF AUTHORITIES ...................................................... iv

STATEMENT OF IDENTITY OF *AMICUS CURIAE*, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ........................... 1

STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS ................................................................. 2

STATEMENT OF ISSUE PRESENTED .................................... 2

SUMMARY OF ARGUMENT ..................................................... 2

ARGUMENT ............................................................................... 6

THE EQUAL-SOVEREIGNTY DOCTRINE DOES NOT PROHIBIT EPA FROM GRANTING A PREEMPTION WAIVER TO CALIFORNIA ................................................................... 6

    A.   The Equal-Sovereignty Doctrine Does Not Require Congress To Impose Identical Restrictions On Every State. ..................................................................................... 6

    B.   The Doctrine Of Equal Sovereignty Does Not Prohibit Congress From Permitting The EPA To Grant A Preemption Exemption To California ................................. 17

CONCLUSION ......................................................................... 32

# TABLE OF AUTHORITIES*

**CASES**

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011) ...............................................................20

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001) ...............................................................19

*Blanchette v. Conn. Gen. Ins. Corps.,*
    419 U.S. 102 (1974) .................................................................7

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ...............................................................26

*Bond v. United States,*
    564 U.S. 211 (2011) .........................................................14, 31

*Carrington v. Rash,*
    380 U.S. 89 (1965) .................................................................14

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...............................................................19

*\*Coyle v. Smith,*
    221 U.S. 559 (1911) ...............................8, 9, 10, 14, 20, 21

*Currin v. Wallace,*
    306 U.S. 1 (1939) .....................................................................8

*Cuyler v. Adams,*
    449 U.S. 433 (1981) ...............................................................27

*Escanaba & Lake Mich. Transp. Co. v. City of Chicago,*
    107 U.S. 678 (1883) ...............................................................10

*Gibbons v. Ogden,*
    22 U.S. 1 (1824) .......................................................................4

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) .........................................................14, 21

*Mayhew v. Burwell,*
    772 F.3d 80 (1st Cir. 2014) ...................................................21

---

\* Authorities upon which *amicus* chiefly relies are marked with asterisks.

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
 138 S. Ct. 1461 (2018) ........................................................... 18

*Nat'l Collegiate Athletic Ass'n v. Governor of N.J.,*
 730 F.3d 208 (3d Cir. 2013) ............................................ 18, 21

*New York v. United States,*
 505 U.S. 144 (1992) ................................................................ 26

\*Nw. Austin Mun. Util. Dist. No. One v. Holder,
 557 U.S. 193 (2009) ............................... 3, 4, 5, 8, 12, 13, 19, 20

*Organic Cow, LLC v. Ctr. for New Eng. Dairy Compact Rsch.,*
 335 F.3d 66 (2d Cir. 2003) ..................................................... 27

*Pennsylvania v. Wheeling & Belmont Bridge Co.,*
 54 U.S. 518 (1852) .................................................................. 25

*Pollard's Lessee v. Hagan,*
 44 U.S. 212 (1845) .................................................................. 11

*PPL Mont., LLC v. Montana,*
 565 U.S. 576 (2012) .................................................................. 8

*Sec'y of Agric. v. Cent. Roig Refin. Co.,*
 338 U.S. 604 (1950) .................................................................. 8

\*Shelby County v. Holder,
 570 U.S. 529 (2013) ........................ 3, 4, 5, 12, 13, 14, 15, 16, 17, 20, 21

*South Carolina v. Katzenbach,*
 383 U.S. 301 (1966) ........................................................... 12, 17

*Sturgeon v. Frost,*
 577 U.S. 424 (2016) ................................................................ 23

*United States v. Ptasynski,*
 462 U.S. 74 (1983) .................................................................... 7

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 8, cl. 1 ............................................................... 7, 16, 24

U.S. Const. art. I, § 8, cl. 3 ............................ 2, 4, 7, 12, 16, 17, 18, 19, 31

U.S. Const. art. I, § 8, cl. 4 ..................................................................... 7

U.S. Const. art. I, § 10 ................................................... 24, 25, 26, 27

U.S. Const. art. VI, cl. 2 ........................................................................ 28

U.S. Const. amend. X .................................................................... 3, 14, 21

U.S. Const. amend. XIV ................................................................... 19

U.S. Const. amend. XV ................................................ 4, 15, 16, 17, 18, 20, 22

## STATUTES

1 *Laws of the United States of America*, ch. 35 (1796) ........................... 24

Act of Apr. 14, 1802, ch. 23, 2 Stat. 152 ................................................ 25

Act of Aug. 11, 1790, ch. 43, 1 Stat. 184 ............................................... 24

Act of Aug. 31, 1852, ch. 111, 10 Stat. 110 ........................................... 25

Act of Feb. 28, 1806, ch. 12, 2 Stat. 353 ............................................... 24

Act of Feb. 9, 1791, ch. 5, 1 Stat. 190 ................................................... 24

Act of Mar. 27, 1798, ch. 21, 1 Stat. 546 .............................................. 25

