**ORAL ARGUMENT NOT YET SCHEDULED**
No. 22-1081 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

---

STATE OF OHIO, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN
HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY ECONOMY, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0257)

---

**JOINT DEFERRED APPENDIX VOLUME I**
**(Pages JA-1 - JA-470)**

---

ERIC D. MCARTHUR
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical
Manufacturers, Domestic
Energy Producers Alliance,
Energy Marketers of
America, and National
Association of Convenience
Stores*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable
Fuels Company, LLC*

(Additional counsel listed on
the following page)

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES,
PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Kansas Corn Growers Association,
Michigan Corn Growers
Association, Missouri Corn
Growers Association, and Valero
Renewable Fuels Company, LLC*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW
PITTMAN LLP
1200 17th Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Iowa Soybean
Association, Minnesota Soybean
Growers Association, South Dakota
Soybean Association, and Diamond
Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Valero Renewable Fuels
Company, LLC and Diamond
Alternative Energy, LLC*

# TABLE OF CONTENTS

87 Fed. Reg. 14,332 (Mar. 14, 2022), California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision ................................... 1

    A.    R-1, Comment submitted by California Air Resources Board (CARB), EPA-HQ-OAR-2018-0283-5054 (Excerpted Title Page, Pages 23-59, 282-309, 366-373) ................................... 50

    B.    R-5, Cover Letter to EPA from Mary Nichols, EPA-HQ-OAR-2021-0257-0004 .............................................................131

    C.    R-7, 2012-06-27 ACC Waiver Request, EPA-HQ-OAR-2021-0257-0006 (Excerpted Pages 1-18) ................................................................... 136

    D.    R-29, Comment submitted by Ford Motor Company, EPA-HQ-OAR-2021-0257-0028 ......................................................... 155

    E.    R-125, Comment submitted by Attorney General, State of Ohio et al., EPA-HQ-OAR-2021-0257-0124 ....................................................... 158

    F.    R-132, Comment submitted by National Coalition for Advanced Transportation (NCAT), EPA-HQ-OAR-2021-0257-0130 ....................................................... 171

    G.    R-133, Comment submitted by the State of California et al., EPA-HQ-OAR-2021-0257-0132 (Excerpted Pages 1-50) ................................................................... 187
        (Appendix A) ................................................................................. 238
        (Appendix B) ................................................................................. 257
        (Appendix C) ................................................................................. 275
        (Appendix D) ................................................................................. 287
        (Appendix E) ................................................................................. 298
        (Appendix F, California's Fourth Climate Assessment) .............................. 318
        (Appendix F, MJ Bradley Memorandum) ........................................... 339

    H.    R-136, Comment submitted by Rivian, EPA-HQ-OAR-2021-0257-0135 ....................................................... 362

    I.    R-137, Comment submitted by Tesla, Inc., EPA-HQ-OAR-2021-0257-0136 ....................................................... 366

J.     R-140, Comment submitted by American Fuel &
       Petrochemical Manufacturers (AFPM),
       EPA-HQ-OAR-2021-0257-0139..................................................................... 380

K.     R-224, Comment submitted by Urban Air Initiative
       and Consumers' Research,
       EPA-HQ-OAR-2021-0257-0223..................................................................... 409

L.     R-360, Comment submitted by Center for Biological Diversity (Part 2 of 2),
       EPA-HQ-OAR-2021-0257-0359
       (Excerpted Attachment 9, Pages 51-53),....................................................... 471

M.     R-382, Comment submitted Toyota Motor North America, Inc.,
       EPA-HQ-OAR-2021-0257-0381 ....................................................................... 476

N.     R-390, Comment submitted by M.J. Bradley & Associates Energy Strategy
       Coalition,
       EPA-HQ-OAR-2021-0257-0389....................................................................... 484

O.     R-484, The Safer Affordable Fuel-Efficient Vehicles Rule
       Part One: One National Program,
       EPA-HQ-OAR-2018-0283-7602 ....................................................................... 489

P.     R-490, Letter from the Edison Electric Institute et al to U.S. DOT
       Secretary Chao and EPA Administrator Pruitt (May 22, 2018),
       EPA-HQ-OAR-2018-0283-0006 ....................................................................... 544

Q.     R-4665, Commented submitted by Joseph Mendelson, Senior Counsel,
       Tesla, Inc.,
       EPA-HQ-OAR-2018-0283-4186
       (Excerpted Pages 1-5, 29-31)........................................................................ 549

R.     R-4676, Commented submitted  by Michael Bradley, President, M.J.
       Bradley & Associates LLC,
       EPA-HQ-OAR-2018-0283-4197 ....................................................................... 558

S.     R-4683, Comment submitted by Roberto Rossetti, Vice President of
       Engineering, on behalf of BMW AG, BMW of North America, LLC,
       EPA-HQ-OAR-2018-0283-4204 ....................................................................... 568

T.     R-5546, Comment submitted by National Coalition for Advanced
       Transportation (NCAT),
       EPA-HQ-OAR-2018-0283-5067
       (Excerpted Pages 1-3, 8-25, 46-47, 51-52, 56-57) ........................................ 572

U.       R-5960, Comment submitted by the State of California et al.,
         EPA-HQ-OAR-2018-0283-5481
         (Excerpted Pages 15-33) ..................................................................... 600

V.       R-5966, Comment submitted by Tracy Woodard, Director, Government
         Affairs, Nissan North America, Inc.,
         EPA-HQ-OAR-2018-0283-5487 ........................................................ 621

W.      R-6168, Comment submitted by Rob Sutschek, Senior Director,
         Environmental Engineering Office Department, Volkswagen Group of
         America, Inc. (Volkswagen),
         EPA-HQ-OAR-2018-0283-5689
         (Excerpted Pages 1-3) ......................................................................... 629

X.       R-61670, Comment submitted by Bob Holycross, Global Director,
         Sustainability and Vehicle Environmental Matters, Ford Motor Company,
         EPA-HQ-OAR-2018-0283-5691
         (Excerpted Pages 1-2, 17-20)............................................................. 633

Y.       R-6177, Comments of the American Fuel & Petrochemical Manufacturers
         on the U.S. Environmental Protection Agency's Request for Comment on
         The Safe Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years
         2021 - 2026 Passenger Cars and Light Trucks,
         EPA-HQ-OAR-2018-0283-5698.......................................................... 640

Z.       R-6183, Comment submitted by Julia Rege, Director, Environment &
         Energy and Amandine Muskus, Manager, Environment & Energy,
         Association of Global Automakers, Inc.,
         EPA-HQ-OAR-2018-0283-5704
         (Excerpted Attachment A, Pages A3-A9) ...................................... 757

AA.     R-6245, Comment submitted by Tom Stricker, VP, Product Regulatory
         Affairs, and Richard Gezelle, Jr., Senior Program Manager, Product
         Regulatory Affairs, Toyota Motor North America, Inc.,
         EPA-HQ-OAR-2018-0283-5766
         (Excerpted Pages 1-2) ......................................................................... 765

BB.     R-7874, Comment submitted by American Honda Motor Co, Inc.,
         EPA-HQ-OAR-2018-0283-7445
         (Excerpted Pages 1-3) ......................................................................... 768

CC.     R-7941, Item 7 - LEV - Initial Statement of Reasons,
         EPA-HQ-OAR-2012-0562-0011
         (Excerpted Pages 121-131, 185-202)................................................ 772

DD.   R-8103, Comment submitted by California Air Resources Board (CARB),
      EPA-HQ-OAR-2012-0562-0371
      (Excerpted Pages 1-21, T1-T2) ......................................................................... 803

EE.   R-8158, Item 4 - ZEV - Initial Statement of Reasons,
      EPA-HQ-OAR-2012-0562-0008
      (Excerpted Pages 68-70, 89-109, A1-1-A1-3, iii, B1-B9, C1-C2) ................... 828

FF.   R-8248, Letter to Janet Cohen, Hearing Officer, USEPA regarding CARB
      supplemental comments,
      EPA-HQ-OAR-2012-0562-0373
      (Excerpted Pages 1-5) ..................................................................................... 873

GG.   R-8323, California State Motor Vehicle Pollution Control Standards;
      Notice of Decision Denying a Waiver of Clean Air Act Preemption for
      California's 2009 and Subsequent Model Year Greenhouse Gas
      Emission Standards for New Motor Vehicles,
      73 FR 12156 (Mar. 6, 2008) ..............................................................................879

87 Fed. Reg. 14, 332 (Mar. 14, 2022)

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OAR–2021–0257; FRL–9325–01–OAR]**

### California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency (EPA) has completed the reconsideration of its 2019 action withdrawing a 2013 Clean Air Act (CAA) waiver of preemption for California's greenhouse gas (GHG) emission standards and zero emission vehicle (ZEV) sale mandate, which are part of California's Advanced Clean Car (ACC) program. This decision rescinds EPA's 2019 waiver withdrawal, thus bringing back into force the 2013 ACC program waiver, including a waiver of preemption for California's ZEV sales mandate and GHG emissions standards. In addition, EPA is withdrawing the interpretive view of CAA section 177 included in its 2019 action, that States may not adopt California's GHG standards pursuant to section 177 even if EPA has granted California a waiver for such standards. Accordingly, other States may continue to adopt and enforce California's GHG standards under section 177 so long as they meet the requirements of that section.

**DATES:** Petitions for review must be filed by May 13, 2022.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2021–0257. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available electronically through *www.regulations.gov*. After opening the *www.regulations.gov* website, enter EPA–HQ–OAR–2021–0257 in the "Enter Keyword or ID" fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. EPA's Office of Transportation and Air Quality (OTAQ) maintains a web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are cited in this notice;

the page can be accessed at *https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations*.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW. Telephone: (202) 343–9256. Email: *Dickinson.David@epa.gov* or Kayla Steinberg, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW. Telephone: (202) 564–7658. Email: *Steinberg.Kayla@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. California's Advanced Clean Car (ACC) Program and EPA's 2013 Waiver
  B. Prior Waivers for GHG Standards
  C. SAFE 1 Decision
  D. Petitions for Reconsideration
III. Principles Governing This Review
  A. Scope of Preemption and Waiver Criteria Under the Clean Air Act
  B. Deference to California
  C. Standard and Burden of Proof
IV. EPA did not Appropriately Exercise its Limited Authority To Reconsider the ACC Program Waiver in SAFE 1
  A. Comments Received
  B. Analysis: EPA Inappropriately Exercised Its Limited Authority To Reconsider
  C. Conclusion
V. The SAFE 1 Interpretation of Section 209(b)(1)(B) was Inappropriate and, in any Event, California met Its Requirements
  A. Historical Practice
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: California Needs the ACC Program GHG Standards and ZEV Sales Mandate to Address Compelling and Extraordinary Conditions Under Section 209(b)(1)(B)
  1. EPA is Withdrawing the SAFE 1 Section 209(b)(1)(B) Interpretation
  2. California Needs the GHG Standards and ZEV Sales Mandate Even Under the SAFE 1 Interpretation
  a. GHG Standards and ZEV Sales Mandates Have Criteria Emission Benefits
  b. California Needs Its Standards To Address the Impacts of Climate Change in California
  3. California's ZEV Sales Mandate as Motor Vehicle Control Technology Development
  E. Conclusion
VI. EPA Inappropriately Considered Preemption Under the Energy and Policy Conservation Act (EPCA) in Its Waiver Decision
  A. Historical Practice and Legislative History
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: EPA is Rescinding its SAFE 1 Actions Related to Preemption Under EPCA
  1. NHTSA Has Since Repealed Its Findings of Preemption Made in SAFE 1
  2. EPA Improperly Deviated From its Historical Practice of Limiting its Review to Section 209(b) Criteria
  E. Conclusion
VII. EPA Inappropriately set Forth an Interpretive View of Section 177 in SAFE 1
  A. SAFE 1 Interpretation
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: EPA is Rescinding SAFE 1's Interpretive Views of Section 177
  E. Conclusion
VIII. Other Issues
  A. Equal Sovereignty
  B. CARB's Deemed-to-Comply Provision
IX. Decision
X. Statutory and Executive Order Reviews

## I. Executive Summary

CAA section 209(a) generally preempts states from adopting emission control standards for new motor vehicles. But Congress created an important exception from preemption. Under CAA section 209(b), the State of California [1] may seek a waiver of preemption, and EPA must grant it unless the Agency makes one of three statutory findings. California's waiver of preemption for its motor vehicle emissions standards allows other States to adopt and enforce identical standards pursuant to CAA section 177. Since the CAA was enacted, EPA has granted California dozens of waivers of preemption, permitting California to enforce its own motor vehicle emission standards.

Of particular relevance to this action, in 2013, EPA granted California's waiver request for the state's Advanced Clean Car (ACC) program (ACC program waiver).[2] California's ACC program includes both a Low Emission Vehicle (LEV) program, which regulates criteria pollutants and greenhouse gas (GHG) emissions, as well as a Zero Emission Vehicle (ZEV) sales mandate. These two requirements are designed to control smog- and soot-causing pollutants and GHG emissions in a single coordinated package of requirements for passenger cars, light-duty trucks, and medium-duty passenger vehicles (as well as

---

[1] The CAA section 209(b) waiver is limited "to any State which has adopted standards . . . for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966," and California is the only State that had standards in place before that date. "California" and "California Air Resources Board" (CARB) are used interchangeably in certain instances in this notice when referring to the waiver process under section 209(b).

[2] 78 FR 2111 (January 9, 2013).

JA-2

*Federal Register* / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices **14333**

limited requirements related to heavy-duty vehicles). Between 2013 and 2019, twelve States adopted one or both of California's standards as their own. But in 2019, EPA partially withdrew this waiver as part of a final action entitled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program" (SAFE 1), marking the first time the agency withdrew a previously granted waiver.[3] In addition, in the context of SAFE 1, EPA provided an interpretive view of CAA section 177 asserting that other states were precluded from adopting California's GHG standards.

As Administrator of the Environmental Protection Agency (EPA), I am now rescinding EPA's 2019 actions in SAFE 1 that partially withdrew the ACC program waiver for California's ACC program. I am rescinding these actions because (1) EPA's reconsideration of the waiver under the particular facts and circumstances of this case was improper; (2) EPA's reconsideration was based on a flawed interpretation of CAA section 209(b); (3) even under that flawed interpretation, EPA misapplied the facts and inappropriately withdrew the waiver; (4) EPA erred in looking beyond the statutory factors in CAA 209(b) to action taken by another agency under another statute to justify withdrawing the waiver; (5) that agency has also since withdrawn the action EPA relied on in any event; and (6) EPA inappropriately provided an interpretive view of section 177.

As a result of this action, EPA's 2013 waiver for the ACC program, specifically the waiver for California's GHG emission standards and ZEV sales mandate requirements for model years (MYs) 2017 through 2025, comes back into force.[4] I am also rescinding the interpretive view set forth in SAFE 1 that States may not adopt California's GHG standards pursuant to CAA section 177 even if EPA has granted California a section 209 waiver for such standards. Accordingly, States may now adopt and enforce California's GHG standards so long as they meet the requirements of

Section 177, and EPA will evaluate any State's request to include those provisions in a SIP through a separate notice and comment process.

Section II of this action contains a detailed history of EPA's waiver adjudications leading up to this action. In summary, in 2012, CARB submitted the ACC waiver request to EPA, which included ample evidence of the criteria pollution benefits of the GHG standards and the ZEV sales mandate. As it had in all prior waiver decisions with two exceptions (including SAFE 1), in considering the request EPA relied on its "traditional" interpretation of section 209(b)(1)(B), which examines whether California needs a separate motor vehicle program as a whole—not specific standards—to address the state's compelling and extraordinary conditions. In 2013, EPA granted California's waiver request for its ACC program in full. In 2018, however, EPA proposed to withdraw portions of its waiver granted in 2013 based on a new interpretation of section 209(b)(1)(B) that looked at whether the specific standards (the GHG standards and ZEV sales mandate), as opposed to the program as a whole, continued to meet the second and third waiver prongs (found in sections 209(b)(1)(B) and (C)).[5] In addition, EPA proposed to look beyond the section 209(b) criteria to consider the promulgation of a NHTSA regulation and pronouncements in SAFE 1 that declared state GHG emission standards and ZEV sales mandates preempted under EPCA. In 2019, after granting CARB a waiver for its ACC program in 2013 and after 12 states had adopted all or part of the California standards under section 177, EPA withdrew portions of the waiver for CARB's GHG emission standards and ZEV sales mandates. In SAFE 1, EPA cited changed circumstances and was based on a new interpretation of the CAA and the agency's reliance on an action by NHTSA that has now been repealed.[6]

On January 20, 2021, President Biden issued Executive Order 13990, directing the Federal Agencies to "immediately review" SAFE 1 and to consider action "suspending, revising, or rescinding" that action by April 2021. On April 28, 2021, EPA announced its Notice of Reconsideration, including a public hearing and an opportunity for public comment.[7] The Agency stated its belief that there were significant issues regarding whether SAFE 1 was a valid and appropriate exercise of Agency authority, including the amount of time that had passed since EPA's ACC program waiver decision, the approach and legal interpretations used in SAFE 1, whether EPA took proper account of the environmental conditions (*e.g.,* local climate and topography, number of motor vehicles, and local and regional air quality) in California, and the environmental consequences from the waiver withdrawal in SAFE 1. Further, EPA stated it would be addressing issues raised in the related petitions for reconsideration of EPA's SAFE 1 action. In the meantime, having reconsidered its own action, and also in response to Executive Order 13990, NHTSA repealed its conclusion that state and local laws related to fuel economy standards, including GHG standards and ZEV sales mandates, were preempted under EPCA,[8] and EPA revised and made more stringent the Federal GHG emission standards for light-duty vehicles for 2023 and later model years, under section 202(a).[9]

Section III of this action outlines the principles that govern waiver reconsiderations. It sets forth the statutory background and context for the CAA preemption of new motor vehicle emission standards, the criteria for granting a waiver of preemption, and the ability of other States to adopt and enforce California's new motor vehicle emission standards where a waiver has been issued if certain CAA criteria are met. In brief, CAA section 209(a) generally preempts all States or political subdivisions from adopting and enforcing any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines. But section 209(b) contains an important exception that allows only

---

[3] 84 FR 51310 (September 27, 2019).

[4] In SAFE 1, EPA did not withdraw the entire 2013 waiver, but instead only withdrew the waiver as it related to California's GHG emission standards and the ZEV sales mandate. The waiver for the low-emission vehicle (LEV III) criteria pollutant standards in the ACC program remained in place. EPA's reconsideration of SAFE 1 and the impact on the ACC waiver therefore relates only to the GHG emission standards and the ZEV sales mandate, although "ACC program waiver" is used in this document. This action rescinds the waiver withdrawal in SAFE 1. In this decision, the Agency takes no position on any impacts this decision may have on state law matters regarding implementation.

[5] EPA's 2018 proposal was jointly issued with the National Highway Traffic Safety Administration (NHTSA). 83 FR 42986 (August 24, 2018) (the "SAFE proposal"). In addition to partially withdrawing the waiver, that proposal proposed to set less stringent greenhouse gas and CAFE standards for model years 2021–2026. NHTSA also proposed to make findings related to preemption under the Energy Policy and Conservation Act (EPCA) and its relationship to state and local GHG emission standards and ZEV sales mandates.

[6] 84 FR 51310. In SAFE 1, NHTSA also finalized its action related to preemption under EPCA. NHTSA's action included both regulatory text and well as pronouncements within the preamble of SAFE 1. In 2020, EPA finalized its amended and less stringent carbon dioxide standards for the 2021–2026 model years in an action titled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles

Rule for Model Years 2021–2026 Passenger Cars and Light Trucks" (SAFE 2). 85 FR 24174 (April 30, 2020).

[7] "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Opportunity for Public Hearing and Public Comment." 86 FR 22421 (April 28, 2021).

[8] 86 FR 74236 (December 29, 2021).

[9] 86 FR 74434 (December 30, 2021).

California to submit a request to waive preemption for its standards. Importantly, EPA must grant the waiver unless the Administrator makes at least one of three findings: (1) That California's determination that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards, is arbitrary and capricious (the "first waiver prong," under section 209(b)(1)(A)); (2) that California does not need such State standards to meet compelling and extraordinary conditions (the "second waiver prong," under section 209(b)(1)(B)); or (3) that California standards are not consistent with section 202(a), which contains EPA's authority to regulate motor vehicles (the "third waiver prong," under section 209(b)(1)(C)). In the 1977 amendments to the CAA, section 177 was added to allow other States that may be facing their own air quality concerns to adopt and enforce the California new motor vehicle emission standards for which California has been granted a waiver under section 209(b) if certain criteria are met.

Section III also provides more context to indicate that Congress intended that, when reviewing a request for a waiver, EPA treat with deference the policy judgments on which California's vehicle emission standards are based. It discusses the history of Congress allowing states to adopt more stringent standards. Ultimately, Congress built a structure in section 209(b) that grants California authority to address its air quality problems, and also acknowledges the needs of other states to address their air quality problems through section 177. Lastly, Section III describes the burden and standard of proof for waiver decisions.

Section IV of this action then discusses EPA's first basis for rescinding the SAFE 1 waiver withdrawal: That EPA did not appropriately exercise its limited authority to withdraw a waiver once granted. Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. In the context of reconsidering a waiver grant, that authority may only be exercised sparingly. EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). EPA's reconsideration may not be broader than the limits Congress placed on its ability to deny a waiver in the first place. EPA notes further support for limiting its

exercise of reconsideration authority, relevant in the context of a waiver withdrawal, is evidenced by Congress's creation of a state and federal regulatory framework to drive motor vehicle emissions reduction and technology innovation that depends for its success on the stable market signal of the waiver grant—automobile manufacturers must be able to depend reliably on the continuing validity of the waiver grant in order to justify the necessary investments in cleaner vehicle technology. Accordingly, EPA now believes it may only reconsider a previously granted waiver to address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Even then, as with other adjudicatory actions, when choosing to undertake such a reconsideration EPA believes it should exercise its limited authority within a reasonable timeframe and be mindful of reliance interests. EPA expects such occurrences will be rare. The Agency's waiver withdrawal in SAFE 1 was not an appropriate exercise of EPA's limited authority; there was no clerical error or factual error in the ACC program waiver, and SAFE 1 did not point to any factual circumstances or conditions related to the three waiver prongs that have changed so significantly that the propriety of the waiver grant is called into doubt. Rather, the 2019 waiver withdrawal was based on a change in EPA's statutory interpretation, an incomplete assessment of the record, and another agency's action beyond the confines of section 209(b). EPA erred in reconsidering a previously granted waiver on these bases. Accordingly, EPA is rescinding its 2019 withdrawal of its 2013 ACC program waiver.

Sections V and VI further explain why, even if SAFE 1 were an appropriate exercise of EPA's limited authority to reconsider its previously-granted waiver, the Agency would still now rescind its waiver withdrawal.

As discussed in Section V, the Agency's reinterpretation of the second waiver prong in SAFE 1 was flawed. While EPA has traditionally interpreted the second waiver prong, section 209(b)(1)(B), to require a waiver unless the Agency demonstrates that California does not need its own motor vehicle emissions program, to meet compelling and extraordinary conditions, the SAFE 1 waiver withdrawal decision was based on a statutory interpretation that calls for an examination of the need for the specific standard at issue. Section V

explains why EPA believes that its traditional interpretation is, at least, the better interpretation of the second waiver prong because it is most consistent with the statutory language and supported by the legislative history. Accordingly, we reaffirm the traditional interpretation—in which EPA reviews the need for California's motor vehicle program—in this action.

Additionally, Section V explains why even if the focus is on the specific standards, when looking at the record before it, EPA erred in SAFE 1 in concluding that California does not have a compelling need for the specific standards at issue—the GHG emission standards and ZEV sales mandate. In particular, in SAFE 1, the Agency failed to take proper account of the nature and magnitude of California's serious air quality problems, including the interrelationship between criteria and GHG pollution.[10] Section V further discusses EPA's improper substitution in SAFE 1 of its own policy preferences for California's, and discusses the importance of deferring to California's judgment on "ambiguous and controversial matters of public policy" that relate to the health and welfare of its citizens.[11] Based on a complete review of the record in this action, EPA now believes that, even under the SAFE 1 interpretation, California needs the ZEV sales mandate and GHG standards at issue to address compelling and extraordinary air quality conditions in the state. EPA's findings in SAFE 1, which were based on the Agency's inaccurate belief that these standards were either not intended to or did not result in criteria emission reductions to address California's National Ambient Air Quality Standard (NAAQS) obligations, are withdrawn.

Section VI discusses SAFE 1's other basis for withdrawing the ACC program waiver, EPCA. In SAFE 1, EPA reached beyond the waiver criteria in section 209(b)(1) and considered NHTSA's regulations in SAFE 1 that state or local regulation of carbon dioxide emission from new motor vehicles (including

---

[10] As explained herein, the requirements in the ACC program were designed to work together in terms of the technologies that would be used to both lower criteria emissions and GHG emissions. The standards, including the ZEV sales mandate and the GHG emission standards, were designed to address the short- and long-term air quality goals in California in terms of the criteria emission reductions (including upstream reductions) along GHG emission reductions. The air quality issues and pollutants addressed in the ACC program are interconnected in terms of the impacts of climate change on such local air quality concerns such as ozone exacerbation and climate effects on wildfires that affect local air quality.

[11] 40 FR 23102, 23104 (May 28, 1975); 58 FR 4166 (January 13, 1993).

JA-4

California's ZEV sales mandate and GHG standards) are related to fuel economy and as such are preempted under EPCA. NHTSA has since issued a final rule that repeals all regulatory text and additional pronouncements regarding preemption under EPCA set forth in SAFE 1.[12] This action by NHTSA effectively removes the underpinning and any possible reasoned basis for EPA's withdrawal decision based on preemption under EPCA in SAFE 1. Additionally, the Agency has historically refrained from consideration of factors beyond the scope of the waiver criteria in section 209(b)(1) and the 2013 ACC program waiver decision was undertaken consistent with this practice. EPA believes that the consideration of EPCA preemption in SAFE 1 led the Agency to improperly withdraw the ACC program waiver on this non-CAA basis. EPA's explanation that withdrawal on this basis was justified because SAFE 1 was a joint action, and its announcement that this would be a single occurrence, does not justify the ACC waiver withdrawal. Thus, EPA is rescinding the withdrawal of those aspects of the ACC program waiver that were based on NHTSA's actions in SAFE 1.

Section VII addresses SAFE 1's interpretive view of section 177 that States adopting California's new motor vehicle emission standards could not adopt California's GHG standards.[13] EPA believes it was both unnecessary and inappropriate in a waiver proceeding to provide an interpretive view of the authority of states to adopt California standards when section 177 does not assign EPA any approval role in states' adoption of the standards. Therefore, as more fully explained in Section VII, the Agency is rescinding the interpretive view on section 177 set out in SAFE 1. Section VIII discusses certain other considerations, including the equal sovereignty doctrine and California's deemed-to-comply provision, and concludes that they do not disturb EPA's decision to rescind the 2019 waiver withdrawal action.

Section IX contains the final decision to rescind the withdrawal of the 2013 ACC program waiver. In summary, I find that although EPA has inherent authority to reconsider its prior waiver decisions, that authority to reconsider is limited and may be exercised only when EPA has made a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated

when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Further, EPA's reconsideration may not be broader than the limits Congress placed on its ability to deny a waiver in the first place. Even where those conditions are met, I believe that any waiver withdrawal decision should consider other factors such as the length of time since the initial decision and California and others' reliance on the initial decision. Because there were no factual or clerical errors or such significantly changed factual circumstances or conditions necessary to trigger EPA's authority to reconsider its previously granted waiver during the SAFE 1 proceeding, I believe SAFE 1 was not an appropriate exercise of EPA's authority to reconsider. In addition, even if it were an appropriate exercise, EPA should not have departed from its traditional interpretation of the second waiver prong (section 209(b)(1)(B)), which is properly focused on California's need for a separate motor vehicle emission program—not specific standards—to meet compelling and extraordinary conditions. And even under EPA's SAFE 1 interpretation of the second waiver prong, a complete review of the factual record demonstrates that California does need the GHG emission standards and ZEV sales mandate to meet compelling and extraordinary conditions in the State. Therefore, EPA should not have withdrawn the ACC program waiver based upon the second waiver prong in SAFE 1 and recission of the withdrawal is warranted. Additionally, I find that EPA inappropriately relied on NHTSA's finding of preemption, now withdrawn, to support its waiver withdrawal, and rescind the waiver withdrawal on that basis as well. Finally, independently in this action, I am rescinding the interpretive views of section 177 that were set forth in SAFE 1, because it was inappropriate to include those views as part of this waiver proceeding.

For these reasons, I am rescinding EPA's part of SAFE 1 related to the CAA preemption of California's standards. This recission has the effect of bringing the ACC program waiver back into force.

## II. Background

This section provides background information needed to understand EPA's decision process in SAFE 1, and this decision. This context includes: A summary of California's ACC program including the record on the criteria pollutant benefits of its ZEV sales mandate and GHG emission standards; a review of the prior GHG emission standards waivers in order to explain

EPA's historical evaluation of the second waiver prong; an overview of the SAFE 1 decision; a review of the petitions for reconsideration filed subsequent to SAFE 1; and a description of the bases and scope of EPA's reconsideration of SAFE 1. EPA's sole purpose in soliciting public comment on its reconsideration was to determine whether SAFE 1 was a valid and appropriate exercise of the Agency's authority. In the Notice of Reconsideration, EPA therefore noted that reconsideration was limited to SAFE 1 and that the Agency was not reopening the ACC program waiver decision.

### A. California's Advanced Clean Car (ACC) Program and EPA's 2013 Waiver

On June 27, 2012, CARB notified EPA of its adoption of the ACC program regulatory package that contained amendments to its LEV III and ZEV sales mandate, and requested a waiver of preemption under section 209(b) to enforce regulations pertaining to this program.[14] The ACC program combined the control of smog- and soot-causing pollutants and GHG emissions into a single coordinated package of requirements for passenger cars, light-duty trucks, and medium-duty passenger vehicles (as well as limited requirements related to heavy-duty vehicles for certain model years).[15]

In its 2012 waiver request, CARB noted that the 2012 ZEV amendments would also result in additional criteria pollutant benefits in California in comparison to the earlier ZEV regulations and would likely provide benefits beyond those achieved by

---

[14] 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 (2012 Waiver Request) at 1, 3–6. CARB's LEV III standards include both its criteria emission standards and its GHG emission standards. SAFE 1 did not address the LEV III criteria emission standards and as such the ACC program waiver remained in place. SAFE 1 did address CARB's GHG emission standards and ZEV sales mandate and this action addresses these two standards as well. As noted in CARB's 2012 Waiver Request, these three standards are interrelated and comprehensive in order to address the State's serious air quality problems including its criteria pollutants and climate change challenges.

[15] As noted in CARB's waiver request, ''[a]t the December 2009 hearing, the Board adopted Resolution 09–66, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies. The Board further directed staff to consider shifting the *focus of the ZEV regulation to both GHG and criteria pollutant emission reductions*, commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly.'' 2012 Waiver Request at 2 (emphasis added). EPA stated in SAFE 1 that California's ZEV standard initially targeted only criteria pollutants. 84 FR at 51329. *See also* 78 FR at 2118.

---

[12] 86 FR 74236.
[13] 84 FR at 51310, 51350.

complying with the LEV III criteria pollutant standard for conventional vehicles only. CARB attributed these benefits not to vehicle emissions reductions specifically, but to increased electricity and hydrogen use that would be more than offset by decreased gasoline production and refinery emissions.[16] CARB's waiver request attributed the criteria emissions benefits to its LEV III criteria pollutant fleet standard and did not include similar benefits from its ZEV sales mandate. According to the request, the fleet would become cleaner regardless of the ZEV sales mandate because the ZEV sales mandate is a way to comply with the LEV III standards and, regardless of the ZEV sales mandate, manufacturers might adjust their compliance response to the standard by making less polluting conventional vehicles. CARB further explained that because upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production.[17]

On August 31, 2012, EPA issued a notice of opportunity for public hearing and written comment on CARB's request and solicited comment on all aspects of a full waiver analysis for such request under the criteria of section 209(b).[18] Commenters opposing the waiver asked EPA to deny the waiver under the second waiver prong, section 209(b)(1)(B), as it applied to the GHG provisions in the ACC Program, calling on EPA to adopt an alternative interpretation of that provision focusing on California's need for the specific standards. Following public notice and comment and based on its traditional interpretation of section 209(b), on January 9, 2013, EPA granted California's request for a waiver of preemption to enforce the ACC program regulations.[19] The traditional interpretation, which EPA stated is the better interpretation of section 209(b)(1)(B), calls for evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary

conditions.[20] As explained, EPA must grant a waiver to California unless the Administrator makes at least one of the three statutorily-prescribed findings in section 209(b)(1). Concluding that opponents of the waiver did not meet their burden of proof to demonstrate that California does not have such need, EPA found that it could not deny the waiver under the second waiver prong.[21]

Without adopting the alternative interpretation, EPA noted that, to the extent that it was appropriate to examine the need for CARB's specific GHG standards to meet compelling and extraordinary conditions, EPA had explained at length in its earlier 2009 GHG waiver decision that California does have compelling and extraordinary conditions directly related to regulation of GHGs. This conclusion was supported by additional evidence submitted by CARB in the ACC program waiver proceeding, including reports that demonstrate record-setting wildfires, deadly heat waves, destructive storm surges, and loss of winter snowpack. Many of these extreme weather events and other conditions have the potential to dramatically affect human health and well-being.[22] Similarly, to the extent

that it was appropriate to examine the need for CARB's ZEV sales mandate, EPA noted that the ZEV sales mandate in the ACC program enables California to meet both its air quality and climate goals into the future. EPA recognized that CARB's coordinated strategies reflected in the ACC program for addressing both criteria pollutants and GHGs and the magnitude of the technology and energy transformation needed to meet such goals.[23] Therefore, EPA determined that, to the extent the second waiver prong should be interpreted to mean a need for the specific standards at issue, CARB's GHG emission standards and ZEV sales mandate satisfy such a finding.

In the context of assessing the need for the specific ZEV sales mandate in the ACC program waiver, EPA noted CARB's intent in the redesign of the ZEV regulation of addressing both criteria pollutants and GHG emissions, and CARB's demonstration of "the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet . . . the goals set forth by California's climate change requirements" and found that the ZEV standards would help California achieve those "long term emission benefits as well as . . . some [short-term] reduction in criteria pollutant emissions." [24]

## B. Prior Waivers for GHG Standards

For over fifty years, EPA has evaluated California's requests for waivers of preemption under section 209(b), primarily considering CARB's motor vehicle emission program for criteria pollutants.[25] More recently, the Agency has worked to determine how

---

[16] 2012 Waiver Request at 6.

[17] Id. at 15–16.

[18] 77 FR 53119 (August 31, 2012).

[19] Set forth in the ACC program waiver decision is a summary discussion of EPA's earlier decision to depart from its traditional interpretation of section 209(b)(1)(B) (the second waiver prong) in the 2008 waiver denial for CARB's initial GHG standards for certain model years along with EPA's return to the traditional interpretation of the second prong in the waiver issued in 2009. 78 FR at 2125–31. These interpretations are discussed more fully in Section III.

[20] Id. at 2128 ("The better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.").

[21] Because EPA received comment on this issue during the ACC program waiver proceeding, as it pertained to both CARB's GHG emission standards and ZEV sales mandate, the Agency recounted the interpretive history associated with standards for both GHG emissions and criteria air pollutants to explain EPA's belief that section 209(b)(1)(B) should be interpreted the same way for all air pollutants. Id. at 2125–31 ("As discussed above, EPA believes that the better interpretation of the section 209(b)(1)(B) criterion is the traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions. Applying this approach with the reasoning noted above, with due deference to California, I cannot deny the waiver.").

[22] Id. at 2126–29. Within the 2009 GHG waiver, and again in the 2013 ACC program waiver, EPA explained that the traditional approach does not make section 209(b)(1)(B) a nullity, as before EPA must still determine whether California does not need its motor vehicle program to meet compelling and extraordinary conditions as discussed in the legislative history. Conditions in California may one day improve such that it may no longer have a need for its motor vehicle program.

[23] Id. at 2131 ("Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions. The ZEV standards are a reasonable pathway to reach the LEV III goals, in the context of California's longer-term goals.").

[24] Id. at 2130–31. See also 2012 Waiver Request at 15–16); CARB Supplemental Comments, EPA–HQ–OAR–2012–0562–0373 at 4 (submitted November 14, 2012).

[25] EPA notes that the 1990 amendments to the CAA added subsection (e) to section 209. Subsection (e) addresses the preemption of State or political subdivision regulation of emissions from nonroad engines or vehicles. Section 209(e)(2)(A) sets forth language similar to section 209(b) in terms of the criteria associated with EPA waiving preemption, in this instance for California nonroad vehicle and engine emission standards. Congress directed EPA to implement subsection (e). See 40 CFR part 1074. EPA review of CARB requests submitted under section 209(e)(2)(A)(ii) includes consideration of whether CARB needs its nonroad vehicle and engine program to meet compelling and extraordinary conditions. See 78 FR 58090 (September 20, 2013).

section 209(b)(1)(B) should be interpreted and applied to GHG standards, including consideration of the relationship of GHG standards to California's historical air quality problems, the public health impacts of GHG emissions on NAAQS pollutants, and the direct impacts of GHG emissions and climate change on California and its inhabitants. While the SAFE 1 withdrawal and revocation of the waiver for CARB's ACC program represents a singular snapshot of this task, it is important to examine EPA's long-standing and consistent waiver practice in general, including EPA's interpretations in prior waiver decisions pertaining to CARB's GHG emission standards, in order to determine whether EPA properly applied the waiver criterion in section 209(b)(1)(B) in SAFE 1.[26]

Historically, EPA has consistently interpreted and applied the second waiver prong by considering whether California needed a separate motor vehicle emission program as compared to the specific standards at issue to meet compelling and extraordinary conditions.[27] At the same time, in response to commenters that have argued that EPA is required to examine the specific standards at issue in the waiver request, EPA's practice has been to nevertheless review the specific standards to determine whether California needs those individual standards to meet compelling and extraordinary conditions.[28] This does not mean that EPA has adopted an "alternative approach" and required a demonstration for the need for specific standards; rather, this additional Agency review has been afforded to

address commenters' concerns and this secondary analysis has been done to support the Agency's primary assessment. For example, EPA granted an authorization for CARB's In-use Off-road Diesel Standards (Fleet Requirements) that included an analysis under both approaches.[29] The only two departures from this traditional approach occurred first in 2008 when EPA adopted an "alternative approach" to the second waiver prong and second in 2019 when EPA adopted the "SAFE 1 interpretation" of the second waiver criterion.

EPA's task of interpreting and applying section 209(b)(1)(B) to California's GHG standards and consideration of the State's historical air quality problems that now include the public health and welfare challenge of climate change began in 2005, with CARB's waiver request for 2009 and subsequent model years' GHG emission standards. On March 6, 2008, EPA denied the waiver request based on a new interpretive finding that section 209(b) was intended for California to enforce new motor vehicle emission standards that address local or regional air pollution problems, and an Agency belief that California could not demonstrate a "need" under section 209(b)(1)(B) for standards intended to address global climate change problems. EPA also employed this new alternative interpretation to state a belief that the effects of climate change in California are not compelling and extraordinary in comparison with the rest of the country. Therefore, in the 2008 waiver denial, EPA did not evaluate whether California had a need for its motor vehicle emission program to meet compelling and extraordinary conditions (the traditional interpretation) but rather focused on the specific GHG emission standard in isolation and not in conjunction with the other motor vehicle emission standards for criteria pollutants.

In 2009, EPA initiated a reconsideration of the 2008 waiver denial. The reconsideration resulted in granting CARB a waiver for its GHG emission standards commencing in the

2009 model year.[30] In granting the waiver, EPA rejected the Agency's alternative interpretation of the second waiver prong announced in the 2008 waiver denial. Instead, EPA returned to its traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions because the Agency viewed it as the better interpretation of the second waiver prong. Under the traditional interpretation, EPA found that the opponents of the waiver had not met their burden of proof to demonstrate that California did not need its motor vehicle emission program to meet compelling and extraordinary conditions. In responding to comments on this issue, EPA also determined that, even if the alternative interpretation were to be applied, the opponents of the waiver had not demonstrated that California did not need its GHG emissions standards to meet compelling and extraordinary conditions.[31]

Since EPA's 2009 GHG waiver decision and before SAFE 1 the Agency applied the traditional interpretation of the second waiver prong in its GHG-related waiver proceedings, including the on-going review of California's GHG emission standards for vehicles. In the first instance, in 2009, CARB adopted amendments to its certification requirements that would accept demonstration to the Federal GHG standards as compliance with CARB's GHG program. This provision is known as a "deemed-to-comply" provision.[32] In 2011, EPA determined that this deemed-to-comply provision was within-the-scope of the waiver issued in July 2009, relying on the traditional interpretation of the second waiver prong.[33] As such, in the June 14, 2011

---

[26] EPA notes that, in the history of EPA waiver decisions, it has only denied a waiver once (in 2008) and withdrawn a waiver once (in 2019). Each instance was under this second waiver prong in section 209(b)(1)(B).

[27] 49 FR 18887, 18890 (May 3, 1984).

[28] For example, in EPA's 2009 GHG waiver that reconsidered the 2008 GHG waiver denial, the Agency noted that "Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference. EPA's consistent view is that it should give deference to California's policy judgments, as it has in past waiver decisions, on California's choice of mechanism used to address air pollution problems. EPA does not second-guess the wisdom or efficacy of California's standards. EPA has also considered this approach with respect to the specific GHG standards themselves, as well as California's motor vehicle emissions program." 74 FR at 32766 (citing to *Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1110–11 (D.C. Cir. 1979)).

[29] 78 FR at 58090. The United States Court of Appeals for the Ninth Circuit reviewed EPA's grant of a waiver of preemption under the traditional approach, and because of comments seeking an alternative interpretation, an assessment of the need for the standards contained in California's request. *Dalton Trucking* v. *EPA*, No. 13–74019 (9th Cir. 2021) (finding that EPA was not arbitrary in granting the waiver of preemption under either approach). The court opinion noted that "[t]his disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3."

[30] 74 FR 32743, 32745 (July 8, 2009).

[31] 74 FR at 32759–67. For example, EPA noted that the analysis of the need for CARB's GHG standards in the 2008 waiver denial failed to consider that although the factors that cause ozone are primarily local in nature and that ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. EPA noted that California had made a case that its greenhouse gas standards are linked to amelioration of its smog problems. *See also* 76 FR 34693 (June 14, 2011).

[32] California Code of Regulations, Title 13 1961(a)(1)(B). Under this provision, automakers could comply with the California GHG standards for model years 2017–2025 by meeting Federal GHG standards for the same model years.

[33] 76 FR 34693. EPA's "within-the-scope" decisions are generally performed when CARB has amended its regulations that were previously waived by EPA under section 209(b)(1) and include an analysis of whether EPA's prior evaluation of the waiver criteria has been undermined by CARB's amendments. EPA received comment during the
Continued

within-the-scope decision EPA determined that CARB's 2009 amendments did not affect or undermine the Agency's prior determination made in the 2009 GHG waiver decision, including the technological feasibility findings in section 209(b)(1)(C).[34] EPA also acted on two requests for waivers of preemption for CARB's heavy-duty (HD) tractor-trailer GHG emission standards.[35] Once again, EPA relied upon its traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions and found that no evidence had been submitted to demonstrate that California no longer needed its motor vehicle emission program to meet compelling and extraordinary conditions.[36] EPA's

---

reconsideration of SAFE 1 that questioned whether CARB needed its GHG standards if it was otherwise accepting compliance with the Federal GHG standards. EPA addressed the issue in its final decision (76 FR at 34696–98) and continues to believe EPA's analysis applies. The existence of federal emission standards that CARB may choose to harmonize with or deem as compliance with its own State standards (or that CARB may choose to set more stringent standards) does not on its own render California's as not needed. CARB continues to administer an integrated and comprehensive motor vehicle emission program (including its ZEV sales mandate and GHG emission standards and other applicable emission standards for light-duty vehicles) and this program continues to evolve to address California's serious air quality issues. CARB's decision to select some federal emission standards as sufficient to comply with its own State emission standards does not negate the overall design and purpose of section 209 of the CAA. In the within-the-scope decision issued in 2011, EPA agreed with Global Automakers comment that the deemed-to-comply provision renders emission benefits equally protective as between California and Federal programs. *Id.* at 34696.

[34] *Id.* at 34696–97.

[35] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014). In this waiver decision EPA responded to comments regarding whether CARB had quantified how the GHG regulations would contribute to attainment of ozone or particulate matter standards by noting that nothing in section 209(b)(1)(B) calls for California to quantify specifically how its regulations would affect attainment of the NAAQS in the State. Rather, EPA noted, the relevant question is whether California needs its own motor vehicle emission program and not whether there is a need for specific standards. The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

[36] Relatedly, California explained the need for these standards based on projected "reductions in NOx emissions of 3.1 tons per day in 2014 and one ton per day in 2020 due to the HD GHG Regulations. California state[d] that these emissions reductions will help California in its efforts to attain applicable air quality standards. California further projects that the HD GHG Regulations will reduce GHG emissions in California by approximately 0.7 million metric tons (MMT) of carbon dioxide equivalent emissions ($CO_2$e) by 2020." 79 FR at 46261. *See also* 81 FR at 95982.

second waiver for the HD GHG emission standards made a similar finding that California's compelling and extraordinary conditions continue to exist under the traditional approach for the interpretation of the second waiver criterion.[37]

### C. SAFE 1 Decision

In 2018, NHTSA issued a proposal for new Corporate Average Fuel Economy (CAFE) standards that must be achieved by each manufacturer for its car and light-duty truck fleet while EPA revisited its light-duty vehicle GHG emissions standards for certain model years in the SAFE Proposal.[38] EPA also proposed to withdraw the waiver for the ACC program GHG emission standards and ZEV sales mandate, referencing both sections 209(b)(1)(B) and (C). EPA posited that since the grant of the initial waiver a reassessment of California's need for its GHG standards and ZEV sales mandate under the second waiver prong, section 209(b)(1)(B), was appropriate. EPA further posited that its own Federal GHG rulemaking in the SAFE proposal raised questions about the feasibility of CARB's standards under the third waiver prong, section 209(b)(1)(C).[39] In addition, EPA reasoned that the SAFE proposal presented a unique situation that required EPA to consider the implications of NHTSA's proposed conclusion that California's GHG emission standards and ZEV sales mandate were preempted by EPCA.[40]

---

[37] 81 FR at 95987. At the time of CARB's Board adoption of the HD Phase I GHG regulation, CARB determined in Resolution 13–50 that California continues to need its own motor vehicle program to meet serious ongoing air pollution problems. CARB asserted that "[t]he geographical and climatic conditions and the tremendous growth in vehicle population and use that moved Congress to authorize California to establish vehicle standards in 1967 still exist today. EPA has long confirmed CARB's judgment, on behalf of the State of California, on this matter." See EPA Air Docket at *regulations.gov* at EPA–HQ–OAR–2016–0179– 0012. In enacting the California Global Warming Solutions Act of 2006, the Legislature found and declared that "Global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California. The potential adverse impacts of global warming include the exacerbation of air quality problems, a reduction in the quality and supply of water to the state from the Sierra snowpack, a rise in sea levels resulting in the displacement of thousands of coastal businesses and residences, damage to the marine ecosystems and the natural environment, and an increase in the incidences of infectious diseases, asthma, and other health-related problems."

[38] The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 83 FR at 42986.

[39] As explained below, EPA did not make a determination regarding section 209(b)(1)(C) in SAFE 1.

[40] "To the extent that NHTSA has determined that these standards are void *ab initio* because EPCA

EPA thus also posited that state standards preempted under EPCA cannot be afforded a valid section 209(b) waiver and then proposed that it would be necessary to withdraw the waiver separate and apart from section 209(b)(1)(B) and (C) if NHTSA finalized its interpretation regarding preemption under EPCA.

During the SAFE 1 proceeding, EPA received additional information demonstrating that the ZEV sales mandate plays a role in reducing criteria pollution, including CARB's comments that EPA's prior findings in the ACC program waiver were correct. As noted by a number of States and Cities, "[f]or example, CARB modeled the consequences of the actions proposed in SAFE, which included withdrawing California's waiver for its GHG and ZEV standards and freezing the federal GHG standards at MY 2020 levels. CARB concluded these actions, which would eliminate California's ZEV and GHG standards and leave in place only federal GHG standards at MY 2020 levels, would increase NOx emissions in the South Coast air basin alone by 1.24 tons per day."[41] The SAFE 1 record also includes information that demonstrates that California is "one of the most climate challenged" regions of North America, and that it is home to some of the country's hottest and driest areas, which are particularly threatened by record-breaking heatwaves, sustained droughts, and wildfire, as a result of GHG emissions.[42] This record also includes information from the United States *Fourth National Climate Assessment* that documents the impact of climate change in exacerbating California's record-breaking fires seasons, multi-year drought, heat waves, and flood risk, and notes that California faces a particular threat from sea-level rise and ocean acidification and that the State has "the most valuable ocean-based economy in the country."[43] EPA

---

preempts standards that relate to fuel economy, that determination presents an independent basis for EPA to consider the validity of the initial grant of a waiver for these standards, separate and apart from EPA's analysis under the criteria that invalidate a waiver request." 84 FR at 51338.

[41] States and Cities in Support of EPA Reversing Its SAFE 1 Actions (States and Cities), Docket No. EPA–HQ–OAR–2021–0257–0132 at 10 (citing CARB, Docket No. NHTSA–2018–0067–11873 at 287–88, 290–91 (upstream emission impacts), 308).

[42] States and Cities at 43–47 (citing EPA–HQ– OAR–2018–0283–5481, EPA–HQ–OAR–2018– 0283–5683, and EPA–HQ–OAR–2018–0283–5054).

[43] *Id.* at 45 (EPA–HQ–OAR–2018–0283–7447— U.S. Global Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, Chapter 25., 2018). (*E.g.*, "The California coast extends 3,400 miles (5,500 km), 8 with 200,000 people living 3 feet (0.9 m) or less above sea level.9 The seaports of Long

received information during the SAFE 1 public comment period regarding the criteria emission benefits of CARB's ZEV sales mandate and GHG emission standards.[44]

On September 27, 2019, EPA and NHTSA published the final SAFE 1 action that promulgated preemption regulations which supported NHTSA's conclusion that EPCA preempted California's GHG standards and ZEV sales mandate. In the same action, EPA withdrew the waiver of preemption for California to enforce the ACC program GHG and ZEV sales mandate on two grounds.[45]

First, in SAFE 1 the Agency posited that standards preempted under EPCA could not be afforded a valid waiver of preemption under section 209(b). EPA explained that Agency pronouncements in the ACC program waiver decision on the historical practice of disregarding the preemptive effect of EPCA in the context of evaluating California's waiver applications were "inappropriately broad, to the extent it suggested that EPA is categorically forbidden from ever determining that a waiver is inappropriate due to consideration of anything other than the 'criteria' or 'prongs' at section 209(b)(1)(B)(A)–(C).[46] EPA further explained that those pronouncements were made in waiver

proceedings where the Agency was acting solely on its own in contrast to a joint action with NHTSA such as SAFE 1. Additionally, EPA expressed its intention not to consider factors other than statutory criteria set out in section 209(b)(1)(A)–(C) in future waiver proceedings, explaining that addressing the preemptive effect of EPCA and its implications for EPA's waiver for California's GHG standards and ZEV sales mandate was uniquely called for in SAFE 1 because EPA and NHTSA were coordinating regulatory actions in a single notice.[47]

Second, EPA withdrew the waiver for the GHG standards and ZEV sales mandate under the second waiver prong, section 209(b)(1)(B), on two alternative grounds. Specifically, EPA determined first that California does not need the GHG standards "to meet compelling and extraordinary conditions," under section 209(b)(1)(B), and second, even if California does have compelling and extraordinary conditions in the context of global climate change, California does not "need" the specific GHG standards under section 209(b)(1)(B) because they will not meaningfully address global air pollution problems of the type associated with GHG emissions.[48] EPA also reasoned that because CARB had characterized the ZEV sales mandate as a compliance mechanism for GHG standards, both were "closely interrelated" given the overlapping compliance regimes for the ACC program, and as the result the ZEV sales mandate was inextricably interconnected with CARB's GHG standards.[49] In support of its overall determination that the ZEV sales mandate was not needed to meet compelling and extraordinary conditions, EPA relied on a single statement in the ACC program waiver support document where CARB did not attribute criteria emission reductions to the ZEV sales mandate, but rather noted its LEV III criteria pollutant fleet standard was responsible for those emission reductions.[50] Relying on this reasoning, EPA also withdrew the waiver for the ZEV sales mandate under the second waiver prong finding that California had no "need" for its own ZEV sales mandate.

In withdrawing the waiver, EPA relied on an alternative view of the scope of the Agency's analysis of California waiver requests and posited that reading "such State standards" as

requiring EPA to only and always consider California's entire motor vehicle program would limit the application of this waiver prong in a way that EPA did not believe Congress intended.[51] EPA further noted that the Supreme Court had found that CAA provisions may apply differently to GHGs than they do to traditional pollutants in *UARG* v. *EPA*, 134 S. Ct. 2427 (2014) (partially reversing the GHG "Tailoring" Rule on grounds that the CAA section 202(a) endangerment finding for GHG emissions from motor vehicles did not compel regulation of all sources of GHG emissions under the Prevention of Significant Deterioration and Title V permit programs). EPA then interpreted section 209(b)(1)(B) as requiring a particularized, local nexus between (1) pollutant emissions from sources, (2) air pollution, and (3) resulting impact on health and welfare.[52] Interpreting section 209(b)(1)(C) to be limited to the specific standards under the waiver, EPA stated that "such State standards" in sections 209(b)(1)(B) and (C) should be read consistently with each other, which EPA asserted was a departure from the traditional approach where this phrase in section 209(b)(1)(B) is read as referring back to "in the aggregate" in section 209(b)(1).[53]

In the SAFE proposal, as an additional basis for the waiver withdrawal, EPA proposed to find that CARB's ZEV sales mandate and GHG

---

Beach and Oakland, several international airports, many homes, and high-value infrastructure lie along the coast. In addition, much of the Sacramento–San Joaquin River Delta is near sea level. California has the most valuable ocean-based economy in the country, employing over half a million people and generating $20 billion in wages and $42 billion in economic production in 2014.10 Coastal wetlands buffer against storms, protect water quality, provide habitat for plants and wildlife, and supply nutrients to fisheries. Sea level rise, storm surges, ocean warming, and ocean acidification are altering the coastal shoreline and ecosystems."

[44] During the current reconsideration proceeding, EPA received additional comment regarding the criteria emission benefits of California's GHG and ZEV standards. The States and Cities at 10–11. Likewise, CARB notes this connection in comments on the SAFE proposal. Multi-State SAFE Comments, EPA–HQ–OAR–2018–0283–5481 at 24. The States and Cities provided supplemental information in response to the Notice of Reconsideration by submitting California's latest analyses of the criteria pollutant benefits of its GHG standards. For example, CARB estimated those benefits for calendar years by which the South Coast air basin must meet increasingly stringent NAAQS for ozone: 2023, 2031, and 2037. States and Cities app. A at 2–4, app. C at 8–9.

[45] 84 FR at 51328–29. Parties subsequently brought litigation against EPA on its SAFE 1 decision. *See generally Union of Concerned Scientists, et al.* v. *NHTSA, et al.,* No. 19–1230 (D.C. Cir. filed Oct. 28, 2019) (on February 8, 2021, the D.C. Circuit granted the Agencies' motion to hold the case in abeyance in light of the reconsideration of the SAFE 1 action). EPA also received three petitions for reconsideration of this waiver withdrawal.

[46] 84 FR at 51338.

[47] *Id.*
[48] *Id.* at 51341–42.
[49] *Id.* at 51337.
[50] *Id.* at 51330.

[51] In other words, EPA asserted that once it determines that California is very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver. EPA based its reading also on an assertion of ambiguity in the meaning of "such State standards" in section 209(b)(1)(B).

[52] *Id.* at 51339–40.

[53] *Id.* at 51344–45.EPA notes that this SAFE 1 position was taken despite the Agency previously stating in the ACC program waiver that "Similarly, although the Dealers might suggest that EPA only be obligated to determine whether each of CARB's ACC regulatory components, in isolation, is consistent with section 202(a) we believe the better approach is to determine the technological feasibility of each standard in the context of the entire regulatory program for the particular industry category. In this case, we believe CARB has in fact recognized the interrelated, integrated approach the industry must take in order to address the regulatory components of the ACC program. As noted above, the House Committee Report explained as part of the 1977 amendments to the Clean Air Act that California was to be afforded flexibility to adopt a complete program of motor vehicle emission controls (emphasis added). As such, EPA believes that Congress intended EPA to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.32 EPA believes this intent extends to CARB's flexibility in designing its motor vehicle emission program and evaluating the aggregate effect of regulations within the program." 78 FR at 2217.

standards are not consistent with section 202(a) of the CAA under the third waiver prong, section 209(b)(1)(C).[54] However, in the final SAFE 1 action, EPA and NHTSA explained they were not finalizing the proposed assessment regarding the technological feasibility of the Federal GHG and CAFE standards for MY 2021 through 2025 in SAFE 1, and thus EPA did not finalize any determination with respect to section 209(b)(1)(C).[55]

In justifying the withdrawal action in SAFE 1, EPA opined that the text, structure, and context of section 209(b) supported EPA's authority to reconsider prior waiver grants. Specifically, EPA asserted that the Agency's authority to reconsider the grant of ACC program waiver was implicit in section 209(b) given that revocation of a waiver is implied in the authority to grant a waiver. The Agency noted that further support for the authority to reconsider could be found in a single sentence in the 1967 legislative history of provisions now codified in sections 209(a) and (b) and the judicial principle that agencies possess inherent authority to reconsider their decisions. According to the Senate report from the 1967 CAA amendments, the Administrator has "the right . . . to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver."[56] EPA also noted that, subject to certain limitations, administrative agencies possess inherent authority to reconsider their decisions in response to changed circumstances: "It is well settled that EPA has inherent authority to reconsider, revise, or repeal past decisions to the extent permitted by law so long as the Agency provides a reasoned explanation."[57] This authority exists in part because EPA's interpretations of the statutes it administers "are not carved in stone."[58]

Finally, in SAFE 1, EPA provided an interpretive view of section 177 as not authorizing other states to adopt California's GHG standards for which EPA had granted a waiver of preemption under section 209(b). Although section 177 does not require states that adopt California's emission standards to

submit such regulations for EPA review and provides no statutory role for EPA in states' decision to adopt California's standards, EPA chose to nevertheless provide an interpretation that this provision is available only to states with approved nonattainment plans. EPA stated that nonattainment designations exist only as to criteria pollutants and GHGs are not criteria pollutants; therefore, states could not adopt GHG standards under section 177. Notably, California in previous waiver requests addressed the criteria pollutant benefits of GHG emissions reductions, specifically related to ground level ozone.

## D. Petitions for Reconsideration

After issuing SAFE 1, EPA received three petitions for reconsideration urging the Agency to reconsider the waiver withdrawal of the ACC program's GHG standards and ZEV sales mandate and to rescind part or all of the SAFE 1 action.[59] The first Petition for Clarification/Reconsideration was submitted by the State of California and a number of States and Cities on October 9, 2019 (California Petition for Clarification).[60] These Petitioners sought both clarification and reconsideration of the scope of SAFE 1. Citing somewhat contradictory statements in the action, they claimed that SAFE 1 created confusion regarding which model years of the ACC program were affected by the waiver withdrawal.[61] They based their request for reconsideration of the withdrawal on the grounds that the SAFE 1 action relied on analyses and justifications not presented at proposal and, thus, was beyond the scope of the proposal.

A second Petition for Reconsideration was submitted by several non-governmental organizations on

November 25, 2019 (NGOs' Petition).[62] These Petitioners claimed that EPA's reconsideration of the ACC program waiver was not a proper exercise of agency authority because the Agency failed to consider comments submitted after the formal comment period—which they charged as inadequate—and because the EPA's rationale was a pretextual cover for the Administration's political animosity towards California and the oil industry's influence. The late comments summarized in the Petition address SAFE 1's EPCA preemption and second waiver prong arguments. On EPCA preemption, the summarized comments asserted that EPCA does not preempt GHG standards because GHG emission standards are not the "functional equivalent" of fuel economy standards, as SAFE 1 claimed. On the second waiver prong, the summarized comments asserted both that GHG and ZEV standards do have criteria pollutant benefits, and that the threat of climate change is compelling and extraordinary and will have California-specific impacts. In addition to objections to SAFE 1's EPCA preemption and second waiver prong arguments, the summarized comments asserted that ZEV standards play a key role in SIPs, which were disrupted by SAFE 1. This disruption, Petitioners claimed, violated "conformity" rules prohibiting federal actions from undermining state's air quality plans.[63]

A third Petition for Reconsideration was submitted by several states and cities on November 26, 2019 (States and Cities' Petition).[64] These Petitioners sought reconsideration of the withdrawal on the grounds that EPA failed to provide an opportunity to comment on various rationales and determinations, in particular on its authority to revoke argument, flawed re-interpretation and application of the second waiver prong, its flawed new

---

[54] 83 FR at 43240.

[55] 84 FR at 51350. EPA explained that it may make a determination in connection with a future final action with regard to Federal standards. EPA's subsequent regulation to issue Federal standards did not address this issue. 85 FR 24174.

[56] 84 FR at 51332 (citing S. Rep. No. 90–403, at 34 (1967)).

[57] *Id.* at 51333.

[58] *Chevron U.S.A. Inc.* v. *NRDC, Inc.,* 467 U.S. 837, 863 (1984).

[59] The California Petition for Clarification only sought reconsideration of SAFE 1 to the extent it withdrew the ACC program waiver for model years outside those proposed. The other two petitions sought reconsideration of the full SAFE 1 action.

[60] EPA–HQ–OAR–2021–0257–0015.

[61] The California Petition for Clarification notes that, "[i]n the Final Actions, EPA makes statements that are creating confusion, and, indeed, appear contradictory, concerning the temporal scope of its action(s)—specifically, which model years are covered by the purported withdrawal of California's waiver for its GHG and ZEV standards. In some places, EPA's statements indicate that it has limited its action(s) to the model years for which it proposed to withdraw and for which it now claims to have authority to withdraw—namely model years 2021 through 2025. In other places, however, EPA's statements suggest action(s) with a broader scope— one that would include earlier model years." *Id.* at 2. In SAFE 1, EPA withdrew the waiver for California's GHG and ZEV standards for model years 2017–2025 on the basis of EPCA preemption and for model years 2021–2025 on the basis of the second waiver prong.

[62] EPA–HQ–OAR–2021–0257–0014. This Petition was joined by The Center for Biological Diversity, Chesapeake Bay Foundation, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Public Citizen, Inc., Sierra Club, and the Union of Concerned Scientists.

[63] These "late comments" can be found in the "Appendix of Exhibits" attached to the Petition for Reconsideration. These comments are considered part of EPA's record for purposes of the reconsideration of SAFE 1.

[64] See EPA–HQ–OAR–2021–0257–0029. This Petition was joined by the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin, Michigan, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, San Francisco, and San Jose.

rationale for considering factors outside section 209(b) (namely, EPCA preemption), and its determination that states cannot adopt California's GHG standards under section 177. For example, these Petitioners claimed they did not have an adequate opportunity to comment on EPA's use of equal sovereignty or the endangerment finding as rationales for its new "particularized nexus" interpretation of the second waiver prong. These Petitioners also claimed that EPA's statements concerning the burden of proof applicable to a waiver revocation were either unclear or inaccurate, particularly whether the Agency bears the burden of proof in withdrawing a previously granted waiver and, if not, how and why this burden of proof is different from the burden of proof for denying a waiver request.[65] Finally, these Petitioners asserted that the Agency failed to consider comments, submitted after the formal comment period, that challenged EPA's interpretation of the second waiver prong, including new evidence of California's need for its GHG emission standards and ZEV sales mandate, and alleged that EPA's rationale was pretextual and based on the Administration's political animosity towards California and on the oil industry's influence.

EPA notified the petitioners in the above-noted Petitions for Reconsideration that the Agency would be considering issues raised in their petitions as part of the proceeding to reconsider SAFE 1. This action addresses these petitions in the broader context of EPA's adjudicatory reconsideration of SAFE 1 commenced in response to a number of significant issues with SAFE 1.

## III. Principles Governing This Review

The CAA has been a paradigmatic example of cooperative federalism, under which "States and the Federal Government [are] partners in the struggle against air pollution." [66] In Title II, Congress authorized EPA to promulgate emission standards for mobile sources and generally preempted states from adopting their own standards.[67] At the same time, Congress

created an important exception for the State of California.

### A. Scope of Preemption and Waiver Criteria Under the Clean Air Act

The legal framework for this decision stems from the waiver provision first adopted by Congress in 1967, and subsequent amendments. In Title II of the CAA, Congress established only two programs for control of emissions from new motor vehicles—EPA emission standards adopted under the CAA and California emission standards adopted under its state law. Congress accomplished this by preempting all state and local governments from adopting or enforcing emission standards for new motor vehicles, while at the same time providing that California could receive a waiver of preemption for its emission standards and enforcement procedures in keeping with its prior experience regulating motor vehicles and its serious air quality problems. Accordingly, section 209(a) preempts states or political subdivisions from adopting or attempting to enforce any standard relating to the control of emissions from new motor vehicles.[68] Under the terms of section 209(b)(1), after notice and opportunity for public hearing, EPA must waive the application of section 209(a) to California unless the Administrator finds at least one of three criteria to deny a waiver in section 209(b)(1)(A)–(C) has been met.[69] EPA may thus deny a waiver only if it makes at least one of these three findings based on evidence in the record, including

arguments that opponents of the waiver have provided. This framework struck an important balance that protected manufacturers from multiple and different state emission standards and preserved a pivotal role for California in the control of emissions from new motor vehicles. Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver and did this to ensure that California had broad discretion in selecting the means it determined best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to allow California to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[70] Accordingly, section 209(b) specifies that EPA must grant California a waiver if California determines that its standards are, in the aggregate, at least as protective of the public health and welfare as applicable Federal standards.

EPA has consistently interpreted the waiver provision as placing the burden on the opponents of a waiver and EPA to demonstrate that one of the criteria for a denial has been met. In this context, since 1970, EPA has recognized its limited discretion in reviewing California waiver requests. For over fifty years, therefore, EPA's role upon receiving a request for waiver of preemption from California has been limited and remains only to determine whether it is appropriate to make any of the three findings specified by the CAA. If the Agency cannot make at least one of the three findings, then the waiver must be granted. The three waiver criteria are also properly seen as criteria for a denial. This reversal of the normal statutory structure embodies and is consistent with the congressional intent of providing deference to California to maintain its own new motor vehicle emission program.

The 1970 CAA Amendments strengthened EPA's authority to regulate vehicular "emission[s] of any air pollutant," while reaffirming the corresponding breadth of California's entitlement to regulate those emissions (amending CAA section 202 and recodifying the waiver provision as section 209(b), respectively). Congress also established the NAAQS program,

---

[65] The applicable burden of proof for a waiver withdrawal is discussed in Section III of this decision.

[66] *General Motors Corp.* v. *United States,* 496 U.S. 530, 532 (1990).

[67] "The regulatory difference [between Titles I and II] is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states." *Engine Mfrs. Ass'n* v. *EPA,* 88 F.3d 1075, 1079 (D.C. Cir. 1996). Congress also asserted federal control in this area to avoid "the specter of an anarchic patchwork of federal and state regulatory

programs" nationwide. *See Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA,* 627 F.2d 1095, 1109 (D.C. Cir. 1979) (*MEMA I*).

[68] 42 U.S.C. 7543(a)–(a) Prohibition No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

[69] 42 U.S.C. 7543(b)(1):

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

[70] *See, e.g.,* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy); *MEMA I,* 627 F.2d 1095, 1111 (D.C. Cir. 1979).

under which EPA issues air quality criteria and sets standards for so-called "criteria" pollutants, and states with regions that have not "attained" those federal standards must submit SIPs indicating how they plan to attain the NAAQS (which is often a multi-year, comprehensive plan). With the CAA Amendments of 1977, Congress allowed California to consider the protectiveness of its standards "in the aggregate," rather than requiring that each standard proposed by the State be as or more stringent than its federal counterpart.[71] Congress also approved EPA's interpretation of the waiver provision as providing appropriate deference to California's policy goals and consistent with Congress's intent "to permit California to proceed with its own regulatory program" for new motor vehicle emissions.[72]

In previous waiver decisions, EPA has noted that the statute specifies particular and limited grounds for rejecting a waiver and has therefore limited its review to those grounds. EPA has also noted that the structure Congress established for reviewing California's decision-making is deliberately narrow, which further supports this approach. This has led EPA to reject arguments that are not specified in the statute as grounds for denying a waiver:

The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California. Thus, my consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions that I may consider under section 209(b).[73]

Given the text, legislative history, and judicial precedent, EPA has consistently interpreted section 209(b) as requiring it to grant a waiver unless opponents of a waiver can demonstrate that one of the criteria for a denial has been met.[74]

The 1977 CAA Amendments additionally demonstrated the significance of California's standards to the Nation as a whole with Congress' adoption of a new section 177. Section 177 permits other states addressing their own air pollution problems to adopt and enforce California new motor vehicle standards "for which a waiver has been granted if certain criteria are met."[75] Also known as the "opt-in" provision, section 177 of the Act, 42 U.S.C. 7507, provides:

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

Nothing in this section or in Subchapter II of this chapter shall be construed as authorizing any such State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different that a motor vehicle or engine certified in California under

California standards (a "third vehicle") or otherwise create such a "third vehicle."

Any state with qualifying SIP provisions may exercise this option and become a "Section 177 State," without first seeking the approval from EPA.[76] Thus, over time, Congress has recognized the important state role, for example, by making it easier (by allowing California to consider its standards "in the aggregate") and by expanding the opportunity (via section 177) for states to adopt standards different from EPA's standards.[77]

*B. Deference to California*

EPA has consistently noted that the text, structure, and history of the California waiver provision clearly indicate both congressional intent and appropriate EPA practice of leaving the decision on "ambiguous and controversial matters of public policy" to California's judgment. In waiver decisions, EPA has thus recognized that congressional intent in creating a limited review of California waiver requests based on the section 209(b)(1) criteria was to ensure that the federal government did not second-guess the wisdom of state policy. In an early waiver decision EPA highlighted this deference:

It is worth noting * * * I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission

---

[71] 42 U.S.C. 7543(b)(1).

[72] H.R. Rep. No. 95–294, at 301 (1977).

[73] 78 FR at 2115 (footnote omitted).

[74] *MEMA I*, 627 F.2d at 1120–21 ("The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the

burden of proving otherwise is on whoever attacks them."); *Motor & Equip. Mfrs. Ass'n, Inc.* v. *Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998) (*MEMA II*) ("[S]ection 209(b) sets forth the only waiver standards with which California must comply. . . . If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application.").

[75] This provision was intended to continue the balance, carefully drawn in 1967, between states' need to meet increasingly stringent federal air pollution limits and the burden of compliance on auto-manufacturers. *See, e.g.,* H.R. Rep. No. 294, 95th Cong., 1st Sess. 309–10 (1977) ("[S]ection 221 of the bill broadens State authority, so that a State other than California . . . is authorized to adopt and enforce new motor vehicle emission standards which are identical to California's standards. Here again, however, strict limits are applied . . . . This new State authority should not place an undue burden on vehicle manufacturers . . . ."); *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation*, 17 F.3d 521, 527 (2d Cir. 1994) ("Many states, including New York, are in danger of not meeting increasingly stringent federal air pollution limits . . . . It was in an effort to assist those states struggling to meet federal pollution standards that Congress, as noted earlier, directed in 1977 that other states could promulgate regulations requiring vehicles sold in their state to be in compliance with California's emission standards or to "piggyback" onto California's preemption exemption. This opt-in authority, set forth in § 177 of the Act, 42 U.S.C. 7507, is carefully circumscribed to avoid placing an undue burden on the automobile manufacturing industry.").

[76] In 1990 Congress amended the CAA by adding section 209(e) to section 209. Section 209(e) sets forth the terms of CAA preemption for nonroad engines and vehicles and the ability of States to adopt California emissions standards for such vehicles and engines if certain criteria are met. 42 U.S.C. 7543(e)(2)(B) ("Any State other than California which has plan provisions approved under part D of subchapter I may adopt and enforce, after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines . . . if (i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards . . . ."). Courts have interpreted these amendments as reinforcing the important role Congress assigned to California. *See Engine Mfrs. Ass'n* v. *EPA*, 88 F.3d 1075, 1090 ("Given the indications before Congress that California's regulatory proposals for nonroad sources were ahead of the EPA's development of its own proposals and the Congressional history of permitting California to enjoy coordinated regulatory authority over mobile sources with the EPA, the decision to identify California as the lead state is comprehensible. California has served for almost 30 years as a 'laboratory' for motor vehicle regulation."); *MEMA I*, 627 F.2d 1095, 1110 (D.C. Cir. 1979) ("Its severe air pollution problems, diverse industrial and agricultural base, and variety of climatic and geographical conditions suit it well for a similar role with respect to nonroad sources.").

[77] 40 FR at 23104; *see also* LEV I waiver at 58 FR 4166, Decision Document at 64.

control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shape of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[78]

As noted above, Congress amended the CAA in 1977. Within these amendments, Congress had the opportunity to reexamine the waiver provision and elected to expand California's flexibility to adopt a complete program of motor vehicle emission controls. The House Committee Report explained that "[t]he amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [79]

SAFE 1 was a departure from congressional intent and EPA's typical practice of deference to California on matters of state public policy regarding how best to address its serious air quality problems. In SAFE 1, EPA adopted a new interpretation of section 209(b)(1)(B) more than five years after the initial grant of the ACC program waiver and applied it to CARB's GHG standards and ZEV sales mandate. Specifically, EPA premised its finding on a consideration of California's "need" for the specific standards, instead of the "need" for a separate motor vehicle emission program to meet compelling and extraordinary conditions, stating that "such State standards" in section 209(b)(1)(B) was ambiguous with respect to the scope of the Agency's analysis. EPA further determined that California did not need the ZEV sales mandate to meet compelling and extraordinary conditions by relying on a single statement in the ACC program waiver support document taken out of context, where it noted that the ZEV sales

mandate had no criteria emissions benefits in terms of vehicle emissions and its LEV III criteria pollutant fleet standard was responsible for those emission reductions. In response to the SAFE 1 proposal, California had provided further context and additional data on net upstream emissions benefits of the ZEV sales mandate, but EPA did not consider them in arriving at the findings and conclusions in SAFE 1. The final decision in SAFE 1 was not based on the third waiver prong.[80] EPA also explained in SAFE 1 that the task of interpreting section 209(b)(1)(B) required no deference to California.[81]

*C. Standard and Burden of Proof*

In *Motor and Equipment Manufacturers' Association* v. *EPA*, 627 F.2d 1095 (D.C. Cir. 1979) (*MEMA I*), the U.S. Court of Appeals for the District of Columbia stated, with regard to the standard and burden of proof, that the Administrator's role in a section 209 proceeding is to "consider all evidence that passes the threshold test of materiality and . . . thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver." [82] The court in *MEMA I* considered the standards of proof under section 209 for the two findings necessary to grant a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) Protectiveness in the aggregate and (2) consistency with CAA section 202(a) findings. The court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved. We need not decide how this standard operates in every waiver decision." [83] The court upheld the Administrator's position that to deny a waiver, there must be clear and compelling evidence to show that the proposed procedures undermine the protectiveness of California's standards. The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and

welfare.[84] With respect to the consistency finding, the court did not articulate a standard of proof applicable to all proceedings but found that the opponents of the waiver were unable to meet their burden of proof even if the standard were a mere preponderance of the evidence.

Although *MEMA I* did not explicitly consider the standards of proof under section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations. EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary conditions and whether the standards are technologically feasible—Congress intended that the standard of EPA review of the State decision to be a narrow one." [85] Although EPA evaluates whether there are compelling and extraordinary conditions in California, the Agency nevertheless accords deference to California on its choices for how best to address such conditions in light of the legislative history of section 209(b).

As noted earlier, the burden of proof in a waiver proceeding is on EPA and the opponents of the waiver. This is clear from the statutory language stating that EPA "shall . . . waive" preemption unless one of three statutory factors is met. This reading was upheld by the D.C. Circuit in *MEMA I*, which concluded that this obligation rests firmly with opponents of the waiver in a section 209 proceeding, holding that: "[t]he language of the statute and its legislative history indicate that California's regulations, and California's determinations that they must comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at

---

[78] 40 FR at 23104.

[79] *MEMA I*, 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)). Congress amended section 209(b)(1)(A) regarding California's determination that its standards are as at least as protective as applicable Federal standards so that such determination may be done "in the aggregate" looking at the summation of the standards within the vehicle program.

[80] 84 FR at 51322–33. EPA notes that when reviewing California's standards under the third waiver prong, the Agency may grant a waiver to California for standards that EPA may choose not to adopt at the federal level due to different considerations. *See* 78 FR at 2133.

[81] 84 FR at 51339–40.

[82] *MEMA I*, 627 F.2d at 1122.

[83] *Id.*

[84] *Id.*

[85] *See, e.g.*, 40 FR at 23102–03. *See also MEMA I*, 627 F.2d at 1109 ("Congress had an opportunity to restrict the waiver provision in making the 1977 amendments, and it instead elected to expand California's flexibility to adopt a complete program of motor vehicle emissions control. Under the 1977 amendments, California need only determine that its standards will be 'in the aggregate, at least as protective of public health and welfare than applicable Federal standards,' rather than the ''more stringent'' standard contained in the 1967 Act.") (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977), U.S. Code Cong. & Admin. News 1977, p. 1380).

the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied.'' [86]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the information in the record in coming to the waiver decision. As the court in *MEMA I* stated, ''Here, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assumptions of his own, he runs the risk of having his waiver decision set aside as 'arbitrary and capricious.' '' [87] Therefore, the Administrator's burden is to act ''reasonably.'' [88]

In this instance, EPA has withdrawn a previously granted waiver and is now reconsidering whether that withdrawal was an appropriate exercise of authority, whether the reinterpretation of the second waiver prong was appropriate, and whether EPA's evaluation and findings of fact under the second waiver prong meet the applicable burden of proof in the context of deference to California's policy choices. EPA believes that the same burden that is applicable to those opposed to an initial waiver request from CARB (this applies to any party including the Administrator as explained in *MEMA I*) is also applicable to EPA's actions in SAFE 1 (*e.g.*, the burden of proof of whether California does not need its standards to meet compelling and extraordinary conditions rests on those opposing a waiver for California). [89]

[86] *MEMA I*, 627 F.2d at 1121.

[87] *Id.* at 1126.

[88] *Id.*

[89] In EPA's 2009 evaluation of the 2008 GHG waiver denial the Agency applied a similar test. *See* 74 FR at 32763 (''After a thorough evaluation of the record, I am withdrawing EPA's March 6, 2008 Denial and have determined that the most appropriate action in response to California's greenhouse gas waiver request is to grant that request. I have determined that the waiver opponents have not met their burden of proof in order for me to deny the waiver under any of the three criteria in section 209(b)(1).''). In the context of 2009 GHG waiver that reconsidered the Agency's 2008 GHG waiver denial, EPA determined it was appropriate to apply the same burden of proof during the reconsideration as would apply at the time of the initial waiver evaluation. EPA received comment suggesting that the entire burden of proof shifts to California in order for the prior 2008 denial to be reversed. EPA, in response, stated that ''. . . regardless of the previous waiver denial, once California makes its protectiveness determination the burden of proof falls on the opponents of the waiver . . . . This is consistent with the legislative history, which indicates that Congress intended a narrow review by EPA and to preserve the broadest possible discretion for California.'' *Id.* at 32749. EPA acknowledges that in SAFE 1 the Agency not

## IV. EPA Did Not Appropriately Exercise Its Limited Authority To Reconsider the ACC Program Waiver in SAFE 1

The first question this final action tackles is whether the agency properly exercised its reconsideration authority to withdraw its previously-granted waiver in SAFE 1. EPA concludes that it did not, and on that independent basis rescinds SAFE 1's waiver withdrawal.

Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. For several reasons, in the context of reconsidering a waiver grant, that authority may only be exercised sparingly. First, EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). A contrary approach, which treats reconsiderations as more broadly appropriate, would undermine Congress' intent that California be able to exercise its policy judgments and develop motor vehicle controls programs to address California's air pollution problems, and make advances which could be built on by EPA or adopted by other states. Second, EPA believes it may only reconsider a previously granted waiver to address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Even when EPA is acting within the appropriate bounds of its authority to reconsider, during that reconsideration EPA should exercise its limited

only adopted an interpretation of the second waiver prong which was similar to the previously rejected interpretation, but that in doing so also questioned its previous position that the burden of proof in evaluating the need for standards at issue resides with those that oppose the waiver, including EPA. *See* 84 FR at 51344 n.268. In this action, however, EPA now finds that the historical deference provided to California regarding its policy choices on how best to address its serious air quality conditions also requires that the burden of proof should reside in those seeking to demonstrate that standards are not needed under the second waiver prong regardless of whether the rationale is characterized as a new interpretation or not. The language of section 209(b)(1) requires California to make a protectiveness finding under the first waiver prong. Moreover, nothing in section 209(b) could be read as support for drawing a distinction between the burden of proof when the Agency considers an initial waiver request and one where the Agency reconsiders a waiver decision based on a new interpretation of the statutory criteria. That burden properly resides with opponents of the waiver.

authority within a reasonable timeframe and be mindful of reliance interests.

The Agency's reconsideration in SAFE 1 was not an appropriate exercise of authority; there was no clerical error or factual error in the ACC program waiver, and SAFE 1 did not point to any factual circumstances or conditions related to the three waiver prongs that had changed so significantly that the propriety of the waiver grant is called into doubt. Rather, the 2019 waiver withdrawal was based on a change in EPA's statutory interpretation, an incomplete and inaccurate assessment of the record, and another agency's action beyond the confines of section 209(b). EPA erred in reconsidering a previously granted waiver on these bases. Moreover, in considering the passage of time between the initial waiver and the SAFE 1 action, and the development of reliance interests based on the waiver, EPA finds those factors do not support the reconsideration of the ACC program waiver that occurred in SAFE 1. Accordingly, as explained in detail below, EPA is rescinding SAFE 1's withdrawal of its 2013 ACC program waiver because it was an inappropriate exercise of reconsideration authority.

### A. Comments Received

EPA received several comments in the reconsideration proceeding on the Agency's authority to reconsider waivers. Comments on explicit authority focused on whether any language in section 209(b)(1), on its face, permits EPA to reconsider a previously granted waiver. Some of these commenters also distinguished between the denial of the 2008 waiver and the reconsideration and grant of the GHG waiver in 2009, and EPA's grant of the ACC program waiver in 2013 and the reconsideration and withdrawal of the ACC program waiver in 2019.

EPA received comments in support of and against the view that EPA has inherent authority to reconsider waivers. As support for EPA's implied authority to reconsider, one commenter cited relevant language from the Senate Committee Report from 1967 that stated, ''implicit in [§ 209] is the right of [EPA] to withdraw the waiver [if] at any time after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of that waiver.'' [90] According to the commenter because ''the waiver authorizes *future* regulation, which always remains open to change,'' EPA must have the authority to reconsider a

[90] Urban Air Initiative (Urban Air), Docket No. EPA–HQ–OAR–2021–0257–0223 at 22 (quoting S. Rep. 90–403, at 34 (1967)).

waiver. Otherwise, EPA would be unable to monitor CARB's continued compliance with the waiver conditions in light of updated information.[91] The same commenter also argued that an agency generally retains the authority to reconsider and correct any earlier decision unless Congress acts to displace the authority with a process to rectify the Agency's mistakes and that explicit statutory authority to withdraw a waiver is therefore not necessary, because "the power to reconsider is inherent in the power to decide."[92] The commenter claimed that, under *Chevron*, "[a]n agency has a 'continuing' statutory obligation to consider the 'wisdom of its policy.'"[93]

In contrast, several commenters maintained that section 209(b) strongly indicates that EPA's authority to withdraw a previously issued waiver is, at most, limited. Several commenters argued that, absent language in a statute, administrative agencies lack inherent authority to reconsider adjudicatory decisions.[94] These commenters noted that courts highly scrutinize administrative revocations and are "unwilling[ ] to wrest a standardless and open-ended revocation authority from a silent statute."[95] Instead, these commenters argued, EPA may act only with the authorities conferred upon it by Congress, and thus the Agency may only act if the CAA explicitly or

implicitly grants it power to do so.[96] According to these commenters, section 209(b) is silent on waiver withdrawal, its text indicates that EPA may only consider 209(b)'s three factors before either granting or denying a waiver, and its purpose and structure affords broad deference to California's standards. "Taken together, these factors indicate that EPA may not withdraw a previously-issued waiver based solely upon a reconsideration of its initial judgment."[97] Commenters suggested that Congress, by listing the three waiver criteria and directing that EPA evaluate such criteria prior to granting the waiver, only authorized EPA to perform the evaluation once and that it "cannot later second-guess the wisdom of legal and policy judgments made as part of that evaluation."[98] Similarly, commenters noted that section 209 does not textually "provide" EPA any authority nor specify any process by which EPA might revoke the rights given by an earlier-granted waiver.[99] In response to SAFE 1's claim of inherent

reconsideration authority and the other commenters' reliance on the relevant excerpt from the 1967 Senate Report, these commenters argued that this "single sentence . . . does not establish any withdrawal authority," either generally or for the SAFE 1 withdrawal specifically.[100] That statement, commenters argued, "predate[s] the creation of the NAAQS program and Congress's invitations to development of numerous state reliance interests."[101] Moreover, according to these commenters, the statement only discusses authority in the case that "California no longer complies with the conditions of the waiver," which commenters believe means California's "compliance with waiver conditions and, specifically, its cooperation with EPA concerning enforcement and certification procedures," not "redefined waiver criteria."[102]

In response to the argument made by EPA in SAFE 1 that, given the "considerable degree of future prediction" required by the third waiver prong, "where circumstances arise that suggest that such predictions may have been inaccurate, it necessarily follows that EPA has authority to revisit those predictions,"[103] some commenters claimed that California's standards do not become inconsistent with federal standards simply because they become more stringent than federal standards (in other words, a weakening of the federal standards does not necessarily create an inconsistency). The commenters noted also that EPA did not in fact revise its section 202(a) standards between issuing and withdrawing the waiver at issue, nor did EPA in fact make any final findings under the third waiver prong.[104]

Many commenters stated that in order to exercise any implied or inherent authority, an agency must provide a "detailed justification" when departing from a policy that has "engendered serious reliance interests" and should not "rest on mere 'policy changes'"

---

[91] *Id.* at 21 ("A determination that California's state standards are technologically feasible and appropriate requires complex technical projections at the frontiers of science, which must be continually updated 'if the actual future course of technology diverges from expectation.'" (quoting *NRDC Inc.* v. *EPA*, 655 F.2d 318, 329 (D.C. Cir. 1981))).

[92] Urban Air at 20 (citing *Ivy Sports Med., LLC* v. *Burwell*, 767 F.3d 81, 86, 93 (D.C. Cir. 2014)). This commenter also notes that, in EPA's 2009 action to reconsider its prior denial of a GHG waiver in 2008, CARB submitted a letter to EPA stating that "California believes EPA has inherent authority to reconsider the denial and should do so in order to restore the interpretations and applications of the Clean Air Act to continue California's longstanding leadership role in setting emission standards." *Id.*

[93] *Id.* at 21.

[94] Institute for Policy Integrity Amicus Brief at 4 ("Lacking textual support, EPA invokes so-called 'inherent authority'—'more accurate[ly] label[ed] . . . 'statutorily implicit' authority,' *HTH Corp.* v. *NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016)—to justify its action. 84 FR at 51,331. But this Court is 'unwilling[ ] to wrest a standardless and open-ended revocation authority from a silent statute,' *Am. Methyl*, 749 F.2d 826, 837 (D.C. Cir. 1984), and EPA fails to justify the implicit authority it claims."); Twelve Public Interest Organizations app 1 at 32 (citing *Am. Methyl* for "rejecting 'implied power' as 'contrary to the intention of Congress and the design of the Act and quoting *HTH Corp.*'s statement that agencies, as creatures of statute, lack inherent authority); States and Cities at 16 (also citing *Am. Methyl*).

[95] Institute for Policy Integrity at 1 (citing *Am. Methyl*).

[96] States and Cities at 15 (citing *HTH Corp.* v. *NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016)); Twelve Public Interest Organizations, Docket No. EPA–HQ–OAR–2021–0257–0277 app. 1 at 28 ("The Clean Air Act preserves state authority to regulate emissions unless expressly 'provided' otherwise. 42 U.S.C. 7416. In statutes like this where preemption is the exception, only Congress's 'precise terms' can produce preemption. *CTS Corp.* v. *Waldburger*, 573 U.S. 1, 12–13 (2014)."); National Coalition for Advanced Transportation (NCAT), Docket No. EPA–HQ–OAR–2021–0257–0131 at 7–8 ; Institute for Policy Integrity at New York University School of Law (Institute for Policy Integrity), Docket No. EPA–HQ–OAR–2021–0257–0115 at 2, citing its Final Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Support of Petitioners (Institute for Policy Integrity Amicus Brief) at 4, *Union of Concerned Scientists, et al.* v. *NHTSA, et al.*, Nos. 19–1230 (D.C. Cir. filed Oct. 28, 2019), reprinted in the Institute's comments on the 2021 Notice of Reconsideration.

[97] Institute for Policy Integrity at 2, citing its Amicus Brief at 6–11.

[98] *Id.* at 7. *See also* Twelve Public Interest Organizations app. 1 at 28–29 ("Section 209(b)(1)'s precise terms mandate that EPA "shall" grant California a waiver unless EPA finds one of the three specified bases for denial. This language charges EPA "with undertaking a single review in which [the Administrator] applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver." *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1302 (D.C. Cir. 1979). It evinces no intent to provide EPA with the different and greater authority to withdraw a previously granted waiver, thereby arresting the State's ongoing implementation of its own laws.")

[99] *See* South Coast Air Quality Management District (SCAQMD), Docket No. EPA–HQ–OAR–2021–0257–0228 at 3. This commenter argued that section 116 of the CAA (which explicitly references section 209) provides that there needs to be a textual basis for any exercise of authority to deny California the right (which it achieved via the 2013 waiver) to enforce its emission standards. Thus, the commenter continued, because there is no language in section 209 that gives any authority nor specifies any process for EPA to revoke the rights/waiver previously granted then EPA may not do so by the terms of section 116.

[100] States and Cities at 16. *See also* Twelve Public Interest Organizations app. 1 at 33–34.

[101] States and Cities at 16; *See also* Twelve Public Interest Organizations app. 1 at 33–34.

[102] Twelve Public Interest Organizations app. 1 at 34. *See also* States and Cities at 16 (arguing that, although EPA proposed to withdraw the waiver on multiple grounds, such as the third waiver prong, "EPA's final action was based entirely on its own changed policy positions, namely its interpretation of Section 209(b)(1) to create a categorical bar against state regulation of vehicular GHG emissions and its decision to rely on another agency's newly articulated views of a different statute [EPCA].").

[103] 84 FR at 51332.

[104] Institute for Policy Integrity at 2.

alone.[105] Thus, supporters and opponents of SAFE 1 also provided comments on whether, assuming EPA did have authority to reconsider the ACC program waiver—either because of language in the CAA or because of its inherent authority to reevaluate decisions because of changed conditions—it was appropriate to exercise that authority in SAFE 1. Some commenters summarized precedent as requiring that the Agency consider reliance interests that have attached to its original decision, that reversals of informal adjudications occur within a reasonable time after the original decision, and that the reversal is not for the sole purpose of applying some change in administrative policy.[106] Opponents and supporters of SAFE 1 did, however, disagree on the significance of each of these factors.[107]

Commenters who argued that reliance interests were relevant to EPA's authority to reconsider also offered evidence of reliance interests that had accrued over the five years the ACC program waiver had been in effect, with several commenters providing specific details regarding their reliance on the GHG and ZEV standards. As commenters noted, California's standards are incorporated into plans and regulations aimed at achieving state and federal air pollution goals. These plans can be complex and cannot "change on a dime." [108] According to one commenter "[w]ithout the full Waiver, past decision-making was blighted and planned-for reductions to meet Air District goals need to be reassessed. The emission reductions are

key to combatting climate change, curbing ozone formation, preventing additional wildlife impacts, and attaining California [air quality goals] and [NAAQS]." [109] Revoking a waiver and disrupting existing air quality plans, they argue, also has "far-reaching ripple effects" because "businesses operating in California base their own long-term plans on the State's policies" and, if California cannot reduce emissions from the automobile sector, it will have to "consider requiring further reductions from other sectors of the economy." [110] Additionally, they said that by the time of the SAFE proposal, twelve states had already adopted at least one or both of the California standards under section 177.[111] Several of these states submitted comments attesting to their need for these standards to achieve both greenhouse gas and criteria emission reductions.[112] Like the reliance interests of Californian air districts, several of these section 177

states and other opponents of SAFE 1 claim that "reliance interests in State Implementation Plans are particularly acute" because "they set expectations for extended periods of time and for many sectors of the economy, making it challenging (if not impossible) to change them quickly." [113] These commenters note that "planning failures can carry significant consequences, including the imposition of federal plans that limit local flexibility and control, as well as penalties such as loss of highway funds." [114] Some automakers and industry groups also discussed their reliance interests.[115] For example, the National Coalition for Advanced

---

[105] States and Cities at 21–22 (quoting *FCC* v. *Fox*, 556 U.S. 502, 515 (2009)).

[106] *Id.* at 17 (citing *Am. Methyl*, 749 F.2d at 835; *Chapman* v. *El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953); *DHS* v. *Regents of the Univ. of California*, 140 S. Ct. 1891, 1914 (2020); *United States* v. *Seatrain Lines Inc.*, 329 U.S. 424, 429 (1947)).

[107] Urban Air at 21 (arguing that agencies need only provide a "detailed justification" to overcome reliance interests); Competitive Enterprise Institute (CEI), Docket No. EPA–HQ–OAR–2021–0257–0398 (correction to an earlier comment by the same commenter, which can be found at Docket No. EPA–HQ–OAR–2021–0257–0140) at 9 ("As for reliance interests, all costly, wasteful, or otherwise defective government programs create reliance interests. Usurpations of power do as well. If the creation of reliance interests is enough to legitimize bad or unlawful policies, anything goes."). *Compare* to States and Cities at 17–18 (citing their comments on SAFE 1 at 130–31 and citing *Ctr. for Sustainable Econ.* v. *Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (describing reliance interests as "weighty," stating that "[t]he Clean Air Act and long-standing Executive branch policy both place substantial importance on States' interests in implementing the plans and laws they have determined best meet the needs of their States"—plans and laws such as SIPs, which can and do include California standards).

[108] Twelve Public Interest Organizations app. 1 at 29.

[109] Bay Area Air Quality Management District (BAAQMD), Docket No. EPA–HQ–OAR–2021–0257–0278 at 2.

[110] Twelve Public Interest Organizations app. 1 at 29.

[111] States and Cities at 17. With these state adoptions, auto-manufacturers would then need to meet program requirements in these states.

[112] *See, e.g.*, Delaware Department of Natural Resources and Environmental Control (Delaware), Docket No. EPA–HQ–OAR–2021–0257–0109 at 1 ("The GHG program allowed by the waiver is vitally important, as it enables long-term plans and yields critical emission reductions that will contribute significantly to Delaware's ability to attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) for criteria pollutants."); Connecticut Department of Transportation and Connecticut Department of Energy and Environmental Protection (Connecticut), Docket No. EPA–HQ–OAR–2021–0257–0104 at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQS."); Minnesota Pollution Control Agency and Minnesota Department of Transportation (Minnesota), Docket No. EPA–HQ–OAR–2021–0257–0113 at 2 ("The MPCA is in the process of adopting the LEV and ZEV standards in Minnesota as allowed under section 177 of the CAA. These rules are vitally important in helping our state achieve our GHG emission reduction goals and reduce other harmful air pollutants. . . ."); Maine Department of Environmental Protection (Maine), Docket No. EPA–HQ–OAR–2021–0257–0130 at 1, 3 ("While the LEV program was initially created to help attain and maintain the health-based [NAAQS] for criteria pollutants, the California GHG and ZEV standards will contribute significantly to states' abilities to meet their emission reduction goals. . . . [T]he transportation sector is the largest source of ozone forming pollution in Maine . . . and California's ability to set ZEV standards under the [CAA] is an essential tool for addressing both criteria pollutants and GHGs."); Virginia Department of Environmental Quality (Virginia), Docket No. EPA–HQ–OAR–2021–0257–0112 at 2 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements.")

[113] Twelve Public Interest Organizations app. 1 at 30; Delaware at 3 (explaining that, without the California standards, adopted into Delaware's SIP, the State will not be able to meet air quality goals). These reliance interests, one commenter argued, are another reason to doubt the implicit authority of EPA to reconsider an already granted waiver: "It would be quite surprising, then, for EPA to have implicit authority to upend this multi-actor, multi-step scheme by pulling the rug out from under it after the fact." States and Cities at 16 (citing *Am. Methyl*, 749 F.2d at 840).

[114] Twelve Public Interest Organizations app. 1 at 30–31 (citing 42 U.S.C. 7410(c)(1) (establishing triggers for imposition of federal plan), 7509 (outlining sanctions for state planning failures)).

[115] *See* Ford Motor Company (Ford), Docket No. EPA–HQ–OAR–2021–0257–0028 at 1 ("Ford supports EPA's rescission of its SAFE I action, which withdrew California's waiver for zero emission vehicle (ZEV) mandate and greenhouse gas (GHG) emission standards within California's Advanced Clean Car (ACC) program. Ford does not believe this previous action was appropriate. Ford firmly supports recognition of California's authority to implement ZEV and GHG standards in support of its air quality targets pursuant to its 2012 waiver application. We have relied on California's actions pursuant to the waiver and California's related pronouncements in negotiating and agreeing to the California Framework Agreement, and in the development of our own product and compliance plans. Ultimately, Ford considered EPA's and NHTSA's rationales and California's statements regarding SAFE I and took action in the best interests of the company and of the environment."). *See also* Tesla, Docket No. EPA–HQ–OAR–2021–0257–0136 at 4 ("Because of the sizeable investments required to develop alternative fuel and advanced technology vehicles, regulatory stability is vital for ensuring the level of manufacturer and investor confidence necessary to facilitate innovation.") and at n.5 (quoting comments from several automakers and auto industry groups about reliance interests on the waiver from the MTE). *See also* Toyota, Docket No. EPA–HQ–OAR–2021–0381 ("Should EPA reinstate California's waiver, we request it be reinstated as it was originally granted, including the 'deemed-to-comply' provision that was so important in establishing One National Program (ONP) over a decade ago. . . . Reinstatement of California's waiver for model years 2021 and 2022 poses significant lead time challenges considering that 2021 model year is well underway, and 2022 model year vehicles are generally already designed, sourced, certified to various regulatory requirements, and ready to begin production. Some manufacturers may have already begun production of 2022 model year vehicles. As a result, a reinstatement of California's waiver by EPA should apply prospectively to model years 2023 and later.").

Transportation, an industry coalition group, stated "NCAT members have invested billions of dollars with the well-founded expectation that increased demand for electric vehicles would be propelled by California and the section 177 States' continued ability to drive technology innovation and emission reductions." [116] EPA also received comment from CARB, by and through the comments of the States and Cities, that provided data on manufacturer compliance.[117]

According to commenters, these reliance interests were compounded by the considerable passage of time between the granting of the ACC program waiver in 2013 and SAFE 1's withdrawal in 2019. Commenters also remarked that the more than five years that had passed was too long a delay and well beyond the "weeks, not years" sometimes referenced as guidance for reasonableness.[118] SAFE 1, they noted "comes years after the waiver was granted, years after multiple sovereign States adopted California's standards, and years into long-term plans States developed in reliance on anticipated emission reductions from those standards—including, but not limited to, multiple EPA approved State Implementation Plans." [119]

Other commenters argued that SAFE 1 did not upend reliance interests and was not untimely. They agreed with the SAFE 1 decision that the 2018 Mid-Term Evaluation (MTE), which was agreed to in 2013, prevented any reliance interests from accruing.[120] Although this MTE was for the federal GHG standards for MYs 2022–2025, not the California GHG standards approved under the ACC program waiver, these commenters argued that the two were linked through the "deemed to comply"

provision approved in the ACC program waiver, which allowed manufacturers to comply with the California standards by meeting the federal standards.[121] They also noted that California separately agreed to a 2016 mid-term evaluation of its own state standards for the same model years.[122] Therefore, they argued, because the initial grant of the waiver was contingent on two subsequent mid-term evaluations, no one could have reasonably believed the ACC program waiver was "set in stone." Additionally, at least one commenter argued that California and other states' purported reliance interests were further undermined because they "have known for years that NHTSA's longstanding position is that state carbon dioxide regulations and zero-emissions vehicle mandates are related to average fuel economy standards and therefore preempted by CAFE" and "could not have reasonably believed that EPA would continue to ignore NHTSA's view of the law in perpetuity.[123]

Some commenters also argued that even if reliance interests are relevant, automakers and industry groups have reliance interests of their own affected by CARB's 2018 deemed to comply amendments and the SAFE 1 action itself. One commenter wrote that "CARB tossed automakers' reliance interests out the window when it refused to be bound by the results of the EPA and NHTSA's Mid-Term Evaluation (MTE) . . . and refused to honor its 'deemed to comply' pledge to automakers unless they complied with the standards set by the EPA in 2012 and 2017." [124] Another commenter noted that "[w]hatever 'reliance interests' are disturbed when EPA reverses a waiver grant are no more real, and no more serious for the parties involved, than the reliance interests upended by reversal of a waiver denial." [125]

Some commenters also argued that SAFE 1 was timely, disputing opponents' claims that a "reasonable" amount of time is measured in "weeks, not years." Commenters noted that "courts have not reached consensus on the amount of time that is reasonable." [126] Moreover, one commenter argued that "timeliness depends on reliance interests" and, because those could not have accrued prior to the MTE, the time period at issue is only four months (between the conclusion of the MTE and the reconsideration of the ACC program waiver, starting in 2018).[127] This "short time," the commenter claimed, "lies in the acceptable range given the intervening events." [128] Another commenter argued that, if "time elapsed" is a factor to be considered in the appropriateness of an action, it cuts in favor of SAFE 1, as thirty years passed between EPCA's enactment in 1975 and California's first request for a "waiver implicitly authorizing the State to regulate fuel economy." [129] Even if the time period at issue was nearly six years between the grant of the ACC program and the final SAFE 1 action, that commenter wrote, such a length of time is not unreasonable, since "[i]f six years locks a policy in place and puts it beyond revision or repeal by the next administration, elections no longer matter." [130]

In addition to reliance interests and timeliness, some commenters claimed that EPA's authority to revoke, if it existed, requires the Agency to have a purpose other than "applying some . . . change in administrative policy." [131] SAFE 1, they argued, did not meet this requirement. Instead, in SAFE 1, EPA "chose to *sua sponte* reconsider its 2013 Waiver Grant for the sole purpose of applying new policy determinations," specifically "NHTSA's views of EPCA preemption" and "new interpretations

[116] NCAT at 13; Rivian as a member of NCAT (Rivian), Docket No. EPA–HQ–OAR–2021–0135.

[117] States and Cities at 55–57, including app. D and app. E.

[118] *Id.* at 17 (citing *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977)). Twelve Public Interest Organizations app. 1 at 73. In addition, this commenter notes that the time period for seeking judicial review of the ACC program waiver had run long ago and that no one had sought that review (citing *Am. Methyl Corp.,* 749 F.2d at 835); NCAT at 14–15.

[119] Twelve Public Interest Organizations app. 1 at 58.

[120] America Fuel & Petrochemical Manufacturers, EPA–HQ–OAR–2021–0257–0139 (AFPM) at 26 ("And no reliance interests derive from this decision because one could not reasonably expect that the standards approved in that waiver would remain untouched. As part of the 2013 waiver decision, EPA and CARB committed to a 2018 mid-term evaluation of the federal standards for MYs 2022–2025."); Urban Air at 22; NADA at 6 ("as discussed at length repeatedly in EPA's 2013 CAA preemption waiver rule, a coordinated mid-term evaluation (MTE) involving EPA and NHTSA's MY 2022–2025 rules was expected to be conducted.").

[121] AFPM at 26 ("Because California's deemed-to-comply provision linked those standards to compliance with its own state program, any change in federal standards from the mid-term review would have required an equal overhaul of California's emissions program for those future MYs."); Urban Air at 22–23 ("The 2018-re-evaluation is relevant because California's deemed-to-comply provision allowed a manufacturer to satisfy state GHG standards simply by complying with federal standards."); NADA at 6 ("[A]s noted above, CA's GHG mandates included both a 'deem-to-comply' rule enabling vehicle manufacturers to meet those mandates by complying with applicable federal rules, and a commitment on the part of the state to conduct a mid-term evaluation of its own GHG standards.").

[122] AFPM at 26–27; Urban Air at 22; NADA at 6.

[123] Urban Air at 23.

[124] CEI at 9.

[125] AFPM at 27. *See also* Urban Air at 20–21 ("And under the presumption that 'an agency retains authority to reconsider and correct an earlier

decision,' the grant of a waiver is as liable to change as the denial of a waiver. No greater reliance interests attach to the grant of a waiver authorizing regulation than to the denial of a waiver preventing regulation, so reliance interests provide no support for California's ratchet argument.").

[126] Urban Air at 23–24.

[127] *Id.* at 24. Another commenter disagreed with this accounting of time, stating that "timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. *E.g., Am. Methyl,* 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision)." Twelve Public Interest Organizations app. 1 at 38.

[128] Urban Air at 23–24.

[129] CEI at 8 (calling "time elapsed" a "frivolous objection.").

[130] *Id.*

[131] States and Cities at 17 (quoting *Chapman* v. *El Paso Nat. Gas Co.,* 204 F.2d 46, 53–54 (D.C. Cir. 1953)).

[of section 209(b)(1)(B)] that served only to categorically bar state standards that reduce vehicular GHG emissions.''[132] Still, another commenter disagreed, arguing that EPA's reconsideration was an appropriate reevaluation of the legal interpretation and facts upon which the initial waiver determination was based because—''reconsideration determinations do not become 'policy' decisions simply because they address substantive errors.''[133]

EPA also received comment on whether EPA's actions were inappropriate because the Agency failed to satisfy the ''requirements of reasoned decision-making.'' Some commenters noted that EPA had taken the position in SAFE 1 that ''reducing criteria pollution is of overriding importance'' yet failed to ''consider[ ] the criteria-pollution and SIP consequences of its Waiver Withdrawal and Section 177 Determination.''[134] Similarly, EPA received comments claiming that the decision to apply a new approach to the ACC program waiver section 209(b)(1)(B) was both unnecessary and unjustified because, as EPA acknowledged in SAFE 1, the Agency has consistently posited that section 209(b)(1)(B) calls for determining whether the State needs its own regulatory program, separate from that of the federal government, not whether the State needs each specific standard or package of standards for which it seeks a waiver.[135] One of these commenters pointed out that EPA also acknowledged that the phrase ''such State standards'' could reasonably remain the program-level interpretation (EPA's traditional interpretation) yet the Agency chose to adopt a new interpretation and apply it to the more than five-year old ACC program waiver, impacting expectations and reliance interests.

The Agency also received comments on whether NHTSA's finding of preemption under EPCA in the joint action granted EPA authority to reconsider the ACC program waiver. Commenters argued that NHTSA is charged with interpreting and

implementing EPCA and that its finding ''that Congress prohibited California's standards'' in the same action cannot be ignored.[136] Still other commenters pointed to the language of section 209(b)(1) itself, where only three criteria are provided by which EPA can deny a waiver. As such, they argued, EPA cannot have broad, implicit authority to revoke a waiver on entirely different grounds than by which it may deny a waiver.[137] The commenters also argued that the joint context of the action did not grant the Agency special authority to reconsider, explaining that ''[w]hat Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency.''[138] Some commenters also pointedly noted that SAFE 1's distinction between single-agency and joint actions is arbitrary and capricious and therefore not a valid basis for reconsideration because EPA stated it ''does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C),''[139] and because NHTSA and EPA now consider SAFE 1 as ''two severable actions.''[140]

*B. Analysis: EPA Inappropriately Exercised Its Limited Authority To Reconsider*

EPA finds it does have authority to reconsider waivers, although its reconsideration of previously-granted waivers is limited and circumscribed. In the context of adjudicatory decisions (as contrasted to rulemakings), administrative law principles and case law support limited reconsideration authority for waiver proceedings. For example, in *Ivy Sports Med., LLC* v. *Burwell*, 767 F.3d 81, 86, 93 (D.C. Cir. 2014), the D.C. Circuit noted that where a statute ''does not contain an express provision granting [the agency] authority to reconsider,'' ''administrative agencies are assumed to possess at least some inherent authority to revisit prior decisions, at least if done in a timely fashion,'' noting the baseline limitations of such inherent authority. And in *Chapman* v. *El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953), the D.C. Circuit made clear that once concluded, an adjudicatory decision

granting a right ''may not be repudiated for the sole purpose of applying some quirk or change in administrative policy.''[141] These precedents suggest that, while agencies do generally possess some inherent authority to reconsider previous adjudicatory decisions, that authority is limited in scope.

Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. The 1967 legislative history provides some indication of congressional intent to preserve some implied authority for EPA to reconsider previous waiver decisions, but also to place limitations on it. This legislative history explains: ''[i]mplicit in this provision is the right of the [Administrator] to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver.''[142] Thus, from the earliest days of the program it has been understood that any withdrawal of a waiver should be tied to the statutory criteria and California's compliance with them. This legislative history must be taken into account along with Congress's intent expressed in the 1977 legislative history, which, as discussed previously, sought to ensure deference to California and to strengthen that state's role in driving emissions-reducing technological innovation. Congress was also mindful to ensure the ability of other states to adopt California's standards.[143] Ultimately, EPA concludes it has authority to reconsider previously-granted waivers, but that this authority may only be exercised sparingly. As discussed below, there are several considerations that support narrow authority to reconsider waiver grants.

First and most important, EPA believes its inherent authority to reconsider a waiver decision is

---

[132] *Id.* at 8, 19 (''No statute compelled EPA to reconsider the 2013 waiver at all, let alone to apply new policies to that long-settled decision rather than to new waiver requests.''); Twelve Public Interest Organizations app. 1 at 35 (''EPA relied exclusively on its purported discretion to reinterpret Section 209(b)(1)(B) of the Clean Air Act . . . and its purported discretion to consider factors not enumerated in Section 209(b)(1).''). *See also* SCAQMD at 3 (''Because the 2013 waiver decision was not pending judicial review in 2019 and was a long-closed matter, the EPA could not rightfully reopen its adjudication.'').

[133] Urban Air at 24 (citing *Civil Aeronautics Bd.* v. *Delta Air Lines,* 367 US 316, 321 (1961)).

[134] States and Cities at 8–9, 12.

[135] *Id.* at 22.

[136] *See, e.g.,* CEI at 11.

[137] States and Cities at 16–17.

[138] *Id.* at 20. *See also* Twelve Public Interest Organizations app. 1 64–65.

[139] Northeast States for Coordinated Air Use Management (NESCAUM), Docket No. EPA–HQ–OAR–2021–0257–0126 at 3; Twelve Public Interest Organizations app. 1 64–65; States and Cities at 20.

[140] SCAQMD at 7 (citing 86 FR at 22439 n.40).

[141] *See also Am. Methyl,* 749 F.2d 826, 835 (D.C. Cir. 1984) (''We have held that agencies have an inherent power to correct their mistakes by reconsidering their decisions within the period available for taking an appeal.''); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) (''We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.'') (quoting *Gratehouse* v. *United States,* 512 F.2d 1104, 1109 (Ct. Cl. 1975)); *Albertson* v. *FCC,* 182 F.2d 397, 399 (D.C. Cir. 1950) (''in the absence of any specific limitation,'' reconsideration available ''within the period for taking an appeal''). *See generally* Daniel Bress, Note, Administrative Reconsideration, 91 VA. L. REV. 1737 (2005).

[142] S. Rep. No. 90–403, at 34 (1967).

[143] *See supra* Section III.B.

constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). It would be inappropriate and inconsistent with congressional intent for EPA to reconsider and withdraw a waiver on a ground outside the limited scope of those which Congress specified for EPA to consider when reviewing a waiver in the first place.[144] In the few instances where the Agency reconsidered prior waiver decisions prior to SAFE 1, EPA focused its review on the section 209(b) statutory waiver criteria.[145]

A circumscribed approach to reconsideration of waivers is consistent with the deference to California's policy judgment that Congress built into the waiver process.[146] Congress explicitly required that EPA "shall" grant the waiver unless one of three limited criteria are met. The use of the word "shall" (versus "may") was heavily debated by the enacting Congress, with the successful proponents of "shall" explaining that such language would "guarantee" that California could regulate with the burden placed on EPA to demonstrate why California should not be allowed to go beyond federal limitations.[147] Congress's legislative enactments since its creation of the waiver program—including adding section 177 to allow other states to adopt California's standards in 1977 and section 209(e)(2)(A) to create parallel deference for nonroad engines and vehicles in 1990—reinforce the important role it envisioned for, and deference it afforded to, California.[148]

In SAFE 1, EPA argued instead that deference to California was not merited where the Agency was interpreting its "own statute."[149] But in Title II of the Clean Air Act, Congress envisioned two standards—California and Federal.[150]

Congress recognized California's early attempts to address motor vehicle emissions intended to address its extraordinary environmental conditions as well as being a laboratory for motor vehicle emissions control.[151] Congress called for EPA deference to California in implementing section 209(b) by not only limiting EPA review of California waiver requests to three specific criteria but also instructing that EPA is "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[152] Similarly, "[t]he Administrator, . . . is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State."[153] Additionally, the D.C. Circuit has explained that "Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight" and "[t]he statute does not provide for any probing substantive review of the California standards by federal officials."[154] Further, "[t]here is no indication in either the statute or the legislative history that . . . the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial."[155] Thus, early in the waiver program's history, EPA explained the deference that Congress intended for the Agency's review of waiver requests by noting that it would feel constrained to approve a California approach to a problem that the EPA Administrator might not feel able to adopt at the federal level as a regulator. EPA explained that the balancing of risks and costs against potential benefits from reduced emissions is a central policy decision for any regulatory agency and substantial deference should be provided to California's judgement on such matters.[156]

In addition, limiting reconsideration of waivers undergirds Congress' intent that California be a laboratory for the country driving emissions-reducing

technological innovation when it created the program in the first place. As the D.C. Circuit explained in *MEMA I*: "The history of congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation."[157] Indeed, broad authority to reconsider waiver grants could undermine the very structure that Congress built in Title II. Specifically, while EPA does not consider section 177 when reviewing waiver requests under section 209, Congress built a structure wherein EPA must grant California a waiver under section 209 unless one of the three statutory criteria are met, and then other states may adopt California's standards under section 177 as part of their overall air quality programs. Limited inherent authority to reconsider previously-granted waivers as described in this action is important to the success of Congress's structure.

Finally, even the sentence in the legislative history that suggests EPA has inherent reconsideration authority in the first place, and which SAFE 1 relied on for its assertion of inherent reconsideration authority, lends weight to the view that this authority is limited. According to the Senate report from the 1967 CAA amendments, the Administrator has "the right . . . to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver."[158] That specific circumstance—where California does not comply with the conditions of a waiver—should not be expanded to include a gaping hole for discretionary administrative policy changes.

Given all of the above considerations, several principles emerge. EPA's authority to reconsider a grant of a waiver, which is an adjudicatory action by the Administrator, is not open-ended. Any reconsideration is constrained to the criteria that Congress set out in section 209(b). Even within those statutory criteria, considering all of the factors that weigh in favor of a narrow interpretation of the Agency's authority and the importance of not disrupting Congress's scheme, EPA believes reconsideration is limited to situations where the Agency has made

---

[144] *See MEMA I*, 627 F.2d at 1115 (noting that section 209(b) creates "a narrowly circumscribed proceeding requiring no broad policy judgments").

[145] EPA initiated reconsideration of certain motorcycle standards, under the third waiver prong, section 209(b)(1)(C), in order to "vacate that portion of the waiver previously granted under section 209(b)." 47 FR 7306, 7309 (February 18, 1982). EPA affirmed the grant of the waiver in the absence of "findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations." *Id.* at 7310.

[146] *See MEMA I*, 627 F.2d at 1124–25 (describing Congress's intent to defer to California's judgments regarding its motor vehicle program).

[147] H.R. Rep. No 90–728 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

[148] 40 FR 23104; 58 FR 4166.

[149] 84 FR at 51344 n.268.

[150] Motor vehicles are "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079–80,

1088 (D.C. Cir. 1996) ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards.").

[151] *See, e.g.*, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) [The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy).

[152] H.R. Rep. No. 95–294, at 301–02 (1977).

[153] H.R. Rep. No. 95–294, at 302 (1977), reprinted in 1977 U.S.C.C.A.N. at 1381)).

[154] *Ford Motor Co. v. EPA*, 606 F.3d 1293, 1297, 1300 (D.C. Cir. 1979).

[155] *Id.* at 1302.

[156] 40 FR at 23104.

[157] *MEMA I*, 627 F.2d at 110–11.

[158] S. Rep. No. 90–403, at 34 (1967).

a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt.

Even if the bases for EPA's reconsideration did satisfy one of the foregoing conditions such that reconsideration may be appropriate, during that reconsideration EPA believes it should consider the passage of time and reliance interests. In the context of CAA waiver grants in general, and the 2013 ACC program waiver grant in particular, California is relying on its standards to meet short- and long-term emission reduction goals.[159] In addition, by the time the SAFE proposal was published, twelve states had already adopted at least one or both of the GHG and ZEV standards.[160] Several of these states incorporated these adopted standards into their SIPs.[161] Several automakers and industry groups have also indicated reliance on these standards.[162]

Reconsideration thus must carefully consider the factors noted and should not be undertaken where immense degrees of uncertainty are introduced in settled expectations of California, other states, and regulated industry or to allow for the continual questioning of EPA's decisions, thus impairing needed finality. Such reconsideration could frustrate congressional intent in designing the waiver program and ultimately discourage reliance by the recipient of EPA's waiver decision (CARB), states that may have adopted CARB's regulations under the terms of section 177 (and are permitted to enforce the regulations once EPA grants

a waiver to California) as well as the regulated industry.

We now turn to whether the reconsideration in SAFE 1 was a proper exercise of EPA's inherent reconsideration authority. As an initial matter, SAFE 1 did not assert that any clerical or factual error or mistake was made in the 2013 ACC program waiver. Nor did SAFE 1 point to any evidence showing that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. For example, SAFE 1 did not assert that California was not complying with the terms of the waiver. Instead, SAFE 1's reconsideration was premised on retroactive application of discretionary policy changes. Therefore, EPA believes it did not appropriately exercise its inherent authority in SAFE 1 to reconsider the prior ACC program waiver. Upon reconsideration, and as further shown in Sections V and VI, EPA now believes that SAFE 1 amounted to an improper exercise of the Agency's limited inherent authority to reconsider.[163]

SAFE 1 gave two primary reasons for withdrawing the 2013 ACC program waiver. Neither was an appropriate basis for reconsideration. First, SAFE 1 premised the revocation on its interpretation of the second waiver prong, section 209(b)(1)(B), that called for the Agency's scrutiny of specific standards under the waiver rather than California's program as a whole. As explained in detail in Section V of this final action, that statutory interpretation is flawed, and EPA does not believe a new statutory interpretation should be

the basis of reconsidering the grant of a waiver.

SAFE 1 premised the withdrawal of the ACC program waiver under section 209(b)(1)(B) on the perceived lack of record support on the causal link between GHG emission standards and air quality conditions in California.[164] Yet, the underlying record from the ACC program waiver, and the record of SAFE 1, have shown that CARB's ZEV sales mandate and GHG emission standards are designed to address California's serious air quality problems, including both its NAAQS pollutants and a variety of climate impacts from GHG emissions. As discussed in greater detail in Section V, EPA has since at least 2009 recognized that greenhouse gas pollution exacerbates criteria pollution, and climate change impacts on California's air quality conditions (*e.g.,* heat exacerbation of ozone).[165] The ACC program was especially designed to

---

[159] States and Cities at 17–18.

[160] *Id.* at 17.

[161] *Id.* at 10; Wisconsin Department of Natural Resources (Wisconsin), Docket No. EPA–HQ–OAR–2021–0257–0095 at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQs."); Delaware 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[162] *E.g.,* Ford at 1; Tesla at n.5, 4; Rivian (as a member of NCAT) at 13–14.

[163] EPA acknowledges that, in the SAFE 1 proceedings, it had noted that at the time of proposal that CARB had given notice that it was considering amending its "deemed to comply" provision and that by the time of SAFE 1, California had entered into agreements with several automobile manufacturers to accept less stringent standards than the California program or the Federal standards as promulgated in 2012. As noted in SAFE 1, EPA believed that neither of these matters were necessary for EPA's action in SAFE 1, but that they provided further support for the action. 84 FR at 51334 n.230. By this action, EPA finds that neither of these matters amounted to a change in circumstances or conditions associated with the three waiver criteria and EPA's evaluation of the criteria in the ACC program waiver. EPA did not predicate its ACC program waiver on CARB's deemed-to-comply provision or any changes to the deemed-to-comply provision. (EPA does not take a position as to whether that provision has changed in its purpose as a result of CARB's 2018 amendment.) To the extent CARB utilized a deemed-to-comply provision or uses non-regulatory mechanisms to achieve its air quality objectives, this had no bearing on EPA's assessment of whether CARB has a need for its standards under the second waiver prong at the time of SAFE 1 or now.

[164] "California's *approach* in its ACC program waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified $NO_X$ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment." 84 FR at 51337 n.252 (citing 79 FR at 46256, 46257 n.15, 46261, 46262 n.75).

[165] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014). CARB projected, for example, "reductions in $NO_X$ emissions of 3.1 tons per day in 2014 and one ton per day in 2020" in California. *Id.* at 46261. The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

CARB also noted the scientific findings since EPA's 2009 GHG waiver including the report titled "Our Changing Climate 2012 Vulnerability &Adaptation to the Increasing Risks from Climate Change in California." The summary report highlights new insights for the energy, water, agriculture, public health, coastal, transportation, and ecological resource sectors that are vital to California residents and businesses. The study also predicts that peak concentrations of dangerous airborne particles will increase in the San Joaquin Valley because of climate change on wind patterns. This study provides further evidence of what is known as the "climate penalty," where rising temperatures increase ground-level ozone and health-damaging particles, despite the reductions achieved by successful programs targeting smog-forming emissions from cars, trucks, and industrial sources. *Id.* at 8–9. *See also* "The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment" Chapter 3 Air Quality Impacts—Key Finding ("Climate change will make it harder for any given regulatory approach to reduce ground-level ozone pollution in the future as meteorological conditions become increasingly conducive to forming ozone over most of the United States. Unless offset by additional emissions reductions, these climate-driven increases in ozone will cause premature deaths, hospital visits, lost school days, and acute respiratory symptoms.") at *https:// health2016.globalchange.gov/air-quality-impacts;* Chapter 13: Air Quality, Fourth National Climate Assessment at *https://nca2018.globalchange.gov/ chapter/13/.*

address both criteria and GHG pollution, including the effects of GHG pollution on criteria pollution in California.[166] As also further discussed in Section V, in SAFE 1 the Agency dismissed the criteria pollutant benefits of California's ZEV sales mandate requirements based on a snippet from the 2012 waiver request, taken out of context.[167] This was also remarkable considering EPA's prior waivers for ZEV sales mandate requirements that demonstrated criteria pollutant emissions reduction benefits.[168] The record also includes information that demonstrates that a withdrawal of the waiver for the GHG emission standards and ZEV sales mandate (and leaving the Federal GHG standards at the 2020 levels as proposed in SAFE) would increase NOx emissions in the South Coast air basin alone by 1.24 tons per day.[169] In sum, EPA opted to elide the available ample technical support from the ACC program waiver proceedings. EPA's factual predicates in SAFE 1—that there was no criteria pollutant benefit of the GHG standards and ZEV sales mandate—for reconsideration based on the second waiver prong were simply inaccurate and inappropriate. Reconsideration was thus improper on this basis because there were no factual errors in the ACC program waiver and EPA should not be exercising authority to reconsider prior valid waivers that present no factual errors based on different statutory interpretations.

Second, SAFE 1 premised its revocation on NHTSA's finding of preemption under EPCA. This, too, was an inappropriate ground for reconsideration. As earlier noted, EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). Preemption under EPCA is not one of these criteria and was not considered in CARB's ACC program

waiver request or in EPA's granting of that waiver. In fact, in its waiver grant, the Agency expressly found that consideration of preemption under EPCA would be inappropriate and unnecessary. In SAFE 1, the Agency did not premise its consideration of preemption under EPCA on any of the three statutory criteria. Therefore, EPA believes that SAFE 1 was not a proper exercise of the authority to reconsider on this basis, and any subsequent action in SAFE 1 to withdraw the ACC program waiver was inappropriate.

Although SAFE 1 was an inappropriate exercise of inherent authority given that the Agency did not correct a factual error and there was no change in factual circumstances so significant that the propriety of the waiver would be called into doubt, it is nevertheless relevant to note that SAFE 1 did not give appropriate consideration to the passage of time and the reliance interests that had developed between the granting and the revocation of the ACC program waiver. Several automakers and industry groups have also indicated reliance on these standards, as previously discussed.[170] California and section 177 states were, by the time of the reconsideration, into the long-term plans they had developed relying on the ACC program waiver standards.[171] California and other states

rely on waivers that EPA has approved to meet short- and long-term emission reduction goals.[172] In addition, by the time the SAFE proposal was published, twelve states had already adopted at least one or both of the GHG and ZEV standards.[173] Several of these states incorporated these adopted standards into their SIPs.[174]

SAFE 1 barely mentioned these reliance interests, explaining only that the Agency "will consider whether and how to address SIP implications of this action, to the extent that they exist, in separate actions; EPA believes that it is not necessary to resolve those implications in the course of this action." [175] EPA now believes that,

---

[166] 2012 Waiver Request at 1, 9–11, 15–17 ("[A]s detailed below, the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the federal standards that exist."). 78 FR at 2122 ([T]he ACC program will result in reductions of both criteria pollutants and GHG emissions.").

[167] 84 FR at 51337 (quoting CARB's statement that "[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions."). As explained in more detail below, this statement merely reflected how CARB attributed pollution reductions between its different standards and compliance mandates, not the reality of how those standards and mandates actually drive pollution reductions.

[168] 58 FR at 4156. 71 FR 78190 (December 28, 2006); 75 FR 11878 (March 12, 2010) and 76 FR 61095 (October 3, 2011).

[169] States and Cities at 10.

[170] E.g., Ford at 1; Tesla at n.5, 4; Rivian (as a member of NCAT) at 13–14. EPA notes that it received limited comment on whether reliance interests had formed since the issuance of SAFE 1 but nothing to demonstrate error in the findings regarding section 209(b)(1)(C) made within the ACC program waiver. See Toyota, Docket No. EPA–HQ–OAR–2021–0381 ("Reinstatement of California's waiver for model years 2021 and 2022 poses significant lead time challenges considering that 2021 model year is well underway, and 2022 model year vehicles are generally already designed, sourced, certified to various regulatory requirements, and ready to begin production."). Further, as discussed elsewhere, the short passage of time since the promulgation of SAFE 1 and ongoing litigation over that action has, as automakers have noted in the briefing, prevented automakers from relying on the waiver revocation. See also Twelve Public Interest Organizations at 11 (noting filings by automakers suggesting lack of reliance on the waiver withdrawal).

[171] E.g., States and Cities at 17 (the length between the waiver grant and reconsideration was too long "by any measure."); Twelve Public Interest Organizations at app. 36. EPA acknowledges the commenter who argued that "timeliness depends on reliance interests" and, because the standards were not final before the MTE, the time period at issue is the four months between the MTE and the SAFE 1 proposal. Urban Air at 24. EPA also received comment that disagreed with this accounting of time stating that timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. E.g., Am. Methyl, 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision)." Twelve Public Interest Organizations app. 1 at 38. EPA believes it is not necessary to resolve the

permissible amount of time, or the existence or lack of a bright line, that may pass before reconsideration of its prior adjudication is no longer appropriate. However, EPA did not "condition" its ACC program waiver on any subsequent action, including the MTE, which explicitly applied to the federal standards. See 78 FR at 2137. EPA expects its waiver adjudications to be final and that appropriate reliance may flow to affected parties. Moreover, in this instance EPA did not make any final determination regarding the third waiver prong at section 209(b)(1)(C). EPA notes that it has administered the California waiver program for a number of decades and acknowledges that emission standards continue to evolve at the California and the federal levels. This evolution in the standards has rested on regulatory certainty and the enforceability of CARB's emission standards once a waiver has been issued by EPA under section 209(b) of the CAA. As for the inclusion of the deemed-to-comply provision in the California standards, California provided documentation demonstrating that the deemed-to-comply provision was reliant upon the federal standards having a certain level of stringency, a fact that EPA had recognized. See States and Cities at 18–19 n. 14, 57–60. EPA found that the California standards were feasible even without the deemed-to-comply provision, 78 FR at 2138, making it irrelevant to the waiver grant. California's own actions with respect to its standards, such as its independent review of the ACC program, cannot disturb California's or other state's reliance on the federal waiver.

[172] States and Cities at 17–18.

[173] Id. at 17.

[174] Id. at 10; Wisconsin Department of Natural Resources (Wisconsin), Docket No. EPA–HQ–OAR–2021–0257–0095 at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQs."); Delaware 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[175] Id. at 51324 n.167.

when exercising its inherent authority to reconsider the 2013 waiver decision, it was inappropriate to ignore these possible reliance interests and to "resolve" any potential implications at a later time. In the SAFE 1 context, while it was not necessary to resolve the status of every SIP, it was inappropriate to not even consider the reliance interests raised by the adoption of California standards by section 177 states (including, but not limited to, their adoption into SIPs). EPA has consistently recognized the importance of long-term planning in the attainment and maintenance of NAAQS.[176] Given the long-term nature of these plans, it is "challenging (if not impossible) to change them quickly," and any changes in one part of a SIP can affect multiple sectors of the economy.[177]

As noted above, EPA also received other comments regarding reliance interests, including those noting that the midterm evaluation (MTE) was an indication that the technological feasibility of the GHG emission standards was not a settled matter and hence no certainty or reliance could accrue. EPA, however, did not "condition" its ACC program waiver on any subsequent actions, including the

MTE.[178] EPA expects its waiver adjudications to be final and that appropriate reliance may flow to affected parties. Moreover, in this instance EPA did not make any final determination regarding the third waiver prong at section 209(b)(1)(C). EPA notes that it has administered the California waiver program for a number of decades and acknowledges that emission standards continue to evolve at the California and the federal levels. This evolution in the standards has rested on regulatory certainty and the enforceability of CARB's emission standards once a waiver has been issued by EPA under section 209(b) of the CAA.

EPA's historic practice of properly affording broad discretion to California has meant that in almost fifty years of administering the California waiver program the Agency had never withdrawn any waiver prior to SAFE 1. And while SAFE 1 cited prior reconsideration actions as support for the Agency's authority to reconsider prior waiver decisions, as previously noted, EPA has historically limited reconsideration of prior waived standards to statutory criteria and most important, none of these prior reconsideration actions resulted in a revocation.[179] As further shown in Sections V and VI, SAFE 1 was the result of a "probing substantive review of the California standards," with the Agency substituting its own judgment for California's contrary to both congressional exhortation of deference to California and the Agency's review practice.

This present reconsideration is an appropriate exercise of the Agency's reconsideration authority. It is not at all clear that the reasons for limiting reconsideration of waiver grants apply to the same degree to reconsideration of waiver denials and withdrawals. However, EPA need not resolve the question in this action, because this action falls well within the bounds of even the limited authority this action concludes the Agency possesses for reconsideration of waiver grants. First, this action corrects factual errors made in the SAFE 1 waiver withdrawal. Specifically, even under SAFE 1's flawed interpretation of section 209(b)(1)(B), SAFE 1 ignored facts demonstrating that California does need the specific standards at issue to meet compelling and extraordinary

conditions. Second, in this reconsideration EPA properly constrains its analysis to whether SAFE 1 made one of the three statutory findings necessary to deny a waiver. Third, this reconsideration is timely with respect to the finalization of SAFE 1 and limited, if any, reliance interests have developed as a result of SAFE 1 (which has been subject to judicial review since its promulgation).

*C. Conclusion*

In SAFE 1, EPA inappropriately exercised its limited inherent authority to reconsider the ACC program waiver for several reasons. EPA believes its exercise of reconsideration authority to reinterpret the language of section 209(b)(1)(B) was not taken to correct any factual or clerical error or based upon factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted that have changed so significantly that the propriety of the waiver grant is called into doubt. Rather, as discussed in detail in Section V, it was based upon a flawed statutory interpretation and a misapplication of the facts under that interpretation. Likewise, EPA's decision to reconsider the ACC program waiver based on NHTSA's rulemaking within SAFE 1, which raised issues beyond the statutory waiver criteria, was inappropriate. For these reasons EPA now believes it is appropriate to rescind its actions within SAFE 1.

**V. The SAFE 1 Interpretation of Section 209(b)(1)(B) Was Inappropriate and, in any Event, California met its Requirements**

Even if SAFE 1's reconsideration of the 2013 program waiver grant was appropriate, EPA concludes for two independent reasons that its waiver withdrawal in SAFE 1 based upon its new statutory interpretation was flawed. First, EPA concludes that the SAFE 1 interpretation of the second waiver prong was not an appropriate reading of that second waiver prong, section 209(b)(1)(B). It bears noting that the traditional interpretation is, at least, the better interpretation. Informed by but separate from the factual analysis discussed next, the Agency finds that the new interpretation set out in SAFE 1 was inconsistent with congressional intent and contrary to the purpose of section 209(b). Under the traditional interpretation of the second waiver prong, California's need for its own motor vehicle program, including its GHG emission standards and ZEV sales mandate, to meet compelling and extraordinary conditions is clear and the

---

[176] EPA is responsible for approving SIPs and SIP amendments, which span years. *See, e.g.,* 82 FR 42233 (September 7, 2017) (approval of Maine's SIP revision including updates to be consistent with California's updated LEV program); 80 FR 13768 (March 17, 2015) (approval of Connecticut's SIP revision, including the adoption of elements of California's LEV program). For example, states with areas that achieve attainment for any air pollutant must submit for EPA approval a revised SIP that sets out the State's plan for maintaining attainment for at least ten years after the redesignation. At the end of that ten-year period, the State must submit another ten-year maintenance plan to EPA for approval. 42 U.S.C. 7505a.

[177] Twelve Public Interest Organizations app. 1 at 29, 30. Several states also commented, during this reconsideration, that they rely on the California GHG standards and ZEV sales mandate to reach their own state emission reduction goals. *E.g.,* Connecticut at 2 ("Reducing GHG emissions from the transportation sector is required to achieve Connecticut's economy-wide targets of at least 45 percent below 2001 levels by 2030 and 80 percent below 2001 levels by 2050, as required by the 2008 Global Warming Solutions Act (GWSA) and the 2018 Act Concerning Climate Change Planning and Resiliency."); Minnesota at 2 ("[California's standards] are vitally important in helping our state achieve our GHG emission reduction goals and reduce other harmful air pollutants, especially in communities of color and lower-income communities, which are disproportionately impacted by vehicle pollution. The MPCA found that these rules are needed to address GHG emissions in our state and take steps towards achieving Minnesota's statutory Next Generation Energy Act GHG reduction goals. On May 7, 2021, an independent Administrative Law Judge affirmed the MPCA findings."); Maine at 1 n.3 ("Maine statute at 38 M.R.S 576–A establishes tiered GHG emission reduction requirements culminating in gross annual reductions of at least 80% from 1990 baseline levels.").

[178] *See* 78 FR at 2137.

[179] *See, e.g.,* 43 FR at 7310 (affirming the grant of the waiver in the absence of "findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations.").

waiver should not have been withdrawn.

Second, even if the interpretation in SAFE 1 were appropriate, EPA concludes that SAFE 1 incorrectly found that California did not have a need for its specific standards. EPA has evaluated California's need for both requirements by applying both the traditional and the SAFE 1 interpretations of section 209(b)(1)(B). In doing so, EPA reviewed the record from the ACC program waiver proceedings, including CARB's ACC program waiver request and supporting documents, as well as the comments received as part of the SAFE 1 proceeding and the comments received under the present reconsideration of SAFE 1.[180] The record review focused on salient pronouncements and findings in the ACC program waiver decision, such as the relationship of both criteria and GHG pollutants and the impacts of climate change on California's serious air quality conditions. For example, the effects of climate change and the heat exacerbation of tropospheric ozone is well established. California's ACC program is established, in part, to address this. California's program, including its GHG emission standards, is also designed to address upstream criteria emission pollutants. The review did so primarily because SAFE 1 premised the withdrawal of the GHG standards at issue on the lack of a causal link between GHG standards and air quality conditions in California. The review included EPA's prior findings regarding heat exacerbation of ozone, a serious air quality issue recognized by EPA as presenting compelling and extraordinary conditions under the second waiver prong.

On completion of this review, EPA finds no basis for discounting the ample record support on California's need for both the GHG standards and the ZEV sales mandate to address compelling and extraordinary conditions in California when using both the traditional and SAFE 1 interpretation to the second waiver prong. Additionally, because of the way CARB's motor vehicle emission standards operate in tandem and are designed to reduce both criteria and GHG pollution and the ways in which GHG pollution exacerbates California's serious air quality problems, including the heat exacerbation of ozone, the Agency in SAFE 1 should not have evaluated California's specific "need" for GHG standards. In sum, in reconsidering SAFE 1, and after having now reviewed and evaluated the complete factual record, EPA reaffirms that California needs the GHG standards and ZEV sales mandate at issue to "meet compelling and extraordinary conditions."

*A. Historical Practice*

Under section 209(b)(1)(B), EPA shall not grant a waiver if California "does not need such State standards to meet compelling and extraordinary conditions." For nearly the entire history of the waiver program, EPA has read the phrase "such State standards" in section 209(b)(1)(B) as referring back to standards "in the aggregate," in the root paragraph of section 209(b)(1), which calls for California to make a protectiveness finding for its standards. EPA has interpreted the phrase "in the aggregate" as referring to California's program as a whole, rather than each State standard, and as such not calling for the Agency's standard-by-standard analysis of California's waiver request.[181] EPA has thus reasoned that both statutory provisions must be read together so that the Agency reviews the same standards that California considers in making its protectiveness determination and to afford California discretion.[182] The D.C. Circuit has also stated that "[t]he expansive statutory language gives California (and in turn EPA) a good deal of flexibility in assessing California's regulatory needs. We therefore find no basis to disturb EPA's reasonable interpretation of the second criterion."[183]

In addressing the Agency's reading of section 209(b)(1)(B), for example, in the 1983 LEV waiver request EPA explained that:

> This approach to the "need" criterion is also consistent with the fact that because California standards must be as protective as Federal standards in the aggregate, it is permissible for a particular California standard or standards to be less protective than the corresponding Federal standard. For example, for many years, California chose to allow a carbon monoxide standard for passenger cars that was less stringent than the corresponding Federal standard as a "trade-off" for California's stringent nitrogen oxide standard. Under a standard of review like that proposed by MVMA/AIAM, EPA could not approve a waiver request for only a less stringent California standard because such a standard, in isolation, necessarily could be found to be contributing to rather than helping, California's air pollution problems.[184]

In 1994, EPA again had cause to explain the Agency's reading of section 209(b)(1)(B) in the context of California's particulate matter standards waiver request:

> [T]o find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could 'include some less stringent than the corresponding federal standards.' See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977). Congress could not have given this flexibility to California and simultaneously assigned to the state the

---

[180] EPA notes that it reviewed the factual record within the ACC program waiver proceeding and finds there was no factual error in its evaluation of whether CARB's standards satisfied the second waiver prong. EPA also notes, merely as confirming the finding it made at the time of the ACC program waiver but not for purposes of making a new factual finding from that made at the time of the ACC program waiver decision, that the record and information contained in the SAFE 1 proceeding as well as the record and information contained in the Agency's reconsideration of SAFE 1 (including late comments submitted during the SAFE 1 proceeding and, in some cases, resubmitted during the Agency's reconsideration of SAFE 1) at each point in time clearly demonstrates the need of California's standards (whether evaluated as a program or as specific standards) to meet compelling and extraordinary conditions within California.

[181] "The interpretation that my inquiry under (b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[182] 74 FR at 32751 n. 44;.32761 n.104. EPA cited *Entergy Corp.* v. *Riverkeeper, Inc.,* 129 S. Ct. 1498 (2009) ("That view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts"), and *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843– 844 (1984).) ("It seems to us, therefore, that the phrase "best available,'" even with the added specification ''for minimizing adverse environmental impact,'" does not unambiguously preclude cost-benefit analysis."). *See also* 78 FR at 2126–2127 n. 78.

[183] *Am. Trucking Ass'n* v. *EPA,* 600 F.3d 624, 627 (D.C. Cir. 2010) *(ATA* v. *EPA). See also Dalton Trucking* v. *EPA,* No. 13–74019 (9th Cir. 2021) ("The EPA was not arbitrary and capricious in declining to find that 'California does not need such California standards to meet compelling and extraordinary conditions,' § 7543(e)(2)(A)(ii), under the alternative version of the needs test, which requires 'a review of whether the Fleet Requirements are per se needed to meet compelling and extraordinary conditions,' 78 FR at 58,103. The EPA considered 'the relevant factors,' *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co., Inc.,* 463 U.S. 29, 42–43 (1983), including statewide air quality, 78 FR 58,104, the state's compliance with federal National Ambient Air Quality standards for ozone and PM$_{2.5}$ on a statewide basis, *id.* at 58,103–04, the statewide public health benefits, *id.* at 58,104, and the utility of the Fleet Requirements in assisting California to meet its goals, *id.* at 58,110. Contrary to Dalton's argument, the EPA did not limit its review to two of California's fourteen air quality regions. The EPA examined the relevant data provided by CARB, and it articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.' *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 43, 103 S.Ct. 2856 (cleaned up).").

[184] 58 FR 4166, LEV Waiver Decision Document at 50–51.

seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard.[185]

Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for EPA review of California's whole program. With two noted exceptions described below, EPA has consistently interpreted this provision as requiring the Agency to consider whether California needs a separate motor vehicle emission program as compared to the specific standards in the waiver request at issue to meet compelling and extraordinary conditions.

Congress intended to allow California to address its extraordinary environmental conditions and foster its role as a laboratory for motor vehicle emissions control. The Agency's long-standing practice therefore has been to evaluate CARB's waiver requests with the broadest possible discretion to allow California to select the means it determines best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[186] EPA notes that "the statute does not provide for any probing substantive review of the California standards by federal officials." [187]

As a general matter, EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[188] As discussed in Section II, there have only been two exceptions to this practice: one in 2008 and one in 2019. In 2008, EPA for the first time analyzed California's waiver request under an alternative approach and denied CARB's waiver request. EPA concluded that section 209(b) was intended to allow California to promulgate state standards applicable to emissions from new motor vehicles to address air pollution problems that are local or regional, but that section 209(b)(1)(B) was not intended to allow California to promulgate state standards for emissions from new motor vehicles designed to address global climate change problems. Or, in the alternative,

EPA concluded that effects of climate change in California were not compelling and extraordinary compared to the effects in the rest of the country.[189] EPA rejected this view a little over a year later in 2009 by applying the traditional interpretation in granting California's waiver request for the same GHG standard, finding no support in the statute or congressional intent for the alternative application of the statute.[190]

In evaluating the ACC program waiver in 2013, EPA applied the traditional interpretation to the ACC program waiver request and found that the Agency could not deny the waiver request under the second waiver prong.[191] Further, without adopting the alternative interpretation that had been applied in the 2008 GHG waiver denial, EPA assessed California's need for the GHG standards at issue and found that the Agency could not deny the ACC program waiver request, even applying the alternative interpretation. EPA noted that to the extent that it was appropriate to examine the CARB's need for the GHG standards at issue to meet compelling and extraordinary conditions, the Agency had discussed at length in the 2009 GHG waiver decision that California has compelling and extraordinary conditions directly related to regulations of GHGs.[192] Similarly,

[189] 73 FR at 12160–64.

[190] 74 FR at 32744, 32746, 32763 ("The text of section 209(b) and the legislative history, when viewed together, lead me to reject the interpretation adopted in the March 6, 2008 Denial, and to apply the traditional interpretation to the evaluation of California's greenhouse gas standards for motor vehicles. If California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional interpretation, then Congress intended that California could have such a program. Congress also intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems and protect the health and welfare of its citizens. The better interpretation of the text and legislative history of this provision is that Congress did not use this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. EPA concluded that even under this alternative approach California GHG standards were intended at least in part to address a local or regional problem because of the 'logical link between the local air pollution problem of ozone and GHG.'").

[191] 78 FR at 2129 ("CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California. As discussed above, the term compelling and extraordinary conditions 'does not refer to the levels of pollution directly.' Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. California still faces such conditions.").

[192] Id. at 2129–30.

EPA explained that to the extent it was appropriate to examine California's need for the ZEV sales mandate, these requirements would enable California to meet both air quality and climate goals into the future.[193] Additionally, EPA recognized CARB's coordinated strategies reflected in the technologies envisioned to meet the ACC program requirements and in turn addressing both criteria pollutants and GHGs and the magnitude of the technology and energy transformation needed to meet such goals.[194]

[193] Id. at 2129 ("[A]s EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California. In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California. CARB notes that "Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems." (footnotes omitted)).

[194] Id. at 2130–31 ("As CARB notes in its waiver request, the goal of the CARB Board in directing CARB staff to redesign the ZEV regulation was to focus primarily on zero emission drive—that is BEV, FCV, and PHEVs in order to move advanced, low GHG vehicles from demonstration phase to commercialization. CARB also analyzed pathways to meeting California's long term 2050 GHG reduction targets in the light-duty vehicle sector and determined that ZEVs would need to reach nearly 100 percent of new vehicle sales between 2040 and 2050. CARB also notes that the "critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air) demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements. . . . The Vision for Clean Air effort illustrates that in addition to the cleanup of passenger vehicles (at issue here) as soon as possible as required in the LEV III regulation, transition to zero- and near-zero emission technologies in all on- and off-road engine categories is necessary to achieve the coordinated goals. Therefore, EPA believes that CARB's 2018 and later MY ZEV standards represent a reasonable pathway to reach these longer term goals. Under EPA's traditional practice of affording CARB the broadest discretion possible, and deferring to CARB on its policy choices, we believe there is a rational connection between California ZEV standards and its attainment of long term air quality goals. Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve

[185] 49 FR at 18887, 18890.

[186] See, e.g., S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy).

[187] Ford Motor Co., v. EPA, 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[188] 74 FR at 32763–65; 76 FR 34693; 79 FR 46256; 81 FR 95982.

The only other exception to the application of the traditional interpretation was in SAFE 1, when EPA again used a standard-specific level of review and focused on California's need for GHG standards at issue under the waiver. There, EPA posited that section 209(b)(1)(B) called for a "particularized nexus" for California's motor vehicle standards: "Congress enacted the waiver authority for California under section 209(b) against the backdrop of traditional, criteria pollutant environmental problems, under which all lines in this chain bear a particularized nexus to specific local California features: (1) Criteria pollutants are emitted from the tailpipes of the California motor vehicle fleet; (2) those emissions of criteria pollutants contribute to air pollution by concentrating locally in elevated ambient levels, which concentration, in turn; (3) results in health and welfare effects (*e.g.,* from ozone) that are extraordinarily aggravated in California as compared to other parts of the country, with this extraordinary situation being attributable to a confluence of California's peculiar characteristics, *e.g.,* population density, transportation patterns, wind and ocean currents, temperature inversions, and topography." [195] As support for the nexus test, EPA, for the first time in waiver decisions, relied on section 202(a) and its own terms of authority to inform interpretation of the second waiver prong.[196] In addition, EPA relied on legislative history to interpret "compelling and extraordinary" conditions as a reference to "peculiar local conditions" and "unique problems" in California.[197]

Accordingly, EPA reasoned that California must demonstrate "compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards." [198]

In SAFE 1, EPA then posited that the nexus test should be applied to California's GHG standards specifically, rather than California's program "as a whole" under the traditional "aggregate" approach, "to ensure that such standard is linked to local conditions that giv[e] rise to the air pollution problem, that the air pollution problem is serious and of a local nature, and that the State standards at issue will meaningfully redress that local problem." [199] As support for the GHG-specific scrutiny, EPA reasoned that "[t]he Supreme Court's opinion in *UARG* v. *EPA,* 134 S. Ct. 2427 (2014), instructs that Clean Air Act provisions cannot necessarily rationally be applied identically to GHG as they are to traditional pollutants." [200]

Applying the nexus test, EPA concluded that California did not need its GHG standards to meet "compelling and extraordinary conditions" because they were missing a particularized nexus to specific local features. EPA in the alternative posited that "even if California does have compelling and extraordinary conditions in the context of global climate change, California does not 'need' these standards under section 209(b)(1)(B) because they will not meaningfully address global air pollution problem of the sort associated with GHG emissions." [201] EPA also dismissed the 2009 GHG waiver conclusion on deleterious effects of GHG emissions on ozone (*e.g.,* how increases in ambient temperature are conducive to ground-level ozone formation), stating that such a relationship "does not satisfy this requirement for a particularized nexus, because to allow such attenuated effects to fill in the gaps would eliminate the function of requiring such a nexus in the first place." [202]

### B. Notice of Reconsideration of SAFE 1 and Request for Comment

In the Notice of Reconsideration of SAFE 1, EPA noted its interest in any new or additional information or comments regarding whether it

appropriately interpreted and applied section 209(b)(1)(B) in SAFE 1. The Agency noted that EPA's finding in SAFE 1, that such standards were only designed to address climate change and a global air pollution problem, led EPA to a new interpretation of section 209(b)(1)(B). EPA solicited views on whether it was permissible to construe section 209(b)(1)(B) as calling for a consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue as well as California's specific standards where GHG standards are at issue.

The Notice of Reconsideration also set forth that EPA's decision to withdraw the ACC program waiver as it relates to California's ZEV sales mandate was based on the same new interpretation and application of the second waiver prong and rested heavily on the conclusion that California only adopted the ZEV sales mandate requirement for purposes of achieving GHG emission reductions. EPA recognized that this conclusion in turn rested solely on a specific reading of a single sentence in CARB's ACC program waiver request.[203] EPA requested comment on these specific conclusions and readings as well as whether the withdrawal of the ACC program waiver, within the context of California's environmental conditions and as applied to the GHG standards and ZEV sales mandate requirement, was permissible and appropriate.

### C. Comments Received

EPA received multiple comments on its decision to evaluate California's need for its GHG standards separate from its need for a separate motor vehicle emission program as a whole. Some commenters agreed that EPA could evaluate waiver requests for the specific GHG standards under the waiver along the lines of the Agency's pronouncements in SAFE 1. Additionally, commenters pointed to the method of EPA's review in SAFE 1—evaluating the standards individually, as they are received, rather than in the aggregate—as evidence of the flaw in the traditional interpretation.[204] Some commenters echoed SAFE 1's concern that "once EPA had determined that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the

---

such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions." (footnote omitted)).

[195] 84 FR at 51339.

[196] *Id.* at 51339–40.

[197] *Id.* at 51342 (quoting S. Rep. No. 403, 90th Cong. 1st Sess., at 32 (1967)) ("Congress discussed 'the unique problems faced in California as a result of its climate and topography.' H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). *See also* Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. *See, e.g.,* Statement of Cong. Bell (CA) 113 Cong. Rec. 30946. As explained at proposal, Congress focus was on California's ozone problem, which is especially affected by local conditions and local pollution. *See* Statement of Cong. Smith (CA) 113 Cong. Rec. 30940–41 (1967); Statement of Cong. Holifield (CA), *id.,* at 30942. *See also,* MEMA I, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (noting the discussion of California's 'peculiar local conditions' in the legislative history). In sum and as explained at proposal, conditions that are similar on a global scale are not 'extraordinary,' especially where 'extraordinary' conditions are a predicate for a local deviation from national standards, under section 209(b). 83 FR 43247.").

[198] *Id.*

[199] *Id.* at 51345.

[200] *Id.* at 51340.

[201] *Id.* at 51349.

[202] *Id.*

[203] *Id.* at 51330 ("Regarding the ACC program ZEV mandate requirements, CARB's waiver request noted that there was no criteria emissions benefit in terms of vehicle (tank-to-wheel—TTW) emissions because its LEV III criteria pollutant fleet standard was responsible for those emission reductions.").

[204] CEI at 13–14.

**14356**     **Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices

discretion to determine that California did not need any subsequent standards." [205]

Under this analysis of the specific standards at issue under the waiver, these commenters continued, California could not demonstrate that its GHG and ZEV standards were, on their own, compelling and extraordinary. These commenters agreed with SAFE 1's "particularized nexus" interpretation of "compelling and extraordinary," arguing that the words required unique consequences in order to give adequate meaning to the words themselves and in order to overcome equal sovereignty implications.[206] Using this interpretation, these commenters concluded that, because "GHG concentrations are essentially uniform throughout the globe, and are not affected by California's topography and meteorology," and because the entire nation would be affected by climate change, neither the effects of the regulations on climate change, nor the impacts of climate change on California could be considered "compelling and extraordinary." [207] Some commenters also argued that these standards were unnecessary given California's "deemed to comply" provision, which would theoretically allow all automobile manufacturers to comply with California's standards by meeting the less stringent Federal GHG standards.[208]

In contrast, other commenters asked that EPA reverse its SAFE 1 section 209(b)(1)(B) determination by reverting to EPA's long-standing "program-level" approach to the "need" inquiry, where "EPA considers California's need for its own mobile-source-emissions program as a whole, not whether California needs a particular standard for which it has requested a waiver." [209] These

commenters noted the long tradition of interpreting California's need in the aggregate, an interpretation that SAFE 1 acknowledged was reasonable.[210] This interpretation, they argued, best aligned with the text, legislative history, and purpose of the waiver program.[211] For example, some commenters argued that, because feasibility was evaluated under an aggregate approach, it would be unreasonable for California's need for the program to be evaluated under a more restrictive approach.[212] These commenters also argued that Congress had expressed approval of this aggregate approach, citing legislative history from 1977 and 1990.[213] This approach, they continued, aligns with the Waiver Program's broad deference to California to create an entire regulatory program, which is comprised of regulations that interact with and affect each other.[214] One commenter also responded directly to the question EPA posed in its Notice of Reconsideration, whether it was "permissible for EPA to construe section 209(b)(1)(B) as calling for consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue and consideration of California's individual standards where GHG standards are at issue." [215] According to the commenter, "The Supreme Court has rejected this 'novel interpretive approach' of assigning different meanings to the same statutory text in the same provision, depending on the application, because it 'would render every statute a chameleon.' " [216]

These commenters also asked EPA to revert to the traditional interpretation of "compelling and extraordinary" instead of SAFE 1's "particularized nexus" formulation. Commenters noted the SAFE 1 requirement appears nowhere in the text of the statute.[217] Because of this absence, they continued, EPA's references to the legislative history from 1967 have no "tether" to the statutory text and cannot justify the nexus requirement.[218] Further, commenters argued that EPA's reliance on the equal sovereignty doctrine improperly informed how EPA should interpret the phrase "compelling and extraordinary conditions" in the second waiver prong, and therefore requiring such conditions to be sufficiently different or unique among states, was inappropriate.[219] Commenters argued that the equal sovereignty doctrine was inapplicable to the second waiver prong. They explained that the Supreme Court has only applied the "rarely invoked" doctrine of equal sovereignty in the "rare instance where Congress undertook 'a drastic departure from basic principles of federalism' by authorizing 'federal intrusion into sensitive areas of state and local policymaking.' " [220] Congress's exercise of its Commerce Clause power in regulating air pollution from new motor vehicles, commenters continued, is not such an "intrusion." Moreover, they wrote, applying the equal sovereignty doctrine in this instance would actually "diminish most States' sovereignty" because it would "reduce the regulatory options available to California and to other [section 177] States." This diminished sovereignty, they argued, would not "enhance[e] the sovereignty of any State" or "alleviate" any unjustified burden because "Section 209(b)(1) imposes no such burden." [221]

---

[205] 84 FR at 51341. *See, e.g.,* NADA at 5; Urban Air at 25, 29–33; AFPM at 22–23.

[206] AFPM at 12; Urban Air at 4.

[207] CEI at 14–16 ("The resulting "global pool" of GHG emissions is not any more concentrated in California than anywhere else . . . [E]ven if one assumes "compelling and extraordinary conditions" can refer to climate change impacts, such as heat waves, drought, and coastal flooding, California's vulnerability is not "sufficiently different" from the rest of the nation to merit waiving federal preemption of state emission standards. Thus, California is not "extraordinary" in regard to either the "causes" of the "effects" of global climate change."); NADA at 5 ("while vehicle GHG emissions also were, by definition, local, their impact on serious local air quality concerns could not be shown."); AFPM at 11–14 ("Neither the causes nor effects of GHG emissions are compelling and extraordinary conditions, as they are global rather than local conditions, and California's GHG standards and ZEV mandate will not meaningfully address the causes or effects of these GHG emissions.").

[208] NADA at 4–5; Urban Air at 33.

[209] States and Cities at 22 n.16.

[210] Twelve Public Interest Organizations at 7 ("The Trump EPA in turn acknowledged that this longstanding interpretation of Section 209(b)(1)(B) was a reasonable one, 84 FR at 51,341 . . . .").

[211] States and Cities at 22 (citing 84 FR at 51341); Tesla at 11 ("The plural reference to 'such State standards' requires that the standards be considered in the aggregate as a group. This language stands in stark contrast to alternate phrasing that was available to Congress and that would have permitted a non-aggregate determination, such as: 'such State does not need a State standard to meet compelling and extraordinary conditions.' Indeed, alternative language referencing individual standards is present in subsection (b)(2), which references 'each State standard.'").

[212] States and Cities at 25–26; Twelve Public Interest Organizations at 8 ("An aggregate approach to the consistency inquiry also makes sense under Section 209(b)(1)(C) because technological feasibility is effectively evaluated on a program basis. The feasibility of a new standard cannot be evaluated on its own if there are interactions with pre-existing standards. Such interactions between standards are what prompted Congress to add the 'in the aggregate' phrase to section 209 in the first place.").

[213] States and Cities at 26–27; Ozone Transport Commission (OTC), Docket No. EPA–HQ–OAR–2021–0257–0283 at 4.

[214] States and Cities at 27–28.

[215] 86 FR at 22429.

[216] States and Cities at 24 (quoting *Clark* v. *Martinez,* 543 U.S. 371, 382 (2005) and citing *U.S.* v. *Santos,* 553 U.S. 507, 522 (2008); *U.S. Dep't of*

*the Treasury* v. *FLRA,* 739 F.3d 13,21 (D.C. Cir. 2014)). The commenter notes that in the SAFE 1 brief, EPA claimed that its new approach to section 209(b)(1)(B) would apply "for all types of air pollutants" but EPA could point to nowhere in SAFE 1 decision where this was said. *Id.* at 25. And "only two sentences later," EPA acknowledged that its review under this second prong would change "depending upon which 'air quality concerns' were implicated." *Id.*

[217] States and Cities at 34 (noting the lack of the words "nexus," "particularized," "peculiar," and "local" anywhere in sections 209(b) or 202(a)(1)).

[218] *Id.* at 35.

[219] *Id.* at 41–43; Twelve Public Interest Organizations at 4–6.

[220] States and Cities at 42 (quoting *Shelby Cnty.* v. *Holder,* 570 U.S. 529, 535, 545 (2013)).

[221] *Id.* at 43; Twelve Public Interest Organizations at 5 ("Clean Air Act Section 209(b) places no extraordinary burden or disadvantage on one or more States. Rather, the statute benefits California by allowing the exercise of its police power authority to address its particular pollution control needs").

Similarly, commenters rebutted SAFE 1's use of words like "peculiar" and "unique" to further define "compelling and extraordinary." These words, they noted, appear nowhere in the text of section 209(b)(1)(B) and do not align with the plain meaning of the word "extraordinary."[222] Further, they argued, this narrow interpretation "would render the waiver provision unworkable" as, "for any given air pollutant, it is possible to identify other areas of the country that suffer from a similar pollution problem."[223] In fact, they continued, this argument was rejected in the 1967 legislative history and in 1984, "when EPA thoroughly rebutted the assertion that California could not receive a waiver if individual pollutant levels were 'no worse than some other areas of the country.'"[224] Moreover, they argued, the existence of section 177 necessarily acknowledges that other states may have the same or similar air pollution problems as California.[225]

Other commenters argued that California needed GHG standards to address "compelling and extraordinary" conditions in California even under the SAFE 1 interpretation of the second waiver prong. These commenters argued that GHG and ZEV standards produce both GHG and criteria pollution benefits, pointing to language in the ACC program waiver that acknowledged these dual benefits and to subsequent SIP approvals that incorporated the California standards in order to achieve criteria emission reductions.[226] In

particular, commenters explained that the 2012 California waiver request established that the ZEV standard would reduce criteria pollution both "by reducing emissions associated with the production, transportation, and distribution of gasoline" and "by driving the commercialization of zero-emission-vehicle technologies necessary to reduce future emissions and achieve California's long-term air quality goals."[227] As for the GHG standards, commenters noted that, as acknowledged in the ACC program waiver, "global warming exacerbates criteria pollution and makes it harder to meet air pollution standards."[228] Thus, they argue, "EPA expressly and improperly limited its Determination to consideration of the 'application of section 209(b)(1)(B) to California's need *for a GHG climate program.*"[229] Given EPA's consistent acceptance that "California's criteria pollution 'conditions' are 'extraordinary and

compelling' and that the record demonstrates that California's GHG and ZEV standards reduce criteria emissions in California," EPA should "reverse its SAFE 1 section 209(b)(1)(B) determination and the waiver withdrawal that rested on it—regardless of whether EPA reverts to its traditional, program-level approach."[230]

Regardless of the emissions benefits of the standards, some commenters argued that California's plan to address both long-term and short-term climate and criteria pollutant reduction goals is entitled to deference. Thus, even if "the mandate truly added nothing to the emission benefits of California's standards for vehicular emissions of criteria and greenhouse gas pollutants," commenters claimed, "the mandate would simply constitute the State's choice of means for automakers to comply with its standards."[231] These commenters further argued that section 209(b)(1)(B) "does not authorize EPA to inquire into whether the means to comply with California emission standards, as opposed to the actual standards themselves, are needed to meet compelling and extraordinary conditions."[232] Commenters also claimed that EPA's argument, that California cannot need the GHG and ZEV standards because those standards alone would not "meaningfully address global air pollution problems" posed by climate change, "lacks merit" and "is illogical."[233] Such an approach, they

[222] States and Cities at 38–39 (explaining that the existence of those words in the legislative history "simply highlight that Congress did *not* codify [them] in Section 209(b)(1)(B)" and that plain meaning of "extraordinary" is "out of the ordinary"); Twelve Public Interest Organizations app. 1 at 49 ("Congress understood, even in 1967, that '[o]ther regions of the Nation may develop air pollution situations related to automobile emissions which will require standards different from those applicable nationally.' S. Rep. No. 90–403, at 33.").

[223] Tesla at 9.

[224] *Id.* (quoting 49 FR at 18887, 18891) (stating that EPA explained that "there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted.")).

[225] Twelve Public Interest Organizations app. 1 at 49; States and Cities at 38–39.

[226] States and Cities at 9–14, 30–31; Center for Biological Diversity, Docket No. EPA–HQ–OAR–2021–0257–0358 at 2 ("The Trump EPA improperly separated California's need for greenhouse gas regulations from its need for criteria pollutant standards. In reality, these two goals are tightly linked, and both are critical to the Clean Air Act's goals of safeguarding public health and welfare."); San Joaquin Valley Air Pollution Control District (SJVAPCD), Docket No. EPA–HQ–OAR–2021–0257–0105 at 3 ("The District's *2016 Plan for the 2009 9-Hour Ozone Standard* adopted June 16, 2016, and *2018 Plan for the 1997, 2006, and 2012 PM 2.5 Standards,* adopted November 15, 2018, both rely on emission reductions from California's Advanced

Clean Cars regulation and other mobile source measures to support the Valley's attainment of the federal health-based NAAQS."); NCAT at 11 ("In addition, California's ZEV standards are intended to and do achieve significant incremental reductions of NOx and other non-GHG emissions."); Tesla at 10–11 ("In comments submitted to the EPA in 2009 regarding a preemption waiver, [California] explained that it 'specifically designed its GHG standards for criteria pollutants.' It also emphasized that it has 'frequently referenced the science to support GHG standards as a necessary method for controlling ozone and particulate matter pollution' and has 'consistently recognized that the State's ability to reduce nonattainment days for ozone and wildfire-caused particulate matter depends on its ability to reduce GHG emissions. . . . EPA also has repeatedly expressed its own understanding that GHG standards should be viewed as a strategy to help control criteria pollutants to address National Ambient Air Quality Standards nonattainment.'"); Twelve Public Interest Organizations at 5 ("For example, atmospheric heating due to global warming can increase the production of ground-level ozone in California, which suffers from extraordinary amounts of locally reacting nitrogen oxides and volatile organic compounds.").

[227] Center for Biological Diversity at 2–3. In contrast, some commenters, echoing SAFE 1, argued that these upstream emission benefits should not be considered in determining the criteria pollutant benefits of these standards. CEI at 16 ("Although NHTSA and EPA are required to consider all relevant factors when determining CAFE and tailpipe CO2 standards, it is inappropriate to elevate stationary source criteria pollutant emissions into a make-or-break factor in waivers for mobile source programs. The Clean Air Act already provides the EPA with ample authorities to regulate stationary sources, including the NAAQS program, New Source Performance Standards program, Prevention of Significant Deterioration of Air Quality program, Acid Rain program, and Regional Haze program. If Congress wanted NHTSA's CAFE program and EPA's mobile source program to prioritize reductions of indirect stationary source emissions, it could easily have said so. The indirect effects on stationary source emissions are not even mentioned.").

[228] Center for Biological Diversity at 3.

[229] States and Cities at 28 (citing 84 FR at 51339 (emphasis added)) (limiting section 209(b)(1)(B) consideration to "the case of GHG emissions.").

[230] States and Cities at 29. The commenter notes that EPA never considered whether California needed those criteria emission reductions from its ZEV and GHG standards because it refused to consider those criteria reductions at all: "EPA attempted to justify disregarding record evidence and its own prior findings concerning the criteria emission benefits of these California standards by mischaracterizing CARB's 2012 waiver request. . . . But, having chosen to *sua sponte* reopen the question whether California continues to need standards it has been implementing for six years, . . . , EPA could not limit its consideration to what the standards were intended to achieve when they were originally designed or presented. . . . . CARB (and others) asserted clearly in SAFE 1 comments that both the GHG and ZEV standards produce criteria pollution benefits upon which California and other States rely to improve air quality." *Id.* at 29–30.

[231] Twelve Public Interest Organizations at 9–10.

[232] *Id.* (citing *MEMA I,* 627 F.2d 1095, 1111–14 (D.C. Cir. 1979)).

[233] States and Cities at 40, 49–50; NCAT at 11 ("EPA's argument that California does not 'need' vehicle standards that reduce GHG emissions because such standards alone cannot meaningfully reduce the impacts of climate change in California lacks merit. 84 FR at 51,346–47. EPA's approach in SAFE 1 read requirements into the statute that Congress did not choose to impose: That a single standard be sufficient to resolve an environmental problem caused by multiple and diverse sources. Instead, need should be defined by reference to the underlying problem, and California's standards are
Continued

explained "amounts to a conclusion that California is forbidden from acting precisely because climate change is a global threat—when in fact the global aspect of this problem demonstrates the need for California to take action," a conclusion, they noted, that was rejected by the Supreme Court in *Massachusetts* v. *EPA*.[234] Even if there was some merit to the argument, one commenter argued, SAFE 1's assertion that the regulations "would have only a *de minimis* effect on climate change understates the impact that collective action by California and the Section 177 states can have on GHG emissions."[235] The commenter noted that "[w]ith a total population of over 140 million people, these 19 jurisdictions collectively account for more than 42 percent of the U.S. population . . . and more than 40 percent of the U.S. new car market."[236]

Finally, these commenters also argued that climate change and its impacts are, themselves, "extraordinary and compelling" conditions. They provided evidence of increased weather events, agricultural effects, and wildfires, amongst other impacts of climate change, which have already begun to severely affect California.[237]

---

[234] Tesla at 8–9 (citing *Massachusetts* v. *EPA*, 549 U.S. 497, 525–26 (2007)) ("'Nor is it dispositive that developing countries such as China and India are poised to increase greenhouse gas emissions substantially over the next century: A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere.'").

[234] Tesla at 8–9 ("Indeed, the Supreme Court rejected this logic in *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), explaining: 'Because of the enormity of the potential consequences associated with man-made climate change, the fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant."); States and Cities at 41.

[235] NESCAUM at 7.

[236] *Id.*

[237] States and Cities at 43–48; Twelve Public Interest Organizations at 5; Center for Biological Diversity at 3; Tesla at 8–9. States and Cities at 43–48; Twelve Public Interest Organizations at 5–6; Center for Biological Diversity at 3 ("California *also* experiences uniquely dangerous effects from increases in greenhouse gases. For example, the California legislature has found that global warming will cause adverse health impacts from increased air pollution and a projected doubling of catastrophic wildfires. Many of the state's most extreme weather events have occurred in the last decade, including a severe drought from 2012–2016, an almost non-existent Sierra Nevada winter snowpack in 2014–2015, three of the five deadliest wildfires in state history, and back-to-back years of the warmest average temperatures on record. These ongoing disasters demonstrate California's status as 'one of the most 'climate-challenged' regions of North America.'").

## D. Analysis: California Needs the ACC Program GHG Standards and ZEV Sales Mandate To Address Compelling and Extraordinary Conditions Under Section 209(b)(1)(B)

In this action, EPA first finds that the Agency should not have reinterpreted section 209(b)(1)(B) in evaluating California's "need" for GHG standards and ZEV sales mandate requirements at issue. The analysis below walks through the statutory language and history associated with this provision. As part of this discussion, the relationship of this provision and California's authority and deference is highlighted. The two interpretations of the waiver prong are then reviewed, presenting the Agency's rationale for its findings of the inappropriate SAFE 1 interpretation and support for its conclusion about the better interpretation. Second, as shown below, the factual record before the Agency at the time of SAFE 1 supports the GHG standards and ZEV sales mandate requirements at issue under either the traditional or SAFE 1 interpretation of section 209(b)(1)(B).

### 1. EPA Is Withdrawing the SAFE 1 Section 209(b)(1)(B) Interpretation

Except for two short-lived exceptions in the context of the 2008 waiver denial and SAFE 1, EPA has consistently recognized that reading the "needs" test of the second waiver prong as calling for a standard-specific evaluation would be inconsistent with congressional intent given the text of section 209(b)(1) legislative history, as well as the way the different standards in the ACC program work together to reduce criteria and GHG pollution and spur innovation. As further explained below, all of these aspects lend support to the Agency practice of not subjecting California's waiver requests to review of the specific standards under the second waiver prong, and we agree that the traditional interpretation of section 209(b) is, at least, the better interpretation.

Under section 209(b)(1)(B), EPA must grant a waiver request unless the Agency finds that California "does not need such State standards to meet compelling and extraordinary conditions." EPA has historically read the phrase "such State standards" in section 209(b)(1)(B) as referring back to standards "in the aggregate" in section 209(b)(1), which addresses the protectiveness finding that California must make for its waiver requests. In addition, as EPA has explained in the past, reading the provision otherwise would conflict with Congress's 1977 amendment to the waiver provision to allow California's standards to be "at

least as protective" as the federal standards "in the aggregate." This amendment must mean that some of California's standards may be weaker than federal standards counterbalanced by others that are stronger. If, however, a waiver can only be granted if each standard on its own meets a compelling need, then California could never have a standard that is weaker than the federal standard, rendering Congress's 1977 amendment inoperative. Congress would not have created the option for California's individual standards to be at least as protective "in the aggregate" and then taken that option away in the second waiver prong's "compelling need" inquiry.

In addition, EPA has reasoned that giving effect to section 209(b)(1) means that both subparagraph (b)(1)(B) and paragraph (b)(1) must be read together such that the Agency reviews the same standards that California considers in making its protectiveness determination. "§ 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver of preemption if its standards 'in the aggregate' protected public health at least as well as federal standards."[238]

EPA has thus explained the reasoning for the reading of "such State standards" for instance, as follows:

[I]f Congress had intended a review of the need for each individual standard under (b)(1)(B), it is unlikely that it would have used the phrase ". . . does not need such state standards," which apparently refers back to the phrase "State standards . . . in the aggregate," as used in the first sentence of section 209(b)(1), rather than to the particular standard being considered. The use of the plural, *i.e.*, "standards," further confirms that Congress did not intend EPA to review the need for each individual standard in isolation.[239]

EPA has also explained that "to find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 made in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could include some less stringent than the corresponding federal standards."[240] This is in accord with *MEMA I*, where the D.C. Circuit explained that:

The intent of the 1977 amendment was to accommodate California's particular concern

---

[238] *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation,* 17 F.3d 521, 525 (2d Cir. 1994).

[239] 49 FR at 18890.

[240] *Id.* at 18890 n.24.

with oxides of nitrogen, which the State regards as a more serious threat to public health and welfare than carbon monoxide. California was eager to establish oxides of nitrogen standards considerably higher than applicable federal standards, but technological developments posed the possibility that emission control devices could not be constructed to meet both the high California oxides of nitrogen standard and the high federal carbon monoxide standard.[241]

EPA has further explained that the crucial consequence of the 1977 Amendment was to require waiver grants for California's specific standards that are part of the State's overall approach to reducing vehicle emissions to address air pollution even if those specific standards might not be needed to address compelling and extraordinary conditions.[242] For instance, EPA has previously granted a waiver for what was then described as "harmless emissions constituents such as methane" while reminding objectors of "EPA's practice to leave the decisions on controversial matters of public policy, such as whether to regulate methane emissions, to California." [243] Similarly, in the 1984 p.m. standards waiver decision, EPA also discussed California's "need" for its own standards at length in response to comments that California must have worse air quality problems than the rest of the country to qualify for a waiver.[244] There, EPA explained that California need not "have a 'unique' particulate problem, *i.e.,* one that is demonstrably worse than in the rest of the country [because], there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted." [245] Indeed, the word "unique" is not contained in the statutory provision. EPA further explained that "even if it were true that California's total suspended particulate problem is, as certain manufacturers argue, no worse than some other areas of the country, this does not mean that diesel particulates do not pose a special problem in California." [246]

As explained at length earlier, EPA believes Congress intended the Agency to grant substantial deference to California on its choice of standards that are appropriate to meet its needs. EPA has explained that "Congress has made it abundantly clear that the manufacturers would face a heavy burden in attempting to show 'compelling and extraordinary conditions' no longer exist: The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be "clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver." [247] Likewise, the House Committee Report explained for instance that "[t]he [1977] amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.,* to afford California the *broadest possible discretion* in selecting the best means to protect the health of its citizens and the public welfare." [248] EPA's past practice prior to SAFE 1, except for one instance, was consistent with this deferential stance.

In enacting section 209(b)(1), Congress struck a deliberate balance first in 1967 when it acknowledged California's serious air quality problems as well as its role as a laboratory for emissions control technology for the country,[249] and again, in the 1977 Amendments that allowed for California to seek and obtain waivers for standards that are less stringent than the federal standards (by amending section 209(b)(1)(A)) and also added section 177 to acknowledge that states may have air quality problems similar to California's by allowing states, subject to certain conditions, to adopt California's new motor vehicle standards once waived by EPA.[250] These provisions struck a balance between having only one national standard and having 51 different state standards by settling on two standards—a federal one and a California one that other states may also adopt. Since 1967, in various amendments to section 209, Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for the review of the standards as a whole program. Likewise, Congress has also not placed any additional constraints on California's ability to obtain waivers beyond those now contained in section 209(b)(1). The Agency has thus viewed the text, legislative history, and structure of section 209(b)(1) as support for the program-level review of waiver requests as well for the conclusion that California's air quality need not be worse than the rest of the country for EPA to grant a waiver of preemption. In addition, to the extent that SAFE 1 was intended to preclude California's regulation of all greenhouse gases from light-duty vehicles, the SAFE 1 interpretation creates a structural conflict within the relevant CAA provisions and could also create an inability for California to address GHG emissions and its contribution to the serious air quality problems within the State. There is a fundamental relationship between sections 209(a) and 209(b). Section 209(a) preempts states from adopting or enforcing new motor vehicle emission standards, and section 209(b) calls for EPA to waive that preemption for California vehicular emission standards unless EPA finds that one or more of the waiver criteria set out therein are not met. Nothing on the face of the CAA or applicable legislative history indicates that the scope of section 209(b)—the pollutants for which California may obtain a waiver—is more limited than the scope of section 209(a).[251] The D.C. Circuit has

---

[241] *MEMA I,* 627 F.2d 1095, 1110 n.32 (D.C. Cir. 1979).

[242] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards.'"); "[T]he 1977 amendments significantly altered the California waiver provision." *Ford Motor Co.,* 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[243] 43 FR at 25735.

[244] It bears note that these are the same kinds of comments that EPA received in the context of the ACC program waiver proceedings on California's need for GHG standards.

[245] 49 FR at 18891.

[246] *Id.*

[247] *Id.* at 18890 n.25 (citing H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 302 (1977)).

[248] *MEMA I,* 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)) (emphasis added). Congress amended section 209(b)(1)(A) so that California's determination that its standards are as at least as protective as applicable Federal standards so that such determination may be done "in the aggregate" looking at the summation of the standards within the vehicle program.

[249] The CAA has been a paradigmatic example of cooperative federalism, under which "States and the Federal Government [are] partners in the struggle against air pollution." *General Motors Corp.* v. *United States,* 496 U.S. 530, 532 (1990). Motor vehicles "must be either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs.,* 88 F.3d at 1079–80, 1088 ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards."). *See also MEMA II,* 142 F.3d at 463.

[250] "'§ 177 . . . permitted other states to 'piggyback' onto California 's standards, if the state's standards 'are identical to the California standards for which a waiver has been granted for such model year.'" *Motor Vehicle Mfrs. Ass'n* v. *New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 525 (2d Cir. 1994).

[251] EPA believes that, to the extent the SAFE 1 interpretation has the practical effect of defining or implementing the scope of section 209(b) differently depending on the pollutants involved, the interpretation is contrary to legislative intent and the Agency's historic practice given the criteria emission benefits of CARB's GHG emission

Continued

already held as much as to section 209(a): "whatever is preempted [by section 209(a)] is subject to waiver under subsection (b)." [252] As demonstrated by EPA's review of the record in this decision, California's GHG emission standards at issue meet the SAFE 1 interpretation of the second waiver prong. Nevertheless, to the extent that SAFE 1 was intended to preclude all California regulation of greenhouse gases, EPA believes it improper to exclude entirely a pollutant from a waiver under section 209(b) that is otherwise preempted by section 209(a).

In addition, Congress has cited California's GHG standards and ZEV sales mandate in subsequent legislation. Federal procurement regulations direct the EPA to issue guidance identifying the makes and models numbers of vehicles that are low GHG emitting vehicles.[253] In a clear reference to California's motor vehicle GHG standards, Congress has required EPA when identifying those vehicles to "take into account the most stringent standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States." [254] And in its State Implementation Plan provision regarding fleet programs required for certain non-attainment areas relating to issuing credits for cleaner vehicles, Congress stated that the "standards established by the Administrator under this paragraph . . . shall conform as closely as possible to standards which are established for the State of California for ULEV and ZEV vehicles in the same class." [255] Congress would not likely have adopted California's standards into its own legislation if it believed those standards to be preempted.

EPA also disagrees with SAFE 1's related argument that the statutory criteria must be interpreted in the context of the constitutional doctrine of "equal sovereignty." As explained in detail in Section VIII, waiver requests should be reviewed based solely on the criteria in section 209(b)(1) and the Agency should not consider constitutional issues in evaluating waiver requests.[256] The constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver

requests. However, because the Agency asserted in SAFE 1 that the equal sovereignty doctrine formed a gloss on its statutory interpretation of the three criteria, EPA addresses that argument here briefly. In short, in SAFE 1, EPA stated that because section 209(b)(1) provides "extraordinary treatment" to California, the second waiver prong should be interpreted to require a "state-specific" and "particularized" pollution problem.[257] But section 177's grant of authority to other states to adopt California's standards undermines the notion that the regulatory scheme treats California in an extraordinary manner. Indeed, if section 209(b) is interpreted to limit the types of air pollution that California may regulate, it would diminish the sovereignty of California and the states that adopt California's standards pursuant to section 177 without enhancing any other state's sovereignty. Nor does section 209(b) impose any burden on any state. For these reasons, EPA agrees with commenters who argued that the Supreme Court's decision in *Shelby County* is inapposite. In section 209(b), Congress did not authorize "federal intrusion into sensitive areas of state and local policymaking." [258] Rather, it underscored a foundational principle of federalism—allowing California to be a laboratory for innovation. Nor is section 209(b) an "extraordinary departure from the traditional course of relations between the States and the Federal Government." [259] To the contrary, it is just one of many laws Congress passes that treat States differently, and where, as discussed more fully below, Congress struck a reasonable balance between authorizing one standard and authorizing 51 standards in deciding to authorize two. SAFE 1's invocation of the rarely used equal sovereignty principle as an aid in interpreting the second waiver prong simply does not fit section 209.

SAFE 1 dismissed the Agency's traditional interpretation of the second waiver prong under which EPA reviews the same standards that California considers in making its protectiveness determination, asserting that the practical implications of reviewing standards in the "aggregate" compared to specific standards presented in a waiver request meant that the Agency would never have the discretion to determine that California did not need any subsequent standards. But nothing in section 209(b)(1)(B) can be read as

calling for scrutinizing the specific California standards under the waiver.[260] Under section 209(b)(1)(B), EPA is to grant a waiver unless California does not need "such State standards" (plural). EPA interprets section 209(b)(1)(B) to refer back to the phrase "in the aggregate" in section 209(b)(1), which was added in the 1977 CAA Amendments when Congress removed the stringency requirements for waiver of California standards allowing instead for standards that are not as stringent as comparable federal standards, so long as the standards were "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." EPA believes that referring back to section 209(b)(1) is appropriate given that it precedes the language prior to section 209(b)(1)(B) and is in accord with the deference Congress intended by the 1977 Amendments.[261] Conversely, EPA believes that under the SAFE 1 interpretation California would, of necessity, be required to make a protectiveness finding for each of the specific standards, and the Agency believes this would be an inappropriate outcome from SAFE 1. Under the 1977 Amendments, California can "include some less stringent [standards] than the corresponding federal standards." [262] As previously explained, "Congress could not have given this flexibility to California and simultaneously assigned to the state the seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard." [263]

SAFE 1 further argued that its interpretation read the use of "such standards" consistently between the second and third waiver prongs,

---

[252] *MEMA I,* 627 F.2d 1095, 1106–08 (D.C. Cir. 1979).

[253] 42 U.S.C. 13212(f)(3).

[254] *Id.*

[255] 42 U.S.C. 7586(f)(4).

[256] 78 FR at 2145.

[257] 84 FR 51340, 51347.

[258] *Shelby County* v. *Holder,* 570 U.S. 529, 535, 545 (2013).

[259] *Id.*

[260] In the 2009 GHG waiver, and again in the 2013 ACC program waiver, EPA explained that the traditional approach does not make section 209(b)(1)(B) a nullity, as EPA must still determine whether California does not need its motor vehicle program to meet compelling and extraordinary conditions as discussed in the legislative history. Conditions in California may one day improve such that it may no longer have a need for its motor vehicle program, or a program designed for a particular type of air pollution problem, if the underlying specific air pollutant is no longer at issue.

[261] EPA had applied the traditional interpretation of the second waiver prong prior to the 1977 Amendments.

[262] *See* H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977); "In further amendments to the Act in 1977, § 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver from preemption if its standards 'in the aggregate' protected public health at least as well as federal standards." *Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation,* 17 F.3d at 525.

[263] 49 FR at 18890 n.24.

sections 209(b)(1)(B) and (C).[264] It is true that section 209(b)(1)(C) employs the same phrase ''such State standards'' as employed in section 209(b)(1)(B), and it similarly uses that phrase to refer to standards in the aggregate. Indeed, section 209(b)(1)(C) involves an analysis of feasibility that can take more than the feasibility and impacts of the new standards into account. The feasibility assessment conducted for a new waiver request focuses on the standards in that request but builds on the previous feasibility assessments made for the standards already in the program and assesses any new feasibility risks created by the interaction between the standards in the petition and the existing standards.[265]

In sum, EPA now views as inconsistent with congressional intent the SAFE 1 interpretation, which was a flawed interpretation and also a significant departure from the traditional interpretation under which the Agency reviews California's need for the same standards as those that the State determines are ''in the aggregate'' as protective of public health and welfare, under section 209(b)(1).[266] EPA

believes the traditional interpretation is, at least, the better reading of the statute.

As previously explained, in reviewing waiver requests EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[267] In SAFE 1, however, EPA reinterpreted section 209(b)(1)(B) and further set out a particularized nexus test and applied this test separately to GHG standards at issue. SAFE 1 then concluded that no nexus exists for GHG emissions in California.[268] SAFE 1 further posited that California must demonstrate ''compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards.''[269] This has resulted in potentially different practical results depending on whether GHG standards or criteria emission pollutants are at issue, a distinction neither found in nor supported by the text of section 209(b)(1)(B) and legislative history. Specifically, SAFE 1 would have the ACC program MYs 2017–2025 criteria pollutants standards subject to review under the traditional interpretation while GHG standards at issue would be subject to review under the SAFE 1 particularized nexus test or individualized scrutiny.[270] This uneven application is even more irreconcilable given that California's motor vehicle emission program includes two GHG standards for highway heavy-duty vehicles that EPA previously reviewed under the traditional approach.[271] EPA

acknowledges that ascribing different meanings to the same statutory text in the same provision here, depending on its application, ''would render every statute a chameleon.''[272] Nothing in either section 209 or the relevant legislative history can be read as calling for a distinction between criteria pollutants and GHG standards and thus, the individualized scrutiny under the SAFE 1 particularized nexus test.[273] Nothing in section 209(b) can be read as calling for EPA to waive preemption only if California seeks to enforce criteria pollutant standards. The Administrator is required to waive the preemption in section 209(a) unless California ''does not need *such State standards to meet compelling and extraordinary conditions.*''[274] This is in stark contrast to, for example, section 211(c)(4)(C), which calls for a waiver of preemption only if a state demonstrates that a fuel program is ''necessary'' to achieve the NAAQS.[275] Moreover, as previously noted, ''[I]f Congress had intended a review of the need for each individual standard under (b)(1)(B), it is unlikely that it would have used the phrase ''. . . does not need *such state standards*'' (emphasis in original), which apparently refers back to the phrase ''State standards . . . in the aggregate as used in the first sentence of section 209(b)(1), rather than the particular standard being considered.''[276] EPA has also explained that an individualized review of standards would mean that Congress ''[gave] flexibility to California and simultaneously assigned to the state the seemingly impossible tasks of establishing that 'extraordinary and compelling conditions' exist for each less stringent standard.''[277]

---

[264] Section 209(b)(1)(C) provides that no such waiver shall be granted if the Administrator finds that ''such State standards and accompanying enforcement procedures are not consistent with section 7521(a) [202(a)] of this title.''

[265] For example, in the 2013 ACC waiver that contains CARB's Tier III criteria pollutant standards and GHG emission standards, as well as the ZEV sales mandate, EPA assessed information submitted by CARB regarding the technological feasibility, lead time available to meet the requirements, and the cost of compliance and the technical and resource challenges manufacturers face in complying with the requirements to simultaneously reduce criteria and GHG emissions. 78 FR at 2131.

[266] 84 FR at 51345. EPA notes that in SAFE 1 the following rationale was used to interpret both 209(b)(1)(B) and then connect it with 209(b)(1)(B): ''[B]ecause both sections 209(b)(1)(B) and (C) employ the term 'such state standards,' it is appropriate for EPA to read the term consistently between prongs (B) and (C). Under section 209(b)(1)(C), EPA conducts review of standards California has submitted to EPA for the grant of a waiver to determine if they are consistent with section 202(a). It follows then that EPA must read 'such state standards' in section 209(b)(1)(B) as a reference to the same standards in subsection (C).'' Although the Agency has not pointed to 209(b)(1)(C) as a basis of statutory construction to support the traditional interpretation of 209(b)(1)(B), EPA nevertheless believes it is supportive. EPA notes that the term ''such state standards'' in 209(b)(1)(C) allows the Agency, in appropriate circumstances, to review the consistency of CARB's suite of standards, for a particular vehicle category, with section 202(a). For example, EPA evaluated all of the standards (LEV III criteria pollutant, ZEV sales mandate, and GHG standards) of the ACC program in recognition of the aggregate costs and lead time associated with CARB's standards as well as technologies that may be employed to meet more than one standard. 78 FR 2131–45. EPA's assessment under 209(b)(1)(C) is not in practice a standard-by-standard review. EPA believes it appropriate to read the entirety of 209 together, along with its purposes, in order to

properly interpret its components such as 209(b)(1)(B).

[267] 74 FR at 32763–65; 76 FR at 34693; 79 FR at 46256; 81 FR at 95982.

[268] SAFE 1 also relied on *UARG* v. *EPA*, 134 S. Ct. 2427 (2014), where the Supreme Court disagreed with the Agency's decision to regulate all sources of GHG under Titles I and V as the consequence of the Agency's section 202(a) endangerment finding for motor vehicle GHG emissions. In EPA's view upon reconsideration of SAFE 1, *UARG* is distinguishable because here the Agency is acting under a specific exemption to section 202(a) that allows for California to set its own standards for motor vehicle GHG standards under California state law, and thus, regulate major sources of GHG emissions within the State. California's authority to promulgate standards is neither contingent nor dependant on the Agency's section 202(a) endangerment finding for GHG. *See* 74 FR at 32778–80; 79 FR at 46262. Moreover, as discussed above, EPA's waiver authority under section 209(b) is coextensive with preemption under section 209(a). *See MEMA I*, 627 F.2d at 1107. UARG is inapplicable to the scope of preemption under section 209(a).

[269] 84 FR at 51341.

[270] *Id.* at 51337.

[271] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014).

The second HD GHG emissions standard waiver related to CARB's ''Phase I'' regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

[272] *See* States and Cities at 24 (quoting *Clark* v. *Martinez*, 543 U.S. 371, 382 (2005) and citing *U.S.* v. *Santos*, 553 U.S. 507, 522 (2008); *U.S. Dep't of the Treasury* v. *FLRA*, 739 F.3d 13, 21 (D.C. Cir. 2014)). The commenter notes that in the SAFE 1 brief, EPA claimed that its new approach to section 209(b)(1)(B) would apply ''for all types of air pollutants'' but EPA could point to nowhere in SAFE 1 decision where this was said. *Id.* at 25. And ''only two sentences later,'' EPA acknowledged that its review under this second prong would change ''depending upon which 'air quality concerns' were implicated.'' *Id.*

[273] H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977); 49 FR at 18890 n.24.

[274] CAA section 209(b)(1)(B) (emphasis added).

[275] Section 211(c)(4)(C) allows EPA to waive preemption of a state fuel program respecting a fuel characteristic or component that EPA regulates through a demonstration that the state fuel program is necessary to achieve a NAAQS.

[276] 49 FR at 18890.

[277] *Id.* at 18890 n.24.

Similarly, nothing in either section 209 or legislative history can be read as requiring EPA to grant GHG standards waiver requests only if California's GHG pollution problem is the worst in the country.[278] "There is no indication in either the statute or the legislative history that . . . the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial." [279] And most certainly, nothing in either section 209 or the legislative history can be read as calling for EPA to draw a comparison between California's GHG pollution problem and the rest of the country (or world) when reviewing California's need for GHG standards. Instead, the crucial consequence of the 1977 Amendment was to require waiver grants for California's specific standards that are part of the State's overall approach to reducing vehicle emissions to address air pollution even if those specific standards might not be needed to address compelling and extraordinary conditions.[280] Thus, "even if it were true that California's [GHG] problem is, . . . no worse than some other areas of the country, this does not mean that [GHG] do not pose a special problem in California." [281] Rather, "EPA's practice [is] to leave the decisions on controversial matters of public policy, such as whether to regulate [GHG] emissions, to California." [282]

In addition, in Title II, Congress established only two programs for control of emissions from new motor vehicles: EPA emission standards adopted under the Clean Air Act and California emission standards adopted under its state law. And states other than California may not "tak[e] any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so-called 'third vehicle.' " [283]

As previously explained, and noted in the Notice of Reconsideration, since the grant of the initial GHG waiver request in 2009, the Agency has applied the traditional interpretation in granting two additional waivers for CARB's Heavy-Duty Vehicle GHG emission standards and these GHG standards are now part of California's motor vehicle program, but EPA did not address these waivers in SAFE 1.[284] It also bears note that, given the limited analysis and application of the SAFE 1 interpretation of the second waiver prong, it is uncertain whether the traditional interpretation remains otherwise applicable to earlier model year GHG standards under prior waivers. Ambiguity also applies to SAFE 1's interpretation of this prong in respect to all criteria pollutant standards in the ACC program. While SAFE 1 stated it was only applicable to the GHG standards at issue, in at least one instance the Agency indicated that the SAFE 1 interpretation could also be applicable to future evaluation of waiver requests for criteria pollutant standards.[285] This uncertainty between these statements in SAFE 1 further highlights the inappropriateness of the new interpretation of the second prong.

In sum, for the reasons noted above, EPA is withdrawing the SAFE 1 interpretation and reinstating certain aspects of the ACC program waiver that were earlier granted under the traditional interpretation and approach. EPA concludes it erred by not properly evaluating the statutory interpretation of section 209, the associated legislative history including the policy deference that should be afforded to California to address its serious air quality problems and to serve as a laboratory for the country, and because the "need" for a motor vehicle emission program and related standards within the program are necessarily better viewed as a comprehensive and interrelated effort to address the range of air quality problems facing California.[286] At the same time, EPA notes that the traditional interpretation is reasonable and consistent with the text, structure and congressional intent and purpose of section 209(b) and EPA is thus confirming that the traditional interpretation of section 209(b)(1)(B) was appropriate and is, at least, the better interpretation.[287]

## 2. California Needs the GHG Standards and ZEV Sales Mandate Even Under the SAFE 1 Interpretation

Even if the SAFE 1 interpretation of section 209(b)(1)(B) was appropriate, the record of both the ACC program waiver and SAFE 1 proceeding demonstrate that California has a need for the GHG standards and ZEV sales mandate at issue under the SAFE 1 interpretation as well. The opponents of the waiver (including EPA in SAFE 1) did not met their burden of proof to demonstrate that California does not need its GHG emission standards and ZEV sales mandate, whether individually or as part of California's motor vehicle emission program, to meet compelling and extraordinary conditions.[288]

[278] Id. at 18891.

[279] Ford Motor Co., v. EPA, 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[280] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual federal standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards.' "); "[T]he 1977 amendments significantly altered the California waiver provision." Ford Motor Co., 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[281] 49 FR at 18890.

[282] 43 FR at 25735.

[283] Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation, 17 F.3d 521, 526, 528 (2d Cir. 1994).

[284] 79 FR 46256 (August 7, 2014); 81 FR 95982 (December 29, 2016).

[285] 84 FR at 51341 n.263. "EPA determines in this document that GHG emissions, with regard to the lack of a nexus between their State-specific sources and their State specific impacts, and California's GHG standard program, are sufficiently distinct from criteria pollutants and traditional, criteria pollutant standards, that it is appropriate for EPA to consider whether California needs its own GHG vehicles emissions program. EPA does not determine in this document and does not need to determine today how this determination may affect subsequent reviews of waiver applications with regard to criteria pollutant control programs." (Emphasis added). See also id. at 51344 n.268 ("EPA is adopting an interpretation of CAA section 209(b)(1)(B), specifically its provision that no waiver is appropriate if California does not need standards "to meet compelling and extraordinary conditions," similar to the interpretation that it adopted in the 2008 waiver denial but abandoned in the 2009 and 2013 waiver grants, and applying that interpretation to determine to withdraw the January 2013 waiver for California's GHG and ZEV program for model years 2021 through 2025"), and at 51346 ("EPA therefore views this interpretation and application of CAA section 209(b)(1)(B) set forth here as, at minimum, a reasonable one that gives appropriate meaning and effect to this provision.").

[286] As noted previously, in the context of evaluating the "need" for California's motor vehicle emission standards the Agency is informed by the legislative history from 1967 and 1977, whereby California is properly viewed as a laboratory for the country and that its policy decisions on how best to address its serious air quality issues, and that deference on the question of "need" is in order. Therefore, EPA believes it misapplied the concept of deference in the context of the second waiver prong application in SAFE 1. See e.g., 84 FR at 51344 n.268. While EPA believes it appropriate to not defer when it is interpreting its own statute, the Agency nevertheless determines that California's policy choices in term of its "need" in how best to address compelling and extraordinary conditions in California requires deference by the Agency. This is consistent with EPA's longstanding waiver practice and its integration of the legislative history behind section 209. In any event, EPA would reach the same conclusions regarding the second waiver prong even if it did not defer to California regarding the nature of its air quality problems. 86 FR at 74489 ("The 2009 Endangerment Finding further explained that compared with a future without climate change, climate change is expected to increase tropospheric ozone pollution over broad areas of the U.S., including in the largest metropolitan areas with the worst tropospheric ozone problems, and thereby increase the risk of adverse effects on public health (74 FR 66525)."). See also 86 FR at 74492.

[287] "The interpretation that my inquiry under (b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[288] EPA notes that by this action it is rescinding the interpretation of section 209(b)(1)(B) as set forth in SAFE 1. Nevertheless, EPA believes it appropriate to address comments received that suggest the SAFE 1 interpretation was not only

As previously explained, the 1977 CAA Amendments allow California to promulgate standards that might not be considered needed to meet compelling and extraordinary circumstances but would nevertheless be part of California's overall approach of reducing vehicle emissions to address air pollution in California.[289] Thus, CARB may now design motor vehicle emission standards, individually, that might sometimes not be as stringent as federal standards but collectively with other standards would be best suited for California air quality problems because under the 1977 Amendments, California can "include some less stringent [standards] than the corresponding federal standards."[290] And EPA is "required to give very substantial deference to California's judgments on this score."[291]

Indeed, as EPA noted in the ACC program waiver, Congress intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems that exist in California, whether or not those problems are only local or regional in nature, and to protect the health and welfare of its citizens:

Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.[292]

In the context of implementing section 209(b)(1)(B) and assessing the "need" for California's standards even under the SAFE 1 interpretation, EPA sees no reason to distinguish between "local or regional" air pollutants versus other pollutants that may be more globally mixed. Rather, it is appropriate to acknowledge that all pollutants and their effects may play a role in creating air pollution problems in California and that EPA should provide deference to California in its comprehensive policy choices for addressing them. Again, even if a new interpretation of section 209(b)(1)(B) were appropriate in SAFE 1, and EPA believes it is not, it is important to note that historically, criteria pollutant reductions have been relevant to section 209(b)(1)(B). As previously noted, nothing in section 209(b) can be read as calling for EPA to waive preemption only if California seeks to enforce criteria pollutant standards. The Administrator is required to waive the preemption in section 209(a) unless California "does not need *such State standards to meet compelling and extraordinary conditions.*"[293] As also previously noted this is in stark contrast to, for example, section 211(c)(4)(C), which calls for a waiver of preemption only if a state demonstrates that a fuel program will result in criteria pollutant reductions that will enable achievement of applicable NAAQS.

The first section below focuses on criteria pollution reduction, which has long been relevant to section 209(b)(1)(B). EPA has never put in doubt that California's serious criteria air pollution problems (such as NAAQS nonattainment and the factors that give rise to those conditions, including the geographic and climate conditions in the State, the number of motor vehicles in California, and local and regional air quality) are "compelling and extraordinary," or that California "needs" regulations that address such emissions in order to achieve every fraction of criteria pollutant emissions it can achieve.[294] The factual record before the Agency in 2013 and again in 2019 includes ample documentation of criteria emission reductions from California's GHG standards and ZEV

sales mandate.[295] Nothing in the record is sufficient to demonstrate that California does not need the ACC program (or the motor vehicle emission program) or, in the context of the SAFE 1 interpretation, the specific GHG emission standards and the ZEV sales mandate to meet compelling needs related to criteria pollution. These benefits have a clear connection to California's "need" for its specific GHG standards and ZEV sales mandate, at issue under the waiver. The second section below focuses on the GHG reduction benefits of California's GHG standards and ZEV sales mandate. EPA acknowledges that California is particularly impacted by climate change, including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat, and that climate-change impacts in California are therefore "compelling and extraordinary conditions" for which California needs the GHG standards and ZEV sales mandate.

a. GHG Standards and ZEV Sales Mandates Have Criteria Emission Benefits

As shown below, criteria pollutant reductions are demonstrably connected to California's "need" for its GHG standards and ZEV sales mandate at issue under the waiver.[296] EPA first concluded that there is a "logical link between the local air pollution problem

---

correct, but that the factual record supported the SAFE 1 withdrawal of the ACC waiver based on this interpretation.

[289] *See Ford Motor Co.,* v. *EPA,* 606 F.2d 1293, 1296–97 (D.C. Cir. 1979); See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977).

[290] 43 FR 25729, 25735 (June 14, 1978). See *Ford Motor Co.,* 606 F.2d at 1296–97.

[291] 40 FR at 23104. See also LEV I (58 FR 4166 (January 13, 1993)) Decision Document at 64.

[292] 78 FR at 2128–29. *See* "Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California." Publication # CEC–500–2012– 007. Posted: July 31, 2012; available at *https://uccarn.edu/sites/Jackson_Lab/files/155618.pdf* at 4 ("Higher temperatures also increase ground-level ozone levels. Furthermore, wildfires can increase particulate air pollution in the major air basins of California. Together, these consequences of climate change could offset air quality improvements that have successfully reduced dangerous ozone concentrations. Given this "climate penalty," as it

is commonly called, air quality improvement efforts in many of California's air basins will need to be strengthened as temperatures increase in order to reach existing air quality goals.").

[293] CAA section 209(b)(1)(B) (emphasis added).

[294] In SAFE 1, EPA found that California's criteria pollution conditions remain "compelling and extraordinary and that California needs standards to produce any and all reductions in criteria pollutant emissions." 84 FR at 51344, 51346.

[295] When California originally adopted a ZEV sales mandate into its regulations, a significant factor in support of its action was addressing criteria pollutant emissions. In SAFE 1 EPA acknowledged that California's ZEV mandate initially targeted only criteria pollution. 84 FR at 51329. EPA's 2013 waiver grant recognized that with California's ACC program California had shifted to relying on the ZEV requirements to reduce both criteria and GHG pollution. 78 FR at 2114.

[296] In response to comments arguing that upstream emission benefits should not be considered in determining the criteria pollutant benefits of CARB' standards or that it is inappropriate to elevate stationary source criteria pollutant emissions into a make-or-break factor in waivers for motor vehicle emission programs, EPA believes it appropriate to reiterate the air quality problems facing California, as evidenced by NAAQS attainment challenges. Waiver practice and applicable case law, as previously noted, afford California wide deference in its policy and regulatory approaches in addressing these challenges. Therefore, EPA believes that to the degree a nexus between CARB's standards and addressing its serious air quality problems is required, that it is reasonable to base the need on related criteria emission impacts. EPA notes that, in setting its federal light-duty vehicle GHG standards, it is afforded discretion under the CAA to consider upstream emission impacts and does include such consideration in its own rulemakings. 77 FR 62624, 62819 (October 15, 2012) (taking fuel related upstream GHG emissions into account in setting compliance values for vehicle GHG emissions standards).

JA-33

of ozone and GHGs'' in the 2009 California GHG waiver by explaining, for instance, that ''the impacts of global climate change can nevertheless exacerbate this local air pollution problem.'' [297] Moreover, as previously explained, in two additional GHG waiver requests and associated EPA waiver decisions since the 2009 GHG waiver, EPA acknowledged that CARB had demonstrated the need for GHG standards to address criteria pollutant concentrations in California. In the 2014 HD GHG waiver request, CARB projected, for example, ''reductions in $NO_X$ emissions of 3.1 tons per day in 2014 and one ton per day in 2020'' in California.[298]

In SAFE 1, EPA distinguished prior GHG waivers from the ACC program GHG waiver solely on grounds of how CARB attributed the pollution benefits in its waiver request. EPA explained that CARB had linked those prior waived GHG standards to criteria pollutant benefits but had not done so in the ACC program waiver request: ''California's *approach* in its ACC program waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified $NO_X$ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment.'' [299] Moreover, how CARB attributes the pollution reductions for accounting purposes from its various standards does not reflect the reality of how the standards deliver

emissions reductions and should not drive whether or not a waiver can be withdrawn. EPA believes, based on its historical deference to CARB in waiver proceedings, that CARB is entitled to this discretion.

EPA also believes that prior waiver decisions indicate that the ''approach'' taken by California in its waiver requests needs to be carefully assessed and understood by the Agency before discounting the benefits of its mobile source emission standards. The characterization of CARB's ''approach,'' as not calling out criteria emissions benefits (such as upstream criteria emission benefits) of GHG standards, was incorrect and should not have undermined EPA's findings and grant of the initial ACC program waiver request for the following reasons: (1) As previously noted, the ACC program standards are interrelated and all serve to reduce both criteria and GHG pollution; (2) CARB conducted a combined emissions analysis of the elements of the ACC program because the program was designed to work as an integrated whole; and (3) EPA has always considered California's standards as a whole or ''in the aggregate'' under the traditional interpretation of section 209(b)(1)(B).[300] EPA noted the associated criteria pollutant and GHG emissions benefits for the whole ACC program: ''the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the pre-existing federal standards.'' [301] EPA also made the requisite finding that California's protectiveness finding for the ACC program was not arbitrary and capricious, under section 209(b)(1)(A), by explaining that ''California's ZEV and GHG emission standards are an addition to its LEV program.'' [302]

In SAFE 1, EPA further asserted that ''California's responses to the SAFE proposal do not rebut the Agency's views that the ZEV standards for MY 2021–2025 are inextricably interconnected with the design and purpose of California's overall GHG reduction strategy.'' [303] For the following reasons, however, EPA was also incorrect in the assessment of criteria emission benefits of CARB's ZEV sales mandate. EPA focused on only the following snippet from one salient paragraph in CARB's 2012

waiver request as support for the lack of criteria emissions benefits: ''There is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles.'' [304] But, as discussed above, that was merely an attribution of benefits and did not reflect the practical reality of how California's standards work. Moreover, the paragraph in its entirety goes on to explain that CARB's ZEV sales mandate would achieve criteria emission reductions: ''However, since upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production.'' [305]

It bears note that this attribution of criteria pollutant reductions was similar to the one that CARB made almost a decade ago for the 2009 GHG waiver request.[306] For example, CARB provided ''extensive evidence of its current and serious air quality problems and the increasingly stringent health-based air quality standards and federally required state planning efforts to meet those standards firmly.'' [307] The States and Cities also commented that ''the attribution CARB made as part of its waiver request was never intended to, and did not, establish the absence of any

---

[297] 74 FR at 32763. According to California, ''California's high ozone levels–clearly a condition Congress considered–will be exacerbated by higher temperatures from global warming . . . [T]here is general consensus that temperature increases from climate change will exacerbate the historic climate, topography, and population factors conducive to smog formation in California, which were the driving forces behind Congress's inclusion of the waiver provision in the Clean Air Act.'' *Id.* (quoting comments submitted by CARB during the 2009 reconsideration). CARB also explained that ''the factors that cause ozone are primarily local in nature and [ ] ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. Whether or not local conditions are the primary cause of elevated concentrations of greenhouse gases and climate change, California has made a case that its greenhouse gas standards are linked to amelioration of California's smog problems . . . . There is a logical link between the local air pollution problem of ozone and California's desire to reduce GHGs as one way to address the adverse impact that climate change may have on local ozone conditions.'' *Id.*

[298] 79 FR at 46261. See *also* 81 FR at 95985–86 n.27 (referencing Resolution 13–50's statements supporting California's continued need for its own motor vehicle program in order to meet serious ongoing pollution problems).

[299] 84 FR at 51337 n.252 (citing 79 FR at 46256, 46257 n.15, 46261, 46262 n.75).

[300] ZEV ISOR, EPA–HQ–OAR–2012–0562–0008 at 72; CARB Supplemental Comments, EPA–HQ–OAR–2012–0562–0373 at 3.

[301] 74 FR at 2122.

[302] *Id.* at 2125.

[303] 84 FR at 51337.

[304] *Id.* at 51337, 51330, 51337, 51353–54, 51356, 51358.

[305] 2012 Waiver Request at 15–16. CARB also noted that criteria and PM emission benefits will vary by region throughout the State depending on the location of emission sources. Refinery emission reductions will occur primarily in the east Bay Area and South Coast region where existing refinery facilities operate. As refinery operations reduce production and emissions, the input and output activities, such as truck and ship deliveries, will also decline. This includes crude oil imported through the Los Angeles and Oakland ports, as well as pipeline and local gasoline truck distribution statewide. EPA again notes that in its light-duty vehicle GHG rulemaking in 2012 it also noted the upstream emission impacts. 77 FR at 62819.

[306] ''The establishment of greenhouse gas emission standards will result in a reduction in upstream emissions (emission due to the production and transportation of the fuel used by the vehicle) of greenhouse gas, criteria and toxic pollutants due to reduced fuel usage.'' EPA–HQ–OAR–2006–0173–0010.107 at 8.

[307] CARB, EPA–HQ–OAR–2012–0562–0371. CARB estimated benefits of the ZEV and GHG standards for calendar years by which the South Coast air basin must meeting increasingly stringent NAAQS for ozone: 2023, 2031, and 2037. States and Cities app. A at 2–4, app. C at 8–9.

vehicular emission benefits from the ZEV standard." EPA believes that CARB's statement was merely a "simplification that distinguished the standards based on the *primary* objectives of the two, complementary standards." [308] EPA agrees that the record from 2013, and 2019, demonstrates that CARB's attribution of short-term emissions benefits did not undercut the long-term ZEV vehicular emission benefits of the ZEV standards. Thus, regardless of how the emissions reductions are attributed, the GHG standards and ZEV sales mandate drive reductions in criteria pollution.

EPA has also consistently explained that "consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions . . . consider[ed] under section 209(b)." [309] And so, as earlier noted, any reconsideration of a prior waiver decision must comport with criteria in section 209(b)(1) as well as have record support. Moreover, in prior waiver requests for ZEV sales mandate requirements, CARB has discussed criteria pollutant emissions reductions because of the mandate for sale of vehicles that have zero emissions. [310] CARB's 2012 waiver request also indicated the clear intent regarding the evolution of the ZEV program and California's decision to focus both on criteria pollutant and GHG reductions. [311] EPA's reading of and reliance on the snippet from CARB's waiver request describing the ZEV sales mandate requirements in the ACC program was both incorrect and improper, as well as contrary to congressional intent and EPA's historic practice of affording broad discretion to California in selecting the best means for addressing the health and welfare of its citizens.

b. California Needs Its Standards To Address the Impacts of Climate Change in California

Under section 209(b)(1)(B), EPA is to grant a waiver request unless California

does not need the standards at issue to address "compelling and extraordinary conditions." In applying the traditional approach, EPA has consistently reasoned that "compelling and extraordinary conditions" refers primarily to the factors that tend to produce higher levels of pollution in California—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. [312] These conditions continue to exist in California and CARB, since the initial 2009 GHG waiver, has consistently drawn attention to the existential crisis that California faces from climate change and maintained that air quality issues associated with GHG emissions have exacerbated this crisis and have yet to attenuate. [313]

EPA now recognizes that CARB, as part of its original waiver request and in comments in response to SAFE 1, submitted ample evidence of multiple ways California is particularly impacted by climate change, including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat; in other words that GHG emissions contribute to local air pollution, and that climate-change impacts in California are "compelling and extraordinary conditions." For example, CARB noted that "[r]ecord-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack— California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the State so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems." [314]

Within the ACC waiver request, CARB provided a summary report on the third assessment from the California Climate Change Center (2012), which described dramatic sea level rises and increases in temperatures in California and associated impacts on local air quality and other conditions in California. [315]

To the extent that SAFE 1 relied on the premise that GHG emissions from motor vehicles located in California become globally-mixed as part of global climate change, and therefore do not pose a local air quality issue (placing aside the impacts of heat on ozone as

---

[308] States and Cities at 31 (original emphasis).

[309] 74 FR at 32748. *See also* 78 FR at 2115.

[310] 71 FR 78190 (December 28, 2006); 75 FR 11878 (March 12, 2010) and 76 FR 61095 (October 3, 2011).

[311] *See* 2012 Waiver Request at 2. At the December 2009 hearing, the Board adopted Resolution 09–66, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies. The Board further directed staff to consider shifting the focus of the ZEV regulation to both GHG and criteria pollutant emission reductions, commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly.

[312] 49 FR at 18890 (citing legislative history).

[313] 2012 Waiver Request at 1.

[314] CARB supplemental comment at EPA–HQ– OAR–2012–0562–0371. CARB notes that EPA's reasoning that the "compelling and extraordinary conditions" criteria should be viewed as a "program as a whole" was upheld as "eminently reasonable" in *ATA* v. *EPA*, 600 F.3d 624, 627–29 (D.C. Cir. 2010), and that the ACC program appropriately integrates the passenger vehicle program to address multiple pollutant types, which also reflects the intent of Congress in 1977 to broaden California's discretion to adjust its program as needed (*Ford Motor Co.* v. *EPA*, 606 F.2d at

1294). This comment extensively lays out the compelling and extraordinary conditions associated with California's air quality challenges and the need to reduce criteria emissions and greenhouse gas emissions associated with CARB's ZEV sale mandate and GHG standards. *Id.* at 5 ("This critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air) demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements.").

[315] 78 FR at 2129 ("To the extent that it is appropriate to examine the need for CARB's GHG standards to meet compelling and extraordinary conditions, as EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California. In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California. CARB notes that 'Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous— is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems.") ("Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California. Publication # CEC–500–2012– 007. Posted: July 31, 2012; available at *http:// www.climatechange.ca.gov/adaptation/third- assessment*"). EPA also noted that "the better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long-range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs." 78 FR at 2128.

JA-35

well as air quality impacts from the dramatic increase in wildfires), EPA notes that in addition to the record from the ACC waiver proceeding noted above, the SAFE 1 record contains sufficient and unrefuted evidence that there can be locally elevated carbon dioxide concentrations resulting from nearby carbon dioxide emissions.[316] This can have local impacts on, for instance, the extent of ocean acidification.[317] Thus, like criteria pollution, emissions of GHGs can lead to locally elevated concentrations with local impacts, in addition to the longer-term global impacts resulting from global increases in GHG concentrations.

Finally, in demonstrating the need for GHG standards at issue, CARB attributed GHG emissions reductions to vehicles in California. For instance, "CARB project[ed] that the standards will reduce car $CO_2$ emissions by approximately 4.9%/year, reduce truck $CO_2$ emissions by approximately 4.1%/year (the truck $CO_2$ standard target curves move downward at

approximately 3.5%/year through the 2016–2021 period and about 5%/year from 2021–2025), and reduce combined light-duty $CO_2$ emissions by approximately 4.5%/year from 2016 through 2025." [318] CARB also projected that its GHG emissions standards for MYs 2017–2025 will reduce fleet average $CO_2$ levels by about 34 percent from MY 2016 levels of 251 g/mile down to about 166 g/mile, based on the projected mix of vehicles sold in California.[319] CARB further noted that there might be a GHG emission deficit if only the Federal GHG standards were implemented in California.[320] The GHG emissions from California cars, therefore, are particularly relevant to both California's air pollution problems and GHG standards at issue.

In SAFE 1, EPA dismissed California's "need" for the GHG standards at issue because their impact on GHG emissions would be too small to "meaningfully address global air pollution problems of the sort associated with GHG emissions": "[T]he most stringent regulatory alternative considered in the 2012 final rule and [Final Regulatory Impact Analysis] . . . , which would have required a seven percent average annual fleetwide increase in fuel economy for MYs 2017–2025 compared to MY 2016 standards, was forecast to decrease global temperatures by only 0.02 °C in 2100." [321] EPA also received similar comments in response to the Notice of Reconsideration. But since the inception of the waiver program, EPA has never applied a test to determine whether a California waiver request under 209(b)(1) would independently solve a pollution problem. EPA has never applied a *de minimis* exemption authority to California waiver request under section 209(b)(1).[322] EPA believes there is no basis for exercise of such a test under section 209(b), considering that CARB continues to maintain that emissions reductions in California are essential for meeting the NAAQS.[323] EPA has reiterated that "California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's

judgment, to great deference." [324] As the Supreme Court has recognized, "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." [325] And so, in the ACC program waiver decision, EPA also explained that "[t]he issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209." [326]

Further, nothing in either section 209 or the legislative history could be read as requiring EPA to grant GHG standards waiver requests only if California's GHG pollution problem is the worst in the country.[327] CARB further demonstrated a "need" for its GHG standards by projecting GHG emissions reductions deficits from implementation of only the Federal GHG program in California. "[I]f a National Program standard was theoretically applied only to California new vehicle sales alone, it might create a GHG deficit of roughly two million tons compared to the California standards." [328]

## 3. California's ZEV Sales Mandate as Motor Vehicle Control Technology Development

Congress also envisioned that California's other role under section 209(b) would be an innovative laboratory for motor vehicle emission

---

[316] CARB comment at EPA–HQ–OAR–2018–0283–5054 at 305–06 (California's Fourth Climate Assessment; *https://www.energy.ca.gov/sites/default/files/2019-12/Governance_External_Ekstrom_ada.pdf*).

[317] See, for example, reports from California's Fourth Climate Change Assessment, "California Mussels as Bio-indicators of Ocean Acidification," *available at https://www.energy.ca.gov/sites/default/files/2019/Oceans_CCCA4-CNRA-2018-003_ada.pdf* ("Because of the coupling between natural (upwelling-driven) and anthropogenic (CO2 emission-driven) processes, California waters are already experiencing declines in pH that are not expected in other areas of the world's oceans for decades (Feely et al. 2008; Chan et al. 2017). These perturbations to seawater chemistry join others associated with changing seawater temperatures (García-Reyes and Largier 2010) and reductions in ocean oxygenation (Bograd et al. 2008; Chan et al. 2008). Therefore, marine communities along the coast of California are increasingly subjected to a suite of concurrent environmental stressors. Substantial impetus exists to understand, quantify, and project biological and ecological consequences of these stressors, which current work suggests may be pervasive and diverse (Kroeker et al. 2010, 2013; Gaylord et al. 2015)."). Further, evidence in the record from a 2019 study demonstrated that locally enhanced carbon dioxide concentrations above Monterey Bay, California, fluctuate by time of day likely because of the magnitude of nearby urban carbon dioxide pollution and the effects of topography on offshore winds, and that this fluctuation increases the expected rate of acidification of the Bay. *See* Northcott, et al., *Impacts of urban carbon dioxide emissions on sea-air flux and ocean acidification in nearshore waters,* PLoS ONE (2019). For decades, the monthly average carbon dioxide concentrations off California's coast have been consistently higher and more variable than those at Mauna Loa (which are commonly used as the global measurements). In fact, another more recent study shows that the waters of the California Current Ecosystem, off the coast of Southern California, have already acidified more than twice as much as the global average. *E.g.,* Cal. Office of Environmental Health Hazard Assessment, *Atmospheric Greenhouse Gas Concentrations* (Feb. 11, 2019).

[318] 78 FR at 2139.

[319] *Id.* at 2135.

[320] *Id.* at 2122.

[321] 84 FR at 51349.

[322] *See, e.g.,* 74 FR at 32766 ("As noted by the Supreme Court in *Massachusetts* v. *EPA,* while it is true that regulating motor vehicle GHG emissions will not by itself reverse global warming, a reduction in domestic automobile emissions would slow the pace of global emissions increase no matter what happens with regard to other emissions.").

[323] *See Alabama Power Co.* v. *Costle,* 636 F.2d 323, 360–66, n.89 (D.C. Cir. 1979).

[324] 74 FR at 32766 ("Under this approach, there is no need to delve into the extent to which the GHG standards at issue here would address climate change or ozone problems. That is an issue appropriately left to California's judgment. . . . Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference.").

[325] *Massachusetts* v. *EPA,* 549 U.S. 497, 524 (2007).

[326] 78 FR at 2134.

[327] 49 FR at 18891.

[328] 78 FR at 2122 (citing EPA–HQ–OAR–2012–0562–0374 at 3). CARB also noted that "to the extent a manufacturer chooses not to exercise their National Program compliance option in California this would actually provide additional GHG benefits in California, so compliance in California can never yield fewer cumulative greenhouse gas reductions from the industry wide fleet certified in California." *Id.* at 2122 n.61.

standards and control technology. California is to serve as "a kind of laboratory for innovation" [329] and to "blaze its own trail with a minimum of federal oversight.[330] California's "unique [air pollution] problems and [its] pioneering efforts justif[ied] a waiver of the preemption section." [331] Congress stressed that California should serve the Nation as a "testing area" for more protective standards." [332] In the 2009 GHG waiver, for example, EPA explained that "the basic nature of the compromise established by Congress [is that] California could act as the laboratory for the nation with respect to motor vehicle emission control, and manufacturers would continue to face just two sets of emissions standards— California's and EPA's." [333] California's ZEV sales mandates have so far supported development of technologies such as battery electric and fuel cell vehicles that embody the pioneering efforts Congress envisaged. EPA acknowledged this important role in the ACC program waiver by explaining that California needs the ZEV sales mandate requirement to ensure the development and commercialization of technology required for the future, deeper vehicular emission reductions California will have to attain to meet its NAAQS obligations as well as achieve other long-term emission goals of new vehicle sales between 2040 and 2050.[334] In SAFE 1, however, EPA did not consider this additional role carved out in section 209(b)(1) for California as a proven ground for motor vehicle control emissions technology.[335]

In sum, while nothing in section 209 or the legislative history limits EPA's waiver authority to standards that reduce criteria pollution,[336] analyses in this section again recognize the way the different requirements in the ACC program work together to reduce criteria

and GHG pollution and spur technological innovation. These analyses conclude that GHG pollution exacerbates tropospheric ozone pollution, worsening California's air quality problems, and the manner in which GHG and criteria pollutant standards work together to reduce both forms of pollution. Ample record support exists on California's need for both GHG standards and ZEV sales mandate at issue to address compelling and extraordinary conditions in California. As noted above, in SAFE 1 EPA, however, relied on an excerpt of the ACC program waiver record to determine the lack of criteria emission benefits of GHG emission standards and ZEV sales mandate at issue. In doing so, EPA did not evaluate the complete record from the ACC waiver proceeding and the nature of California's air quality problem, including the relationship of climate change to California's ability to achieve the ozone NAAQS in the assessment of California's need for these requirements.[337]

As noted above, in SAFE 1, EPA established a new test under section 209, requiring a particularized, local nexus between (1) pollutant emissions from sources, (2) air pollution, and (3) resulting impact on health and welfare, a test that would exclude GHG pollution from the scope of the waiver.[338] But this test is found nowhere in the text of section 209— the statute does not contain this requirement, or even use these terms.

EPA's review of the complete record confirms the Agency's conclusions in the ACC program waiver that California needs the GHG standards at issue to meet a compelling and extraordinary conditions regardless of whether the Agency focuses on criteria or greenhouse gas pollution reduction.

This review also indicates that opponents of the waiver (including EPA in SAFE 1) did not meet the burden of proof necessary to demonstrate that California did not have a need for the GHG standards, including under the nexus test applied in SAFE 1. It also bears note that EPA's longstanding practice, based on the statutory text, legislative history, and precedent calls for deference to California in its approach to addressing the interconnected nature of air pollution within the state and is not limited to criteria pollutant problems. Critically, EPA is not to engage in "probing substantive review" of waiver requests,[339] but rather "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [340]

*E. Conclusion*

Considering the text, legislative history, and precedent that support the Agency's historical practice of interpreting section 209(b)(1)(B) as calling for a program-level evaluation of waiver requests, as well as the uncertainty in settled expectations created by the SAFE 1 interpretation, EPA rescinds its actions in SAFE 1 regarding both the interpretation of section 209(b)(1)(B) and the findings regarding California's need for the GHG standards and ZEV sales mandate. EPA believes that the burden of proof had not been met in SAFE 1, based on the complete factual record, to demonstrate that California did not have a need for the GHG standards and ZEV sales mandate under the SAFE 1 interpretation of the second waiver prong nor had the burden been met to support a finding that the ample evidence in the record at the time of the ACC waiver decision did not demonstrate that California had a need for its standards to meet compelling and extraordinary conditions. As noted above, the result of the recission of the SAFE 1 action is the reinstatement of the ACC program waiver. EPA confirms the traditional interpretation of section 209(b)(1)(B) was appropriate and continues to be, at least, a better interpretation regardless of the recission of the SAFE 1 interpretation of this criterion.[341]

---

[329] *MEMA I*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).

[330] *Ford Motor Co.*, v. *EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

[331] S. Rep. No. 90–403, at 33 (1967).

[332] *Id.*

[333] 74 FR at 32763.

[334] 78 FR at 2123, 2130–31.

[335] 84 FR at 51343 ("[I]n a statute designed to address public health and welfare, it certainly cannot mean standards that allow a state to be "a laboratory for innovation" in the abstract, without any connection to a need to address pollution problems.").

[336] The Agency again notes that, unlike provisions of the CAA such as section 211(c)(4)(C) which allows EPA to waive preemption of a state fuel program respecting a fuel characteristic or component that EPA regulates through a demonstration that the state fuel program is necessary to achieve a NAAQS, section 209(b) makes no mention of NAAQS pollutants or otherwise indicates that air pollutants should be treated differently.

[337] For example, CARB's ISOR for its ZEV standards identifies at Table 6.2 the well to wheel emission benefits of the ZEV program compared to the LEV III program. ZEV ISOR, EPA–HQ–OAR–2012–0562–0008 at 78. *See also* 2012 Waiver Request at 16. CARB noted in its comments on the SAFE proposal that "Rising temperatures exacerbate California's ozone problem by increasing ground-level ozone concentrations." CARB, EPA–HQ–OAR–2018–0283–5054 at 371–72 (citing the 2012 Waiver Request). In addition, "Several studies indicate that a warming climate is expected to exacerbate surface ozone in California's two major air basins: South Coast Air Basin and San Joaquin Valley. *Id.* at 372 (citing Jacob & Winner. *Effect of Climate Change on Air Quality*, 43:1 ATMOS. ENVIRON. 51 (Jan. 2009); Wu, et al., *Effects of 2000–2050 Global Change on Ozone Air Quality in the United States*, 113, D06302, J. GEOPHYS. RES.-ATMOS. (Mar. 19, 2008), *available at https://doi.org/10.1029/2007JD008917;* Rasmussen, et al., *The Ozone-climate Penalty: Past, Present, and Future*, 47:24 ENVTL. SCI. & TECH. 14258 (Dec. 17, 2013), *available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3990462/*).

[338] 84 FR at 51339–40.

[339] *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[340] *MEMA II*, 142 F.3d 449, 453 (D.C. Cir. 1998).

[341] *See* 84 FR at 51344 n.269.

JA-37

## VI. EPA Inappropriately Considered Preemption Under the Energy Policy and Conservation Act (EPCA) in Its Waiver Decision

SAFE 1's other justification for withdrawing the ACC program waiver was that California's GHG standards and ZEV sales mandate were preempted under EPCA. As explained in detail in Section IV, EPA believes this basis for reconsideration was outside the appropriate bounds of EPA's authority to reconsider previously granted waivers. In particular, if EPA could reconsider and withdraw a waiver based on a factor not contained in the specified criteria for denial in section 209(b)(1), EPA could circumvent the specified criteria for denial via reconsideration of previously granted waiver.

Even if it were appropriate for EPA to reconsider a previously granted waiver based on non-statutory factors, in this action, EPA concludes that it was inappropriate to rely on preemption under EPCA as a basis for withdrawing certain aspects of the ACC program waiver. In SAFE 1, a joint action between NHTSA and EPA, NHTSA concluded that state or local regulations of tailpipe carbon dioxide emissions are "related to fuel economy standards" and are therefore preempted under EPCA.[342] As a direct result of NHTSA's codified text and pronouncements on preemption set forth in SAFE 1, EPA withdrew the ACC program waiver for California's GHG standards and ZEV sales mandate on grounds that they were preempted under EPCA. In SAFE 1, EPA believed it was appropriate to consider the effect of NHTSA's actions, including the view that California cannot enforce standards that are void *ab initio*, and thus EPA stated that "to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis."[343] NHTSA has since issued a new final rule that formally repeals the codified text and pronouncements regarding preemption under EPCA found in SAFE 1. Upon reconsideration, EPA now believes that, given NHTSA's repeal of its regulation and pronouncements in SAFE 1, preemption under EPCA cannot serve as a basis for the withdrawal of the ACC program waiver as it did in SAFE 1—if it could ever legitimately serve as such basis. EPA thus believes it is appropriate to rescind the portion of the waiver withdrawal that was based on preemption under EPCA.

In addition, given the unique consideration of preemption under EPCA in SAFE 1 and its effect on an otherwise validly issued waiver under the CAA, EPA believes it is helpful to provide additional information regarding the Agency's historical practice and views to demonstrate why consideration of preemption under EPCA was inappropriate. Consideration of preemption under EPCA is beyond the statutorily prescribed criteria for EPA in section 209(b)(1). Preemption under EPCA was not a factor that California addressed under the applicable waiver criteria in its initial request nor was it a factor that EPA considered in granting the ACC program waiver. Until SAFE 1, the Agency consistently refrained from reviewing waiver requests against factors beyond the statutorily listed criteria under section 209(b)(1). Thus, EPA also believes that in the reconsideration of a waiver where EPA had previously declined to consider preemption under EPCA, SAFE 1 was contrary to congressional intent and the Agency's historic practice of hewing to section 209(b)(1) statutory criteria in reviewing waiver requests. Given this backdrop, EPA believes the joint rulemaking context of SAFE 1 was an improper basis to deviate from EPA's long held belief to not consider factors outside the scope of section 209(b)(1), especially given that the Agency indicated it would only be a singular occurrence. EPA continues to view the text and congressional intent of the statute, as well as subsequent case law, as best supporting a limited scope of review for waiver requests under section 209(b)(1)—irrespective of whether a waiver proceeding is undertaken either solely by EPA or in unison with another agency. Therefore, based on EPA's historical practice of not considering factors outside of the section 209(b)(1) criteria and because EPA believes the "joint-action" premise was improper, the Agency is rescinding its withdrawal of the ACC program waiver based on preemption under EPCA.

### A. Historical Practice and Legislative History

Historically, in reviewing California's waiver requests, EPA has refrained from the consideration of factors beyond those criteria set out in section 209(b)(1).[344] EPA has generally explained that the text, structure, and purpose of the California waiver provision indicate congressional intent for EPA to provide significant deference to California's judgment, especially on "ambiguous and controversial matters of public policy."[345] In section 209(a), Congress generally preempted state standards relating to the control of emissions from new motor vehicles and engines, but, in section 209(b), Congress carved out an exception for California, directing EPA to grant California a waiver of section 209(a) unless the Agency can make a finding under section 209(b). Congress recognized that California's "compelling and extraordinary circumstances," and its historical practice of regulating in the area, were sufficient "to justify standards on automobile emissions which may, from time to time, need be more stringent than national standards."[346] In creating the waiver program, Congress intended not only for California to be able to meet its own emission reduction needs, but also for California to act as "a kind of laboratory for innovation" for motor vehicle standards and control technology."[347]

---

[342] 49 U.S.C. 32919(a) ("When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter."). NHTSA noted that a law or regulation having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919(a). 84 FR at 51317–18. NHTSA's rule was codified at 49 CFR 531.7 ("Preemption") and 533.7 ("Preemption"), as well as each Appendix B in 49 CFR part 531 ("APPENDIX B TO PART 531—PREEMPTION") and Part 533 ("APPENDIX B TO PART 533—PREEMPTION").

[343] 84 FR at 51338.

[344] *See, e.g.,* 43 FR at 32184 (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review); 74 FR at 32783 (rejecting comments asking for the consideration of EPCA because it is not one of the three statutorily prescribed criteria); 78 FR at 2145 (again rejecting comments asking for the consideration of EPCA because it is outside the statutory criteria); 79 FR at 46265 (rejecting the argument that the HD GHG Regulations "impermissibly regulate fuel economy" because, like the commerce clause and Federal Aviation Administration Authorization Act of 1994 (FAAAA) issues, this issue is "outside the proper scope of review since it is not among the criteria listed under section 209(b).").

[345] H.R. Rep. No. 90–728, 90th Cong., 1st Sess. 21 (1967); S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("The waiver of preemption is for California's 'unique problems and pioneering efforts.'").

[346] H.R. Rep. No. 90–728, 90th Cong., 1st Sess. 21 (1967); S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("The waiver of preemption is for California's 'unique problems and pioneering efforts.'").

[347] *MEMA I,* 627 F.2d 1095, 1111 (D.C. Cir. 1979); 113 Cong. Rec. 30950, 32478 (Statement of Sen. Murphy) ("The United States as a whole will benefit by allowing California to continue setting its own more advanced standards for control of motor vehicle emissions. . . [The] State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.").

Thus "Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight." [348]

Legislative history makes clear that the Administrator must "presume" that the California standards "satisfy the waiver requirements" and that the burden of proving otherwise rests on the Administrator or other parties favoring denial of the waiver.[349] Further, according to the House Committee Report for the 1977 amendments that strengthened California's waiver provisions, EPA is "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [350] According to the House Report, "The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be "clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver." [351] EPA's historic practice of considering only listed criteria is thus in keeping with the highly deferential review of waiver requests that Congress intended in carving out the exception from preemption of new motor vehicle and engine standards in section 209(a).[352]

Courts have generally agreed with the Agency's consideration of only listed CAA criteria in reviewing waiver requests, also pointing to the statute's lack of any indication of the ability to consider non-statutory criteria as well as the waiver program's significant deference to California. The D.C. Circuit has stated that, under the text of the statute, the section 209(b) criteria are "the only waiver standards with which California must comply" and that, therefore, "[i]f EPA concludes that California's standards [meet section 209(b)], it is obligated to approve California's waiver application." [353] The D.C. Circuit has repeatedly described EPA's waiver approval role as "limited" and "narrow." In *MEMA I*, for example, the court explained that the "Administrator has consistently held

since first vested with the waiver authority, [that] his inquiry under section 209 is modest in scope. He has no 'broad and impressive' authority to modify California regulations." [354] The court further noted that "there is no such thing as a 'general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider." [355] Similarly, the court has stated that "[t]he statute does not provide for any probing substantive review of the California standards by federal officials" and that "EPA's only role is to review California's proposed rules under a narrowly defined set of statutory criteria." [356] Thus, the court has consistently rejected arguments requiring EPA to consider factors outside of the statutory criteria. In *MEMA I*, the court rejected a constitutional objection to a waiver, explaining that, because "the Administrator operates in a narrowly circumscribed proceeding requiring no broad policy judgments on constitutionally sensitive matters," "[n]othing in section 209 requires him to consider the constitutional ramifications of the regulations for which California requests a waiver . . . although nothing in section 209 categorically forbids" it.[357] In the same case, the court also rejected an antitrust objection as outside the scope of the Administrator's review.[358] The court again upheld EPA's decision to not consider constitutional objections in *American Trucking Association (ATA)* v. *EPA*, stating, "We agree with EPA that ATA is seeking 'improperly to engraft a type of constitutional Commerce Clause analysis onto EPA's [s]ection 7543(e) waiver decisions that is neither present in nor authorized by the statute." [359]

It is against this backdrop that EPA has reviewed waiver requests by evaluating them solely under the criteria of section 209(b). For instance, prior to SAFE 1, EPA had solicited comment, in the context of the 2008 and 2009 EPA notices for comment on CARB's first waiver request for GHG emission

standards, as to whether the EPCA fuel economy preemption provisions were relevant to EPA's consideration of CARB's authority to implement its motor vehicle GHG regulations.[360] In both instances, EPA declined to consider preemption under EPCA.[361] In the 2009 waiver, EPA explained that "section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein." [362] EPA further pointed to its historic practice of "refrain[ing] from denying California's requests for waivers based on any other criteria," which had been reviewed and upheld by the Court of Appeals for the District of Columbia Circuit.[363] In the 2013 review of the ACC program waiver request, the Agency again declined to consider factors outside the statutory criteria, explaining that "EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria." [364] A year later, EPA yet again declined to consider constitutionality claims, preemption under EPCA, and the implications of the Federal Aviation Administration Authorization Act of 1994 (FAAAA).[365] EPA explained that section 209(b) limits the Agency's authority to deny California's requests for waivers to the three criteria therein and that the Agency has consistently refrained from denying California's requests for waivers based on any other criteria.[366]

In SAFE 1, EPA changed course, reasoning instead that the Agency pronouncement in the ACC program waiver decision on factors EPA could consider in denying a waiver request "was inappropriately broad, to the extent it suggested that EPA is categorically forbidden from ever determining that a waiver is inappropriate due to consideration of anything other than the 'criteria' or 'prongs' at section 209(b)(1)(B)(A)–

---

[348] *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

[349] *MEMA I*, 627 F.2d at 1121–22 (citing, for example, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

[350] *MEMA II*, 142 F.3d 449, 453 (D.C. Cir. 1998) (quoting H.R. Rep. No. 95–294, at 301–02 (1977)).

[351] H.R. Rep. No. 95–294, at 302 (1977), reprinted in 1977 U.S.C.C.A.N. at 1381.

[352] *See, e.g.*, 74 FR at 32783; 78 FR at 2145.

[353] *MEMA II*, 142 F.3d at 463.

[354] *MEMA I*, 627 F.2d at 1119 (internal citations omitted).

[355] *Id.* at 1116–17.

[356] *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1300 (D.C. Cir. 1979), and *ATA* v. *EPA*, 600 F.3d 624, 628 (2010), respectively.

[357] *MEMA I*, 627 F.2d at 1115 (declining to consider whether California standards are constitutional).

[358] *Id.* at 1117 ("[N]othing in section 209 or elsewhere in the Clean Air Act can fairly be read to imply a duty on the Administrator to deny a waiver on the basis of the antitrust implications of California regulations.").

[359] *ATA* v. *EPA*, 600 F.3d at 628.

[360] 73 FR at 12159.

[361] *Id.*; 74 FR at 32783.

[362] 74 FR at 32783.

[363] *Id.* (citing *MEMA I*, 627 F.2d at 1111, 1114–20, and *MEMA II*, 142 F.3d 449, 466–67 (D.C. Cir. 1998)).

[364] 78 FR at 2145.

[365] HD GHG Regulations for certain model year sleeper-cab tractors and dry-van and refrigerated-van trailers. 79 FR at 46256, 46264.

[366] *Id.* In rejecting the commerce clause objection, the decision cited *MEMA I*'s statement that "[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims." *Id.* (citing *MEMA I*, 627 F.2d at 1114–20). Thus, the decision concluded, "Constitutional challenges to the HD GHG Regulations [were] more appropriately addressed by a legal challenge directly against the state." *Id.*

(C)." [367] EPA explained that this statement and EPA's historical practice of not considering preemption under EPCA "were made in the context of EPA acting on its own to administer section 209(b) in considering such applications." [368] Further, EPA distinguished these previous single-agency actions from its SAFE 1 joint action context by explaining that ignoring NHTSA's determination of preemption in the same action, "would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio*." [369] At the same time, EPA expressed intentions not to consider factors outside the statutory criteria in future waiver proceedings. [370] EPA then concluded that NHTSA's determination of preemption in the same action "renders EPA's prior grant of a waiver for those aspects of California's regulations that EPCA preempts invalid, null, and void" because "California cannot enforce standards that are void *ab initio*." [371]

*B. Notice of Reconsideration of SAFE 1 and Request for Comment*

In its April 28, 2021, Notice of Reconsideration, EPA acknowledged that SAFE 1's consideration of NHTSA's finding of preemption under EPCA deviated from its historic practice of "declin[ing] to look beyond the waiver criteria in section 209(b) when deciding the merits of a waiver request from CARB." [372] EPA sought comment on whether "EPA properly considered and withdrew portions of the ACC program waiver pertaining to GHG standards and the ZEV sales mandate based on NHTSA's EPCA preemption action, including whether EPA had the authority to withdraw an existing waiver based on a new action beyond the scope of section 209." [373] Given EPA's reliance on NHTSA's preemption findings as a basis of waiver withdrawal in SAFE 1, EPA also sought comment on how the repeal of SAFE 1, should NHTSA take final action to do so, would

affect its own reconsideration of SAFE 1.

*C. Comments Received*

EPA received comments in support of and against the consideration of preemption under EPCA in reviewing requests for waivers by California. Multiple comments related to the Agency's use of the joint action with NHTSA as a justification for deviating from the Agency's practice of reviewing waiver requests under the specific statutory criteria. Some commenters agreed that the context of a joint action necessitated consideration of preemption under EPCA because NHTSA was the agency charged with interpreting and implementing EPCA and so EPA must consider its findings in the same action. [374] One commenter also argued that the joint rulemaking of SAFE 1 would be consistent with pronouncements in *Massachusetts* v. *EPA* (2007) on the agencies' respective statutory obligations and the need to avoid inconsistency and so, "[o]nce NHTSA proposed to finalize a determination that EPCA preempts California's GHG motor vehicle standards, it would be unreasonable for the EPA to refuse to take NHTSA's action into account." [375]

Other commenters argued that the context of the rulemaking, whether joint or not, was irrelevant. One commenter stated emphatically that "what Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency." [376] Some commenters also argued that the context of the rulemaking was a particularly insufficient justification for revoking the waiver given language in SAFE 1 that allowed for inconsistent consideration of EPCA preemption. Several commenters noted that EPA constrained the future applicability of SAFE 1 by explaining that the Agency would not consider factors outside statutory criteria in future waiver reviews in other subject areas. [377] Another commenter also noted that "the action purported to be 'joint,' and yet as now acknowledged, SAFE Part 1 'is properly considered as two severable actions, a rulemaking by NHTSA and a final informal adjudication by EPA.'" [378] These inconsistencies, they argued, made SAFE 1's distinction between single-

agency and joint actions arbitrary and capricious.

Commenters also argued for and against consideration of factors outside the statutory criteria—including, but not limited to, preemption under EPCA—regardless of the kind of agency action, although EPA did not make this argument in SAFE 1. Commenters argued that EPA's authority to look outside the statutory criteria at EPCA was at least permissive, if not mandatory. According to one commenter, "EPA exaggerates the Court's position" in *MEMA I* in its Reconsideration notice: "[T]he court did not say that the EPA is *forbidden* to take constitutional ramifications into consideration, only that it is *not required* to do so." [379] Another commenter agreed that *MEMA I* and *MEMA II* "do not preclude EPA from considering" preemption under EPCA but then went further, saying that "EPA is *required* to consider EPCA preemption." [380] The commenter argued that *MEMA I* rejected petitioners' constitutional objections to a waiver under an institutional competence line of reasoning, concluding that "[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims." [381] In contrast, they continued, the waiver proceeding is an appropriate forum for determining whether emission standards "relate to" fuel economy because this issue is "within the agency's competence, as this relationship is mathematical and based in science rather than understandings of Constitutional law and precedent." [382] However, the other commenter, who agreed that EPA is not "forbidden" from considering preemption under EPCA, also noted that EPA "has no special competence to interpret EPCA." [383]

Several commenters also argued that EPA could not reinstate the waiver because NHTSA concluded that EPCA preempts the standards, such standards were void *ab initio,* and therefore "the state mandates referenced in CA's petition for reconsideration are not even eligible to be considered for a CAA waiver of preemption." [384] To ignore

---

[367] A complete discussion of preemption under EPCA in SAFE 1 can be found at 84 FR at 51337–38.

[368] *Id.*

[369] *Id.* Citing *Massachusetts* v. *EPA,* the Agency also asserted that the consideration of EPCA was supported by the Supreme Court's holding because it ensured consistency between NHTSA and EPA's programs. *Id.*

[370] 84 FR at 51338.

[371] *Id.*

[372] 86 FR at 22429.

[373] *Id.*

[374] *See, e.g.,* CEI at 11–12; AFPM at 2, 6.

[375] CEI at 11.

[376] States and Cities at 20. *See also* Twelve Public Interest Organizations app. 1 64–65.

[377] NESCAUM at 3; Twelve Public Interest Organizations at app. 1 64–65; States and Cities at 20.

[378] SCAQMD at 7 (quoting 86 FR at 22439, n.40).

[379] CEI at 10 (original emphasis).

[380] AFPM at 5–6.

[381] *Id.* at 6 (quoting *MEMA I,* 627 F.2d 1095, 1114–15 (DC Cir. 1979)).

[382] *Id.*

[383] CEI at 11.

[384] NADA at 3–4; *See also* AFPM at 3 ("Since California's GHG tailpipe standards and ZEV mandate are related to fuel economy, they are not lawfully adopted and void *ab initio*—and there is nothing for EPA to reinstate."); Urban Air at 47–48; CEI at 2 ("But EPCA preemption is the proverbial elephant in the room. If SAFE 1's EPCA preemption argument is correct, the EPA could not grant a valid CAA preemption waiver for California's tailpipe

this, they claimed, would violate the Supremacy Clause of the Constitution. EPA, therefore, must look outside the statutory criteria to consider preemption under EPCA because it cannot "reasonably claim that the lawfulness and constitutionality of state actions over which it has supervision are issues outside the scope of its responsibility[.]" [385]

In contrast, other commenters pointed to EPA's historical practice of evaluating waiver requests under the section 209 statutory criteria, the text of the statute, and the policy implications of looking outside the statutory criteria, to support a return to EPA's traditional narrow approach. Most commenters argued that EPA's traditional interpretation was consistent with the text of section 209(b), which has no reference to preemption under EPCA or any other factors outside the three statutory criteria.[386] Not only does EPA have "no grounds to read EPCA preemption considerations into the statute," [387] these commenters argued, but to consider non-statutory criteria would actually be "arbitrary and capricious" [388] and contrary to "precedent respecting separation of powers and federalism principles." [389] Yet another commenter stated that the narrow interpretation "provides a safeguard from the capricious injection of outside-the-scope argumentation" because "[w]hen the adjudication is permitted to stray from the statutory criteria, prospects for a fair hearing can be derailed, and the EPA Administrator may be more prone to overstep and

exert policy preferences that are impermissible." [390]

Additionally, in their petitions for reconsideration of SAFE 1, several states and cities asserted that EPA unlawfully changed course in SAFE 1 by considering (and relying on) the purported preemptive effect of EPCA, which is outside the confines of section 209(b) and argued that this rationale for withdrawing the waiver was flawed.[391]

### D. Analysis: EPA Is Rescinding Its SAFE 1 Actions Related to Preemption Under EPCA

Since SAFE 1, NHTSA has formally withdrawn its conclusions (and associated regulatory text) that state or local regulations of tailpipe carbon dioxide emissions are related to fuel economy standards and therefore preempted under EPCA.[392] Thus the predicate for EPA's decision to withdraw the ACC waiver on that basis no longer exists. Furthermore, given the context of EPA's reconsideration of the ACC program waiver at the time of SAFE 1, the Agency believes it was inappropriate to reconsider the validity of the waiver against criteria such as preemption under EPCA. In this action, based on the two independent grounds noted above, the Agency is rescinding the portion of SAFE 1 that withdrew the ACC program waiver based on preemption under EPCA.

### 1. NHTSA Has Since Repealed Its Findings of Preemption Made in SAFE 1

In the Notice of Reconsideration, EPA sought comment on the Agency's reliance on NHTSA's preemption findings as a basis for its withdrawal of the ACC program waiver in SAFE 1. EPA also sought comment on how the repeal of SAFE 1, should NHTSA take final action to do so, would affect its own reconsideration of SAFE 1.[393] NHTSA has since withdrawn its findings of preemption and the preemption basis of withdrawal is no longer applicable. Specifically, NHTSA has issued a new final rule that formally repeals the codified text and additional pronouncements regarding preemption under EPCA found in SAFE 1.[394] In

SAFE 1, EPA stated that it was appropriate to consider the effect of NHTSA's actions, including the view that California cannot enforce standards that are void *ab initio* and thus EPA stated that "to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis." [395] Since this condition no longer exists, EPA believes it is appropriate to rescind the waiver withdrawal that was based on preemption under EPCA. EPA believes that, to the extent it was ever appropriate for the Agency to base its action on NHTSA's finding of preemption under EPCA in SAFE 1, the repeal of the preemption rule makes it likewise appropriate to rescind the Agency's action in SAFE 1. This would also act to minimize regulatory uncertainty as to do otherwise would create further confusion that resulted from the joint action in SAFE 1 and would not appropriately reflect the current state of affairs under the circumstances of a unique federal regulation that had otherwise motivated EPA's actions in SAFE 1. NHTSA's recent action also supports EPA's belief that its practice of limiting its review of section 209(b) criteria, as explained below, remains appropriate in the context of preemption under EPCA.

### 2. EPA Improperly Deviated From Its Historical Practice of Limiting Its Review to Section 209(b) Criteria

Section 209(b)(1) of the Act limits the Agency's authority to deny California's requests for waivers to the three criteria contained therein and the Agency has consistently refrained from reviewing California's requests for waivers based on any other criteria. EPA acknowledges that California adopts its standards as a matter of law under its state police powers, that the Agency's task in reviewing waiver requests is limited to evaluating California's request according to the criteria in section 209(b), and that it is appropriate to defer to litigation brought by third parties in other courts, such as state or federal district court, for the resolution of any constitutionality claims and assertions of inconsistency with other statutes.

---

[385] CEI at 11.

[386] *See, e.g.,* States and Cities at 20 ("EPA's traditional understanding of its limited role is entirely consistent with the text of Section 209(b)(1) and precedent interpreting it."); NCAT at 12 ("As EPA has stated in several prior waiver decisions, there is no reference in Section 209(b) to EPCA preemption nor anything that could be construed to address this issue. Section 209(b) is unambiguous in this regard, and EPA has no grounds to read EPCA preemption considerations into the statute.").

[387] NCAT at 12.

[388] NESCAUM at 7 ("As the D.C. Circuit has explained in the context of Section 209(b), 'there is no such thing as a general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider.' It is a basic principle of administrative law that an agency action is 'arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.'").

[389] States and Cities at 20 ("It is likewise entirely consistent with precedent respecting separation of powers and federalism principles and holding that 'a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority.' *Louisiana Pub. Serv. Comm'n* v. *FCC,* 476 U.S. 355, 374 (1986).").

[390] SCAQMD at 7.

[391] 86 FR at 22428.

[392] 86 FR 74236.

[393] 86 FR at 22429.

[394] 86 FR 74236. NHTSA notes in this rulemaking that "the Agency is repealing all regulatory text and appendices promulgated in the SAFE I Rule. In doing so, the Agency underscores that any positions announced in preambulatory statements of prior NHTSA rulemakings, including in the SAFE I Rule, which purported to define the scope of preemption under the Energy Policy and Conservation Act (EPCA), do not reflect the Agency's reconsidered understanding of its proper role in matters of EPCA preemption."

[395] EPA distinguished these previous single-agency actions from its joint action context by explaining that ignoring NHTSA's determination of preemption in the same action, "would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio.*" 84 FR at 51338.

---

CO₂ standards and ZEV mandates, because EPCA had already turned those policies into legal phantoms—mere proposals without legal force or effect.").

Considering the lack of statutory and precedential support as shown below, even if EPA were to have discretion to consider criteria outside section 209(b), EPA now views the joint-action context of SAFE 1 as an insufficient justification for deviating from its statutory authority and the Agency's historical practice and therefore the Agency rescinds its actions regarding preemption under EPCA in SAFE 1.

Withdrawal of the waiver was premised on NHTSA's preemption regulations in what EPA explained was a joint rulemaking action. But nothing in section 209(b) can be read as calling for consideration of preemption under EPCA in evaluating waiver requests regardless of whether EPA engaged in joint rulemaking with another agency or acted alone. Specifically, under section 209(b), EPA must grant California a waiver of the preemption contained in section 209(a) unless the Administrator makes a finding under any one of the listed criteria: "The Administrator shall . . . waive application of the preemption in section 209(a) if the Administrator finds any of the following: '(A) [California's] determination [that its standards in the aggregate will be at least as protective] is arbitrary and capricious, (B) [California] does not need such State standards to meet compelling and extraordinary conditions, or (C) such State standards and accompanying enforcement procedures are not consistent with section [202(a)].' "[396] Evaluation of preemption under EPCA is not a listed criterion.

Nor did SAFE 1 premise preemption under EPCA on any of the three statutory criteria. In the ACC program waiver request, CARB made a protectiveness finding that, as a quantitative matter, its standards, in the aggregate, were as protective as the Federal standards and did not address preemption under EPCA.[397] In fact, while California might opt to respond to comments on preemption under EPCA, California would not be expected to take it into account in any protectiveness finding made for a waiver request. It bears note that California's practice is not unusual because there are other factors and provisions of the CAA that California does not account for in making its protectiveness finding under section 209(b)(1).[398] In granting the ACC program waiver request, EPA found that California's protectiveness finding was

neither arbitrary nor capricious.[399] EPA also responded to comments on the consideration of preemption under EPCA in granting the waiver but dismissed such objections as outside the scope of its review.[400] Historically, EPA draws a comparison between the numerical stringency of California and federal standards in making the requisite finding as to whether California's protectiveness determination is arbitrary and capricious.[401] Thus, neither California's initial request, nor EPA's waiver grant, considered preemption under EPCA and as previously explained in the ACC program waiver, EPA declined to consider preemption under EPCA viewing it as outside the scope of Agency review.

SAFE 1 made clear that consideration of and reliance on preemption under EPCA was the consequence of regulations promulgated by NHTSA. As SAFE 1 also acknowledged, however, EPA does not "administer" EPCA; that task falls to NHTSA.[402] Instead, "[i]f EPA concludes that California's standards [meet section 209(b)], it is obligated to approve California's waiver application."[403] EPA therefore disagrees with the comment that *Massachusetts* provides the Agency special duty to consider preemption under EPCA in a joint rulemaking action in reviewing waiver requests. In *Massachusetts,* the Supreme Court recognized the potential overlap between NHTSA's and EPA's statutory obligations and concluded that "there is no reason to think the two agencies cannot both administer their obligations yet avoid inconsistency."[404] As one commenter noted, EPA and NHTSA have previously engaged in joint actions that addressed fuel economy and GHG emissions. In those actions, NHTSA's role has been to set national fuel economy standards and EPA's role has been to set national GHG

standards.[405] These roles are complementary, but distinct. The Court acknowledged the independence of these roles in *Massachusetts:* "EPA has been charged with protecting the public's 'health' and 'welfare,' 42 U.S.C. 7521(a)(1), a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. See Energy Policy and Conservation Act, § 2(5), 89 Stat. 874, 42 U.S.C. 6201(5)."[406]

Regarding the Agency's simultaneous pronouncement that reliance on preemption under EPCA would be a singular exercise that would not be repeated, statutory support or past precedent for this singular consideration was also lacking.[407] In fact, this singular exercise would allow for EPA to evaluate the same waiver request differently and depending on EPA's own choice—the choice to act with another agency or not—rather than on the merits of the waiver request itself within specified criteria in section 209(b). Again, the result of this unique application of EPA's authority is unsupported under section 209(b)(1).

As previously noted, EPCA is generally administered by NHTSA and consideration of preemption under EPCA in reviewing waiver requests would for instance call for EPA to resolve the much debated and differing views as to what is a "law or regulation related to fuel economy," as contemplated by 39 U.S.C. 32919(a).[408] Relevant judicial precedent would also appear to call into question whether California's GHG standards and ZEV sales mandates are indeed preempted under EPCA.[409] But as previously explained, EPA does not implement EPCA, and the Agency's review of waiver requests is highly deferential.

EPA also disagrees with comments that the Agency must generally consider factors outside the criteria listed in section 209(b), including preemption under EPCA, regardless of the joint- or single-agency nature of the action. EPA

---

[396] CAA section 209(b)(1)(A)–(C).

[397] 2012 Waiver Request at 15–17.

[398] For example, "California is not required to comply with section 207 to get a waiver." *MEMA II,* 142 F.3d 449, 467 (D.C. Cir. 1989).

[399] 78 FR at 2125.

[400] *Id.* at 2145.

[401] Section 209(b)(2) provides that if each State [California] standard is at least as stringent as comparable applicable Federal standards then such standard shall be deemed to be as protective of public health and welfare as such federal standards for purposes of section 209(b)(1)(A). EPA acknowledges that in 1977 Congress amended the waiver provision to allow for California to address its unique combination of air quality problems and that California only be required to demonstrate stringency in the aggregate and that therefore some pollutant standards may not be as stringent.

[402] 84 FR at 51338 ("EPA agrees with commenters that EPA is not the agency that Congress has tasked with administering and interpreting EPCA. This is especially so because '[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims.' *MEMA I,* 627 F.2d at 1115.").

[403] *MEMA II,* 142 F.3d at 463.

[404] *Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007).

[405] In its most recent rulemaking addressing GHG emissions from light-duty vehicles, EPA extensively coordinated with NHTSA on details of the program but did not conduct it as a joint rulemaking. *See* 86 FR 74434, 74436 (December 30, 2021).

[406] *Massachusetts,* 549 U.S. at 497, 532.

[407] "EPA does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C)." 84 FR at 51338.

[408] EPA takes no position on any role NHTSA might play under 42 U.S.C. 32919(a) and acknowledges that NHTSA discusses this in its recent final rulemaking. *See generally* 86 FR 74236.

[409] *See, e.g., Cent. Valley Chrysler-Jeep, Inc.* v. *Goldstene,* 529 F. Supp. 2d 1151, 1153–54 (E.D. Cal. 2007), *as corrected* Mar. 26, 2008; *Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie,* 508 F. Supp. 2d 295, 300–01 (D. Vt. 2007).

has never claimed that it has such broad authority to consider factors outside section 209(b) and the decades of waiver practice, as well as judicial precedent, are indicative of the Agency's narrow scope of review for California waiver requests: ''[T]he Administrator has consistently held since first vested with the waiver authority, [that] his inquiry under section 209 is modest in scope. He has no 'broad and impressive' authority to modify California regulations.'' [410] Instead, EPA has consistently declined to consider factors outside the three statutory criteria listed in section 209(b).[411] This limited scope of review has been repeatedly upheld by the courts. For example, in *MEMA I,* the D.C. Circuit stated that ''there is no such thing as a ''general duty'' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider.'' [412] In *MEMA II,* the D.C. Circuit again rejected consideration of a factor outside the 209(b) statutory criteria because doing so would restrict California's ability to ''exercise broad discretion.'' [413]

Commenters also claim that ignoring NHTSA's finding of preemption would violate the Supremacy Clause of the Constitution because the necessary consequence of NHTSA's conclusion in SAFE 1 is that certain standards were void *ab initio* as preempted under EPCA and as such that ''the state mandates referenced in [California's] petition for reconsideration are not even eligible to be considered for a CAA waiver of preemption.'' [414] EPA disagrees. As the D.C. Circuit has held, ''[t]hat [the Administrator] like every other administrative officer owes allegiance to the Constitution does not mean that he is required to issue rulings of constitutional dimension.'' [415] Thus, ''[n]othing in section 209 requires [the Administrator] to consider the constitutional ramifications of the

regulations for which California requests a waiver.'' [416]

Moreover, consideration of factors beyond those set out in section 209(b)(1) would subject California and vehicle and engine manufacturers to changes in regulatory schemes by other federal agencies not acting under the authority of the CAA.[417] SAFE 1 and subsequent events perfectly encapsulate this problem. For instance, NHTSA has since finalized the repeal of the regulatory provisions and pronouncements it made in SAFE 1 that were the underpinnings for EPA withdrawing certain aspects of the ACC program waiver and with that action the Agency's basis for revocation of the waiver under EPCA has now evanesced.[418] Additionally, this is affirmation of EPA's long held view that waiver proceedings are not the appropriate venue for resolving these issues, and the joint-rulemaking context is not and should never have been justification for deviating from statutory authority and the Agency's historical practice.

It also bears note that consideration of factors beyond the criteria contained in section 209(b) would not be limited to preemption under EPCA. Commenters suggested, for instance, that EPA would not be able to ''ignore the First Amendment,'' in the hypothetical situation where California impos[ed] standards on some manufacturers in retaliation for their voiced opposition to California's authority as well as criminality such as ''bribery and extortion had been instrumental in assembling the legislative majorities.'' [419] In short, under the commenter's view, factors for consideration in waiver proceedings would be innumerable. And yet these factors bear little or no relation to specific criteria in section 209(b) that would otherwise warrant the denial of a waiver request. The D.C. Circuit has already, several times, held that EPA is not required to consider factors outside of and unconnected to these statutory criteria, especially constitutional objections. In fact, regarding the commenter's example, the court has already specifically rejected consideration of the First Amendment

in waiver evaluations. In *MEMA I,* the court considered and upheld EPA's decision declining to consider a First Amendment objection to a waiver as beyond the scope of agency review.[420] Courts have also rejected objections based on the applicability of CAA section 207 to California waiver requests [421] and the Commerce Clause.[422] EPA is therefore not persuaded by these arguments. Additionally, courts have long held that administrative proceedings for California waiver requests are ill-suited for consideration of constitutional issues. Nothing precludes commenters from challenging California's standards themselves—whether under EPCA, another statute, or the Constitution—in other, better-suited fora. According to the D.C. Circuit, for instance, [w]hile nothing in section 209 categorically forbids the Administrator from listening to constitutionality-based challenges, petitioners are assured through a petition of review . . . that their contentions will get a hearing.'' [423] The D.C. Circuit has also repeatedly stated that challenges which go to the legality of California's standards themselves, are better addressed directly by either courts or Congress.[424] Challenges based on preemption under EPCA similarly go to the legality of California's standards themselves and are thus more appropriate in court or addressed to Congress.

*E. Conclusion*

Because the landscape of federal law has changed since SAFE 1 due to NHTSA's repeal of its regulatory text, appendix, and pronouncements regarding EPCA preemption in SAFE 1, EPA believes that it is appropriate to rescind its waiver withdrawal actions in SAFE 1 that were predicated on the federal law context created by NHTSA's SAFE 1 action. On separate grounds, EPA also believes that, based on the foregoing, EPA should not have deviated from its practice of limiting its waiver review to the criteria in section

---

[410] *MEMA I,* 627 F.2d 1095, 1119 (D.C. Cir. 1979).

[411] *See, e.g.,* 43 FR at 32184 (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the ''narrow'' scope of the Administrator's review); 74 FR at 32783 (declining to consider EPCA preemption, stating that ''section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein.''); 79 FR at 46264 (reiterating that EPA can only deny a waiver request based on the 209(b) statutory criteria, dismissing comments on preemption under EPCA, as well as the Constitution and the implications of the FAAAA).

[412] 627 F.2d at 1116.

[413] 142 F.3d at 464.

[414] NADA at 3.

[415] *MEMA I,* 627 F.2d at 1114–15.

[416] *Id.* at 1115.

[417] ''The manufacture of automobiles is a complex matter, requiring decisions to be made far in advance of their actual execution. The ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance so as to permit economies in production.'' S. Rep. No. 403, 90th Cong., at 730 1st Sess. (1967).

[418] *See* 86 FR 74236.

[419] CEI at 11.

[420] *MEMA I,* 627 F.2d 1095, 1115 (D.C. Cir. 1979).

[421] *MEMA II,* 142 F.3d 449, 467 (D.C. Cir. 1998).

[422] *ATA* v. *EPA,* 600 F.3d 624, 628 (D.C. Cir. 2010) (''EPA's only role is to review California's proposed rules under a narrowly defined set of statutory criteria.''); *OOIDA* v. *EPA,* 622 Fed. Appx. 4, 5 (D.C. Cir. 2015) (rejecting a challenge for lack of jurisdiction because challengers objected to California's regulations themselves, not EPA's approval of them in a waiver under 209(b)).

[423] *MEMA I,* 627 F.2d at 1115.

[424] *Id.* at 1105. In *ATA* v. *EPA,* the D.C. Circuit rejected a constitutional challenge to a California waiver, concluding that Congress made the decision to give California ''the primary role in regulating certain mobile pollution sources'' so the challenger's argument was best directed to Congress. 600 F.3d 624, 628 (D.C. Cir. 2010).

209(b)(1). Thus, for the reasons stated above, EPA is rescinding those portions of SAFE 1 that withdrew the waiver of the ACC program on the basis of preemption under EPCA.

## VII. EPA Inappropriately Set Forth an Interpretive View of Section 177 in SAFE 1

In SAFE 1, EPA provided an interpretive view of section 177 of the CAA, stating that states adopting California's new motor vehicle emission standards (section 177 states) could not adopt California's GHG standards.[425] In this action, EPA determines that it was both inappropriate and unnecessary within a waiver proceeding to provide an interpretive view of the authority of section 177 states to adopt California standards, as EPA plays no statutory approval role in connection with states' adoption of standards identical to those standards for which a waiver has been granted to California.[426] Rather, if a state chooses to submit such standards for inclusion in an SIP, EPA's role with regard to approval of these standards is to review them in the same way that EPA reviews all SIP revisions a state submits, via a notice and comment process, to ensure that the submission meets all statutory and regulatory requirements as part of the Agency's decision whether to approve or disapprove the submission. Therefore, the Agency is rescinding the interpretive views on section 177 set out in SAFE 1.

### A. SAFE 1 Interpretation

In the SAFE proposal, EPA proposed to conclude that ''States may not adopt California's GHG standards pursuant to section 177 because the text, context, and purpose of section 177 support the conclusion that this provision is limited to providing States the ability, under certain circumstances and with certain conditions, to adopt and enforce standards designed to control criteria pollutants to address NAAQS nonattainment.''[427] Additionally, the proposal noted the title of section 177 (''New motor vehicle emission standards in nonattainment areas'') indicates a limited scope of application.[428] The proposal also suggested that, because ''[a]reas are only designated nonattainment with respect to criteria pollutants,'' it would be

''illogical'' if states could use their 177 authority ''to adopt California standards that addressed environmental problems other than nonattainment of criteria pollutant standards.''[429]

In the SAFE 1 decision, EPA finalized its proposed interpretive view, reiterating that ''the text (including both the title and main text), structural location, and purpose of the provision confirm that it does not apply to GHG standards.''[430] Because section 177's title references nonattainment areas, and because nonattainment designations only exist for criteria pollutants, EPA claimed, states could not adopt standards for purposes of GHG control under section 177.[431]

As evidence for this interpretive view, EPA again pointed to the text and location of the section, which had been the basis for the Agency's interpretation in the SAFE proposal. EPA acknowledged commenters who argued that ''CAA section 177 does not contain any text that could be read as limiting its applicability to certain pollutants only'' and that EPA had ''inappropriately relied on the heading for CAA section 177 to construe a statutory provision as well as arrogated authority to implement an otherwise self-implementing provision,'' but disagreed with these commenters.[432] In addition to the evidence relied on in the proposal, EPA provided examples of legislative history from the 1977 amendments to support its interpretive view.[433]

### B. Notice of Reconsideration of SAFE 1 and Request for Comment

Acknowledging that ''section 177 does not require States that adopt California emission standards to submit such regulations for EPA review'' and that ''California in previous waiver requests has addressed the benefits of GHG emissions reductions as it relates to ozone,'' EPA sought comment in the 2021 Notice of Reconsideration on whether EPA had the authority in the

SAFE 1 context to interpret section 177 of the CAA and whether the interpretive view was appropriate.[434] Specifically, EPA sought comment on whether it was appropriate for EPA to provide an interpretive view of section 177 within the SAFE 1 proceeding.[435] To the extent it was appropriate to provide an interpretation, EPA sought comment on whether section 177 was properly interpreted and whether California's motor vehicle emission standards adopted by states pursuant to section 177 may have both criteria emission and GHG emission benefits and purposes.[436]

### C. Comments Received

In response to SAFE 1, EPA received multiple petitions for reconsideration. One petition submitted by several states and cities asserted that, in adopting its interpretation of section 177, EPA ''relie[d] on information and reasoning not presented in the SAFE Proposal,'' particularly the ''superseded version of Section 172 . . . and legislative history for that outdated provision.''[437] The petition noted that the use of this information and reasoning was used in the SAFE 1 to conclude that ''section 177 is in fact intended for NAAQS attainment planning and not to address global air pollution.''[438] Petitioners argued that because this information and reasoning was not presented in the proposal, ''EPA should withdraw and reconsider its finalization of the Section 177 interpretation and allow for full and fair public comment before proceeding further.''[439]

EPA also received many comments in response to the Notice of Reconsideration of SAFE 1, both supporting and opposing EPA's statements regarding section 177 in SAFE 1. Supporters of SAFE 1 reiterated the reasoning from the proposal and final action.[440] For example, one commenter wrote, ''In short, 'the text, context, and purpose of Section 177 suggest' that the provision is limited to motor vehicle standards 'designed to control criteria pollutants to address NAAQS nonattainment.' '' [441] Like the SAFE proposal and final action, the commenter stated that in addition to the text and context of the section, there is ''substantial legislative history showing that Congress's purpose in creating the Section 177 program was to address

---

[425] 84 FR at 51310, 51350.

[426] EPA is aware of instances of States adopting California new motor vehicle emission standards and not subsequently including such standards in their SIP. In these circumstances EPA has not played and would not play an approval role.

[427] 83 FR at 43240.

[428] Id.

[429] Id.

[430] 84 FR at 51350.

[431] Id.

[432] Id.

[433] In particular, EPA cited legislative history on section 172(b), which set forth the ''requisite provisions'' for state plans for nonattainment areas. Id. at 51350 n.286. According to the legislative history, one of the many factors that must be considered by a state plan is ''actual emissions of such pollutant resulting from in-use motor vehicles.'' Id. (quoting H.R. Rep. No. 294, 95th Cong., 1st Sess. 212 (1977), 1977 U.S.C.C.A.N. 1077, 1291, 1997 WL 16034). Therefore, EPA claimed, this legislative history ''identifies section 177 as a means of addressing the NAAQS attainment planning requirements of CAA section 172, including the specific SIP content and approvals criteria for EPA.'' Id. at 51351.

[434] 86 FR at 22429.

[435] Id.

[436] Id.

[437] See States and Cities' Petition at 27.

[438] Id. (quoting 84 FR at 51351).

[439] Id.

[440] CEI at 17–18; NADA at 6; AFPM at 12–13.

[441] CEI at 18 (quoting heavily from the SAFE proposal and SAFE final action).

non-attainment with NAAQS for criteria pollutants, not to address any global atmospheric phenomenon.''[442]

Opponents of SAFE 1 argued both that EPA had no authority to issue its 177 statement and that the merits of EPA's argument were wrong. On the issue of authority, opponents of SAFE 1 claimed that SAFE 1 failed to consider the reliance interests of the stakeholders, particularly section 177 states.[443] SAFE 1, they argued, upset this reliance and created uncertainty.[444] A substantial number of commentors also argued that EPA had no authority to make its statements on section 177 because ''Congress gave EPA no role in implementing Section 177 and no authority to constrain States' decisions regarding adoption of California emissions standards.''[445]

[442] *Id.*

[443] States and Cities at 50–55; Institute for Policy Integrity Amicus Brief at 22–26 (''[T]he fact that California and many other states have detrimentally relied on this waiver to meet federal and state air-pollution mandates resolves any lingering doubt about the lawfulness of EPA's Action. . . . Revoking the preemption waiver . . . jeopardizes the state's ability to meet federal standards for other harmful air pollutants, since the standards covered by the waiver would have reduced—directly and indirectly—nitrogen-oxide, ozone, and particulate-matter pollution. *See* 78 FR 2122, 2129, and 2134.''); Tesla at 11–13; National Association of Clean Air Agencies (NACAA), Docket No. EPA–HQ–OAR–2021–0257–0096 at 3. Many of the 177 states had also provided comments, during the SAFE 1 comment period, explaining that they have adopted the ACC program standards to meet their public health goals. *See, e.g.,* Maryland Department of the Environment, Docket No. EPA–HQ–OAR–2018–0283–5831 at 2–3; Delaware Department of Natural Resources and Environment Control, Docket No. EPA–HQ–OAR–2018–0283–5066 at 3–5; Massachusetts Department of Environmental Protection, Docket No. EPA–HQ–OAR–2018–0283–5476; State of California et al., Docket No. EPA–HQ–OAR–2018–0283–5481 at 130–31 (California was joined by the States of Connecticut, Delaware, Hawaii, Iowa, Illinois, Maine, Maryland, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, Oakland, San Francisco, and San Jose).

[444] *See, e.g.,* States and Cities at 50–55; Tesla at 11–13.

[445] States and Cities at 51. *See also* Tesla at 11–13; Twelve Public Interest Organizations app. 1 at 2; NESCAUM at 8–9; Southern Environmental Law Center (SELC), Docket No. EPA–HQ–OAR–2021–0257–0125 at 2–3; NCAT at 12; Class of '85, Docket No. EPA–HQ–OAR–2021–0257–0454 (correction to an earlier comment by the same commenter, which can be found at Docket No. EPA–HQ–OAR–2021–0257–0388) at 5–6; Maine at 2; OTC at 2. Ironically, one supporter of SAFE 1, while arguing that EPA cannot consider GHG reductions from section 177 states in its second prong analysis, acknowledged EPA's lack of an oversight role under section 177: ''EPA cannot consider GHG reductions, if any, attributable to 'opt-in' states under Section 177, as these are out of the scope of a waiver application. Indeed, EPA has no legal role in reviewing opt-in states, as the statute grants the agency no role in reviewing opt-in by other states.'' AFPM at 15.

On the merits of EPA's SAFE 1 argument, opponents of the action commented that EPA misinterpreted section 177 and that, even if EPA's interpretive view were correct, EPA misapplied it. Multiple commenters wrote that the text of section 177 does not limit the types of pollutants for which motor vehicle emission standards can be authorized.[446] Commenters also noted that the title of section 177 refers to geographic *areas,* not pollutants, and argued that the restriction was therefore on which states could adopt California standards (states with plan provisions approved under Part D) not on the pollutants for which those states could adopt standards.[447] A few commenters also argued that EPA's section 177 interpretive view would create a ''third vehicle'' scenario, in contradiction of section 177's identicality requirement.[448] Even if EPA's interpretation were correct, opponents continued, California's standards have both criteria emission and GHG emission benefits and purposes.[449] Commenters cited the factual record as well as EPA's own past findings as evidence of the connection between GHG standards and NAAQS attainment.

### D. Analysis: EPA Is Rescinding SAFE 1's Interpretive Views of Section 177

EPA is withdrawing its non-regulatory and non-binding interpretation of section 177 set forth in SAFE 1. EPA plays no statutory approval role in connection with states' adoption of standards identical to those standards for which the Agency has granted a waiver to California.[450] Rather, if a state chooses to submit such standards for inclusion in a SIP, EPA's role with regard to approval of these standards is

[446] *See, e.g.,* States and Cities at 53; NESCAUM at 9; NCAT at 12.

[447] *See, e.g.,* States and Cities at 53 (''[T]he reference in the title to 'nonattainment areas' is not a limitation to 'nonattainment (*i.e.,* criteria) pollutants' or standards that target them'' but rather a limitation on the states that can adopt California's standards); NESCAUM at 9; SELC at 2; NCAT at 12.

[448] Commenters feared that EPA's interpretation, which ''prevents Section 177 States from adopting California's GHG standards, but not any other California standards,'' could require states to ''extract just the GHG portion of the Advanced Clean Cars rules from their programs, thus potentially creating type of ''third vehicle'' forbidden by Section 177 (*i.e.,* a vehicle subject to a hybrid combination of the other California standards and the (now weakened) federal GHG standards.'' States and Cities at 54. *See also* NESCAUM at 11–12; SELC at 5.

[449] States and Cities at 31–32, 50–55; NESCAUM at 12–13; SELC at 5; NCAT at 12; Class of '85 at 4–5.

[450] EPA is aware of instances of States adopting California new motor vehicle emission standards and not subsequently including such standards in their SIP. In these circumstances EPA has not played and would not play an approval role.

to review them in the same way that EPA reviews all SIP revisions a state submits, via a notice and comment process, to ensure that the submission meets all statutory and regulatory requirements as part of the Agency's decision whether to approve or disapprove the submission.[451]

In reconsidering SAFE 1, EPA now believes that it was inappropriate to offer an interpretive view of section 177 in the context of that action. EPA believes it acted inappropriately in providing an interpretive view in SAFE 1 and that such action was based on an inaccurate assessment of the factual record. EPA's interpretive view was not compelled by any petition, request, or legislative or judicial mandate and was otherwise not final agency action.[452] EPA is therefore rescinding the interpretive views contained in SAFE 1.

As commenters have noted, section 177 does not describe a direct approval role for EPA. Section 177 says that ''any State which has plan provisions approved under this part may adopt and enforce'' identical California standards and delineates three specific criteria for adoption.[453] Nothing in this language or in the text of the rest of the section requires or allows EPA to approve such adoption and enforcement or directs EPA to implement the section through regulation; EPA plays no statutory approval role in the adoption of California standards by other states other than action on a SIP revision, should those states include the standards in their plans. In fact, there are only three prerequisites to adoption and enforcement by a state: That the state has a federally approved SIP, that the standards are identical (thus the state standards must not create or have the effect of creating a ''third vehicle'') to California standards for which California has received a waiver, and that California and the state adopt the standards with at least two years lead time.[454] This limited role has been

[451] EPA notes that although section 177 states that ''. . . any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles . . .'' the language in section 177 does not require a state to submit its adopted motor vehicle emissions standards for SIP approval.

[452] 84 FR at 51338 n.256 (''EPA acknowledges that its actions in this document may have implications for certain prior and potential future EPA reviews of and actions on state SIPs. . . . EPA will consider whether and how to address those implications, to the that they exist, is separate actions.''). EPA action on a state plan (including application of Section 177) is subject to judicial review. 42 U.S.C. 7607(b)(1).

[453] 42 U.S.C. 7507.

[454] *Id.*

acknowledged by courts and EPA alike.[455] Thus, it is well established that states have broad discretion to adopt California standards without being subject to EPA's approval.[456]

States with approved SIPs that have adopted the waived California standard into state law may submit a SIP revision that includes that adopted standard. In that proceeding, EPA could determine whether the statutory criteria for adoption are met for purposes of approving a SIP revision. Indeed, in the litigation following SAFE 1, EPA acknowledged that its interpretive view of section 177 would have no actual effect until applied in a future SIP context.[457] SIPs are a crucial planning tool in helping states reach attainment for NAAQS and California's standards are key components of many of these SIPs.[458] In a SIP proceeding, these states

and other stakeholders are better able to provide specific and comprehensive comments about the intent and effect of adopting California standards.[459]

For these reasons, EPA believes that it was inappropriate to provide an interpretive view of section 177 in SAFE 1.[460] Therefore, EPA is withdrawing its SAFE 1 interpretive view of section 177.

*E. Conclusion*

EPA determines that it was both inappropriate and unnecessary, within the SAFE 1 waiver proceeding, to provide an interpretive view of the authority of section 177 states to adopt California standards. Therefore, EPA withdraws its interpretive views that had been set forth in SAFE 1.

**VIII. Other Issues**

*A. Equal Sovereignty*

As explained in Section VI, EPA must grant California's waiver request unless the Agency makes one of the specified findings in section 209(b)(1). In this instance, Congress has made multiple determinations through its adoption of section 209 and subsequent amendments, dating from 1967 through the 1990 CAA Amendments, regarding California's role and its relation to federal standard setting for mobile sources. EPA's longstanding waiver practice, consistent with case law, has been to refrain from considering factors beyond section 209(b)(1) criteria as well as constitutional claims in the review of California waiver requests.[461] EPA

acknowledges that California adopts its standards as a matter of law under its police powers,[462] that the Agency's task in reviewing waiver requests is properly limited to evaluating California's request according to the criteria in section 209(b), and that it is appropriate to defer to litigation brought by third parties in other courts, such as state or federal court, for the resolution of constitutionality claims and inconsistency, if any, with other statutes. As further explained this practice flows from the statute and legislative history, which reflect a broad policy deference that is afforded to California to address its serious air quality problems (which are on-going) as well as to drive emission control innovation. And so, EPA has historically declined to consider constitutional issues in evaluating and granting section 209 waivers. In *MEMA I*, the D.C. Circuit rejected a First Amendment challenge to a waiver as outside the scope of review.[463] In 2009, EPA approved a waiver (and authorization) under section 209(e), granting California authority to enforce its Airborne Toxic Control Measure, which established in-use emission performance standards for engines in transport refrigeration units (TRUs) and TRU generator sets.[464] Responding to comments that the waiver reached beyond California's borders in violation of the Dormant Commerce Clause, EPA stated that such considerations are not factors that EPA must consider under section 209(e) because "EPA's review of California's regulations is limited to the criteria that Congress directed EPA to review." [465] This interpretation was upheld by the D.C. Circuit Court of Appeals. The Court agreed with EPA that the commenters had sought to "improperly . . . engraft a type of constitutional Commerce Clause analysis onto EPA's Section 7543(e) waiver decisions that is neither present in nor authorized by the statute." [466]

---

[455] In 1979, for example, only two years after the adoption of section 177, the D.C. Circuit stated that the Act only requires the three listed prerequisites, "not . . . that the EPA administrator conduct a separate waiver proceeding for each state that chooses [to adopt California standards]." *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1298 (D.C. Cir. 1979). Similarly, in 1994, while enacting rules implementing section 209(e)(2)(B), the parallel provision for the nonroad vehicle section of the California Waiver program, EPA noted that section 177 states had not "ask[ed] for EPA authorization before they adopted the California standards, nor did EPA or the automobile industry suggest that they needed such authorization." 56 FR 36969, 36983 (1994). *See also* 77 FR 62637 n.54 ("States are not required to seek EPA approval under the terms of section 177.").

[456] EPA also notes that there are ample judicial avenues to directly challenge state adoption of California standards. For example, the First and Second Circuits have already addressed objections to the adoption of California standards under section 177. In both *Am. Auto. Mfrs. Ass'n* v. *Mass. DEP* and *Motor Vehicle Mfrs. Ass'n* v. *NYSDEC*, petitioners argued that the States' adoption of California's low emission vehicles standards without the associated clean fuels plan violated section 177. 31 F.3d 18 (1st Cir. 1994); 17 F.3d 521 (2d Cir. 1994).

[457] Several commenters on the Notice of Reconsideration argued that SAFE 1 violated conformity rules by interfering with already approved SIPs. However, as EPA explained in the litigation over SAFE 1, the action had no actual effect on "either existing approvals of state plans or the plans themselves for criteria pollutants." Final Brief for Respondents at 106, *Union of Concerned Scientists* v. *NHTSA*, No. 19–1230 (D.C. Cir. Oct. 27, 2020). *See also* 84 FR 51338, n.256.

[458] Wisconsin at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQS."); Delaware at 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards. "); Maine at 1 ("[T]he LEV program was initially created to help attain

and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[459] The Agency has considered whether there may be any reliance interests on EPA's previous interpretive view of section 177 described in the SAFE 1 action. EPA is unaware of any such interests, and none were raised in comments.

[460] To the extent that EPA's reasoning in its SAFE 1 section 177 determination lacked fair notice, as the States and Cities' Petition claimed, such a contention is rendered moot by this action.

[461] EPA has declined to consider constitutional challenges to California Waivers since at least 1976. 41 FR 44212 (Oct. 7, 1976) ("An additional argument against granting the waiver was raised by the Motorcycle Industry Council and Yamaha, who contended that the CARB had violated due process when adopting their standards, by not allowing the manufacturers a fair and full opportunity to present their views at a State hearing. If this argument has any validity, the EPA waiver hearing is not the proper forum in which to raise it. Section 209(b) does not require that EPA insist on any particular procedures at the State level. Furthermore, a complete opportunity was provided at the EPA waiver hearing for the presentation of views."). *See also, e.g.,* 43 FR at 32184 (July 25, 1978) (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review).

[462] *Central Valley Chrysler-Jeep, Inc.* v. *Goldstene,* 529 F.Supp.2d 1151, 1174 ("The waiver provision of the Clean Air Act recognizes that California has exercised its police power to regulate pollution emissions from motor vehicles since before March 30, 1966; a date that predates both the Clean Air Act and EPCA.").

[463] *MEMA I,* 627 F.2d 1095, 1111, 1114–14 (D.C. Cir. 1979).

[464] 74 FR 3030 (January 16, 2009).

[465] Decision Document, EPA–HQ–OAR–2005–0123–0049 at 67.

[466] *ATA* v. *EPA,* 600 F.3d 624, 628 (D.C. Cir. 2010) (quoting the U.S. brief). In a footnote to this statement, the Court said ATA could attempt to bring a constitutional challenge directly (which would argue that the waiver unconstitutionally burdens interstate commerce) but "express[ed] no view on that possibility." *Id.* at n.1. *See also OOIDA* v. *EPA,* 622 Fed. Appx. 4, 5 (D.C. Cir. 2015)

**Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices **14377**

Consistent with the Agency's long standing practice, the decision on whether to grant the ACC program waiver was based solely on criteria in section 209(b) and the Agency did not either interpret or apply the Equal Sovereignty Doctrine or any other constitutional or statutory provision in that waiver decision.[467]

Although EPA specified issues that it was seeking comment on within the Notice of Reconsideration, commenters nevertheless argued that the Equal Sovereignty Doctrine, which was not one of the identified aspects in that notice, preempts reinstitution of the relevant aspects of the ACC program waiver. According to these commenters, "Section 209, by allowing California and only California to retain a portion of its sovereign authority that the Clean Air Act takes from other States, is unconstitutional and thus unenforceable." [468] Other commenters argued that the Equal Sovereignty doctrine does not apply to the California waiver program. One comment maintained that the holding in *Shelby County* v. *Holder* is distinguishable from the CAA.[469] California disagreed with

EPA's characterization of the relevance of the doctrine, commenting that the Supreme Court has only applied the "rarely invoked" doctrine of Equal Sovereignty in the "rare instance where Congress undertook 'a drastic departure from basic principles of federalism' by authorizing 'federal intrusion into sensitive areas of state and local policymaking.' " [470]

As explained in the 2013 ACC program waiver decision, EPA continues to believe that waiver requests should be reviewed based solely on the criteria in section 209(b)(1) and specifically, that the Agency should not consider constitutional issues in evaluating waiver requests.[471] As previously noted in Section VI, the constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver requests, and such objections are better directed to either the courts or Congress. As the D.C. Circuit reasoned in *MEMA I*, "it is generally considered that the constitutionality of Congressional enactments is beyond the jurisdiction of administrative agencies." [472] Although commenters here raise a new constitutional argument—that of Equal Sovereignty rather than the First Amendment or the Dormant Commerce Clause—EPA is no more well-suited to resolve this constitutional objection than it is to resolve previous constitutional objections.[473]

EPA notes that Congress struck a deliberate balance in 1967 when it acknowledged California's serious air quality problems as well as it being a laboratory for the country, and once again in 1977 when Congress continued to acknowledge California's air quality problems as well as problems in other states and decided that California's new motor vehicle standards, once waived by EPA and subject to certain conditions, would be optionally

available for all states under section 177 under specified criteria.[474] In striking a balance between one national standard and 51 different state standards, Congress chose to authorize two standards—the federal standard, and California's standards (which other states may adopt). EPA believes this balance reflected Congress's desire for California to serve as a laboratory of innovation and Congress's understanding of California's extraordinary pollution problems on the one hand, and its desire to ensure that automakers were not subject to too many different standards on the other.

In reconsidering the SAFE 1 action and the appropriateness of reinstating the 2013 ACC program waiver, EPA has not considered whether section 209(a) and section 209(b) are unconstitutional under the Equal Sovereignty Doctrine. As in the 2013 ACC program waiver, the decision on whether to grant the waiver and the consequence of a reinstated waiver is based solely on the criteria in section 209(b) and this decision does not attempt to interpret or apply the Equal Sovereignty Doctrine or any other constitutional or statutory provision.

*B. CARB's Deemed-To-Comply Provision*

EPA received comments arguing that California's 2018 clarification to its deemed-to-comply provision "changed important underlying requirements of the original 2012 waiver application" and "EPA cannot reinstate a Clean Air Act waiver for a program that no longer exists." [475] These commenters maintain that California has never sought a waiver for the 2018 amendments or a determination that the change is within the scope of the prior waiver. As such, commenters maintain that EPA lacks a necessary predicate to permit California's enforcement of its amended GHG standards.

Other commenters argued that the "deemed to comply" provision was always conditioned on the federal standards providing GHG reductions that were at least equal to or as protective as California's program and so the 2018 amendments did not substantively change the provision or affect any related reliance interests and instead were designed to clarify the

---

[rejecting a challenge for lack of jurisdiction because challengers objected to the state regulations themselves, not EPA's approval of them in a waiver under 209(b)] ("To the extent there is any tension in our case law surrounding whether we might decide a constitutional claim brought within a broader challenge to an EPA waiver decision, OOIDA does not present us with such a challenge, and we have no occasion to resolve that question here.").

[467] 78 FR at 2145.

[468] Ohio and 15 States, Docket No. EPA–HQ–OAR–2021–0257–0124 at 1. This commenter also stated that "The waiver at issue here, allowing only California to regulate carbon emissions, is not sufficiently related to the problem that Section 209(a) targets, Congress enacted that section to permit California to address *local* air pollution. But California seeks special treatment for its proposed greenhouse gas targets . . . designed to mitigate climate change—an inherently global interest." *Id.* at 8–9. EPA notes that this characterization of CARB's standards is addressed in Section V.

[469] Twelve Public Interest Organizations at 5 ("*Shelby County* does not govern here. *See* Amicus Br. of Prof. Leah Litman 12–17, *Union of Concerned Scientists* v. *NHTSA*, No. 19–1230 (July 6, 2020) (A–0384). First, Clean Air Act Section 209(b) places no extraordinary burden or disadvantage on one or more States. Rather, the statute benefits California by allowing the exercise of its police power authority to address its particular pollution control needs. Second, the foundation for reserving California's authority has not waned over time. California had in 1967, and continues to have, the Nation's absolute worst air quality. For example, the South Coast air basin, home to 17 million people, typically leads the Nation in ozone (smog) pollution. The American Lung Association's 2021 'State of the Air' report on national air pollution shows that seven of the ten worst areas for ozone pollution in the country are in California, as are six of the worst ten for small particulate matter. Am. Lung Ass'n, *Most Polluted Cities, https://www.lung.org/research/sota/city-rankings/most-polluted-cities* (last visited July 2, 2021) (A–0422).").

[470] States and Cities at 41–42.

[471] 78 FR at 2145.

[472] *MEMA I,* 627 F.2d 1095, 1114–15 (D.C. Cir. 1979) (holding that EPA did not need to consider whether California's standards "unconstitutionally burden[ed] [petitioners'] right to communicate with vehicle purchasers."). *See also* Twelve Public Interest Organizations at 7 ("As regulatory agencies are not free to declare an act of Congress unconstitutional,' *Springsteen-Abbott* v. *SEC,* 989 F.3d 4, 8 (D.C. Cir. 2021), EPA cannot determine whether a statute Congress directed it to implement contravenes the equal-sovereignty principle. Thus, EPA should proceed to rescind the Waiver Withdrawal and leave Ohio's argument for review by an appropriate court.").

[473] *See, e.g., Johnson* v. *Robison,* 415 U.S. 361, 368, (1974) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies"); *Springsteen-Abbott,* 989 F.3d at 8; *Meredith Corp.* v. *FCC,* 809 F.2d 863, 872 (D.C. Cir. 1987).

[474] "§ 177 . . . permitted other states to 'piggyback' onto California 's standards, if the state's standards 'are identical to the California standards for which a waiver has been granted for such model year.' " *Motor Vehicle Mfrs. Ass'n* v. *New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 525 (2d Cir. 1994).

[475] AFPM at 7; Urban Air at 2, 18–19; NADA at 6.

JA-47

provision.[476] Commenters maintain that CARB adopted "non-substantive amendments for its LEV III regulations to further clarify that the deemed-to-comply provision would only apply if the federal GHG standards remained substantially as they were as of the date of the 2017 Final Determination." [477] According to these commenters, California adopted these amendments after EPA's withdrawal of its 2017 Final Determination that had determined that its Federal GHG standards for model years 2022–2025 remained appropriate and instead concluded that the federal standards for model years 2022–2025 may be too stringent and should be revised. EPA notes that after the January 2017 MTE CARB subsequently found that compliance with those federal standards would result in equivalent or greater GHG benefits than originally projected for California.[478] These commenters further maintain that the clarification of the deemed-to-comply provision is immaterial to the reversal of the waiver withdrawal in SAFE 1 because the SAFE 1 action was expressly based on EPA's decision to rely on NHTSA's preemption findings and section 209(b)(1)(B) determination, neither of which was based on CARB's 2018 clarification rulemaking. As such, the commenters maintain that the clarification of the deemed-to-comply provision has no bearing on and does not preclude EPA's SAFE 1 waiver withdrawal.[479]

As previously explained, under section 209(b)(1) EPA is to grant a waiver of preemption for California to enforce its own standards that would otherwise be preempted under section 209(a). This preemption does not extend to federal standards that are adopted under section 202(a). EPA explained this in responding to comments on the deemed-to-comply provision in the ACC program waiver decision. "[T]he waiver decision affects only California's emission standards, not the federal standards that exist regardless of EPA's decision." [480] This preemptive effect of section 209(a) does not change even when California chooses to allow for compliance with its standards through

federal standards as envisaged by the deemed-to-comply provision.

It also bears note that in SAFE 1, EPA made clear that the 2018 amendment was not a "necessary part of the basis for the waiver withdrawal and other actions that EPA finalizes in this [SAFE1] document.[481] In the Notice of Reconsideration, EPA neither reopened nor reconsidered elements of the 2013 waiver that were not part of EPA's findings in SAFE 1.[482] As noted in this decision, EPA has evaluated the factual and legal errors that occurred in SAFE 1. As part of this evaluation, EPA believes it has considered all appropriate and relevant information necessary to its review of issues associated with the second waiver prong or consideration of preemption under EPCA. The Agency also recognizes that it received comments from parties that raised non-germane issues to EPA's Notice of Reconsideration. EPA did not conduct an analysis of such comments in the context of reconsidering the specific actions taken in SAFE 1. EPA also makes clear that the result of rescinding its part of SAFE 1 is the automatic reinstatement of the waiver granted to California in 2013 for its ACC program. That is the result of the action taken herein.[483]

[481] EPA declined to "take any position at this point on what effect California's December 2018 amendment to its 'deemed to comply' provision . . . [may] have on the continued validity of the January 2013 waiver." 84 FR at 51329, n.208, 51334, n.230. Although EPA claimed in SAFE 1 that the deemed to comply clarification confirmed and provided further support for the SAFE 1 action, EPA no longer makes this claim to the extent it is relevant in its reconsideration and rescission of SAFE 1. The consequence of this action is the reinstatement of the ACC program waiver issued in 2013 and does not extend to other regulatory developments in California or by EPA that occurred subsequent to that waiver decision.

[482] 86 FR at 22423. In addition to declining to take a position on the effect of California's 2018 amendments to its "deemed to comply" provision, SAFE 1 did not finalize the withdrawal of the waiver under the first or third waiver prongs. EPA also notes that it has previously responded twice to the comments suggesting that CARB's deemed-to-comply provision demonstrates that California does not have a need for its own standards. *See* 78 FR at 2124–25.

[483] EPA acknowledges that motor vehicle emission standards in California as well as federally are periodically clarified, amended, or revised. For example, after California issued its first deemed-to-comply regulation, EPA determined that the state's GHG standards were within the scope of the 2009 waiver. While EPA believes that Congress intended regulatory certainty to be attached to the Agency's waivers issued under section 209, EPA acknowledges that conditions may change over time so significantly that it could merit a review of California's motor vehicle emission program and applicable standards therein or that would prompt California to submit a related waiver request to EPA. As explained in this decision, the conditions associated with the analysis of the three waiver criteria performed in the ACC waiver decision did not change so as to merit the SAFE 1 action. EPA

## IX. Decision

After review of the information submitted by CARB and other public commenters, the SAFE 1 action, and the record pertaining to EPA's 2013 ACC program waiver, I find that EPA did not appropriately exercise its limited inherent authority to reconsider waiver grants in SAFE 1. SAFE 1 did not correct a clerical or factual error, nor did the factual circumstances and conditions related to the three statutory criteria change prior to SAFE 1, much less change so significantly as to cast the propriety of the waiver grant into doubt. On this basis, I am rescinding the SAFE 1 action.

Furthermore, after review of both the 2013 ACC program waiver record as well as the SAFE 1 record, to the extent that EPA did have authority to reconsider the ACC program waiver, I have determined that the asserted bases were in error and did not justify the waiver withdrawal. With respect to the Agency's first purported basis—its discretionary decision to undertake a reinterpretation of the second waiver prong—I find that the statutory interpretation adopted in SAFE 1 is a flawed reading of the statute, and I hereby return to the traditional interpretation of the second waiver prong, which is, at least, the better interpretation. Under the traditional interpretation, which looks at the program as a whole, California clearly had a compelling need for the ACC program. Even if SAFE 1's statutory reinterpretation, which focuses on California's compelling need for the specific standards, were an appropriate reading, EPA did not perform a reasonable, accurate, and complete review of the factual record in its findings regarding the criteria emission benefits of CARB's ZEV sales mandate and GHG emission regulations. Upon review, I find that SAFE 1's predicate for concluding that California did not have a compelling need for these specific standards was not reasonable given the record at the time of the ACC program waiver and once again during the SAFE 1 proceeding. A reasonable, accurate, and complete review of the record supports the need for California's specific GHG emission standards and ZEV sales mandate to meet compelling and extraordinary conditions in California. This is true whether I look at how these standards reduce criteria pollution, GHG pollution, or both. In

recognizes that federal light-duty vehicle GHG emission standards have been modified twice since SAFE 1 was issued; the current standards do not change EPA's conclusion that SAFE 1 should be rescinded.

---

[476] States and Cities at 58–61. ("California always intended its standards would 'remain an important backstop in the event the national program is weakened or terminated.' 78 FR at 2,128.'").

[477] *Id.* at 60. "Final Determination on the Appropriateness of the Model Year 2022–2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation" (2017 Final Determination) at *https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100QQ91.pdf.*

[478] 82 FR 14671 (March 22, 2017) and 83 FR 16077 (April 13, 2018).

[479] States and Cities at 60–62.

[480] 78 FR at 2124.

**Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices  **14379**

sum, although I am not adopting the interpretation of the second waiver prong set forth in SAFE 1, I find that the burden of proof necessary to demonstrate that CARB's ZEV sales mandate and GHG emission standards are not needed to meet compelling and extraordinary conditions has not been met under either interpretation of the second waiver prong. Therefore, I rescind the Agency's part of the SAFE 1 action to the extent it relied upon the second waiver prong to withdraw the ACC program waiver.

With regard to the applicability of preemption under EPCA, I find that, to the extent EPA's authority to reconsider the ACC program waiver rested upon NHTSA's joint action at the time as well as the applicability of its EPCA interpretation to EPA's review, this statute falls clearly outside the confines of section 209(b) where EPA's authority to grant, deny, and reconsider waivers resides. In any event, the grounds for such action under SAFE 1 no longer exist given NHTSA's recent final action withdrawing its EPCA preemption rule in its entirety.

Each of the decisions and justifications contained in this final action is severable.

This decision rescinds EPA's SAFE 1 action and therefore, as a result, the waiver of preemption EPA granted to California for its ACC program ZEV sales mandates and GHG emission standards issued in 2013, including for the 2017 through 2025 model years, comes back into force.

*Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of ''nationally applicable regulations promulgated, or final actions taken, by the Administrator,'' or (ii) when such action is locally or regionally applicable, but ''such action is based on

a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.'' For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).

This final action is ''nationally applicable'' within the meaning of section 307(b)(1). In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of ''nationwide scope or effect'' within the meaning of section 307(b)(1).[484] This action rescinds EPA's final action in SAFE 1, which withdrew a waiver for new motor vehicle greenhouse gas emission standards and ZEV sales mandate granted to California under section 209(b) of the CAA. In addition to California, sixteen other states and the District of Columbia have already adopted California's motor vehicle greenhouse gas standards. The other states are New York, Massachusetts, Vermont, Maine, Pennsylvania, Connecticut, Rhode Island, Washington, Oregon, Minnesota, New Jersey, Nevada, Maryland, Virginia, Colorado, and Delaware.[485] These jurisdictions represent a wide geographic area and fall within eight different judicial circuits.[486] In addition,

this action will affect manufacturers nationwide who produce vehicles to meet the emissions standards of these states. For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of section 307(b)(1) and is hereby publishing that finding in the **Federal Register**.

Under CAA section 307(b)(1), petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit within 60 days from the date this final action is published in the **Federal Register**.

**X. Statutory and Executive Order Reviews**

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Further, Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act, 5 U.S.C. 801, *et seq.,* does not apply because this action is not a rule for purposes of 5 U.S.C. 804(3).

**Michael S. Regan,**
*Administrator.*
[FR Doc. 2022–05227 Filed 3–11–22; 8:45 am]
**BILLING CODE 6560–50–P**

---

[484] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[485] The same states have adopted California's ZEV sales mandate regulation with the exception of Pennsylvania, Washington, and Delaware.

[486] In the report on the 1977 Amendments that revised CAA section 307(b)(1), Congress noted that the Administrator's determination that the ''nationwide scope or effect'' exception applies would be appropriate for any action that has a

scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323–24, reprinted in 1977 U.S.C.C.A.N. 1402–03.

R-1,  Comment submitted by California Air Resources Board (CARB)

# Analysis in Support of Comments of the California Air Resources Board on the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks

Docket ID: EPA-HQ-OAR-2018-0283; NHTSA-2018-0067; NHTSA-2017-0069



October 26, 2018

CALIFORNIA
AIR RESOURCES BOARD

Mary D. Nichols, Chair
Matthew Rodriquez, CalEPA Secretary
Edmund G. Brown Jr., Governor

October 26, 2018

National Highway Traffic Safety Administration
U.S. Department of Transportation
Docket Management Facility, M-30
West Building, Ground Floor, Room W12-140
1200 New Jersey Avenue, SE
Washington, DC 20590

U.S. Environmental Protection Agency
EPA Docket Center (EPA/DC)
Air and Radiation Docket, Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, DC 20460

Attention: Ms. Heidi King, Deputy Administrator
        Docket ID Nos. NHTSA-2018-0067 and NHTSA-2017-0069

        Mr. Andrew Wheeler, Acting Administrator
        Docket ID No. EPA–HQ–OAR–2018–0283

Via: http://www.regulations.gov
    Docket Nos.: EPA-HQ-OAR-2018-0283; NHTSA-2018-0067; NHTSA-2017-0069

Re: Comments of the California Air Resources Board on the Safer Affordable Fuel-
Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light
Trucks

Dear Ms. King and Mr. Wheeler:

The National Highway Traffic Safety Administration (NHTSA) and the United States
Environmental Protection Agency (EPA) have proposed to break the unified national
vehicle program, flat-line federal standards, and attack emissions regulations developed
by California on which many states depend. Finalizing this proposal would worsen air
quality for the most vulnerable, waste billions of gallons of gasoline, forfeit our best
chance to fight climate change, and result in years of uncertainty in the marketplace
thereby stifling job-creating investments.  The proposal ignores Congressional
mandates, and threatens the sovereign responsibilities of the states to protect the
public.

The proposed Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years
2021-2026 Passenger Cars and Light Trucks does not even accord with basic principles
of reasoned decision-making and must be withdrawn. As summarized below and

Ms. Heidi King and Mr. Andrew Wheeler
October 26, 2018
Page 2 of 6

explained in our attached comments and analysis, the proposal will hurt the American
people. In fact, the only clear winners from the efficiency-killing proposal are oil
companies that realize increased demand for their products.

**The rollback threatens public health and welfare.**

The future envisioned by the rollback rule, on the federal agencies' own admission, is
one in which greenhouse gases nearly double from today, further exacerbating climate
change. In that future, according to the world's leading scientists, hundreds of millions of
people would be displaced, millions would die, and trillions of dollars of harm would
come to what remains of the global economy. These tragedies are coming to pass now.
The Intergovernmental Panel on Climate Change has estimated that human-caused
emissions have already increased global average temperatures approximately 1 degree
Celsius. Hurricanes, rampant wildfire, drought, heat waves, and other extreme weather
events are becoming more common and severe. Moreover, worsening smog and soot
pollution caused by vehicle emissions will be exacerbated by the rollback, rendering it
difficult or impossible for the states readily to meet core state and federal public health
standards. Yet, the federal agencies propose to actually make the situation worse, while
attacking the states' sovereign authority to protect their own citizens.

**Technology and ingenuity support the existing standards.**

For decades, vehicles have gotten cleaner and safer, and the auto industry has
prospered. The federal agencies nonetheless assert that vehicle technology is not ready
to meet the existing standards, and that costly electrification is the only option available
to meet the standards. To reach these erroneous conclusions, the modeling on
technology penetration and use departs from EPA's own long-standing models, instead
relying entirely on a set of NHTSA tools that are not designed for this purpose and
which massively inflate the real costs of compliance. In fact, the technology on the road
today has already beaten what the agencies project, demonstrating the engineering
creativity of the industry. The agencies' technology analysis artificially restricts the cost-
effective vehicle technologies already in use or under substantial development. Instead
of relying on real-world results, the proposal leads, inaccurately, to grossly inflated
costs. The analysis is so disconnected from real world experience that even the vast
majority of the automotive industry agree that the proposal goes too far, is not
substantiated, and does not support continued investment in innovation.

**The existing standards are cost-effective – the rollback is not.**

When costs and technology are considered consistent with what is actually being
achieved in the current vehicle market, the existing standards are cost effective. Better
cars save everyone gas money. In most cases, the difference is made up within the first

Ms. Heidi King and Mr. Andrew Wheeler
October 26, 2018
Page 3 of 6

three years, providing a net benefit for the majority of the life of the vehicle. Low-income families have the most to gain from reduced fuel costs, which constitute a more significant portion of their household expenses. The rollback will cost consumers billions of dollars over the lifetime of the vehicles.

## The rollback will hurt economic, energy, and national security.

The rollback would badly damage progress towards building an innovative and efficient auto industry in this country, isolating America and diminishing its competitiveness as the rest of the world continues to move ahead. As your own analysis concedes, the proposal will waste fuel and other natural resources.

This proposal – not the regulations - is the job killer. This proposal predicts 50,000 job losses in 2025, based on a limited analysis. A full analysis predicts job losses between 90,000 and 160,000 by that year. These losses will come from decreased investment in clean technologies, and a chilling effect on developing technology to make vehicles run cleaner. This will suppress larger related market activity that would follow from that development. Overall, the industry will suffer from the risk, uncertainty, and inefficiency from this proposal.

The rollback will also increase costs on drivers and on businesses, large and small, who will have to pay more every time they fill up. And, adding insult to injury, consumers, businesses, and federal, state, and local governments will pay mounting costs for accelerating climate changes and local health impacts – which we are already witnessing.

## The rollback is unsafe.

Cars produced today are vastly cleaner and safer than cars proposed just a few years ago. But the rollback claims that driving is dangerous, and therefore cars should be less fuel-efficient to deter people to drive less. This perverse logic is unsupported by the federal agencies' analyses and fails to reflect the reality that the auto industry is already engineering a way towards a better future.

The facts, engineering, and experience unequivocally support continuing on the current path of making cars ever safer and less polluting, a trend that has accompanied a steady decline in highway fatalities.

The federal agencies rely on inappropriate and illogical modeling to conclude that the rollback will increase highway safety. Based on the flawed claim above that the technology to meet the existing standards is much more expensive, the proposal claims that new car sales will drop markedly if the existing standards are maintained, resulting

Ms. Heidi King and Mr. Andrew Wheeler
October 26, 2018
Page 4 of 6

in a dramatic expansion of the existing car fleet. This is asserted to, in turn, cause a sharp increase in fatalities because supposedly less-safe older cars will remain on the road longer and (for some unexplained reason) people will drive these cars far more than they do today. Compounding these conclusions that do not accord with experience of car sales over the past decade, the proposal claims that driving in newer, cleaner, and more fuel-efficient cars if there is no rollback will dramatically increase – the so-called "rebound effect" that cars will be so efficient people will drive much further – also resulting in more fatalities.

Thus, the federal agencies appear to conclude that the best way to cut vehicle pollution and reduce fatalities is essentially to try to make new cars cheaper but more expensive to drive, expecting that this will reduce the use of older cars, but diminishing incentives to drive. In reaching this conclusion, they acknowledge that the main thrust of the rollback will be to push consumers away from the utilitarian vehicles they prefer and into smaller vehicles because refueling them will become more expensive with the rollback. In essence, the proposal is to chart a course for less efficient and more polluting cars that cost more to drive.

To reach these conclusions, the federal agencies used modeling approaches that are fundamentally inappropriate and which do not reflect reality. The "scrappage" model used to support these conclusions does not comport with economic theory or provide statistically reliable results; leading experts, including our own as detailed in our comments, have rejected it. Similarly, federal agencies' predictions of driving and fatality behavior reflect neither reality nor expert opinion and analyses.

This bizarre prediction builds on a stack of bad ideas, including a total unwillingness to consider the technological progress and intelligent design reflected in today's vehicles and transportation sector – or even what is already under development and will be on the market in the near future. The equations and their predictions are inconsistent with logic, economic theory, and manufacturers' practices. They do not pass basic tests of mathematical and statistical rigor.

It is clear the federal agencies contrived the proposal to support the President's impulsive and uninformed direction to "cancel" this program, and it does not hold up to scrutiny. In the real world, auto pollution has been falling for years, fuel economy and durability have increased, while the industry has enjoyed record sales despite rising sales prices, and the roads have become steadily safer despite increasing vehicle miles traveled.

Ms. Heidi King and Mr. Andrew Wheeler
October 26, 2018
Page 5 of 6

**The rollback is illegal and violates principles of federalism.**

Underlying the flawed analysis this proposal conflicts with Congress's clear direction to keep improving cars and making them cleaner, while attacking sovereign state authority. This behavior threatens the rule of law. The SAFE Rule departs entirely from the federal agencies' governing statutes to control emissions that threaten the public health and welfare, and to set fuel economy standards that are, in the language of the enabling legislation itself, the "maximum feasible." On the contrary: this proposal vastly increases greenhouse gas emissions, worsens air quality, wastes billions of gallons of gasoline, and attacks state authority that Congress has expressly preserved and extended. The slackened fuel economy standards would impose unnecessary costs on consumers to refuel their vehicles, ensure the nation remains dependent on imported energy, and tacitly recognizes the standards are not the maximum feasible when it also predicts manufacturers will voluntarily sell cars that exceed the standards.

Executive agencies are not empowered to rewrite or ignore statutes, much less to reverse their meaning, as the federal agencies now propose. That the agencies rely upon their inverted reading of the statutes to further propose to end a decades-long partnership with California for vehicle regulation that is preserved in both statutes, and reflects a settled Congressional judgment is even more concerning. If the proposal is finalized, Congress cannot be assured that its directives will be followed in any administrative context, and states must be on their guard as to threats from administrative bureaucracies to their sovereign police powers and statutory prerogatives.

Nor are the federal agencies free to rely upon their misreading of the law to attack authority that Congress has explicitly preserved for California (and states choosing to adopt California standards) to set vehicle pollution standards. The California Air Resources Board (CARB) is a critical part of Congress's plans for national vehicle regulation, and has been for half a century. The federal agencies' attempt not just to rollback the standards but to attack sovereign state prerogatives protected by Congress are the hallmark of unaccountable agency overreach, and will be reversed by the courts (as they have in the past).

The analysis, content, and arguments, as outlined in our attached comments, demonstrate how far off course the federal agencies have veered.

NHTSA and EPA must withdraw the SAFE Vehicles proposal. CARB asks that the agencies heed the overwhelming public outcry and work with California, the other states that have adopted California's standards, and the auto industry to maintain a national program that achieves real emission and fuel consumption reductions year-over-year,

Ms. Heidi King and Mr. Andrew Wheeler
October 26, 2018
Page 6 of 6

promotes innovation and a competitive national manufacturing base, and serves all of
the public.

We have yet to see any evidence supporting any sensible changes to the standards, but
we are open to conversations rooted in the facts. If adjustments are appropriate, as the
manufacturers have claimed but not substantiated, CARB is ready to respond
appropriately. If you would like to discuss any potential reasonable changes that
maintain steady improvements, you may contact me at (916) 322-7077 or
richard.corey@arb.ca.gov.

Sincerely,

Richard W. Corey
Executive Officer

cc:     Governor Edmund G. Brown

        Matthew Rodriquez
        California Secretary for Environmental Protection

        Mary D. Nichols
        Chair, California Air Resources Board

analysis does not support the Agencies' proposal, going on to explain that the further attack upon California's authority in the proposal is illegal. We also explore other legal flaws and resulting consequences that will follow if the proposal is finalized.[6]

## III.    CARB has consistently led the nation in regulating emissions from motor vehicles.

The Agencies are proposing not only to flatline their own programs, contrary to law, but to also strip California of its authority to regulate GHG emissions from light-duty vehicles and to require ZEVs to control both criteria pollutants and GHG emissions. California, through CARB, has been regulating vehicle emissions since 1959, ZEVs since 1990, and GHGs since 2009 (the latter, in successful partnership with EPA and NHTSA). Congress has repeatedly preserved and strengthened CARB's authorities as an integral part of the cooperative federalism scheme of the federal Clean Air Act. EPA has developed decades of administrative practice consistent with this Congressional intent, and both California and the states that have opted into its program rely upon its vehicle program, with EPA's approval, to meet federal emissions standards and state law mandates. Millions of people have benefitted as a result. The Agencies' late-breaking proposal to discover, decades later, that California's program is improper in major regards stands in stark contrast to this history.

We therefore begin these comments with a thorough discussion of CARB's long regulatory history. California began regulating, pursuant to the police power authority inherent in its sovereignty (and preserved by the Tenth Amendment) by the 1950s, reacting to persistent problems with vehicle air pollution caused by California's particular circumstances.

When federal law entered this space, Congress appropriately preserved California's authorities. In 1967, Congress deliberated considerations weighing in favor and against allowing only California to establish and implement its own motor vehicle emissions control program, and elected to expressly grant California the authority to "blaze its own trail, with a minimum of federal oversight".  Since 1967, Congress has had ample opportunities to reconsider that initial decision, but in each instance has consistently elected to expand California's authority, based on its recognition that California has consistently achieved more stringent emissions controls than the comparable federal program, and has fulfilled its role as the nation's laboratory in advancing the development of increasingly stringent emissions motor vehicle emissions programs.

Moreover, California's unique authority to adopt and implement more stringent motor vehicle emission standards has played a critical role throughout the years in ensuring that the motor vehicle industry continues its efforts to research and develop

---

[6] We also note that NHTSA's limitation on comments to 15 pages is untenable and precludes effective public participation. See 83 Fed. Reg. at 43,470, citing 49 C.F.R. § 553.21. CARB submits these comments as "attachments" that are not subject to this improper constraint.

23

advancements in technology needed to further reduce motor vehicle emissions. As discussed below, for instance, when Congress enacted the 1970 Amendments to the Clean Air Act, it directed EPA to promulgate emission standards for 1975 model year vehicles that were 90 percent lower than the corresponding hydrocarbon (HC) and carbon monoxide (CO) emissions standards for 1970 model year vehicles, and standards for 1976 model year vehicles that were 90 percent lower than the corresponding oxides of nitrogen (NOx) standard for 1971 model year vehicles, respectively. However, that statutory mandate was effectively diluted when the motor vehicle industry claimed that it lacked the experience and knowledge to mass produce the catalytic converter technology needed to comply with the specified emission standards, by Congressional concerns that stringent emission standards might adversely impair vehicle fuel economy, and by concerns that catalytic converters might emit harmful levels of sulfuric acid mist. Consequently, the emission standards that were initially intended to apply to 1975 and 1976 model year vehicles were not implemented on federal vehicles until the 1981 model year.

Fortunately, by virtue of its unique authority under section 209(b) of the Clean Air Act, California was able to continue to promulgate and implement more stringent emission standards that required manufacturers to equip nearly all California vehicles with catalytic converters four years before the corresponding federal emission standards would require catalytic converters on federal vehicles. Those California requirements led to the development of the three-way catalytic converter, and demonstrated that vehicle manufacturers could comply with comparably stringent federal emission standards on a nationwide basis. As the EPA Administrator recognized in 1973, requiring manufacturers to comply with more stringent California requirements before imposing those requirements on a nationwide basis was fully consistent with California's practices of continually establishing more stringent emission standards than comparable federal emission standards, and with the waiver provisions of the Clean Air Act in which Congress expressly authorized California to adopt and enforce more stringent state standards.

As discussed below, California has also led the nation in promulgating other categories of emission standards and emission related requirements, including requirements for on-board diagnostic systems, and criteria and GHG emission standards for 1994 and subsequent model year light-duty motor vehicles, and EPA and Congress have largely relied upon information demonstrating that vehicle manufacturers are capable of complying with California requirements in subsequently promulgating federal requirements that largely mirror the earlier promulgated California emission standards. Professor Ann E. Carlson[7] has explained that California's motor vehicle emissions

---

[7] "Ann Carlson is the Shirley Shapiro Professor of Environmental Law, and the inaugural Faculty Director of the Emmett Institute on Climate Change and the Environment at the UCLA School of Law. She is also on the faculty of the UCLA Institute of the Environment. [She] is one of the country's leading scholars of climate change law and

control program comprises a crucial and integral component of the larger federal motor vehicle emission control program because it directly fosters the sustained enactment of increasingly stringent emission standards across the nation, as exemplifying "iterative federalism."

Professor Carlson defines "iterative federalism" as encompassing the repeated, sustained and dynamic lawmaking efforts by both certain states that have been effectively delegated a "super regulator status" by federal law, and by the federal government.  Under this scheme, a governmental actor initially enacts regulations that results in the second governmental actor adopting a subsequent set of regulations, and that further triggers action by the initial regulator.  Professor Carlson explains that Congress' decision to exempt only California from the preemptive effects of the Clean Air Act effectively grants a California a "superregulator" status that allows California to engage in policy experimentation and risk taking that has ultimately benefited other states and the federal government.  For instance, allowing California to regulate in advance of the federal government allows EPA to avoid imposing regulations that California first determines impose higher compliance costs than initially anticipated, and further allows California to promulgate more stringent state emission standards even as directives to promulgate more stringent federal emission regulations stagnate, as directly evidenced by the events occurring after the enactment of the 1970 Amendments to the Clean Air Act.

> *Here, instead, the unique iterative federalism structure enacted in 1967 allowed public choice pathologies at the federal level to be corrected at the state level.  Furthermore, the iterative federalism structure allowed a state to experiment with potentially costly regulations prior to widespread federal adoption, without imposing multiple regulatory schemes on a nationwide industry.  When federal law appeared to be too rigid or politically unpalatable, California's regulatory activity gave the EPA something to follow.*

Ann E. Carlson, *Iterative Federalism and Climate Change*, 103 NW. U. L. Rev. 1097, 1117-1118 (2009).

The more detailed discussion below demonstrates that California's unique authority to establish its own distinct motor vehicle emissions control program has not impaired or hindered EPA's ability to promulgate effective a federal motor vehicle emissions control

---

policy. Two of her articles, Iterative Federalism and Climate Change and Takings on the Ground, have been selected by the Land Use and Environmental Law Review as among the top five environmental articles of the year, and her work has been published in leading journals including the UCLA, California, Northwestern and Michigan law reviews.  She is co-author (with Daniel Farber and Jody Freeman) of a leading casebook, Environmental Law (8th ed.). She recently served on a National Academy of Sciences panel, America's Climate Choices:  Limiting the Magnitude of Future Climate Change, and she is currently serving on an American Academy of Arts and Sciences panel studying the future of America's energy systems." *See* https://law.ucla.edu/faculty/faculty-profiles/ann-e-carlson/.

program.  Instead, that authority has enabled California to create an innovative motor vehicle emissions control program that has both significantly reduced pollution from motor vehicles in California, and that has benefitted the nation by demonstrating the feasibility of attaining more stringent state standards in California, thereby providing EPA a foundation upon which it can base comparable federal standards that have already been tested in California.

California has consistently led the nation in regulating motor vehicle emissions, and any implication that its motor vehicle emissions control program could potentially hinder the development of more protective federal emission standards is simply incorrect, and is not consistent with the developments of air pollution law since Dr. Haagen-Smit first identified the causal link between motor vehicle emissions and the smog impairing Los Angeles' air quality. Now is not the time to repeal that progress, or ignore Congress's considered and repeated decisions to preserve it.

### A. The nation's control of motor vehicle pollution began in California.

CARB pioneered regulating emissions from motor vehicles.  Dr. Arie Haagen-Smitt, a professor from the California Institute of Technology, first identified the causal link between the exhaust emissions from motor vehicles and the smog in the air above Los Angeles.  Dr. Haagen-Smit conducted a series of experiments in the 1950s that demonstrated ozone – a primary component of the smog affecting residents of Los Angeles – was produced when the hydrocarbon and NOx components of automotive exhaust reacted in the atmosphere in the presence of sunlight.

> *Through investigations initiated at Caltech, we know that the main source of this smog is due to the release of two types of material.  One is organic material – mostly hydrocarbons from gasoline – and the other is a mixture of oxides of nitrogen.  Each one of these emissions by itself would be hardly noticed.  However, in the presence of sunlight, a reaction occurs, resulting in products which give rise to the typical smog symptoms.*

A.J. Haagen-Smit, Smog Control – Is it just around the corner?, 26 Engineering and Science, 9, 10 (1962).

Recognizing this public health threat, and exercising its inherent authority to protect public welfare, California enacted legislation in 1959 requiring the Department of Public Health to determine, by February 1, 1960, "the maximum allowable standards of emissions of exhaust contaminants from motor vehicles which are compatible with the preservation of public health including the prevention of irritation to the senses."

Pursuant to that directive, the Department of Public Heath adopted tailpipe emission standards that required reductions of new motor vehicle emissions of HC and CO of 80 percent and 60 percent, respectively, compared to the average emissions of current (uncontrolled) motor vehicles.  Expressed numerically, those standards were: 275 parts per million by volume, (as hexane) for HC emissions, and 1.5 percent by volume for CO.

26

In 1960, California's legislature enacted the Motor Vehicle Pollution Control Act (MVPCA). The MVPCA established the Motor Vehicle Pollution Control Board (MVPCB) within the Department of Public Health, and authorized the MVPCB to, among other specified duties, "determine and publish criteria for approval of motor vehicle pollution control devices." The MVPCB was directed to approve motor vehicle pollution control devices that it found met the emission standards adopted by the Department of Public Health.[8] However, the installation of approved motor vehicle pollution control devices on new motor vehicles was not required until one year after the date that the MVPCB certified two devices.

The MVPCB certified four motor vehicle pollution control devices for use on new motor vehicles in June 1964, and therefore, under the existing law, the installation of such devices on new motor vehicles became mandatory starting in 1966. It is notable that the three major domestic auto manufacturers were able to certify 1966 model year vehicles without the use of the certified motor vehicle pollution control devices; instead, they were able to meet the applicable exhaust emission standards solely by incorporating engine modifications such as carburetor adjustments, timing changes, and air injection systems.

In 1967, California's legislature enacted the Mulford-Carrell Air Resources Act which abolished the MVPCB, established the State Air Resources Board (CARB), and authorized CARB to, among other things, adopt motor vehicle emission standards. The Mulford-Carrell Air Resources Act expressly required 1966 and newer model year motor vehicles to be equipped with certified devices to control crankcase and exhaust emissions, and further required, effective December 1, 1967, that 1968 or newer model year passenger vehicles, 1967 or newer model year commercial motor vehicles under 6,001 pounds maximum gross vehicle weight rating (GVWR), and 1969 or newer model year trucks, truck tractors or buses not powered by diesel fuel, to be equipped with certified devices to control emissions of pollutants from the crankcase and exhaust. California Governor Ronald Reagan appointed Dr. Arie Haagen-Smit the first Chairman of CARB.

### B. Early federal and California control of motor vehicle emissions recognized the role of both authorities.

#### 1. The Federal Motor Vehicle Air Pollution Control Act was enacted in 1965.

Unfortunately, California was not the only state adversely affected by the suffocating effects of air pollution caused by motor vehicles during the 1950s and the 1960s. In 1965, the United States Congress enacted the Motor Vehicle Air Pollution Control Act (MVAPCA) to address, on a national level, the broad and intractable harm presented by motor vehicle emissions. The legislative history of the MVAPCA indicates that

---

[8] Pursuant to Cal. Hlth. § Saf. Code § 426.5.

Congress was fully aware that motor vehicles and motor vehicle engines were a significant source of air pollutants that were harming the public's health and welfare, and that a comprehensive nationwide approach was required to reduce such emissions.

> *Motor exhaust is the only major source of air pollution not under some degree of local or Federal regulation. The time for such regulation is now. Motor vehicles already dump 92 million tons of carbon monoxide alone into the air. Within the next decade, the number of automobiles trailing this lethal gas and other harmful pollutants along our roads and highways will increase by a third. The air around us is an exhaustible resource which must be protected and conserved. To prevent increasing damage to property and health from exhaust fumes and to insure that our children and grandchildren will have clean air to breathe, we must begin the moves needed to stop this fouling of our environment now.*

Hearings on H.R. 463, H.R. 2105, H.R. 4001, H.R. 7065, H.R. 7394, H.R. 7429, H.R. 8007, H.R. 8398, H.R. 8723, H.R. 8800, and S. 306 before the Subcomm. on Public Health and Welfare of the House Comm. on Interstate and Foreign Commerce, 89th Cong., 1st Sess.  (Cong. Long, pp. 98-99).

Section 202(a) of the MVAPCA required the Secretary of Health, Education, and Welfare to:

> *[P]rescribe as soon as practicable standards, applicable to the emission of any kind of substance, from any class or classes of new motor vehicles or new motor vehicle engines, which in his judgment cause or contribute to, or are likely to cause or contribute to, air pollution which endangers the health or welfare of any persons, and such standards shall apply to such vehicles or engines whether they are designed as complete systems or incorporate other devices to prevent or control such pollution.*

Pub. L. 89-272, 79 Stat. 992-993.

Although Congress was fully aware of California's motor vehicle emissions program when it enacted the MVAPCA, it did not enact provisions in MVAPCA to preempt states from promulgating their own vehicle emission standards, and several states subsequently proceeded to enact legislation regarding controls of motor vehicle emissions.  As discussed below, Congress subsequently acted to preempt almost all states from controlling new motor vehicle emissions, but also authorized only California to continue to develop and adopt emission standards for new motor vehicles that were distinct from otherwise applicable federal new motor vehicle emission standards.

### 2. To balance national consistency with state sovereignty to protect public welfare, congress expressly preserved only California's authority to control motor vehicle emissions.

In 1967, Congress enacted the Air Quality Act of 1967 that, in pertinent part, expressly preempted nearly all of the states from adopting separate new vehicle emission standards.  The automotive industry maintained that it should only be subject to a

28

single, nationwide standard, and that it would be unduly disruptive to subject manufacturers to a patchwork of federal and multiple state standards. However, Congress was also fully aware that California was experiencing significant air pollution problems because of compelling and extraordinary circumstances, and also recognized that California was leading the nation in regulating motor vehicle emissions. For instance, as previously discussed, California adopted the first tailpipe emission standards for new 1966 model vehicles, and EPA subsequently adopted essentially those same emission standards for federal 1968 model year vehicles on March 30, 1966.

California's Senator Murphy was able to convince his colleagues from across the nation that allowing California to continue its pioneering efforts to control emissions from motor vehicles, and to essentially serve as a laboratory for innovation that might lead to new developments in control systems and designs, would ultimately benefit the nation.

> *The amendment permits California to continue a role of leadership which it has occupied among the States of this Union for at least the last two decades. As I said in general debate, it offers a unique laboratory, with all of the resources necessary, to develop effective control devices which can become a part of the resources of this Nation and contribute significantly to the lessening of the growing problems of air pollution throughout the Nation.*

> 113 Cong. Rec. H14428 (Nov. 2, 1967) (statement of Cong. Moss)

In essence, the nation as a whole would benefit from California's efforts, without having to duplicate those efforts.

The preemptive provision of the Air Quality Act of 1967 consequently reflected a compromise between the desire of the motor vehicle industry to be subject to a single set of emission standards, and California's interest in maintaining its preexisting authority, under state law, to establish motor vehicle standards needed to address the pollution resulting from its unique conditions.

> *SEC. 208. (a) No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this title. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.*

> *(b) The Secretary shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of*

29

*emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, unless he finds that such State does not require standards more stringent than applicable Federal standards to meet compelling and extraordinary conditions or that such State standards and accompanying enforcement procedures are not consistent with section 202(a) of this title.*

*(c) Nothing in this title shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles.*

Pub. Law 90-148, § 208, 81 Stat. 485, 501 (1967)

Although Section 208(b) did not explicitly refer to California, the legislative history clearly indicated that provision was solely applicable to California.  Congress accordingly explicitly authorized and directed California to forge ahead of the nation in order to continue its pioneering role of establishing more stringent motor vehicle emissions controls that would necessarily spur advancements in motor vehicle emissions control technology that would ultimately benefit both California and the United States.

### 3. California obtained its first waiver in 1968.

Once Congress enacted the provision in the Air Quality Act of 1967 that authorized California to adopt separate new motor vehicle emission standards, CARB did not hesitate in requesting a waiver for new motor vehicle emission standards.  On July 11, 1968 the Secretary of Health, Education, and Welfare granted California a waiver for several California emission standards, including exhaust emission standards for 1969 model gasoline-powered motor vehicles, evaporative emission standards for 1970 model year vehicles at and below 6,000 lbs GVWR, and associated test procedures.[9]

The waived exhaust emission standards for 1969 model year gasoline-powered motor vehicles at or below 6,000 lbs GVWR, and with engine displacement above 140 cubic inches were: 1) hydrocarbons,  275 parts per million (ppm) by volume (as hexane), and 2) carbon monoxide, 1.5 percent by volume.

### 4. California continued its progress with the Pure Air Act of 1968 and emissions standards for the 1970 model year.

Although California had already enacted the most stringent motor vehicle emission controls in the nation, it continued its long-standing efforts to seek and attain further reductions of motor vehicle emissions.  In 1968, California's legislature enacted the Pure Air Act of 1968, which, among other provisions, established specific exhaust emission standards for new 1970 through 1974 and newer model year gasoline

---

[9] 33 Fed.Reg. 10160 (July 16, 1968).

powered motor vehicles. Notably, that legislation also established the first emission standards for oxides of nitrogen (NOx) beginning with 1971 model year passenger vehicles. The legislation also specified exhaust emission standards for new 1970, 1971, and 1972 and newer heavy-duty gasoline powered heavy-duty trucks. California's legislature stated that these standards had been determined "to be technologically feasible and capable of implementation with reasonable economic cost by a technical advisory panel of nine California engineers, scientists, and air pollution experts." CARB was also authorized to adopt emission standards that were more stringent than the numerical standards specified in the legislation, if CARB determined such standards were necessary and technically feasible, and to adopt emission standards for other pollutants that CARB found were necessary and technically feasible.

CARB developed test procedures applicable to the above-mentioned exhaust and evaporative emission standards, and requested a waiver for the exhaust and evaporative emission standards as specified in the Pure Air Act of 1968 and the accompanying test procedures. EPA granted that waiver on May 2, 1969.[10]

The California exhaust emission standards for gasoline-powered motor vehicles under 6,001 lbs maximum GVWR are set forth below in units of grams of pollutant per mile (g/mi).

*Table III-1 California Exhaust Emissions Standards for 1970 through 1973 Model Year Light-Duty Motor Vehicles*

| Model Year | Hydrocarbons (g/mi) | Carbon Monoxide (g/mi) | NOx (g/mi) |
|---|---|---|---|
| 1970 | 2.2 | 23 | N/A |
| 1971 | 2.2 | 23 | 4.0 |
| 1972 and 1973 | 1.5 | 23 | 3.0 |
| 1974 and newer | 1.5 | 23 | 1.3 |

### 5. Federal motor vehicle emissions standards for 1970 adopted California's standards.

In June of 1968, the federal Department of Health, Education and Welfare (HEW) adopted federal exhaust emission standards for 1970 and newer light-duty vehicles that were identical to the corresponding California exhaust emissions standards for 1970 model year light-duty vehicles. On November 2, 1970, the Department of HEW adopted federal exhaust emission standards of: 3.4 g/mi of hydrocarbons, and 39.0 grams per mile for carbon monoxide for 1972 through 1974 light-duty vehicles. These standards applied through the 1974 model year.

---

[10] 34 Fed.Reg. 7348 (May 6, 1969).

31

## C. Federal and California air pollution law developed in the 1970s.

The early history of the federal/state relationship preserved under federal law set a repeating theme: California continued to press forward with stringent standards, while national standards moved more slowly, or in stops and starts. Despite these contrasts, neither Congress nor EPA suggested anything was improper about California's actions; on the contrary, EPA repeatedly affirmed them, and ultimately adopted California's choices into national standards.

EPA also expressly affirmed, in granting California a waiver for 1979 and subsequent model year light-duty vehicles, that the Clean Air Act authorizes California to regulate emissions of methane, a climate altering pollutant.[11] EPA's affirmance is consistent with legislative history indicating Congress did not limit California's authority to regulate emissions of pollutants to only those categories of pollutants that would contribute to the formation of smog.

> *California's particular problem is that of photochemical smog, the constituent components of which are hydrocarbons and nitrogen oxide. However, the total program for control of automotive emissions is expected to include the control of many other pollutants including carbon monoxide, lead, and particulate matters.*

> 113 Cong. Rec. H 30951 (daily ed. Nov. 2, 1967) (Cong. Herlong).

1970 ushered in two events that would significantly affect the federal motor vehicle emissions control program.  First, President Nixon established the United States Environmental Protection Agency (EPA).  The EPA assumed the responsibility to administer the National Air Pollution Control Administration program previously administered by the Department of the HEW.

### 1.  The Clean Air Act was amended in 1970.

The second event was Congress' enactment of the 1970 Amendments to the Clean Air Act, which again affirmed California's authorities.  Congress determined that significant reductions in motor vehicle emissions were required to protect the public health, and accordingly amended the Clean Air Act to require EPA to adopt regulations that achieved specified reductions in emissions from new motor vehicles.  Specifically, EPA was required to adopt regulations that required new 1975 light-duty vehicles to emit 90 percent less hydrocarbons and carbon monoxide emissions than the corresponding standards for 1970 model year vehicles,  and was further required to establish emissions standards for NOx for new 1976 light-duty vehicles that were at least 90 percent lower than the average emissions of NOx emitted from 1971 light-duty vehicles that were not subject to any federal or state emissions standards for NOx.  Affected

---

[11] 43 Fed.Reg. 25,729; 25,735 (June 14, 1978).

vehicles were required to comply with such standards for a specified period of use (useful life), defined as five years or 50,000 miles, whichever first occurs. Those statutory directives corresponded to emissions standards of 0.41 g/mi of hydrocarbons and 3.4 grams per mile for carbon monoxide for 1975 vehicles, and 0.4 g/mi of NOx for 1976 model year vehicles.

Congress recognized that the statutorily mandated emissions reductions comprised aggressive, technology forcing requirements, and accordingly also enacted safety valve provisions that allowed vehicle manufacturers to request the EPA Administrator to suspend the effective dates of the statutorily prescribed emission standards for one year. The EPA Administrator could only grant a suspension request if he or she determined that the suspension was essential to the public interest, that the applicant had made good-faith efforts to meet the standards, and if the applicant established that the necessary control technology was not available for a sufficient period of time to achieve compliance. Moreover, Congress authorized the National Academy of Sciences (NAS) to assess the technical feasibility of achieving the statutorily mandated emission standards, and specified that the EPA Administrator could not grant a suspension request if the "study and investigation" of the NAS indicated that the requisite control technology was available. If the Administrator granted a request to suspend the statutory emission standards, he or she was required to simultaneously prescribe interim emission standards.

The stringent emission reductions mandated by the 1970 Amendments effectively required most vehicle manufacturers to install catalytic converters on their 1975 model year vehicles in order to reduce the quantities of hydrocarbon and carbon monoxide present in vehicle tailpipe exhaust to acceptable limits. However, vehicle manufacturers asserted that they did not possess extensive knowledge or experience regarding the capabilities of catalytic converter technology to reduce vehicular emissions, and further expressed doubts whether advancements in catalytic converter technology could be developed and successfully implemented in time to permit them to install sufficiently robust converters on all of their 1975 model year production vehicles.

### 2. CARB and EPA adopted exhaust emission standards for 1973 and subsequent model year light-duty vehicles.

With statutory authorities firmly in place, CARB again led the way, with EPA affirming from the start that more stringent California standards were appropriate even as it moved slowly on federal standards.

In 1971, EPA adopted the first federal emission standards for oxides of nitrogen (NOx), 3 g/mi, for 1973 and 1974 model year light-duty vehicles. The federal exhaust emission standards for 1973 and 1974 model year light-duty vehicles were subsequently adjusted to reflect later modifications of test procedures to: 3.0 g/mi HC, 28.0 g/mi CO, and 3.1 g/mi NOx.

33

CARB adopted emissions standards and associated test procedures for 1973 through 1976 model year light-duty vehicles, and requested a waiver for the 1973 through 1975 model year standards. The California emissions standards for 1973 and 1974 model year light-duty vehicles were: 1.5 g/mi HC, 23 g/mi CO, and 3.0 g/mi NOx (1973), and 1.5 g/mi HC, 23 g/mi CO, and 2.0 g/mi NOx (1974), respectively. The EPA Administrator granted a waiver for the emissions standards applicable to 1973 and 1974 model year vehicles, but withheld a decision regarding the 1975 model year standards "pending development of additional information by the Environmental Protection Agency."[12]

### 3. Vehicle manufacturers requested and were granted suspensions of statutory federal 1975 hydrocarbon and carbon monoxide emission standards.

In 1972, vehicle manufacturers requested that the EPA Administrator suspend the statutory hydrocarbons and carbon monoxide emission standards for 1975 model year vehicles for one year, primarily asserting that the catalytic converter technology needed to ensure that 1975 model year vehicles would comply with the statutory emission standards would not be available within the time needed to ensure compliance with the standards. The EPA Administrator denied the requests, and the manufacturers appealed the denial to the U.S. Court of Appeals for the District of Columbia Circuit. The court held that the EPA Administrator had not sufficiently supported his determination that the catalytic converter control technology needed to comply with the emission standards would be available in the needed time, and remanded the matter to the EPA Administrator for further consideration.

The EPA Administrator subsequently conducted public hearings, determined that a suspension of the standards was warranted, and accordingly granted the manufacturers a one year suspension of the statutory 1975 emission standards. During the second round of the EPA hearings, vehicle manufacturers stated that catalyst technology was not sufficiently robust to ensure that their 1975 model year vehicles could comply with the statutory 1975 emission standards, and that even if they could equip vehicles with catalysts and certify those vehicles to the 1975 emission standards, the requirement to equip all production vehicles with catalytic converters would result in massive production problems.

The Administrator determined that although catalytic converter technology needed to meet the 1975 model year standards appeared to be "effective, durable, and reasonably inexpensive," neither the automotive nor the catalyst industry had significant experience in mass producing the needed quantity of catalysts, which presented a risk that the nationwide production of vehicles could be terminated, due to inabilities to procure acceptable catalysts, assembly-line problems, or both. The Administrator further found that overall, the automotive industry could only meet the 1975 standards with 66 percent

---

[12] 37 Fed.Reg. 8,128 (April 25, 1972).

of vehicle sales, which was not sufficient to meet the basic market demand for the vehicles, and accordingly granted manufacturers a one year suspension from the 1975 model year standards.

### a. EPA authorized California to require catalytic converters on 1975 model year vehicles.

As previously discussed, the 1970 Amendments required that if the Administrator granted a suspension of the statutory emission standards, he or she was required to simultaneously prescribe interim emission standards for 1975 model year vehicles that "reflected the greatest degree of emission control … achievable by the application of technology which the EPA Administrator determines is available, giving appropriate consideration to the cost of applying such technology within the period of time available to manufacturers." The EPA Administrator determined it was appropriate to establish two separate sets of interim standards – national interim standards that would not require manufacturers to install catalysts on vehicles certified in all states other than California, and a more stringent set of interim standards that would require manufacturers to equip all of the vehicles they intended for sale in California with catalysts.  The interim national 1975 model year emission standards were 1.5 g/mi hydrocarbon, 15 g/mi carbon monoxide, and 3.1 g/mi NOx.

The EPA Administrator implemented the more stringent interim standards in conjunction with also granting California a waiver for its 1975 model year light-duty vehicle emission standards, therefore authorizing California to enforce emission standards of 0.9 g/mi hydrocarbon, 9.0 g/mi carbon monoxide, and 2.0 g/mi of NOx.  CARB subsequently requested that EPA grant it a waiver allowing California to enforce the waived 1975 model year emission standards to 1976 model year vehicles.  EPA granted that waiver request on September 16, 1974.

The Administrator reasoned that this approach (of establishing less stringent national interim standards and more stringent California interim standards) comprised the most reasonable means of ensuring that the requisite compliance technology would be developed and installed on motor vehicles to meet the statutory standards.  Requiring manufacturers to equip their California vehicles with catalysts before mandating nationwide installations of catalysts was entirely consistent with both California's trend of establishing more stringent emission standards than comparable federal emission standards, and with the waiver provisions of the Clean Air Act that expressly authorized California to adopt and enforce more stringent state standards.  Manufacturers would be provided the opportunity to gain experience with the mass production of catalytic converters for their full range of motor vehicles, which would therefore maintain the industry's momentum towards achieving advances in improving and installing catalytic converters on their nationwide fleet of vehicles, while also facing minimized levels of risk.  This momentum would "lay the necessary foundation for full-scale of catalysts in 1976." Representatives from Ford and General Motors testified that limiting the more stringent interim standards to California vehicles would allow their companies to test the

35

necessary mass production processes on a more limited scale, which would enable better quality control and the ability to remedy identified deficiencies, and to address in-use failures of catalysts.

The Administrator specifically noted California's expertise in regulating motor vehicles as a factor in his determination.  "The selection of California for initial introduction of catalytic converters has other advantages as well.  Because of California's history of leadership in emission control, that State has in existence a legal and regulatory framework for implementing and enforcing a set of standards different from those applicable outside California." Furthermore, authorizing California to implement more stringent requirements would continue to spur advancements in emissions control technology that could benefit the nation.  The Administrator specifically noted that two Japanese manufacturers planned to market vehicles that did not require catalytic converters to meet stringent emission standards.  Notably, Honda had developed a Compound Vortex Controlled Combustion engine that had demonstrated a capability of complying with the 1975 statutory standards without requiring a catalytic converter, but the available information indicated it would require more than five years for other vehicle manufacturers to modify their production lines to install that technology on their vehicles.  The EPA Administrator stated his conviction that "the best way to accelerate development and use of a superior technology is to put strict emissions control requirements into effect as soon as they are technologically feasible. … When this happens, other companies will be spurred by competitive forces to adopt it." "Where regulatory requirements for emission control challenge conventional technology to its limits, the marketplace will in my judgment provide a strong lever for causing a shift into any superior technology."

Finally, the EPA Administrator considered and rejected claims that catalytic converters would significantly adversely affect fuel economy and vehicle driveability.  Information submitted during the hearing indicated that catalytic converters would reduce fuel economy on 1975 model year vehicles by more than 4 percent, and further indicated that 1975 model year vehicles would not exhibit degraded driveability compared to 1973 model year vehicles.

### 4.  EPA suspended the 1976 statutory standard for NOx.

Approximately three months later, the EPA Administrator granted vehicle manufacturers a requested one-year suspension of the 1976 statutory NOx emission standards, largely based on his determination that the technology needed to comply with the statutory emission standards for NOx (a reducing catalyst) would not be available by the 1976 model year.  Information indicated that reducing catalysts required more precise control of air to fuel ratios, and were less durable than the oxidation catalysts required to control hydrocarbon and carbon monoxide emissions.  As required by the 1970 Amendments, the Administrator simultaneously issued interim NOx standard for 1976 model year vehicles of 2.0 g/mile.  However, as discussed below, these standards were further postponed until the 1978 model year.

36

**5.** **The national energy crisis led Congress to delay the statutory 1975 and 1976 exhaust emission standards until 1977 and 1978.**

In 1974, the nation experienced an energy crisis that led Congress to enact legislation (the Energy Supply and Environmental Coordination Act of 1974 (ESECA)), to "…assist in meeting the essential needs of the United States for fuels, in a manner which is consistent, to the fullest extent practicable, with existing national commitments to protect and improve the environment, and (2) to provide requirements for reports respecting energy resources." ESECA, in pertinent part, delayed and weakened the federal vehicle emission standards promulgated by the 1970 Amendments of the Clean Air Act. Notably, as described in greater detail below, California continued to promulgate increasingly stringent vehicle emission standards during this period, with EPA support. Moreover, Congress expressly noted California's demonstrated progress in reducing vehicle emission standards when it enacted the 1977 Amendments to the federal Clean Air Act.

Section 5 of ESECA extended the applicability of the interim 1975 model year standards for hydrocarbon and carbon monoxide emissions to 1976 model year vehicles, and delayed the applicability of the statutory 1975 model year standards for hydrocarbon and CO emissions until 1977. ESECA also delayed the applicability of the statutory 1976 model year standards for NOx emissions until 1978, extended the applicability of the interim 1976 model year NOx standards to both 1975 and 1976 model year vehicles, and decreased the stringency of the 1977 model year NOx emission standard to 2.0 g/mile. Finally, ESECA authorized manufacturers to request that the EPA Administrator suspend the hydrocarbon and carbon monoxide emission standards for 1977 model year vehicles for one year, and required the EPA Administrator to promulgate interim emission standards if he or she granted such suspension requests. These provisions notably did not extend to California's vehicle emission standards or to the waiver provisions of Clean Air Act sections 209(a) or 209(b), and as discussed below, CARB continued to promulgate more stringent standards even as Congress delayed and relaxed the stringency of federal emission standards through its enactment of ESECA. Section 10 of ESECA directed the EPA Administrator and the Secretary of Transportation to conduct a joint study and subsequently issue a report regarding the "the practicability of establishing a fuel economy improvement standard of 20 per centum for new motor vehicles manufactured during and after model year 1980." The study and report were required to address factors including, but not limited to, technological problems and economic costs of meeting such standard, and the impact of applicable emission standards.

**6.** **Congress enacted the Energy Policy and Conservation Act (EPCA) in 1975, building upon the foundation laid by ESECA.**

The following year, Congress enacted the Energy Policy and Conservation Act (EPCA), which established a comprehensive and systematic national energy policy that sought to achieve increasing domestic energy production and supply, reducing energy demand,

37

and the more efficient use of energy.  EPCA expressly expanded upon the energy policies of prior energy legislation, including ESECA.

Title III of EPCA authorized the Secretary of Transportation to prescribe fuel economy standards for automobiles, and statutorily prescribed average fuel economies beginning at 18 miles per gallon for 1978 model year automobiles and leading to 27.5 miles per gallon for 1985 model year automobiles.

Section 509(a) of EPCA stated "[w]henever an average fuel economy standard established under this part is in effect, no State or political subdivision of a State shall have authority to adopt or enforce any law or regulation relating to fuel economy standards or average fuel economy standards applicable to automobiles covered by such Federal standard."  However, section 502(d) allowed any vehicle manufacturer to apply to the Secretary of Transportation for a modification of an average fuel economy standard for model years 1978 through 1980 if it could show the likely existence of a "Federal standards fuel economy reduction." As NHTSA acknowledges in the NPRM, "Federal standards fuel economy reduction" was defined as including California vehicle emission standards that had been granted a waiver by EPA pursuant to Clean Air Act section 209(b).[13]

In *Green Mountain Chrysler Plymouth Dodge Jeep, et. al. v. Crombie*,[14] a federal district court determined that it need not address plaintiffs' claim that EPCA preempted a Vermont regulation that adopted GHG emission standards for 2009 and newer model year passenger vehicles. The court reasoned that Congress, in enacting section 502(d) of EPCA, did not intend to restrict California's preexisting authority to adopt and enforce separate vehicle emission standards when it enacted EPCA, but rather intended that NHTSA must take California emission standards that have been issued a waiver under section 209(b) of the Clean Air Act into account when it promulgates fuel economy standards.

### 7. EPA suspended hydrocarbon and carbon monoxide emission standards for 1977 model year vehicles for one year.

On May 20, 1975, the EPA Administrator, acting pursuant to the authority of section 5(c) of ESECA, granted an industry request to suspended the federal hydrocarbon and CO emission standards for 1977 model year vehicles for one year, and simultaneously promulgated interim 1977 model year emission standards of 1.5 g/mi hydrocarbon, 15 g/mi CO, and 2.0 g/mi NOx.

During the hearing to consider the suspension of the 1977 standards, information was presented indicating that the oxidation catalysts needed to control hydrocarbon and carbon monoxide emissions also converted sulfur in gasoline to sulfuric acid, which could result in harmful levels of sulfuric acid mist near freeways and other facilities that

---

[13] 83 Fed.Reg. 42986, 43210 (Aug. 24, 2018).
[14] 508 F.Supp.2d 295 (D. Vt. 2007).

38

attract large numbers of vehicles.  This posed a concern that the harmful effects of sulfuric acid mist would outweigh the benefits associated with the reductions of hydrocarbons and carbon monoxide, and the EPA Administrator therefore determined that the nation's interests would be best served by maintaining the interim 1977 standards until the sulfuric acid mist question was resolved.

### 8. EPA granted the waiver for California's 1977 model year emission standards, recognizing the statutory directive to defer to California.

During this time period, as both Congress and EPA were delaying and weakening the stringency of motor vehicle standards, CARB was continuing to promulgate more stringent California vehicle emission standards.  CARB adopted California 1977 model year standards of 0.41 g/mi hydrocarbon, 9.0 g/mi CO, and 1.5 g/mi NOx, and requested a waiver for these standards on March 26, 1975.  EPA granted CARB's waiver request on May 20, 1975.[15]

In considering that waiver request, EPA Administrator Train discussed the legislative history associated with Congress' enactment of the waiver provision of Section 209(b) of the Clean Air Act, and stated that history supported three major points:  (1) Congress believed that California was experiencing 'compelling and extraordinary' conditions that justified a waiver from the preemption from Section 209(a) of the Clean Air Act,  (2) Congress intended that the federal government would not second-guess the wisdom of state policy in order to preserve the California motor vehicle emission control program in its original form;  and (3) that Congress intended that the standard of EPA's review of California's request for a waiver is narrow.

Administrator Train then noted that EPA's waiver decisions were consistent with the aforementioned Congressional intent, and that former EPA Administrator Ruckelhaus had stated:

> *The law makes it clear that the waiver request cannot be denied unless the specific findings designated in the statute can properly be made.  The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguable unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution on California.*

40 Fed.Reg. 23102, 23104 (citing 36 Fed.Reg. 17458 (Aug. 31, 1971).

---

[15] 40 Fed.Reg. 23102, 23103 (May 28, 1975).

39

Administrator Train then stated that, consistent with the above mentioned considerations, he would not deny California's waiver based on the possibility that California's standards could result in the emissions of sulfuric acid mist.

> *Accordingly, I do not view arguments of increased cost or fuel economy penalties, or only marginal improvements in air quality, advanced by some as arguments against the waiver, as controlling in my decision here.  For similar reasons, I do not view the question whether the proposed California standards may result in emissions of sulfuric acid mist as controlling given the current state of our knowledge.   The structure and history of the California waiver provision clearly indicate both a Congressional intent and an EPA practice of leaving the decision on ambiguous and controversial matters of public policy to California's judgment.   As I indicated in my suspension decision, any assessment of the magnitude of the automobile sulfate risk and measures to deal with it clearly falls under that heading.*

> 40 Fed.Reg. 23102, 23104 (May 28, 1975)

The EPA Administrator found that he could not make any of the findings that would compel him to deny California's request for a waiver, and consequently granted the waiver despite concerns expressed by vehicle manufacturers that the California 1977 model year standards would adversely affect drivability, experience an 8 to 24 percent decrease in fuel economy, and reduce new vehicle sales as a result of the waiver decision.

### 9.  Congress, in 1977, amended the Clean Air Act.

In 1977, Congress enacted significant amendments to the Clean Air Act.  In enacting the 1977 Amendments, Congress had the opportunity to restrict the Clean Air Act's waiver provision.  However, Congress – at the height of its consideration of fuel economy statutes and their relationship to air quality -- instead elected to expand California's ability to adopt and implement its own complete program to control motor vehicle emissions.  Congress expressed in the House Committee report for the 1977 Clean Air Act Amendments that "[t]he Committee amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, i.e., to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."

Prior to the 1977 Amendments, the EPA Administrator was required to grant California a waiver unless he or she found that California did not require state standards that were more stringent than applicable federal standards to meet compelling and extraordinary conditions, or unless he or she found such state standards and accompanying enforcement procedures were not consistent with section 202(a) of the Clean Air Act. The 1977 Amendments modified the waiver criteria to require the Administrator to grant California a waiver unless *California,* not the Administrator, determined that its state standards are, *in the aggregate*, at least as protective as applicable federal standards.

40

Congress explained that its intent in promulgating these modifications was to accommodate California's concern with regulating emissions of NOx, which California regarded as a more serious concern than emissions of carbon monoxide.  California wanted to establish vehicle emission standards for NOx that were more stringent than the comparable federal emission standard for NOx, but technological constraints appeared to require that the California emission standard for carbon monoxide  would then be less stringent than the comparable federal carbon monoxide emission standard. California would not be able to obtain a waiver in this situation because the then applicable waiver criteria required each California standard to be more stringent than the corresponding federal standard.  Congress therefore amended the criteria to require the EPA Administrator to "grant a waiver for the entire set of California standards, unless he finds that California acted arbitrarily or capriciously in concluding that its set of standards are at least as protective of the public health and welfare as the Federal standards."

Congress also enacted section 177 of the Clean Air Act, which allows other states that are noncompliant with federal ambient air quality standards to adopt California's new motor vehicle emissions standards that have been granted a waiver, provided such state standards are identical to California's standards, and provided both California and other state adopt the standards at least two years before the first model year of affected vehicles. This provision therefore allows other states to benefit from California's pioneering efforts to control vehicle emissions.

### a. Congress recognized California's achievements in controlling motor vehicle emissions.

While Congress was contemplating the 1977 Amendments to the Clean Air Act, it expressly noted that California's experiences in adopting and implementing more stringent emission standards for 1977 model year vehicles effectively refuted the concerns expressed by vehicle manufacturers relating to purported technical difficulties of complying with the statutory emission standards prescribed by the 1970 Amendments to the Clean Air Act.  CARB submitted test data to Congress that indicated "cars in all weight classes on the road in California are already achieving emission levels at or very near to .41 gpm hydrocarbon; 3.4 gpm carbon monoxide; and 1.0 gpm NOx or below, despite the requirement to meet weaker standards of .41/9.0/1.5."

Congress also noted both foreign and domestic vehicle manufacturers had equipped their California vehicles with three-way catalysts (that simultaneously control emissions of hydrocarbons, carbon monoxide, and oxides of nitrogen) to meet California's 1978 motor vehicle emission standards, and that three-way catalysts accordingly were not only considered "proven technology," but also demonstrated the ability to comply with a 0.4 g/mi NOx standard while simultaneously increasing the vehicle's fuel economy. Indeed, California's experience demonstrated that California compliant vehicles did not necessarily incur reductions of fuel economy, but could in certain instances, experience increases of fuel economy.  Congress also noted that the National Academy of

41

Sciences had determined that catalytic converters could both reduce vehicle emissions and improve fuel economy of motor vehicles.

Congress further noted that subsequently acquired data and information indicated that prior concerns that catalyst equipped vehicles would emit sulfuric acid mists were "grossly overestimated" based on information including a National Academy of Sciences report that concluded "the statutory hydrocarbon, carbon monoxide, and probably NOx standards can be met in 1978 with at least one technology (the three-way catalyst) with no increase in emissions of sulfuric acid emissions from uncontrolled vehicles," and that dual catalyst systems would achieve "little or no increase" in sulfuric acid emissions. The National Academy of Sciences stated that "relaxing the statutory hydrocarbon, carbon monoxide, and NOx standards in itself is unlikely to result in reduction of sulfuric acid emissions below levels from 1975 model automobiles. Vehicle manufacturers may well choose to continue use of present catalyst systems, even if the standards are relaxed, for reasons of fuel economy and their investment in catalyst technology."

Finally, Congress noted that EPA had expressed frustration because EPA believed that manufacturers had been withholding information regarding their development of new emission control technologies "that would have dramatic impacts on both emissions and fuel economy," and were only providing EPA information that served the manufacturer's own interests. EPA opined that manufacturers had deliberately slowed their efforts to achieve compliance with a 0.4 g/mi NOx standard due to manufacturers' hopes that "Congress may act to abolish the NOx standard," and noted that vehicle manufacturers "calculations concerning potential fuel efficiency problems, as well as potential problems of technological and economic feasibility of any set of emission standards have been consistently overstated."

### b. Congress delayed the statutory vehicular emission reduction goals of the 1970 amendments to the Clean Air Act.

The 1977 Amendments to the Clean Air Act had other effects. On the one hand, Congress carefully and deliberately expanded and broadened California's authority to adopt and implement its own distinct and more stringent vehicle emissions control program, and it also determined that the technology needed to achieve more stringent emission standards was available and would not adversely impact either fuel economy or result in significant emissions of sulfuric acid mists. Nevertheless, the 1977 Amendments also set federal motor vehicle emission standards that effectively provided manufacturers further extensions and relaxations of the vehicle emission reduction goals established by the 1970 Amendments of the Clean Air Act, largely to accommodate manufacturer claims that postponement of those light-duty vehicle emission standards was needed to avert an industry shutdown.

Congress accordingly extended the hydrocarbon emissions standard for 1975 model year vehicles as initially established by the 1970 Amendments to the Clean Air Act (0.41 g/mi) until the 1980 model year, extended the carbon monoxide emissions standard for

42

1975 model year vehicles as initially established by the 1970 Amendments to the Clean Air Act (7.0 g/mi) until the 1981 model year, and relaxed the NOx emissions standard for 1976 model year vehicles as initially established by the 1970 Amendments to the Clean Air Act from 0.4 g/mi to 1.0 g/mi, and extended the effective date of that standard to 1981 model year vehicles.  Congress also enacted provisions allowing manufacturers to request waivers of the carbon monoxide standard for 1981 and 1982 model year vehicles, and allowing qualifying small manufacturers to certify 1981 and 1982 model year vehicles to a 2.0 g/mi NOx standard.

The following table compares the federal emission standards enacted by the 1977 Amendments to the Clean Air Act and the corresponding California emission standards for model year 1977 through 1981 light-duty motor vehicles:

*Table III-2 1977 through 1981 Primary Light-Duty Motor Vehicle Emission Standards*
(all standards expressed in grams/mile)[16]

| Model Year | Federal | | | California | | |
|---|---|---|---|---|---|---|
| | Hydrocarbon | Carbon Monoxide | NOx | Hydrocarbon | Carbon Monoxide | NOx |
| 1977 | 1.5 | 15 | 2.0 | 0.41 | 9.0 | 1.5 |
| 1978 | 1.5 | 15 | 2.0 | 0.41 | 9.0 | 1.5 |
| 1979 | 1.5 | 15 | 2.0 | 0.41 | 9.0 | 1.5 |
| 1980 | 0.41 | 7.0 | 2.0 | 0.41 | 9.0 | 1.0 |
| 1981 | 0.41 | 3.4 | 1.0 | 0.41 | 3.4 | 1.0 |
| 1982 | 0.41 | 3.4 | 1.0 | 0.41<br>0.41 | 7.0<br>7.0 | 0.4<br>0.7[17] |

This table illustrates that the federal emissions standards for NOx do not become sufficiently stringent to require the installation of oxidation catalytic converters until 1981 – four years after California's 1977 model year standards took effect.  The table also demonstrates that even as both Congress and EPA relaxed and delayed the federal light-duty vehicle emission standards, CARB continued its long established practice of adopting more stringent emission standards and other emission related requirements in order to address the compelling and extraordinary conditions affecting California.

---

[16] California standards for 1977 and 1978 model year – Title 13, California Administrative Code (CAC) § 1955.1 (1983); for 1979 model year vehicles in 13 CAC 1959.5, (1988) for 1980 model year vehicles in Title 13, California Code of Regulations (CCR) § 1960 (2013), and for 1981 and 1982 model years, 13 CCR §§ 1960.1(a) (2013), 1960.1(b) (2013).  Federal standards for 1977 through 1979 model year vehicles are set forth at 40 Fed.Reg. 32906, 32911 (June 28, 1977) [40 CFR §077-8 (1977)], 40 Fed.Reg. 32906, 32930 (June 28, 1977) [40 CFR § 078-8].
[17] This set of standards is optional.  A manufacturer must select either the primary or optional set of standards for its entire product line of 1981 and 1982 models.

43

### D. California continued to lead the nation in developing more stringent motor vehicle emission requirements throughout the 1980s.

**1. California's motor vehicle emission standards for 1982 model year light-duty vehicles required compliance with a 0.4 g/mi NOx emission standard.**

That pattern continued through the 1980s; California moved the nation forward, and both Congress and EPA moved more slowly, while supporting California's continued authorities.

EPA granted CARB a waiver for the California 1979 and subsequent model year light-duty motor vehicle emission standards in 1978. CARB adopted those standards to address the "peculiar oxidant and $NO^2$ air quality problems in the California South Coast Air Basin." Although certain vehicle manufacturers testified that they lacked the technology needed to meet the primary 1982 model year standards, CARB testified that two manufacturers had already demonstrated compliance with the 1982 model standards with 1977 certification data. Acting EPA Administrator Blum stated she could not find that the technology needed to meet the 1982 model year standards could not be developed and applied in the lead time provided, or that the costs of compliance were sufficiently excessive, and accordingly granted the waiver.

The stringent 0.4 g/mi NOx emission standard associated with the California 1982 model year standard required motor vehicle manufacturers to equip vehicles with increasingly sophisticated emission control and fuel metering systems, including three-way catalytic converters, fuel injection systems, and oxygen sensors. It is especially notable that California was able to require the introduction of such controls years before the federal light-duty motor vehicle standards became sufficiently comparable in stringency to California's standards. In fact, the federal light-duty motor vehicle emission standards did not prescribe a 0.4 g/mi NOx standard until the 1994 model year. This example, particularly when viewed in the context of the continued delays and weakening of the federal motor vehicle emissions standards as discussed above, illustrates the benefits resulting from California's ability to establish its separate motor vehicle emissions control program that is free from the constraints of the federal motor vehicle emissions control program, and is also consistent with the benefits resulting from EPA Administrator Train's decision in 1973 to allow California to manufacturers to equip their vehicles with catalytic converters despite manufacturers' claims that catalytic converter technology was not sufficiently developed or available in the quantities needed for installation on all production vehicles. As previously discussed, that California requirement enabled manufacturers to gain experience and knowledge with catalytic converters, and provided CARB information regarding the capability of future technical advancements needed to achieve even more stringent future emissions requirements, such as the primary 1982 model year emissions standards. It is difficult to imagine how CARB would have obtained the knowledge and information needed to

44

support its assessment of technical feasibility of equipment needed to comply with the 1982 model year standards if it was subject to the same constraints imposed on EPA. Recall that EPA previously expressed that it was largely dependent on information supplied by vehicle manufacturers regarding the status and capability of future emission control technologies, and that it believed manufacturers were deliberately stalling their efforts to develop compliant technologies based on hopes that Congress would abolish the 0.4 g/mi NOx standard.

### 2. CARB adopted diesel particulate matter standards for 1985 model year diesel-fueled light-duty vehicles.

In 1982, CARB amended California's exhaust emission standards for 1985 and subsequent model year diesel powered light-duty vehicles to ensure that more stringent particulate matter standards would be in effect in California 1985.  EPA was also considering the adoption of essentially equivalent federal particulate matter emission standards for diesel-powered vehicles, but decided to delay a 0.2 g/mi particulate matter standard from the 1985 to the 1987 model year.

EPA determined that the requisite technology (trap oxidizer systems) would be widely available by the 1986 model year, but decided to delay the 0.2 g/mi particulate matter standard to 1987.  CARB also determined that trap oxidizer systems would be available by the 1986 model year, but elected to adopt a 0.2 g/mi particulate matter standard for 1986 through 1988 model year vehicles.  CARB further adopted a 0.08 g/mi particulate matter standard for 1989 and subsequent model year vehicles, and requested that EPA grant California a waiver for such standards.  Motor vehicle manufacturers opposing California's waiver request asserted that California did not meet waiver criterion of Clean Air Act section 209(b)(1)(B), that California needs "such State standards to meet compelling and extraordinary conditions".

In considering CARB's waiver request, EPA extensively discussed the "compelling and extraordinary" criterion of Clean Air Act section 209(b)(1)(B). EPA determined that its traditional interpretation of this criterion, that it concerns California's need for its own motor vehicle program, as opposed to its need for the particular standards at issue in the waiver, was supported by both the statutory text and legislative history indicating that Congress, in enacting the initial waiver provision, was expressly aware that by authorizing California to enact its own motor vehicle program, it would require the automotive industry to comply with two separate sets of requirements.  EPA accordingly concluded that "[t]he 'need' issue thus went to the question of standards in general, not the particular standards for which California sought [a] waiver in a given instance,"  and further noted: "It is evident from this history that "compelling and extraordinary conditions" does not refer to levels of pollution directly, but primarily to the factors that tend to produce them: geographical and climatic conditions that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems."

45

EPA then considered arguments advanced by manufacturers that Clean Air Act section 209(b)(1)(B) applies to California's need for the particular particulate emission standards.  EPA determined that even under this alternative interpretation, the manufacturers did not meet their burden of demonstrating that California did not satisfy the compelling and extraordinary criterion.

EPA expressly rejected manufacturer claims that the section 209(b)(1)(B) criterion is limited to emission standards for pollutants that are related to California's smog problem (i.e., hydrocarbons and oxides of nitrogen), and that consequently California's standards for particulate emissions should not be afforded the "benefit of the Congressional presumptions which supported all prior waivers."[18]

> *If Congress had been concerned only with California's smog problem, however, it easily could have limited the ability of California to set more stringent standards to hydrocarbons and oxides of nitrogen—the only two regulated automotive pollutants substantially contributing to that phenomenon.  Instead, Congress took a broader approach consistent with its goal of allowing California to operate its own comprehensive program.*

> 49 Fed.Reg. 18887, 18890 (May 3, 1984)

EPA cited legislative history indicating Congress, in enacting the waiver provision, was aware that California might seek to control non-smog pollutants including carbon monoxide, lead, and particulate matter.[19]

EPA also rejected claims that California must demonstrate that it suffers from a "unique" particulate problem (i.e., one that is demonstrably worse than the problem experienced in the rest of the country) to qualify for a waiver for its particulate emission standards. "However, as CARB points out, there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted."

EPA further rejected claims that California failed to establish the necessity of its particulate standards because the State's emissions standards would allegedly produce only minor reductions of particulate matter emissions.

> *Arguments concerning … the marginal improvements in air quality that will allegedly result [from implementation of the standards], and the question of whether these particular standards are actually required by California …fall within the broad area of public policy. The EPA practice of leaving the decision on such controversial matters of public policy to*

---

[18] 49 Fed.Reg. 18887, 18890 (May 3, 1984).
[19] Ibid.,113 Cong. Rec. 30591 (Nov. 2, 1967) (Rep. Herlong).

*California's judgment is entirely consistent with the Congressional intent*
*….*

49 Fed.Reg. 18887, 18891 citing 41 Fed.Reg. 44209, 44210 (October 7, 1976).

EPA additionally noted that CARB had established that California was experiencing unique limited visibility problems resulting from diesel particulate matter, and that diesel particulate matter, in combination with the high levels of ozone and oxides of nitrogen concentrations found in areas such as the South Coast Air Basin, potentially posed at least three unique public health problems. EPA then concluded that even if its finding "regarding the existence of 'compelling and extraordinary conditions' were focused only upon California's particulate problem, [it] could not find that the opponents of the waiver had met their burden of proof to show that such conditions do not exist".

EPA also found that CARB's determination that trap oxidizers needed to meet the 0.2 g/mi particulate standard would be available in California by model year 1986 was not inconsistent with its own determination that trap oxidizers would be available in 1987. EPA's forecast was based on the availability of trap oxidizers on a nationwide basis, whereas CARB's forecast was based on availability of trap oxidizers in California. EPA noted it had historically granted California waivers that allowed California to require new technology prior to the nationwide implementation of that technology, and that this approach was consistent with EPA's rationale in authorizing California to enforce requirements necessitating the use of catalytic converters on 1975 model year vehicles a year before they were required on federal vehicles, as that approach would ensure that trap oxidizers would be successfully implemented on a nationwide basis the following year.

EPA granted California a waiver for the 1975 and subsequent model year standards that included a 0.2 g/mi particulate standard for California 1986 through 1988 model year vehicles, and a 0.08 g/mi particulate matter standard for 1989 and subsequent model year vehicles. EPA subsequently adopted a federal 0.2 g/mi particulate standard for 1987 model year vehicles and would later adopt a 0.08 g/mi standard that would be fully required on 1995 model year vehicles.

### 3. California required On-Board Diagnostic (OBD) systems.

As CARB continued to adopt and implement more stringent motor vehicle emissions standards and other emissions related requirements, vehicle manufacturers increasingly relied on three-way catalytic converters to meet those emission standards. Because three-way catalytic converters are most effective if vehicles operate within a relatively narrow range of air to fuel ratio, manufacturers also began implementing fuel feedback systems to more precisely meter fuel into engines and also increasingly equipped their vehicles with emissions control equipment that was controlled by computers on the vehicles. Although new motor vehicles could demonstrate compliance with stringent emission standards when they were new, it was also critically important that those vehicles demonstrate compliance with the standards throughout the period that they

47

were actually operated.  In 1985 CARB therefore first adopted regulations that required manufacturers to equip 1988 and newer model year vehicles equipped with three-way catalysts and feedback fuel systems to be equipped with on-board diagnostic (OBD) systems (OBD I systems).

OBD systems are primarily comprised of software that is used by a vehicle on-board computer to detect emission control system malfunctions as they occur.  OBD I systems were required to detect malfunctions of the fuel metering system, exhaust gas recirculation system valve, on-board computer, and of emission control components that provided inputs into the on-board computer, and to notify the operator of such malfunctions by illuminating a light on the vehicle dashboard.  EPA determined that the OBD I system requirements were within the scope of prior waivers issued to California in 1986.

Since 1988, both OBD systems and vehicle emission controls have become increasingly sophisticated.  In 1989, CARB adopted more comprehensive OBD regulations that required all 1996 and newer model year light-duty vehicles and medium-duty vehicles and engines to be equipped with OBD systems (referred to as OBD II).  The OBD II regulation prescribes much more comprehensive and detailed monitoring requirements than the OBD I regulation.  For instance, OBD II systems must monitor for malfunctions including engine misfire, catalysts, oxygen sensors, evaporative systems, exhaust gas recirculation systems, secondary air systems, fuel systems, and all electronic powertrain components that can affect emissions when malfunctioning - virtually every component and system on a vehicle that can cause increases in emissions.  OBD II systems must further timely notify the vehicle operator of a detected malfunction, and store a code in the computer that will aid a technician in identifying the likely cause of the malfunction.  OBD II systems help to ensure that motor vehicles comply with applicable emission standards in real-world use throughout their entire life, not just when the vehicle or engine is being certified.  CARB has regularly updated the OBD II regulation to amend the monitoring requirements of OBD II systems, and to establish OBD II specific enforcement requirements.  EPA has granted California waivers for both the initial OBD II regulation and for subsequent amendments to the OBD II regulation.

EPA promulgated federal OBD requirements for federally certified light-duty vehicles and trucks in 1993, and later amended these requirements to require OBD systems on medium-duty vehicles by the 2008 model year.  EPA's final rule with the latest modifications of the OBD requirements was published on February 24, 2009.  A central part of the federal regulation is that, for purposes of federal certification of vehicles, EPA will deem California-certified OBD II systems to comply with the federal regulations.  Historically, virtually every vehicle sold in the United States is designed and certified to California's OBD II requirements, in lieu of the federal OBD requirements.

### E. Congress strengthened the Clean Air Act in 1990.

In 1990, Congress enacted significant amendments to the Clean Air Act, including provisions that expressly authorized EPA to regulate new non-road engines and vehicles, and which further expanded California's vehicle regulatory authorities. Once again, after a decade of experience with California as a co-regulator, Congress decided to preserve state innovation, and to expand CARB authority.

Non-road engines are internal combustion engines that are not used in motor vehicles or vehicles used solely for competition, or that are subject to standards promulgated under section 111 of the Clean Air Act (standards of performance for new stationary sources) or section 202 of the Clean Air Act (standards for on-road mobile sources). EPA's authority to regulate new non-road sources differs in several respects from its authority to regulate new motor vehicles and engines. Significantly, Congress conclusively preempted states and their political subdivisions from adopting or enforcing any standard or other requirement relating to the control of emissions from certain categories of new non-road engines: new engines less than 175 horsepower used in farm and construction equipment and vehicles, new engines used in new locomotives, and new locomotives.

Congress generally preempted states and political subdivisions from adopting or enforcing standards or other emission related requirements for any other categories of non-road engines or equipment. However, as it had previously provided in the context of emission standards for new on-road vehicles and engines, Congress authorized only California to initially adopt and enforce standards and other emission related requirements from new and in-use non-road engines that are not expressly preempted by section 209(e)(1) if EPA authorizes California to adopt and enforce such standards and requirements pursuant to section 209(e)(2). The criteria for obtaining an authorization are nearly identical to the criteria for obtaining a waiver for motor vehicles. It is notable that Congress has entrusted only California with the authority to establish standards and emissions related requirements from in-use non-road engines and equipment; as it has only authorized EPA to adopt standards and emission related requirements for new non-road engines and equipment.

Congress also enacted a provision in Clean Air Act section 209(e)(2)(C) that is analogous to Clean Air Act section 177, in that it allows other states to adopt and enforce California non-road standards that have been granted an authorization, provided the other state's standards and implementation and enforcement are identical to the authorized California standards, and provided California and the other state adopt the subject standards at least 2 years before commencement of the period for which the standards take effect.

49

In *Engine Mfrs Ass'n v. U.S. E.P.A (EMA)*,[20] the U.S. Court of Appeals for the District of Columbia Circuit noted that Congress understandably authorized only California to adopt and enforce its own non-road emission standards and other emission-related requirements based on Congress' experience with California's success in implementing its own motor vehicle emissions control program.

> *Given the indications before Congress that California's regulatory proposals for non-road sources were ahead of the EPA's development of its own proposals and the Congressional history of permitting California to enjoy coordinate regulatory authority over mobile sources with the EPA, the decision to identify California as the lead state is comprehensible. California has served for almost 30 years as a "laboratory" for motor vehicle regulation. See [Motor & Equip. Mfrs. Ass'n, Inc. v. EPA ("MEMA I"), 627 F.2d 1095, 1110]. Its severe air pollution problems, diverse industrial and agricultural base, and variety of climatic and geographical conditions suit it well for a similar role with respect to non-road sources. As was the case when Congress first regulated motor vehicle emissions, California was already in the lead on non-road sources in 1990.*

88 F.3d 1075, 1090 (D.C. Cir. 1996)

### F. California's Advanced Clean Cars Program brought together comprehensive emission control and advanced technology to maximum benefit.

With this long history behind us, we turn to the modern light- and medium-duty vehicle programs. California's existing light-duty vehicle motor vehicle emission control program utilizes a comprehensive approach to address both criteria and GHG emissions, and assures the development of environmentally superior vehicles that will continue to deliver the performance, utility, and safety that vehicle owners have come to expect. CARB refers to that set of regulations as the California Advanced Clean Cars Program, and has most recently obtained a waiver for that program in 2013.  However, EPA has repeatedly granted waivers for its component part since the early 1990s. The components of the program function together to reduce criteria air pollutant risks, reduce climate risk, and support continued innovation in vehicle emission controls, just as Congress intended.

A more detailed description of each element of the Advanced Clean Cars regulation is provided below.  As also described below, EPA has largely also adopted elements of California's motor vehicle emissions control program into the corresponding federal motor vehicle emissions control program.

---

[20] 88 F.3d 1075 (D.C. Cir. 1996).

50

### 1.  The ACC program included criteria emissions standards.

#### a.  California's Low Emission Vehicle program.

In 1990, CARB adopted the first phase of California's low-emission vehicle (LEV) program (LEV I).  The LEV I program required vehicle manufacturers to introduce progressively cleaner light- and medium-duty vehicles with more durable emission controls during model years 1994 through 2003, and consisted of three primary elements: tiers of exhaust emission standards for increasingly stringent categories of low-emission vehicles; requirements that manufacturers phase-in a progressively cleaner mix of vehicles each year, with separate fleet average requirements for passenger cars and light-duty trucks, and the option of banking and trading credits; and a requirement that specified percentages of passenger cars and lighter light-duty trucks be zero-emission vehicles (ZEVs), which have no exhaust or evaporative emissions. EPA granted California a waiver for the LEV I regulation emission standards applicable to passenger cars and light-duty trucks in 1993, and granted California a waiver for the LEV I regulation emission standards applicable to medium-duty vehicles in 1998.

In 1999, CARB adopted the second phase of the LEV regulation, known as the LEV II regulation. The LEV II regulation primarily increased the stringency of emission standards for all light- and medium-duty vehicles beginning with the 2004 model year, and expanded the light-duty truck category to include vehicles up to 8,500 lbs. gross vehicle weight rating (GVWR) so that most sport utility vehicles, mini-vans and pick-up trucks were subject to the same low-emission vehicle standards as passenger cars. EPA granted California a waiver for the LEV II emission standards in 2003, and confirmed that CARB's subsequent amendments to the LEV II regulation fell within the scope of the LEV II waiver.

In 2012, CARB adopted further amendments to the LEV program to achieve further emission reductions from the California light- and medium-duty fleet (LEV III Criteria). The primary elements of the LEV III Criteria:  (1) reduce fleet average emissions of new vehicles to super ultra-low-emission vehicle (SULEV) levels by 2025, which represents an approximate 75 percent reduction of emissions from 2010 levels; (2) establish additional light-duty vehicle emission standard categories, such as ULEV70, ULEV50, and SULEV20 to provide vehicle manufacturers additional options for complying with the SULEV fleet average; (3)  establish more stringent particulate matter emission standards for light- and medium-duty vehicles; (4) establish essentially zero evaporative emission standards for passenger cars and light-duty trucks, and (5) increase full useful life durability requirements from 120,000 miles to 150,000 miles.  EPA granted California a waiver for the LEV III Criteria when it granted California's waiver request for the Advanced Clean Cars program in 2013.

#### b.  The federal Low Emissions Vehicle program.

The comparable federal motor vehicle emissions control program for 1994 and subsequent model year light- and medium-duty vehicles has largely established criteria

emission standards that are consistent with those in California's LEV regulations. The 1990 Amendments to the Clean Air Act required EPA to prescribe emission standards for 1994 and subsequent model light-duty vehicles and light-duty trucks. EPA adopted such standards, designated the federal Tier 1 standards, in 1991. The Tier 1 standards were comparable to, but less stringent than California's LEV I standards. EPA subsequently adopted federal Tier 2 standards in 2000 that established average passenger car standards of 0.07 g/mi NOx beginning in 2004, and Tier 3 standards in 2014. The Tier 3 standards are closely coordinated with California's LEV III Criteria regulation, but delay the implementation dates of the federal standards for light-duty vehicles. The federal Tier 3 standards apply to 2017 and subsequent model light-duty vehicles, whereas California's LEV III Criteria standards apply to 2015 model year light-duty vehicles.

## 2. Greenhouse gas emissions standards.

### a. California adopted the first vehicle GHG emission standards in the nation.

In 2002, California's legislature adopted, and the Governor signed California Assembly Bill (AB) 1493[21] that authorized and directed CARB to adopt the maximum feasible and cost-effective reductions in greenhouse gas (GHG) emissions from light-duty vehicles.

Pursuant to the directives of Assembly Bill 1493, CARB adopted the first GHG emissions standards for light-duty vehicles in the nation. California's regulations apply to 2009 to 2016 and later MYs vehicles, and require a 17 percent overall reduction in GHG emissions from the light-duty fleet by 2020, and a 25 percent overall reduction by 2030. EPA granted CARB's waiver request on July 8, 2009. California's regulations formed the foundation for EPA's comparable federal GHG program for 2012 through 2016 model year light-duty vehicles.

### b. EPA adopted comparable federal vehicle GHG emission standards after protracted litigation.

In 2003, EPA denied a rulemaking petition to regulate greenhouse gas emissions from new motor vehicles under section 202 of the Clean Air Act. The EPA's denial of the rulemaking petition ultimately proceeded to the U.S. Supreme Court, which held that EPA had improperly denied the rulemaking petition.[22] The Court first held that the Clean Air Act's definition of "air pollutant" in section 302(g) unambiguously encompasses compounds that contribute to climate change, including carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons, and that section 202(a)(1) of the Act authorizes EPA to regulate greenhouse gases emitted from motor vehicles if EPA "forms a 'judgment' that such emissions contribute to climate change."[23]

---

[21] Cal. Stats. 2002, Ch. .; Cal. Health & Saf. Code § 43018.5.
[22] *Massachusetts v. EPA*, 549 U.S. 497 (2007).
[23] *Massachusetts v. EPA*, 549 U.S. 497, 528 (2007).

52

The Court then held that EPA also improperly denied the petition under the alternative basis (that even if EPA had the statutory authority to regulate greenhouse gases, it would be unwise to do so at this time). The Court noted that Clean Air Act section 202(a)(1) conditions EPA's discretion to regulate air pollutants upon a judgment that "must relate to whether an air pollutant "cause[s], or contribute[s] to, air pollution which may reasonably be anticipated to endanger public health or welfare,"[24] and then determined that EPA's "laundry list of reasons not to regulate" in this case did not meet the Clean Air Act's clear statutory directive requiring EPA to justify not taking further action "only if it determines that greenhouse gases do not contribute to climate change or if it provides some reasonable explanation as to why it cannot or will not exercise its discretion to determine whether they do."[25] The Court expressly rejected EPA's argument that it lacked the authority to regulate GHG emissions from motor vehicles, because regulating those emissions would effectively require EPA to increase vehicle fuel efficiencies, a task that EPA argued was solely assigned to the Department of Transportation (DOT) by EPCA:

> [T]hat DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's 'health' and 'welfare', [citation omitted], a statutory obligation wholly independent of DOT's mandate to promote energy efficiency… The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.

> 549 U.S. 497, 532.

In response to the *Massachusetts v. EPA* decision, EPA subsequently determined that six greenhouse gases in the atmosphere may reasonably be anticipated to endanger both public health and public welfare, and further determined that

> the emissions of such greenhouse gases from new motor vehicles and new motor vehicle engines contribute to the greenhouse gas air pollution that endangers public health and welfare under Clean Air Act section 202(a).[26]

These EPA determinations were upheld by the U.S. Court of Appeals for the District of Columbia Circuit in *Coalition for Responsible Regulation v. EPA*,[27] (affirmed in part, and reversed in part on unrelated grounds by *Utility Air Regulatory Group v. EPA*,[28]).

---

[24] *Massachusetts*, 549 U.S. 497, 532-533.
[25] *Id.* at 533.
[26] 74 Fed.Reg. 66,496 (Dec. 15, 2009).
[27] 684 F.3d 102 (D.C. Cir. 2012).
[28] 134 S. Ct. 2427 (2014).

###### c. California enacted the California Global Warming Solutions Act, and U.S. Congress amended EPCA by enacting the Energy Independence and Security Act of 2017.

In 2006, California's legislature adopted, and the Governor signed California Assembly Bill 32, the California Global Warming Solutions Act.[29]  Assembly Bill 32 charges CARB with the responsibility of monitoring, regulating, and reducing GHG emissions in the State, and directs CARB to prepare a Scoping Plan outlining the State's strategy to achieve the maximum feasible and cost-effective reductions in furtherance of reducing GHG emissions to 1990 levels by 2020.  Measure T1 of the Scoping Plan anticipates an additional 3.8 million metric tons carbon dioxide equivalent ($MMTCO_2e$) reduction by 2020 from the subject regulatory amendments, beyond the GHG reductions arising from the 2009-2016 Assembly Bill 1493 standards.

In 2007, Congress enacted the Energy Independence and Security Act of 2017 (EISA) which amends EPCA by mandating the Secretary of Transportation to prescribe annual fuel economy increases for 2011 model year automobiles that ultimately require a combined fuel economy fleet average of at least 35 miles per gallon by model year 2020.

In enacting EISA, Congress expressed its intent, as it did when it enacted EPCA, to preserve California's authority to adopt more stringent vehicle emission standards. Specifically, section 3 of EISA[30] broadly preserves California's authority to develop and administer its own motor vehicle emissions control program.

> *Except to the extent expressly provided in this Act or an amendment made by this Act, nothing in this Act or an amendment made by this Act supersedes, limits the authority provided or responsibility conferred by, or authorizes any violation of any provision of law (including a regulation), including any energy or environmental law or regulation.*
>
> § 3, Pub. L. 110-140, 121 Stat. 1492, 1498 (codified at 42 U.S.C. § 17002).

This intent is also clearly evidenced by the pertinent legislative history.  Senator Diane Feinstein, the original sponsor of EISA's provisions to increase fuel economy standards, testified that those provisions would not prevent California from establishing tailpipe emission standards.

> *The legislation increasing the fuel economy standards of vehicles by 10 miles per gallon over 10 years does not impact the authority to regulate tailpipe emissions  of the EPA, California, or other States, under the Clean Air Act.*

---

[29] Cal. Assem. Bill 32, stats. 2006, ch. 488.
[30] Pub. L. 110-140, § 3, 121 Stat. 1492, 1498.

*The intent was to give NHTSA the ability to regulate fuel efficiency standards of vehicles, and increase the fleet-wide average to at least 35 miles per gallon by 2020.*

*There was no intent in any way, shape, or form to negatively affect, or otherwise restrain, California or any other State's existing or future tailpipe emissions.*

*The two issues are separate and distinct.*

*As the Supreme Court correctly observed in* Massachusetts v. EPA*, the fact "that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities. EPA has been charged with protecting the public's health and welfare, a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency."*

*I agree with the Supreme Court's view of consistency. There is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.*

*The U.S. District Court for the Eastern District of California in* Central Valley Chrysler-Jeep v. Goldstone *has reiterated this point in finding that if approved by EPA, California's standards are not preempted by the Energy Policy Conservation Act.*

*Title I of the Energy Security and Independence Act of 2007, H.R. 6, provides clear direction to the Department of Transportation, in consultation with the Department of Energy and the Environmental Protection Agency, to raise fuel economy standards.*

*By taking this action, Congress is continuing DOT's existing authority to set vehicle fuel economy standards. Importantly, the separate authority and responsibility of the U.S. Environmental Protection Agency to regulate vehicle greenhouse gas emissions under the Clean Air Act is in no manner affected by this legislation as plainly provided for in section 3 of the bill addressing the relationship of H.R. 6 to other laws.*

*I fought for section 3. I have resisted all efforts to add legislative language requiring "harmonization" of these EPA and NHTSA standards. This language could have required that EPA standards adopted under section 202 of the Clean Air Act reduce only the air pollution emissions that would already result from NHTSA fuel economy standards, effectively making the NHTSA fuel economy standards a national ceiling for the reduction of pollution. Our legislation does not establish a NHTSA ceiling.*

55

*It does not mention the Clean Air Act, so we certainly do not intend to strip EPA of its wholly separate mandate to protect the public health and welfare from air pollution.*

*To be clear, Federal standards can avoid inconsistency according to the Supreme Court, while still fulfilling their separate mandates.*

153 Cong. Rec. 15386 (daily ed. Dec. 13, 2007).

This Congressional intent is further reinforced in light of legislative history that indicates certain members of Congress in fact actively sought to enact provisions in EISA that would explicitly preempt EPA's ability to establish greenhouse gas tailpipe emission standards. Those provisions would have required the Administrator of EPA to consult with the Secretary of Transportation before promulgating regulations for GHG emissions from automobiles, and would also expressly require the Administrator to consider fuel economy standards in assessing the maximum feasible reduction of GHG emissions.[31] Other versions of the proposals would have required EPA to ensure that GHG emission standards were fully consistent with fuel economy standards.[32]

Congress ultimately rejected those proposals, which further evidences that it did not intend that EISA would preempt EPA or California from promulgating GHG emission standards for motor vehicles.[33]

### d. EPA, NHTSA and CARB's collaborative efforts resulted in national GHG vehicle standards.

In 2010, President Barack Obama directed EPA and NHTSA to work with California to develop GHG fleet standards for MY 2017 through 2025 light duty vehicles. EPA, NHTSA, and CARB developed a Joint Technical Assessment Report (Joint TAR) which was released in September 2010. The report concluded "electric drive vehicles including hybrid(s)…battery electric vehicles…plug-in hybrid(s)…and hydrogen fuel cell vehicles…can dramatically reduce petroleum consumption and GHG emissions compared to conventional technologies.... The future rate of penetration of these technologies into the vehicle fleet is not only related to future GHG and CAFE standards, but also to future reductions in HEV/PHEV/EV [electric vehicle] battery costs, [and] the overall performance and consumer demand for the advanced technologies…."

---

[31] Draft Amendment to Chapter 329, title 49, United States Code (Nov. 20,2007); §32920(a), (b), (c), pp.3-5, Committee on Environment and Public Works Democratic Staff CAFE documents3.pdf.
[32] Michael Freedhoff, recipient. "Language – GHG Rulemaking" email to Michal Freedhoff, Nov. 28, 2007; Author unknown. Michael Freedhoff, recipient, "GHG Rulemaking" email, Nov. 29, 2007, pp. 6-7, Committee on Environment and Public Works Democratic Staff CAFE documents3.pdf.
[33] Jessica Schafer, "MARKEY: President Threatens to Undo Fuel Economy Deal", email Michael Freedhoff, et al., Dec. 7, 2007. pp. 14-15, Committee on Environment and Public Works Democratic Staff CAFE documents3.pdf ; O'Donnell, Frank "Car industry makes its move! – Sen. Levin floats energy language to kneecap EPA, California and other states", email to Frank O'Donnell, Dec. 12, 2007. p. 17. Committee on Environment and Public Works Democratic Staff CAFE documents3.pdf.

In July 2011, automakers, California, and the federal government committed to a series of actions that would allow for the development of national greenhouse gas standards (and complementary CAFE standards) for model years 2017 through 2025.  As part of that agreement, California committed to a continuation of the "deemed to comply" option, accepting federal program compliance for model years 2017 through 2025 with the understanding that it would provide equivalent or better overall greenhouse gas reductions in the state compared to California's program.  California also understood that any changes to the national program would be based on extensive technical review jointly conducted by all three agencies.

Consistent with the national program commitment, CARB adopted the Advanced Clean Cars regulations in 2012, which is comprised of three components. The first two components created the LEV III regulation, which combines the control of criteria pollutants (to create LEV III Criteria, as discussed above) and GHG emissions (LEV III GHG) into a single coordinated package of requirements.  The LEV III Criteria program applies to 2015 through 2025 model year vehicles, and the LEV III GHG program applies to 2017 through 2025 model year vehicles. The third component consisted of amendments to California's Zero Emission Vehicle (ZEV) regulation that establishes requirements for zero- and near-zero-emission vehicles.

The adopted LEV III GHG regulation includes elements that: (1) reduce $CO_2$ emissions from new light-duty regulatory MY 2016 levels by approximately 34 percent by MY 2025, and from about 251 grams of $CO_2$ per mile to 166 grams, based on the projected mix of vehicles sold in California; (2) set emission standards for $CO_2$, methane ($CH_4$), and nitrous oxide ($N_2O$); (3) establish footprint-based $CO_2$ emission standards instead of GHG fleet average emission standards;(4) provide credits toward the ZEV regulation if a manufacturer over complied with its national GHG requirement, and (5) unlike the federal GHG program, require upstream emissions from ZEVs to be counted towards a manufacturer's light-duty vehicle GHG emissions.

EPA and NHTSA adopted federal passenger vehicle GHG standards and fuel economy standards in 2012 that were consistent with the California standards.  The 2012 Final Rule is referred to as the "2017 through 2025 model year National Program" (or National Program).  Because the federal program was expected to achieve GHG emission reductions that are equivalent to the California program, CARB modified its LEV III GHG regulation to continue to allow the "deemed to comply" option beyond model year 2016, by accepting federal compliance with the EPA standards as sufficient to demonstrate compliance with California's standards for the 2017 through 2025 model years.

As part of the National Program, EPA included a requirement that NHTSA and it conduct a midterm evaluation (MTE) to assess the appropriateness of the greenhouse standards for the 2022 through 2025 model years, because of the long timeframe for the standards.  The regulation codifying this commitment required that, "[b]y no later than April 1, 2018, the Administrator shall determine whether the standards … for the

57

2022 through 2025 model years are appropriate under section 202(a) of the Clean Air Act …"[34] (the "MTE Regulation"). When CARB adopted the "deemed to comply" option for model year 2017 through 2025, CARB also agreed to participate in the federal mid-term evaluation.[35]

The first milestone in the federal MTE was an extensive multi-year study that updated the technical and cost data used in the original 2012 analysis.  The results of this joint agency study were presented in a July 2016 report titled Draft Technical Assessment Report: Midterm Evaluation of Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards for Model Years 2022-2025[17] (2016 Draft TAR).  The 2016 Draft TAR provided the technical basis for determining the feasibility and cost of compliance with the federal passenger vehicle greenhouse gas and fuel economy standards in the 2022 through 2025 model years.  The 2016 Draft TAR itself was not a determination of the appropriateness of the standards; rather it provided a core input to future policy decisions on the 2022 through 2025 model year greenhouse gas and CAFE standards.

On November 30, 2016, EPA provided for public comment its "proposed adjudicatory determination (Proposed Determination) that the [National Program] greenhouse gas standards currently in place for model years 2022 through 2025 remain appropriate under the Clean Air Act and therefore should not be amended to be either more or less stringent."[36]

On January 13, 2017, EPA released its final determination (Final Determination) to maintain the existing federal greenhouse gas emission standards for 2022 through 2025 model year vehicles, finding that automakers are well positioned to meet the standards at lower costs than previously estimated.  EPA concluded that "there has been no information presented in the public comments on the Proposed Determination that materially changes the Agency's analysis documented in the Proposed Determination."[37]

### 3.  The Zero Emission Vehicle regulation.

As stated above, in 1990, CARB adopted an ambitious program designed to significantly reduce the environmental impact of light-duty vehicles through the commercial introduction of ZEVs into the California fleet, as part of the LEV I regulation. The ZEV regulation has subsequently been amended in 1996, 1999, 2001, 2003, 2008, and 2012 and obtained waivers for each of those amendments.

---

[34] 40 C.F.R. § 86.1818-12(h).
[35] CARB Reso. 12-11 (Jan. 26, 2012).
[36] EPA, Proposed Determination on the Appropriateness of the Model Year 2022-2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation: Technical Support Document, 81 Fed.Reg. 87,927 (Dec. 16, 2016), EPA-420-R-16-021.
[37] EPA-420-R-17-001.

58

The ZEV regulation existed as a footnote to the original LEV I standards, which asserted manufacturers would need to make a certain percent of ZEV in order to comply with the LEV standards.  However, manufacturers failed to develop ZEV technology quick enough to meet requirements, and the Board withdrew all but the 2003 10 percent ZEV production requirement in 1996.  In 1998, as other technologies like hybrid electric vehicles (HEV) and partial zero emission vehicles (PZEV)  came to market, the Board adopted changes to allow manufacturers to earn credit for those new technologies  and use those credits to meeting their ZEV requirements.  HEV and PZEV technology proliferated through the early 2000s as ZEV technology progressed more slowly.

In 2009, CARB staff analyzed pathways to meeting California's long-term 2050 GHG reduction goals in the light duty vehicle subsector and determined that ZEVs would need to comprise nearly 100 percent of new vehicle sales between 2040 and 2050, and commercial markets for ZEVs would need to launch in the 2015 to 2020 timeframe. Staff's analysis concluded that even widespread adoption of advanced conventional technologies, like (HEV, would be inadequate to meet the 2050 GHG targets.[38]  CARB heard staff's findings at its December 2009 hearing and adopted Resolution 09-66,[39] reaffirming its commitment to meeting California's long-term air quality and climate change reduction goals through commercialization of ZEV technologies.  CARB further directed staff to propose future amendments to the ZEV program, and specified that future proposals should consider shifting the ZEV regulation's focus to both GHG and criteria pollutant emission reductions, and pathways for commercializing ZEVs and PHEVs in order to meet the 2050 goals.  The Board also recommended in the same Resolution that hybrid and PZEV technology should become foundational in setting LEV III GHG and criteria standards, previously discussed.

In 2012, CARB adopted amendments to its ZEV regulation when it adopted the California Advanced Clean Car Program.  The amendments affecting ZEVs through the MY 2017 primarily enacted minor changes to enable manufacturers to successfully meet 2018 and subsequent MY requirements, and amendments affecting 2018 and later MY ZEVs were intended to achieve increased commercialization of ZEVs and PHEVs, and disallowed conventional technologies like HEV and PZEVs to count toward meeting a manufacturer's ZEV obligation, since those technologies help set the LEV III Criteria and GHG standards.

As stated previously, EPA granted California a waiver for the 2016 Draft TAR program in 2013, which included the LEV III Criteria, LEV III GHG, and ZEV regulation.

---

[38] "White Paper: Summary of Staff's Preliminary Assessment of the Need for Revisions to the Zero Emission Vehicle Regulation". *CARB*. Accessed on October 24, 2018.
https://www.arb.ca.gov/msprog/zevprog/2009zevreview/zevwhitepaper.pdf.
[39]Resolution 09-66. *CARB*. Accessed on October 24, 2018.
https://www.arb.ca.gov/msprog/zevprog/2009zevreview/res09_66.pdf.

warning, and blind spot assist permeate the fleet.  Third, the Agencies' coefficients are flawed because the safety model fails to control for the effects of driver characteristics or calendar years.  Moreover, the mass coefficients are also statistically insignificant at a 95 percent confidence interval, meaning the model is not capable of producing reliable conclusions.  NHTSA itself acknowledged the wide range in the confidence bounds yields the results "not definitive," and yet the Agencies still base the proposal in part on these unreliable results.  Fourth, the Agencies' historical crash data is based on older vehicles that pre-date California's GHG standards and therefore do not represent intentionally lightweighted vehicles, meaning the data cannot provide an adequate representation of how these vehicles will fare in crash scenarios.  Moreover, evidence shows that the relationship between increased mass and fatality risk in crashes in weak at best.  Fifth, the Agencies make several inappropriate assumptions in the safety model, including using static values for median weights, even as the fleet becomes progressively lighter.

In sum, the Agencies have created an impressively flawed safety analysis that incorrectly and unreliably predicts more fatalities under the existing standards.  The Agencies then propose an unexpected solution: to make driving more expensive as a disincentive.  If the main goal of the Agencies is to reduce fatalities, there are many other effective countermeasures that can be taken other than rolling back the existing standards.

## VII.   The federal proposals undermine public health and impose major costs on California and the public.

We now discussed the many ways the federal proposal's foundations rest on sand. It ignores federal mandates, and it is not support by substantial evidence. We next turn to the damage the proposal will do, including its proposal to rollback key components of state authority.

### A. The federal proposal increases emissions, frustrates meeting the NAAQS, harms public health, and threatens the climate.

#### 1. The federal proposal increases criteria emissions and undermines state implementation plans and modeling.

Cooperative federalism is at the core of the federal Clean Air Act.  Congress recognized that "air pollution preventing… and air pollution control at its source is the primary responsibility of States and local governments" but that "federal financial assistance and leadership is essential" for this cooperative effort.[544] For years, this partnership has dramatically improved air quality throughout the country, with the benefits vastly

---

[544] 42 U.S.C. § 7401(a).

outweighing the costs.[545] The Agencies' proposal reverses this progress. It would yank away tools states, including California, need to comply with state and federal ambient air quality standards, and to meet climate mandates. The result is perverse: failure to comply with these standards has serious financial and public health consequences, yet EPA is using its authority to render these standards nearly impossible to meet, and especially so as climate change worsens air quality. Further, EPA is critically undermining a wide range of state laws and policies, developed in reliance upon its current standards and its adjudicatory decision to grant California a waiver for the current standards.

Such interference with states and their police power obligations to protect their publics on behalf of an executive agency is simply improper, raising the same profound separation of powers and federalism concerns we have already discussed. As the Supreme Court reminds us, the "States … retain 'a residuary and inviolable sovereignty.' The Federalist No. 39, at 245. They are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty."[546] A core incident of sovereignty, recognized in the scheme of the federal Clean Air Act, is the ability to protect the public. Congress so recognized in general via its recognition of the central role of the states in air pollution prevention, and specifically with regard to its decision clearly to preserve and expand California's specific vehicle regulatory power.

 At this stage, many state decisions turn upon these Congressional actions, made against the background of our federal system. "Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation."[547] The Agencies' treatment of the states here – breaching a settled unified national program, ignoring decades of precedent, Congress's direction, and the evidence – is simply not consistent with the authorities of the states, including those reserved to them by the Act. The Agencies have created an entirely improper Catch-22 in which the states are stripped of the very authority which Congress relied upon them to use to fulfill their sovereign obligations.

### e.  States are required to prepare Implementation Plans under federal law.

The State Implementation Plan (SIP) is the instrument by which the states exercise their obligations under their public sovereign responsibilities and under federal law. A SIP is a federally enforceable plan for a state, which identifies how that state will attain and maintain a federal air quality standard.  The federal Clean Air Act (CAA) sets out

---

[545] See U.S. EPA's extensive studies on this point, available at: https://www.epa.gov/clean-air-act-overview/benefits-and-costs-clean-air-act.
[546] Alden v. Maine, 527 U.S. 706, 714 (Kennedy, J.).
[547] Id., at 748.

requirements for EPA's adoption of air quality standards,[548] as well as the required elements of SIPs.[549] SIPs must identify both the magnitude of reductions needed and the actions necessary to achieve those reductions. SIPs also include a demonstration that: the area will make reasonable further progress toward attainment, is implementing reasonably available control technology on all major sources, has a program in place to address emissions from new stationary sources, and meets transportation conformity requirements.

In the Clean Air Act, the U.S. Congress developed a program based on science and implemented by state and local regulators to provide safe, healthy air to the American population. The scientific community is tasked to determine levels of pollution that are acceptable and will not adversely influence human health and local regulators are tasked to implement programs to lower the pollution-causing emissions. Understanding that science is an iterative process where discoveries lead to not only a better understanding of the actual dangers of pollution but also a new baseline of knowledge to investigate these dangers further, the Clean Air Act requires EPA to revisit the NAAQS on a regular 5-year cycle to verify that the NAAQS are in line with the most recent science.

Since setting the original ozone NAAQS, the NAAQS has been revised three times. The most recent 8-hour ozone NAAQS was set in 2015 at 70 ppb. Lowering ozone levels from the current 75 ppb to the more health-protective 70 ppb 8-hour ozone standard in California is predicted to reduce annual premature mortality by an estimated 72 to 120 deaths, asthma exacerbations for 160,000 people, and lost days at work and school by more than 125,000.[550] Delaying implementation of the latest ozone NAAQS would harm the health and well-being of millions of people, not only in California but throughout the country. Simply put, meeting the ozone standard is a public health imperative.

The NAAQS[551] provide California with achievable goals to protect the health of Californians from health effects associated with air pollution. The Clean Air Act adds deadlines for meeting the NAAQS and consequences if these deadlines are not met. With its health-based air quality standards, meaningful deadlines, and requirements for comprehensive plans, the Clean Air Act has been the tool for achieving California's success in both clean air quality goals and economic success. The Clean Air Act requires early, comprehensive planning and any delays in implementing the Clean Air

---

[548] 42 U.S.C. § 7409.

[549] 42 U.SC. § 7410.

[550] *Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone.* U.S. EPA. Accessed on October 24, 2018. https://www.epa.gov/sites/production/files/2016-02/documents/20151001ria.pdf.

[551] California, like many states, has parallel state ambient air quality standards, for which it must also plan implementation steps. The Agencies' actions offend compliance with these standards in the same ways they undermine NAAQS compliance, and so invade State prerogatives in this regard as well.

Act requirements can increase cost.  California uses the early planning required by the Clean Air Act as a tool to minimize costs in the long-term.[552]

If EPA disapproves a submitted SIP, the Clean Air Act requires EPA to issue a finding of failure-to-submit an approvable SIP with notice that, if an approvable SIP is not submitted, sanctions will be applied within 18 months.[553]  The Act provides for two types of sanctions required after EPA makes a finding of failure: "offset" sanctions occurs within 18 months of the finding and "highway" sanctions that occur within six months after the offset sanctions (i.e., 24 months after the finding).  The offset sanctions apply to new or expanded stationary sources that emit pollutants for which the area is in nonattainment.  The source must offset their increased emissions by reducing existing emissions by two tons for every one ton of new emissions.  Highway sanctions prohibit the use of federal funds for transportation projects within the area impacted by the failure.

### f. California's State Implementation Plan meets federal law.

SIPs must contain enforceable commitments to achieve the level of emissions necessary to meet federal air quality standards, as defined by a plan's attainment demonstration.  California's "State SIP Strategy"[554] proposes new mobile source SIP measures and quantifies the State's SIP commitments for covered areas of California to meet these reduction needs.  The total emission reductions, and the obligation to propose certain actions, that are contained in the State SIP Strategy become enforceable upon approval by EPA of the elements of the State SIP Strategy that are included in each air district's SIP to meet the planning needs of that district.  The measures included in California's 2016 State SIP Strategy incorporate elements of CARB's Mobile Source Strategy, including measures to accelerate the deployment of cleaner technologies.

All of the California ozone and PM2.5 SIPs submitted to EPA since approximately early 2016 have included benefits of the California Advanced Clean Car program in their light-duty vehicle emission inventories.  These SIPs include the South Coast Air Basin, the San Joaquin Valley, the West Mojave Desert, the Coachella Valley, Sacramento Metro, Eastern Kern County, Ventura County, Imperial County, Western Nevada County, and San Diego County.  Two of California's areas, the South Coast Air Basin and the San Joaquin Valley, with the worst ozone pollution in the nation, will need the next iteration of California's Advanced Clean Car regulations to meet the latest ozone standard.  To meet the ozone standard in 2031, these areas require additional emission reductions from light-duty vehicles.

---

[552] Legislative Hearing on S. 2882 and S.2072, 2016, Oral Testimony by Kurt Karperos on Examining Pathways Towards Compliance of the National Ambient Air Quality Standard for Ground-Level Ozone.
[553] 42 U.S.C. § 7509.
[554] CARB. Revised 2016 State Strategy for the State Implementation Plan. Accessed on October 24, 2018. https://www.arb.ca.gov/planning/sip/2016sip/rev2016statesip.pdf. (Adopted by Reso. 17-7.)

285

A clear example of the dire importance of California's Advanced Clean Car program to SIP planning comes from the South Coast Air Quality Management District's plan for how it will meet the 2032 ozone NAAQS. For the South Coast Air Basin to attain this standard, California must reduce NOx emissions by an additional 118 tons per day NOx in 2031 beyond the current programs already providing significant NOx reductions. This means California must ensure more ZEVs are introduced than are required by California's current light-duty fleet ZEV requirements.

Actions at the federal, State and local levels have resulted in a decrease in NOx emissions of over 75 percent in both mobile and stationary source NOx emissions since 1990. New reductions that will continue to accrue from implementation of California's existing mobile source control program will reduce NOx emissions in 2031 by over 50 percent from 2016 levels. These programs will also result in significant reductions in PM2.5 emissions. The key remaining challenges are meeting ozone NAAQS in South Coast and PM2.5 NAAQS in the San Joaquin Valley. Further reductions in the South Coast will also be necessary to provide for attainment in the Coachella Valley and Mojave Desert regions downwind of the South Coast.

Air quality modeling for South Coast indicates NOx emissions will need to decline to approximately 141 tons per day in 2023 and 96 tons per day in 2031 to provide for attainment in the remaining portions of the region that do not yet meet the 8-hour ozone NAAQS.[555] Reaching these levels will require approximately 70 percent reductions in NOx from today's levels by 2023 and an overall 80 percent reduction by 2031.

Achieving an 80 percent reduction in NOx emissions will require comprehensive efforts to address emissions from both stationary and mobile sources through ongoing implementation of already adopted measures as well as new actions. These efforts have been the driver for the substantial air quality progress that has occurred to date in the South Coast region. Looking forward, continued implementation of current control efforts would reduce mobile source NOx emissions a further 50 percent by 2031. Controls on these mobile sources are crucial as more than 80 percent of the current NOx emissions originate from mobile sources,[556] and, while continued implementation of current programs will continue to achieve emission reductions in the future, mobile sources will remain the largest source of ozone-forming emissions.

Achieving the benefits of the current control program will continue to require significant efforts for implementation and enforcement. For example, as part of the Advanced Clean Cars program more stringent passenger vehicle standards began with model year 2017 vehicles. Even absent the potential impacts of this proposal, this will require ongoing efforts associated with vehicle certification and in-use surveillance. Outreach

---

[555] *Ibid.* p. 23.
[556]Final 2016 Air Quality Management Plan Appendix III. SCAQMD. Accessed on October 24, 2018. http://www.aqmd.gov/home/air-quality/clean-air-plans/air-quality-mgt-plan/final-2016-aqmp .

and infrastructure development will be needed to continue to grow the market for light-duty ZEVs to meet the ZEV regulation.

### g. The proposal increases criteria pollutant emissions.

CARB staff have estimated that the Agencies' proposal to rollback fuel economy and GHG standards can significantly impact California's criteria and GHG emissions in future years.

Passenger cars and light trucks are a major contributor to NOx emissions in California. The State's 39 million residents[557] collectively own about 24 million passenger vehicles[558] and drive more than most other Americans. Over ten million of these vehicles are in South Coast.[559] The vast majority of these vehicles have internal combustion engines and use gasoline. The light-duty vehicle sector is projected to grow to approximately 30 million vehicles statewide by 2031. CARB's 2016 State Strategy for the SIP[560] calls for reducing NOx emissions by approximately six tons per day from the light duty sector[561] in order for South Coast air basin to attain the 75 ppb ozone standard. According to the State Strategy, a fraction of these emissions reductions (about 0.6 tons per day) will be achieved through a combination of aggressive light-duty vehicle strategies such as higher zero emission vehicle (ZEV) sales requirement, and more stringent tailpipe standards. The remaining NOx emission reductions (about 5 tons per day) need to be achieved through incentive programs by accelerating the turnover of the oldest, highest emitting vehicles. This would mean removing older, dirtier vehicles from the road, either by replacing 1.1 million old vehicles with the cleanest conventional vehicle in 2031 or 700,000 zero emission vehicles.

Passenger cars and light trucks are a major contributor to NOx emissions in California. The State's 39 million residents[562] collectively own about 24 million passenger vehicles[563] and drive more than most other Americans. Over ten million of these vehicles are in South Coast.[564] The vast majority of these vehicles have internal combustion engines and use gasoline. The light-duty vehicle sector is projected to grow to approximately 30 million vehicles statewide by 2031.

---

[559] EMFAC2014. CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/emfac/2014/.
[559] EMFAC2014. CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/emfac/2014/.
[559] EMFAC2014. CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/emfac/2014/.
[562] Department of Finance Population Estimates for Cities, Counties, and the State, 2011-2018 with 2010 Census Benchmark. California Department of Finance. Accessed on October 24, 2018. http://www.dof.ca.gov/Forecasting/Demographics/Estimates/E-4/2010-18/documents/E-4_2018InternetVersion.xls.
[562] Department of Finance Population Estimates for Cities, Counties, and the State, 2011-2018 with 2010 Census Benchmark. California Department of Finance. Accessed on October 24, 2018. http://www.dof.ca.gov/Forecasting/Demographics/Estimates/E-4/2010-18/documents/E-4_2018InternetVersion.xls.
[562] Department of Finance Population Estimates for Cities, Counties, and the State, 2011-2018 with 2010 Census Benchmark. California Department of Finance. Accessed on October 24, 2018. http://www.dof.ca.gov/Forecasting/Demographics/Estimates/E-4/2010-18/documents/E-4_2018InternetVersion.xls.
[563] EMFAC2014. CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/emfac/2014/.
[564] EMFAC2014. CARB. Accessed on October 24, 2018.  https://www.arb.ca.gov/emfac/2014/.

As a result of the Agencies proposal, CARB staff has estimated that regional criteria and local toxic emissions would further increase in California non-attainment regions such as South Coast, primarily from increased fuel production activity at refineries and fuel distribution systems. More gasoline consumption means more diesel tanker truck trips to community gasoline stations, and therefore higher diesel PM emissions and refueling evaporative emissions.

According to staff analysis, the proposed rollback creates an additional 1.24 tons per day of NOx emissions in the South Coast air basin,[565] 90 percent of which is from upstream fuel activity increases. Because of the SIP commitments for federal ozone standards, these increased refinery emissions would have to be offset elsewhere. This means that even more vehicles would need to be removed to compensate for the NPRM increased NOx emissions of 1.24 tons per day.  Because the dirtiest vehicles would already be removed to achieve the targets set by South Coast, comparatively newer and cleaner vehicles would need to be removed--either an additional 1.3 million clean conventional vehicles or 1 million zero emission vehicles.[566] This will almost double the number of vehicles that were originally supposed to be replaced to meet the region's air quality commitments.

The federal proposal to rollback vehicle standards and withdraw Clean Air Act preemption waivers granted to California for its GHG standards and Zero Emissions Vehicle (ZEV) mandate will not allow California to achieve the 2031 South Coast SIP commitments or statewide 2030 and 2045 GHG requirements. This may result in dramatic counter-measures to meet emission reduction requirements; these measures would be costly and impact the state's economic growth and mobility needs.  If such measures cannot be developed within the strict time frames dictated by the Clean Air Act, regions of California could suffer the costs associated with federal "offset" and "highway" sanctions.  Such sanctions are onerous and would have lasting impact on the economic development of the impacted area.  In addition to the immense direct cost of developing needed counter-measures and the potential sanctions that would flow from a failure to do so, one must consider the costs that would flow from the time-consuming SIP planning process itself.  These costs would impact government both at the local district and State levels.

###### h. The proposal threatens California's federally approved modeling of emissions.

The GHG emission standards and ZEV requirements in California's Advanced Clean Cars (ACC) program, with its approval into California's SIP in 2012, was integrated into the EMission FACtor (EMFAC2014) transportation model.  The EMFAC model is a

---

[565] Calculated using data from CARB's EMFAC and Vision models.
[566] Calculated using data from the EMFAC model (Attachment – Saved in CARBDOJcollaboration/references/ File Name: EMFAC DATA SHOWING CRITERIA IMPACTS FROM PROPOSAL.xlsx).

computer model that can estimate emission rates for on-road mobile sources operating in California for calendar years 2000 to 2050. EMFAC provides outputs of the modeled emissions for hydrocarbons, carbon monoxide (CO), NOx, PM10, PM2.5, lead, carbon dioxide ($CO_2$), and sulfur oxides (SOx). Once approved by EPA,[567] EMFAC 2014 became the model California is required to use for the majority of SIP planning.

Accurate modeling of projected emissions is crucial to meeting the Clean Air Act's SIP requirements. The Clean Air Act requires that SIP inventories include motor vehicle emission estimates based on the latest planning assumptions and emission model to calculate inventories that are available at the time the SIP is developed.[568] Accordingly, EPA has agreed that EMFAC2014 meets these criteria; inventories based on EMFAC2014 have thus been used in recent federally-mandated SIPs. The Clean Air Act's general conformity requirements bar federal agencies from supporting any actions that are not consistent with (i.e. "conform to") an approved SIP, while the Clean Air Act's transportation conformity requirements ensure that federally supported regional transportation plans (RTPs), transportation improvement programs (TIPs), and highway and transit projects are consistent with the purpose of the SIP.

If California's programs to achieve reductions from the light-duty sector are invalidated, the inventories based on EMFAC 2014 would no longer be valid, and EPA would disapprove SIPs and associated motor vehicle emission budgets (MVEB) used to demonstrate transportation conformity, as the budgets derived from EMFAC2014 would include the effects of regulations no longer valid. Consistent with 40 CFR section 93.120, if EPA disapproves such SIPs without a protective finding,[569] then the transportation conformity budgets from the SIP may not be used for conformity purposes, resulting in a conformity freeze. This would halt new RTPs and TIPs in the region until the issue causing EPA's disapproval of the SIP is remedied. During a conformity freeze only transportation projects scheduled to occur in the first four years of the conforming RTP and TIP could continue to advance, and no new regional conformity determinations for RTPs, TIPs, or RTP/TIP amendments could be made. If conformity of an RTP and TIP has not been determined within two years of EPA's SIP disapproval using budgets that EPA approves or finds adequate from a new SIP that has replaced the disapproved SIP, then highway sanctions would apply and the conformity freeze would become a conformity lapse.

During a conformity lapse, no new RTPs, TIPS, or regionally significant transportation projects may be adopted or approved unless the project is a Transportation Control Measure or if all necessary approvals were in place prior to the date of the lapse. Either of these scenarios (conformity freeze or conformity lapse) would greatly limit the ability

---

[567] 80 Fed.Reg. 77,337 (Dec. 14, 2014).
[568] 40 CFR §§93.110, 93.111.
[569] A protective finding may be made when EPA finds the SIP identifies control measures sufficient to achieve Reasonable Further Progress or attainment and that SIP disapproval does not affect the validity of the mobile source budgets. (40 CFR 93.101.).

of California's Metropolitan Planning Organizations to amend their RTP and TIPs, and so would severely impact their ability to plan, fund, and implement transportation projects.

Another impact that would flow from this proposal's effect on EMFAC2014 is the likely disapproval of numerous California SIPs, as their underlying modeling would be invalidated. This could result in Clean Air Act sanctions being imposed on California. As described above, when SIPs are disapproved, the Clean Air Act requires EPA to issue a finding of failure to submit an approvable SIP with notice that if an approvable SIP is not submitted, sanctions (first "offset" and later "highway") will apply.

All SIPs that California has submitted since January 1, 2016 have utilized EMFAC2014 for modeled attainment demonstrations and Reasonable Further Progress demonstrations, both of which are required by the Clean Air Act to be part of an approvable SIP. As of this writing, 16 California SIPs have been submitted that used EMFAC2014. If EMFAC2014 is invalidated, EPA would most likely disapprove the 14 of those submitted SIPs that they have not yet acted upon and possibly make calls for revisions to the two it has acted on due their being rendered substantially inadequate through the invalidation of their modeling. Other states that have relied on either the federal or California light-duty emission standards would face similar consequences if the proposed rollback is finalized. Through this proposal, the Agencies are effectively breaking approved SIPs throughout the nation, without so much as acknowledging it, much less discussing the impacts and how states can prevent the damage that will come from not meeting legal planning requirements or actually improving air quality – which is what this is ultimately all about.

### i.    The proposal threatens California's Conformity Plan.

*Figure VII-1* shows a comparison of CARB's estimated NOx emissions impacts in California non-attainment/maintenance areas[570] versus those estimated by the Agencies in Appendix A[571] of the Draft Environmental Impacts Statement. The Agencies' emissions impact assessment shows reduction in NOx emissions in almost all non-attainment or maintenance areas except for Los Angeles-San Bernardino counties and San Francisco Bay Area, where almost 12 out of 15 refineries that produce transportation fuels are situated. However, CARB's estimates which are based on robust emissions modeling using California specific information that considers the proposal's impacts on tailpipe emissions as well as emissions from fuel production and distribution, reach a different conclusion. CARB's estimates indicate that, as a result of the Agencies' proposal, NOx emissions will increase in all non-attainment regions of

---

[570] Designations in US EPA Regions for the 2008 8-Hour Ozone National Ambient Air Quality Standards. U.S. EPA. Accessed on October 24, 2018. https://www3.epa.gov/region9/air/maps/pdfs/air1100018-7.pdf
[571] Draft Environmental Impact Statement. NHTSA. Accessed on October 24, 2018. https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/ld_cafe_my2021-26_deis_appendices_0.pdf

California.  CARB's estimates show that 90 percent of these increases flow from upstream fuel activity increases.

*Figure VII-1 NOx emissions impact in 2035 from the Agencies proposal in California non-attainments or maintenance areas – CARB vs. the Agencies estimates[572]*



---

[572] Note: to generate Figure VII-1, CARB's statewide estimates were disaggregated to different regions using tailpipe emissions as surrogates.  The supporting documentation for this figure is titled "Attachment – Emissions Impact Alternative1.xlsx, included in the submitted DVD.

*Figure VII-2 NOx emissions impact in 2025 from the Agencies proposal in California non-attainments or maintenance areas – CARB vs. the Agencies estimates*



These increases will have dire implications for SIP planning in some of California's major metropolitan areas. These impacts are not explained in the proposal due to the Agencies' reliance on modeling that is not the most detailed and accurate available, and that is different from the more detailed and accurate modeling that California is required to use in its SIP planning. The Agencies' failure to utilize the appropriate modeling when describing the criteria impacts of the proposal is arbitrary.

As addressed in California's comments on the DEIS, an additional criteria-related issue is whether the proposed action meets the Clean Air Act's general conformity requirements.[573] NHTSA offered a discussion of general conformity in its DEIS, but did

---

[573] To ensure compliance with SIPs and progress toward NAAQS attainment, the Clean Air Act's conformity provision requires that federal agencies not "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity" that does not "conform" to a SIP. 42 U.S.C. § 7506(c)(1). EPA is responsible for determining that its action is consistent with the applicable SIP and does not cause or contribute to any new NAAQS violation, increase the severity or frequency of an existing NAAQS violation, delay attainment of a standard, emissions reduction, or other milestone. To guide an agency's conformity determination, the EPA has promulgated

so utilizing modeling other than the relevant EMFAC2014.  Regardless, the DEIS lists general conformity thresholds, but it states those thresholds are "provided for information only; a general conformity determination is not required for the Proposed Action.[574]  NHTSA arrived at this conclusion because it claims the proposed action would not cause any direct or indirect emissions within the meaning of the General Conformity Rule.[575]

There are three fundamental issues with NHTSA's handling of the Clean Air Act's general conformity requirements.  First, NHTSA uses inappropriate modeling to reach its conclusion.  NHTSA has – without explanation – chosen not to utilize EMFAC 2014, the model that California is required to use under the Clean Air Act, to generate the numbers relevant to a conformity determination under the Act. Second, NHTSA argues that any emissions flowing from its actions are neither direct nor indirect for general conformity purposes under 40 CFR section 93.152, stating that it cannot control the technologies that auto manufacturers would use or consumer behavior (including purchasing).[576]  Yet this assertion flies in the face of the primary reason NHTSA is undertaking this rulemaking, which is that the existing standards' costs purportedly are causing new vehicles to become more costly and thereby negatively impacting consumer purchasing behavior. NHTSA then attempts to justify this course of action by predicting, using new modelling inputs of its own design, the emissions levels that would flow from its action. In other words, the rulemaking is premised on understanding consumer purchasing and the emissions implications of such purchasing, while NHTSA claims on the other hand that it cannot make assumptions about these very things when it comes to satisfying general conformity obligations.  NHTSA cannot have it both ways. Indeed, the Ninth Circuit Court of Appeals has previously recognized that "[b]y allowing particular fuel economy levels, which NHTSA argues translate directly into particular tailpipe emissions, NHTSA's regulations are the proximate cause of those emissions just as EPA Clean Air Act rules permitting particular smokestack emissions are the proximate cause of those air pollutants…."[577] Finally, in the context of this joint rulemaking between NHTSA and EPA, it is inappropriate that NHTSA's determination regarding its own conformity obligations, regardless of its independent merit or lack thereof, does not address any conformity-related obligations EPA may have that flow from the joint rulemaking.

---

two sets of regulations—a Transportation Conformity Rule, and a General Conformity Rule. The EPA's General Conformity rule requires that federal agencies perform a conformity determination if the action's cumulative direct and indirect emissions in a nonattainment or maintenance area exceed specified thresholds. 40 C.F.R. § 93.153(b).

[574] *See, e.g.*, DEIS, Appendix A, p. A-19.

[575] DEIS at 4-14 and 4-15.

[576] DEIS at 4-14 and 4-15.

[577] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008).

## 2. The federal proposal increases community exposures to air pollution.

Removal of CARB's ZEV regulation under the proposed rollback will cause increased air pollution exposures for people living within 200-500 meters of high-volume roadways. This will increase rates of health impacts associated with vehicle air pollution such as cancer, lung disease, asthma, and increased rates of mortality.  These impacts are disproportionately imposed on low-income communities and communities of color in California because there are disproportionally higher concentrations of these communities living near major roadways, and this concentration is expected to increase in the next two decades. CARB is committed to prioritizing environmental justice and ensuring that regulatory efforts focus on communities facing cumulative environmental and economic burdens, which include disadvantaged communities.  Hindering CARB's regulatory efforts to increase the number of zero-emission cars operating on California's roadways, therefore also hinders environmental justice and CARB's efforts to improve health and quality of life in disadvantaged communities. Specifically, the removal of even one of CARB's mobile source control regulations impedes CARB's efforts to significant reduce air toxic contaminant and criteria pollutant emissions in the most burdened communities under California Assembly Bill Number 617.[578]

### a. The federal proposal increases the concentration of harmful pollutants near major roadways.

Near-source exposure from vehicle emissions poses a significant health risk for those living within 300 to 500 meters of a major roadway.[579] As noted in analysis underlying the proposed rollback, locations near to major roadways have elevated concentrations of many air pollutants emitted from vehicles, making these "microclimates" or "hot spots" of harmful pollution.[580]

Traffic on major roadways is the largest source of near-source pollution due in part to the combustion of gasoline.[581] Traffic pollution is a complex mixture of gaseous and particulate pollutants, including particulate matter, NOx, and benzene.  The extent of exposure to these components depends on a number of factors, including upwind/downwind location, meteorological conditions, time of day, and season. For instance, high volumes of vehicles on a roadway during early morning commute hours can increase traffic delay and thus concentrations of near-roadway emissions. Differences in meteorology can contribute to pollutants from roadways traveling farther

---

[578] Garcia, Cal. Stats. 2017, Ch. 136.
[579] A. Carlson, The Clean Air Act's Blind Spot: Microclimates and Hotspot Pollution, 65 UCLA L. Rev. 1036, 1056 (2018) (hereinafter Hot Spot Pollution); Health Effects Institute, Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects, Special Report 17, available at https://www.healtheffects.org/publication/traffic-related-air-pollution-critical-review-literature-emissions-exposure-and-health (hereinafter HEI 2010).
[580] 83 Fed.Reg. at 43,344; Hot Spot Pollution, 1038.
[581] Hot Spot Pollution, 1056.

into nearby areas at night and during early morning hours than during the day.[582] Also, $NO_2$ concentrations have been shown to increase with rush hour traffic and areas of traffic delay.[583] At trafficked intersections, levels of PM can be elevated by as much as 40 percent for larger PM (PM 10) and by 16 percent to 17 percent for fine PM (PM 2.5).[584] These pollutants can enter vehicles, further exposing those driving on major roadways. For instance, significantly high levels of PM have been measured inside of Los Angeles-area buses.[585] The vehicle pollutants can also enter homes through open windows and vents in the early morning due to air patterns.[586]

Exposure to vehicle pollution by those living within 300 to 500 meters of a major roadway has been shown to contribute to and exacerbate asthma, impair lung function, and increase cardiovascular mortality.[587] Additionally, there is evidence linking near-roadway pollution exposures to higher rates of heart attacks, strokes, lung cancer, pre-term births, childhood obesity, autism, and dementia. Epidemiological studies have shown that even levels below the PM2.5 NAAQS[588] can increase the risk of health impacts. These studies estimate that "[f]or every increase of 10 micrograms per cubic meter of PM 2.5, mortality increased by 13.6 percent."[589]

California studies have indicated that some groups are more sensitive to traffic-related pollutants than the general population including children, the unborn, the elderly, and those with preexisting conditions. One study found that the total number of deaths from cardiovascular disease associated with near-roadway pollution will increase by 2035 due to an increased number of the elderly in the population at risk, even though the exposures and the risk to individuals will be reduced.[590] Traffic exposure can be linked to an increased prevalence of childhood asthma and bronchitis symptoms.[591] The Children's Health Study, conducted in California, demonstrated that particulate pollution

---

[582] Hu et al. Atmospheric Environment 43 (2009) 2541-49.
[583] Hot Spot Pollution, 1057.
[584] Hot Spot Pollution, 1058.
[585] Hot Spot Pollution, 1058.
[586] Hot Spot Pollution, 1057.
[587] Hot Spot Pollution, 1052 and 1057.
[588] *See*, University of Southern California Environmental Health Centers, References: Living Near Busy Roads or Traffic Pollution. University of Southern California. Accessed on October 24, 2018. https://envhealthydrocarbonenters.usc.edu/infographics/infographic-living-near-busy-roads-or-traffic-pollution/references-living-near-busy-roads-or-traffic-pollution.
[589] Hot Spot Pollution, 1053.
[590] Ghosh, R., et al. "Near-roadway air pollution and coronary heart disease: burden of disease and potential impact of greenhouse gas reduction strategy in Southern California" Environmental Health Perspectives, 2016. 124(2):193-200.
[591] Kim JJ, Smorodinsky S, Lipsett M, Singer BC, Hodgson AT, Ostro B. Traffic-related air pollution near busy roads: the East Bay Children's Respiratory Health Study. American Journal of Respiratory and Critical Care Medicine, 2004. 170 (5): 520-6; Delfino RJ, Gong H Jr, Linn WS, Pellizzari ED, Hu Y. Asthma Symptoms in Hispanic Children and Daily Ambient Exposures to Toxic and Criteria Air Pollutants. Environmental Health Perspectives vol 111 number 4 April 2003; Delfino RJ, Gong H, Linn WS, Hu Y, Pellizzari ED. Respiratory symptoms and peak expiratory flow in children with asthma in relation to volatile organic compounds in exhaled breath and ambient air. Journal of Exposure Analysis and Environmental Epidemiology, 2003. 13, 348–363.

295

may significantly reduce lung development in children, and that these effects are likely permanent.[592] The investigators found associations between children exposed to heavy traffic and slower lung development, as well as significant increases in asthma prevalence, asthma medication use, and wheezing.[593] Living near heavy traffic could also be associated with increased rates of new cases of asthma.[594] Ongoing studies examining long-term health trends in the Children's Health Study participants have found that the recent reductions of air pollution in South Coast are associated with significantly reduced bronchitic symptoms and clinically significant positive effects on lung development in these children.[595] Both regional particulate matter pollution and local near-roadway exposures affect children's health independently, resulting in reduced lung function.[596] Other investigators have found adverse birth outcomes, such as low birth weight seen in infants whose mothers are exposed to traffic pollution.[597] Short-term exposure to PM2.5 causes premature mortality, and long-term exposure additionally may cause reproductive harm, developmental problems in children, and cancer.[598]

The specific component or components of traffic pollution responsible for the health impacts observed are not known and the mechanisms of toxicity are an active area of research.  Epidemiological studies worldwide, as well as California-specific studies, however, have clearly shown that adverse health effects are associated with vehicle emissions and are concentrated within a few hundred meters of heavily traveled freeways and major roadways. A comprehensive review of traffic impacts by the Health

---

[592] Avol EL, Gauderman WJ, Tan SM, London SJ, Peters JM. "Respiratory effects of relocating to areas of differing air pollution levels," American Journal of Respiratory and Critical Care Medicine, 2001. 164: 2067-2072; Gauderman WJ, Avol E, Gilliland F, Vora H, Thomas D, Berhane K, McConnell R, Kuenzli N, Lurmann F, Rappaport E, Margolis H, Bates D, Peters J. "The effect of air pollution on lung development from 10 to 18 years of age," New England Journal of Medicine, 2004. 351(11): 1057-1067. Erratum in: New England Journal of Medicine 2005 352(12):1276.
[593] Gauderman WJ, Avol E, Lurmann F, Kuenzli N, Gilliland F, Peters J, McConnell R. Childhood asthma and exposure to traffic and nitrogen dioxide. Epidemiology, 2005. 16 (6): 737-43;
Gauderman WJ, Vora H, McConnell R, Berhane K, Gilliland F, Thomas D, Lurmann F, Avol E, Kunzli N, Jerrett M, Peters J. Effect of exposure to traffic on lung development from 10 to 18 years of age: a cohort study. Lancet, 2008. 369 (9561): 571-7; McConnell R, Berhane K, Yao L, Jerrett M, Lurmann F, Gilliland F, Kunzli N, Gauderman J, Avol E, Thomas D, Peters J. Traffic, susceptibility, and childhood asthma. Environmental Health Perspectives, 2006. 114 (5): 766-72.
[594] McConnell R, Islam T, Shankardass K, Jerrett M, Lurmann F, Gilliland F, Gauderman J, Avol E, Künzli N, Yao L, Peters J, Berhane K. Childhood incident asthma and traffic-related air pollution at home and school. Environmental Health Perspectives, 2010. 118 (7): 1021-1026.
[595] Gauderman, W.J., et al. "Association of improved air quality with lung development in children" New England Journal of Medicine, 2015. 372(10):905-913; Berhane, K. et al. "Association of changes in air quality with bronchitic symptoms in children in California, 1993-2012", Journal of the American Medical Association, 2016. 315(14):1491-1501.
[596] Urman, R, McConnell R, Islam T, Avol EL, Lurmann FW, Vora H, Linn WS, Rappaport EB, Gilliland FD, Gauderman WJ. "Associations of children's lung function with ambient air pollution: joint effects of regional and near-roadway pollutants" Thorax, 2014. 69(6):540-547doi: 10.1136/thoraxjnl-2012-203159.
[597] Michelle Wilhelm, Jo Kay Ghosh, Jason Su, Myles Cockburn,Michael Jerrett, and Beate Ritz. Traffic-Related Air Toxics and Term Low Birth Weight in Los Angeles County, California vol. 120 no. 1.  January 2012  Environmental Health Perspectives.
[598] Hot Spot Pollution, 1053.

296

Effects Institute (HEI) concluded that there is evidence to indicate that traffic-related pollution is a public health concern.[599]

The proposed rollback acknowledges that there are elevated concentrations of air pollutants from vehicles near major roadways. This acknowledgement supports the importance of keeping California's ZEV rule in place as an effective method to reduce near-roadway emissions. The proposed rollback asserts that it will reduce such exposures without conducting an analysis of reductions as compared to the ZEV rule.

### b. Low-income communities and communities of color are disproportionately burdened by near-roadway exposures.

Many communities in California are located near major roadways. California has three cities in the top ten largest U.S. cities by population, and some of the largest freight corridors in the U.S. are located in or near those cities. Busy traffic corridors have been built adjacent to and through existing neighborhoods (sometimes as a result of planning policies), and new developments have been built near existing roadways due to a variety of factors, including economic growth, demand for built environment uses, and the scarcity of land available for development in some areas. Estimations based on the 2000 Census suggest that 24 percent of all Californians live within 500 meters of a highway and 44 percent within 1000 meters of a highway.[600] In Los Angeles, more than a third of the population lives within 300 meters of a major roadway.[601]

Of those living near major roadways, there is a disproportionate concentration of low income communities and communities of color. In California, Latinos, African Americans, Asian/Pacific Islanders, and low-income individuals and families are more likely to live next to a major roadway than whites or high-income earners.[602] And almost half of Californians living next to major roadways are "poor or near-poor."[603] Economically disadvantaged neighborhoods and individual residences have been linked to higher levels of traffic air pollution[604] and more asthma symptoms, among other health impacts.[605] Near-roadway exposures exacerbate existing health impacts experienced by these communities, and a lack of resources inhibit responses that might otherwise promote healthy outcomes.[606] For instance, lack of access to health care,

---

[599] Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects. HEI Special Report 17. Health Effects Institute. 2010. Accessed on October 24, 2018. https://www.healtheffects.org/publication/traffic-related-air-pollution-critical-review-literature-emissions-exposure-and-health.

[600] Census 2000.

[601] Hot Spot Pollution, 1057-58.

[602] Hot Spot Pollution, 1047.

[603] Hot Spot Pollution, 1047.

[604] Gunier RB, Hertz A, Von Behren J, Reynolds P. Traffic density in California: socioeconomic and ethnic differences among potentially exposed children. Journal of Exposure Analysis and Environmental Epidemiology, 2003. 13(3): pp. 240-46.

[605] Meng Y-Y, Wilhelm M, Rull RP, English P, Nathan S, Ritz B.  "Are frequent asthma symptoms among low-income individuals related to heavy traffic near homes, vulnerabilities, or both?" 18:343-350 Annals of Epidemiology. 2008.

[606] Gunier, R.B., et al., Traffic density in California: socioeconomic and ethnic differences among potentially exposed children. Journal of Exposure Science and Environmental Epidemiology, 2003. 13(3): pp. 240-246.

historical discrimination, and the inability to move to an affordable, healthier location can present obstacles to fair and equal health and economic outcomes for low income communities and communities of color.

Ultimately, historical inequities can be compounded by the continuation and increase in air pollution, by disproportionately burdening these communities with the health impacts of harmful pollutants from traffic. These unfair outcomes for particular communities are a result of decades of decision-making that did not prioritize fundamentally fair outcomes for all Californians regardless of their economic, racial, or ethnic background. Environmental justice is of critical importance to reduce and eliminate health, environmental, and economic disparities that disproportionately negatively affect communities of color and low-income communities in California and to create a more fair economy and quality of life for all Californians. A priority for CARB is to achieve environmental justice and to make it an integral part of its activities to improve their health outcomes and quality of life. This reflected in the ZEV regulation, which ultimately works to directly reduce near-roadway exposures, improving health outcomes for those living near major roadways.

Despite the EPA's reaffirmed commitment to environmental justice, the proposed rollback does not adequately analyze the effect of removing the ZEV regulation on furthering environmental justice, particularly as a result of increasing near-roadway exposures.[607] In 1994, a federal Executive Order directed federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law. The order also directed each agency to develop a strategy for implementing environmental justice. This executive order has not been revoked and is a core statement of federal policy in effect today. Further, EPA's Environmental 2020 Action Agenda creates procedures to consider environmental justice routinely throughout agency decision-making. Additionally, the February 23, 2018 memo by EPA Associate Administrator Samantha Dravis notes that EPA will "[a]chieve measureable environmental outcomes for underserved and overburdened communities in areas of [. . .] reduction of air pollutants [. . .] and [s]trengthen the ability of our partner agencies to integrate [environmental justice] in their work through enhanced coordination and collaboration with states, tries and local governments to address [environmental justice] concerns."[608]

However, this commitment is not reflected in the proposed rollback, which would eliminate CARB's ability to enforce its ZEV regulation. A statement of commitment to environmental justice is ineffective without corresponding action to ensure the commitment and its expected benefits are realized. In the proposed rollback's

---

[607] Memorandum on EPA's Environmental Justice and Community Revitalization Priorities. U.S. EPA. Accessed on October 24, 2018.  https://www.epa.gov/sites/production/files/2018-02/documents/epa_ej_memo_02.23.2018.pdf. (hereinafter EPA Environmental Justice Memo); Executive Order, 59 Fed.Reg. 32 (Feb. 18, 1994).
[608] EPA Environmental Justice Memo.

298

Environmental Justice section, it attempts to delegitimize the disproportionate health impacts experienced by low-income communities and communities of color and makes an unfounded and unanalyzed conclusion that the emissions reductions from the proposed rule will have the most direct air quality improvements by those living near-roadways.

Moreover, the proposed rollback's Environmental Justice section appears to misunderstand the purpose of implementing environmental justice. The proposed rollback states that it is other stressors associated with low-income communities and communities of color that are largely to blame for any worsened health outcomes; however, it fails to acknowledge the significant impact social and economic disparities have on exposure disparities. There is no analysis or description in the proposed rollback of how economic circumstances; historical, social, and economic discrimination and inequities; and health are interrelated and can work to exacerbate negative outcomes. As stated above, the proposed rollback acknowledges that vehicle pollution causes significant health impacts for those living near major roadways and the importance of reducing such exposures. Nonetheless, the rollback's Environmental Justice section concludes by stating that direct emissions reductions will occur from the proposed rollback, and thus reduce near-highway exposures, without any supporting analysis.

The fact that there are disproportionate stressors within low-income communities and communities of color is a significant reason for prioritizing environmental justice and fair treatment by government actions. Reducing pollution exposures and improving health can in turn increase economic and social benefits, thereby reducing other disparities experienced in these communities. For example, reducing rates of asthma or asthma symptoms can increase school and work attendance. The existence of other stressors that affect health does not lessen the connection between vehicle pollution and health impacts, as the proposed rollback appears to imply, it strengthens the justification for the necessity of the ZEV regulation to cause direct reductions of near-roadway exposures.

### 3. Increasing ZEVs are essential to improving the health of those living near major roadways.

Full electrification of all vehicles in California would avoid the majority of near-source exposure health impacts. The ZEV regulation intends to push California towards that goal, and the revocation of California's authority to implement this rule will substantially impair the immediate reductions of near-highway exposures and future anticipated reductions. CARB's policies and plans to reduce car and truck pollution statewide are already improving air quality, but will take time before the full benefits are achieved. Revoking California's authority to implement the ZEV regulation is particularly harmful to ongoing efforts to reduce exposures to the most burdened communities such as through CARB's Community Air Protection Program pursuant to Assembly Bill 617. These direct near-roadway emission reductions are necessary because the size of the population

299

living near major roadways in California is growing, increasing the risk of health impacts and related harms to these expanding communities.

Under Assembly Bill 617, CARB and local air districts are partnering to transform California's air quality programs to address air pollution disparities at the neighborhood level. The goal is to substantially reduce air toxic contaminants and criteria air pollutant exposures in communities that experience the most significant exposure burdens. CARB selected these first ten communities. The air district for each community must develop and implement a Community Emissions Reduction Program (CERP) that will include strategies to reduce toxic air pollutants and criteria air pollutants from stationary sources in the community in the near-term. CARB, for its part, is to adopt new and implement existing mobile source controls to support the emissions reductions.

The ZEV regulation is a critical part of the existing regulatory regime expected to reduce emissions in these communities. Many of the communities have major roadways that cause near-highway exposures of harmful vehicle pollutants, contributing to the pollution burden of these communities. Without the ZEV regulation, CARB will not have one of the most effective tools to reduce pollution exposures in these communities.

Additionally, according to the U.S. Census Bureau, California is the second-fastest growing state and Los Angeles is also one of the fastest growing cities in the U.S.[609] The Southern California Association of Governments (SCAG), the regional planning agency for Los Angeles, Ventura, Orange, Riverside, San Bernadino, and Imperial Counties estimates that the population in these counties that will live within 500 feet (152 meters) of a freeway will increase by 250,000 by 2035.[610] As populations increase, so do the numbers of vehicles on the roadways, increasing vehicle emissions and exposures for those living near the freeways. In areas where infill development is prioritized, the populations near roadways are also expected to increase in the coming decades.

CARB intended to rely on its existing programs, such as the ZEV regulation, and its new efforts, such as Assembly Bill 617, to attempt to minimize emissions that otherwise would be expected to grow with increasing populations and vehicles operated in California. To remove the ZEV regulation causes substantial harm to this effort and will directly result in increases in near-roadway emissions exposures for Californians during this time of population growth.

### 4. Reducing near-term exposures must be addressed in part by increasing use of ZEVs.

Reducing near-roadway exposures requires a comprehensive, integrated approach through reducing emissions from the vehicles themselves and reducing emissions

---

[609] Census Bureau Reveals Fastest-Growing Large Cities. U.S. Census Bureau. Accessed on October 24, 2018. https://www.census.gov/newsroom/press-releases/2018/estimates-cities.html.
[610] Regional Transportation Plan 2012-2035, Environmental Justice Appendix. SCAG. Accessed on October 24, 2018. http://rtpscs.scag.ca.gov/Documents/2012/final/SR/2012fRTP_EnvironmentalJustice.pdf.

300

exposures from the transportation system. This comprehensive approach is needed because no one solution can meet the overall reductions that are needed, and the potential to reduce emissions in the near term compared to the longer term differs. Motor vehicle regulations like the ZEV regulation provide an opportunity to reduce emissions in the near- and mid-term, while reductions in emissions from the transportation system and land use, which are equally important, provide an opportunity to reduce exposure and emissions in the mid- and long-term.  Further, reducing emissions from vehicles are seen as the "low hanging fruit" from a cost-effectiveness perspective, and are therefore the appropriate first line of defense when developing a strategy to improve air quality and reduce exposure for communities, especially the most vulnerable ones.  If removing the ZEV regulation would mean that the State must rely solely on mechanisms to reduce emissions or exposures from the transportation system and land use to achieve the same public health benefits, this would include reducing reliance on vehicles (such as reducing VMT) or creating more distance between communities and roadways. These two options are important and being pursued through existing efforts by the State agencies and local jurisdictions, but they cannot be the sole mechanisms to reduce vehicle pollutant emissions or exposures.

First, the amount of time it takes to implement these solutions means that exposure is prolonged when there are cost-effective measures to address them (i.e. ZEV regulation).  Second, it is logistically impractical and costly to expect all near-roadway exposure is achieved solely from changes to all existing and future infrastructure. Lastly, it is a substantial burden to impose on local jurisdictions to use their authorities to reduce this magnitude of near-roadway exposure. Increasing the use of ZEVs is essential to the multi-prong effort to reduce pollution exposures from vehicles and that is best achieved through the ZEV regulation.

There are numerous efforts underway in the policy, planning, and technology areas in California to reduce reliance on vehicles and otherwise reduce VMT. These efforts are undertaken for a variety of reasons, including to improve quality of life (e.g., reducing congestion and commute times), reduce consumer costs, and reduce vehicle pollution. These efforts are also necessary because of the speed of population growth – and personal car ownership – in the State and the inability of existing housing and transportation infrastructure to serve these populations and vehicles. Examples of ongoing efforts to reduce reliance on vehicles include incorporating VMT into the project evaluation and mitigation process through CEQA,[611] Sustainable Communities Strategies to meet regional GHG reduction targets from light-duty vehicles by regional Metropolitan Planning Organizations under Senate Bill 375,[612] and State grants to local jurisdictions to build active transportation infrastructure.[613] These efforts, however, face implementation challenges as a result of a number of factors, including existing federal,

---

[611] Cal. Senate Bill (SB) 743, Chap. 386, Stats. 2013 (Steinberg).
[612] Cal. Senate Bill (SB) 375, Chap. 728, Stats. 2008 (Steinberg).
[613] Cal. Senate Bill (SB) 99, Chap. 359, States 2013; Cal. Assembly Bill (AB) 101, Chap. 354, Stats. 2013.

state, and local transportation fund structures that favor investments in roads over alternative modes, inadequate affordable housing near jobs, and increases in use of ride-hailing companies, all of which promote the use of vehicles or longer trip lengths.

First, the amount of time it takes to implement transportation infrastructure and land use development solutions means that resident exposure will be unnecessarily prolonged if forced to solely rely on these strategies to achieve near-roadway pollution exposure reductions.  In general, transportation infrastructure projects are identified and programmed in a way that helps to influence the distribution of population, employment growth, and associated land use changes.  It then takes several years to update local general plans and zoning codes to reflect more sustainable land use planning, followed by several more years to affect land use changes on individual parcels. The elapsed time to affect transportation system and land use change is on the order of several decades.  These efforts will be an important strategy to achieve public health benefits, but not at the scale that clean vehicles can provide in the near-term.

Second, it is currently logistically and legally impracticable and costly to solely rely on changes to the transportation system and land use to achieve near-roadway pollution exposure reductions. As noted above, about one third of residents of Los Angeles live near a major roadway. To modify existing infrastructure to reduce the number of residents living near a major roadway, or to reduce the number of vehicles driving on that roadway, could require movement of millions of people and jobs; large amounts of capital and other funds; and or new legal authority to allow for road user pricing strategies.

Lastly, it would be a substantial burden on local jurisdictions to solely rely on changes to the transportation system and land use to achieve near-roadway pollution exposure reductions. These local jurisdictions have primary authority to determine transportation and land use patterns within their boundaries within the parameters set by State law. This is a significant responsibility. Local jurisdictions are on the front lines of understanding what their communities need and how funding availability, population growth, new transportation services (such as ride-hailing companies), and housing availability affect the health, prosperity, and wellbeing of their residents. While their role is integral to shaping the low-pollution communities of the future, local jurisdictions should not be expected to use their authority to meet all GHG and pollution reduction goals, especially when ZEV technologies are available today. CARB developed a Technical Advisory that identifies effective strategies that planners and other land use decision-makers can implement locally. The Technical Advisory specifically calls out the ZEV regulation as one of the mechanisms expected to reduce emissions in tandem with local development. ZEVs can be deployed feasibly, cost-effectively, and immediately in large numbers over the next few decades, causing substantial reductions in near-roadway emissions exposures and creating immediate air quality, public health, and environmental justice benefits.

302

**5.  The significant climate impacts of motor vehicle emissions compel reductions.**

California is one of the most geographically and ecologically diverse regions in the world, with landscapes ranging from sandy beaches to coastal redwood rainforests to snow-covered alpine mountains to dry desert valleys. California suffers from compelling and extraordinary circumstances in part because it is highly vulnerable to climate change. It contains multiple climate zones, and each region could experience a combination of impacts from climate change unique to that area. These include drought, prolonged and extreme heat waves, proliferating wildfires, and rising seas. Climate change poses an immediate and escalating threat to California's environment, public health, and economic vitality.

CARB's estimates indicate that the Agencies proposal can increase the $CO_2$ emissions in California by almost 12 million metric tons in 2030[614] accounting for both vehicle and fuel production emissions. This is equivalent to about half of the projected annual GHG benefits from the Advanced Clean Cars and represent 9 percent of the GHG reductions needed to meet the targets set by the California Global Warming Solutions Act of 2006.

*Figure VII-3 Carbon Pollution in California Increases under Cleaner Cars Rollback*



California is already experiencing the effects of climate change, and projections show that these effects will continue and worsen over the coming centuries. Changes in weather patterns can influence the frequency of meteorological conditions conducive to the development of high pollutant levels. Some of the key air pollutants (ozone,

---

[614] Calculated using data from the EMFAC model.

secondary particulate matter) depend strongly on temperature. Increases in atmospheric GHGs since the Industrial Revolution are well-known to warm global near-surface and tropospheric air temperatures. Some of the other broad range of effects of higher temperatures on air quality could include increases in emissions of biogenic gases year-around, in electric power and vehicle-fuel emissions in summer, in the temperature-dependent rates of photochemical reactions, and vaporization of volatile particle components. Higher temperatures will also impact meteorology by increasing atmospheric stability due to enhanced cloudiness but decreasing in stability due to warmer near-surface temperatures.

The impacts of climate change disproportionately impact the state's most vulnerable populations. The magnitude and rate of climate change in this century will likely exceed that experienced by California's native peoples over past millennia. California is committed to accelerating efforts to incorporate climate science and adaptation into its planning activities. California's leadership in climate change program is built on a strong foundation of scientific research addressing the impacts of climate change on the state. The ability for all Californians to withstand impacts to climate change is dependent on considering climate change impacts in scientific discussions and coordinating public agencies efforts to address these issues. Hence, as climate change exacerbates inland and coastal flooding, wildfires, droughts, extreme heat and other hazards, Californians and their public agencies are working alongside to prioritize long-term safety and resilience. This year two major reports prepared by the Office of Environmental Health Hazard Assessment and California Energy Commission, provide the scientific foundation for understanding climate-related impacts at the local scale that serves the growing needs of state and local-level decision-makers from a variety of sectors.

***2018 Report: Indicators of Climate Change in California***: The impacts of climate change have been compiled by the California Office of Environmental Health Hazard Assessment (OEHHA) in the Indicators of Climate Change Report, which details a number of already occurring changes.  The report documents the growing number of extreme weather-related events in recent years, such as the devastating 2017 wildfires and the record-setting 2012-2016 drought. Some of the long-term warming trends underlying these events, including the rise in average temperatures and the number of extremely hot days and nights, have accelerated in recent decades. The report also tracks a variety of other climate change indicators: the declining snowpack and dramatic retreat of glaciers in the Sierra Nevada, unprecedented tree mortality in California forests, a rise in ocean temperatures off the California coast, and the shifting ranges of many species of California plants and animals. These impacts are similar to those that are occurring globally. The following highlight the report findings:

- Atmospheric concentrations of $CO_2$ continue to increase. Measurements at California coastal sites are consistent with those at Mauna Loa, Hawaii, where the first and longest continuous measurements of global atmospheric $CO_2$ concentrations have been taken.

- As atmospheric concentrations of $CO_2$ increase, so do levels in the ocean, part of a process known as "ocean acidification". The net result of adding $CO_2$ to seawater is to increase seawater acidity, a fundamental 'building block' for organisms forming shells of calcium carbonate.

- Since 1895, annual average air temperatures have increased throughout the state, with temperatures rising at a faster rate beginning in the 1980s. The last four years were notably warm, with 2014 being the warmest on record, followed by 2015, 2017, and 2016.

- California has become drier over time. Five of the eight years of severe to extreme drought occurred between 2007 and 2016, with unprecedented dry years in 2014 and 2015.

- Since 1950, the area burned by wildfires each year has been increasing, and five of the largest fire years have occurred since 2006. The largest recorded wildfire in the state (Thomas Fire) occurred in December 2017.

- The amount of water stored in the state's snowpack — referred to as snow-water content — ranges from a high in 1952 of about 240 percent to a record low of 5 percent in 2015. With less spring runoff, less water is available during summer months to meet the state's domestic and agricultural water demands.

- Compared to the 1930s, today's forests have more small trees and fewer large trees. Pines occupy less area statewide and, in certain parts of the state, oaks cover larger areas. The decline in large trees and increased abundance of oaks are associated with statewide increases in climatic water deficit.

- Along the California coast, sea levels have generally risen. Since 1900, mean sea level has increased by about 180 millimeters (7 inches) at San Francisco.

- Climate change poses a threat to public health. Warming temperatures and changes in precipitation can affect vector-borne pathogen transmission and disease patterns in California. West Nile Virus currently poses the greatest mosquito-borne disease threat. Heat-related deaths and illnesses, which are severely underreported, vary from year to year. In 2006, they were much higher than any other year because of a prolonged heat wave.

**California's Fourth Climate Change Assessment (Fourth Assessment)**: California is committed to further supporting new research on ways to mitigate climate change and to understand its ongoing and projected impacts. California's Fourth Climate Change Assessment further updates our understanding of the impacts from climate change in a way that directly informs State agencies' efforts to safeguard the State's people, economy, and environment.  The Fourth Assessment report also includes new climate projections with higher spatial resolution to better simulate and project extreme events. These updated projections reinforce past findings about temperature and precipitation extremes. The key findings from the Fourth Assessment are summarized below:

- *Economic Impacts:* Emerging findings for California show that costs associated with direct climate impacts by 2050 are dominated by human mortality, damages to coastal properties, and the potential for droughts and mega-floods. The costs are in the order of tens of billions of dollars. If global greenhouse gas emissions

305

are reduced substantially from the current business-as-usual trajectory, the economic impacts could be greatly reduced.

- *Wildfire Projections*: By 2100, if greenhouse gas emissions continue to rise, one study found that the frequency of extreme wildfires burning over approximately 25,000 acres would increase by nearly 50 percent, and that average area burned statewide would increase by 77 percent by the end of the century. In the areas that have the highest fire risk, wildfire insurance is estimated to see costs rise by 18 percent by 2055 and the fraction of property insured would decrease.

- *Sea Level Rise Projections:* A new study estimates that, under mid-to high-sea-level rise scenarios, 30 to 70 percent of Southern California beaches may completely erode by 2100 without large-scale human interventions. Statewide damages could reach nearly $17.9 billion from inundation of residential and commercial buildings under 50 cm (around 20 inches) of sea-level rise, which is close to the 95th percentile of potential sea-level rise by the middle of this century. A 100-year coastal flood, on top of this level of sea-level rise, would almost double the costs.

- *Public Health Impact*: Heat-Health Events (HHEs), which better predict risk to populations vulnerable to heat, will worsen drastically throughout the State: by midcentury, the Central Valley is projected to experience average HHEs that are two weeks longer, and HHEs could occur four to ten times more often in the Northern Sierra region.

- *Water Supply Impact:* Current management practices for water supply and flood management in California may need to be revised for a changing climate. As one example, the reduction in the Sierra Nevada snowpack, which provides natural water storage, will have implications throughout California's water management system.

- *Delta Levees and Infrastructure Impact*: New measurements found mean subsidence rates for some of the levees in the Sacramento-San Joaquin Delta of about 0.4 to 0.8 inches per year. This subsidence compounds the risk that sea-level rise and storms could cause overtopping or failure of the levees, exposing natural gas pipelines and other infrastructure to damage or structural failure. At this rate of subsidence, the levees may fail to meet the federal levee height standard (1.5 feet of freeboard above 100-year flood level) between 2050 and 2080, depending on the rate of sea-level rise.

- *Agriculture Impact*: Many of California's important crops, including fruit and nut trees, are particularly vulnerable to climate change impacts like changing temperature regimes and water-induced stress. A Fourth Assessment study indicates that adaptive decision-making and technological advancement may maintain the viability of California agriculture. However, additional studies show that viability of the sector overall may be at the expense of agricultural jobs and the dairy sector.

- *Oceans Impact:* There is increasing evidence that climate change is transforming and degrading California's coastal and marine ecosystems due to impacts including sea-level rise, ocean acidification, and ocean warming. Continued climate-driven changes to the ocean and coast will have significant consequences for California's coastal ecosystems, economy, communities,

culture, and heritage.  Together, historical data, current conditions, and future projections provide a picture of California's changing climate. Sea level rise, droughts, floods, and forest impacts are just some of the impacts affected by climate change, and as GHG emissions continue to accumulate, such destructive events will become more prevalent.  The historical record, which has long provided the basis for our expectations for the traditional range of weather and other natural events, is becoming an increasingly unreliable predictor of the conditions we will face in the future. Climate disruption can drive extreme weather events such as coastal storm surges, drought, wildfires, floods, and heat waves. Thus, California's efforts are vital steps toward minimizing risks to public health, safety, and the economy and maximizing equity and protection of the most vulnerable so that they do not simply survive climate-related events, but thrive despite and after these events.

Recognizing the facts, the California Legislature has acted to reduce GHG emissions in California. In 2006, the California Legislature passed, and the Governor signed, Assembly Bill 32, the California Global Warming Solutions Act of 2006.[615] Assembly Bill 32 requires CARB to enact regulations to achieve the level of statewide GHG emissions in 1990 by 2020, authorizes and directs CARB to monitor and regulate sources of GHG emissions,[616] and specifically directs CARB to "adopt rules and regulations … to achieve the maximum technologically feasible and cost-effective greenhouse gas emission reductions from sources … subject to the criteria and schedules set forth in this part."[617]

In 2016 California's Legislature passed, and California's Governor Brown signed Senate Bill 32,[618] which requires CARB to ensure that California's statewide emissions of GHG emissions are reduced to at least 40 percent below the level of statewide GHG emissions in 1990, no later than December 31, 2030.[619]

In addition to its directional shift in 2012 based on the 2009 Vision modeling mentioned above, CARB has reconfirmed it needs to obtain significant reductions in GHG emissions from the transportation sector (which includes mobile sources) in order to comply with the above mentioned statutory mandates, especially since the transportation sector is largest source of GHG emissions in California.[620]  CARB has identified strategies to obtain GHG emissions from mobile sources that include policies to move toward a goal of achieving 100 percent ZEV sales in the light-duty vehicle sector and reductions in vehicle miles travelled, and accelerating the use of clean

---

[615] Cal. Assembly Bill (AB) 32, Chap. 488, Stats. 2006 (Nunez).
[616] Cal. Health & Saf. Code § 38510.
[617] Cal. Health & Saf. Code § 38560.
[618] Cal. Sen. Bill 32, Chap. 249, Stats. 2016 (Pavley).
[619] Cal. Health & Saf. Code § 38566.
[620] *The 2017 Climate Change Scoping Plan Update.* CARB. 2017. p 98.

vehicle and equipment technologies and fuels through the targeted introduction of zero emission and near-zero emission technologies in other sectors.[621]

These analyses maintain the need for strong GHG fleet-wide standards in congruence with meaningful ZEV requirements.  As mentioned above, the ZEV regulation acted as an incubator for hybrid technology, and hybrid technology (once commercialized) was used to help set the 2012 LEV III GHG emission standards for all cars.  Now, the aforementioned analyses show ZEV technology is imperative for meeting long-term emission reduction goals.  Manufacturers would not likely make a more expensive technology to reduce GHG emissions (like a BEV) if there were other technologies that could still help achieve GHG standards at less cost.  The ZEV regulation can help set a floor to ensure manufacturers are developing technologies that can be used to set meaningful GHG fleet-wide standards in the future.

### 6. California and the nation must reduce greenhouse gas emissions from motor vehicles and promote zero-emission vehicles.

There is an urgent need to help the transportation system take the next step in innovation to reduced- and zero-emission technologies. The ZEV regulation is designed to accelerate technology development through steadily increasing minimum sales. These technologies are necessary to reverse the increasing emissions from the transportation sector. Total ZEV and PHEV sales and the number of available vehicle models are steadily climbing. Manufacturers have over-complied with the requirements, and costs are falling faster than predicted.[622]

As detailed above the rollback scenario creates an additional 1.24 tons per day increase in NOx emissions in the South Coast air basin, 90 percent of which is from upstream fuel activity increases. Because of the SIP commitments for federal ozone standards, these increased refinery emissions would have to be offset elsewhere. This means that even more vehicles would need to be removed to compensate, and because the dirtiest vehicles would already have been removed, more newer and cleaner vehicles would need to be removed - either an additional 1.3 million clean conventional vehicles, or 1 million additional electric vehicles. This will almost double the number of vehicles that must be replaced to meet the region's air quality commitments. To put it plainly, California's ZEV regulation is a practical necessity to meeting the National Ambient Air Quality Standards for ozone.

California is not putting all the burden on manufacturers. To further advance zero-emission technology, California enacted a law to reduce emissions from the next frontier of transportation: ride-hailing, or transportation network, companies.[623] California

---

[621] *Id.* at 97-102.
[622] *California's Advanced Clean Cars Midterm Review.* CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/board/books/2017/032317/17-3-8pres.pdf. pp. 21-29.
[623] Cal. Senate Bill (SB) 1014, Chap. 369, Stats. 2018.

requires local governments to reduce greenhouse gas emissions through coordinated land use and transportation planning.[624] California is providing funding, policies, regulatory frameworks, and other resources to provide the necessary incentives for innovation and investment to reach those targets, and to ensure the most advanced technologies are available to all, not just the most affluent.[625]

## B. The assumed social cost of carbon in the federal proposal is wrongly discounted.

The social cost of carbon (SC-$CO_2$) is the cost to society (in U.S. dollars) of adding 1-metric ton of $CO_2$ to the atmosphere in a particular year—it is intended to provide a measure of the damages from global climate change. Framed alternatively, it is the avoided cost (or benefit) of reducing $CO_2$ emissions by the same amount in a given year. The SC-$CO_2$ is a critically important metric to accurately estimate because fuel economy and $CO_2$ emissions are the very subjects of the proposed regulation. Without an accurate estimation of the SC-$CO_2$ the Agencies cannot provide the informed analysis required by law.

In 2008, the U.S. Ninth Circuit Court of Appeals set aside NHTSA's 2006 CAFE standard as arbitrary and capricious because it failed to monetize the benefits of GHG emission reductions.[626] There, the Court characterized reductions in carbon emissions as, "the most significant benefit of more stringent CAFE standards."[627] Subsequently, federal agencies have incorporated the social costs of GHGs, including carbon dioxide, methane, and nitrous oxide, into their analysis of regulatory actions in an effort to comprehensively account for the economic impact of regulations that impact GHG emissions.

In 2009, the President's Council of Economic Advisors and the U.S. Office of Management and Budget convened the Interagency Working Group (IWG) on the Social Cost of Greenhouse Gases to develop a methodology for estimating SC-$CO_2$. This methodology relied on a standardized range of assumptions that could be used consistently when estimating the benefits of regulations across agencies. The IWG, comprised of scientific and economic experts, recommended the use of SC-$CO_2$ values based on three integrated assessment models (IAMs) developed over decades of global peer-reviewed research. William Nordhaus, awarded the Sverigse Riksbank Prize in Economic Sciences in Memory of Alfred Nobel in 2018 and a member of the IWG,[628] defines IAMs as "approaches that integrate knowledge from two or more domains into a

---

[624] Cal. Senate Bill (SB) 375, Chap. 728, Stats. 2008.

[625] *See* Cal. Senate Bill (SB) 1014, Chap. 369, Stats. 2018, § 1.

[626] *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1203 (9th Cir. 2008).

[627] *Id.* at 1199.

[628] The Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel 2018. The Nobel Prize. Accessed on October 24, 2018. https://www.nobelprize.org/prizes/economics/2018/summary/.

cities in the United States experiencing the highest levels of short-term particulate matter (24-hour PM2.5)) are in California.[864]

Notably, EPA has not proposed to find that, under the proper "whole program" approach, California would not satisfy Section 209(b)(1)(B) for its entire motor vehicle program, including the GHG and ZEV standards. Nor could it lawfully do so.

Further, and contrary to EPA's claims, the compelling and extraordinary threats and challenges California faces from climate change, discussed in more detail below, underscore the State's need for its motor vehicle program. These threats and challenges are relevant under EPA's traditional and proper consideration of California's whole program because they are themselves compelling and extraordinary conditions that support California's need for its own vehicle emissions program. They are, further, relevant to California's long-standing compelling and extraordinary conditions regarding criteria pollution because of the relationship between ozone formation and climate change which is discussed in more detail below.

EPA's proposal to revoke California's waiver for certain model years of its GHG and ZEV standards under Section 209(b)(1)(B) is unlawful because California still needs its entire vehicle emissions program to meet compelling and extraordinary conditions—the same ones Congress initially recognized as well as conditions that have emerged since enactment of the waiver provision.

> 5. **EPA's proposed revocation of California's waiver is arbitrary and capricious and otherwise unlawful even if EPA looks at the GHG and ZEV standards rather than California's whole program.**
>
> > a. **California needs its GHG-reducing standards to meet the extraordinary and compelling conditions caused by GHG emissions.**

Climate change poses an existential threat to California. CARB described this threat, with supporting evidence, in its Advanced Clean Cars waiver request, and EPA does not dispute the evidence or California's findings. Nor could EPA reasonably do so, given the overwhelming evidence and EPA's own endangerment findings.[865]

Rather, EPA's proposal to revoke California's GHG and ZEV standards is based on a new interpretation of Section 209(b)(1)(B) that permits EPA to review these standards separate from California's whole vehicle emissions program (and separate from the rest of the Advanced Clean Cars program); precludes "global" pollutants and their impacts from being considered "compelling and extraordinary conditions"; and requires

---

[864] *State of the Air 2018.* American Lung Association. Accessed on October 24, 2018. https://www.lung.org/assets/documents/healthy-air/state-of-the-air/sota-2018-full.pdf.
[865] EPA attempts to distance itself from the logical consequence of its own endangerment findings by claiming those findings are a "completely different determination than whether California needs its mobile source pollution program." 83 Fed.Reg. at 43,249. EPA relies on a statement it made in 2014 when it applied its traditional "whole program" interpretation of "such State standards." *See id.* (quoting 79 Fed.Reg. 46,256, 46,262 (Aug. 7, 2014)). If, as it is proposing to do, EPA now rejects that interpretation, it cannot rely on this statement, particularly since it has provided no justification for them. In any event, whether or not the endangerment findings were "completely different determination[s]," California plainly needs its GHG-reducing standards to meet compelling and extraordinary conditions.

California to show that its standards will address the primary cause of California's climate impacts or will have an (undefined) meaningful effect on those climate impacts. As discussed above, these interpretations are unambiguously foreclosed and unreasonable and, in any event, cannot lawfully be applied retroactively to a waiver approved five years ago.

But even under an interpretation that considers California's GHG-reducing standards separately from its other vehicle emissions standards, EPA's proposed revocation is unlawful. There is no basis to find that GHG concentrations, the vehicles that contribute to them, and the climate impacts that result from them are not "compelling and extraordinary conditions" or that California does not need its own vehicle emissions standards to address those conditions.

California recognized the severe threats the State faces from climate change, and the causal relationship between vehicular GHG emissions and those threats, as early as 2002.[866]  Specifically, the California Legislature found that "[g]lobal warming would impose on California, in particular, compelling and extraordinary impacts."[867]  The identified impacts included reductions in water supply, more catastrophic wildfires, damage to the State's sizable coastline and ocean resources, and adverse health impacts from increasing air pollution due to higher temperatures.  The Legislature also recognized that vehicles—particularly passenger vehicles and light-duty trucks— contribute significantly to California's greenhouse gas emissions and that reducing those emissions would, thus, necessarily have to be an important part of the State's efforts to reduce climate threats to the State and its people.

Since 2002, evidence of the severe threats facing California from climate change has only become clearer, as scientific understanding has advanced and California has begun to feel significant impacts.  California's Fourth Climate Change Assessment documents some of the existing and expected impacts from climate change specifically in California, including:

- Air quality: rising temperatures "could lead to increases in ground-level ozone and reduce the effectiveness of emission reductions taken to achieve air quality standards."[868]
- Sea-level rise and coastal erosion: "If emissions continue at current rates, Fourth Assessment model results indicate that total sea-level rise by 2100 is expected to be 54 inches, almost twice the rise that would occur if greenhouse gas emissions are lowered to reduce risk."[869]  "31 to 67 percent of Southern California beaches may completely erode by 2100 without large-scale human interventions."[870]

---

[866] Cal. Assembly Bill (AB) 1493, Chap. 200, Stats. 2002.
[867] *Id.*
[868] California's Fourth Climate Change Assessment, California's Changing Climate 2018: Statewide Summary Report 40 (Aug. 2018), *available at* http://www.climateassessment.ca.gov/state/docs/20180827-StatewideSummary.pdf.
[869] California's Fourth Climate Change Assessment, California's Changing Climate 2018: A Summary of Key Findings from California's Fourth Climate Change Assessment 6 (Aug. 2018). Climate Assessment. Accessed on October 24, 2018. http://www.climateassessment.ca.gov/state/docs/20180827-SummaryBrochure.pdf.
[870] *Id.* at 15.

367

- Precipitation and water supply: "California has the highest variability of year-to-year precipitation in the contiguous United States."[871]  By 2050, "the average water supply from snowpack is projected to decline by 2/3 from historical levels."[872]

- Drought and land subsidence: The frequency of droughts is likely to increase due to climate change.  "A secondary, but large, effect of droughts is the increased extraction of groundwater from aquifers in the Central Valley, primarily for agricultural uses. The pumping can lead to subsidence of ground levels, which around the San Joaquin-Sacramento Delta has been measured at over three-quarters of an inch per year. This subsidence impacts the canals that deliver water across the region."[873]

- Agriculture: "Agricultural production could face climate-related water shortages of up to 16 percent in certain regions. Regardless of whether California receives more or less annual precipitation in the future, the state will be dryer because hotter conditions will increase the loss of soil moisture."[874]

- Wildfires: "One Fourth Assessment model suggests large wildfires (greater than 25,000 acres) could become 50 percent more frequent by the end of century if emissions are not reduced. The model produces more years with extremely high areas burned, even compared to the historically destructive wildfires of 2017 and 2018."[875]  "By the end of the century, California could experience wildfires that burn up to a maximum of 178 percent more acres per year than current averages."[876]  Increased wildfire smoke will also lead to more respiratory illness.[877]

- Extreme heat events and human health: "Heat-Health Events (HHEs), which predict heat risk to local vulnerable populations, will worsen drastically throughout the state by mid-century. The Central Valley is projected to experience average HHEs that are up to two weeks long, and HHEs could occur four to ten times more often in the North Sierra region."[878]  "The 2006 heat wave killed over 600 people, resulted in 16,000 emergency department visits, and led to nearly $5.4 billion in damages. The human cost of these events is already immense, but research suggests that mortality risk for those 65 or older could increase ten-fold by the 2090s because of climate change."[879]

- Infrastructure: Airports in major urban areas will be susceptible to major flooding from sea-level rise and storm surge by 2040-2080, and 370 miles of coastal

---

[871] California's Fourth Climate Change Assessment, California's Changing Climate 2018: Statewide Summary Report at 24.
[872] California's Fourth Climate Change Assessment, California's Changing Climate 2018: A Summary of Key Findings from California's Fourth Climate Change Assessment at 5.
[873] *Id.* at 14.
[874] *Id.*
[875] *Id.* at 6.
[876] *Id.*
[877] *Id.* at 8.
[878] *Id.* at 7.
[879] *Id.*

368

highway will be susceptible to coastal flooding by 2100.[880]  Land subsidence and sea-level rise could cause overtopping or failure of the levees in the Sacramento-San Joaquin Delta, "exposing natural gas pipelines and other infrastructure to damage or structural failure."[881]

There can be no question that California faces "extraordinary and compelling conditions"—now and in the future—from GHG emissions.

In fact, California is "one of the most 'climate-challenged' regions of North America."[882] While other States will experience their own substantial climate harms, California's extensive coastline, reliance on snowpack for water storage, susceptibility to drought, potential for land subsidence, and other geographic and climatic factors render it particularly vulnerable and impacted.  Further, the impacts to California's agricultural sector have the potential to dramatically affect the Nation as a whole because California currently produces more than a third of the country's vegetables and two-thirds of the country's fruits and nuts.[883]  Thus, even if EPA's unlawful requirement that California's conditions be "sufficiently different" from the rest of the nation could apply here, climate change impacts would still constitute such conditions.

California needs its GHG-reducing vehicle standards to meet these compelling and extraordinary conditions.  As the Legislature found in 2002, and as remains true today, motor vehicles in California contribute significantly to total GHG emissions.[884]  In 2016, the transportation sector accounted for approximately 40 percent of California's total GHG emissions.[885]  And within the transportation sector, light-duty vehicles account for the majority of GHG emissions, representing approximately 60 percent of the GHG emissions from the transportation sector.[886]  Therefore, any effective approach to reducing GHG emissions in California must include regulations to reduce emissions from motor vehicles.

EPA maintains that the Clean Air Act precludes California from addressing these substantial sources of the very pollution that poses an existential threat to California because other sources, in other states and other countries, also contribute to this pollution.  In other words, EPA proposes to find that California may not reduce its contributions to an enormous problem because those reductions will not fully solve the problem.  This is an absurd interpretation of one of the country's most comprehensive environmental laws.  Indeed, EPA's interpretation reads the Clean Air Act as *requiring* of California the very inaction which leads to the tragedy of the commons.  If California

---

[880] California's Fourth Climate Change Assessment, California's Changing Climate 2018: Statewide Summary Report at 54-55.
[881] *Id.* at 12.
[882] California's Fourth Climate Change Assessment, California's Changing Climate 2018: A Summary of Key Findings from California's Fourth Climate Change Assessment.
[883] California Agricultural Production Statistics. California Department of Food and Agriculture. Accessed on October 24, 2018.  https://www.cdfa.ca.gov/statistics/.
[884] *See also* Fifth Assessment Synthesis Report: Summary for Policymakers. IPCC. 2014. p. 4.
[885] Greenhouse Gas Inventory. CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/cc/inventory/inventory.htm.
[886] Fast Facts on Transportation Greenhouse Gas Emissions. U.S. EPA. Accessed on October 24, 2018. https://www.epa.gov/greenvehicles/fast-facts-transportation-greenhouse-gas-emissions.

369

is prevented from acting, it may well decrease the incentives others have to take the collective action necessary to solve the problem.  Congress intended California to lead, not for EPA to tie California's hands when the scale of a problem gets "too big."

CARB recently compared the GHG emissions from California's light-duty vehicle on-road fleet under CARB's existing GHG standards and under a federal rollback (assuming flatlined standards beginning in 2021.  CARB's standards would reduce $CO_2$ emissions by 57.37 million metric tonnes (MMT) from 2021 to 2030 relative to the scenario where only the federal, rolled-back standards are in effect.[887]  There is no question that these reductions are necessary, as part of larger efforts within California and around the world, to minimize the threats of catastrophic climate change.

In fact, these policies are especially critical now to avoid a tipping point with respect to climate change, at which juncture the GHG emissions baked into the atmosphere will result in abrupt climate change and rapid warming even without additional emissions. An international team of scientists has published a study in Proceedings of the National Academy of Sciences (PNAS)[888] that indicates there is a risk of Earth entering what the scientists call "Hothouse Earth" conditions, even if the carbon emission reductions called for in the Paris Agreement are obtained.[889]  According to that study, a "Hothouse Earth" climate will stabilize in the long term at a global average of 4–5 degrees Celsius higher than pre-industrial temperatures with sea level 10–60 meters higher than today. Lead author Will Steffen from the Australian National University and Stockholm Resilience Centre explained, "our study suggests that human-induced global warming of 2 [degrees Celsius] may trigger other Earth system processes, often called 'feedbacks,' that can drive further warming - even if we stop emitting greenhouse gases."[890]  It is therefore critical, the authors conclude, to greatly accelerate the reduction, and ultimately elimination, of these emissions.  CARB's GHG and ZEV standards are designed to advance that objective.

Indeed, when it adopted its Advanced Clean Cars program, CARB expressly recognized the importance of "the transformation of California's light-duty vehicle fleet" to enable the State's long-term air quality and climate objectives.[891]Accordingly, it designed this program to "be the catalyst to that transformative process."[892]  The ZEV mandate is a crucial part of this strategy; it "act[s] as the technology forcing piece of the 2016 Draft TAR program" which is necessary because "the new vehicle fleet [in California] will need to be primarily composed of advanced technology vehicles … by 2035" in order to

---

[887] Proposed Amendments to the Low-Emission Vehicle III Greenhouse Gas Emission Regulation: Standardized Regulatory Impact Assessment (SRIA) Equivalent Document at A-1–A-2 (June 7, 2018). CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/regact/2018/leviii2018/appd.pdf. p. A-1 to A-2.
[888] Steffen, et al., *Trajectories of the Earth System in the Anthropocene*, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES. Accessed on October 24, 2018.  10.1073/pnas.1810141115.
[889] *Id.*
[890] Planet at risk of heading towards "Hothouse Earth" state. Stockholm University. Accessed on October 24, 2018. https://www.stockholmresilience.org/research/research-news/2018-08-06-planet-at-risk-of-heading-towards-hothouse-earth-state.html.
[891] Staff Report: Initial Statement of Reasons Advanced Clean Cars 2012 Proposed Amendments to the California Zero Emission Vehicle Program Regulations (Dec. 7, 2011) ("ZEV ISOR"). CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/regact/2012/zev2012/zevisor.pdf. p. ES-2.
[892] *Id.*

370

meet the State's 2050 GHG goal.[893]  Put simply, "[t]o achieve full commercialization and place the industry on a pathway consistent with meeting long term goals, volume sales of ZEVs need to ramp up quickly."[894]

As discussed in detail above, EPA's consideration of the wisdom of California's policies in reducing GHG emissions and climate impacts in California is unlawful.  Indeed, it has long, and appropriately, been "EPA's practice to leave the decisions on controversial matters of public policy . . . to California."[895]  EPA's intrusion on California's sovereign policymaking role here is inconsistent with the Agency's past practice and, more importantly, inconsistent with congressional intent and principles of federalism.

Finally, by inaccurately faulting California for not having demonstrated the connection between its "GHG standards and reducing any adverse effects of climate change *in California*"[896] EPA is improperly shifting the burden of proof to California.  *EPA* has the burden to demonstrate that no causal connection exists.[897]  EPA may not revoke California's waiver simply after concluding (erroneously) that *California* has not shown a causal connection.  And EPA cannot meet its burden.  For one thing, well-established law recognizes the importance and legitimacy of incremental progress, and the Clean Air Act, generally, and Section 209(b)(1), specifically, were designed to do so as well.  For another, in other contexts, EPA is taking a position opposite to this one—asserting that incremental reductions in GHG emissions from major sources of those emissions are important and meaningful.[898]  EPA cannot have it both ways.

For all of these reasons, EPA has not demonstrated, and cannot demonstrate, that California does not need its GHG-reducing standards to meet compelling and extraordinary conditions of climate change.

> ### b.  California also needs its GHG-reducing standards because those standards address California's on-going criteria pollution challenges.

California's GHG and ZEV standards are also justified even if EPA focuses solely on their contribution to criteria pollution.  And contrary to EPA's baseless contention, CARB explained in its 2012 waiver request, and explains further here, how its GHG and ZEV standards would help reduce criteria emissions.[899]

Rising temperatures exacerbate California's ozone problem by increasing ground-level ozone concentrations.[900]  Several studies indicate that a warming climate is expected to exacerbate surface ozone in California's two major air basins: South Coast Air Basin

---

[893] *Id.* at ES-5.
[894] *Id.* at 53.
[895] 43 Fed.Reg. at 25,735; 41 Fed.Reg. at 44,210; *see also* 47 Fed.Reg. 7306 (Feb. 18, 1982) (granting deference to California in weighing policy matters); 36 Fed.Reg. 17,458 (Aug. 31, 1971); 40 Fed.Reg. at 23,104.
[896] 83 Fed.Reg. at 43,249 (emphasis in original).
[897] *MEMA I*, 627 F.2d at 1118.
[898] *See, e.g.*, 93 Fed.Reg. 44,746, 44,749 (Aug. 31, 2018) ("This regulation will … caus[e] affected EGUs to begin to internalize the negative externality associated with $CO_2$ emissions.").
[899] Clean Air Act § 209(b) Waiver Support Document Submitted by the California Air Resources Board 15–16 (May 2012).
[900] *Id.*

and San Joaquin Valley.[901]  Median surface temperatures during the ozone season over western North America, including in the South Coast Air Basin and San Joaquin Valley, are projected to increase by the end of the 21st century.  These temperature increases could counter the benefits from pollution control strategies used in an effort to meet established air quality standards, resulting in a "climate penalty."  This penalty is an increase in emission control requirements needed to offset changes in climate that increase the severity and frequency of air pollution episodes.  Hence, while many analyses still show improvements in air quality over the coming century, climate change reduces the degree of improvement.  Thus, efforts to reduce climate change by reducing GHG emissions are important as part of California's broader efforts to reduce ozone levels in the State and achieve attainment with national standards that have become more stringent over time and may well continue to do so.[902]  This, in itself, is sufficient justification for California's GHG standards, even under a narrow interpretation of "compelling and extraordinary conditions."  It also underscores that EPA cannot propose this revocation on the basis of an alleged distinction between "global" and "local" pollution when there is no hard line between the two.

In addition, and contrary to EPA's misleading assertion[903] the ZEV standards reduce criteria pollutant emissions—emissions EPA does not dispute contribute to "compelling and extraordinary conditions" in California.  EPA takes out of context a statement in CARB's 2012 waiver request, in which CARB stated that there is "no criteria emissions benefit from including the ZEV proposal *in terms of vehicle (tank-to-wheel or TTW) emissions.*"[904]  The paragraph continues to explain that this is simply because the tailpipe criteria emissions reductions of the Advanced Clean Cars program are attributed to the LEV III criteria pollutant standards.[905]  Even so, there is no question that ZEVs emit zero tailpipe criteria pollutant emissions.  Moreover, the ZEV standards would effectively reduce *upstream* criteria pollutant emissions by decreasing emissions from gasoline production and refineries.[906]  CARB projected the ZEV standards would reduce statewide reactive organic gas emissions by 6 tons per day, non-methane organic gas and NOx emissions by 3.5 tons per day, and particulate matter emissions by 0.2 tons per day in 2030, over and above the criteria emission reductions projected for the LEV III criteria program.[907]  EPA may not ignore these criteria pollution benefits, especially since it has approved this measure as part of California's SIP and, thereby, acknowledged these very emission reductions, as discussed above. Notably, in its proposal EPA acknowledges that all components of California's Advanced Clean Cars

---

[901] Jacob & Winner. *Effect of Climate Change on Air Quality*, 43:1 ATMOS. ENVIRON. 51 (Jan. 2009); Wu, et al., *Effects of 2000−2050 Global Change on Ozone Air Quality in the United States*, 113, D06302, J. GEOPHYS. RES.-ATMOS. (Mar. 19, 2008), *available at* https://doi.org/10.1029/2007JD008917; Rasmussen, et al., *The Ozone-climate Penalty: Past, Present, and Future*, 47:24 ENVTL. SCI. & TECH. 14258 (Dec. 17, 2013), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3990462/.

[902] *See* California's Fourth Climate Change Assessment, California's Changing Climate 2018: Statewide Summary Report at 40.

[903] 83 Fed.Reg. at 43,249.

[904] Clean Air Act § 209(b) Waiver Support Document Submitted by the California Air Resources Board 15 (May 2012) (emphasis added).

[905] *Id.*

[906] *Id.* at 16; *see also* ZEV ISOR at 72, 75-79..

[907] *Id.*

372

program are designed to work together, but EPA fails to provide any analysis of whether the program could still achieve its criteria emissions reductions benefits, including those anticipated in the approved SIP, if EPA breaks this integrated program apart.  EPA cannot, therefore, determine that California does not need its GHG or ZEV standards to address the State's criteria pollution challenges, which EPA admits qualify as compelling and extraordinary.

Further, as CARB has consistently explained, California needs its Advanced Clean Cars program, and specifically its GHG and ZEV standards, now to increase adoption of technologies that will allow for greater emissions reductions required in future years.[908] This "coordinated package of requirements … assures the development of environmentally superior cars that will continue to deliver the performance, utility, and safety vehicle owners have come to expect."[909]  As part of this integrated program, the ZEV standards provide a crucial "technology-forcing piece … by requiring manufacturers to produce increasing numbers of pure ZEVs and plug-in hybrid electric vehicles in the 2018-2025 model years."[910]  This increasing ZEV deployment is critical to achieving the statewide 2030 and 2045 GHG requirements and 2031 South Coast SIP commitments (the 2016 State SIP Strategy identified the need for light-duty vehicles to reduce NOx emissions by over 85 percent by 2031 to meet federal standards).[911]

California needs both its GHG and ZEV standards to meet compelling and extraordinary conditions associated with climate change and criteria pollutants.  There is no basis for EPA to revoke California's waiver for its GHG and ZEV standards based on Section 209(b)(1)(B).

## H. EPA's proposal to find that California's ZEV and GHG standards are inconsistent with Section 202(a) is unlawful.

EPA also proposes to revoke California's waiver for its GHG and ZEV standards under Section 209(b)(1)(C) based on a proposed finding of inconsistency with Section 202(a). EPA's proposed finding under Section 209(b)(1)(C) is unlawful because the sole basis for it is EPA's reinterpretation of this provision which, as explained above cannot lawfully be applied retroactively to an already granted waiver.[912]  EPA's proposed finding is also unlawful because it is based on an unambiguously foreclosed and unreasonable reinterpretation of the statute, and an improper and inadequate evaluation of the facts.

---

[908] CARB Staff Report:  Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider the "LEV III" Amendments (December 7, 2011) ("ACC ISOR"). CARB. Accessed on October 24, 2018. https://www.arb.ca.gov/regact/2012/leviiighg2012/levisor.pdf. p. ES-3.

[909] *Id.*

[910] *Id.*

[911]  Revised Proposed 2016 State Strategy for the State Implementation Plan 11, 12, 24 (2017). CARB. Accessed on October 24, 2018.  https://www.arb.ca.gov/planning/sip/2016sip/rev2016statesip.pdf.

[912] EPA has not proposed to find that the waiver should be revoked based on the agency's historical interpretation of § 209(b)(1)(C) and, therefore, may not make such a finding in its final action.

R-5,   Cover Letter to EPA from Mary Nichols

 

# Air Resources Board

**Mary D. Nichols, Chairman**
1001 I Street • P.O. Box 2815
Sacramento, California 95812 • www.arb.ca.gov

**Matthew Rodriquez**
*Secretary for
Environmental Protection*

**Edmund G. Brown Jr.**
*Governor*

June 27, 2012

Administrator Lisa P. Jackson
United States Environmental Protection Agency
Headquarters Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code 1101A
Washington, D.C. 20460

RE:     REQUEST FOR WAIVER ACTION PURSUANT TO CLEAN AIR ACT
         SECTION 209(b) FOR AMENDMENTS TO CALIFORNIA'S ZERO EMISSION
         VEHICLE AND LOW EMISSION VEHICLE REGULATIONS

Dear Administrator Jackson:

I write to request the United States Environmental Protection Agency (EPA) waive
federal preemption for California's amended zero emission vehicle (ZEV) standards and
low emission vehicle standards pursuant to Clean Air Act (CAA) section 209(b). The
amended ZEV and LEV standards are components of California's Advanced Clean Cars
(ACC) regulatory package. This submission represents an historic further step in state
and federal efforts to control motor vehicle and other greenhouse gas (GHG) emissions
and their consequent effect on global warming.

The California Air Resources Board (CARB or Board) amended its ZEV and LEV
standards in January 2012. CARB requests the Administrator treat the amended ZEV
requirements as within the scope of previously granted waivers for the ZEV program.
To the extent that the Administrator cannot find that the amendments fall within the
scope of previously granted waivers, CARB alternatively requests that the Administrator
grant a new waiver of preemption. Regarding the LEV amendments, CARB requests
that the administrator grant a new waiver of preemption. CARB expressly found that the
ACC regulations, in the aggregate, are at least as protective of public health and welfare
as applicable federal standards for passenger cars and light-duty trucks and that no
basis exists for denying a waiver under the three criteria that the Administrator must
consider under CAA section 209(b).

The 2012 ZEV and LEV amendments flow from the historic collaboration between EPA,
the National Highway Traffic Safety Administration, and CARB as directed by President

*The energy challenge facing California is real. Every Californian needs to take immediate action to reduce energy consumption*
*For a list of simple ways you can reduce demand and cut your energy costs, see our website: http://www.arb.ca.gov.*

California Environmental Protection Agency

*Printed on Recycled Paper*

JA-132

Administrator Lisa P. Jackson
June 27, 2012
Page 2

Obama in May 2010.  CARB plans to continue working with EPA as it implements its
federal GHG standards.  Specifically, CARB will collaborate with EPA in conducting
EPA's mid-term review of the federal GHG standards for light duty vehicles for model
years 2022 to 2025 with the overall goal of maintaining a single national framework for
regulating vehicle GHG emissions.  As you know, these collaborative efforts to protect
our nation's air quality were recently vindicated in a June 26, 2012 decision by the U.S.
Court of Appeals for the District of Columbia, which upheld the validity of the federal
GHG standards that aligned with California's (see *Coalition for Responsible Regulation,
Inc. v. U.S. EPA* (D.C. Cir. June 26, 2012, No. 09-1322).

Attached for your review is an analysis setting forth California's basis for the waiver
requests.  The analysis sets forth a summary of the regulatory actions, a review of the
criteria governing EPA's evaluation of a California waiver request, and the legal
arguments that support and compel EPA to grant California's request.  The analysis is
further supported by enclosures, included in DVD format for your convenience.

If you need additional technical information relating to the ZEV standards please contact
Analisa Bevan, Chief of the Sustainable Transportation Technology Branch of the
Mobile Source Control Division, at (916) 323-8966 or abevan@arb.ca.gov.  If you need
additional technical information relating to the LEV standards please contact Paul
Hughes, Manager of the LEV Implementation Section of the Mobile Source Control
Division, at (626) 575-6977 or phughes@arb.ca.gov.  You may address legal questions
to Aron Livingston, Assistant Chief Counsel, at (916) 323-9610 or dlivings@arb.ca.gov,
or to Daniel Whitney, Staff Counsel, at (916) 445-5514 or dwhitney@arb.ca.gov.

Sincerely,

Mary D. Nichols
Chairman

Attachment

Enclosures

cc:   David Dickinson (w/attachment; w/ enclosures)
      Compliance and Innovative Strategies Division
      United States Environmental Protection Agency
      1310 L Street, N.W., Room 644
      Washington, D.C. 20005

Administrator Lisa P. Jackson
June 27, 2012
Page 3

cc:   (continued)

    Analisa Bevan, Chief (w/ attachment; w/o enclosures)
    Sustainable Transportation Technology Branch
    Mobile Source Control Division

    Paul Hughes (w/attachment; w/o enclosures)
    Mobile Source Control Division
    LEV Implementation Section

    Aron Livingston (w/attachment; w/enclosure)
    Assistant Chief Counsel
    Office of Legal Affairs

    Daniel Whitney (w/attachment; w/enclosures)
    Staff Counsel
    Office of Legal Affairs

Administrator Lisa P. Jackson
June 27, 2012
Page 4

bcc: (all w/attachment; w/o enclosures)

Ellen M. Peter, EO

Tom Cackette, EO

Elise Keddie, MSCD

Anna Gromis, MSCD

Legal Chron

R-7,   2012-06-27 ACC Waiver Request

**BEFORE THE**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| **In the Matter of California's Request for** | ) |
| **Waiver Action Pursuant to Clean Air** | ) |
| **Act Section 209(b) for Amendments to** | ) |
| **California's Zero Emission Vehicle** | ) |
| **Regulation and Low Emission Vehicle** | ) |
| **Regulations** | ) |

**CLEAN AIR ACT § 209(b) WAIVER SUPPORT DOCUMENT SUBMITTED BY THE**
**CALIFORNIA AIR RESOURCES BOARD**

**May 2012**

## I.    INTRODUCTION

California's Air Resources Board (CARB or the Board) has developed the Advanced Clean Cars program, a pioneering approach of a "package" of regulations that, although separate in construction, are related in terms of the synergy developed to address interrelated ambient air quality needs and climate change.

The Advanced Clean Cars program combines the control of smog, soot causing pollutants and greenhouse gas emissions into a single coordinated package of requirements for model years (MY) 2015 through 2025 and assures the development of environmentally superior passenger vehicles. The Advanced Clean Cars package includes amendments to three regulations: the Low Emission Vehicles regulation (LEV), the Zero Emission Vehicles regulation (ZEV), hereinafter "2012 ZEV/LEV Amendments," and the Clean Fuels Outlet regulation. Two of these regulations, LEV and ZEV, require a federal waiver submittal under the Clean Air Act (CAA).

The earliest requirements of the LEV regulation as amended are set to affect MY 2014 vehicles. Consequently, manufacturers would benefit from the increased lead time that an expedited consideration of this waiver request would allow. The remainder of this support document provides background for California's LEV and ZEV regulations, details their recent amendments, and gives the basis for CARB's waiver or within the scope request for each.

## II.    ZEV REGULATION

### A.    BACKGROUND AND WAIVER HISTORY

In 1990, CARB adopted an ambitious program to significantly reduce the environmental impact of light-duty vehicles through the commercial introduction of ZEVs into the California fleet. The ZEV program, which was a part of California's first-generation low-emission

vehicle regulations (LEV I), has been modified five times since its inception – in 1996, 1998/1999, 2001, 2003, 2008, and most recently in 2012.[1]

The 2012 ZEV amendments flow from the Board's 2008 direction to CARB staff to redesign the 2015 and subsequent MY requirements for the ZEV regulation.  The Board directed its staff to strengthen the regulation above what was currently required and focus primarily on zero emission drive, that is battery electric vehicle (BEV), hydrogen fuel cell electric vehicle (FCV), and plug-in hybrid electric vehicle (PHEV) technologies.  The goal of the Board direction was to maintain California as the central location for moving advanced, low greenhouse gas (GHG) technology vehicles from the demonstration phase to commercialization.

In 2009, CARB staff analyzed pathways to meeting California's long term 2050 GHG reduction goals in the light-duty vehicle subsector.  The analysis showed that ZEVs would need to reach nearly 100 percent of new vehicle sales between 2040 and 2050, with commercial markets for ZEVs launching in the 2015 to 2020 timeframe.  The analysis concluded that even widespread adoption of advanced conventional technologies, like non-plug-in hybrid electric vehicles (HEV), would not be enough to meet the 2050 GHG targets.  Staff presented its findings at the December 2009 Board hearing.

At the December 2009 hearing, the Board adopted Resolution 09-66, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies.  The Board further directed staff to consider shifting the focus of the ZEV regulation to both GHG and criteria pollutant emission reductions, commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly.

In addition to the Board's directives, in 2010, President Barack Obama directed the United States Environmental Protection Agency (EPA) and National Highway Traffic Safety Administration (NHTSA) to work with California to develop GHG fleet standards for MY 2017 through 2025 LDVs.  The Joint Technical Assessment Report (TAR), which was developed by EPA, NHTSA, and CARB, was released in September 2010.  The report concluded "electric drive vehicles including hybrid(s)…battery electric vehicles…plug-in hybrid(s)…and hydrogen fuel cell vehicles…can dramatically reduce petroleum consumption and GHG emissions compared to conventional technologies....  The future rate of penetration of these technologies into the vehicle fleet is not only related to future GHG and corporate average fuel economy (CAFE) standards, but also to future reductions in HEV/PHEV/EV [electric vehicle] battery costs, [and] the overall performance and consumer demand for the advanced technologies…."[2]  Manufacturers confirmed in meetings leading up to the release of the TAR their commitment to develop

---

[1] A detailed account of these modifications, and their waiver history, can be found in 71 Fed Reg 78190-78191(Dec. 28, 2006) and 76 Fed Reg 61095-61096 (Oct 3, 2011).
[2] EPA, 2010.  United States Environmental Protection Agency, National Highway Safety and Traffic Administration and California Air Resources Board.  September 2010.  "Interim Joint Technical Assessment Report: Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards for Model Years 2017-2025" (p. vii).

ZEV technologies.  "…[A] number of the firms suggested that in the 2020 timeframe their U.S. sales of HEVs, PHEVs, and EVs [electric vehicle] combined could be on the order of 15-20 percent of their production."[3]

For the California ZEV rulemakings described above, the Board sought and obtained waivers of federal preemption from the EPA under Clean Air Act (CAA) section 209(b). EPA granted California an initial waiver of federal preemption for California's original 1990 ZEV requirements in January 1993 as part of the LEV I waiver.[4]  In January 2001, it found that the Board's 1996 ZEV amendments, which amended manufacturer ZEV production mandates for MY 1998 through 2002, were within the scope of the originally granted 1993 waiver.[5]  In December 2006, EPA determined that the 1999, 2001, and 2003 ZEV amendments as they applied to 2007 and prior MY passenger cars and light-duty trucks equal to or less than 3,750 pounds loaded vehicle weight (LDT1) also fell within the scope of the 1993 waiver.[6]  It further granted California a new waiver for MY 2007 through 2011 passenger cars and light-duty trucks, including light-duty trucks with a loaded vehicle weight greater than 3,750 pounds (LDT2).[7]

In its December 2006 decision, EPA expressly made no finding as to MYs 2012 and later.[8]  In September 2009, CARB submitted a Waiver request to EPA seeking confirmation that amendments to the ZEV regulation adopted in 2008, as they relate to the vehicles of 2011 and earlier MYs, were within the scope of EPA's prior ZEV waivers. Additionally, CARB sought confirmation that its 2008 ZEV amendments, as they relate to 2012 and later MYs, were within the scope of EPA's prior waivers or otherwise met the criteria for a waiver of preemption.  On October 3, 2011, EPA determined that amendments to the ZEV regulations, as they affected 2011 and prior MYs, were within the scope of previous waivers for the ZEV regulations (or in the alternative qualified for a new waiver).[9]  At that time EPA also granted a waiver allowing California to enforce the 2008 ZEV amendments as they affected 2012 and later MYs.[10]

## B.   2012 ZEV AMENDMENTS

The subject amendments to California's ZEV regulation are described below in two parts based on the timeframe during which they apply.  These timeframes are:  1) MY 2012 through 2017; and 2) MY 2018 and beyond.  The amendments identified in this section B. represent the most significant changes during each of these timeframes.

---

[3] *Id.* at pp. 2-5.
[4] 58 Fed.Reg. 4166 (Jan. 13, 1993).
[5] 66 Fed.Reg. 7751 (Jan. 25, 2001).  See section IV.A.1., *infra*, for discussion of EPA's within the scope analysis.
[6] 71 Fed.Reg. 78190 (Dec. 28, 2006). In the alternative, EPA found that the amendments affecting these vehicles also met the requirements for a granting of a full waiver.  *Id.,* Decision Document accompanying waiver decision at p. 61.
[7] *Id.*
[8] *Id.*
[9] 76 Fed.Reg. 61095 (Oct. 3, 2011).
[10] *Id.*

3

### 1.  2009 through 2017 Model Year Amendments

CARB's goal for amendments affecting the current ZEV regulation through MY 2017 was to make minor mid-course corrections and clarifications and to enable manufacturers to successfully meet 2018 and subsequent MY requirements.  These amendments included:

a.  *Provision of Compliance Flexibility:*  Removed carry forward credit limitations for ZEVs, allowing manufacturers to bank ZEV credits indefinitely for use in later years.  Slightly reduced the 2015 through 2017 credit requirement for intermediate volume manufacturers (IVM, less than 60,000 vehicles produced each year), to allow them to better prepare for requirements in 2018.  Extended the provision that allows ZEVs placed in any state that has adopted the California ZEV regulation to count towards the ZEV requirement through 2017 (i.e. extending the "travel provision" for BEVs through 2017).

b.  *Adjustment of Credits and Allowances:*  Increased credits for Type V (300 mile FCV) ZEVs to appropriately incentivize this longer-term technology.

c.  *Addition of New Vehicle Category:*  Added Type I.5x and Type IIx vehicles (collectively "BEVx" vehicles) as a compliance option for manufacturers to meet up to half of their minimum ZEV requirement.  The proposed vehicle types are closer to a BEV than to a PHEV, in that they are vehicles primarily designed for zero-emission operation but are equipped with a small non-ZEV fuel auxiliary power unit (APU) to be used only for limited range extension if the zero-emission capacity is depleted.

### 2.  2018 and Subsequent Model Year Amendments

CARB's goal for amendments affecting 2018 and subsequent MYs is to achieve ZEV and transitional zero-emission vehicle (TZEV; most commonly a PHEV) commercialization through simplifying the regulation and pushing technology to higher volume production in order to achieve cost reductions.  The amendments included:

a.  *Increased ZEV Requirement for 2018 and Subsequent MYs:*  Increased requirements which push ZEVs and TZEVs to over 15 percent of new sales by 2025.  This will ensure production volumes are at a level sufficient to bring battery and fuel cell technology down the cost curve and reduce incremental ZEV prices.

b.  *Regulation Focused on ZEVs and TZEVs:*  Removed PZEV (near-zero emitting conventional technologies) and advanced technology PZEV (AT PZEV, typically non-plug-in HEVs) credits as compliance options for

4

manufacturers because these technologies are now commercialized and their emissions are better reflected in the LEV III program. Allowed manufacturers to use banked PZEV and AT PZEV credits earned in 2017 and previous MYs, but discount the credits, and place a cap on usage in 2018 and subsequent MYs. Focused the 2018 and subsequent MY requirements on ZEVs and TZEVs

c. *Amended Manufacturer Size Definitions, Ownership Requirements, and Transitions*: Amended IVM and large volume manufacturer (LVM) size definitions to bring all but the smallest manufacturers under the full ZEV requirements by MY 2018. Aligned LEV III and ZEV ownership requirements, so that manufacturers who own more than 33.4 percent of each other are considered as the same manufacturer for determination of size. Modified transition periods for manufacturers switching size categories. These changes result in applying the ZEV regulation to manufacturers that represent 97 percent of the light-duty vehicle market.

d. *Modified Credit System:* Based credits for ZEVs on range, with 50 mile BEVs earning 1 credit each and 350 Mile FCVs earning 4 credits each. Allowed extended range BEVs (BEVx) which have a limited combustion engine range extender to meet up to half of a manufacturer's minimum ZEV requirement. The range of credit reflects the utility of the vehicle (i.e. the zero emitting miles it may travel) and its expected timing for commercialization. Simplified and streamlined TZEV credits based on the vehicle's zero-emission range capability, and their ability to perform at least 10 miles on the more aggressive US06 drive schedule. In addition to simplifying the program, reducing the spread of credits makes the technologies more evenly treated and reduces the variation in compliance outcomes (numbers of vehicles produced to meet the regulation requirements).

e. *Modified Travel Provision:* Ended the Travel Provision for BEVs after MY 2017. Extended the Travel Provision for FCVs until sufficient complementary polices are in place in states that have adopted the California ZEV regulation. This will allow FCV technology to continue to mature and provide time for Section 177 states to build infrastructure and put in place incentives to foster FCVs.

f. *Added GHG-ZEV Over-Compliance Credits:* Allows manufacturers who systematically over comply with the proposed LEV III GHG fleet standard to offset a portion of their ZEV requirement in 2018 through 2021 MYs only.

JA-141

### 3. Effect of Amendments

As a result of the 2012 amendments, over 1.4 million ZEVs and TZEVs are expected to be produced cumulatively in California by 2025, with 500,000 of those vehicles being pure ZEVs (BEVs and FCVs) as represented in the top two wedges in the figure below.

**Expected ZEV Regulation Compliance for 2018 through 2025 Model Years**



During this timeframe, the incremental price of a ZEV or TZEV is expected to rapidly decline, yet remain higher than a conventional vehicle by approximately $10,000 (high-end estimate in 2025).

The 2012 amendments will also result in an emissions benefit as compared to the earlier ZEV regulations and will likely provide benefits beyond one achieved by complying with the LEV III criteria pollutant standard with conventional vehicles only. This is due to increased electricity and hydrogen use that is more than offset by decreased gasoline production and refinery emissions.

6

### III.    CALIFORNIA'S LOW EMISSION VEHICLE PROGRAM FOR LIGHT-DUTY VEHICLES

### A. BACKGROUND

Despite significant progress in reducing smog-forming and particulate matter criteria emissions from the passenger vehicle fleet, California needs further reductions in order to meet State and federal ambient air quality standards.  Additionally, climate change continues to pose a serious threat to the economic well-being, public health, natural resources, and environment of California.  To address the challenge presented by climate change, vehicle GHG emissions must be drastically reduced to meet our state goal of an 80 percent reduction from 1990 levels by 2050.  To address these issues, CARB adopted its LEV III program as described below.

### 1.  Criteria Emissions

In 1990, CARB established the LEV program that contained the most stringent exhaust emission regulations ever for light-duty passenger cars and trucks.  The regulations included three primary elements:  1) tiers of increasingly stringent exhaust emission standards; 2) a fleet-average emission requirement for 1994-2003 that required manufacturers to phase-in a progressively cleaner mix of vehicles from year to year; and 3) a requirement that a specified percentage of passenger cars and lighter light-duty trucks be ZEVs, vehicles with zero emissions of any pollutants.  EPA granted CARB's associated waiver request on February 13, 1993.[11]

In 1999, CARB adopted the second phase of the LEV program.  These amendments, known as LEV II, set more stringent fleet average non-methane organic gas (NMOG) requirements for MYs 2004-2010 for passenger cars and light-duty trucks and established a new more stringent super ultra-low emission vehicle (SULEV) standard.  In addition, a partial zero-emission vehicle (PZEV) category was established for vehicles meeting the SULEV emission standard that also included extended 150,000-mile durability, zero fuel evaporative emissions, and extended emission warranty requirements.  PZEVs could be used to meet a portion of the zero-emission vehicle requirement.  The amendments also expanded the light-duty truck category to include trucks and sports utility vehicles (SUV) up to 8,500 lbs. gross vehicle weight rating (GVWR) and required these vehicles to meet the same emission standards as passenger cars and extended full useful life from 100,000 miles to 120,000 miles.  The LEV II amendments also established more stringent emission standards for medium-duty vehicles (MDV) between 8,501-14,000 lbs. GVW.  EPA granted CARB's associated waiver request on August 5, 1999.[12]  EPA has also found that CARB's other amendments to the LEV program were either within the scope of previous waivers or qualified for a waiver on their own.  EPA took final action on these waiver requests on April 22, 2003[13], April 28, 2005[14], and July 30, 2010.[15]

---

[11] 58 Fed.Reg. 4166 (January 13, 1993).
[12] 64 Fed.Reg. 42689 (August 5, 1999).
[13] 68 Fed.Reg. 19811 (April 22, 2003).

## 2. Greenhouse Gas Emissions

Recognizing the increasing threat of climate change to the well-being of California's citizens and the environment, in 2002 the legislature adopted and the Governor signed Assembly Bill (AB) 1493 (Chapter 200, Statutes 2002, Pavley). AB 1493 directed CARB to adopt the maximum feasible and cost-effective reductions in GHG emissions from light-duty vehicles. Vehicle GHG emissions included carbon dioxide ($CO_2$), methane ($CH_4$), and nitrous oxide ($N_2O$) that are emitted from the tailpipe, as well as emissions of HFC134a, the refrigerant then currently used in most vehicle air conditioning systems.

As directed by AB 1493, CARB adopted what is commonly referred to as the Pavley regulations, the first in the nation to require significant reductions of GHGs from motor vehicles. These regulations, covering the 2009-2016 and later MYs, call for a 17 percent overall reduction in climate change emissions from the light-duty fleet by 2020 and a 25 percent overall reduction by 2030. They also formed the foundation for the federal GHG program for light-duty vehicles for 2012-2016 MYs. EPA granted CARB's associated waiver request on July 8, 2009.[16]

After the Board adopted the Pavley regulations, the legislature adopted and the Governor signed AB 32, the California Global Warming Solutions Act (Chapter 488, Statutes 2006, Nuñez/Pavley). AB 32 charges CARB with the responsibility of monitoring, regulating, and reducing GHG emissions in the State. AB 32 also directed CARB to prepare a Scoping Plan outlining the State's strategy to achieve the maximum feasible and cost-effective reductions in furtherance of reducing GHG emissions to 1990 levels by 2020. Measure T1 of the Scoping Plan anticipates an additional 3.8 million metric tons carbon dioxide equivalent ($MMTCO_2e$) reduction by 2020 from the subject regulatory amendments, beyond the GHG reductions arising from the 2009-2016 AB 1493 standards.

In addition, in 2005, in order to mitigate the long-term impacts of climate change, the Governor issued Executive Order S-3-05. Among other actions, the Executive Order called for reducing GHG emissions to 80 percent below 1990 levels by 2050. This ambitious yet achievable reduction path and goal are considered necessary to stabilize the long-term climate. The subject amendments' 2021-2025 MY requirements will further both AB 32 and the 2050 reduction goal.

As mentioned earlier, in 2010, President Barack Obama directed the EPA and NHTSA to work with California to develop GHG fleet standards for MY 2017 through 2025 LDVs.[17] The resulting jointly developed report concluded "electric drive vehicles

---

[14] 70 Fed.Reg. 22034 (April 28, 2005).
[15] 75 Fed.Reg. 44951 (July 30, 2010).
[16] 74 Fed.Reg. 32744 (July 8, 2009).
[17] http://www.whitehouse.gov/the-press-office/presidential-memorandum-regarding-fuel-efficiency-standards

including hybrid(s)…battery electric vehicles…plug-in hybrid(s)…and hydrogen fuel cell vehicles…can dramatically reduce petroleum consumption and GHG emissions compared to conventional technologies.... The future rate of penetration of these technologies into the vehicle fleet is not only related to future GHG and CAFE standards, but also to future reductions in HEV/PHEV/EV [electric vehicle] battery costs, [and] the overall performance and consumer demand for the advanced technologies…."[18]  Following development of this report, NHTSA and EPA formally issued a Notice of Joint intent to develop strong greenhouse gas and fuel economy standards for the 2017 to 2025 timeframe,[19] and 14 automobile manufacturers have joined CARB in submitting letters to EPA committing to a continued national program of light-duty GHG and CAFE standards[20].

## B. SUMMARY OF RECENT LEV III AMENDMENTS INCLUDING GHG COMPONENTS

In order to achieve further emission reductions from the light- and medium-duty fleet, CARB adopted several amendments that together represent a significant strengthening of the LEV program.  Specifically, the criteria emission requirements of the program are made substantially more stringent, and the GHG requirements are restructured to provide for later acceptance of the EPA and National Highway Traffic Safety Administration (NHTSA) proposed 2017-2025 federal GHG emission and fuel economy standards for light-duty vehicles as compliance with CARB standards.[21]  Effectively, these amendments will do the following:

Criteria Pollutants:

- Reduce fleet average emissions of new light-duty vehicles to SULEV levels by 2025, an approximate 75 percent reduction from 2010 levels;
- Replace separate NMOG and oxides of nitrogen (NOx) standards with combined NMOG plus NOx standards, in order to provide manufacturers with compliance flexibility to more cost-effectively meet SULEV emission levels across their light-duty fleets;
- Establish additional emission standard categories, such as ULEV70, ULEV50, and SULEV20 in order to provide additional options for compliance with the SULEV fleet average;
- Eliminate intermediate useful life (50,000 miles) standards;
- Increase full useful life durability requirements from 120,000 miles to 150,000 miles;

---

[18] EPA, 2010.  United States Environmental Protection Agency, National Highway Safety and Traffic Administration and California Air Resources Board.  September 2010.  "Interim Joint Technical Assessment Report: Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards for Model Years 2017-2025" (p. vii).
[19] 76 Fed.Reg. 48758 (August 9, 2011).
[20] http://www.epa.gov/otaq/climate/letters.htm#2011al
[21] CARB Resolution 12-11, January 26, 2012 (p. 6).

- Provide a backstop to help ensure continued production of SULEVs after PZEVs migrate from the ZEV program to the LEV program in 2018. Without a backstop, beginning in 2018, manufacturers would not need to produce SULEVs until 2023 in order to meet the fleet average requirement;
- Establish more stringent emission requirements for MDVs;
- Require all MDVs between 8,501-10,000 lbs., GVWR to certify on a chassis dynamometer, which would greatly enhance the ability to perform in-use compliance evaluation of these vehicles;
- Establish more stringent 3 mg/mi and 1 mg/mi particulate matter (PM) standards for light-duty vehicles  and more stringent PM standards for medium-duty vehicles;
- Establish zero fuel evaporative emission standards for light-duty vehicles, and more stringent evaporative emission standards for medium-, and heavy-duty vehicles;
- Establish more stringent supplemental federal test procedure (SFTP, reflecting more aggressive driving) standards for light-duty vehicles and, for the first time, require medium-duty vehicles to meet SFTP standards;
- Allow pooled fleet average NMOG plus NOx emissions from California and the federal CAA Section 177 States that adopt the LEV III program; and
- Revise the NMOG Test Procedures.

Greenhouse Gases:

- Reduce new light-duty $CO_2$ emissions from new light-duty regulatory MY 2016 levels by approximately 34 percent by MY 2025, and from about 251 grams of $CO_2$ per mile to 166 grams, based on the projected mix of vehicles sold in California;
- Set emission standards for $CO_2$, $CH_4$, and $N_2O$;
- Establish footprint based $CO_2$ emission standards, as distinguished from the current California GHG requirement of a fleet average GHG standard. This will allow manufacturers' new vehicle fleet CO2 emissions to fluctuate according to their car-truck composition and sales according to vehicle footprint and will align the requirement with current federal GHG requirements;
- Provide credits toward the $CO_2$ standard if a manufacturer reduces refrigerant emissions from the vehicle's air-conditioning system;
- Provide credits toward the ZEV standards if a manufacturer over complies with the LEV III GHG fleet requirement;
- Provide credits towards the $CO_2$ standards if a manufacturer produces full size pickups with high efficiency drivetrains;

- Provide credits for deployment of technologies that reduce off-cycle $CO_2$ emissions; and
- Unlike the proposed federal GHG program for 2017-2025, require upstream emissions from zero-emission vehicles to be counted towards a manufacturer's light-duty vehicle GHG emissions.

## IV.    WAIVER ANALYSIS

### A. CRITERIA FOR DETERMINING WHETHER AMENDMENTS QUALIFY FOR A WAIVER OF PREEMPTION OR ARE WITHIN THE SCOPE OF PREVIOUS WAIVERS OF FEDERAL PREEMPTION

#### 1.  The Clean Air Act Section 209(b) Waiver Mechanism

CAA section 209(a) preempts states from adopting or enforcing any emission standard for new motor vehicles and from requiring certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle as a condition of registration or titling in the states.  However, section 209(b) directs the Administrator to waive federal preemption for new motor vehicle emission standards adopted and enforced by California[22] if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards.  The Administrator is to deny a waiver on a finding:  (1) that the protectiveness determination of the State is arbitrary and capricious, (2) that California does not need separate State standards to meet compelling and extraordinary conditions, or (3) that the State standards and accompanying enforcement procedures are not consistent with CAA section 202(a).  With regard to the consistency criterion, the Administrator has stated that California's standards and accompanying test procedures are inconsistent with section 202(a) if:  (1) there is inadequate lead time to permit the development of technology to meet those requirements, giving appropriate consideration to the cost of compliance within that timeframe, or (2) the federal and California test procedures impose inconsistent certification requirements so as to make manufacturers unable to meet both sets of requirements with the same vehicle.[23]

For nearly 30 years, EPA has administered a mechanism under which, in appropriate cases, no new waiver is needed for amendments to California's motor vehicle emission control regulations for new motor vehicles because the amendments are within the

---

[22] The section 209(b) waiver provisions apply to any state which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or motor vehicle engines prior to March 30, 1966.  (Clean Air Act §209(b)(1).)  California is the only state that meets this condition.  (S. Rep. No. 403, 90th Cong. 1st Sess., 532 (1967); *Motor and Equipment Manufacturers Ass'n v. EPA  [MEMA I]*, 627 F.2d 1095, 1100 note 1 (D.C.Cir. 1979).).

[23] See, e.g., 46 Fed.Reg. 26371 (May 12, 1981).  Even where there is incompatibility between the California and federal test procedures, EPA has granted a waiver under circumstances where EPA accepts a demonstration of federal compliance based on California test results, thus obviating the need for two separate tests.  (43 Fed.Reg. 1829, 1830 (Jan. 12, 1978); 40 Fed.Reg. 30311, 30314 (July 18, 1975).).

scope of previously issued waivers.[24]  As the Assistant Administrator stated in the 2001 finding that repeal of the ZEV sales requirements for MYs 1998-2002 was within the scope of previous waivers, an amendment may be considered to be within the scope of a previously granted waiver if it does not undermine California's determination that its standards, in the aggregate, are at least as protective of public health and welfare as comparable Federal standards, does not affect the consistency of California's requirements with CAA section 202(a), and raises no new issues affecting EPA's previous waiver determination.[25]

The individual elements of section 209(b) are discussed below as follows.  CARB's protectiveness determination for the 2012 amendments to both the ZEV and LEV regulations is discussed below in Section IV. B.  The necessity of the amendments to both the ZEV and LEV regulations to meet compelling and extraordinary conditions is discussed in Section IV. C.  The ZEV amendments' consistency with section 202(a) is discussed in Section IV. D. and E.  The ZEV amendments' qualifications for a waiver if they are not deemed to qualify as within the scope are discussed in Section IV. F.  The LEV amendments' qualifications for a waiver are discussed in Section IV. G.

### 2.  The Scope of EPA's Inquiry in a Waiver Proceeding Is Limited

The scope of the Administrator's inquiry in determining whether to deny a waiver or within-the-scope request is limited by the express terms of CAA section 209(b).  Thus, once California determines that its standards are, in the aggregate, at least as protective of public health and welfare as applicable federal standards, the Administrator must grant the waiver request unless one of the three specified findings can be made.  As Administrator Ruckelshaus stated in a 1971 decision:

> The law makes clear that the waiver request cannot be denied unless the specific findings designated in the statute can properly be made.  The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate to its costs or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under Section 209, so long as the California requirement is consistent with Section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California.[26]

---

[24] See, e.g., 46 Fed.Reg. 36742 (July 15, 1981); 51 Fed.Reg. 12391 (April 10, 1986).

[25] Decision Document accompanying scope of waiver determination in 66 Fed.Reg. 7751 (Jan. 25, 2001) at 9.

[26] 36 Fed.Reg. 17458 (Aug. 31, 1971), quoted on pp. 8-9 of the Decision Document accompanying 66 Fed.Reg. 7751 (Jan. 25, 2001), which notes that the "more stringent" terminology reflected the section 209(b) requirement before the 1977 amendments to the Clean Air Act substituted the reference to California standards that are, in the aggregate, at least as protective as comparable Federal standards.

12

### 3. Deference Should be Given to California's Policy Judgments

In granting waivers to California's motor vehicle program, EPA has routinely deferred to the policy judgments of California's decision makers. The agency has recognized that the intent of Congress in creating a limited review of California's determinations that California needs its own State separate standards was to ensure that the federal government would not second-guess the wisdom of State policy.[27] Administrators have recognized that the deference is wide-ranging:

> The structure and history of the California waiver provision clearly indicate both a Congressional intent and an EPA practice of leaving the decision on ambiguous and controversial matters of public policy to California's judgment.
>
> *     *     *     *     *     *
>
> It is worth noting . . . I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach . . . may be attended with costs, in the shape of a reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, *I believe I am required to give very substantial deference to California's judgments on this score.*[28]

In 2009, EPA reiterated its recognition that Congress intended EPA to show great deference to California's decision making when analyzing a waiver request for California's GHG standards for new vehicles.[29] In that decision, the administrator considered the fact that Congress had the opportunity to restrict CAA's waiver provision as part of its 1977 amendments to the CAA and had instead elected to highlight the utility of California's flexibility to adopt a complete program of motor vehicle emission controls as the state saw fit. The administrator interpreted Congress' act as showing its intent "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[30]

---

[27] 40 Fed.Reg. 23102, 23103 (May 28, 1975).

[28] 40 Fed.Reg. 23102, 23104 (May 28, 1975; emphasis added). See also Decision Document accompanying waiver determination in 58 Fed.Reg. 4166 (Jan. 13. 1993).

[29] 74 Fed.Reg. 32744 (July 8, 2009).

[30] *Id.* at p. 32748.

### 4. The Burden of Proof Is On Those Opposed to the Waiver Request

It is well settled that the burden to demonstrate that EPA should not grant a waiver is on the opponents of the waiver.  The *MEMA I* Court expressly held that the burden of proof to show that there is a basis for making one of the three findings is squarely on the opponents of a waiver:

> It is not necessary for the Administrator affirmatively to find that these conditions do not exist before granting a waiver.  The statute does not say "the Administrator shall grant a waiver only if" he makes the negative of these findings.  That he must deny a waiver if certain facts exist does not mean that he must independently proceed to make the opposite of those findings before he grants the waiver regardless of the state of the record. . . . The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them.  California must present its regulations and findings at the hearing, and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied.[31]

### B.    PROTECTIVENESS REQUIREMENT OF CLEAN AIR ACT SECTION 209

Section 209(b)(1)(A) of the CAA requires EPA to deny a waiver if the Administrator finds that California was arbitrary and capricious in its determination that its State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.  Historically, EPA has simply compared the California standards to any comparable Federal standard, and that comparison has been undertaken within the broader context of the previously waived California program, which relies upon protectiveness determinations that EPA has previously found were not arbitrary and capricious.[32]

Traditionally, EPA's evaluation of the stringency of California's standards relative to comparable EPA emission standards has followed the instruction of section 209(b)(2), which states:  "If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at least as protective of health and welfare as such Federal standards for purposes of [209(b)(1)]."[33]  A finding that California's determination was arbitrary and capricious under section 209(b)(1)(A) would need to be based upon "'clear and compelling evidence' to show that proposed [standards] undermine the protectiveness of California's standards."[34]  Even if EPA's own analysis of comparable protectiveness or

---

[31] *MEMA I*, *supra*, 627 F.2d at 1120-1121.
[32] 74 Fed.Reg. 32744, at p. 32749 (July 8, 2009).
[33] *Ibid.*
[34] *Ibid.*

that suggested by a commenter might diverge from California's protectiveness finding, that is not a sufficient basis on its own for EPA to make a section 209(b)(1)(A) finding that California's protectiveness finding is arbitrary and capricious.[35]

Additionally, in granting California's past waiver requests EPA has acknowledged that a given California standard may, by itself, be less protective than comparable federal standards so long as California's regulations *in the aggregate* are at least as protective of comparable federal standards.[36]  "California could enforce emission control standards which it determined to be in its own best interest even if those standards were in some respects less stringent than comparable federal ones."[37]

### 1.  PROTECTIVENESS OF ACC PACKAGE

Here, California made a protectiveness determination with regard to the 2012 ZEV and LEV amendments in CARB's Resolution 12-11, finding that the amendments would not cause the California motor vehicle emission standards, in the aggregate, to be less protective of public health and welfare than applicable federal standards.  This protectiveness determination is the logical extension of the comparable findings that were found to be sufficient in the analysis of California's previous protectiveness determinations for its ZEV regulation[38], its LEV regulation[39], and its GHG regulation.[40]  In analyzing CARB's protectiveness finding for the 2012 ZEV and LEV amendments, EPA should consider that – as was the case with the granted waivers cited above - there are either no comparable Federal standards or the Federal standards that exist are quantifiably less protective than those included in the 2012 ZEV and LEV amendments.

Moreover, as detailed below, the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the federal standards that exist.  Criteria pollutant emission benefits for the ACC program are fully realized in the 2035-2040 timeframe when nearly all vehicles operating in the fleet are expected to be compliant with the proposed standards.  By 2035, reactive organic gas (ROG) emissions would be reduced by an additional 34 percent, and NOx emissions by an additional 37 percent, compared to 2035 without the proposed ACC rules.  Under the amended rule, the new $PM_{2.5}$ standard is reduced to 3 mg/mi in 2020 and 1 mg/mi in 2028.  With these standards, $PM_{2.5}$ emissions will be essentially unchanged between 2010 and 2040 despite growth in vehicle miles traveled.

There is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions.  The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner

---

[35] *Ibid.*
[36] 74 Fed.Reg. 32744, 32761 (July 8, 2009).
[37] *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 464 (D.C. Cir. 1998, citation omitted).
[38] 76 Fed.Reg. 61095 (October 3, 2011).
[39] 68 Fed.Reg. 19811 (April 22, 2003).
[40] 74 Fed.Reg. 32744 (July 8, 2009).

regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles. However, since upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production.

The table below presents the emissions impacts in well-to-wheel (WTW) criteria pollutant and PM emissions in 2030 due to the 2012 Amendments. 2030 was chosen as a reference year to account for a significant amount of fleet turn-over.

**Statewide Criteria and PM Emissions in 2030 (tons per day)**

| 2030 | ROG | NMOG+ NOx | PM |
|---|---|---|---|
| LEVIII fleet WTW emissions <u>without</u> new ZEV proposal | 231 | 233 | 56.4 |
| LEVIII fleet WTW emissions <u>with</u> new ZEV proposal | 225 | 229.5 | 56.2 |

The upstream emissions from the production of hydrogen and electricity represent a very small fraction of the combined vehicle and upstream emissions impacts of the fleet, and are far outweighed by the reduction in gasoline production emissions. Additionally, a portion of these upstream emissions are in non-urban areas.

Criteria and PM emission benefits will vary by region throughout the state depending on the location of emission sources. Refinery emission reductions will occur primarily in the east Bay Area and South Coast region where existing refinery facilities operate. As refinery operations reduce production and emissions, the input and output activities, such as truck and ship deliveries, will also decline. This includes crude oil imported through the Los Angeles and Oakland ports, as well as pipeline and local gasoline truck distribution statewide.

As noted below in the discussion on the criteria emission element of LEV III (Section IV.G.3.a.(i)), the primary fleet average emission requirement, beginning in 2015, declines every year to a fleet average NMOG plus NOx emission standard of 0.030 g/mi in 2025. Clearly, this is significantly more stringent than the current federal Tier 2 fleet average NOx emission requirement of 0.07 g/mi NOx[41], with its implied fleet average NMOG plus NOx emission requirement of 160 g/mi (a 0.07 g/mi NOx emission level is equal to the NOx emission standard for Tier 2 Bin 5 (0.090 g/mi NMOG, 0.07 g/mi NOx)[42], implying a Tier 2 NMOG plus NOx fleet average requirement of 0.160 g/mi). LEV III PM standards of 0.003 g/mi and 0.001 g/mi are also significantly more stringent than the Tier 2 PM standards of 0.02 g/mi and 0.01 g/mi[43].

The ZEV regulation does not provide GHG emission reductions in addition to the LEV III GHG regulation given that ZEV emissions are included in determining compliance with the GHG standard. Specifically, because the California GHG standard

---

[41] 40 C.F.R. section 86.1811-04(d)
[42] 40 C.F.R. section 86.1811(c)(6)
[43] *Id.*

includes upstream emissions, in addition to the vehicle emissions, there is no difference in GHG emissions under varying ZEV scenarios. However, the ACC program as a whole – i.e. the California fleet - would provide major reductions in GHG emissions. By 2025, $CO_2$ emissions would be reduced by almost 14 million metric tonnes (MMT) per year, which is 12 percent from baseline levels. The reduction increases in 2035 to 32 MMT which is a 27 percent reduction from baseline levels. By 2050, the proposed regulation will reduce emissions by more than 42MMT per year, which is a reduction of 33 percent from baseline levels. Currently, there are no federal GHG standards for these 2017-2025 MYs, though CARB understands they will soon be finalized.

For these reasons it is clear that California's fleet under these amendments will be at least as protective as a comparably sized fleet of vehicles that only meet the existing federal rules. Should CARB adopt an amendment later this year to allow federal GHG compliance to serve as compliance with California's LEV (including GHG) standards, California's program will be necessarily as protective as the federal program.

## C.   THE 2012 ZEV AND LEV AMENDMENTS ARE NECESSARY TO MEET COMPELLING AND EXTRAORDINARY CONDITIONS

Under section 209(b)(1)(B) of the CAA, the Administrator may not grant a waiver if they find that California "does not need such State standards to meet compelling and extraordinary conditions." EPA has traditionally interpreted this provision to require a consideration of whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions.[44] In granting past waivers, EPA has noted that "Congress requires EPA to allow California to promulgate individual standards that, in and of themselves, might not be considered needed to meet compelling and extraordinary circumstances, but are part of California's overall approach to reducing vehicle emissions to address air pollution problems."[45] EPA has repeatedly determined that CARB has demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California and has based such determinations on the fact that California's essential "geographic and climactic conditions" remained the same as they were under earlier determinations.[46]

The relevant inquiry under this criterion is whether California needs its own motor vehicle pollution control program to meet compelling and extraordinary conditions, not whether any particular standards are necessary to meet such conditions.[47] The Administrator has determined that the phrase "compelling and extraordinary conditions" refers to:

> … certain general circumstances, unique to California, primarily
> responsible for causing its air pollution problem [including] . . .
> geographical and climatic factors [as well as] … the presence and growth

---

[44] 74 Fed.Reg. 32744, at p. 32759 (July 8, 2009).

[45] *Id*. at p. 32761.

[46] Id. at pp. 32761-32762.

[47] See, e.g., 49 Fed.Reg. 18887, 18889-18890 (May 3, 1984).

of California's vehicle population, whose emissions were thought to be responsible for ninety percent of the air pollution problem in certain parts of California.[48]

Thus, the Administrator has stated,

> It is evident from [the legislative history of the Clean Air Act] that "compelling and extraordinary conditions" does [sic] not refer to levels of pollution directly, but primarily to the factors that tend to produce them: geographical and climatic conditions that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems.[49]

In granting previous waiver requests, EPA has noted that CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California.[50]  To explain this, EPA has previously referenced the fact that California—the South Coast and San Joaquin Air basins in particular—continues to experience some of the worst air quality in the nation and that California had an ongoing need for dramatic emission reductions generally and from passenger vehicles specifically.[51]  EPA also referenced California's unique geographical and climatic conditions and the tremendous growth in the vehicle population and use which had initially moved Congress to authorize California to establish separate vehicle standards in 1967.[52]  In granting previous waivers, EPA has noted that – as in 1967 - California then continued to have geographic and climatic conditions that, when combined with the large numbers and high concentrations of automobiles, created a serious pollution problem.[53]

For purposes of the instant request for the 2012 ZEV and LEV amendments, CARB submits that those same compelling and extraordinary conditions justifying previous waivers continue to exist in California and so the requirements of section 209(b)(1)(B) are satisfied.

---

[48] 49 Fed.Reg. at 18890.
[49] *Id.*
[50] *Id.* at p. 32762.
[51] *Ibid.*
[52] *Id.* at pp. 32762-327623.
[53] *Id.* at p. 32763.

R-29,  Comment submitted by Ford Motor
Company



April 29, 2021

Michael S. Regan
Administrator
Environmental Protection Agency


RE: Docket ID No. EPA–HQ–OAR–2021–0257


At Ford, we believe that climate change is a crucial global challenge that affects all of us. As part of our aspiration to become the world's most trusted company, Ford has strengthened its support for commitments to limit global temperature increases consistent with the Paris Agreement.  Ford seeks to achieve carbon neutrality globally by 2050 (including our auto production, our suppliers, our facilities, and use of our vehicles). When President Biden announced his intention to reenter the Paris Agreement, our Executive Chairman Bill Ford applauded that move enthusiastically.

Ford recently supported President Biden's 2030 Nationally Determined Contribution (NDC) of 50-52% emission reductions below 2005 by 2030 for the U.S. This goal is consistent with our commitment to be carbon neutral by 2050, and to utilize science-based interim GHG targets as we progress towards that goal. We will continue to rely on partnerships with our dealers, union partners, and government agencies to meet these objectives. We firmly believe this course of action will benefit the planet, our customers, and our business.

At Ford, we are acting on our beliefs, and leading on climate change initiatives. In 2018, we were the only American automaker to reject the Trump fuel economy standards, and not to pursue preemption of California's regulatory authority. This was the right choice for us. In 2019, in cooperation with the California Air Resources Board, we resolved questions on California's regulatory authority by creating and committing ourselves to the California Framework Agreement, a 50-state GHG solution with stringency far beyond the Trump Administration's preferred SAFE Vehicles Rule.

We are simultaneously rapidly changing our business. We are electrifying our most iconic vehicles, including the Mustang Mach-E, the all-electric F-150, and the E-Transit line of commercial vehicles. We will invest $22 billion by 2025 to put electrified vehicle models on the road globally

Ford supports EPA's rescission of its SAFE I action, which withdrew California's waiver for zero emission vehicle (ZEV) mandate and greenhouse gas (GHG) emission standards within California's Advanced Clean Car (ACC) program. Ford does not believe this previous action was appropriate. Ford firmly supports recognition of California's authority to implement ZEV and GHG standards in support of its air quality targets pursuant to its 2012 waiver application. We have relied on California's actions pursuant to the waiver and California's related pronouncements in negotiating and agreeing to the California Framework Agreement, and in the development of our own product and compliance plans.  Ultimately, Ford considered EPA's and NHTSA's rationales and California's statements regarding SAFE I and took action in the best interests of the company and of the environment.

In our 2018 comments to the SAFE I rulemaking, we stated that we "seek to preserve and extend One National Program, maintaining the level of coordination that has existed between the federal government and California since the 2012 model year."  This remains our goal.  Ford supports efforts to rescind this waiver withdrawal

action as a first step towards a 50-state solution, coordinated between the federal government and California to regulate GHG emissions, and aligned with the principles of the Paris Agreement.

We appreciate the opportunity to comment. Please feel free to contact Steve Henderson (SHENDERS@FORD.COM) if there are further questions.

Sincerely,

/s/

Cynthia Williams
Global Director, Sustainability, Homologation and Compliance
Ford Motor Company

R-125,     Comment submitted by Attorney General, State of Ohio et al.



# DAVE YOST
## OHIO ATTORNEY GENERAL

Administration
Office 614-728-5458
Fax 614-466-5087

July 6, 2021

Michael S. Regan
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, DC 20460

Re:  Comments related to the notice reconsidering withdrawal of a waiver of preemption for California's zero emission vehicle (ZEV) mandate and greenhouse gas (GHG) emission standards, Docket No. 2021-08826

In 2019, the previous administration adopted The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One:  One National Program.  The program, among other things, revoked a waiver that had previously been extended to California under Section 209 of the Clean Air Act.  That section allows California, and no other State, to obtain a waiver relating to the Clean Air Act's emissions standards.  The waiver allows California, and no other State, to regulate new car emissions standards.

You recently issued a notice of reconsideration, seeking comments on whether the SAFE Vehicles Rule, in particular EPA's decision to withdraw a waiver of preemption previously granted to California, was a valid and appropriate exercise of agency authority.[1]  It was.  Ohio and 15 other States are submitting this letter to make clear that any attempt to restore California's January 9, 2013, waiver would be unconstitutional:  Section 209, by allowing California and only California to retain a portion of its sovereign authority that the Clean Air Act takes from other States, is unconstitutional and thus unenforceable.  Any waiver granted to California is thus "repugnant to the constitution" and "void."[2]  In our union of equally sovereign States, the Golden State is not a golden child.

## Equal Sovereignty of the States

The United States of America "was and is a union of States, equal in power, dignity and authority, each competent to exert that residuum of sovereignty not

---

[1] 86 Fed. Reg 22421 (April 28, 2021).
[2] *Marbury v. Madison*, 1 Cranch 137, 177 (1803).

delegated to the United States by the Constitution itself."[3] This "'constitutional equality' among the States,"[4] derives from the Constitution's text and structure. Indeed, the principle is so deeply embedded in our constitutional order that the Supreme Court treats the States' sovereign equality as a "truism."[5] The equal-sovereignty of the States is one of those principles that, while "not spelled out in the Constitution," is "nevertheless implicit in its structure and supported by historical practice."[6]

To see why, begin at the beginning. When the States declared their independence from Britain, "they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all … Acts and Things which Independent States may of right do.'"[7] By then, one key aspect of the sovereignty possessed by the States consisted of their "equal sovereignty."[8] The "law of nations" clearly established that "'Free and Independent States' were entitled to the 'perfect equality and absolute independence of sovereigns.'"[9] "The notion of a 'State' with fewer sovereign rights than another 'State' was unknown to the law of nations."[10] And the States would have understood themselves to possess this fundamental aspect of sovereignty.

Years later, in 1789, the Framers famously "split the atom of sovereignty," dividing sovereign authority between the States and the federal government.[11] This division of authority "limited … the sovereign powers of the States."[12] For example, the Framers' sovereignty-splitting gave the federal government exclusive authority over some matters,[13] restricted state authority over others,[14] and made validly enacted federal laws and treaties "the supreme Law of the Land."[15] But these changes did not *abolish* the States' sovereignty; to the contrary, the States "retained 'a residuary and inviolable sovereignty.'"[16] The Tenth Amendment confirms as

---

[3] *Coyle v. Smith*, 221 U.S. 559, 567 (1911).

[4] *Franchise Tax Bd. v. Hyatt*, 136 S. Ct. 1277, 1283 (2016) (citation omitted).

[5] *Virginia v. West Virginia*, 246 U.S. 565, 593 (1918).

[6] *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1498 (2019); *accord see Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2205 (2020).

[7] *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018) (quoting Declaration of Independence ¶32).

[8] Anthony J. Bellia Jr. & Bradford R. Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. 835, 935 (2020).

[9] *Id*. at 937 (quoting *Schooner Exch. v. McFaddon*, 7 Cranch 116, 137 (1812)).

[10] *Id*. at 937–38.

[11] *Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019) (quoting *Alden v. Maine*, 527 U.S. 706, 751 (1999)).

[12] *Murphy*, 138 S. Ct. at 1475.

[13] *See* U.S. Const. art. I, §8, cl.4.

[14] *Id*., art. I, §10.

[15] *Id*., art. VI, cl.2.

[16] *Murphy*, 138 S. Ct. at 1475 (quoting The Federalist No. 39, p.245 (C. Rossiter ed. 1961)).

2

much, stating that the States and the People retain all powers not expressly surrendered in the Constitution.

One key aspect of the States' retained sovereignty included the longstanding notion of "equal sovereignty."[17]  Again, that had long been understood as an essential aspect of sovereignty.[18]  While the Constitution limited the States' sovereignty in some ways, it nowhere took from the States' their sovereign equality. Thus, the States retained that sovereign equality.[19]  The fact that the States called themselves "States" confirms the point.  "By using the term 'States,' the Constitution recognized the traditional sovereign rights of the States minus only those rights that they expressly surrendered in the document."[20]  And the right to sovereign equality is not among the rights surrendered.

The States' sovereign equality remained complete until the Civil War Amendments.  The Thirteenth, Fourteenth, and Fifteenth Amendments all permit Congress to enforce their guarantees by "appropriate" legislation.[21]  (A few later-adopted civil-rights amendments use identical language when empowering Congress to enforce their terms.[22])  Appropriate legislation might entail limiting the sovereign authority of only the States found to be acting in violation of these Amendments.[23]  Therefore, "by adopting these Amendments, the States expressly … compromised their right to equal sovereignty with regard to enforcement of the prohibitions set forth in the Amendments."[24]  But the States did not *otherwise* compromise their equal sovereignty—the Amendments do not speak to, and thus do not alter, the States' equal sovereignty in contexts unrelated to the prohibitions and guarantees of these amendments.

This background principle of equal sovereignty among the States accords with the "separation of powers," which the Framers viewed "as the absolutely central guarantee of a just Government."[25]  The separation of powers depends as much on "preventing the diffusion" of power as it does on stopping the centralization of power.[26]  After all, to avoid "a gradual concentration" of governmental authority in one level or branch of government,[27] we must ensure

---

[17] Bellia & Clark, *International Law Origins*, 120 Colum. L. Rev. at 935.

[18] *Id*.

[19] *Id*. at 937–38.

[20] *Id*. at 938.

[21] U.S. Const. ams. 13 §2; 14 §5; 15 §2.

[22] *See id*., Ams. 19; 24 §2; 26 §2.

[23] *See United States v. Morrison*, 529 U.S. 598, 626–27 (2000).

[24] Bellia & Clark, *International Law Origins*, 120 Colum. L. Rev. at 938.

[25] *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting).

[26] *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 878 (1991).

[27] The Federalist No. 51, p.349 (J. Madison) (Cooke, ed., 1961).

3

that each level and branch of government retains for itself the power the Constitution assigns to it.[28]

The equal-sovereignty doctrine performs this function. When Congress unequally limits the States' sovereignty—when it allows *some* States but not others to exercise some aspect of their sovereign authority—it reorders the constitutional division of power among the States. Imagine a law allowing some States, but not others, to boycott Israel.[29] Or a law permitting just one State to enact and enforce immigration laws.[30] It is one thing for Congress to enact preemptive laws, which necessarily limit state sovereignty; the federal government clearly has the power to do that, as the Supremacy Clause confirms. It is quite another thing for Congress to limit state sovereignty of disfavored States. When Congress picks favorites, it is not incidentally limiting state sovereignty in the exercise of its own power, but rather regulating the States *as States*. "[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."[31] And when the federal government exercises such authority anyway, it aggrandizes its own power and the power of the favored States while weakening the power of the disfavored States. Allowing Congress to reorder power that the Constitution gives equally to each State contradicts any sensible understanding of the separation of powers.

In addition to furthering the purposes of the separation-of-powers doctrine, the "constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized."[32] As one distinguished jurist recognized early in her legal career, equal sovereignty "rests on concepts of federalism."[33] "The Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."[34] If the States' sovereignty could be reduced unequally, then the States would be in no relevant sense "indestructible"; a State is the sum of its sovereign authority, and a rule allowing the unequal reduction of sovereign authority would allow politically powerful States to win limits on sister States' authority. In addition to undermining "the integrity, dignity, and residual sovereignty of the States,"[35] political rent-seeking of that sort would undermine a key virtue of federalism. Our federalist structure "makes

---

[28] *See Seila Law*, 140 S. Ct. at 2202–03; *Stern v. Marshall*, 564 U.S. 462, 483 (2011); *Morrison*, 487 U.S. at 710 (Scalia, J., dissenting); *INS* v. *Chadha*, 462 U.S. 919, 946 (1983).
[29] *Cf. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374–77 (2000).
[30] *Cf. Arizona v. United States*, 567 U.S. 387, 393–94 (2012).
[31] *New York v. United States*, 505 U.S. 144, 166 (1992); *see also Murphy*, 138 S. Ct. at 1476.
[32] *Coyle*, 221 U.S. at 580.
[33] Sonia Sotomayor de Noonan, Note, *Statehood and the Equal Footing Doctrine: The Case for Puerto Rican Seabed Rights*, 88 Yale L.J. 825, 835 (1979).
[34] *Texas v. White*, 1 Wall. 700, 725 (1869).
[35] *Bond v. United States*, 564 U.S. 211, 221 (2011).

4

government 'more responsive by putting the States in competition for a mobile citizenry.'"[36]  Competition between the States gives all States incentive to make policy attractive to the People.  The virtue of competition would be seriously hampered if the States could compete by harming their rivals rather than by improving themselves.

In sum, the equal-sovereignty principle follows from the Constitution's history, text, and structure.

It follows from Supreme Court precedent, too.  The Supreme Court long ago recognized that every State, as a matter of "the constitution" and "laws" of admission, is "admitted into the union on an equal footing with the original states."[37]  "[N]o compact," the Supreme Court has explained, can "diminish or enlarge" the rights a State has, as a State, when it enters the Union.[38]  Put differently, "a State admitted into the Union enters therein in full equality with all the others, and such equality may forbid any agreement or compact limiting or qualifying political rights and obligations."[39]  This principle precludes any arrangement in which one State is admitted on less-favorable terms than any other.[40]  Conversely, it bars any State from being admitted on terms *more favorable* than those extended to its predecessors.[41]  Each State has the right, "under the constitution, to have and enjoy the same measure of local or self government, and to be admitted to an equal participation in the maintenance, administration, and conduct of the common or national government."[42]

The States' equality upon admission would not matter much if Congress could vitiate it *after* admission.  Therefore, it is perhaps unsurprising that the case law treats the right to equal sovereignty as surviving admission to the Union.  The Court recently reaffirmed that the "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States" after their admission.[43]  These cases—*Shelby County* and *Northwest Austin*—both involved challenges to the Voting Rights Act, which required some States, but not others, to receive federal permission before amending their election laws.[44]  In *Northwest Austin*, the Court signaled that the equal-sovereignty principle cast

---

[36] *Id.* (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)).

[37] *Pollard v. Hagan*, 44 U.S. 212, 228–29 (1845).

[38] *Id.* at 229.

[39] *Stearns v. Minnesota*, 179 U.S. 223, 245 (1900); *see also Coyle*, 221 U.S. at 568.

[40] *See Or. ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 378 (1977).

[41] *United States v. Texas*, 339 U.S. 707, 717 (1950).

[42] *Case v. Toftus*, 39 F. 730, 732 (C.C.D. Or. 1889).

[43] *Shelby Cnty. v. Holder*, 570 U.S. 529, 544 (2013); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

[44] *Shelby County* 570 U.S. at 537–39, 544–45; *Nw. Austin*, 557 U.S. at 196.

5

doubt on the constitutionality of this differential treatment, though it decided the case on statutory grounds instead of reaching the constitutional issue.[45] A few years later, *Shelby County* squarely presented the constitutional issue. And *Shelby County* held unconstitutional Section 4 of the Voting Rights Act, which contained the formula used to decide which States needed federal preclearance before changing their election laws. The Court held that the law exceeded Congress's authority under the Fifteenth Amendment, which empowers Congress to pass "appropriate legislation" enforcing the Amendment's prohibition on denying or abridging the right to vote based on race.[46] The Court determined that, in deciding whether such legislation was "appropriate," courts must consult the background principle of equal sovereignty. When legislation departs from that principle—as Section 4 did, by unequally limiting the States' power to adopt and enforce election laws—it will be upheld as "appropriate legislation" only if the disparate treatment is reasonably justified.[47] Because the federal government had failed to make such a showing with respect to Section 4, Congress had no authority to enact that provision.[48]

 *Shelby County* shows just how strong the equal-sovereignty principle is. Again, the Fifteenth Amendment *allows* Congress to single out some States for less-favorable treatment of their sovereign authority.[49] Still, the background rule that States retain equal sovereignty is so strong, even after admission to the Union, that Fifteenth Amendment legislation departing from that principle will be upheld as "appropriate" only if the need for such differential treatment is solidly grounded in evidence.[50] If the equal-sovereignty principle retains some strength post-admission even in contexts where the States have surrendered their entitlement to complete sovereign equality, it necessarily retains all its strength—which is to say, it is dispositive—in contexts where the States *have not* surrendered their entitlement to sovereign equality.

 Before moving on to consider what the doctrine means for Section 209 of the Clean Air Act, it is critical to emphasize that the Constitution guarantees "equal *sovereignty*, not … equal treatment in all respects."[51] To demand that every law benefit everyone and everything equally "would make legislation impossible and would be as wise as to try to shut off the gentle rain from heaven because every

---

[45] *Nw. Austin*, 557 U.S. at 203, 211.

[46] U.S. Const. am. 15, §2.

[47] *Shelby County*, 570 U.S. at 544–45, 552; *accord Nw. Austin*, 557 U.S. at 203.

[48] *Shelby County*, 570 U.S. at 551–55.

[49] *See South Carolina v. Katzenbach*, 383 U.S. 301, 329 (1966); *Shelby County*, 570 U.S. at 551–55.

[50] *Shelby County*, 570 U.S. at 554.

[51] Thomas B. Colby, *In Defense of the Equal Sovereignty Principle*, 65 Duke L.J. 1087, 1149 (2016) (emphasis added).

man does not get the same quantity of water."[52]  Put a lot less poetically and a lot more bluntly:  "Perfect uniformity and perfect equality" in law "is a baseless dream."[53]  So it is when it comes to the States.  Congress frequently treats States differently in unremarkable ways, such as when it locates naval bases in States with coastlines, or directs funding to projects in particular States.  States located in areas prone to natural disasters gain more from federal laws empowering and enriching FEMA.  States that sit atop oil fields bear the brunt and reap the benefit of federal energy policy.  Spending Clause legislation will inevitably flow to the States whose populations or conditions disproportionately exhibit the problems at which the funding is aimed.[54]

Such laws create no equal-sovereignty issues.  The equal-sovereignty doctrine demands "parity" *only* "as respects political standing and sovereignty."[55]  Congress may not unequally limit or expand the States' "political and sovereign power,"[56] and must instead adhere to the principle that no State is "less or greater … in dignity or power" than another.[57]  Disparate limitations on the States' sovereignty thus violate the equal-sovereignty doctrine.  Disparate treatment *unrelated to sovereign authority*, however, does not.  That means "Congress may devise … national policy with due regard for the varying and fluctuating interests of different regions."[58]  Congress may, in other words, pass legislation that expressly or implicitly favors some States over others, as long as it does not give some States favorable treatment with respect to the amount of sovereign authority they are permitted to exercise.  Only disparate treatment of sovereign authority implicates the equal-sovereignty principle.

### Section 209(b)(1) of the Clean Air Act, because it violates the equal-sovereignty-of-the-States doctrine, is unconstitutional, and may not be enforced

Section 209 of the Clean Air Act, which is codified at 42 U.S.C. §7543, preempts the States from setting emissions standards for new cars and new engines.[59]  But the Act makes two exceptions to its preemptive scope.  *First*, Section 209(b)(1) allows California—and only California—to set emissions standards that are more stringent than those adopted by the federal government.[60]  *Second*, the Act

---

[52] *State ex rel. Webber v. Felton*, 77 Ohio St. 554, 572 (1908).

[53] *Edye v. Robertson* (*The Head Money Cases*), 112 U.S. 580, 595 (1884).

[54] *See* 20 U.S.C. §1411 (special-education funding); 34 U.S.C. §10351 (rural drug enforcement).

[55] *Texas*, 339 U.S. at 716.

[56] *Id*. at 719–20.

[57] *Coyle*, 221 U.S. at 566.

[58] *Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 616 (1950).

[59] 42 U.S.C. §7543(a); *see also id*. §7543(e)(2)(A).

[60] §7543(b)(1); S. Rep. No. 91-1196, 32 (June 30, 1970).

7

allows States with air quality below federal standards to adopt an emissions standard "identical to the California standards."[61]  Thus, "the 49 other states" may depart from the federal standard if and only if they adopt "a standard identical to an existing California standard."[62]

Section 209(a), by preempting state laws setting emissions standards for new cars, limits the States' sovereign authority.  After all, the "power of giving the law on any subject whatever, is a sovereign power."[63]  Since the States would have the power to regulate new-car emissions but for Section 209(a), that subsection of the Clean Air Act limits state sovereignty.  The fact that Section 209(a) limits state sovereignty creates no *equal*-sovereignty problem.  But the fact that Section 209(b)(1) limits state sovereignty *unequally*, does.  Again, Section 209(b)(1) allows California, and *only* California, to obtain a federal waiver that permits it to set new-car emissions standards.  While other States may adopt those same standards, California alone may set them.  And so California alone retains some of its "sovereign power" to "giv[e] the law" in this area.[64]

Section 209(b) violates the equal-sovereignty doctrine by allowing California to exercise sovereign authority that Section 209(a) takes from every other State.  The law effects an "extension of the sovereignty of [California] into a domain of political and sovereign power of the United States from which the other States have been excluded."[65]  This unequal treatment is unconstitutional, full stop.  Congress passed Section 209 under its Commerce Clause authority.  And the States, in ratifying the Commerce Clause, did not "compromise[] their right to equal sovereignty,"[66] as they did with later amendments.[67]  Thus, the Commerce Clause provides no basis for disrupting the States' retained right to equal sovereignty.

Even if, outside the Civil Rights Amendments, a distinction between the States "can be justified in some cases," that distinction must be "sufficiently related to the problem that it targets."[68]  The waiver at issue here, allowing only California to regulate carbon emissions, is not sufficiently related to the problem that Section 209(a) targets.  Congress enacted that section to permit California to address *local* air pollution.[69]  But California seeks special treatment for its proposed greenhouse

---

[61] 42 U.S.C. §7507(1); *see also id*. §7543(e)(2)(B)(i) (similar exception for non-road engines).

[62] *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 201 (2d Cir. 1998); *accord Ass'n of Int'l Auto. Mfrs. v. Comm'r, Mass. Dep't of Envtl. Prot.*, 208 F.3d 1, 8 (1st Cir. 2000).

[63] *McCulloch v. Maryland*, 4 Wheat. 316, 409 (1819).

[64] *McCulloch*, 4 Wheat. at 409.

[65] *Texas*, 339 U.S. at 719–20.

[66] Bellia & Clark, *International Law Origins*, 120 Colum. L. Rev. at 938.

[67] *See Shelby County*, 570 U.S. at 551–55.

[68] *Nw. Austin*, 557 U.S. at 203.

[69] 84 Fed. Reg. 51310, 51330 (Sept. 27, 2019).

gas targets and zero emission vehicle mandate designed to mitigate climate change—an inherently global interest.[70]  As the EPA previously recognized, "[p]arts of California have a real and significant local air pollution problem, but $CO_2$ is not part of that local problem."[71]  Thus, *even if* Congress's differential treatment of California and the other States could be upheld as applied to a situation where the differential treatment is necessary, the differential treatment would remain impermissible as applied here.

To make matters worse, giving California special treatment will have concrete negative effects in other States.  When California was merely allowed to "solve its air quality issues, there was a relatively-straightforward technology solution to the problems, implementation of which did not affect how consumers lived and drove."[72]  But allowing California to set carbon-emission standards requires vehicle manufacturers to make "changes to the entire vehicle."[73]  Car manufacturers, given the choice between creating two vehicle fleets versus one that complies with the stricter California standard, have no real choice at all.  This means the vehicles available to Ohioans are not governed by Ohio's standards or the Federal government's standards, but rather by California's standards.  That not only offends the Constitution, but it makes bad policy.  The annual household income for a family in Ohio is almost $19,000 less than the annual income for a family in California.[74]  Thus, Ohioans may not be able to afford drastic changes mandated by California, leading Ohioans to drive older vehicles for longer and exacerbating the problem California believes it is solving.  Ohio and California have different key industries, different commuting patterns, and different access to alternative fuel stations.  So it makes no sense to let California regulate Ohio's vehicles.  While Ohio ceded some of its sovereignty to the Federal government in joining the Union, at no point has Ohio ceded its sovereignty to California, which is precisely what granting California a waiver would amount to.

Section 209's unconstitutionality is not some technicality.  The unequal treatment undermines the federalist system by making California, in a very practical sense, "greater … in dignity or power" than the other States.[75]  The law gives California a stick that it can use to win concessions and deals—even concessions and deals having nothing to do with emissions control—unavailable to any other State.  For example, after the national government proposed new nationwide emissions standards, several car manufacturers met with California to

---

[70] *Id.* at 51346.

[71] 83 Fed. Reg. 42986, 42999 (Aug. 24, 2018).

[72] *Id.*

[73] *Id.*

[74] *Compare* U.S. Census Bureau, QuickFacts: Ohio, https://perma.cc/N52Q-KKM3, *with* U.S. Census Bureau, QuickFacts: California, https://perma.cc/7SVJ-R9GG.

[75] *Coyle*, 221 U.S. at 566.

secure favorable treatment under California's regulations.[76]  These manufacturers met with California because California had the ability to seriously help or hinder their businesses:  the Golden State, and *only* that State, can adopt standards that manufacturers must either implement nationwide or find a way to implement in California alone, either way at potentially significant cost.  A federal law giving one State special power to regulate a major national industry contradicts the notion of a union of sovereign States.

<div align="center">*</div>

Agencies are bound by the Constitution.  For the foregoing reasons, Section 209(b) violates the Constitution by allowing California to obtain a preemption waiver unavailable to any other State.  In reinstating such a waiver, especially the 2013 waiver that allows only California to regulate carbon emissions, the EPA would therefore act unconstitutionally.

Yours,

DAVE YOST
Attorney General
State of Ohio

---

[76] Coral Davenport and Hiroko Tabuchi, *Automakers, Rejecting Trump Pollution Rule, Strike a Deal With California*, New York Times (July 25, 2019), https://perma.cc/EZG4-47LA.

STEVE MARSHALL
Attorney General
State of Alabama

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

LESLIE RUTLEDGE
Attorney General
State of Arkansas

DAWN CASH
Acting Attorney General
State of Oklahoma

CHRISTOPHER M. CARR
Attorney General
State of Georgia

ALAN WILSON
Attorney General
State of South Carolina

TODD ROKITA
Attorney General
State of Indiana

JASON RAVNSBORG
Attorney General
State of South Dakota

DEREK SCHMIDT
Attorney General
State of Kansas

KEN PAXTON
Attorney General
State of Texas

DANIEL CAMERON
Attorney General
State of Kentucky

SEAN REYES
Attorney General
State of Utah

JEFF LANDRY
Attorney General
State of Louisiana

PATRICK MORRISEY
Attorney General
State of West Virginia

LYNN FITCH
Attorney General
State of Mississippi

12

R-132,     Comment submitted by National Coalition for Advanced Transportation (NCAT)



**Comments of the National Coalition for Advanced Transportation**

**On the U.S. Environmental Protection Agency's Notice of Opportunity for Public Hearing and Comment: California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption**

**Docket No. EPA-HQ-OAR-2021-0257**

**July 6, 2021**

**Submitted via Regulations.gov**

## I.     INTRODUCTION AND EXECUTIVE SUMMARY

The National Coalition for Advanced Transportation (NCAT) submits these comments in response to the Environmental Protection Agency's (EPA) notice entitled "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Opportunity for Hearing and Public Comment," Docket No. EPA-HQ-OAR-2021-0257, 86 Fed. Reg. 22,421 (Apr. 28, 2021) (Notice).

NCAT is a coalition of companies and non-profit organizations that support electric vehicle and other advanced transportation technologies and related infrastructure, including business leaders engaged in energy supply, transmission, and distribution; vehicle and component design and manufacturing; and charging infrastructure production and implementation, among other activities.[1]  California's longstanding ability to set state vehicle standards drives innovation and incentivizes new technologies, in addition to significantly reducing air pollution.  Over the past several years, NCAT has vigorously defended California's authority to issue its own state vehicle greenhouse gas (GHG) and Zero Emission Vehicle (ZEV) regulations.

NCAT strongly urges EPA to reconsider and rescind the unlawful actions the agency took in "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51,310 (Sept. 27, 2019) (SAFE 1).  In SAFE 1, EPA sought to strip California's and

---

[1] NCAT's membership is listed on its website https://www.lwncat.com/Membership.html, and currently includes Atlantic City Electric, Baltimore Gas & Electric, Center for Climate and Energy Solutions, ChargePoint, Commonwealth Edison Company, Delmarva Power, Edison International, EVgo, Exelon Corporation, Pacific Gas and Electric Company, PECO, PEPCO, Plug In America, Portland General Electric, Rivian Automotive, Sacramento Municipal Utility District, and Tesla, Inc.  These comments represent an integrated package that reconciles individual member perspectives that may differ on specific issues; accordingly, no particular position should be attributed to any individual NCAT member.

National Coalition for Advanced Transportation Comments – EPA-2021-0257

the Clean Air Act (CAA) Section 177 States' authority to enforce GHG and ZEV standards. EPA purported to withdraw the CAA Section 209(b) waiver EPA granted to California in 2013 (2013 Waiver) by arguing, among other things, that California does not "need" its GHG and ZEV standards under Section 209(b)(1)(B) and that the National Highway Traffic Safety Administration's (NHTSA) SAFE 1 Preemption Rule precludes California's regulations. EPA also interpreted CAA Section 177, which authorizes other states to adopt California's standards for which EPA had granted a waiver of preemption under section 209(b), to not apply to GHG standards. NCAT, among other stakeholders, demonstrated the legal flaws in EPA's proposal, urged EPA not to take these actions in SAFE 1, and challenged such actions in federal court. That litigation is currently on hold pending the outcome of EPA's final action following this reconsideration Notice.[2]

State GHG and ZEV standards play a critical role in addressing climate change and state, regional, and local air pollution problems by, among other things, incentivizing and supporting investment in the development and deployment of electric vehicles and related infrastructure. The 2019 SAFE 1 Rule undermined state regulatory authority and created substantial uncertainty. EPA must rescind its actions in SAFE 1 for the following reasons:

- EPA should rescind its SAFE 1 withdrawal of the 2013 Waiver to California because EPA lacks statutory authority to withdraw a previously granted CAA waiver of preemption. EPA's purported waiver withdrawal has always been invalid on this basis, and was therefore never effectuated.

- Even if EPA were authorized to rescind a waiver (which it is not), the SAFE 1 withdrawal of the 2013 Waiver is inconsistent with the CAA, unsupported by the record, and otherwise arbitrary and capricious. In particular, EPA's finding that California's GHG and ZEV standards are not "need[ed] . . . to meet compelling and extraordinary conditions" under CAA Section 209(b)(1)(B) is plainly false.

- EPA should also rescind its SAFE 1 actions because it impermissibly relied on NHTSA's flawed Energy Policy Conservation Act (EPCA) preemption rule as a basis for withdrawing the 2013 Waiver.

- EPA must rescind its determination in SAFE 1 that States cannot adopt California's GHG standards under CAA Section 177 because this determination is contrary to the statute and exceeds EPA's authority.

- Finally, in its SAFE 1 actions, EPA failed to justify its unilateral reversal of prior decisions and disregard for significant industry reliance interests. NCAT's members have invested billions of dollars with the well-founded expectation that increased demand for electric vehicles would be propelled by California and the Section 177 States' continued ability to drive technology innovation and emission reductions. EPA also ignored reliance interests of states and other regulated sources on the GHG and

---

[2] *Union of Concerned Scientists, et al. v. NHTSA*, No. 19-1230 (D.C. Cir.) (NCAT filed a petition for review of EPA's and NHTSA's actions in SAFE 1 on November 15, 2019, which was consolidated with other petitions filed).

ZEV standards that were incorporated into State Implementation Plans to achieve compliance with National Ambient Air Quality Standards (NAAQS).

## II.    BACKGROUND TO NCAT'S COMMENTS ON EPA'S NOTICE

### A.    Statutory and Regulatory Background

California has regulated motor vehicle air pollutant emissions for well over 50 years in accordance with the CAA, setting pioneering emissions standards that have driven advances in electric and other advanced vehicle technology.  In recognition of California's history of cutting-edge emissions regulations and the need for such regulations in the state, Congress provided in Section 209(b) of the CAA that EPA must grant a waiver of preemption to California to allow the state to issue its own vehicle emissions regulations, if certain statutory conditions are met.  *See* 42 U.S.C. § 7543(b)(1).  EPA "shall" grant a waiver to California if "the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards" unless EPA finds that: (A) California's protectiveness determination is arbitrary and capricious; (B) California "does not need such State standards to meet compelling and extraordinary conditions"; or (C) California's standards are not "consistent with" CAA Section 202(a), 42 U.S.C. § 7521(a)—meaning the standards are not technologically feasible.  *Id.* § 7543(b)(1).

Accordingly, for decades EPA has granted waivers of preemption allowing California to regulate vehicle emissions.  *Cf. Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1110–11 (D.C. Cir. 1979) ("The history of congressional consideration of the California waiver provision . . . indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation.") (hereinafter "*MEMA I*").  CAA Section 177 provides that other states may adopt California's vehicle emissions standards for which a waiver of preemption has been granted (the Section 177 States).  42 U.S.C. § 7507.

EPA has granted waivers of preemption under CAA Section 209(b) to California for standards that limit GHG emissions from new vehicles as well as for ZEV standards, which require that a certain percentage of new vehicles be zero emission vehicles.  Most recently, in January 2013, EPA granted the California Air Resources Board's request for a CAA Section 209(b) waiver to enforce its Advanced Clean Car regulations, which include Low Emission Vehicle III GHG standards and ZEV standards.  *See* California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years, 78 Fed. Reg. 2112 (Jan. 9, 2013) (2013 Waiver). California's Low Emission Vehicle III regulations require that manufacturers reduce criteria pollutants and GHG emissions from light- and medium-duty vehicles.  *See* Cal. Code Regs. tit. 13, §§ 1961.2, 1961.3.  California's ZEV standards require manufacturers to submit credits reflecting the production and delivery for sale in California of prescribed volumes of ZEVs, as adjusted through certain crediting formulas established by the regulation.  Importantly, ZEVs are defined as "vehicles that produce zero exhaust emissions of any criteria pollutant (or precursor pollutant) or greenhouse gas, excluding emissions from air conditioning systems, under any possible

3

operational modes or conditions." *Id.* § 1962.2(a). To date, thirteen states have adopted California's GHG standards and ten have adopted the ZEV standards[3]—in each case pursuant to CAA Section 177. And additional states have taken steps toward adoption of ZEV standards as well.[4]

### B.     EPA's SAFE 1 Actions and Subsequent Litigation

In August 2018, EPA made an unprecedented about-face by proposing to withdraw the waiver it had previously granted California in 2013 for the GHG and ZEV requirements of its Advanced Clean Cars program. *See* The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 83 Fed. Reg. 42,986, 42,999 (proposed Aug. 24, 2018). NCAT submitted comments on EPA's proposed actions, demonstrating the legal infirmities in EPA's proposed interpretation of its CAA Section 209(b) waiver authority, among other items. *See* Comments of the National Coalition for Advanced Transportation on the Proposed Regulation, Docket No. EPA-HQ-OAR-2018-0283, (Oct. 26, 2018), https://www.regulations.gov/comment/EPA-HQ-OAR-2018-0283-5067.

Despite voluminous objections and significant questions regarding EPA's authority to proceed, EPA took unprecedented action in September 2019 in "The Safer Affordable Fuel-Efficient Vehicles Rule Part One: One National Program" (SAFE 1) by purporting to withdraw the 2013 Waiver to California based on EPA's determination that California does not "need" its GHG and ZEV standards under Section 209(b)(1)(B) and on NHTSA's SAFE 1 Preemption Rule, which interpreted EPCA to preempt state GHG and ZEV standards. In SAFE 1, EPA also interpreted CAA Section 177, which authorizes other states to adopt California's standards for which EPA had granted a waiver of preemption under section 209(b), to not apply to GHG standards.

Shortly after EPA's SAFE 1 actions were finalized, NCAT, along with multiple groups of stakeholders—including States, air districts, public interest organizations and other industry stakeholders—challenged EPA's actions in SAFE 1 as arbitrary and capricious, exceeding EPA's authority, and contravening Congressional intent, among other deficiencies.[5] These consolidated cases are currently being held in abeyance, pending the outcome of EPA's and NHTSA's SAFE 1 reconsideration actions. If EPA rescinds its SAFE 1 actions as described in the Notice, then the agency will have addressed the deficiencies in EPA's portion of SAFE 1.

## III.     THE CRITICAL ROLE OF STATE VEHICLE STANDARDS

### A.     Air Quality and Climate Benefits

---

[3] This includes Colorado, whose Low Emission Vehicle and ZEV standards have not yet gone into effect.

[4] This includes Virginia, Minnesota, Nevada, New Mexico, Pennsylvania, and Washington.

[5] *Union of Concerned Scientists, et al. v. NHTSA*, No. 19-1230 (D.C. Cir.) (consolidated cases). On February 8, 2021, the D.C. Circuit Court of Appeals ordered the consolidated cases to be held in abeyance pending EPA's and NHTSA's reconsideration of the SAFE 1 actions.

National Coalition for Advanced Transportation Comments – EPA-2021-0257

For California and the Section 177 States, state vehicle standards are central to addressing climate change and state, regional, and local air pollution problems, which in many cases are severe. It is clear that action is needed and, in the U.S., the transportation sector generates the largest share of GHG emissions (29 percent of 2019 GHG emissions).[6] The transportation sector is also responsible for a significant share of criteria pollutant emissions, including over 55% of the nitrogen oxides (NOx) total emissions inventory in the U.S.,[7] 17.9 million tons per year of carbon monoxide, 133,000 tons per year of fine particulate matter (PM) $PM_{2.5}$, 287,000 tons per year of $PM_{10}$, and 1.8 million tons per year of volatile organic compounds (VOCs).[8] These emissions have significant effects on communities around the country. In 2020, approximately 97 million people nationwide lived in counties with pollution levels above the primary National Ambient Air Quality Standards (NAAQS).[9] In many areas of the country, pollution from vehicles are also the leading source of poor air quality.

Electric and other zero emission vehicles are a critically important, cost-effective strategy to reduce such air pollution, particularly in areas with severe air quality problems. All-electric vehicles produce zero direct emissions since these vehicles lack a tailpipe and thus have zero tailpipe emissions of GHGs or other pollutants. As a result, use of these vehicles in place of internal combustion engine vehicles can significantly improve air quality in urban areas. On average across the United States, annual life cycle emissions per vehicle are substantially lower for all electric vehicles as compared to gasoline vehicles. The emissions reductions are even greater in geographic areas that use relatively low-polluting energy sources for electricity generation.[10] The share of electricity generated from renewable energy resources (*e.g.*, wind, solar, geothermal, hydroelectric, and biomass) has dramatically increased in recent years to about 20% of total U.S. electricity generation in 2020.[11] And the U.S. Energy Information Administration (EIA) predicts that this trend of significant increases in generation from renewable resources will

---

[6] U.S. EPA, Sources of Greenhouse Gas Emissions, https://www.epa.gov/ghgemissions/sources-greenhouse-gas-emissions (last updated Apr. 14, 2021).

[7] U.S. EPA, Smog, Soot, and Other Air Pollution from Transportation, https://www.epa.gov/transportation-air-pollution-and-climate-change/smog-soot-and-local-air-pollution (last updated Nov. 20, 2020).

[8] NHTSA, The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Year 2021 – 2026 Passenger Cars and Light Trucks Final Environmental Impact Statement (Mar. 2020) at 4-1–4-2, *available at* https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/safe_vehicles_rule_feis.pdf.

[9] U.S. EPA, Air Quality - National Summary, https://www.epa.gov/air-trends/air-quality-national-summary (last updated May 20, 2021).

[10] U.S. DOE Alternative Fuels Data Center, Emissions from Hybrid and Plug-In Electric Vehicles, https://afdc.energy.gov/vehicles/electric_emissions.html (last visited July 5, 2021) (see comparison of electricity sources and annual vehicle emissions, on a national average and state-by-state basis).

[11] U.S. EIA, Electricity in the United States, https://www.eia.gov/energyexplained/electricity/electricity-in-the-us.php (last updated Mar. 18, 2021) (figure showing U.S. electricity generation by major energy sources, 1950-2020)

National Coalition for Advanced Transportation Comments – EPA-2021-0257

continue.[12]  As the sources of electricity generation become cleaner, GHG and criteria pollutant emissions related to use of electric vehicles will further decline.

### B.    Electric Vehicle Deployment and Infrastructure

State GHG and ZEV performance standards incentivize and support investment in the development and deployment of electric vehicles and other advanced low-emission and zero-emission vehicles.  California and the Section 177 States that have adopted these standards make up more than one-third of the U.S. auto market.[13]  California's standards have helped drive investment in electric vehicle manufacturing and technology because those performance standards incentivize manufacturing vehicles with lower GHG and criteria pollutant emissions and provide a mechanism by which vehicle manufacturers that deploy innovative technologies and out-perform the standards can earn and sell tradeable compliance credits.[14]  Accordingly, EPA's purported elimination of state authority through SAFE 1 adversely affects the marketplace for transportation electrification and deployment of advanced vehicle technologies across the country—undermining the important investments of manufacturers and infrastructure companies.  State standards also play a key role in catalyzing major infrastructure and economic development plans.  NCAT members are making significant investments and implementing long-term business strategies designed to support the implementation of GHG and ZEV regulations, and will also stimulate technology innovation and market competition, enable consumer choice, attract private capital investments, and create high quality jobs.  And state public utility commissions make long-term regulatory decisions based in part on these GHG and ZEV regulations.

NCAT members manufacture all-electric vehicles in the U.S. that are sold in California, the Section 177 States, and across the U.S., and thus are subject to state GHG and ZEV standards. These companies earn tradeable compliance credits under the state performance standards, which reward manufacturers that deploy innovative technologies that exceed the standards.  NCAT members also include companies engaged in electricity generation, transmission and distribution and companies involved in manufacturing, deploying, and operating electric vehicle charging infrastructure.  NCAT's members collectively have invested, or are in the process of investing, billions of dollars in manufacturing electric vehicles and deploying charging-related infrastructure.

Electric vehicles and other advanced technology vehicles and supporting infrastructure play a critical role in supporting U.S. global competitiveness, economic growth, energy security, and cost-effective protection of public health and environmental quality.  To remain a leader in the

---

[12] U.S. EIA, Annual Energy Outlook 2021 (Feb. 2021) at 16, *available at* https://www.eia.gov/outlooks/aeo/pdf/AEO_Narrative_2021.pdf.

[13]  California Air Resources Board, *States that have Adopted California's Vehicle Standards under Section 177 of the Federal Clean Air Act* (Sept. 27, 2019), https://ww2.arb.ca.gov/sites/default/files/2019-10/ca_177_states.pdf.

[14] *See, e.g.*, Virginia McConnell, Benjamin Leard & Fred Kardos, Resources for the Future, California's Evolving Zero Emission Vehicle Program: Pulling New Technology into the market at 22-31 (Nov. 2019), https://media.rff.org/documents/RFF_WP_Californias_Evolving_Zero_Emission_Vehicle_Program.pdf (California state Zero Emissions Vehicle credit banking and trading.)

6

global automotive market, the U.S. must continue to support policies that encourage adoption of electric and other advanced technology vehicles and related infrastructure to serve the needs of American consumers. Since the Model Year (MY) 2021-2025 standards were adopted in 2012, the U.S. electric vehicle market has grown and is expected to continue substantial growth into the future. Electric vehicle battery costs have continued to decline, reducing the cost of electric vehicles relative to other vehicles.[15] Charging infrastructure providers continue to expand charging networks across the country.

EPA's actions in SAFE 1 undermine these advances, reducing incentives for electric vehicle manufacturing and creating substantial investment uncertainty in related areas that affect NCAT members. To address these problems, NCAT urges EPA to fully rescind EPA's actions in SAFE 1.

## IV.    EPA LACKED STATUTORY AUTHORITY TO RESCIND THE CAA WAIVER OF PREEMPTION FOR CALIFORNIA'S GHG AND ZEV STANDARDS

### A.    Congress Did Not Provide EPA with a Means to Withdraw a Granted Waiver under Section 209(b)

EPA's SAFE 1 action was unlawful because EPA lacks authority under the CAA to rescind a waiver granted under Section 209(b). It is telling that the EPA has never—in the course of 50 years since Section 209 was first enacted—attempted to rescind a Section 209(b) waiver or suggested it has authority to do so. While Section 209(b) clearly and expressly sets forth the process and criteria for EPA to grant or deny a waiver to California ("after notice and opportunity for public hearing"), it includes no language authorizing the agency to rescind a previously granted waiver. Indeed, nothing in the text or structure of the statute remotely suggests that Congress intended EPA to have such authority. To read such authority into the statute would violate the well-established principle that when Congress intends to preempt the historic powers of the States, "it must make its intention to do so unmistakably clear in the language of the statute." *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 544-45 (2002) (internal quotations omitted). This same principle applies here where Congress has expressly limited the scope of preemption under Section 209 by requiring EPA to waive preemption unless the agency makes one or more specific affirmative determinations. Accordingly, absent a clear Congressional statement, EPA lacks authority to rescind a waiver.

---

[15] *E.g.*, BloombergNEF, *Hitting the EV Inflection Point: Electric Vehicle Price Parity and Phasing Out Combustion Vehicle Sales in Europe* (May 2021) at 5-6, *available at* https://www.transportenvironment.org/sites/te/files/publications/2021_05_05_Electric_vehicle_price_parity_and_adoption_in_Europe_Final.pdf.; The National Academies of Sciences, Engineering, Medicine, *Assessment of Technologies for Improving Light Duty Vehicle Fuel Economy– 2025-2035: Public Report Release Briefing* (Mar. 2021) at 13, *available at* https://www.nap.edu/resource/26092/Briefing%20Slides%20Public%20Release%20Final%2020210331.pdf; DNV, Tesla's Battery Day and the Energy Transition (Oct. 2020), https://www.dnv.com/feature/tesla-battery-day-energy-transition.html?utm_campaign=GR_GLOB_20Q4_PROM_ETO_2020_Tesla_Battery_Article&utm_medium=email&utm_source=Eloqua.

National Coalition for Advanced Transportation Comments – EPA-2021-0257

Other provisions of the CAA make clear that Congress knows how to authorize EPA to rescind a waiver if it chooses to do so.  For example, CAA Section 505(d), authorized EPA to waive certain notification requirements for Title V permit applicants, but expressly states that "*[a]ny waiver granted under this subsection may be revoked or modified by the Administrator by rule.*" 42 U.S.C. § 7661d(d) (emphasis added).  Several other CAA provisions likewise specify the conditions for termination or extension of a waiver.  *See, e.g.,* 42 U.S.C. § 7411(j)(D)-(F) (expressly establishing a time frame and basis for termination of a waiver for innovative systems of emission reduction); 42 U.S.C. § 7412(f)(4) (establishing express time limit for waiver of standards); 42 U.S.C. § 7545(o)(7)(C) (expressly providing for termination and limited extension of a waiver of certain renewable fuel standard requirements).  Where, as here, "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Brown v. Gardner*, 513 U.S. 115, 118 (1994) (internal quotations omitted).  Accordingly, Congress's decision not to include similar language in Section 209(b) makes clear that it did not intend to authorize EPA to rescind a waiver once granted.

In SAFE 1, EPA cited one sentence of legislative history from 1967 suggesting the agency could withdraw a waiver "if California no longer complies with the conditions of the waiver."  S. Rep. No. 90-403, at 34.  However, the statement and the context in which it was made focused on the State's conduct: its compliance with waiver conditions and, specifically, its cooperation with EPA concerning enforcement and certification procedures.  *See id.*  The conditions considered under that discussion do not apply here because the justification given by the EPA did not cite any evidence of California's noncompliance with "conditions" or conduct of the waiver.

Instead, Congress gave California broad discretion to enact its own standards under the CAA framework.  The 1977 amendments to Section 209 were expressly intended "to ratify and strengthen" the waiver provision and to "afford California the broadest possible discretion" to design and implement its own standards.  H.R. Rep. No. 95-294, at 301-02, 1977 U.S.C.C.A.N. 1077, 1380-81 (1977).  EPA's decision to withdraw California's waiver ignored this superseding history and disregarded Congress's instruction that the Administrator "is not to overturn California's judgment lightly" or "substitute his judgment for that of the State."  *Id.* at 302; *see also Ford Motor Co. v. EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979) ("Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight.").

The fact that Congress did not authorize EPA to revoke a previously granted waiver makes good sense as a policy matter.  Both California and the other Section 177 States, and the entities they regulate, justifiably rely on EPA waiver decisions in order to implement state programs for which a waiver has been granted.  States and regulated entities make substantial investments based on this reliance, as described below in Section VII.

Long-standing statutory interpretations and agency practices demonstrate that EPA lacked that authority to withdraw the 2013 Waiver to California in SAFE 1.  EPA's purported waiver withdrawal has always exceeded EPA's authority and been invalid on this basis, and was therefore never effectuated.  EPA should confirm that in its final action.

### B.    EPA's SAFE 1 Action Was Inconsistent with the CAA's Technology-Forcing Design

8

EPA's purported waiver withdrawal ignores that the CAA is designed to be "technology forcing." *Union Elec. Co. v. EPA*, 427 U.S. 246, 258 (1976); *Train v. NRDC*, 421 U.S. 60, 90 (1975). The 1970 amendments were "expressly designed to force regulated sources to develop pollution control devices that might at the time appear to be economically or technologically infeasible." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 491-92 (2001) (Breyer, J., concurring). Congress intended California to spur technological innovation for the entire country's benefit. *See* S. Rep. No. 90-403, at 33; *see also MEMA I*, 627 F.2d at 1111. That goal is completely incompatible with the regulatory uncertainty that would be created by allowing waivers to be withdrawn. *See Am. Methyl Corp. v. EPA*, 749 F.2d 826, 839-40 (D.C. Cir. 1984).

CAA Section 209 reflects Congress's cooperative-federalist vision that California was "in short, to act as a kind of laboratory for innovation." *MEMA I*, 627 F.2d at 1111; *cf*. S. Rep. No. 90-403 at 33 (1967) ("The Nation will have the benefit of California's experience with lower standards, which will require new control systems and design."). The withdrawal of California's waiver contravened Congress's intent that Section 209 would enable California and the Section 177 States to drive the development of pollution-reducing technologies, and is also invalid on that basis.

## V.     EPA'S STATED GROUNDS FOR THE WAIVER WITHDRAWAL IN 2019 WERE ALSO INVALID

### A.     EPA Must Meet a High Bar to Deny Waiver

Even if EPA were authorized to rescind a previously granted waiver (which it is not), EPA's purported withdrawal of the 2013 Waiver is inconsistent with the statute, unsupported by the record, and otherwise arbitrary and capricious. The legislative history of Section 209 makes clear that Congress intended "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare" and that EPA "is not to overturn California's judgement lightly." *MEMA I*, 627 F.2d at 1110, 1122 (quoting H.R. Rep. No. 95 – 294 (1977), at 301-02). EPA has granted over 50 waivers of preemption under Section 209, including waivers of preemption for earlier generations of California's LEV and ZEV standards, going back to the 1990s.[16] EPA has partially denied waivers in a handful of instances, but has only fully denied a waiver once in the 50 years since Section 209 was enacted–and that denial was fully reversed.[17]

EPA's consistent practice, and governing D.C. Circuit precedent, make clear that the agency's review of a waiver request must be deferential and limited in scope. Section 209(b) requires EPA to waive federal preemption of California vehicle emission control regulations unless EPA makes certain findings that a waiver is inappropriate. *MEMA I*, 627 F.2d at 1100. Section

---

[16] EPA, *California State Motor Vehicle Pollution Control Standards; Within the Scope Determination and Waiver of Preemption Decision for Amendments to California's Zero-Emission Vehicle (ZEV) Standards*, 76 Fed. Reg. 61,095, 61,096 (Oct. 3, 2011) (providing chronology).

[17] EPA, *California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 74 Fed. Reg. 32,744, 32,745, 32,782 (July 8, 2009) (2009 Waiver).

209(b) limits the agency's authority to deny California's requests for waivers to the three criteria, and EPA therefore has refrained from denying California's requests for waivers based on any other basis. 2013 Waiver, 78 Fed. Reg. at 2145 (rejecting argument that the agency should evaluated whether California's GHG standards are preempted under EPCA); *see also* 2009 Waiver, 74 Fed. Reg. at 32783 (same). The D.C. Circuit has upheld EPA's position that it may not evaluate California's waiver request based on any other factors outside of those Congress directed it to consider. *See Motor & Equip. Mfrs. Ass'n, Inc. v. Nichols*, 142 F.3d 449, 462-64 (D.C. Cir. 1998); *MEMA I*, 627 F.2d at 1116-17.

Both the D.C. Circuit and EPA have made clear that Section 209(b) places the burden on the waiver opponents to demonstrate that one of the criteria in Section 209(b)(1) for a denial has been met. *See, e.g., MEMA I*, 627 F.2d at 1121-22 ("The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them."); EPA, 2013 Waiver, 78 Fed. Reg. at 2116. Even if EPA had authority to rescind a previously granted waiver (which it does not, *see* Section IV above), EPA would have to demonstrate why its prior determination granting a waiver was incorrect as a matter of facts and/or law. EPA certainly did not meet this high bar in its 2019 decision purporting to rescind the 2013 Waiver; therefore, that waiver rescission was invalid.

## B.    EPA Had No Basis Under CAA Section 209(b) to Deny and Withdraw California's Waiver for Either the GHG or ZEV Standards

EPA's finding in SAFE 1 that California's GHG and ZEV standards are not "need[ed] . . . to meet compelling and extraordinary conditions" within the meaning of CAA Section 209(b)(1)(B), 42 U.S.C. § 7543(b)(1)(B), is plainly incorrect.

Section 209(b) provides that EPA shall waive preemption of state standards if the state determines that "the State standards will be, *in the aggregate* at least as protective of public health and welfare as applicable Federal standards." 42 U.S.C. § 7543(b)(1)(B) (emphasis added). Section 209(b)(1)(B) provides, however, that no such waiver request shall be granted if EPA determines that the state "does not need *such State standards* to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b)(1)(B) (emphasis added). For decades, EPA has read this provision to focus not on whether California needs any particular standard to meet compelling and extraordinary conditions, but rather whether the state needs its separate *program* of vehicle standards to meet such conditions. In SAFE 1, EPA reversed that interpretation, arguing that it should examine the need for state standards independently from the rest of California's program. 84 Fed. Reg. at 51,341, 51,344. Further, in SAFE 1, EPA found that California does not need the GHG and ZEV standards because (1) California does not face climate change impacts that are materially different from those affecting the rest of the United States, and (2) California's standards will not meaningfully reduce climate impacts on the state. *Id.* at 51,339.

NCAT disagrees with each element of this proposed reading of the statute. With regard to the scope of EPA's analysis, the plain text of Section 209(b) confirms EPA's longstanding reading of Section 209(b)(1)(B) to apply to California's need for its vehicle standards program "in the aggregate." California plainly met this test in 2013 when EPA granted the waiver, and California

10

National Coalition for Advanced Transportation Comments – EPA-2021-0257

continues to meet it to the present day. Even if EPA's new reading of the provision were permissible, however, it has not demonstrated that California does not need GHG standards to address compelling and extraordinary conditions. The impacts of climate change are unquestionably compelling and extraordinary. California need not show that those impacts affect it uniquely relative to the rest of the United States. But even if it did, California faces unique challenges associated with climate change.[18]

In addition, California's ZEV standards are intended to and do achieve significant incremental reductions of NOx and other non-GHG emissions.[19] California faces compelling and extraordinary challenges with regard to criteria air pollution. Importantly, vehicle emissions in California are a leading source of poor air quality, *see* Section II.A, and vehicles meeting California's ZEV standards can reduce criteria pollutant emissions substantially relative to gasoline-fueled vehicles. For this reason, several of California's air quality management districts have identified deployment of ZEVs as a critical element of their overall attainment strategies.[20]

Finally, EPA's argument that California does not "need" vehicle standards that reduce GHG emissions because such standards alone cannot meaningfully reduce the impacts of climate change on California lacks merit. 84 Fed. Reg. at 51,346-47. EPA's approach in SAFE 1 read requirements into the statute that Congress did not choose to impose: that a single standard be sufficient to resolve an environmental problem caused by multiple and diverse sources. Instead, need should be defined by reference to the underlying problem, and California's standards are one important element of the broader response.

### C.     EPA's Reliance on NHTSA's EPCA Preemption Rule in SAFE 1 was Inappropriate and Unlawful

In SAFE 1, EPA impermissibly relied on NHTSA's EPCA preemption rule as a basis for withdrawing the 2013 Waiver to California. 84 Fed. Reg. at 51,350. EPA reversed its prior interpretations of Section 209(b) to read the provision to permit denial or rescission of a waiver to California based on factors outside of Section 209(b)(1), namely NHTSA's assertion that EPCA preempts the waiver. California's GHG and ZEV standards are not preempted by EPCA, and NHTSA's findings to the contrary in SAFE 1 were incorrect.[21] But in any event, EPCA preemption

---

[18] *See, e.g.*, CARB, Analysis in Support of Comments of the California Air Resources Board on the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks (Oct. 26, 2018) at 366-71, https://www.regulations.gov/comment/EPA-HQ-OAR-2018-0283-5054 (Oct. 2018 CARB Comments) (explaining why "California needs its GHG-reducing standards to meet the extraordinary and compelling conditions caused by GHG emissions").

[19] *See, e.g.*, Oct. 2018 CARB Comments at 371-73 (explaining why "California also needs its GHG-reducing standards because those standards address California's on-going criteria pollution challenges").

[20] *See, e.g.*, South Coast Air Quality Management District, Final 2016 Air Quality Management Plan at 4-2 (Mar. 2017), at http://www.aqmd.gov/home/air-quality/clean-air-plans/air-quality-mgt-plan/final-2016-aqmp.

[21] *See* Attachment A to this comment explaining why NHTSA's EPCA preemption rule is invalid and must be repealed. Attachment A is NCAT's June 11, 2021 comments on NHTSA's Notice of Proposed

11

is simply not relevant to EPA's decision to grant a waiver under Section 209(b). As EPA has stated in several prior waiver decisions, there is no reference in Section 209(b) to EPCA preemption nor anything that could be construed to address this issue. Section 209(b) is unambiguous in this regard, and EPA has no grounds to read EPCA preemption considerations into the statute. When considering a waiver, EPA is limited to the statutory considerations specified in Section 209. Accordingly, EPCA preemption considerations are not a proper basis for a waiver decision under Section 209(b).

Due to these many errors, EPA's purported waiver withdrawal has always been invalid, and was therefore never effectuated.

## VI. THE SECTION 177 STATES HAVE AUTHORITY TO ADOPT CALIFORNIA'S GHG AND ZEV STANDARDS

In SAFE 1, EPA incorrectly found that CAA Section 177 does not apply to GHG standards, meaning that the states that adopted California's GHG and ZEV standards pursuant to Section 177 purportedly could not enforce those standards. *See* 84 Fed. Reg. at 51,350. CAA Section 177 unequivocally allows states to "adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines . . . if (1) [s]uch standards are identical to the California standards for which a waiver has been granted for such model year, and (2) California and such State adopt such standards at least two years before the commencement of such model year." 42 U.S.C. § 7507. The availability of this provision is unambiguous and nothing in it supports the limitation EPA read into it to exclude GHG emissions. EPA's reading of the statute in SAFE 1 was plainly incorrect and should be discarded.

But even if EPA's proposed interpretation of Section 177 were permissible (which it is not), California's ZEV and GHG standards would qualify under this interpretation. As explained above, the ZEV standards are intended to and do achieve significant reductions in NOx and other criteria pollutant emissions and, as such, are designed to control criteria pollutants. The Low Emission Vehicle III GHG standards are designed to harmonize with the Low Emission Vehicle III non-GHG standards that directly target criteria pollutants, and they are also intended to mitigate climate change, which exacerbates ozone nonattainment problems.

Moreover, EPA's Section 177 determination in SAFE 1 exceeded its authority. The statute does not provide EPA with a role in determining whether qualifying States may adopt California emission standards. Instead, Section 177 exclusively gives those states the discretion to "adopt and enforce" California standards for which a waiver has been granted, subject only to lead time and identicality requirements. *See* 42 U.S.C. § 7507. The CAA does not authorize EPA to "conduct a separate waiver proceeding for each [Section 177] state" that adopts California standards. *Ford Motor Co.*, 606 F.2d at 1298. "States are not required to seek EPA approval under the terms of section 177" whatsoever. 77 Fed. Reg. 62,624, 62,637 n.54 (Oct. 15, 2012).

Therefore, EPA must rescind its finding in SAFE 1 that States cannot adopt California's GHG standards under CAA Section 177.

---

Rulemaking regarding the proposed repeal of NHTSA's EPCA preemption rule. These comments have been submitted to Docket No. NHTSA-2021-0030.

## VII.    EPA FAILED TO CONSIDER INDUSTRY AND OTHER STAKEHOLDER RELIANCE INTERESTS IN ITS SAFE 1 ACTIONS

EPA has asked for comment on whether in its SAFE 1 action EPA identified and considered relevant reliance interests.  86 Fed. Reg. at 22,429.  As NCAT has explained in litigation filings, in SAFE 1 EPA failed to justify its unilateral reversal of its prior decision and disregarded significant industry and other stakeholder reliance interests.

NCAT members have invested billions of dollars with the well-founded expectation that increased demand for electric vehicles would be propelled by California and the Section 177 States' continued ability to drive technology innovation and emission reductions.  By purporting to withdraw these states' authority to enforce GHG and ZEV standards that incentivize the deployment of electric vehicles, EPA actions in SAFE 1 contradicted Congress' intent, and arbitrarily devalued NCAT members' reasonable investments in electric vehicle technology and supporting infrastructure.  Innovation in the transportation sector requires very significant investments and advance planning.  In the years since EPA granted California's waiver, the state GHG and ZEV standards have spurred billions of dollars of investment in electric vehicle manufacturing and infrastructure.  NCAT members based substantial investments in part on the reasonable expectation that, regardless of what happened with the federal standards, California's and the Section 177 States' authority would remain intact.  EPA failed to address these industry reliance interests when it withdrew the waiver in SAFE 1 in 2019, and such failure was arbitrary and capricious.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (declaring an agency's action arbitrary and capricious when an agency "entirely failed to consider an important aspect of the problem.").

For instance, NCAT Member Tesla, Inc. (Tesla) designs, develops, manufactures, and sells high-performance fully electric vehicles, among other products, and has made significant investments to establish, and continues to grow, a large network of retail stores, vehicle service centers, and electric vehicle charging stations to accelerate and support the widespread adoption of its vehicle products.  For many years, the California standards have helped drive investment in electric vehicle manufacturing and technology because those performance standards incentivize manufacturing vehicles with lower GHG and criteria pollutant emissions and provide a mechanism by which vehicle manufacturers that deploy innovative technologies and out-perform the standards are rewarded as they can earn and sell tradeable compliance credits.[22]  Tesla's required, public SEC filings regularly report quarterly revenue derived from automotive regulatory credit sales, including those occurring in California and other participating states' ZEV programs.  Moreover, the regulatory certainty embodied in California and the Section 177 States' Model Year 2017-2025 GHG performance standards and ZEV programs have contributed to market conditions that have supported billions of dollars in manufacturing investments by Tesla.  These are clear industry reliance interests that EPA failed to consider in its waiver withdrawal decision in SAFE 1.

---

[22] *See, e.g.*, IHS Markit, The Economic Footprint of Tesla in California (May 15, 2018), https://ihsmarkit.com/research-analysis/the-economic-footprint-of-tesla-in-california.html (finding that in 2017 Tesla supported over 31,000 additional jobs in the state, and the company's economic impact in California goes far beyond that of its immediate employees and includes infusing over $4 billion into the California economy).

National Coalition for Advanced Transportation Comments – EPA-2021-0257

EPA's waiver withdrawal also overlooked utilities' reliance interests. Utilities have long-term planning horizons for considering investments in improvements to the electricity grid to support transportation electrification. In addition to preparing the grid to support increased electric vehicle adoption, utilities across the country have been planning and implementing significant transportation electrification infrastructure programs. In order to successfully plan, develop, obtain approval, and execute programs like these, as well as to plan for the increased load resulting from increased electric vehicle adoption, utilities must rely on consistent implementation of regulatory programs, including state standards. Regulatory uncertainty and disruption of existing and effective regulatory programs that inform and influence transportation electrification planning leads to unnecessary transaction and planning costs by causing confusion in the market. EPA must consider these reliance interests.

EPA also ignored reliance interests of states and other regulated sources on the GHG and ZEV standards that were incorporated into State Implementation Plans (SIPs) to achieve and maintain compliance with NAAQS and the Regional Haze program. Vehicles are a very significant source of criteria pollutant emissions, and California and the Section 177 States rely on GHG/ZEV standards to meet their CAA criteria pollutant obligations, as set forth in their respective SIPs. Without those state GHG and ZEV standards, the burden of additional criteria pollutant reductions would fall onto stationary sources—if it would even be possible to achieve the required reductions without state GHG/ZEV vehicle standards.[23]

Even if EPA had authority to revoke California's waiver once granted (which it did not), EPA's action was arbitrary and capricious because it failed to consider NCAT's investment-backed reliance on the States' continued authority to enforce their standards. *See* 84 Fed. Reg. at 51,331 (asserting "no cognizable reliance interests have accrued sufficient to foreclose EPA's ability to exercise [the authority to withdraw the granted CAA waiver]."). Indeed, the Supreme Court recently found arbitrary and capricious an agency's failure to properly assess the existence and strength of reliance interests impacted by a change in government policy, weigh those interests against competing policy concerns, and consider its flexibility to accommodate those interests. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1915 (2020). EPA should adequately consider these reliance interests in its review of the SAFE 1 waiver withdrawal decision.

EPA's disregard for reliance interests in SAFE 1 was particularly troubling given how much time had passed between EPA's 2013 Waiver and the 2019 waiver withdrawal. In SAFE 1, EPA stated that "[a]n agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time." 84 Fed. Reg. at 51,333 (citing *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977)). However, as the Court decided in *Mazaleski*, "absent unusual circumstances," a reasonable period of time "would be measured in weeks, not years." *Id.* EPA granted the waiver at issue more than six years before attempting to rescind it. In that time, significant industry reliance interests accrued based upon that waiver. EPA did not address these reliance interests when it sought to reverse course six years after the fact. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016) ("Agencies are free to change their existing policies . . . [but] [i]n explaining its changed position, an agency must also be cognizant that

---

[23] *See* Final Brief of Amicus Curiae Edison Electric Institute in Support of Petitioners, *Union of Concerned Scientists, et al. v. NHTSA*, No. 19-1230 (D.C. Cir. Oct. 27, 2020) at 10-14.

National Coalition for Advanced Transportation Comments – EPA-2021-0257

longstanding policies may have engendered serious reliance interests that must be taken into account" (internal quotations omitted)).

EPA must rescind its actions in SAFE 1 for all the reasons provided above.


**Counsel for NCAT:**          Stacey VanBelleghem
                               **Latham & Watkins LLP**
                               stacey.vanbelleghem@lw.com

                               Devin O'Connor
                               **Latham & Watkins LLP**
                               devin.o'connor@lw.com

15

R-133,    Comment submitted by the State
of California et al.

COMMENTS OF STATES AND CITIES
IN SUPPORT OF EPA REVERSING ITS SAFE 1 ACTIONS

July 6, 2021

Docket ID No. EPA–HQ–OAR–2021–0257
*via www.regulations.gov*

## INTRODUCTION

The State of California, by and through the California Air Resources Board (CARB) and California Attorney General Rob Bonta, along with the undersigned States and cities submit these comments in response to EPA's Notice of Reconsideration (86 Fed. Reg. 22,421 (Apr. 28, 2021)) concerning the actions EPA took in "SAFE 1" (84 Fed. Reg. 51,310 (Sept. 27, 2019)). We welcome EPA's reconsideration of its SAFE 1 actions and the opportunity to comment.

We urge EPA to reverse both actions it took in SAFE 1: 1) the withdrawal of the portions of the 2013 waiver covering California's greenhouse gas (GHG) and zero-emission-vehicle (ZEV) standards (Waiver Withdrawal) and 2) the conclusion that Section 177 of the Clean Air Act does not authorize other States to adopt California's GHG standards (Section 177 Determination). Both actions were unprecedented, unlawful, and ill-advised. Moreover, both actions were entirely unnecessary and upset long-settled reliance interests, including EPA-approved State Implementation Plans (SIPs) to meet National Ambient Air Quality Standards (NAAQS). In fact, many of the undersigned States are depending on emissions reductions from these standards to protect their residents and natural resources from multiple forms of harmful pollution, including smog, particulate matter, and the GHGs that are causing the growing climate change crisis. As discussed below, there are multiple grounds on which EPA can and should reverse its SAFE 1 actions.

**1.** EPA can and should reverse both its Waiver Withdrawal and its Section 177 Determination because those actions will increase harmful criteria pollution and have already, at a minimum, cast a cloud of uncertainty over approved SIPs. Nothing compelled EPA to take these actions, and EPA should not have taken discretionary actions that undermined public health protections and SIPs. Indeed, Congress has expressly prohibited federal agencies, including EPA, from taking actions that interfere with—or do not "conform" with—approved SIPs. EPA itself maintained throughout SAFE 1 that reducing criteria pollution and attaining and maintaining NAAQS is central to the Clean Air Act, generally, and Sections 209(b)(1) and 177, specifically. Yet, EPA nonetheless expressly opted to ignore its own prior findings concerning the criteria benefits of GHG and ZEV standards (including its approval of multiple SIPs containing those standards). EPA's disregard for the record was a clear violation of reasoned decision-making requirements, was inconsistent with its own assertions about the importance of reducing criteria pollution, and contravened the spirit (and letter) of the Clean Air Act's general conformity requirements. EPA can and should reverse its unnecessary SAFE 1 actions to correct those errors and restore the public health protections California's GHG and ZEV standards provide. And it may do so without regard to the conclusions it reaches on any of the other, alternative grounds discussed below.

JA-188

**2.** EPA should reverse its Waiver Withdrawal because it was *ultra vires*. EPA's authority to withdraw a previously granted waiver is questionable, at best. But whatever withdrawal authority EPA might have in other circumstances, that authority does not extend to withdrawing a six-year-old waiver, on which multiple States have relied and on which multiple SIPs rest, simply because EPA adopts different policy views concerning the scope of the waiver provision or because another agency has decided to articulate its policy views concerning an entirely different statute. Congress did not intend EPA to have, and precedent does not provide EPA with, authority to withdraw a previously granted waiver in these circumstances or on these grounds.

**3.** EPA should also reverse its decision to rely on a rule promulgated by the National Highway Traffic Safety Administration (NHTSA) as a basis for EPA's Waiver Withdrawal. EPA's decision to withdraw a previously granted waiver based on a factor entirely outside the three exclusive statutory criteria Congress established was unjustified and unlawful. Indeed, EPA's explanation for why it would look beyond those three criteria in this *and only this* proceeding was woefully inadequate. Reversing EPA's reliance on NHTSA's rule would require reinstatement of the waiver for California's GHG and ZEV standards for model years (MYs) 2017-2020 because EPA's reliance on NHTSA's rule was the sole basis for that part of the Waiver Withdrawal. That reinstatement would also correct the clear legal error the agency committed when it extended the Waiver Withdrawal to MYs 2017-2020 without notice.

**4.** EPA should also reverse its Section 209(b)(1)(B) Determination—its conclusion that California does not "need" its GHG and ZEV standards within the meaning of this provision. This, combined with EPA's reversal of its decision to rely on NHTSA's Preemption Rule, would require EPA to restore the waiver for California's GHG and ZEV standards for MYs 2021-2025. There are three independent and alternative grounds for reversing the SAFE 1 Section 209(b)(1)(B) Determination.

    **a.** EPA should revert back to its long-standing, traditional approach to this "need" inquiry—the one in which EPA considers California's need for its own mobile-source-emissions program as a whole, not whether California needs a particular standard for which it has requested a waiver. EPA can revert back to its traditional interpretation via one of two paths (or both, as alternatives). First, regardless of EPA's current views concerning its SAFE 1 approach, EPA can decide that it was unreasonable to apply that new approach to the long-settled 2013 waiver because doing so upended important reliance interests (including approved SIPs) and was particularly unnecessary given EPA's statement in SAFE 1 that its traditional approach remained a reasonable one. Second, EPA can readopt its traditional interpretation as its construction of Section 209(b)(1)(B) for the 2013 waiver and for waiver decisions going forward. Either way, EPA would have to reverse its Section 209(b)(1)(B) Determination and the portions of the Waiver Withdrawal resting on it because, even in SAFE 1, EPA did not and could not dispute that California still needs its own mobile-source emissions program.

    **b.** EPA should reverse its Section 209(b)(1)(B) Determination on the grounds that, even under the SAFE 1 single-standard approach to this need inquiry, California needs its GHG and ZEV standards because they produce criteria pollution benefits upon which California (and other States) depend. EPA originally concluded in 2013 that the ZEV standard reduces criteria pollutant emissions. And the records in SAFE 1 and here, as well as EPA's own SIP approvals, confirm that both the ZEV and GHG standards reduce criteria pollution. Nonetheless, EPA disavowed the existence of any such reductions, while expressly declining to consider any evidence to the contrary. EPA should now correct those errors and find that California's need for

these standards to meet the undisputed and severe challenges it faces regarding criteria pollution suffices to reverse EPA's SAFE 1 Section 209(b)(1)(B) Determination.

    **c.** EPA should also reinstate the Section 209(b)(1)(B) determination it made in 2013: that California needs standards that reduce its contributions to GHG emissions to address the extraordinary and compelling climate change conditions the State faces. EPA's reversal of that determination in SAFE 1 was based on new interpretations of Section 209(b)(1)(B) that should never have been applied both because it was unlawful to apply new policies to a long-settled waiver grant and because the new interpretations were unjustified and unreasonable. The records in SAFE 1 and here confirm EPA's prior position: that climate change conditions in California are "extraordinary" and the State needs to reduce its contributions to the emissions causing and exacerbating those conditions.

**5.** In addition, EPA should withdraw its Section 177 Determination for additional reasons beyond those referenced in point 1 above. EPA's Section 177 Determination can and should also be withdrawn because it was both *ultra vires* and an unreasonable interpretation of clear statutory text.

We also provide herein some additional information pertaining to the feasibility of automaker compliance with California's GHG and ZEV standards. To be clear, this information is *not* provided to support a determination under Section 209(b)(1)(C). As EPA made clear in SAFE 1 and in the Notice to which these comments respond, it did not finalize any changes to its 2013 analysis or decision under Section 209(b)(1) except as to Section 209(b)(1)(B). We agree with EPA that there are no issues before it concerning Section 209(b)(1)(C) or any other part of Section 209(b)(1). We are providing this additional information to underscore that automakers have been over-complying with California's GHG and ZEV standards and are expected to be able to continue to comply. Thus, there are no feasibility-related reasons not to reverse EPA's SAFE 1 actions.

We also explain below why neither CARB's 2018-2019 rulemaking to clarify its "deemed-to-comply" provision nor voluntary agreements between CARB and certain automakers are relevant to EPA's reconsideration of its SAFE 1 actions. Although these were mentioned in EPA's SAFE 1 decision, none of these CARB actions were a basis for EPA's SAFE 1 actions, none changed the GHG and ZEV standards for which EPA granted the waiver in 2013, and none have any bearing on California's need for those standards or any other issue raised by EPA's Notice.

In sum, we welcome EPA's decision to reconsider its SAFE 1 actions. We urge EPA to reverse those actions and observe that there are multiple, independent grounds on which it can do so.

<div align="center">

**BACKGROUND**

</div>

    **A.**   **The Original Waiver Provision**

When Congress enacted the original waiver provision in 1967, it recognized that California was already leading the Nation in regulating vehicular emissions. In fact, the State's "interest in pollution control from motor vehicles dates to 1946," *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* (*MEMA I*), 627 F.2d 1095, 1109 n.26 (D.C. Cir. 1979), and California's legislature mandated statewide motor vehicle emission standards beginning in the 1950s, *see* 1959 Cal. Stat. 2091. By contrast, "[n]o federal statute purported to regulate emissions from motor vehicles until 1965." *MEMA I*, 627 F.2d at 1108; *see also* Pub. L. No. 89-272, § 202, 79 Stat. 992 (1965).

<div align="center">

3

</div>

When Congress did authorize federal regulation in this space, automakers urged Congress to preempt all state regulation, citing fears of "having to meet fifty-one separate sets of emissions control requirements." *MEMA I*, 627 F.2d at 1109. Congress, however, recognized that "the entire country" had benefitted from California's serving as "a kind of laboratory for innovation," *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1080 (D.C. Cir. 1996). These "benefits for the Nation" included the "new control systems and design[s]," developed in response to California's technology-forcing standards. *MEMA I*, 627 F.2d at 1109–10 (quotation marks omitted); *see also* 38 Fed. Reg. 10,317, 10,318 (Apr. 26, 1973) (finding that waiver provision "has … made possible" "[i]nitial introduction of new emission control technology in California, followed by nationwide use in a later model year"). Congress also recognized the "harsh reality" of California's air pollution problems, the substantial contributions motor vehicles make to those problems, and the State's expertise in regulating vehicular emissions. H.R. Rep. No. 90-728, at 96-97 (1967); *see also* S. Rep. No. 90-403, at 33 (1967). For all these reasons, Congress chose to allow California to continue its technology-forcing leadership role—to continue "improv[ing] on 'its already excellent program' of emissions control," *MEMA I*, 627 F.2d at 1110 (quoting S. Rep. No. 90-403, at 33), over automaker objections that even two vehicular emission control regimes was too many, *see id.* at 1121 (citing H.R. Rep. No. 728, at 21-22).

Congress's careful compromise is reflected in Section 202, which requires EPA to regulate harmful emissions from new motor vehicles; Section 209(a), which preempts state regulation of new motor vehicle emissions; and Section 209(b)(1), which requires EPA to waive that preemption for California unless the agency makes one of three, narrow findings. That latter point—that EPA can only deny a waiver request on limited grounds—reflects the conclusion of a fierce debate in Congress. Specifically, Congress considered two versions of the original waiver provision at length. The Senate version provided that the waiver "shall" be granted (absent certain limited findings), while the House version provided that it "may" be granted. *See* 113 Cong. Rec. 30,956–57 (1967); *see also id.* at 30,950, 30,952. Advocates of the Senate's "shall" language described it as a "guarantee[]" that California could regulate, *id.* at 30,952, with the "burden … on the [agency] to show why California … should not be allowed to go beyond the Federal limitations," H.R. Rep. No. 90-728, at 96. By contrast, they viewed the "may" language of the House version as improperly placing California "at the mercy of the decision of one appointed head of a Federal department," forcing the State "to come with hat in hand to Washington." 113 Cong. Rec. at 30,941, 30,955; *see also* H.R. Rep. No. 90-728, at 96 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?"). Congress chose "shall," Pub. L. No. 90-148, § 208(b), 81 Stat. 501, and, by design, "the statute does not provide for any probing substantive review of the California standards by federal officials," *Ford Motor Co. v. EPA*, 606 F.2d 1293, 1301 (D.C. Cir. 1979). *See also* 40 Fed. Reg. 23,102, 23,103 (May 28, 1975) (recounting this "unusually detailed and explicit legislative history").

As EPA and courts have long recognized, this legislative history and the text that resulted from it reflect Congress's decision "to grant California the broadest possible discretion in adopting and enforcing standards for the control of emissions from new motor vehicles." *MEMA I*, 627 F.2d at 1128. Accordingly, with judicial approval, EPA has long applied "deferential standards" when reviewing California's waiver requests, and particularly when that review implicates California's policy judgments such as which pollutants and which vehicles to regulate. *Ford Motor Co.*, 606 F.2d at 1302; *see also e.g.*, 41 Fed. Reg. 44,209 44,210 (Oct. 7., 1976) (describing and applying

4

"EPA practice of leaving the decision on … controversial matters of public policy to California's judgment"); *MEMA I*, 627 F.2d at 1121 ("[Congress] sharply restricted [EPA's] role in a waiver proceeding.").[1] Put simply, "Congress meant to ensure by the language it adopted that the Federal government would not second-guess the wisdom of state policy here." 40 Fed. Reg. at 23,103.

## B.    The 1977 Amendments to the Waiver Provision

The original waiver provision appeared to require that each California standard be more stringent than its federal counterpart (if any). In 1977, Congress "expand[ed] the waiver provision so that California could enforce emission control standards which it determined to be in its own best interest even if those standards were in some respects less stringent than comparable federal ones." *Ford Motor Co.*, 606 F.2d at 1301. Under Congress's deliberate "elect[ion] to expand California's flexibility to adopt a complete program of motor vehicle emissions control[,] … California need only determine that its standards will be in the aggregate, at least as protective of public health and welfare than applicable Federal standards, rather than the more stringent standard contained in the 1967 Act." *MEMA I*, 627 F.2d at 1110 (internal quotation marks omitted).

Thus, the waiver provision, as amended in 1977, requires EPA to grant California a waiver unless the Administrator finds:

- the State's determination that its standards "will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards" is arbitrary and capricious;
- California "does not need such State standards to meet compelling and extraordinary conditions"; or
- "such State standards and accompanying enforcement procedures are not consistent with" Section 202(a) (which involves questions of technological feasibility and lead time).

42 U.S.C. § 7543(b)(1).

When it enacted these 1977 amendments, "Congress expressed general approval of the Administrator's waiver decisions," *MEMA I*, 627 F.2d at 1122 (citing H.R. Rep. No. 95-294, at 301 (1977)), which, as noted above, were deferential, especially to California's policy judgments. It also described these amendments as "ratify[ing] and strengthen[ing] the California waiver provision." H.R. Rep. No. 95-294, at 301 (1977). As the D.C. Circuit summarized it shortly thereafter:

> The history of congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation. Had

---

[1] Courts have also understood EPA's limited role in the broader legal context in which it sits, namely that challengers who "dislike the substance of the CARB's regulations, or … believe the procedures the CARB used to enact them were unsatisfactory, … are free to challenge the regulations in the state courts of California." *MEMA I*, 627 F.2d at 1105.

Congress wanted to limit California's role to forbid its adoption of [certain program components], it could have easily done so. It did not. For a court to do so despite the absence of such an indication would only frustrate the congressional intent.

*MEMA I*, 627 F.2d at 1110–11.

Under both the original provision and the amended version, California has continued to lead the Nation in vehicle emission control, often regulating before, or more stringently, than EPA. *See* CARB SAFE Comments at 23–48 (EPA-HQ-OAR-2018-0283-5054).[2] As Congress anticipated, these pioneering efforts have led to the development of emission control technologies that have ultimately been deployed nationwide (and even internationally) to protect public health and welfare. *See id.*[3] And EPA's practice of deferring to California's policy judgments continued, as Congress intended. *E.g.*, 43 Fed. Reg. 25,729, 25,736 (June 14, 1978); 49 Fed. Reg. 18,887, 18,891 (May 3, 1984).

### C. Section 177

In 1977, Congress also added a new, related provision to the Clean Air Act: Section 177. This section permits other States to adopt and enforce standards for which California receives a waiver, subject to three conditions:

- the State must have State Implementation Plan (SIP) provisions approved under Part D of Subchapter 1 of the Clean Air Act;

- the standards the State adopts and enforces must be identical to California's; and

- the State must provide auto manufacturers with at least two years of lead time.

42 U.S.C. § 7507. In enacting Section 177, Congress recognized, as it had in 1967, that California is not the only State that suffers from "automotive-related air pollution problems." H.R. Rep. No. 95-564, at 156 (1977) (Conf. Rep.); *see also* S. Rep. No. 90-403, at 33 (1967).

### D. Section 209(e)(2)(A)

In 1990, after more than twenty years of waiver requests and decisions, Congress enacted a new but very similar provision to the Clean Air Act: Section 209(e)(2)(A). 42 U.S.C. § 7543(e)(2)(A). Like the waiver provision, Section 209(e)(2)(A) authorizes EPA to waive preemption for California emission standards regulating mobile sources. Section 209(e)(2)(A) applies to a different type of vehicles and engines: those that operate off road, such as bulldozers,

---

[2] References to comments submitted in the SAFE proceeding are identified herein by the party or parties who submitted the comment (e.g., "CARB"). When these comments are first cited, the SAFE Docket ID is provided to clearly identify the document. Although we anticipate that the record from SAFE 1 is part of the record for this reconsideration proceedings, the cited comments are also being submitted into the docket for this proceeding along with these comments.

[3] *See also* Michael P. Walsh SAFE Comment at 1–3 (EPA-HQ-OAR-2018-0283-4029); M.J. Bradley & Associates, *California Transportation Policy Leadership: How California Led the World Toward Cleaner, Advanced Vehicles* (Oct. 2018) (EPA-HQ-OAR-2018-0283-4029).

graders, etc. To a significant extent, Section 209(e)(2)(A) mirrors Section 209(b)(1), requiring EPA to waive preemption unless EPA makes one of three findings. *Compare* 42 U.S.C. § 7543(b)(1), *with id.* § 7543(e)(2)(A). Most relevant here, the text of the "need" prong of Section 209(e)(2)(A) is identical to that of Section 209(b)(1) except that Congress replaced "State" with "California." Congress also adopted a provision similar to Section 177 that permits other States to adopt California's non-road standards, subject to similar conditions as those applicable under Section 177. *Id.* § 7543(e)(2)(B).

### E.   EPA's SAFE 1 Actions

In 2013, EPA granted California a preemption waiver under Section 209(b)(1) for the State's Advanced Clean Cars program. 78 Fed. Reg. 2,112 (Jan. 9, 2013) (Waiver Grant). That program combined multiple standards "into a single coordinated package of requirements for MY 2015 through 2025" light-duty vehicles. *Id.* It was designed to control a number of pollutants, including "smog and soot causing pollutants and GHG emissions." *Id.* Included in this coordinated package were Low Emission Vehicle (LEV) standards for criteria pollutants and for GHGs, as well as the State's Zero Emission Vehicle (ZEV) standard. *Id.* No one sought judicial review of EPA's decision to waive preemption for this program. Multiple States (Section 177 States) adopted California's standards, and EPA approved multiple State Implementation Plans containing some or all of these California standards.[4]

In 2018, EPA proposed to withdraw the portions of the 2013 waiver corresponding to California's GHG and ZEV standards (but not the criteria pollution standards that were part of the same program) for model years 2021-2025. 83 Fed. Reg. 42,986, 43,240 (Aug. 24, 2018). It proposed to do so on three grounds: 1) that NHTSA had proposed to promulgate a Preemption Rule stating that California's GHG and ZEV standards were preempted under the Energy Policy and Conservation Act (EPCA); 2) that, contrary to EPA's conclusion in 2013, California did not need these standards to meet compelling and extraordinary conditions under Section 209(b)(1)(B); and 3) that California's standards for these model years were technologically infeasible under Section 209(b)(1)(C)'s "consistency" requirement. *Id.* EPA also proposed to determine that Section 177 would not permit other States to adopt California's GHG standards, even if the State qualified to do so under Section 177 and California had a waiver for those standards. *Id.*

Most of the undersigned States and cities filed comments objecting to EPA's proposal and identifying numerous legal and other flaws therein. Nonetheless, in 2019, EPA finalized the Waiver Withdrawal on the first two grounds (including the Preemption Rule that NHTSA finalized at the same time). 84 Fed. Reg. 51,310, 51,328 (Sept. 27, 2019) (SAFE 1). EPA declined to make any feasibility findings under Section 209(b)(1)(C). *Id.* at 51,350. However, the agency appeared to expand the scope of the withdrawal beyond what it had proposed, seeming to assert that, based on EPA's reliance on NHTSA's Preemption Rule, the waiver for California's GHG and ZEV standards was "invalid, null, and void" for *all* model years (2017-2025), *id.* at

---

[4] 82 Fed. Reg. 42,233 (Sept. 7, 2017) (Maine); 81 Fed. Reg. 39,424 (June 16, 2016) (California); 80 Fed. Reg. 61,752 (Oct. 14, 2015) (Delaware); 80 Fed. Reg. 50,203 (Aug. 19, 2015) (Rhode Island); 80 Fed. Reg. 40,917 (July 14, 2015) (Maryland); 80 Fed. Reg. 13,768 (Mar. 17, 2015) (Connecticut).

51,328, whereas the proposal had been limited to MY 2021-2025, *id.* at 51,329.[5] EPA also finalized the Section 177 Determination. *Id.* at 51,350-51.

Most of the undersigned States and cities sought judicial review and submitted a petition for reconsideration to EPA (in addition to a separate, limited petition for reconsideration submitted by California through its Attorney General and the California Air Resources Board). Those legal challenges are fully briefed before the D.C. Circuit but are in abeyance while EPA and NHTSA reconsider their respective SAFE 1 actions. EPA also granted both of the above mentioned reconsideration petitions by letters on April 23, 2021.[6]

The undersigned States and cities welcome EPA's reconsideration and urge EPA to reverse its SAFE 1 actions.

## REASONS TO REVERSE EPA'S SAFE 1 ACTIONS

### I.    EPA SHOULD REVERSE ITS SAFE 1 ACTIONS BECAUSE OF THEIR SIGNIFICANT, ADVERSE CRITERIA POLLUTION CONSEQUENCES

Both of EPA's SAFE 1 actions—its Waiver Withdrawal and its Section 177 Determination—will increase criteria pollution that endangers public health and welfare. Both actions, at a minimum, cast a cloud of uncertainty over multiple already approved SIPs—state plans designed to reach or maintain the public-health-based standards EPA has set for criteria pollution levels. Yet, neither action was necessary. No statute compelled EPA to reconsider the 2013 waiver at all, let alone to apply new policies to that long-settled decision rather than to new waiver requests. EPA should not have taken discretionary actions that increase harmful criteria pollution and interfere with EPA-approved state plans to reduce that pollution. In so doing, EPA contravened the letter and the spirit of the Clean Air Act's general conformity requirements; created unexplained inconsistency with its own SAFE 1 position that reducing criteria pollution is of overriding importance; and, indeed, failed entirely to consider this important aspect of its actions. EPA should reverse both the Waiver Withdrawal and the Section 177 Determination to correct these errors, to protect public health and welfare, and to restore certainty to the affected SIPs. This reversal is, in fact, necessary to achieve consistency with the Clean Air Act's objectives and text concerning criteria pollution, as well as with the requirements of reasoned decision-making. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1064–65 (D.C. Cir. 2018) (vacating agency action that did "not demonstrate, or even acknowledge, that EPA considered … statutory objectives" and that, in fact, "undermine[d] these objectives without explaining why [doing so] was necessary"); *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Recognizing the well-documented, harmful criteria pollution consequences of EPA's unnecessary SAFE 1 actions also provides a more than sufficient "reasoned analysis for" reversing both of EPA's SAFE 1 actions, particularly since no reasonable reliance interests in those actions have developed. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

---

[5] *See also* Petition for Clarification and Reconsideration submitted by CARB and the California Attorney General (October 9, 2019).

[6] These reconsideration petitions and EPA's letters granting them are included in the materials submitted with this comment.

### A.    As EPA Acknowledged in SAFE 1, Protecting Public Health and Welfare by Reducing Criteria Pollution Is a Core Objective of the Clean Air Act

The core objective of the Clean Air Act is to reduce harmful air pollution, and one of the central mechanisms by which it seeks to do that are the NAAQS for criteria pollution and the implementation plans designed to attain those standards and then maintain that level of air quality (or better). *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (describing "the NAAQS" as "the engine that drives nearly all of Title I of the CAA"). These plans (SIPs) are so central to the Act's objectives, Congress has forbidden federal agencies from engaging in activities that do not "conform" to approved SIPs. 42 U.S.C. § 7506(c).

In SAFE 1, EPA itself repeatedly recognized the importance of reducing criteria pollution as a core objective of the Clean Air Act and, specifically, of Section 209(b)(1). *E.g.*, 84 Fed. Reg. at 51,344, 51,349. Indeed, EPA crafted its new interpretation of Section 209(b)(1)(B) on the (mistaken) notion that it limits the availability of waivers to criteria pollution standards. *See infra* at 33 (Section IV.C.1). EPA went so far as to assert that, under a proper understanding of Section 209(b)(1), "California's need for a GHG/climate program" should be "subordinat[e]" "to California's need for a criteria pollutant program." 84 Fed. Reg. at 51,339. Consistent with EPA's own statements—and the text and intent of the Act—EPA should have considered the criteria-pollution and SIP consequences of its Waiver Withdrawal and Section 177 Determination. It did not, and those consequences are more than sufficient reason to reverse EPA's actions.

### B.    California's GHG and ZEV Standards Provide Criteria Pollution Benefits

As the records in SAFE 1 and here demonstrate, and as EPA itself has repeatedly found, California's GHG and ZEV standards reduce emissions that contribute to criteria pollution, including ozone and particulate matter.

#### 1.    The Zero-Emission Vehicle Standard

As EPA acknowledged in SAFE 1, California's ZEV standard initially targeted only criteria pollution. 84 Fed. Reg. at 51,329 ("Up until the ACC [Advanced Clean Cars] program waiver request, CARB had relied on the ZEV requirements as a compliance option for reducing criteria pollutants."); *see also* 78 Fed. Reg. at 2,118. In the 2013 Waiver Grant, EPA correctly recognized that, with its Advanced Clean Cars program, California had shifted to relying on the ZEV requirements to reduce *both* criteria and GHG pollution. 78 Fed. Reg. at 2,114 (recognizing that the ZEV amendments in ACC were "designed to address" "near and long term smog issues" as well as "GHG emission reduction goals"). EPA also accepted CARB's demonstration of "the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards *and* the goals set forth by California's climate change requirements" and found that the ZEV standards would help California achieve those "long term emission benefits as well as … some [short-term] reduction in criteria pollutant emissions." 78 Fed. Reg. at 2,131 (emphasis added); *see also* CARB Waiver Support Document (May 2012) at 15–16 ("Waiver Request") (EPA-HQ-OAR-2012-0562-0004); CARB Nov. 2012 Supp. Comments (Nov. 14, 2012) at 4 (EPA-HQ-OAR-2012-0562-0373).

JA-196

Indeed, EPA found that CARB had "reasonably refute[d]" the contrary claim—that its ZEV standard would produce no criteria emission benefits. 78 Fed. Reg. at 2,125.[7]

EPA confirmed the ZEV standard's role in reducing criteria pollution yet again when it approved that standard into California's and other States' SIPs. 81 Fed. Reg. 39,424, 39,425 (June 16, 2016) (California).[8] EPA acknowledged this in SAFE 1: "EPA reviewed [and approved] California's SIP submission, including ZEV measures, *as a matter of NAAQS compliance strategy*." 84 Fed. Reg. at 51,337 (emphasis added). Similarly, EPA has approved CARB's EMission FACtor (EMFAC) emission inventory model as a tool to estimate emissions and develop implementation plans to attain the NAAQS. *See* 80 Fed. Reg. 77,337 (Dec. 14, 2015) (EMFAC2014 approval); 84 Fed. Reg. 41,717 (Aug. 15, 2019) (EMFAC2017 approval). Both EMFAC2014 and EMFAC2017 reflect the emission benefits of CARB's motor vehicle pollution control program, including its GHG and ZEV standards. EPA's approval of these models is further indication that EPA recognizes the emission reductions benefits of these programs.

In SAFE 1, EPA identified no record evidence that would support reversing its prior conclusions. And, in fact, CARB's comments in the SAFE 1 proceeding confirmed that EPA's prior findings were correct: that the ZEV standard reduces criteria pollution. For example, CARB modeled the consequences of the actions proposed in SAFE, which included withdrawing California's waiver for its GHG and ZEV standards and freezing the federal GHG standards at MY 2020 levels. CARB concluded those actions, which would eliminate California's ZEV and GHG standards and leave in place only federal GHG standards at MY 2020 levels, would increase NOx emissions in the South Coast air basin alone by 1.24 tons per day. CARB SAFE Comments at 288, 308. While that figure combined the effects of replacing both California standards with a weaker federal standard, it nonetheless demonstrated that invalidating the state standards would have adverse criteria pollution consequences—including in the area of the country with the worst ozone challenges.

CARB's additional analysis submitted in this docket provides still more confirmation and documentation of the criteria pollution benefits of the ZEV standard. *See* Appendix A at 2–5 (estimating criteria pollution benefits of replacing conventional vehicles with ZEVs); Appendix B at 11–15 (describing the importance of ZEVs for reducing pollution in overburdened communities).

### 2. The GHG Standard

EPA has also found that vehicular GHG emission standards reduce criteria pollutant emissions. For example, when it adopted its federal GHG standards for the same period at issue here (MY2017-2025), EPA found that those standards would reduce emissions of most criteria pollutants, including those, like VOCs and PM2.5, related to California's well-documented challenges with criteria pollution. 77 Fed. Reg. 62,624, 62,899 (Oct. 15, 2012). California's

---

[7] Congress, too, has recognized that ZEVs and California's ZEV standards reduce criteria pollution. 42 U.S.C. § 7586(f) (authorizing credits for zero-emission vehicles, defined "as closely as possible" as in "standards which are established by the State of California," as part of state plans to attain criteria-pollution standards).

[8] *See also* 82 Fed. Reg. 42,233, 42,235 (Sept. 7, 2017) (Maine); 80 Fed. Reg. 40,917, 40,920 (Jul. 14, 2015) (Maryland); 80 Fed. Reg. 13,768, 13,769 (Mar. 17, 2015) (Connecticut).

GHG standards are roughly equivalent to those EPA promulgated in 2012 and will, therefore, have similar criteria pollution benefits, albeit on a smaller (state) scale. If there were any doubt, EPA confirmed this connection again by approving California's GHG standards into multiple State SIPs,[9] and into California's EMFAC models, *see supra* at 33. And CARB likewise confirmed this connection in its SAFE comments. CARB SAFE Comments at 288, 308.

In addition, as EPA has previously recognized, reducing the GHGs that are causing climate change is important to mitigate increases in ozone formation. *E.g.*, 81 Fed. Reg. 73,478, 73,486 (Oct. 25, 2016) ("[C]limate change is expected to increase ozone pollution over broad areas of the U.S., including in the largest metropolitan areas with the worst ozone problems, and thereby increase the risk of morbidity and mortality."); 74 Fed. Reg. 32,744, 32,763 (July 8, 2009) ("California has made a case that its greenhouse gas standards are linked to amelioration of California's smog problems."). The record in the SAFE proceeding confirmed these criteria pollution benefits of reducing GHGs. *E.g.*, Multi-State SAFE Comments at 24 (EPA-HQ-OAR-2018-0283-5481).[10]

The fact that CARB's 2012 waiver request did not specifically call out the criteria pollution benefits of its GHG standard does not undermine EPA's findings or the record evidence. CARB "performed a combined … emissions analysis" of all components of the Advanced Clean Cars program because that program was designed to work as an integrated whole and because EPA has always considered California's emissions reductions in the aggregate. ZEV Initial Statement of Reasons at 72 ("ZEV ISOR") (EPA-HQ-OAR-2012-0562-0008); CARB Nov. 2012 Supp. Comments at 3. As CARB noted at the time, even those objecting to the waiver "concede[d]" the Advanced Clean Cars standards were "interrelated." CARB Nov. 2012 Supp. Comments at 3. The GHG standards contribute to the combined benefits of the integrated program, as EPA's prior findings confirm.

Although no further evidence is required to establish that state GHG standards produce criteria pollution benefits, CARB nonetheless submits its latest analysis of the criteria pollution benefits of its GHG standards. Appendix C. CARB's analysis estimated those benefits for the calendar years by which the South Coast air basin must meet increasingly stringent NAAQS for ozone: 2023, 2031, 2037. The estimated statewide NOx emission benefits are as follows:

- 51-67 fewer tons per year, or 0.15-0.18 tons per day, in calendar year 2023;

- 297-358 fewer tons per year, or 0.86-1.03 tons per day, in calendar year 2031; and

- 404-483 fewer tons per year of NOx, or 1.16-1.39 tons per day, in calendar year 2037.

---

[9] 82 Fed. Reg. 42,233 (Sept. 7, 2017) (Maine); 80 Fed. Reg. 61,752 (Oct. 14, 2015) (Delaware); 80 Fed. Reg. 50,203 (Aug. 19, 2015) (Rhode Island); 80 Fed. Reg. 40,917 (July 14, 2015) (Maryland).

[10] *See also* U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, at 514, 518 (2018) (EPA-HQ-OAR-2018-0283-7447); Union of Concerned Scientists, *Climate Change and Your Health: Rising Temperatures, Worsening Ozone Pollution* at 2–3 (June 2011) (EPA-HQ-OAR-2018-0283-5683).

*Id.* at 2–3. To place these figures in context, mobile-source NOx emissions in the South Coast air basin—which is in extreme non-attainment for ozone—must be reduced by more than half of 2021 levels by 2023, with further, deep reductions required for later years. *Id.* at 8. Every ton, and every fraction of a ton, of emission reductions is absolutely necessary in that region and in the multiple other regions of California in which ozone levels threaten public health and welfare. For these reasons, CARB has included its GHG standards in a recent SIP submittal, as multiple States have already done (and EPA has approved).

**C.    EPA's Refusal to Consider the Criteria Pollution Consequences of Its SAFE 1 Actions Contravened the Clean Air Act and Reasoned Decision-Making Requirements**

Despite acknowledging California's criteria pollution challenges and the importance of addressing those challenges under the Act, EPA expressly declined to consider the criteria emission consequences of 1) withdrawing the waiver for California's GHG and ZEV standards and 2) determining that other States may not adopt California's GHG standards under Section 177. EPA claimed that California had asserted no criteria benefits from these standards in its 2012 waiver application and that considering those benefits in SAFE 1 would, therefore, contravene EPA's practice "not to scrutinize California's criteria pollutant emissions reductions projections or air emissions benefits." 84 Fed. Reg. at 51,349 n.284. Thus, EPA chose to ignore the record and its own prior findings and to treat "elevated atmospheric concentrations of greenhouse gases" as the only "air pollution problem at issue" in SAFE 1. 84 Fed. Reg. at 51,346. Agencies cannot disregard the relevant evidence before them, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 313 (D.C. Cir. 2018), and this general principle applies to waiver proceedings, *MEMA I*, 627 F.2d at 1122. EPA's purported rationale does not support its deliberate decision to ignore the criteria pollution consequences of its SAFE 1 actions or otherwise cure EPA's multiple legal errors.

First, the premise of EPA's claim is false: California *did* assert criteria benefits from its standards in the 2012 waiver proceeding. In fact, EPA accepted those assertions. 78 Fed. Reg. at 2,125. CARB established that the ZEV standard would address criteria pollution in two ways: 1) by reducing emissions associated with the production, transportation, and distribution of gasoline; and 2) by driving the commercialization of zero-emission-vehicle technologies necessary to reduce future emissions and achieve California's long-term air quality goals. Waiver Request at 16 (quantifying criteria benefits from resulting from ZEV standards by 2030); *id.* at 22 (describing "ZEV technology commercialization and long-term GHG and *criteria emission goals*" as "one of the [ZEV] program's primary objectives") (emphasis added). The California rulemaking material CARB submitted made these same two points, stating that "[t]he ZEV regulation … remains critically important to California's efforts to meet health based air quality goals." ZEV ISOR at ES -1; *see also id.* at 72 ("ZEVs are needed as a critical part of the future California fleet to achieve … critical criteria pollutant emission reductions"); CARB Nov. 2012 Supp. Comments at 3–4 ("[W]e need these technologies to be commercialized by 2025 to reach smog forming … reduction targets long term."). As the record made clear, the ZEV standard was always intended to drive the commercialization of zero-emission technologies to reduce criteria pollution and achieve California's long-term air quality goals. The fact that CARB decided the ZEV standard could *also* advance the State's long-term GHG emission reduction goals did not change that. *See* Waiver Request at 2 (describing "shifting the focus of the ZEV regulation to

12

*both* GHG and criteria pollutant emission reductions") (emphasis added). CARB did not "present[] its ZEV program to EPA solely as a GHG compliance strategy." *See* 84 Fed. Reg. at 51,337.

Second, all federal agencies, including EPA, are required to "conform" their actions to approved SIPs, meaning agencies are prohibited from taking actions—like EPA's SAFE 1 actions—that undermine approved plans. 42 U.S.C. § 7506(c). EPA acknowledged in SAFE 1 that it had approved multiple SIPs containing one or both of the California standards it effectively invalidated in SAFE 1. 84 Fed. Reg. at 51,388 n.256. EPA also acknowledged, perhaps inadvertently, CARB's comments in SAFE 1 that called attention to the SIP risks EPA's actions would create. 84 Fed. Reg. at 51,337 n.251 (quoting CARB's SAFE 1 Comments at 373: ''This increasing ZEV deployment is critical to achieving the statewide 2030 and 2045 GHG requirements *and 2031 South Coast SIP commitments* (the 2016 State SIP Strategy identified the need for light-duty vehicles to reduce NOX emissions by over 85 percent by 2031 to meet federal standards)" (emphasis added)).

EPA's deliberate decision to ignore any and all evidence of the criteria pollution consequences of its actions—including consequences for the approved SIPs—plainly contravened its conformity obligations. *See* CARB SAFE Comments at 288 ("The federal proposal to rollback vehicle standards and withdraw Clean Air Act preemption waivers granted to California for its GHG standards and Zero Emissions Vehicle (ZEV) mandate will not allow California to achieve the 2031 South Coast SIP commitments or statewide 2030 and 2045 GHG requirements."); *id.* at 308 ("California's ZEV regulation is a practical necessity to meeting the National Ambient Air Quality Standards for ozone."). Indeed, EPA did not even conduct the initial step of a conformity analysis, despite a comment demanding that it do so. South Coast Air Quality Management District SAFE Comments at 2–3 (EPA-HQ-OAR-2018-0283-4124).

In its SAFE 1 brief, EPA tried to justify this failure, asserting exceptions to conformity and purporting to adopt NHTSA's inadequate conformity analysis. Respondents' Final Br. (Respondents' Br.) at 104–105 (*UCS v. NHTSA*, D.C. Cir. No. 19-1230 and consolidated). None of those justifications withstands scrutiny (and, notably, EPA asserted none of them in SAFE 1 itself). *See* Final Reply Br. of State & Local Gov't Petitioners and Public Interest Petitioners at 17. But even if the general conformity requirements somehow did not apply, EPA's discretionary actions in SAFE 1—and its refusal to even consider the criteria pollution consequences of those actions—plainly contravened the spirit of those requirements. EPA's statement that it might address the consequences of SAFE 1 for those SIPs at a later date, 84 Fed. Reg. at 51,833 n.256, only underscores the point: there were such consequences and EPA failed to even begin to grapple with them. The serious tension with—if not violation of—EPA's conformity obligations is more than sufficient reason to reverse its SAFE 1 actions.

Third, having claimed that criteria pollution reduction is the primary, if not sole, purpose of Section 209(b)(1), EPA could not lawfully ignore the comments and record evidence indicating that its SAFE 1 actions would increase that very pollution. 84 Fed. Reg. at 51,350 n.285 (asserting "section's original purpose [was] addressing smog-related air quality problems"); *id.* at 51,350 (claiming Section 177 was enacted solely to facilitate the struggle to attain NAAQS); *State Farm*, 463 U.S. at 43. EPA's SAFE 1 actions purported to put criteria pollution "at the center of its reasoning." *See Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 15

13

(D.C. Cir. 2015). EPA's "refus[al] to engage" the record on that pollution rendered EPA's actions internally inconsistent and unlawful. *Id. See also MEMA I*, 627 F.2d at 1122 ("[The Administrator] must consider all evidence that passes the threshold test of materiality.").

Fourth, and finally, EPA did not even consistently apply the principle it articulated as its rationale for ignoring criteria pollution consequences. While EPA (correctly) does not "scrutinize" California's projections of emission reductions it anticipates from the State's standards, 84 Fed. Reg. at 51,349 n.284, if EPA had truly applied that principle in SAFE 1, it would have *accepted California's demonstration* of criteria benefits, not declined to consider it. Moreover, application of that principle precludes EPA from quibbling with California's *quantification* of projected emission benefits. It does not permit EPA to disregard all evidence that pollution reduction benefits will occur. *See Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action."); *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 178 (D.C. Cir. 2005) ("[Agency's] decision does not withstand review because the agency decisionmaker *entirely ignored* relevant evidence.").

### D. EPA Should Reverse Its Unnecessary SAFE 1 Actions to Correct Its Errors and Restore Public Health Protections

As the Clean Air Act's general conformity provision makes clear, EPA should not take discretionary, unnecessary actions that undermine approved SIPs. Likewise, EPA should not take discretionary, unnecessary actions that increase criteria pollution and the risks it poses to public health and welfare. Yet that is what EPA did in SAFE 1. EPA can and should reverse its SAFE 1 actions to protect public health and welfare and return certainty to approved SIPs designed to do just that.

EPA can reverse its actions on this ground, regardless of its position on any of the alternative grounds described below. Nothing *required* EPA to reconsider its 2013 decision, to adopt new policy positions, or to apply those new positions to a long-settled waiver grant. EPA never claimed otherwise; nor could it have. At a minimum, then, EPA has discretion to reverse these decisions, so long as it acknowledges it is doing so and provides an explanation for changing course. And, because no reasonable reliance interests have attached to EPA's SAFE 1 actions and EPA's reversal would comport with precedents governing reconsideration of adjudications, the agency need only provide "good reasons" for changing course, *Fox Television*, 556 U.S. at 515. Protecting public health, complying with the spirit (and letter) of the law, advancing the statute's objectives, and correcting violations of reasoned decision-making principles are all "good reasons" here, again regardless of what decisions EPA makes on the other strong bases for reversal discussed below.

EPA's reversal and reinstatement of the waiver on this ground would not contravene the principles governing reconsideration of adjudications as its SAFE 1 actions did. First, unlike SAFE 1, this reversal would not be unreasonably delayed. Although EPA did not open this proceeding within the period for initiating judicial review, many petitioners, including CARB, did initiate judicial review within the statutorily prescribed period, and those consolidated cases have not yet been resolved. Thus, unlike in SAFE 1, EPA would not be reconsidering a settled decision for which the period of judicial review had long ago run without a single challenge

14

being filed. *See Nat'l Ass'n of Trailer Owners, Inc. v. Day*, 299 F.2d 137, 138 (D.C. Cir. 1962) (holding reconsideration period reasonable where permanency of adjudication was not "assumed by either of the parties" involved). Second, EPA's reversal would be based on 1) honoring the policies long extant in the Clean Air Act regarding the importance of reducing criteria pollution, 2) factual findings (which the agency should re-confirm here) concerning the criteria pollution benefits of these standards, and 3) the need to correct plain legal errors. The reversal would not be impermissibly based on changes in agency policy as SAFE 1 was.

In addition, no reasonable reliance interests can have attached to EPA's SAFE 1 actions. Those actions were challenged immediately, and that litigation is unresolved. Where, as here, "[t]he state of the law has never been clear, and the issue has been disputed since it first arose," reliance is generally unreasonable. *Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1207 (D.C. Cir. 1996). Automakers and others who may claim to have relied on EPA's SAFE 1 actions did so unreasonably, "in the face of considerable uncertainty." *Id.* The automakers who intervened to defend EPA's SAFE 1 actions confirmed as much in their filings in the D.C. Circuit. They asked the Court to expedite the SAFE 1 litigation, asserting that they *could not rely* on EPA's actions, and, until the litigation was resolved, they would have to prepare to comply with California's standards as well as EPA's. Intervenors' Motion for Expedited Consideration at 11 (*UCS v. NHTSA*, D.C. Cir. No. 19-1230) ("[W]hile Petitioners' challenge is pending, Movants' members will continue to face multiple, overlapping, and inconsistent regulations, and will be required to expend unrecoverable resources developing production plans preparing for this possibility—even if California's separate standards are later deemed to be illegal."); *see also id.* at 14 ("Prompt resolution of this case is thus necessary to provide Movants' members with a clear answer regarding California's authority to regulate."). Put simply, these automakers—the only ones who sought to defend EPA's SAFE 1 actions—told the Court that those actions did "not serve as a guide to lawful behavior." *See Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2179 (2019) (internal quotation marks omitted). Thus, the automakers (and those affected by their decisions) had "no reliance interests" in those actions. *See id.*

Consistent with the Clean Air Act and the agency's own statements in SAFE 1, EPA should reverse both of its SAFE 1 actions to eliminate uncertainty it created regarding already approved SIPs and to restore the public health protections California's GHG and ZEV standards provide.

## II.  EPA SHOULD REVERSE ITS SAFE 1 WAIVER WITHDRAWAL BECAUSE THAT ACTION WAS OUTSIDE EPA'S AUTHORITY

EPA is "a creature of statute" with "only those authorities conferred upon it by Congress." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). Thus, EPA may act "only if some provision or provisions of the [Clean Air] Act explicitly or implicitly grant it power to do so." *HTH Corp. v. NLRB*, 823 F.3d 668, 679 (D.C. Cir. 2016). Neither Section 209(b)(1) nor any other section of the Clean Air Act explicitly authorizes EPA to withdraw a previously granted waiver in whole or in part. Section 209(b)(1) refers only to EPA's action to "grant[ ]" or not grant a waiver requested by California. *See* 42 U.S.C. § 7543(b)(1). It makes no mention of, let alone explicitly authorizes, withdrawals of previously granted waivers. Section 209(b)(1) likewise does not implicitly authorize waiver withdrawals, and, even if it did so under some circumstances, EPA's SAFE 1 Waiver Withdrawal was far outside those bounds. EPA should reverse that withdrawal on the grounds that it was *ultra vires*.

In SAFE 1, EPA asserted that the authority to withdraw a waiver is implicit in Section 209(b)(1). 84 Fed. Reg. at 51,332 (quoting S. Rep. No. 90–403, at 34 (1967)). That position suffers from multiple flaws. It fails to recognize the difference between a decision to grant or deny a waiver in the first instance—the decision explicitly authorized by the provision—and a decision to withdraw a previously granted waiver. The former prevents States from beginning to enforce and otherwise implement a regulation or program; the latter derails a state program already in effect and underway (possibly in multiple States). The sovereign and reliance interests at stake in the latter would be far stronger, as Congress was well aware, having invited some of those interests to develop. Specifically, in Section 177, Congress invited other States to rely on EPA's waivers by adopting California's standards as their own—an act that would obviously become the basis for state planning and other exercises of sovereign police powers. Congress also invited States to rely on EPA's waivers by including California standards in their SIPs to attain or maintain NAAQS. Congress believed so strongly in the importance of those plans that it expressly forbade federal agencies from interfering with them after EPA approval. It would be quite surprising, then, for EPA to have *implicit* authority to upend this multi-actor, multi-step scheme by pulling the rug out from under it after the fact. *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 840 (D.C. Cir. 1984) (rejecting "implied power" as "contrary to the intention of Congress and the design of" the Act).[11]

But EPA need not reach the general question of withdrawal authority and its particular bounds here because EPA's SAFE 1 action was plainly *ultra vires* under any view of EPA's withdrawal authority. As a threshold point, EPA's sole source of support for its authority was a single sentence from 1967 legislative history that does not establish any withdrawal authority and, in any event, does not establish authority for the SAFE 1 withdrawal. EPA's selected snippet predated both the creation of the NAAQS program and Congress's invitations to the development of numerous state reliance interests in waiver grants. Moreover, EPA's legislative history stated a view that the Administrator had an "implicit … right … to withdraw" *if* he or she found "that the State of California *no longer complies with the conditions of the waiver*.'' S. Rep. No. 90–403, at 34 (1967) (emphasis added). But EPA made no such finding in SAFE 1. Indeed, EPA's SAFE 1 withdrawal was not predicated on any finding that California was conducting its program differently than anticipated at the time the waiver was granted or on any factual finding at all. Quite the contrary: EPA's action was based entirely on its own changed policy positions, namely its reinterpretation of Section 209(b)(1) to create a categorical bar against state regulation of vehicular GHG emissions and its decision to rely on another agency's newly articulated views of a different statute. None of those bases involved California's compliance with "conditions of the waiver." EPA's action was, thus, outside even the authority to which EPA attempted to lay claim.

In addition, Section 209(b)(1) cannot provide implicit authority to revoke on grounds—including NHTSA's Preemption Rule—that are entirely outside its scope. The waiver provision provides three, and only three, criteria upon which EPA can deny a waiver. If EPA must grant a waiver

---

[11] The importance and complexity of the structure Congress chose to allow States and EPA to build on top of granted waivers indicates, at a minimum, that any withdrawal authority EPA has is constrained and is plainly not capacious enough to include changes in policy views of the kind that underlay SAFE 1.

absent satisfaction of one of those three criteria (and it must), it cannot have *broader, implicit* authority to revoke such a grant on entirely different grounds.

Finally, any withdrawal authority EPA might have must be exercised consistent with the principles and precedents governing agency actions, generally, and reversals of informal adjudications, specifically.[12] As the constraints of Section 209(b)(1) itself indicate, Congress has not "countenance[d]" the "ill-conceived revisory power" EPA claimed in SAFE 1—where "[w]aivers granted after the statutorily-prescribed determination … would be open to revocation at any time, based on any evidence, subject to no substantive or procedural safeguards." *Am. Methyl Corp.*, 749 F.2d at 835. At a minimum, precedent requires 1) that reversals of informal adjudications occur within a reasonable time after the original decision (*id.*); 2) that the agency consider reliance interests that have attached to its original decision (*Chapman v. El Paso Nat. Gas Co.,* 204 F.2d 46, 53–54 (D.C. Cir. 1953); *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914 (2020)); and 3) that the reversal is not for "the sole purpose of applying some … change in administrative policy" (*Chapman*, 204 F.2d at 53–54.; *see also United States v. Seatrain Lines Inc.*, 329 U.S. 424, 429 (1947)).[13] EPA's Waiver Withdrawal violated each and every one of these principles.

1.  By any measure, six years was too long a delay for EPA's reconsideration to be lawful. That period was well beyond the "weeks, not years" sometimes referenced as guidance for reasonableness. *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977). Likewise, the period for seeking judicial review had long ago run, *Am. Methyl Corp.*, 749 F.2d at 835, and, in fact, no one had sought that review.

2.  EPA refused to consider the reliance interests that had attached to its 2013 Waiver Grant. At the time EPA proposed SAFE 1, twelve other States had relied on EPA's 2013 Waiver Grant and adopted one or both of the California standards as their own. Multi-State SAFE Comments at 130. California and those Section 177 States further relied on the 2013 Waiver Grant in developing their long-term plans to control various forms of air pollution—including plans to reach state GHG and air quality targets as well as SIPs to attain or maintain compliance with NAAQS. *Id.* at 131.

These reliance interests are weighty. *See Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (describing as "important" state and local governments' reliance interests in "long-term plans" based on federal agency actions). The Clean Air Act and long-standing Executive branch policy both place substantial importance on States' interests in implementing

---

[12] EPA has long maintained (including in in SAFE 1) that its waiver actions are informal adjudications. *E.g.*, 84 Fed. Reg. at 51,337 (SAFE 1); 74 Fed. Reg. at 32,781 ("EPA believes that its waiver proceedings and actions therein should be considered an informal adjudication…. EPA has been conducting its waiver proceedings in this manner for decades, and while Congress has amended provisions in section 209 on two separate occasions, Congress has not chosen to alter EPA's administrative requirements. Instead, Congress has expressed support for EPA's practice in applying and interpreting section 209(b).").

[13] Some statutes may also grant agencies the authority to correct ministerial errors in their original adjudications. *See Am. Trucking Ass'ns v. Frisco Transp. Co.*, 358 U.S. 133, 145 (1958). EPA's SAFE 1 action was not a correction of a ministerial error, nor did EPA claim that it was.

the plans and laws they have determined best meet the needs of their States. *E.g.*, 42 U.S.C. §§ 7401(a)(3), (a)(4), (b)(3), 7416; 64 Fed. Reg. 43,255 (Aug. 10, 1999) (E.O. 13132). And, at bottom, the States' interests here are in protecting their residents and natural resources from harm, precisely as the Clean Air Act intends. *E.g.*, 42 U.S.C. §§ 7401(c), 7506. Moreover, because achievement of the NAAQS and many other air pollution goals requires long-term plans that often cannot change easily or quickly, upending those plans causes serious disruptions that could require years of additional state planning (and attendant expenditures of state resources) and could result in the imposition of unexpected regulatory burdens on various parties to ensure the achievement of public health and welfare objectives. And, as EPA well knows, States face serious consequences for not achieving NAAQS goals, only enhancing the significance of reliance interests here for States relying on California's GHG and ZEV standards as part of their plans to achieve those goals. Other parties, including industry groups, also identified significant reliance interests, including sizable investments and their own long-range planning, in California's standards. Yet, EPA gave these reasonable, explained, and serious reliance interests no weight at all.

Instead, EPA asserted that no reliance interests could reasonably attach to the 2013 Waiver Grant because EPA had agreed, in 2012, to conduct a Mid-Term Evaluation of its own *federal* GHG standards. 84 Fed. Reg. at 51,335. The mere fact that an agency *might* change its standards in the future is insufficient to undercut reliance interests in already promulgated standards. To conclude otherwise would suggest that no reliance interests in regulations are reasonable given that, as EPA itself forcefully asserted in SAFE 1, agencies can generally reconsider their own regulations for prospective application. *See* 84 Fed. Reg. at 51,333. Indeed, the requirement that agencies "provide a more detailed justification" when replacing a "prior policy [that] has engendered serious reliance interests" demonstrates that substantial and reasonable reliance interests can attach to policies that are subject to change. *See Fox Television*, 556 U.S. at 515. But, even accepting *arguendo* that EPA's Mid-Term Evaluation commitment could undercut the reasonableness of reliance on the *federal* standards adopted in 2012, that commitment would remain immaterial to reliance on *California's* separate standards.

Notably, EPA pointed to no "express limitations," *Regents of the Univ. of California*, 140 S. Ct. at 1914, or anything else that would have provided "explicit notice" that EPA might reconsider that waiver decision as part of EPA's Mid-Term Evaluation or otherwise, *Solenex LLC v. Bernhardt*, 962 F.3d 520, 528 (D.C. Cir. 2020). EPA's Mid-Term Evaluation regulation speaks only of the *federal* standards and nowhere mentions *California's*. 40 C.F.R. § 86.1818–12(h). Given that EPA had never before withdrawn a waiver in more than fifty years of waiver practice, the absence of any indication from EPA that this particular waiver was unsettled speaks volumes.[14] Moreover, EPA entirely failed to consider the self-evident state (and state resident)

---

[14] CARB's inclusion of a "deemed-to-comply" provision, under which CARB would accept compliance with EPA's GHG standards as compliance with California's GHG standards, does not aid EPA's contention. *See* 84 Fed. Reg. at 51,335. As California made clear at the time it adopted that provision, acceptance of federal compliance was conditioned on the federal standards "provid[ing] equivalent or better overall greenhouse gas reductions in the state compared to California's program." CARB Initial Statement of Reasons to Consider Proposed Amendments to the LEV III GHG Emission Regulation at 6 ("DTC Clarification ISOR"); *see also infra* at 57 (Section VI.A.1). The "deemed-to-comply" provision did not, then, undercut

reliance interests in EPA-approved State Implementation Plans containing one or both of these California standards, going so far as to indefinitely postpone this consideration. 84 Fed. Reg. at 51,338 n.256. This failure is particularly noteworthy given Congress's clear indication that it shares the interests of these States in the ongoing validity and effectiveness of their approved SIPs, such that federal agencies are prohibited from undercutting those plans. 42 U.S.C. § 7506(c)(1). EPA's rejection of the substantial reliance interests in the 2013 Waiver was unjustified. And EPA's failure to adequately consider those interests—including its failure to determine that they were outweighed by some (unidentified) need to take this action—renders its action unlawful. *Chapman*, 204 F.2d at 54; *Regents of the Univ. of California*, 140 S. Ct. at 1914.

3. EPA chose to *sua sponte* reconsider its 2013 Waiver Grant for the sole purpose of applying new policy determinations, as reflected in the two bases for the Waiver Withdrawal. EPA chose, for the first time, to rely on NHTSA's views of EPCA preemption and its Preemption Rule. EPA also chose to depart from its long-standing interpretations of Section 209(b)(1)(B), to adopt new interpretations that served only to categorically bar state standards that reduce vehicular GHG emissions, and to apply those new interpretations to a six-year-old, settled decision. EPA thus acted for "the sole purpose of applying some … change in administrative policy," *Chapman,* 204 F.2d at 53–54, and neither precedent nor some implicit power in Section 209(b)(1) authorized it to do so.

EPA lacked authority for its Waiver Withdrawal, even if it has some withdrawal authority, because this action flouted every constraint on an agency's authority to reconsider a settled adjudication. EPA should reverse its *ultra vires* action.

### III.  EPA SHOULD REVERSE ITS DECISION TO RELY ON NHTSA'S PREEMPTION RULE AND REINSTATE THE WAIVER FOR MODEL YEARS 2017-2020

EPA should reverse its decision to rely on NHTSA's Preemption Rule as a basis for a Waiver Withdrawal. We note that NHTSA has proposed to repeal its unlawful and unwarranted Preemption Rule. But, regardless of whether NHTSA finalizes that repeal, EPA should reverse its decision to rely on NHTSA's Rule.

In its Notice, EPA asked whether "EPA has the authority to withdraw an existing waiver based on a new action that is beyond the scope of section 209 of the CAA." 86 Fed. Reg. at 22,429. As discussed above, the answer is no. Whatever reconsideration authority EPA may have (*but see supra* at 16), EPA may not reconsider a settled waiver grant simply because the agency has changed its mind on policy matters, *supra* at 19, and particularly cannot do so when the result upends weighty reliance interests and EPA-approved SIPs, *supra* at 17. EPA's decision to look outside the three Section 209(b)(1) criteria—for the first time—was precisely the kind of policy

---

California's reliance interests in the emissions benefits of its own standards because, as EPA noted in 2013, California always intended its standards would "remain an important backstop in the event the national program is weakened or terminated." 78 Fed. Reg. at 2,128. Moreover, that provision only applies to the GHG standard, and EPA never attempted to explain how its Mid-Term Evaluation commitment or the "deemed-to-comply" provision undercut reliance interests in the ZEV standard.

change that may not be applied to a settled waiver grant, as was NHTSA's decision to promulgate a Preemption Rule and EPA's decision to rely on another agency's action.

But, even if EPA had the authority to rely on NHTSA's Preemption Rule, it had no need to do so; and it never justified doing so, particularly since its action upended consequential reliance interests and, at a minimum, cast a cloud over approved SIPs. EPA can reverse this reliance on the alternative (or additional) ground that a reversal will correct those errors without infringing on any reasonable reliance interests in SAFE 1. *See supra* at 15.

Over decades and across administrations, EPA's consistent position has been that the only bases on which it could deny California a waiver were those factors Congress enumerated in Section 209(b)(1): "waiver request[s] cannot be denied unless the specific findings designated in the statute can properly be made." 41 Fed. Reg. at 44,210; *see also e.g.*, 49 Fed. Reg. at 18,889; 36 Fed. Reg. 17,458, 17,458 (Aug. 31, 1971). EPA's traditional understanding of its limited role is entirely consistent with the text of Section 209(b)(1) and precedent interpreting it. *See Motor & Equip. Mfrs. Ass'n v. Nichols* (*MEMA II*), 142 F.3d 449, 462–63 (D.C. Cir. 1998) (absent an adverse finding under one of those enumerated factors, EPA is "obligated to approve California's waiver application"); *MEMA I*, 627 F.2d at 1115–20 (similar). It is likewise entirely consistent with precedent respecting separation of powers and federalism principles and holding that "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). EPA has always reasonably understood that scope to be limited to the three waiver criteria—the only bases on which EPA may deny a waiver request.

In SAFE 1, EPA changed course, for one time only, relying on NHTSA's Preemption Rule to make a waiver decision although no one argued (or could argue) that that Rule was within the scope of Section 209(b)(1). But EPA failed to provide the reasoned explanation required for such an abrupt reversal—especially given the substantial reliance interests engendered by EPA's 2013 Waiver Grant.

EPA asserted only that the "context here is different" because it had chosen to "undertak[e] a joint action with NHTSA." 84 Fed. Reg. at 51,338. But what Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency. This was not an adequate justification for EPA's change of course, particularly when EPA has no particular expertise on the relevant question and the position NHTSA took is contrary to that of the only courts to have addressed the issues. *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1153–54 (E.D. Cal. 2007), *as corrected* Mar. 26, 2008; *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 300–01 (D. Vt. 2007). The inadequacy of EPA's justification was only magnified by EPA's remarkable admission that it did not "intend in *future* waiver proceedings … to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C)." 84 Fed. Reg. at 51,338 (emphasis added); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (observing that "[u]nexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice") (internal quotation marks omitted).

EPA should reverse its reliance on NHTSA's Preemption Rule. EPA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem," *and* "offered an explanation for its decision that … is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. This reversal requires restoration of the withdrawn portions of the 2013 waiver for model years 2017-2020, if, as the agency asserted in the D.C. Circuit, it withdrew the waiver for those years. EPA's reliance on NHTSA's Preemption Rule was the sole basis of any withdrawal for those model years. 84 Fed. Reg. at 51,328 (withdrawing only for MY2021–2025 on Section 209(b)(1)(B) grounds). Confirming that the waiver is in effect for those model years would have the added advantage of correcting the legal error EPA made when it purported to expand the scope of the Waiver Withdrawal to include those model years without any notice.[15] We appreciate EPA granting California's petition for reconsideration or clarification on that issue, and encourage EPA to reverse course.

Finally, there are no reasonable reliance interests that could outweigh the stability and clarity that would result from a return to EPA's consistent long-standing approach of limiting review to the Section 209(b)(1) criteria or the correction of EPA's error in failing to justify its one-time change in course. As discussed above, there are no reasonable reliance interests in any parts of the Waiver Withdrawal. *See supra* at 15. In addition, no automaker (or party affected by automaker compliance) could have reasonable reliance interests in the withdrawal of a preemption waiver for standards governing periods that were already past or well underway when the withdrawal occurred. And, in any event, the automakers have complied with, and often over-complied with, model years 2017-2020 already and are projected to be able to comply easily with the remaining model years. Appendix D at 2 ("[T]he industry will enter the 2021 model year in compliance with California's [GHG] standards and, given the progression of technologies, are on a trajectory to continue to comply at or below previous cost projections."); Appendix E at 2 ("Since 2005, all auto manufacturers have complied with California's Zero Emission Vehicle (ZEV) Regulation, and all have collectively exceeded its requirements - and by increasing margins."), 4 (Figure 1) (showing significant over-compliance through MY 2019, the latest year for which data was available).

Moreover, restoration of the waiver for already-completed model years of the ZEV standard would actually serve the reliance interests of automakers. All of them hold credit balances now under California's ZEV program, Appendix E at 18 (Table 6, 2019); *see also id.* at 7 (Table 2), and those existing balances reflect credits issued for model years 2017 and later. If the waiver is not restored for those model years, the status of credits issued for those model years (and the automakers' credit balances) could become questionable.

Whatever force NHTSA's Preemption Rule had, and whatever NHTSA decides to do about that Rule, EPA should abandon its reliance on it and reverse the Waiver Withdrawal for model years 2017-2020.

---

[15] *See* Petition for Clarification and Reconsideration submitted by CARB and the California Attorney General (October 9, 2019).

IV. **EPA Should Also Reverse Its SAFE 1 Section 209(b)(1)(B) Determination and the Waiver Withdrawal for Model Years 2021-2025 that Was Based on That Determination**

In SAFE 1, EPA determined that California did not need its own standards to reduce vehicular GHG emissions and withdrew the 2013 waiver for California's GHG and ZEV standards for MYs 2021-2025 on that ground. 84 Fed. Reg. at 51,328. That determination was ill-founded and unlawful, and should be reversed, for multiple, independent reasons, as discussed below.

A. **EPA Should Reverse Its SAFE 1 Section 209(b)(1)(B) Determination by Reverting to EPA's Long-Standing Program-Level Approach to This "Need" Inquiry**

As EPA acknowledged in SAFE 1, it has, for many decades, consistently understood Section 209(b)(1)(B) to ask whether the State needs its own regulatory program, separate from that of the federal government, not whether the State needs each individual standard or package of standards for which it seeks a waiver. 84 Fed. Reg. at 51,330.[16] In SAFE 1, EPA also acknowledged that this program-level interpretation of the phrase "such State standards" remains a reasonable one. 84 Fed. Reg. at 51,341 ("[T]hat phrase could reasonably be considered as referring either to the standards in the entire California program, the program for similar vehicles, or the particular standards for which California is requesting a waiver under the pending request."). Yet, EPA chose to adopt a new interpretation and apply it to the six-year-old 2013 Waiver Grant. Under that interpretation, EPA considered California's need for its GHG and ZEV standards, individually, and concluded that, although California still needs its own program to address its compelling and extraordinary criteria pollution conditions, the State does not need standards that reduce GHG emissions. 84 Fed. Reg. at 51,340.

EPA can and should reverse its decision to apply this new interpretation of "such State standards" in Section 209(b)(1)(B). Indeed, irrespective of whether EPA's SAFE 1 interpretation is a reasonable one (it is not), EPA should revert back to the traditional approach it applied in 2013. Nothing compelled EPA to apply a new interpretation to a well-settled adjudicatory decision reached six years earlier, and reversing that decision would correct multiple legal errors, reduce confusion, respect federalism principles and the weighty reliance interests of States, and fulfill the purposes of the Clean Air Act (including its conformity provision). In addition, EPA should revert back to its traditional interpretation because, as EPA has correctly stated, it is "the most straightforward reading of the text and legislative history of section 209(b)." 78 Fed. Reg. at 2,127. At a minimum, EPA's traditional interpretation is a better choice than the interpretation adopted in SAFE 1.

If EPA reverses application of its new approach to the need inquiry, it must also revert to its 2013 determination that California needs its own new motor vehicle emissions program,

---

[16] As EPA stated, it had always approached the "need" inquiry as a program-level one "up until the 2008 GHG waiver denial," which it reversed in 2009 in part by returning "the traditional interpretation of CAA section 209(b)(1)(B), under which it would only consider whether California had a need for its new motor vehicle emissions program as a whole." 84 Fed. Reg. at 51,330–31 (internal quotation marks omitted). Since that 2009 reversal, EPA has continued to consistently apply its traditional, program-level approach. *E.g.*, 79 Fed. Reg. at 46,261.

including its GHG and ZEV standards, and restore the withdrawn portions of the 2013 waiver. Even in SAFE 1 (and in unrelated litigation that followed it), EPA maintained that California still needs its own new motor vehicle program under the traditional approach it employed in 2013. And there is certainly no reason to conclude otherwise here.

> **1.    EPA should reverse its application of a new Section 209(b)(1)(B) approach to the 2013 waiver, irrespective of whether it might apply that new approach going forward**

EPA's decision to apply a new approach to its 2013 Section 209(b)(1)(B) determination was both unnecessary and unjustified. Given that, the multitude of interests upended by EPA's action, and the absence of any reasonable reliance interests in the SAFE 1 action, EPA can and should reverse its new approach and, thus, its SAFE 1 Section 209(b)(1)(B) Determination, regardless of EPA's views of the reasonableness of applying its SAFE 1 approach to *future* waiver requests.

It was plainly unnecessary for EPA to reconsider the Section 209(b)(1)(B) determination it reached in the 2013 Waiver Grant. No one had sought judicial review or agency reconsideration of that determination.[17] EPA made no factual findings that suggest, let alone establish, any need to reconsider, opting not to finalize any feasibility findings.[18] And even if EPA has some authority to reconsider previously granted waivers and that authority could extend to the application of new polices to prior waiver grants (*but see supra* at 19), EPA was not *compelled* to do so.

These facts alone support reversal in light of the longstanding Executive Branch federal policy against unnecessarily preempting state law. 64 Fed. Reg. 43,255 (Aug. 10, 1999) (Executive Order 13132). That policy—which has stood through administrations of both parties— recognizes the value of state experimentation of precisely the kind Congress wanted California to continue pursuant to Section 209(b)(1)(B), *id.* § 1(f), and expressly states that federal agencies should "carefully assess the necessity" of "any action that would limit the policymaking discretion of the States," *id.* § 3(a). *See also id.* § 3(c) ("Intrusive Federal oversight of State administration is neither necessary nor desirable" with respect to "Federal statutes and regulations administered by the States").

Reversal is also supported by the fact that EPA's unnecessary Section 209(b)(1)(B) Determination upended reliance interests, including those of States striving to improve air quality for their residents through EPA-approved SIPs. As discussed above, EPA unjustifiably disregarded the substantial and reasonable reliance interests of multiple States (California and the Section 177 States), among others. *See supra* at 17. In and of itself, EPA's failure to consider those reliance interests is a sufficient reason to reverse its Section 209(b)(1)(B) Determination.

---

[17] Two automaker associations sought EPA's reconsideration of the 2013 waiver, but they did so only on "consistency" grounds under Section 209(b)(1)(C) (and only as to the ZEV standard). 84 Fed. Reg. at 51,330 n.215. Not surprisingly, then, that reconsideration petition played no role in EPA's SAFE 1 actions. *Id.*

[18] In arguing that it need conduct no analysis under the Endangered Species Act, EPA did claim that its reconsideration was "necessitate[ed]" by NHTSA's decision to promulgate its Preemption Rule. 84 Fed. Reg. at 51,356. That claim is simply wrong, *see supra* at 19 (Section III), but, in any event, it does not constitute a factual finding.

*Regents of the Univ. of California*, 140 S. Ct. at 1913 (confirming it is arbitrary and capricious to ignore serious reliance interests when reversing course).

But the fact that those state reliance interests included EPA-approved SIPs establishes an independent, but related, additional reason for reversal. As discussed above, federal agencies are prohibited from "engag[ing] in" or "support[ing] in any way... any activity which does not conform to an implementation plan after it has been approved." 42 U.S.C. § 7506(c). There can be no question that EPA's SAFE 1 actions effectively preempting California's GHG and ZEV standards failed to "conform" to the multiple EPA-approved plans containing those very standards. At best, EPA's actions flew in the face of the intent behind the general conformity requirement; at worst, they violated that requirement. Either way, eliminating the cloud now hanging over those approved SIPs is sufficient reason to reverse the unnecessary Section 209(b)(1)(B) Determination.

It is abundantly reasonable to return, *in this proceeding*, to the agency's traditional approach to Section 209(b)(1)(B)—the one it applied in 2013. That approach has worked for decades, went unchallenged in 2013, and EPA has acknowledged, in SAFE 1, that it remains reasonable. Reversing EPA's unnecessary Section 209(b)(1)(B) Determination would not upend any reasonable or substantial reliance interests, *see supra* at 15, but it would correct multiple errors: EPA's application of a new policy judgment to a long-settled adjudication, EPA's failure to weigh substantial reliance interests, and EPA's failure to consider the consequences of its actions for SIPs and public health. EPA can reverse its application of its new approach to the settled 2013 Waiver Grant on this ground, without determining whether to apply its SAFE 1 approach to Section 209(b)(1)(B)'s inquiry as to new waiver requests.

## 2.    EPA's should return to the traditional, program-level approach it applied in 2013

In the alternative (or in addition), EPA can and should reverse its Section 209(b)(1)(B) Determination by rejecting the approach to that inquiry adopted, for GHG-reducing standards only, in SAFE 1. EPA should return to its prior, decades-old program-level approach instead. Because no reliance interests reasonably attached to SAFE 1's Waiver Withdrawal, *see supra* at 15, and EPA made no factual findings in SAFE 1 that would contravene a return to the traditional interpretation, EPA need not conclude here that its traditional approach is *more* reasonable. *Fox Television*, 556 U.S. at 515 ("reasons for the new policy" need not be "*better* than the reasons for the old one" absent reliance interests or contrary factual findings). But EPA could easily reach that conclusion for multiple reasons discussed below.

First, to answer one of the questions EPA posed in its Notice, 86 Fed. Reg. at 22,429, it was *not* "permissible for EPA to construe section 209(b)(1)(B) as calling for consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue and consideration of California's specific standards where GHG standards are at issue." The Supreme Court has rejected this "novel interpretive approach" of assigning different meanings to the same statutory text in the same provision, depending on the application, because it "would render every statute a chameleon." *Clark v. Martinez*, 543 U.S. 371, 382 (2005); *see also United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality opinion) ("forcefully" rejecting this "interpretive contortion"); *U.S. Dep't of the Treasury v. FLRA*, 739 F.3d 13, 21 (D.C. Cir. 2014) (rejecting "two inconsistent interpretations" of the same statutory provision).

In its SAFE 1 brief, EPA claimed that its new approach to Section 209(b)(1)(B) would apply "for all types of pollutants." Respondents' Br. at 85 (emphasis omitted). But EPA could point to nowhere in SAFE 1 where EPA so indicated. *See id.* Moreover, only two sentences later, EPA's brief demonstrated that this was simply not true: that EPA's approach would "change the 'compelling and extraordinary conditions' against which EPA reviews California's" need, depending on which "air quality concerns" were implicated. *Id.* That is just another way of saying EPA would not apply a program-level approach to GHG-reducing standards but would do so for standards reducing other emissions (such as criteria pollution emissions). As EPA has acknowledged in this Notice, it adopted a pollutant-specific approach to Section 209(b)(1)(B)'s inquiry. *E.g.*, 83 Fed. Reg. at 43,247 (explicitly proposing different interpretations for different pollutants); 84 Fed. Reg. at 51,339 (finalizing proposal); 84 Fed. Reg. at 51342 n.263 (affirming new interpretation "relates to the review of GHG standards" but not "criteria pollutant" standards). That was impermissible. *See also* 78 Fed. Reg. at 2,125 ("[S]ection 209(b)(1)(B) should be applied in the same manner for all air pollutants.").

Second, EPA's SAFE 1 interpretation conflicts with the plain text of Section 209(b)(1)(B). EPA erroneously read the plural "standards" as singular. *See generally Life Techs. Corp. v. Promega Corp.*, 137 S. Ct. 734, 741–42 (2017) (assigning interpretive meaning to Congress's use of plural and singular). Even more improperly, EPA read the word "such" out of the phrase "such State standards." "Prima facie, the use of the iterative adjective 'such' indicates that this language is understandable only by reference to" a prior reference to "State standards"—namely the reference in in Section 209(b)(1), "which immediately precedes section [209(b)(1)(B)] and which, it is undisputed," is an aggregate inquiry. *See Middle S. Energy, Inc. v. FERC*, 747 F.2d 763, 768 (D.C. Cir. 1984). The word "such" can play either a "particularizing" or "non-particularizing" role, meaning it can refer either to the "object[s] as already particularized" in the antecedent use or to those kind of objects more broadly. *N. Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 95 (D.C. Cir. 1999). Thus, for example, when it followed the phrase "single-family house sold or rented by an owner," the phrase "such single-family houses" could refer either to single family houses sold or rented by an owner (particularizing) or to all single family houses (non-particularizing). *Id.* (discussing *Hogar Agua y Vida en el Desierto, Inc. v. Suarez–Medina*, 36 F.3d 177 (1st Cir. 1994), in which the court adopted the non-particularizing meaning); *see also SoundExchange, Inc. v. Muzak LLC*, 854 F.3d 713, 716 (D.C. Cir. 2017). Thus, "such State standards" in Section 209(b)(1)(B) can only be understood as referring to the set of California standards considered for protectiveness—the "aggregate" set described in the antecedent reference in Section 209(b)(1)—or to all California standards of that kind (i.e., all California vehicular emission standards).[19] *See Culbertson v. Berryhill*, 139 S. Ct. 517, 522 (2019) (quoting 1964 dictionary defining "such" as "[o]f the kind or degree already described or implied"). This reading—that the set of standards considered for "need" is either the same or larger than the set of standards considered for "protectiveness"—also reflects the logical tie between these two inquiries. *MEMA I*, 627 F.2d at 1113.

---

[19] Notably, in both the 2013 Waiver Grant and SAFE 1, EPA understood "State standards, … in the aggregate" in Section 209(b)(1) to refer to California's whole motor vehicle emissions program. 78 Fed. Reg. at 2,121; 84 Fed. Reg. at 51,342; Respondents Br. at 85. The "particularizing" reading and the generalizing one produce the same result in that event, and "such State standards" must refer to California's whole program.

In fact, reading the "need" inquiry as *narrower* than the protectiveness inquiry, as EPA did in SAFE 1, would produce absurd results. The protectiveness inquiry is expressly an "aggregate" one so that California can design the program it believes best serves the State's needs. Congress explicitly permitted California to "promulgate individual standards that are not as stringent as comparable federal standards" as part of a larger program that, on the whole, is equally or more protective. 74 Fed. Reg. at 32,761. Thus, by congressional design, California may "promulgate individual standards that, in and of themselves, might not be considered needed to meet compelling and extraordinary circumstances." *Id.* Section 209(b)(1)(B) cannot logically be understood as permitting EPA to deny a waiver for those individual standards. Congress did not provide California with flexibility under one prong and then render that flexibility "meaningless" by eviscerating it in a different prong. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 20, (1995) ("It is an elementary rule of construction that the act cannot be held to destroy itself.") (internal quotation marks omitted). There is no reasonable interpretation of "such State standards" in Section 209(b)(1) that produces EPA's narrower, single-standard approach, as underscored by EPA's failure to provide a meaning for "such." *See* Respondents' Br. 81-88.

Third, EPA failed to justify, and in some instances failed even to acknowledge, its departures from multiple prior positions it had taken that support its traditional, program-level interpretation. Specifically, EPA had previously found that the program-level approach was supported by "the legislative history of section 209, particularly the fact that in creating an exception to Federal preemption for California, Congress expressed particular concern with the potential problems to the automotive industry arising from the administration of two programs." 49 Fed. Reg. at 18,990. EPA had also previously recognized the logical tie between the need and protectiveness inquiries created by the word "such" and the nature of the two inquiries. 74 Fed. Reg. at 32,761. At most, EPA offered only circular logic to explain the departure from its decades-old interpretation, arguing that it had to reinterpret the provision to allow single-standard review so that it could engage in single-standard review. 84 Fed. Reg. at 51,341. Such "conclusory statements," including statements that EPA simply believed its new interpretation to be reasonable, "do not suffice to explain its decision," particularly "[i]n light of the reliance interests at stake." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). "[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Id.* at 2126 (internal quotation marks and modifications omitted).

Fourth, Congress resolved the scope of Section 209(b)(1)(B)'s "need" inquiry by ratifying the agency's long-standing program-level approach in 1977 and again in 1990. EPA did not dispute (and could not have disputed) that it has been employing its program-level approach from the beginning. *See, e.g.*, 38 Fed. Reg. 30,316 (Nov. 1, 1973); 40 Fed. Reg. 23,102, 23,104 (May 28, 1975). Indeed, in 1976, EPA rejected an approach by which it would determine "whether *these particular standards* are actually required by California." 41 Fed. Reg. at 44,210, 44,213 (emphasis added). The legislative history from 1977, when Congress enacted what is now Section 209(b)(1)(B)—including its "such State standards" phrase—reflects Congress's approval of EPA's practice of "liberally constru[ing] the waiver provision." H.R. Rep. No. 95-294, at 301 (1977). Congress's "awareness of and familiarity with" EPA's program-level approach to the need inquiry "is particularly strong evidence" of congressional affirmation. *See Jackson v. Modly*, 949 F.3d 763, 773 (D.C. Cir. 2020).

And, if there were any doubt, Congress confirmed the point in 1990. It enacted a new subsection of the Act that, *inter alia*, permits California to obtain EPA's authorization to regulate emissions from non-road vehicles in engines. That new subsection—Section 209(e)(2)(A)—largely mirrors Section 209(b)(1)'s waiver provision, and the text of the "need" prong—Section 209(e)(2)(A)(ii)—is a word-for-word copy of Section 209(b)(1)(B) except that Congress changed "State" to "California." By the time of that 1990 re-enactment, EPA had not only been consistently interpreting Section 209(b)(1)(B) as a program-level inquiry for decades, it had also explicitly defended that interpretation for the second time. 49 Fed. Reg. at 18,889–90. When Congress "re-enacts a statute without change," as it did here, it is "presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran* (*Curran*), 456 U.S. 353, 382 n.66 (1982).

Finally, EPA claimed its new SAFE 1 interpretation was an improvement because it would allow the agency to read the phrase "such State standards" as having the same meaning in Sections 209(b)(1)(B) and 209(b)(1)(C). 84 Fed. Reg. at 51,345. But this is simply not true. EPA has never defined the scope of its inquiry under Section 209(b)(1)(C) based on the pollution problem(s) the standards are purportedly designed to solve, which is the approach to Section 209(b)(1)(B) EPA adopted in SAFE 1. 84 Fed. Reg. at 51,341 ("standards which address pollution problems that lack that type of particularized nexus to California are particularly appropriate candidates for an individualized consideration"); Respondents' Br. at 85 ("EPA must further particularize its [Section 209(b)(1)(B)] review when different 'subsets' of standards address different air-quality concerns (as happened here).").

Further, when EPA asserted "it is appropriate for EPA to read the term ["such State standards"] consistently between prongs (B) and (C)," it claimed that the scope of its review under (C) was the "standards California has submitted to EPA" in its waiver request. 84 Fed. Reg. at 51,345. But that approach is not the one EPA employed in SAFE 1 for its (B) inquiry *or* the one EPA employs for its (C) inquiry. In SAFE 1, EPA did not consider whether California needs the "standards California ... submitted to EPA" in 2013—the entire Advanced Clean Cars (ACC) program. *See* 78 Fed. Reg. at 2,112 (describing the ACC as "combin[ing] the control of smog and soot causing pollutants and GHG emissions into a single coordinated package of requirements"); 84 Fed. Reg. at 51,329 (describing the 2013 ACC waiver package as containing a suite of "interrelate[ed] … regulatory provisions," including criteria pollutant standards). Instead, EPA pulled out two standards from that package and analyzed California's need for *those standards on their own*. 84 Fed. Reg. at 51,343 ("In this action, EPA is reviewing a waiver for motor vehicle standards designed to address a global air pollution problem and its effects.").[20]

Moreover, EPA does not conduct its (C) inquiry by looking solely at the "standards California has submitted to EPA" in a particular package because one standard (including an existing standard) can affect the feasibility of another. Congress understood these interactions—that standards for different pollutants can be technologically interrelated—when it made the

---

[20] Because EPA did not apply a waiver-package-approach in SAFE 1, it need not reject a package-level approach in order to reverse the Waiver Withdrawal. The question here is simply whether EPA should stand behind its SAFE 1 single-standard approach as applied to the 2013 Waiver Grant or reverse that and revert to the traditional, program-level approach it originally applied in 2013.

protectiveness inquiry an "aggregate one." *MEMA I*, 627 F.2d at 1110 n.32 (describing Congress's intent to address the problem that "technological developments posed the possibility that emission control devices could not be constructed to meet both the high California oxides of nitrogen standard and the high federal carbon monoxide standard"). And EPA has likewise found that to be true. *E.g.*, 38 Fed. Reg. at 30,136 (considering whether certain standards are "achievable … in conjunction with" others); 49 Fed. Reg. at 18,893–94 (granting waiver for amendments to particulate matter standards after considering automaker arguments "that it will be difficult or impossible for them to meet the 1985 particulate standard in conjunction with the [existing] more stringent NO[x] standards"). In sum, EPA never made a credible argument that its SAFE 1 interpretation of (B) was more consistent with the interpretation it applies in (C) because it misstated both interpretations. These fatal flaws in EPA's claim of greater consistency are reasons enough to abandon that justification for EPA's SAFE 1 interpretation of (B).

And EPA need not go further here. It need not, for example, conclude that it would be better to interpret prongs (B) and (C) as having the same or different scopes. Indeed, any such conclusion has no bearing on this proceeding where the only question is whether EPA should stand behind its SAFE 1, single-standard approach to (B) and its decision to apply that new approach to a previously decided waiver *or* should revert to the decades-old, program-level approach EPA applied, without legal challenge, in 2013.[21] Specifically, if EPA were to conclude that (B) and (C) should have the same scope (as it stated in SAFE 1), that would not support retaining EPA's SAFE 1, single-standard approach because EPA does not, and cannot, limit its consideration of feasibility under (C) to individual standards standing alone and because the word "such" indicates that the (B) inquiry is at least as broad as the multiple-standards, "aggregate" protectiveness inquiry, as shown above. Similarly, if EPA were to conclude that (B) and (C) may have different scopes, or even different applications of the same scope, that would not support retaining the SAFE 1 approach to (B) because it would entirely undercut one of the (erroneous) justifications offered for that approach. Moreover, because neither SAFE 1 nor this proceeding involves a determination under Section 209(b)(1)(C), EPA need not, and should not, opine about the scope or meaning of that section. To the extent EPA (or commenters) wish to address the relative scope of the three prongs, it (and they) may do so when EPA considers a new waiver request and all three inquiries will result in determinations. There is simply no reason to do so here.

### B.    EPA Should Reverse Its SAFE 1 Section 209(b)(1)(B) Determination Because California (and Other States) Need These Standards for Criteria Pollution Reductions Now and in the Future

As it did throughout its SAFE 1 actions, EPA failed to consider criteria pollution emissions in making its Section 209(b)(1)(B) Determination. EPA expressly and improperly limited its Determination to consideration of the "application of CAA section 209(b)(1)(B) to California's need *for a GHG/climate program*." 84 Fed. Reg. at 51,339 (emphasis added); *see also id.* (limiting Section 209(b)(1)(B) consideration to "the case of GHG emissions"). As noted above, EPA's refusal to consider the criteria pollution consequences of its actions is a sufficient basis to

---

[21] EPA should certainly not adopt a new, *third* approach in this reconsideration of a reconsideration proceeding. *See supra* at 19 (discussing impermissibility of applying new policies to previously decided adjudications).

reverse the agency's reconsideration of the 2013 waiver and its Section 177 Determination. *See supra* at 8 (Section I).

That refusal also introduced independent legal error specifically into EPA's Section 209(b)(1)(B) Determination that California does not need its GHG and ZEV standards. Criteria pollution is particularly relevant to Section 209(b)(1)(B) because EPA has never questioned that California's criteria pollution "conditions" are "extraordinary and compelling" or that California needs, essentially, every fraction of a metric ton of criteria emission reductions it can produce. The record demonstrates that California's GHG and ZEV standards reduce criteria emissions in California, and that suffices for EPA to reverse its SAFE 1 Section 209(b)(1)(B) Determination, and the portion of the Waiver Withdrawal that rests on it, regardless of whether EPA reverts to its traditional, program-level approach to this section's inquiry.

As a threshold point, EPA has repeatedly found—including in SAFE 1 itself—that California's criteria pollution conditions remain "compelling and extraordinary," 84 Fed. Reg. at 51,344, and that California "needs" standards to produce any and all reductions in criteria pollution emission, 84 Fed. Reg. at 51,346. *See also*, *e.g.*, 41 Fed. Reg. at 44,210 (rejecting claims of only "marginal improvements in air quality" as grounds to deny waiver). Given that, EPA could not properly determine whether California still needs its GHG and ZEV standards while explicitly (and unlawfully) declining to consider the criteria pollution evidence in the record.[22] But that is precisely what EPA did in SAFE 1. 84 Fed. Reg. at 51,349 n.284. EPA never considered whether California needed those criteria emission reductions, because it refused to consider those reductions at all. Even under the SAFE 1 single-standard approach to the Section 209(b)(1)(B) inquiry, EPA's consideration of California's need for these two standards was inadequate and cannot stand.

As shown above, EPA attempted to justify disregarding record evidence and its own prior findings concerning the criteria emission benefits of these California standards by mischaracterizing CARB's 2012 waiver request. That attempt fails. *See supra* at 12 (Section I.C). EPA also claimed California's GHG and ZEV standards—collectively—were "designed to address … [only] climate change problems." 84 Fed. Reg. at 51,344. But, having chosen to *sua sponte* reopen the question whether California continues to need standards that it has been implementing for six years, pursuant to an EPA preemption waiver, EPA could not limit its consideration to what the standards were intended to achieve when they were originally designed or presented to EPA. At a minimum, EPA had to consider evidence of the need for these standards that may have developed after EPA's initial waiver grant. CARB (and others) asserted clearly in SAFE 1 comments that both the GHG and ZEV standards produce criteria pollution benefits upon which California and other States rely to improve air quality. *See supra* at 9. EPA unlawfully ignored those new submissions from CARB, all the while purporting to rely on CARB's characterizations of its standards.

---

[22] In 2013, no one challenged California's need for its GHG standards on the grounds that they produced no criteria benefits; the objections were limited to whether California could "need" its own standards when it had agreed to accept compliance with the 2012 federal GHG standards as compliance with California's. 78 Fed. Reg. at 2,128.

As shown above, a review of the records in SAFE 1 and here demonstrates that California's GHG and ZEV standards reduce criteria pollution emissions, as well as GHG emissions. *See supra* at 9 (Section I.B). EPA can and should find that California continues to have compelling and extraordinary conditions with respect to criteria pollution (which was undisputed in SAFE 1) and that it needs these standards to address those long-standing and immensely challenging conditions. *See* Waiver Request at 18; CARB SAFE Comments at 285–88, 290–92, 294–302, 365–66.

**1.** Other commenters may claim that California cannot "need" these standards within the meaning of Section 209(b)(1)(B) because some of the criteria emission reductions demonstrated in the record are not vehicular emission reductions, in the strictest sense of that phrase.[23] However, in this unusual and unprecedented context where EPA *sua sponte* reopened selected portions of a long-settled waiver grant, that distinction need not be relevant. "[T]he baseline for measuring the impact of *a change or rescission*" to a previous, final action "is the requirements of [the action] itself, not the world as it would have been" had the action never been taken. *Air All. Houston v. EPA*, 906 F.3d 1049, 1068 (D.C. Cir. 2018). Having granted California a waiver for its GHG and ZEV standards, EPA cannot ignore the impact of that grant, or the impact that reversing it would have, on California's need to reduce criteria pollution. "At the very least this alternative way of achieving the objectives of the Act"—the continuation of California's standards, including in States with EPA-approved SIPs containing them—"should have been addressed and adequate reasons given for its abandonment." *See State Farm*, 463 U.S. at 48. But EPA "did not even consider the possibility" in SAFE 1. *Id.*

This is particularly problematic, here, where the record indicated that at least some of the emissions reductions will occur in the parts of California that need them the most. For example, "NOx emissions in the greater Los Angeles region must be reduced by two thirds to meet the current ozone attainment goal, even after considering all of the regulations in place today." ZEV ISOR at 72; *see also* Waiver Request at 16 ("Refinery emission reductions will occur primarily in the east Bay Area *and South Coast region*…"); *id.* (anticipating reductions from reduced truck and ship activity around, *inter alia*, the port of Los Angeles); CARB SAFE Comments at 308.

**2.** In any event, the records in 2013, in SAFE 1, and here establish that the ZEV standards do reduce vehicular emissions. At a minimum, then, EPA should reverse its SAFE 1 Section 209(b)(1)(B) Determination on this ground for the ZEV standard. EPA previously acknowledged that California needs the ZEV standard now to ensure the development and commercialization of technology required for the future, deeper vehicular emission reductions California will have to make to attain the NAAQS and achieve other long-term emission goals. *See supra* at 9; *see also* 78 Fed. Reg. at 2,131 ("The ZEV standards are a reasonable pathway to reach the LEV III goals, in the context of California's longer term goals [for GHG *and* criteria pollution].") (emphasis added). As CARB has made clear, the ZEV standard—and the technologies it requires automakers to develop and deploy—are essential to attaining the NAAQS in critical regions and

---

[23] We note, as we did in our SAFE 1 briefing, that EPA did not rely on the distinction between "vehicular" and "other" emissions for its SAFE 1 actions. *See* Final Reply Br. at 15 n.9. We take no position here on whether, or how, such a distinction should affect EPA's decisions in other contexts, such as when it considers waiver request in the first instance, and encourage EPA to do the same.

to improving air quality for Californians, generally, and vulnerable populations living near roadways, specifically.[24]

The records also establish that the ZEV standards play an important role in reducing shorter-term vehicular criteria emissions as well. Contrary to EPA's claim in SAFE 1, CARB's attribution of vehicular criteria emissions to its LEV III criteria standards does not establish otherwise. As EPA has always recognized, and CARB clearly stated during its own rulemakings and EPA's proceedings, the Advanced Clean Cars program was designed as an integrated regulatory regime harnessing multiple regulations to drive in the same direction: reducing criteria and GHG emissions. Accordingly, CARB's emissions analysis under the California Environmental Quality Act looked at the "combined" effects of the LEV and ZEV standards (and others). ZEV ISOR at 72. So, too, did its summary of emission benefits submitted to EPA with its 2012 waiver request. Waiver Request at 15; *see also* CARB Nov. 2012 Supp. Comments at 3 ("EPA must review CARB's determination of compared California and federal *aggregate* emissions from what NADA concedes are "interrelated" regulations.").

In its 2012 initial submission to EPA, CARB did attribute most or all of the immediate vehicular criteria emission benefits of the Advanced Clean Cars program to the LEV criteria standard, choosing to focus on the primary objective of the ZEV standard: enabling long-term reductions in vehicular criteria and GHG emissions. Waiver Request at 2 (describing CARB's "commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies"), 15-16 (attributing emissions benefits). EPA accepted that showing. 78 Fed. Reg. at 2,131 ("Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions.").

But the attribution CARB made as part of its waiver request was never intended to, and did not, establish the absence of any vehicular emission benefits from the ZEV standard. Instead, it reflected a simplification that distinguished the standards based on the *primary* objectives of the two, complementary standards. Further, CARB's attribution of short-term emissions benefits does not undercut the long-term vehicular benefits of the ZEV standards which were well-established in the 2013 and 2019 records.

In contexts like this, where emissions or emission reductions have multiple causes, attribution of those emissions or reductions among those causes is part science and part policy, and agencies are entitled to discretion to adopt reasonable approaches. *See Nat. Res. Def. Council v. EPA*, 896 F.3d 459, 464 (D.C. Cir. 2018) (considering EPA's attempt to delineate "natural" and "human" causes for emission-increasing events and noting "many events are caused by a combination of the two"). Accordingly, CARB has re-examined the short-term criteria benefits of its ZEV standard and now estimates that, for this calendar year (2021), the cumulative effect of California's requirement that automakers sell certain numbers of ZEVs has reduced emissions of NOx, total organic gases (TOG) (from both exhaust and evaporative emissions), and PM2.5.

---

[24] *E.g.*, ZEV ISOR at 72 ("[T]he most significant share of needed emission reductions" in the greater Los Angeles region would come "from long-term advanced clean air technologies."); CARB SAFE Comments at 286–88, 290–29, 297–302; Appendix B.

Appendix A at 3–4. Specifically, had those ZEVs not been sold, and similar conventional vehicles sold instead, vehicular emissions of those pollutants in 2021 would have increased by approximately:

- 326 tons of NOx exhaust emissions,

- 366 tons of total organic gas (TOG) exhaust and evaporative emissions, and

- 16 tons of PM2.5 exhaust emissions.

*Id.* at 3. By calendar year 2023—a critical year for ozone NAAQS compliance—the emissions avoided due to ZEV sales are estimated to be even higher:

- 516 tons of NOx exhaust emissions,

- 538 tons of TOG exhaust and evaporative emissions, and

- 20 tons of PM2.5 exhaust emissions.

*Id.* These emission benefits from ZEV sales are only projected to grow over time, with increasing sales percentages required by the standards. *Id.* These emission benefits—from the small to the large—are necessary to protect public health (especially for vulnerable populations living near roadways) and to attain and maintain NAAQS. 81 Fed. Reg. at 39,425 (EPA approval of California SIP containing ZEV standards); CARB SAFE Comments at 285–88; Appendix B. To be clear, CARB recognizes that these emission benefits from ZEVs *could be* attributed to the Advanced Clean Cars program, generally, or to the LEV III criteria standard as CARB had previously done. But that does not change the fact there are emission benefits—both short- and long-term—from the requirement that automakers sell ZEVs instead of conventional vehicles. And those benefits can be attributed to the ZEV standards themselves.

**3.**  As EPA previously found, "California has made a case that its greenhouse gas standards are linked to amelioration of California's smog problems." 74 Fed. Reg. at 32,763; *see also* Multi-State SAFE Comments at 24. Put simply, the reduction in vehicular GHG emissions—reductions that were undisputed as to both the GHG and ZEV standards in SAFE 1—also reduce the formation of ozone (or smog). EPA failed to justify its departure from this prior conclusion. EPA merely asserted:

> the fact that GHG emissions may affect criteria pollutant concentrations (*e.g.,* increases in ambient temperature are conducive to ground-level ozone formation) does not satisfy this requirement for a particularized nexus, because to allow such attenuated effects to fill in the gaps would eliminate the function of requiring such a nexus in the first place and would elide the distinction between national and local pollution problems which EPA discerns as underlying the text, structure, and purpose of the waiver provision.

84 Fed. Reg. at 51,340. EPA did not explain what makes these recognized effects "attenuated" or how EPA was distinguishing "attenuated" effects from others it would consider under Section 209(b)(1)(B). It likewise identified no evidence that supports EPA's attempt to distance itself from its prior finding of a relevant link.

Moreover, where a well-established scientific phenomenon—the relationship between increased GHG pollution and exacerbated ozone problems (*see supra* at 11)—"would elide" a purported distinction between types of pollution, that is not a basis for declining to consider the well-established phenomenon. Rather, it is a reason to reject the distinction as artificial. Put simply, the fact that EPA could not reconcile its manufactured distinction with the scientific evidence provides no support for maintaining that distinction, let alone for departing from its 2013 finding recognizing the relationship between GHG and ozone pollution and its conclusion that this relationship supported California's waiver.

EPA should correct its failure to consider the record before it and reverse its Section 209(b)(1)(B) Determination on the grounds that California needs these standards to address its undisputed compelling and extraordinary criteria pollution conditions.

    **C.    EPA Should Reverse Its SAFE 1 Section 209(b)(1)(B) Determination Because Its Conclusion that California Does Not Need these Standards to Address Its Climate Change Conditions Was Unjustified and Unlawful**

Even if it were proper for EPA to reconsider California's need for the GHG-reducing effects of its GHG and ZEV standards on their own, EPA should still reverse its SAFE 1 Section 209(b)(1)(B) Determination. EPA was correct, in 2009 and 2013, when it concluded "California does have compelling and extraordinary conditions directly related to regulations of GHGs." 86 Fed. Reg. at 22,424 (citing 78 Fed. Reg. at 2,129–30); *see also* 74 Fed. Reg. 32,744. California needs its GHG and ZEV standards to address its contribution to the emissions causing extraordinary climate change conditions. EPA's contrary conclusion in SAFE 1, 84 Fed. Reg. at 51,328-33, was unlawful not only because it applied new interpretations to an already granted waiver, *see supra* at 19, but also because those interpretations were unlawful and unreasonable, and because EPA's conclusion was, and is, contradicted by the record.

    **1.    In SAFE 1, EPA read atextual and unreasonable limitations into Section 209(b)(1)(B)**

In SAFE 1, EPA articulated a new, atextual interpretation of Section 209(b)(1)(B) that required a particularized, local nexus between emissions from California's vehicles, air pollution, and the resulting impacts on health and welfare. 86 Fed. Reg. at 22,425 (citing 84 Fed. Reg. at 51,339, 51,347). EPA also narrowly interpreted "extraordinary" in Section 209(b)(1)(B) to require state-specific conditions and created a heightened standard for "need" that required the GHG and ZEV standards to "meaningfully address" climate change on their own. All of these new interpretations led EPA to one conclusion (which was also EPA's starting point): that state regulation of vehicular GHG emissions is categorically barred by the Clean Air Act. All of these new interpretations—and the categorical bar they produce—are unjustified and unreasonable. EPA's traditional interpretations—which reflect Congress's intent that California "continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program," *MEMA I*, 627 F.2d at 1110—should be restored. And EPA's SAFE 1 Section 209(b)(1)(B) Determination should be reversed.

a.    **SAFE 1's particularized, local nexus test is divorced from the statute and contravened by the legislative history on which EPA purported to rely**

EPA did not explain in SAFE 1 how its particularized nexus test was connected to the text of Section 209(b)(1)(B). Nor could it. Section 209(b)(1)(B) does not contain the word "nexus" or any word or phrase EPA claimed to read as having that meaning. It likewise includes none of the other words EPA used in articulating its "nexus" requirement, including "particularized," "peculiar," and "local." *See* 84 Fed. Reg. at 51,339. As with "nexus," EPA failed to identify which of the words in Section 209(b)(1)(B) it was interpreting as having those meanings. Instead, EPA pointed to the text of a different section of the Clean Air Act—Section 202(a)(1)—that provides *EPA's* authority to regulate vehicle emissions. In addition, EPA pointed to Congress's consideration of California's smog problem when it adopted the waiver provision. Neither of these alleged sources provides supports for EPA's novel "nexus" requirement.

Section 202(a)(1) does not itself contain a particularized, local nexus requirement (or the words EPA used to articulate that requirement), let alone establish that such a requirement applies under Section 209(b)(1)(B) which contains entirely different text. *See* 84 Fed. Reg. at 51,339–40 (claiming the "nexus" requirement flows from Section 202(a)). Section 202(a) requires EPA to set vehicle emission standards for "any air pollutant … which in [the Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a). Far from creating a complex, particularized nexus requirement, Section 202(a)(1) "requires EPA to answer only two questions: whether particular 'air pollution'—here, greenhouse gases—'may reasonably be anticipated to endanger public health or welfare,' and whether motor-vehicle emissions 'cause, or contribute to' that endangerment." *Coal. for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 117 (D.C. Cir. 2012), *aff'd in part, rev'd in unrelated part sub nom. UARG v. EPA*, 573 U.S. 302 (2014). In fact, rather than creating a barrier to regulation,"[t]his language requires a precautionary, forward-looking scientific judgment about the risks of a particular air pollutant, consistent with the CAA's precautionary and preventive orientation." *Id.* at 122 (internal quotation marks omitted).[25] And, of course, the Supreme Court held that Section 202(a) provides EPA with "the statutory authority to regulate the emission of [GHGs] from new motor vehicles," even though "regulating motor-vehicle emissions will not by itself *reverse* global warming." *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). Section 202(a) does not require SAFE 1's "particularized, local nexus." But even if it did, EPA identified no textual similarities between that provision and Section 209(b)(1)(B) that would permit importing such a limitation across the sections; and, indeed, there are none. *See also* 79 Fed. Reg. 46,256, 46,262 (Aug. 7, 2014) ("[California's] Regulations are promulgated under the authority of California state law, and are neither contingent on nor dependent upon EPA's endangerment finding.").

Nor does the 1967 Congress's interest in California's smog problem justify SAFE 1's particularized, local nexus test. *See* 84 Fed. Reg. at 51,339 (claiming Congress's "original

---

[25] Similar language has likewise been interpreted to support broad authority to regulate, including by adopting rules that do not directly reduce emissions but, rather "facilitate[] the reduction of emissions by other[s]." *Env't Def. Fund, Inc. v. EPA*, 82 F.3d 451, 460 (D.C. Cir.), *amended sub nom. Env't Fund v. EPA*, 92 F.3d 1209 (D.C. Cir. 1996)).

JA-221

motivation … informs the proper understanding of what CAA section 209(b)(1)(B) requires"). EPA's references to congressional discussions do not identify the *statutory text* EPA purported to interpret or otherwise tether EPA's "nexus" requirement to that text. In addition, the legislative history establishes the opposite intent: Congress drafted Section 209(b)(1), including Section 209(b)(1)(B), broadly to enable California's continued exercise of leadership and technical expertise to respond to emerging threats "from various pollutants." H.R. Rep. No. 95-294, at 23; S. Rep. 90-403 at 81 (California leads the nation as a "laboratory of innovation"); *see also MEMA I*, 627 F.2d at 1122 (finding "congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and welfare"). Indeed, allowing California to regulate pollutants *before*, or more stringently than, the federal government so was at the heart of Congress's intent. *MEMA I*, 627 F.2d at 1111 ("Congress intended the State *to continue and expand* its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program.") (emphasis added). The legislative history of the waiver provision is not a source of *limitations* on the pollutants California could regulate or the pollution problems it could address.

In fact, as EPA previously observed, Congress "easily could have limited" Section 209(b)(1)(B) to particular pollutants. 49 Fed. Reg. at 18,890; *see also MEMA I*, 627 F.2d at 1111. It did so elsewhere in the Clean Air Act, including in Sections 202(b)(1)(A) and (B) where Congress singled out particular vehicular emissions for specialized treatment by EPA. 42 U.S.C. § 7521(b)(1)(A), (B); *see also*, *e.g.*, 42 U.S.C. § 7412(b)(1). The absence of similar language in Section 209(b)(1)(B) underscores that Congress "took a broader approach" toward California's regulatory program—an approach "consistent with [Congress's] goal of allowing California to operate its own comprehensive program." 49 Fed. Reg. at 18,890. The phrase "compelling and extraordinary conditions" is broad for this reason—to provide "regulatory flexibility" to respond to "changing circumstances and scientific developments" and "forestall . . . obsolescence." *Id.*; *see also Am. Trucking Ass'ns, Inc. v. EPA*, 600 F.3d 624, 627 (2010) (describing phrase "compelling and extraordinary conditions" "expansive statutory language" in virtually identical statutory provision). Thus, Section 209(b)(1)(B)'s language does not limit California to addressing the smog problem present at the time of its enactment or establish that a smog-like nexus is required. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1752–53 (2020) (recognizing that "broad language" can lead to "many . . . applications . . . 'unanticipated' at the time of the law's adoption"). "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Massachusetts*, 549 U.S. at 532 (quoting *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998)); *see also id.* at 528–29. Atextual limitations on types of pollution (or pollution problems) should not be read into this broadly written provision simply because Congress was concerned about California's smog problem at the time of enactment.

Consistent with Congress's intent, EPA has historically left "the decisions on controversial matters of public policy, such as whether to regulate [certain] emissions, to California." 43 Fed. Reg. at 25,735. For example, EPA has granted at least one waiver over industry objections that the regulated pollutant was "harmless," deferring to California's judgment as to whether the State should control those emissions. *Id.* Congress has twice approved of EPA's deferential approach. First, when Congress amended Section 209(b)(1) in 1977 to expand California's discretion by instructing EPA to consider the protectiveness of the State's standards "in the

aggregate," Congress acknowledged and approved of EPA's practice of "liberally constru[ing] the waiver provision." H.R. Rep. No. 95-294 at 301–02; *see also Jackson*, 949 F.3d at 773 ("indication [of congressional affirmation] is particularly strong if evidence exists of the Congress's awareness of and familiarity with [the] interpretation"). And, second, when Congress enacted Section 209(e)(2)(A) in 1990 to establish a preemption waiver process for regulation of non-road vehicles and engines, it used language identical to Section 209(b)(1)(B) for the "need" prong, changing only "State" to "California." *Curran*, 456 U.S. at 382 n.66. Courts have likewise taken note of and approved of EPA's deferential approach: "[T]he agency has long interpreted the statute to give California very broad authority, and the court has held that this interpretation is not unreasonable." *MEMA II*, 142 F.3d at 463.

Nothing in the text of the statute, its statutory or legislative history, EPA's long-standing interpretations, or judicial opinions concerning the waiver provision supports the SAFE 1 "nexus" requirement. EPA should abandon it.

**b.    In SAFE 1, EPA crafted and imposed an unlawful categorical ban on state regulations that reduce vehicular greenhouse gas emissions**

In addition to being untethered from text and legislative history, EPA's SAFE 1 interpretative efforts all started and ended in the same unlawful place: a categorical ban on state regulation of vehicular GHG emissions. *E.g.*, 84 Fed. Reg. at 51,347 (identifying purported "support" for the "conclusion" EPA had already reached: "that Congress did not intend the waiver provision in CAA section 209(b) to be applied to California measures that address pollution problems of a national or global nature…"). Indeed, SAFE 1's approach to Section 209(b)(1)(B) is understood most clearly by what it was designed to exclude: "globally elevated atmospheric concentrations of [greenhouse gases] and their environmental effects." 84 Fed. Reg. at 51,349. But any categorical pollutant-specific or pollution-problem-specific ban is irreconcilable with Section 209(b)(1)(B)'s plain text, statutory structure, and the statutory and legislative histories, as well as EPA's decades-old practices and court decisions interpreting the section.

First, as noted above, Section 209(b)(1)(B) contains none of the myriad adjectives—such as "local," "particularized," "state-specific," "global," or "national"—that EPA conjured in SAFE 1 to erect its categorical ban and distinguish between purportedly included and excluded pollutants or pollution problems. *See, e.g.*, 84 Fed. Reg. at 51,339–40. Congress's choice *not* to limit Section 209(b)(1)(B) to particular pollutants—as it limited other sections of the Act—is especially telling regarding the purported distinction between "local" and other pollution because Congress clearly knows that air pollution is not always "state-specific" or "local." *See, e.g.*, 42 U.S.C. §§ 7402(a) (encouraging interstate cooperation regarding air pollution), 7426 (addressing interstate pollution), 7415 (addressing international pollution).

Second, EPA's categorical ban creates structural conflict in the Clean Air Act. As explained above, Section 202(a) requires EPA to set standards applicable to emissions from new motor vehicles once EPA has found that they endanger public health or welfare. Section 209(a) preempts States from adopting new motor vehicle emission standards, and Section 209(b) requires EPA to waive that preemption for California vehicular emission standards unless EPA finds that one or more of the waiver criteria are not met. The scope of Section 209(b)—the

36

pollutants for which California may obtain a waiver—is not more limited than the scope of Sections 209(a) or 202(a).

The D.C. Circuit has already held as much as to Section 209(a): "whatever is preempted [by Section 209(a)] is subject to waiver under subsection (b)." *MEMA I*, 627 F.2d at 1106; *see also id.* at 1107–08. If state standards for GHG emissions from new motor vehicles are preempted under Section 209(a), California standards that regulate those emissions must be "subject to a waiver." EPA's SAFE 1 categorical ban creates a gap where none exists.

It is just as unreasonable to assert, as EPA did, that the scope of Section 209(b) is narrower than that of Section 202(a). As EPA has long recognized, Section 209(b) exists to allow California to take more aggressive action than EPA—including the regulation of pollutants EPA might not yet be regulating under Section 202(a). *E.g.*, 38 Fed. Reg. at 10,318 ("In general, Federal standards have followed California standards by at least 1 full model year."). California's history of doing precisely that is a primary reason Section 209(b) exists. *MEMA I*, 627 F.2d at 1111. And Congress has twice reaffirmed the value of California continuing to lead in this field: by expanding the State's discretion and permitting other States to adopt California's standards, in 1977, and by expanding the scope of California regulation to include non-road mobile sources in 1990. *See supra* at 5–6. Section 202(a) unambiguously embraces "all airborne compounds" despite the absence of specific references to carbon dioxide and other greenhouse gases, *Massachusetts*, 549 U.S. at 512, 529, and there is no reason to interpret Section 209(b)(1)(B) to categorically bar state regulation of greenhouse gases. Indeed, EPA continues to implement its federal vehicular GHG standards, adopted pursuant to Section 202(a), albeit in an unlawfully weakened state. Because EPA can regulate greenhouse gases under Section 202(a), it cannot reasonably conclude that California is categorically barred from doing so.

Third, both Congress and EPA have recognized that a "local" versus global distinction for pollutants is illusory. *See*, *e.g.*, 42 U.S.C. §§ 7410(a)(2)(D)(i); 7415; *see also Wisconsin v. EPA*, 938 F.3d 303, 309 (D.C. Cir. 2019) ("When upwind States pollute, downwind States can suffer the consequences."). For example, EPA has recognized that pollutants and pollutant pre-cursors other than greenhouse gases (such as those it deemed "local" in SAFE 1—i.e., ozone and particulate matter) "can involve long range transport." 78 Fed. Reg. at 2,128; 86 Fed. Reg. 23,054, 23,056 (Apr. 30, 2021) ("Studies have established that ozone transport occurs on a regional scale (i.e., hundreds of miles).")[26] In prior waiver proceedings, moreover, EPA concluded that "[t]here is a logical link between" reducing greenhouse gas emissions and "ground-level ozone formation" because temperature increases caused by the former contribute to the latter. 74 Fed. Reg. at 32,763. And, while in SAFE 1 EPA unjustifiably rejected this as a legal basis for the waiver, *see supra* at 32, it did not claim, let alone establish, that this well-understood link no longer exists. Nor could it have done so. *See supra* at 11. EPA unlawfully

---

[26] *See also* NGO SAFE Comments at 101-02 (Oct. 24, 2018) (EPA-HQ-OAR-2018-0283-5070) (citing Lin, M., et al., *US surface ozone trends and extremes from 1980 to 2014: quantifying the roles of rising Asian emissions, domestic controls, wildfires, and climate*, 17 ATMOS. CHEM. PHYS., 2943-2970 (2017); Ewing, S., et al., *Pb Isotopes as an Indicator of the Asian Contribution to Particulate Air Pollution in Urban California*, ENVIRON. SCI. TECHNOL., 44 (23), 8911–8916 (2010)).

interpreted Section 209(b)(1)(B) as drawing a bright, categorical line between local and global pollution that even the agency recognizes does not exist.

Finally, EPA's atextual, pollutant-specific categorical bar is inconsistent with other provisions in which Congress has recognized, and even relied on, the existence of California's GHG and ZEV standards. For instance, Congress required EPA to consider California's GHG emission standard when developing federal procurement policies, 42 U.S.C. § 13212(f)(3), and to consider California's zero-emission-vehicle standard when defining "Zero Emissions Vehicle" for a federal program, 42 U.S.C. § 7586(f)(4). Neither of these instructions makes sense if, as EPA claimed in SAFE 1, California's GHG and ZEV standards are preempted by Section 209(a) and no preemption waiver is available under Section 209(b).

Section 209(b)(1)(B) cannot be read as containing a categorical bar against state regulation of vehicular GHG emissions.

### c.    EPA unlawfully narrowed the term "extraordinary conditions"

In the instances where EPA actually interpreted specific words or phrases in the statute, those interpretations fare no better than its untethered "nexus" requirement or its categorical ban. Indeed, EPA's "conclusion that Congress did not intend the waiver provision in CAA section 209(b) to be applied to California measures that address pollution problems of a national or global nature" drove and infected all of its interpretations. 84 Fed. Reg. at 51,347. Specifically, EPA narrowly interpreted the phrase "compelling and extraordinary conditions" to require "state-specific" causes and effects, 84 Fed. Reg. at 51,344, although that limited reading is contrary to the plain text, congressional intent, statutory structure, and EPA's past practice.

Indeed, nothing in the text of Section 209(b)(1)(B) requires that California's conditions be peculiar or unique to the State. The plain meaning of "extraordinary" is "out of the ordinary." *SEC v. Gemstar-TV Guide Int'l, Inc.*, 401 F.3d 1031, 1045 (9th Cir. 2005); *see also Advance Pharm., Inc. v. United States*, 391 F.3d 377, 392 (2d Cir. 2004). And the word "conditions" simply refers to the "attendant circumstances" that California faces. *See Fort Stewart Sch. v. FLRA*, 495 U.S. 641, 645 (1990) (citing Webster's Third New International Dictionary 473 (1961)).[27] These terms do not limit the relevant conditions to those unique to California or to those exclusively caused by California vehicles. The plain meanings of these terms provide no basis to exclude GHGs and climate impacts from the scope of the waiver provision.

EPA's attempt in SAFE 1 to exclude "global" pollution problems because they are not "specific to California" or "different from circumstances in the country at large," 84 Fed. Reg. at 51,342, also creates structural conflict with Section 177. Congress enacted Section 177 in 1977 after recognizing that the very circumstances it had considered in 1967—that other regions of the country may develop air pollution problems somewhat akin to those in California—had materialized. *See* 42 U.S.C. § 7507.[28] If Section 209(b) applies only to pollution problems

---

[27] "Compelling" has a distinct plain meaning—"demanding attention"—that also does not justify EPA's constrained SAFE 1 approach to Section 209(b)(1)(B). Merriam-Webster Online Dictionary, https://www.merriam- webster.com/dictionary/compelling; *accord* Webster's Third New International Dictionary 463 (1961).

[28] *See also, e.g.*, H.R. Rep. No. 95-564, at 156 (1977) (Conf. Rep.) (recognizing that other States had "automotive-related air pollution problems"); 113 Cong. Rec. at 30,947 (statement of Rep.

*specific to* California, then Congress's decision to permit Section 177 States to adopt and enforce California's standards serves no purpose. But a "cardinal principle of statutory construction" disfavors interpretations that render provisions "insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotation marks omitted); *see also Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) ("Congress cannot be presumed to do a futile thing.").

Nor does the legislative history support EPA's SAFE 1 interpretation. In SAFE 1, EPA cited descriptions of "California's 'peculiar local conditions' and 'unique problems'" in the 1967 legislative history. 84 Fed. Reg. at 51,342 (quoting S. Rep. No. 90-403, at 33). But those passages simply highlight that Congress did *not* codify words like "peculiar" or "unique" in Section 209(b)(1)(B). The legislative history of Section 209(b) consistently emphasizes California's leadership as a laboratory of innovation that had benefited, and would continue to benefit, the rest of the country. *See, e.g.*, S. Rep. 90-43 at 33, 81; H.R. Rep. No. 95-204 at 301. If the only pollution problems California may tackle were specific to that State, there would be no reason to anticipate that the rest of the country would benefit from California's leadership. In fact, Congress understood, even in 1967, that "[o]ther regions of the Nation may develop air pollution situations related to automobile emissions which will require standards different from those applicable nationally." S. Rep. No. 90-403, at 33. As EPA previously recognized, nothing "in the language of section 209 or the legislative history [indicates] that California's pollution problem must be the worst in the country, for a waiver to be granted." 49 Fed. Reg. at 18,891.

Finally, EPA's SAFE 1 interpretations are inconsistent with its traditional ones. In granting past waivers, EPA has historically pointed to "factors that tend to produce higher levels of pollution," including "geographical and climatic conditions" as well as California's sizable motor vehicle population. 74 Fed. Reg. at 32,759–62; 78 Fed. Reg. at 2,129. EPA did not previously describe this as an exclusive list or as imposing the state-specific, cause-and-effect requirements EPA purported to read into the text in SAFE 1. In fact, EPA has traditionally rejected a constrained reading of "conditions," concluding that the term is not a direct reference to "levels of pollution." 78 Fed. Reg. at 2,129. In SAFE 1, EPA departed dramatically from its traditional interpretations to exclude GHGs because atmospheric levels of that pollution tend to be relatively consistent around the globe, 84 Fed. Reg. at 51,347, and to exclude climate change conditions because they are purportedly not "state-specific" enough, *id.* at 51,348. EPA did not explain its departure from its prior positions. *Fox Television*, 566 U.S. at 515–16. In fact, EPA's main attempt at this justification was to point to "global average" "concentrations" of GHGs, *id.* at 51,347, but that itself is a departure from EPA's prior position that the relevant "conditions" are not simply the levels of pollution. Simply stating one's new position cannot justify departing from a prior one. In any event, EPA's conclusory claim that the "factors looked at in the past … cannot form the basis of a meaningful analysis of" GHG-related conditions, 84 Fed. Reg. at 51,346, is simply not true. As explained below, California's large motor vehicle population, which is the State's largest source of greenhouse gas emissions, California's particular climate impacts, and the geographic, economic, and climatic conditions that exacerbate those impacts, all support the conclusion EPA correctly reached in 2013: that California has compelling and extraordinary conditions related to climate change.

---

Staggers) (noting smog-related deaths in New York); *id.* at 30,955 (statement of Rep. Roybal) (noting smog-related illnesses and deaths in Pennsylvania and New York).

    **d.**    **EPA's SAFE 1 interpretation of "need" that required standards to "meaningfully address" climate change is inconsistent with the statute and past agency practice**

EPA also adopted an unlawful interpretation of "need" in SAFE 1, concluding that even if California's climate change conditions were extraordinary, California would not need its GHG and ZEV standards "because they will not meaningfully address" global climate change. 84 Fed. Reg. at 51,347. This new interpretation is no more supported than the others.

First, the plain text of Section 209(b)—including the instruction that EPA "*shall* waive" preemption and the requirement to consider protectiveness "in the aggregate," 42 U.S.C. § 7543(b)(1) (emphasis added)—forbid EPA from "'overturn[ing] California's judgment lightly.'" *MEMA II*, 142 F.3d at 463 (quoting H.R. Rep. No. 95-294, at 302). But that is exactly what EPA did in SAFE 1 by concluding that California cannot "need" standards that substantially reduce the largest sources of its contribution to climate change—a serious threat the State identified almost twenty years ago.

Second, consistent with the Clean Air Act's overall objective to reduce dangerous emissions, other provisions of the Act have been interpreted not to constrain regulatory authority to sole, or even primary, sources of a given pollutant or sole, or even primary, causes of a pollution problem. *See Wisconsin*, 938 F.3d at 324 (recognizing the need to regulate sources "even if [their] emissions are not the but-for cause" of a pollution problem); *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 500 (2014) (upholding EPA's determination that States contributing "less than one percent" of proscribed pollution levels "contributed significantly" to pollution such that further reductions should be considered); *Coal. for Responsible Regulation*, 684 F.3d at 123 ("EPA need not establish a minimum threshold of risk or harm before determining whether an air pollutant endangers. It may base an endangerment finding on a lesser risk of greater harm ... or a greater risk of lesser harm or any combination in between.") (internal quotation marks omitted). Nothing in the text of Section 209(b)(1)(B) constrains California further. In fact, the text—which constrains *EPA*'s role and anticipates California will lead—indicates exactly the opposite.

Third, EPA has long and correctly understood that the word "need" does not limit California to tackling only air pollution problems that can be solved by its vehicular emission standards alone. Since the earliest days of waiver proceedings, it sufficed that California standards "may result in some further reduction in air pollution in California," and it was "not legally pertinent" that the improvement might be "only marginal." 36 Fed. Reg. at 17,458; *see also* 49 Fed. Reg. at 18,891; 79 Fed. Reg. at 46,262. That understanding of need is consistent with EPA's long-held, correct view of Congress's intent to leave decisions about "whether to regulate" particular pollutants to California. 43 Fed. Reg. at 25,735 (rejecting argument that "the intent of Congress was to control only detrimental [hydrocarbon] emissions and not" methane emissions commenter considered "harmless"). EPA did not justify its departure from this view. *Encino Motorcars*, 136 S. Ct. at 2126. Nor could it do so, particularly since Congress has twice ratified EPA's understanding. *See supra* at 26, 35. Moreover, to the extent EPA adopted its new interpretation of "need" solely for analyzing GHG-reducing standards, this is yet another improper pollutant-specific interpretation. *See supra* at 24.

Fourth, long before Congress enacted the original waiver provision, the Supreme Court had recognized that States can and do tackle large problems "one step at a time, addressing [themselves] to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 489 (1955). There is no reason to think Congress eliminated this course for California in Section 209(b)(1). In fact, given that Congress has also expressly recognized that some air pollution problems cannot be solved by individual states acting alone, any intent to limit California to problems it could solve on its own would be clear and express. *See, e.g.*, 42 U.S.C. §§ 7402(a) (encouraging interstate cooperation regarding air pollution), 7410(a)(2)(D)(i) ("good neighbor" provision), 7426 (addressing interstate pollution). However, there is no such indication in Section 209(b)(1). That absence is all the more striking, given the Congress has amended or duplicated the provision, without change, while California has had to regulate an enormous array of sources of criteria pollution— not only vehicles—to improve its smog conditions. Put simply, Congress was and is well aware that air pollution problems are complex and multi-dimensional, and nothing in Section 209(b)(1)(B) suggests an intent to limit California to addressing only the simplest of these problems.

Finally, the Supreme Court has confirmed that greenhouse gas emissions are precisely one of the "massive problems" that cannot be tacked "in one fell regulatory swoop." *Massachusetts*, 549 U.S. at 524. EPA itself has found that vehicular greenhouse gas emissions in the United States cause or contribute to air pollution that endangers public health and welfare, 74 Fed. Reg. 66,496 (Dec. 15, 2009), and in SAFE 1 the agency failed to explain why California does *not* "need" to reduce the sizable contribution its vehicles make to this harmful pollution. In fact, a reduction from this highest-emitting sector "would slow the pace of global emissions increases, no matter what happens elsewhere." *Massachusetts*, 549 U.S. at 526.

Regardless of whether its inquiry focuses on California's program as a whole or on individual standards, Section 209(b)(1)(B) is logically read as asking whether California needs to reduce *its contribution* to pollution problems the State faces. No limiting language suggests otherwise. This reading, unlike the one adopted in SAFE 1, reflects congressional intent to afford California broad discretion. EPA's contrived requirement that standards "meaningfully address" global climate change is unlawful and should be reversed.

### e.    Equal sovereignty principles are not applicable here and, in any event, do not support EPA's interpretations

EPA also appealed to the rarely invoked constitutional doctrine of "equal sovereignty" to argue that Section 209(b)(1) provides "extraordinary treatment" to California that requires a "state-specific" and "particularized" pollution problem. 84 Fed. Reg. at 51,340 n.260, 51,347. California confronts such a problem with respect to greenhouse gas pollution, *see infra* at 43 (Section IV.C.2), and continues to confront such a problem with respect to criteria pollution as EPA has acknowledged, 84 Fed. Reg. at 51,344. But, in any event, the equal sovereignty doctrine does not apply here.[29]

---

[29] We note that a group of States, led by Ohio, have asserted that equal sovereignty principles render Section 209(b) unconstitutional. Even if commenters raise that argument in this reconsideration proceeding, EPA need not address it. As noted above, EPA has long (and

Contrary to EPA's SAFE 1 position, "[f]ederal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system." *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014); *see also, e.g.*, *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070-71 (2016) (upholding "Alaska-specific" carve-out that "treated [Alaska] differently"). Accordingly, the Supreme Court has only applied the equal-sovereignty doctrine in the rare instance where Congress undertook "a drastic departure from basic principles of federalism" by authorizing "federal intrusion into sensitive areas of state and local policymaking"—namely, state elections. *Shelby Cnty. v. Holder*, 570 U.S. 529, 535, 545 (2013) (quotation omitted); *see also* Professor Leah M. Litman Amicus Br. 12–17 (*UCS v. NHTSA*, D.C. Cir. No. 19-1230). Congress did not so intrude in exercising its Commerce Clause power to structure interstate commerce in new motor vehicles or the regulation of air pollution those vehicles produce.

Section 209(b) is not an "extraordinary departure from the traditional course of relations between the States and the Federal Government." *Shelby County*, 570 U.S. at 545. Rather, the balance Congress struck was a careful exercise of its enumerated powers. Congress recognized the potential detriments of subjecting automakers to up to 51 different regulatory regimes and, thus, concluded that some preemption was warranted to protect interstate commerce. *MEMA I*, 627 F.2d at 1109–10. It also, however, determined that the Nation's public health and welfare would be served by the continuation of a foundational benefit of our system of federalism—the existence of state-level laboratories for regulatory experimentation. *Id.*; *see also New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). Accordingly, Congress concluded that the protection of the Nation's residents and the interests of automakers would be best served by subjecting interstate commerce in new motor vehicles to two, but only two, emission control regimes. Congress has made similar choices in other Commerce Clause contexts. *E.g.*, 16 U.S.C. §§ 824k(k), 824p(k), 824q(h), 824t(f) (reserving to Texas's electric-grid operator several regulatory powers that, for other jurisdictions, belong to the Federal Energy Regulatory Commission); *see also* Litman Amicus Br. 22-23 (describing other examples). Equal sovereignty principles do not bar Congress's regulatory design or limit Congress to two stark choices: a single-federal-standard regime that would stifle innovation and, thus, less optimally protect the public health and welfare of Americans or a 51-standards regime that would impose greater burdens on interstate commerce in new motor vehicles.

Underscoring the point, construing Section 209(b) to limit the types of pollutants that California may regulate, as EPA did in SAFE 1, would diminish most States' sovereignty without enhancing the sovereignty of any State. Specifically, EPA's SAFE 1 categorical bar against state

---

correctly) limited its consideration of waiver matters to the three statutory criteria laid out in Section 209(b)(1) and has thus declined to take up constitutional questions in waiver proceedings. *See supra* at 19 (Section III); *MEMA I*, 627 F.2d at 1114 ("We think the Administrator was entitled to refuse to pass on petitioners' constitutional claims"). In addition, "regulatory agencies are not free to declare an act of Congress unconstitutional." *Springsteen-Abbott v. SEC*, 989 F.3d 4, 8 (D.C. Cir. 2021); *see also MEMA I*, 627 F.2d at 1115. And, of course, doing so would have far-reaching consequences, given the number of still-active waivers EPA has granted, the reliance interests attached to those waivers, and the volume of emission reductions and number of SIPs dependent on California's various waiver standards. In any event, equal sovereignty principles are not applicable here for the reasons explained herein and in the SAFE 1 briefing.

GHG-reducing regulations would drastically reduce the regulatory options available to California and to other States that can opt to implement California's standards under Section 177. At the same time, it would alleviate no purportedly unjustified "burden[]" imposed by Congress on any State because Section 209(b)(1) imposes no such burdens. *See Shelby Cnty*, 570 U.S. at 536. Indeed, to the extent that Section 209(b)(1) imposes burdens on any State, Congress itself found those burdens would fall only on California, and only *if it chose to take them on*. Not only would California have to expend its resources designing its regulatory regime, but Californians, not the "general consumer of the Nation" would pay the "increased costs associated with new control systems" required under that regime. *See* S. Rep. No. 90-403, at 33. No court has ever applied the doctrine of equal sovereignty to limit state sovereignty, as EPA's SAFE 1 position would do. The doctrine did not support EPA's SAFE 1 interpretations and creates no barrier to reversal of EPA's SAFE 1 actions.

2.    **The record before EPA in 2013 and 2019, along with more recent information, demonstrates that California has compelling and extraordinary conditions related to climate change and needs its standards to meet them**

a.    **California's climate change conditions are compelling and extraordinary**

EPA correctly concluded in 2013 that California's climate change conditions are compelling and extraordinary. 78 Fed. Reg. at 2,129. In SAFE 1, EPA made no supported factual findings to justify departing from its 2013 conclusion. Indeed, the records before EPA both in 2013 and in 2019 are replete with evidence that California's climate change impacts from greenhouse gas emissions constitute "compelling and extraordinary conditions" under any reasonable interpretation of Section 209(b)(1)(B). This is true even under EPA's unlawful SAFE 1 interpretation that required "state-specific" conditions. And more recent evidence of climate impacts in California provides further confirmation still.

(1)    **The record before EPA in 2013 and 2019 amply demonstrated California's compelling and extraordinary climate change conditions**

In its 2012 waiver request and supporting materials, CARB articulated the myriad ways California is particularly impacted by climate change. For instance, California faces increasing risks from record-setting fires, deadly heat waves, destructive storm surges, sea-level rise, water supply shortages, and extreme heat.[30] California also faces threats to the State's agriculture industry, which produces most of the United States' nuts and fruits, risks to the ecosystems in the State, which is one of the world's most ecologically diverse places, and "enormous risks" to the

---

[30] CARB Oct. 2012 Supp. Comments at 7–18 (EPA-HQ-OAR-2012-0562-0371); *see also* 2002 Cal. Legis. Serv. Ch. 200 (A.B. 1493) (finding that "[g]lobal warming would impose on California, in particular, compelling and extraordinary impacts," including reductions in water supply, damage to the State's extensive coastline and ocean ecosystems, aggravation of existing and severe air quality problems and related adverse health impacts, increases in catastrophic wildfires, and threats to the State's economy, including its agricultural sector).

State's economy.[31] CARB also detailed the large size of California's motor vehicle population, which was and is the leading cause of greenhouse gas emissions in the State.[32]

In SAFE 1, EPA made no supported findings to justify departing from its 2013 conclusion. Nor could it. The record before EPA in 2019 confirms that California is "one of the most 'climate-challenged' regions of North America."[33] California is home to some of the country's hottest and driest areas, which are particularly threatened by record-breaking heatwaves and sustained droughts,[34] as well as dense forests increasingly susceptible to wildfires. In addition, the State's extensive coastline, unusually heavy dependence on snowpack for water storage, potential for land subsidence, and other geographic and climate factors render it particularly vulnerable to and impacted by climate change.[35] Consequently, California faces both existing and projected climate risks from sea-level rise that are expected to be more intense in California than other areas, water supply shortages and resulting impacts on the nation's most productive agricultural economy,[36] drought and land subsidence, increasingly frequent and severe wildfires, extreme heat events, and harm to coastal infrastructure.[37] And California's unique challenges with ozone pollution make it and its residents especially susceptible to greater ozone formation and

---

[31] CARB Oct. 2012 Supp. Comments at 7–18.

[32] LEV III Initial Statement of Reasons at 75 (EPA-HQ-OAR-2012-0562-0011); 2002 Cal. Legis. Serv. Ch. 200 (A.B. 1493).

[33] California's Fourth Climate Change Assessment, *California's Changing Climate 2018: A Summary of Key Findings* at 3 (2018), https://www.energy.ca.gov/sites/default/files/2019-11/20180827_Summary_Brochure_ADA.pdf (submitted to the docket at EPA-HQ-OAR-2018-0283-5481).

[34] NOAA, State Climate Summary: California at 1 (EPA-HQ-OAR-2018-0283-5683); CalEPA, *Indicators of Climate Change in California* at 98–103 (May 2018) (EPA-HQ-OAR-2018-0283-5481); M. Mann & P. Gleick, *Climate Change and California Drought in the 21ˢᵗ Century*, 112 PNAS 3858, 3858–59 (Mar. 31, 2015) (EPA-HQ-OAR-2018-0283-5682).

[35] CARB SAFE Comments at 369 (citing California's Fourth Climate Change Assessment, *California's Changing Climate 2018: Statewide Summary Report* (2018), https://www.energy.ca.gov/sites/default/files/2019-11/Statewide_Reports-SUM-CCCA4-2018-013_Statewide_Summary_Report_ADA.pdf; *id.*, *A Summary of Key Findings*).

[36] NOAA, State Climate Summary: California at 3 (EPA-HQ-OAR-2018-0283-5683).

[37] CARB SAFE Comments at 367–69 (EPA-HQ-OAR-2018-0283-5054) (citing California's Fourth Climate Change Assessment, *California's Changing Climate 2018: Statewide Summary Report*; *id.*, *A Summary of Key Findings*; California Agricultural Production Statistics, California Department of Food and Agriculture, https://www.cdfa.ca.gov/statistics/); NGO SAFE Comments at 107–126 (EPA-HQ-2018-0283-5070) (citing, among others, California's Fourth Climate Change Assessment, *California's Changing Climate 2018: Statewide Summary Report*; NOAA, State Climate Summary: California; USGCRP, *Our Changing Planet: The U.S. Global Change Research Program for Fiscal Year 2017* (2016), https://downloads.globalchange.gov/ocp/ocp2017/Our-Changing-Planet_FY-2017_full.pdf; CalEPA, *Indicators of Climate Change in California* (May 2018); California Ocean Science Trust, *Rising Seas in California: An Update on Sea-Level Rise Science* (2017), http://www.opc.ca.gov/webmaster/ftp/pdf/docs/rising-seas-in-california- an-update-on-sea-level-rise-science.pdf); *see also* P.W. Mote, et al., *Dramatic Declines in Snowpack in the Western US*, 1 NATURE PARTNER JS. CLIM. ATMOS. SCI. (2018), https://doi.org/10.1038/s41612-018-0012-1.

corresponding health impacts from rising temperatures, a well understood connection between climate change and air quality.[38] *See supra* at 11.

A November 2018 study issued by EPA and twelve other federal government agencies corroborated these findings, documenting the impact of climate change in exacerbating California's recent record-breaking fire seasons, multi-year drought, heat waves, and flood risk, and explained that California faces a particular threat from sea-level rise and ocean acidification because the State has "the most valuable ocean-based economy in the country."[39] A 2019 study further demonstrated the extraordinary nature of these impacts by finding that prior studies had underestimated the impacts of sea-level rise, storms, and flooding in California.[40]

With respect to wildfire risk in particular, the extent of California's annual wildfires has increased fivefold since the 1970s.[41] California's Fourth Climate Change Assessment, released in 2018, suggested that climate change would lead to wildfires in the next few decades that will be unprecedented in size and severity.[42] One study projected that, if greenhouse gas emissions continue to rise, by 2100 the frequency of extreme wildfires burning 25,000 acres or more will increase by nearly 50 percent and average area burned statewide will increase by 77 percent.[43] More recent studies, also submitted to EPA in SAFE 1, have further cemented this connection between California's worsening and expanding fire seasons and climate change. For instance, Williams, et al. (2019)[44] examined several factors that can promote wildfire in California and concluded that warming-induced increases in vapor pressure deficits accounted for nearly all of the growth of California forest fires from 1972 to 2018. This has been particularly notable in the North Coast and Sierra Nevada regions, which have seen over 600 percent increases in annual burned area. And Gleason, et al. (2019)[45] documented that increased wildfires are causing earlier snowmelt—which in turn influences the frequency and degree of wildfires.

---

[38] Union of Concerned Scientists, *Climate Change and Your Health: Rising Temperatures, Worsening Ozone Pollution* at 2-3 (2011) (EPA-HQ-OAR-2018-0283-5683).

[39] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* at 1107 (2018) (EPA-HQ-OAR-2018-0283-7447).

[40] Patrick L. Barnard, et al*., Dynamic Flood Modeling Essential to Assess the Coastal Impacts of Climate Change*, 9 SCI. REPTS. 4309 (Mar. 13, 2019) (submitted to the docket in NGO Letter, Apr. 5, 2019 (EPA-HQ-OAR- 2018-0283-7452)).

[41] A. Park Williams, et al., *Observed Impacts of Anthropogenic Climate Change on Wildfire in California*, 7 EARTH'S FUTURE 892 (2019), https://doi.org/10.1029/2019EF001210 (submitted to the docket in CARB Letter, Aug. 21, 2019 (EPA-HQ-OAR-2018-0283-7594)).

[42] California's Fourth Climate Change Assessment, *California's Changing Climate 2018: Statewide Summary Report* at 9.

[43] *Id.*

[44] Williams, et al. (2019) *supra* note 41.

[45] Kelly E. Gleason, et al., *Four-fold Increase in Solar Forcing on Snow in Western U.S. Burned Forests Since 1999*, 10 NATURE COMM. 2026 (2019), https://doi.org/10.1038/s41467-019-09935-y (study on feedback loop between increasingly severe wildfires and snowpack, with important water supply implications).

More destructive fire seasons result in significant damages to State lands and other property as well as utility grid infrastructure, and create substantial health risks for State residents.[46] Taken together, the climate-induced dramatic increase in acres burned by wildfires and the wildfire-snowpack feedback loop suggest a particularly stark future for California.

Because California is the most populous State in the country, these climate impacts put more people at heightened risk and are all the more compelling and extraordinary. Additionally, the sheer number of vehicles in the State causes the transportation sector's contribution to California's greenhouse gas emissions to be especially large—almost forty percent, as compared to approximately thirty percent nationally.[47] Even under EPA's improper state-specific constraint, this record evidence would satisfy Section 209(b)(1)(B).

Moreover, local carbon dioxide concentrations can result from *local* carbon-dioxide emissions and can have *local* impacts on, for instance, the extent of ocean acidification. A 2019 study demonstrated that locally enhanced carbon dioxide concentrations above Monterey Bay, California, fluctuate by time of day likely because of the magnitude of nearby urban carbon dioxide pollution and the effects of topography on offshore winds, and that this fluctuation increases the expected rate of acidification of the Bay.[48] For decades, the monthly average carbon dioxide concentrations off California's coast have been consistently higher and more variable than those at Mauna Loa (which are commonly used as the global measurements).[49] In fact, another more recent study shows that the waters of the California Current Ecosystem, off the coast of Southern California, have already acidified more than twice as much as the global average.[50]

The impacts of climate change in California and these multiple geographic, climatic, and economic exacerbating factors constitute "compelling and extraordinary conditions" under any reasonable interpretation of a statutory provision designed to give California the broadest possible discretion in reducing air pollution and its impacts. In addition, the severity of these factors, individually and collectively, in California is "sufficiently different" from the rest of the country to constitute compelling and extraordinary conditions even under the unlawfully constrained interpretations EPA applied in SAFE 1. Indeed, the particularly serious confluence of California's wide-ranging and severe climate risks—coupled with the size and nature of its economy, the size and import of its coastline and oceanic resources, the size and diversity of its

---

[46] *See* California's Fourth Climate Change Assessment, *California's Changing Climate 2018: Statewide Summary* at 95 (2018) (projecting over $47 million annual damage costs from wildfires on utility grid infrastructure).

[47] CARB SAFE Comments at 369 (Oct. 24, 2018) (EPA-HQ-OAR-2018-0283-5054) (citing Greenhouse Gas Inventory, https://www.arb.ca.gov/cc/inventory/inventory.htm); *see also* 77 Fed. Reg. 62,624, 62,634 (Oct. 15, 2012).

[48] *See* Northcott, et al., *Impacts of urban carbon dioxide emissions on sea-air flux and ocean acidification in nearshore waters*, PLoS ONE (2019).

[49] *E.g.*, Cal. Office of Environmental Health Hazard Assessment, *Atmospheric Greenhouse Gas Concentrations* (Feb. 11, 2019), https://oehha.ca.gov/epic/climate-change-drivers/atmospheric-greenhouse-gas-concentrations.

[50] E.B. Osborne, et al., *Decadal Variability in Twentieth-century Ocean Acidification in the California Current Ecosystem*, 13 NAT. GEOSCI. 43 (2020), https://doi.org/10.1038/s41561-019-0499-z.

JA-233

geography, and the size of its human and motor-vehicle populations—undeniably establish compelling and extraordinary conditions. EPA's conclusion to the contrary in SAFE 1 ignored the overwhelming weight of the record, and that conclusion should be reversed.[51]

> **(2)    More recent evidence further confirms that California has compelling and extraordinary climate change conditions**

Additional and more recent evidence of climate change impacts in California further demonstrates their extraordinary nature, and EPA can, and must, consider that evidence in this proceeding. In August 2020, heat waves in California were some of the worst to hit the State in years.[52] Data from NOAA's National Centers for Environmental Information[53] show that September 2020 officially ranks as California's hottest September since record-keeping began in 1880. And studies have already confirmed that local carbon dioxide emissions can alter local temperatures. For instance, domes of increased carbon dioxide concentrations above cities cause local temperature increases that in turn increase the amounts of local air pollutants, raising concentrations of health-damaging ground-level ozone as well as particulate matter in populated areas of California.[54]

Tracking with rising temperatures, California's 2020 fire season was record-breaking, not only because over 4 million acres burned but also because 5 of the 6 largest wildfires in California history occurred in 2020.[55] Some of those fires burned so hot that they created their own tornadoes and lightning storms.[56] At one point, California came under siege from record-

---

[51] In SAFE 1, EPA pointed to only one study to support its new position that the effects of climate change in California are insufficiently unique to support a waiver for the State's GHG and ZEV standards. *See* 84 Fed. Reg. at 51,348 n.278 (citing S. Hsiang, et al. "Estimating Economic Damage from Climate Change in the United States," 356 Science 1362 (2017)). This study, however, did not even analyze multiple climate effects critical to California, including wildfires and droughts, and it predates multiple studies in the record that firmly demonstrate the particularly challenging collection of climate impacts that California faces. EPA's reliance on this single study to justify its change in position was inappropriate. *Genuine Parts Co.*, 890 F.3d at 346 ("[A]n agency ... may not minimize such evidence without adequate explanation.").

[52] Tony Barboza, "As Second Heat Wave Sears California, Experts Say Health Impacts Will Worsen With Climate Change," L.A. TIMES, Sept. 5, 2020, https://www.latimes.com/california/story/2020-09-05/heat-health-risks.

[53] NOAA, "Earth Just Had its Hottest September on Record," Oct. 14, 2020, https://www.noaa.gov/news/earth-just-had-its-hottest-september-on-record.

[54] M.Z. Jacobson, *Enhancement of Local Air Pollution by Urban CO2 Domes*, 44 ENVIRON. SCI. TECHNOL. 2497 (2010), DOI: https://doi.org/10.1021/es903018m.

[55] John Myers, "California Unveils Sweeping Wildfire Prevention Plan Amid Record Fire Losses and Drought," L.A. TIMES, Apr. 8, 2021, https://www.latimes.com/california/story/2021-04-08/california-wildfire-prevention-536-million-newsom-lawmakers.

[56] *See* Susanne Rust & Tony Barboza, "How Climate Change Is Fueling Record-Breaking California Wildfires, Heat and Smog," L.A. TIMES, Sept. 13, 2020, https://tinyurl.com/y4skzftm; Matthew Cappucci, "California's Wildfire Smoke Plumes Are Unlike Anything Previously Seen," WASH. POST, Sept. 12, 2020, https://tinyurl.com/y5au5r9z.

breaking heat waves and smoke from thousands of fires burning simultaneously, and the Bay Area even awoke to an eerie, dark, and deep-orange sky.[57] A recent study suggests that smoke from wildfires like these is a rapidly growing health threat and could become one of the deadliest climate impacts within decades.[58] And the economic toll of California's fires has been enormous—the 10 costliest wildfires in U.S. history all occurred in California[59]—and will only continue to grow. Since 2015, California has incurred as much as $100 billion in costs from 10 billion-dollar disasters, nearly half of which is attributable to wildfires.[60]

This year, California saw only a little over half of its traditional snowpack levels, and the snowpack is already melting rapidly—putting substantial areas of the State in emergency drought situations and amplifying the potential for another extremely dangerous wildfire season.[61] According to the National Drought Mitigation Center, approximately 95 percent of the State is in a "severe" drought, meaning the fire season will be extended, and 85 percent of the State is in an "extreme" drought, meaning the fire season is year-round.[62] As of May 2021, 41 counties in California are under a drought state of emergency.[63]

---

[57] Thomas Fuller & Christopher Flavelle, "A Climate Reckoning in Fire-Stricken California," N.Y. TIMES, Sept. 10, 2020, https://www.nytimes.com/2020/09/10/us/climate-change-california-wildfires.html.

[58] Tony Barboza, "Wildfire smoke now causes up to half the fine-particle pollution in Western U.S., study finds," L.A. TIMES, Jan. 13, 2021, https://www.latimes.com/california/story/2021-01-13/wildfire-smoke-fine-particle-pollution-western-us-study (new study links climate change to worsening air quality and health risks in both urban and rural communities in recent years); Marshall Burke, et al., *The Changing Risk and Burden of Wildfire in the United States*, PNAS 118(2) e2011048118 (Jan. 12. 2021), https://doi.org/10.1073/pnas.2011048118.

[59] Insurance Information Institute, Facts + Statistics: Wildfires, https://www.iii.org/fact-statistic/facts-statistics-wildfires.

[60] Senator Henry Stern, California Must Prepare for Financial Fallout as Cost of Climate Emergency Threatens to Drain Budgets, Sept. 25, 2020, https://sd27.senate.ca.gov/news/20200925-california-must-prepare-financial-fallout-cost-climate-emergency-threatens-drain; https://www.ncdc.noaa.gov/billions/.

[61] *E.g.*, Jeremy P. Jacobs, "Crisis mode: California Confronts Drought, Infrastructure Mess," E&E NEWS, May 11, 2021, https://www.eenews.net/greenwire/2021/05/11/stories/1063732257?utm_campaign=edition&utm_medium=email&utm_source=eenews%3Agreenwire; *see also* "As Drought Intensifies, State Seeing More Wildfires," E&E NEWS, May 26, 2021, https://www.eenews.net/climatewire/2021/05/26/stories/1063733501?utm_campaign=edition&utm_medium=email&utm_source=eenews%3Aclimatewire.

[62] Drought.gov, Current U.S. Drought Monitor Conditions for California (updated as of June 29, 2021), https://www.drought.gov/states/california.

[63] Ca.gov, Governor Newsom Expands Drought Emergency to Klamath River, Sacramento-San Joaquin Delta and Tulare Lake Watershed Counties, May 10, 2021, https://www.gov.ca.gov/2021/05/10/governor-newsom-expands-drought-emergency-to-klamath-river-sacramento-san-joaquin-delta-and-tulare-lake-watershed-counties/.

These recent unprecedented fire seasons, droughts, and the rising temperatures that help fuel them reaffirm that California's climate conditions are compelling and extraordinary and that EPA's conclusion to the contrary in SAFE 1 was arbitrary and capricious.

> **b.    The record also demonstrates that California needs its GHG and ZEV standards now**

The record also demonstrates 1) that California's GHG and ZEV standards effectively reduce greenhouse gas emissions now, 2) that these immediate emissions reductions are critical in avoiding climate "tipping points"—thresholds of abrupt and irreversible change—and 3) that the standards are necessary now to incentivize technological advancements essential to longer-term emission reductions. In SAFE 1, EPA failed to identify any contrary evidence that would undermine the inevitable conclusion that California needs these standards.

In erroneously concluding that California did not need its GHG and ZEV standards, EPA claimed California's standards would cause "indistinguishable change[s] in global temperatures." 84 Fed. Reg. at 51,341. That assertion rests on an inappropriately narrow construction of "need." *See supra* at 40. Indeed, if governments were limited to taking actions that would, by themselves, solve a particular problem, only the smallest of problems would ever be solvable. EPA's approach to "need" also ignores the incremental emission reductions that will result from California's GHG and ZEV standards as well as CARB's analysis in the record showing larger emissions impacts. CARB SAFE Comments at 57, 370; Waiver Request at 10, 16–17. Recently, CARB conducted another analysis of the emission reductions attributable to its GHG standards, confirming that these standards effectively reduce greenhouse gas emissions today and will increasingly do so in the future. Appendix C at 5–6, 9–11.

These incremental emissions reductions in greenhouse gas emissions are needed now because greenhouse gases can remain in the atmosphere for long time periods. Carbon dioxide in particular remains in the atmosphere longer than the other major greenhouse gases emitted as a result of human activities: once emitted, 40 percent will remain in the atmosphere after 100 years and 20 percent will reside after 1000 years; only after about 10,000 years will the remainder break down. As explained in the Fourth National Climate Assessment, "[w]aiting to begin reducing emissions is likely to increase the damages from climate-related extreme events (such as heat waves, droughts, wildfires, flash floods, and stronger storm surges due to higher sea levels and more powerful hurricanes)."[64]

Even moderate climate change could pose serious risks. For instance, there may be tipping points in the climate system such that even a small incremental change in temperature could push Earth's climate into catastrophic runaway global warming. Indeed, a recent commentary in the journal *Nature* warned that nine major climate tipping points (including the accelerating ice loss from the West Antarctic ice sheet) are "dangerously close" to being triggered.[65] Therefore, serious efforts to reduce GHG emissions are needed now to avoid scenarios where steeper (and

---

[64] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, at 1488 (2018) (EPA-HQ-OAR-2018-0283-7447).
[65] Timothy M. Lenton, et al., *Comment: Climate Tipping Points - Too Risky to Bet Against*, Nature (Apr. 9, 2020), https://www.nature.com/articles/d41586-019-03595-0.

likely more expensive) emission reductions are needed later. Delaying efforts to mitigate carbon dioxide emissions will have negative—and potentially irreversible—consequences for global warming and its impacts, including more extreme wildfires, rising sea levels, greater ocean acidification, and increased risks to food security and public health.

Finally, California's regulations are critical not just for immediate emissions reductions but also because they incentivize technological advancement that facilitates greater emission reductions in the future. Waiver Request at 2, 4–5, 16–17; CARB SAFE Comments at 373. Notably, in SAFE 1, EPA did not contest that California's GHG and ZEV standards are critical for incentivizing production and deployment of zero-emission vehicles, reducing greenhouse gas emissions, and achieving California's long-term greenhouse gas emission reduction goals. 84 Fed. Reg. at 51,337. Nor could it, given CARB's demonstration in its 2012 waiver request and the confirmation provided by the remainder of the record. *See, e.g.*, Waiver Request at 2–3, 8–9, 16–17; CARB Board Resolution 12-11.

In SAFE 1, EPA inappropriately narrowed its interpretation of "need" to exclude the incremental emission reductions from California's GHG and ZEV standards. EPA's SAFE 1 Section 209(b)(1)(B) Determination should be reversed on this additional ground: because this unjustified change in interpretation was unlawful, as explained above, and because the record firmly indicates that California does need these standards to reduce its contribution to its climate crisis,.

## V.    EPA SHOULD WITHDRAW ITS SECTION 177 DETERMINATION

In Section 177 of the Clean Air Act, Congress conferred directly on States the discretionary authority to adopt California motor vehicle emission standards, so long as: 1) the States' standards are identical to standards for which California has been granted a waiver by EPA; and 2) the States provide two years of lead time. 42 U.S.C. § 7507. This authority belongs exclusively to States, with no intermediary role for EPA. As the agency has long acknowledged: "States are not required to seek EPA approval under the terms of section 177."[66] The one prerequisite for a State to avail itself of Section 177 is that the State must have "plan provisions approved under" Part D of Subchapter I of the Act. *Id.*

Thirteen States have adopted California's light-duty vehicle GHG emission standards pursuant to Section 177, and many have been implementing these GHG standards for up to a decade. These standards play an important role in State's planning for reaching their GHG emission reduction targets and mandates[67] as well as in planning for attainment of NAAQS, which States face legal

---

[66] https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations#state

[67] For example, in 2019, New York State adopted the Climate Leadership and Community Protection Act, which mandates an 85% reduction in GHG emissions in New York by 2050. New York Environmental Conservation Law, Article 75.  In 2021, Massachusetts enacted new climate change legislation that mandates the Commonwealth achieve net-zero economywide greenhouse gas emissions by 2050, with interim milestones in 2030 and 2040 and a requirement to adopt sector-specific greenhouse gas emissions sublimits, including for the transportation sector. 2021 Mass. Acts Ch. 8. §§ 8–10. In 2007 New Jersey's legislature passed, and in 2018 modified, the Global Warming Response Act which mandates an 80% reduction in greenhouse

R-133, Appendix A: ZEV Criteria Benefits

**Appendix A**

State of California
Air Resources Board

# Criteria Pollutant Emission Reductions from California's Zero-Emission Vehicle Standards for Model Years 2017-2025

## Staff Report

**Date of Release: July 6, 2021**

This report has been prepared by the staff of the California Air Resources Board and approved by the Executive Officer for publication. At this time, this report has not been approved by a vote of the Board itself, and, accordingly, the views expressed herein should not be assumed to necessarily reflect those of the Board. In addition, the use of trade names or commercial products herein does not constitute endorsement or recommendation.

July 6, 2021
Page 2

# Summary

California has adopted requirements for zero-emission passenger vehicles for model years 2017-2025 as part of its Advanced Clean Cars (ACC) program. CARB analyzed three scenarios to estimate the emission benefits of these requirements:

- Estimates using the most recent version of CARB's emission inventory tool, EMFAC2021, that uses the most recent data and ZEV forecasting tools;
- Estimates using EMFAC2017, the version of CARB's emission inventory tool that U.S. EPA has approved for transportation and air quality planning under the Clean Air Act; and
- Estimates using EMFAC 2021 that estimate the benefits of manufacturer statements and California's policy directives to transition new passenger car and light-truck sales to zero-emission vehicles (ZEVs) by 2035.

All these scenarios show significant reductions in air pollution from the transition to ZEV technology. CARB has shown, including in implementation plans required under the Clean Air Act and approved by the U.S. Environmental Protection Agency, that a transition towards requiring nearly all new passenger vehicles to be zero emission is critical to attaining health and climate standards. California's authority to reduce emissions from vehicles is critical to meeting public health standards, including the National Ambient Air Quality Standards. Public health will improve dramatically if emissions from transportation-related combustion are nearly eliminated, through the proper regulatory course and in a reasonable time considering the costs and advancement of technology.

# Analysis

## ZEV Benefits Based on EMFAC2021

The first analysis uses the current version of CARB's on-road emission modeling tool, EMFAC2021,[1] to estimate the emission benefits of the ZEV requirements. EMFAC2021 uses the best available data and forecasting tools. These include the most recent available California Department of Motor Vehicle (DMV) population data and an updated market share projection that reflects recent policy and industry developments.

As one way of estimating the emission benefits of CARB's ZEV regulation for calendar years 2021, 2030, and 2035, CARB calculated the emissions benefits of the ZEV vehicles required under that regulation to illustrate that required ZEV sales have

---

[1] EMFAC is approved by U.S. EPA for planning required to meet the National Ambient Air Quality Standards. See 40 C.F.R. §§ 93.110, 93.111; 80 Fed.Reg. 77,337 (Dec. 14, 2014) [EMFAC2014 approval]; 84 Fed.Reg. 41,717 (Aug. 15, 2019) [EMFAC2017 approval]. EMFAC2021 is pending approval.

reduced harmful emissions in California to date and will continue to do so in the coming years. Results for calendar years 2023, 2031, and 2037 are also included to show the reductions needed for the South Coast air basin to attain the ozone National Ambient Air Quality Standards (NAAQS) by the applicable deadlines. These results are presented in Tables 1 through 6 below.

California's ZEV program for passenger vehicles is expected to result, by the end of 2021, in approximately 360,000 pure zero-emission electric vehicles (i.e., battery or fuel cell electric vehicles) and 200,000 plug-in hybrid electric vehicles of model year 2017 and newer operating in California. If these ZEVs instead had been equivalent model year gasoline vehicles, these vehicles would have emitted in calendar year 2021 an additional:

- 326 tons of NOx exhaust emissions,
- 366 tons of total organic gas (TOG) exhaust and evaporative emissions, and
- 16 tons of PM2.5 exhaust emissions

By the first key ozone NAAQS attainment year of 2023, the ZEV requirements are predicted to result in California having approximately 585,000 zero-emission electric vehicles and 308,000 plug-in hybrid electric vehicles of model year 2017 or newer operating on the State's highways. If those ZEVs were replaced with gasoline vehicles of an equivalent model year in calendar year 2023, they are estimated to emit an additional:

- 516 tons of NOx exhaust emissions,
- 538 tons of TOG exhaust and evaporative emissions, and
- 20 tons of PM2.5 exhaust emissions.

Looking forward to 2030, California's requirements for zero-emission vehicles are expected to result in approximately 1.4 million zero-emission electric vehicles and more than 600,000 plug-in hybrid vehicles of model year 2017 and newer operating in California. Substituting these ZEVs with equivalent model year gasoline vehicles is projected to result in calendar year 2030 of an additional:

- 1,122 tons of NOx exhaust emissions,
- 1,017 tons of TOG exhaust and evaporative emissions, and
- 27 tons of PM2.5 exhaust emissions.

By the second key ozone NAAQS attainment year of 2031, approximately 1.5 million zero-emission electric vehicles and 666,000 plug-in hybrid vehicles of model year 2017 and newer are projected to operate in California under the ZEV program. Replacing these ZEVs with equivalent model year gasoline vehicles in calendar year 2031 is projected to have an additional:

- 1,202 tons of NOx exhaust emissions,
- 1,081 tons of TOG exhaust and evaporative emissions, and
- 27 tons of PM2.5 exhaust emissions.

In 2035, CARB expects to see approximately 1.8 million zero-emission electric vehicles and 790,000 plug-in hybrid vehicles of model year 2017 and newer. If these vehicles were to be replaced with equivalent gasoline vehicles, they would have emitted in calendar year 2035 an additional:

- 1,476 tons of NOx exhaust emissions,
- 1,408 tons of TOG exhaust and evaporative emissions, and
- 26 tons of PM2.5 exhaust emissions.

By the third key ozone NAAQS attainment year of 2037, California's ZEV program is expected to result in approximately 2.0 million zero-emission electric vehicles and 837,000 plug-in hybrid vehicles of model year 2017 and newer. To substitute these ZEVs with equivalent model year gasoline vehicles, in calendar year 2037 they would have emitted an additional:

- 1,580 tons of NOx exhaust emissions,
- 1,579 tons of TOG exhaust and evaporative emissions, and
- 26 tons of PM2.5 exhaust emissions.

The methods used to calculate these estimates are described in the methodology section of this document, below. Tables 1 through 6 show the estimated emission benefits, separated by the major criteria pollutants from electric and plug-in hybrid vehicles, in years 2021, 2023, 2030, 2031, 2035 and 2037, separately.

## ZEV Benefits Based on EMFAC2017

CARB also estimated the same emission benefits using the prior version of CARB's model, EMFAC2017. U.S. EPA has approved this model for transportation and air quality planning. This version estimates ZEV population under a minimum compliance scenario and does not reflect the significant increase in ZEV sales over the most recent model years. EMFAC2017 likely underestimates the actual benefits that will result from California's ZEV program, but was used as a comparison to the estimates using the updated data and forecasting tools and to provide an estimate using the model currently approved by U.S. EPA for use in planning under the Clean Air Act. These emission benefits are presented in Tables 7 through 12. In sum, by 2037, the ZEV standards will have avoided:

- 687 tons of NOx exhaust emissions,
- 915 tons of TOG exhaust and evaporative emissions, and
- 15 tons of PM2.5 exhaust emissions.

## ZEV Benefits from 100% ZEVs

Finally, to fully underscore the magnitude of emission benefits ZEVs can achieve and the critical role they can play in meeting State and federal air quality and climate requirements, CARB estimated the emission benefits if the California fleet fully

transitions to zero-emission technology after model year 2025.[2] Staff's preliminary assessment, focused solely on emission benefits, shows that a full transition to the sale of 100% zero-emission passenger vehicles by 2035, with the criteria emissions standards[3] for internal combustion engines maintained in the interim, can lead to significant annual emissions benefits as presented in Table 13 of this document. The preliminary assessment only selected NOx, hydrocarbon (HC), and PM. In calendar year 2037, the increased sales of ZEVs in model years 2025-2037 would have avoided:

- 6,274 tons per year NOx exhaust emissions,
- 5,504 tons per year HC exhaust and evaporative emissions, and
- 861 tons per year PM exhaust and brake wear emissions.

To consider these reductions in context, NOx emissions in the South Coast air basin are approximately 278 tons per day as of calendar year 2021 for all mobile sources (annual average).[4]  These emissions must be reduced to 141 tons per day to meet the 1997 ozone NAAQS of 80 parts per billion (ppb), which has a deadline of 2023. To meet the 2008 standard of 75 ppb, which has a deadline of 2031, NOx emissions must be reduced to 96 tpd. A significant portion of the reductions described above will occur in the South Coast air basin because of its high concentration of people, vehicles, and refineries; they are a significant part of the solution to meeting the air quality standards in California. Every reduction matters for meeting these health-based standards. (Other regions in California are also in non-attainment with federal air quality standards for ozone, and reductions of all sizes are likewise needed there, although the South Coast air basin faces the most significant ozone air quality challenge in the country.)

# Methodology

The following assumptions and methodologies were used in the above analyses:

---

[2] Automakers representing one-third of California's market have already announced targets for greater than 50% ZEV sales by 2030, as well as significant financial commitments to electrification and sustainability. See CARB, Advanced *May 2021 Advanced Clean Cars (ACC) Workshop Presentation*, May 6, 2021, slide 39. Governor Newsom, through Executive Order N-79-20, has also directed CARB to consider regulations to require all zero-emission new passenger car and truck sales in the State. CARB staff are developing the Advance Clean Cars II program focusing on post-2025 model year light-duty vehicles and are considering, in light of the current state of technology, where the next iteration of its ZEV standard will fall. This is an ongoing public process, and CARB welcomes participation from all stakeholders. For purposes of this analysis and commenting on U.S. EPA's proposal to reconsider SAFE 1, CARB provides the potential emission benefits of 100% ZEV sales by 2035 to illustrate how critical a role the ZEV standard can play in achieving requisite criteria and GHG emission reductions. This does not necessarily represent where CARB's ACC II program may end up.

[3] Assuming non-ZEV fleet will meet the 0.030 g/mi of HC+NOx standard.

[4] Based on CARB's CEPAM 2016 SIP Standard Emissions Tool
*https://www.arb.ca.gov/app/emsinv/fcemssumcat/fcemssumcat2016.php*.

July 6, 2021
Page 6

1. EMFAC2021 v1.0.1 and EMFAC2017 v1.0.3
   https://arb.ca.gov/emfac/emissions-inventory are used to generate the default light-duty vehicle population and emission outputs. EMFAC2021 is based on the best available vehicle emissions and activity data, and reflects the most recent model development, emission standards, and adopted regulations in California. EMFAC2017 is the prior model version and has been approved by U.S. EPA in 2019 for use in state implementation plan development and transportation conformity in California.

2. For MY2017+, staff assumed the total light-duty vehicle population of pure electric and plug-in hybrid electric vehicles (PHEV) would be replaced with conventional or internal-combustion engine (ICE) gasoline vehicles. EMFAC2021 utilizes the historical vehicle registration data from the California Department of Motor Vehicles (DMV) to estimate California's vehicle population prior to 2019 and is using the best available forecasting methods (as described in the EMFAC2021 technical documentation[5]) to forecast the fleet population for years 2020 and onward.

3. In each model year, the light-duty car and truck categories had different vehicle technology group combinations to achieve the required fleet average emission standard, from about 0.091 g/mile in MY2017 to 0.030 g/mile in MY2025 and beyond. For the replaced vehicles, staff assumed that for each model year, the replaced vehicles will have the same emission rate in grams/vehicle/day per gasoline vehicle, which is calculated from the total estimated emissions of light-duty gasoline vehicles in tons/day for each pollutant, divided by the light-duty gasoline car and truck population for each 2017 and newer model year under the chosen calendar year using the default EMFAC2021 output. The replaced vehicles are not any specified vehicle type, but reflects the fleet average light-duty car and truck emission rate of each model year.

4. Using this information, the benefits of zero emission vehicles are calculated as:
   $$Emissions\ Benefits\ (tons/year) =$$
   $$\{[Gasoline\ Vehicle\ Emission\ Rate\ (grams/vehicle/day) \times$$
   $$Total\ Electricity\ and\ PHEV\ Population) \div 907185\ (grams/ton)] -$$
   $$EMFAC2021\ PHEV\ Emissions\ (tons/day)\} \times 347\ (days/year)$$

5. Calendar Years 2021, 2023, 2030, 2031,2035 and 2037 are selected to demonstrate the approach. 2023, 2031, and 2037 are the deadlines for the South Coast air basin to attain the NAAQS for ozone. The emission benefits evaluated include NOx total exhaust emissions (NOx_TOTEX), total organic gas (TOG) total exhaust (TOG_TOTEX) and evaporative emissions (TOG_EVAP), PM10 (PM10_TOTEX) and PM2.5 (PM2.5_TOTEX) total exhaust emissions, separately. The TOG evaporative emissions will be calculated from the total

---

[5] See CARB, EMFAC2021 Volume III Technical Document Version 1.0.1 April, 2021, pp. 170-172, available at: https://ww2.arb.ca.gov/sites/default/files/2021-04/emfac2021_technical_documentation_april2021.pdf

July 6, 2021
Page 7

TOG emissions (TOG_TOTAL) minus total TOG exhaust emissions (TOG_TOTEX).

6. Finally, for purposes of this analysis in illustrating potential emission benefits of a more aggressive scenario of all new passenger vehicle sales being zero-emission by 2035, staff assumes 1% of vehicle sales will be very-low emission engines as an artifact of remaining credit balances, and that about 20% of ZEVs will be plug-in hybrid electric vehicles. EMFAC2021 is used to generate emissions for the selected calendar years and results are compared with default results that do not contain this more aggressive scenario. Note that this is a preliminary assessment based on potential emissions reductions from the developing Advanced Clean Cars II program, and therefore both the numbers and assumptions are subject to change through the regulatory development process to ultimate adoption by CARB's Board. Any estimates of the emission benefits of proposed regulations will be based on the terms of those proposals.

July 6, 2021
Page 8

**Table 1. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2021 Estimated from EMFAC2021**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1,761,857 | 53,040 | 45,887 | 63.20 | 49.36 | 21.49 | 3.14 | 2.88 |
| 2018 | 1,664,054 | 91,971 | 46,925 | 88.32 | 70.36 | 28.22 | 5.24 | 4.82 |
| 2019 | 1,439,688 | 67,342 | 34,733 | 60.61 | 47.81 | 20.83 | 3.78 | 3.48 |
| 2020 | 1,130,389 | 65,310 | 33,970 | 54.08 | 41.95 | 17.67 | 2.74 | 2.52 |
| 2021 | 1,194,017 | 81,141 | 41,713 | 60.02 | 46.05 | 22.06 | 2.20 | 2.03 |
| *Total* | *7,190,005* | *358,804* | *203,228* | *326* | *256* | *110* | *17* | *16* |

**Table 2. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2023 Estimated from EMFAC2021**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1,670,673 | 49,736 | 43,025 | 62.93 | 47.73 | 21.48 | 2.79 | 2.56 |
| 2018 | 1,601,896 | 88,001 | 44,810 | 90.71 | 69.58 | 28.50 | 4.75 | 4.37 |
| 2019 | 1,377,643 | 64,738 | 33,061 | 63.65 | 47.75 | 21.13 | 3.44 | 3.16 |
| 2020 | 1,083,871 | 62,723 | 32,594 | 58.22 | 42.25 | 16.81 | 2.49 | 2.29 |
| 2021 | 1,301,842 | 88,377 | 45,362 | 75.51 | 53.20 | 23.83 | 2.27 | 2.09 |
| 2022 | 1,506,367 | 117,592 | 57,049 | 89.90 | 61.70 | 27.16 | 3.15 | 2.90 |
| 2023 | 1,341,403 | 113,719 | 52,192 | 75.17 | 50.52 | 26.32 | 3.15 | 2.89 |
| *Total* | *9,883,695* | *584,886* | *308,092* | *516* | *373* | *165* | *22* | *20* |

**Table 3. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2030 Estimated from EMFAC2021**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1,171,534 | 33,196 | 29,042 | 44.14 | 32.64 | 27.44 | 1.44 | 1.32 |

July 6, 2021
Page 9

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2018 | 1,172,676 | 61,338 | 31,733 | 68.29 | 50.18 | 41.08 | 2.58 | 2.37 |
| 2019 | 1,060,740 | 47,916 | 24,787 | 52.92 | 37.11 | 32.40 | 1.98 | 1.82 |
| 2020 | 865,905 | 48,302 | 25,425 | 52.74 | 34.83 | 28.59 | 1.49 | 1.37 |
| 2021 | 1,071,287 | 70,581 | 36,650 | 74.81 | 46.56 | 21.47 | 1.41 | 1.29 |
| 2022 | 1,264,816 | 96,896 | 47,309 | 97.76 | 57.18 | 23.63 | 2.02 | 1.86 |
| 2023 | 1,298,428 | 108,549 | 49,978 | 102.48 | 56.10 | 25.50 | 2.33 | 2.14 |
| 2024 | 1,328,316 | 118,306 | 52,422 | 102.76 | 50.75 | 27.92 | 2.63 | 2.42 |
| 2025 | 1,372,397 | 128,913 | 55,600 | 100.16 | 43.19 | 29.16 | 2.97 | 2.73 |
| 2026 | 1,427,168 | 118,969 | 52,365 | 88.46 | 38.52 | 27.08 | 2.43 | 2.24 |
| 2027 | 1,453,913 | 126,340 | 54,553 | 88.82 | 39.95 | 28.84 | 2.13 | 1.96 |
| 2028 | 1,492,029 | 135,186 | 56,763 | 88.78 | 41.59 | 30.95 | 1.85 | 1.70 |
| 2029 | 1,519,090 | 142,232 | 58,351 | 86.24 | 42.37 | 32.65 | 2.01 | 1.84 |
| 2030 | 1,368,210 | 134,517 | 53,328 | 73.92 | 38.58 | 30.93 | 1.95 | 1.79 |
| Total | 17,866,509 | 1,371,241 | 628,306 | 1,122 | 610 | 408 | 29 | 27 |

**Table 4. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2031 Estimated from EMFAC2021**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1,071,221 | 30,057 | 26,384 | 39.81 | 29.47 | 24.69 | 1.26 | 1.16 |
| 2018 | 1,092,974 | 56,594 | 29,425 | 62.97 | 46.23 | 37.70 | 2.29 | 2.11 |
| 2019 | 988,258 | 44,336 | 23,007 | 49.10 | 34.32 | 29.81 | 1.76 | 1.62 |
| 2020 | 820,271 | 45,591 | 24,024 | 50.09 | 32.90 | 26.83 | 1.36 | 1.25 |
| 2021 | 1,014,781 | 66,643 | 34,650 | 71.42 | 44.09 | 39.53 | 1.28 | 1.18 |
| 2022 | 1,219,075 | 92,965 | 45,454 | 95.33 | 55.19 | 22.56 | 1.87 | 1.72 |
| 2023 | 1,249,998 | 103,905 | 47,942 | 100.32 | 54.20 | 25.30 | 2.15 | 1.98 |
| 2024 | 1,293,112 | 114,771 | 50,923 | 102.62 | 49.87 | 26.95 | 2.46 | 2.26 |

July 6, 2021
Page 10

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2025 | 1,330,016 | 124,459 | 53,759 | 100.34 | 42.49 | 29.38 | 2.77 | 2.54 |
| 2026 | 1,398,587 | 116,253 | 51,224 | 90.36 | 38.51 | 26.34 | 2.29 | 2.11 |
| 2027 | 1,430,048 | 123,999 | 53,590 | 91.90 | 40.29 | 28.19 | 2.02 | 1.86 |
| 2028 | 1,456,568 | 131,849 | 55,384 | 92.24 | 41.85 | 30.04 | 1.74 | 1.60 |
| 2029 | 1,495,012 | 140,282 | 57,490 | 91.74 | 43.32 | 32.06 | 1.91 | 1.76 |
| 2030 | 1,519,756 | 149,237 | 59,187 | 90.02 | 44.72 | 34.18 | 2.09 | 1.92 |
| 2031 | 1,374,436 | 135,129 | 53,570 | 74.20 | 38.74 | 31.07 | 1.96 | 1.80 |
| *Total* | *18,754,112* | *1,476,072* | *666,013* | *1,202* | *636* | *445* | *29* | *27* |

**Table 5. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2035 Estimated from EMFAC2021**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2017 | 676,018 | 18,043 | 16,106 | 23.09 | 17.25 | 33.62 | 0.65 | 0.60 |
| 2018 | 726,693 | 35,783 | 19,106 | 38.95 | 28.67 | 55.20 | 1.26 | 1.15 |
| 2019 | 687,254 | 29,611 | 15,619 | 32.40 | 22.56 | 46.16 | 1.02 | 0.94 |
| 2020 | 593,252 | 32,125 | 17,035 | 35.25 | 22.89 | 45.78 | 0.82 | 0.76 |
| 2021 | 763,839 | 49,217 | 25,714 | 53.44 | 32.37 | 28.52 | 0.82 | 0.75 |
| 2022 | 949,815 | 71,450 | 35,064 | 75.43 | 42.49 | 35.46 | 1.24 | 1.14 |
| 2023 | 1,007,414 | 82,698 | 38,295 | 83.75 | 43.63 | 41.23 | 1.48 | 1.36 |
| 2024 | 1,076,841 | 94,160 | 41,998 | 90.18 | 41.89 | 47.21 | 1.74 | 1.60 |
| 2025 | 1,138,154 | 104,886 | 45,573 | 92.67 | 37.32 | 52.93 | 2.02 | 1.85 |
| 2026 | 1,224,047 | 100,179 | 44,415 | 87.21 | 35.10 | 24.31 | 1.71 | 1.57 |
| 2027 | 1,272,643 | 108,812 | 47,308 | 92.50 | 37.91 | 26.50 | 1.54 | 1.41 |
| 2028 | 1,324,547 | 118,591 | 50,062 | 97.75 | 40.92 | 27.82 | 1.36 | 1.25 |
| 2029 | 1,363,588 | 126,851 | 52,199 | 100.94 | 43.24 | 29.85 | 1.50 | 1.38 |
| 2030 | 1,408,044 | 137,839 | 54,750 | 105.08 | 46.32 | 31.00 | 1.67 | 1.54 |

July 6, 2021
Page 11

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2031 | 1,443,939 | 141,712 | 56,217 | 103.33 | 46.56 | 32.03 | 1.78 | 1.64 |
| 2032 | 1,474,914 | 145,038 | 57,478 | 100.29 | 46.40 | 32.92 | 1.89 | 1.74 |
| 2033 | 1,517,172 | 149,322 | 59,150 | 96.90 | 46.31 | 34.05 | 2.01 | 1.85 |
| 2034 | 1,547,365 | 151,962 | 60,264 | 91.38 | 45.47 | 34.81 | 2.12 | 1.95 |
| 2035 | 1,397,424 | 137,390 | 54,466 | 75.18 | 39.33 | 31.59 | 1.98 | 1.82 |
| Total | 21,592,963 | 1,835,669 | 790,819 | 1,476 | 717 | 691 | 29 | 26 |

**Table 6. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2037 Estimated from EMFAC2021**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2017 | 496,490 | 12,805 | 11,577 | 15.97 | 12.01 | 64.42 | 0.43 | 0.40 |
| 2018 | 550,355 | 26,158 | 14,223 | 27.89 | 20.63 | 39.82 | 0.86 | 0.79 |
| 2019 | 533,639 | 22,371 | 11,924 | 24.04 | 16.78 | 34.41 | 0.72 | 0.66 |
| 2020 | 472,503 | 25,148 | 13,381 | 27.20 | 17.65 | 35.34 | 0.60 | 0.55 |
| 2021 | 623,338 | 39,603 | 20,738 | 42.62 | 25.72 | 56.18 | 0.61 | 0.56 |
| 2022 | 791,255 | 58,873 | 28,949 | 62.00 | 34.69 | 75.77 | 0.95 | 0.87 |
| 2023 | 859,063 | 69,900 | 32,419 | 71.10 | 36.66 | 34.43 | 1.16 | 1.07 |
| 2024 | 934,956 | 81,168 | 36,285 | 78.68 | 36.03 | 40.21 | 1.39 | 1.28 |
| 2025 | 1,004,667 | 92,104 | 40,092 | 83.01 | 32.89 | 45.94 | 1.64 | 1.51 |
| 2026 | 1,098,477 | 89,487 | 39,745 | 80.05 | 31.62 | 44.97 | 1.42 | 1.30 |
| 2027 | 1,161,921 | 98,760 | 43,043 | 87.01 | 34.91 | 49.85 | 1.29 | 1.19 |
| 2028 | 1,228,842 | 109,133 | 46,237 | 94.12 | 38.47 | 26.41 | 1.16 | 1.07 |
| 2029 | 1,277,774 | 118,001 | 48,731 | 99.25 | 41.33 | 28.65 | 1.29 | 1.19 |
| 2030 | 1,328,353 | 129,282 | 51,509 | 105.34 | 44.91 | 30.21 | 1.46 | 1.34 |
| 2031 | 1,371,458 | 133,851 | 53,251 | 105.74 | 45.80 | 31.42 | 1.57 | 1.44 |
| 2032 | 1,422,045 | 139,226 | 55,298 | 105.95 | 46.75 | 31.32 | 1.69 | 1.55 |

July 6, 2021
Page 12

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | EMFAC Population PHEV | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|---|
| 2033 | 1,457,795 | 143,090 | 56,760 | 104.15 | 46.97 | 32.34 | 1.79 | 1.65 |
| 2034 | 1,488,416 | 146,383 | 58,007 | 101.04 | 46.79 | 33.23 | 1.90 | 1.75 |
| 2035 | 1,530,253 | 150,624 | 59,663 | 97.57 | 46.67 | 34.35 | 2.03 | 1.86 |
| 2036 | 1,559,736 | 153,184 | 60,748 | 91.93 | 45.80 | 35.09 | 2.13 | 1.96 |
| 2037 | 1,407,545 | 138,385 | 54,861 | 75.57 | 39.58 | 31.82 | 1.99 | 1.83 |
| *Total* | *22,598,881* | *1,977,534* | *837,439* | *1,580* | *743* | *836* | *28* | *26* |

**Table 7. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2021 Estimated from EMFAC2017**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2017 | 1,707,208 | 33,578 | 22.91 | 16.89 | 9.05 | 1.43 | 1.32 |
| 2018 | 1,789,432 | 35,247 | 22.79 | 16.74 | 8.07 | 1.62 | 1.49 |
| 2019 | 1,872,756 | 38,985 | 23.38 | 16.90 | 8.21 | 1.76 | 1.61 |
| 2020 | 1,925,463 | 52,245 | 28.34 | 20.20 | 10.43 | 1.75 | 1.61 |
| 2021 | 1,753,482 | 60,092 | 29.80 | 20.81 | 11.43 | 1.30 | 1.19 |
| *Total* | *9,048,341* | *220,147* | *127* | *92* | *47* | *8* | *7* |

**Table 8. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2023 Estimated from EMFAC2017**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2017 | 1,616,231 | 31,671 | 21.15 | 15.64 | 12.20 | 1.23 | 1.13 |
| 2018 | 1,720,501 | 33,770 | 21.41 | 15.77 | 9.71 | 1.42 | 1.30 |
| 2019 | 1,794,590 | 37,277 | 21.96 | 15.91 | 9.49 | 1.53 | 1.41 |
| 2020 | 1,848,275 | 50,157 | 26.83 | 19.10 | 11.36 | 1.53 | 1.41 |

July 6, 2021
Page 13

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2021 | 1,910,812 | 65,516 | 32.22 | 22.38 | 13.85 | 1.29 | 1.18 |
| 2022 | 1,944,581 | 80,665 | 35.92 | 24.37 | 16.39 | 1.64 | 1.51 |
| 2023 | 1,755,829 | 84,326 | 33.59 | 22.07 | 16.51 | 1.78 | 1.63 |
| *Total* | *12,590,818* | *383,383* | *193* | *135* | *90* | *10* | *10* |

**Table 9. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2030 Estimated from EMFAC2017**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2017 | 1,127,802 | 21,739 | 13.53 | 9.94 | 22.75 | 0.63 | 0.58 |
| 2018 | 1,247,826 | 24,145 | 14.39 | 10.49 | 17.15 | 0.75 | 0.69 |
| 2019 | 1,367,976 | 28,097 | 15.75 | 11.25 | 18.50 | 0.86 | 0.79 |
| 2020 | 1,462,409 | 39,275 | 20.41 | 14.10 | 20.59 | 0.89 | 0.82 |
| 2021 | 1,558,158 | 53,180 | 26.18 | 17.24 | 25.61 | 0.78 | 0.71 |
| 2022 | 1,622,234 | 67,050 | 31.00 | 19.34 | 25.56 | 1.01 | 0.93 |
| 2023 | 1,689,450 | 80,927 | 35.43 | 20.38 | 27.64 | 1.27 | 1.16 |
| 2024 | 1,738,183 | 94,365 | 39.56 | 20.22 | 26.78 | 1.53 | 1.41 |
| 2025 | 1,802,153 | 109,068 | 44.20 | 19.35 | 28.12 | 1.83 | 1.68 |
| 2026 | 1,860,393 | 112,676 | 43.68 | 19.97 | 26.85 | 1.67 | 1.54 |
| 2027 | 1,907,670 | 115,617 | 42.76 | 20.46 | 25.86 | 1.42 | 1.31 |
| 2028 | 1,976,732 | 119,856 | 42.17 | 21.18 | 25.43 | 1.20 | 1.10 |
| 2029 | 2,028,476 | 122,928 | 41.03 | 21.73 | 25.00 | 1.27 | 1.17 |
| 2030 | 1,848,208 | 112,003 | 35.35 | 19.84 | 21.94 | 1.20 | 1.10 |
| *Total* | *23,237,670* | *1,100,925* | *445* | *245* | *338* | *16* | *15* |

July 6, 2021
Page 14

**Table 10. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2031 Estimated from EMFAC2017**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2017 | 1,031,258 | 19,780 | 12.18 | 8.93 | 22.31 | 0.55 | 0.50 |
| 2018 | 1,161,484 | 22,389 | 13.22 | 9.61 | 17.08 | 0.67 | 0.62 |
| 2019 | 1,273,815 | 26,108 | 14.52 | 10.33 | 18.59 | 0.76 | 0.70 |
| 2020 | 1,384,461 | 37,139 | 19.21 | 13.19 | 21.03 | 0.81 | 0.74 |
| 2021 | 1,474,864 | 50,307 | 24.76 | 16.15 | 26.39 | 0.71 | 0.65 |
| 2022 | 1,561,296 | 64,477 | 29.96 | 18.44 | 26.61 | 0.94 | 0.86 |
| 2023 | 1,623,050 | 77,655 | 34.43 | 19.42 | 29.61 | 1.17 | 1.07 |
| 2024 | 1,689,278 | 91,649 | 39.34 | 19.55 | 31.31 | 1.43 | 1.31 |
| 2025 | 1,743,661 | 105,437 | 44.38 | 18.69 | 29.93 | 1.70 | 1.57 |
| 2026 | 1,820,926 | 110,206 | 44.49 | 19.53 | 28.42 | 1.57 | 1.45 |
| 2027 | 1,874,953 | 113,560 | 43.85 | 20.11 | 27.07 | 1.34 | 1.23 |
| 2028 | 1,929,773 | 116,958 | 43.09 | 20.68 | 26.16 | 1.12 | 1.03 |
| 2029 | 1,998,944 | 121,204 | 42.47 | 21.40 | 25.72 | 1.21 | 1.11 |
| 2030 | 2,050,376 | 124,257 | 41.31 | 21.94 | 25.27 | 1.28 | 1.18 |
| 2031 | 1,867,302 | 113,159 | 35.57 | 20.02 | 22.17 | 1.21 | 1.11 |
| Total | 24,485,440 | 1,194,285 | 483 | 258 | 378 | 16 | 15 |

**Table 11. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2035 Estimated from EMFAC2017**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2017 | 652,599 | 12,162 | 7.10 | 5.20 | 17.56 | 0.29 | 0.26 |
| 2018 | 769,029 | 14,457 | 8.14 | 5.89 | 13.95 | 0.37 | 0.34 |
| 2019 | 883,819 | 17,840 | 9.54 | 6.72 | 16.37 | 0.44 | 0.41 |
| 2020 | 998,159 | 26,544 | 13.36 | 8.98 | 19.30 | 0.49 | 0.45 |

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2021 | 1,106,549 | 37,627 | 18.33 | 11.54 | 25.89 | 0.45 | 0.41 |
| 2022 | 1,212,707 | 49,938 | 23.44 | 13.69 | 26.44 | 0.62 | 0.57 |
| 2023 | 1,303,587 | 62,189 | 28.66 | 14.99 | 31.17 | 0.79 | 0.73 |
| 2024 | 1,399,855 | 75,682 | 35.11 | 15.68 | 35.75 | 1.00 | 0.92 |
| 2025 | 1,483,341 | 89,365 | 42.68 | 15.60 | 39.60 | 1.23 | 1.13 |
| 2026 | 1,583,338 | 95,459 | 44.20 | 16.74 | 39.42 | 1.16 | 1.07 |
| 2027 | 1,658,048 | 100,064 | 44.80 | 17.59 | 38.17 | 1.01 | 0.93 |
| 2028 | 1,745,961 | 105,507 | 45.55 | 18.58 | 36.06 | 0.86 | 0.79 |
| 2029 | 1,816,999 | 109,879 | 45.62 | 19.36 | 31.19 | 0.93 | 0.86 |
| 2030 | 1,898,706 | 114,924 | 45.75 | 20.25 | 29.65 | 1.01 | 0.93 |
| 2031 | 1,960,815 | 118,770 | 45.21 | 20.90 | 28.32 | 1.08 | 0.99 |
| 2032 | 2,015,720 | 122,178 | 44.36 | 21.47 | 27.33 | 1.15 | 1.06 |
| 2033 | 2,084,769 | 126,417 | 43.65 | 22.18 | 26.84 | 1.23 | 1.13 |
| 2034 | 2,134,760 | 129,374 | 42.36 | 22.71 | 26.33 | 1.30 | 1.20 |
| 2035 | 1,940,276 | 117,582 | 36.40 | 20.68 | 23.05 | 1.22 | 1.13 |
| Total | 28,649,038 | 1,525,960 | 624 | 299 | 532 | 17 | 15 |

**Table 12. Emissions Benefits from Electric and Plug-in Hybrid Vehicles in CY2037 Estimated from EMFAC2017**

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2017 | 481,250 | 8,746 | 4.95 | 3.63 | 13.98 | 0.19 | 0.17 |
| 2018 | 581,085 | 10,704 | 5.86 | 4.24 | 11.38 | 0.25 | 0.23 |
| 2019 | 686,039 | 13,689 | 7.14 | 5.01 | 13.92 | 0.31 | 0.29 |
| 2020 | 794,431 | 20,995 | 10.37 | 6.92 | 16.88 | 0.36 | 0.33 |
| 2021 | 902,009 | 30,598 | 14.74 | 9.15 | 23.44 | 0.34 | 0.31 |
| 2022 | 1,008,751 | 41,440 | 19.40 | 11.09 | 24.22 | 0.47 | 0.43 |

July 6, 2021
Page 16

| Model Year | EMFAC Population Gasoline | EMFAC Population Electricity | Emissions Benefits (tons/year) NOx_Exhaust | Emissions Benefits (tons/year) TOG_Exhaust | Emissions Benefits (tons/year) TOG_Evap | Emissions Benefits (tons/year) PM10_Exhaust | Emissions Benefits (tons/year) PM2.5_Exhaust |
|---|---|---|---|---|---|---|---|
| 2023 | 1,109,572 | 52,818 | 24.60 | 12.45 | 29.43 | 0.62 | 0.57 |
| 2024 | 1,213,438 | 65,480 | 31.22 | 13.32 | 34.67 | 0.80 | 0.74 |
| 2025 | 1,307,809 | 78,673 | 39.40 | 13.55 | 39.44 | 1.00 | 0.92 |
| 2026 | 1,419,113 | 85,441 | 41.74 | 14.81 | 40.37 | 0.96 | 0.88 |
| 2027 | 1,510,729 | 91,019 | 43.23 | 15.85 | 40.33 | 0.85 | 0.78 |
| 2028 | 1,614,479 | 97,340 | 44.83 | 17.03 | 40.20 | 0.74 | 0.68 |
| 2029 | 1,696,631 | 102,397 | 45.59 | 17.96 | 39.06 | 0.80 | 0.74 |
| 2030 | 1,785,659 | 107,911 | 46.32 | 18.95 | 36.88 | 0.87 | 0.80 |
| 2031 | 1,857,354 | 112,324 | 46.36 | 19.74 | 31.89 | 0.94 | 0.87 |
| 2032 | 1,939,813 | 117,417 | 46.46 | 20.63 | 30.29 | 1.02 | 0.94 |
| 2033 | 2,001,986 | 121,270 | 45.89 | 21.29 | 28.92 | 1.09 | 1.00 |
| 2034 | 2,056,690 | 124,666 | 44.99 | 21.85 | 27.90 | 1.16 | 1.07 |
| 2035 | 2,125,638 | 128,899 | 44.23 | 22.56 | 27.37 | 1.24 | 1.14 |
| 2036 | 2,174,905 | 131,809 | 42.88 | 23.07 | 26.83 | 1.31 | 1.21 |
| 2037 | 1,974,898 | 119,680 | 36.81 | 20.99 | 23.46 | 1.23 | 1.13 |
| Total | 30,242,278 | 1,663,316 | 687 | 314 | 601 | 17 | 15 |

Table 13. Annual Statewide Criteria Emissions Benefits of Full Transition to Zero Emission Vehicles under ACC II proposal[6]

| Calendar Year | Annual Emissions Benefit (tons/year)* NOx (tpy) | Annual Emissions Benefit (tons/year)* HC (tpy) | Annual Emissions Benefit (tons/year)* PM (tpy)** |
|---|---|---|---|
| 2030 | 1,483 | 1,341 | 235 |

[6] The scenario presents the ZEV sales requirements as well as fleet average criteria pollutant standards for non-methane organic gases and oxides of nitrogen (NMOG+NOx) that contribute to ozone pollution, for conventional vehicles. For this scenario staff assumes that by 2035, only

July 6, 2021
Page 17

| Calendar Year | Annual Emissions Benefit (tons/year)* NOx (tpy) | Annual Emissions Benefit (tons/year)* HC (tpy) | Annual Emissions Benefit (tons/year)* PM (tpy)** |
|---|---|---|---|
| **2031** | 1,988 | 1,804 | 306 |
| **2035** | 4,697 | 4,155 | 667 |
| **2037** | 6,274 | 5,504 | 861 |

* For this assessment, staff calculated emissions benefit for total hydrocarbons (HC), and total particulate matter (PM). For the ACC II regulatory proposal, staff will provide emissions benefits in terms of total organic gases (TOG) and fine particulate matter (PM2.5).

* including PM emissions benefit from reduced brake wear as zero emission vehicles deploy regenerative braking systems.

---

1% of vehicle sales will be very-low emission engines as an artifact of remaining credit balances, and that about 20% of ZEVs will be plug-in hybrid electric vehicles and the rest will be battery electric vehicles.

July 6, 2021
Page 18

R-133, Appendix B: ZEV Community
Emissions

**Appendix B**

State of California
Air Resources Board

# Benefits of California's Zero-Emission Vehicle Standards on Community-Scale Emission Impacts

## Staff Report

**Date of Release: July 6, 2021**

This report has been prepared by the staff of the California Air Resources Board and approved by the Executive Officer for publication. At this time, this report has not been approved by a vote of the Board itself, and, accordingly, the views expressed herein should not be assumed to necessarily reflect those of the Board. In addition, the use of trade names or commercial products herein does not constitute endorsement or recommendation.

## Summary

The benefits of California's Zero-Emission Vehicle (ZEV) standards are especially critical from a community perspective in disadvantaged communities along heavily traveled roads. In these communities, the pollution and public health impacts from on-road vehicle emissions are especially significant and greater than in other communities. One such community is the East Los Angeles, Boyle Heights, West Commerce (East LA/Boyle Heights/West Commerce) community. This community has more than 30 miles of freeways within its approximately 26 square mile emissions study boundary area (Figure 1), making on-road emissions a significant contributor to the community's air pollution exposure, and its population shows a greater degree of health impacts from air pollution than other communities. The following analysis describes the air quality benefits of California's zero-emission vehicle standards in this community.

**Figure 1. East LA/Boyle Heights/West Commerce Community Emissions Study Boundary**



## Background - About the Community

Based on the 2018 American Community Survey (ACS) data from the Census Bureau[1], more than 310,600 people live within the East LA/Boyle Heights/West Commerce community emission study boundary. Major freeways bisecting the community include Highways 101 and 60, and Interstates 5, 10, and 710, resulting in four freeway

---

[1] U.S. Census Bureau, 2014-2018 American Community Survey 5-year Estimates. *https://data.census.gov/cedsci/*

July 6, 2021
Page 3

junctions and increased pollution exposures for the populations living and working in this community as compared to Los Angeles County as a whole.

Approximately 86% of the population in this community is Latino (Figure 2), nearly 13% are children under the age of 10 years, and 12% of the population is elderly (over the age of 65 years) (Figure 3). These population characteristics are important indicators of disparities in existing pollution burden, exposure to air pollution, and health vulnerabilities - especially for children and the elderly.[2]

**Figure 2. Comparison of Population by Race/Ethnicity in East LA/Boyle Heights/West Commerce Community and the State of California using the Latest American Community Survey 5-year Estimates (2014-2018)**



[2] The metrics presented here are the same as the data presented in the 2019 Community Emissions Reduction Plan for East Los Angeles, Boyle Heights, West Commerce, but have been updated to include the latest Census ACS 5-year estimates (2014-2018) for the emission study boundary. South Coast Air Quality Management District, Assembly Bill (AB) 617 Community Air Initiatives, Community Emissions Reduction Plan for East Los Angeles, Boyle Heights, West Commerce, September 2019, *http://www.aqmd.gov/docs/default-source/ab-617-ab-134/steering-committees/east-la/cerp/carb-submittal/final-cerp.pdf?sfvrsn=8*

July 6, 2021
Page 4

**Figure 3. Comparison of Age profile in East LA/Boyle Heights/West Commerce Community and the State of California using the Latest American Community Survey 5-year Estimates (2014-2018)**



Certain groups of the general population are more vulnerable to air pollution by virtue of their age and health, including children, elderly, pregnant women, and health compromised individuals. Places where these sensitive populations gather, called sensitive receptor locations, can include schools, day-care providers, hospitals, nursing homes, and senior care facilities. There are numerous sensitive receptor locations in the East LA/Boyle Heights/West Commerce community, including 80 schools, 79 day-care providers, and 36 health care facilities including hospitals, nursing homes and dialysis clinics (Figure 4).

July 6, 2021
Page 5

**Figure 4. Sensitive Receptors in East LA/Boyle Heights/West Commerce Community[3]**



Most of the census tracts in this community are considered disadvantaged under California law.[4] Approximately 90% of the census tracts in this community are in the top 25% (75-100th percentile) of the Draft CalEnviroScreen 4.0[5] (CES) scores within the State. The California Office of Environmental Health Hazard Assessment's (OEHHA) CES is a screening method that can be used to help identify California communities

---

[3] Public and private schools data obtained from the Dept. of Education for the 2018 school year. Hospitals and Other Licensed Healthcare Facilities: The data are from both Office of Statewide Health Planning and Development (OSHPD), and California Department of Public Health (CDPH), *https://data.chhs.ca.gov/dataset/healthcare-facility-locations*
Daycares: Data are from California Department of Public Health (CDPH)
*https://data.chhs.ca.gov/dataset/community-care-licensing-child-care-center-locations*
Nursing Homes: Data from Homeland Infrastructure Foundation-Level Data (HIFLD) database , Oak Ridge National Laboratory (ORNL), National Geospatial-Intelligence Agency (NGA) Homeland Security Infrastructure Program (HSIP) Team. *https://gii.dhs.gov/HIFLD.* Data was downloaded via ArcGIS Online Living Atlas as of June 4, 2021.
Dialysis clinics/Home Health Care: Data were compiled by Federal User Community, National Maps for USA, National Apps for USA, and A-16, and downloaded via ArcGIS Online Living Atlas June 4, 2021.
[4] Disadvantaged community designations per Senate Bill 535 (De León, Chapter 830, Statutes of 2012).
[5] The Office of Environmental Health Hazard Assessment (OEHHA) released a draft version of the California Communities Environmental Health Screening Tool: CalEnviroScreen 4.0 in February 2021.
*https://oehha.ca.gov/calenviroscreen/report/draft-calenviroscreen-40*

July 6, 2021
Page 6

that are disproportionately burdened by multiple sources of pollution. The maximum overall CES score for any census tract in the community is in the 99th percentile, which means that people living in that census tract are in the top 1% of the most impacted census tracts in the State. Tables 1.1 and 1.2 present the maximum percentile for exposure (e.g., ozone, PM2.5, diesel PM, traffic impacts), health status (asthma, cardiovascular disease, low birth weight), and socio-economic (education, linguistic isolation, poverty, unemployment, and housing burden) indicators for the census tracts in this community. It also presents the number of census tracts in the community that are in the top 25% (75-100th percentile) of impacted tracts in the State. Figure 5 compares the average scores for the above indicators in the community against statewide averages - the community scores for these key indicators are generally higher compared to the statewide averages.

The metrics discussed above also explain the disparate effects of air pollution faced by other communities across the State. Many California communities experience significantly higher levels of both regional and near-source air pollution; and the demographic and socio-economic characteristics of these communities exacerbate their susceptibility and vulnerability to the adverse effects of air pollution. A 2019 CARB research study revealed on-road vehicles and industrial activity to be the top two sources of exposure in California, each contributing to 24 percent of the total PM2.5 exposure, and disproportionately impacting non-white and low-income populations.[6]

Figure 6 presents the average scores for PM2.5 concentrations and diesel PM emissions relative to statewide averages for a few communities across the State; vehicle emissions contribute predominantly to the particulate matter and diesel PM impacts in these communities. The chart also includes asthma related emergency room visits and linguistic isolation (i.e., limited English speaking) as proxies for demographic and socio-economic disadvantages faced by these communities.

Existing scientific literature conclusively links air pollution to adverse health outcomes, including pre-mature mortality, and the disproportionate pollution and health burden on poor and socially disadvantaged communities. OEHHA's draft CES 4.0 report provides an exhaustive review of existing literature connecting each of the indicators used in the CES method to pollution burden and population sensitivities.[7]

---

[6] Apte J. et al (2019). A Method to Prioritize Sources for Reducing High PM2.5 Exposures in Environmental Justice Communities in California. CARB Research Contract Number 17RD006. *https://ww2.arb.ca.gov/sites/default/files/classic//research/apr/past/17rd006.pdf*
[7] OEHHA Draft CES 4.0 Report (Feb 2021), pages 26-191, "Individual Indicators: Description and Analysis". *https://oehha.ca.gov/media/downloads/calenviroscreen/document/calenviroscreen40reportd12021.pdf*

July 6, 2021
Page 7

**Table 1.1. DRAFT CalEnviroScreen (CES) 4.0 Overall Score in the East LA/Boyle Heights/West Commerce Community**

| CES 4.0 Overall Score | Number of Census Tracts with Highest CES Scores (Top 25%, 75-100th Percentile) | Percent of Census Tracts with Highest CES Scores (Top 25%, 75-100th Percentile)[8] | Maximum Percentile in Community |
|---|---|---|---|
| CES Score | 67 | 89% | 99.9 |

**Table 1.2. DRAFT CalEnviroScreen (CES) 4.0 Scores for Key Exposure, Health, and Socio-Economic Indicators in the East LA/Boyle Heights/West Commerce Community**

| CES 4.0 Indicators | Number of Census Tracts with Highest CES Scores (Top 25%, 75-100th Percentile) | Percent of Census Tracts with Highest CES Scores (Top 25%, 75-100th Percentile)[9] | Maximum Percentile in Community | Indicator Description |
|---|---|---|---|---|
| Ozone | 0 | 0% | 61.9 | Amount of daily maximum 8-hour Ozone concentrations |
| PM2.5 | 76 | 100% | 95.0 | Annual mean PM 2.5 concentrations |
| Diesel PM | 65 | 86% | 99.3 | Diesel PM emissions from on-road and non-road sources |
| Traffic Impacts | 47 | 62% | 98.8 | In vehicle-kilometers per hour per road length, within 150 meters of census tract boundary |
| Asthma | 29 | 38% | 94.9 | Age-adjusted rate of emergency department visits for asthma |
| Low Birth Weight | 23 | 31% | 99.7 | Percent low birth weight |
| Cardiovascular Disease | 26 | 34% | 90.2 | Age-adjusted rate of emergency department visits for heart attacks per 10,000 |
| Education | 69 | 92% | 99.5 | Percent of population over 25 with less than a high school education |
| Linguistic Isolation | 64 | 85% | 98.3 | Percent limited English speaking households |
| Poverty | 53 | 71% | 99.0 | Percent of population living below two times the federal poverty level |
| Unemployment | 32 | 44% | 97.7 | Percent of population over the age of 16 that is unemployed and eligible for the labor force |
| Housing Burden | 43 | 58% | 96.0 | Percent housing burdened low-income households |

---

[8] The percentages for the overall CES 4.0 score represent the number of census tracts in this community that are considered "disadvantaged" per SB 535 (75th percentile or top 25% of all census tracts in the State).

[9] The percentages for the individual CES 4.0 metrics present the number of census tracts in the community that are in the top 25% of census tracts for a given indicator.

July 6, 2021
Page 8

**Figure 5. DRAFT CalEnviroScreen (CES) 4.0 Scores for Key Indicators in the East LA/Boyle Heights/West Commerce Community Relative to Statewide Averages**



July 6, 2021
Page 9

**Figure 6. DRAFT CalEnviroScreen 4.0 Scores for PM2.5 Concentrations, Diesel PM Emissions, and Socio-economic Indicators in California Communities**



# Analysis - On-Road Mobile Emissions in the Community

A variety of sources contribute to the emissions of criteria pollutants in the East LA/Boyle Heights/West Commerce community, with on-road mobile sources among one of the largest emitters of criteria pollutants like nitrogen oxides (NOx), total organic gases (TOG), and particulate matter (PM) emissions.

Criteria pollutant emissions from on-road vehicles in Los Angeles County make up roughly 45% of all NOx emissions, 22% of all volatile organic carbon (VOC) emissions (which are a subset of TOG emissions), and 18% of all PM2.5 emissions.[10] Due to the significant number of freeways that traverse the community, the East LA/Boyle Heights/West Commerce community has a higher percentage of NOx, VOC, and PM2.5 emissions from on-road vehicles as compared to Los Angeles County. On-road

---

[10] California Air Resources Board Preliminary SIP Emission Inventory Data for Los Angeles County, California Emission Projection Analysis Model (CEPAM) v1.02. Data downloaded in June 2021.

July 6, 2021
Page 10

emissions in the East LA/Boyle Heights/West Commerce community make up 58% of all NOx emissions, 29% of all VOC emissions, and 23% of all PM2.5 emissions.[11]

Passenger light-and medium-duty vehicles emit most of the on-road TOG and PM2.5 emissions. Passenger light-and medium duty vehicles also emit nearly half of all NOx emissions from on-road vehicles. Figure 7 shows the relative contribution of passenger light-and medium-duty vehicle emissions as compared to all other vehicles in the East LA/Boyle Heights/West Commerce community. Passenger cars are the main source of TOG emissions because of the large number of vehicles and miles travelled by these types of vehicles in the community. PM2.5 emissions from on-road sources are from fuel combustion as well as from tire and brake wear. Light- and medium-duty vehicles are the main contributors to the total emissions of PM2.5, as these vehicles travel the most miles in the community.

Figure 8 shows the toxicity weighted emissions for the top 10 toxic air contaminants (TACs) with a cancer risk health value from passenger light- and medium-duty vehicles in the community.[12] Benzene and 1,3-butadiene contribute the most to the cancer risk weighted emissions from these vehicles in the community. Reducing criteria pollutant and TAC emissions from passenger light-and medium-duty vehicles through the increased adoption of ZEVs could have a significant impact in reducing the air pollution burden on the community and substantial impact on overall health and well-being of people living and working there.

---

[11] Community Emissions Reduction Plan for East Los Angeles, Boyle Heights, West Commerce, September 2019 *http://www.aqmd.gov/docs/default-source/ab-617-ab-134/steering-committees/east-la/cerp/carb-submittal/final-cerp.pdf?sfvrsn=8*

[12] One way to compare different toxic pollutants is to look at Toxicity Weighted Emissions (TWE). TWE are adjusted emissions for TACs that have OEHHA approved health values. They are calculated by multiplying the mass emissions of each TAC by the corresponding health values as determined by OEHHA, molecular weight adjustment factors accounting for the molecular weight fraction of a compound associated with the specific health effects, maximum hours of emissions, and normalization factors (these are factors that allow the conversion of different toxic pollutant emissions into a standard to help compare pollutants to one another). TWEs are not risks, but the weighted emissions are useful to compare the relative toxicity of TACs.

**Figure 7. On-road sources of 2017 NOx, TOG, and PM2.5 Emissions in East LA/Boyle Heights/West Commerce (tons per year)**



**Figure 8. 2017 Cancer Toxicity Weighted Emissions from Passenger Light- and Medium-Duty Vehicles in East LA/Boyle Heights/West Commerce (pounds per year)**



# Impact of California ZEV Standards on Emissions in the Community

California has adopted requirements for zero-emission passenger vehicles for model years 2017-2025 as part of its Advanced Clean Cars (ACC) program. To evaluate the impact of California's ZEV program at the community level, the most current version of CARB's on-road emission modeling tool, EMFAC2021, was used in conjunction with latest activity data from the Southern California Association of Governments for the

July 6, 2021
Page 12

East LA/Boyle Heights/West Commerce community. EMFAC2021 is based on the best available vehicle emissions and activity data, and reflects the most recent model development, emission standards, and adopted regulations in California.[13] To be consistent with the accompanying criteria pollutant and GHG analyses, CARB calculated the community-scale emission impacts from California's ZEV program for calendar years 2021, 2023, 2030, 2031, 2035, and 2037. The results presented below are also summarized in Table 2.[14]

If the 2017 model year and newer pure zero-emission electric vehicles (i.e., battery or fuel cell electric vehicles) and plug-in hybrid electric vehicles (PHEV) sold due to California's program were instead equivalent gasoline vehicles, these vehicles would emit, in calendar year 2021, an additional:

- 2.9 tons of NOx exhaust emissions,
- 3.2 tons of TOG exhaust and evaporative emissions,
- 0.2 tons of PM2.5 exhaust emissions, and
- 0.2 tons of PM2.5 brake and tire wear emissions.

By 2023, without California's ZEV program, there would be more gasoline vehicles of the equivalent model years and an additional:

- 4.5 tons of NOx exhaust emissions,
- 4.6 tons of TOG exhaust and evaporative emissions,
- 0.2 tons of PM2.5 exhaust emissions, and
- 0.2 tons of PM2.5 brake and tire wear emissions.

In 2030, the increase would be:

- 9.4 tons of NOx exhaust emissions,
- 8.2 tons of TOG exhaust and evaporative emissions,
- 0.2 tons of PM2.5 exhaust emissions, and
- 0.4 tons of PM2.5 brake and tire wear emissions.

By 2031, the annual increase would be:

- 10 tons of NOx exhaust emissions,
- 8.7 tons of TOG exhaust and evaporative emissions,

---

[13] EMFAC is approved by U.S. EPA for planning required to meet the National Ambient Air Quality Standards. See 40 C.F.R. §§ 93.110, 93.111; 80 Fed.Reg. 77,337 (Dec. 14, 2014) [EMFAC2014 approval]; 84 Fed.Reg. 41,717 (Aug. 15, 2019) [EMFAC2017 approval]. EMFAC2021 is pending submittal to and approval by U.S. EPA.

[14] Criteria pollutant emission impacts from California's ZEV program are calculated by applying statewide emission increase factors to the East LA/Boyle Heights/West Commerce community on-road emissions in tons per year. The increase factors were estimated by comparing two emission scenarios using EMFAC2021 – a baseline scenario, where the light-duty fleet includes California's ZEV standards and is comprised of ICEs, ZEVs, and PHEVs, and another scenario where all the ZEVs and PHEVs are replaced with gasoline ICEs for model years 2017 and newer.

July 6, 2021
Page 13

- 0.2 tons of PM2.5 exhaust emissions, and
- 0.5 tons of PM2.5 brake and tire wear emissions.

In 2035, the increase would be:

- 12.3 tons of NOx exhaust emissions,
- 11.4 tons of TOG exhaust and evaporative emissions,
- 0.2 tons of PM2.5 exhaust emissions, and
- 0.6 tons of PM2.5 brake and tire wear emissions.

In 2037, without California's ZEV program the increase would be:

- 13.2 tons of NOx exhaust emissions,
- 12.8 tons of TOG exhaust and evaporative emissions,
- 0.2 tons of PM2.5 exhaust emissions, and
- 0.6 tons of PM2.5 brake and tire wear emissions.

Table 2.1, 2.2, and 2.3 show the estimated baseline emissions in the community from gasoline internal combustion engine (ICE) vehicles, ZEVs, and PHEVs. It then shows the emission increases for NOx, TOG, and PM2.5 in future years if the ZEVs and PHEVs required by California's program are instead model year 2017 and newer vehicles with conventional gasoline engines.

**Table 2.1. Baseline Community Emissions (in tons per year) from ICEs + ZEVs + PHEVs, All Model Years**

| Calendar Year | NOx Exhaust (tons/year) | TOG Exhaust (tons/year) | TOG Evaporative (tons/year) | PM2.5 Exhaust (tons/year) | PM2.5 Brake Wear (tons/year) | PM2.5 Tire Wear (tons/year) |
|---|---|---|---|---|---|---|
| **2021** | 480.2 | 309.7 | 300.7 | 6.6 | 11.1 | 6.8 |
| **2023** | 379.2 | 250.4 | 275.0 | 5.8 | 11.0 | 6.8 |
| **2030** | 212.6 | 145.0 | 208.7 | 3.9 | 10.5 | 6.6 |
| **2031** | 200.6 | 136.5 | 201.3 | 3.6 | 10.5 | 6.5 |
| **2035** | 171.8 | 113.5 | 187.4 | 2.9 | 10.6 | 6.6 |
| **2037** | 162.5 | 105.2 | 183.4 | 2.6 | 10.6 | 6.6 |

July 6, 2021
Page 14

**Table 2.2. Emission Increases (in tons per year) from Replacing Model Years 2017+ ZEVs and PHEVs with Equivalent Gasoline Vehicles in the Community**

| Calendar Year | NOx Exhaust (tons/year) | TOG Exhaust (tons/year) | TOG Evaporative (tons/year) | PM2.5 Exhaust (tons/year) | PM2.5 Brake Wear (tons/year) | PM2.5 Tire Wear (tons/year) |
|---|---|---|---|---|---|---|
| **2021** | 2.9 | 2.3 | 0.9 | 0.2 | 0.2 | 0.02 |
| **2023** | 4.5 | 3.2 | 1.3 | 0.2 | 0.2 | 0.01 |
| **2030** | 9.4 | 5.1 | 3.1 | 0.2 | 0.4 | 0.01 |
| **2031** | 10.0 | 5.4 | 3.4 | 0.2 | 0.5 | 0.02 |
| **2035** | 12.3 | 6.2 | 5.2 | 0.2 | 0.6 | 0.02 |
| **2037** | 13.2 | 6.5 | 6.3 | 0.2 | 0.6 | 0.03 |

**Table 2.3. Emission Increases (in percentages) from Replacing Model Years 2017+ ZEVs and PHEVs with Equivalent Gasoline Vehicles in the Community**

| Calendar Year | NOx Exhaust (Percent) | TOG Exhaust (Percent) | TOG Evaporative (Percent) | PM2.5 Exhaust (Percent) | PM2.5 Brake Wear (Percent) | PM2.5 Tire Wear (Percent) |
|---|---|---|---|---|---|---|
| **2021** | 0.6% | 0.7% | 0.3% | 2.4% | 1.4% | 0.2% |
| **2023** | 1.2% | 1.3% | 0.5% | 3.3% | 2.1% | 0.2% |
| **2030** | 4.4% | 3.5% | 1.5% | 6.1% | 4.2% | 0.2% |
| **2031** | 5.0% | 3.9% | 1.7% | 6.4% | 4.5% | 0.2% |
| **2035** | 7.2% | 5.4% | 2.8% | 8.0% | 5.4% | 0.4% |
| **2037** | 8.1% | 6.2% | 3.4% | 8.7% | 5.7% | 0.4% |

Along with criteria pollutant emission increases, the absence of a ZEV program in California will also increase emissions of toxic air contaminants. While the increased criteria pollutant emissions add to the burden of achieving healthful air in a timely manner for many communities, the related increase in toxics could be even more consequential for the community living along major freeways and heavily traveled roads. Unlike criteria pollutants, toxics (especially cancer causing) have no safe exposure thresholds, and any increase in these emissions adversely impacts the health of individuals and communities. Figure 9 shows the

July 6, 2021
Page 15

emission increase trend from 2021 through 2037 for the top 10 toxics with an OEHHA-approved cancer risk health value.

**Figure 9. Emission Increases (lbs/year) for the Top 10 Toxics from Passenger Light- and Medium-Duty Vehicles in East LA/Boyle Heights/West Commerce in the Absence of California's ZEV Program**



## Methodology

To determine emission impacts from California's ZEV requirement under the Advanced Clean Cars program at the community level, the following methodologies and assumptions are used.

1. On-road community inventories are developed by multiplying vehicle activity in terms of vehicle miles traveled (VMT) on each road segment by vehicle emissions factors according to road segment vehicle distribution. Vehicle distribution and VMT data from the Southern California Association of Governments (SCAG) 2020-2045 Regional Transportation Plan/Sustainable Communities Strategy (RTP 2020) was used for this analysis.[15] Emission factors by vehicle type from EMFAC2021[16] were used for this analysis. EMFAC2021 is used to generate the default population and emission outputs because it is based on the best available emissions and activity data and reflects the

---

[15] Southern California Association of Governments, 2020–2045 Regional Transportation Plan/Sustainable Communities Strategy. Adopted September 2020. *https://scag.ca.gov/read-plan-adopted-final-plan*
[16] Emission factors by vehicle type are calculated using on-road emissions for Los Angeles County downloaded from EMFAC2021 on May 28, 2021.

most recent model development, emission standards, and adopted regulations in California.[17]

2. Criteria pollutant emission impacts from California's ZEV program are calculated by applying statewide emission increase factors to the East LA/Boyle Heights/West Commerce community on-road emissions in tons per year. The increase factors were estimated by comparing two emission scenarios using EMFAC2021 – a baseline scenario, where the light duty fleet includes the California's ZEV standards and is comprised of ICEs, ZEVs, and PHEVs, and another scenario where all the ZEVs and PHEVs are replaced with gasoline ICEs for model years 2017 and newer. The increase factors for each pollutant are calculated as:

$$\text{Emission Increase Factors}_{\text{Pollutant}}\ (\%) = \left( \frac{\text{All Gasoline Emissions} - \text{Baseline Emissions}}{\text{Baseline Emissions}} \right)_{\text{Pollutant}} \times 100$$

3. CARB staff assumed that the replaced vehicles would have the same emission rate in grams/vehicle/day per gasoline vehicle per model year, which is calculated from the total estimated emissions of gasoline vehicles in tons/day for each pollutant, divided by the gasoline vehicle population for each 2017 and newer model year under the chosen calendar year using the default EMFAC2021 output.[18]

4. Toxics emission impacts from California's ZEV program are calculated by applying statewide PM and TOG emission increase factors (same as above) to the East LA/Boyle Heights/West Commerce community on-road heavy metal and organic toxic air contaminant emissions (in pounds per year) respectively.

5. The on-road heavy metal and organic toxics emissions, mentioned in the previous step, are calculated using chemical speciation profiles for PM and TOG species by source category, process, and material or fuel type. The chemical speciation profiles are developed, maintained, and updated by CARB[19], and essentially break down PM and TOG emissions into their individual constituents, including toxics, for each source category, process and material or fuel type. Then all the species which are listed in Appendix A-I of AB 2588 Air Toxics "Hot Spots" Emission Inventory Criteria and Guidelines Regulation[20] are filtered out as toxics. The TOG-based toxics (e.g., formaldehyde, benzene, xylenes, naphthalene, 1,3-butadiene) are estimated using TOG speciation profiles, and PM based toxics (heavy metals such as lead, chromium, nickel, and arsenic) are estimated using PM speciation profiles. There are some toxic air contaminant species that are not presently included in the speciation profiles, e.g., hexavalent chromium, which is a carcinogen. Therefore, CARB augments the

---

[17] See CARB, *EMFAC2021 Volume III Technical Document, April 2021.*
*https://ww2.arb.ca.gov/sites/default/files/2021-04/emfac2021_technical_documentation_april2021.pdf*
[18] Note, this is consistent with the approach in the accompanying analysis of criteria emission benefits of California's zero-emission vehicle program in California, considering the state's vehicle sales and other state-specific data.
[19] Speciation Profiles Used in CARB Modeling. *https://ww2.arb.ca.gov/speciation-profiles-used-carb-modeling*
[20] AB 2588 Air Toxics "Hot Spots" Emission Inventory Criteria and Guidelines Regulation.
*https://ww2.arb.ca.gov/our-work/programs/ab-2588-air-toxics-hot-spots/hot-spots-inventory-guidelines*

hexavalent chromium to include their emissions in the community inventory. Hexavalent chromium emissions are estimated as 5% of the total speciated chromium emissions for liquid fuel combustion sources.

6. Toxicity Weighted Emissions (TWE) are calculated for all TACs using health values[21] approved by OEHHA. It is important to note that TWEs are not risks, but weighted emissions useful to compare relative toxicity of TACs. TWEs are calculated by multiplying mass emissions of each TAC by the corresponding health values (e.g., cancer unit risk factor, non-cancer chronic, and acute reference exposure levels) as determined by OEHHA, molecular weight adjustment factors accounting for the molecular weight fraction of a compound associated with the specific health effects, maximum hours of emissions, and normalization factors.

7. Calendar Years 2021, 2023, 2030, 2031, 2035 and 2037 are selected to demonstrate the emission impacts from the absence of California's ZEV program. Emission are evaluated for different criteria pollutants and TACs. Examples of criteria pollutants include NOx total exhaust emissions (NOx Exhaust), TOG total exhaust (TOG Exhaust) and evaporative (TOG Evaporative) emissions and PM2.5 total exhaust (PM2.5 Exhaust), brake wear (PM2.5 Brake Wear), and tire wear (PM2.5 Tire Wear) emissions. For toxic air contaminants, emission impacts are evaluated for Benzene, 1,3-Butadiene, Formaldehyde, Hexavalent Chromium, Naphthalene, Ethyl benzene, Acetaldehyde, Nickel, Cadmium, and Arsenic.

---

[21] OEHHA Approved Health Values.
https://ww2.arb.ca.gov/sites/default/files/classic/toxics/healthval/contable.pdf

# R-133, Appendix C: Emission Benefits of California's Passenger Vehicle GHG Standards

**Appendix C**

State of California
Air Resources Board

# Emission Benefits of California's Passenger Vehicle GHG Standards

# Staff Report

**Date of Release: July 2, 2021**

This report has been prepared by the staff of the California Air Resources Board and approved by the Executive Officer for publication. At this time, this report has not been approved by a vote of the Board itself, and, accordingly, the views expressed herein should not be assumed to necessarily reflect those of the Board.  In addition, the use of trade names or commercial products herein does not constitute endorsement or recommendation.

July 2, 2021
Page 2

# Summary

Staff at the California Air Resources Board (CARB) have estimated the emissions benefits of its passenger-vehicle greenhouse gas (GHG) emission standards.

Emissions from motor vehicle use may be comprehensively described as well-to-wheel, or WTW. These emissions are comprised of two components reflecting the production and use of fuel (well-to-tank or WTT) and from the use of the vehicle (tank-to-wheel or TTW). TTW emissions are from the vehicle tailpipe as well as evaporative emissions from the vehicle's fuel system. These emissions are distinguished from the vehicle's WTT emissions, which are the proportionate emissions attributed to the vehicle from fuel extraction, processing and production, and distribution to refueling stations for consumers.

This analysis estimates the upstream (WTT), downstream (TTW), and total (WTW) criteria and GHG emission reductions from CARB's GHG emission standards for model years 2021-2025. These estimates are quantified for the years by when the South Coast air basin must meet the National Ambient Air Quality Standards (NAAQS) for ozone.

CARB estimated the emission benefits of its GHG standards for passenger vehicles using two versions of its emission inventory tool, EMFAC.[1] Under the first approach, CARB used EMFAC2017, which U.S. EPA has approved for use in transportation and air quality planning under the Clean Air Act. Under this approach, CARB's GHG standards will result in a statewide decrease in tons per year (tpy) and tons per day (tpd) of upstream oxides of nitrogen (NOx) emissions of:

- 67 fewer tons per year NOx, or 0.18 tons per day, in calendar year 2023
- 358 fewer tons per year NOx, or 1.03 tons per day, in calendar year 2031, and
- 483 fewer tons per year NOx, or 1.39 tons per day, in calendar year 2037.

Similarly, CARB's GHG standards for passenger vehicles will result in a statewide decrease in carbon dioxide equivalent (MMTCO$_2$e) GHG emissions of:

- 1.6 million fewer metric tons in 2023,
- 8.4 million fewer metric tons in 2031, and
- 11.3 million fewer metric tons in 2037.

Using EMFAC2021, which incorporates the best available data and ZEV forecasting assumptions, CARB's GHG standards will result in a statewide decrease in tons per year (tpy) and tons per day (tpd) of upstream oxides of nitrogen (NOx) emissions of:

- 51 fewer tons per year NOx, or 0.15 tons per day, in calendar year 2023

---

[1] EMFAC is approved by U.S. EPA for planning required to meet the National Ambient Air Quality Standards. See 40 C.F.R. §§ 93.110, 93.111; 84 Fed.Reg. 41,717 (Aug. 15, 2019) [EMFAC2017 approval]. EMFAC2021 is pending approval.

- 297 fewer tons per year NOx, or 0.86 tons per day, in calendar year 2031, and
- 404 fewer tons per year NOx, or 1.16 tons per day, in calendar year 2037.

Similarly, CARB's GHG standards for passenger vehicles will result in a statewide decrease in carbon dioxide equivalent ($MMTCO_2e$) GHG emissions of:

- 1.2 million fewer metric tons in 2023,
- 7.0 million fewer metric tons in 2031, and
- 9.5 million fewer metric tons in 2037.

## Background of California's Passenger Vehicle GHG Standards

In 2002, California's Legislature found that "[g]lobal warming would impose on California, in particular, compelling and extraordinary impacts." These included poor air quality, more extreme wildfires, and agricultural damage. To address the root causes, the Legislature directed CARB to reduce motor vehicle greenhouse gas emissions, which comprised about 40 percent of state's total greenhouse gas pollution.[2]

CARB adopted its first greenhouse gas emission standards for passenger vehicles in 2005, codifying them in section 1961.1 of title 13 of the California Code of Regulations. U.S. EPA initially denied California's request for a waiver of federal preemption under Section 209 of the Clean Air Act for these standards.[3] Upon reconsideration, U.S. EPA granted the waiver.[4] EPA, NHTSA, and California subsequently created a harmonized "National Program" for regulating passenger vehicle greenhouse gas emissions and fuel-economy to maximize benefits and minimize costs.[5] Automakers supported the approach.[6] California included provisions under which manufacturers would be deemed to meet the State's GHG emission standards if they complied with EPA's roughly analogous federal standards.[7]

In 2013, U.S. EPA granted California a waiver for its Advanced Clean Cars program, which included GHG emission standards, criteria pollutant emission standards, and requirements for zero-emission vehicles, for model years 2017 and later.[8] The program also included the "deemed-to-comply" provision referenced above. That followed U.S. EPA's adoption, in 2012, of federal GHG emission standards analogous to California's and harmonized with NHTSA's fuel economy standards.

---

[2] 2002 Cal. Stat. c. 200 (A.B. 1493) (Digest).
[3] 73 Fed. Reg. 12,156 (Mar. 6, 2008).
[4] 74 Fed. Reg. 32,744 (July 8, 2009).
[5] 75 Fed. Reg. 25,324, 25,545 (May 7, 2010).
[6] *Id.* at 25,328.
[7] Cal. Code. Regs. tit. 13, §§ 1961.1(a)(1)(A)(ii) [compliance option for model years 2012-2016], 1961.3(c) [compliance option for model years 2017-2025].
[8] 78 Fed. Reg. 2,112 (Jan. 9, 2013).

In 2018, U.S. EPA and NHTSA proposed to end this harmonized national program through the "Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks."[9] In 2020, U.S. EPA and NHTSA finalized a portion of this proposal and issued the "Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks" (Final SAFE 2 Rule).[10] In those final rules, U.S. EPA and NHTSA set improperly lax federal GHG emission and Corporate Average Fuel Economy standards that increase in stringency at only about 1.5 percent (%) per year from model year (MY) 2020 levels over MYs 2021–2026. The previously established federal GHG emission standards and related "augural" fuel economy standards would have achieved about 5% per year improvements through MY 2025.

If left in place, the federal GHG emission standards will dramatically increase emissions compared to the previous set of standards. California's "deemed to comply" provision was never intended to allow for that in California, and California does not accept compliance with the improperly relaxed federal standards as equivalent to compliance with its own standards under the "deemed to comply" provision. The analysis here summarizes CARB staff's assessment of both the criteria pollutant and GHG emissions benefits of CARB's GHG emission standards for model years 2021-2025. These benefits are from both the upstream (WTT) and downstream (TTW) reduced GHG and criteria emissions from CARB's standards.

This assessment models the impacts of the standards themselves. This assessment does not account for the Framework Agreements in which, given the SAFE rulemaking and resulting ongoing litigation, CARB entered agreements with various forward-thinking manufacturers which required those manufacturers to take specific actions that would result in fewer emissions than direct compliance with California's GHG standards. These agreements do not change the underlying standards.

# Analysis

## Tank-to-Wheel (TTW) Emissions Impact

CARB estimated the change in TTW (or downstream vehicle tailpipe and evaporative) emissions of the California light-duty vehicle fleet using its EMission FACtor 2017 (EMFAC2017) model.[11] EMFAC2017 is the latest U.S. EPA-approved version of California's on-road mobile source emission inventory model. It reflects California-specific driving and environmental conditions, fleet mix, and most importantly the impact of California's unique mobile source regulations. These include the Low-Emission Vehicle (LEV) program, the LEV II and LEV III standards, California inspection

---

[9] 83 Fed. Reg. 42,986 (Aug. 24, 2018).
[10] 85 Fed. Reg. 24,174 (Apr. 30, 2020).
[11] EMFAC2017, EMFAC2021and other versions of CARB's emission models are available at:
https://ww2.arb.ca.gov/our-work/programs/mobile-source-emissions-inventory/msei-modeling-tools

July 2, 2021
Page 5

and maintenance programs, and in-use diesel fleet rules. The EMFAC model supports CARB's regulatory and air quality planning efforts and fulfills the federal Clean Air Act and the Federal Highway Administration's transportation planning requirements. The U.S. EPA has approved EMFAC2017 for use in state implementation plan (SIP) and transportation conformity analyses.[12]

The EMFAC2017 default model, with an "annual average" setting, was run to estimate statewide vehicle emissions by calendar year, vehicle category, fuel type, and model year projected to occur under the existing Federal and CARB GHG standards.

In addition, CARB also estimated emission benefits using the latest version of the EMFAC model, EMFAC2021, to consider the best available information and most current data. These results are presented in Tables 4 to 6. EMFAC2021 provides an updated estimate of ZEV populations in California, which are higher than predicted by EMFAC2017. The 2021 model, like the 2017 model, is based on CARB's Advanced Clean Cars regulations but also considers updated California Department of Motor Vehicles data through calendar year 2019 and improved projections of the ZEV market share to forecast future ZEV population. EMFAC2021 is not yet approved by U.S. EPA for use in SIP and transportation conformity analyses.

These projections recognize California's policies to transition to clean transportation technology. On September 23, 2020, California Governor Newsom issued Executive Order N-79-20 that set a goal for all new passenger car and truck sales in the state to be zero-emission by 2035 and directed CARB to consider regulations to reach this goal. CARB staff are developing the Advanced Clean Cars II (ACC II) program that will focus on post-2025 model year light-duty vehicles.

Fully transitioning to zero-emission passenger vehicles is expected to significantly reduce emissions. For instance, according to staff analysis presented in the Revised Draft of the 2020 Mobile Source Strategy,[13] meeting the ZEV targets set by the Governor's executive order combined with more stringent GHG standards[14] for internal combustion engine vehicles and VMT reduction[15] strategies can reduce GHG emissions associated with passenger vehicles by more than 80% in 2045 below the

---

[12] 84 Fed. Reg. 41,717 (Aug. 15, 2019).

[13] https://ww2.arb.ca.gov/sites/default/files/2021-04/Revised_Draft_2020_Mobile_Source_Strategy.pdf

[14] The light duty vehicle scenario of the 2020 Mobile Source Strategy assumes that GHG emissions of new gasoline-only vehicles, including hybrids (non-plugged vehicles), will be reduced by 2.0% per year from 2026 to 2035. This assumption reflects an investment by the automotive industry in ongoing conventional vehicle improvements while focusing most investments on ZEVs, and likely would require a regulatory change to California's vehicle standards. More details are provided on pages 86 through 88 of the Revised Draft 2020 Mobile Source Strategy.

[15] The light duty vehicle scenario of the 2020 Mobile Source Strategy assumes a 15% reduction in statewide light-duty VMT by 2050 compared to business-as-usual assumption, the same as the 2016 Mobile Source Strategy and the 2017 Scoping Plan. The VMT reduction strategy areas discussed in this document reflect the nature of the actions necessary to achieve the level of reductions in the scenario. More details are provided on pages 99 through 120 of the Revised Draft 2020 Mobile Source Strategy.

July 2, 2021
Page 6

2045 baseline and beyond what would otherwise be expected with current programs absent the zero-emission executive order and other upcoming measures[16]. Additionally, the 2020 Mobile Source Strategy shows that fully transitioning to ZEVs can generate a 17% reduction in NOx emissions in 2031 and a 43% reduction in 2037 relative to baseline projections of tailpipe emissions Statewide for each of those years. More details are provided in Chapter 6 of the Revised Draft of the 2020 Mobile Source Strategy.

## Well-to-Tank (WTT) Emissions Impact

For WTT, or upstream, emission impacts, CARB's analysis calculated the emissions reductions that would result from the avoided production and delivery of gasoline, and the increased emissions from increased production of electricity and hydrogen to fuel ZEVs that can be part of an automakers' compliance with the GHG standards. Though both of these categories of emissions impacts could be attributed to the ZEV standard to the extent the impacts are tied to ZEV sales, a substantial portion of the benefits estimated herein would nonetheless remain for the GHG standard given that ZEVs constitute a relatively modest (but growing) percentage of the fleet sold in California.

To calculate these values, staff used the following analyses and data previously developed or relied upon for CARB's vehicle emission standards:

1. VMT by ZEV were divided into miles driven by battery electric vehicles (BEVs) and fuel cell electric vehicles (FCEVs) based on the technology splits projected in the Mid-Range Scenario of CARB's Advanced Clean Cars Midterm Review.[17]
2. Vehicle electricity and hydrogen consumption was estimated by applying the average vehicle efficiencies for BEVs and FCEVs developed in CARB's Vision scenario modeling framework.[18]
3. Upstream emission factors associated with fuel and energy production for gasoline, electricity, and hydrogen were based on the best available California-specific data when possible. Data sources for criteria emission factors included the California Emission Inventory Development and Reporting System (CEIDARS) from CARB, annual power generation by plant unit reported by the Energy Commission, facility nameplate capacities and utilization rates, Renewable Portfolio Standards (RPS), and Argonne National Laboratory's study on refinery products' contributions to facility emissions. Staff used CA GREET 3.0 to develop the GHG emission factors by fuel/energy type and estimated

---

[16] This is equivalent to an 87% reduction in well-to-wheel GHG emissions in 2045 below 2020 levels. See Revised Draft 2020 Mobile Source Strategy, p. 89.
[17] https://ww2.arb.ca.gov/sites/default/files/2020-01/appendix_a_minimum_zev_regulation_compliance_scenarios_formatted_ac.pdf
[18] https://ww2.arb.ca.gov/sites/default/files/2020-06/vision2.1_scenario_modeling_system_general_documentation.pdf, Appendix B

GHG emissions changes within California for gasoline and hydrogen, and globally for electricity. These sources are summarized below.

The California Emissions Inventory Data Analysis and Reporting System (CEIDARS) is a database management system developed to track statewide criteria pollutant and air toxic emissions. The database includes emissions from stationary point sources that can be identified by locations and are often permitted by local Air Quality Management Districts and Air Pollution Control Districts (Districts). Examples of stationary sources include facility point sources, such as power plants and oil refineries. See *Criteria Pollutant Emission Inventory Data | California Air Resources Board* and *https://ww3.arb.ca.gov/ei/drei/maintain/database.htm*.

The statistics presented in the Annual Generation - Plant Unit are derived from the Quarterly Fuel and Energy Report (QFER) CEC-1304 Power Plant Owner Reporting Form. The CEC-1304 reporting form collects data from power plants with a total nameplate capacity of 1MW or more that are located within California or within a control area with end users inside California. The information includes capacity, net generation, and fuel use by fuel type for each plant. See *QFER CEC-1304 Power Plant Owner Reporting Database (ca.gov)*.

The U.S. Energy Information Administration (EIA) creates the annual fuel ethanol production capacity report. The report contains detailed nameplate capacity of fuel ethanol plants by Petroleum Administration for Defense District (PAD District) for all operating U.S. fuel ethanol production plants. See *https://www.eia.gov/petroleum/ethanolcapacity/*.

Maintained by the Pacific Northwest National Laboratory, the Merchant Hydrogen Plant Capacities In North America data file contains data on location, capacity, hydrogen source, and customers for individual hydrogen plants in North America. See *Merchant Hydrogen Plant Capacities in North America | Hydrogen Tools (h2tools.org)*.

The U.S. Energy Information Administration (EIA) releases Refinery Utilization and Capacity data by PADDs which includes Operable Utilization Rate representing the utilization of the atmospheric crude oil distillation units. The rate is calculated by dividing the gross input to these units by the operable calendar day refining capacity of the units. See *PAD District 5 Refinery Utilization and Capacity (eia.gov)*.

The Clean Energy and Pollution Reduction Act of 2015 (De Leon, Chapter 547, Statutes of 2015) (SB 350) put into law the requirement to serve 50% of the State's electricity use with renewable resources by 2030. See *50 RPS Procurement Rules (ca.gov)*.

The study titled "Creation of unit process data for life cycle assessment of steam methane reforming and petroleum refining" and authored by B. Young, B. Morelli, and T. Hawkins, provides detailed, baseline gate-to-gate unit process data for petroleum refining and hydrogen production by PADDs. The datasets improve the resolution of the emissions attributable to specific processes involved in petroleum refining and

steam methane reforming (SMR) and the attribution of emissions to the products of refineries. This study updated emission factors of fossil fuel production in the latest GREET model. See *Argonne GREET Publication: Creation of unit process data for life cycle assessment of steam methane reforming and petroleum refining (anl.gov).*

The CA-GREET3.0 model is used to generate the carbon intensities (CIs) of all fuel pathways. The CIs are calculated using a modified, California-specific version of Argonne National Laboratory's Greenhouse Gases, Regulated Emissions, and Energy Use in Transportation (GREET) model. See *CA-Greet 3.0 Supplemental Document and Tables of Changes.*

## Benefits of California's GHG Standards on Reducing Emissions

Tables 1 - 3 summarize the criteria pollutant and GHG emissions reductions of California's GHG standards, apportioned for WTT (or upstream), TTW (or downstream), and total WTW emissions, respectively, as estimated by EMFAC2017. Tables 4 - 6 provide these estimates using EMFAC2021. The two versions are used to show the benefits using the version currently approved by U.S. EPA for use in planning under the Clean Air Act, and using the next version that incorporates updated data and forecasting tools. For both approaches, the reductions are shown in the years for which the South Coast air basin must meet the National Ambient Air Quality Standards (NAAQS) for ozone.

As shown using EMFAC2017, CARB's GHG standards for passenger vehicles will result in a statewide decrease in tons per year (tpy) and tons per day (tpd) of upstream oxides of nitrogen (NOx) emissions of:

- 67 fewer tons per year NOx, or 0.18 tons per day, in calendar year 2023
- 358 fewer tons per year NOx, or 1.03 tons per day, in calendar year 2031, and
- 483 fewer tons per year NOx, or 1.39 tons per day, in calendar year 2037.

To consider this in context, NOx emissions in the South Coast air basin are approximately 278 tons per day as of calendar year 2021 for all mobile sources (annual average).[19] These emissions must be reduced to 141 tons per day to meet the 1997 ozone NAAQS of 80 parts per billion (ppb), which has a deadline of 2023. To meet the 2008 standard of 75 ppb, which has a deadline of 2031, NOx emissions must be reduced to 96 tpd. A significant portion of the reductions described above will occur in the South Coast air basin because of its high concentration of people, vehicles, and refineries; they are a significant part of the solution to meeting the air quality standards in California. Every reduction matters to meet these health-based standards. (Other regions in California are also in non-attainment with federal standards for

---

[19] Based on CARB's CEPAM 2016 SIP Standard Emissions Tool
https://www.arb.ca.gov/app/emsinv/fcemssumcat/fcemssumcat2016.php

ozone, and reductions of all sizes are likewise needed there, although the South Coast air basin faces the most significant ozone air quality challenge in the country.)

Similarly, using EMFAC2017, CARB's GHG standards for passenger vehicles will result in a statewide decrease in carbon dioxide equivalent (MMTCO$_2$e) GHG emissions of:

- 1.6 million fewer metric tons in 2023,
- 8.4 million fewer metric tons in 2031, and
- 11.3 million fewer metric tons in 2037.

Based on EMFAC2017, a typical passenger vehicle emits about 4.3 metric tons of CO$_2$ per year. The statewide decreases in GHG emissions are equivalent to:

- 372,000 passenger vehicles in 2023,
- 2.0 million passenger vehicles in 2031, and
- 2.6 million passenger vehicles in 2037.

In comparison, using EMFAC2021, CARB's GHG standards for passenger vehicles will result in a statewide decrease in tons per year (tpy) and tons per day (tpd) of upstream oxides of nitrogen (NOx) emissions of:

- 51 fewer tons per year NOx, or 0.15 tons per day, in calendar year 2023
- 297 fewer tons per year NOx, or 0.86 tons per day, in calendar year 2031, and
- 404 fewer tons per year NOx, or 1.16 tons per day, in calendar year 2037.

And a statewide decrease in carbon dioxide equivalent (MMTCO$_2$e) GHG emissions of:

- 1.2 million fewer metric tons in 2023,
- 7.0 million fewer metric tons in 2031, and
- 9.5 million fewer metric tons in 2037.

These results are shown in Tables 4-6, below.

**Table 1. Tank-to-Wheel Downstream GHG Emissions Benefits of GHG Standards calculated using EMFAC2017**

| Years | Downstream Reductions (Tank-to-Wheel) CO2e (MMTCO2/year) |
|-------|---------------------------------------------------------|
| 2021 | 0.3 |
| 2023 | 1.3 |
| 2030 | 6.4 |
| 2031 | 6.9 |
| 2035 | 8.6 |
| 2037 | 9.2 |

July 2, 2021
Page 10

**Table 2. Well-to-Tank Upstream Criteria and GHG Emissions Benefits of GHG Standards calculated using EMFAC2017**

| Years | Upstream Emissions Reductions - Well-to-Tank NOx (tpy) | Upstream Emissions Reductions - Well-to-Tank PM2.5 (tpy) | Upstream Emissions Reductions - Well-to-Tank CO2e (MMTCO2/year) |
|---|---|---|---|
| 2021 | 13 | 1.7 | 0.05 |
| 2023 | 67 | 10.2 | 0.26 |
| 2030 | 331 | 58.7 | 1.42 |
| 2031 | 358 | 63.6 | 1.54 |
| 2035 | 449 | 79.9 | 1.95 |
| 2037 | 483 | 86.2 | 2.11 |

**Table 3. Well-to-Wheel (Total) GHG Emissions Benefits of GHG Standards calculated using EMFAC2017**

| Years | Well to Wheel Reductions CO2e (MMTCO2/year) |
|---|---|
| 2021 | 0.3 |
| 2023 | 1.6 |
| 2030 | 7.8 |
| 2031 | 8.4 |
| 2035 | 10.5 |
| 2037 | 11.3 |

**Table 4. Tank-to-Wheel Downstream GHG Emissions Benefits of GHG Standards calculated using EMFAC2021**

| Years | Downstream Reductions (Tank-to-Wheel) CO2e (MMTCO2/year) |
|---|---|
| 2021 | 0.2 |
| 2023 | 1.1 |
| 2030 | 5.3 |
| 2031 | 5.8 |
| 2035 | 7.3 |
| 2037 | 7.8 |

**Table 5. Well-to-Tank Upstream Criteria and GHG Emissions Benefits of GHG Standards calculated using EMFAC2021**

| Years | Upstream Emissions Reductions - Well-to-Tank NOx (tpy) | Upstream Emissions Reductions - Well-to-Tank PM2.5 (tpy) | Upstream Emissions Reductions - Well-to-Tank CO2e (MMTCO2/year) |
|---|---|---|---|
| 2021 | 8 | 0.8 | 0.02 |
| 2023 | 51 | 7.3 | 0.18 |
| 2030 | 273 | 47.9 | 1.12 |

July 2, 2021
Page 11

| Years | Upstream Emissions Reductions - Well-to-Tank NOx (tpy) | Upstream Emissions Reductions - Well-to-Tank PM2.5 (tpy) | Upstream Emissions Reductions - Well-to-Tank CO2e (MMTCO2/year) |
|---|---|---|---|
| 2031 | 297 | 52.2 | 1.23 |
| 2035 | 375 | 66.3 | 1.58 |
| 2037 | 404 | 71.6 | 1.71 |

**Table 6. Well-to-Wheel (Total) GHG Emissions Benefits of GHG Standards calculated using EMFAC2021**

| Years | Well to Wheel Reductions CO2e (MMTCO2e/year) |
|---|---|
| 2021 | 0.2 |
| 2023 | 1.2 |
| 2030 | 6.5 |
| 2031 | 7.0 |
| 2035 | 8.9 |
| 2037 | 9.5 |

# R-133, Appendix D: California Historical GHG Compliance Summary

Appendix D

State of California
Air Resources Board

# Compliance with California's Greenhouse Gas Emission Standards

# Staff Report

**Date of Release: July 6, 2021**

This report has been prepared by the staff of the California Air Resources Board and approved by the Executive Officer for publication. At this time, this report has not been approved by a vote of the Board itself, and, accordingly, the views expressed herein should not be assumed to necessarily reflect those of the Board. In addition, the use of trade names or commercial products herein does not constitute endorsement or recommendation.

## Summary

Since the 2009 model year, California has had standards to reduce greenhouse gas (GHG) emissions from passenger cars (PC) and light-duty trucks (LT). Since 2012, California allowed auto manufacturers to comply with the then-roughly analogous federal greenhouse gas emission standards. That option was available through the 2020 model year but ended when the U.S. Environmental Protection Agency significantly relaxed its own standards through the SAFE Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, 85 Fed. Reg. 24,174 (April 20, 2020). Beginning with the 2021 model year, and pending restoration of California's authority to enforce its standards, manufacturers must meet California's GHG standards.

Auto manufacturers have complied with the federal GHG emission standards through model year 2020, thereby complying with California's GHG standards as well. Auto manufacturers are well positioned to meet California's standards for model year 2021 and beyond. As a whole, the industry will enter the 2021 model year in compliance with California's standards and, given the progression of technologies, are on a trajectory to continue to comply at or below previous cost projections.

## Background

In 2004, the California Air Resources Board (CARB) adopted regulations (known as the "Pavley regulations" because they were in response to California Assembly Bill 1493, statutes of 2002, chapter 200, by Assemblymember Pavley) requiring significant reductions in greenhouse gas emissions from passenger cars and light-duty trucks. The regulations achieved these reductions by requiring manufacturers to meet separate, increasingly stringent fleet average GHG levels for both their PC and LT fleets. These regulations originally applied to model years 2009 - 2016 and were amended in 2009 when CARB adopted a provision to allow manufacturers to comply with the federal emission standards for the 2012 - 2016 model years (which were roughly analogous in stringency) in lieu of the Pavley standards. This provision, known as the deemed-to-comply (DTC) provision, harmonized the California and federal emission standards under one national program. In 2012, California adopted the Advanced Clean Cars regulations, which required continued GHG emission reductions from manufacturers' PC and LT fleets for model years 2017 – 2025. Similar to the 2009 amendments, California incorporated a DTC provision that harmonized its emission standards for these model years with roughly analogous federal standards under one national program.

Under the national program, a manufacturer demonstrated compliance by conducting testing to determine the tailpipe-emitted GHG emissions from both their nationwide PC and LT fleets. Using these emission data, vehicle sales data, and vehicle lifetime miles assumptions specified in regulation and applying any additional emission credits that were earned for vehicles equipped with advanced air conditioning (A/C) systems or certain other off-cycle technologies, the total GHG emissions were calculated for each manufacturer's PC and LT fleets. A manufacturer then calculated its required

GHG levels by using vehicle sales, footprint (approximately wheelbase times track width), and the footprint-scaled standards in the regulation for its PC and LT fleet.  A manufacturer then compared its total GHG levels to this required level.  Over-compliance with the standard for any given model year (i.e., GHG values lower than the required level) allowed the manufacturer to earn credits that could be banked and used to offset deficits in past or future model years.  Likewise, exceedance of the standard in any model year resulted in the manufacturer earning a deficit that could be satisfied through purchased or previously banked credits or over-compliance in future years.  Manufacturers were required to submit emission testing data and nationwide sales data in sufficient detail to allow the United States Environmental Protection Agency (U.S. EPA) to verify each manufacturer's fleet average GHG levels for each model year.

## Analysis

### Calculating California's Historical GHG Emissions Compliance Trends

Since all manufacturers elected to comply with California's standards using the DTC provisions for all model years since 2012, there have been no calculations to date to determine to what extent they would have separately complied under the California program.  However, the same general methodology used in the federal program is used to calculate compliance for the California fleet.  Specifically, the emission standards for both programs are numerically identical for the PC and LT fleets.  The methodology for determining certain emission credits such as the flex-fuel vehicle credits, A/C credits and off-cycle credits is only slightly different between the two programs.  The use of advanced technology production multipliers and treatment of upstream emissions for battery electric and plug-in hybrid vehicles, though, is different between the two programs.  For example, under the federal program, battery and plug-in hybrid vehicles are assumed to have zero upstream emissions while, under the California program, they are assumed to have non-zero upstream emissions that must be included in the fleet average calculation.

To assess compliance with California-specific regulations, CARB staff developed a calculation methodology that relied on the same emission testing data used to demonstrate compliance with the federal program and combined it with California-specific sales data from manufacturers to calculate the requisite sales-weighted averages in the California light-duty vehicle fleet.  In addition to these data, staff made simplifying assumptions to estimate the emission credits when specific data were not available from the national emission testing data.

### Data Sources

The main source of data for this analysis were the emission data associated with the U.S. EPA Automotive Trends report[1].  This annual report provides detailed information

---

[1] See https://www.epa.gov/automotive-trends

July 6, 2021
Page 4

on tailpipe GHG certification levels and the emission credits used to calculate current compliance status for each manufacturer.  It also provides information on credit bank transactions used in each model year by each manufacturer to determine their final compliance status.  Although these reports are public, certain data, such as individual vehicle sales and individual vehicle certification levels, are not provided in the report.  Such information had to be requested by CARB to estimate California GHG compliance levels.  Specifically, CARB requested and received manufacturer-submitted vehicle-level GHG data from the U.S. EPA on an annual basis.  In addition to these data, CARB requested and received California-specific sales data from each manufacturer.  When combined, these two data sources allowed staff to estimate manufacturer compliance in a California-specific vehicle fleet—in other words, manufacturer compliance with California's GHG standards.  Table 1 below provides a summary of the data available for each manufacturer in the California fleet.  An "X" in the table means data were available for calculation of a manufacturer's California GHG compliance.

| Manufacturer | California GHG Data Availability | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| Aston Martin | | | | | | X | X |
| BMW | X | X | X | X | X | X | X |
| BYD Motors | | | | | | X | X |
| Ferrari | | | | | | X | X |
| Fiat Chrysler | X | X | X | X | X | X | X |
| Ford | X | X | X | X | X | X | X |
| GM | X | X | X | X | X | X | X |
| Honda | X | X | X | X | X | X | X |
| Hyundai | X | X | X | X | X | X | X |
| Jaguar Land Rover | | | | | | X | X |
| Kia | X | X | X | X | X | X | X |
| Lotus | | | | | | X | X |
| Mazda | | | | | | X | X |
| McLaren | | | | | | X | X |
| Mercedes | X | X | X | X | X | X | X |
| Mitsubishi | X | X | X | X | X | X | X |
| Nissan | X | X | X | X | X | X | X |
| Subaru | X | X | X | X | X | X | X |
| Tesla | X | X | X | X | X | X | X |
| Toyota | X | X | X | X | X | X | X |
| Volkswagen | | | | | | X | X |
| Volvo | X | X | | X | X | X | X |

Table 1:  California GHG Data Availability

Overall, for model years between 2012 and 2016, CARB staff were able to collect more than 90% of total vehicle sales and engine certification data.[2]  For model years 2017 and later, staff were able to collect 100% of vehicle sales and certification data.

## Calculation Methodology

The calculation of historical compliance trends in California requires certain assumptions in the calculation methodology due to data availability limitations, detailed further below.  The regulatory determination of compliance during the period of 2012 to 2018 is based on the requirements set forth in Title 13, CCR section 1961.1 for model years 2012 – 2016 and section 1961.3 for model years 2017 and 2018.

## Compliance Calculations (2012-2016)

For the 2012-2016 model years, the $CO_2$- equivalent emission value is calculated according to the following equation for each vehicle test group of each manufacturer:

$$CO_2\text{-Equivalent Value} = CO_2 + (296 \times N_2O) + (23 \times CH_4) - \text{A/C Direct Emissions Allowance} - \text{A/C Indirect Emissions Allowance}$$

All the terms in this equation were derived from the engine certification data submitted for compliance with the national program described earlier.  The calculation methodology used to determine compliance in the national program is slightly different than the California program.  As a result, the national engine certification data did not contain all necessary inputs to the equation.  Table 2 below provides a description of the terms in the equation and any simplifying assumptions or data modifications needed to calculate $CO_2$-equivalent values for the California program.

| Equation Term | Description | Calculation Notes |
|---|---|---|
| $CO_2$ | The weighted carbon dioxide emissions (g/mile) of a vehicle test group calculated for the Federal Test Procedure (FTP) (55%) and Highway Fuel Economy Test (HWFET) (45%) according to the procedures described in 40 CFR Part 86, Subpart B and 40 CFR Part 600, Subpart B, respectively. | The national engine certification data contains data for carbon-related exhaust emissions (CREE) in lieu of $CO_2$.  CREE represents the sum of $CO_2$ plus a portion of carbon monoxide and hydrocarbon emissions.  As a result, the use of the national data will result in slight over-estimation of the $CO_2$-equivalent values that would be calculated under the California program.  In addition, the national program does not require the calculation of upstream emissions associated with the use of electric, plug-in hybrid, and fuel cell vehicles.  For this analysis, staff estimated upstream emissions for |

[2] The model years and manufacturers where data was not available were either smaller volume manufacturers subject to a different set of GHG standards in those model years or were manufacturers that were part of a enforcement action involving the subject model years that would likely result in a revision of their compliance status.

| Equation Term | Description | Calculation Notes |
|---|---|---|
| | | such vehicles using the procedures described in the CCR. |
| $(296 \times N_2O)$ | This term represents nitrous oxide exhaust emissions weighted by global warming potential (GWP). | For model years 2012-16, the national certification data uses a GWP multiplier of 298, which slightly over-estimates the $N_2O$ emissions that would be calculated under the California program.  In the current analysis, staff incorporated the national certification values without any adjustments for the multipliers for model years 2012-2016.  For model years 2017 and 2018, the California GWP multiplier was harmonized with the national program (i.e. 298) and no adjustment was necessary. |
| $(23 \times CH_4)$ | This term represents the methane exhaust emissions weighted by GWP. | For model years 2012-16, the national certification data uses a GWP multiplier of 25, which slightly over-estimates the $CH_4$ emissions that would be calculated under the California program.  In the current analysis, staff incorporated the national certification values without any adjustments for the multipliers for model years 2012-2016.  For model years 2017 and 2018, the California GWP multiplier was harmonized with the national program (i.e. 25) and no adjustment was necessary. |
| A/C Direct Emissions Allowance | These credits represent any $CO_2$ reductions associated with the use of low-GWP refrigerants in a vehicle's air conditioning system. | For model years 2012-16, the California program and the national program have different procedures for the measurement of direct A/C credits.  For this analysis, we will assume the direct A/C credits in the national program are similar enough to provide an estimate of direct A/C credits in the California program. |
| A/C Indirect Emissions Allowance | These credits represent any $CO_2$ reductions associated with the use of efficient A/C system components that reduce the load on the vehicle's engine. | For model years 2012-16, the California program and the national program have different procedures for the measurement of indirect A/C credits.  For this analysis, we will assume the indirect A/C credits in the national program are similar enough to provide an estimate of indirect A/C credits in the California program. |

Table 2:  Summary of Terms in California GHG Compliance Equation

Staff generated a year-by-year California historical compliance trend using the following steps for each model year:

1. Calculate the sales-weighted $CO_2$ certification values using the certification and sales data for all vehicles in the California fleet.  These calculations were

performed using the procedures found in California's Code of Regulations at sections 1961.1 and 1961.3 of title 13. These calculations include upstream emissions associated with battery electric, fuel cell, and plug-in hybrid vehicles. For such vehicles, battery efficiencies (kWh/mile) and utility factors were obtained from the U.S. Department of Energy website.[3]

2. Apply $N_2O$ and $CH_4$ emission adjustments to reflect the tailpipe emissions of these compounds in the vehicle fleet.  These adjustments were derived from the U.S EPA Automotive Trends reports and incorporated national program GWP multipliers.  This was a simplifying assumption since staff did not have specific information about $N_2O$ and $CH_4$ emissions of vehicles in the California fleet.

3. Apply A/C credit adjustments to reflect the use of high-efficiency air conditioners and low-GWP A/C refrigerants.  These manufacturer-specific credits were derived from the U.S. EPA Automotive Trends reports and were applied to the fleet average $CO_2$ certification values of the PC and LT fleets of each manufacturer.  This was a simplifying assumption since staff did not have specific information about the A/C system characteristics of vehicles in the California fleet.  The A/C credits, however, were sales-weighted to estimate California-specific A/C credit allowances. This yields adjusted $CO_2$ certification values.

4. Based on vehicle footprint data (provided with the California sales data), calculate a sales-weighted $CO_2$ standard for the California fleet.

5. Compare the adjusted $CO_2$ certification values to the $CO_2$ standards.  If the certification values were less than the standard, the California fleet complied.  If not, the California fleet would generate a deficit and would require the use of banked (or future earned) credits to meet the requisite standard.

## Example of 2016 model year calculation

1. California sales-weighted $CO_2$ certification value = 260.5 g/mile
2. $N_2O$ and $CH_4$ emission adjustments = 0.1 g/mile
3. Direct and Indirect A/C credits = -9.6 g/mile
4. Adjusted $CO_2$ Certification Value = 260 g/mile + 0.1 g/mile – 9.6 g/mile = 251.0 g/mile
5. Fleet Standard = 254.8 g/mile
6. Adjusted $CO_2$ Certification Value – Fleet Standard = 251.0 g/mile – 254.8 g/mile = -3.8 g/mile

---

[3] See https://www.fueleconomy.gov

July 6, 2021
Page 8

Based on this example calculation, the California fleet over-complied with the fleet standard by 3.8 g/mile, indicating GHG credits were generated that year and could be used to meet any deficit that may occur in future years.

## Compliance Calculations (2017-2018)

For model years 2017 and 2018, additional off-cycle credits were introduced to the California program.  These credits represent $CO_2$-reducing technologies that are not adequately captured on the FTP and HWFET cycles and include technologies such as aerodynamic improvements and solar reflective paint.  These manufacturer-specific credits were derived directly from the U.S. EPA Automotive Trends reports and were applied to the fleet-average $CO_2$ certification values of the PC and LT fleets of each manufacturer.  This was a simplifying assumption since staff did not have specific information about the off-cycle technologies present in vehicles in the California fleet. Such information was sales-weighted to estimate California-specific off-cycle credit allowances.

## Results

The GHG compliance values for the California fleet in the 2012 – 2018 model years are summarized in Figure 1 below, which represents an aggregation of all manufacturers. This incorporates the most recent complete and validated compliance data provided to CARB. To understand the chart, the line represents the average effective standard for the combined fleets from all manufacturers. The checkerboard columns represent the adjusted $CO_2$ equivalent certification value (the value compared to the standard for compliance), derived by adding $CO_2$ and $N_2O/CH_4$ adjustments (as provided by the national certification data[4]) and subtracting A/C and off-cycle credits.

---

[4] As noted earlier, the national data actually reports CREE emissions which results in a slight over-estimation of what the actual $CO_2$ equivalent emissions would have been in the CA program but no adjustment was made to correct for this minor difference in this analysis given the unavailability of the data needed to make such an adjustment.



**Figure 1: California GHG Compliance Trends**

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| CO2 (g/mile) | 273.4 | 264.3 | 262.3 | 260.4 | 260.5 | 257.4 | 251.2 |
| N2O/CH4 Adjustment | 0.2 | 0.3 | 0.2 | 0.2 | 0.1 | 0.2 | 0.1 |
| Off-Cycle Credits | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -4.4 | -5.5 |
| A/C Credits | -5.8 | -6.6 | -7.7 | -8.5 | -9.6 | -12.4 | -15.3 |
| Compliance CO2 | 267.8 | 258.0 | 254.8 | 252.0 | 251.0 | 240.8 | 230.6 |
| Standard CO2 | 290.2 | 282.4 | 277.3 | 264.8 | 254.8 | 248.3 | 241.3 |
| Compliance - Standard | -22.4 | -24.4 | -22.5 | -12.8 | -3.8 | -7.5 | -10.7 |

As seen from the chart, manufacturers in California have over-complied with the requisite GHG standard in each model year by as little as 3.8 g/mile in model year 2017 and as much as 24.4 g/mile in 2013.

These results are consistent with previous analyses regarding the feasibility of achieving the California GHG fleet-average targets in the 2018-2025 timeframe. The CARB Midterm Review (MTR)[5], conducted in 2016, provided an in-depth technical analysis of the California fleet and projected how much it would cost to achieve fleet-average targets. In Appendix M of the MTR, staff made projections (using the 2014 model year as a baseline) of future characteristics of the California vehicle fleet, including vehicle footprints, car/truck sales splits, and fuel prices in the 2015 through

---

[5] See *https://ww2.arb.ca.gov/resources/documents/2017-midterm-review-report*

July 6, 2021
Page 10

2025 timeframe under various scenarios.  In all scenario results, the California fleet was projected to meet or exceed the GHG reduction targets in the 2025 model year.

Based on the results of the scenario analyses and other findings in the MTR, CARB concluded that the GHG standards through model year 2025 were appropriate.  This analysis, now factoring in the 2015 through 2018 model years, indicates the conclusions of the MTR remain valid; nothing in the new data sets for those model years contradicts the conclusions of the MTR or leads staff to believe that the conclusions of the MTR are invalid.  Specifically, there has not been a significant shift in vehicle footprint or car/truck sales ratios outside the assumptions in the MTR to indicate there would be any significant changes in the GHG reduction targets or any additional burden on manufacturers to meet the projected targets.  These fleet characteristics, combined with the degree of overcompliance demonstrated in this analysis, indicate California has established reasonable GHG reduction targets.

R-133, Appendix E: ZEV Over-Compliance

Appendix E

State of California
Air Resources Board

# Passenger Vehicle Manufacturers Are Outperforming the ZEV Regulation

## Staff Report

**Date of Release: July 6, 2021**

This report has been prepared by the staff of the California Air Resources Board and approved by the Executive Officer for publication. At this time, this report has not been approved by a vote of the Board itself, and, accordingly, the views expressed herein should not be assumed to necessarily reflect those of the Board.  In addition, the use of trade names or commercial products herein does not constitute endorsement or recommendation.

July 6, 2021
Page 2

# Summary

Since 2005, all auto manufacturers have complied with California's Zero Emission Vehicle (ZEV) Regulation, and all have collectively exceeded its requirements - and by increasing margins. Since 2012, each auto manufacturer has entered every model year with a positive balance in its ZEV credit bank. Prior to 2017, manufacturer credit banks typically contained enough credits for one to two years of compliance ahead of the ZEV requirement.[1] As of the end of the 2019 model year (MY), most manufacturers are retaining credit balances sufficient for compliance for two to five years.

Manufacturers are also complying more and more on their own. Transfers, or credit sales, between auto manufacturers have slowed dramatically in the last four years. Transfers went from an industrywide high of 93,770 total ZEV credits transferred in the 2015 model year among ten auto manufacturers to only 6,000 total ZEV credits transferred among two auto manufacturers in the 2019 model year.[2,3]

In sum, even if all manufacturers maintained ZEV production at model year 2019 levels and did not increase their ZEV production as expected or required, approximately half of the manufacturers would comply through model year 2025 based on their own credit banks and the industry as a whole would comply easily through model year 2025 through available credit transfers.

But manufacturers are in fact expected to increase ZEV production. Manufacturers have made tangible, public commitments to zero-emission technology. Manufacturers have steadily increased the performance and reduced the costs of their zero-emission technology, especially for battery-electric vehicles, and that trend is expected to continue. Battery charge capacity, vehicle range, and efficiency have all gone up. These all point to increased deployment of zero-emission technologies at costs competitive with conventional engines.

# Analysis

To illustrate historical compliance margins, Figure 1 below shows MY 2012 through 2019 ZEV credit compliance requirements and the number of credits produced for

---

[1] CARB, California's Advance Clean Cars Midterm Review, January 18, 2017, *MTR Summary (ca.gov)*, Appendix A: Analysis of Zero Emission Vehicle Regulation Compliance Scenarios: Estimated minimum 1.2 million ZEVs and PHEVs by 2025, p. A-9, *Attachment A Compliance Scenarios (ca.gov)*.

[2] 2015 ZEV Credit Annual Disclosure, *https://ww2.arb.ca.gov/sites/default/files/2020-10/2019_zev_credit_annual_disclosure.pdf*.

[3] 2019 ZEV Credit Annual Disclosure, *https://ww2.arb.ca.gov/sites/default/files/2020-10/2019_zev_credit_annual_disclosure.pdf*.

July 6, 2021
Page 3

both ZEVs[4] and transitional zero emission vehicles (TZEVs), more commonly known as plug-in hybrids. The period from the 2012 to the 2019 model years represents the most recent data available; 2020 model year data is still being processed at the time of this analysis. The blue area represents the minimum ZEV requirement for large-volume manufacturers, while the pink area represents the maximum TZEV credits that large-volume manufacturers can use for compliance. The total annual requirement for all manufacturers is the sum of the blue and pink areas (vertically) for each model year. The ZEV and TZEV credits represent an estimated total of ZEV and TZEV credits earned in each model year. In some model years, manufacturers may have earned more TZEV credits than the maximum amount allowed to be used for compliance in a model year (represented by the dashed black line being above the pink area).

For this analysis, the number of ZEVs and TZEVs produced in a given model year are multiplied by a weighted average of the credits earned per vehicle in lieu of the actual credits earned as an approximation of credits generated. CARB based the value of ZEV and TZEV credits earned per vehicle on model year 2015 vehicle population numbers and the actual credits those vehicles generated.[5] ZEV credit estimates for each model year are calculated by multiplying the annual ZEV production numbers reported by manufacturers[6] by a production-weighted average of 3.29 credits per ZEV. The TZEV credits are similarly based on TZEV production numbers reported by manufacturers multiplied by a sales-weighted average of 1.98 credits per TZEV.[7]

This analysis, as represented by Figure 1 below, shows that estimated ZEV and TZEV credits earned have substantially exceeded the ZEV Regulation requirement.

---

[4] ZEVs include battery electric vehicles (BEVs), range extended battery electric vehicles (BEVx), and fuel-cell electric vehicles (FCEVs).

[5] California's Advance Clean Cars Midterm Review, App. A, p. A-7.

[6] The number of credits generated, and the number of credits required, under the ZEV Regulation is calculated based on the number of vehicles produced and delivered for sale in California. The number of passenger cars and light-duty trucks produced and delivered for sale are also reported to CARB to comply with the low-emission vehicle criteria pollutant standards. These compliance reports are called the "non-methane organic gases and nitrogen oxides (NMOG + NOx) annual vehicle production reports." For simplicity, CARB will often refer to vehicles produced and delivered for sale as sales. See California 2015 and Subsequent Model Criteria Pollutant Exhaust Emission Standards and Test Procedures and 2017 and Subsequent Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles, Part I, Section H.3.3, incorporated by reference in Cal. Code Regs., tit. 13, § 1961.2(d).

[7] California's Advance Clean Cars Midterm Review, App. A, p. A-7.

July 6, 2021
Page 4



Figure 1. California Zero-Emission Vehicle Credit Requirements and Estimated Credits Produced from Model Year 2012 to 2019

## The Data Shows Manufacturers Will Continue Outperforming the Standard

CARB staff analyzed a hypothetical ZEV Regulation compliance scenario (Scenario Y) to demonstrate that there is no feasibility problem with manufacturers meeting the ZEV requirements in upcoming model years. Scenario Y's key assumption is that all manufacturers will continue future ZEV production at model year 2019 levels. Under this scenario, approximately half of the manufacturers would comply through model year 2025 based on their own fleets and credit banks as indicated by Table 1. Summary of ZEV Compliance for Scenario Y from Model Year 2020 to 2025, below, and as described in more detail below industry as a whole would comply easily through model year 2025.

Table 1. Summary of ZEV Compliance for Scenario Y from Model Year 2020 to 2025

| Manufacturer | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| BMW | | | | | | + |
| Fiat Chrysler | | | ✓ | | | |
| Ford | | | ✓ | | | |
| GM | | | | | | + |
| Honda | | | ✓ | | | |
| Hyundai | | | | | | ✓ |
| KIA | | | | | | + |
| Mercedes | | | ✓ | | | |
| Nissan | | | | | | + |
| Toyota | | | | | ✓ | |
| Volkswagen | | | | | | + |
| Jaguar Land Rover* | | | | | | + |
| Mazda* | ✓ | | | | | |
| Subaru* | | | | | ✓ | |
| Volvo* | | | | ✓ | | |
| Tesla* | | | | | | + |

*Manufacturers with asterisks are intermediate volume manufacturers (IVMs), while the rest without asterisks are large volume manufacturers (LVMs). Intermediate volume manufacturers can use TZEV credits to completely fulfill their annual requirements, whereas large volume manufacturers can only use TZEV credits to fulfill a portion of their annual requirements. This distinction is relevant when analyzing how each manufacturer's existing TZEV credits can be used to satisfy future model year obligations.

Note: Tesla and other manufacturers will remain in compliance beyond model year 2025, as denoted by the "plus" symbol. Even though Tesla sells no internal combustion engine (ICE) vehicles, it still has a ZEV requirement starting in model year 2020. All other manufacturers that would comply with the regulation through a specific model year receive a "check" symbol for that model year.

## Future Overcompliance Projections for Model Years 2020-2025 (Scenario Y)



Figure 2. Summary of ZEV Compliance Projections for Scenario Y from Model Year 2019 to 2025

Figure 2 above displays the trends associated with manufacturer credit generation, annual requirements, and credit balances from model year 2019-2025 under Scenario Y where future ZEV production remains constant at a model year 2019 level for all manufacturers.

The green area in Figure 2 above represents the minimum ZEV requirement for large-volume manufacturers, while the textured blue area represents the maximum TZEV credits that can be used for compliance for large-volume manufacturers. Intermediate volume manufacturers may meet their compliance obligation exclusively with TZEVs. The total annual requirement for all manufacturers is the sum of the textured blue and green areas (vertically) for each model year.

The brown line represents the total credits earned (all ZEVs and TZEVs) during each model year for all manufacturers, whereas the dark purple line represents the same information as the brown line but excludes Tesla. These two lines are parallel and have

July 6, 2021
Page 7

flat slopes because it reflects a scenario where credit generation remains constant at model year 2019 levels out through model year 2025.

The pink line with markers on the very top represents overall cumulative credit balances for all manufacturers at the end of each reporting year, after considering credits earned and debits tendered (or credits used) for that year. Since the pink line remains far above zero, the manufacturers as a whole would remain in compliance through model year 2025. Similarly, the blue line with markers below the pink line represents cumulative credit balances but excludes Tesla and shows that the manufacturers also would remain collectively in compliance through model year 2025, without any reliance on credits earned by Tesla. In fact, the industry as a whole (without Tesla) would still have 313,964 credits at the end of model year 2025 reporting, representing almost another full model years' worth of credit obligation at model year 2025 levels.

The credit balances are provided in Table 2, below.

Table 2. Annual Requirements, Credits Earned, and Ending Year Balances for Model Years 2019-2025 (Scenario Y)

| All Manufacturers (General Analysis) | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| Annual Requirement (ZEVs) | 77,902 | 113,376 | 145,722 | 172,192 | 202,507 | 236,259 | 270,010 |
| Max TZEV Credits | 71,440 | 86,621 | 98,392 | 108,743 | 119,022 | 132,554 | 146,086 |
| Annual Requirement (ZEVs+TZEVs) | 149,342 | 199,996 | 244,114 | 280,935 | 321,529 | 368,813 | 416,096 |
| Credits Earned (ZEVs) | 364,223 | 364,223 | 364,223 | 364,223 | 364,223 | 364,223 | 364,223 |
| Credits Earned (ZEVs, no Tesla) | 120,161 | 120,161 | 120,161 | 120,161 | 120,161 | 120,161 | 120,161 |
| Credits Earned (TZEVs) | 30,319 | 30,319 | 30,319 | 30,319 | 30,319 | 30,319 | 30,319 |
| Credits Earned (ZEVs+TZEVs) | 394,542 | 394,542 | 394,542 | 394,542 | 394,542 | 394,542 | 394,542 |
| Credits Earned (ZEVs+TZEVs, no Tesla) | 150,480 | 150,480 | 150,480 | 150,480 | 150,480 | 150,480 | 150,480 |
| Ending Year Balances | 1,619,794 | 1,825,843 | 1,986,735 | 2,100,342 | 2,173,355 | 2,199,084 | 2,177,530 |
| Ending Year Balances (no Tesla) | 1,170,880 | 1,137,880 | 1,061,503 | 939,739 | 777,182 | 568,590 | 313,964 |

In summary, the chart shows the robust credit balances for all manufacturers, as a result of over-compliance to date, and demonstrates that the industry should have no

issues with future year compliance, given that manufacturers can trade credits with one another to address individual credit shortages. This again underscores that the standards will remain feasible well past model year 2025 because it is very likely that, on average, automakers will produce more ZEVs in later years than they did in model year 2019, as evident from automaker-provided data described below.

## Market Share Projections for Future ZEV Sales

Scenario Y is quite conservative since it does not consider advancing ZEV technology or manufacturer statements about increasing commitments to zero-emission technology, which are expected to lead to higher production levels, more credits earned per vehicle for future model year ZEVs, and overall increased ability to comply.

Manufacturers annually submit alternative fuel vehicle sales projections to CARB, including sales projections for battery electric vehicles, plug-in hybrids (PHEVs), and hydrogen fuel cell vehicles.[8] CARB uses this information in a variety of ways, primarily to inform infrastructure planning. Starting with 8% of actual new vehicles sold in California being ZEVs and PHEVs combined in 2020, the manufacturer-provided data shows steady projected growth through the 2023 model year to over 25% of sales (as shown in Figure 3 below). With levels of production at these projected rates, the manufacturers would overwhelmingly earn enough credits to far exceed the ZEV Regulation obligation through model year 2025.

---

[8] California 2015 and Subsequent Model Criteria Pollutant Exhaust Emission Standards and Test Procedures and 2017 and Subsequent Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light Duty Trucks, and Medium Duty Vehicles.



Figure 3. ZEV Projections from Model Year 2020 – 2025[9]

## Manufacturers Continue to Improve Zero-Emission Technologies

Beyond the information from manufacturers about future products, the industry has made significant progress developing zero-emission technology, which further illustrates the technological feasibility of California's ZEV (and GHG) standards.

As CARB explained in its comments on the SAFE Vehicles Rule proposal, manufacturers increased the performance and reduced the costs of their zero-emission technology, especially for battery-electric vehicles, and that trend is expected to continue. Battery charge capacity, vehicle range, and efficiency have all gone up. See CARB, Analysis in Support of Comments of the California Air Resources Board on the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks, Oct. 26, 2018, EPA-HQ-OAR-2018-0283-5054, pp. 128-134, 142-144. And, over the past several years, manufacturers have steadily increased their commitments to zero-emission transportation. Automakers representing one-third of California's market have already announced targets for

---

[9] Public Workshop on Advanced Clean Cars II, *https://ww2.arb.ca.gov/sites/default/files/2021-05/acc2_workshop_slides_may062021_ac.pdf*.

greater than 50% ZEV sales by 2030, as well as significant financial commitments to electrification and sustainability.[10]

Battery technology continues to rapidly evolve and improve, which is helping to drive significant increases in all-electric range of new light-duty ZEVs. Battery costs have been steadily falling and are expected to continue to do so as battery and automotive manufacturers increase their commitments to electrification and increase manufacturing capacity.[11] Based on its research and analysis, CARB projects battery costs will decline are shown in the following graph.



Figure 4. Projected ZEV Battery Costs

Costs for non-battery components are also declining due to improvements to efficiency, demonstrated by several vehicle and component teardowns.[12] The combined effects of these improvements are battery-electric vehicles in the 2020 model year have a median range topping 250 miles.[13]

---

[10] See CARB, Advanced *May 2021 Advanced Clean Cars (ACC) Workshop Presentation,* May 6, 2021, slide 39.

[11] See, e.g., *https://www.cnbc.com/2021/04/16/gm-and-lg-to-spend-2point3-billion-on-second-ev-battery-plant-in-us.html, https://www.cnbc.com/2021/05/20/ford-announces-joint-venture-to-manufacture-ev-battery-cells-in-us.html, https://www.theverge.com/2020/9/22/21450840/tesla-battery-day-production-elon-musk-tabless-range-cathode-cobalt-plaid.*

[12] See CARB, Advanced *May 2021 Advanced Clean Cars (ACC) Workshop Presentation,* May 6, 2021, slide 59.

[13] See *https://www.energy.gov/eere/vehicles/articles/fotw-1167-january-4-2021-median-driving-range-all-electric-vehicles-tops-250.*



Figure 5. Electric Vehicle Range for Model Years 2011-2020

Several significant models with ranges above 250 miles at increasingly lower price points have been released since CARB's assessment for the Mid-Term Review (MTR), including the Tesla Model 3 and Model Y, Chevrolet Bolt with increased battery capacity, the Hyundai Kona Electric, the Ford Mustang Mach-E, and the VW iD.4. Ranges will continue to increase and costs decrease as manufacturers develop new models, like the Hyundai Ioniq 5, Kia EV6 GT, Nissan Ariya, BMW i4, refreshed Chevrolet Bolt and Bolt EUV, and others. Manufacturers have announced models for the larger SUV and pickup segments, including the Ford F-150 Lightning electric, GM Hummer EV SUV and truck, Rivian R1T and R1S, and Tesla Cybertruck. The diversity of vehicle offerings that are available now or soon to be available to consumers demonstrates how quickly the technology evolves.

In the next several years, technology improvements will likely debut that have the potential to lower costs, increase range, and shorten charging times more quickly than expected. Several companies are now demonstrating, and in some cases delivering,

July 6, 2021
Page 12

pre-production solid state battery cells to OEMs for testing.[14] Batteries will also become better able to accommodate high-power fast charging technology.[15] New dedicated and further optimized EV platforms will launch, improving vehicle efficiency, range, and costs.[16] The combination of those improvements, should they deliver as anticipated, will push ZEV technology well beyond its current, and relatively capable, state.

---

[14] See *https://www.greencarcongress.com/2020/10/20201009-solid.html*.

[15] See *https://www.enevate.com/technology/hd-energy-technology/*.

[16] See *https://www.volkswagen-newsroom.com/en/press-releases/project-trinity-with-high-range-extremely-short-charging-times-and-revolutionary-production-the-sedan-will-launch-in-2026-6879*.

## Methodology & Sample Calculations for Model Year 2020, Using a Representative Original Equipment Manufacturer (OEM A) for Scenario Y

This section describes how the compliance estimates were reached, the data considered, and basis for the projections.

1) Annual Requirement

Step 1: Retrieve the manufacturer's passenger car (PC) and light-duty truck (LDT) production numbers from historical years (2018 and newer model year data is publicly available from ZEV credit annual disclosures).[17,18] Production data in the ZEV credit annual disclosures from 2017 and prior exclude ZEVs, and only includes the non-ZEV fleet. ZEV credit reporting data or the manufacturer's PC and LDT production from low-emission vehicle reporting will allow you to determine pre-2018 total production data (for ZEVs and non-ZEVs).

Table 3. OEM A's sales from MY 2015-2025 (Scenario Y)

| Model Year | OEM A's Total Sales |
|---|---|
| 2016 | 86,949* |
| 2017 | 78,576* |
| 2018 | 83,575 |
| 2019 | 78,400 |
| 2020 | 78,400 |
| 2021 | 78,400 |
| 2022 | 78,400 |
| 2023 | 78,400 |
| 2024 | 78,400 |
| 2025 | 78,400 |

*Not found in annual ZEV disclosure reports, requires low-emission vehicle certification reports; values from 2020 – 2025 remain constant due to the assumption that OEM A produces vehicles at the same level as 2019.

Step 2: Calculate OEM A's ZEV/TZEV/Total Annual Requirements

---

[17] 2019 ZEV Credit Annual Disclosure *https://ww2.arb.ca.gov/sites/default/files/2020-10/2019_zev_credit_annual_disclosure.pdf*.
[18] Vehicles produced and delivered for sale in California are stated as sales.

July 6, 2021
Page 14

Table 4. OEM A's Annual Requirements from Model Year 2020 to 2025 (Scenario Y)

| Model Year | ZEV | TZEV | Total | ZEV Requirement | TZEV Requirement | Total Requirement |
|---|---|---|---|---|---|---|
| 2019 | 4.0% | 3.0% | 7.0% | 3,556 | 2,667 | 6,223 |
| 2020 | 6.0% | 3.5% | 9.5% | 4,982 | 2,906 | 7,888 |
| 2021 | 8.0% | 4.0% | 12.0% | 6,415 | 3,207 | 9,622 |
| 2022 | 10.0% | 4.5% | 14.5% | 8,012 | 3,606 | 11,618 |
| 2023 | 12.0% | 5.0% | 17.0% | 9,408 | 3,920 | 13,328 |
| 2024 | 14.0% | 5.5% | 19.5% | 10,976 | 4,312 | 15,288 |
| 2025 | 16.0% | 6.0% | 22.0% | 12,544 | 4,704 | 17,248 |

The basic annual requirements are found in section 1962.2.(b)(1)(A), Basic Requirement. Additional details are found in section 1962.2.(b)(1)(E), Requirements for Large Volume Manufacturers in 2018 and through 2025 Model Years.

For model year 2020, we derive the annual requirements based on the product of the percentage requirement and the 3-year average of the manufacturer's PC and LDT sales from 2016, 2017, and 2018, as referenced in section 1962.2.(b)(1)(B), Calculating the Number of Vehicles to Which the Percentage ZEV Requirement is Applied.

The general formulas are:

- ZEV: MY 2020 ZEV Requirement * (MY 2016 Sales + MY 2017 Sales + MY 2018 Sales) / 3
- TZEV: MY 2020 TZEV Requirement * (MY 2016 Sales + MY 2017 Sales + MY 2018 Sales) / 3
- Total Annual Requirement: MY 2020 Total Annual Requirement * (MY 2016 Sales + MY 2017 Sales + MY 2018 Sales) / 3

OEM A's Calculations:

- ZEV: 0.06 * (86,949 + 78,576 + 83,575) / 3 = 4,982
- TZEV: 0.035 * (86,949 + 78,576 + 83,575) / 3 = 2,906
- Total Annual Requirement: 0.095 * (86,949 + 78,576 + 83,575) / 3 = 7,888

The analysis above is replicated for future model year projections and the calculations are repeated for the other manufacturers (16 total). The overall results summed up across all manufacturers are found in Table 2.

2) Credits Earned each year (Derived from ZEV credit reporting CRDTS for model year MY 2019)

For OEM A's model year 2019 reporting, the ZEV credits generated are as follows:

- ZEV Credits = BEVs + BEVxs + FCEVs = 3,102 + 4,861 + 0 = 7,963
- TZEV Credits = 2,770

Based on the Scenario Y assumption, these credit values would remain the same for OEM A for 2020 to 2025 model years. This analysis is repeated for the other manufacturers and credits earned are summed together in their respective credit categories to obtain the results seen in Table 2. The credits earned (ZEVs + TZEVs) row in Table 2 is found by summing all ZEV and TZEV balances together.

3) Ending Model Year Balances (Derived from ZEV credit reporting, available in the annual public summary reports for pre-2019 years; future years rely on assumptions described below.)

The accurate calculation for a manufacturer's ending year balance for a specific credit type (ZEV/TZEV) as follows:

- Prior Year Ending Balance + Credits Earned in Current Year – Debits (i.e., specific allocation of credits used to meet the annual requirement) + Transfers from another manufacturer (i.e., credits bought) – Transfers to another manufacturer (i.e., credits sold)

For simplicity purposes, we calculated each manufacturer's ending year balance for a specific credit type (ZEV/TZEV) using the following:

- Prior Year Ending Balance + Credits Earned in Current Year – Annual Requirement

The important assumption is that the manufacturer uses ZEV credit balances (FCEVs, BEVs, BEVxs) for ZEV requirements only, and TZEV credit balances (also NEV+ and Discount credits, if available) for TZEV requirements only. There is no mixing of different credit categories during spending/debiting (i.e., some manufacturers can use some ZEV credits to fulfill their TZEV requirement – this is not captured in the simplifying assumption for this analysis). Also, we assume there are no credit transfers initiated in our analysis, even though manufacturers may transfer among themselves.

For clarity, we perform the calculations by credit type (ZEVs/TZEVs) before summing them up. Here are the generic formulas for model year 2020:

- BEVs Ending Balance for MY 2020: MY 2019 BEV Ending Balance + MY 2020 Earned BEV credits – MY 2020 Annual Requirement for ZEVs
- BEVx Ending Balance for MY 2020: MY 2019 BEVx Ending Balance + MY 2020 Earned BEVx credits – MY 2020 Annual Requirement for ZEVs (we don't need to subtract the ZEV requirement twice, so it should be zero here)
- TZEV Ending Balance for MY 2020: MY 2019 TZEV Ending Balance + MY 2020 Earned TZEV credits – MY 2020 Annual Requirement for TZEVs

- Total Ending Balance for MY 2020: BEVs + BEVx + TZEV

For OEM A, for example, the model year 2020 calculations are:

- BEVs: 16,494 + 3,102 – 4,982 = 14,614
- BEVx: 35,705 + 4,861 – 0 = 40,566 (we don't need to subtract the ZEV requirement twice)
- TZEV: 617 + 2,770 – 2,906 = 481
- Total: 14,614 + 40,566 + 481 = **55,661**

The analysis above is replicated for future model year projections and repeated for the other manufacturers (16 total). The overall results for each OEM are found in Table 7.

Note that some manufacturers have additional credit types such as FCEVs, Discount credits, and GHG-ZEV Over Compliance credits where the calculation methodology is very similar.

Only six manufacturers had discount credit balances at the start of model year 2020, while the other 10 had none. Discount credits can only be used in certain quantities, as described in the ZEV Regulation:

> *Use of Discounted PZEV and AT PZEV Credits and NEV Credits.* For model years 2018 through 2025, discounted PZEV and AT PZEV credits, and NEV credits may be used to satisfy up to one-quarter of the portion of a manufacturer's requirement that can be met with credits from TZEVs, or, if applicable, the portion of a manufacturer's obligation that may be met with TZEVs specified under subdivision 1962.2(d)(5)(E)2.a. Intermediate volume manufacturers may fulfill their entire requirement with discounted PZEV and AT PZEV credits, and NEV credits in model years 2018 and 2019. These credits may be earned previously by the manufacturer or acquired from another party. Discounted PZEV and AT PZEV credits may no longer be used after model year 2025 compliance.

(Cal. Code Regs., tit. 13, § 1961.3(g)(6)(A).)

Manufacturers may also use any available GHG-ZEV Over Compliance credits for model years 2018-2021. After model year 2021, manufacturers are unable to earn any additional GHG overcompliance credits. Furthermore, GHG-ZEV Over Compliance credits earned in any given model year under this may only be used in the applicable model year and may not be used in any other model year.

As described in the ZEV Regulation:

> *Use of GHG-ZEV Over Compliance Credits.* A manufacturer may use no more than the percentage enumerated in the table below to meet either the total

July 6, 2021
Page 17

> ZEV requirement or the portion of their ZEV requirement that must be met with
> ZEV credits, with credits earned under this subdivision 1962.2(g)(6)(C).

(Cal. Code Regs., tit. 13, § 1961.3(g)(6)(C)(3).)

Table 5. GHG Overcompliance Credits from the ZEV Regulation

| 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|
| 50%  | 50%  | 40%  | 30%  |

For example, if a manufacturer has a total annual requirement (ZEV + TZEV) of 28,758 credits for model year 2020, then it will be able to meet up to 40% of that total obligation, or 0.4 * 28,756 = 11,502, with GHG-ZEV Over Compliance credits to fulfill its compliance obligation for that model year. If the manufacturer decides not to use any GHG-ZEV Over Compliance credits, it would lose all 11,502 credits at the end of model year 2020 reporting, so it is reasonable to assume that if a manufacturer opted into this program, it would use the maximum number of GHG-ZEV Over Compliance credits before using any other credit categories to meet compliance.

After accounting for these special types of credits, total remaining credits across all credit types are summed for each model year. The ending balances by manufacturer under Scenario Y are displayed below in Table 6.

July 6, 2021
Page 18

Table 6. Manufacturer Ending Balances from Model Year 2019 to 2025 (Scenario Y)

| OEM | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|
| BMW | 52,816 | 55,661 | 56,771 | 55,886 | 53,291 | 48,736 | 42,221 |
| Fiat Chrysler | 73,909 | 59,638 | 41,070 | 17,720 | -10,366 | -42,817 | -79,633 |
| Ford | 141,195 | 125,233 | 106,293 | 85,477 | 62,027 | 34,678 | 3,429 |
| GM | 286,420 | 311,314 | 331,354 | 348,587 | 362,637 | 371,926 | 376,454 |
| Honda | 77,100 | 68,762 | 53,262 | 21,499 | -16,680 | -61,784 | -113,814 |
| Hyundai | 12,575 | 13,621 | 13,391 | 13,379 | 12,355 | 9,679 | 5,349 |
| KIA | 20,223 | 23,735 | 26,240 | 27,204 | 26,112 | 23,286 | 18,727 |
| Mercedes | 26,801 | 21,135 | 13,432 | 3,714 | -7,390 | -20,419 | -35,372 |
| Nissan | 67,794 | 71,078 | 71,987 | 72,028 | 69,327 | 63,711 | 55,178 |
| Toyota | 281,665 | 257,119 | 223,780 | 184,262 | 136,037 | 78,820 | 12,610 |
| Volkswagen | 57,157 | 67,170 | 73,587 | 76,552 | 76,891 | 74,172 | 68,394 |
| Jaguar Land Rover | 7,196 | 9,318 | 10,994 | 12,456 | 13,590 | 14,259 | 14,463 |
| Mazda | 6,118 | 347 | -5,159 | -11,653 | -18,631 | -26,634 | -35,663 |
| Subaru | 55,870 | 49,994 | 41,458 | 30,736 | 17,588 | 2,419 | -14,771 |
| Volvo | 4,042 | 3,754 | 3,043 | 1,893 | 393 | -1,440 | -3,606 |
| Tesla | 448,913 | 687,963 | 925,233 | 1,160,604 | 1,396,173 | 1,630,494 | 1,863,566 |
| All Manufacturers | 1,619,794 | 1,825,843 | 1,986,735 | 2,100,342 | 2,173,355 | 2,199,084 | 2,177,530 |
| Totals Excluding Tesla | 1,170,880 | 1,137,880 | 1,061,503 | 939,739 | 777,182 | 568,590 | 313,964 |

Note: The results here may not always align perfectly with Table 2, since Table 6 incorporates all credit categories (BEVs, BEVxs, FCEVs, Discount, NEV+, TZEVs). For example, even though Ford has 3,429 total credits in their balance at the end of model year 2025, they were not in compliance with the ZEV Regulation, under Scenario Y, for model year 2025. In fact, they could only meet compliance through model year 2022. The reasoning is that Ford has a very large TZEV and NEV+ balance. By model year 2025, they had an approximate negative 51,000 credits in their ZEV account balance, but approximately 54,000 in their TZEV account balance. Large volume manufacturers like Ford cannot use TZEVs credits to fulfill their ZEV requirement, so even if their net balance for all credit categories is greater than 0, that does not necessarily mean they are in compliance. However, manufacturers can still trade credits between each other. Due to the surplus of BEV credits from manufacturers collectively, the system as a whole will maintain compliance through model year 2025.

July 6, 2021
Page 19

## Conclusion

A comprehensive, retrospective and forward-looking analysis corroborates what industry has said: zero-emission technology is here now and ready for the coming years. CARB's existing standards through model year 2025 would be met by industry if they did not do more than what they are doing now. But that is not their plan. The technology is getting better and more cost-competitive. The personal transportation industry is ready to take the next step to clean technology.

# R-133, Appendix F: California's Changing Climate 2018



CALIFORNIA'S FOURTH
**CLIMATE CHANGE**
ASSESSMENT



# California's Changing Climate 2018

A Summary of Key Findings from California's
Fourth Climate Change Assessment

Coordinating Agencies:









JA-319

# Introduction to California's Fourth Climate Change Assessment

Calalifornia is a global leader in using, investing in, and advancing research to set proactive climate change policy, and its Climate Change Assessments provide the scientific foundation for understanding climate-related vulnerability at the local scale and informing resilience actions. The Climate Change Assessments directly inform State policies, plans, programs, and guidance to promote effective and integrated action to safeguard California from climate change.

This capstone report presents key findings from California's Fourth Climate Change Assessment (also referred to as the Fourth Assessment). It provides an overview of the state of climate science while pointing out how the Fourth Assessment contributes to better understanding the impacts of climate change and how to take action to become more resilient.

To find out more about the other components of the Fourth Assessment, please visit: www.ClimateAssessment.ca.gov

**KEY FINDINGS**

**STATEWIDE SUMMARY**

**SUMMARIES FOR REGIONS AND COMMUNITIES**

**ORIGINAL RESEARCH TO INFORM POLICY AND ACTION**

**ASSESSMENT FOUNDATION: UPDATED CLIMATE PROJECTIONS AND DATA**

---

**CALIFORNIA'S CLIMATE CHANGE POLICY AND THE FOURTH ASSESSMENT**

While California is leading efforts to reduce greenhouse gas emissions, the State must also proactively address current and future impacts of climate change. The Fourth Assessment is part of California's comprehensive strategy to take action based on cutting-edge climate research. The Fourth Assessment addresses critical information gaps that decision-makers at the state, regional, and local levels need addressed in order to protect California's people, infrastructure, natural systems, working lands, and waters.



People and communities can respond to changing average conditions, shocks, and stresses in a manner that minimizes risks to public health, safety, and the economy; and maximizes equity and protection of the most vulnerable so that they both survive climate-related events and thrive despite and after these events.

**PEOPLE**

Built infrastructure systems can withstand changing conditions and shocks, including changes in climate conditions, while continuing to provide critical services

**INFRA-STRUCTURE**

**NATURAL SYSTEMS**

Natural systems adjust and maintain desirable ecosystem characteristics in the face of change.

The Fourth Assessment provides critical information that will enable more ambitious efforts to support a climate-resilient California.

# Why Study Climate Change in California?

California is one of the most "climate-challenged" regions of North America; its historical climate is extremely variable, and climate change is making extreme conditions more frequent and severe. California's temperatures are already warming, heat waves are more frequent, and precipitation continues to be highly variable. Since its Third Climate Change Assessment in 2012, California has experienced several of the most extreme natural events in its recorded history: a severe drought from 2012-2016, an almost non-existent Sierra Nevada winter snowpack in 2014-2015, increasingly large and severe wildfires, and back-to-back years of the warmest average temperatures.

California and the world need to rapidly reduce climate pollution to avoid the worst effects of climate change. We must also prepare for the continued acceleration of climate impacts in the future. The Fourth Assessment has prepared information needed to reach these goals.

The Fourth Assessment includes 33 State-funded research projects and contributions from 11 externally-funded researchers. The State-funded projects include the development of cutting-edge climate projections for California. The projections use a broader range of climate models, emission scenarios, and simulations than previous assessments, and included:

- The development and use of a new technique that provides spatial climate data that can be used at the local to regional level.

- Improved understanding of additional climate variables, including relative humidity and wind speed, and extremes like drought, heat waves, and heavy precipitation events.

- More extensive simulations of wildfire to help visualize increases in area burned.

- A more detailed set of sea-level rise projections that incorporate recent research on ice sheet collapse in West Antarctica.

These projections are critical tools necessary to understand and plan for climate impacts. They also inform research into critical actions for resilience.

**CATALYZING ACTION THROUGH NEW ONLINE RESOURCES**

The Fourth Assessment supported the development and expansion of new and existing resources to directly support climate action. Examples include:



www.Cal-Adapt.org

Cal-Adapt is the State's portal for the climate projections produced for the Fourth Assessment, enabling data downloading and visualizations of climate scenarios at the local level and wildfire projections for the entire state.



www.Cal-Heat.org

Cal-Heat is a new tool funded by the Fourth Assessment to inform local public health officials' initiatives to protect the public during climate-exacerbated extreme heat events.

**COASTAL STORM MODELING SYSTEM (COSMOS)**

The CoSMoS model, partly funded by the Fourth Assessment, provides information about the complex interplay of coastal dynamics and climate change for California's coast.

View updated CoSMoS results on these websites:

- Hazard Exposure Reporting and Analytics (HERA) https://www.usgs.gov/apps/hera/

- Our Coast Our Future Flood Map www.OurCoastOurFuture.org

The full suite of Fourth Assessment projects and other tools can be found at: www.ClimateAssessment.ca.gov

## How is California's climate projected to change?

The Fourth Assessment produced updated climate projections that provide state-of-the-art understanding of different possible climate futures for California. The science is highly certain that California (and the world) will continue to warm and experience greater impacts from climate change in the future. While the Intergovernmental Panel on Climate Change and the National Climate Assessment have released descriptions of scientific consensus on climate change for the world and the United States, respectively, the Fourth Assessment summarizes the current understanding of climate impacts and adaptation options in California. The greater detail provided by the Fourth Assessment supports efforts by individuals, businesses and communities to prepare for and reduce the impacts of climate change.

| | CLIMATE IMPACT | DIRECTION | SCIENTIFIC CONFIDENCE FOR FUTURE CHANGE |
|---|---|---|---|
| | TEMPERATURE | WARMING ↗ | Very High |
| | SEA LEVELS | RISING ↗ | Very High |
| | SNOWPACK | DECLINING ↘ | Very High |
| | HEAVY PRECIPITATION EVENTS | INCREASING ↗ | Medium-High |
| | DROUGHT | INCREASING ↗ | Medium-High |
| | AREA BURNED BY WILDFIRE | INCREASING ↗ | Medium High |

While most of these trends have been generally understood and expected since before California's First Climate Change Assessment in 2006, the Fourth Assessment provides new quantitative tools to understand and address these impacts. The updated results from the suite of Fourth Assessment models and analyses demonstrate the importance of achieving global reductions in greenhouse gas emissions. [1]

---

1   The phrase "if greenhouse gas emissions continue at current rates" refers to the Representative Concentration Pathway (RCP) 8.5. The phrase "if greenhouse gas emissions are reduced at a moderate rate" refers to RCP4.5. The RCP4.5 emissions level represents reduced emissions, but those reductions are not sufficient to achieve the targets called for in the Paris Agreement.  However, the RCP4.5 emissions scenario was used in many of the Fourth Assessment's studies.

| If greenhouse gas emissions… | are reduced at a moderate rate… | then California will experience average daily high temperatures that are warmer than the historical average by… | **2.5°F** from 2006 to 2039. | **4.4°F** from 2040 to 2069. | **5.6°F** from 2070 to 2100. |
|---|---|---|---|---|---|
| | continue at current rates… | | **2.7°F** from 2006 to 2039. | **5.8°F** from 2040 to 2069. | **8.8°F** from 2070 to 2100. |

While the averages of daily maximum temperatures over an entire year are easily understood, in many ways this indicator obscures the risks from extreme weather events due to changing climate. For example, the number of extreme heat days will increase exponentially in many areas.

Projections developed for the Fourth Assessment do not show a consensus in the overall trend in yearly precipitation, but they do have increasing variability in precipitation. However, across all the simulations, higher temperatures lead to dryer conditions because of increasing evaporation and plant stress. With increased numbers of dry days, several of the models indicated an increased occurrence of dry years and strings of dry years resulting in more frequent and more intense droughts. At the same time that most of the simulations had more dry days, there was also a tendency for increased precipitation on very wet days, so that the risk of floods caused by large storms will increase, sometimes occurring in bursts over several weeks.

The Paris Agreement brought, for the first time, all nations of the world together around the common cause of limiting global average temperature warming to 2°C [3.6°F] or less (1.5°C [2.7°F]) above pre-industrial levels. A Fourth Assessment study reports estimated climate impacts to California assuming global compliance with the Paris goals, finding that impacts in California would be substantially reduced. However, California still needs to prepare, at a minimum, for significant unavoidable impacts that would occur even if global average temperate rise is limited to 1.5°C, and adopt precautionary adaptation policy to protect against impacts from higher emissions scenarios.

By 2050, the average water supply from snowpack is projected to decline to 2/3 from historical levels. If emissions reductions do not occur, water from snowpack could fall to less than 1/3 of historical levels by 2100.



| EXTREME HEAT DAYS PER YEAR IN DOWNTOWN FRESNO (Days exceeding 106.6°F) | | |
|---|---|---|
| 1961 – 2005 | 2050 – 2099 | 2050 – 2099 |
| **4** | **26** | **43** |
| | if greenhouse gas emissions are reduced at a moderate rate | if greenhouse gas emissions continue at current rates |

Sea-level rise is virtually certain to increase beyond the 6 inches that much of California experienced in the past century, but there are important questions involving how fast and how extreme the rates of sea-level rise will be. The Fourth Assessment's projections underscore the dependence of sea levels upon greenhouse gas emissions and the associated melt and ice-loss from Greenland and Antarctica. If emissions continue at current rates, Fourth Assessment model results indicate that total sea-level rise by 2100 is expected to be 54 inches, almost twice the rise that would occur if greenhouse gas emissions are lowered to reduce risk.

Increasing acreage burned by wildfire is associated with increasing air temperatures. One Fourth Assessment model suggests large wildfires (greater than 25,000 acres) could become 50% more frequent by the end of century if emissions are not reduced. The model produces more years with extremely high areas burned, even compared to the historically destructive wildfires of 2017 and 2018.



This image shows the modeled area burned by wildfires from current time (modeled as 1961-1990), for mid-century (2035-2064), and for late century (2070-2099). By the end of the century, California could experience wildfires that burn up to a maximum of 178% more acres per year than current averages.

# Impacts of Climate Change on People

While the impacts of climate change vary over time and place, each community will also experience these impacts in unique ways that will depend on social, economic, and demographic factors. The Fourth Assessment makes new strides at the intersection of social and physical sciences to understand how climate change will affect Californians – and how Californians can adapt and safeguard their communities from climate change.

## PUBLIC HEALTH

Climate change will affect California's diverse people and communities differently, depending on their location and existing vulnerabilities. While research shows that all Californians will likely endure more illness and be at greater risk of early death because of climate change, vulnerable populations that already experience the greatest adverse health impacts will be disproportionately affected.

Heat waves, the natural disaster responsible for the most deaths in California over the last 30 years, are an example of the current and future risk climate change poses to people. The 2006 heat wave killed over 600 people, resulted in 16,000 emergency department visits, and led to nearly $5.4 billion in damages. The human cost of these events is already immense, but research suggests that mortality risk for those 65 or older could increase ten-fold by the 2090s because of climate change. Studies show that while air conditioning can reduce mortality and illness from heat, increased electrical demand for cooling due to hotter conditions could also drive up emissions. However, the state is rapidly moving to cleaner electricity generation. Greenhouse gas emissions from electricity generation in 2016 were about 37% lower than emissions in 1990.



Social Vulnerability Composite Score

- 0 – 20
- 20 – 40
- 40 – 60
- 60 – 80
- 80 – 100

A Fourth Assessment study produced this map of social vulnerability to heat by using 18 health, social, and environmental factors associated with heat vulnerability. The map highlights the relative heat vulnerability of 8,046 census tracts by synthesizing vulnerability indicators to render a clearer picture of overall heat vulnerability. In more detail, Map A illustrates the Bay Area and Map B shows greater Los Angeles area.

**IMPACT FROM CLIMATE CHANGE:** Heat-Health Events (HHEs), which predict heat risk to local vulnerable populations, will worsen drastically throughout the state by mid-century. The Central Valley is projected to experience average HHEs that are up to two weeks long, and HHEs could occur four to ten times more often in the North Sierra region.

**ACTION FOR RESILIENCE:** The Fourth Assessment supported the development of a prototype heat warning system known as the California Heat Assessment Tool (CHAT), which was designed to provide information about heat events most likely to result in adverse health outcomes. It will support public health departments taking action to reduce heat-related morbidity and mortality outcomes.

A new study found that deep greenhouse gas emission reductions (80% below 1990 levels) in California could significantly improve health outcomes, and cost savings would be comparable to the cost of achieving those reductions by 2050. These savings are achieved because shifting from polluting technologies to clean technology improves air quality, saves lives, and improves overall public health.

In addition to heat, direct climate impacts like wildfire, drought, and coastal and inland flooding will negatively affect public health. However, there are also additional indirect effects of climate change on human health: wildfire smoke leads to increased respiratory illness, warmer temperatures lead to the spread of mosquito-borne diseases like Zika, and increased disasters lead to greater stress and mental trauma.

## CLIMATE JUSTICE

The Fourth Assessment includes a report on climate justice in California, a new addition to the assessment process. Climate justice is the concept that no group of people should disproportionately bear the burden of climate impacts or the costs of mitigation and adaptation, and is a critical component of California's climate strategy.

This Fourth Assessment report highlights the importance of adaptation efforts to minimize climate impacts to disadvantaged communities, as well as case studies of innovative programs to increase the resiliency of vulnerable populations in California. The report identifies areas for additional research needed to improve climate adaptation for vulnerable populations and to promote climate justice in California. These include better tools, indices, maps, and metrics for identifying and quantifying resilience in vulnerable communities, research into achieving a just transition to a low carbon economy, and methods for ensuring community involvement in climate adaptation planning.



Vulnerable communities include field workers, such as this person being given a protective N95 face mask who was exposed to poor air quality during the California wildfires in the fall/early winter of 2017/2018. Photo: CAUSE

## TRIBAL AND INDIGENOUS COMMUNITIES

For the first time, the Fourth Assessment includes a Tribal and Indigenous Communities Summary Report. Tribes and Indigenous communities in California face unique challenges under a changing climate. Tribes maintain cultural lifeways and rely on traditional resources (like salmon fisheries) for both social and



An example of how tribes use Traditional Ecological Knowledge can be seen in the use of prescribed burns. These are commonly deployed within a centuries-old cultural context to manage meadows, forests, and other areas within tribal lands.

economic purposes. For many tribes in California, seasonal movement and camps were a part of living with the environment. Today, these nomadic options are not available or are limited. This is the result of Euro-American and U.S. policy and actions and underpins several climate vulnerabilities. Tribes with reservations, Rancherias, or allotments are vulnerable to climate change in a specific way: tribal lands are essentially locked into fixed geographic locations and land status. Only relatively few tribal members are still able to engage in their cultural traditions as livelihoods.

Traditional Ecological Knowledge (TEK)-based methods are gaining a revitalized position within a larger statewide toolset to build resilience against climate change by tribal and non-tribal stakeholders alike. The importance of maintaining TEK is not isolated to environmental and ecological improvements. These ancient, traditional practices are closely linked to climate resilience across tribal cultural health, identity, and continuity. Cultural practices and traditional land management are also linked to improving physical and mental health among tribal members. These TEK techniques are increasingly incorporated by non-tribal land and resource managers as part of wildfire prevention and ecosystem management.


# Impacts of Climate Change on Infrastructure

The Fourth Assessment provides in-depth assessments that support proactive steps to protect California's energy, transportation, and water infrastructure systems and the communities they serve. These systems face increasing risks from climate change as temperatures warm, sea levels rise, and other climate impacts worsen. These systems are interconnected, and disruption in one part can impact other connected parts with both direct and indirect economic effects.

## ENERGY

Energy resources can be considered from both supply and demand perspectives. Fourth Assessment studies found infrastructure that supplies energy along the coast – particularly docks, terminals, and refineries – will increasingly be exposed to coastal flooding. Meanwhile, electrical power lines, rails, and roads are primarily at risk from increasing wildfire. Costs and impacts of wildfire to electricity transmission and distribution systems are expected to grow as climate change impacts increase.

**IMPACT FROM CLIMATE CHANGE:** Annual demand for residential electricity is projected to increase in inland and Southern California, with more moderate increases in cool coastal areas. Increases in peak hourly demand during the hot months of the year could be more pronounced. Even though reduced use of natural gas in warmer winter months will offset some of the total demand for energy, it will be critical to be able to meet higher peak loads while protecting infrastructure from climate impacts.

**ACTION FOR RESILIENCE:** Studies found that flexible adaptation pathways that allow for implementation of adaptation actions over time enable utilities to protect services to customers most effectively. The California Public Utilities Commission recently began a process to consider strategies and guidance for climate adaptation for electric and natural gas utilities, which will be informed by the Fourth Assessment.

**IMPACT FROM CLIMATE CHANGE:** Emerging findings for California show that direct climate impact costs by the middle of this century are dominated by human mortality, damages to coastal properties, and the potential for droughts and damaging floods. The costs have been estimated at tens of billions of dollars. The impacts after the middle of this century will be much lower if global greenhouse gas emissions are reduced substantially.

**ACTION FOR RESILIENCE:** California's Fourth Climate Assessment contributes information and tools that are needed from local to statewide levels to design and implement adaptation measures to lower economic impacts. In addition, the Climate-Safe Infrastructure Working Group, created in response to Assembly Bill 2800 (Quirk), is releasing recommendations that build on the Fourth Assessment findings to inform a robust, comprehensive, and equitable approach to building for the future.



Solar panels produce energy at the California Department of Water Resources Pearblossom Pumping Plant in Pearblossom, California. The Fourth Assessment considered climate risk to the electricity system in the context of the growth of renewable energy supply. Photo credit: Florence Low/California Department of Water Resources 2017.

## TRANSPORTATION

California's roads, railroads, pipelines, waterways, ports, and airports are critical for the movement of people and goods. They will be significantly affected by climate change. A growing threat to California's transportation system is wildfire, which can also have cascading effects like landslides and mudslides that occur after rain falls on newly burned areas.

Increasing temperatures are also expected to increase road construction costs between 3 and 9%. Adapting roadway materials to withstand higher temperatures is needed to avoid potential costs of over $1 billion by 2070. 115 miles of railroad could be at risk of coastal flooding by 2040, with an additional 285 miles at risk by 2100.



The combination of the Thomas wildfire (281,893 acres) and a subsequent intense rainstorm caused heavy mud and debris flows in the towns of Carpinteria and Montecito, resulting in 21 fatalities, destroying at least 1,063 structures, causing over $2.176 billion in damages, and closing Highway 101 for two weeks.

**IMPACT FROM CLIMATE CHANGE:** Miles of highway at risk of flooding in a 100-year storm event will triple from current levels to 370 miles by 2100. Under that scenario, over 3,750 additional miles of highway will be exposed to temporary flooding.

**ACTION FOR RESILIENCE:** Based in part on its work with the Climate-Safe Infrastructure Working Group, Caltrans will update its Highway Design Manual to include the latest climate-informed data on precipitation and heat. Caltrans will also complete climate vulnerability assessments and develop climate adaptation strategies for each of its 12 districts.

Airports in major urban areas including San Francisco (SFO), Oakland, and San Diego will be susceptible to major flooding from a combination of sea-level rise and storm surge by 2040-2080, depending on location, without implementation of protective measures. SFO is already at risk of flooding from storm surge.

## WATER INFRASTRUCTURE

The impacts of climate change on California's water infrastructure and management are especially profound and are causing shifts in the water cycle, greater risks to engineered systems, and threats to ecosystems and water quality. The complex network that stores and distributes water throughout the state was designed for historical hydrologic conditions that are now changing. The Fourth Assessment contributes critical knowledge to understand these new risks and to improve management.

Modeling of reservoir operations show that Shasta and Oroville reservoirs, the two largest in the state, will have roughly one-third less water stored annually by the end of the century under current management practices. This reduced storage could limit water supplies and thus lower resilience to droughts. Changes in seasonal precipitation combined with the effects of sea level rise in the Delta may compound water supply reliability for

cities and farms that depend on imported water from the State Water Project and Central Valley Project, as exports from the Delta in future droughts could be reduced by as much as 50% more than during historical droughts. The Fourth Assessment also found that water rights administration and oversight practices from past droughts are ill-suited to the growing challenges for water management from climate change.

As temperatures increase, more precipitation will fall as rain rather than snow. With potentially larger storms, existing flood management practices and infrastructure will be challenged to meet the higher flows. Advances in monitoring systems, forecasts, and coordination, coupled with continuing modifications and repairs to flood management infrastructure, will enable more time to prepare for future large floods while increasing options to improve and maintain supply reliability.

**IMPACT FROM CLIMATE CHANGE:** Current management practices for water supply and flood management in California may need to be revised for a changing climate. This is in part because such practices were designed for historical climatic conditions, which are changing and will continue to change during the rest of this century and beyond. As one example, the reduction in the Sierra Nevada snowpack, which provides natural water storage, has significant implications for California's water management system.

**ACTION FOR RESILIENCE:** Promising adaptation options such as the use of probabilistic hydrological forecasts, better measurements of the snowpack, and other improved ways to manage water can reduce these negative impacts. Increased groundwater storage is another promising option, which may include taking advantage of increased winter runoff to flood agricultural and natural areas to recharge aquifers. Institutional, regulatory, legal, and other barriers may need to be overcome to implement science-based solutions.

In addition to illuminating impacts from climate change to California's water infrastructure, the Fourth Assessment also presents potential solutions from around the state. One study shows how creative approaches from local water districts better prepared them for California's drought. While small water systems throughout the state currently struggle to incorporate climate change into their planning and management practices, the State could help disadvantaged communities most impacted by climate change by providing funding, technical assistance, and assistance consolidating these water providers.



The Shasta Dam is one of California's two largest, with a storage capacity of 4.55 million acre feet. Photo credit: Apaliwal 2009.

Land subsidence and sea-level rise will impede the function of levees in the Sacramento-San Joaquin Delta, and by 2050-2080 some Delta levees may no longer meet federal standards.

# Impacts of Climate Change on Natural and Working Lands and Waters

Natural and working lands and waters include forests, rangelands, farmland, riparian areas, and California's ocean and coast. These lands contribute to the natural infrastructure of the state. They harbor the species and ecosystems of California, and are increasingly at risk of disruption due to climate change.

## FORESTS

California's forests cover almost one-third of the state and provide important ecosystem services including water capture and filtration, wildlife habitat, recreation opportunities, and timber products. Climate change poses increased risk of wildfire and potential for insect infestations. California's forests have the potential to remove and store carbon from the atmosphere, and are an important element of the State's programs to reduce carbon in the atmosphere. However, more research is needed to understand the relationship between forest management practices to reduce wildfire risk and the effect on carbon storage. A Fourth Assessment study found that fuel treatments lowered the biomass stored in a forest, but that more of the remaining biomass survived a fire than in an untreated forest area. The study also developed a new method to track how much biomass is stored in living trees on large scales.

California's forests contain over 60 species of trees including red fir (Abies magnifica) and extends from coastal regions to high elevations in the Sierra Nevada and other mountain ranges. Photo: Jean Pawek



**ACTION FOR RESILIENCE:** A Fourth Assessment review of forest health literature provides further scientific backing to the State's Forest Carbon Plan to increase forest restoration and treatment such as prescribed fire to an average of 35,000 acres a year by 2020. Additionally, intensive thinning in highly productive forests reduced tree evapotranspiration, suggesting that forest thinning could result in increased base flows of up to 10% for dry years and 5% for all years.

This review found prescribed fire a suitable tool to lower extreme fire risk. However, under extreme fire weather conditions, fires may simply jump or burn through treated areas. With regards to sequestering carbon, a key question in California forests is whether fuel treatment data such as fire intensity, stand age, and extent of treatment can be used to predict the reduction of carbon lost in a subsequent wildfire.

A Fourth Assessment wildfire model suggests a 77% increase in mean and up to a 178% increase in maximum area burned by wildfires (compared to 1961-1990) by 2050, but the actual impacts could be substantially more severe because external factors such as wind are not yet incorporated. By the end of the century, if greenhouse gas emissions continue to rise, extreme wildfires burning over about 25,000 acres is projected to increase by nearly 50%. Reducing tree density and restoring beneficial, controlled fire can improve resilience of California's forests to wildfire. In the areas that have the highest fire risk, wildfire insurance is estimated to rise by 18% by 2055, and the fraction of property insured would decrease.

## RANGELANDS

Conservation of California's grasslands, chaparral, and oak woodlands and improved management of their soils has strong potential to improve soil water-holding capacity, increase stream flows and aquifer recharge, reduce flooding and erosion, and reduce climate-related water deficits. Increasing organic matter in soils by 3% by applying compost could increase the soil's water holding capacity by up to 4.7 million acre-feet across all working lands in California, with hydrologic benefits greatest in locations with enough precipitation to fill increases in soil storage capacity.

**ACTION FOR RESILIENCE:** Field experiments and modeling show that a single application of compost to rangelands in California can increase soil organic carbon sequestration for up to 30 years and enhance net primary productivity. The resulting increase in soil organic matter and increased vegetation also supports infiltration of water during storm events, contributing to recharge of aquifers. A lifecycle assessment of California's largest organic waste streams — food waste, yard waste, and cattle manure — showed that composting these feedstocks and applying the compost to California rangelands has lower net greenhouse gas emissions than other waste management approaches.



Many of California's rangelands consist of nonnative grasses and oak woodlands including these blue oaks (Quercus douglasii) or chaparral. Photo: Neal Kramer

## BIODIVERSITY AND HABITATS

California is a globally ranked biodiversity hotspot: only 25 regions in the world have as many species. These species live in the state's natural vegetation types: forests, chaparral, riparian areas, riverside and wetlands, as well as in its working landscapes, which include rangelands and agricultural lands. Under current emissions levels, between 45 to 56% of the natural vegetation in California becomes climatically stressed by 2100. The recent tree die-off during the drought of 2012-2016 shows how projected impacts are already having drastic effects.

Corridors can provide a means for plants and animals to migrate to more suitable areas as the climate changes. A Fourth Assessment study provides a framework for climate-wise corridor design and implementation for terrestrial plants and wildlife. It recommends starting with designs based on land use and land cover, to capture the connectivity needs of the majority of species. Corridors should be prioritized that connect habitat patches to sites where the future climate will be similar to the current climate in the habitat patch and incorporate climate refugia.

## AGRICULTURE

California produces over half of the nation's specialty crops, including fruits, vegetables, nuts, flowers, and nursery crops. Many of these crops, including fruit and nut trees, are particularly vulnerable to climate change impacts such as altered temperatures and stress from warmth and dryness. Climate change impacts to California agriculture will add to ongoing challenges from conversion of agricultural land to urban areas and regulatory challenges. California agriculture is projected to experience lower crop yields due to extreme heat waves, heat stress and increased water needs of crops and livestock (particularly during dry and warm years), and changes in pest and disease threats. Many of these impacts can be lessened through on-farm management practices, technological advances, and incorporation of climate change risks in decision-making. A Fourth Assessment study suggests that climate-related crop losses will be less than impacts associated with the loss of water supply and conversion of agricultural lands to other uses.

An analysis of crops, dairies, and beef cattle in California based on historical and projected climate conditions suggests that agriculture will continue to thrive through 2050, although with a reduction of 5 to 15% in gross crop revenues, assuming reductions in irrigation water. When proper growing conditions exist, farms may rely on the production of higher value crops to cope with rising opportunity costs of water and land. The high demand for specialty crops means that production of these crops will continue, while field and grain crops may face more important decreases in irrigated area and associated loss of agricultural jobs.

**IMPACT FROM CLIMATE CHANGE:** A secondary, but large, effect of droughts is the increased extraction of groundwater from aquifers in the Central Valley, primarily for agricultural uses. The pumping can lead to subsidence of ground levels, which around the San Joaquin-Sacramento Delta has been measured at over three-quarters of an inch per year. This subsidence impacts the canals that deliver water across the region.

**ACTION FOR RESILIENCE:** Flooding of some types of agricultural fields during wet years can provide some additional groundwater recharge, which can be used to support agriculture through longer droughts. This could be an important adaptation option considering the loss of snowpack forecasted for the rest of this century. California's Sustainable Groundwater Management Act will also reduce groundwater overdraft, and guidance for incorporating climate change projections will increase resilience.

**IMPACT FROM CLIMATE CHANGE:** Agricultural production could face climate-related water shortages of up to 16% in certain regions. Regardless of whether California receives more or less annual precipitation in the future, the state will be dryer because hotter conditions will increase the loss of soil moisture.

**ACTION FOR RESILIENCE:** Increasing soil organic matter by 3% by applying a ¼ inch of compost could increase the soil water holding capacity by up to 4.7 million acre-feet if applied to all working lands in California.

California's agriculture produces a high diversity of crops, and depends on water that is frequently imported from other parts of the state or western US.
Photo:Patrick Huber



JA-332



# Impacts of Climate Change on the Ocean and Coast

California's iconic shoreline is integral to the state's identity, but climate change is rapidly changing the ocean and coast. The coastal region, which stretches over 1,200 miles of shoreline, is an economic powerhouse that contributed $41.1 billion to the state's GDP, provided $19.3 billion in wages and salaries, and supplied 502,073 jobs in 2013. Rising sea levels, warming ocean waters, increasing acidity, and decreasing dissolved oxygen levels will have effects that ripple far beyond the three-quarters of Californians who live in coastal counties. The Fourth Assessment included a Coast and Ocean Summary Report for the first time; this report synthesizes the latest research – touched on below – about the challenges facing our coast and ocean because of climate change and what actions we can take to increase their resilience.

## OCEAN WARMING

California has recently experienced unprecedented events along its coasts including a historic marine heat wave, record harmful algal blooms, fisheries closures, and a significant loss of northern kelp forests. These events increase concern that coastal and marine ecosystems are being transformed, degraded, or lost due to climate change impacts, particularly sea-level rise, ocean acidification, and warming. From 1900 to 2016, California's coastal oceans warmed by 1.26 °F. "The Blob," a very warm patch of ocean water off the coast of California from 2013-2016, demonstrated that anomalously warm ocean temperatures can produce unprecedented events, including the mass abandonment of sea lion pups and California's record-setting drought.

## RISING SEA LEVELS

Building resilience to sea-level rise in California requires approaches tailored to communities' needs, climate impacts, and many other factors. Options to protect communities and ecosystems include combinations of armoring, natural infrastructure, and hybrid approaches. Decision-makers need tools to evaluate the economic and environmental costs and benefits of alternative strategies with more complete information. The Fourth Assessment contributed to this need



The CoSMoS tool permits assessment of flood risk for all parts of California. This image shows the San Diego Harbor with a 4.9 foot sea level rise and with or without a 100-Year storm.

**IMPACT FROM CLIMATE CHANGE:** A new model estimates that, under mid to high sea-level rise scenarios, 31 to 67% of Southern California beaches may completely erode by 2100 without large-scale human interventions. Damages in the state's major population areas could reach nearly $17.9 billion from inundation of residential and commercial buildings under 20 inches of sea-level rise, which is close to the 95th percentile of potential sea-level rise by the middle of this century. A 100-year coastal flood, on top of this level of sea-level rise, would almost double the costs.

**ACTION FOR RESILIENCE:** A Fourth Assessment study developed technical guidance on design and implementation of natural infrastructure for adaptation to sea-level rise, such as the use of vegetated dunes, marsh sills, and native oyster reefs. This research included case studies on existing natural shoreline infrastructure projects at five sites spanning from Humboldt to Los Angeles counties that show promising approaches to increase resilience to sea-level rise and other benefits.



> **A** Fourth Assessment study found that sea-level rise has become the dominant concern for coastal managers, and most also face funding and financing barriers.

by supporting the expansion of CoSMoS – a tool that can simulate sea-level rise in combination with storm events and other coastal dynamics – to include Southern California.

Coastal protection strategies can include the restoration of tidal marshes, judiciously-placed coastal armoring, and beach renourishment for highly accessed urban locations (e.g., adding large volumes of sand, an expensive solution lasting only 1-2 years). However, by 2050, with increasing sea-level rise and coastal storms, localities may begin to consider retreat strategies.

The restoration of marine plants and seaweeds in coastal environments is a tactic that could increase dissolved oxygen levels, at least for local areas. Ocean and coastal vegetation including marshes also sequester carbon, and quantifying the locations and contributions that marine plants can make to reducing carbon dioxide in local waters is needed. Other actions include reducing nutrient runoff from sewage disposal and excess agricultural fertilizer.



This site in Ventura County showed severe coastal erosion in 1990. A managed retreat of infrastructure from the waterline provided adequate space for restoration using cobble, sand, and dune plantings. To learn more about this project and other case studies, see the brochure "Case Studies of Natural Shoreline Infrastructure in Coastal California" that was prepared as part of the Fourth Assessment.

### OCEAN CONDITIONS

The ocean has been absorbing atmospheric carbon dioxide, which diminishes the amount of greenhouse gases in the atmosphere and slows the rate of climate warming but causes the ocean to become more acidic. However, its capacity to do so will decrease. Improving our understanding of the overlapping effects of rising

temperature, ocean acidification, and identifying potential survival thresholds for species or ecosystems will allow us to make better-informed decisions and improve management options to reduce future losses and impacts.

Ocean warming, ocean chemistry changes, sea-level rise, and other greenhouse gas-driven changes to California's ocean and coast – those already occurring and projected – will have significant consequences for California's coastal economy, communities, ecosystems, culture, and heritage. Reducing greenhouse gas emissions is the most effective long-term solution to man-made climate change and ocean acidification.

**IMPACT FROM CLIMATE CHANGE:** Climate extremes and ocean acidification are already impacting shellfish in California. Acidification affects shell-building species by decreasing the carbonate ions available in the water that they need to build their shells, causing larvae to essentially dissolve at certain acidities.

**ACTION FOR RESILIENCE:** A Fourth Assessment study found a species of mussel can be an important "indicator species" for California to help us understand the biological and chemical processes altering ocean waters, potentially pointing the way to strategies that are more effective for mitigating the harmful effects of acidification.



Climate change can affect many parts of the ocean ecosystem including what species can live in the ocean, foodwebs, winds and storms, ocean currents, sea level rise, and ocean chemistry, particularly the acidity of the water and the level of dissolved oxygen held in the water.

# Building Capacity to Address Local Impacts

For climate adaptation to be effective there is a need for action from all levels of government. Adaptation planning and actions at the community level will need regional and local context. The sector-specific analyses and advanced projections developed as part of the Fourth Assessment are key to increasing resilience against natural disasters and enabling effective local action.

## EMERGENCY MANAGEMENT AND DISASTER PREVENTION

Climate change is making major disasters more frequent and destructive, and emergency managers are starting to ensure their capacity matches growing challenges. A Fourth Assessment study found that $1.7 billion of critical facilities for emergency response, like dispatch centers and fire stations, are at risk to wildfire or flood damage by 2100, and researchers developed a tool to assess emergency infrastructure vulnerability.

**IMPACT FROM CLIMATE CHANGE:** In the City of Los Angeles, eight days of power disruption due to a prolonged heat wave would pose critical threats to lifeline systems such as treated water, supplies, and access to air conditioning.

**ACTION FOR RESILIENCE:** Integrated maps of interconnected emergency services systems can help make practitioners more aware of the importance of cascading events and geographically-connected impacts (teleconnections) and can support effective efforts to prevent or otherwise mitigate them.

Another Fourth Assessment study shows that interconnected systems are vulnerable to disasters in ways that may be beyond the traditional jurisdictional scope of local emergency managers. Maps of interconnected lifeline systems will be needed to recognize and prepare for cascading effects of climate impacts.

Proactive planning for future urban growth will be particularly important to avoid loss of life and property in the future. Avoiding residential growth in areas at high risk of wildfire and other forms of "climate-smart development" will be critical to reducing vulnerability to climate change. Future research is needed on the interplay between climate risk and development patterns.

## LOCAL AND REGIONAL GOVERNMENTS

In order to address the impacts of climate change, California's local and regional governments must build institutional capacity to ensure the resilience of individuals, communities, natural systems, and infrastructure. The Fourth Assessment explores the social aspects of preparing people and communities to grapple with and adapt to the imminent impacts of climate change, particularly in light of the high cost of natural disasters and other climate change-related events.

In addition to the social aspects of preparing communities for the impacts of natural disasters and recovery, local governments must identify strategies to deal with the financial burden estimated to be in the tens of billions of dollars. Given the potentially high cost of inaction, climate adaptation is a highly cost-effective option for governments to pursue.

A Fourth Assessment study found that models that can quantify risks to people's assets can help engage stakeholders who may be reluctant to participate in discussions of climate vulnerability and adaptation by allowing them to see how their communities will experience the impacts of extreme climate-related events.

While California's three prior climate change assessments were focused on developing climate models and assessing climate change impacts, the Fourth Assessment prioritized an additional focus: identifying actions for successful climate change adaptation across different sectors and regions.

**IMPACT FROM CLIMATE CHANGE:** A Fourth Assessment study found that funding and financing challenges are among the top barriers to adaptation, with these challenges exacerbated by a number of organizational barriers such as limited local government staff and lack of technical capacity, agency leadership, and stakeholder partnerships.

**ACTION FOR RESILIENCE:** As part of the Fourth Assessment, the Adaptation Capability Advancement Toolkit, termed Adapt-CA, was created to help local governments overcome common organizational barriers and advance their capability to implement climate change adaptation measures. The Toolkit can help local governments assess their existing capabilities for climate adaptation and identify concrete actions to advance their capabilities for more effective planning and implementation of climate change adaptation activities.

View the Adaptation Capability Advancement Toolkit (Adapt-CA) at:

www.arccacalifornia.org/adapt-ca

The Alliance of Regional Collaboratives for Climate Adaptation represents networks across California that are building resilience to regional impacts. It hosts the Adapt-CA Toolkit.

To support action at the local scale, the Fourth Assessment includes reports for 9 regions of the state. These summary reports were included for the first time as part of the State's assessment process in part because the vast majority of adaptation planning and implementation will happen at the local and regional scales. Each of these regional reports provides a summary of relevant climate impacts, adaptation solutions, and local initiatives. As previously mentioned, the Fourth Assessment also includes three summary reports on climate justice, tribal and indigenous communities, and the coast and ocean. Like the regional summary reports, each of these 3 reports was designed to catalyze discussions, planning, and actions to understand and address climate vulnerability.

The map on this page shows the regions and the icon for all 12 summary reports.



The Fourth Assessment produced nine regional reports and three topical reports to provide greater detail for the public on the climate change risks and potential adaptation strategies for California.

These reports, the statewide summary report, 44 technical research reports, and other resources are available on the Fourth Assessment website:

www.ClimateAssessment.ca.gov

# Acknowledgments

Multiple sources of funding, dozens of state agencies, and hundreds of researchers from public universities, federal agencies, and the private sector – not to mention a wide range of stakeholders – made California's Fourth Climate Change Assessment possible. There is not enough space here to list every person who contributed to the Fourth Assessment, but additional acknowledgments can be found at www.ClimateAssessment.ca.gov.

Thank you to everyone who contributed to the Fourth Assessment!

**STATE AGENCY MANAGEMENT TEAM**

**Agency Leadership**

**Secretary John Laird**
California Governor's Office of Planning and Research
**Chair Robert Weisenmiller**
California Energy Commission
**Director Ken Alex**
California Governor's Office of Planning and Research

**Executive Management**
**Louise Bedsworth**
California Strategic Growth Council
**Keali'i Bright**
California Natural Resources Agency
**Drew Bohan**
California Energy Commission

**Management Staff**
**Jamie Anderson**
California Department of Water Resources
**Pamela Doughman**
California Energy Commission
**Leah Fisher**
California Governor's Office of Planning and Research
**Guido Franco**
California Energy Commission
**Nuin-Tara Key**
California Governor's Office of Planning and Research
**Susan Wilhelm**
California Energy Commission
**Joseph Wraithwall**
California Natural Resources Agency

**Editorial Board for the Fourth Assessment**
**Dan Cayan**
(Editor-in-Chief), Scripps Institution of Oceanography, University of California San Diego
**Susan Wilhelm**
(Deputy Editor-in-Chief), California Energy Commission

**Associate Editors**
**Alan Sanstad**
Lawrence Berkeley National Laboratory
**Fred Lipschultz**
USGCRP
**Glynis Lough**
Union of Concerned Scientists
**Guido Franco**
California Energy Commission
**Jamie Anderson**
California Department of Water Resources
**James H. Thorne**
University of California, Davis
**John Andrew**
California Department of Water Resources
**John Battles**
University of California, Berkeley
**Klaus Scott**
California Air Resources Board
**Michael Mastrandrea**
Stanford University
**Nuin-Tara Key**
California Governor's Office of Planning and Research
**Pamela Doughman**
California Energy Commission
**Rupa Basu**
California Office of Environmental Health Hazard Assessment
**Tamara Wall**
Desert Research Institute
**Terry Surles**
California Institute for Energy and Environment

**Duane Waliser**
NASA Jet Propulsion Laboratory
**Julie Maldonado**
University of California, Santa Barbara
**Louise Bedsworth**
California Strategic Growth Council
**Robert Lempert**
RAND, Head Reviewer of the Peer Review Committee for the Statewide Summary Report

**Publication Team**
**Marketing by Design** and **Della Gilleran**

**Technical Editor**
**Grayson Hough**

**Stakeholder Advisor**
**Bruce Riordan**

**SUGGESTED CITATION**
Thorne, James H., Joseph Wraithwall, Guido Franco. 2018. California's Changing Climate 2018. California's Fourth Climate Change Assessment, California Natural Resources Agency.

**DISCLAIMER:** This report summarizes the results of work sponsored by the California Natural Resources Agency and California Energy Commission, in the context of broader scientific literature. The information presented here does not necessarily represent the views of the funding agencies or the State of California.

# R-133, Appendix F: California Transportation Policy Leadership

# California Transportation Policy Leadership

How California Led the World Toward Cleaner, Advanced Vehicles









October 2018

# Contents

Introduction ................................................................................................................................. 1

California Leadership: Stimulating Market and Policy Developments ......................................... 1

   Mandatory Tailpipe Emissions Standards: Criteria Pollutants ................................................. 1

   Emissions Control Technologies Stimulated by California Standards ........................................ 3

      Catalytic Converters ............................................................................................................. 3

      Onboard Diagnostic (OBD) Technologies ............................................................................ 4

      Fuel Injection: Electronic, Throttle Body, and Direct ........................................................ 4

      Additional Technological Developments ............................................................................. 5

   Gasoline Requirements: Unleaded, Low Sulfur, and Reformulated Gasoline ........................... 5

   Statewide Clean Diesel Strategy ............................................................................................. 7

   Mandatory Requirements for Zero Emissions Vehicles ........................................................... 9

      Zero Emissions Vehicle Requirements ................................................................................ 9

   Mandatory Tailpipe Emissions Standards: Greenhouse Gases ............................................... 11

Conclusion ................................................................................................................................ 12

End Notes .................................................................................................................................. 13

# Acknowledgements

**Lead Authors:** Carrie Jenks, Grace Van Horn, Alissa Huntington, Sophia Hill

This report is available at www.mjbradley.com.

## About M.J. Bradley & Associates

M.J. Bradley & Associates, LLC (MJB&A), founded in 1994, is a strategic consulting firm focused on energy and environmental issues.  The firm includes a multi-disciplinary team of experts with backgrounds in economics, law, engineering, and policy.  The company works with private companies, public agencies, and non-profit organizations to understand and evaluate environmental regulations and policy, facilitate multi-stakeholder initiatives, shape business strategies, and deploy clean energy technologies.

© M.J. Bradley & Associates 2018

## For questions or comments, please contact:

Carrie Jenks
Senior Vice President
M.J. Bradley & Associates, LLC
+1 978 369 5533
cjenks@mjbradley.com

Grace Van Horn
Consultant
M.J. Bradley & Associates, LLC
+1 202 525 5770
gvanhorn@mjbradley.com

# Introduction

California has long led the U.S. in establishing innovative, technology-driving, and effective emissions-reducing regulations in the light- and heavy-duty vehicle sector. As explored in this report, California has achieved significant reductions in emissions due to these programs, leading to healthier air and meaningful steps toward state contributions to climate change and serving as an incubator for technological development. Just as importantly, California has also served as a proving ground for policy and technological innovations that have since been adopted across the country and world. The environmental and economic gains of these policies have thus been multiplied as state actors, investors, technology developers, and industry apply lessons learned, ultimately improving the efficiency, affordability, and effectiveness of environmental initiatives across the country and beyond.

In 1947, California Governor Earl Warren signed into law the Air Pollution Control Act, authorizing the formation of county air pollution control districts.[1] In 1957, these control boards were given the authority to prescribe standards for emission control devices.[2] California's first vehicle tailpipe emissions standards were promulgated in 1966, establishing the nation's first tailpipe emissions standards for hydrocarbons and carbon monoxide. In 1967, two important pieces of federal legislation, the Mulford-Carrel Act and the Federal Air Quality Act, preserved California's authority to set its own air quality rules and emissions standards because of the state's leadership and the value that policy innovations in California delivered for the rest of the country.

This report highlights key examples of California's leadership role in setting technology-driving standards later adopted by other states, EPA, and countries around the world. Figure 1 below summarizes key policies, showing with darkening colors how standards have increased over time, with federal programs largely following California's lead.  This begins with the first tailpipe standards, which, then and today, pushed forward technical innovations. Since then, California has implemented standards for gasoline and diesel emissions standards, mandatory targets for zero emissions vehicles and, most recently, tailpipe standards for greenhouse gases. Each of these policies is explored in turn. As context alongside key policies referenced, this report also includes a brief background on the development and requirements of these policies.

1

| Figure 1 | California Vehicle Standards Leadership |



# California Leadership: Stimulating Market and Policy Developments

The policies and innovations in this report are organized largely chronologically by the time of first promulgation. California has subsequently amended and strengthened many of the policies described here over the past 50 years leading to greater innovation and adoption of these refined policies at the state, federal, and international levels.

## Mandatory Tailpipe Emissions Standards: Criteria Pollutants

When California issued standards for hydrocarbon (HC) and carbon monoxide (CO) emissions from passenger vehicles in 1966, it was the first jurisdiction—subnational, national, or otherwise—to introduce tailpipe emissions standards for new vehicles. California continued its leadership in developing vehicle emissions standards for criteria pollutants throughout the 1970s and 1980s, continuing to regulate CO and particulates and establishing mandatory regulations on oxides of nitrogen (NOx) in 1971. The first comprehensive policy that combined these separate standards into one program that allowed increased flexibility for vehicle manufacturers was the Low Emissions Vehicle (LEV) Program (see box to right).

Additional states soon thereafter adopted these standards. In 1991, the 13 northeastern states that comprised the Ozone Transport Region pledged to adopt California's new LEV program and its stricter multi-pollutant vehicle emissions standards.[*] In 1994, the region's Ozone Transport Commission (OTC) officially resolved to adopt the LEV standards on a regional basis because "regional ozone modeling to date has shown the need for emission reductions beyond those which will be realized through the strategies specifically included in the [CAA; and]…based on the technical analysis done by the states of the OTC to date, LEVs provide substantial and cost effective emissions reductions." The Commission also noted that implementation of the LEV program in the "Northeast will result in substantially greater emission reductions than provided by the Federal Motor Vehicle Control Program not only of ozone precursors but of airborne toxics, acid rain producing gases and to prevent air pollution in general."[3]

The California LEV program also drove technology development and adoption that facilitated the tightening of national standards (these technological improvements are discussed in more detail below). In some cases, automakers decided to certify their vehicles for all 50 states instead of only for California. By doing this, they put California emission controls on all of their vehicles in order to simplify their

## Low Emissions Vehicle (LEV) Program

In 1990, building off a nearly 25-year history of establishing tailpipe emissions standards, the California Air Resources Board (ARB) adopted the Low Emissions Vehicle (LEV) program which, among other things, set criteria pollutant emissions standards for passenger vehicles for model years (MY) 1994 through 2003. These standards required each automaker to calculate a "fleet" average emissions rate—an average rate of all new vehicles sold by that automaker. In addition, the program was carefully crafted to balance how the individual pollutant standards were met. For example, compared to the federal standards, LEV I allowed for higher CO emissions in order to implement a lower NOx standard.

This fleet-based approach, the first of its kind, granted manufacturers flexibility in how to meet the new standards that would regulate five non-greenhouse gas pollutants: nonmethane organic gas (NMOG), NOx, CO, particulate matter (PM), and formaldehyde. ARB continued to make changes to these regulations including increasing the stringency of the emissions requirements under the subsequent LEV II and LEV III programs.

---

[*] Original member states of the Ozone Transport Region were Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, parts of Virginia and the District of Columbia.

JA-345

production and distribution. For example, in 1997, Honda announced that it would distribute its low emitting, redesigned Accord in all 50 states, becoming the first automaker to sell a vehicle throughout the United States that met California's low-emission vehicle standard.[4] Starting in 1998, additional competition among the 'Big Three' U.S. auto manufacturers and major Japanese companies pushed each company to pledge voluntarily to market low emitting vehicles in all states, even in the 45 states that had not mandated California cars at that time.[5]

When EPA finalized its Tier 2 vehicle emissions standards in February 2000, it wrote that its standards were "aimed at improving the implementation efficiency of the program by better aligning the federal Tier 2 program with the [voluntary federal] NLEV program and with California's [LEV II] program."[6] However, it also noted that "many current production vehicles are already certified at or near the Tier 2 standards."[7] EPA also wrote at the time that "[e]mission control technology has evolved rapidly in recent years…some vehicles currently in production are well below [required] levels…The reductions have been brought about by ongoing improvements in engine air-fuel management hardware and software plus improvements in catalyst designs."[8]

Since implementing criteria standards and the LEV programs, California has experienced significant improvements in air quality, even as the number of cars on the road has increased (see Figure 2). The LEV program not only led to cleaner air within the state, but California's actions have also benefitted the rest of the nation: as of 2018, 13 states have adopted California's emissions standards under Section 177.[*] More recently, Colorado's Executive Order B 2018 006 committed to establishing a state LEV program that would incorporate the requirements of California's LEV program. Governor John Hickenlooper's Executive Order states that by adopting LEV standards Colorado can continue its history of "adopting and implementing strategies to protect and improve our air quality."[9]

| Figure 2 | Ozone in California |
|---|---|



*Source: Adapted from the California Air Resources Board[10]*

---

[*] These states are: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington.

## Emissions Control Technologies Stimulated by California Standards

In order to meet California standards, auto manufacturers accelerated research and development of advanced technologies. This technology forcing function is a long-recognized feature of vehicle emissions standards. For example, a study of patents for new engine and vehicle emissions control technologies found that the automotive industry introduced new emission control technologies in each period of phasing in more stringent standards: oxidation catalysts in 1975; three-way catalysts in 1980, and thermal management and onboard diagnostic systems in 1994.[11] These technologies, often pioneered in the California market, made their way throughout the U.S. and international markets where they contributed to reducing emissions, improving associated health and environmental outcomes, and easing compliance with subsequent federal emissions standards. Below, we highlight some of the more prominent examples of this California leadership.

### Catalytic Converters

A chief example of this technological development is the catalytic converter, a device installed in the exhaust system to significantly reduce tailpipe emission levels. The two-way catalytic converter, more commonly known as an oxidation catalyst, was first introduced commercially in the 1970s and controlled for CO and HC engine emissions. Modern three-way catalytic converters also control for NOx emissions. The technology has reduced emissions from a range of sources: cars, trucks, buses, and motorcycles as well as vehicles fueled with alternative fuels like propane and natural gas.

When California first established standards for NOx, catalytic converters utilized two-way technology. However, California's NOx standards pushed the industry to further advance research and development—and industry rose to the occasion by developing a range of technologies to improve emissions performance. Chief among these was the advancement of three-way technology, which started being placed in vehicles by 1976. These catalytic converters were enabled only through the application of other critical technologies discussed in more detail below, such as electronic fuel injection controlled by on board diagnostics and computers.

A federal Congressional vehicle technology assessment in 1979 noted that "the 1982 California NOx standard of 0.4 gram per mile introduces a more difficult technical problem than the 1981 Federal standard of 1.0 gram per mile," and that while "no method has been demonstrated to meet the California standard with typical large U.S. spark ignition engines,…Volvo, Saab, and GM have shown, however, that they can meet the 0.4 gram per mile requirement with a three-way catalyst system on a four-cylinder engine."[12] This same report noted that Volvo had installed a three-way catalyst and electronic feedback control on some of its 1977 cars, and that Ford and General Motors introduced this system on a limited number of their 1978 new cars in California. This allowed these automakers to "comply with the tighter California emission standards and to gain operating experience prior to full-scale use."[13] Advanced catalytic converter technology also was applied in the heavy duty and diesel fleet thanks to California-driven technological development: in its 1993 rulemaking on emissions standards for heavy duty vehicles, EPA noted that "close coupled catalytic converters will be available for the 1994 model year due to the California LEV standards."[14]

The three-way catalytic converter is widely recognized as one of, if not the, best technologies to reduce criteria air pollution from mobile sources. According to the National Resource Council of the National Academies, "[t]he primary success of the [California] LEV program has been in achieving near-zero levels of tailpipe emissions from gasoline-fueled vehicles, exceeding the expectations of experts in both industry and government."[15] Studies have found that "[a]mong all the types of technologies developed so far, use of catalytic converters is the best way to control auto exhaust emission," and EPA considers it to "be one of the great environmental inventions of all time."[16] The Society of Automotive Engineers and the magazine *Car and Driver* called the catalytic converter one of the top ten automotive breakthroughs of the 20th century.[17] A Swedish study found that passenger cars with catalysts have substantial emissions reductions compared to cars without the technology: 95 percent lower CO emissions, 90 percent lower NOx, 95 percent lower HC, and 70 percent lower methane.[18]

Although first used in the U.S., the catalytic converter has had a global impact. Catalytic converters first were adopted in Europe, with the European Union mandating their use in the early 1990s.[19]  Since then, the technology

has been adopted across countries where car ownership is rapidly increasing—such as China, Brazil, India, and Russia—as a result of regulations that require catalytic converters on all new passenger cars. As of 2011, more than 750 million vehicles with catalytic converters have been sold worldwide.[20] A report from the United Nations cited the catalytic converter as an example of how "[t]he United States has often set technology-forcing standards, advancing emissions control technology worldwide."[21] Likewise, a European Union report notes that because German car manufacturers had been required to develop vehicle models with catalytic converters to meet California's standards, they were prepared to address the growing public pressure from Europeans in the 1980s to address air quality issues.[22] Now, a technology that was developed in response to California's standards is used in almost all light duty vehicles globally.[23]

*Onboard Diagnostic (OBD) Technologies*

Manufacturers began utilizing electronic means to control and diagnose engine functions in the 1970s and 1980s.[24] These "on board diagnostic" (OBD) systems control, monitor, and assist in diagnosing electronic component problems, including monitoring and assisting many emission-related components. For example, OBD systems are critical for controlling the precise fuel injection necessary for the operation of three-way catalysts. California introduced OBD regulation that specifically required manufacturers to enable these and other important emissions-controlling functions as well monitor some of the emission control components on vehicles. In more advanced forms, OBD systems monitor all the vehicle components that can affect emissions performance, ultimately ensuring that the vehicle is operating as designed to comply with emissions standards. The California Air Resources Board (ARB) states that "[w]hile the new vehicles in California may start out with very low emissions, improper maintenance or faulty components can cause vehicle emission levels to sharply increase," citing studies that concluded that approximately 50 percent of total criteria emissions from late-model vehicles are the result of malfunctions.[25] California first imposed requirements for OBD systems for models released in 1988 in order to ensure all vehicles complied with state, and subsequently national, emissions standards.[26]

California has consistently demonstrated leadership in OBD systems and requirements, especially relating to emissions reducing technology. As OBD technology rapidly improved, in 1992 ARB published their "OBD II" requirements that incorporated the emerging technologies, such as tracking catalyst efficiency.[27] In 1993, EPA followed, publishing its first version of regulations called "Federal OBD." Over time EPA and ARB harmonized these requirements, though, as EPA noted, "ARB OBD II requirements tend to focus on OBD system design and, as a result, are more technology forcing and provide greater detail for each required OBD monitor."[28] The advanced OBD system developed for compliance with OBD II was much more sophisticated; it monitored nearly all emission related functions of the engine and specifically targeted emissions performance.[29] OBD II also results in improvements in fuel efficiency, reduced maintenance costs, and increased engine power. Because EPA accepts compliance with ARB's more comprehensive design requirements, most manufacturers prefer to certify to ARB OBD II design requirements,[30] ensuring that this technological development extends throughout the U.S. vehicle market.

After development and implementation in the U.S., other countries began to incorporate OBD II technology. Even though Japan officially required OBD II system integration in 2000, Japanese manufacturers—who also sell vehicles in the U.S. market—had been producing cars with the technology since 1996. The European Union's Directive 1999/96/EC followed California's lead and mandated that "[f]rom 1 October 2005, new types of vehicles, and from 1 October 2006, all types of vehicles, should be equipped with an OBD system or an On-Board Measurement (OBM) system to monitor in-service exhaust emissions."[31] After Europe mandated in 2005 that OBD II systems must be used on heavy-duty vehicles as well, countries like Brazil and China followed suit.[32] An *OECD Journal: Economic Studies* report tracking the effects of environmental policy on innovation finds that ultimately "the forerunner in development and implementation of both OBD legislation and OBD systems was the United States" with its technology-forcing standards.[33] And, California led developments in the U.S.

*Fuel Injection: Electronic, Throttle Body, and Direct*

Similarly, electronically controlled, throttle body, and direct fuel injection (DFI) began in California to meet local standards and spread throughout the industry. Fuel injection modifications began in the 1950s to replace the less

efficient and dirtier carburetors that were at the time standard in the industry. These standard carburetors used the pressure drop in an engine air intake system to pull fuel into the air stream. Electronically controlled injection, on the other hand, injects fuel from an electronically controlled valve directly into the air intake, and in smaller discrete amounts, allowing for better control of combustion within the cylinder. It can also be directly injected into single or multiple ports within the engine. Because this process is controlled by the vehicle's computer, it is much more precise and results in more efficient fuel use, reduced fuel consumption, and fewer emissions.[34]

Electronically controlled injection first got a boost from California's tightening NOx standards to 0.4 grams per mile starting with model year 1982, since three way catalytic converters needed precisely controlled injection of fuel to function appropriately. To achieve this, the auto industry adopted throttle body injection, which injects fuel into the engine using an electric pump. The technology continued to improve in concert with advancements in OBD technology, which controlled the injection and made it more feasible to achieve more accurate fuel metering and to control the complex and precise injection. This included "multi-port" fuel injection, which adjusts fuel injection for each cylinder using improving computers. By the mid-1980s, virtually every European carmaker used an electronic fuel injection system or its components, and the carbureted vehicle died out in the early 1990s.[35] However, in 2008, prior to the establishment of California's Advanced Clean Car Program, only two percent of gasoline fueled vehicles used gasoline *direct* injection, a more efficient but also more complex process that involves spraying fuel directly into the cylinder. After the Advanced Clean Car standards took effect, however, this penetration rapidly increased: by 2014, 38 percent of vehicles utilized DFI. This "diffusion" of technology was spurred only when "stimulated by emissions standards," standards which California drove.[36]

By allowing for more precise control of combustion, electronically controlled and direct fuel injection has led to more powerful engines with improved fuel efficiency and lower emissions. A study done by the U.S. Department of Health, Education and Welfare during the early transition toward electronically controlled injection in the 1960s found that switching from a carburetor to a timed port fuel injection reduced on road emissions of CO by 50 to 60 percent and HC by 25 to 50 percent.[37] DFI has a further significant improvement on emissions by reducing fuel consumption, leading to a 14.5 percent decrease in $CO_2$ emissions in one recent study.[38]

*Additional Technological Developments*

Auto manufacturers developed myriad other technologies to reduce emissions and improve performance. For example, in 1972 Honda released a passenger vehicle with a compound vortex controlled combustion (CVCC) engine in response to California's pending NOx emissions standards. This helped drive forward the rest of the industry, especially domestically, where it "dispelled the myth in Detroit that stiffer new [California] emissions standards could not be met."[39]

## Gasoline Requirements: Unleaded, Low Sulfur, and Reformulated Gasoline

Starting in the early 1920s, gasoline refiners began including various additives in their fuels to improve engine performance. One of the first—and most common—was lead in various forms. Emissions of lead from this gasoline, however, created new environmental problems. In addition, lead in gasoline significantly harmed the operations of catalytic converters. As these devices became more necessary to meet other emissions standards for NOx, CO, and other pollutants and health concerns grew, California increasingly turned its focus to regulations to reduce lead content in gasoline.

In 1970, California set the first standard for airborne lead (from all sources, including vehicles), at 1.5 µg/m³, laying the groundwork for and creating pressure for EPA to develop a federal standard.[40,41] Although EPA set standards to reduce lead from gasoline in 1973, EPA showed a reluctance to enforce the regulations and litigation continued for multiple years.[42] Indeed, although refiners such as Texaco had begun manufacturing unleaded or low-lead fuels by 1970, these fuels were only initially offered for sale in California.[43] California, meanwhile, established binding regulations in 1976 to phase out lead from gasoline over several years. According to one study, California's requirements corresponded with a significant decrease in California average ambient air lead levels between 1976 and 1980 (see Figure 3), precipitating a 37 percent drop in average blood lead levels during the same period.[44] California ultimately banned leaded gasoline in 1992 and the federal government followed in 1996.[45]

5

| Figure 3 | Ambient Air Lead in Los Angeles |



*Source: Adapted from the California Air Resources Board[46]*

In addition to the health benefits of reducing ambient lead, reducing the amount of lead in gasoline was important to avoid damaging catalytic converters. By damaging and reducing the effectiveness of catalytic converters, leaded gasoline can increase emissions of HC, CO, and NOx by as much as a factor of eight.[47] EPA,[48] industry,[49] and academic literature[50] cite this negative interaction with catalytic converters as a critical reason for the reduction in leaded gasoline. As California emissions standards tightened and catalytic converters became necessary to meet those and subsequent federal emissions standards, the demand for unleaded gasoline that was compatible with these devices grew. For example, ARB found that while leaded gasoline constituted around 75 percent of gasoline produced in California in 1977, it fell to only 15 percent in 1989.[51]

Similarly, sulfur in gasoline has been shown to inhibit the emission control performance of catalyst technology. California recognized the need to reduce sulfur in gasoline in order to meet LEV II vehicle standards,[52] and, in setting its reformulated gasoline requirements to take effect in 1992, set an average sulfur level in gasoline of 300 ppm.[53] The ARB has continued to make these standards more stringent, imposing the current standard of 20 ppm.[54] ARB lists reducing sulfur to "enabl[e] catalytic converters to work more effectively and further reduce tailpipe emissions" as the first goal of clean gasoline standards.[55] When EPA established its Tier 3 sulfur standards, it noted that these "vehicle standards are intended to harmonize with California's Low Emission Vehicle program, thus creating a federal vehicle emissions program that will allow automakers to sell the same vehicles in all 50 states."[56] It also noted that "the experience in California demonstrates that commercial technologies already exist to permit refiners to produce low sulfur gasoline."[57] The European Union has also followed in establishing a two phase reduction in gasoline sulfur to 150 ppm in 2000 and 50 ppm in 2005.

Finally, California has also led the developments of a reformulated gasoline program, with its standards serving as the template for federal action. The California reformulated gasoline program (CaRFG) sets stringent standards for California gasoline that produce "cost-effective emission reductions from gasoline-powered vehicles" and focus largely on reducing ozone-causing pollutants. The CaRFG program has been implemented in three phases. Phase

1, in 1991, eliminated lead (as discussed above) and set regulations on other additives and volatile compound emissions. This program is a critical component of California's State Implementation Plan (SIP) to reduce air pollution and also was formulated such that the state would meet the requirements of the federal RFG program three to four years earlier than that mandated.[58] Phase 2, implemented in 1996, set standards for pollutants such as sulfur and other volatile compounds, including the carcinogen benzene. Phase 3, implemented in 1999, eliminated a common additive that had replaced lead in gasoline to increase octane but had been found to pose a cancer risk through groundwater contamination. EPA has since adopted federal reformulated gas requirements similar to Phase 2 standards for areas not in compliance with federal ozone national ambient air quality standards.

## Statewide Clean Diesel Strategy

California first established limits on diesel particulates from mobile sources in 1982. Building from these regulations and upon additional findings of the health harm of diesel particulates,[59] ARB approved a comprehensive plan in 2000 to reduce diesel PM emissions from new and existing diesel-fueled engines and vehicles. This "Risk Reduction Plan to Reduce Particulate Matter Emissions from Diesel-Fueled Engines and Vehicles" set goals to reduce diesel PM emissions and the associated health risk by 75 percent in 2010 and 85 percent by 2020.[60] The plan identified fourteen measures that ARB recommended be developed to further reduce diesel PM emissions, with a particular emphasis on measures to reduce emissions from in-use diesel engines. ARB stated that the measures were meant to "comprise a comprehensive program to be implemented in California to control and reduce potential cancer risk from exposure to diesel particulate matter from mobile sources."[61]

California, unlike any other state in the U.S., currently uses a multi-pronged regulatory approach to reduce diesel emissions from both in-use and new engines. Since 1990, when the stringency of federal standards tightened to mostly align with California's program,[*] the two have had matching emissions requirements for emissions of PM, NOx, CO, and HC from new heavy-duty diesel engines.[62] However, California has also implemented various innovative programs to reduce emissions from in-use engines. These regulations are generally based on three types of control:

1. Retrofitting engines with emission control systems, such as diesel particulate filters or oxidation catalysts;
2. Replacement of existing engines with new technology diesel engines or natural gas engines; and
3. Restrictions placed on the operation of existing equipment.[63]

In total, the state's regulations for both new and in-use engines require diesel PM levels of less than 0.01 g/bhp-hour, equivalent to the 2007 PM emission standard for new heavy-duty highway engines.[64] While the regulations are mandatory, operators have a degree of flexibility in the how they approach compliance.[65]

Additionally, ARB encouraged EPA to adopt a nationwide low sulfur diesel fuel standard, as well as other diesel-related emissions reduction programs. California's Low Sulfur Diesel Fuel Program, in effect since 1993, sets limits on aromatic HC content (10 percent by volume) and on sulfur content (15 parts per million by weight) to reduce emissions from diesel engines and equipment.[66]

EPA began regulating diesel fuel sulfur levels in 1993. Beginning in 2006, EPA phased in more stringent regulations limiting sulfur in diesel fuel to 15 ppm (known as ultra-low sulfur diesel), bringing these standards more in line with California's. Several states, such as Oregon and New Jersey, have formed their own clean diesel plans and programs.[67] In listing acceptable retrofit devises, the New Jersey Department of Environmental Protection's Mandatory Diesel Retrofit Program incorporates both California's and EPA's list of verified retrofits by reference.[68]

Diesel engines emit both solid PM and gaseous material, including volatile organic compounds and NOx. ARB regulations have had a major impact in particular on PM reductions: since 1990, statewide PM emissions from diesel engines have decreased by 68 percent.[69] Figure 4 shows this drastic decrease in the Los Angeles area. ARB expects diesel PM levels to continue to decline as additional controls are adopted, including the use of cleaner-

---

[*] California does still impose more stringent standards for certain classes of vehicles, such as diesel buses.

burning diesel fuel and increasing use of alternative fuels, retrofitting engines with particle-trapping filters, and integrating new, advanced technologies.[70]

| Figure 4 | Fine Particulate Matter (PM2.5) in Los Angeles |
|---|---|



*Source: Adapted from the California Air Resources Board[71]*

Most recently, China, the country with the largest diesel vehicle fleet in the world (largely heavy trucks and off-road vehicles), has launched a similar comprehensive strategy to reduce emissions, including PM and NOx, from diesel on- and off-road vehicles. Nationwide implementation of the current standard was completed in 2016.[72] The International Council on Clean Transportation stated that the regulations combine "best practices from the latest emissions regulations in the EU, the State of California, and the U.S."[73]

<div style="float:left; width:40%">

**Zero Emissions Vehicle Requirements**

In 1990, California first adopted a "zero emissions vehicle" (ZEV) mandate as part of its LEV I program, effective starting MY 1994. The initial regulations required two percent of new vehicle sales by major manufacturers to be ZEVs by 1998 and 10 percent by 2003. Over time, California has modified the ZEV through biennial reviews to evaluate the status of ZEV technology and make regulatory modifications.

Today, California's ZEV program requires increasing deployment of electric vehicles in California. The regulation is imposed on automakers, who earn credits for the deployment of electric vehicle technology, including fully electric vehicles as well as plug-in hybrid vehicles. In MY 2018, large volume vehicle manufacturers must meet a ZEV credit requirement of 4.5 percent. By 2025, the sale target increases to 15.4 percent.

</div>

## Mandatory Requirements for Zero Emissions Vehicles

The Zero Emissions Vehicles (ZEV) program has long been viewed by both its designers and compliance entities as a technology forcing mechanism. When ARB first imposed the program in 1990, it stated that "without the mandate, it is uncertain whether manufacturers would be willing to commit the resources needed to accelerate the commercialization of ZEVs."[74] And certainly, at the time of the mandate's initial enactment, electric vehicle and battery technology was relatively immature.[75]

Results from the first ten years of the program demonstrate its success in advancing technological development. Battery developers have stated that the ZEV mandate was a crucial component to obtaining outside investment in early stages of the industry.[76] A study interviewing 134 automakers, fleet managers, and policy agencies found that 80 percent said that between 1990 and 1998, the program was very or somewhat important to the success of their business, and an even greater percentage—90 percent—viewed the policy as very or somewhat important to the *future* success of their business.[77] A 2000 ARB report concluded that the ZEV requirements had been "instrumental in promoting battery, fuel cell, component and vehicle research and development…[and] spawning a large variety of extremely low emission vehicle technologies,"[78] including not only electric vehicles and battery technologies but also "gasoline vehicles with zero evaporative emissions, exceedingly clean exhaust…and emission control systems that are twice as durable than their conventional forebearers."[79]

This development has only accelerated since. As of January 2018, global carmakers' investments in batteries and electric cars surpassed $90 billion.[80] Automakers are continuing this investment and have committed significant resources toward electric vehicles. A few examples of recent commitments include:

- General Motors CEO Mary Barra has stated, "we believe in an all-electric future;" the company will launch 20 new all-electric vehicles globally by 2023.[81]
- Daimler Group, owner of Mercedes and the SmartCar brands, has said that it is "all systems go" on an electric future, bringing more than ten different all-electric vehicles to market by 2022 and electrifying the entire Mercedes-Benz portfolio, leading to more than 50 electric options for customers overall.[82]
- Volkswagen Group is going to make everything electric "in some shape or form" by 2030.[83]
- Ford is investing $11 billion to bring 40 total EVs to market by 2022, including seven to the U.S. market.[84]
- Finally, Volvo Cars has announced that every Volvo it launches from 2019 will have an electric motor, in its words "marking the historic end of cars that only have an internal combustion engine (ICE) and placing electrification at the core of its future business."[85]

The ZEV program also fostered improvements and greater efficiency in the research and development process. For example, the program increased public-private partnerships and research efforts.[86] In 1990, prior to implementation of the ZEV mandate, government funding to support electric vehicle technology improvements totaled $18 million. By 2000, related funding had increased to $100 million.[87] In addition, prior to the ZEV program, research and development efforts were fragmented between industry and federal programs.[88] After its implementation, a variety

9

of U.S-based partnerships emerged to support technological development to meet the ZEV standard, most notably the U.S. Advanced Battery Consortium (USABC), which was formed to leverage private research and development with federal resources.[89] In 1991, shortly after the finalization of the ZEV mandate, members of the USABC matched $130 million in Department of Energy research funds.[90] In addition, a variety of other supportive U.S policies and programs have ramped up since the ZEV mandate. Today, investments in electric vehicle and charging infrastructure development continue to grow. In May 2018 alone, New York and California authorized almost $1 billion in spending on electric vehicles, with the California Public Utilities Commission approving $738 million in transportation electrification projects and New York dedicating $250 million to the launch of Evolve NY, a new electric vehicle expansion initiative in partnership with the New York Power Authority.[91]

Other states have been able to take advantage of and contributing to these technological improvements. Directly, nine states have adopted California's ZEV requirements.[92] Together, these ten states represent more than a quarter of total annual light-duty vehicle sales in the United States.[*]  Potential benefits of adopting California's standards include facilitating state air quality goals and/or more readily meeting federal air quality standards through reduced vehicle emissions.[93]  These standards have also inspired international action. For example, China's New Energy Vehicle (NEV) mandate, finalized in September 2017, is modeled off of California's ZEV mandate, setting required fleet ZEV requirements and a crediting mechanism, scaled based on electric range, for automakers to track compliance.[94]

<div style="background:#1763A6;color:white;">

### GHG Emissions Regulation and the Advanced Clean Cars Program

In 2002, the California Legislature passed Assembly Bill 1493, sponsored by Assemblywoman Pavley, directing ARB for the first time to establish GHG emissions standards for passenger vehicles. As part of the LEV II program updates in 2004, ARB approved the "Pavley standards," ultimately put into place for MY 2009 through 2016. ARB developed standards for both light-duty cars and trucks as well as heavy-duty trucks, with near-term (2009-2013) and mid-term (2013-2016) standards for both vehicle subcategories. The standards required carmakers to reduce GHG emissions from their vehicle fleets by approximately 30 percent by 2016. As well as establishing $CO_2$ standards, the program required automakers to control two other GHGs, nitrous oxide ($N_2O$) and methane ($CH_4$), measured in equivalent emissions of $CO_2$.

In addition, the regulations included the option for manufacturers to receive credit for the inclusion of systems demonstrated to mitigate fugitive emissions of hydrofluorocarbons (HFCs), a GHG with a high global warming potential, from vehicle air conditioning (AC) systems. AC systems contribute to GHG emissions through the direct release of HFC emissions (AC direct emissions) and through tailpipe emissions due to increased load on the system (AC indirect emissions) associated with AC operation. The regulations provided that automakers could earn credit toward compliance with GHG standards through both indirect and direct AC emissions reduction.

In 2012, in coordination with EPA and NHTSA, ARB adopted the Advanced Clean Cars program. ARB began with this phase of vehicle emissions standards "a new approach to passenger vehicles," that combined "the control of smog-causing pollutants and greenhouse gas emissions into a single coordinated package of standards." This package of regulations under the Advanced Clean Cars umbrella included the latest criteria emissions (the LEV III program), the GHG standards, and the ZEV program.

</div>

---

[*] Connecticut, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont

## Mandatory Tailpipe Emissions Standards: Greenhouse Gases

A similar trajectory can be seen with California's development of GHG tailpipe standards. Currently, thirteen states have adopted California's GHG standards.* In California alone, ARB estimated that the standards would reduce GHG emissions by approximately 30 million metric tons by 2020 and by over 50 million metric tons by 2030, equating to an 18 percent overall reduction in GHG emissions from passenger cars in 2020 and a 27 percent reduction in 2030.[95] In addition, ARB estimated that the regulation would reduce "upstream" smog-forming emissions of HCs and NOx by approximately six tons per day in 2020 and 10 tons per day in 2030.[96] ARB estimated that emissions reductions from the twelve total states adhering to California's vehicle standards† would reduce greenhouse gas emissions by 74 million metric tons per year by 2020.[97] While much of these regulations were focused on reducing $CO_2$ emissions, these regulations also transitioned from the LEV II optional standards for non-$CO_2$ GHGs to mandatory standards.

The federal government looked to California's standards upon determining that federal vehicle GHG emissions standards were needed to mitigate the danger to human health and welfare posed by these emissions.[98] In order to avoid the creation of two different sets of standards across the country, EPA, the U.S. Department of Transportation, ARB, and vehicle manufacturers began collaborating on the creation of one harmonized fuel economy and GHG standards program for cars and light-duty vehicles at the federal level.[99]

In 2009, the Obama Administration announced "One National Program," a harmonized national standard on GHG emissions and light-duty vehicle fuel economy for model years 2012 through 2016.[100] As part of the program, California agreed to allow compliance with the national standards in order to satisfy its own requirements, even though its existing criteria and GHG emissions standards as finalized in 2004 were more stringent than the proposed federal standards. In 2009, as "part of California's commitment toward a nation-wide program," and with the intent to "prepare California to harmonize its rules with the federal rules for passenger vehicles," ARB amended its Pavley regulations for MYs 2012 through 2016 such that compliance with the new federal GHG standards would be deemed to be in compliance with California's GHG standards.[101]

The new harmonized Federal and California standards, covering model years 2012 to 2016, ultimately required light-duty vehicles to meet an estimated combined average emissions level of 250 grams/mile of $CO_2$ in model year 2016 and were projected to achieve a reduction of approximately 900 million metric tons in GHG emissions.[102] EPA's standards were finalized in April 2010 and were further strengthened for model years 2017 through 2025 in a separate rulemaking.[103]

One example of this harmonization under EPA's One National Program standards was the incorporation of California's standards by allowing manufacturers to generate and use credits for improved AC systems that reduced leakage of non-$CO_2$ GHGs to comply with the $CO_2$ fleet average standards.[104] Indirect credits were awarded for the use of a range of approved technologies.[105] In the final rule's Regulatory Impact Analysis, EPA found both the reduction of AC system leakage and increasing efficiency of the technology to be highly cost-effective and technologically feasible.[106] EPA and ARB also aligned their standards for $N_2O$ and $CH_4$ under this program.

In 2011, regarding One National Program, President Obama stated, "[t]his agreement on fuel standards represents the single most important step we've ever taken as a nation to reduce our dependence on foreign oil."[107] California and major automakers showed their support for the continuation of One National Program for light-duty GHG and fuel efficiency standards by sending letters to the agencies in July 2011.[108] In 2012, EPA and ARB issued emission standards for model year 2017 to 2025 light-duty vehicles that further strengthened these criteria and GHG emissions standards.[109]

Other countries have also since implemented GHG standards. For example, the European Union (EU) had imposed voluntary standards and various downstream policies (e.g., registration fees and labelling requirements) since the

---

* These states are: Colorado, Connecticut, Delaware, Maine, Maryland, Massachusetts, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington.

† Note that this does not include Colorado, which has since adopted these standards.

early 2000s[110] but in 2011 first proposed direct binding standards for $CO_2$ from vehicles.[111] The EU finalized these standards in 2014.[112]   Today, ten governments have established fuel economy or GHG emission standards for light duty vehicles: Brazil, Canada, China, the European Union, India, Japan, Mexico, Saudi Arabia, South Korea, and the United States.   These ten locations are all within the top 15 vehicle markets worldwide.[113]   California's leadership in putting mandatory GHG standards in place has started to spread around the world.

## Conclusion

California's transportation policy leadership has resulted in cleaner air and more efficient vehicles across the country. It has spurred growth in new and exciting markets such as electric transportation.  And it has provided policy certainty for automakers to make investments in innovative technologies for cars and trucks—innovations that have since been adopted around the world. The environmental and economic gains of these policies have thus been multiplied as state actors, investors, technology developers, and industry apply lessons learned, ultimately improving the efficiency, affordability, and effectiveness of environmental initiatives across the country and beyond.

# End Notes

---

[1] "Clean Air -- California's Success and Future Challenges." *California Air Resources Board.* https://www.arb.ca.gov/ba/omb/50thfinal/tsld007.htm

[2] *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F2d 1095, 1109, fn. 26 (D.C. Cir. 1979), citing 1959 Cal. Stats., chap. 239, § 1 (former Cal. Health & Saf. Code § 24386).

[3] "Petition to the Ozone Transport Commission for the Adoption of Recommendation Calling for the Application of LEV Throughout the Transport Region." https://otcair.org/upload/Documents/Formal%20Actions/MISC%2093-1%20PETITION.pdf.

[4] Nauss, Donald W. "Honda Will Sell Low-Emission Cars Nationwide." *Los Angeles Times*, 18 Jul. 1977, http://articles.latimes.com/1997/jul/18/business/fi-13800.

[5] Bayrakal, Suna. "Canadian Environmental Policy and Technology Change: Air Pollution and the Automobile" Order No. NR5167 York University (Canada), *ProQuest Dissertations Publishing*, 2009.

[6] EPA. "Control of Air Pollution from New Motor Vehicles: Tier 2 Motor Vehicle Emissions Standards and Gasoline Sulfur Control Requirements." 65 Fed Reg 6697, 10 Feb. 2000, https://www.federalregister.gov/documents/2000/02/10/00-19/control-of-air-pollution-from-new-motor-vehicles-tier-2-motor-vehicle-emissions-standards-and.

[7] Ibid.

[8] Ibid.

[9] Colorado, Office of the Governor. "Executive Order B 2018 006: Maintaining Progress on Clean Vehicles." 18 Jun. 2018, https://www.colorado.gov/governor/sites/default/files/b_2018-006_maintaining_progress_on_clean_vehicles.pdf.

[10] California Air Resources Board (ARB 2018). "Fifty Year Air Quality Trends and Health Benefits." February 2018, https://ww2.arb.ca.gov/ma020818.

[11] Lee, Jaegul et al. "Forcing technological change: A case of automobile emissions control technology development in the US." *Technovation* vol. 30, no. 4, 2010, pp. 249-264.

[12] U.S. Congress. "Office of Technology Assessment. Technology Assessment of Changes in the Future Use and Characteristics of the Automobile Transportation System—Volume I: Summary and Findings." Feb. 1979, https://digital.library.unt.edu/ark:/67531/metadc39846/m2/1/high_res_d/9585.pdf.

[13] Ibid.

[14] EPA. "Regulatory Development and Support Division. Regulatory Support Document: Emissions Standards for Heavy Duty Clean-Fuel Fleets." May 1993, https://nepis.epa.gov/Exe/ZyPDF.cgi/9100X3FW.PDF?Dockey=9100X3FW.PDF.

[15] National Research Council of the National Academies. *State and Federal Standards for Mobile-Source Emissions.* Washington, DC: The National Academies Press, 2006, https://www.nap.edu/read/11586/chapter/8.

[16] Pardiwala, Julie M., Femina Patel, and Sanjay Patel. "Review paper on Catalytic Converter for Automotive Exhaust Emissions." *Institute of Technology, Nirma University, Ahmedabad*, 382 481, Dec. 2011, http://nuicone.org/site/common/proceedings/Chemical/oral/CH_09.pdf ; "History of Reducing Air Pollution from Transportation in the United States." *EPA*, https://www.epa.gov/transportation-air-pollution-and-climate-change/accomplishments-and-success-air-pollution-transportation.

[17] "Clean Air Facts – The Catalytic Converter: Technology for Clean Air." *Manufacturers of Emissions Controls Association (MECA)*, Aug. 2011, http://www.meca.org/galleries/files/catconfact_0811_FINAL.pdf.

[18] Amatayakul, Wathanyu, and Olle Ramnas. "Life cycle assessment of a catalytic converter for passenger cars." *Journal of Cleaner Production* vol. 9, no. 5, 2001, pp. 395-403.

[19] Klier, Thomas and Joshua Linn. "Comparing US and EU Approaches to Regulating Automotive Emissions and Fuel Economy." *Resources for the Future*, Policy Brief No 16-03 (2016). Available at http://www.rff.org/files/document/file/RFF-PB-16-03.pdf

[20] "Clean Air Facts – The Catalytic Converter: Technology for Clean Air." *Manufacturers of Emissions Controls Association (MECA)*, Aug. 2011, http://www.meca.org/galleries/files/catconfact_0811_FINAL.pdf.

[21] Faiz, Asif, Christopher S. Weaver, and Michael P. Walsh. "Air Pollution from Motor Vehicles: Standards and Technologies for Controlling Emissions." Washington, DC: The World Bank, 1996, http://www.un.org/esa/gite/iandm/faizpaper.pdf.

13

[22] Nesbit, Martin, et al. "Comparative study on the differences between the EU and US legislation on emissions in the automotive sector." European Union, 2016, http://www.europarl.europa.eu/RegData/etudes/STUD/2016/587331/IPOL_STU(2016)587331_EN.pdf.

[23] Mooney, John J. "The 3-Way Catalytic Converter: a) Invention and Introduction into Commerce – Impacts and Results b) Barriers Negotiated." *California Air Resources Board*, 9 Oct. 2007, https://www.arb.ca.gov/research/seminars/mooney/mooney.pdf.

[24] "OBD-II Background." *B&B Electronic*, 2011, http://www.obdii.com/background.html

[25] "On-Board Diagnostic II (OBD II) Systems – Fact Sheet / FAQs." *California Air Resources Board,* 28 Oct. 2015, https://www.arb.ca.gov/msprog/obdprog/obdfaq.htm.

[26] Ibid.

[27] EPA, Certification and Compliance Division Office of Transportation and Air Quality. "On-Board Diagnostic (OBD) Regulations and Requirements: Questions and Answers." Dec. 2003, https://nepis.epa.gov/Exe/ZyPDF.cgi/P100LW9G.PDF?Dockey=P100LW9G.PDF.

[28] Ibid.

[29] "OBD-II Background." *B&B Electronics*, 2011, http://www.obdii.com/background.html.

[30] EPA, Office of Transportation and Air Quality. "On-Board Diagnostic (OBD) Regulations and Requirements: Questions and Answers." *National Service Center for Environmental Publications*, Dec. 2003, https://nepis.epa.gov/Exe/ZyNET.exe/P100LW9G.TXT?ZyActionD=ZyDocument&Client=EPA&Index=2000+Thru+2005&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C00thru05%5CTxt%5C00000034%5CP100LW9G.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL.

[31] Hascic, Ivan, et al. "Effects of Environmental Policy on the Type of Innovation: The Case of Automotive Emission-control Technologies." *OECD Journal: Economic Studies*, 2009, http://www.oecd.org/economy/growth/46908508.pdf.

[32] Posada, Francisco, and Anup Bandivadekar. "Global Overview of On-Board Diagnostic (OBD) Systems for Heavy-Duty Vehicles." *The International Council on Clean Transportation (ICCT)*, Jan. 2015, https://www.theicct.org/sites/default/files/publications/ICCT_Overview_OBD-HDVs_20150209.pdf.

[33] Hascic et al 2009.

[34] Jerew, Benjamin. "Carburetor vs Fuel Injection – A Short History and Pros & Cons." *NAPA Know How Blog*, 30 Jun. 2016, http://knowhow.napaonline.com/carburetor-vs-fuel-injection-short-history-pros-cons/.

[35] Armstrong, Julie. "Electronic fuel injection: A history lesson." *Automotive News*, 23 Aug. 2004, http://www.autonews.com/article/20040823/SUB/408230807/electronic-fuel-injection:-a-history-lesson ; Jensen, Andy. "The evolution of fuel injection." *Advanced Auto Parts*, 14 Jun. 2018, https://shop.advanceautoparts.com/r/advice/car-technology/the-evolution-of-fuel-injection.

[36] EPA, NHTSA, and ARB. "Draft Technical Assessment Report: Midterm Evaluation of Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards for Model Years 2022-2025." Jul. 2016, https://nepis.epa.gov/Exe/ZyPDF.cgi/P100OXEO.PDF?Dockey=P100OXEO.PDF.

[37] Stahman, Ralph C., and Andrew H. Rose Jr. "Emissions from Carbureted and Timed Port Fuel Injected Engines." *Journal of the Air Pollution Control Association* vol. 16, no. 1, 2012, pp. 15-18, https://www.tandfonline.com/doi/pdf/10.1080/00022470.1966.10468433.

[38] Saliba, Georges., et al. "Comparison of Gasoline Direct-Injection (GDI) and Port Fuel Injection (PFI) Vehicle Emissions: Emission Certification Standards, Cold-Start, Secondary Organic Aerosol Formation Potential, and Potential Climate Impacts." *Environmental Science Technology* vol. 51, no. 11, 2017, pp. 6542-6552, https://www.ncbi.nlm.nih.gov/pubmed/28441489.

[39] Schreffler, Roger, and Mack Chrysler. "One's Not the Loneliest Number." Ward's Auto World vol. 37, no. 7, 2001, pp. 39.

[40] Needleman, Herbert L. "Review – The Removal of Lead from Gasoline: Historical and Personal Reflections." *Environmental Research*, vol. 84, 2000, pp. 20-35, http://www.unc.edu/courses/2008fall/envr/230/001/Needleman_2000.pdf.

41 "History of Lead Air Quality Standard." *California Air Resources Board*, 24 Nov. 2009, https://www.arb.ca.gov/research/aaqs/caaqs/pb-1/pb-1.htm.

42 Needleman 2000.

43 Oudijk, Gil. "The Rise and Fall of Organometallic Additives in Automotive Gasoline." *Environmental Forensics*, vol. 11, no. 1, 2010, pp. 17-49, https://www.researchgate.net/publication/249050811_The_Rise_and_Fall_of_Organometallic_Additives_in_Automotive_Gasoline.

44 The Manufacturers of Emission Controls Association (MECA). "The Case for Banning Lead in Gasoline." Nov. 1998. http://www.meca.org/galleries/files/111698_lead.pdf.

45 Title 13, California Code of Regulations, § 2253.4. Lead in Gasoline. https://www.arb.ca.gov/fuels/gasoline/082908CaRFG_regs.pdf. *and* EPA. "EPA Takes Final Step in Phaseout of Leaded Gasoline." January 29, 1996, https://archive.epa.gov/epa/aboutepa/epa-takes-final-step-phaseout-leaded-gasoline.html.

46 ARB 2018

47 Schwartz, Joel, et al. "Costs and Benefits of Reducing Lead in Gasoline: Final Regulatory Impact Analysis." Washington, DC, 1985: EPA, Office of Policy Analysis, https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=9100YK16.PDF.

48 Ibid.

49 Manufacturers of Emission Controls Association (MECA). "The Case for Banning Lead in Gasoline." Nov. 1998. http://www.meca.org/galleries/files/111698_lead.pdf.

50 Oudijk, Gil. "The Rise and Fall of Organometallic Additives in Automotive Gasoline." *Environmental Forensics*, vol. 11, no. 1, 2010, pp. 17-49, https://www.researchgate.net/publication/249050811_The_Rise_and_Fall_of_Organometallic_Additives_in_Automotive_Gasoline.

51 California Air Resources Board. "Proposal to Eliminate Leaded Gasoline in California." 13 Aug. 1990, https://www.arb.ca.gov/fuels/gasoline/carfg1/P1_ch4.pdf.

52 Manufacturers of Emission Controls Association (MECA). "The impact of gasoline fuel sulfur on catalytic emission control systems." Jun. 2013, http://www.meca.org/Gasoline_Fuel_Sulfur_2013Final.pdf.

53 California Air Resources Board. "The California reformulated gasoline regulations: Unofficial electronic version." Title 13, California Code of Regulations, Sections 2250-2273.5, 16 Feb. 2014, https://www.arb.ca.gov/fuels/gasoline/021614_unofficial_carfg3regs.pdf.

54 California Air Resources Board. "Brief Summary: CARB Phase 3 Gasoline Specifications and Test Methods." 13 Mar. 2014, https://www.arb.ca.gov/enf/fuels/gasspecs.pdf.

55 "Cleaner-Burning Gasoline: An Update." *California Air Resource Board*, 25 Sept. 2008, https://www.arb.ca.gov/fuels/gasoline/cbgupdat.htm.

56 EPA. "Control of Air Pollution from Motor Vehicles: Tier 3 Motor Vehicle Emission and Fuel Standards." 40 Fed Reg Parts 79 et al., 79.81, 28 Apr. 2014, https://www.gpo.gov/fdsys/pkg/FR-2014-04-28/pdf/2014-06954.pdf.

57 EPA, Engine Programs and Compliance Division. "Regulatory Impact Analysis – Control of Air Pollution from New Motor Vehicles: Tier 2 Motor Vehicle Emissions Standards and Gasoline Sulfur Control Requirements." Dec. 1999, https://nepis.epa.gov/Exe/ZyPDF.cgi/P100F1UV.PDF?Dockey=P100F1UV.PDF.

58 National Research Council. *Ozone-Forming Potential of Reformulated Gasoline*. Washington, DC: National Academy Press, 1999, https://www.nap.edu/read/9461/chapter/7#110.

59 "Particulate Emissions from Diesel-Fueled Engines as a Toxic Air Contaminant." *California Air Resources Board*, 29 Jul. 2008, https://www.arb.ca.gov/toxics/dieseltac/dieseltac.htm.

60 California Air Resources Board. "California's Plan to Reduce Diesel Particulate Matter Emissions." Oct. 2000, https://www.arb.ca.gov/diesel/factsheets/rrpfactsheet.pdf.

61 California Air Resources Board, Stationary Source Division and Mobile Source Control Division. "Risk Reduction Plan to Reduce Particulate Matter Emissions from Diesel-Fueled Engines and Vehicles." Oct. 2000, https://www.arb.ca.gov/diesel/documents/rrpFinal.pdf.

62 "California: Heavy-Duty: Emissions" *TransportPolicy.net*, http://www.transportpolicy.net/standard/california-heavy-duty-emissions/ ; "U.S.: Heavy-Duty: Emissions" *TransportPolicy.net*, https://www.transportpolicy.net/standard/us-heavy-duty-emissions/.

63 "United States: California Diesel Risk Reduction Program." *DieselNet*, https://www.dieselnet.com/standards/us/ca_diesel.php.

64 Ibid.

65 Ibid.

66 California Air Resources Board. "California Low Sulfur Diesel Fuel." Jul. 2003,
   https://www.arb.ca.gov/fuels/diesel/lsdffactsheet.pdf.

67 "Oregon Clean Diesel Initiative." *Oregon.gov*, https://www.oregon.gov/deq/aq/programs/Pages/Diesel-Initiative.aspx.

68 "NJDEP's Mandatory Diesel Retrofit Program." *State of New Jersey, Department of Environmental Protection, Bureau of Mobile Sources*, 19 May 2015, https://www.state.nj.us/dep/stopthesoot/retrofit.htm.

69 "Overview: Diesel Exhaust and Health." *California Air Resources Board*, https://ww2.arb.ca.gov/resources/overview-diesel-exhaust-and-health.

70 Ibid.

71 ARB 2018

72 "China: Air Quality Standards." *TransportPolicy.net*, https://www.transportpolicy.net/standard/china-air-quality-standards/.

73 Shao, Zenying. "China IV non-road standards: A golden opportunity to advance stringent limits and mandate filters." *The International Council on Clean Transportation*, 25 Aug. 2017, https://www.theicct.org/blogs/staff/china-IV-non-road-standards-a-golden-opportunity.

74 California Air Resources Board. "Board Meeting." 27 Sept. 2007,

75 Collantes, G. and D. Sperling. "The origin of California's zero emission vehicle mandate." Transportation Research Part A: Policy and Practice, 2008, pp. 1302-1313, .https://jmie.pure.elsevier.com/en/publications/the-origin-of-californias-zero-emission-vehicle-mandate.

76 Anderman, Menahem, Fritz R. Kalhammer, and Donald MacArthur. "Advanced Batteries for Electric Vehicles: An Assessment of Performance, Cost, and Availability." *California Air Resources Board*, 22 Jun. 2000, https://www.arb.ca.gov/msprog/zevprog/2000review/btapreport.doc.

77 Burke, A.F., K.S. Kurani, E.J. Kenney. "Study of the Secondary Benefits of the ZEV Mandate." *UC Davis, Institute of Transportation Studies*, Aug. 2000, https://www.arb.ca.gov/msprog/zevprog/2000review/zevben.doc.

78 California Air Resource Board. "2000 Zero Emission Vehicle Program Biennial Review." 7 Aug. 2000, https://www.arb.ca.gov/msprog/zevprog/2000review/staffreportfinal.doc.

79 "ARB Modifies Zero-Emission Vehicle (ZEV) Regulation." 24 Apr. 2003, https://www.arb.ca.gov/newsrel/nr042403.htm.

80 Lienert, Paul. "Global carmakers to invest at least $90 billion in electric vehicles." *Reuters*,15 Jan. 2018, https://www.reuters.com/article/us-autoshow-detroit-electric/global-carmakers-to-invest-at-least-90-billion-in-electric-vehicles-idUSKBN1F42NW.

81 Barra, Mary. "We believe in an all-electric future, here's what we're doing today to get there." *LinkedIn*, 5 Sept. 2018, https://www.linkedin.com/pulse/we-believe-all-electric-future-heres-what-were-doing-today-mary-barra/.

82 "Plans for more than ten different all-electric vehicles by 2022: All systems are go." *Daimler*, https://media.daimler.com/marsMediaSite/en/instance/ko/Plans-for-more-than-ten-different-all-electric-vehicles-by-2022-All-systems-are-go.xhtml?oid=29779739.

83 Estrada, Zac. "VW to electrify entire 300-car lineup by 2030." *The Verge*, 11 Sept. 2017, https://www.theverge.com/2017/9/11/16289292/vw-electrify-entire-300-car-lineup-2030.

84 Ford Motor Company. *Twitter*, 28 Apr. 2018, https://twitter.com/Ford/status/990323423783149570; Naughton, Keith, Ryan Beene, and Gabrielle Coppola. "Ford Goes 'All In' on Electric Cars." Bloomberg, 14 Jan. 2018, https://www.bloomberg.com/news/articles/2018-01-14/ford-doubling-electric-vehicle-spending-to-11-billion-by-2022.

85 "Volvo Cars to go all electric." *Volvo Car Group*, 5 Jul. 2017, https://www.media.volvocars.com/global/en-gb/media/pressreleases/210058/volvo-cars-to-go-all-electric.

86 Vergis, Sydney, and Vishal K. Metha. "Technology Innovation and Policy: A case study of the California ZEV Mandate." *UC Davis*, https://itspubs.ucdavis.edu/wp-content/themes/ucdavis/pubs/download_pdf.php?id=1940.

87 Burke et al. 2000.

88 Vergis and Metha.

89 Ibid.

90 Ibid.

91 Walton, Robert. "California, New York, New Jersey see nearly $1.3B in new EV funding." *Utility Dive*, 1 Jun. 2018, https://www.utilitydive.com/news/california-new-york-new-jersey-see-nearly-13b-in-new-ev-funding/524757/.

92 "State Electric Vehicle Mandate: ZEV Mandate States." *Auto Alliance*, https://autoalliance.org/energy-environment/state-electric-vehicle-mandate/ ; U.S. Energy Information Administration. "Analysis of the Effect of Zero-Emission Vehicle Policies: State-Level Incentives and the California Zero-Emission Vehicle Regulations." Sept. 2017, https://www.eia.gov/analysis/studies/transportation/zeroemissions/pdf/zero_emissions.pdf.
93 National Research Council of the National Academies. *State and Federal Standards for Mobile-Source Emissions.* Washington, DC: The National Academies Press, 2006, https://www.nap.edu/catalog/11586/state-and-federal-standards-for-mobile-source-emissions.
94 The International Council on Clean Transportation. "China's new energy vehicle mandate policy (Final rule)." Jan. 2018, https://www.theicct.org/publications/china-new-mandate-final-policy-update-20180111 .
95 California Air Resources Board. "Climate Change Emissions Standards for Vehicles." 30 May 2007, https://www.arb.ca.gov/cc/ccms/factsheets/ccfaq.pdf.
96 Ibid.
97 Ibid.
98 Carley, Sanya, et al. "Rethinking Auto Fuel Economy Policy: Technical and Policy Suggestions for the 2016-2017 Midterm Reviews." *School of Public and Environmental Affairs, Indiana University*, Feb. 2016, https://spea.indiana.edu/doc/research/working-groups/fuel-economy-policy-022016.pdf.
99 "President Obama Announces National Fuel Efficiency Policy." *The White Office of the Press Secretary*, 19 May 2009, https://obamawhitehouse.archives.gov/the-press-office/president-obama-announces-national-fuel-efficiency-policy.
100 Ibid.
101 EPA. "Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards; Final Rule" 40 CFR Parts 85, et al., 49 CFR Parts 531, et al., 7 May 2010, https://www.gpo.gov/fdsys/pkg/FR-2010-05-07/pdf/2010-8159.pdf ; "Clean Car Standards – Pavley, Assembly Bill 1493." *California Air Resources Board*, 11 July 2017, https://www.arb.ca.gov/cc/ccms/ccms.htm.
102 "Final Fuel for Model Year 2012-2016 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards." *EPA*, https://www.epa.gov/regulations-emissions-vehicles-and-engines/final-rule-model-year-2012-2016-light-duty-vehicle (EPA 2009a); "President Obama Announces National Fuel Efficiency Policy." *EPA*, 19 May 2009, https://archive.epa.gov/epapages/newsroom_archive/newsreleases/451902cb77d4add5852575bb006d3f9b.html.
103 EPA 2009a
104 California Air Resources Board. "LEV III Greenhouse Gas Non-Test Cycle Provisions." 7 Dec. 2011, https://www.arb.ca.gov/regact/2012/leviiighg2012/levappr.pdf.
105 Ibid.
106 EPA, Office of Transportation and Air Quality. "Final Rulemaking to Establish Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards: Regulatory Impact Analysis." April 2010, https://nepis.epa.gov/Exe/ZyPDF.cgi/P1006V2V.PDF?Dockey=P1006V2V.PDF.
107 The White House, President Barack Obama. "Remarks by the President on Fuel Efficiency Standards." 29 Jul. 2011, https://obamawhitehouse.archives.gov/the-press-office/2011/07/29/remarks-president-fuel-efficiency-standards.
108 "2011 Commitment Letters for 2017-2025 Light-Duty National Program." *EPA*, https://www.epa.gov/regulations-emissions-vehicles-and-engines/2011-commitment-letters-2017-2025-light-duty-national.
109 EPA. "2017 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions and Corporate Average Fuel Economy Standards," 77 Fed Reg 62623. 15 October 2012.
110 European Commission. "Report to the Commission to the European Parliament, the Council, and the European Economic and Social Committee: Progress report on implementation of the Community's integrated approach to reduce $CO_2$ emissions from light-duty vehicles." 10 Nov. 2010, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:52010DC0656.
111 The International Council on Clean Transportation. "European $CO_2$ Emission Performance Standards for Passenger Cars and Light Commercial Vehicles." 12 Jul. 2012, https://www.theicct.org/publications/eu-2020-co2-emission-standards-cars-and-vans.
112 "Road transport: Reducing $CO_2$ emissions from vehicles." *European Commission*, https://ec.europa.eu/clima/policies/transport/vehicles_en#tab-0-0.
113 International Council on Clean Transportation. "2017 Global update: Light-duty vehicle greenhouse gas and fuel economy standards." 23 July 2017. Available at https://www.theicct.org/publications/2017-global-update-LDV-GHG-FE-standards

17

R-136,    Comment submitted by Rivian



13250 N Haggerty Rd
Plymouth MI, 48170

VIA https:// www.regulations.gov

Docket No. EPA-HQ-OAR-2021-0257

Re:    U.S. Environmental Protection Agency's Notice of Opportunity for Public
       Hearing and Comment: Reconsideration of the Withdrawal of a Waiver for
       California's Light-duty Vehicle ZEV and GHG Standards California State
       Motor Vehicle Pollution Control Standards; Docket EPA-HQ-OAR-2021-
       0257(Non-rulemaking Docket)

Rivian appreciates the opportunity to comment on EPA's reconsideration of The Safer
Affordable Fuel-Efficient Vehicles Rule Part One ('SAFE 1") action that withdrew an EPA
waiver for California to enforce its light-duty zero emission vehicle ("ZEV") and
greenhouse gas emission ("GHG") standards.  Rivian strongly recommends the EPA
reconsider and rescind the actions the Agency took in SAFE 1 to revoke California's and
the Clean Air Act (CAA) Section 177 States' authority to enforce GHG and ZEV
requirements.

Rivian is an independent U.S. company dedicated to the mission of Keeping the World
Adventurous Forever through the introduction of a lineup of all electric adventure
vehicles, namely trucks and SUVs. The Company is in the process of launching its first
truck (R1T) and SUV (R1S) that will be available for sale beginning in 2021. With features
like an electric motor at each wheel, over 300 miles of range on a single charge, 0-
60mph times of 3 seconds and the ability to tow up to 11,000 pounds, these all electric
vehicles will open-up a new class of zero emission vehicles to the consumer. In addition
to the R1 vehicles, Rivian will be delivering 100,000 all-electric last-mile delivery vans for
Amazon. These all-electric delivery vans will be produced at the same Normal, Illinois,
assembly plant as the R1T and R1S beginning this year.

Rivian has an interest in this reconsideration by EPA not only in terms Rivian's mission to
Keep the World Adventurous Forever, but also as Rivian produces vehicles subject to
the applicable affected standards.  The Rivian R1T and R1S are subject to light duty
GHG and ZEV standards. Additionally, the R1T, R1S and last-mile delivery vehicles can
earn compliance credits toward ZEV requirements. Accordingly, Rivian respectfully

submits these comments to the docket requesting EPA rescind the SAFE 1 decisions to withdrawal the 2013 Waiver to California and rescind its determination that States cannot adopt California's GHG and ZEV standards.

**Support for the National Coalition for Advanced Transportation**

As a member of the National Coalition for Advanced Transportation ("NCAT"), Rivian agrees with the NCAT comments on the EPA "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Opportunity for Hearing and Public Comment" that the EPA must rescind its actions in SAFE 1. [1] From the NCAT comments, the reasons for EPA to rescind its actions are summarized as follows:

- EPA should rescind its SAFE 1 withdrawal of the 2013 Waiver to California because EPA lacks statutory authority to withdraw a previously granted CAA waiver of preemption. EPA's purported waiver withdrawal has always been invalid on this basis and was therefore never effectuated.
- Even if EPA were authorized to rescind a waiver (which it is not), the SAFE 1 withdrawal of the 2013 Waiver is inconsistent with the CAA, unsupported by the record, and otherwise arbitrary and capricious...
- EPA should also rescind its SAFE 1 actions because it impermissibly relied on [the National Highway Traffic Safety Administration's] NHTSA's flawed Energy Policy Conservation Act (EPCA) preemption rule as a basis for withdrawing the 2013 Waiver.
- EPA must rescind its determination in SAFE 1 that States cannot adopt California's GHG standards under CAA Section 177 because this determination is contrary to the statute and exceeds EPA's authority.
- Finally, in its SAFE 1 actions, EPA failed to justify its unilateral reversal of prior decisions and disregard for significant industry reliance interests…

---

[1] S. VanBelleghem and D. O'Connor (July 6, 2021). *NCAT Comments of the National Coalition for Advanced Transportation On the U.S. Environmental Protection Agency's Notice of Opportunity for Public Hearing and Comment: California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption Docket No. EPA-HQ-OAR-2021-0257 July [6], 2021.*

2

**Conclusion**

Thank you for your time and consideration. EPA must rescind the actions it took in SAFE 1 to revoke California's and the Clean Air Act (CAA) Section 177 States' authority to enforce GHG and ZEV requirements.

We look forward to working with EPA, California, and Clean Air Act (CAA) Section 177 States to Keep the World Adventurous Forever.  Rivian is committed to a cleaner environment for all and is happy to discuss the above comments or any other questions.

Sincerely,

Chris Nevers, Senior Director, Environmental Policy

cnevers@rivian.com

3

R-137,     Comment submitted by Tesla, Inc.

# T E S L A

3500 Deer Creek Road, Palo Alto CA 94304
P 650.681.5100 F 650.681.5101

July 6, 2021

**Submitted electronically via regulations.gov**
U.S. Environment Protection Agency
EPA Docket Center, Air Docket
Mail Code 28221T
1200 Pennsylvania Avenue N.W.
Washington, D.C. 20460
Docket No. EPA-HQ-OAR-2021-0257

        RE: *Environmental Protection Agency, Docket No. EPA-HQ-OAR-2021-0257, 86 Fed. Reg. 22421 (April 28, 2021)*

        Pursuant to the Environmental Protection Agency (EPA)'s Proposed Determination: California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption, Docket No. EPA–HQ–OAR–2021–0257, 86 Fed. Reg. 22,421 (Apr. 28, 2021), Tesla, Inc. (Tesla) submits the following comments in support of EPA's proposal.

        Tesla supports the Administration's recognition that California's leadership on motor vehicle innovation has been—and continues to be—vital to advancing technology and solving critical air pollution problems and is fully supported by the law. Rather than undermining federal or state efforts, California's framework for fostering innovation and investment in mobile source pollution controls should be acknowledged, respected, and in many instances adopted by other states in order to achieve the scale of emissions reductions necessary to solve the climate crisis. The wisdom of the Clean Air Act's compromise—with Federal primacy held accountable through state options to adopt a more rigorous California regime, although with limits designed to foster national uniformity—cannot be ignored in favor of minimizing costs for the automotive industry. Preemption, or withdrawal of an already-granted waiver, cannot be a pretext for weakening necessary climate protections nor can it serve as a sword to undermine innovation.

        Tesla notes that through its participation in the National Coalition for Alternative Transportation (NCAT) it has litigated against adoption of the SAFE Part 1 final rule. *See* 86 Fed. Reg. at 25,982, n.7. Accordingly, Tesla incorporates by reference Tesla's and NCAT's comments submitted during the SAFE 1 rulemaking, NCAT's comments filed in response to this proposed rulemaking, and the substance of NCAT's legal pleadings filed in *Union of Concerned Scientists v. NHTSA*, Docket No. 19-1230 (and consolidated cases) (D.C. Circuit), including but not limited to, the opening brief (Document No. 849201, filed June 26, 2020) and the reply brief (Document No. 1868408, filed Oct. 27, 2020). *See* 86 Fed. Reg. at 25,990, n.90.

**Background**

        Tesla's mission is to accelerate the world's transition to sustainable energy. Moreover, Tesla believes the world will not be able to solve the climate change crisis without directly reducing air pollutant emissions—including carbon dioxide and other greenhouse gases—from the transportation and power sectors.

        To accomplish its mission, Tesla designs, develops, manufactures, and sells high-performance fully electric vehicles and energy generation and storage systems, installs, and maintains such systems, and sells solar electricity. Tesla currently produces and sells four fully electric, zero emissions vehicles (ZEVs): the Model S sedan, the Model X sport utility vehicle, the Model 3 sedan, and the Model Y mid-sized SUV.

        Tesla is also deeply committed to ensuring the U.S. remains a leader in advanced manufacturing, and all Tesla vehicles sold in North America are manufactured in the U.S.[1] Currently, Tesla has more than 50,000 employees in the U.S. and has infused billions of dollars in economic activity and created thousands of direct and

---

[1] *See* Tesla, Final submission to USTR requesting participation in the Alternative Staging Regime (submitted on Sept. 30, 2020) (detailing that Tesla's fleet will be USMCA compliant).

indirect jobs in states like California, Nevada and New York. In addition, Tesla's U.S. supply chain spans across more than 40 states, such as Alabama, Georgia, Ohio, Indiana, and Michigan.

In the U.S., Tesla conducts vehicle manufacturing and assembly operations at its factory in Fremont, CA, and produces electric drive trains and manufactures advanced battery packs, as well as Tesla's energy storage products, at its Gigafactory Nevada in Sparks, NV. It also builds and services highly automated, high-volume manufacturing machinery at its facility in Brooklyn Park, MN, and operates a tool and die facility in Grand Rapids, MI. Tesla produces solar energy and vehicle charging products at its Gigafactory New York in Buffalo, NY.

Additionally, in the summer of 2020, Tesla began construction of its newest vehicle and advanced battery manufacturing facility in Austin, TX. The project will invest over $1B in new construction and create at least 10,000 new jobs.[2] Upon completion, the Gigafactory Texas will produce Tesla's new Cybertruck, Model Y crossover, and manufacture Tesla's new, advanced 4680 lithium-ion battery cell and battery packs.

Tesla also continues to make significant investments to establish, and continues to grow, a large network of retail stores, vehicle service centers, and electric vehicle charging stations to accelerate and support the widespread adoption of its zero emission vehicle (ZEV) products.

As a vehicle manufacturer, Tesla is subject to regulation under NHTSA's Corporate Average Fuel Economy (CAFE) standards, the Environmental Protection Administration's (EPA) light-duty vehicle greenhouse gas (GHG) emission standards, and California's Advanced Clean Car and ZEV regulations.

I.     **EPA Lacked Authority to Reconsider California's Already-Granted Waiver.**

The Clean Air Act ("CAA") does not confer any express authority on EPA to reconsider or revoke an already-granted waiver. *See* 42 U.S.C. § 7543. Indeed, in purporting to revoke the waiver, EPA did not invoke any specific statutory authority, but rather relied on its supposed "inherent authority" to reconsider its grant of a waiver. 84 Fed. Reg. 51,310, 51,332 (Sept. 27, 2019). It is far from clear whether any such inherent authority exists here, where Congress established a comprehensive scheme governing the grant of waivers to California and made no mention of any revocation authority.[3] Indeed, the statute *requires* waivers to be granted unless certain findings are made, and was designed to provide California "the broadest possible discretion in selecting the best means to protect the health of its citizens," and empower it to "blaze its own trail with a minimum of federal oversight." *Motor & Equip. Mfrs' Ass'n v. Nichols*, 142 F.2d 449, 463 (D.C. Cir. 1998) (citations omitted).

Revocation of a waiver pursuant to supposed inherent authority is in significant tension with the statutory scheme, which contemplates a carefully circumscribed role for EPA in reviewing California's waiver requests. Indeed, in other environmental statutes, Congress has expressly provided for withdrawal of delegation of state authority in certain circumstances, and so its decision not to include any parallel authority here demonstrates that EPA is *not* empowered to revoke a waiver. *See* 33 U.S.C. § 1342(c)(3) (withdrawal of NPDES authority); 33 U.S.C. § 1344(i) (withdrawal of section 404 authority); 42 U.S.C. § 6926(e) (withdrawal of RCRA authority). As the Supreme Court has instructed, "an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *City of New York v. FCC*, 486 U.S. 57, 66 (1988). An "inherent" authority to revoke an already-granted waiver would amount to the agency assuming power that Congress did not confer on it.

Indeed, the D.C. Circuit recently addressed a similar issue, explaining that "we require an explicit authorization from Congress before we will permit an agency to regulate in an area that alters the balance of powers between states and the federal government," and noted that, in part, this is because "[f]ederal agencies are creatures of statute. They possess only those powers that Congress confers upon them." *Judge Rotenberg Educational Ctr., Inc. v. FDA*, No. 20-1087, slip op. at 15 (D.C. Cir. July 6, 2021). Here, EPA has no "explicit authorization" from Congress to reconsider or revoke already-granted waivers—especially waivers granted many years ago whose revocation is based on policy reasons.

---

[2] *See, e.g.*, Statement of Governor Abbott, Governor Abbott Welcomes Tesla to Texas (July 22, 2020).
[3] Moreover, while some courts have held that agencies generally have some degree of inherent authority to reconsider decisions, others have explained that "there is no general principle that what one can do, one can undo." *Gorbach v. Reno*, 219 F.3d 1087, 1095 (9th Cir. 2000).

Moreover, here, unlike in at least one other situation involving the Clean Air Act, EPA's action in originally granting the waiver did not "contain[] an express reservation of the right to revoke" California's waiver, providing another reason to doubt the propriety of EPA's attempt to invoke inherent reconsideration authority. *Greater Detroit Resource Recovery Auth. v. EPA*, 916 F.2d 317, 324 (6th Cir. 1990).[4]

There is a lone item of legislative history, a 1967 Senate Report, stating that EPA can withdraw waivers if California "no longer complies with the conditions of that waiver." S. Rep. 90-403, at 34 (1967). However, that isolated legislative history language is irrelevant in light of the 1977 CAA amendments, which "broaden and strengthen California's authority to prescribe and enforce separate new motor vehicle emission standards." H.R. Rep. No. 95-294, at *23, 233 (Conf. Rep.) (1977). Moreover, even taking the 1967 statement at face value, it is on its own terms limited to situations where California "no longer complies with the conditions" of an existing waiver, not where EPA makes a policy determination that the waiver should not have been granted in the first instance.

II.    **Even If EPA Had Inherent Authority to Reconsider Waivers, the Revocation Was Untimely and Unreasonably Upended Reliance Interests.**

A.    **EPA's Revocation Was Untimely.**

California's waiver was granted on January 6, 2013, and EPA did not purport to revoke it until September 27, 2019, more than six and a half years after it was granted. 78 Fed. Reg. 2,112 (Jan. 9, 2013); 84 Fed. Reg. 51,310 (Sept. 27, 2019). Indeed, EPA did not even *propose* reconsideration until August 24, 2018, more than five and a half years after the waiver was granted. 83 Fed. Reg. 42,986 (Aug. 24, 2018).

EPA's revocation, more than 6.5 years after the waiver was granted, was not conducted "in a timely fashion." *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *see also Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352, 1361 (Fed. Cir. 2008) (agency reconsideration "must occur within a reasonable time").

EPA's revocation did not even attempt to explain how its belated action could satisfy this standard. Instead, EPA conflated the "timely fashion" requirement with the independent requirement that reconsideration can be improper if it unduly upends reliance interests. *See* 84 Fed. Reg. at 51,333-35. But the two are separate and independent requirements an agency must satisfy to lawfully engage in reconsideration. For example, the D.C. Circuit has explained that reconsideration authority "must be exercised **both** within a reasonable time after the issuance of a final departmental decision **and** without subjecting the parties affected by any undue or unnecessary hardships." *Nat'l Ass'n of Trailer Owners, Inc. v. Day*, 299 F.3d 137, 139-40 (D.C. Cir. 1962) (emphasis added); *see also Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015).

Simply put, EPA's attempted revocation was untimely, and therefore invalid on that basis.

B.    **EPA's Reliance Interest Argument Was Flawed.**

EPA's reliance interest argument in support of revocation was also wrong on its own terms. The agency's principal argument was that there were no reliance interests for the 2021-2025 model-years, because the *federal* GHG standards could be reconsidered as a result of a mid-term evaluation. 84 Fed. Reg. at 51,335. Setting aside other flaws with this argument, it is a non-sequitur on its own terms: the possibility of reconsideration of federal GHG standards has no direct bearing on the finality of California's waiver. Moreover, no federal statutory provision requires a mid-term evaluation of standards established under section 209. Instead, the mid-term evaluation process was created by federal regulation regarding the federal standards, and that rule contains no

---

[4] EPA also argued that its reconsideration of a waiver *denial* is precedent supporting its decision to reconsider a *granted* waiver. 84 Fed. Reg. at 51,333. That is illogical: because California can always submit a renewed waiver application, there no reason to interpret the statute to prohibit EPA from promptly reconsidering a denial determination; such reconsideration is tantamount to EPA simply reviewing a resubmission of the same waiver request.

The one example EPA cited of reconsideration of a granted waiver contains no discussion of the agency's legal authority for engaging in reconsideration. 43 Fed. Reg. 998 (Jan. 5, 1978).

provision linking the mid-term evaluation process to California's waiver or regulations. 40 C.F.R. § 86.1818-12(h). Accordingly, reliance interests were generated with respect to *California's* regulations, because those regulations would continue to be in force regardless of the possibility that the mid-term evaluation might result in changes to the *federal* rules.

Indeed, significant reliance interests were generated during the 6.5+ years California's waiver was in force. Reliance interests are particularly acute in this area, where the very purpose of the statute is to incent investment in new technologies to address the air pollution challenge, and to foster California's particular efforts to serve as a laboratory for innovation. In an industry that requires huge capital investments for such innovation, any reversal in policy that undermines those investments must be regarded with particular wariness.

The Clean Air Act was structured to be "technology forcing" by requiring and providing incentives for new, improved pollution-control technologies. *Union Elec. Co. v. EPA*, 427 U.S. 246, 258 (1976). That is consistent with the basic purpose of the statute, which is to "enhance" air quality. 42 U.S.C. § 7401(b)(1). The statute thus contemplates not simply mere regulatory certainty, but rather ongoing enhancement of air quality as technology improves, and standards are revised through an iterative process to reflect and incentivize the ongoing "development and application of the requisite technology" necessary to control air pollution. 42 U.S.C. § 7521(a)(1). As the D.C. Circuit has explained, "[t]his is a technology-forcing provision; it mandates regulations with which manufacturers can comply only by adopting new technologies as they become available." *Crete Carrier Corp. v. EPA*, 363 F.3d 490, 491 (D.C. Cir. 2004).

Auto industry members have recognized the technology-forcing role played by the statute and its implementing regulations and the resulting reliance interests.[5] EPA and NHTSA also have recognized that regulatory stability can give rise to lower costs, greater efficiencies, more uptake across fleets, and new technologies, as well as "facilitate long-term planning by manufacturers and suppliers." 77 Fed. Reg. 62,624, 62,631 (Oct. 15, 2012).

The significance of reliance interests is particularly true for those automakers who, like Tesla, are at the cutting edge of the "development and application of the requisite technology," and who thus provide significant air quality and other benefits. Companies like Tesla thus strongly prefer regulatory stability and the predictable administration of these programs. In particular, Tesla's business decisions and investments are made with a long-established understanding that California possesses an independent authority to set advanced vehicle, GHG, and ZEV performance standards, and that other states have the authority to opt into that more rigorous approach. A departure from these principles could significantly impact Tesla's operations and upend its deep-

---

[5] In comments on this proposal, Ford explained that "[w]e have relied on California's actions pursuant to the waiver." Ford Comments, EPA-HQ-OAR-2021-0257-0028. In comments regarding the development of regulations requiring a Mid-Term Evaluation process for greenhouse gas emissions from light-duty vehicles, Chrysler noted that "provid[ing] long-term fuel economy and greenhouse gas goals to automotive manufacturers and suppliers enabl[es] strategic planning for the needed improvements." Chrysler Group LLC Comments at 5, EPA-HQ-OAR-2010-0799-9495 (Feb. 13, 2012). Similarly, the Chamber of Commerce acknowledged that a stable regulatory scheme would "incentivize[]" the "infrastructure for many of the new technologies," "such as electric vehicles, fuel cells and alternative fuels" and was necessary "for long-term planning purposes." Chamber of Commerce Comments at 1, 3, EPA-HQ-OAR-2010-0799-9521 (Feb. 13, 2012). Hyundai too emphasized "stability for long-term product planning." Hyundai America Technical Center, Inc. Comments at 3, EPA-HQ-OAR-2010-0799-9547 (Feb. 13, 2012). The Motor and Equipment Manufacturers Association explained that "[l]ong-term planning is an especially important factor in the motor vehicle industry." Motor and Equipment Manufacturers Association Comments at 5, EPA-HQ-OAR-2010-0799-9478 (Feb. 13, 2012). This is because, as Mitsubishi explained in its comments, "the product cycle development begins nearly 10 years before the launch of a vehicle," and "[p]roduct plans are set in general for approximately five years at a time." Mitsubishi North America Comments at 3, EPA-HQ-OAR-2010-0799-9507 (Feb. 13, 2012). For these reasons, industry members advocated for EPA to act quickly to establish regulatory certainty in order to prevent future disputes. *See, e.g.*, Alliance of Automobile Manufacturers Comments at 6, EPA-HQ-OAR-2010-0799-9487 (Feb. 13, 2012) (stressing need to meet all deadlines in the mid-term evaluation process and noting that "[i]f anything is allowed to undermine or delay the process, it creates a significant potential for disputes and difficulties in the future, something we all hope to avoid").

rooted reliance interests under programs run by California and other section 177 states.[6]  Because of the sizeable investments required to develop alternative fuel and advanced technology vehicles, regulatory stability is vital for ensuring the level of manufacturer and investor confidence necessary to facilitate innovation.  And because the product cycle for a vehicle can begin years before the vehicle is launched, a shifting regulatory framework could have an immediate impact on Tesla's investments.  By undermining the predictability of the regulatory landscape, a departure from long-standing practice regarding California's authority to set independent environmental standards could disrupt Tesla's business operations and generate substantial uncertainty in the industry, as well as undermine the statutory purposes of the CAA to incent innovation, "enhance" air quality, and protect the public health and welfare.

The reliance interests generated by EPA's actions skew much more heavily towards the 2013 waiver than the 2019 revocation.  To start, the purported revocation has been in effect for less than two years.  Moreover, the 2013 grant of waiver was not challenged in court; from an industry perspective, the waiver had settled legal effect.  In contrast, several lawsuits quickly were filed challenging the much more recent 2019 revocation.  *See* Complaint (ECF No. 1), *California v. Chao*, No. 1:19-cv-02826 (D.D.C. Sept. 20, 2019); *Union of Concerned Scientists v. NHTSA*, No. 19-1230 (D.C. Cir.) (consolidated cases).  Reliance interests are weaker when an agency action is subject to legal challenge because parties are typically less likely to rely on an action that is facing unsettled questions over its legality.  *Cf. Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001) (recognizing that for purposes of a retroactivity analysis, reliance on agency decision was "something short of reasonable" "[i]n light of the ongoing legal challenges").

EPA should find that, in the context of this particular statutory provision, unique waiver, and other fact-specific circumstances, the reliance interests associated with this waiver along with the significant delay in its revocation constitute an independent, legally sufficient basis that compel rescinding the revocation.

**III.    Even If EPA Did Have Waiver Reconsideration Authority, It Could Only Reconsider a Waiver Based Upon the Section 209 Statutory Criteria.**

Even if EPA's reconsideration were timely, any reconsideration could only be based on the statutory criteria.  The statute contains specific criteria that govern the determination of whether to grant a waiver.  42 U.S.C. § 7543(b).  And EPA is not to consider other factors in making its waiver determination.  As the D.C. Circuit has explained in the context of section 209(b), "there is no such thing as a 'general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider."  *Motor & Equipment Mfrs' Ass'n v. EPA*, 627 F.2d 1095, 1116 (D.C. Cir. 1979); *see also, e.g.*, *Motor & Equipment Mfrs' Ass'n v. EPA*, 142 F.3d 449, 467 (D.C. Cir. 1998) (same).  Indeed, the basic principle of administrative law bears repeating: an agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider."  *State Farm v. Motor Vehicle Mfrs' Ass'n*, 463 U.S 29, 43 (1983).

To the extent "inherent authority" exists to "reconsider" a waiver, such reconsideration must be based on the same statutory criteria governing the initial determination—after all, that is implicit in the very concept of *re*consideration.  It would be illogical to conclude that a different, unspoken, unenumerated set of criteria could be used to revoke a waiver.  As EPA has previously recognized, consideration of EPCA in evaluating a waiver request is outside the scope of its permissible review under the Clean Air Act.  *See, e.g.*, 78 Fed. Reg. 2,112, 2,145 (Jan. 9, 2013) ("evaluation of whether California's GHG standards are preempted, either explicitly or implicitly, under EPCA, is not among the criteria listed under section 209(b)."); 74 Fed. Reg. at 32,783 (July 8, 2009) ("EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria.").

Yet that is precisely what EPA did here: it purported to "find[] that California's GHG and ZEV standards are preempted as a result of NHTSA's finalized determinations" relating to preemption.  84 Fed. Reg. at 51,338.  There was no legal basis for EPA to take that action.

---

[6] *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.").

Even if EPA could have considered EPCA preemption in evaluating the California waiver, the underlying EPCA preemption regulations were invalid and for that separate reason could not have served as a basis for withdrawing the waiver. *See* 86 Fed. Reg. 25,980 (May 12, 2021); Tesla Comments, NHTSA-2021-0030-0398. If anything, the opposite is true: the grant of a CAA waiver operates as an exception to any potential preemption under EPCA.

IV.    **SAFE I Did Not Take into Proper Consideration Environmental Conditions in California and the Consequences of Withdrawal.**

Environmental conditions in California have worsened since 2013, when the waiver was granted. California has attempted to address these conditions through state-level action, including on ZEV standards. However, the waiver withdrawal has had the effect of further deteriorating environmental conditions in the state. These environmental conditions are not only a significant policy problem, but they also demonstrate the need of California's standards to "meet compelling and extraordinary circumstances" facing the state. 42 U.S.C. § 7543(b)(1)(B).

A.    **Environmental Conditions in California Have Worsened Since 2013.**

EPA granted the waiver in 2013, and the last Clean Air Act waiver evaluation took place in 2009. In the years since, California has faced worsening public health and welfare from climate change and air quality and environmental degradation.

California's recent, peer-reviewed Fourth Climate Change Assessment found that state-specific impacts of climate change have continued and intensified since 2009.[7] In that time period, the state has seen a series of historic extreme weather events. Between October 2011 and September 2015, California saw its driest four-year period in the instrumental record (dating back to 1895). Indeed, a study by scientists from the National Oceanic and Atmospheric Administration National Centers for Environmental Information suggested that, based on paleoclimate records, that dry spell was the worst that the Californian southern Central Valley and South Coast has faced in nearly 450 years.[8] In addition, since 2017, California has also faced 8 of the 20 largest fires in the state's history.[9]

California's Fourth Climate Change Assessment also projects that environmental conditions will continue to worsen into the future. Among other consequences, the Assessment indicates that heat-related illnesses and deaths will increase, and more severe wildfires, more frequent and longer droughts, rising sea levels, increased flooding, and more extreme weather events will all uniquely and increasingly impact the state.[10]

Worsening air pollution and climate change are closely intertwined with negative public health and safety effects on the state's most vulnerable communities. California's Air Resources Board has explained that many communities of color and low-income communities in California experience the heaviest truck traffic because they are located adjacent to ports, railyards, distribution centers, and freight corridors.[11] As environmental conditions in California worsen, these communities face disproportionate risks and health and pollution burdens.[12] In turn, as the Fourth Climate Change Assessment recognized, the effects of these burdens are compounded by

---

[7] *See* California Fourth Climate Change Assessment, Statewide Summary Report (2019), *available at* https://www.energy.ca.gov/sites/default/files/2019-11/Statewide_Reports-SUM-CCCA4-2018-013_Statewide_Summary_Report_ADA.pdf.

[8] *See* California Dryness and Recovery Challenge Multi-Century Odds, Nat'l Ctrs. for Env't. Info., Nat'l Oceanic & Atmospheric Admin. (April 13, 2017), *available at* https://www.ncei.noaa.gov/news/california-dryness-and-recovery-challenge-multi-century-odds.

[9] Wildfires & Climate Change, Cal. Air Res. Board (last visited June 29, 2021), *available at* https://ww2.arb.ca.gov/wildfires-climate-change.

[10] Cal. Dep't of Nat. Res., California's Fourth Climate Change Assessment: Key Findings (Aug. 27, 2018); *see also* Evan Halper, *Climate scientists see alarming new threat to California*, LA Times (Dec. 5, 2017), *available at* https://www.latimes.com/politics/la-na-pol-climate-california-20171205-htmlstory.html.

[11] California takes bold step to reduce truck pollution, Cal. Air Res. Board (June 25, 2020), *available at* https://ww2.arb.ca.gov/news/california-takes-bold-step-reduce-truck-pollution.

[12] *See id.*

JA-372

"decades-long, pervasive socio-economic conditions that are perpetuated by systems of inequitable power and resource distribution."[13]

### B. California's Advanced Clean Car Approach Recognizes the Continuing Need to Address These Conditions, Including Through Zero-Emission Vehicles.

California has sought to address these worsening environmental and public health conditions through state action, including through its ZEV programs. In January 2021, Governor Gavin Newsom issued Executive Order N-79-20, targeted at reducing the greenhouse gas emissions and toxic air contaminants that threaten the environment and public health in California.[14] The Executive Order aims to end the sale of internal combustion passenger vehicles by 2035 and put California on a path to carbon neutrality by 2045. In addition, a recent analysis by the Environmental Defense Fund found that California's ZEV standards will significantly reduce harmful pollution and improve public health, particularly for communities of color and low-income communities that disproportionately bear the burdens of pollution.[15]

In its efforts to address environmental and public health conditions, Congress has mandated that California be afforded significant discretion. California's ability to operate largely unfettered by external constraints is well-established. As the D.C. Circuit has explained, EPA "is not to overturn California's judgment lightly" and California may "blaze its own trail with a minimum of federal oversight." *Motor & Equip. Mfrs' Ass'n v. Nichols*, 142 F.2d 449, 463 (D.C. Cir. 1998) (citations omitted). The Court emphasized that California must have "the broadest possible discretion in selecting the best means to protect the health of its citizens." *Id*.

### C. SAFE I Has Had the Effect of Further Worsening Air Quality.

Despite California's efforts to improve air quality, SAFE I has and will continue to operate to the detriment of the state's air quality unless it is revoked.

In 2020, the independent research provider Rhodium Group estimated that the waiver withdrawal will increase emissions by 573 million metric tons cumulatively through 2035.[16] Nearly two-thirds of this increase is solely the result of striking down the ZEV mandate.[17] The absence of the ZEV mandate significantly undercuts the electric vehicle market, resulting in an estimated 5 million fewer electric vehicles on U.S. roads by 2035 — a 17% reduction from expected levels.[18] Notably, the emissions increases resulting from the waiver withdrawal amounts to more than half of the total one gigaton of additional greenhouse gas emissions that Rhodium Group projects to be released into the atmosphere as a result of the rollback of federal and state environmental regulations.[19] According to Rhodium Group, as compared to the estimated cumulative emissions abatement under the Obama-Era CAFE standards, the SAFE rule will result in "about one-fifth" of the abatement amount.[20] This significant difference represents "an increase in cumulative emissions through 2035 that is greater than the annual economy-wide emissions of more than 77% of countries on Earth."[21] Rhodium also notes the continuing growth in 177 states that ascribe to these more rigorous standards.

---

[13] California's Fourth Climate Change Assessment, Climate Justice Summary Report, at 6 (Sept. 28, 2018), https://www.energy.ca.gov/sites/default/files/2019-11/Statewide%20Reports-%20SUM-CCCA4-2018-012%20ClimateJusticeSummary_ADA.pdf.

[14] Ca. E.O. N-79-20 (Jan. 19, 2021), *available at* https://ww2.arb.ca.gov/resources/fact-sheets/governor-newsoms-zero-emission-2035-executive-order-n-79-20.

[15] *See* California: 100% New zero-emission vehicle sales by 2035 will deliver extensive health, environmental and economic benefits, Environmental Defense Fund (May 2021) at 10, *available at* http://blogs.edf.org/climate411/files/2021/05/Final-Combined-CA-ZEV-Report-5.4.21.pdf.

[16] The Undoing of US Climate Policy: The Emissions Impact of Trump-Era Rollbacks, Rhodium Group (Sept. 17, 2020), *available at* https://rhg.com/research/the-rollback-of-us-climate-policy/?source=email.

[17] *See id*.

[18] *See id*.

[19] *See id*.

[20] States Pave the Way for a Zero-Emission Vehicle Future, Rhodium Group (Aug. 13, 2020), *available at* https://rhg.com/research/states-zero-emission-vehicles/.

[21] *See id*.

Increases in these emissions will directly contribute to worsening air quality.  EPA has long recognized this link, finding:

> Increases in regional ozone pollution relative to ozone levels without climate change are expected due to higher temperatures and weaker circulation in the United States and other world cities relative to air quality levels without climate change. Climate change is expected to increase regional ozone pollution, with associated risks in respiratory illnesses and premature death.

74 Fed. Reg. 66,496, 66,525 (Dec. 15, 2009).

Further, the Fourth National Climate Assessment directly warns that such increases in carbon pollution will exacerbate air pollution conditions and offset the benefits of past attempts to reduce other air pollutants, stating:

> Due in part to air pollutant regulations driven by the Clean Air Act, NOx and VOC emissions from human sources should continue to decline over the next few decades. These emissions reductions are designed to reduce ozone concentrations so that polluted areas of the country meet air quality standards. However, climate change will also influence future levels of ozone in the United States by altering weather conditions and impacting emissions from human and natural sources. The prevailing evidence strongly suggests that climate change alone introduces a climate penalty (an increase in air pollution resulting from climate change) for ozone over most of the United States from warmer temperatures and increases in natural emissions. This climate penalty will partially counteract the continued reductions in emissions of ozone precursors from human activities.

Fourth National Climate Assessment Chapter 13: Air Quality, U.S. Glob. Change Rsch. Program (Nov. 23, 2018).[22]

The waiver withdrawal also operates within the broader context of national environmental regulatory roll-back and the resulting environmental impacts.  According to the Environmental Defense Fund, by the year 2040, the rollback of the national Clean Car Standards will result in an additional 1.5 billion metric tons of climate pollution, equivalent to the total pollution from 68 coal plants operating for five years.[23]  It will also use 142 billion more gallons of additional gasoline and result in Americans paying $244 billion more at the gas pump.[24]

### D.  California Has Demonstrated "Compelling and Extraordinary Conditions."

Under any common-sense understanding of the term, these environmental conditions are compelling and extraordinary, and thus fully justify a CAA waiver for California to address them.

EPA's determination to the contrary is based on a novel interpretation of the Act that would require California to demonstrate that GHG emissions in California "are specific to California and contribute primarily to environmental effects that are specific to California." 84 Fed. Reg. at 51,343.  The Agency went on to argue that because GHGs are well-mixed air pollutants, they are not specific to California, nor does California face extraordinary environmental consequences.  84 Fed. Reg. at 51,339-44.

EPA's new approach is illogical: it amounts to a conclusion that California is forbidden from acting precisely because climate change is a global threat—when in fact the global aspect of this problem demonstrates the need for California to take action.  Indeed, the Supreme Court rejected this logic in *Massachusetts v. EPA*, 549 U.S. 497 (2007), explaining: "Because of the enormity of the potential consequences associated with man-made climate change, the fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant.  Nor is it dispositive that

---

[22] *available at* https://nca2018.globalchange.gov/chapter/13/.

[23] *See* Trump Administration moves ahead with harmful Clean Cars rollback: Rollback would increase pollution and fuel costs, put Americans at unnecessary risk, Environmental Defense Fund (March 31, 2020), *available at* https://www.edf.org/sites/default/files/Cars_Final_Rollback_Factsheet.pdf.

[24] *See id.*

developing countries such as China and India are poised to increase greenhouse gas emissions substantially over the next century: A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere." *Id*. at 525-26.

EPA's narrow interpretation of the wavier as requiring California to demonstrate a "unique" problem would render the waiver provision unworkable.  If it were sufficient to merely point to a handful of other states that may face similar environmental issues, a waiver would *never* be appropriate: for any given air pollutant, it is possible to identify other areas of the country that suffer from a similar pollution problem.  Indeed, this argument was rejected in 1984, when EPA thoroughly rebutted the assertion that California could not receive a waiver if individual pollutant levels were "no worse than some other areas of the country," explaining that "there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted."  49 Fed. Reg. at 18,887, 18,891 (May 3, 1984).  Likewise, the D.C. Circuit has not narrowly interpreted the "compelling and ordinary conditions" language, but instead observed that this "*expansive* statutory language gives California (and in turn EPA) a good deal of flexibility in assessing California's regulatory needs."  *Am. Trucking Ass'n v. EPA*, 600 F.3d 624, 628 (D.C. Cir. 2010) (discussing 42 U.S.C. § 7543(e)(2)(A)) (emphasis added).

EPA's novel interpretation would also be at odds with Section 177 of the Act, where Congress explicitly authorized other states to opt-in to the California standards on the grounds that they might similarly benefit from access to enhanced motor vehicle pollution controls to meet their air pollution challenges.

In any event, as a factual matter, the conditions in California *are* uniquely compelling and extraordinary, as described above.

## V.    California's ZEV Program Has Benefits for Criteria Pollutants and Greenhouse Gas Benefits and Is Directed at the Reduction of Both.

California's state-level ZEV programs are targeted at and have the effect of reducing *both* criteria pollutants and greenhouse gases.  California's ZEV program requires that ZEVs produce zero exhaust emissions of any criteria pollutant (or precursor pollutant) or greenhouse gas (excluding emissions from air conditioning systems) under any possible operational modes or conditions.  *See* 13 C.C.R. § 1962.2(a).

### A.    ZEVs Have Clear Benefits Regarding Criteria Pollutants.

ZEVs do not have any exhaust emissions, so the only pollution caused by their fuel consumption stems from their electricity sources.  As EPA itself has explained, "EVs typically result in lower $CO_2$ emissions over their lifetime compared to gasoline vehicles.  This is due largely to two factors: EVs do not emit tailpipe emissions, and they are much more efficient in terms of onboard energy usage because an electric motor is much more efficient than a gasoline engine.  Thus, even though there are emissions associated with the generation of electricity, the EV overall uses less energy than its gasoline-powered counterpart."[25]  Indeed, as the nation's electricity generation continues to become less and less carbon intensive,[26] the air quality and environmental benefits derived from electrifying the transportation continues to grow.

Similarly, California's Air Resources Board has explained that battery-electric vehicles, hydrogen fuel cell vehicles, and plug-in hybrid electric vehicles have "ultra-low smog-forming and GHG pollutants, even over the life of a vehicle, which includes the vehicle's fuel production emissions."[27]  As a result, "even compared to 2025 vehicles meeting the strictest smog and GHG fleet standards, ZEVs and plug-in hybrid-electric vehicles are significantly lower emitting."[28]

---

[25] The 2018 EPA Automotive Trends Report: Greenhouse Gas Emissions, Fuel Economy, and Technology since 1975, EPA (March 2019) at 53, *available at* https://tinyurl.com/3yx7bj9s.

[26] *See, e.g.*, U.S. renewable energy consumption surpasses coal for the first time in over 130 years, U.S. Energy Info. Admin. (May 28, 2020), *available at* https://www.eia.gov/todayinenergy/detail.php?id=43895.

[27] About, Zero-Emission Vehicle Program, Cal. Air Res. Board (last visited June 29, 2021), *available at* https://ww2.arb.ca.gov/our-work/programs/zero-emission-vehicle-program/about.

[28] *See id*.

### B. California Adopted its ZEV Program for Both Criteria Pollutant and Greenhouse Gas Reasons.

California's ZEV program is directed at addressing both criteria pollutants and greenhouse gases. In comments submitted to the EPA in 2009 regarding a preemption waiver, the state explained that it "specifically designed its GHG standards for criteria pollutants."[29] It also emphasized that it has "frequently referenced the science to support GHG standards as a necessary method for controlling ozone and particulate matter pollution" and has "consistently recognized that the State's ability to reduce nonattainment days for ozone and wildfire-caused particulate matter depends on its ability to reduce GHG emissions."

More recently, in 2021, the San Joaquin Valley submitted a comment to EPA supporting EPA's reconsideration of the withdrawal of California's waiver, explaining that the waiver plays a key role in the Valley's strategy to solve its significant air pollution challenges.[30] The Valley is currently in extreme non-attainment with federal ozone standards and non-attainment with federal PM2.5 standards, and it emphasized that action made possible by California's waiver is "critical" to the Valley's future attainment of those standards and "vitally important" to ensuring its residents breathe clean air.[31] In fact, the Valley's plans for addressing non-attainment rely on emission reductions from California's Advanced Clean Car Regulation and other mobile source measures, as mobile source emissions contribute the majority of the Valley's NOx emissions.[32] In February 2021, the U.S. Court of Appeals for the Ninth Circuit upheld EPA's authority to approve California's State Implementation Plan revisions under the Clean Air Act that take credit for these kinds of emissions reductions. *See Dalton Trucking Inc. v. EPA*, Slip Op. No. 13-74019 (9th Cir. Feb. 10, 2021).

EPA also has repeatedly expressed its own understanding that GHG standards should be viewed as a strategy to help control criteria pollutants to address National Ambient Air Quality Standards nonattainment. For example, EPA has previously explained that "[c]limate change is expected to increase regional ozone pollution," noting the "associated risks in respiratory illnesses and premature death." 74 Fed. Reg. at 66,525.

This is consistent with the history of California's ZEV program, which has long been designed in part to address conventional criteria pollutants. For example, when California first developed its ZEV regulations roughly three decades ago, a reviewing court observed that ZEVs are "vehicles with no tailpipe emissions of any pollutants throughout their lifetimes, which are presumably electric cars." *Motor Veh. Mfrs. Ass'n v. NYSDEC*, 17 F.3d 521, 528 (2d Cir. 1994). Likewise, courts have explained that "the ZEV sales requirement must be considered a standard 'relating to the control of emissions.' ZEV, after all, stands for 'zero-emission vehicle,' and a requirement that a particular percentage of vehicle sales be ZEVs has no purpose other than to effect a general reduction in emissions. Indeed, the EPA has noted that 'the ZEV sales requirement clearly will have a beneficial effect on emissions of evaporative hydrocarbons and tailpipe emissions of No[x] from vehicles in the LEV program' independent of the fleet averages. The ZEV sales requirement is, therefore, in the nature of a command having a direct effect on the level of emissions …." *Am. Auto Mfrs. v. Cahill*, 152 F.3d 196, 200 (2d Cir. 1998).

### C. A Climate Nexus Exists Between Air Pollution and Greenhouse Gases.

Whether through its impact on reducing atmospheric temperatures that contribute to the formation of ozone, or through its direct impact on air quality by lowering or eliminating altogether tailpipe emissions of smog-forming pollutants and particulate matter, California's enhanced ZEV requirements will have a significant impact on achieving air quality targets.

---

[29] *See, e.g.,* California Air Resources Board, Reconsideration of Previous Denial of a Waiver of Preemption, Docket No. EPA-HQ-OAR-2006-0173-9006 (Apr. 6, 2009).
[30] *See* San Joaquin Valley Air Pollution District, Comments on California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption, Docket No. EPA-HQ-OAR-2021-0257-0105 (posted July 1, 2021).
[31] *Id*. at 2, 3.
[32] *Id*. at 3.

The California Air Resources Board states that mobile sources are responsible for approximately 80 percent of smog- and ozone-forming nitrogen oxide emissions.[33]  The Board also explains that mobile sources represent approximately 50% of greenhouse gas emissions when including emissions from fuel production.[34]

EPA repeatedly has recognized such a nexus.  It has explained that "[c]limate change can affect ozone by modifying emissions of precursors, atmospheric chemistry, and transport and removal.  There is now consistent evidence from models and observations that 21st century climate change will worsen summertime surface ozone in polluted regions of North America compared to a future with no climate change."  74 Fed. Reg. at 66,525.  And it has recognized "an expectation that there will be an increase in levels of ambient ozone, leading to increased risk of morbidity and mortality from exposure to ozone. All of these are effects on human health, and all of them are associated with the effect on climate from elevated atmospheric concentrations of greenhouse gases."  74 Fed. Reg. at 66,52.  Finally, EPA has previously expressed its understanding that while ozone "is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem."  74 Fed. Reg. 32,744, 32,763 (July 8, 2009).

This climate nexus between air pollution and greenhouse gases is also well-established internationally.  The United Nations has emphasized that burning fossil fuels releases both air pollutants and greenhouse gases, and, as a result, reducing air pollution from fossil fuels "will help to improve air quality and address climate change at the same time."[35]

### D.  Section 209 Requires EPA to Evaluate California's Standards in the Aggregate, Not a Pollutant-by-Pollutant Waiver Determination.

EPA is required by statute to evaluate California's standards "in the aggregate."  42 U.S.C. § 7543(b)(1).  This aggregate approach plainly applies to the evaluation of compelling and extraordinary conditions: the Clean Air Act requires EPA to assess whether "such State does not need such State standards to meet compelling and extraordinary conditions."  42 U.S.C. § 7543(b)(1)(B).  The plural reference to "such State standards" requires that the standards be considered in the aggregate as a group.  This language stands in stark contrast to alternate phrasing that was available to Congress and that would have permitted a non-aggregate determination, such as: "such State does not need a State standard to meet compelling and extraordinary conditions."  Indeed, alternative language referencing individual standards is present in subsection (b)(2), which references "each State standard."  42 U.S.C. § 7543(b)(2).

As EPA correctly and consistently explained in 1984, 2009 and 2013, the language in the Clean Air Act does not allow EPA to evaluate on a pollutant-by-pollutant basis whether or not specific pollutants amount to compelling and extraordinary conditions.  *See, e.g.*, 78 Fed. Reg. 58,090, 58,100-01 (Sept. 20, 2013).  As far back as 1984, EPA explained "to find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards."  49 Fed. Reg. 18,887, 18,890 (May 3, 1984).  EPA's conclusions were correct then and remain correct today.

### VI.  Other States' Adoption of California's ZEV Program Creates an Additional Basis for Tesla's Reliance, Is Vital for Solving the Climate Crisis, and Highlights EPA's Overreach in Revoking the Waiver.

The expansion of California's technology requirements to other states who opt into California's approach, as contemplated by Congress in authorizing states to opt into the California standards, is a vital complement to the overall transition of the automotive fleet to electric vehicles.  Congress never contemplated a role for EPA in approving state decisions under Clean Air Act section 177 to adopt California's standards, and it would be wrong to impose one here.  Section 177 is carefully drawn to empower states to decide for themselves whether to adopt California's standards, without giving EPA any additional oversight role.

---

[33] *See* Advanced Clean Trucks Fact Sheet, Cal. Air Res. Board (June 25, 2020), *available at* https://ww2.arb.ca.gov/resources/fact-sheets/advanced-clean-trucks-fact-sheet.

[34] *See id.*

[35] Improving air quality while fighting climate change, UN Economic Commission for Europe (last visited June 29, 2021), *available at* https://unece.org/unece-and-sdgs/improving-air-quality-while-fighting-climate-change.

States across the country have followed California's lead on ZEV standards.  New York, for example, has been adopting California's emissions standards, including its ZEV standards, for over thirty years.  As recently explained at the public hearings on the reconsideration of SAFE I, New York relies heavily on those standards to reduce air pollution and combat climate change.[36]

As of 2019, 11 states had adopted similar ZEV programs, which together were responsible for nearly 40% of the U.S.'s new light-duty vehicle sales.[37]  Since then, more states have followed suit, either by adopting ZEV programs or beginning proceedings for adoption.  In 2021, Virginia signed into law a statute establishing the ZEV standards;[38] in Washington, Pennsylvania, Nevada, and New Mexico, and Minnesota, proceedings are underway or nearly finished regarding the adoption of ZEV programs.[39]

Tesla reasonably expects more states to see the air quality, climate, and economic benefits of this transition and thus to follow California's lead.  Tesla is confident in its ability to deliver the fleets necessary for emissions reductions in these section 177 states.  Projections indicate that electric vehicles may reach global supremacy by 2033, largely because of ZEV regulations and corresponding interest in ZEV transportation.[40]  Tesla has made and continues to make investments in infrastructure, sales, and distribution facilities across the country and is leading the expansion of ZEVs in the market.[41]  Its vehicles currently make up approximately 75% of the U.S. market share for electric vehicle sales,[42] and in the second quarter of 2021 alone, Tesla produced and delivered over 200,000 vehicles.[43]

Leaving states freer to adopt California's standards under section 177 advances the Biden Administration's broader clean infrastructure and climate agenda by incentivizing the development and sale of clean energy vehicles across the country.  The ability of states to rapidly deploy ZEVs is also essential to the Administration's pledge to reach a net zero emissions economy-wide by no later than 2050.[44]  As the IEA has

---

[36] *See* Testimony of Gavin G. McCabe, Public Hearing on Reconsideration of The Safer Affordable Fuel-Efficient Vehicles Rule Part One: One National Program Rule (SAFE-1), Docket No. EPA-HQ-OAR-2021-0257-0088 (June 2, 2021) at 1.

[37] *See States that have Adopted California's Vehicle Standards under Section 177 of the Federal Clean Air Act*, Cal. Air Res. Board (Aug. 19, 2019), *available at* https://ww2.arb.ca.gov/sites/default/files/2019-10/ca_177_states.pdf.

[38] *See State Air Pollution Control Board; low-emissions and zero-emissions vehicle program,* Va. H.B. 1965 (adopted Mar. 30, 2021).

[39] *See* Wa. S.B. 5811 (adopted Mar. 25, 2020) (requiring Washington Department of Ecology to begin rulemaking for ZEV program); *DEP Advances Actions to Support Electric Vehicle Use Statewide*, Pa. Dep't Env't Prot. (Feb. 19, 2021), *available at* https://www.ahs.dep.pa.gov/NewsRoomPublic/articleviewer.aspx?id=21920&typeid=1 (announcing start of ZEV proceedings in Pennsylvania); *Clean Cars Nevada*, N.V. Div. Env't Prot. (last visited July 2, 2021), *available at* https://ndep.nv.gov/air/clean-cars-nevada (announcing the start of rulemaking process for ZEV standards in Nevada); N.M. E.O. 2019-003 (Jan. 29, 2019), *available at* https://www.governor.state.nm.us/wp-content/uploads/2019/01/EO_2019-003.pdf (ordering New Mexico Climate Change Task Force to evaluate adoption of ZEV standards); Report of Admin. Law Judge, Office of Admin. Hearings (May 7, 2021), *available at* https://mn.gov/oah/assets/9003-36416-mpca-clean-cars-minnesota-rules-report_tcm19-480433.pdf (recommending Minnesota proposed rules on ZEV standards be adopted).

[40] *See* Brett Haensel and Keith Naughton, Electric Vehicles Seen Reaching Sales Supremacy by 2033, Faster Than Expected, Bloomberg (June 22, 2021), *available at* https://www.bloomberg.com/news/articles/2021-06-22/shift-to-electric-cars-coming-faster-than-expected-study-shows?cmpid=BBD062621_GREENDAILY&utm_medium=email&utm_source=newsletter&utm_term=210626&utm_campaign=greendaily.

[41] *See* Phil LeBeau, Led by Tesla, electric vehicle sales are predicted to surge in 2021, CNBC (May 29, 2020), *available at* https://www.cnbc.com/2020/05/29/led-by-tesla-electric-vehicle-sales-are-predicted-to-surge-in-2021.html?utm_source=Center+for+Climate+and+Energy+Solutions+newsletter+list&utm_campaign=aece7980c1-EMAIL_CAMPAIGN_2020_06_05_02_29&utm_medium=email&utm_term=0_36e5120ca4-aece7980c1-303640237.

[42] *See* Niall McCarthy, Report: Tesla Dominated U.S. Electric Vehicle Sales Over The Past Three Years, Forbes (May 25, 2021), *available at* https://www.forbes.com/sites/niallmccarthy/2021/05/25/report-tesla-dominated-us-electric-vehicle-sales-over-the-past-three-years-infographic/?sh=56ae8576426d.

[43] *See Tesla Q2 2021 Vehicle Production & Deliveries*, Tesla (July 2, 2021), *available at* https://ir.tesla.com/press-release/tesla-q2-2021-vehicle-production-deliveries.

[44] *See* Fact Sheet: President Biden Sets 2030 Greenhouse Gas Pollution Reduction Target Aimed at Creating Good-Paying Union Jobs and Securing U.S. Leadership on Clean Energy Technologies, The White House (April 22, 2021), *available at*

recently asserted, to reach net-zero by 2050, by 2035, there will need to be no new internal combustion engine car sales.[45]

Moreover, the Clean Air Act does not confer any authority on EPA to impose additional requirements or otherwise implement section 177.  As EPA itself has stated, "language requiring that other States request and receive authorization from EPA is noticeably absent.  Indeed, the statutory text reads as authorizing States to adopt California standards on their own volition" (59 Fed. Reg. 36969 36983 [1994]); Reilly 1993), cited in 3 Regulation of Emissions from New Mobile Sources." National Research Council. 2006. State and Federal Standards for Mobile-Source Emissions. Washington, DC: The National Academies Press. doi: 10.17226/11586 at 83.  The statute provides EPA with one narrow role in implementing section 177: it may determine when a model year commences for purposes of section 177's lead-time requirement.  42 U.S.C. § 7507(2).  As the Second Circuit has explained, "Section 177 charges the EPA with a single, narrow responsibility to issue 'regulations' in order to define the commencement of a model year under § 177."  *Motor Vehicle Mfrs. Ass'n v. NYSDEC*, 17 F.3d 521, 535 (2d Cir. 1994).  Indeed, in the 1990 Clean Air Act Amendments, Congress specifically considered, and rejected, an attempt to allow EPA to be responsible for enforcing Section 177 States' standards. S. 16976 (Oct. 27, 1990) (conference report) ("In this regard, it is vital to note that the Conferees from the other body proposed to the Conference that opt-in states are barred from enforcing the California standards, and that instead, EPA would enforce them. . . . Comparing this proposal, which was wisely rejected by the Conference, with the language on Section 177 adopted by the Conference makes indisputable the authority of states that adopt California emissions standards to enforce those standards through recall and other methods.").

**Conclusion**

As explained above and for the reasons incorporated by reference, the SAFE Rule I was not lawfully issued and failed to consider environmental conditions and the role of California and other state's ZEV programs in advancing technology and solving critical air pollution and climate change problems.  Tesla supports EPA's prompt reconsideration and repeal of the SAFE Rule I, and the reinstatement of California's already-granted, longstanding waiver.

Respectfully submitted,

Joseph Mendelson III
Senior Counsel

---

https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/22/fact-sheet-president-biden-sets-2030-greenhouse-gas-pollution-reduction-target-aimed-at-creating-good-paying-union-jobs-and-securing-u-s-leadership-on-clean-energy-technologies/.

[45] *See* Net Zero by 2050: A Roadmap for the Global Energy Sector, Int'l. Energy Agency (May 18, 2021), *available at* https://iea.blob.core.windows.net/assets/0716bb9a-6138-4918-8023-cb24caa47794/NetZeroby2050-ARoadmapfortheGlobalEnergySector.pdf?utm_source=newsletter&utm_medium=email&utm_campaign=newsletter_axios generate&stream=top.

R-140,     Comment submitted by
American Fuel & Petrochemical
Manufacturers (AFPM)

July 6, 2021

The Honorable Michael S. Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue NW          ***Via eRulemaking Portal: [www.regulations.gov](www.regulations.gov)***
Washington, DC 20460

Re:     Docket No. EPA-HQ-OAR-2021-0257 -- Request for Public Comment on
        California State Motor Vehicle Pollution Control Standards; Advanced Clean Car
        <u>Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption</u>

Dear Administrator Regan:

The American Fuel & Petrochemical Manufacturers ("AFPM") submit these comments in response to the U.S. Environmental Protection Agency's ("EPA") request for comment on the proposed California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption ("Notice").[1]

AFPM is a national trade association representing most U.S. refining and petrochemical manufacturing capacity. These industries provide jobs, directly and indirectly, to more than three million Americans, contribute to our economic and national security, and enable the production of thousands of vital products used by families and businesses throughout the United States.

AFPM acknowledges climate change is real and is committed to the development of sound policies that enable our members to supply the fuel and petrochemicals that growing populations need to thrive in an environmentally sustainable way. Global emission reductions will not be achieved by political rhetoric or hyperbole. In that regard, there is no such thing as a Zero Emission Vehicle ("ZEV"). ZEVs have no tailpipe emissions; however, they have significant emissions during charging and other phases of their lifecycle.[2]

AFPM supports technology neutral, free market solutions that provide consumer choice for purchasing vehicles, including electric vehicles ("EVs"), but opposes government mandates for EVs and subsidies that create an unlevel playing field and fail to achieve cost-effective

---

[1] 86 Fed. Reg. 22,421 (Apr. 28, 2021).
[2] ZEVs cause criteria pollutant and GHG emissions and environmental impacts throughout their lifecycle, including from minerals mining, component production, assembly, electricity generation, and other processes. *See, e.g.,* Reuters, *This is how many kilometres it takes for an EV to become cleaner than a petrol car*, Sunday Times (Jun 29, 2021) ("Jarod Cory Kelly, principal energy systems analyst at Argonne, said making EVs generates more carbon than combustion engine cars, mainly due to the extraction and processing of minerals in EV batteries. . . .").

emission reductions.[3] The consumer stands in the best position to determine how much efficiency and other vehicle features should factor into vehicle selection. Absent government mandates, manufacturers produce vehicles responsive to consumer needs, whether those involve performance, passenger capacity, cargo capacity, aesthetics, safety, or other configuration options. There is no reason to believe that manufacturers would not respond to consumer demand for greater fuel efficiency and reduced emissions.

## **Executive Summary**

AFPM opposes EPA's proposed action—rescinding The Safer Affordable Fuel Efficient Vehicles Rule Part One: One National Program ("SAFE I") rule and granting a waiver for the greenhouse gas ("GHG") and ZEV aspects of California's Advanced Clean Car Program ("ACCP"),[4] which purports to reinstate California's prior wavier for those programs. The proposal should be rejected because: (1) The California ACCP is preempted by the Energy Policy & Conservation Act ("EPCA") and void *ab initio* – there is no lawful waiver application for EPA to approve; (2) ACCP fails to meet the Clean Air Act ("CAA") Section 209 criteria for a waiver of preemption and is unconstitutional; and (3) The "whole program" approach is contrary to the Clean Air Act and produces absurd results.

First, California's GHG standards and ZEV mandate are void *ab initio* because EPCA preempts states from enacting regulations related to fuel economy. In a 2006 rulemaking, NHTSA concluded that state GHG regulations are "expressly preempted" by EPCA because they have "the direct effect of regulating fuel consumption."[5] NHTSA, in the SAFE I rule, correctly reached the same conclusion.[6] EPA cannot ignore that California's proposed GHG standards and ZEV mandate are preempted under EPCA. This is especially true in these circumstances given the Agency's recent joint rule with NHTSA on this very subject.

Second, EPA cannot reinstate California's waiver application. CAA Section 209(a) also preempts states from adopting or enforcing new motor vehicle emission standards.[7] EPA may waive Section 209 preemption for a validly issued California regulation, but it must first consider each of the Section 209(b) waiver criteria, which it has not done. Even under the requisite analysis, EPA must conclude that California's ACCP fails to meet CAA Section 209 criteria for

---

[3] *See, e.g.,* ConservAmerica, *Slow Down: The Case for Technology Neutral Transportation Policy*, (Dec. 2020), https://static1.squarespace.com/static/5d0c9cc5b4fb470001e12e6d/t/5fd1580999fe644e8a504a54/1607555090612/C A+Tech+Neutral+Paper+-+12.20+%281%29.pdf. A recently completed research review by ConservAmerica (ConservAmerica Review) examines five unique studies that assess the GHG emissions from a variety of powertrain technologies. Each study uses a life cycle analysis approach to analyze the vehicles emissions based upon "… vehicle size and performance, battery size and lifetime, the carbon intensity of electricity generation and fuel production, and the state of technology advancements." Recognizing these differences, the review concludes that "a variety of automotive technologies and powertrains deliver comparable GHG emission reductions," and that all vehicle technologies should be examined based on the entire lifecycle of the vehicle and their energy sources as all vehicles produce GHG emissions.
[4] Hereinafter, references to the ACCP refer to the ACCP's GHG standards and ZEV mandate.
[5] 71 Fed. Reg. 17,566, 17,654 (Apr. 6, 2006).
[6] 84 Fed. Reg. 51,310, 51,314 (Sept. 27, 2019).
[7] 42 U.S.C. § 7543(a).

a waiver of preemption because California does not "need" its GHG standards and ZEV mandate to meet "compelling and extraordinary conditions." California does not face compelling and extraordinary conditions due to GHG emissions, since climate change is a global phenomenon that does not uniquely affect California. Nor is ACCP needed for California to ensure compliance with the National Ambient Air Quality Standards ("NAAQS"). EPA's proposed "reinstatement" of California's waiver would compound these legal infirmities to the extent that it reimposed requirements for past model years, a retroactive decision that would be contrary to due process and fair notice.

Additionally, considering California's "whole program" rather than individually evaluating the program's particular components (*e.g.*, ZEV mandate) is arbitrary and produces absurd results. Nowhere in the text of Section 209(b) did Congress tie EPA's hands and force EPA to grant or deny California's entire proposed program, rather than consider each new CARB regulation on the merits. Such an extraordinary constraint on the Agency's discretion is found nowhere else in the CAA – or other federal environmental laws. And that is for a good reason: the "whole program" approach would effectively force EPA to grant a waiver for any later standard California proposes once EPA decided initially that California "needs" its own motor vehicle program to address criteria pollution. EPA decisions made in the 1970s would tie EPA's hands more than 50 years later and force approval of whatever new regulation CARB proposes for a waiver. The CAA does not authorize intergenerational bootstrapping.

The SAFE I rule restored Congress's intent to have one national standard. The rule recognized that EPCA's statutory text and purpose signal a robust preemption program for fuel economy. And EPA appropriately scrutinized whether California needs separate GHG tailpipe standards and a ZEV mandate to address compelling and extraordinary conditions. Rescinding SAFE I and purporting to reinstate California's waiver without expressly examining California's modified ACCP and applying the Section 209 criteria is an unlawful and arbitrary political rush to judgment. Therefore, we respectfully request that EPA neither rescind the SAFE I rule nor reinstate California's waiver.

<u>Analysis</u>

## I.    EPA Does Not Have a Proper Waiver Application Before It

EPA cannot reinstate California's waiver application because California's GHG standards and ZEV mandate are preempted by EPCA. EPCA prohibits states from *adopting* or enforcing regulations "related to" fuel economy.[8] Since California's GHG tailpipe standards and ZEV mandate are related to fuel economy, they are not lawfully adopted and void *ab initio*—and there is nothing for EPA to reinstate. Contrary to EPA's Notice,[9] nothing in the text or history of

---

[8] 49 U.S.C. § 32919(a).
[9] *See* 86 Fed. Reg. at 22,424, 22,424 n.8 ("Prior to SAFE 1, EPA has consistently declined to consider other potential bases for denying a waiver such as Constitutional claims or the preemptive effect of other Federal statutes.").

CAA Section 209(b)(1) permits EPA to close its eyes to the fact that California's GHG standards and ZEV mandate are unconstitutional under the Supremacy Clause.[10]

EPCA broadly preempts State regulations that are "related to" fuel economy standards,[11] whether or not EPA grants a CAA Section 209 waiver for such regulations. Congress chose the broadest possible preemption language: "related to." As the Supreme Court has noted, "related to" preemption provisions have a "broad scope,"[12] are "deliberately expansive,"[13] and are "conspicuous for [their] breadth."[14] The provision's breadth derives from its plain meaning: "related" means "connected in some way; having relationship to or with something else."[15] At the very least, EPCA's preemption provision preempts state laws that *directly* or *substantially* affect corporate average fuel economy, since such laws lie at the preemption clause's core under any reasonable reading of "related to."[16] Moreover, EPCA does not authorize NHTSA (or EPA) to waive this preemption.

EPCA preempts state tailpipe GHG standards. Such standards are, to say the least, "connected in some way" to federal fuel economy standards, given the direct mathematical relationship between $CO_2$ emissions and fuel economy[17]—a relationship Congress, NHTSA, and EPA recognized such as in EPCA's methodology for measuring fuel economy and EPA's fuel economy labeling program.[18] As NHTSA and EPA explained in the SAFE I proposed rule, "[i]mproving fuel economy is the only feasible method of achieving full compliance" with the state standards.[19] Thus, EPCA expressly preempts state tailpipe GHG standards. Additionally, EPCA impliedly preempts state tailpipe GHG standards because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in creating a national framework for fuel economy regulation.[20] The obstacle is obvious: to the extent a state imposes more onerous standards than the federal government, it has effectively voided NHTSA's

---

[10] *See infra,* pages 5-6.

[11] 49 U.S.C. § 32919(a) ("When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.").

[12] Morales v. *Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).

[13] *Pilot Life Ins. Co, v. Dedeaux*, 481 U.S. 41, 46 (1987).

[14] *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990), *accord Shaw v. Delta Air Lines, Inc.*, 463 U.S. 86, 97 (1983) (concluding that a state law "relates to" a federal law if it has a connection with or "refers to" the subject of the federal law).

[15] *Related*, Black's Law Dictionary (11th ed. 2019).

[16] 84 Fed. Reg. at 54,313.

[17] 84 Fed. Reg. at 51,315; 71 Fed. Reg. at 17,654 ("A State requirement limiting CO2 emissions is such a law or regulation because it has the direct effect of regulating fuel consumption. CO2 emissions are directly linked to fuel consumption because CO2 is the ultimate end product of burning gasoline. Moreover, because there is but one pool of technologies for reducing tailpipe CO2 emissions and increasing fuel economy available now and for the foreseeable future, regulation of CO2 emissions and fuel consumption are inextricably linked.").

[18] *See, e.g.,* 49 U.S.C. §§ 32901–32919; 40 C.F.R. Part 600.

[19] 83 Fed. Reg. 42,986, 43,236 (Aug. 24, 2018); *see Metro. Taxicab Bd. Of Trade v. City of New York*, 615 F.3d 152, 157 (2d Cir. 2010) (EPCA preempts state rules that "make fuel economy standards essential to the operation of those rules.").

[20] *Int'l Paper Co. v. Ouelette*, 479 U.S. 481, 491-92 (1987) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67(1941)).

determination as to the "maximum feasible" standard and disrupted the national program envisioned by Congress.[21]

EPCA preempts ZEV mandates too. ZEV mandates "requir[e] manufacturers to eliminate fossil fuel use in a portion of their fleet,"[22] and thus directly and substantially affect manufacturers' average fuel economy.[23] Therefore, ZEV mandates are expressly preempted under EPCA. ZEV mandates are also impliedly preempted because they conflict with Congress's determination that the "maximum feasible" fuel economy standard should be set without regard to ZEVs.[24] Congress relied on incentives rather than mandates for ZEVs, which "involve[] [the] implementation of some of the most expensive and advanced technologies in the automotive industry."[25] Allowing states to countermand that determination by mandating ZEVs—on top of the "maximum feasible" fuel economy standards set by NHTSA—necessarily "interfere[s] with NHTSA's balancing of statutory factors in establishing maximum feasible fuel economy standards."[26] Simply put, state ZEV mandates require manufacturers to apply and sell the most expensive fuel-reducing technologies first, thus frustrating the economic practicability consideration assessed by NHTSA in determining "maximum feasible" standards.

The D.C. Circuit's holdings in *Motor & Equipment Manufacturers Ass'n v. EPA* (D.C. Cir. 1979) ("*MEMA I*")[27] and *Motor & Equipment Manufacturers Ass'n v. Nichols* (D.C. Cir. 1998) ("*MEMA II*")[28] do not forbid EPA from considering whether California's GHG standards or ZEV mandate are preempted under EPCA. These cases involved EPA's scope of review under CAA Section 209. Unlike in *MEMA II*, where industry challenged EPA's failure to consider certain technical requirements beyond the statutory criteria,[29] considering the elemental Constitutional question of whether California's standards are legal under EPCA's express preemption provision is a necessary and proper prerequisite to granting or reinstating a waiver. Moreover, the Court in *MEMA II* thought Section 209(b)(1)'s enumerated factors were not exclusive: "the agency may not evaluate California's waiver application based on factors other than those Congress expressly *or impliedly* intended the agency to consider."[30] Similarly, in *MEMA I* the Court explained that Section 209 "[does not] … forbid[] the Administrator from listening to constitutionally-based challenges."[31] Indeed, while EPA did not consider EPCA preemption until the SAFE I rule, EPA has solicited comments concerning EPCA preemption in

---

[21] 49 U.S.C. § 32902(a). In other words, the statutory language "maximum feasible" must not be treated as a floor.
[22] 84 Fed. Reg. at 51,314.
[23] *See* 49 U.S.C. §§ 32904(a)(2), 32905 (providing for inclusion of EVs' "fuel economy" in calculating corporate average fuel economy). EPCA preempts fuel economy standards regardless of whether the standards are expressed in miles per gallon or some other metric, since Congress intended the preemption provision to apply broadly. S. Rep. No. 93-526 at 66 ("State or local fuel economy standards would be preempted, regardless of whether they were in terms of miles per gallon or some other parameter such as horsepower or weight.").
[24] *See* 49 U.S.C. § 32902(h)(1); 84 Fed. Reg. at 51,320-21.
[25] 83 Fed. Reg. at 43,239.
[26] *Id.*
[27] 627 F.2d 1095 (D.C. Cir. 1979).
[28] 142 F.3d 449, 462-63 (D.C. Cir. 1998).
[29] *MEMA II*, 142 F.3d at 459.
[30] *MEMA II*, 142 F.3d at 467 (internal quotation marks omitted and emphasis added).
[31] *See Motor & Equipment Manufacturers Ass'n v. EPA*, 627 F.2d 1095, 1115 (D.C. Cir. 1979) ("*MEMA I*").

past waiver proceedings.[32] Therefore, *MEMA I* and *MEMA II* do not preclude EPA from considering whether California standards are preempted under EPCA.

In this instance, EPA is required to consider EPCA preemption. While *MEMA I* held that the Administrator was not required to hear due process and First Amendment Constitutional challenges during waiver proceedings, and "[t]he waiver proceeding produces a forum ill-suited to the resolution" of these Constitutional claims,[33] that holding sounded in the comparative competence of agencies versus courts. However, whether emission standards "relate to" fuel economy *is* within the agency's competence, as this relationship is mathematical and based in science rather than understandings of Constitutional law and precedent.[34] As such, *MEMA I*'s reasoning does not apply here.

CAA Section 209(b)(1)(B) waiver criteria support EPA considering EPCA preemption before granting a waiver. For example, California's determination that its state standards would be "at least as protective of public health and welfare as applicable Federal standards" necessarily would be arbitrary and capricious under Section 209(b)(1)(A) if its standards were preempted under EPCA, since its standards cannot protect at all if they are unlawful and thus unenforceable.[35] Nor can California "need" unlawful standards under Section 209(b)(1)(B). As a result, the Section 209 criteria prevent EPA from reinstating a waiver for an application proposing unlawful regulations.

EPA's attempt to bifurcate the SAFE I joint rulemaking and proceed separately from NHTSA does not insulate EPA from having to analyze whether California acted arbitrarily in adopting a state emission standard that is related to fuel economy and therefore preempted.[36]

An agency reversing course "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[37] While agencies "need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate," agencies must at least "display awareness that it is changing position" and "show that there are good reasons for the new policy."[38] An agency must therefore address why it is "disregarding facts and circumstances that underlay or were

---

[32] 74 Fed. Reg. 32,744, 32782-83 (July 8, 2008).

[33] *MEMA I*, 627 F.3d at 1114-15.

[34] Even if it were not within EPA's competence, NHTSA's EPCA regulation is still in the Code of Federal Regulations, and reflects that agency's judgment that GHG standards are inextricably related to fuel economy and thus preempted by EPCA. Moreover, the only way for EPA to administer its vehicle emission standard authority consistent with EPCA is to refuse to grant a Section 209 waiver for standards that are related to fuel economy. *See Mass. v. EPA*, 549 U.S. 497, 521 (2006) ("The two obligations [for NHTSA to set fuel economy standards under EPCA and for EPA to regulate motor vehicle GHG emissions under CAA section 202] may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.").

[35] 42 U.S.C. § 7543 (b)(1), (b)(1)(A). *MEMA I* did not address this reasoning and is therefore inapposite here.

[36] *See* 84 Fed. Reg. at 51,338.

[37] *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins.* Co., 463 U.S. 29, 43 (1983); *see also Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 981-82 (2005).

[38] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

engendered by the prior policy."[39] Because EPA applied EPCA preemption in the SAFE I rule, it would be arbitrary and capricious for EPA to now ignore EPCA preemption by taking no position whether EPCA preempts California's GHG standards and ZEV mandate because that was of central relevance to EPA's revocation of California's waiver. Unlike CAA Section 209, EPCA does not contain a preemption waiver; thus, Congress did not authorize NHTSA (or EPA) to waive EPCA preemption. California's GHG tailpipe standards and ZEV mandate are void *ab initio*. As such, EPA does not have a valid waiver request to grant or reinstate.

## II.  California Does Not Qualify for a CAA Section 209 Waiver for GHGs

EPA has not provided a proper legal and factual basis for rescinding the SAFE I rule and purporting to reinstate California's 2013 waiver for the ACCP, including the ZEV mandate. California must resubmit its application because, as a matter of state law, it has changed important underlying requirements of the original 2012 waiver application, including removing the ACCP's deemed to comply provision that ensured compliance with the federal standards would be deemed compliance with California's regulations. Even without this significant amendment, the passage of time and changed circumstances require EPA to fully evaluate the CAA Section 209 waiver criteria prior to reinstating California's waiver.[40] It has not. Moreover, as shown below, California fails to satisfy the CAA Section 209 waiver criteria, so EPA's Notice proposing to rescind the SAFE I rule and purporting to reinstate California's waiver is arbitrary, capricious, and contrary to law.

### A.  EPA Must Analyze Each CAA Section 209 Factor to Reinstate California's Waiver

EPA, in its Notice, refuses to analyze the waiver criteria in Section 209(b) beyond what was addressed in the SAFE I rule.[41] This refusal is unlawful because the CAA compels EPA to review the factors in Section 209(b) in deciding whether California's program should remain preempted or be granted a waiver.[42] This is a mandatory obligation; EPA does not have the discretion to ignore this duty.

First, the SAFE I rule withdrew California's waiver, so rescinding SAFE I does not automatically reinstate California's waiver. Reinstating the waiver at this point would violate due process because the ZEV and GHG tailpipe mandates would be reinstated for prior model years

---

[39] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Fox*, 556 U.S. at 516).

[40] *Note* EPA has limited authority to waive preemption under the CAA; however, neither EPA nor NHTSA have the authority to waive EPCA preemption.

[41] 86 Fed. Reg. at 22,423 ("EPA is not soliciting comments on the 2013 ACC program waiver decision, and therefore has not reopened that decision for comments. Specifically, EPA is not soliciting comments on issues addressed in the ACC program waiver decision beyond those issues addressed in the final SAFE I action. EPA will treat any other comments it receives as beyond the scope of this reconsideration proceeding."); *id.* at 22,428-29.

[42] 42 U.S.C. § 7543 ("No such waiver shall be granted if the Administrator finds that— (A) the determination of the State is arbitrary and capricious, (B) such State does not need such State standards to meet compelling and extraordinary conditions, or (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.").

(MYs). Such a retroactive agency action offends principles of fair notice.[43] And granting California's waiver application prospectively would require EPA to effectively re-write the state's application to apply only to MY 2022-2025, an action outside of the agency's authority under Section 209(b).  Indeed, applying the waiver prospectively to those future MYs would arbitrarily ignore statutory lead-time requirements for developing and setting emission standards.[44] Since EPA is effectively operating on a blank slate, EPA must again consider each statutory factor to grant California's waiver application. EPA cannot simply declare that its 2013 decision to grant California's waiver is beyond the scope of this proposal and outside the boundaries of formal rulemaking.

Second, EPA must review each of the Section 209(b) preemption waiver criteria because California's original 2012 waiver application no longer exists. California modified its ACCP to no longer allow manufacturers of federally-compliant vehicles to be deemed to comply with the California standards. Similarly, in July 2019, California announced a "framework" agreement with certain automakers establishing an emissions program entirely different from the one approved by EPA in 2013 — again failing to seek any within-the-scope determination.[45]As a result, California's standards requiring this waiver differ materially from 2012.  California must therefore resubmit its waiver application and EPA must review the statutory criteria in assessing that application.[53] Nothing in Section 209(b) grants EPA the authority to put a "red pen" to California's application. It needs to be approved or rejected as submitted, as EPA has done for decades. Otherwise, the regulated community would be deprived notice of what EPA might decide to revise as part of a waiver request.[46]

Third, while an agency ordinarily need not consider new justifications or reopen the administrative record when it reconsiders a decision, here EPA's 2013 decision granting California's waiver decision is of central relevance to EPA's reconsideration of the SAFE I rule. It could not be otherwise—the SAFE I rule itself reconsidered the 2013 waiver decision.[47] This "Notice" concerns whether California qualified for a CAA Section 209 waiver, just as the SAFE I rulemaking and the 2013 waiver decision did.

---

[43] *Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994) ("The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact."); *see Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (holding that agencies may not give their new statutory interpretations "retroactive effect unless [the statutory] language requires this result").

[44] *See* 42 U.S.C. 7543(b)(1)(C)("No such waiver shall be granted if the Administrator finds that - such State standards and accompanying enforcement procedures are not consistent with Section 7521(a) of this title"); *id.* § 7521(a) (requiring EPA to consider lead time in setting emission standards for motor vehicles).

[45] 78 Fed. Reg. at 2113; *see* also CARB Res. 18-35, at 12 (Sept. 28, 2018), https://tinyurl.com/y55xslh4 (acknowledging that CARB "shall … forward the regulations to [EPA] with a request for a waiver or confirmation that the regulations are within the scope of an existing waiver").

[46] *See* 78 Fed. Reg. at 2113 ("If California acts to amend a previously waived standard or *accompanying enforcement procedure*, the amendment may be considered within the scope of a previously granted waiver[,] provided that it … *raises no new issues* affecting EPA's previous waiver decisions.") (emphases added).

[47] *See* 42 U.S.C. § 7607(d)(8) ("In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.").

Here, EPA is taking comment on and revisiting the legal and factual foundations of the SAFE I rule,[48] which itself revisited the legal and factual foundations of the 2013 waiver decision.[49] EPA is therefore reopening its 2013 decision granting California's waiver application.[50] EPA must take comment and evaluate California's waiver application under the statutory criteria, just as it did when EPA denied California's waiver application in 2008,[51] granted California's waiver application in 2009,[52] and revoked California's waiver in the SAFE I rule.[53] Under these circumstances, EPA cannot simply declare its decision granting California's waiver beyond the scope of the rulemaking.[54]

Finally, failing to fully analyze California's waiver petition flies in the face of President Biden's call for transparency in his "Day One" memorandum.[55] Evaluating the underlying waiver may not be politically expedient, but it would help the public understand changes in the data and assumptions underlying California's original waiver request, such as predictions

---

[48] 86 Fed. Reg. at 22,421 ("EPA believes that there are significant issues regarding whether SAFE 1 was a valid and appropriate exercise of agency authority, including the amount of time that had passed since EPA's 2013 waiver decision, the novel approach and legal interpretations used in SAFE 1, and whether EPA took proper account of the environmental conditions in California and the environmental consequences from the waiver withdrawal in SAFE 1."); *id.* at 22,422 ("EPA has conducted a review of both the legal and factual predicates for SAFE I. EPA now believes that there are significant issues with the SAFE 1 action, including the time elapsed since EPA's 2013 waiver decision (and associated reliance interests), the novel statutory interpretations set forth in SAFE 1, and whether EPA took proper account of the environmental conditions in California and the environmental consequences of the waiver withdrawal in SAFE 1."); *id.* at 22,429 ("EPA is also interested in any new or additional information or comments regarding whether it appropriately interpreted and applied section 209(b)(1)(B) in SAFE 1."); *id.* at 22,429 ("EPA's decision to withdraw the ACC program waiver as it relates to California's ZEV mandate, based on the same new interpretation and application of the second waiver prong, rested heavily on the conclusion that California only adopted the ZEV program to achieve GHG emission reductions. EPA recognizes that this conclusion, in turn, rested solely on a specific reading of CARB's ACC program waiver request. EPA requests comment on these specific conclusions and readings as well as within the context of environmental conditions in California whether the withdrawal of the ACC program waiver as it applied to the ZEV mandate was permissible and appropriate, under applicable factors identified above and in relevant caselaw.").

[49] 84 Fed. Reg. at 51,328 ("[S]ubsection D, separate and apart from the determinations in subsection C with regard to the effect of EPCA preemption on the January 2013 waiver, finalizes EPA's reconsideration of, and its proposed determination that it is appropriate to withdraw, its January 2013 grant of a waiver of CAA preemption for the GHG and ZEV standards in California's ACC program for model years 2021 through 2025, based on a determination that California "does not need [those] standards to meet compelling and extraordinary conditions" within the meaning of CAA section 209(b)(1)(B)."); *id.* at 51,339-50.

[50] *See CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006) ("The general principle is that if the agency has opened the issue up anew, even though not explicitly, its renewed adherence is substantively reviewable.") (citation omitted)).

[51] 73 Fed. Reg. 12,156 (March 6, 2008).

[52] 74 Fed. Reg. 32,744 (July 8, 2009).

[53] 84 Fed. Reg. 51,310 (Sept. 27, 2019).

[54] EPA cannot simultaneously reinstate fuel economy regulations and then brush off comments that EPCA, which concerns fuel economy standards governed by NHTSA, preempts the fuel economy regulations. *See Delaware Dep't of Nat'l Res. & Envtl. Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015) (vacating an EPA decision establishing new source performance standards for certain power generators because EPA "simultaneously rel[ied] on grid reliability concerns" to justify the rule while "brush[ing] off comments about those concerns"—such as that FERC, not EPA, regulated grid reliability—"as beyond its purview").

[55] Memorandum for the Heads of Executive Departments and Agencies, "Modernizing Regulatory Review" (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/modernizing-regulatory-review/ (directing the OMB director to develop recommendations that "identify reforms that will promote the efficiency, transparency, and inclusiveness of the interagency review process, and determine an appropriate approach with respect to the review of guidance documents").

relating to the cost of ZEVs, the emissions impact of fuels, significant investments needed to improve the electricity grid capacity, California's progress towards NAAQS attainment, national security interests associated with EV battery minerals, and changes to national climate change strategies. As discussed above, EPA may consider these issues and should not sweep these important considerations under the rug in its rush to force a transition to electric vehicles. Transparency necessarily involves looking at and reporting on all aspects of the issue.[56]

### B.  EPA Cannot Reinstate California's Waiver Because the ACCP's GHG Standards and ZEV Mandate Fail the CAA Section 209 Waiver Criteria

CAA Section 202(a)[57] provides EPA with the exclusive authority to promulgate standards "applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines" for their full useful life. With one exception, all state regulation over motor vehicle tailpipe emissions is preempted.[58] The one exception is that EPA may issue a preemption waiver to California under CAA Section 209(b)(1) to establish its own motor vehicle emission standards if certain conditions are met. If EPA grants California a waiver, other states may adopt and enforce California's emission standards under CAA Section 177.[59]

EPA must grant a California waiver request if, "after notice and opportunity for public hearing," "the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards,"[60] unless EPA makes one or more of three findings:

(1) California's determination regarding its state standards is arbitrary and capricious;
(2) California does not need its standards to meet "compelling and extraordinary conditions;" or
(3) California standards and accompanying enforcement procedures are not consistent with 42 U.S.C. § 7521(a).[61]

The ACCP's GHG Standards and ZEV mandate do not meet the Section 209 waiver criteria for several reasons. First, California does not face compelling and extraordinary local air quality conditions from GHG emissions and EPA should not presume that the waiver designed by Congress for criteria pollutants also applies to GHGs. Second, even if California faced compelling and extraordinary air quality conditions, it does not need the GHG Standards and ZEV mandate to address these conditions because these programs would not meaningfully address California's alleged harms from climate change. Third, California arbitrarily determined that its standard was at least as protective as the federal standard, despite failing to present a full lifecycle assessment of vehicle GHG emissions to include emissions arising out of battery production and disposal. Fourth, the ZEV mandate contradicts EPA's emissions standards

---

[56] *See* footnotes 27-35 and accompanying text.
[57] 42 U.S.C. § 7521(a).
[58] 42 U.S.C. § 7543.
[59] 42 U.S.C. § 7507.
[60] 42 U.S.C. § 7543(b)(1).
[61] 42 U.S.C. § 7543(b)(1)(A)-(C).

program by mandating a particular technology. Fifth, criteria pollutant problems do not justify California's waiver. Finally, EPA's "whole program" approach to reviewing CARB's program – that the statute ties EPA's hands to approve or reject CARB's entire emissions program – is illogical, unlawful, and creates a never-ending bootstrap. Therefore, the ACCP's GHG Standards and ZEV mandate do not meet the Section 209 waiver criteria and EPA cannot reinstate California's Section 209 waiver.

As EPA explained in the SAFE I rule, "compelling and extraordinary conditions" mean environmental conditions presenting a significant air-quality problem with causes or effects particular or unique to California.[62] The ACCP's GHG standards and ZEV mandate fail this test. Neither the causes nor effects of GHG emissions are compelling and extraordinary conditions, as they are global rather than local conditions, and California's GHG standards and ZEV mandate will not meaningfully address the causes or effects of these GHG emissions.

EPA's interpretation in the SAFE I rule gives concrete expression to Congress's use of the word "extraordinary," which presupposes that the problems California seeks to address are atypical in some way—not the sort of "usual, regular, [or] common" problems from a global pollutant with which other regions, and our nation as a whole, are currently grappling.[63] To argue otherwise is to read "extraordinary" out of the statute entirely.[64] Additionally, the terms "compelling" *and* "extraordinary" denote the highest possible burden on California, since these terms denote occurrences that are especially grave and unique.[65] The terms lack sufficient ambiguity for EPA to interpret them to mean something similar to "routine," "as a matter of course," or "perfunctory" as it did in its 2009 and 2013 waiver decisions.[66] Instead of requiring a showing of grave or paramount *and* uncommon concern, these waiver decisions transformed the term "compelling and extraordinary" into a rubber stamp, burdening *opponents* of the waiver, instead of California, with disproving a nearly non-rebuttable presumption of "compelling and extraordinary conditions."[67]

EPA's interpretation in SAFE I captured the historical and contextual backdrop against which Section 209(b) was enacted. Congress did not give California special treatment so that it

---

[62] *See* 84 Fed. Reg. at 51,344/1; 83 Fed. Reg. at 43,247/1-2. *See also* 73 Fed. Reg. at 12,163 ("Atmospheric concentrations of greenhouse gases are an air pollution problem that is global in nature, and this air pollution problem does not bear the same causal link to factors local to California as do local or regional air pollution problems."). The comments submitted by AFPM, then known as the National Petrochemical and Refiners Association, in support of EPA's reconsideration of its previous denial of a waiver of preemption, EPA-HQ-OAR-0173-8915, are hereby incorporated by reference.

[63] *Extraordinary*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (3d ed. 1961).

[64] *See Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) ("[W]hen construing a statute courts 'give effect, if possible, to every clause and word.'") (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

[65] *Cf. Sherbert v. Verner*, 374 U.S. 398, 406 (1963) (a "compelling state interest" is not a "showing merely of a rational relationship to some colorable state interest" but involves "the gravest abuses, endangering paramount interests") (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)); *Ex parte Fahey*, 332 U.S. 258, 260 (1947) (writs of *mandamus* are "extraordinary remedies … reserved for really extraordinary causes.").

[66] 74 Fed. Reg. at 32,746; 78 Fed. Reg. 2112, 2126-28 (Jan. 9, 2013).

[67] 86 Fed. Reg. at 22,424 ("EPA, given the text, legislative history and judicial precedent, has consistently interpreted section 209(b) as placing the burden on the opponents of a waiver to demonstrate that one of the criterion for a denial has been met."). *See also* 74 Fed. Reg. at 32,746; 78 Fed. Reg. at 2,116.

could address problems that are global rather than local in nature—just the opposite. Congress sought to empower California to deal with "circumstances sufficiently different from the nation as a whole."[68] Only these sort of "unique problems . . . as a result of [California's] climate and topography"[69] could "justify standards on automobile emissions . . . more stringent than national standards."[70] Indeed, just one year before Section 209(b) was adopted, the Supreme Court specifically explained that diversions from equal sovereignty require "exceptional conditions"[71]—language repeated in Section 209(b). EPA's interpretation in the SAFE I rule reflected these objectives. It did not read "extraordinary conditions" as stagnant from the time of enactment, but rather appropriately limited that term to the type of conditions that Congress, in 1967, found justified a special exemption from an otherwise uniform scheme of national regulation: conditions resulting from local emissions and local pollution concentrations interacting with California's peculiar topographical or other features.

Compelling and extraordinary conditions should be interpreted in this manner because a laxer definition would violate the equal sovereignty doctrine.[72] The doctrine of equal sovereignty presumes that federal laws will not favor or disfavor different states.[73] As the Supreme Court has explained, disparate treatment is permissible only after "a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets."[74] Section 209 bars states other than California from regulating vehicle emissions,[75] so it is paramount that Section 209 is interpreted so that California's preferential treatment under federal law is "sufficiently related to" its peculiar local conditions to avoid violating the equal sovereignty doctrine.[76] California's vague gestures at its internal police power and Section 177[77] are insufficient to overcome the equal sovereignty doctrine's strictures.

This definition of compelling and extraordinary conditions is consistent with Section 177.[78] Section 177 allows qualifying states to adopt and enforce certain California "standards relating to control of emissions" from new motor vehicles.[79] "Standards" means emission

---

[68] S. Rep. No. 90-403, at 32; *see also Ford Motor Co. v. EPA*, 606 F.2d 1293, 1303 (D.C. Cir. 1979) ("[T]he intent of the Act … [was to] focus on local air quality problems that may differ substantially from those in other parts of the nation.") (emphasis added).

[69] H.R. Rep. No. 90-728, at 22 (1967).

[70] S. Rep. No. 90-403, at 32.

[71] *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966).

[72] 86 Fed. Reg. at 22,428.

[73] *See* 84 Fed. Reg. 51,310, 51,347 (Sept. 27, 2019).

[74] *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

[75] At most, states can adopt "identical" requirements to California's under Section 177. But this limit applies to every state other than California, which is the only state than may set its own emission standards.

[76] It is a settled rule, the Supreme Court has explained, "that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) (quoting *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) (Holmes, J., concurring)).

[77] Petition for Reconsideration of the Safer, Affordable Fuel-Efficient (SAFE) Vehicles Rule, Part One: One National Program 21-22, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0257-0029.

[78] 86 Fed. Reg. at 22,429 ("EPA seeks comment on whether section 177 was properly interpreted.").

[79] 42 U.S.C. § 7507.

standards for criteria pollutants, not GHGs, for several reasons.[80] First, Section 177 is located in a part of the CAA dealing with criteria pollutants.[81] Second, Section 177 applies to states in nonattainment, and states can only be in nonattainment of the NAAQS.[82] Since there are no GHG NAAQS—given the global nature of GHG concentrations—states cannot adopt California's GHG standards and ZEV mandate, as EPA properly explained in the SAFE I rule.[83]

### 1. No Compelling and Extraordinary Conditions Exist Due to GHG Emissions

California adopted its GHG standards and ZEV mandate to address climate change.[84] However, California does not face the type of "compelling and extraordinary conditions" that Congress intended for a waiver. The impacts of climate change on California are not unique in any other state. California lacks heightened local GHG concentrations attributable to in-state emissions or local conditions, such as its climate or topography that uniquely or particularly exacerbate the effects of GHGs on California's air quality.

California's alleged harms from climate are not extraordinary because they are not unique to California. GHGs are global, not local, pollutants. As such, other regions of the United States are similarly situated.[85] Because California's alleged climate-related effects "are not sufficiently different from the conditions in the nation as a whole to justify separate State standards under . . . Section 209(b)(1)(B)," California does not face extraordinary conditions with respect to climate change compared to the rest of the nation. In fact, in granting the waiver for California's ZEV mandate in 2013, EPA did not identify any record evidence that California would experience harms from global GHG emissions that would differ from any other coastal state.[86]

Additionally, unlike criteria pollutant emissions, California's GHG emissions "bear no particular relation" to "California-specific circumstances" like thermal inversions resulting from

---

[80] 84 Fed. Reg. at 51,350/2.

[81] *See* 42 U.S.C. §§ 7501-7515.

[82] *See* 42 U.S.C. § 7407(d)(1)(A).

[83] *See* 84 Fed. Reg. at 51,328, 51,350-51. Given that Section 209 and 177 are inextricably related, EPA properly included an interpretation of Section 177 in the SAFE I rulemaking.

[84] CARB, Clean Air Act § 209(b) Waiver Support Document at 1 (May 2012), https://downloads.regulations.gov/EPA-HQ-OAR-2012-0562-0004/content.pdf ("Waiver Request"); 84 Fed. Reg. at 51,344/1.

[85] 84 Fed. Reg. at 51,348/2-3; 83 Fed. Reg. at 43,249/1. It has never been shown how California's alleged climate change concerns—fires, heatwaves, storm surges, sea-level rise, and water shortages—are "out of the ordinary" compared with the rest of the country. Other states have expressed similar concerns. These concerns are not, in other words, "extraordinary." *See, e.g.*, *Mass. v. EPA*, 549 U.S. at 521 (group of 12 states including California alleging the same losses of coastal property, reduced snowpack and other harms alleged by California); 73 Fed. Reg. at 12,164-65 (comments by states supporting California claiming that they are subject to the same or similar effects of GHG emissions as California); *id.* at 12,167 ("California is expected to experience many of the key risks and impacts" from global GHG emissions as "the U.S. as a whole.").

[86] 78 Fed. Reg. at 2,129. EPA's analysis of the effects of global GHG emissions was provided as an alternative analysis. 83 Fed. Reg. at 43,421. EPA should be wary of providing any detailed analysis of such effects as it will be difficult, if not impossible, to separate the effects of global GHG emissions on natural resources, such as water availability or wildfires, from any adverse effects stemming from California's management of those resources, which has been subject to long-standing criticism.

local geography and wind patterns (which Congress specifically identified when enacting Section 209),[87] local pollution, or local vehicle emissions. Rather, GHGs globally mix in the upper atmosphere, leaving the same concentration over California as over the rest of the country.[88] Thus, California vehicle GHG emissions are no more connected to California GHG concentrations than emissions from anywhere else.[89] At bottom, California has failed to show that its faces compelling and extraordinary conditions pertaining to GHG emissions.

### 2. California Does Not "Need" the ACCP's GHG Standards and ZEV Mandate

Even if California were to face compelling and extraordinary air quality conditions from GHGs, it does not "need" the ACCP to address these conditions, since the ACCP will not meaningfully address California's alleged climate harms.

Courts have already held that emissions from sources within a single state cannot alleviate any harms from global GHG emissions.[90] In denying standing to an environmental group alleging harm from Washington state agencies' failure to regulate GHG emissions from in-state petroleum refineries, the Ninth Circuit in *Washington Environmental Council v. Bellon* held that "[w]hile Plaintiffs need not connect each molecule [of carbon dioxide] to their injuries, simply saying that the Agencies have failed to curb emission of greenhouse gases, which contribute (in some undefined way to some undefined degree) to their injuries, relies on an attenuated chain of conjecture insufficient to support standing."[91] The court also held:

> This is so because there is a natural disjunction between Plaintiffs' localized injuries and the greenhouse effect. Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime … But there is limited scientific capability in assessing, detecting, or measuring the relationship between a certain GHG emission source and localized climate impacts in a given region. As the U.S. Geological Survey observed, "[i]t is currently beyond the scope of existing science to identify a specific source of CO2 emissions and designate it as the cause of specific climate impacts at an exact location."[92]

---

[87] 84 Fed. Reg. at 51,341/2, 51,343/2-3.
[88] 84 Fed. Reg. at 51,346/3; 73 Fed. Reg. at 12,160 ("In contrast to local or regional air pollution problems, the atmospheric concentrations of these greenhouse gases is [sic] basically uniform across the globe.").
[89] 73 Fed. Reg. at 12,160.
[90] *See generally Wash. Envtl. Council v. Bellon*, 732 F.3d 1131 (9th Cir. 2013); *Barnes v. DOT*, 655 F.3d 1124 (9th Cir. 2011).
[91] *Bellon*, 732 F.3d at 1142-43 (internal quotations omitted).
[92] *Id.* (quoting Letter from Dir., U.S. Geological Survey, to Dir., U.S. Fish & Wildlife Service, The Challenges from Linking Carbon Emissions, Atmospheric Greenhouse Gas Concentrations, Global Warming, and Consequential Impacts (May 14, 2008)).

Thirteen years has passed since the letter relied upon by the *Bellon* court was drafted, yet California has failed to demonstrate that scientific evidence had evolved to demonstrate how the ZEV mandate will actually alleviate an injury to California. On the contrary, California has acknowledged that its regulations were never designed to alleviate either global GHG emissions or their asserted effects.[93] As such, California cannot meet its burden for a waiver of preemption under CAA Section 209.

Under CAA Section 209(b)(1)(B), the EPA Administrator "shall" deny a preemption waiver if California "does not need such State standards to meet compelling and extraordinary conditions." California's GHG standards, according to EPA, "would result in an indistinguishable change in global temperatures and . . . likely no change in temperatures or physical impacts" in California.[94] Indeed, California has clearly communicated that its standards were part of a "movement to commercialize"[95] uneconomic technologies, by forcing every new U.S. car buyer to unknowingly subsidize California's preferred technology through a new currency created and mandated by California: ZEV credits. As EPA determined in SAFE I, more stringent standards "would only reduce global temperature by 0.02 degrees Celsius in 2100,"[96] which cannot be considered meaningful incremental progress in mitigating California's alleged harms.

EPA cannot consider GHG reductions, if any, attributable to "opt-in" states under Section 177, as these are out of the scope of a waiver application. Indeed, EPA has no legal role in reviewing opt-in states, as the statute grants the agency no role in reviewing opt-in by other states. If California cannot meaningfully alter the in-state GHG concentration or ambient temperature—the source of its alleged harms—it does not need its separate GHG standards.[97] California's lack of "need" was further underscored by the fact that, until recently, California endorsed the deemed-to-comply option, allowing compliance with EPA's GHG standards in lieu of CARB's standards. This option constituted a frank admission that CARB's standards are no better equipped than federal standards to combat California's alleged climate change problems.[98]

---

[93] *See, e.g.*, CARB, Final Statement of Reasons, Regulations to Control Greenhouse Gases from Motor Vehicles (Aug. 4, 2005) at 376 ("[T]he reductions in climate change associated with individual policies or the actions of individual regions will not be identifiable…."); CARB, Final Statement of Reasons for Rulemaking, Mandatory Reporting of Greenhouse Gas Emissions (Dec. 6, 2007) at 136 ("GHG emissions have global rather than local impacts….").

[94] 84 Fed. Reg. at 51,341/1, 51,340/3.

[95] *See* CARB, Initial Statement of Reasons, Advanced Clean Cars, 2012 Proposed Amendments to the California Zero Emission Vehicle Program Regulations at ES-1 ("This movement to commercialize advanced clean cars has occurred in large part because of the ZEV regulation.").

[96] 84 Fed. Reg. at 51,340. *See also Bellon*, 732 F.3d at 1145-1146.

[97] This interpretation of "need" does not conflict with the Supreme Court's valuation of incremental progress. *See Mass. v. EPA*, 549 U.S. at 524.

[98] The same could be said of the reduced emissions standards at the center of California's July 2019 agreement with certain automakers, permitting them to meet those less-stringent standards on a nationwide basis if they refrained from challenging California's regulatory authority. *See* Press Release, Office of Gov. Newsom, California and Major Automakers Reach Groundbreaking Framework Agreement on Clean Emission Standards (July 25, 2019), https://tinyurl.com/yxp4q57d ("Framework Agreement Press Release").

This is evident by California's own concession that its ZEV mandate is incapable of limiting either global GHG emissions or any of their effects.[99]

Practical considerations also support this understanding of need. If federal and state standards achieve the same goal to the same degree, and the state can pursue their goals through alternative means, it is arbitrary to demand that industry members shoulder the burden of complying with two distinct and often conflicting regulatory frameworks and that nationwide consumers are forced to cross-subsidize one state's whims. "Need" should require a showing of significantly greater incremental progress over the status quo in order to justify a separate emissions program, and all the costs to industry and consumers that come with it.

### 3. California has not Appropriately Quantified the Relative Performance of ZEV Mandate to Demonstrate it is As Protective As the Federal Standard

Finally, the ACCP slows California's progress toward NAAQS attainment relative to the federal standards because ZEV mandates slow fleet turnover, so California's ACCP is not as protective as the federal standards. Since California would be better off without the ACCP, the ACCP is not needed, even if there are compelling and extraordinary air quality problems.

Liquid fuels and internal combustion engines have an exceptional history of delivering increased efficiency and reduced emissions. As EPA has reported, from model year 2004 to model year 2016, the average vehicle delivered improved fuel economy of 5.4 MPG while also increasing horsepower by 9.2%.[100] Only 0.1 MPG of this benefit came from alternative fuel vehicles,[101] which includes electric vehicles, plug in hybrids, fuel cell vehicles, and compressed natural gas vehicles. EIA data reveals that households that own BEVs and PHEVs tend to have more vehicles per household, owning 2.7 vehicles compared with the household average of 2.1 vehicles. BEVs and PHEVs owned and operated in California also tend to be used about 50% less than other vehicles in terms of annual mileage per vehicle. California and EPA have ignored this real-world data by assuming gasoline vehicles and EVs are driven the same distance. This error alone requires that all of California's cost estimates must be roughly doubled and all of California's benefits estimates halved.[102]

While vehicle emission standards directly regulate tailpipe emissions, they affect emissions more broadly through their impact on consumer choice. More stringent vehicle tailpipe emission standards require regulated parties to rely more heavily on certain technologies

---

[99] *See*, *e.g.*, CARB, Final Statement of Reasons, Regulations to Control Greenhouse Gases from Motor Vehicles (Aug. 4, 2005) at 376 ("the reductions in climate change associated with individual policies or the actions of individual reasons will not be identifiable…."); CARB, Final Statement of Reasons for Rulemaking, Mandatory Reporting of Greenhouse Gas Emissions (Dec. 6, 2007) at 136 ("GHG emissions have global rather than local impacts….").

[100] EPA, Light-Duty Automotive Technology, Carbon Dioxide Emissions, and Fuel Economy Trends: 1975 Through 2017 (Jan. 2018) at 9, Table 2-2, https://fueleconomy.gov/feg/pdfs/420r16010.pdf.

[101] *Id.* at 53.

[102] *See* Burlig et al.. *Electric Vehicle Owners Drive Less Than We Thought*, Energy Institute Blog, UC Berkeley (Feb. 16, 2021), https://energyathaas.wordpress.com/2021/02/16/electric-vehicle-owners-drive-less-than-we-thought/.

to comply, such as EVs, which are more expensive and less popular than traditional internal combustion engine vehicles.

Automobile manufacturers therefore implement cross-subsidies to encourage consumers to buy EVs while paying for the artificially low price of EVs through charging higher prices on non-EVs.[103] California's ZEV mandate, in particular, will exacerbate cross-subsidies due to weak demand for EVs. This means that all vehicle purchasers, even those who are completely unwilling to pay for these vehicles, still pay for ZEVs in part by absorbing a markup on internal combustion engine vehicle costs. These cross-subsidies are effectively a tax imposed on all those choosing *not* to purchase electrified vehicles. Further, imposing cross-subsidies on new vehicle purchasers shoulders states who choose not to adopt California's ZEV mandate with a significant portion of the mandate's cost. Those states lack any power to reduce or block the cross-subsidies imposed on their citizens that are necessary to comply with California regulations. Nor will they have any power to control future California actions, such as increasing the magnitude of the ZEV mandate or even banning the sale of new vehicles powered by internal combustion engines.

Overall, this mechanism drives up vehicle prices and incentivizes car owners to hold onto their vehicles longer,[104] slowing fleet turnover[105] and delaying the introduction of vehicles with better fuel efficiency, improved emission control technologies, and added safety features.[106] As EPA and NHTSA explained in the Final Regulatory Impact Analysis[107] for SAFE II,[108] "[e]conomic literature and theory indicate that the retirement (or scrappage) rates of existing vehicles slows when new vehicle fuel economy standards increase and cause new vehicle price

---

[103] 83 Fed. Reg. at 43,084-85, 43,224. McKinsey & Company found that EV manufacturers "do not make a profit from the sale of EVs. In fact, these vehicles often cost $12,000 more to produce than comparable vehicles powered by internal-combustion engines (ICEs) in the small- to midsize-car segment and the small-utility-vehicle segment. What is more, carmakers often struggle to recoup those costs through pricing alone. The result: apart from a few premium models, OEMs stand to lose money on almost every EV sold, which is clearly unsustainable." McKinsey & Company. March 2019. https://www.mckinsey.com/industries/automotive-and-assembly/our-insights/making-electric-vehicles-profitable.

[104] Jacobsen, M. and van Benthem, A., "Vehicle Scrappage and Gasoline Policy", American Economic Review (2015) Vol. 105, No. 3, 1312-1338.

[105] Gruenspecht, Howard "Differentiated Regulation: The Case of Auto Emissions Standards", American Economic Review, (1982) Vol. 72(2): 328-31.

[106] Recently introduced safety features include blind spot monitoring, lane departure warning, and electronic stability control. By 2020, NHTSA estimated an 8% reduction in fatality rates from vehicle crashes due to the introduction of electronic stability control alone." Blincoe, L. and Shankar, U., "The Impact of Safety Standards and Behavioral Trends on Motor Vehicle Fatality Rates," National Highway Traffic Safety Administration, DOT HS 810 777, Washington, D.C., Jan. 2007. Two recent studies from the Insurance Institute for Highway Safety found significantly lower crash rates for vehicles equipped with blind spot monitoring or lane departure warning. It found that cars equipped with lane departure warning are 24% less likely to be involved in accidents with injuries and 86% less likely to be involved in fatal accidents, while cars with blind spot detection are 23% less likely to be involved in lane-change accidents with injuries. Cicchino, J. "Effects of lane departure warning on police-reported crash rates". *Journal of Safety Research*, September 2018. Cicchino, J. "Effects of blind spot monitoring systems on police-reported lane-change crashes" Insurance Institute for Highway Safety, August 2017.

[107] Final Regulatory Impact Analysis, The Safer Affordable Fuel Efficient Vehicles Rule for Model Year 2021-2026 Passenger Cars and Light Trucks (March 2020) ("RIA"), https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/final_safe_fria_web_version_200701.pdf.

[108] 85 Fed. Reg. 24,174 (April 30, 2020).

increases. Slower retirement rates result in an older distribution of the on-road fleet."[109] By slowing fleet turnover, the agencies explained, fuel economy standard increases "thus slow[] improvements in fleet-wide fuel economy, reductions in CO2 emissions, reductions in criteria pollutant emissions, and advances in safety" because "older vehicles are, on average, less safe and less fuel efficient."[110] One analysis has shown that "the share of new vehicle fuel savings lost to the used vehicle fleet due to delayed scrappage [was] between 13 and 16 percent."[111] It would be arbitrary and capricious to deem California's ACCP necessary to achieve NAAQS compliance and at least as protective as the federal standard without analyzing fleet turnover impacts. California has not demonstrated that its GHG standards and ZEV mandate will not undermine the protectiveness of the federal standard or slow NAAQS attainment by reducing fleet turnover.[112]

ZEV mandates turn their back on technology improvements to the internal combustion engine and the potential benefits from near-zero emission vehicles. A recent technical paper delivered at the Society of Automotive Engineers ("SAE") conference suggests that the cleanest gasoline- and diesel-powered vehicles use aftertreatment systems to remove criteria pollutants from the air taken into the vehicle along with treating the vehicle's own emissions.[113] EPA must fully evaluate this new SAE paper. Failing to do so while purporting to reinstate California's waiver would be arbitrary and unlawful.[114]

---

[109] RIA at 887.
[110] RIA at 62. *See also* RIA at 889 ("[S]ince fuel economy standards affect only new vehicles, any increase in price (net of the portion of reduced fuel savings valued by consumers) will increase the expected life of used vehicles and reduce the number of new vehicles entering the fleet." (citing Gruenspecht, H. "Differentiated Regulation: The Case of Auto Emissions Standards." American Economic Review, Vol. 72(2), pp. 328-331 (1982))).
[111] RIA at 889 (citing M. Jacobsen and A. van Benthem, "Vehicle Scrappage and Gasoline Policy," American Economic Review, Vol. 105, pp. 1312-38 (2015)).
[112] In the context of California's Advanced Clean Trucks Regulation, the South Coast Air Quality Management District has indicated "there is and will remain a critical need for near-zero technologies (*e.g.* Internal Combustion Engines . . .)" to achieve pollutant emissions reductions. South Coast Air Quality Management District, Comment Letter on Proposed Advanced Clean Trucks Regulation (Dec. 6, 2019), https://www.arb.ca.gov/lists/com-attach/60-act2019-VzYHYlciWVUBZFM8.pdf.
[113] Gary Yowell, How Do ZEV Emissions Stack Up Against Super-Clean Gasoline and Diesel Engines? (Aug. 29, 2019). https://stillwaterassociates.com/how-do-zev-emissions-stack-up-against-super-clean-gasoline-and-diesel-engines/; Stillwater Associates, How Do ZEV Emissions Stack Up Against Super Clean Gasoline and Diesel Engines? (April 12, 2021), https://stillwaterassociates.com/wp-content/uploads/2021/04/Gary-Yowell-SAE-2021-How-Do-ZEV-Emissions-Stack-Up-Against-Super-Clean.pdf.
[114] Having a vehicle clean the air is not necessarily a new development. In the past, CARB has granted approval for Volvo passenger cars to take measures such as coating radiators with chemicals that removed pollution from the air. *See* Gary Tracy, *How Volvo Once Used a Catalyst-Coated Radiator to Remove Pollution From the Air*, JALOPNIK (Jan. 2, 2019), https://jalopnik.com/how-volvo-once-used-a-catalyst-coated-radiator-to-remov-1831438959; Petersson et al., PremAir ® Catalyst System – Long-term On-road Aging Results, 109 J. FUELS & LUBRICANTS 2809 (2000), https://www.jstor.org/stable/44746070.

4.    **The ACCP is Inconsistent with EPA's Vehicle Emissions Program under CAA Section 202(a) Because it Mandates the Use of Specific Technologies**

EPA has authority under CAA Section 202(a) to prescribe vehicle emission standards for new motor vehicles and new motor vehicle engines.[115] Nothing in CAA Section 202(a) gives EPA authority to mandate particular vehicle technologies or waive EPCA preemption. These standards must "reflect the greatest degree of emission reduction available through the application of technology which the Administrator determines will be available for the model year to which such standards apply, giving appropriate consideration to cost, energy, and safety factors associated with the application of such technology,"[116] and "shall not become effective until the introduction of the model year for which it would be feasible to implement such standards, taking into consideration the restraints of an adequate lead time for design and production."[117] EPA is thus required to set emission standards for each type of new vehicle or engine, rather than forbid or mandate any type of new vehicle or engine. Standards must "reflect" technology, not mandate it, as standards allow regulated parties to select the mix of technologies they will use to comply with the standard. Since Section 209 only allows California to seek a waiver for vehicle emission standards, and a ZEV mandate is not a "standard," EPA cannot grant California's waiver application for its ZEV mandate.

5.    **Criteria Pollutant Problems Do Not Justify the ACCP's GHG Standards or ZEV Mandate**

California's criteria pollutant problems do not justify a waiver for ACCP's GHG standards and ZEV mandate either. Even if climate-related rising temperatures exacerbate the formation of ground-level ozone, a criteria pollutant, this problem is caused by global GHG concentrations and lacks a particularized nexus to local GHG emissions leading to elevated local GHG concentrations and local temperature changes. As EPA reasonably explained, the multi-link causal chain between California's standards and ground-level criteria pollution was too attenuated to allow California to purport that they address local, as well as global, pollution problems. And this causal chain assumes that California's standards would reduce air temperatures in the first place—an assumption that EPA has found to be false. Indeed, California's own State Implementation Plan ("SIP") lacked tailpipe GHG standards.[118] This would be quite an anomaly if California needs its GHG standards, since SIPs must include "all emission limitations, control measures, means, and techniques on which the state relies to ensure compliance with the" CAA.[119] But most importantly, California failed to argue that its GHG and ZEV standards would meaningfully reduce criteria pollution on top of California's other, criteria-pollution specific programs. Moreover, whatever criteria-pollution "co-benefits" might also be attained by California's standards should be excluded from EPA's analysis because

---

[115] 42 U.S.C. § 7521(a).
[116] 42 U.S.C. § 7521(a)(3)(A)(i).
[117] 42 U.S.C. § 7521(a)(5)(B).
[118] 81 Fed. Reg. 39,424, 39,427 (June 16, 2016); see 84 Fed. Reg. at 51,355/2.
[119] *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1175-78 (9th Cir. 2015) (discussing 42 U.S.C. § 7410(a)(2)(A)).

California did not rely on these co-benefits in its 2012 waiver request and has not analyzed and quantified them as required under CAA Section 209.

California's ZEV mandate fares far worse. The mandate grew out of a CARB Resolution issued shortly after the enactment of the California Global Warming Solutions Act of 2006, more commonly known as "A.B. 32." CARB's "Initial Statement of Reasons"[120] to adopt its revised ZEV mandate (packaged as part of an "Advanced Clean Car" program), was dedicated almost exclusively to GHGs, and even boasted of California's impact on federal agency policies. It was not until page 13 that CARB made passing reference to other air quality issues and there, it only lumped the ZEV mandate in with its discussion of unrelated Low Emission Vehicle ("LEV") standards.[121] The document never connected the ZEV mandate independently to any improvement of PM or ozone; in fact, it describes them inseparably: "The ZEV element of the Advanced Clean Cars program also fulfills California's third commitment towards the development of the 2017 through 2025 model year national greenhouse gas program."[122]

Similar to the Initial Statement of Reasons, CARB's Final Statement of Reasons[123] never connected the ZEV mandate with air quality. CARB repeatedly states: "The purpose of these regulatory changes is merely to allow manufacturers to demonstrate compliance with the final national passenger motor vehicle *greenhouse gas regulations* for the 2017 through 2025 model years, as an alternative option to achieve compliance with California's regulations and to make specified minor corrections to the LEV III criteria pollutant and ZEV regulations."[124] CARB's discussion of air quality is limited to their admittedly "minor" changes to their LEV standards. Unsurprisingly, California conceded in its waiver application to EPA for the ZEV program that

> [t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles.[125]

---

[120] CARB, "Staff Report: Initial Statement Of Reasons For Rulemaking. Proposed Amendments to New Passenger Motor Vehicle Greenhouse Gas Emission Standards For Model Years 2017-2025 To Permit Compliance Based On Federal Greenhouse Gas Emission Standards And Additional Minor Revisions to the LEV III and ZEV Regulations" (Sept. 2012), https://www.arb.ca.gov/regact/2012/leviiidtc12/dtcisor.pdf.

[121] *Id.* at 13.

[122] *Id.* at 4.

[123] CARB, "Final Statement of Reasons: Amendments to New Passenger Motor Vehicle Greenhouse Gas Emission Standards for Model Years 2017-2025 to Permit Compliance Based on Federal Greenhouse Gas Emission Standards and Additional Minor Revisions to the LEV III and ZEV Regulations" (Dec. 2012), https://www.arb.ca.gov/regact/2012/leviiidtc12/leviiifsorrev.pdf.

[124] *Id.* at 8-11 (emphasis added).

[125] Waiver Request at 15-16. While California included its ZEV mandate in its SIP, the fact remains that California's waiver application deemed its ZEV mandate superfluous.

Because the same criteria-pollutant reductions will be achieved with or without the ZEV mandate, the ZEV mandate will not reduce vehicle emissions or criteria pollutants.[126] California has not met its CAA Section 209 burden to show a ZEV mandate is needed to address compelling and extraordinary circumstances, and EPA is without statutory authority to waive preemption in these circumstances.

The structure of the ZEV mandate further demonstrates that the program is unnecessary to address extraordinary and compelling air quality conditions for criteria pollutants *in California.* The ZEV mandate provides credits to large and intermediate volume manufacturers for ZEVs sold in Section 177 states.[127] The fact that California's ZEV mandate provided OEMs with credit for *out-of-state* sales demonstrates that California's ZEV mandate is disconnected from any purported "compelling and extraordinary conditions" in California.

Fundamentally, California never links the effects it purports to its GHG standards or ZEV mandate.[128] Therefore, California does not "need" the ZEV mandate even if "compelling and extraordinary conditions" existed. To the extent that any doubt exists about whether Congress intended to grant California authority over GHGs, Section 209(b) should be interpreted to cover only criteria pollutants to avoid serious constitutional questions.[129] The "presumption against extra-territoriality" is a canon of statutory construction that requires courts to interpret federal statutes to avoid extra-territorial application absent a clear congressional statement to the contrary. That canon reflects the commonsense notion that Congress is "primarily concerned with domestic conditions"[130] and seeks to guard against clashes with foreign laws.[131]

California's view of its waiver authority shreds these prudent constraints. Any global issue—including climate change—would be fair game for California to address through its unconstrained automobile emissions standard-setting authority. California has even entered into formal partnership agreements with foreign governments in order to implement its ZEV mandate, stating "[w]e aren't going to get there until Chinese business people, Chinese

---

[126] *See infra*, Section II.B.3.

[127] 13 C.C.R. §§ 1962.2(d)(5)(E)(1) (credits for hydrogen fuel cell vehicles "delivered for sale and placed in service in California or in a Section 177 state"); *id.* § 1962.2(d)(5)(E)(2) ("Optional Section 177 Compliance Path" providing up to 50% credits for certain types of ZEVs sold in Section 177 states).

[128] 73 Fed. Reg. at 12,162 ("California does not link these [GHG] emission standards with such effects [from GHGs].").

[129] *See, e.g., United States v. Wells Fargo Bank*, 485 U.S. 351, 354 (1988) (applying the doctrine of constitutional avoidance, which "resolve[s] statutory questions at the outset where to do so might obviate the need to consider a constitutional issue.").

[130] *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

[131] *RJR Nabisco v. European Community*, 136 S. Ct. 2090 (2016). In a related vein, courts have held preempted state laws and regulations that attempted to intrude upon the Executive Branch's authority over foreign affairs. *Japan Line, Ltd. v. County of Los Angeles*, 441 U. S. 434, 449 (1979) (negative Foreign Commerce Clause protects the National Government's ability to speak with "one voice" in regulating commerce with foreign countries); *American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003) (striking down a California law that attempted to regulate companies that sold insurance in Germany during World War II, finding that the law intruded into the President's conduct of foreign affairs).

government leaders make it a priority to develop batteries and electric cars. And we will too."[132] Congress never envisioned that Section 209(b)'s grant of authority to address *local* air quality would empower California to regulate *global* issues and disrupt the orderly conduct of the nation's foreign affairs.

### 6. Interpreting "such State standards" to Allow EPA to Consider California's Whole Program, rather than Individually Assess California's Standards, is Arbitrary and Nonsensical

In prior reviews of California applications for preemption waivers, EPA has interpreted its duty under CAA Section 209(b) as determining whether California needs its own motor vehicle emissions control program—its "program as a whole"[133]—to meet compelling and extraordinary conditions, not whether a particular emissions standard is needed to meet compelling and extraordinary conditions related to state air quality concerns.[134]

By contrast, in the SAFE I rule, EPA interpreted the phrase "such State standards" as permitting the individual consideration of the standards proposed in California's waiver application, rather than the binary, all-or-nothing determination that California generally needs a separate state program.[135] The latter "whole program" approach produces absurd results, implicates the equal sovereignty doctrine, undermines Congress's intent, and conflicts with the statutory text and structure. EPA should not finalize any determination reinstating California's waiver that fails to individually assess California's standards.[136]

Congress *already decided* that California needs its own motor vehicle pollution control program. The entire purpose of the waiver is to create a mechanism for California to retain and further develop its own motor vehicle pollution control program, but only to the extent necessary to address a compelling and extraordinary local pollution problem. By shifting EPA's responsibilities under CAA Section 209(b) from reviewing the preemption waiver applicability for individual standards to considering merely whether California should have *any type* of motor vehicle emission control program, the agency's "whole program" interpretation renders all of CAA Section 209(b) surplusage.

---

[132] Jessica Meyers, Governor Jerry Brown Says California Wants China's Help on Electric Vehicles, *Los Angeles Times* (June 5, 2017), *available at* http://www.latimes.com/politics/essential/la-pol-ca-essential-politics-updates-gov-jerrybrown-says-california-wants-1496685564-htmlstory.html.

[133] 73 Fed. Reg. at 12,160.

[134] 73 Fed. Reg. at 12,159; *see also* 74 Fed. Reg. at 32,759 (question is "whether California needs a separate motor vehicle program to meet compelling and extraordinary conditions."); 49 Fed. Reg. at 18,889 (question is whether "California needs its own motor vehicle pollution control program to meet compelling and extraordinary conditions, and not whether any given standard (*e.g.*, the instant particulate standards) is necessary to meet such conditions.") (footnote omitted).

[135] 84 Fed. Reg. 51,310, 51,344/3; *see* 83 Fed. Reg. 42,986, 43,246/2-3 (Aug. 24, 2018).

[136] 86 Fed. Reg. at 22,426-22,427 ("EPA has consistently interpreted and applied the second waiver criterion by considering whether California needed a separate mobile source program as compared to the individual standards at issue to meet compelling and extraordinary conditions.").

EPA has generally provided the same answer for over 40 years: California needs its own motor vehicle emission control program. No other answer is possible under EPA's "program as a whole" interpretation, as once EPA has determined that California requires a "program," there is nothing left to evaluate under further preemption waiver applications. Once having decided that California "needs" its own motor vehicle program to address criteria pollution, EPA would be forced to grant a waiver for any later standards that California proposes—even if the standards are different in kind from those previously approved, and even if they are not the sort of localized standards that Congress has authorized California to adopt.[137] The statute requires the Administrator to undertake a substantive evaluation of "standards." The "program as a whole" approach is an abdication of that statutory duty and allows EPA to bootstrap *forever any* new CARB regulation based on EPA's prior approval of the program. Nothing in Section 209(b) requires such an absurd result.[138]

The "whole program" reading would also implicate the equal sovereignty doctrine because it would eviscerate the particularized nexus between California's standards and any compelling and extraordinary air quality problem. No longer would there be a sufficient relationship to any extraordinary conditions existing in California that would justify legislation treating the states differently if California was not required to show that it needs the *particular standard* at issue.

Additionally, Congress sought to strike a balance between giving California latitude to address its "compelling and extraordinary conditions" and promoting national uniformity and certainty.[139] The resulting compromise allowed California standards only when necessary to address California's unique local conditions. By interpreting the phrase "such State standards" to require review of California's need for the particular standards in a given waiver request, EPA in the SAFE I rule reflected this balance and ensured that California's waiver did not extend to pollution problems California merely shares with the nation at large.

By the same token, the fact that Congress included the phrase "in the aggregate" in Section 209(b)(1)—but not in Section 209(b)(1)(B)—does not show that Congress required an aggregate determination in the latter provision. Quite the contrary. If Congress had meant for Section 209(b)(1)(B)'s "need" inquiry to mirror Section 209(b)(1)'s "protectiveness" inquiry, one might presume it would have replicated the same text.[140] It did not.

---

[137] "[O]nce EPA determined that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver." 84 Fed. Reg. at 51,341/3; *see id.* at 51,342/1.

[138] Statutes should be read so as not to "produce an absurd result." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 252 (2010). *See also K Mart Corp. v. Cartier*, 486 U.S. 281, 324 (1988) (Scalia, J., concurring) ("[I]t is a venerable principle that a law will not be interpreted to produce absurd results.").

[139] 84 Fed. Reg. at 51,347/3 to 51,348/1.

[140] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally[.]" (brackets omitted)).

By addressing proposed GHG and ZEV standards separately from the standards in the rest of California's program in the SAFE I rule, EPA was not "assigning different meanings to the same statutory text." Rather, EPA's interpretation remained consistent: "such State standards" means whatever standards are submitted as part of California's waiver-request package. The SAFE I rule reflected the determination that criteria-pollutant standards satisfy Section 209(b)(1)(B), whereas GHG-related standards do not because they bear no relation to the "extraordinary" conditions justifying a California-specific preemption waiver.

## III.    EPA Properly Withdrew California's Waiver

In several determinations granting California's preemption waiver applications, EPA has unnecessarily limited the scope of its review and provided unwarranted deference to the state. These limitations include at least two self-imposed restraints that operate to improperly remove the burden on California to justify the departure from national standards and demonstrate that a unique state standard is necessary to address compelling and extraordinary conditions. EPA's Notice rehashes these errors,[141] despite these restraints lacking any support in the text or structure of the Clean Air Act.

*First*, EPA has declared that it will only perform a limited review of California waiver applications because it believed that Congress did not want "the federal government" to "second-guess state policy choices."[142] This has resulted in a reversal of the burden of proof required under CAA Section 209(b) so that anyone opposed to a California waiver application must produce "'clear and compelling' evidence to show that the proposed procedures undermine the protectiveness of California standards."[143] This heightened burden *in favor* of approval not only contravenes CAA Section 209(b) but imposes a standard on challenging parties that is inconsistent with the Administrative Procedure Act.[144]

In addition, such deferential review, at least for EPA's approval and any purported reinstatement of the 2013 ZEV mandate waiver, conflicts with Executive Order 12866's requirement to conduct a cost-benefit analysis for significant rulemakings.[145] Nothing in Executive Order 12866 exempts EPA's evaluation of California waiver applications from its

---

[141] *See* 86 Fed. Reg. at 22,423, n.7.

[142] 78 Fed. Reg. 44,111, 44,114 (July 23, 2013) (California Urban Bus standards); *id.* at 44,115 (EPA will "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."); 86 Fed. Reg. at 22,424 ("EPA's practice has been to defer and not to intrude in policy decisions made by California in adopting standards for protecting the health and welfare of its citizens.").

[143] 77 Fed. Reg. 9,239, 9,241 (Feb. 16, 2012) (approval of waiver for California non-road engine standards and truck idling requirements) (citing *MEMA I*). In the SAFE I rule, EPA concluded that it was ""not necessary to resolve this issue as regardless of whether a preponderance of the evidence or clear and compelling evidence standard is applied, the Agency was concluding that withdrawal of the waiver was appropriate." 84 Fed. Reg. at 51,344 n.268.

[144] *See* 5 U.S.C. § 706 (barring agency action that is unlawful, arbitrary and capricious, or an abuse of discretion).

[145] The 2013 waiver decision incorrectly asserted that granting a Clean Air Act preemption waiver for the ZEV mandate was not a "rule" as defined under the Regulatory Flexibility Act. 5 U.S.C. § 601(2). *See* 78 Fed. Reg. at 2,145. The 2013 waiver does not fall under any exemption to the definition of a "rule" identified in the Regulatory Flexibility Act. Further, due to the costs imposed by the ZEV mandate on new vehicle purchasers nationwide, it should be considered a "significant regulatory action" subject to Executive Order 12866's requirements.

responsibilities to perform a cost-benefit analysis; however, EPA did not perform one in issuing the 2013 ZEV mandate waiver.[146] The ZEV mandate imposes substantial costs, well exceeding $100 million, on all new vehicle purchasers, not just on new vehicle purchasers in California and states that choose to adopt the ZEV mandate. As such, the issuance of a waiver is also a "major rule" as defined under the Congressional Review Act. EPA's failure to treat a waiver as a rule subject to the APA, E.O. 12866, and the requirements of the Congressional Review Act, inappropriately denies the public the opportunity to provide informed comment on the implications of the waiver and blocks Congress from taking expedited action to withdraw an unlawfully issued waiver.

*Second*, EPA has traditionally declined to review the actual regulations that are the subject of a California waiver application. Instead, it only reviews the question of whether California requires a separate motor vehicle emissions control program. This creates a never-ending bootstrap approval where prior waivers automatically justify departures from federal standards and converts the Administrator's duty to review California preemption waiver applications into a *pro forma* rubber stamp. EPA should adhere to the language of CAA § 209(b) and avoid reverting to these prior misinterpretations.

A.    **The CAA Does Not Permit EPA to Defer to California on Whether it May Deny an Application**

Section 209(b)(1) states that "[n]o such waiver shall be granted if the *Administrator* finds that" California "does not need such State standards to meet compelling and extraordinary conditions…."[147] Defying this statutory duty, the Administrator has often deferred to California on whether there are grounds to deny its own application,[148] as well as "on ambiguous and controversial matters of public policy."[149] Further, whenever there is any question of whether the Administrator should find that the grounds for denial under CAA § 209(b)(1) are present, it has *reversed* the burden of proof by placing it upon objectors.[150] There is nothing in the statute even hinting at either policy and the statutory language unambiguously fails to justify these interpretations.

Nothing in the Clean Air Act supports deference to California regarding the CAA Section 209 criteria. The language unambiguously charges "the Administrator" with "find[ing]" whether or not any of the listed grounds exist. Despite claiming "that the text, [and] structure … of the California waiver provision" demand deference to California,[151] EPA has never actually identified any aspect of the text or structure supporting this claim. Instead, it has always relied on a statement in a House Committee report as an indication of Congressional intent for the Administrator "to afford California the broadest possible discretion" in approving preemption

---

[146] Nor did the 2013 ZEV mandate waiver undergo inter-agency or Small Business Administration review under Executive Order 12866 and the Regulatory Flexibility Act.
[147] 42 U.S.C. § 7543(b)(1)(B) (emphasis added).
[148] 78 Fed. Reg. at 2,115-16.
[149] 73 Fed. Reg. at 12,158.
[150] 78 Fed. Reg. at 2,116.
[151] *Id.* at 2,115.

waiver applications.[152] Yet, EPA has never identified any ambiguity in CAA Section 209(b)(1) allowing it to resort to the legislative history in the first place.[153] Here, the statute unambiguously commands the "Administrator" to "find[]" whether there are grounds to deny a preemption waiver application.

### B.    No Valid Reliance Interests Derive from EPA's 2013 Waiver Grant

EPA urges in the Notice that "the amount of time that had passed since EPA's 2013 waiver decision" raises "significant issues regarding whether SAFE I was a valid and appropriate exercise of agency authority,"[154] and questions whether "EPA properly identif[ied] and consider[ed] any relevant reliance interests, such as the inclusion of GHG emission standards and ZEV mandates in approved SIPs, in its SAFE 1 action."[155] However, timing and reliance interests do not derive from EPA's 2013 waiver grant, which itself followed a 2008 denial of a waiver when the issue was first presented. There is no statutory limit on timing to reconsider a decision, and the timing of a decision is not an independent basis to reconsider the SAFE I rule. And no reliance interests derive from this decision because one could not reasonably expect that the standards approved in that waiver would remain untouched. As part of the 2013 waiver decision, EPA and CARB committed to a 2018 mid-term evaluation of the federal standards for MYs 2022-2025.[156] Because California's deemed-to-comply provision linked those standards to compliance with its own state program, any change in federal standards from the mid-term review would have required an equal overhaul of California's emissions program for those future MYs[157]—a program that was not carved in stone in 2013. Reconsidering a waiver decision five years later, at the very time CARB and EPA committed to a mid-term evaluation of the standards, is nothing short of reasonable. What's more, California pledged to conduct a 2016 "mid-term review" of its own state standards for MYs 2022-2025, separate from EPA and CARB's mid-term evaluation of federal standards for those same years.[158]

Thus, the public had ample notice that California's emissions program would be revisited (and likely revised) several years after California obtained the waiver to enforce that program. To the extent any individual or entity affected by EPA's waiver withdrawal rooted their long-term plans in the expectation that California's standards for MYs 2022-2025 would not change, knowing that the emissions program would be reexamined in 2016 (by CARB) and in 2018 (by

---

[152] *Id.* at 2,115-16.
[153] *See Dept' of Housing & Urban Devel. v. Rucker*, 535 U.S. 125, 132-133 (2002) ("[R]eference to legislative history is inappropriate when the text of the statute is unambiguous."); *Chicago v. Envt'l Defense Fund*, 511 U.S. 328, 337 (1994) ("But it is the statute, and not the Committee Report, which is the authoritative expression of the law.").
[154] 86 Fed. Reg. at 22,421; *id.* at 22,429 ("[W]as it permissible for EPA to withdraw elements of the ACC program waiver over five years after it was issued?").
[155] 86 Fed. Reg. at 22,429.
[156] *See* 78 Fed. Reg. at 2137.
[157] *See* 77 Fed. Reg. 62,624, 62,785 (Oct. 15, 2012); 78 Fed. Reg. at 2132 n. 99.
[158] *See* CARB Res. 12-11 (Jan. 26, 2012), https://tinyurl.com/y679m95m; CARB, 2017 Midterm Review Report, https://tinyurl.com/yxt6qaoh (last visited Sept. 21, 2020).

EPA), they did so at their own peril: the possibility of change was baked into the waiver.[159] Plainly, these "reliance interests"—stemming from the public's own misplaced assumption that California's emissions program would remain intact even after the anticipated midterm reviews—cannot defeat EPA's reconsideration authority exercised in the SAFE I rule.[160]

Additionally, the argument that if EPA has reconsideration authority at all, it must be limited to waiver denials because "reconsideration of a waiver denial implicates none of the reliance interests implicated by withdrawal of a granted waiver," makes little sense.[161] There is no basis in the CAA, nor any other cogent reason, to view EPA's reconsideration power as a one-way ratchet. Whatever "reliance interests" are disturbed when EPA reverses a waiver grant are no more real, and no more serious for the parties involved, than the reliance interests upended by reversal of a waiver denial (which the 2013 waiver decision was)—including the reliance interests of AFPM members, who incur real, considerable costs when EPA changes direction. At any rate, almost all agency decisions create reliance interests. If that were sufficient to defeat reconsideration authority, then such authority would be the exception, not the "normal[]" rule.[162]

## C.    EPA Must Consider the Environmental Justice Harms of California's ACCP

California's ZEV mandate will inflict harms on environmental justice communities, such as low-income Americans, which EPA must address in this proceeding.

About one-third of all households have annual incomes higher than $100,000. However, about two-thirds of households with BEVs or PHEVs have incomes higher than $100,000.[163] University of California researchers determined that EV penetration is "taking hold" in the very highest income category ($200K+/year).[164] EV mandates and subsidies benefit wealthier Americans, while imposing new costs on all other vehicle purchasers through cross-subsidies that put new vehicles out of reach of low- or even middle-income Americans. This contradicts the Administration's commitments to advancing environmental justice and socioeconomic equity.[165]

---

[159] *Cf. Bell Atl. Tel. Cos. v. FCC*, 79 F.3d 1195, 1205 (D.C. Cir. 1996) ("In 1990, the Commission announced its plan to conduct a performance review in 1994 to assess how well the price cap system had worked. Petitioners made all of their … elections with that in mind. Petitioners could not have reasonably assumed that the price cap index would not be altered." (citation omitted))

[160] *See Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) ("[R]eliance interests [can]not … undo agency action … [unless they are] specifically identified, reasonably incurred, and causally tied to the delay.").

[161] *See* Letter from Mary Nichols, Chairman, CARB, to Lisa Jackson, Adm'r, EPA (Jan. 21, 2009) (urging EPA to exercise its "inherent authority to reconsider" the 2008 waiver denial).

[162] *New Jersey v. EPA*, 517 F.3d 574, 582-83 (D.C. Cir. 2008).

[163] *See* U.S. Energy Information Administration, Today in Energy, "Electrified vehicles continue to see slow growth and less use than conventional vehicles," May 22, 2018, https://www.eia.gov/todayinenergy/detail.php?id=36312.

[164] Davis & Lucas, *An Electric Vehicle in Every Driveway?* Energy Institute Blog, UC Berkeley (May 13, 2019), https://energyathaas.wordpress.com/2019/05/13/an-electric-vehicle-in-every-driveway/.

[165] Executive Order 13,990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/; Executive Order 13,985, Advancing Racial Equity and Support for Underserved Communities

California's ZEV mandate could result in utilities raising the rates of all households to pay for the electric vehicle service equipment (EVSE) needed to service the mandated volumes of BEVs that would have to be sold. Indeed, the California PUC has approved requests from state-regulated electric utilities to do just that. Southern California Edison (SCE), for example, established an EV rate that eliminates demand charges for EV charging through at least March 2024, cutting typical EV cost of service by approximately 60%, and transferring those costs to other ratepayers.[166] California's other major utilities have sought and received approval for similar preferential utility rate treatment of EV owners.

Even small utility rate hikes in good economic times can have a disproportionate impact on less wealthy households. Nearly 1 in 3 American households reported difficulty paying their energy bill, according to a 2018 Energy Information Administration report.[167]

## Conclusion

AFPM appreciates EPA's consideration of its comments on the Notice. AFPM opposes EPA's proposed action—rescinding the SAFE I rule and purporting to reinstate a waiver for the GHG and ZEV aspects of California's ACCP. Withdrawing of the Notice is neither a referendum nor a prohibition on the sale of EV's in California. Instead, it is an outcome compelled by the rule of law that recognizes EPA does not have the authority to waive EPCA preemption and cannot make a regulatory decision without applying the required statutory criteria. Should you have questions concerning these comments, please contact Richard Moskowitz at 202-844-5474.

Respectfully submitted,

Richard Moskowitz, General Counsel

---

Through the Federal Government (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-advancing-racial-equity-and-support-for-underserved-communities-through-the-federal-government/.

[166] "For the first five years, commencing March 1, 2019, no Demand Charge shall apply to Customers receiving service under this Schedule. After the five-year introductory period, and commencing on March 1, 2024, Demand Charge on Option D shall be phased-in unless otherwise authorized by the Commission." Southern California Edison, Schedule TOU-EV-7, General Service Time-of-Use, Electric Vehicle Charging (Mar. 22, 2019). https://library.sce.com/content/dam/sce-doclib/public/regulatory/tariff/electric/schedules/general-service-&-industrial-rates/ELECTRIC_SCHEDULES_TOU-EV-7.pdf. SCE's arguments in favor of below-market rates for EV customers were outlined in testimony to the PUC. See http://www3.sce.com/sscc/law/dis/dbattach5e.nsf/0/F5582C9D0A9A3659882580AE007F74A4/$FILE/A1701XXX-SCE%20TE%20Testimony%201-20-17.pdf.

[167] EIA, *One in three U.S. households faces a challenge in meeting energy needs*, Today in Energy (Sept. 19, 2018), https://www.eia.gov/todayinenergy/detail.php?id=37072.

R-224,     Comment submitted by Urban
Air Initiative and Consumers' Research

# COMMENTS

## submitted on behalf of

## URBAN AIR INITIATIVE

## *and*

## CONSUMERS' RESEARCH

## Concerning the

## *Environmental Protection Agency's Reconsideration of a Previous Withdrawal of a Waiver of Preemption*

## EPA-HQ-OAR-2021-0257

by   C. Boyden Gray
Jonathan Berry
*Primary Contact*
Michael Buschbacher
James R. Conde
Jordan Smith
BOYDEN GRAY & ASSOCIATES
801 17th Street NW, Suite 350
Washington, DC 20006
202-955-0620
berry@boydengrayassociates.com

July 6, 2021

# CONTENTS

CONTENTS .................................................................................................... II

INTRODUCTION AND EXECUTIVE SUMMARY ................................................... 1

BACKGROUND ............................................................................................... 6

I.      THE CLEAN AIR ACT PERMITS A LIMITED WAIVER OF FEDERAL CLEAN AIR
        ACT PREEMPTION FOR CALIFORNIA ..................................................... 6

II.     CALIFORNIA TRADITIONALLY USED ITS WAIVER AUTHORITY TO TARGET
        CRITERIA POLLUTION. ......................................................................... 9

III.    CALIFORNIA NOW USES ITS WAIVERS TO PROMOTE FLEET
        ELECTRIFICATION AND NATIONAL CLIMATE CHANGE REGULATION. .................. 10

        A.      California's Earlier Greenhouse Gas and Zero-Emission
                Standard Waivers .................................................... 10

        B.      California's "Clean Cars" Regulations .................................... 11

        1.      Low-Emission Vehicle Standards ........................................ 12

        2.      2017 Model Year and Later Greenhouse Gas Standards .................... 13

        3.      2018 Model Year and Later Zero-Emission-Vehicle Standards .......... 13

IV.     THE SAFE RULE ...................................................................... 15

V.      EPA'S PROPOSED REPEAL OF THE ONE NATIONAL PROGRAM RULE .................. 17

ARGUMENT .................................................................................. 18

I.      WAIVER REINSTATEMENT WOULD BE IMPROPER BECAUSE CALIFORNIA'S
        GREENHOUSE GAS STANDARDS HAVE BEEN AMENDED WITHOUT EPA
        APPROVAL. ............................................................................ 18

II.     WAIVER REINSTATEMENT WOULD BE UNLAWFUL BECAUSE THE ONE
        NATIONAL PROGRAM'S WAIVER WITHDRAWAL WAS COMPELLED BY LAW. .......... 19

        A.      EPA Has Inherent Authority to Reconsider Prior Waiver
                Decisions. ............................................................ 19

        B.      EPA's Interpretation of § 209(b)(1)(B) Was Compelled by Law. .......... 24

1.   The Statute Does Not Permit a "Whole-Program" Review Interpretation. ................................................... 24

2.   California "needs" separate standards only if those standards meaningfully address its "extraordinary and compelling" air quality problems created by the state's particular circumstances. ...... 29

C.   California Does Not Need the Greenhouse Gas Standards Because State Standards Have No Demonstrated Beneficial Effect on Greenhouse Gas Emissions. ................................. 32

D.   California Does Not Need the Zero-Emission Vehicle Standard Because the Zero-Emissions Vehicle Standard has Zero Beneficial Effects on Vehicle Pollution ................................ 37

E.   California's Need for a Separate Motor Vehicle Program Is No Longer "Compelling." ............................................. 43

III.   WAIVER REINSTATEMENT WOULD VIOLATE THE CONSTITUTION'S EQUAL SOVEREIGNTY DOCTRINE. .................................................. 46

IV.   WAIVER REINSTATEMENT WOULD BE UNLAWFUL BECAUSE CALIFORNIA'S STANDARDS ARE PROHIBITED BY CAFE. ............................. 47

V.   WAIVER REINSTATEMENT WOULD BE UNLAWFUL BECAUSE CALIFORNIA'S ADVANCED CLEAN CARS WAIVER WAS UNLAWFUL ON OTHER GROUNDS. ......... 49

A.   Reinstatement Would Provide After-Arising Grounds to Challenge the Advanced Clean Cars Waiver and Constructively Reopen the Issues Raised in Waiver. .................................. 49

B.   The Advanced Clean Car Waiver's Protectiveness Determination Was Arbitrary and Capricious. ............................... 52

C.   The Advanced Clean Cars Waiver Failed to Give Appropriate Consideration to Cost When Setting Lead Time for the Greenhouse Gas and Zero-Emissions Vehicle Standards ................ 52

1.   EPA was required to weigh the benefits and costs of California's greenhouse gas and zero-emission vehicle standards ...................... 52

2.   EPA failed to give "appropriate" consideration to the cost of compliance because it did not weigh the regulatory burden of the waiver against its putative benefits. ................................. 54

3.    EPA could not have granted the zero-emissions vehicle waiver if it had given "appropriate" consideration because costs far outweigh the benefits. .......................................................................... 55

CONCLUSION............................................................................................. 57

## INTRODUCTION AND EXECUTIVE SUMMARY

For nearly a decade, California "deemed" car manufacturers to be compliant with California's state greenhouse gas emission standards so long as manufacturers complied with national greenhouse gas standards. But in 2018, California amended its regulations, and threatened to unleash balkanizing car regulations if national regulators dared to disagree with its preferred policy outcomes. California then acted on this threat.

California's balkanizing regulations created significant uncertainty but failed to do *anything* to reduce greenhouse gas emissions. It is well understood, now and then, that car manufacturers simply offset any in-state emission reductions in California with out-of-state emission increases in other states, while on net meeting the same national fleet-average greenhouse gas standard. This phenomenon, called "carbon leakage," is like the old arcade game of Whack-A-Mole—what gets knocked down in one place immediately pops up elsewhere.

The effects of carbon leakage are perverse, especially when combined with California's electric car mandate. This is because federal regulations already artificially downplay the emissions of electric cars. For example, for the purposes of calculating fleet-average greenhouse gas emissions, federal regulations falsely assume that electric car operation produces zero carbon emissions, and they allow manufacturers to count each electric car twice when calculating fleet averages. Thus, each new electric car sold effectively reduces the stringency of the national fleet-average greenhouse gas standards. Because California's regulations increase the number of new electric cars that must be sold, its regulations are thus worse than useless, as they impose substantial costs while simultaneously *increasing* net greenhouse gas emissions.

California knows this—as does EPA—and the state's threat of balkanization is designed, not to improve environmental quality, but to pressure the United States into adopting regulatory outcomes California likes, without regard to national interests. Given the absence of any legitimate environmental policy justification for California's separate standards, EPA properly partially withdrew California's Clean Air Act waiver under § 209(b) and restored a single national program.

EPA now proposes to restore California's Clean Air Act waiver to regulate greenhouse gases and mandate electric cars. EPA should not do so. Restoring California's waiver would improperly abnegate national motor vehicle greenhouse gas policy to Sacramento politicians and bureaucrats with no accountability to the voters of the other 49 states. These California state officials have no reason to consider the welfare of the nation as a whole. EPA should not unleash this "monster, in which the head [is] under the direction of the members."[1] Instead, EPA should resist California's encroachments on its own national prerogatives and set national greenhouse policies based on EPA's impartial assessment of the evidence, without special solicitude to California's interests.

In any event, even if EPA *wants* to abnegate national authority to California, EPA cannot do so. The Clean Air Act forbids it. The Corporate Average Fuel Economy law forbids it. The Constitution forbids it.

First, EPA cannot reinstate a Clean Air Act waiver for a program that no longer exists. When California was granted a waiver in 2012, it deemed compliance with federal greenhouse gas standards to be compliance with state standards. That avoided the regulatory patchwork. But in 2018, California transformed its greenhouse gas program by eliminating the "deemed to comply" provision, unleashing enormous costs and uncertainty without any approval from EPA. That was impermissible. EPA may not reinstate the waiver until California formally petitions for a waiver, and EPA gives notice and solicits comments on a *new* waiver or a determination that this amendment was within the scope of the prior waiver. Since California has yet to so petition, and EPA has yet to request comments on this issue, reinstatement would be improper.

Second, even if this problem were set aside, reinstatement would be unlawful under the Clean Air Act. EPA's withdrawal was procedurally proper, and its interpretation was compelled by law. Under § 209(b)(1)(B), EPA may not approve a California standard if California does not "need" the standard "to meet compelling and extraordinary conditions" relating to California's uniquely pollution-inducing geography and climate features. California reads this provision as a blank check to regulate

---

[1] The Federalist No. 44 (James Madison).

motor vehicles as long as the state continues to have the same climate and topography—effectively, until the moon falls or the sun grows cold. But text and structure of the Clean Air Act show that Congress had in mind something much more modest and sensible. California must show that each standard it seeks a waiver for plays a sufficient and demonstrable role in meeting California's unique pollution challenges.

California cannot "need" greenhouse gas standards because they have no environmental benefits, much less any benefits that would address the state's smog or air-quality problems. From model year 2009 to 2020, California's standards had no benefits because manufacturers complied with federal standards instead. From model year 2021 through 2026, California's standards will continue having no benefit because any reductions in in-state greenhouse gas emissions will be offset by out-of-state greenhouse gas emissions increases.

California also cannot "need" the zero-emissions vehicle standards because, even on its own rosy assumptions, these too have zero effects on pollution. The state projects that its standards would result in *no* incremental greenhouse gas or vehicle criteria-pollution reductions and would have only some extremely negligible *stationary source* reductions decades after the effective date of the program. But California does not "need" a Clean Air Act motor vehicle regulation waiver to reduce stationary source emissions. It already has that authority.

And, as noted above, the reality would be far worse than California has predicted. Zero-emissions vehicle standards *increase* total greenhouse gas emissions. Since electric vehicles do not have a "tailpipe," federal regulations assume (incorrectly) that their operation does not produce the emission of any greenhouse gases. Moreover, electric vehicles are also double counted for fleet-average calculations— thus, every electric car sold to comply with a zero-emissions vehicle standard effectively reduces the stringency of binding federal regulations and increases national fleet-average emissions. California's regulations therefore interfere with—and actively frustrate—EPA's efforts to reduce national greenhouse gas emissions.

And this environmentally counterproductive policy comes at a steep economic cost. By California's own estimate, through model year 2025, zero-emission vehicle mandates will impose $10.5 billion in costs from California's regulations alone. Other

studies find $31 to $35 billion in costs nationwide when considering the identical California mandates adopted by like-minded copycat states. A zero-emissions vehicle standard that increases greenhouse gases, produces no reductions in criteria motor vehicle emissions, and costs billions is not needed to confront California's special pollution challenges.

EPA cannot arbitrarily ignore the regulations' lack of merit by reading § 209(b) to give California a blank check for a more fundamental reason, too. That reading of the law would run afoul of the Constitution's equal sovereignty doctrine. The Supreme Court has held that deviations from equal state sovereignty must be justified by (1) compelling evidence of need, and that (2) the means of addressing the need must be "sufficiently related to the problem that it targets."[2] Reading § 209(b) to allow waivers for standards without any demonstration of a sufficient relationship to the problem the statute meant to target—ambient air pollution caused by California's unique combination of climatic and geographic features—would improperly depart from equal sovereignty without sufficient justification.

Apart from violating the Constitution and the Clean Air Act, California's greenhouse gas and zero-emissions vehicle standards also "relate to" average fuel economy standards, so they are preempted by CAFE. EPA cannot, consistent with the Supremacy Clause, grant a waiver for state regulations that are deemed void *ab initio* when "adopt[ed]." And the President and his subordinate officers cannot ignore their responsibility to faithfully execute this law. The Government's strategic attempts at artful circumvention will only waste resources and delay the inevitable reckoning in the courtroom.

Reinstating the waiver would also require EPA to confront the original merits of its decision. By reinstating the waiver, including of California's amended greenhouse gas program, EPA would create new grounds to attack the original waiver decision. That waiver decision was unlawful on several grounds. For example, EPA stated that California gives "appropriate" consideration to the costs of the zero-emissions vehicle standard and greenhouse gas standards so long as California finds its regulations will not double or triple vehicle costs. That astonishing cost standard has

---

[2] *Shelby County v. Holder*, 570 U.S. 529, 542 (2013).

no textual or jurisprudential justification. In *Michigan v. EPA*, the Supreme Court rejected an analogous EPA standard and held that the word "appropriate" and the Administrative Procedure Act requires balancing costs and benefits, as "[o]ne would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."[3] California's zero-emissions vehicle standards fail this common-sense test. They impose billions of costs on car buyers to pay for luxury sedans and SUVs that on net produce no health or environmental benefits. Compared to these regulations, California's never-ending and dramatically overbudget multi-billion-dollar High-Speed Rail project looks like a paradigm of success—it may lack running trains, but at least the trains are not running backwards.

*     *     *

EPA must and should say *No* to California's extraordinarily costly, regressive, and environmentally counterproductive greenhouse gas and zero-emissions vehicle standards.

---

[3] *Michigan v. EPA*, 576 U.S. 743, 752 (2015).

## <u>BACKGROUND</u>

### I.   THE CLEAN AIR ACT PERMITS A LIMITED WAIVER OF FEDERAL CLEAN AIR ACT PREEMPTION FOR CALIFORNIA.

Under the Clean Air Act, EPA sets National Ambient Air Quality Standards (NAAQS) for certain "criteria" pollutants, including ground-level ozone ($O_3$), or "smog," and fine particulate matter ($PM_{2.5}$).[4] States must then seek to attain NAAQS by adopting state implementation plans aiming to reduce area, stationary and mobile source emissions.[5]

While states have broad authority to regulate emissions from stationary sources located within their borders, Title II of the Clean Air Act makes EPA the Nation's primary regulator of new mobile source emissions that may harm public health or welfare.[6] Section 209(a) of the Clean Air Act broadly prohibits states from adopting or enforcing "any standard *relating to* the control of emissions from new motor vehicles."[7] For example, the Supreme Court has held that § 209(a) preempts any "state laws mandating that a specified percentage of a manufacturer's in-state sales be of 'zero-emission vehicles,'" even if the laws have no specific emission targets.[8] This avoids "an anarchic patchwork of federal and state regulatory programs, a prospect which threatened to create nightmares for [vehicle] manufacturers."[9]

But § 209(b) of the Clean Air Act authorizes EPA to grant a waiver of this prohibition to California—and only California.[10] Under the statute (as further

---

[4] 42 U.S.C. §§ 7408(a), 7409; *see also* 40 C.F.R § 50.19 (2015 smog NAAQS); *id.* § 50.18 (2012 $PM_{2.5}$ NAAQS).

[5] 42 U.S.C. § 7410.

[6] *Id.* § 7521(a)(1).

[7] *Id.* § 7543(a) (emphasis added).

[8] *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 251 (2004) (holding fleet rules requiring certain private parties to purchase a specified percentage of electric cars was preempted).

[9] *Motor Equip. Mfrs. Assn., Inc. v. EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979); *see also Motor Vehicle Mfrs. Ass'n v. N.Y. Dep't Envtl. Conservation*, 17 F.3d 521, 526 (2nd Cir. 1994) ("The cornerstone of Title II is Congress' continued express preemption of state regulation of automobile emissions.").

[10] 42 U.S.C. § 7543(b)(1); *see also* Air Quality Act of 1967, Pub. L. No. 90-148, § 208(b), 81 Stat. 485, 501 (1967). "California is the only state . . . eligible for a waiver of federal preemption under this provision." *Chamber of Commerce v. EPA*, 642 F.3d 192, 196 (D.C. Cir. 2011); *see also* 42 U.S.C. § 7507 (allowing other states to adopt "California standards" in certain circumstances).

amended in 1977), California may apply for a waiver of preemption under § 209(a) if California "determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards."[11] EPA "shall" then grant a waiver—but "[n]o such waiver shall be granted" if EPA "finds that"

> (i)     California's "determination . . . is arbitrary and capricious";

> (ii)    California "does not need such . . . standards to meet compelling and extraordinary conditions"; or

> (iii)   California's "standards and accompanying enforcement procedures are not consistent with section 202(a) [7521(a)] of this title,"[12] which requires sufficient lead time "to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."[13]

Once California has a waiver, some other states can copy California. Specifically, as a result of a legislative compromise adopted in the Clean Air Amendments of 1977, "[n]otwithstanding section 209(a) of" the Clean Air Act, any state which has an EPA-approved non-attainment or maintenance plan for one or more NAAQS may adopt standards identical to California's exempted standards.[14]

California's special treatment is one of the most unusual aspects of the Clean Air Act. The statute aims to achieve *national* air quality improvement, and—while certain parts of its regulatory framework have been more successful than others—the overall improvement in national air quality since its passage is undeniable. Indeed, our air is cleaner than it has ever been. Implementation of existing federal rules is expected to bring nearly the entire country into attainment with the current NAAQS. At the same time, the law's "cooperative federalism" approach allows states

---

[11] 42 U.S.C. § 7543(b)(1).

[12] *Id.*

[13] *Id.* § 7521(a)(2).

[14] 42 U.S.C. § 7507; *see also Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 201 (2d Cir. 1998) ("[T]he Section 177 exception is available to the 49 other states only when a standard identical to an existing California standard is adopted.").

flexibility and respects in some measure their sovereignty over their own air, land, and water.

California's special treatment, though, goes well beyond this. One of the axioms of our constitutional structure is that the federal government may not play favorites, but must respect the equal dignity and sovereignty of the several states. As the Supreme Court has explained, the United States "was and is a union of States, equal in power, dignity and authority."[15] And "the constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized."[16] This "fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States."[17] Special treatment of one state thus "represents an 'extraordinary departure from the traditional course of relations between the States and the Federal Government.'"[18]

The Clean Air Act's "extraordinary departure" with respect to California's mobile source regulations thus can only be justified by Congress making a well-supported finding that this special treatment is necessary to address California's "unique" problems. The problems Congress had in view are those arising from the unique way in which ozone and particulate matter pollution contribute to smog in the state. California is prone to smog because of "numerous thermal inversions that occur within that state because of its geography and prevailing wind patterns."[19] California's warm and sunny climate, its cities surrounded by mountains and valleys that trap pollution, and California's frequent thermal inversions along the coast, in which the air close to the ground becomes cooler than the air above, trapping ozone close to the ground, make California (and particularly Los Angeles) the perfect place for smog. Indeed, when Congress enacted the California waiver provision in 1967, "the air in

---

[15] *Coyle v. Smith*, 221 U. S. 559, 567 (1911).

[16] *Id.* at 580.

[17] *Shelby County v. Holder*, 570 U.S. 529, 544 (2013).

[18] *Id.* at 545 (quoting *Presley v. Etowah Cnty. Comm'n*, 502 U. S. 491, 500–501 (1992)).

[19] *California State Motor Vehicle Pollution Control Standards: Waiver of Federal Preemption Notice of Decision*, 49 Fed. Reg. 18887, 18890 (May 3, 1984) (citing 113 Cong. Reg. 30,948, (Nov. 2, 1967)) (hereinafter 1984 Waiver).

Los Angeles basin was so thick with smog that a mountain, or even a nearby mountain range, could simply disappear."[20] The "unique . . . smog problem" caused by these conditions led California "to begin regulating auto emissions" before 1966, and it is for that compelling reason that Congress authorized California alone to seek a waiver.[21] And, consistent with this, EPA has granted many California waivers since 1967.[22]

## II.  CALIFORNIA TRADITIONALLY USED ITS WAIVER AUTHORITY TO TARGET CRITERIA POLLUTION.

Since 1967, California and EPA criteria pollution performance standards have required manufacturers to reduce new light-duty vehicle emission rates of smog-forming emissions by over "99 percent."[23] Indeed, California Air Resources Board chief Mary Nichols recently explained that "I started working in this area of air-pollution control back in 1971," and "in that time, the air emissions from internal combustion engines have been slashed by over 90 percent—twice."[24] By model year 2025, new light-duty vehicle fleets certified in California (or nationally) must emit on average no more than California's "super ultra-low emission vehicle" certification levels of smog-forming pollution (no more than 0.03 grams per mile), compared to over 12 grams per mile for an uncontrolled 1960s vehicle.[25]

California has made enormous progress in ambient air quality as a result. Ozone concentrations in California's South Coast Air Basin (which includes coastal

[20] *Coal. for Responsible Regulation, Inc. v. EPA*, 2012 WL 6621785, at *3 (D.C. Cir. 2012) (Brown, J., dissenting from denial of rehearing *en banc*).

[21] *NYDEC*, 17 F.3d at 526.

[22] EPA's predecessor, the Department of Health, Education, and Welfare, had already granted waivers for model years 1969 and 1970. *See California State Standards; Waiver of Application of Section 208, Clean Air Act*, 33 Fed. Reg. 10160 (July 16, 1968). As of 2009, the Government Accountability Office estimated that EPA had granted more than fifty preemption waivers to California, granting approximately 42 waivers in full and nine only in part. GAO, Clean Air Act: Historical Information on EPA's Process for Reviewing California Waiver Requests and Making Waiver Determinations, GAO-09-249r, at 4 (2009).

[23] CARB SAFE Rule Comments, EPA-HQ-OAR-2018-0283, at 60–61, https://tinyurl.com/8hw6f2pn. For a lengthy discussion of pollution controls, see *id.* at 32–61.

[24] Camila Domonoske, *As More Electric Cars Arrive, What's the Future for Gas-Powered Engines*, NPR (Feb. 16, 2019), https://www.npr.org/2019/02/16/694303169/as-more-electric-cars-arrive-whats-the-future-for-gas-powered-engines.

[25] *Id.* at 60–61; 13 Cal. Code Regs. § 1961.2(b); Graham Affidavit ¶¶ 69–75.

Los Angeles) have fallen by a factor of three, a reduction that is "predominantly attributed to decreasing emissions from motor vehicles."[26]

But motor vehicles, and especially light-duty vehicles, are an increasingly small part of the problem: in large part, today's particulate matter and ozone formation in California results from international emissions and volatile organic compound pollutions from household products, ships in California ports, wildfires, airborne dust, agriculture, livestock, natural sources, and even backyard grilling. Given the declining role of light-duty vehicle regulation in compliance with NAAQS, in recent years, California's motor vehicle policy has emphasized greenhouse gas emissions and industrial policy—promoting vehicle electrification to boost California's "green" technology industry.

## III. CALIFORNIA NOW USES ITS WAIVERS TO PROMOTE FLEET ELECTRIFICATION AND NATIONAL CLIMATE CHANGE REGULATION.

### A. California's Earlier Greenhouse Gas and Zero-Emission Standard Waivers

California's attempt to force electrification began in 1990 when cars emitted far more pollution. EPA waived California's first "zero-emissions vehicle" standards in 1990, which were effectively a percentage-of-sales quota for electric vehicles.[27] But car manufacturers failed to produce the mandated electric cars, and the program had to be repeatedly scaled back. In 2002, car manufacturers obtained a preliminary injunction of the zero-emissions quota as preempted by NHTSA's corporate average fuel economy standards ("CAFE").[28]

---

[26] Ilana Pollack et al., *Trends in Ozone, its Precursors, and Related Secondary Oxidation Products in Los Angeles, California: A Synthesis of Measurements from 1960 to 2010*, 118 J. Geophys. Res. Atmos. 5893, 5901–02 (2013) (finding that the South Coast Air Basin's ozone concentrations have fallen by "a factor of 2.9" since the 1960s).

[27] 58 Fed. Reg. 4166 (Jan. 7, 1993) (waiving preemption under Clean Air Act § 209(a)).

[28] *Cent. Valley Chrysler-Plymouth v. California Air Res. Bd*., No. CV-F-02-5017 REC/SMS, 2002 WL 34499459, at *7 (E.D. Cal. June 11, 2002). California settled the lawsuit before the appeal was decided. Agreement of Counsel Concerning the 2001 California ZEV Litigation, https://web.archive.org/web/20101009073549/https://www.arb.ca.gov/msprog/zevprog/zevlitigation/zevlitigation.pdf.

In 2005, California requested, for the first time, a waiver to regulate motor vehicle greenhouse gas emissions, including carbon dioxide.[29] EPA initially denied California's waiver request.[30]

But in 2009, EPA reversed course and granted the waiver.[31] Car manufacturers did not challenge the 2009 waiver decision because they had agreed to forgo any such challenge as part of a negotiated settlement agreement that would "create a uniform federal system" for regulation starting in model year 2012, under carbon dioxide and fuel economy regulations promulgated by EPA and NHTSA, in consultation with California.[32] As a critical part of that agreement, California adopted an amendment to its state greenhouse gas standards that would deem compliance with *federal* greenhouse gas standards compliance with the *state*'s standards.[33]

The greenhouse gas waiver was challenged in court by automobile dealers, but the Court of Appeals for the D.C. Circuit held that the lawsuit was moot because the "deemed to comply" provision had harmonized California's regulations with the federal rules. Since manufacturers would comply with federal rules, any future injury would be traceable to the federal rules, not California's.[34]

## B.     California's "Clean Cars" Regulations

In May of 2012, California submitted a waiver application for a package of standards collectively labeled as the "Advanced Clean Car" standards.[35] EPA granted

---

[29] Letter from Catherine Witherspoon, Executive Officer, CARB, to Stephen Johnson, Administrator, EPA (Dec. 21, 2005).

[30] 73 Fed. Reg. 12156, 12168 (Mar. 6, 2008).

[31] 74 Fed. Reg. 32744, 32745 (July 8, 2009).

[32] *See* Jody Freeman, *The Obama Administration's National Auto Policy: Lessons from the "Car Deal*," 35 Harv. Envtl. L. Rev. 343, 345–46 (2011).

[33] *See id.*

[34] *See Chamber of Commerce v. EPA*, 642 F.3d 192, 206 (D.C. Cir. 2011).

[35] Advanced Clean Cars Waiver Application (May 2012), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0257-0006 (2012 Waiver Application); *see also* CARB Resolution 12-11 (Jan. 26, 2012) (resolution approving Advanced Clean Car regulations), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0257-0010; Advanced Clean Cars, Initial Statement of Reasons (Dec. 7, 2011) (ACC ISR), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0257-0013; CARB, Zero Emissions

the waiver in 2013.[36] The Advanced Clean Cars waiver approved three separate sets of standards:

### 1.    Low-Emission Vehicle Standards

The first category is California's latest low-emissions vehicle air pollution standards, or "LEV III," which are designed to address criteria pollution by requiring reductions in vehicle smog-precursor and particulate matter emissions.[37] Among other things, California's regulations would:

- Reduce fleet-average light-duty smog-forming emission rates to "super ultra-low emission" certification levels (0.03 g/mile) by 2025, "an approximate 75 percent reduction from 2010 levels."[38]

- Reduce light-duty vehicle exhaust particulate matter emission rates to 3 milligrams per mile by 2021 and 1 milligram per mile by 2028.[39]

- Require "zero fuel evaporative emission standards for light-duty vehicles."[40]

Shortly after the waiver, EPA proposed and then finalized its own latest "Tier 3" regulations which are largely harmonized with California's.[41] As a result, new gasoline light-duty vehicles are required to emit nearly no criteria emissions throughout their useful lives. The marginal impact of these California regulations is therefore negligible when compared to the otherwise applicable national standards.

Vehicle Program Regulations, Initial Statement of Reasons (Dec. 7, 2011) ( ZEV ISR) (analyzing effects of zero-emissions vehicle mandate), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0257-0012.

[36] 78 Fed. Reg. 2112, 2114 (Jan. 9, 2013) (hereinafter 2013 Waiver).

[37] *Id.*

[38] 2012 Waiver Application, *supra* note 35, at 9.

[39] *Id.* at 10 & 15.

[40] *Id.*

[41] *See* 81 Fed. Reg. 23414, 23414 (Apr. 28, 2014) ("These vehicle standards are intended to harmonize with California's Low Emission Vehicle program, thus creating a federal vehicle emissions program that will allow automakers to sell the same vehicles in all 50 states.").

### 2.    2017 Model Year and Later Greenhouse Gas Standards

The second category is California's greenhouse gas standards for model year 2017 and later light-duty vehicles, which seek to reduce the fleet-average rate of vehicle carbon dioxide emissions per mile.[42] California estimated its fleet-average carbon dioxide standards would reduce model year 2017 to 2025 light-duty vehicle carbon dioxide emission rates by 4.5% per year, for a 34% reduction in new vehicle carbon dioxide emission rates compared to model year 2016.[43] California estimated costs from this regulation would increase model year 2025 passenger car and light-truck prices by an average of $1,340.[44]

But California's greenhouse gas standards had no favorable real-world effect. By the time EPA granted California the Advanced Clean Cars waiver, EPA and NHTSA, in coordination with California, had promulgated national greenhouse gas standards for model years 2017 and later.[45] California agreed to deem compliance with EPA's regulations compliance with California greenhouse gas standards, a compliance option that EPA (correctly) believed all car manufacturers were "very likely" to take advantage of.[46] This cuts the legs out from under California's claim that a waiver was needed as these regulations had no real-world effect. Reinstituting the waiver would be equally pointless. Of course, California eliminated the "deemed to comply" regulations in 2018 without seeking a new waiver. But as discussed later, since this was neither considered nor approved by the 2013 waiver, it cannot be covered by its reinstitution, but must be subject to new proceedings.

### 3.    2018 Model Year and Later Zero-Emission-Vehicle Standards

The third category is California's zero-emissions vehicle standards for model year 2018 and later vehicles. This program requires manufacturers to generate an increasing percentage of regulatory "credits"—a quota—representing new electric or fuel-cell vehicles produced and delivered for sale as a fraction of a manufacturer's

---

[42] *Id.* (codified at 13 Cal. Code Reg. § 1961.3).

[43] ACC ISR, *supra* note 35, at 99–100.

[44] 2013 Waiver, 78 Fed. Reg. at 2139; ACC ISR, *supra* note 35, at 147.

[45] 77 Fed. Reg. 62,624, 62,638 (Oct. 15, 2012).

[46] 78 Fed. Reg. at 2138; CARB Letter to Lisa Jackson (Dec. 7, 2012).

total light-duty vehicles produced and delivered for sale in California.[47] By model year 2025, the credit percentage requirement will rise to 22% of all light-duty vehicles produced and delivered for sale in the state.[48] Not all zero-emission vehicles are treated equally: a zero-emission vehicle may generate up to four credits, depending on the vehicle's range.[49]

As California explained, the goal of the zero-emissions vehicle sales mandate is "to maintain California as the central location for moving advanced, low greenhouse gas (GHG) technology vehicles from the demonstration phase to commercialization."[50] California asserted that this industrial policy would also allow California to meet its self-imposed requirement of achieving an 80% reduction in statewide greenhouse gas emissions in 2050 compared to 1990 levels.[51] At the same time, however, California paradoxically recognized that zero-emission vehicle standards would do *nothing* to reduce state greenhouse gas emissions or even vehicle criteria pollution emissions beyond the other Advanced Clean Car regulations.[52] It would, however, impose significant costs. Through model years 2018 to 2025, California projected compliance costs in California alone (excluding § 177 states) "to be approximately $10.5 billion," or an increase of $500 in average model year 2025 vehicle prices.[53] Given that regulation had no "emission reduction targets" and, at best, trivial benefits—California refused to measure the cost-effectiveness of the zero-emissions vehicle mandate.[54]

Despite these issues, EPA approved the zero-emissions vehicle mandate after finding it satisfied all three waiver conditions.

---

[47] 13 Cal. Code Reg. § 1962.2(b).

[48] *Id*. CARB most recently estimated that from 2018 to 2025, the mandate will result in the sale of nearly one million new electric vehicles in California, and nearly 1 million new electric vehicles in section 177 states. *See* CARB, California's Advanced Clean Cars Midterm Review A-24 (Jan. 2017).

[49] 13 Cal. Code Reg. § 1962.2(d)(5)(A).

[50] 2012 Waiver Application, *supra* note 35, at 2; CARB Resolution, *supra* note 35, 12-11 at 7.

[51] CARB Resolution 12-11, *supra* note 35, at 5–9; 2012 Waiver Application, *supra* note 35, at 2.

[52] 2012 Waiver Application, *supra* note 35, at 15–16; ZEV ISR, *supra* note 35, at 72, 77–79.

[53] ZEV ISR, *supra* note 35, at 62-63. The average incremental price increase of the greenhouse gas standards alone was $1,340. Adding the zero-emission vehicle standard raised average incremental price increases to $1,840. *Id.*

[54] ZEV ISR, *supra* note 35, at 80.

(A) *Protectiveness.* EPA concluded that California's "protectiveness" determination was not arbitrary and capricious because "an individual protectiveness determination" for the zero-emission vehicle standards was not necessary. As long as the omnibus package of standards was "in the aggregate" as protective, EPA deemed any negative effects on human health or welfare from the zero-emissions vehicle standards irrelevant.[55]

(B) *Need.* EPA then concluded that California's standards were needed to meet compelling and extraordinary conditions because (a) California still suffered from the same set of "geographical and climatic conditions" that lead to particularly severe difficulties meeting ozone NAAQS (it *always* will), and in any event (b) even if zero-emissions standards had no effect on criteria pollution or greenhouse gas emissions, the zero-emissions standards should be waived because the Advanced Clean Cars omnibus package of standards considered in the aggregate would reduce criteria emissions.[56]

(C) *Consistency.* EPA finally considered technical feasibility and lead time cost appropriateness under § 202(a) of the Clean Air Act. EPA concluded that cost-effectiveness was irrelevant and that any costs imposed by California would be "appropriate" under the waiver provision as long as they were not "excessive"—by which EPA apparently meant that the regulations would not double or triple vehicle prices.[57]

## IV.    THE SAFE RULE

Due to the long timeframe involved and NHTSA's legal inability to set standards for more than five years into the future, the relevant federal agencies and California agreed to perform a mid-term evaluation of the carbon dioxide standards in 2018, and to make adjustments needed to maintain a harmonized national program.[58] At the time, EPA recognized that after mid-term evaluation "California may need to amend one or more of its . . . standards and would submit such amendments to EPA

---

[55] 78 Fed. Reg. at 2125. Relatedly, EPA rejected the need to consider delayed fleet turnover from higher prices, deeming those effects irrelevant and concluding that there was insufficient evidence of delayed turnover. *Id.*

[56] *Id.* at 2130–31.

[57] *Id.* at 2134, 2143–44.

[58] *Brown*, 940 F.3d at 1346.

with a request for a waiver, or for confirmation that said amendments fall within the scope of any existing waiver."[59]

The federal agencies ultimately concluded that the greenhouse gas standards were "not appropriate," but California disagreed.[60] In 2018, as NHTSA and EPA reconsidered the stringency of federal fuel economy and greenhouse gas standards, California amended its rules (without requesting another waiver) to eliminate its "deemed to comply" provision, which had previously allowed the automobile industry to satisfy California by complying with the federal standards for greenhouse-gas emissions. This threatened the automobile industry with balkanization unless federal agencies adopted California's preferred policy determinations.[61]

In September of 2019, in a joint rulemaking with NHTSA known as the Safer Affordable Fuel-Efficient Vehicles Rule—"SAFE 1" or the "One National Program" rule, EPA revoked the preemption waiver for California's greenhouse gas standards and zero-emission vehicle standards.[62] In explaining its decision to revoke the waiver, EPA relied on NHTSA's determination that CAFE preempted California's standards and EPA's separate determination that California did not need greenhouse gas or zero-emission vehicle standards to "meet compelling and extraordinary conditions" within the meaning of § 209(b)(1)(B).[63]

In April of 2020, notwithstanding California's threats to the car industry, NHTSA and EPA revised the standards for model years up to 2026 as part of the Safer Affordable Fuel-Efficient (SAFE 2) Vehicles final rule.[64] The standards are projected to limit vehicles to an average of 202 grams of carbon dioxide per mile by model

[59] 77 Fed. Reg. at 62,785.

[60] *Brown*, 940 F.3d at 1348.

[61] California's "deemed to comply" provision was amended in September 2018 to provide that it "shall not be available" for model years 2021 and later if the final standards promulgated in 2012 were "altered." 13 Cal. Code Reg. § 1961.3(c); CARB, Staff Report: Initial Statement of Reasons (Aug. 7, 2018); *see also* Statement by CARB Chair on Action to Preserve California Vehicle Standards (Sept. 28, 2018), https://ww2.arb.ca.gov/news/statement-carb-chair-action-preserve-california-vehicle-standards.

[62] 84 Fed. Reg. 51,310 (Sept. 27, 2019) ("One National Program Rule").

[63] *Id.* at 51,328.

[64] *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks*, 85 Fed. Reg. 24,174 (Apr. 30, 2020) (SAFE Rule).

year 2026, equivalent to reducing the emissions rate by approximately 1.5% per year.[65]

With the promulgation of the final SAFE Rule in April of 2020, under California law and the identical laws adopted in all § 177 states, compliance with federal standards is no longer deemed compliance with California's own greenhouse standards.[66]

## V.    EPA'S PROPOSED REPEAL OF THE ONE NATIONAL PROGRAM RULE

On Inauguration Day, President Biden signed Executive Order 13,990 directing NHTSA and EPA to consider "suspending, revising, or rescinding" various regulatory actions taken by the previous administration, including the One National Program Rule.[67] In response, EPA now reconsiders its prior withdrawal of California's waiver.[68]

Contrary to its position in the One National Program rulemaking, EPA now contends that "there are significant issues regarding whether SAFE 1 was a valid and appropriate exercise of agency authority."[69] In addition, the agency expresses other policy concerns regarding "the amount of time that had passed since EPA's 2013 waiver decision, the allegedly novel approach and legal interpretations used in SAFE 1, and whether EPA took proper account of the environmental conditions in California and the environmental consequences from the waiver withdrawal in SAFE 1."[70]

---

[65] *Id.* at 24,199.

[66] 13 Cal. Code Reg. § 1961.3(c).

[67] Exec. Order No. 13,990, 86 Fed. Reg. 7,037, 7,037-38 (Jan. 25, 2021).

[68] 86 Fed. Reg. 22,421, 22,428 (Apr. 28, 2021) ("Notice of Proposed Repeal").

[69] *Id.* at 22,421.

[70] *Id.*

# ARGUMENT

### I.   WAIVER REINSTATEMENT WOULD BE IMPROPER BECAUSE CALIFORNIA'S GREENHOUSE GAS STANDARDS HAVE BEEN AMENDED WITHOUT EPA AP-PROVAL.

EPA cannot restore a preemption waiver for a greenhouse gas program that no longer exists. That is the case here. In 2018, California unilaterally altered its green-house gas regulations to revoke the "deemed to comply" provision, a fundamental change in the regulations that has never been approved by EPA. California's amend-ment transforms the state greenhouse gas regulations and significantly alters com-pliance costs for car manufacturers after model year 2020 without any of the required technical review by EPA. California has never sought a new waiver or a determina-tion that the change is within the scope of the prior waiver. Nor did it consider the effects of this change on § 177 states. Until California obtains approval for its amend-ments, EPA lacks a necessary predicate to permit California's "enforce[ment]" of its amended greenhouse gas standards without Clean Air Act preemption.[71] And EPA cannot approve enforcement of these amended rules without an opportunity for notice and comment.[72] Since it has not provided the required notice and opportunity for comment on this issue, the Agency cannot lawfully permit enforcement of California's amended greenhouse gas standards. EPA cannot reinstate a waiver for a phantom California greenhouse gas program that ceased to exist per final agency action by EPA in 2020. And even if it does so, reinstatement would have no effect on the preemption of California's *amended* greenhouse gas standards.

To circumvent the Clean Air Act's procedures for approving amendments, Cal-ifornia relies on a decade-old statement finding that opponents of the original waiver had not shown that California's greenhouse gas standards would be infeasible or in-appropriate "even without the deemed to comply provision."[73] But that passing state-ment was based on information gathered by California and commenters over a decade ago, long before the mid-term evaluation and the SAFE 2 Rule required changes in stringency. California cannot reasonably rely on waiver statements based on decade-

---

[71] 42 U.S.C. § 7543(a).

[72] *Id*. § 7543(b)(1).

[73] CARB, *supra* note 61, at 39 (citing 78 Fed. Reg. at 2138).

old information that are entirely undermined by later EPA determinations as to cost and feasibility. As EPA said before granting the Advanced Clean Car waiver, depending on the outcome of the joint midterm evaluation, "California may need to amend one or more of its . . . standards and would submit such amendments to EPA with a request for a waiver, or for confirmation that said amendments fall within the scope of any existing waiver."[74] California has drastically amended its greenhouse gas program since then, but it has never submitted the amendments for EPA approval.

In short, before allowing enforcement of California's *amended* greenhouse gas regulations, EPA must give notice and seek comment on the issue of whether the standards are eligible for a new waiver (and, if so, whether such waiver constitutes a "rule" requiring a full economic analysis) or within the scope of a prior waiver. A simple waiver reinstatement that ignores this necessary predicate for authorizing enforcement of California's *amended* regulations would be procedurally defective and vacated on judicial review.

## II. WAIVER REINSTATEMENT WOULD BE UNLAWFUL BECAUSE THE ONE NATIONAL PROGRAM'S WAIVER WITHDRAWAL WAS COMPELLED BY LAW.

EPA had authority to reconsider California's waiver under the Clean Air Act. And once a reconsideration proceeding was properly underway, withdrawal was the only lawful outcome. California's zero-emissions vehicle and greenhouse gas standards are not needed to meet extraordinary and compelling conditions particular to California. Reinstatement would therefore be unlawful.

### A. EPA Has Inherent Authority to Reconsider Prior Waiver Decisions.

The book of Daniel recounts the failed plot of Babylon's satraps and prefects to get rid of Daniel, a Jewish exile who had risen to be King Darius's most trusted counselor. The satraps and prefects convinced the king to pass a decree ordering that anyone who prayed to anyone but him for the next thirty days would be thrown into the lions' den, knowing that the devout Daniel would not cease praying to his God. The King would never have agreed if he had known this, but, under the "law of the Medes and Persians," "no interdict or ordinance which the king establishes can be

---

[74] 77 Fed. Reg. at 62,785.

changed."[75] As the jealous officials gleefully remind the King once Daniel was taken while praying in his room, even the King could not change his earlier decree. Of course, the story has a happy ending but only because God miraculously stopped the mouths of the lions, saving Daniel's life.[76]

No such divine intervention is necessary here, however. The American system of lawmaking has wisely declined to follow the example of the Medes and Persians. And just as EPA is now reconsidering its 2019 waiver decision, EPA had this same authority to reconsider its 2013 waiver decision.

The default presumption is that "an agency retains authority to reconsider and correct an earlier decision," unless Congress "displaces" that authority with a process to rectify the agency's mistakes.[77] There is no separate statutory regime here to rectify a mistaken waiver decision, so EPA retains inherent authority to reconsider past waivers.

California argues that the Clean Air Act's text does not explicitly confer the Agency any "withdrawal authority," only the power to *grant* a waiver.[78] But an explicit statutory statement regarding the power to rescind has never been required. This authority exists even where there is no "express provision granting [the agency] authority to reconsider," because "the 'power to reconsider is inherent in the power to decide.'"[79] California concedes, as it must, that EPA has inherent authority to reconsider the *denial* of a waiver, as it did in 2009 at California's urging.[80] But California argues that EPA must have express authority to withdraw a waiver because greater

---

[75] Daniel 6:15.

[76] The jealous satraps and prefects, however, were not so fortunate. After the plot failed, the King ordered that they and their families be themselves thrown into the lions' den, where they were devoured before they had even touched the ground.

[77] *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 & 93 (D.C. Cir. 2014).

[78] Reply Brief of State and Local Government Petitioners at 2-3, Union of Concerned Scientists v. NHTSA, No. 19-1230.

[79] *Ivy Sports Med., LLC*, 767 F.3d at 86 (quoting *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950)).

[80] 74 Fed. Reg. at 32,752 (reconsidering the 2008 waiver denial); Letter from Mary Nichols, CARB, to Lisa Jackson, EPA (Jan 21, 2009) ("California believes EPA has inherent authority to reconsider the denial and should do so in order to restore the interpretations and applications of the Clean Air Act to continue California's longstanding leadership role in setting emission standards.").

reliance interests attach to waiver grant than a denial. This ratchet has no basis in law. The Supreme Court has repeatedly refused to find that reliance interests preclude changes in agency policy. An agency has a "continuing" statutory obligation to consider the "wisdom of its policy."[81] Under *FCC v. Fox*, an agency must only provide a "detailed justification" to depart from a policy that has "engendered serious reliance interests."[82] And under the presumption that "an agency retains authority to reconsider and correct an earlier decision," the grant of a waiver is as liable to change as the denial of a waiver. No greater reliance interests attach to the grant of a waiver authorizing regulation than to the denial of a waiver preventing regulation, so reliance interests provide no support for California's ratchet argument.

Withdrawal is also supported by statutory context. The waiver authorizes *future* regulation, which always remains open to change. Agencies do not have crystal balls. A determination that California's state standards are technologically feasible and appropriate requires complex technical projections at the frontiers of science, which must be continually updated "if the actual future course of technology diverges from expectation."[83] For example, California's first zero-emissions vehicle standard was adopted in 1990 and then amended *six* times over 18 years ("in 1996, 1998/1999, 2001, 2003, 2008") before it was substantially altered in 2012, as the mandated battery-powered vehicles repeatedly failed to materialize in a way that would meet regulators' requirements.[84] If waivers are a one-way ratchet, EPA would have no ability to monitor California's continued compliance with the waiver conditions in light of updated information. This would be a significant departure from prior practice, as EPA has always claimed authority to revisit the lawfulness of prior waiver decisions.[85] Under California's "no withdrawal authority" argument, California could regulate the car industry until model year 2050 (or beyond) through a single waiver based on far-flung technical projections. If the regulation turned out to be unfeasible,

---

[81] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 864 (1984).

[82] *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).

[83] *NRDC Inc. v. EPA*, 655 F.2d 318, 329 (D.C. Cir. 1981).

[84] 2012 Waiver Application, *supra* note 35, at 2.

[85] *See* 84 Fed. Reg. at 51,333 n.223.

threatening to bankrupt car manufacturers (predominately located outside of California), EPA would be unable to step in to ensure California is meeting statutory waiver conditions.

Last, the legislative history supports inherent withdrawal authority. The Senate Committee Report explains that "implicit in [§ 209] is the right of [EPA] to withdraw the waiver [if] at any time after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of that waiver."[86]

EPA has inherent reconsideration authority.

Reconsideration was also properly exercised in the circumstances of this waiver. EPA's decision to reconsider California's waiver did not unreasonably undermine longstanding reliance interests, was timely, and did not rest on mere "policy changes."

First, EPA's reconsideration of the waiver did not upset longstanding reliance interests. "[R]eliance interests" must be "specifically identified, reasonably incurred, and causally tied to the delay."[87] No reliance interests were "specifically identified" or "reasonably incurred" regarding the waiver withdrawal because the initial grant of the waiver was contingent on two subsequent mid-term evaluations. California pledged to conduct a 2016 mid-term review of its own state standards for vehicles from model years 2022 to 2025. EPA and CARB also committed to a 2018 mid-term evaluation of the federal standards for model years 2022 to 2025 due to concerns regarding the "long timeframe of the rule and uncertainty in assumptions given this timeframe."[88] The 2018 re-evaluation is relevant because California's "deemed-to-comply" provision allowed a manufacturer to satisfy state greenhouse gas standards

---

[86] S. Rep. 90-403, at 34 (1967).

[87] *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020).

[88] *See* 77 Fed. Reg. at 62,643/1; *see also* CARB Res. 12-11 (Jan. 26, 2012), https://tinyurl.com/y679m95m; CARB, 2017 Midterm Review Report, https://tinyurl.com/yxt6qaoh (last visited June 1, 2021); 78 Fed. Reg. 2112, 2137 (Jan. 9, 2013); 77 Fed. Reg. at 62,652 (stating that EPA would reevaluate standards by April 2018).

simply by complying with federal standards, and as California and EPA have recognized compliance with zero-emission vehicle standards is intertwined with compliance with greenhouse gas standards.[89]

Because reliance interests could not reasonably have formed before the midterm evaluations, EPA's 2018 waiver reconsideration was not unreasonably delayed. "Delay alone is not enough to strip the agency of its ability to act."[90] Instead, a party must show "harmful consequences emanating from the delay" that the agency did not reasonably take into account.[91] Although opponents of the One National Program Rule point to the inclusion of greenhouse gas emissions standards and zero-emissions vehicle mandates in state implementation plans, these do not amount to serious reliance interests, due to the already-planned review. And in any event, EPA explained in detail why these reliance interests were outweighed by other concerns, satisfying its only obligation under *FCC v. Fox*.[92]

Reliance arguments are further undermined in this case because, as the One National Program Rule explained, California and other states have known for years that NHTSA's longstanding position is that state carbon dioxide regulations and zero-emissions vehicle mandates are related to average fuel economy standards and therefore preempted by CAFE.[93] California and other stakeholders could not have reasonably believed that EPA would continue to ignore NHTSA's view of the law in perpetuity.

Second, although some courts have said that reconsideration must be "timely,"[94] courts have not reached a consensus "about what amount of time is reasonable,"[95] and the short amount of time at issue here lies in the acceptable range

---

[89] ZEV ISR, *supra* note 35, at 63 (acknowledging that zero-emission vehicles are used for compliance with greenhouse gas standards); Appropriateness of the Model Year 2022-2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation: TSD 1-32 (Nov. 2016) (considering ZEV program interaction with greenhouse gas standards).

[90] *Solenex*, 962 F.3d at 527-28 (cleaned up).

[91] *Id.*

[92] 84 Fed. Reg. at 51,334–36.

[93] *See, e.g.*, 71 Fed. Reg. at 17,654 (asserting preemption in 2006).

[94] *Ivy Sports*, 767 F.3d at 86.

[95] *Voyageur Outward Bound Sch. v. United States*, 444 F. Supp. 3d 182, 194 (D.D.C. 2020).

given the intervening events. EPA's reconsideration of the waiver grant began only four months after the 2018 mid-term evaluation concluded, which is "timely" by any measure.[96] Furthermore, timeliness depends in part on reliance interests, and as explained above, none of these interests could have reasonably developed before the waiver was withdrawn.[97] Moreover, California itself has undermined any claim of reliance interests concerning the greenhouse gas standards, since it amended its "deemed to comply" provision in 2018, *upending* reliance interests by creating a novel state greenhouse gas program that was never approved by EPA.

Third, EPA's reconsideration of California's waiver was an appropriate reevaluation of the legal interpretation and facts upon which the initial waiver determination was based. California argued that EPA's exercise of its reconsideration authority was inappropriate here because EPA made a substantive reconsideration decision based on alleged "policy changes." This is a misstatement of the scope of EPA's reconsideration authority. EPA's authority is not limited to correcting clerical mistakes, and reconsideration determinations do not become "policy" decisions simply because they address substantive errors, even those based on prior legal interpretations or applications.[98] And, as explained next, once reconsideration of California's standards was properly underway, EPA's conclusions were compelled by law.

## B.     EPA's Interpretation of § 209(b)(1)(B) Was Compelled by Law.

### 1.     The Statute Does Not Permit a "Whole-Program" Review Interpretation.

In the One National Program Rule, EPA correctly interpreted § 209(b)(1)(B). That provision provides that EPA may not grant a waiver if it finds that California does not need "such [s]tate standards to meet compelling and extraordinary conditions." EPA rightly read this as requiring denial if California does not specifically need the greenhouse gas and zero-emissions vehicle standards to confront its extraordinary criteria pollution problems. This reading of the statute is required by the text,

---

[96] *See, e.g., Belville Mining Co. v. United States*, 999 F.2d 989, 1001-02 (6th Cir. 1993) (reconsideration reasonable after eight months).

[97] *See Civil Aeronautics Bd. v. Delta Air Lines, Inc.*, 367 U.S. 316, 321 (1961).

[98] *See, e.g., Ivy Sports*, 767 F.3d at 86.

structure, and history of the relevant provisions and, despite arguments to the contrary, is not foreclosed by historical interpretations, case precedent, or legislative intent.

By contrast, California's contrary readings, requiring consideration of only (1) whether California's climate and topography remain unchanged, thereby generally justifying a "separate motor vehicle program," or (2) whether the omnibus package of California standards *in the aggregate* does something to address California's need for criteria pollution control, would write a blank check allowing California to adopt *any* motor vehicle standards it wants, no matter how unrelated to California's extraordinary and compelling conditions amounting to an extraordinary departure from equal sovereignty principles and undermining the text, structure, and purpose of the Clean Air Act. These points—along with basic common sense—require a rejection of any blank check or no-line-item-veto approach to California waivers. And to the extent the text of the Clean Air Act is ambiguous, the constitutional avoidance canon forecloses a blank-check interpretation.

*First*, the text of § 209(b) supports the conclusion that each California standard must be evaluated separately. The phrase "such State standards" in § 209(b)(1)(B) refers back to "the State standards" in § 209(b)(1), which require EPA to make a protectiveness determination. And the statute is clear that for purposes of the protectiveness determination, "each State standard" must be evaluated individually and be deemed more protective of public health if it "is at least as stringent as the comparable applicable Federal standards."[99] The same is true for preemption generally: "any [State] standard relating to the control of emissions from [motor vehicles]" is preempted unless the particular California standard has a waiver.[100] A textual interpretation of the statute therefore requires construing "such State standards" to require an individualized determination.

*Second*, the requirement in § 209(b)(1) that California's standards be "in the aggregate" as protective of public health as the federal standards is significantly absent from § 209(b)(1)(B). This demonstrates that an aggregate analysis of the state

---

[99] 42 U.S.C. § 7543(b)(1).

[100] *Id.* § 7543(a).

standards does not apply when examining whether the standards are needed "to meet compelling and extraordinary" circumstances. If Congress wanted § 209(b)(1)(B)'s "need" analysis to be an "aggregate" analysis, it would have used the same text it used to qualify the protectiveness determination.[101]

*Third*, § 209(b)(1)(C) uses this same language when requiring "such State standards" to be consistent with the requirements of § 202(a) of the Clean Air Act. That provision requires that "any regulation" (singular) "shall take effect only after such period as" EPA "finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period."[102] "[S]uch State standards" in § 209(b)(1)(C) cannot refer to the entire California motor vehicle program in general, which includes regulations for heavy-duty trucks, buses, motorcycles, and other off-road vehicle types that require entirely different compliance technologies and lead times. Nor can it refer to all of the state standards in the aggregate seeking a waiver in an omnibus application, since an aggregate lead time requirement would make no sense. Instead, under § 209(b)(1)(C), *every* California regulation must give appropriate lead time. Similarly, under § 209(b)(1)(B), *every* California regulation must be needed "to meet compelling and extraordinary conditions."

California acknowledges the meaning of "such State standards" in paragraph (C), but it insists that "such State standards" may mean different things in the very same subsection. But the "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning."[103] Courts should particularly strive to avoid interpretations that give the same word "two different meanings in the same section of the statute."[104] While this presumption of consistent meaning "yields to context,"[105] statutory context reinforces the presumption here. Sections 209(b)(1)(B) and (C) are interrelated parts of the same

---

[101] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally[.]").

[102] 42 U.S.C. § 7521(a)(2).

[103] *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995).

[104] *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980).

[105] *UARG v. EPA*, 573 U.S. 302, 320 (2014).

comprehensive scheme on preemption.[106] Such a scheme "should not be read as a se-ries of unrelated and isolated provisions."[107] It should be read consistently to work together.[108]

*Fourth*, Congress knows how to write California a blank check untethered from California's specific compelling and extraordinary conditions. It did so in § 211(c)(4)(B), allowing California a perpetual exemption from preemption to regulate fuels.[109] By contrast, § 209(b)(1)(B) tethers California's authority to a particularized demonstration of "need." If that demonstration could be met as long as California had the same smog-inducing warm sunny climate and topography—effectively, for mil-lennia—§ 209(b)(1)(B) would have no teeth. Congress may as well have given Califor-nia the perpetual exemption it gave regarding fuels. But Congress did not.

California raises several counterarguments, but none are persuasive.

*First*, it argues that plural "standards" instead of "standard" in § 209(b)(1)(B) requires a conclusion that a whole-program approach is required or at least reasona-ble. But the general rule of interpretation is that the singular form includes the plural and plural includes the singular, and nothing in the statutory context overrides this presumption.[110]

*Second*, it argues that this reading is undermined by historical interpretations, case precedent, or congressional acquiescence. Although EPA has historically inter-preted § 209(b)(1)(B) as asking whether California needs a separate motor vehicle program as a whole, this approach predates the arrival of state greenhouse-gas-re-lated standards without any clear connection to California's smog problems. As ex-plained further below, greenhouse gas emissions are different from previously regu-

---

[106] *American Methyl v. EPA*, 749 F.2d 826, 834 (1984).

[107] *Gustafson*, 513 U.S. at 570 (interpreting Securities Act of 1933).

[108] *Id.*; *see also* Antonin A. Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 252 (2012) ("Statutes *in pari materia* are to be interpreted together, as though they were one law.").

[109] 42 U.S.C. § 7545(c)(B).

[110] 1 U.S.C. § 1.

lated emissions because a causal link is far more difficult to establish between California vehicles' greenhouse gas emissions and any climate effects felt locally in California.

In any event, consistent agency practice does not overcome clear statutory text. "Even an agency's consistent and longstanding interpretation, if contrary to statute, can be overruled."[111] EPA is not rigidly confined to its prior statutory interpretations.[112] When an agency revises a previous action, it need only demonstrate that "there are good reasons for the new policy."[113] EPA's newly articulated understanding of the statute was well explained as a better reading of text and structure. Therefore, a change from the historical interpretation was more than justified.[114]

California also pointed to one case precedent that they claimed upheld a whole-program approach, *American Trucking Associations, Inc. v. EPA*. But that case says nothing to support a "whole program" interpretation of § 209(b)(1)(B). In *American Trucking*, the D.C. Circuit simply held without much analysis that petitioners had not shown that a California rule relating to transportation refrigeration units was not needed to address compelling and extraordinary conditions in California without remarking on whether this standard was satisfied as long as California's climate and topography remained the same.[115]

Last, California argues that Congress had amended the Clean Air Act multiple times without disturbing EPA's previous whole-program interpretation. That is irrelevant. "Congressional acquiescence" has no interpretive value.[116] And Congress did not acquiesce here. When Congress last enacted various amendments to the Clean

---

[111] *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019); *see also SEC v. Sloan*, 436 U.S. 103, 118 (1978) ("Nor does the existence of a prior administrative practice, even a well-explained one, relieve us of our responsibility to determine whether that practice is consistent with the agency's statutory authority."); *Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009) ("No matter how consistent its past practice, an agency must still explain why that practice comports with the governing statute and reasoned decisionmaking. ... [N]o amount of historical consistency can transmute an unreasoned statutory interpretation into a reasoned one.").

[112] *See Fox Television Stations*, 556 U.S. at 514.

[113] *See id.*

[114] *See id.*; *see also* 84 Fed. Reg. at 51,3141.

[115] *See Am. Trucking*, 600 F.3d at 627–28.

[116] *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994).

Air Act, EPA had not yet even considered how to apply § 209(b)(1)(B) to greenhouse gas and zero-emissions vehicle standards, which are entirely different from traditional criteria pollutant standards.

For these reasons, § 209(b)(1)(B) requires applying an individual-standard analysis to California's waiver application.

### 2. California "needs" separate standards only if those standards meaningfully address its "extraordinary and compelling" air quality problems created by the state's particular circumstances.

EPA determined that the "extraordinary conditions" requirement in § 209(b)(1)(B) means that EPA must find specific facts that suggest local pollution conditions and geography create pollution problems that disproportionately impact California.[117] This is the only logical interpretation of § 209(b)(1)(B) because it gives concrete meaning to the term "extraordinary," which implies that the perils California faces are unique in some way, rather than common throughout the country. Such a reading is required to give effect "to every clause and word" of the statute.[118]

This reading of "extraordinary" is also confirmed by the purpose of § 209(b)(1)(B)—to empower California to address its own, unusual smog and air-quality related pollution problems, not to delegate to California the power to address ordinary, nationwide, or even global pollution issues that do not affect California in exceptionally more significant ways.[119] The 1967 House Report noted allowing California's "unique problems" as a result of its "climate and topography," as the purpose of § 209(b)(1)(B).[120] Only those pollution problems tied to California's pollution-inducing conditions are within the scope of § 209(b)(1)(B).

---

[117]  84 Fed. Reg. at 51,345-47.

[118] *See Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1003 (D.C. Cir. 2016) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

[119] *See Ford Motor Co. v. EPA*, 606 F.2d 1293, 1303 (D.C. Cir. 1979) ("[T]he intent of the Act ... [was to] focus on local air quality problems that may differ substantially from those in other parts of the nation.").

[120] H.R. Rep. No. 90-728, at 22 (1967).

California's various objections to this common-sense interpretation rightly failed to dissuade EPA from its own reading. California argued that EPA had previously looked only to "*factors* that tend to produce higher levels of pollution."[121] But even these earlier interpretations recognized that § 209(b)(1)(B) was designed to address factors that "cause or produce *local* or *regional* air pollution problems," and this is what "set California apart from other areas when Congress adopted the provision."[122]

California also argued that other Clean Air Act provisions differentiated among types of pollutants while § 209(b) did not, and therefore one should not distinguish between "local" and "global" pollutants. This argument also fails because it ignores the text and context of § 209(b). Unlike other sections, § 209 does not mention pollutants at all or concern itself with categorizing pollutants. It instead focuses on the "need" for the standards to address "extraordinary conditions," which is based on a historical understanding of California's unique air quality difficulties in light of its particular circumstances.

California contended further that EPA's interpretation of "extraordinary conditions" conflicts with § 177, which allows other states to adopt California's standards if they have an EPA-approved "non-attainment" or "maintenance" state implementation plan under the Clean Air Act. This argument is misguided because § 177 does not require other states to experience the same "extraordinary conditions" that California faces in order to adopt more stringent emissions standards. When Congress enacted § 177, it did not amend § 209(b)(1)(B) to require EPA to consider other states' need for California's standards.[123] Section 209(b)(1)(B) simply requires an assessment of the "extraordinary conditions" in the one state that is eligible for a waiver under

---

[121] *See* 73 Fed. Reg. at 12,160 (Mar. 6, 2008) (emphasis added; internal quotation marks omitted).

[122] *See id.* (emphasis added).

[123] This was based on the understanding that California would be requiring discrete add-on items such as different catalytic convertors to further lower criteria pollution, which would not add any new hurdles to the auto supply chain for § 177 states. But here, California is not attempting to mandate a small add-on piece of equipment at a modest cost premium for vehicles in CA; rather, it is seeking to mandate the wholesale replacement of the vehicles, at a cost premium to every vehicle sold in the country.

§ 209(b)(1)—California. Once California has a waiver, automobile manufacturers already face a dual-regulation program, so identical regulations in other states impose a lesser burden than initial approval of California's standards.

If anything, § 177 undercuts California's argument, since § 177 only applies when states are in non-compliance with the NAAQS or are in a probation period after having recently demonstrated attainment ("maintenance"). This connection to non-attainment with NAAQS supports limiting § 209(b)(1)(B) to the criteria ambient air pollution that characterizes California's airsheds as unique.

Last, California's circular argument that all of California's standards must be subject to waiver under § 209(b) if they are initially preempted under § 209(a) also fails. Nothing in § 209 states that all possible state standards are eligible for a waiver. In fact, § 209(b)(1)(B) excludes an entire category of possible state standards—those that are not "needed" to address "extraordinary conditions." Standards that are not more protective or give inadequate lead time are also excluded, so California's circular argument cannot be right.

For these reasons, EPA's interpretation of "extraordinary conditions" in the SAFE 1 rule was the only logical reading of the text and context. The objections to this interpretation failed to demonstrate otherwise.

EPA also correctly read the word "need." EPA based its waiver withdrawal determination on the conclusion that the "need" inquiry in § 209(b)(1)(B) requires a finding that the proposed state standards "will meaningfully redress" California's local pollution problems.[124] This interpretation is the only persuasive one because it comports with the common usage of the term "need" as something essential to addressing a particular problem, and it is supported by practical, regulatory considerations.

The common usage of "need" aligns with an interpretation that a "needed" remedy will, at a bare minimum, address a particular problem. The Oxford Languages online dictionary defines "need" as to "require (something) because it is essential or

---

[124] 84 Fed. Reg. at 51,345.

very important."[125] By contrast, California's greenhouse gas and zero-emissions vehicle standards by design do not address California's specific problems with smog and air quality. It cannot "need" them for that purpose. And, further, as EPA found in its SAFE 1 rulemaking, these programs would result in "no change" to the climate conditions in U.S., much less in California specifically.[126]

Arguments that this interpretation of "need" conflicts with prior EPA interpretations and with statements by the United States Supreme Court about valuing "incremental progress," are misguided. As noted repeatedly, EPA is not bound by its prior interpretations as long as its revised interpretations are reasonable, as this one was. And while it is true that the Supreme Court has stated that agencies are expected to take actions that will achieve progress through small, incremental steps, [127] EPA concluded that the greenhouse-gas and zero-emissions-vehicle standards proposed by California would not have resulted even in incremental improvements to that state's criteria pollution.[128] Therefore, EPA's interpretation of "need" in § 209(b)(1)(B) was the only logical and practical one and must be retained.

## C.    California Does Not Need the Greenhouse Gas Standards Because State Standards Have No Demonstrated Beneficial Effect on Greenhouse Gas Emissions.

California's greenhouse gas standards are not needed "to meet compelling and extraordinary conditions" particular to California for at least five reasons.

First, EPA correctly concluded that greenhouse gas emissions do not have a nexus to California's "compelling and extraordinary conditions." Greenhouse gases are global, not local, pollutants. They are well-mixed in the atmosphere, leaving the

---

[125] *Need*, Lexico.com powered by Oxford Languages, https://www.lexico.com/en/definition/need (last visited Jun. 15, 2021).

[126] 84 Fed. Reg. at 51,353 ("NHTSA believes that the argument that separate State standards will have little benefit has merit. The existence of State or local laws does not in any way alter an OEM's obligation under Federal law. For instance, OEMs would likely produce more efficient vehicles for sale in California and the States that have adopted California's standards, but the increased fuel economy of these vehicles would likely be offset by less efficient vehicles produced for sale in the rest of the U.S., leading to little to no change in either fuel use or GHG emissions at a national level."); *id.* at 51,358 (same).

[127] *See Mass. v. EPA*, 549 U.S. 497, 524 (2007).

[128] 84 Fed. Reg. at 51,358.

same concentration of greenhouse gases over California as over the rest of the country, and indeed, over the whole world. As a result, greenhouse gas "emissions from California cars are no more relevant to [climate change] as it impacts California than are the [greenhouse gas] emissions from cars being driven in New York, London, Johannesburg, or Tokyo."[129]

Second, unlike with smog, there is no evidence that any of the effects of climate change will harm California to any significantly greater degree than other states. As EPA observes, California's alleged susceptibility to a changing climate is no more "extraordinary" than the susceptibility of other states, "particularly those coastal States that may possess a greater percentage of low-lying territory than California."[130] If anything, California's mild climate suggests that any climate impacts in California are the opposite of "extraordinary." For example, mild California weather allows its residents to use the fourth-lowest amount of energy *per capita* of any State,[131]

Third, California's greenhouse gas standards are not needed "because they will not meaningfully address global air pollution problems of the sort associated with [greenhouse gas] emissions."[132] There is no credible basis to believe that California's separate regulation will do anything to reduce global greenhouse gas emissions. With a "deemed to comply" provision, California's separate regulation does nothing at all, since car manufacturers will simply choose to comply with national greenhouse gas standards.

Even without the "deemed to comply" provision, California's program still has no demonstrable beneficial effect on greenhouse gas emissions. As the One National Program Rule concluded, state carbon dioxide standards do nothing to reduce emissions when sprinkled atop a national fleet-*average* carbon dioxide standard. Since compliance with national carbon dioxide standards is determined by averaging a

---

[129] 84 Fed. Reg. at 51,339.

[130] *Id*. at 51,348; *see, also, e.g.*, Salomon Hsiang et al., *Estimating Economic Damage from Climate Change in the United States*, 356 Science 1362, 1364, Fig. 2 (2017) (showing estimated damages from climate change are no worse in California than in any other state); Brad Plumer & Nadja Popovich, *As Climate Changes, Southern States Will Suffer More Than Others*, N.Y. Times (June 29, 2017).

[131] U.S. EIA, *California State Energy Profile,* https://www.eia.gov/state/print.php?sid=CA.

[132] 84 Fed. Reg. at 51,349.

manufacturer's car fleet nationwide, "the increased fuel economy of [California] vehicles would likely be offset by less efficient vehicles produced for sale in the rest of the U.S., leading to little or no change in either fuel use or [greenhouse-gas] emissions at a national level."[133]

The net effect on national or global greenhouse gas emissions from California's standards is likely zero, at best. More likely it will *increase* greenhouse gas emissions, due to EPA "multiplier" credits. For each compliant car sold in California, a manufacturer will be able to sell cars that emit *more* grams of carbon per mile elsewhere in the United States while still meeting the same national fleet-average greenhouse standard. Because reducing carbon dioxide emissions is costly, car manufacturers have strong economic incentives to offset the effect of California's state standards in other states.

As one would expect, peer-reviewed modeling studies show that carbon leakage offsets in-state carbon-reduction benefits from California's carbon dioxide standards, imposing additional compliance costs on car manufacturers for little or no demonstrable incremental reduction in global carbon emissions.[134] For a more detailed explanation of the academic literature on carbon leakage, see the Affidavit of Professor John D. Graham attached to these comments. Professor Graham concludes that, contrary to California politicians' claims, "there is little basis to predict any quantifiable net carbon dioxide reductions will result nationally from separate state standards."[135]

As the Nation's chief environmental regulator, EPA cannot parochially focus on California's *in-state* emissions goals while ignoring likely offsetting effects on out-of-state emissions subject to its jurisdiction. Carbon leakage is "an important aspect

---

[133] *Id.* at 51,354.

[134] *See* L. H. Goulder et al., *Unintended Consequences from nested state and federal regulations: The case of the Pavley greenhouse-gas-per-mile limits*, 63 J. of Environ. Econ. & Mgmt. 187, 188 (2012) (concluding that in the presence of binding federal standards, state carbon dioxide rules "would lead to 'emissions leakage' of 100% at the margin: the reductions within [California and the other § 177] states would be *completely* offset by emissions increases outside of those states") (emphasis added).

[135] Graham Affidavit ¶ 52.

of the problem," and it would be entirely arbitrary to simply ignore it.[136] Since California's carbon emissions are "not more relevant . . . than are the [carbon dioxide] emissions from cars being driven in New York, London, Johannesburg, or Tokyo," policies that displace carbon emissions elsewhere do nothing, and cannot possibly be needed to address California's serious criteria pollution problems. In fact, they are counterproductive, since they drain national resources that could be used to meaningfully improve social welfare and allow more investment in newer (both new and used) vehicles that would facilitate a more rapid fleet turnover and greater air quality improvements from reducing the number of older vehicles on the road. Conversely, California's rules increase the prices of vehicles and delay fleet turnover and any corresponding environmental benefits.

Given its lack of any actual reduction in greenhouse gas emissions, California's greenhouse gas program is at best an ill-conceived and unwieldy tool to threaten the car industry with regulatory balkanization should national car policy diverge from California's partisan wishes. While California may think this sword of Damocles is an indispensable threat to protect local interests, California's desire to dictate national car policy to serve its own financial interests is not a "need" recognized by Congress in § 209(b)(1)(B). Restoration of the waiver given this political reality would only aid California's continued attempts to undermine national sovereignty and the Clean Air Act's core mission of protecting "the *Nation's* air resources" while simultaneously promoting "the productive capacity of its population"—*all* of its population, not just California.[137]

Fourth, even ignoring offsetting carbon leakage and the overlapping federal standards, California's predicted in-state carbon reductions would have no discernible effect on global atmospheric greenhouse gas concentrations. California (wrongly) projected that the regulations would reduce statewide light-duty vehicle carbon emissions by 13.7 million metric tons in 2025 and 42.7 million metric tons in 2050.[138] For comparison, 2019 global energy-related carbon emissions were 33 *billion* metric

---

[136] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[137] 42 U.S.C. § 7401(b)(1).

[138] ACC ISR, *supra* note 35, at 174–76.

tons.[139] California's predicted reductions will have negligible effects on the stock of atmospheric carbon (and would have no beneficial effect after accounting for leakage). Even the prior version of the national greenhouse gas standards, which results in far greater emission reductions compared to California's state program, had trivial effects on global carbon concentrations.[140] California may believe its policy is laudable, but engaging in climate virtue-signaling is also not a "need" recognized by § 209(b)(1).

Fifth, even under California's delusional carbon-reduction projections, compliance costs far outweigh California's claimed *global* "Social Cost of Carbon" benefits.[141] From 2017 to 2040, California projects $20 billion in avoided social costs globally, and $70 billion in vehicle compliance costs in the United States, a net global social cost of about $50 billion.[142] Notably, these costs do not consider numerous other offsetting externalities, such as the skyrocketing increases in electric utility rates to cover the costs to invest in the power generation, transmission and distribution equipment needed to supply electric load to California electric vehicle owners;[143] or, the increases in any *global* social cost of particulate matter, arising around the world due to higher particulate matter exposures associated with the mining, processing and manufacturing of the batteries that the California mandates require.

California attempts to paper over significant increases in net (domestic and global) social costs by stating that ancillary fuel savings will somehow enhance drivers' private welfare and yield net benefits, perhaps on the assumption that car buyers suffer from fuel savings myopia—a "market failure."[144] But there is no solid basis to assume this "market failure" exists. Studies show that when manufacturers adopt

---

[139] IEA, *Global CO₂ emissions in 2019*, (Feb. 11, 2020) https://www.iea.org/articles/global-co2-emissions-in-2019.

[140] 84 Fed. Reg. at 51,340.

[141] ACC ISR, *supra* note 35, at 174–76.

[142] *Id.* at S-23–24.

[143] California's electric rates are already double the national average, *see* U.S. Energy Information Administration, *California State Energy Profile* https://www.eia.gov/state/print.php?sid=CA. This is slated to go much higher, *see* California Public Utilities Commission, *Utility Costs and Affordability of the Grid of the Future,* Feb. 2021, https://www.cpuc.ca.gov/uploadedFiles/CPUC_Website/Content/Utilities_and_Industries/Energy/Reports_and_White_Papers/Feb%202021%20Utility%20Costs%20and%20Affordability%20of%20the%20Grid%20of%20the%20Future.pdf...

[144] ACC ISR, *supra* note 35, at S-24.

these expensive fuel-saving technologies, they forego other automobile improvements—like acceleration and towing capacities—that consumers prefer, with little or no net effect on private welfare.[145] The average willingness to pay for a single percentage increase in horsepower has been estimated at $41.[146] Mandating de facto fuel economy increases therefore has enormous opportunity costs to consumers. For example, from 2012 to 2016, federal greenhouse gas standards required automobile manufacturers to reduce fuel consumption by 13%. To reach this goal, automobile manufacturers failed to increase automobile horsepower much at all, and horsepower would have been 30% higher in the absence of tighter fuel economy standards. The forgone improvement in horsepower cost consumers billions in private welfare losses and largely wiped out private welfare gains from fuel savings, at a time when reducing fuel consumption was much lower hanging fruit than it is today.[147] The lesson should be obvious: performance trade-offs cannot be ignored when setting fuel economy or carbon dioxide standards. Counting fuel savings while ignoring these trade-offs substantially overstates private welfare gains.

A policy that yields at least $20 billion in new net social costs is not needed. The waiver cannot be lawfully reinstated.

### D.    California Does Not Need the Zero-Emission Vehicle Standard Because the Zero-Emissions Vehicle Standard has Zero Beneficial Effects on Vehicle Pollution.

California's zero-emissions vehicle mandate is also not needed. Indeed, California's own analysis demonstrates as much.

---

[145] *See, e.g.,* T. Klier and J. Linn, *The effect of vehicle fuel economy standards on technology adoption*, 133 J. of Pub. Econ. 41, 53 (2016) (finding that more stringent fuel economy standards "affected the direction of technology adoption by reducing light truck torque in the United States and both vehicle weight and horsepower in Europe"); K.S. Whitefoot et al., *Compliance by Design: Influence of Acceleration Trade-offs on $CO_2$ Emissions and Costs of Fuel Economy and Greenhouse Gas Regulations*, 51 Environ. Sci. & Technol. 10307, 10313 (2017) ("find[ing] that automakers have an incentive to [trade-off between fuel economy and acceleration performance] and that [greenhouse gas] emissions and compliance costs . . . are significantly lower when these trade-offs are accounted for.").

[146] B. Leard et al., *Have US Fuel Economy and Greenhouse Gas Emissions Standards Improved Social Welfare?* 17 (Resources for the Future, Working Paper 20-06 Mar. 2020).

[147] *Id.* at 23–25.

California asserted that the zero-emissions vehicle mandate would allow California to meet its self-imposed requirement of achieving an 80% reduction in statewide greenhouse gas emissions in 2050 compared to 1990 levels.[148] At the same time, however, California paradoxically recognized that zero-emission vehicle standards would do nothing to reduce state greenhouse gas emissions over and above the fleet-average carbon dioxide emissions reductions already required by the state greenhouse gas standards:

> "The [zero-emissions vehicle] regulation does not provide [greenhouse gas] emission reductions in addition to the [California greenhouse gas] regulation given that [zero-emission vehicle] emissions are included in determining compliance with the [greenhouse gas] standard. Specifically, because the California [greenhouse gas] standard includes upstream emissions, in addition to the vehicle emissions, there is no difference in [greenhouse gas] emissions under varying [zero-emission vehicle] scenarios.[149]

California also recognized that the zero-emissions vehicle mandate would do nothing to reduce vehicle (tank-to-wheels) criteria emissions over and above state criteria emission regulations:

> "There is no criteria emissions benefit from including the [zero-emissions vehicle] proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the [zero-emission vehicle] regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles."[150]

This is correct. Even particulate matter emissions, which are controlled through a per-vehicle standard, will not change for the better. Vehicle particulate matter emissions arise from two sources: exhaust emissions and non-exhaust emissions from tire and road wear and tear.[151] While electric automobiles have no exhaust

---

[148] CARB Resolution, supra note 35, at 12-11 at 8; 2012 Waiver Application, *supra* note 35, at 8.

[149] 2012 Waiver Application, *supra* note 35, at 16–17; ZEV ISR, *supra* note 35, at 79.

[150] 2012 Waiver Application, *supra* note 35, at 15–16; ZEV ISR, *supra* note 35, at 77–79.

[151] *See* V.R.J.H. Timmers & P.A.K. Achten, *Non-exhaust PM emissions from electric vehicles*, 134 Atmospheric Env't. 10, 10 (2016).

particle matter emissions, they have higher non-exhaust wear and tear particle matter emissions than gasoline cars because they are heavier.[152] For passenger cars, the increase in non-exhaust particle emissions nearly fully offsets the decrease in tailpipe particle emissions, so that overall, electric automobiles do not provide substantial particulate matter benefits compared to gasoline-only automobiles.[153] Criteria pollutant emission reductions from fleet turnover and other allowable administrative policies (restrictions on older vehicles) are responsible for nearly all emission reductions compared to any marginal reductions from new model year limits (or electric vehicle mandates) and are sufficient to mitigate any mobile source contributions to air quality issues. Moreover, considering that California requirements increase vehicle costs, it is logical to conclude they reduce overall consumer demand for new vehicles, push up demand for higher-emitting used vehicles, and delay overall fleet turnover and associated emission reductions.

California argued that by replacing demand for gasoline with electricity, the zero-emission vehicle standards could reduce California's upstream *stationary source* criteria pollution.[154] But California's optimistic projections show that even by 2030, the zero-emissions vehicle standard would have negligible effects even on a "fuel lifecycle" criteria emissions basis.[155]

### Statewide Criteria and PM Emissions in 2030 (tons per day)

| 2030 | NMOG+NOx | PM |
|---|---|---|
| LEVIII fleet WTW emissions <u>without</u> new ZEV proposal | 233 | 56.4 |
| LEVIII fleet WTW emissions <u>with</u> new ZEV proposal | 229.5 | 56.2 |
| Change % | -1.5 | -0.4 |

These predicted reductions in upstream smog precursor emissions are trivial. Total NMOG+NO$_X$ emissions in California are predicted to be 7,588 tons per day in

---

[152] *Id*. at 15.

[153] *Id*. at 14 ("EVs emit the same amount of PM$_{10}$ as modern gasoline and diesel cars" and "bring about a negligible reduction in [PM$_{2.5}$] emissions.").

[154] ZEV ISR, *supra* note 35, at 72, 77–79.

[155] *Id*. at 78, Table 6.1.

2030.[156] A 3.5 ton per day reduction in 2030, which California predicts the zero-emissions vehicle standard will generate, is equivalent to less than 0.05% of predicted state emissions. Similarly, California will emit 948 tons per day of fine particulates in 2030.[157] The 0.2 ton per day reduction in fine particulate matter emissions California projects is only 0.02% of state emissions. These reductions, realized ten years from now, would have no discernible effect on aiding compliance with California's NAAQS deadlines. And given the significant uncertainties in making these far-flung predictions about upstream emission sources two decades in advance, these negligible reductions may well not be realized.

In any event, a waiver is not "needed" to achieve these trivial upstream criteria pollution emission reductions. California has broad authority to regulate stationary sources within its own borders. It does not "need" a waiver to address stationary source emissions. Moreover, attempting to achieve these stationary source reductions through convoluted motor vehicle regulation is extraordinarily inefficient and costly. Through model years 2018 to 2025 alone, California projects the compliance costs of the zero-emissions vehicle mandate (excluding § 177 states) "to be approximately $10.5 billion."[158] California projected the mandate would increase average model year 2025 light-duty vehicle prices by $500 on top of the astonishing increase resulting from California's state greenhouse gas standards—a total incremental price increase of $1,840.[159]

---

[156] CARB, *CEPAM: 2016 SIP - Standard Emission Tool Emission Projections By Summary Category Base Year: 2012*, https://www.arb.ca.gov/app/emsinv/fcemssumcat/fcemssumcat2016.php.

[157] *Id.*

[158] ZEV ISR, *supra* note 35, at 62.

[159] *Id.* at 63.



**Figure 15: Incremental Vehicle Price (With and Without* ZEV Proposal)**

*Proposed 2025 GHG Standards means 2025 GHG standards with no change to the current ZEV requirements.

More recent modeling studies predict even greater costs nationwide. Studies find that adding zero-emissions vehicle mandates for 30% of the market (California and § 177 states) on top of national greenhouse gas standards will increase average new car costs *nationally* by $400 in 2025, undermining the practicability of the standards.[160] "The reason for this cost increase is because, on the marginal cost curve of fuel-saving technologies, electrification of vehicles is relatively expensive per unit of fuel saved. Electrification is certainly a less cost-effective method . . . than refinements to the internal combustion engine."[161] On an absolute basis, the compliance costs are staggering. Through just 2025, zero-emission vehicle mandates will impose $31 to $35 billion in compliance costs nationwide, while achieving, by California's own estimate, no greenhouse gas emission reductions, no vehicle criteria pollution reductions, and at best paltry upstream stationary source emission reductions.[162]

And all this is according to *California*'s projections, which ignore leakage from national regulations. The reality is far worse for the environment. As explained in the attached affidavit of Professor John D. Graham, the zero-emissions vehicle standards will in fact *increase* national greenhouse gas emissions. Because under the federal greenhouse gas standards, zero-emissions vehicles are double-counted through

---

[160] Alan Jenn et al., *Cost Implications for Automaker Compliance of Zero Emissions Vehicle Requirements*, 53 Environ. Sci. Technol. 564, 568–69 (2019).

[161] *Id.* at 569.

[162] Graham Affidavit ¶ 62.

production multipliers and over-credited (their operation is assumed to result in 0 grams per mile of carbon dioxide despite their consumption of carbon-based energy), the zero-emission vehicle mandate will increase emissions by artificially reducing the stringency of national greenhouse gas standards, undermining both the national greenhouse gas rules and the Biden Administration's own climate change commitments to the international community.[163] And this still ignores the greater upstream greenhouse gas emissions from mining battery raw materials and manufacturing batteries. This zero-emissions vehicle leakage is a significant aspect of the problem with California's claimed "need." EPA cannot ignore it when considering reinstatement.

Even if the zero-emissions vehicle standard reduced vehicle criteria pollution, and it does not, the zero-emissions vehicle standard will not make a meaningful difference for California's long-term NAAQS obligations.[164] Light-duty vehicles will be a trivial source of California's overall emissions going forward. For example, in the year 2000 light-duty vehicles accounted for a quarter of California's $NO_X$ emissions, but by 2035, light-duty vehicles will account for a paltry 3% (31 tons) of statewide $NO_X$ emissions.[165] During this period, on-road light-duty vehicle tons per day of $NO_X$ will have fallen by 97%.[166] Criteria pollution goals cannot justify this multibillion-dollar joint state venture.

As Professor Graham explains, the zero-emissions vehicle program is not an emissions control program. It is an industrial policy to drive investment in California's "green" industries "at the expense of companies and workers in other states that dominate internal combustion engine production and petroleum/biofuel production, like Michigan, Indiana, Kentucky, Ohio, and Alabama for engines and components and Iowa, Indiana, Nebraska, Oklahoma, Texas, North Dakota, and Louisiana for

---

[163] *Id.* ¶¶ 63–64. California was aware that this over-crediting would increase emission, predicting a 3.7% cumulative increase in greenhouse gas emissions *before* the SAFE Rule further extended the over-crediting from model year 2022 to model year 2026. ACC ISR, *supra* note 35, at 162, Table III-A-5-14.

[164] Graham Affidavit ¶¶ 76–77.

[165] Exhibit J: California Emissions Projection Analysis Model: 2016, Standard Emission Tool, Emissions Projections, Base Year: 2012 3.

[166] *Id.*

petroleum and biofuels production."[167] Promoting California's "green" technology industry at the expense of the whole Nation is not a "need" recognized by § 209(b)(1)(B) of the Clean Air Act. The waiver was properly rescinded.

### E. California's Need for a Separate Motor Vehicle Program Is No Longer "Compelling."

Even assuming the statute can be reasonably interpreted to require only an analysis of whether California generally needs a separate motor vehicle program, the waiver reinstatement would still not be justified because California's conditions are no longer "compelling." Simply put: California's substantial progress in regulating motor vehicle emissions to address its pollution has made it so that it no longer needs a separate motor vehicle program.

Peak ozone concentrations in Southern California have dropped more than 60 percent over the past four decades.[168] California has eliminated 1-hour advisories and emergency smog episodes that afflicted the South Coast Air Basin just a few decades ago.[169]



[167] Graham Affidavit ¶ 87.

[168] CARB SAFE Rule Comments, *supra* note 23, at 63, Fig. III-1. *See also id.* at 62–64 (arguing that California's ambient air pollution has vastly improved),

[169] Graph from South Coast AQMD, *Historical Ozone Air Quality Trends*, http://www.aqmd.gov/home/air-quality/historical-air-quality-data/historic-ozone-air-quality-trends.

As CARB puts it, "[e]ven the California's South Coast Air Basin has achieved progress in reducing ozone levels—although it once exceeded the 1-hour ozone NAAQS over 200 days per year, it has recently only exceeded the 1-hour ozone NAAQS only 17 days per year."[170]



Similarly, the number of days exceeding the 1997 ozone NAAQS has fallen from 200 days per year in 1978 to as low as 40 days per year.[171] And the maximum eight-hour average ozone levels have fallen from nearly 335 ppb in 1978 to 117 ppb.[172]

Using yet a different measure, under EPA's "Air Quality Index" for measuring healthy air days, in 1980 Los Angeles County had 159 days of "very unhealthy air," and just 80 "good" or "moderate" days where the air was healthy even for vulnerable populations. In 2019, Los Angeles County had just *one* "very unhealthy air" day, and 279 good or moderate days.[173]

---

[170] CARB SAFE Rule Comments, *supra* note 23, at 62–63; graph from South Coast AQMD, *Historical Ozone Air Quality Trends*, http://www.aqmd.gov/home/air-quality/historical-air-quality-data/historic-ozone-air-quality-trends.

[171] CARB, *Trends Summary: National Ozone Statistics*, https://www.arb.ca.gov/adam/trends/trends1.php.

[172] *See id.* (selecting "Ozone (National)" pollutant and "South Coast" Air Basin).

[173] EPA, *Air Quality Index Report*, https://www.epa.gov/outdoor-air-quality-data/air-quality-index-report (selecting "CA- Los Angeles" County).

The contribution of motor vehicles to California's problems has also dramatically changed since 1967. The law of diminishing returns means that further regulation of today's ultra-clean new light-duty vehicles will not substantially contribute to improving California's air quality.[174] While medium- and heavy-duty trucks continue to be a significant source of nitrogen oxides, EPA has already announced its intention to mandate cleaner trucks with dramatically reduced nitrogen oxide emissions, anticipated to be reductions in new truck emissions ranging from 50% to 90%.[175] Given this, *new* light-duty motor vehicle regulations will make little difference to California's emissions going forward.

In fact, at least in the near term, California's approach will make its ozone problems *worse*. CARB acknowledges that "initial [automobile] purchase prices will be higher" under its greenhouse gas and zero-emissions vehicle standards, causing some consumers to delay purchasing a new vehicle, "keep[ing] their older (dirtier) vehicles longer[,] which could erode some of the emissions benefits" of the program.[176] Incredibly, however, California concluded in its 2012 analysis that—notwithstanding the laws of supply and demand—California's greenhouse gas and zero-emissions vehicle standards will *not* delay vehicle turnover, but will lead to a *younger* California vehicle fleet.[177] Accordingly, California projected that consumer responses to increased vehicle prices will have little-to-no effect on the projected criteria emissions reductions under their standards.[178]

[174] Graham Affidavit ¶¶ 76–77, Exhibit J at 1–3.

[175] *Control of Air Pollution From New Motor Vehicles: Heavy-Duty Engine Standards*, 85 Fed. Reg. 3,306, 3320 (Jan. 21, 2020). CARB is finalizing omnibus truck regulations to do just that. CARB, *Public Hearing To Consider The Proposed Heavy-Duty Engine And Vehicle Omnibus Regulation And Associated Amendments: Staff Report: Initial Statement of Reasons*, VI-2 (June 23, 2020).

[176] ACC ISR, *supra* note 35, at S-29.

[177] *Id*. at S-40, Table VI-5 (forecasting that, with the greenhouse gas and zero-emissions vehicle standards, the average age of the California vehicle fleet will decrease relative to a baseline scenario).

[178] *Id*. at S-43.

This conclusion runs counter to peer-reviewed analyses by environmental economists as well as common sense. Published studies confirm that consumers respond to the higher prices of new compliant cars by delaying new car purchases.[179] And this delay is estimated to offset emissions reductions by 13% to 16%, considerably decreasing any gain projected by California.[180]

This aside, California's quixotic pursuit of zero emissions through its recent electrification frenzy shows that California's regulators have little ozone-creating motor vehicle pollution left to reduce, and that its pollution problems relating to motor vehicles—the reason for the waiver—are no longer "compelling."

To be sure, California's air quality problems may continue to be "extraordinary" if viewed solely as *compared to rest of the country*—but this is only because the United States has some of the cleanest air basins in the world. Of the 19 counties with the highest ozone design values, 15 were in California.[181] But even if its conditions remain extraordinary compared to the rest of the country, California's conditions are far less "compelling" than they were in 1967, and the need for cleaner cars is virtually non-existent.

## III. WAIVER REINSTATEMENT WOULD VIOLATE THE CONSTITUTION'S EQUAL SOVEREIGNTY DOCTRINE.

The Constitution's equal footing doctrine also demands that California's waiver not be reinstated. Laws that depart from equal sovereignty are only lawful upon "a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets"—the type of showing required by § 209(b)(1)(B).[182] If

---

[179] X. Dou & J. Linn, *How Do US Passenger Vehicle Fuel Economy Standards Affect New Vehicle Purchases?* 102 J Envt'l Econ. & Mgmt. 102332, 18 (2020); M.R. Jacobsen & A.A. Van Benthem, *Vehicle Scrappage and Gasoline Policy*, 105 Am. Econ. Rev. 1312, 1334 (2015).

[180] M.R. Jacobsen & A.A. Van Benthem, *Vehicle Scrappage and Gasoline Policy*, 105 Am. Econ. Rev. 1312, 1333 (2015).

[181] EPA, *Air Quality Statistics by County, 2020),* https://www.epa.gov/sites/production/files/2021-05/ctyfactbook2020.xlsx. An ozone "design value is a statistic that describes the air quality status of a given location relative to the level of the National Ambient Air Quality Standards (NAAQS)." EPA, *Air Quality Design Values*, https://www.epa.gov/air-trends/air-quality-design-values.

[182] *Shelby Cty. v. Holder*, 570 U.S. 529, 544 (2013); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009).

§ 209(b)(1)(B) is construed as a blank check allowing California—and only California—to regulate mobile sources however it wants so long as California continues to have the same climate and topography, meaning *forever*, § 209(b) would grant California a perpetual right to special treatment, in violation of equal sovereignty.

As argued in the intervenor brief filed by Ohio, Alabama, Arkansas, Georgia, Indiana, Louisiana, Missouri, Nebraska, South Carolina, Texas, Utah, and West Virginia in *Union of Concerned Scientists v. NHTSA*, No. 19-1230 (D.C. Cir. 2020), a perpetual right to special treatment for California would violate the Constitution. The states' brief is attached to these comments, and their arguments are incorporated by reference.

## IV. Waiver Reinstatement Would Be Unlawful Because California's Standards Are Prohibited by CAFE.

As NHTSA concluded in the One National Program Rule, 49 U.S.C. § 32919(a) independently preempts California's carbon dioxide and zero-emissions vehicle mandates. This determination is compelled by law.[183]

EPA has previously claimed that it must *ignore* CAFE's express preemption of California's standard when granting Clean Air Act waivers.[184] EPA relies on *Motor & Equipment Manufacturers Association v. Nichols*, 142 F.3d 449, 462–63 (D.C. Cir. 1998) (*"MEMA II"*). There, manufacturers argued that a California waiver conflicted with § 202(m) of the Clean Air Act, which requires EPA to mandate diagnostic systems requirements for light-duty vehicles under certain conditions.[185] The D.C. Circuit held that California's compliance with § 202(m) was not a "prerequisite to any waiver approval."[186]

*MEMA II* does not control. The argument here is not that compliance with 49 U.S.C. § 32919(a) is a prerequisite to receiving a waiver. Rather, it is that under the Constitution's Supremacy Clause, California lacks authority to "adopt" the standards

---

[183] *See* Comments of Boyden Gray & Associates on Behalf of Urban Air Initiative & Consumers' Research, https://www.regulations.gov/comment/NHTSA-2021-0030-0423.

[184] 84 Fed. Reg. at 51,338.

[185] 42 U.S.C. § 7521(m).

[186] *MEMA II*, 142 F.3d at 459.

it is seeking a waiver for, so the standards are void *ab initio* as far as the Constitution is concerned.[187]

The Supremacy Clause provides:

This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

The Supremacy Clause "creates a rule of decision": judges "must not give effect to state laws that conflict with federal laws."[188] This rule of decision ensures that under our federal system, "States have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress."[189] Without the Supremacy Clause, Madison warned, the world "would have seen the authority of the whole society everywhere subordinate to the authority of the parts; it would have seen a monster, in which the head was under the direction of the members."[190]

Under the Supremacy Clause, government officials have a duty—they are "bound"—to follow the Constitution rather than any contrary federal or state law. Judges must therefore set aside any administrative order that gives effect to state regulations preempted by federal law. And the President must ensure that *all* federal laws are faithfully executed. Likewise, other officers of the United States—including EPA's Administrator—are "bound by oath or affirmation" to support the U.S. Constitution, including the Constitution's Supremacy Clause.[191] The Administration and the D.C. Circuit cannot ignore the Supremacy Clause on judicial review of a California waiver, any more than they can ignore the First Amendment. Imagine, for example, that California sought a waiver for a motor vehicle regulation that violated the

---

[187] Art. VI, cl. 2.

[188] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015).

[189] *McCulloch v. Maryland*, 4 Wheat. 316, 436 (1819).

[190] Federalist No. 44.

[191] Art. VI, cl. 3.

First Amendment, say, for example, by imposing standards on some manufacturers in retaliation for their voiced opposition to California's authority.[192] Such regulations would be void, so EPA would violate the Constitution if it purported to give the laws legal effect by granting them a Clean Air Act waiver. The same is true for independently preempted California regulations.

EPA cannot whistle past the law. 49 U.S.C. § 32919(a) preempts California's regulations, so there are no lawful regulations to reinstate through a Clean Air Act waiver.

## V. WAIVER REINSTATEMENT WOULD BE UNLAWFUL BECAUSE CALIFORNIA'S ADVANCED CLEAN CARS WAIVER WAS UNLAWFUL ON OTHER GROUNDS.

While EPA explicitly withdrew California's Advanced Clean Cars waiver because it failed to make an appropriate showing under § 209(b)(1)(B), the waiver is also unlawful because it violates §§ 209(b)(1)(A) and 209(b)(1)(C). Specifically, the waiver's protectiveness determination was arbitrary and capricious (209(b)(1)(A)) and the waiver failed to give appropriate consideration to cost when setting lead time (209(b)(1)(C)). EPA cannot ignore these violations. Reinstatement of the waiver for the greenhouse gas and zero-emissions vehicle standards would provide after-arising grounds, under § 307(b), and constructively reopen the entire waiver for judicial review.

### A. Reinstatement Would Provide After-Arising Grounds to Challenge the Advanced Clean Cars Waiver and Constructively Reopen the Issues Raised in Waiver.

Under § 307(b) of the Clean Air Act, a "petition for review of action . . . shall be filed within sixty days."[193] Review of the Advanced Clean Cars waiver would thus be

---

[192] This example is not far-fetched. *See, e.g.,* Rachel Becker, *California says it won't buy cars from GM, Toyota, others opposing tough tailpipe standards*, CALMATTERS (Nov. 15, 2019), https://calmatters.org/environment/2019/11/california-says-it-wont-buy-cars-from-gm-toyota-others-opposing-tough-fuel-standards/.

[193] 42 U.S.C. § 7607(b)(1).

"untimely" unless the challenge is "'based solely on grounds arising after' the expiration of the 60–day period."[194] Reinstatement of the waiver would provide such after-arising grounds.

After-arising grounds claims are proper when claims become ripe for judicial review. In *Honeywell International v. EPA*, for example, the D.C. Circuit reasoned that the petitioners could not have raised their merits arguments at an earlier time because they depended on a premise that had not yet been borne out.[195] Here, the greenhouse gas waiver was not challengeable previously because, according to the D.C. Circuit, the "deemed to comply" provision of California's regulations prevented these regulations from "caus[ing] injury beyond that caused by intact federal regulations."[196] But in September of 2018, California's "deemed to comply" provision was amended to provide that it "shall not be available" for model years 2021 and later.[197] Because the greenhouse gas waiver was withdrawn through the One National Program Rule in 2019, while the "deemed to comply" provision was still available, there was still no possibility of the California regulations "caus[ing] injury."[198] But now that the amendment has taken effect, reinstatement of the greenhouse gas waiver without a "deemed to comply" provision would give effect to the California regulations, "caus[ing] injury beyond that caused by intact federal regulations."[199] This would "change the legal landscape on that issue, which suffices to constitute after-arising grounds."[200]

Reinstating the greenhouse gas waiver would also reopen review of the waiver under the "reopening doctrine." "The reopening doctrine, 'well established in [the D.C.] Circuit', is 'an exception to statutory limits on the time for seeking review of an agency decision.'"[201] An issue is reopened when "an agency conducts a rulemaking or

---

[194] *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 472 (D.C. Cir. 2013) (quoting 42 U.S.C. § 7607(b)(1)).

[195] *Id.* at 473.

[196] *Chamber of Commerce v. EPA*, 642 F.3d 192, 209 (D.C. Cir. 2011).

[197] 13 Cal. Code Reg. § 1961.3(c)

[198] *Chamber of Commerce*, 642 F.3d at 209.

[199] *Id.*

[200] *Honeywell*, 705 F.3d at 473.

[201] *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 395 F. Supp. 3d 1, 11 (D.D.C. 2019) (quoting *CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 110 (D.C. Cir. 2006)).

adopts a policy on an issue at one time, and then . . . addresses the issue again."[202] "It is designed to ensure that when the agency . . . by some new promulgation creates the opportunity for renewed comment and objection, affected parties may seek judicial review."[203]

If EPA were to reinstate the Advanced Clean Cars waiver for greenhouse gas and zero-emission vehicle standards, EPA will have "constructively reopened" the waiver. An agency "constructively" reopens a decision when its actions lead to a "change in the regulatory context."[204] "A constructive reopening occurs if the revision of accompanying regulations "significantly alters the stakes of judicial review."[205]

EPA will change the "legal landscape" and the "regulatory context" if it reinstates the greenhouse gas and zero-emissions vehicle waivers. This reinstatement would give effect for the first time to California regulations that are no longer neutered by a "deemed to comply" waiver. And by making California's greenhouse gas regulations binding, reinstatement would also significantly alter the costs of the zero-emissions vehicle standard. Unlike federal regulations, California's regulations do not include multipliers for electric cars and do not ignore upstream emissions needed to operate electric vehicles, significantly increasing the cost of simultaneous compliance with both mandates.[206] This "alters the stakes of judicial review" and merits reexamining the Advanced Clean Cars waiver for the greenhouse gas and zero-emissions vehicle standards afresh. Such a waiver would "Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in [E.O. 12866]"; and, moreover, since it would be a "significant regulatory action" with annual costs above $100 million, such a waiver must go through the complete rulemaking process.[207]

---

[202] *Id.*

[203] *Id.*

[204] *Kennecott Utah Copper Corp. v. Department of Interior*, 88 F.3d 1191, 1214 (D.C. Cir. 1996).

[205] *Sierra Club v. EPA*, 551 F.3d 1019, 1025 (D.C. Cir. 2008) (quoting *Kennecott*, 88 F.3d at 1227).

[206] ACC ISR, *supra* note 35, at 159–160 (noting that California considers upstream emissions and does not include production multipliers).

[207] Regulatory Planning and Review, Executive Order 12866 (Oct. 4 1993), 58 Fed. Reg. 51735, 51738.

### B.    The Advanced Clean Car Waiver's Protectiveness Determination Was Arbitrary and Capricious.

California's protectiveness determination was arbitrary and capricious because it failed to consider carbon leakage. As explained above, particularly in the context of the zero-emissions vehicle standard, more than complete leakage means that the zero-emissions vehicle standard *increases* net carbon emissions, undermining California's claim that its state zero-emissions vehicle standards are "at least as protective of public health and welfare as applicable Federal standards."[208] It was irrational for EPA to conclude that the simple *absence* of a federal zero-emissions vehicle standard demonstrates the protectiveness of California's standards. As explained in the attached affidavit of Professor Graham, taken collectively, federal greenhouse gas standards would achieve *more* net reductions in greenhouse gas emissions without California's zero-emissions vehicle standards. Ignoring this reality would be arbitrary.

### C.    The Advanced Clean Cars Waiver Failed to Give Appropriate Consideration to Cost When Setting Lead Time for the Greenhouse Gas and Zero-Emissions Vehicle Standards.

EPA was required by law to appropriately consider the costs and benefits of California's vehicle emissions standards before granting a waiver. But EPA misinterpreted § 202(a) of the Clean Air Act when it granted the waiver and did not consider the costs of the vehicle emissions standards in relation to their putative benefits. Because the compliance costs imposed by the standards are enormous and "[t]here is no benefit" to vehicle emissions from the standards, the waiver was unlawful.

#### 1.    EPA was required to weigh the benefits and costs of California's greenhouse gas and zero-emission vehicle standards.

Clean Air Act § 209(b)(1)(C) provides, "[n]o . . . waiver shall be granted if the Administrator finds that . . . [the] State standards and accompanying enforcement procedures are not consistent with [§ 202(a) of the Clean Air Act]."[209] Clean Air Act § 202(a) in turn requires that any regulation prescribing vehicle emission standards

---

[208] 42 U.S.C. § 7543(b)(1).

[209] *Id.*

"shall take effect after such period as the Administrator finds necessary to permit the development and application of the requisite technology, *giving appropriate consideration to the cost of compliance within such period.*"[210] This requires EPA to ensure that the proposed regulation is both technologically feasible (by giving the time "necessary to permit the development and application of the requisite technology") and cost-effective ("giv[es] appropriate consideration to the cost of compliance within such period").

In *Michigan v. EPA*, examining the Clean Air Act in a statutory context similar to § 202(a), the Supreme Court held that EPA's determinations are "appropriate" only if they reflect a reasonable balancing of costs and benefits.[211] "One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."[212] Under *Michigan*, an agency fails to give "appropriate" consideration to cost when it does not "pay[] attention to the advantages *and* the disadvantages of agency decisions."[213] EPA's own Guidelines for Preparing Economic Analyses tracks *Michigan*'s holding. "The purpose of estimating social cost is to have a reference point for comparing the costs of a regulation with the estimated benefits. Social cost is not a particularly meaningful concept unless it is used as part of a *net* social welfare calculation[] . . . ."[214]

Under § 202(a), "appropriate consideration to the cost" is best understood to require EPA to find the regulation cost-effective. Here then, EPA could not lawfully grant California a waiver without finding the benefits of doing so outweigh the costs, which they do not.

---

[210] *Id*. § 7521(a)(2) (emphasis added).

[211] *Michigan v. EPA*, 576 U.S. 743, 752 (2015).

[212] *Id*.

[213] *Id*. (emphasis in original); *see also Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 734 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("the word 'appropriate' at issue in *Michigan v. EPA* . . . necessitate[s] a balancing of costs and benefits").

[214] EPA, Nat'l Ctr. for Envtl. Econ., Office of Policy, Guidelines for Preparing Economic Analyses 8–2 (2014) (emphasis added).

### 2. EPA failed to give "appropriate" consideration to the cost of compliance because it did not weigh the regulatory burden of the waiver against its putative benefits.

In granting the Advanced Clean Cars waiver, EPA expressly avoided the required cost-effectiveness analysis under § 202(a), instead merging the technological-feasibility and cost-effective requirements into a single test of technological feasibility. EPA asserted in the relevant part of its reasoning that "[t]he scope of [its] review of whether California's action is consistent with section 202(a) . . . is limited to whether . . . California's standards are technologically infeasible."[215] EPA further reasoned it could only find infeasibility if the compliance cost represented "a 'doubling or tripling' of the vehicle cost."[216]

Under this arbitrary cost standard, EPA found that California's projected cost of the zero-emissions vehicle standards—$500 per new light-duty vehicle sold when spread over the entire fleet, or $10.5 *billion* from model year 2017 through 2025 in California alone—passed muster. Since it was not a "doubling or tripling" of vehicle cost, EPA found § 202(a) satisfied. EPA also approved the greenhouse gas standards.

EPA avoided a cost-benefit analysis because it believed "case law clearly precludes EPA's consideration of this issue within the waiver context."[217] This "case law," however, was no more than dicta from a decades-old court decision which held only that EPA may not consider effects on competition as a basis for denying a waiver, rather than cost-effectiveness in general.[218] In the *Motor Vehicle & Equipment Manufacturers Association (MEMA I)*, the petitioners claimed that California's regulations were anticompetitive "because they [we]re designed to reduce the business available to the automotive parts and services industry and because they allegedly create[d] a financial and psychological tie-in . . . between vehicle purchasers and franchise dealerships."[219] The petitioners argued that EPA had a "duty . . . to consider

---

[215] 2013 Waiver, 78 Fed. Reg. at 2,125.

[216] *Id.* at 2,142 (quoting *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1118 (D.C. Cir. 1979)).

[217] *Id.* at 2,143.

[218] *See MEMA I*, 627 F.2d at 1116–20.

[219] *Id.* at 1115-16.

these claims" when granting a waiver.[220] The court rejected that argument, pointing out that anti-competitive effects were not a "cost of compliance" under § 202(a).[221] In deciding whether competition effects could be factored into the analysis, the court had no occasion to pass on the question of whether EPA had to balance benefits against the costs of compliance when setting lead time, nor did it decide what standard of cost EPA should apply.

By contrast, EPA's decision to ignore the cost-effectiveness of the greenhouse gas and zero-emissions vehicle standards cannot be squared with the much more recent Supreme Court precedent in *Michigan*. In *Michigan*, EPA found an air toxic rule was "appropriate and necessary" even though it would impose "costs of $9.6 billion per year" on regulated entities.[222] EPA "concede[d]" that these costs " 'played no role' in its appropriate-and-necessary finding."[223] That concession was fatal. EPA "must consider cost" "before deciding whether regulation is appropriate" because "[n]o regulation is 'appropriate' if it does significantly more harm than good."[224] Although EPA's Advanced Clean Cars waiver decision considered the cost of the greenhouse gas and zero-emissions vehicle mandates, it did so without "paying attention to the advantages" in relation to those costs, and many other costs that it failed to consider.[225]

### 3.    EPA could not have granted the zero-emissions vehicle waiver if it had given "appropriate" consideration because costs far outweigh the benefits.

Had EPA fulfilled its statutory obligation to consider the costs and benefits of the California vehicle emissions standards together, it could not have granted the waiver. EPA failed to recognize that any greenhouse gas emissions benefit in California would be offset by increased emissions in other states and that California itself acknowledged there are only *de minimis* benefits to criteria pollutants. These, at best,

---

[220] *Id.*

[221] *Id.* at 1118.

[222] 576 U.S. at 749.

[223] *Id.* at 750.

[224] *Id.* at 752; *accord Mingo Logan Coal*, 829 F.3d at 732 (Kavanaugh, J., dissenting) ("reasoned decision making requires assessing whether a proposed action would do more good than harm").

[225] *Michigan*, 576 U.S. at 753.

negligible benefits are more than offset by acknowledged enormous costs of the standards.

As explained in detail in Part II.D. above, through just model year 2025, by California's own estimate, its zero-emission vehicle mandates will impose $10.5 billion in costs in California alone, and by more recent modeling $31 to $35 billion in compliance costs nationwide when considering the identical mandates in § 177 states. On the other side of the equation, California projects no greenhouse gas emission reductions, no vehicle criteria pollution reductions, and at best paltry upstream stationary source emission reductions.[226] In fact, the academic evidence shows that California's zero-emissions vehicle mandate will likely *increase* global carbon dioxide emissions.

In short, California's zero-emission vehicle standards would lead to a substantial increase in average vehicle prices in return for no incremental greenhouse gas or vehicle criteria pollution emission reductions, and at best negligible stationary source criteria pollution emission reductions. It is not "rational, never mind 'appropriate,'" for a California standard to "impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits."[227] "[I]n an age of limited resources available to deal with grave environmental problems, . . . too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems."[228] California's attempt to justify the $10.5 billion in costs to reduce California's upstream stationary source smog-forming emissions by a mere 0.05% in 2030 is equivalent to "spend[ing] billions to save one more fish or plankton."[229] It is not rational, and certainly not "appropriate."

California's state greenhouse gas standards did not impose inappropriate costs when they had a "deemed to comply" provision. But without them, these standards

---

[226] Graham Affidavit ¶ 62.

[227] *Michigan*, 576 U.S. at 752.

[228] *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 232–33 (2009) (Breyer, J., concurring in part).

[229] *Id.* at 226.

also impose significant costs in return for no quantifiable benefits. That too, is not appropriate.

## CONCLUSION

California's greenhouse gas and zero-emissions vehicle standards are not eligible for a Clean Air Act waiver under the statute or the Constitution. EPA may not restore the waiver.