Act of Mar. 30, 1802, ch. 13, 2 Stat. 139 .............................................. 25

Federal Agriculture Improvement and Reform Act of 1996,
Pub. L. No. 104-127, 110 Stat. 888 .................................................. 26

New Mexico-Arizona Enabling Act, ch. 310, 36 Stat. 557 (1910) ........... 11

Utah Enabling Act, ch. 138, 28 Stat. 107 (1894) .................................... 11

Voting Rights Act of 1965,
52 U.S.C. § 10101 *et seq.* ............................................ 3, 12, 13, 14, 15, 16

52 U.S.C. § 10304 ............................................................. 13

7 U.S.C. § 608c(5)(A) .............................................................. 26

16 U.S.C. § 3635 ...................................................................... 23

16 U.S.C. § 824k(k) .................................................................. 23

16 U.S.C. § 824p(k) .................................................................. 23

16 U.S.C. § 824q(h) .................................................................. 23

16 U.S.C. § 824t(f) .................................................................... 23

29 U.S.C. § 1144(a) .................................................................. 23

29 U.S.C. § 1144(b)(5)(A) ........................................................ 23

42 U.S.C. § 2021e(b)(1) ........................................................... 23

42 U.S.C. § 2021e(b)(2) ........................................................... 23

42 U.S.C. § 2021e(b)(3) ........................................................... 23

42 U.S.C. § 7543(b)(1) ........................................................ 1, 32

49 U.S.C. § 31112(c) ............................................................... 23

## OTHER AUTHORITIES

Cong. Rsch. Serv., LSB10807, *Interstate Compacts: An Overview* (2022) .................................................................................. 26

Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685 (1925) ........................................................... 27

Henry J. Friendly, *In Praise of* Erie—*and of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964) ..................................... 20

Leah M. Litman, *Inventing Equal Sovereignty*, 114 Mich. L. Rev. 1207 (2016) ............................................. 1, 11, 23, 24

## STATEMENT OF IDENTITY OF *AMICUS CURIAE*, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

The State petitioners urge this Court to declare Section 209(b)(1) of the Clean Air Act unconstitutional. They argue that by permitting California to set emission standards for California vehicles more stringent than the federal standards, the statute "withdraw[s] sovereign authority from some States but not others" in violation of the "equal sovereignty" doctrine. Br. 12. As this *amicus* brief will explain, that argument fundamentally misunderstands the doctrine.

*Amicus* Professor Leah M. Litman is a Professor of Law at the University of Michigan Law School. Professor Litman has extensively studied and written about such topics as constitutional law, public law, and regulatory policy. In particular, she has published a comprehensive analysis of the evolution and proper understanding of the equal-sovereignty doctrine. Leah M. Litman, *Inventing Equal Sovereignty*, 114 Mich. L. Rev. 1207 (2016). With this *amicus* brief, Professor Litman intends to illuminate for the Court the origins and nature of the equal-sovereignty doctrine invoked by the petitioner States, and to explain why that doctrine does not apply in this case.

All parties have consented to the filing of *amicus* briefs in this case.

1

## STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS

No person other than *amicus* Professor Leah M. Litman and her counsel authored any part of this brief or contributed money intended to fund its preparation or submission.

## STATEMENT OF ISSUE PRESENTED

In this brief, *amicus* addresses the following argument of the State petitioners:

Whether the equal-sovereignty doctrine prohibits the federal government from exercising its Commerce Clause authority to grant a State (or subset of States) an exception from preemption.

## SUMMARY OF ARGUMENT

The States' invocation of the equal-sovereignty doctrine must be rejected because it is inconsistent with the origin and evolution of that doctrine and because it inhibits, rather than promotes, state sovereignty.

A.    The Supreme Court has explained that all States are coequal sovereigns under the Constitution, entitled to the benefits of the doctrine of equal sovereignty. That doctrine first took root in a series of cases in which the Court examined whether conditions Congress had placed on the admission of new States were constitutional. The Court explained

the equal-sovereignty doctrine in federalist terms, holding that the doctrine prevents Congress from enacting legislation that either exceeds its constitutionally enumerated powers or impinges on powers reserved to the States under the Tenth Amendment. The Court never suggested that the doctrine prevents Congress from treating States differently; indeed, from its earliest days, Congress has enacted legislation imposing burdens or bestowing benefits on select States only.

More recently, the Supreme Court returned to the topic of equal sovereignty in reviewing the constitutionality of the 2006 reauthorization of certain provisions of the Voting Rights Act of 1965, 52 U.S.C. § 10101 *et seq.* in *Northwest Austin Municipal Utility District No. One v. Holder*, 557 U.S. 193 (2009), and again in *Shelby County v. Holder*, 570 U.S. 529 (2013). The Court reaffirmed *both* that the equal-sovereignty doctrine is rooted in federalism principles *and* that the doctrine is not a bar on Congress's treating States differently. The Court explained that the statutory provisions at issue in those cases were enacted under Congress's more limited authority to regulate the States as States under the Reconstruction Amendments, and regulated the States in an area of core concern to the States. And, the Court explained, the selective

application of certain restrictions on the ability of covered States to enact voting-related laws expressed moral judgment about those States. In those circumstances, the Court held, the selective application of restrictions to certain States was not "appropriate" legislation to enforce the Reconstruction Amendments.

B.    The doctrine of equal sovereignty does not apply in this case because in regulating vehicle emissions, Congress acted pursuant to its Commerce Clause authority to address an area of core federal concern in a manner that does not suggest wrongdoing by any State.

Unlike the provisions at issue in *Shelby County* and *Northwest Austin*, the statutory provisions at issue here were enacted pursuant to Congress's authority under the Commerce Clause. Congress's commerce authority is an affirmative grant of power to legislate on matters of national concern *without* a finding of wrongdoing by any State or other actor. Congress's commerce power is therefore not reactive in the same way that its power to enforce the Fifteenth Amendment is. While Congress's authority under the Fifteenth Amendment is predicated on Congress identifying a violation of that Amendment, Congress's authority to regulate interstate commerce is unconditional. *See Gibbons*

4

*v. Ogden*, 22 U.S. 1, 196-197 (1824) (explaining that the power to regulate interstate commerce "is complete in itself" [and] may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the [text]").  Legislation regulating interstate commerce is also inherently of national concern and, by definition, is not among the powers reserved by the Constitution to the States.  In addition, the Supreme Court has held that legislation to protect the environment falls squarely within Congress's core legislative powers, unlike the regulation of elections at issue in *Shelby County* and *Northwest Austin*.  And nothing about the preemption exemption afforded to California suggests wrongdoing by any State.  Indeed, Congress has, from its earliest days, enacted legislation singling out particular States for differential treatment.  The petitioner States do not suggest any limiting principle that would distinguish those exercises of congressional authority.

    In the end, the State petitioners' arguments would result in *less* authority and flexibility for States and *more* coercive authority for the federal government.  The States are not seeking an "equal" preemption exemption for themselves or for all States.  Instead, they are asking for an expansion of the preemptive effect of federal law by eliminating

California's exemption (and attendant opt-in). But that regime would offer States *fewer* choices, not more, a result that is antithetical to the flexibility and innovation that federalism is designed to promote. Rather than choosing between two emissions standards, States will be forced to adopt the federal standard. It is difficult to see how a forced expansion of federal power would promote any State's sovereign dignity. This Court should therefore reject the States' constitutional challenge.

## ARGUMENT

### THE EQUAL-SOVEREIGNTY DOCTRINE DOES NOT PROHIBIT EPA FROM GRANTING A PREEMPTION WAIVER TO CALIFORNIA

This Court should reject the petitioner States' invocation of the equal-sovereignty doctrine. The States misunderstand the origins and evolution of that doctrine and seek a result that is hostile to—not respectful of—state sovereignty.

**A. The Equal-Sovereignty Doctrine Does Not Require Congress To Impose Identical Restrictions On Every State.**

The State petitioners argue (Br. 22) that the doctrine of equal sovereignty prohibits Congress and the federal government from treating States differently in ways that "unequally burden the States' sovereign authority," regardless of the purpose of the legislation or regulation.

That argument has no basis in the Constitution, let alone the history and evolution of the equal-sovereignty doctrine.

1.    The United States Constitution does not mention the equal-sovereignty doctrine.  Although some of Congress's enumerated powers include a command of "uniform[ity]," U.S. Const. art. I, § 8, cl. 1; *id.* cl. 4, even those provisions do not require strictly equal treatment of States by Congress.  *See, e.g., United States v. Ptasynski*, 462 U.S. 74, 80, 82, 84 (1983) (holding that the Constitution's command that "all Duties, Imposts and Excises shall be uniform throughout the United States" neither "require[s] Congress to devise a tax that falls equally or proportionately on each State" nor "prohibit[s] all geographically defined classifications"); *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 156, 159 (1974) (holding that Constitution's command that "Laws on the subject of Bankruptcies" be "uniform" "throughout the United States" "does not deny Congress the power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems").  But the enumerated power at issue here—Congress's power "To regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3—includes no such qualifying

uniformity command. *See, e.g.*, *Sec'y of Agric. v. Cent. Roig Refin. Co.*, 338 U.S. 604, 616 (1950) (power is not subject to "requirements of geographic uniformity"); *Currin v. Wallace*, 306 U.S. 1, 14 (1939) (rejecting contention that "lack of uniformity in the exercise of the commerce power renders the action of Congress invalid").

The Supreme Court has held that "the States in the Union are coequal sovereigns under the Constitution," *PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012), entitled to the benefits of the "fundamental principle of equal sovereignty," *Nw. Austin*, 557 U.S. at 203. The Court has made clear, however, that the equal-sovereignty doctrine does not require Congress to treat all States equally in all circumstances. Rather, the doctrine is an expression of federalism, confirming that Congress may act only pursuant to its enumerated powers and not in contravention of the powers reserved to the States.

The Supreme Court initially developed the doctrine of equal sovereignty in examining the validity of requirements Congress placed on new States as a condition of admission to the Union. The most expansive early discussion of the doctrine is found in *Coyle v. Smith*, where the Court struck down a federal requirement that Oklahoma

8

retain its state capital in the City of Guthrie until 1913 as a condition of admission. 221 U.S. 559, 564-573 (1911). In examining Congress's power to admit a new State, the Court explained that "[i]t is not [a power] to admit political organizations which are less or greater, or different in dignity or power, from those political entities which constitute the Union." *Id.* at 566. It is, instead, "a 'power to admit states,'" which possess "the powers possessed by the original states which adopted the Constitution." *Ibid.*

In *Coyle*, the Court anchored the equal-sovereignty doctrine in the federalist structure of the Constitution whereby Congress is limited to its enumerated powers and the balance of powers is reserved to the States and the people. The Court thus explained that "when a new state is admitted into the Union, it is so admitted with all of the powers of sovereignty and jurisdiction which pertain to the original states"—and, critically, "that such powers may not be constitutionally diminished, impaired, or shorn away by any conditions, compacts, or stipulations embraced in the act under which the new state came into the Union, which would not be valid and effectual if the subject of congressional legislation after admission." *Coyle*, 221 U.S. at 573. In other words, the

equality-among-States that the Constitution guarantees is the equal benefit of constitutional limits on federal authority. The Court noted that the notion that Congress could direct a State already admitted to the Union where to locate its capital "would not be for a moment entertained." *Id.* at 565. And because Congress could not impose such a requirement on an existing State, the doctrine of equal sovereignty prevented it from doing so on a new State as a condition of admission. *Id.* at 567 ("The power is to admit 'new states into *this* Union.' 'This Union' was and is a union of states, equal in power, dignity, and authority, each competent to exert that residuum of sovereignty not delegated to the United States by the Constitution itself.").

That federalism-based understanding of the equal-sovereignty principle is reflected in other early decisions considering conditions on the admission of new States. In each of those decisions, the Court similarly held that Congress could not impose a condition that was either outside of its enumerated powers or reserved to the States under the structure of the Constitution. *E.g.*, *Escanaba & Lake Mich. Transp. Co. v. City of Chicago*, 107 U.S. 678, 689 (1883) ("Equality of constitutional right and power is the condition of all the states of the Union, old and

new."); *Pollard's Lessee v. Hagan*, 44 U.S. 212, 228-229 (1845) (holding that challenged provision "would be void if inconsistent with the Constitution of the United States").

Thus, the doctrine of equal sovereignty is *not*, as some have suggested, a rule that Congress must treat all States the same for all purposes.[1]  To the contrary, Congress has frequently imposed special conditions on admission, including on States readmitted after the Civil War and on States newly admitted into the Twentieth Century.  *See*, *e.g.*, New Mexico-Arizona Enabling Act, ch. 310, § 2, 36 Stat. 557, 559 (1910) (requiring New Mexico and Arizona to maintain English-speaking schools); Utah Enabling Act, ch. 138, § 3, 28 Stat. 107, 108 (1894) (requiring Utah to ban polygamy); *see* Litman, 114 Mich. L. Rev. at 1218-1219.  Rather, the doctrine prohibits Congress from exceeding its enumerated powers under the Constitution and from otherwise intruding on the powers secured by the Constitution to the States.

2.    As the State petitioners note (Br. 23), the Supreme Court recently returned to the equal-sovereignty doctrine in the context of

---

[1] Nor is it a rule that Congress may not impose conditions on a State's admission to the Union that were not imposed on the original States.

examining the continuing validity of parts of the Voting Rights Act of 1965, 52 U.S.C. § 10101 *et seq.*  *See Shelby County v. Holder*, 570 U.S. 529 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009).  Although the Court's discussion of the doctrine in those cases expanded it beyond the context of Congress's admitting new States, the Court neither held nor suggested, as the States posit, that the doctrine requires Congress to treat all States the same when regulating under the Commerce Clause.  To the contrary, the Court reaffirmed that Congress may apply different rules to a subset of States, "reject[ing] the notion that the principle operate[s] as a *bar* on differential treatment outside th[e] context" of "the admission of new States."  *Shelby County*, 570 U.S. at 544 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 328-329 (1966)).  The Court held instead that differential treatment of States with respect to sovereign powers such as operating election systems is permissible when it "makes sense in light of current conditions."  *Id.* at 553.  And the Court reaffirmed that determining *when* Congress may treat States differently must be guided by ordinary principles of federalism.

In *Northwest Austin* and again in *Shelby County*, the Supreme Court considered the constitutionality of Congress's 2006 reauthorization

of Section 5 of the Voting Rights Act, 52 U.S.C. § 10304. Section 5 prohibited covered States from enacting any law or practice that would affect voting without first obtaining permission from the federal government or a federal court. *Shelby County*, 570 U.S. at 544. Congress determined which States were subject to the requirements of Section 5 by relying on the so-called coverage formula in Section 4, which referenced voting-related data from the 1960s and early 1970s. *Id.* at 551. Although Section 4 on its face treated all States equally, in the sense that it applied the same coverage criteria to every State, its effect was to single out only some States for coverage under Section 5 and other provisions. When Congress reauthorized Section 5 in 2006, it maintained the same coverage formula in Section 4. The Court declined to decide the constitutionality of that reauthorization in *Northwest Austin*, 557 U.S. at 211, but ultimately held that Congress's continued reliance on the old data in the coverage formula violated the doctrine of equal sovereignty, *Shelby County*, 570 U.S. at 557.

In so holding, the Court in *Shelby County* confirmed that the equal-sovereignty doctrine is rooted in principles of federalism, first examining whether the conditions Congress placed on a subset of States were within

13

Congress's enumerated powers. The Court explained that "the Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens" and emphasized that "[t]his 'allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States.'" *Shelby County*, 570 U.S. at 543 (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)). Applying those principles to the Voting Rights Act, the Court explained that Section 5's preclearance requirement applied to "any law related to voting," including those governing state and local elections. *Id.* at 535. Although the Constitution vests Congress with some authority over federal elections, *see id.* at 536, the Court emphasized that "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections" more generally, *id.* at 543 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461-462 (1991)), including by exercising "'broad powers to determine the conditions under which the right of suffrage may be exercised,'" *ibid.* (quoting *Carrington v. Rash*, 380 U.S. 89, 91 (1965)).

The Court's approach to the equal-sovereignty doctrine in *Shelby County* was consistent with its decision in *Coyle* (which the Court relied

on in *Shelby County*, 570 U.S. at 544) because it first examined whether the challenged congressional action was squarely within Congress's enumerated powers. Critical to the Court's application of the equal-sovereignty doctrine was the fact that the Voting Rights Act inverted the usual relationship between state and federal authorities with respect to regulation of elections. In the ordinary course, a state law governing elections would be presumptively valid—and subject to invalidation only if it were preempted by a valid, conflicting federal regulation or if it were ultimately shown to violate a prohibition such as the Fifteenth Amendment's prohibition on race discrimination in voting. Under the Voting Rights Act, in contrast, every election-related law enacted by a covered State or any of its subdivisions was presumptively *invalid* and could not be enforced unless or until the federal government (or a federal court) gave its permission. That inversion of the usual constitutional allocation of power, the Court held, required a particularly strong justification for subjecting only some States to the requirements of Section 5. *Id.* at 552-553.

In that respect, the Court's analysis in *Shelby County* added a new element not present in its early decisions discussing the equal-

sovereignty doctrine.  Unlike Congress's authority under its Article I powers (*e.g.*, under the Commerce Clause or the Spending Clause), Congress's authority to act under the Fifteenth Amendment is limited to addressing denials of the right to vote on the basis of race.  That power is therefore predicated on a finding of morally culpable behavior—either under the Voting Rights Act or the Constitution.  In the Supreme Court's view, Congress's decision in 2006 to reauthorize Section 5 under the existing coverage formula required Congress to consider whether covered States deserved the dignitary harm of being labeled as more likely to engage in racial discrimination based on their misconduct decades earlier.  That moral judgment, the Court held, was an affront to the covered States' dignity because it was based on what the Court viewed as stale data and could not be linked to "current conditions."  *Shelby County*, 570 U.S. at 553.

To be clear, the Court in *Shelby County* reaffirmed that Congress *can* draw distinctions between and among States without running afoul of the equal-sovereignty doctrine when Congress acts pursuant to its enumerated powers—including its power to enforce the Fifteenth Amendment, inherent moral judgments notwithstanding.  570 U.S. at

544 (citing *Katzenbach*, 383 U.S. at 328-329); *id.* at 553.  But the Court

added a new element in *Shelby County* to the equal-sovereignty mix:  a

heightened burden to justify differential treatment of States when

enforcing the Fifteenth Amendment with reference to "current

conditions" rather than "the past."  *Id.* at 553.

**B.   The Doctrine Of Equal Sovereignty Does Not Prohibit Congress From Permitting The EPA To Grant A Preemption Exemption To California.**

With the origins and evolution of the equal-sovereignty doctrine set

out, it is easy to understand why that doctrine does not prohibit Congress

or any federal agency from granting a preemption exemption to

California alone.

1.   The exercise of congressional authority at issue here is

distinct in every relevant sense from the exercise at issue in *Shelby*

*County*.  In regulating vehicle emissions, Congress acted (1) pursuant to

its authority under the Commerce Clause (2) to address an area of core

federal concern (3) in a manner that does not even hint at wrongdoing by

*any* State.

It is undisputed that Congress enacted the statutes at issue here

pursuant to its authority under the Commerce Clause.   Congress's

17

authority under that power is materially different for purposes of the equal-sovereignty doctrine than it is under the Fifteenth Amendment. The subject of interstate commerce is squarely within the core of the federal government's—not the States'—authority. "Congress' exercises of Commerce Clause authority are aimed at matters of national concern" where "national solutions will necessarily affect states differently." *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 238 (3d Cir. 2013), *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). The effect on state sovereign lawmaking power is indirect. Commerce Clause legislation, such as the provisions of the Clean Air Act at issue here, directly regulates the conduct of private individuals. *See Murphy*, 138 S. Ct. at 1476. Preemption of state law is an incidental effect of Congress's decision to enact federal standards.

Legislation to enforce the Fifteenth Amendment is different. The Fifteenth Amendment gives Congress authority to enforce the antidiscrimination guarantees of that amendment directly against the States as States. Moreover, that power is reactive in a way that Congress's commerce power is not. Legislation to enforce the Fifteenth

Amendment must be predicated on (or require a showing of) a constitutional violation. Congress's authority under other enumerated powers—including the Commerce Clause—is not restricted in the same way. The Constitution grants to Congress the affirmative authority "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. That enumerated power is affirmative in a way that Congress's authority under the Reconstruction Amendments has not been construed to be.

The difference between the two powers is reflected in the level of scrutiny courts apply to legislation enacted under each. Unlike the rational-basis review applicable to commerce legislation, courts apply a much more searching review to legislation enacted pursuant to one or more of the Reconstruction Amendments. The Supreme Court has held that legislation to enforce the guarantees of the Fourteenth Amendment "must exhibit 'congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)). And, although the Court declined in *Northwest Austin* to decide what standard is applicable to legislation to

19

enforce the Fifteenth Amendment, 557 U.S. at 204, it applied some form of heightened review in *Shelby County*, requiring a showing that the "'statute's disparate geographic coverage is sufficiently related to the problem that it targets,'" 570 U.S. at 542 (quoting *Nw. Austin*, 557 U.S. at 203). Because Congress need have only a rational basis for its regulation of interstate commerce, heightened scrutiny is not appropriate for any aspect of commerce legislation, including any differential treatment of States.

Relatedly, the subject of the legislation at issue here—environmental protection—is quintessentially one of federal concern, *unlike* the subject of the legislation in *Shelby County* or in *Coyle*. The Supreme Court has held that "[e]nvironmental protection is undoubtedly an area 'within national legislative power,'" including regulation of the emission of air pollutants. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011). Indeed, the Court suggested that federal regulation of air pollution is consistent with "the basic scheme of the Constitution." *Ibid.* (quoting Henry J. Friendly, *In Praise of* Erie—*and of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 405 (1964)). And nothing in the Constitution or in any Supreme Court decision even hints that

20

environmental protection is a subject reserved to the States under the Tenth Amendment. The regulatory scheme at issue in this case thus falls squarely within Congress's core powers. In stark contrast, the Court explained that the ability to regulate elections at issue in *Shelby County* was an area "the Framers of the Constitution intended the States to keep for themselves." 570 U.S. at 543 (quoting *Gregory*, 501 U.S. at 461-462). The Court used similar language in *Coyle*, explaining that "[t]he power to locate its own seat of government, and to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose, are essentially and peculiarly state powers." 221 U.S. at 565. Courts that have considered equal-sovereignty challenges to federal laws in the wake of *Shelby County* agree that the doctrine does not apply at all when, as here, Congress does not "intru[de] into a sensitive area of state or local policymaking." *Mayhew v. Burwell*, 772 F.3d 80, 93 (1st Cir. 2014); *Nat'l Collegiate Athletic Ass'n*, 730 F.3d at 238. Because the federalism concerns that drove the decisions in *Shelby County* and *Coyle* do not apply here, this Court should reject the States' invocation of the equal-sovereignty doctrine.

21

Unlike when Congress enforces the Fifteenth Amendment, moreover, the concept of wrongdoing by States has no place in evaluating whether an exercise of Congress's commerce power is constitutional. Allowing California to enact laws that are more protective of the environment than federal law does not cast aspersions on the dignity of other States let alone suggest any wrongdoing on their part. To the contrary—as discussed at pp. 28-31, *infra*—the challenged scheme gives the purportedly "burdened" States *more* flexibility than the Constitution requires and more flexibility than would be allowed without the exemption for California. Thus, nothing in the Supreme Court's equal-sovereignty cases suggests that that doctrine would apply at all in this case, let alone that it would prohibit Congress from granting a preemption exemption to California alone.

Because the equal-sovereignty doctrine is not implicated when Congress draws a rational distinction pursuant to an enumerated power that is subject to rational-basis review, this Court should reject the petitioner States' arguments to the contrary. *See* Br. 28-29. Congress routinely enacts laws that treat States differently pursuant to its commerce powers and its authority to tax and spend. For example,

Congress has afforded special treatment to petitioner Texas's electric-grid operator in recognition of the operator's unique regulatory competency. 16 U.S.C. §§ 824k(k), 824p(k), 824q(h), 824t(f). Federal law also expressly establishes "[s]pecial rules for Wyoming, [petitioner] Ohio, Alaska, Iowa, [petitioner] Nebraska, [petitioner] Kansas, and Oregon" allowing those States to permit certain commercial vehicle combinations not permitted in other States. 49 U.S.C. § 31112(c). The Employee Retirement and Income Security Act preempts all state laws that "relate to any employee benefit plan," *except* "the Hawaii Prepaid Health Care Act." 29 U.S.C. § 1144(a), (b)(5)(A). Federal law governing the disposal of radioactive waste contains state-specific provisions for Washington, Nevada, and petitioner South Carolina, but not for any other State. 42 U.S.C. § 2021e(b)(1), (2), (3). And federal law requires only four States (Alaska, Idaho, Oregon, and Washington) to advise the federal government "of all pertinent laws or regulations pertaining to the harvest of Pacific salmon." 16 U.S.C. § 3635; *see* Litman, 114 Mich. L. Rev. at 1243-1246 (listing other examples); *Sturgeon v. Frost*, 577 U.S. 424, 438-440 (2016) (discussing various ways in which Congress has provided distinctive statutory treatment of Alaska). And no doctrine of

23

constitutional law prevents Congress from exercising its Spending Clause authority to benefit particular regions or States, as it does routinely.

Congress's differential treatment of States is not a new legislative practice. The first and second Congresses regulated merchandise reports for ships, for example, by establishing different statutory reporting requirements based on which State a ship docked in. 1 *Laws of the United States of America*, ch. 35, § 20, pp. 199-200 (1796) (specifying that each shipmaster had "twenty-four hours after the arrival" of the ship to make the report "except in the state of [petitioner] Georgia, where such report shall be made within forty-eight hours"); *see also* Litman, 114 Mich. L. Rev. at 1242-1243 (listing other examples). Congress likewise exercised its authority under Article I, Section 10, to allow particular States to lay a "duty of tonnage" on exports or imports. *See, e.g.*, Act of Feb. 28, 1806, ch. 12, 2 Stat. 353 (consenting to Pennsylvania legislation that provided for an export tonnage duty to fund piers and navigation improvements on the Delaware river); Act of Feb. 9, 1791, ch. 5, 1 Stat. 190 (consenting to Maryland statute imposing duty at Port of Baltimore); Act of Aug. 11, 1790, ch. 43, 1 Stat. 184 (consenting to tonnage duties

24

imposed by Georgia, Maryland, and Rhode Island). And early Congresses provided state-specific exemptions to general laws and special permission to engage in activities forbidden other States.[2]

As the tonnage duty examples illustrate, the Constitution itself directly contemplates that Congress will, from time to time, authorize some States to exercise sovereign power withheld from other States.[3] The Compact Clause, art. I, § 10, is another example. That provision authorizes Congress to approve compacts between States that enhance and reallocate sovereign power among the signatories to the compact in ways that are unavailable to States outside the compact, even to the extent of allowing particular States to enter compacts "with a foreign

---

[2] *See* Act of Aug. 31, 1852, ch. 111, §§ 6-7, 10 Stat. 110, 112 (permitting maintenance of specific state-owned and operated bridges over the Ohio River despite Supreme Court decision declaring one such bridge in violation of federal law as an obstruction to interstate navigation, *see Pennsylvania v. Wheeling & Belmont Bridge Co.*, 54 U.S. 518, 626 (1852)); Act of Apr. 14, 1802, ch. 23, 2 Stat. 152 (giving Virginia permission to make improvements to navigation on the Appomattox River); Act of Mar. 30, 1802, ch. 13, § 19, 2 Stat. 139, 145 (allowing non-Indians to travel certain reservation trails in Tennessee, but not other States); Act of Mar. 27, 1798, ch. 21, 1 Stat. 546 (giving Massachusetts permission to maintain a pier).

[3] *See also* U.S. Const. art. I, § 10 (allowing a State to obtain congressional consent to "keep Troops, or Ships of War in time of Peace, [or] enter into any Agreement . . . with a foreign Power").

Power." U.S. Const. art. I, § 10; *see also, e.g.*, *New York v. United States*, 505 U.S. 144, 171 (1992) (authorizing "regional compacts … to deny access . . . to radioactive waste generated in States that do not meet federal deadlines [is] . . . within the power of Congress to authorize the States to discriminate against interstate commerce."); Cong. Rsch. Serv., LSB10807, *Interstate Compacts: An Overview* (2022) (collecting examples).[4]

For example, a federal statute authorizes the U.S. Secretary of Agriculture to issue federal milk marketing orders that can set minimum prices. *See* 7 U.S.C. § 608c(5)(A); *see generally Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 342-343 (1984). Those orders would obviously preempt any State's attempt to set lower minimum prices. Yet, using its authority under the Compact Clause, Congress has provided some States, but not others, an exemption from that preemptive effect by allowing States to form compacts to establish their own regional minimum milk prices. Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, tit. I, § 147, 110 Stat. 888, 919-920; *see*

---

[4] *Available at* https://crsreports.congress.gov/product/pdf/LSB/LSB10807.

generally *Organic Cow, LLC v. Ctr. for New Eng. Dairy Compact Rsch.*, 335 F.3d 66, 67-68 (2d Cir. 2003) (describing Compact).

Compacts necessarily "tend[] to . . . increase [the] political power in the States" beyond what the Constitution would otherwise allow, sometimes at the expense of the authority of the United States and sometimes at the expense of other participants in the Compact. *Cuyler v. Adams*, 449 U.S. 433, 440 (1981) (citation omitted). Yet, the drafters of the Constitution saw no invasion of equal sovereignty in allowing Congress to decide which States should be relieved of the restrictions the Constitution or federal law would otherwise impose on their sovereign powers. *See* Felix Frankfurter & James M. Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 Yale L.J. 685, 725-729 (1925) (explaining that Congress may use Commerce and Compact Clause authority to enhance sovereign authority of particular States or regions to enact laws the Constitution would otherwise forbid). This, no doubt, was because the drafters recognized that the federal legislative process—and in particular, the equal state representation in the Senate—was designed to protect state interests against unwarranted federal intrusions.

The State petitioners have offered no limiting principle that would distinguish the preemption exemption granted to California from any of these current or historical examples.

2.    The State petitioners notably do not explore the implications of their argument in this case.  But understanding those implications clearly illustrates why their argument is wrong.

Under ordinary preemption principles, the State petitioners have *no* right to promulgate vehicle-emissions standards that are different from or conflict with the standards promulgated by the federal government.  U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").  By allowing California to promulgate alternative standards—and by allowing  other States to choose between the federal standards and California's standards in certain circumstances, Congress has offered those States *more* options, not fewer.  It is difficult to see how that could be an affront to state sovereignty.

28

Some may complain that, because of populous California's market power, auto manufacturers as a practical matter conform to California's emissions standards rather than to the less-protective federal standards—potentially resulting in higher prices for cars purchased in the petitioner States even though those States prefer the less-protective federal standards. Of course, if Congress treated all 50 States the same by allowing each one to promulgate its own emissions standards, the result would be the same—or possibly "worse" from the perspective of the State petitioners—because car manufacturers would presumably continue to adapt to the most protective standards, or at least to the most protective standards in the State or States with a sufficiently large market share. Such a result would not address the injury the petitioner States allege. Instead, the States ask that the supposed violation of their sovereign dignity be remedied by a *greater* exercise of federal authority. That result would be a bizarre expression of respect for States' sovereignty, to say the least.

Ordinarily, a State asserting a claim under the equal-sovereignty doctrine seeks to be treated as favorably as the most favorably treated States—by eliminating a special burden placed on it or by obtaining the

special favorable treatment afforded to another State.  Not this time.  In this case, the State petitioners argue that the federal government was required to exert *more* federal authority by preempting *more* state legislative and policy goals.  The equal-sovereignty doctrine was developed and has always been applied as a limit on congressional power, not a mandatory boost.  No case applying the doctrine supports such a result.

It bears repeating that the State petitioners do not appear to be seeking the authority to promulgate their own emissions standards.  They just do not want any other State—or at least any State with a large market share—to be able to promulgate its own standards.  The States' failure to seek any expansion of their own authority is difficult to square with their argument that the longstanding statutory and regulatory scheme somehow violated the State petitioners' sovereignty.  In short, they are not arguing that the longstanding scheme prohibited them from doing anything they had a right—or even wanted—to do.

Accepting the States' assertion that the equal-sovereignty doctrine applies in these circumstances would be unprecedented and a dangerous expansion of that limited doctrine.  It would have the effect of stifling the

30

very "innovation and experimentation" that federalism is designed to promote. *Bond*, 564 U.S. at 221. Under the States' view, *no* State is entitled to depart from a uniform federal standard in order to innovate and experiment unless *all* States are entitled to do so. It is not difficult to imagine an industry—including in the agricultural, mining, or car-manufacturing sectors—that could not accommodate 50 different standards but can adapt to a smaller range of standards. Under the State petitioners' view, Congress could not allow a subset of States to experiment with innovative solutions to local problems. Nothing in the Constitution supports the notion that when Congress legislates pursuant to the Commerce Clause, it must choose between imposing a single national standard or tolerating 50 different standards. That approach offers literally no federalism advantage and does nothing to advance the equal sovereignty or dignity of any State.

## CONCLUSION

This Court should reject the State petitioners' constitutional challenge to Section 209(b)(1) of the Clean Air Act.

Respectfully submitted,

/s/ Kevin K. Russell
Kevin K. Russell
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
krussell@goldsteinrussell.com

January 20, 2023

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and this Court's Sept. 22, 2022 briefing order (ECF No. 1965631) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1), this document contains 6,153 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

January 20, 2023

/s/ Kevin K. Russell
Kevin K. Russell
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
krussell@goldsteinrussell.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on January 20, 2023. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Kevin K. Russell
Kevin K. Russell
GOLDSTEIN & RUSSELL, P.C.
7475 Wisconsin Avenue
Suite 850
Bethesda, MD 20814
(202) 362-0636
krussell@goldsteinrussell.com

January 20, 2023