ORAL ARGUMENT NOT YET SCHEDULED
No. 22-1081 and consolidated cases

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

STATE OF OHIO, et al.,

Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

Respondents.

———————————

On Petitions for Review of Final Action
by the U.S. Environmental Protection Agency

———————————

**FINAL BRIEF OF RESPONDENTS**

———————————

TODD KIM
*Assistant Attorney General*
Environment & Natural Resources Div.

CHLOE H. KOLMAN
ERIC G. HOSTETLER
ELISABETH H. CARTER
U.S. Department of Justice
Environment & Natural Resources Div.
P.O. Box 7611
Washington, D.C. 20044
(202) 514-9277 (Kolman)
chloe.kolman@usdoj.gov

March 20, 2023

*Of Counsel:*

WINIFRED OKOYE
U.S. Environmental Protection
Agency
Washington, D.C.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici.

Except for the following, all parties, intervenors, and amici appearing in these consolidated cases are listed in the Proof Brief of State of Ohio, et al. (ECF No. 1969895):

*Amici for Petitioner*:        The Two Hundred for Housing Equity, Americans for Tax Reform, American Commitment, Caesar Rodney Institute, California Policy Center, Energy & Environment Legal Institute, Freedom Foundation of Minnesota, Center of the American Experiment, Institute of Energy Research, Institute for Regulatory Analysis and Engagement, Rio Grande Foundation, Thomas Jefferson Institute for Public Policy, Western States Petroleum Association, National Federation of Independent Business, California Asphalt Pavement Association, American Trucking Associations, Inc., National Tank Truck Carriers, Inc., California Manufacturers & Technology Association, California Business Roundtable, Texas Oil & Gas Association, Louisiana Mid-Continent Oil & Gas Association, Petroleum Alliance of Oklahoma, Texas Independent Producers and Royalty Owners Association, Texas Association of Manufacturers, Texas Royalty Council, Owner-Operator Independent Drivers

Association, Inc., ConservAmerica, The Sulphur Institute, and Western State Trucking Association, Inc.

*Amici for Respondent*:     South Coast Air Quality Management District; American Thoracic Society; American Medical Association; American Association for Respiratory Care; American College of Occupational and Environmental Medicine; American College of Physicians; American College of Chest Physicians; National League for Nursing; American Public Health Association; American Academy of Pediatrics; Academic Pediatric Association; David Dickinson Ackerly; Maximilian Auffhammer; Marshall Burke; Allen Goldstein; John Harte; Michael Mastrandrea; LeRoy Westerling; Tom Carper, Senator, Chairman of the U.S. Senate Committee on Environment and Public Works; Frank Pallone, Jr., Representative, Ranking Member of the U.S. House Committee on Energy and Commerce; Todd S. Aagaard; William Boyd; Alejandro E. Camacho; Robin Kundis Craig; Robert L. Glicksman; Bruce Huber; Sanne Hjamo Knudsen; David Glynne Owen; and Leah M. Litman.

## B.     Rulings Under Review.

The agency action under review is entitled, "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision," 87 Fed. Reg. 14332 (Mar. 14, 2022).

**C.      Related Cases.**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).


*/s/ Chloe H. Kolman*
CHLOE H. KOLMAN

## TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................. i

Table of Authorities ........................................................................ viii

Glossary......................................................................................... xxi

Introduction ...................................................................................1

Statement of Jurisdiction....................................................................4

Statement of the Issues......................................................................4

Pertinent Statutes and Regulations......................................................6

Statement of the Case.......................................................................6

    I.    Statutory background. ..........................................................6

        A.    Clean Air Act. ............................................................6

            1.    Section 209. ....................................................6

            2.    Section 177. ....................................................9

        B.    Energy Policy and Conservation Act of 1975. .........................10

    II.    Factual and regulatory background....................................................10

        A.    California's vehicle program. ....................................................10

            1.    California's pollution challenges.....................................10

            2.    Low-emission and zero-emission vehicle
                regulation under Section 209.........................................12

            3.    The Advanced Clean Cars program. .............................14

        B.    EPA's Advanced Clean Cars program waiver.........................15

1.      The 2013 waiver. .................................................15

2.      The 2019 Withdrawal Decision. ....................................16

3.      The 2022 Restoration Decision. ...................................17

Summary of Argument.........................................................18

Standard of Review .........................................................22

ARGUMENT ...................................................................23

I.      The petitions should be dismissed as a threshold matter. ..................23

    A.      State Petitioners lack Article III standing. ................................23

        1.      State Petitioners have not substantiated economic injury...............................................................23

        2.      State Petitioners lack standing premised on a constitutional injury.....................................................28

    B.      Petitioners do not fall within Section 209's zone of interests. ...................................................................29

II.     Section 209's preemption structure is constitutional. ........................31

    A.      Congress's authority to regulate vehicle emissions under the Commerce Clause is plenary and subject only to rational-basis review. ............................................................32

        1.      Congress may differentiate between states in exercising plenary Commerce Clause authority.............32

        2.      Congress's authority to regulate motor-vehicle emissions under its Commerce Clause power is not limited by equal-sovereignty principles. ........................35

    B.      Even if equal-sovereignty principles apply, Section 209(b) meets any applicable heightened review standard, and Petitioners have forfeited any contrary argument.............39

C. Petitioners' new, categorical constitutional rule is entirely unsupported by text, history, or precedent, and is impractical and unadministrable. ...............................................43

 1. Petitioners' *per se* theory lacks support in text, history, or precedent. .....................................................43

 2. Equal-footing, Tenth-Amendment and separation-of-powers principles have no application here. ..............47

 3. Petitioners' proposed theory is impractical. ...................49

D. Section 209(b) is constitutional as applied to the challenged waiver. ...................................................................52

III. The Withdrawal Decision was an improper exercise of reconsideration authority. .....................................................................53

IV. EPA reasonably concluded that the Withdrawal Decision was legally and factually flawed, and so must be rescinded. .....................58

A. EPA's 2013 waiver reasonably interpreted Section 209's waiver criteria, and the Withdrawal Decision's contrary interpretation was legally unfounded. ......................................58

 1. EPA's traditional interpretation of Section 209 is consistent with the statutory text, congressional purpose, and EPA's historical practice. ..........................58

 2. No aspect of the text or context requires Section 209(b) to be interpreted to exclude state greenhouse-gas regulation as a matter of law ................68

 3. Neither the major questions doctrine nor the federalism canon dictates a narrower interpretation of Section 209. ...............................................................77

B. California's waiver submission satisfied Section 209, and the Withdrawal Decision's conclusion otherwise was improper. ...................................................................................84

1.      There is no dispute that California needs its vehicle program to meet compelling and extraordinary conditions, so EPA was obligated to grant the waiver. ..............................................................84

2.      Even if EPA were obligated to assess California's need for its particular greenhouse-gas and zero-emission vehicle standards, California's waiver request satisfied the second waiver prong. ....................85

C.      EPA appropriately rejected the Withdrawal Decision's reliance on EPCA preemption. ................................................91

1.      Congress constrained EPA waiver determinations to the three criteria listed in Section 209(b). .................92

2.      The Withdrawal Decision does not compel EPA to consider EPCA preemption in this action. ....................94

CONCLUSION ......................................................................97

# TABLE OF AUTHORITIES

## U.S. CONSTITUTIONS

U.S. Const. Art. I, § 2, cl. 3........................................................45

U.S. Const. Art. I, § 8, cl. 1........................................................33

U.S. Const. Art. I, § 8, cl. 3........................................................33

U.S. Const. Art. I, § 8, cl. 4,.......................................................33

U.S. Const. Art. I, § 9, cl. 6........................................................33

U.S. Const. Art. I, § 10, cl. 3......................................................46

U.S. Const. Art. II, § 1, cl. 2 ......................................................45

U.S. Const. Art. VI, cl.2.............................................................47

Articles of Confederation, Art. V, cl. 4 ...................................45

## CASES

*Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*,
  903 F.3d 903 (9th Cir. 2018)................................................73

*Am. Trucking Ass'ns v. EPA*,
  600 F.3d 624 (D.C. Cir. 2010).............................................63

*Arizona v. Biden*,
  40 F.4th 375 (6th Cir. 2022)................................................28

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015)..........................................25-26

*Bond v. United States*,
  572 U.S. 844 (2014) ............................................................81

_____

\* Authorities chiefly relied upon are marked with an asterisk.

*California v. Texas,*
  141 S. Ct. 2104 (2021) ........................................................23

*Carbon Sequestration Council v. EPA,*
  787 F.3d 1129 (D.C. Cir. 2015)........................................ 23, 25

*Cent. Valley Chrysler-Jeep v. Goldstene,*
  529 F. Supp. 2d 1151 (E.D. Cal. 2007) ......................... 95-96

*Cigar Ass'n of Am. v. FDA,*
  5 F.4th 68 (D.C. Cir. 2021) ..............................................68

*Clapper* v. *Amnesty Int'l USA,*
  568 U.S. 398 (2013) .........................................................23

*Commodity Futures Trading Comm'n v. Schor,*
  478 U.S. 833 (1986) .........................................................62

*Coyle v. Smith,*
  221 U.S. 559 (1911) .........................................................48

*CSL Plasma Inc. v. U.S. Customs & Border Prot.,*
  33 F.4th 584 (D.C. Cir. 2022) ..........................................29

*Currin v. Wallace,*
  306 U.S. 1 (1939) .............................................................33

*Cuyler v. Adams,*
  449 U.S. 433 (1981) .........................................................46

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) .........................................................28

*Davis v. Fed. Election Comm'n,*
  554 U.S. 724 (2008) .........................................................24

*Delta Const. Co. v. EPA,*
  783 F.3d 1291 (D.C. Cir. 2015)........................................30

_____

\* Authorities chiefly relied upon are marked with an asterisk.

ix

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ........................................................55

*Engine Mfrs. Ass'n v. EPA*,
  88 F.3d 1075 (D.C. Cir. 1996).................................... 7, 68-69

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ...........................................................37

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ........................................................95

*FCC v. Fox Television Stations*,
  556 U.S. 502 (2009) ...........................................................22

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
  45 F.4th 127 (D.C. Cir. 2022) .............................................23

*Food Mktg. Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) ........................................................59

*Ford Motor Co. v. EPA*,
  606 F.2d 1293 (D.C. Cir. 1979)................................. 8, 61, 72

*Franchise Tax Bd. of Cal. v. Hyatt*,
  139 S. Ct. 1485 (2019) ........................................................44

*Freytag v. C.I.R.*,
  501 U.S. 868 (1991) ...........................................................48

*Gibbons v. Ogden*,
  22 U.S. 1 (1824) ................................................. 32-33, 44

*Gov't of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019)..............................................28

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) ................................. 95-96

_____

* Authorities chiefly relied upon are marked with an asterisk.

x

*Grocery Mfrs. Ass'n v. EPA*,
   693 F.3d 169 (D.C. Cir. 2012)............................................................30

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   45 F.4th 306 (D.C. Cir. 2022) ................................................... 22, 68

*Hess v. Port Auth. Trans-Hudson Corp.*,
   513 U.S. 30 (1994) ............................................................................46

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
   452 U.S. 264 (1981) ............................................................ 29, 32-33

*I.N.S. v. Ventura*,
   537 U.S. 12 (2002) ............................................................................97

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) .......................................................................83

*Kampfer v. Cuomo*,
   643 F. App'x 43 (2d Cir. 2016)........................................................34

*Ky. Mun. Energy Agency v. FERC*,
   45 F.4th 162 (D.C. Cir. 2022) .........................................................56

*Lake Carriers Ass'n v. EPA*,
   652 F.3d 1 (D.C. Cir. 2011)........................................................ 40, 51

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .........................................................................23

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .............................................................. 52, 73, 95

*Mayhew v. Burwell*,
   772 F.3d 80 (1st Cir. 2014) .............................................................38

*Miss. Comm'n on Env't Quality v. EPA*,
   790 F.3d 138 (D.C. Cir. 2015)..........................................................32

_____

* Authorities chiefly relied upon are marked with an asterisk.

*Missouri v. Biden*,
   52 F.4th 362 (8th Cir. 2022) .................................................................29

*\*Motor & Equip. Mfrs. Ass'n v. EPA*,
   627 F.2d 1095 (D.C. Cir. 1979).. 8-9, 12, 22, 31, 41, 61, 66, 68-69, 72, 78, 92, 96

*\*Motor & Equip. Mfrs. Ass'n v. Nichols*,
   142 F.3d 449 (D.C. Cir. 1998)..................................... 9, 66, 79, 93, 96

*Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation*,
   17 F.3d 521 (2d Cir. 1994) ..................................................... 75, 80-81

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................22

*Nat'l Ass'n of Trailer Owners v. Day*,
   299 F.2d 137 (D.C. Cir. 1962).............................................................54

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
   142 S. Ct. 661 (2022) ...........................................................................80

*Nat'l Lifeline Ass'n v. FCC*,
   921 F.3d 1102 (D.C. Cir. 2019)...........................................................85

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*,
   366 F.3d 930 (D.C. Cir. 2004)..............................................................26

*NCAA v. Governor of N.J.*,
   730 F.3d 208 (3d Cir. 2013) ......................................................... 34, 38

*Nieves v. United States*,
   160 F.2d 11 (D.C. Cir. 1947)................................................................60

*N.L.R.B. v. Bell Aerospace Co.*,
   416 U.S. 267 (1974) ..............................................................................62

*N.L.R.B. v. Jones & Laughlin Steel Corp.*,
   301 U.S. 1 (1937) ..................................................................................32

_____

\* Authorities chiefly relied upon are marked with an asterisk.

*Nuclear Energy Inst. v. EPA*,
  373 F.3d 1251 (D.C. Cir. 2004)............................................................. 39, 47

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ...........................................................................39

*Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*,
  838 F.2d 536 (D.C. Cir. 1988)..............................................................51

*Printz v. United States*,
  521 U.S. 898 (1997) ...........................................................................48

*Rocky Mountain Farmers Union v. Corey*,
  730 F.3d 1070 (9th Cir. 2013) .............................................................53

*Shelby County., Ala. v. Holder*,
  570 U.S. 529 (2013) ................................................. 19, 35-40, 42, 44

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002)..............................................................30

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ...........................................................................47

*Swanson Grp. Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015)..............................................................26

*Taylor v. FAA*,
  895 F.3d 56 (D.C. Cir. 2018)................................................................95

*Thompson v. Clark*,
  741 F.2d 401 (D.C. Cir. 1984)..............................................................96

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) .......................................................................23

*Twin Rivers Paper Co. LLC v. SEC*,
  934 F.3d 607 (D.C. Cir. 2019)..............................................................30

---

\* Authorities chiefly relied upon are marked with an asterisk.

xiii

*U.S. Telecom Ass'n v. FCC*,
  825 F.3d 674 (D.C. Cir. 2016)........................................................ 54, 57

*United States v. Davis*,
  139 S. Ct. 2319 (2019) ......................................................................83

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ..................................................................... 77, 80

*Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
  50 F.4th 164 (D.C. Cir. 2022) ...................................................... 22, 68

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022) ................................................................. 77-80

*Williams v. Lew*,
  819 F.3d 466 (D.C. Cir. 2016)..........................................................26

*Ysleta Del Sur Pueblo v. Texas*,
  142 S. Ct. 1929 (2022) ......................................................................67

## STATUTES

5 U.S.C. § 706 ....................................................................................22

16 U.S.C. § 823c ................................................................................35

16 U.S.C. § 824k(k) ...........................................................................34

16 U.S.C. § 824p(k) ...........................................................................34

16 U.S.C. § 824q(h) ...........................................................................34

16 U.S.C. § 824t(f)..............................................................................34

29 U.S.C. § 1144(b)(5).......................................................................35

42 U.S.C. § 6297(c)(4)-(5)..................................................................35

_____

* Authorities chiefly relied upon are marked with an asterisk.

42 U.S.C. § 6297(c)(8)-(9) ...................................................................35

42 U.S.C. § 7408 ..................................................................................12

42 U.S.C. § 7507 ................................................................... 10, 70, 81

42 U.S.C. § 7521 ...................................................................................6

42 U.S.C. § 7521(a) ......................................................................... 7, 65

42 U.S.C. § 7521(a)(1) .........................................................................31

42 U.S.C. § 7543(a) ...............................................................................6

42 U.S.C. § 7543(b)(1).......................... 7, 31, 41, 59, 60, 64, 66, 84, 91

42 U.S.C. § 7543(b)(1)(A) ................................................................... 59

42 U.S.C. § 7543(b)(1)(B) ........................................................ 16, 42, 59

42 U.S.C. § 7543(b)(1)(C) ....................................................................59

42 U.S.C. § 7543(e) ...............................................................................8

42 U.S.C. § 7543(e)(2) ........................................................................63

42 U.S.C. § 7545(c)(4)(B) ...................................................................72

42 U.S.C. § 7545(o)(12) ......................................................................78

42 U.S.C. § 7581(4) .............................................................................75

42 U.S.C. § 7583(f) .............................................................................75

42 U.S.C. § 7584 .................................................................................75

42 U.S.C. § 7586(f)(4) .................................................................... 74-75

_____

\* Authorities chiefly relied upon are marked with an asterisk.

42 U.S.C. § 7607(b)(1)..........................................................................4

42 U.S.C. § 13212(f)(3)(B) ............................................................. 74-75

49 U.S.C. § 31112(c) ..........................................................................35

49 U.S.C. § 32902(a) ..........................................................................10

49 U.S.C. § 32902(f) ...........................................................................10

49 U.S.C. § 32919(a) ..........................................................................10

Pub. L. No. 95-95, 91 Stat. 685 (1977)................................................61

Pub. L. No. 101-549, 104 Stat. 2399 (1990).......................................75

Pub. L. No. 102-486, 106 Stat. 2776 (1992).......................................76

Pub. L. No. 117-58, 135 Stat. 429 (2021)...........................................76

Pub. L. No. 117-169, 136 Stat. 1818 (2022).......................................76

## CODE OF FEDERAL REGULATIONS

40 C.F.R. § 50.1, Part 50....................................................................12

## FEDERAL REGISTER

33 Fed. Reg. 10160 (July 16, 1968)....................................................62

36 Fed. Reg. 17458 (Aug. 31, 1971) ...................................................72

40 Fed. Reg. 23102 (May 28, 1975) ....................................................62

41 Fed. Reg. 44209 (Oct. 7, 1976).......................................................92

43 Fed. Reg. 25729 (June 14, 1978) ....................................................12

_____

* Authorities chiefly relied upon are marked with an asterisk.

49 Fed. Reg. 18887 (May 3, 1984) ........................................... 12, 60-61, 63, 69, 92

58 Fed. Reg. 4166 (Jan. 13, 1993) ................................................... 12, 80

59 Fed. Reg. 36969 (July 20, 1994) ..................................................63

73 Fed. Reg. 12156 (Mar. 6, 2008) .............................................. 13, 92

74 Fed. Reg. 32744 (July 8, 2009) ....................................... 12-13, 89, 92

75 Fed. Reg. 14670 (Mar. 26, 2010) ..................................................78

77 Fed. Reg. 62624 (Oct. 15, 2012) ..................................................88

78 Fed. Reg. 2112 (Jan. 9, 2013) ............................ 11, 13-15, 24-25, 56, 58, 64-65,
.......................................................................... 74, 84, 88, 91

79 Fed. Reg. 46256 (Aug. 7, 2014) ..................................................89

83 Fed. Reg. 42986 (Aug. 24, 2018) ................................................16

84 Fed. Reg. 51310 (Sept. 27, 2019) ....................... 16-17, 56-57, 59-60, 64-65, 67,
..........................................................................74-75, 80, 84, 87-88, 94

86 Fed. Reg. 22421 (Apr. 28, 2021) ................................................17

86 Fed. Reg. 74236 (Dec. 29, 2021) ................................................17

87 Fed. Reg. 14332 (Mar. 14, 2022) .......................... 9, 11, 13-14, 17-18, 42, 52-56
.........................................................60-61, 63, 65-66, 70, 72-76, 83, 86-91, 93

## LEGISLATIVE HISTORY

H.R. Rep. No. 90-728 (1967) ........................................ 7, 11-12, 57, 61, 70, 86

S. Rep. No. 90-403 (1967) ........................................ 7, 40-41, 57, 67, 70, 86

H.R. Rep. 95-294 (1977) ........................................8, 11, 62, 67-68, 70-71

_____

\* Authorities chiefly relied upon are marked with an asterisk.

H.R. 123 Cong. Rec. 27071 (1977) ................................................................ 9, 67

**CALIFORNIA PUBLIC RESOURCES CODE**

Cal. Pub. Res. Code § 25722.8 (2015).................................................................76

**CALIFORNIA CODE OF REGULATIONS**

13 Cal. Code Regs. § 1960.1(g)(2) (1991) ............................................................12

13 Cal. Code Regs. § 1961.3 (1962)......................................................................12

13 Cal. Code Regs. § 1962.2 (1962)......................................................................14

**DICTIONARY**

"Extraordinary," Black's Law Dictionary (4th ed., 1951)......................................70

"Such," Black's Law Dictionary (4th ed., revised 1968) .......................................60

"Such," Merriam-Webster Dictionary, (Established 1828)
    https://www.merriam-webster.com/dictionary/such.............................................60

**PUBLISHED MATERIALS**

Anthony J. Bellia Jr. & Bradford R. Clark, *The International Law Origins of
    American Federalism*, Columbia Law Review
    120 Colum. L. Rev. 835 (2020)............................................................................59

Center for Climate and Energy Solutions, *State Climate Policy Maps*,
    https://www.c2es.org/content/state-climate-policy/ ...........................................83

CNBC, Michael Wayland, *Hyundai to invest $5.5 billion to build EVs and
    batteries in Georgia*, (May 20, 2022)
    https://www.cnbc.com/2022/05/20/hyundai-to-invest-5point5-billion-to-build-
    evs-and-batteries-in-georgia.html .......................................................................27

_____

\* Authorities chiefly relied upon are marked with an asterisk.

CNBC, Michael Wayland, *Ford and SK Innovation to spend $11 billion, create 11,000 jobs on new U.S. EV and battery plants*, (Sept. 27, 2021) https://www.cnbc.com/2021/09/27/ford-battery-supplier-to-spend-11point4-billion-to-build-new-us-plants.html .................................................................27

EPA, Green Book, *8-Hour Ozone (2015) Designated Area/State Information*, (Dec. 31, 2022) https://www3.epa.gov/airquality/greenbook/jbtc.html ......................................11

EPA, *Vehicle Emissions California Waivers and Authorizations*, https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations ..............................................................14

FORTUNE, Tom Krisher, Jeffrey Collins and The Assoc. Press, *BMW is investing $1 billion to pivot its massive South Carolina plant to EVs and it's throwing in $700 million for an electric-battery plan*, (Sept. 29, 2022) https://fortune.com/2022/10/19/bmw-1-billion-electric-vehicle-plant-investment-spartanburg-south-carolina-batteries/ .............................................27

Joint Office for Energy and Transportation, *State Plans for Electric Vehicle Charging*, https://driveelectric.gov/state-plans/ ...................................................28

Kansas Dept. of Commerce, *Kansas Lands $4B, 4,000-Job Panasonic Energy Electric Vehicle Battery Plant*, (July 13, 2022) https://www.kansascommerce.gov/2022/07/kansas-lands-4b-4000-job-panasonic-energy-electric-vehicle-battery-plant/ .................................................28

National Conference of State Legislatures, Austin Iglehart, *Special Fees on Plug-In Hybrid and Electric Vehicles*, (July 26, 2022) https://www.ncsl.org/research/energy/new-fees-on-hybrid-and-electric-vehicles.aspx#map ............................................................................................27

Notes of William Patterson in the Federal Convention of 1787, https://avalon.law.yale.edu/18th_century/patterson.asp ......................................46

South Bend Tribune, Carl Auslander, *Viewpoint: Could Indiana be the Crossroads of an Electrified America?*, (Oct. 7, 2022)

_____

\* Authorities chiefly relied upon are marked with an asterisk.

xix

https://www.southbendtribune.com/story/opinion/columns/2022/10/06/indiana-poised-to-be-a-manufacturing-hub-for-electric-vehicles-parts/69541780007/ ...28

Ohio Dept. of Transportation, *Ohio Electric Vehicle Infrastructure Deployment Plan*, (August 2022)
https://www.fhwa.dot.gov/environment/nevi/ev_deployment_plans/oh_nevi_pla
n.pdf ....................................................................................................................28

_____

\* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| 2013 waiver | "California State Motor Vehicle Pollution Control Standards; Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years; Notice," 78 Fed. Reg. 2112, 2126 (Jan. 9, 2013) |
| EPA | U.S. Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act of 1975 |
| Fuel Br. | Brief of American Fuel & Petrochemical Manufacturers, et al. |
| JA | Joint Appendix |
| NHTSA | National Highway Traffic Safety Administration |
| Restoration Decision | "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision," 87 Fed. Reg. 14332 (Mar. 14, 2022) |
| State Br. | Brief of State of Ohio, et al. |
| Withdrawal Decision | "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51310 (Sept. 27, 2019) |

## INTRODUCTION

Over 60 years ago, California designed the nation's first-ever vehicle-emission control program. That program reflected the State's interest in advancing new vehicle technology to abate its persistent air pollution challenges. When Congress later launched the federal program to regulate vehicle emissions, it generally preempted state regulation. But in Section 209(b) of the Clean Air Act, Congress made one significant exception: entitling California to seek preemption waivers to continue to operate its pre-existing vehicle-emissions program. Congress explained that grandfathering California's landmark program recognized both California's leadership and its "extraordinary" environmental challenges, and would benefit the nation by allowing California to accelerate new vehicle technologies that could be adopted nationwide.

This system has operated as Congress intended for 55 years. EPA has reviewed California's waiver requests under the deferential standard Congress directed, granting more than 75 preemption waivers aimed at addressing the State's severe air quality problems. And California's efforts under those waivers have driven innovation in vehicle-emission controls to the nation's benefit.

For 30 years, California's regulatory program has included a standard for the increasing use of zero-emission vehicles, which eliminate onroad emissions of smog-causing air pollutants and greenhouse gases. For over 15 years, California

has set standards regulating greenhouse gases from conventional vehicles. Both types of standards were included in California's updated emission standards for passenger vehicles, for which EPA granted a preemption waiver in 2013.

The 2013 waiver was not challenged by any party, so those standards governed automakers' obligations in California (and additional states that adopted California's standards under a separate statutory provision not at issue) for years. In its 2019 Withdrawal Decision, however, EPA reopened the 2013 waiver adjudication, claiming newfound bases to reject California's waiver for greenhouse-gas and zero-emission vehicle standards. EPA then determined in the 2022 Restoration Decision challenged here that the 2019 Withdrawal Decision had been improper, and so restored California's 2013 waiver.

Petitioners now claim that Congress's chosen approach to regulation of vehicle emissions – in place for over 50 years – is unconstitutional, that the Clean Air Act's waiver provision should be read to implicitly exclude regulation of greenhouse gases, and that the underlying California standards in the 2013 waiver are preempted by a separate statute. These assorted challenges to the Act and California's longstanding, successful vehicle-emission control program all fail.

Initially, Petitioners all either lack standing or fall outside the zone of interests of the waiver provision. Moreover, Petitioners' claims wholly lack merit. Their constitutional arguments are premised upon a categorical "equal

2

sovereignty" theory that would bar the differential preemption of states no matter how strong Congress's justification, and even where, as here, differential preemption enhances federalism principles by expanding the regulatory options available to states.  This theory is refuted by the Constitution's text and over 200 years of historical practice and precedent.  "Equal sovereignty" principles have never been construed to limit plenary Commerce Clause power, and such principles do not impose, in any constitutional context, a *per se* bar on permitting particular states to adopt standards to address regional considerations.  Petitioners' invented theory is also impractical, as it would undermine provisions across the United States Code and be unadministrable.

Petitioners' remaining objections to the Restoration Decision also fail.  EPA reasonably determined that the Withdrawal Decision was an improper exercise of reconsideration authority, so the Court need not reach Petitioners' statutory theories to hold that EPA lawfully withdrew that decision.  Those theories, meanwhile, ignore the wording, design, and operation of the Act's plain text – asserting, contrary to all evidence, that Congress intended Section 209 as only a narrow, pollutant-limited carve-out, and invoking interpretative canons that are facially inapplicable to Section 209(b)'s preservation of state power.  EPA reasonably concluded that the original 2013 waiver was legally sound, that the Withdrawal Decision was contradicted by its own factual record, and that EPA

3

appropriately executed the limited role designed for it by Congress.  The

Restoration Decision should be upheld.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1), except that State

Petitioners lack Article III standing.  *See* Argument I, *infra*.

## STATEMENT OF THE ISSUES

1.  Whether this Court should dismiss the petitions because:

    a.  State Petitioners lack Article III standing to challenge the Restoration

        Decision where they have failed to allege concrete economic harms,

        have supported vehicle electrification efforts, and fail to identify any

        concrete sovereignty injury; and

    b.  all Petitioners fall outside Section 209's zone of interests, where they

        are not regulated by that Section and seek to impede, rather than

        promote, its pollution-control purpose?

2.  Whether Clean Air Act Section 209 reflects a valid exercise of plenary

    Commerce Clause power, where Congress provided a sensible explanation

    for not preempting California's pre-existing program, and Petitioners'

    categorical equal-sovereignty bar finds no support in constitutional text,

    practice, or precedent?

4

3.      Whether the Restoration Decision properly determined that the Withdrawal Decision exceeded the proper bounds of reconsideration by reopening a settled adjudication to adopt a new policy position without considering longstanding reliance interests?

4.      Alternatively, whether the Restoration Decision appropriately rescinded the Withdrawal Decision and restored the 2013 waiver where:

a.      the original waiver appropriately assessed California's need for its vehicle-emission program rather than individual standards, consistent with the plain language of Section 209, congressional intent to give California expansive policy discretion, and congressional ratification of EPA's longstanding whole-program interpretation;

b.      the record establishes, in any case, that California needs its greenhouse-gas and zero-emission vehicle standards to meet "compelling and extraordinary conditions" under any interpretation of Section 209; and

c.      EPA appropriately limited its consideration of California's waiver application to the specified criteria in Section 209, when this Court has concluded EPA may reasonably do so?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations not reproduced in the addendum to Petitioners' briefs are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Statutory background.

### A.    Clean Air Act.

#### 1.    Section 209.

The Clean Air Act establishes a comprehensive program for improving the nation's air quality.  The Act generally preserves considerable flexibility for states to meet air quality goals.  However, for new motor vehicles, EPA promulgates nationally applicable emission standards, 42 U.S.C. § 7521, and states are generally preempted from adopting their own standards, *id.* § 7543(a).

The Act includes one exception.  Under Section 209(b), the EPA Administrator "shall … waive application of [the preemption] section to any State which has adopted standards … for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards."  *Id.* § 7543(b).  This is known as the protectiveness determination.  The provision then provides the three bases for denying a waiver:

> No such waiver shall be granted if the Administrator finds that –
>   (A) the determination of the State is arbitrary and capricious,
>   (B) such State does not need such State standards to meet compelling and extraordinary conditions, or
>   (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

*Id.* § 7543(b)(1).  Only California regulated vehicle emissions before March 30, 1966, so Section 209(b)'s exception applies only to California.

Congress intentionally grandfathered California's program to account for California's pre-existing leadership and expertise in vehicle-emission control, as well as the State's struggle to address extreme environmental conditions caused by its climate, topography, and large vehicle population.  S. Rep. No. 90-403, at 33-34 (1967); H.R. Rep. No. 90-728, at 21-23, 96-97 (1967).  Automakers had expressed concern that, absent preemption, they risked being subject to 51 different standards programs.  *Id.*; *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079-80 (D.C. Cir. 1996).  Rather than mandate a single program, however, Congress allowed two programs of standards – one for the nation generally and one for California.  *Id.* This, Congress explained, would prevent the free-for-all automakers feared while allowing California to continue its "pioneering efforts" to advance "new control systems and design," benefitting the entire nation.  S. Rep. No. 90-403, at 33.  As anticipated, the federal government "has drawn heavily on the California experience to fashion and to improve the national efforts at emissions control."

7

*Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1109-10 (D.C. Cir. 1979) ("*MEMA I*").

The waiver provision was amended in 1977 to allow California to demonstrate the "aggregate" protectiveness of its standards, rather than requiring that each standard be at least as stringent as any federal counterpart. *See MEMA I*, 627 F.2d at 1110-11. This amendment ensured California could adopt particular standards less stringent than federal analogues (sometimes a technological consequence of other, more stringent standards), so long as the program *as a whole* remained at least as protective as the federal program. *Id.* Congress described its amendment as "ratify[ing] and strengthen[ing]" the waiver provision, and "affirm[ing]" that EPA should "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." H.R. Rep. No. 95-294, at 301-02 (1977).

Congress ratified the waiver provision (and EPA's application thereof) again in 1990, re-enacting Section 209(b)'s language almost exactly to provide a waiver for California regulation of nonroad vehicles and engines in Section 209(e). 42 U.S.C. § 7543(e).

This Court has confirmed that Section 209(b) is deferential to California and generally requires EPA to grant a waiver. *MEMA I*, 627 F.2d at 1120-22. It does not provide for "probing substantive review," *Ford Motor Co. v. EPA*, 606 F.2d

8

1293, 1301 (D.C. Cir. 1979), and "the burden of proof lies with the parties favoring denial of the waiver," *MEMA I*, 627 F.2d at 1121.  EPA is not required to affirmatively find that California passes the three waiver criteria – EPA need only examine waiver opponents' evidence to determine if it overcomes the presumption of waiver.  *Id.* at 1121-22.  The Court has also clarified that EPA's consideration is limited to evidence concerning the three waiver criteria.  *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998) ("*MEMA II*").

Given that deferential posture, EPA's "traditional" interpretation of Section 209(b) has been to assess, under the three waiver criteria, whether California's program of vehicle-emission standards *as a whole* is at least as protective as the federal program (209(b)(1)(A)), is needed to meet compelling and extraordinary conditions (209(b)(1)(B)), and provides for technologically feasible standards considering lead time and cost (209(b)(1)(C)).  *See* 87 Fed. Reg. 14332, 14333 (Mar. 14, 2022).

> ### 2.     Section 177.

Congress's 1977 amendments recognized that California's vehicle-emission regulations might benefit other states struggling to meet national air quality standards.  H.R. Conf. Rep. 95-564, at 1570 (1977).  Clean Air Act Section 177 accordingly allows states with planning obligations under the National Ambient Air Quality Standards program to adopt California vehicle-emission standards in

place of federal standards.  42 U.S.C. § 7507.  While EPA must approve the

inclusion of those standards in state air quality plans under Title I of the Act, *see*

*id.* § 7410(a)(1), (k), EPA has no role in a state's choice to adopt those standards in

the first place, *see id.* § 7507.

### B.    Energy Policy and Conservation Act of 1975.

Under the Energy Policy and Conservation Act of 1975 ("EPCA"), the

National Highway Traffic Safety Administration ("NHTSA") establishes fleet-

wide average fuel-economy standards, set at the "maximum feasible average fuel

economy level that [NHTSA] decides the manufacturers can achieve in that model

year," considering various factors including "the effect of other motor vehicle

standards of the Government on fuel economy."  49 U.S.C. § 32902(a), (f).  EPCA

preempts state laws "adopt[ing] or enforc[ing] a law or regulation related to fuel

economy standards or average fuel economy standards" where a relevant NHTSA

fuel-economy standard is in place.  *Id.* § 32919(a).

### II.    Factual and regulatory background.

### A.    California's vehicle program.

#### 1.    California's pollution challenges.

California historically suffered, and presently suffers, from some of the

worst air quality in the country.  When Section 209(b) was adopted in 1967,

"California's pollution problem was … among the most pervasive and acute in the

Nation." H.R. Rep. No. 95-294, at 301. Today, California contains the only regions in the United States whose ozone problems (*i.e.*, smog) are "extreme" under the Clean Air Act.[1] And it has more than half the nation's ten worst areas for both ozone and particulate matter pollution. 87 Fed. Reg. at 14377 n.469.

These problems derive from several factors, including California's unusual "geographical and climatic conditions (like thermal inversions)" and "large numbers and high concentrations of automobiles." 78 Fed. Reg. 2112, 2126 (Jan. 9, 2013); *see* H.R. Rep. No. 90-728, at 22, 97 (attributing 90% of the smog in Los Angeles County to motor vehicles). Ozone is also exacerbated by higher temperatures, so climate change is expected to worsen California's smog. *See* 87 Fed. Reg. at 14350 & n.165.

California faces other challenges from climate change, "including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat." *Id.* at 14363; *see also id.* at 14338-39 & nn.37 & 43. These particularly affect California due to the State's unique characteristics, including:

- The largest agriculture-based and ocean-based economies of any state

- The largest state coastal population, representing 25% of the nation's total

---

[1] *See* https://www3.epa.gov/airquality/greenbook/jbtc.html.

- The nation's greatest variety of ecosystems and the most threatened and endangered animal species

- Heavy dependence on irrigation and an over-stressed water supply

- Great susceptibility to wildfires

*See* 74 Fed. Reg. 32744, 32746 (July 8, 2009).

### 2.    Low-emission and zero-emission vehicle regulation under Section 209.

California first regulated vehicle emissions in the 1950's, years before Congress inaugurated a federal vehicle-emission program in 1965.  *See MEMA I*, 627 F.2d at 1108-09 & n.26.  After the passage of Section 209(b) in 1967, California's program continued through regular waiver requests.  California's "low-emission vehicle" standards were initially focused on ozone-generating pollutants, like nitrogen oxides.  *See, e.g.*, 43 Fed. Reg. 25729, 25735 (June 14, 1978); H.R. Rep. No. 90-728, at 96.  But over time, California added additional standards for pollutants like particulate matter.  *See* 49 Fed. Reg. 18887, 18890 (May 3, 1984).  Ozone and particulate matter were later included in the list of six pollutants the Clean Air Act refers to as "criteria" pollutants and regulates under the Act's National Ambient Air Quality Standards.  42 U.S.C. § 7408; 40 C.F.R. Part 50.

California adopted its first "zero-emission vehicle" standard in 1990, which EPA approved in 1993.  13 Cal. Code Regs. § 1960.1(g)(2) (1991); 58 Fed. Reg.

4166 (Jan. 13, 1993).  That standard required an annually increasing percentage of vehicles sold in California to have no tailpipe emissions at all – for example, because they run on electric batteries rather than combustion engines.  *See* 78 Fed. Reg. at 2118.  Over the last 30 years, EPA has granted multiple California waiver requests that include zero-emission vehicle standards, recognizing that California now employs those standards to address both criteria and greenhouse-gas pollution. *See* 87 Fed. Reg. at 14363 n.295, 14351 n.168.

California adopted its first light-duty vehicle-emission standards for greenhouse gases in 2004 and included those standards in its 2005 waiver submission to EPA.  *See* 74 Fed. Reg. at 32746-47.  EPA initially denied that waiver request, concluding that Section 209(b)(1)(B), the second waiver criterion, allowed only standards addressing "compelling and extraordinary conditions" that are local or regional.  73 Fed. Reg. 12156, 12160 (Mar. 6, 2008).  A year later, EPA concluded that the denial was based on an "inappropriate interpretation" of Section 209 at odds with the Act's text and history, so EPA returned to its traditional interpretation and granted California's request.  74 Fed. Reg. at 32745-46.

Over the decades, California has requested, and EPA has granted, more than 75 waivers or waiver amendments for standards governing criteria pollutant and

13

greenhouse-gas emissions from light-duty vehicles like passenger cars, heavy-duty vehicles like buses and trucks, and motorcycles. *See, e.g.*, 87 Fed. Reg. at 14338.[2]

### 3.  The Advanced Clean Cars program.

In 2012, California amended its vehicle-emission standards for light-duty vehicles in a comprehensive update it called the Advanced Clean Cars program. *See* 13 Cal. Code Regs. §§ 1961.3, 1962.2; 78 Fed. Reg. at 2114.  Those standards included changes to criteria pollutant requirements covering model years 2015-2025, and updated and integrated California's greenhouse-gas emissions requirements for model years 2017-2025.  78 Fed. Reg. at 2114.  The program also updated California's zero-emission vehicle standard, which requires automakers to generate or acquire credits for zero-emission vehicles sold in California; in the Advanced Clean Cars program, that credit obligation rose from about 10% of a manufacturer's new vehicle sales to about 15% by 2025.  *Id.*

California's waiver request indicated that its standards would reduce emissions causing climate change and smog.  *Id.*  The Advanced Clean Cars program also included a provision specifying that manufacturers complying with contemporaneous federal vehicle-emission standards – which had been coordinated

---

[2] *See* https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations.

14

with California's own program and were also finalized in 2012, *see id.* at 2122 – would be "deemed to comply" with California's standards as well. *Id.* at 2121.

### B.     EPA's Advanced Clean Cars program waiver.

#### 1.     The 2013 waiver.

In 2013, EPA granted California's 2012 waiver request for its Advanced Clean Cars program. 78 Fed. Reg. 2112. EPA determined that California had reasonably concluded that its standards were, in the aggregate, as protective as federal standards, *id.* at 2123-25; opponents had not demonstrated that California "no longer has a need for its motor vehicle emissions program" as a whole, and, in the alternative, no party had demonstrated that California did not need its greenhouse-gas or zero-emission vehicle standards, *id.* at 2125-31; and opponents had not shown California's standards were inconsistent with applicable feasibility requirements, *id.* at 2131-45. EPA specified that its conclusions considered California's own standards and were not predicated on the State's "deemed-to-comply" provision. *Id.* at 2132, 2138-39. EPA also affirmed that its conclusions were final and not conditioned on future review of the standards' feasibility. *Id.* at 2128, 2137.

That 2013 waiver was not challenged.

## 2.    The 2019 Withdrawal Decision.

In 2018, EPA proposed to reopen its 2013 waiver to withdraw the portions covering California's greenhouse-gas and zero-emission vehicle standards.  *See* 83 Fed. Reg. 42986 (Aug. 24, 2018).  That action was finalized in the 2019 Withdrawal Decision, which EPA issued in tandem with new NHTSA regulations addressing EPCA's preemption provision.  84 Fed. Reg. at 51328.

EPA advanced two bases for withdrawal.  The first was that the waiver for California's greenhouse-gas and zero-emission vehicle standards conflicted with NHTSA's new pronouncement that state vehicle greenhouse-gas regulations were preempted by EPCA.  *Id.* at 51337-38.  While EPA "d[id] not intend in future waiver proceedings … to consider factors outside the statutory criteria" in Section 209(b)(1), like EPCA preemption, EPA felt compelled to consider NHTSA's conclusion where the two agencies were acting jointly and simultaneously.  *Id.* at 51338.

The second basis was that EPA no longer supported its traditional whole-program interpretation of Section 209 and believed instead that ambiguity in the second waiver criterion – providing for denial of a waiver where California "does not need such State standards to meet compelling and extraordinary conditions," 42 U.S.C. § 7543(b)(1)(B) – should be read to require assessment of California's greenhouse-gas and zero-emission vehicle standards in isolation, separately from

16

California's other standards. 84 Fed. Reg. at 51340-41. The Withdrawal Decision concluded that California did not need its greenhouse-gas and zero-emission standards because greenhouse-gas pollution is well-mixed in the atmosphere and not unique to California, and so lacks a "particularized nexus" between pollutant emissions from sources, air pollution, and the resulting impacts. *Id.* at 51339, 51347.

EPA received three administrative petitions for reconsideration. 87 Fed. Reg. at 14340. The Withdrawal Decision was also challenged in *Union of Concerned Scientists v. NHTSA*, D.C. Cir. No. 19-1230 (and consolidated cases).

### 3.    The 2022 Restoration Decision.

In 2021, EPA expressed concern that the 2019 Withdrawal Decision had been improper and announced its intention to review it. 86 Fed. Reg. 22421 (Apr. 28, 2021). Meanwhile, NHTSA repealed its preemption regulations and renounced associated interpretive statements concerning EPCA's effect on California's greenhouse-gas standards. 86 Fed. Reg. 74236 (Dec. 29, 2021). In response, the Court placed the litigation over the Withdrawal Decision in abeyance, where it remains, pending the outcome of this matter. *See* D.C. Cir. No. 19-1230, ECF Nos. 1884115, 1952869.

On March 14, 2022, EPA finalized the Restoration Decision, which found the Withdrawal Decision deficient in several respects: first, it was an improper

17

exercise of EPA's reconsideration authority; second, it was based on a "flawed" interpretation of Section 209(b); third, "even under that flawed interpretation, EPA misapplied the facts and inappropriately withdrew the waiver"; and fourth, EPA erred in looking beyond the Section 209(b) criteria to consider NHTSA's view of EPCA, which was, in any case, now withdrawn.  87 Fed. Reg. at 14333.  The Restoration Decision thus rescinded the Withdrawal Decision and restored the 2013 waiver for California's Advanced Clean Cars program.  *Id.* at 14378-79.

## SUMMARY OF ARGUMENT

1.    The Court should dismiss these petitions as a threshold matter.

    a.    State Petitioners lack standing.  Their assertions of economic injury-in-fact from California's zero-emission vehicle standards are unsupported and conclusory, depending on an extended chain of third-party actions without any evidence of harm.  At the same time, State Petitioners have benefitted substantially from the increasing electrification of the vehicle industry.  And State Petitioners do not allege any economic injury from California's greenhouse-gas standards, precluding their challenges to that aspect of EPA's waiver.  Nor have they alleged a concrete constitutional sovereignty injury: they do not claim to have been deprived of any authority that they wish to exercise, and the relief sought would not provide them with any additional authority.

b.      None of the Petitioners can bring their statutory claims.  They are not regulated by the challenged standards and do not seek to promote Congress's objective of ameliorating air quality.  So they fall outside Section 209's zone of interests.

2.      Clean Air Act Section 209(b) is constitutional.  Congress holds plenary power under the Commerce Clause to decide how to regulate motor-vehicle air pollution, and it appropriately exercised such power in authorizing California to continue its landmark vehicle program.  Congress reasonably determined both that California's severe air pollution challenges warranted separate standards, and that preserving the State's pre-existing program would benefit the nation.

State Petitioners' theory that equal-sovereignty principles limit plenary Commerce Clause power by imposing a *per se* bar on differentiation between states is entirely unsupported by constitutional text, history, and precedent.  Even in the separate Fifteenth Amendment context where equal-sovereignty principles have some application, they do not apply in the manner proposed by Petitioners, as Petitioners' own primary authority – *Shelby County, Ala. v. Holder* – underscores. *See* 570 U.S. 529, 544 (2013) (principles of equal sovereignty do not operate as a bar on differential treatment).  In any event, any heightened review standard applied in *Shelby County* does not apply to regulation of motor-vehicle emissions

19

under the Commerce Clause, which does not involve any extraordinary displacement of core state sovereign functions.  And Petitioners have not advanced, and have now forfeited, any argument that Section 209 is not suitably designed to meet either the applicable rational-basis standard or any heightened standard applied in *Shelby County*.

Petitioners' proposed new constitutional limitation is not only invented, it is impractical and unadministrable.  Among other problems, it would void numerous longstanding federal laws, lack clear boundaries, and serve to actually increase federal power in areas where Congress has reasonably elected to leave it closer to the people affected.

3.     EPA appropriately concluded that the Withdrawal Decision was not a proper exercise of its inherent reconsideration authority, as it sought to rewrite the outcome of a settled adjudication after six years and the accrual of substantial reliance interests.  The Withdrawal Decision was therefore inappropriate as a threshold matter – whether or not the interpretations advanced therein were invalid.

4.     Alternatively, the Restoration Decision's substantive grounds for rescinding the Withdrawal Decision were sound.

a.     EPA appropriately determined that the Withdrawal Decision was legally and factually deficient.  For more than 50 years, EPA has reviewed California's need for its separate motor vehicle program, not for individual

20

standards.  The new statutory interpretation deployed in the Withdrawal Decision to partially revoke California's waiver is inconsistent with the statutory text, which directs EPA to consider California's standards "in the aggregate" and invokes that same scope of review in each of Section 209(b)(1)'s subsections.  It is also inconsistent with congressional intent, longstanding practice, and this Court's precedent, which uniformly reflect that Congress intended to give California broad discretion to innovate in the field of vehicle-emission controls.  Neither the fact that the pollutants regulated are greenhouse gases, nor Petitioners' invocation of inapplicable clear-statement rules, changes these facts.

b.      Even assuming the Withdrawal Decision's narrow statutory interpretation was reasonable, waiver opponents failed to prove that California does not need its greenhouse-gas and zero-emission vehicle standards to meet compelling and extraordinary conditions – related to both greenhouse-gas and criteria pollution – so restoration of the waiver was appropriate.

c.      EPA appropriately declined to consider the status of California's vehicle standards under a separate statute, EPCA, which falls outside the limited criteria Congress specified for denial of a waiver and is not administered by EPA.  Even the Withdrawal Decision, by its own terms, considered EPCA only in the context of a simultaneous NHTSA action that has been withdrawn.  EPA explained why such issues were not appropriate for this

21

proceeding and, in any case, such preemption arguments may be raised in more appropriate fora.

## STANDARD OF REVIEW

The Administrative Procedure Act provides the standard of review for EPA's action.  5 U.S.C. § 706.  The Court "must uphold the [EPA] Administrator's action" unless it is "arbitrary, capricious, [an abuse of discretion], or otherwise not in accordance with law," or if it fails to meet statutory, procedural, or constitutional requirements.  *MEMA I*, 627 F.2d at 1105.  The Court may not "substitute [its] judgment for that of the Administrator," *id.*; where EPA has considered the relevant factors and articulated a rational connection between facts found and choices made, its regulatory choices must be upheld.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  This standard applies equally to agency revisions of previous decisions.  *FCC v. Fox Television Stations*, 556 U.S. 502, 513-16 (2009).

Where "traditional tools of statutory interpretation" demonstrate that the agency's interpretation of the statute is "the best one," the court need not rely on deference to the agency.  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 45 F.4th 306, 313 (D.C. Cir. 2022).  But agency interpretations that are "reasonable" should also be upheld.  *Washington All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 192 (D.C. Cir. 2022).

22

# ARGUMENT

**I.    The petitions should be dismissed as a threshold matter.**

**A.    State Petitioners lack Article III standing.**

To have Article III standing, State Petitioners must demonstrate an injury-in-fact that is "concrete and particularized," "fairly traceable to the challenged action," and redressable by the Court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Petitioners bear the burden of establishing standing. *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2207-08 (2021). "[C]onclusory allegations" are insufficient, *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 137 (D.C. Cir. 2022); Petitioners must support each element of their standing claim by affidavit or other evidence, *Carbon Sequestration Council v. EPA*, 787 F.3d 1129, 1133 (D.C. Cir. 2015). Where the alleged injury depends upon third-party decisions, standing "is ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021). The standing inquiry is also "especially rigorous" when petitioners present constitutional questions. *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

**1.    State Petitioners have not substantiated economic injury.**

State Petitioners' purported economic harms do not support standing. While they purport to challenge EPA's grant of a waiver for two separate sets of

California standards – greenhouse-gas standards for conventional vehicles and zero-emission vehicle standards – State Petitioners provide no evidence that they are injured by the former. *See* State Br. 14-15; State Add.38-54. Petitioners' purported harms stem only from California's zero-emission vehicle standard. *Id.*; State Add.54. "[A] plaintiff must demonstrate standing for each claim he seeks to press," *Davis v. FEC*, 554 U.S. 724, 734 (2008), so State Petitioners lack standing to assert that EPA's waiver must be set aside because California's greenhouse-gas standard is unlawful. *See* State Br. 33-41.

State Petitioners' purported injuries from California's zero-emission vehicle standard, meanwhile, are nonspecific, conclusory, and conjectural. State Petitioners premise standing on alleged increases in state vehicle costs or grid investments, or decreases in state fuel tax revenue. *See* State Add.6-54. But despite the fact that this California zero-emission vehicle standard has been operational since 2013, 78 Fed. Reg. at 2119, not one State Petitioner, or Petitioners' expert declaration, asserts – let alone substantiates – that state costs have actually increased or state revenue has actually decreased. State Petitioners' declarations aver only that they have purchased vehicles, not that purchase costs have actually risen. *See* State Add.6-36 (attesting to, *e.g.*, purchases of "two gas-powered vehicles" since December 2019).

Instead, Petitioners' expert declaration attempts to construct a theory of how California's waiver might lead to the alleged harms.  *See* State Add.38-54.  But Petitioners' "evidentiary submissions must be more than an ingenious academic exercise in the conceivable," *Carbon Sequestration Council*, 787 F.3d at 1140; they must provide "substantial evidence" "leaving little doubt" as to the chain of causation, *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015).

Petitioners' declaration falls far short.  It claims that State Petitioners will pay more for fleet vehicles because automakers will raise prices uniformly on all conventional vehicles nationwide to allow lower prices on zero-emission vehicles in California and Section 177 states.  EPA has acknowledged that automakers may choose to cross-subsidize between vehicle models, including to support adoption of zero-emission vehicles.  *See, e.g.*, 78 Fed. Reg. at 2141-42.  But the declaration converts this description of industry flexibility into rampant speculation as to how independent third parties will behave, including that consumers in those select states will not buy sufficient zero-emission vehicles absent discounts; that auto manufacturers will "inexorabl[y]" and unilaterally institute price increases – regardless of market conditions – on every conventional vehicle model, including the precise models that State Petitioners would purchase; and that consumers would, and could, ship vehicles cross-country if vehicle pricing differed between states with and without zero-emission vehicle standards.  *See* State Add.38-54.

And notably, the declaration does so entirely in the future tense – predicting that these changes "will" occur, with no evidence that they have, despite the near-decade since this zero-emission vehicle standard went into effect. *Id.* Such an "extended chain of contingencies" is not sufficient to establish standing. *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016); *see Arpaio*, 797 F.3d at 21.

Even assuming the declaration's many unsupported presumptions, the declaration fails to account for the myriad *other* significant influences on vehicle prices and consumer behavior, like tight vehicle supply chains and rising gasoline costs. Conspicuously, the declaration does not acknowledge that automakers – who notably have not challenged the waiver – have continued to produce electric vehicles with or without the current waiver. *See* 86 Fed. Reg. at 74438 (noting "accelerating transition to electrified vehicles" even with the Withdrawal Decision in place), 74486 (similar). State Petitioners thus do not substantiate redressability. *See Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938 (D.C. Cir. 2004) (rejecting standing based on "speculati[on]" that policy changes "will alter the behavior of regulated third parties that are the direct cause" of the injury); *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 243-44 (D.C. Cir. 2015) (harm reflecting other economic trends was not redressable).

The declaration's assertions as to fuel-tax- and electric-grid-related harms require even more speculative additions to this chain of causation. State

26

Petitioners assert that by affecting conventional vehicle prices, California's standard will reduce the number of conventional vehicles and induce zero-emission vehicle sales in states where that standard does not apply, leading to reductions in fuel-consumption-based tax revenue, and increases in electricity consumption in Petitioner states. *See* State Add.51-54. State Petitioners do not "set forth specific facts" demonstrating that these are "predictable" and "fairly traceable" effects of California's standards – especially where they assert only that California's standard "*might* create some substitution" of zero-emission vehicles for conventional vehicles in Ohio, State Add.51-52 (emphasis added), and where Ohio and 13 other State Petitioners *already* have laws that charge annual zero-emission vehicle fees to replace lost fuel-tax revenues.[3]

Moreover, electric vehicle, battery, and charger manufacturers have announced more than $25 billion in new investments in 15 Petitioner states in the last 18 months alone.[4] Indeed, Ohio has claimed in documents seeking federal

---

[3] https://www.ncsl.org/research/energy/new-fees-on-hybrid-and-electric-vehicles.aspx#map.

[4] *See, e.g.*, https://governor.ohio.gov/media/news-and-media/governor-dewine-announces-honda-to-invest-in-ohio-for-electric-vehicle-production-including-new-battery-plant-with-lg-energy-solution-10112022 ($4.2+ billion investment in Ohio); https://www.cnbc.com/2022/05/20/hyundai-to-invest-5point5-billion-to-build-evs-and-batteries-in-georgia.html ($5.5 billion Georgia); https://www.cnbc.com/2021/09/27/ford-battery-supplier-to-spend-11point4-billion-to-build-new-us-plants.html ($5.8 billion Kentucky); https://fortune.com/2022/10/19/bmw-1-billion-electric-vehicle-plant-investment-spartanburg-south-carolina-batteries/ ($1.7 billion South Carolina);

funding for electric-vehicle infrastructure that it "has supported the [electric-vehicle] transition" and "seeks to ensure Ohio's full participation in building a national [electric-vehicle] charging network."[5]  These benefits and statements undermine State Petitioners' claims of harm.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (rejecting standing based in part on evidence of economic benefit).

State Petitioners' standing deficiencies cannot be ameliorated by their assertion of "special solicitude" for state parties because Petitioners do not claim a quasi-sovereign interest in their economic harms, as Petitioners acknowledge they must.  *See* State Br. 16 (citing *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019)).  In any case, there is no special solicitude for states' economic injuries. *See Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022).

## 2.    State Petitioners lack standing premised on a constitutional injury.

State Petitioners also lack standing premised on a purported constitutional right to equal sovereignty because they identify no particularized, concrete, and

---

https://www.southbendtribune.com/story/opinion/columns/2022/10/06/indiana-poised-to-be-a-manufacturing-hub-for-electric-vehicles-parts/69541780007/ ($2.5+ billion Indiana); https://www.kansascommerce.gov/2022/07/kansas-lands-4b-4000-job-panasonic-energy-electric-vehicle-battery-plant/ ($4 billion Kansas).

[5] https://www.fhwa.dot.gov/environment/nevi/ev_deployment_plans/oh_nevi_plan. pdf; *see also* https://driveelectric.gov/state-plans/ (all 50 state plans).

redressable sovereignty injury.  California's preemption waiver does not "impose obligations on the States." *Missouri v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022). Nor does the waiver "displace[] the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 291 (1981).  And Petitioners profess no interest in lifting preemption and exercising police power to regulate vehicle emissions.  Instead, the relief they seek – lifting the waiver of preemption for California – would only deprive them of the power they presently have to adopt California's standards into their own laws.  As a result, they would have less sovereign power than they have presently.  Thus, no sovereignty injury has been identified or is redressable.

**B.    Petitioners do not fall within Section 209's zone of interests.**

All Petitioners' statutory claims also should be dismissed because precedent indicates that Petitioners do not fall within the zone of interests protected by Section 209.

Petitioners lack a cause of action if their "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress" intended to permit them to bring suit.  *CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589 (D.C. Cir. 2022).  Petitioners cannot meet this test because their interests in propping up demand for certain fuel

29

products, or otherwise furthering their pecuniary interests, are unrelated to, or even inconsistent with, the purposes of Section 209.

The assertion that the Restoration Decision will cause economic injury to Petitioners is insufficient to bring them within the zone of interests. They "make no attempt to show," and cannot show, that Congress intended for the Act to protect Petitioners' economic interests, "either directly or as a proxy for the environmental interests of the public for whose protection the Act was presumably passed." *Sierra Club v. EPA*, 292 F.3d 895, 903 (D.C. Cir. 2002).

In *Delta Construction Co. v. EPA*, this Court held – in the context of the very same kind of greenhouse-gas emission standards at issue here – that a petitioner's interest in incentivizing regulated parties to build vehicles that would accommodate its clean fuel product fell outside the Act's zone of interests. 783 F.3d 1291, 1300 (D.C. Cir. 2015).[6] The Court explained it is not sufficient that "corporations' pecuniary interests in increasing demand for their products are aligned with the goals of the [Act]." *Id.* (internal quotation omitted).

This reasoning dictates that Petitioners' interests are likewise insufficient. Fuel Petitioners similarly seek to incentivize regulated manufacturers to build

---

[6] *See also, e.g.*, *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607 (D.C. Cir. 2019) (paper manufacturers not within zone of interests protected by securities laws); *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (food groups not within zone of interests of renewable fuel volume program).

vehicles that will support Petitioners' preferred fuel products.  Fuel Br. 20.  But these interests are even more marginal than the *Delta* petitioner's interest, as they are in tension with the Act's goals.  Less stringent emission regulation as preferred by Petitioners correlates with increased emissions endangering public health and welfare.  *See* 42 U.S.C. §§ 7521(a)(1), 7543(b)(1) (providing EPA authority to set emission standards for air pollutants and requiring waived state standards to be as protective).  Likewise, State Petitioners' pecuniary interests related to vehicle costs and tax revenue fall outside of Section 209's zone of interests.

## II.    Section 209's preemption structure is constitutional.

The preemption framework in Section 209(b) falls within Congress's plenary Commerce Clause power.  In employing this power to regulate air pollution, Congress may preserve pre-existing State programs; it is not obliged to preempt them indiscriminately.  Moreover, Congress appropriately recognized the benefits for the nation to be derived from permitting California to improve upon "its already excellent program of emissions control" and continuing to serve as a forum for innovation.  *MEMA I*, 627 F.2d at 1109-10.  It also appropriately recognized the benefits to be derived from allowing California to address the State's particularly severe air quality problems.  Petitioners' proposal to impose a new constitutional limit on Congress's Commerce Clause power – premised on

novel ideas as to how equal-sovereignty principles should operate – finds no

support in constitutional text or precedent, and merits rejection.

### A. Congress's authority to regulate vehicle emissions under the Commerce Clause is plenary and subject only to rational-basis review.

Congress holds plenary power to regulate interstate commerce. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937). This Commerce Clause power "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution" and are "expressed in plain terms." *Gibbons v. Ogden*, 22 U.S. 1, 196 (1824).

The regulation of motor-vehicle emissions in Clean Air Act Title II, including the preemption framework in Section 209, is an appropriate exercise of Commerce Clause power. The Commerce Clause power plainly encompasses federal regulation of air pollution. *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 180-83 (D.C. Cir. 2015). Consequently, the only constitutional question presented here is whether "Congress acted rationally in adopting" this specific preemption framework. *Hodel*, 452 U.S. at 276.

### 1. Congress may differentiate between states in exercising plenary Commerce Clause authority.

Petitioners object to Congress's decision to extend to California alone the ability to request a preemption waiver. But there is no bar "expressed in plain

terms" precluding Congress from making reasonable preemption distinctions between states or the regions they represent.  *Gibbons*, 22 U.S. at 196.

The Constitution provides very few promises of equality among the states, and it articulates those with particularity.  For example, it provides for uniform duties, imposts, and excises throughout the United States.  U.S. Const. art. I, § 8, cl. 1.  It provides for uniform naturalization and bankruptcy regulation, and that no preferences shall be given to the ports of one state over those of another.  *Id.* art. I, § 8, cl. 4; § 9, cl. 6.  These specific guarantees of equal treatment reflect the *absence* of any more general principle that Congress's enactments must broadly provide for identical standards across different states.

The Commerce Clause is not among the provisions for which the Constitution prescribes a need for geographic uniformity.  Its text makes as much clear, allowing Congress "[t]o regulate commerce … among the several States."  U.S. Const. art. I, § 8, cl. 3.  The Supreme Court has thus pronounced: "There is no requirement of uniformity in connection with the commerce power … such as there is with respect to the power to lay duties, imposts and excises."  *Currin v. Wallace*, 306 U.S. 1, 14 (1939); *see also Hodel*, 452 U.S. at 332 (a claim of arbitrariness in evaluating exercise of Commerce Clause authority "cannot rest solely on a statute's lack of uniform geographic impact").

33

Thus, while a "guarantee of uniformity in treatment amongst the states cabins some of Congress' powers," "no such guarantee limits the exercise of Commerce Clause Power." *NCAA v. Governor of N.J.*, 730 F.3d 208, 238 (3d Cir. 2013), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018). "This only makes sense: Congress' exercises of Commerce Clause authority are aimed at matters of national concern and finding national solutions will necessarily affect states differently." *Id.* at 238.

Consistent with these principles, Congress may rationally elect to grandfather a state's authority to run its own regulatory program, or otherwise create principled preemption distinctions when creating new federal programs. Indeed, "[g]randfather clauses are a long-accepted legislative tool." *Kampfer v. Cuomo*, 643 F. App'x 43, 44 (2d Cir. 2016).

The United States Code is replete with examples where Congress elected to treat states disparately with respect to preemption, either by including grandfather provisions or otherwise. For example, Congress exempted Texas' intrastate electric grid from the full panoply of federal public utility regulation, thereby allowing Texas alone to retain certain sovereign authority over power transmission not enjoyed by any other state. 16 U.S.C. §§ 824k(k), 824p(k), 824q(h), 824t(f).

Among other examples:

34

- Federal law preempts state regulation of most aspects of hydroelectric projects but allows Alaska to assume jurisdiction over small hydroelectric projects.  16 U.S.C. § 823c.

- Congress exempted Hawaii from preemption under the Employee Retirement Income Security Act.  20 U.S.C. § 1144(b)(5).

- Congress exempted various state laws related to energy conservation from preemption under EPCA.  42 U.S.C. § 6297(c)(4)-(5), (8)-(9).

- Congress authorized certain states to retain or enact special rules concerning vehicle use on interstate highways.  49 U.S.C. § 31112(c).

And beyond differentiating with respect to preemption, Congress routinely legislates in other ways intended to benefit and empower only certain states.  For example, Congress has created numerous regional commissions, such as the Appalachian Regional Commission, that are partnerships between the federal government and selected states to foster regional development.  *See* 40 U.S.C. Chapters 143, 153.

Differential treatment of states is thus both accepted and commonplace.

> ### 2.    Congress's authority to regulate motor-vehicle emissions under its Commerce Clause power is not limited by equal-sovereignty principles.

In one distinct area of federal power outside of the Commerce Clause context, the Supreme Court recognized that principles of equal sovereignty may operate to limit certain exercises of Congress's power.  Specifically, in *Shelby County v. Holder*, the Court held that equal-sovereignty principles applied to limit Congress's Fifteenth-Amendment authority to impose disparate restrictions on

state election procedures. The circumstances in *Shelby County* are not comparable to those here. Indeed, that case, and those construing it, make clear that equal-sovereignty principles do not constrain ordinary Commerce Clause legislation.

In *Shelby County*, the Supreme Court took pains to emphasize the "extraordinary" nature of the Voting Rights Act's preclearance provisions. 570 U.S. at 545. Those provisions required a disfavored small subset of states to obtain federal permission before any of their laws related to voting could take effect; indeed, the Court understood the provisions to constrain those states from even "enacting" such laws. *Id.* at 534-35. Such requirements intruded into a sensitive area of state policymaking – local election regulation – that had traditionally been the exclusive province of the states. In that sensitive and specific context, the Supreme Court found a "principle of equal sovereignty" to be "highly pertinent." *Id.* at 530.

The principles of federalism that animated the heightened standard applied in the voting procedure context do not apply to the regulation of privately manufactured motor vehicles. Unlike Congress's Article I powers, the Fifteenth Amendment operates directly on states and displaces state powers historically recognized as core sovereign ones. Concerns about "federal intrusion into sensitive areas of state and local policymaking," *id.* at 545, have considerably less salience where, as here, Congress is exercising the quintessentially federal power

36

of regulating interstate commerce.  This principle has special force in the present context, as air pollution – by its nature – crosses state borders.  *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 496 (2014).

Indeed, State Petitioners express no interest in pursuing their own regulation of vehicle emissions.  If they had, they would be requesting a remedy that would enable them to apply for a preemption waiver.  They instead request relief intended to further expand federal power at the expense of all states.  State Br. 1.  Nothing in *Shelby County* suggests that any equal-sovereignty principle can be so utilized.

And unlike the situation present in *Shelby County*, neither Section 209(b) nor California's regulatory efforts have imposed any sovereignty burden.  In *Shelby County*, Congress had singled out a handful of states for *disfavored* treatment, obligating them to take additional steps not required of other states.  In contrast, Section 209(b) *enhances* state sovereignty in a regulatory area where states otherwise would have retained no power.

Indeed, by later adding Section 177, which allows other states to opt-in to California standards, Congress increased the regulatory options available to *all* states – while requiring nothing of states that prefer the federal standards.  The preemption exception for California is thus nothing like the "extraordinary departure from the traditional course of relations between the States and the Federal Government" described in *Shelby County*.  570 U.S. at 545.

Considering these distinctions, the two circuit courts that have considered the question subsequent to *Shelby County* have declined to extend equal-sovereignty principles to Article I legislation. *Mayhew v. Burwell*, 772 F.3d 80, 93-96 (1st Cir. 2014); *NCAA*, 730 F.3d at 237-39. Their reasoning for doing so applies fully here.

In *Mayhew*, the First Circuit held that equal sovereignty principles were not applicable to an Affordable Care Act provision enacted under Congress's Spending Clause authority. The court noted that "[f]ederal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system." 772 F.3d at 95. It then concluded that equal-sovereignty principles apply only in "extraordinary situations" where the federal government intrudes into sensitive areas of state policymaking. *Id*. The case presented no such situation.

The Third Circuit in *NCAA* similarly held that equal sovereignty principles did not apply to a statute enacted pursuant to Congress's Commerce Clause power giving preferential treatment to Nevada alone to authorize sports gambling. The court reasoned that any regulation of interstate commerce necessarily affects states differently and that the regulation of gambling via the Commerce Clause is "not of the same nature as the regulation of elections" under the Fifteenth Amendment. 730 F.3d at 238. So too here with respect to regulation of interstate air pollution.

38

This Court's precedent in other constitutional areas also supports this conclusion. In *Nuclear Energy Institute v. EPA*, 373 F.3d 1251 (D.C. Cir. 2004), this Court held that the Constitution does not contain any implied requirement for "equal treatment" of states when Congress is exercising authority under Article IV's Property Clause. *Id.* at 1305-09. Like the Commerce Clause, the Property Clause provides the United States with plenary power, albeit with respect to federal lands. *Id.* at 1308.

**B.** **Even if equal-sovereignty principles apply, Section 209(b) meets any applicable heightened review standard, and Petitioners have forfeited any contrary argument.**

Even in the far more sensitive context of state voting procedures, the Supreme Court has affirmed that principles of equal sovereignty do not operate "as a *bar* on differential treatment." *Shelby Cnty.*, 570 U.S. at 544 (citation omitted) (emphasis in original). Congress's choices may still be upheld if the legislation addresses exceptional conditions and there is "a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Id.* at 542 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)).

Even if the Court were to apply equal-sovereignty principles in the same manner as in *Shelby County*, Section 209(b) would easily clear this bar. Here, the differentiated geographic preemption coverage within Section 209 is "sufficiently

related to the problem that it targets" – *i.e.*, ameliorating threats to public health and welfare caused by motor vehicle pollution. *Id*.

Indeed, State Petitioners fail even to try to demonstrate otherwise. In challenging Section 209(b), despite *Shelby County*, they rely exclusively upon their theory that equal-sovereignty principles categorically bar differentiated treatment of states. Thus, if the Court were to reject Petitioners' *per se* unconstitutional argument, as it should under *Shelby County* itself, that should end the inquiry. Petitioners advance no alternative fact-based argument that Section 209 fails a "sufficiently-related" standard, much less the applicable rational-basis standard (*see supra* Argument II.A), so they have forfeited any such argument. *See Lake Carriers Ass'n v. EPA*, 652 F.3d 1, 9 n.9 (D.C. Cir. 2011).

In any event, the balance that Congress struck in Section 209 would meet any heightened standard articulated in *Shelby County*. As an initial matter, no one contests that Congress reasonably and permissibly elected to generally preempt state vehicle regulation. And here, Congress identified cogent reasons for creating a preemption exception specifically for California. Congress recognized that California's air-quality problems were particularly severe. S. Rep. No. 90-403, at 33. It further recognized that California had already established a successful vehicle-emission control program. *Id*. Therefore, Congress reasonably determined that California should "be able to continue its already excellent program to the

40

benefit of the people of that State." *Id.* Such grandfathering is a plainly legitimate legislative purpose, and one reflected in the statutory text itself: Section 209(b) applies to "any State which ha[d] adopted standards … prior to March 30, 1966." 42 U.S.C. § 7543(b)(1).

Congress also reasonably determined that authorizing the continuation and expansion of California's "pioneering" regulatory efforts would create a state-level laboratory for innovation, driving experimentation in "new control systems and designs" that would benefit the nation as a whole. S. Rep. No. 90-403, at 33. Congress further reasonably concluded that industry, confronted with only one potential variation to federal standards, would "be able to minimize economic disruption." *Id.* In this fashion, Congress struck a reasonable balance between regulatory experimentation and the needs of the regulated industry.

The decades following Congress's enactment of Section 209(b) have served to confirm Congress's prescience in concluding that preserving California's regulatory program would further innovation. In implementing federal standards, the United States has, in fact, been able to draw "heavily" upon "the California experience to fashion and to improve the national efforts at emission control." *MEMA I*, 627 F.2d at 1110. And following the 1977 amendments, numerous states have elected to adopt California's standards, reflecting that California's

41

experimentation has provided concrete benefits to other states pursuing their own air quality objectives. *See* 87 Fed. Reg. at 14379.

Section 209(b) also ensures that its "current burdens" are justified by "current needs." *Shelby County*, 570 U.S. at 536. The statute incorporates a built-in mechanism for continual reevaluation of whether California continues to "need" its separate status. While the conditions in California that led Congress to create a preemption exception remain in place today (*see infra* Argument IV.B), the State will become ineligible for a waiver whenever it no longer has any "compelling and extraordinary" need for its own program. 42 U.S.C. § 7543(b)(1)(B). Thus, there is no danger of the California's preemption exception outliving its utility.[7]

For all of these reasons, Section 209's differentiated geographic preemption coverage satisfies even a heightened standard of judicial review. The differentiated coverage advances government interests in a sensible manner and "sufficiently relate[s] to the problem that it targets." *Shelby County*, 570 U.S. at 242 (quotation omitted).

---

[7] The fact that substantial reliance interests have developed in the 55 years since Section 209(b)'s promulgation further counsels for judicial restraint. *See* 87 Fed. Reg. at 14352 (noting reliance interests of Section 177 states who have adopted California standards to meet their own air quality objectives).

C.    **Petitioners' new, categorical constitutional rule is entirely unsupported by text, history, or precedent, and is impractical and unadministrable.**

As noted, State Petitioners do not contend that Section 209 is not suitably tailored.  Nor are they even proposing the application of equal-sovereignty principles in any previously recognized form.  They instead propose what amounts to an entirely new constitutional doctrine, premised on idiosyncratic notions as to how equal-sovereignty principles should operate.  The Court should decline Petitioners' invitation to invent and apply a new, atextual, constitutional rule.

Petitioners suggest that the Constitution implicitly prohibits, on a categorical basis, the differential treatment of states under any enumerated federal power whenever, in Petitioners' words, such differential treatment concerns "political standing and sovereignty."  State Br. 26.  Petitioners then say, at most, there is an exception when Congress regulates a matter of "unique concern" to a state.  *Id*.

Petitioners invent this theory from whole cloth, pulling various strands of constitutional law from different contexts and twisting them into an unrecognizable new creation.  Their theory is unsupported by text, history, or precedent.  It is also impractical and unadministrable.

1.    **Petitioners' *per se* theory lacks support in text, history, or precedent.**

As Petitioners concede, State Br. 17, there is no limitation "expressed in plain terms" limiting the differential treatment of states under the Commerce

43

Clause. *Gibbons*, 22 U.S. at 196. Nor is there any implicit limitation on Commerce Clause authority "embedded in the text and structure of the Constitution" that is "historically rooted" and supported by judicial precedent. *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1499 (2019).

Far from it. Petitioners cannot identify a single precedent reflecting their proposed equal-sovereignty limitation on Commerce Clause power. Not only that, but Petitioners' take on equal-sovereignty principles is irreconcilable with the principal decision they rely upon, *Shelby County*. As explained above*,* the Supreme Court made clear there that equal-sovereignty principles, where they apply, do not operate "as a *bar* on differential treatment"; they require at most only a heightened standard of review. 570 U.S. at 544 (emphasis in original). Yet, a *per se* bar on differential treatment is exactly what Petitioners are proposing.

Petitioners try a work-around. They claim that the states for the very first time "compromised" a pre-existing absolute right to equal sovereignty with the Reconstruction Amendments. State Br. 19. That assertion is baseless. The text of the Fifteenth Amendment – granting authority to enact "appropriate legislation" to protect voting rights – does not prohibit differentiation among states. But neither does the text of the Commerce Clause that existed prior to that Amendment. The Commerce Clause creates "Power … To regulate Commerce … among the States" and also enables Congress to draw distinctions.

44

Petitioners further fail to point to any evidence from contemporaneous sources, such as the Federalist Papers, that indicates that the Constitution effectuated, *sub silentio*, an implicit expansive equal-sovereignty guarantee that would significantly cabin the powers the Constitution otherwise very explicitly then granted to the federal government. Petitioners likewise fail to identify evidence during debate on the Reconstruction Amendments suggesting that anyone actually thought that the Constitution had embedded such a guarantee until then.

In fact, Petitioners have things quite backwards with respect to the original Constitution. Deeply woven into the original constitutional fabric is the understanding that the states will *not* wield equivalent sovereign power. At the Constitutional Convention, the structure and powers of the national government were the subject of contentious deliberations. Through the Great Compromise, the smaller states compromised their relative sovereign authority. They agreed to proportional representation in the House, granting larger states more representation and resulting power. U.S. Const. art. I, § 2, cl. 3. The smaller states further agreed to grant larger states more votes in nominating a President. *Id.* art. II, § 1, cl. 2. In these respects, the Constitution sharply departed from the earlier Articles of Confederation, which gave each state delegation one vote within the Confederation Congress. Articles of Confederation, art. V, cl. 4. The debates leading up to the Great Compromise confirm that delegates were well aware that proportional

45

representation meant that "some of the States of the Union will possess a greater Share of Sovereignty." Notes of William Patterson in the Federal Convention of 1787 (available at https://avalon.law.yale.edu/18th_century/patterson.asp).

With respect to exercises of congressional power, the Constitution then specifically lists those limited circumstances where states must be treated equally, with those specific guarantees reflecting the absence of any more general guarantee of equal treatment. *See supra* Argument II.A.1. Other provisions then confirm the Framers' expectation that differential political treatment of states could appropriately ensue from Congress's general exercise of enumerated powers. Under the Tonnage Clause (Art. I, § 10, cl. 3), for example, Congress may consent, or not, to a particular state laying duties of tonnage – so the Founders clearly contemplated that some states may be granted such power, and others not.

Likewise, the Compact Clause (Art. I, § 10, cl. 3) reflects the Founders' expectation that federal law could create distinctions between states related to sovereign authority. Under that Clause, states may agree to transfer sovereign rights to other states, or to exercise power that other states may not, if their agreement is approved by Congress into federal law. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 42 (1994); *Cuyler v. Adams*, 449 U.S. 433, 440 (1981) (consent of Congress required where interstate compact will increase "political power" of compact states and consent transforms compact into federal law).

46

Lacking textual, historical, or precedential support, Petitioners largely rely on a single law review commentary, citing repeatedly to Anthony Bellia, Jr. & Bradford Clark, *The International Law Origins of American Federalism*, 120 Colum. L. Rev. 835 (2020).  That commentary extrapolates from eighteenth-century international-law principles and argues that the Constitution's use of the then-established term "States," supports the implicit application of a sweeping prohibition on differential treatment.  *Id.* at 935-38.  That view is unfounded.  As the Constitution repeatedly makes plain, the federal government holds a position in relation to states that does not exist in international law.  Under the Supremacy Clause, federal law is supreme.  U.S. Const. art. VI, cl. 2.

### 2.   Equal-footing, Tenth-Amendment and separation-of-powers principles have no application here.

State Petitioners further attempt to cobble together support for their theory from cases applying the equal footing, anti-commandeering, and separation-of-powers doctrines.  State Br. 20-23.  Petitioners improperly discard "the text, the substantive context, and the jurisprudential history of each of the individual … doctrines" upon which they rely, coming up with an "entirely new creation" having "no textual basis."  *Nuclear Energy Institute*, 373 F.3d at 1306.

The equal-footing doctrine applies "only to the terms upon which States are admitted to the Union."  *South Carolina v. Katzenbach*, 383 U.S. 301, 328-29 (1966).  The doctrine prohibits Congress from leveraging its admission power to

limit new states' sovereignty in ways that "would not be valid and effectual if the subject of congressional legislation after admission." *Coyle v. Smith*, 221 U.S. 559, 573 (1911). But it does not prohibit Congress from enacting legislation pursuant to its Commerce Clause authority, either at or after the time of admission, that would "operate to restrict the [admitted] state's legislative power." *Id.* at 574.

The anti-commandeering doctrine is also inapplicable. State Br. 21. That doctrine bars Congress from commanding state officials to administer or enforce a federal regulatory program. *Printz v. United States*, 521 U.S. 898, 935 (1997). The Clean Air Act imposes federal emission standards on automobile manufacturers. It then contains a preemption waiver allowing California to impose its own standards on manufacturers under state law. None of this commandeers the states.

Nor does Section 209 more broadly implicate the Tenth Amendment. The United States has undisputed power under the Commerce Clause to regulate motor-vehicle emissions and occupy the field. Thus, there is no "residual" state power in play here subject to "diminution." State Br. 22. Indeed, Petitioners would invert the Tenth Amendment, using it to expand federal power at the states' expense.

Petitioners' invocation of separation-of-powers principles also fails. State Br. 20-21. Separation-of-powers jurisprudence concerns the danger of one federal branch aggrandizing its power vis-a-vis another. *Freytag v. C.I.R.*, 501 U.S. 868,

48

878 (1991). That jurisprudence is irrelevant to whether the Constitution precludes

Congress from reasonably distinguishing among states with respect to Commerce

Clause preemption.

### 3.    Petitioners' proposed theory is impractical.

Petitioners' proposed theory is also unworkable. As an initial matter, the

distinction Petitioners draw between laws that differentiate related to "sovereign

authority," and those that otherwise differentiate, is illusory. State Br. 26. Under

Petitioners' logic, for example, Congress could itself adopt a more stringent air

pollution standard for California and apply it to vehicles sold in that State, while

adopting another regime for the rest of the country. Thus, under their construct,

the very same emissions regime could be created by Congress under federal law

directly. But there is no constitutional basis for requiring that such a legislative

result be achieved only through the *expansion* of federal power and preemption

that Petitioners seek. Federalism principles support allowing Congress to place

regulatory power closer to the people affected.

Moreover, Petitioners' test is unadministrable. Even laws that do not

facially differentiate between states can have unequal preemptive effects – for

instance, a law about water conservation during droughts might effect conflict

preemption of certain laws in drought-prone states but not other ones. Petitioners'

apparent view that such unequal preemptive effects *categorically* render laws

unconstitutional because of the affront to "political standing and sovereignty" lacks workable boundaries.[8]

Petitioners' proposed new limitation, if adopted, would also be highly disruptive. It would implausibly call into question a wide swath of federal laws. *See supra* Argument II.A.1. For example, routine grandfathering of particular state laws – a time-honored legislative practice – would now be presumptively unconstitutional.

To the extent Petitioners ground their theory in concerns about political rent-seeking, and fair competition between states, State Br. 21-22, the Framers' design was to allow those concerns to be addressed through the political process established by the Constitution. Moreover, their theory does little to address such concerns. Congress could just as easily pick favorites, for example, by subsidizing industries located within particular states or imposing different standards within them.

Petitioners try to mitigate the extreme implications of their theory by suggesting that laws that address "unique" concerns of states might be exempted from the *per se* bar. State Br. 26-27. That aspect of Petitioners' theory poses its own problems. First, Petitioners' proffered unique-concern exception would

---

[8] If Petitioners' theory applies only when a law *expressly* differentiates between states, they propose a constitutional test in which form would triumph over substance.

undercut their own challenge to Section 209(b). Applying that exception, Section 209(b) is constitutional because it *did* address California's unique pollution challenges and pre-existing program. Indeed, on its face Section 209(b) applies equally to all states, and California is eligible for waivers only because it has the "unique" status of having standards in place prior to March 30, 1966.

To the extent Petitioners nonetheless dispute the "uniqueness" of California's situation, that only underscores that their construct would be hopelessly vague in application. It is unclear what aspects of legislation – which could be complex and motivated by multiple congressional purposes – would be relevant to their "uniqueness" test. Further, under their proposed approach, presumably every instance of regional tailoring under the Commerce Clause would invite fact-intensive litigation over whether it rested on sufficiently "unique" concerns. Here Petitioners have never developed, and so have forfeited, any such factual arguments. *See Lake Carriers Ass'n*, 652 F.3d at 9, n.9 (arguments not raised in opening brief forfeited); *Plaquemines Port, Harbor & Terminal Dist. v. Fed. Mar. Comm'n*, 838 F.2d 536, 551 (D.C. Cir. 1988) (constitutional claims cannot be reached without adequate factual record).

In any event, Petitioners' entire theory – including their unique-concern exception – is atextual. Nothing in the Constitution limits differential preemption treatment to situations where states have wholly "unique" concerns, which would

needlessly hamstring Congress's ability to address important national problems. Congress may permit some states to adopt different standards based on concerns that are more pronounced in the regions covered by those particular states, even if they are not "unique."  In Section 209(b), Congress required that California have a "compelling and extraordinary" need for a waiver, thereby articulating a sufficient basis for differential treatment.

### D.    Section 209(b) is constitutional as applied to the challenged waiver.

Petitioners' argument, State Br. 30-33, that Section 209(b) is unconstitutional as applied to the challenged waiver also fails.  Contrary to Petitioners' assertion, climate change *does* present "an acute California problem." State Br. 31; *see* 87 Fed. Reg. at 14365 (reflecting that California is one of the most climate-challenged regions of North America).  Petitioners additionally ignore that the waived California standards will achieve significant reductions in conventional pollution and thereby help the State address its longstanding problems with excessive smog and soot.  *See infra* Argument IV.B.2.

In any event, nothing in the Constitution precludes a state from mitigating climate-change threats, or Congress from allowing it to do so.  Just like national governments, states are perfectly capable of taking steps to address environmental problems within their boundaries, even if the problems may also extend beyond them.  And states, like the federal government, need not "resolve massive problems

in one fell regulatory swoop." *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007); *see also Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1107 (9th Cir. 2013) (California should be "encouraged to continue and to expand its efforts … to lower carbon emissions").

## III.    The Withdrawal Decision was an improper exercise of reconsideration authority.

EPA appropriately rescinded the 2019 Withdrawal Decision as an improper exercise of the agency's inherent reconsideration authority.  EPA possesses such authority to reconsider its decisions under Section 209(b), subject to articulated reasonable limits in accordance with the statutory framework and relevant legal principles.  EPA's Restoration Decision concluded that the Withdrawal Decision failed to adhere to these limits, reopening a longstanding final adjudication to revise the conditions of California's existing waiver without properly accounting for the disruptive impact of its action.  EPA also determined that the Withdrawal Decision was legally improper, as addressed below, but this Court can, and should, sustain the Restoration Decision on this independent ground.

In the Restoration Decision's first basis for rescission, EPA articulated reasonable boundaries for exercise of inherent reconsideration authority of waivers under Section 209(b), including that reconsideration could not look beyond the three statutory bases for denying a waiver specified by Congress, 87 Fed. Reg. at 14334; and that the Withdrawal Decision improperly advanced discretionary

changes in administrative policy, undermining Congress's intended deference to California's policy choices and the infrastructure of pollution-abatement efforts (and technology investments) in California and other states that Congress intended to be built on a waiver grant. *Id.* at 14348. The Withdrawal Decision was plainly premised on considerations beyond Section 209, *see infra* Argument IV.C, and on "retroactive application of discretionary policy changes," so EPA determined that it exceeded the proper scope of reconsideration under Section 209. 87 Fed. Reg. at 14350-51.

EPA also reasonably concluded that reconsideration on any grounds must fairly consider timeliness and reliance interests. 87 Fed. Reg. at 14350. As this Court has explained, "if there is to be any stability and fairness in administrative proceedings … [agencies' reconsideration] power must be exercised both within a reasonable time after the issuance of a final departmental decision and without subjecting the parties affected by any undue or unnecessary hardships." *Nat'l Ass'n of Trailer Owners, Inc. v. Day*, 299 F.2d 137, 139-40 (D.C. Cir. 1962). These concerns are especially potent in adjudications, where reconsideration risks introducing "immense degrees of uncertainty … in settled expectations" of those operating under a granted waiver. 87 Fed. Reg. at 14350; *see U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 708-09 (D.C. Cir. 2016). In its Restoration Decision, EPA

54

concluded that the Withdrawal Decision failed entirely to take account of these concerns.

Petitioners claim these two determinations cannot be separated from the Agency's rejection of the Withdrawal Decision's substantive grounds for revoking the waiver, Fuel Br. 56-58, and that, in any case, EPA's articulation of the scope of its authority is wrong, *id.* at 58-63. But the Court need not answer that question or decide the proper scope of reconsideration under Section 209 to affirm EPA's determination that the Withdrawal Decision was procedurally flawed: even assuming, *arguendo*, that the Withdrawal Decision was permissible in scope, EPA reasonably concluded that the Withdrawal Decision failed to adequately assess how the waiver "engendered serious reliance interests," magnified by the passage of years. *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). That error is not intertwined with the merits questions here, so the Court may affirm EPA's Restoration Decision on that basis alone.

On that matter, the record is clear. Evidence before EPA at the time established that the waiver standards were "vitally important" to existing short- and long-term plans to meet air quality requirements in numerous states, so waiver withdrawal risked significant consequences. 87 Fed. Reg. at 14346 & nn.112-114, 14351. Industry also warned of the reliance interests it had accrued over the preceding six years, with one coalition commenting that its members "have

55

invested billions of dollars with the well-founded expectation that increased demand for electric vehicles would be propelled by" the waiver.  *Id.* at 14347; *see id.* at 14346 n.115, 14350-51.

As the Restoration Decision explained, the Withdrawal Decision summarily dismissed or deferred consideration of these interests.  87 Fed. Reg. at 14351-52. It declined altogether to weigh impacts on state air quality plans, claiming these concerns could be addressed later.  84 Fed. Reg. at 51324 n.167, 51338 & n.256. And it claimed no party had reasonable reliance interests in the California waiver because there was no "finality" in contemporaneous *federal* vehicle greenhouse-gas standards.  *Id.* at 51335.  But while EPA had committed to a "Mid-Term Evaluation" of its own vehicle standards, *id.* at 51334-36, nothing in California's standards or the 2013 waiver conditioned California's waiver on the outcome of EPA's review, *see* 78 Fed. Reg. at 2137, 2128.  Disclaiming any reliance interests was also contrary to the factual record before EPA, attesting to billions of dollars invested in actual reliance on EPA's "final action" granting the waiver.  *See Ky. Mun. Energy Agency v. FERC*, 45 F.4th 162, 182 (D.C. Cir. 2022) ("[I]nvest[ing] hundreds of millions of dollars" after an agency order is "substantial evidence of reliance").

Petitioners attempt to dismiss this failure in one paragraph, claiming, without support, that reliance interests are a "lesser concern" where EPA's

decision "reduces regulatory obligations," and that the Withdrawal Decision "reasonably explained" why reliance interests were irrelevant. Fuel Br. 63. Neither is a plausible response – the latter because the record demonstrates otherwise; the former because the industry's reliance-backed investments were no less disrupted by the fact that they were no longer obligatory, and because California and the Section 177 states saw their "flexibility" to address pollution concerns, *see id.*, diminished, not increased. *See* S. Rep. No. 90-403, at 730 (noting that automakers make decisions "far in advance" so "obtain[ing] clear and consistent answers concerning emission controls and standards is of considerable importance"); H.R. Rep. No. 90-728, at 21 (same); *see also U.S. Telecom Ass'n*, 825 F.3d at 746-47 (Williams, J., concurring in part and dissenting in part).

Petitioners' objection to EPA's consideration of the timeliness of the Withdrawal Decision also fails. At a minimum, reopening the waiver a full six years later meant reliance interests were far more entrenched and, therefore, especially unreasonable to ignore. Moreover, Petitioners cite no authority for their counterintuitive assertion that timeliness matters only where private rights are at issue. And their claim that timeliness is relevant only to reconsiderations with retroactive effect ignores that the Withdrawal Decision *did* purport to have such effect. Fuel Br. 60; *see* 84 Fed. Reg. at 51337 n.253.

The Withdrawal Decision improperly disregarded substantial evidence in the record as to its disruptive effects and failed to establish that such concerns could be overcome, let alone lawfully ignored.  That failure requires reinstatement of the 2013 waiver, whether or not the Withdrawal Decision was otherwise within the bounds of EPA's reconsideration authority and independent of the Court's view of the Restoration Decision's other grounds.

## IV. EPA reasonably concluded that the Withdrawal Decision was legally and factually flawed, and so must be rescinded.

Even if the Withdrawal Decision was a proper exercise of reconsideration authority, EPA reasonably concluded that the Withdrawal Decision's legal interpretation was at odds with the Clean Air Act's text and history, and that its factual conclusions ignored record evidence demonstrating California's need for its standards.  EPA also properly rejected the Withdrawal Decision's reliance on EPCA.  EPA's judgments should be upheld.

### A. EPA's 2013 waiver reasonably interpreted Section 209's waiver criteria, and the Withdrawal Decision's contrary interpretation was legally unfounded.

#### 1. EPA's traditional interpretation of Section 209 is consistent with the statutory text, congressional purpose, and EPA's historical practice.

In the 2013 waiver, EPA applied its longstanding whole-program interpretation of Section 209 and determined, under the second waiver criterion, that "California continues to have compelling and extraordinary conditions giving

58

rise to a need for its own new motor vehicle emission program." 78 Fed. Reg. at

2131. Six years later, the Withdrawal Decision overturned this determination

based on a novel legal interpretation that not only rejected 50 years of EPA

practice, but strained the statutory text and undermined Congress's intent. *See* 84

Fed. Reg. at 51341. EPA's Restoration Decision properly reinstated its traditional

interpretation, which reflects the best reading of Section 209, so EPA's action

should be upheld.

Statutory interpretation begins with "a careful examination of the ordinary

meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*,

139 S. Ct. 2356, 2364 (2019). Here, the text and structure of Section 209 dictate

EPA's reinstated approach. Section 209(b)(1) states that EPA "shall" grant a

waiver "if the State determines that the State standards will be, in the aggregate, at

least as protective of public health and welfare as applicable Federal standards."

42 U.S.C. § 7543(b)(1). Section 209(b)(1) then lists the three criteria on which a

waiver can be denied. *Id.* § 7543(b)(1)(A)-(C).

The second waiver criterion, at issue here, states that no waiver shall be

granted where EPA finds that "such State does not need such State standards to

meet compelling and extraordinary conditions." *Id.* § 7543(b)(1)(B). The

Withdrawal Decision claimed that this text could be read to impose a "standard-by-

standard" analysis – requiring EPA to assess whether California needs particular

standards to address pollution challenges and allowing EPA to reject any

individual standard that does not independently meet that test.  *See* 84 Fed. Reg. at

51341, 51344-45, 51348.  This interpretation is at odds with the text.

EPA is required to assess California's need for "*such* State standards,"

where "such" means "of the character, quality, or extent *previously indicated or*

*implied*."  https://www.merriam-webster.com/dictionary/such (emphasis added);

*see* "Such," Black's Law Dictionary (4th ed., revised 1968) ("Of that kind, having

particular quality or character specified … Identical with, being the same as what

has been mentioned"); *Nieves v. United States*, 160 F.2d 11, 12 (D.C. Cir. 1947)

(holding that benefits for those "in the active service" after a specified date who

were injured "in such service" excluded those injured before that date because

"[t]he word 'such' is restrictive in its effect and obviously relates to an

antecedent").  No antecedent exists in the text for the phrase "*such* State standards"

in Section 209(b)(1)(B) except the *aggregate* State standards discussed in Section

209(b)(1).  *See* 42 U.S.C. § 7543(b)(1); 87 Fed. Reg. at 14343; 49 Fed. Reg. at

18889.  The meaning of the second waiver prong is therefore clear: EPA can deny

a waiver only where it finds California does not continue to need its whole

program of separate standards – considered in the aggregate – to meet compelling

and extraordinary conditions.

60

The traditional interpretation's focus on whether California needs a separate vehicle program not only honors the text, but best effectuates Congress's choice to "permit California to blaze its own trail with a minimum of federal oversight." *Ford Motor Co.*, 606 F.2d at 1297; 87 Fed. Reg. at 14360, 14362 n.286.  Congress "sharply restricted" EPA's role in reviewing California's waiver requests, *MEMA I*, 627 F.2d at 1121 – directing that "California's regulations … are presumed to satisfy the waiver requirements," *id.*, and placing the "burden" on EPA "to show why California … should not be allowed to go beyond the Federal limitations in adopting and enforcing its own standards."  H.R. Rep. No. 90-728, at 97; *see* 87 Fed. Reg. at 14341-43.

As EPA explained nearly 40 years ago, whole-program review also reflects "that in creating an exception to Federal preemption for California, Congress expressed particular concern with the potential problems to the automotive industry arising from the *administration* of two programs. … [T]he 'need' issue thus went to the question of standards in general, not the particular standards for which California sought a waiver in a given instance.'"  49 Fed. Reg. at 18890 (cleaned up).

The traditional interpretation, and Congress's original intent, were confirmed and ratified by the 1977 Clean Air Act amendments, which further broadened California's flexibility by adding "in the aggregate" to Section

61

209(b)(1).  *See* Pub. L. No. 95-95, title II, §§ 207, 221, 91 Stat. 755, 762.  At the time, EPA had been reviewing California's "need" for its whole program for a decade.  *See, e.g.*, 40 Fed. Reg. 23102, 23103-04 (May 28, 1975); 33 Fed. Reg. 10160, 10160 (July 16, 1968).  Congress noted EPA's practice with approval, explaining that EPA "has liberally construed the waiver provision so as to permit California to proceed with its own regulatory *program*," and that its amendments were "intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.*, to afford California the *broadest possible discretion* in selecting the best means to protect the health of its citizens and the public welfare."  H.R. Rep. No. 95-294 at 301-02 (emphasis added).  "Where … Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation" – as in the 1977 amendments – "we cannot but deem that construction virtually conclusive."  *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (internal quotation omitted).[9]

---

[9] Petitioners are incorrect that the 1967 provision "indisputably" required California to demonstrate its "need" for individual standards.  Fuel Br. 48-49.  The original requirement that each standard be more stringent than any federal counterpart did not foreclose whole-program review, albeit more stringent, as contemporaneous waivers demonstrate.  In any case, the 1977 amendments ensured whole-program review by adding "in the aggregate" and the word "such" in "such State standards."

The historical consistency of EPA's traditional approach also supports the
Restoration Decision. *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 & n.5
(1974). Over more than 75 waivers and 55 years, EPA has deviated only twice –
in a 2008 passenger-vehicle waiver and the Withdrawal Decision – and both times
EPA promptly corrected its error. *See supra* Statement of the Case II.A.2, II.B.3;
87 Fed. Reg. at 14360 n.261; 49 Fed. Reg. at 18889-90 (discussing the traditional
interpretation).

EPA's return to the traditional interpretation also accords with this Court's
precedent. In *American Trucking Ass'ns v. EPA*, 600 F.3d 624 (D.C. Cir. 2010),
this Court construed Section 209(e)(2), which mirrors Section 209(b). *See* 42
U.S.C. § 7543(e)(2). EPA reiterated before the Court that, per its traditional
interpretation of Section 209(b)(1)(B), it read "such … standards" in Section
209(e)(2) to refer to "California's program as a whole" rather than individual
standards. Resp. Br. 23-24, 2009 WL 2842726 (Aug. 31, 2009); *see* 59 Fed. Reg.
36969, 36982 (July 20, 1994). The Court concluded (without extensive
discussion) that the "expansive statutory language" provided "no basis to disturb
EPA's reasonable interpretation of the second criterion." *Am. Trucking Ass'ns*,
600 F.3d at 627.

Petitioners provide no answer to the traditional interpretation's harmony of
statutory text, purpose, history, and precedent. They contend that the reference to

"aggregate" review in Section 209(b)(1) does not justify aggregate review in the second and third waiver prongs, since the qualifier "in the aggregate" does not appear in subsections (b)(1)(B) and (b)(1)(C). Fuel Br. 48. But the phrase "*such State standards*" refers back to the same standards previously indicated. Having employed that phrase, Congress did not have to refer to "any" standards or to California's vehicle "program." Fuel Br. 45.

Indeed, Petitioners, like the Withdrawal Decision, fail to plausibly explain the role of the term "such" in the statutory text. *See* 84 Fed. Reg. at 51341-42. Petitioners wishfully claim "such State standards" refers to the particular standards "for which [California] is presently seeking a waiver." Fuel Br. 45-46. But the text they cite does not describe a group of standards under review. It defines the states to whom Section 209(b) applies: "any State which has adopted standards … prior to March 30, 1966." 42 U.S.C. § 7543(b)(1). Indeed, there is no reference at all to particular standard submissions in the cited text or anywhere else in Section 209(b)(1). To the contrary, Section 209(b)(1) states that EPA shall "waive application of [the preemption provision] to [the] *State*," not some subset of standards, and then clarifies that the substantive terms of waiver depend upon consideration of "the State standards … in the aggregate," *id.* (emphasis added). Moreover, if EPA had reviewed California's "specific waiver request," Fuel Br. 46, it could not have denied a waiver in any case: the Advanced Clean Cars waiver

64

submission encompassed standards for numerous pollutants and was plainly

necessary to meet compelling and extraordinary conditions.  *See* 78 Fed. Reg. at

2114.

Petitioners also err in suggesting that aligning the meaning of "State

standards" in subsections 209(b)(1) and (b)(1)(B) creates a conflict with its

meaning in 209(b)(1)(C) – which requires that "such State standards" be consistent

with other Clean Air Act provisions on technological feasibility.  *See* 84 Fed. Reg.

at 51345; Fuel Br. 46-47; 42 U.S.C. § 7521(a).  Petitioners ignore that their reading

would create the same inconsistency between 209(b)(1) and subsections (b)(1)(B)

and (C), requiring that "State standards" mean all California standards when used

in (b)(1) but only particular standards when used in (b)(1)(B) and (C).  More

significantly, the record does not support Petitioners' claim, or the Withdrawal

Rule's passing assertion, that the "settled interpretation" of Section 209(b)(1)(C)

provides for EPA review of the particular standards at issue.  *Id.*  To the contrary,

EPA has traditionally interpreted the third waiver criterion's feasibility analysis as

a whole-program assessment, 87 Fed. Reg. at 14361 & n.266 – one that ensures

manufacturers have sufficient lead-time to comply with the program's standards as

a whole, accounting for the interactions between new and existing standards.[10]  *See*

---

[10] As a practical matter, EPA's consideration of the third waiver prong, like the
first waiver prong, does not always require reassessment of previously-approved
aspects of California's program – for example, where new and existing standards

78 Fed. Reg. at 2117; 87 Fed. Reg. at 14356 n.212 (quoting commenters explaining that feasibility "cannot be evaluated on its own if there are interactions with pre-existing standards"); *cf. MEMA II*, 142 F.3d at 463-64.

Petitioners are also incorrect that EPA's reading makes the second waiver prong "meaningless."  Fuel Br. 46.  California has yet to resolve its pollutant problems, but that does not mean it will never do so or that Congress could not aim for that goal.  *See* 87 Fed. Reg. at 14336 n.22.  So long as those problems persist, however, EPA's affirmance of California's need for a separate vehicle program allows California to continue to serve as a "laboratory" for resolving its own pollution problems and those of the entire nation.  *See MEMA I*, 627 F.2d at 1109-11.

Meanwhile, Petitioners' interpretation would create a fatal inconsistency in the statutory text.  If EPA were required to reject any individual standard that it found California did not "need" to "meet compelling and extraordinary conditions," EPA could not, in fact, approve the inclusion of any individual standard in California's vehicle program that is less stringent than a corresponding federal standard, and so might "be found to be contributing to rather than helping" pollution problems if considered "in isolation."  87 Fed. Reg. at 14353 (citing 1983

---

obviously will not interact.  But where a new waiver request might affect previous assessments, EPA reviews the program as a whole, or any aspects necessary to confirm alignment with the statutory text.  87 Fed. Reg. at 14361 & n.266.

and 1994 EPA waivers).  But the protectiveness analysis in Section 209(b)(1) was

explicitly expanded in 1977 to allow California to do just that.  *See supra*

Statement of the Case I.A.1; 42 U.S.C. § 7543(b)(1); *MEMA II*, 142 F.3d at 464.

This Court should not countenance an interpretation that would void the

"aggregate" protectiveness test.  *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct.

1929, 1939 (2022).

Likewise, Petitioners' "standard-by-standard" interpretation lacks any

principled basis for segregating review of standards that have interrelated or

cooperative purposes, address more than one pollution problem, and or address

pollution problems that interact.  That confusion is evident throughout the

Withdrawal Decision.  *See, e.g.*, 84 Fed. Reg. at 51341 n.263; *infra* Argument

IV.B.2.

In the end, Petitioners' effort to conjure textual ambiguities and read them as

statutory limits depends on their view that Congress could only have intended

Section 209(b) to confer "narrow" authority that limited "unnecessary deviation"

from national standards.  Fuel Br. 2, 3, 18.  But Petitioners cannot explain how that

depiction of congressional intent aligns with Congress's actual expressions of its

intent.  Congress emphasized California's special status as a pioneer in the field

and a continued "testing ground" for the nation's benefit, S. Rep. No. 90-403, at

33; H.R. Rep. No. 95-294 at 301, and described its enactments as "liberalizing and

extending" California's waiver, 123 Cong. Rec. 27071 (1977), to ensure that EPA was "require[d] … in most instances to waive the preemption," H.R. Rep. No. 95-294, at 23. "[T]here must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning," *Cigar Ass'n of Am. v. FDA*, 5 F.4th 68, 79 (D.C. Cir. 2021) (internal quotation omitted), but that is clearly not the case here. EPA's interpretation may, therefore, be affirmed even without consideration of the deference due the Agency. *Guedes*, 45 F.4th at 313. But at a minimum, EPA's construction is reasonable and may be sustained as such. *See, e.g.*, *Washington All. of Tech. Workers*, 50 F.4th at 192.

> **2.    No aspect of the text or context requires Section 209(b) to be interpreted to exclude state greenhouse-gas regulation as a matter of law.**

Petitioners also claim that despite its broad purpose and deferential structure, Section 209(b) implicitly preserved preemption of California's authority to regulate vehicle greenhouse-gas emissions. But there is no basis for Petitioners' atextual suggestion that Congress intended a pollutant-specific meaning of "compelling and extraordinary conditions." Fuel Br. 27-34.

To begin, the statutory text includes no references to pollutants, let alone specific pollutants. While Congress highlighted California's criteria pollutant problems as one basis for enacting Section 209, *id.* at 31-32, Congress also sought to create a "laboratory" for vehicle policy and technology. *See, e.g.*, *MEMA I*, 627

F.2d at 1110-11; *Engine Mfrs. Ass'n*, 88 F.3d at 1079-80.  This purpose animated

its decision to give California the "broadest possible discretion" to regulate vehicle

emissions.  H.R. Rep. No. 95-294, at 301-02.

Petitioners claim that Congress's desire for innovation speaks to why there is

a waiver program, not the standards California may adopt.  Fuel Br. 35.  But

nothing in the statutory text suggests that Congress meant to allow California to

expand the technologies employed but not the pollutants addressed – which have

already expanded beyond those regulated in 1967.  *See, e.g.*, 49 Fed. Reg. at

18890; *cf. MEMA I*, 627 F.2d at 1110 & n.31 (concluding that Congress intended

California to "adopt an entire program of emissions control," not just "a portion").

In any case, the particular meteorological and topographical features Congress

highlighted as pertinent "conditions" in 1967 would support greenhouse-gas

standards because greenhouse gases exacerbate ozone response under those

conditions.  *See supra* Statement of the Case II.A.1.

Furthermore, even if Petitioners could support their assertion that Congress

sought to "minimize unnecessary deviation" from federal standards, Fuel Br. 18,

allowing waivers for greenhouse-gas standards does not widen the deviation from a

uniform national fleet.  Section 209 allows California to develop a "California car"

that is distinct from the "federal car," an exception from uniformity that does not

change based on what (or how many) specific standards California includes.  *See Engine Mfrs. Ass'n*, 88 F.3d at 1080.

Petitioners err next in ascribing unduly narrow meanings to the specific terms used in the second waiver criterion.  First, "extraordinary" is not limited to meaning most unusual or unique.  Petitioners' authorities define it as "[b]eyond what is ordinary, usual, or common place."  Fuel Br. 28 (citing American Heritage Dictionary); *see* "Extraordinary," Black's Law Dictionary (4th ed. 1951) ("Out of the ordinary; exceeding the usual, average, or normal measure or degree," etc.).  Congress's characterization in 1967 was that California's separate standards were "justif[ied]" because California's conditions were "*sufficiently different* from the Nation as a whole," H.R. Rep. No. 90-728, at 21; S. Rep. No. 90-403, at 33 – not *entirely* or *totally* different.

This was reinforced by Congress's enactment of Section 177, which allows other states struggling to meet federal air quality standards to adopt California's standards.  42 U.S.C. § 7507; *see* H.R. Rep. No. 95-294, at 14.  Section 177 shows that Congress not only understood that California's pollution challenges were not unique in every respect but in fact intended California to address pollutant problems shared by other states.[11]  87 Fed. Reg. at 14357, 14359.

---

[11] Petitioners' suggestion that Section 177 is directed at criteria pollution, and therefore should be read to limit California's authority to address greenhouse-gas emissions, is off the mark.  *See* Fuel Br. 30-31.  Section 177 imposes no constraints

Nor would defining "extraordinary" to mean "sufficiently different from the Nation as a whole" create redundancy with the term "compelling."  Fuel Br. 30.  "Compelling" conditions may still be broadly or universally experienced, so EPA's reading of "extraordinary" places a distinct constraint.  It is unclear, meanwhile, how Petitioners would delineate what constitutes a "most unusual" or "unique" pollution problem when such problems exist on a broad spectrum.  Nor do Petitioners explain how a "uniqueness" test would function where a standard addresses multiple pollution problems of differing character.  Fuel Br. 27-33.

Petitioners' arguments are similarly unavailing with respect to the words "need" and "meet."  Petitioners contend that greenhouse-gas standards categorically fail Section 209(b)(1)(B)'s requirement that California "need" its standards "to meet" compelling and extraordinary conditions, because its standards will not "meaningfully address" the global-level problem of climate change.  Fuel Br. 4, 30, 38-44.  But that argument presupposes that greenhouse-gas standards must be considered separately under Section 209; under the traditional interpretation, there is no dispute that California "needs" its program to "meet" compelling extraordinary conditions and that EPA has given effect to those terms, *see id.* at 39-41, 35-36.

---

on the pollutants addressed by vehicle-emissions standards.  Congress has affirmed states' authority to adopt greenhouse-gas standards and zero-emission standards under Section 177.  *See infra* at 76.

As discussed, any requirement to consider the "need" for individual standards would directly and improperly conflict with the "aggregate" protectiveness determination that Congress deliberately added to Section 209(b)(1) in 1977. *See supra* Argument IV.A.1. Petitioners cannot claim, therefore, that "need" and "meet" have no meaning except to set a bar for the efficacy of individual standards. Fuel Br. 35-36, 41. On the contrary, "need" and "meet" would foreclose EPA from granting a waiver if California failed to show that its vehicle program bore a relationship to addressing the state's compelling and extraordinary conditions.[12]

Moreover, the statute does not require that California demonstrate any particular quantum of improvement from California's standards either individually or collectively. As this Court explained in *Ford Motor Co. v. EPA*, "[t]here is no indication in either the statute or the legislative history that … the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial."[13] 606 F.2d 1293, 1302 (D.C. Cir. 1979). Accordingly, "since the

[12] Nor is the fuel waiver provision instructive. *See* Fuel Br. 36 (citing 42 U.S.C. § 7545(c)(4)(B)). That provision is not a "blanket exemption"; it applies only if California has already shown a "need" under Section 209(b).

[13] Indeed, whether individual California standards may be "unrelated, disruptive, or ineffectual," Fuel Br. 46, is not properly EPA's concern. California remains accountable to its voters and its courts just like any other state exercising state authority. *See MEMA I*, 627 F.2d at 1105.

inception of the waiver program," EPA has established that the magnitude of air quality improvement is "not legally pertinent … under section 209." 36 Fed. Reg. 17458 (Aug. 31, 1971); 87 Fed. Reg. at 14366.

Limiting waivers in the manner suggested by Petitioners would also create an illogical result: the more intractable California's air quality problem, the less authority the State would possess to address it. But the fact that pollutant reductions, including greenhouse-gas reductions, may appear small compared to the enormity of the problem does not render reduction efforts meaningless or inessential, nor place an issue beyond state concern. It is perfectly ordinary English to say some effort is "needed" to "meet" a problem if that effort contributes to the solution. The Supreme Court has already affirmed as much with respect to motor-vehicle greenhouse-gas emissions, validating states' legitimate interest in "small incremental step[s]" to combat climate change even where they do not resolve the underlying problem. *Massachusetts v. EPA*, 549 U.S. at 524-26; 87 Fed. Reg. at 14366 n.322; *see, e.g.*, *Am. Fuel & Petrochemical Mfrs. v. O'Keeffe*, 903 F.3d 903, 913 (9th Cir. 2018) ("combating" climate change is within state police power). And in any event, Congress intended California's program to drive innovation; incremental efforts to address vehicle emissions are "needed" now to potentially enable greater reductions in the future.

Here, California's passenger vehicles contribute about 25% of the State's greenhouse-gas emissions.[14]  The standards included in the 2013 waiver were estimated to reduce light-duty vehicle greenhouse gases by about 4.5% per year, 87 Fed. Reg. at 14366, or almost 14 million metric tons annually by 2025, 78 Fed. Reg. at 2122.  The magnitude of these reductions is plainly "meaningful."[15]

Lastly, Petitioners have only implausible responses to evidence that Congress understood California's authority to include zero-emission vehicle and greenhouse-gas standards.  Clean Air Act Section 7586(f)(4), added in 1990, instructs EPA to define "clean-fuel vehicle" credits in consideration of "standards which are established by the State of California for [Ultra-Low Emission Vehicles] and [Zero-Emissions Vehicles]."  42 U.S.C. § 7586(f)(4).  Section 13212(f)(3)(B), added in 2007, requires EPA's guidance for minimum federal fleet standards to account for "the most stringent standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States."  *Id.* § 13212(f)(3)(B).  Petitioners claim these

---

[14] LEV III Mobile Source Emissions Inventory at T-1, EPA-HQ-OAR-2012-0562-0371 (attachment 11), JA826.

[15] Petitioners cite the Withdrawal Decision's statement that more stringent vehicle standards would "reduce global temperature by 0.02 degrees Celsius in 2100," 84 Fed. Reg. at 51340, as evidence that California's standards will have no impact. Fuel Br. 41-42.  But it is equally reasonable to conclude that the capacity for a *single* regulatory program in a *single* U.S. state to measurably impact *global* average temperature is a remarkably significant result.

provisions only allow consideration of California's or another state's "procurement standards" for "*state-owned* fleets."  Fuel Br. 36-37.  But that makes little sense in context.

The same section of the 1990 Clean Air Act amendments that added Section 7586(f)(4) also added Sections 7583(f), 7581(4), and 7584 – all of which refer to the "Low-Emission Vehicle and Clean Fuel Regulations of the California Air Resources Board."  *See* Pub. L. No. 101-549, Title II, § 229(a), 104 Stat. 2511, 2514, 2519, 2520; 42 U.S.C. §§ 7583(f), 7581(4), 7584.  It strains credulity to believe Congress, in a single section of its bill where it had already discussed California's Low-Emission Vehicle program, somehow intended its reference to "standards which are established for the State of California for [Ultra-Low Emission Vehicles] and [Zero-Emission Vehicles]" to mean in-state procurement policies and not the low- and zero-emission vehicle standards included as part of California's referenced vehicle program.  *See* 87 Fed. Reg. at 14360; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. N.Y. State Dep't of Env't Conservation*, 17 F.3d 521, 537 (2d Cir. 1994) (these sections reflect "Congress' recognition … of California's [Low-Emission Vehicle] program, *including the [Zero-Emission Vehicle] mandate*" (emphasis added)).

Next, while Section 13212(f)(3)(B) does not refer to California specifically, it is equally implausible to believe that Congress's reference to "standards …

75

enforceable against motor vehicle manufacturers" meant enforceable procurement contracts, *see* 84 Fed. Reg. at 51322, Fuel Br. 37, and not actual regulatory emission standards adopted by California and authorized by Section 209. *See* 87 Fed. Reg. at 14360. Indeed, it does not appear California even *had* in-state procurement policies governing vehicle emissions in either 1990 or 2007 when Congress passed these laws. *Cf.* Cal. Pub. Res. Code § 25722.8 (setting fuel-efficient-vehicle procurement standards effective January 1, 2008).

And Petitioners notably omit any mention of Congress's recent action in the Inflation Reduction Act, Pub. L. No. 117-169, tit. VI, Subtitle A, § 60105(g), 136 Stat. 1818, 2068-69 (2022), which provided $5 million for EPA to issue grants to states specifically to support their adoption of California's greenhouse-gas and zero-emission vehicle standards under Section 177. *Id.* This enactment leaves no space for Petitioners' argument that Congress has not affirmed adoption of greenhouse-gas or zero-emission vehicle standards under Section 209; Congress has, in fact, both expressly acknowledged and supported those standards.[16]

---

[16] This is on top of billions of dollars to advance the nation's zero-emission vehicle manufacturing and infrastructure, undermining Petitioners' associated claims that Congress has not pressed for vehicle electrification. *See* Pub. L. No. 102-486, § 403, 106 Stat. 2776, 2876 (1992); Pub. L. No. 117-58, 135 Stat. 429, 1421 (2021); Pub. L. No. 117-169, §§ 13401-02, 50142, 60101, 136 Stat. 1818, 1954-65, 2044, 2063 (2022).

### 3. Neither the major questions doctrine nor the federalism canon dictates a narrower interpretation of Section 209.

Petitioners attempt to rehabilitate their atextual reading of Section 209 by resorting to substantive doctrines of interpretation that have no application to a provision that preserves, rather than usurps, state rights. Neither the major questions doctrine nor the federalism canon can be relied upon here to override the plain text of Section 209.

First, Petitioners argue the Court should apply the major questions doctrine to cabin California's sovereign powers in favor of comprehensive federal authority. Fuel Br. 22-27. The major questions doctrine is inapplicable because it concerns the relationship between federal legislative and federal administrative power. It depends on a presumption that the Framers intended Congress "to make major policy decisions itself." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609, 2616 (2022). As such, the doctrine posits that in certain "extraordinary cases," *id.* at 2608, Congress should not be presumed to delegate its own authority over matters of "vast economic and political significance" to federal agencies in the absence of clear statutory authorization. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("*UARG*").

These concerns have no logical connection to provisions that preserve state authority. There is no constitutional concern that would necessitate using "exceedingly clear language" when Congress chooses *not* to preempt a state's

77

sovereign power.  To the contrary, canons of construction generally favor the preservation of state authority.  *See infra* at 82-83.  California's regulation of vehicles sold within its borders is not a question of the distribution of power between Congress and federal agencies, nor does it run afoul of arguments that significant matters of policy should be reserved to the "people's elected representatives," ideally in "governments more local … than a distant federal authority."  *West Virginia,* 142 S. Ct. at 2617, 2618 (Gorsuch, J., concurring) (internal quotation omitted).  As such, the major questions doctrine has no footing in this dispute.

Moreover, Petitioners' arguments for the doctrine's application do not hold together.  Petitioners' invocation of supposed congressional (in)action on vehicle electrification as evidence of a "major question" to which Congress has not clearly spoken, Fuel Br. 24-26, is misplaced for the reasons above: the doctrine is concerned with questions of federal policy, not what states may do with the power reserved to them.  Nor do Congress's decisions about national policy speak to what policies are appropriate at a state level.  Section 209(b) is built on the premise that California's assessment of the appropriate balance of harms, costs, and other factors informing its vehicle policies is likely to differ from the appropriate balance nationwide.  *MEMA I*, 627 F.2d at 1111.  In any case, Congress's *enactments* are

the truest evidence of its intent.[17]  As discussed, the text and history of Section 209, as well as recent legislation, demonstrate that Congress clearly intended California to have this broad authority.  *See supra* at 76 & n.16.

Invoking the major questions doctrine on the basis of purportedly substantial costs and impacts of state controls on state vehicles also makes little sense.  Absent congressional action to preempt (some) state authority in the first place, all states would have police power authority to regulate vehicles, even where those state regulations might have great "economic and political significance" for industries operating in their state.  *See West Virginia*, 142 S. Ct. at 2608.  This was the state of play before Section 209(a) was passed, and for California, that authority remains grandfathered into the Clean Air Act.  Section 209 does not permit California to exercise authority "delegated" from EPA, *see* Fuel Br. 19; it requires EPA to waive preemption, consistent with Congress's direction, so that the State may exercise the sovereign authority it already possesses.

In any case, the 2013 waiver at issue does not represent an expansion of California's influence over the vehicle industry.  In 1967, Congress preserved

---

[17] Congress's enactment of the Renewable Fuel Standard program does not foreclose California's zero-emission vehicle or greenhouse-gas standards.  *See* Fuel Br. 26.  Rather, that program's savings clause forecloses Petitioners' argument.  42 U.S.C. § 7545(o)(12).  Moreover, non-liquid renewable fuels, including electricity, have been recognized under the program since 2010.  *See* 75 Fed. Reg. 14670, 14729 (Mar. 26, 2010).

California's authority to create a "second vehicle" available for sale in California. *See MEMA II*, 142 F.3d at 453.  California's successive decisions as to *what* standards govern the design of that second vehicle have not altered the division of authority or assumed control of any greater share of the vehicle industry than was always allowed.

Nor was the 2012 waiver submission California's first set of vehicle regulations for greenhouse gases or its first deployment of a zero-emission vehicle standard – the latter appearing in California's vehicle program since 1990.  58 Fed. Reg. 4166, 4166 (Jan. 13, 1993); *see Motor Vehicle Mfrs. Ass'n*, 17 F.3d at 534, 536.  And it plainly was not EPA's first application of whole-program review under Section 209.  This is in marked contrast to the assertions of federal authority rejected in cases where the federal agency was described as asserting "unheralded" regulatory power and taking actions that were "remarkable" or "radical" departures from previous actions.  *See West Virginia*, 142 S. Ct. at 2610; *Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 666 (2022); *UARG*, 573 U.S. at 324.  EPA's continuation of a longstanding practice is hardly the "extraordinary case[]" warranting application of the major questions doctrine.  *West Virginia*, 142 S. Ct. at 2608.

Fuel Petitioners' claim that a clear statement rule is necessary here to rein in expansive state power is also illogical because both the Withdrawal Decision and

Petitioners have acknowledged that California's criteria pollutant problems justify separate state standards at least as to those pollutants, and those separate standards undisputedly can have significant consequences.  Fuel Br. 6-7, 8; 84 Fed. Reg. at 51341 n.261 (affirming California's waiver for criteria pollutant standards).  Even applying clear-statement rules as Petitioners suggest, California would retain authority to regulate vehicle emissions, including through its longstanding zero-emission vehicle standard, and those regulations will drive innovations like increasing in-state fleet electrification.  *See Motor Vehicle Mfrs. Ass'n*, 17 F.3d at 536 (describing California's "technology-forcing" zero-emission vehicle standard for criteria pollutants).  The purportedly substantial consequences Petitioners have claimed signify a major question, Fuel Br. 23-24, thus have no nexus to the question of statutory interpretation for which Petitioners have invoked this doctrine.  Similarly, Congress provided any necessary clear statement by clearly leaving California the ability to set its own vehicle-emission standards, with no need to set forth separate clear statements for every pollutant.[18]

---

[18] Notably, Petitioners' allegedly major "nationwide" consequences, to the extent they exist, *see supra* Argument I.A.1, are largely attributable to Congress's enactment of Section 177, which sets aside preemption for *other* states adopting California standards.  *See* Fuel Br. 23-24; 42 U.S.C. § 7507.  That separate provision is not challenged here, was not at issue in the Restoration Decision, and concerns state choices over which EPA has no approval authority.

The federalism canon is also inapplicable here, as it is directed at ensuring appropriate limits on federal (not state) authority, and in particular that federal authority does not "intrude[]" on traditional state powers. *E.g.*, *Bond v. United States*, 572 U.S. 844, 860 (2014). Petitioners assert that vehicle greenhouse-gas regulation is so significant it should be reserved for federal authority. *See, e.g.*, Fuel Br. 4, 29-30. But invoking the federalism canon to ensure the Court favors *federal* power over state power – as Petitioners do – gets matters entirely backwards.

Petitioners' specific claim that allowing state regulation of greenhouse gases "would radically depart from the 'usual constitutional balance of federal and state powers'" is wrong. Fuel Br. 21. Numerous state laws, like clean energy mandates and carbon-pricing schemes, limit greenhouse gases notwithstanding their potential to indirectly affect state, regional, and national industries.[19] Nor does California's regulatory program here depart from the actual balance of federal and state power under Section 209. As noted above, even Fuel Petitioners' preferred reading of Section 209(b) would preserve California's power to require manufacturers to produce a "second vehicle" for sale in California – including zero-emission vehicles.[20] Indeed, the balance of federal and state power under Section 209

---

[19] *See, e.g.*, https://www.c2es.org/content/state-climate-policy/.

[20] Fuel Petitioners' preferred construction would not exclude zero-emission vehicles employed to address criteria pollution; their only argument against the

already includes California regulation of vehicle greenhouse gases, with these Petitioners having consistently declined to challenge that authority through multiple waiver grants – *including when the 2013 waiver was granted*.  *See* 87 Fed. Reg. at 14347 n.118.  Maintaining the actual regulatory balance of more than a decade and a half is hardly a "radical[]" re-balancing.

The canon of constitutional avoidance also does not justify diverging from the Act's plain text.  Fuel Br. 53-55.  Petitioners fail to demonstrate that EPA's interpretation of Section 209 raises "serious constitutional doubts."  *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018); *see supra* Argument II.  Nor have they demonstrated how the Court could avoid purported doubts by resort to another interpretation of the statute.  As discussed, Fuel Petitioners' proposed interpretation is not a "fairly possible" reading of Section 209, given its disjunction with the statute's text and operation.  *United States v. Davis*, 139 S. Ct. 2319, 2332 (2019).  Moreover, Fuel Petitioners rely on State Petitioners' constitutional arguments here, which would render *all* possible interpretations of Section 209(b) unconstitutional, including the one advanced by Fuel Petitioners.  Fuel Br. 53; *supra* Argument II.

---

zero-emission vehicle standard in this waiver is that it purportedly does not result in those criteria pollutant reductions, which is incorrect.  *See* Fuel Br. 51; *infra* Argument IV.B.2.

**B.    California's waiver submission satisfied Section 209, and the Withdrawal Decision's conclusion otherwise was improper.**

**1.    There is no dispute that California needs its vehicle program to meet compelling and extraordinary conditions, so EPA was obligated to grant the waiver.**

Under EPA's longstanding interpretation of Section 209, EPA need only find that California needs its program as a whole to meet compelling and extraordinary conditions. No party disputes that California's challenging criteria pollutant conditions remain "compelling and extraordinary." 78 Fed. Reg. at 2129. So there is no question California needs separate vehicle standards to meet at least those conditions. Indeed, the Withdrawal Decision itself affirmed that California's criteria pollutant problems satisfied the terms of Section 209 and so declined to withdraw the original waiver as to those standards. *See* 84 Fed. Reg. at 51344, 51346.

Under the traditional interpretation of Section 209, that fact – in the absence of any determination that California failed to meet the first or third waiver prongs – obligated EPA to grant the requested waiver and rendered the Withdrawal Decision invalid. *See* 42 U.S.C. § 7543(b)(1).

84

### 2.    Even if EPA were obligated to assess California's need for its particular greenhouse-gas and zero-emission vehicle standards, California's waiver request satisfied the second waiver prong.

Even under the Withdrawal Decision's legal interpretation, however, California has demonstrated a need for each of the standards in question.  The Withdrawal Decision applied not only a requirement that EPA assess California's need for individual standards, but also a requirement that California demonstrate a "particularized nexus between the emissions from California vehicles, their contribution to local pollution, and the extraordinary impacts that that pollution has on California due to California's specific characteristics."  84 Fed. Reg. at 51346. But the Withdrawal Decision misconstrued or ignored record evidence showing both the greenhouse-gas and zero-emission vehicle standards met this test.  This rendered the Withdrawal Decision improper even under its own erroneous statutory interpretation and fell short of the requirement that agencies provide a "reasoned explanation" for disregarding "prior factual findings" based on "a 'searching and careful inquiry' of the record."  *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1111 (D.C. Cir. 2019).

As EPA explained in its 2009 and 2013 waivers, and again here, California faces compelling and extraordinary conditions as to both greenhouse gases and criteria pollutants, which affect California air quality independently and in combination.  California's criteria pollutant conditions are undisputedly

compelling and extraordinary.  But California is also "particularly impacted by climate change."  87 Fed. Reg. at 14363, 14365.  The Withdrawal Decision's record included information demonstrating that California was "home to some of the country's hottest and driest areas, which are particularly threatened by record-breaking heatwaves, sustained droughts, and wildfire, as a result of [greenhouse-gas] emissions."  *Id.* at 14338.  It also included reports demonstrating that California "faces a particular threat from sea-level rise and ocean acidification" due to climate change because it has "the most valuable ocean-based economy in the country," *id.* at 14338-39 & n.43, as well as numerous other climate-based risks, *e.g.*, *id.* at 14338 n.37.

The Restoration Decision thus found that the Withdrawal Decision's own record "demonstrate[d] that California is 'one of the most climate challenged' regions of North America."  *Id.* at 14338.  Because the magnitude and combination of these risks and harms is "sufficiently different" than conditions in the "Nation as a whole" – and undisputedly compelling – they amount to "compelling and extraordinary conditions" under Section 209.  *See* S. Rep. No. 90-403, at 33; H.R. Rep. No. 90-728, at 21.

Petitioners cite the Withdrawal Decision to claim that some of those impacts are being experienced elsewhere.  *See* 84 Fed. Reg. at 51348 & n.278; Fuel Br. 33. But neither they nor the Withdrawal Decision present evidence that another state –

or the nation on average – is experiencing a comparable suite of simultaneous harms.  And, as noted earlier, California need not be the only state affected by such harms for their impacts to be "beyond what is ordinary."  *Supra* Argument IV.A.2.

In response to commenters, EPA also repeatedly addressed, in the alternative, California's "need" for its specific greenhouse-gas and zero-emission vehicle standards to address compelling and extraordinary conditions.  These standards will "drive reductions in criteria pollution," 87 Fed. Reg. at 14363-65, and create quantifiable reductions in greenhouse gases, leading to "incremental, directional improvement" in the State's air pollutant conditions, *id.* at 14365-66.

The same is true even if that need must meet the Withdrawal Decisions' additional (atextual) "nexus" test: a connection between the pollutants, the pollution, and the impacts, 84 Fed. Reg. at 51340 n.260.  *See* 87 Fed. Reg. at 14336.  The zero-emission vehicle standard directly reduces criteria pollutant emissions by increasing the share of vehicles that produce no criteria pollutants whatsoever.  *Id.* at 14364.  California's vehicle program has included a zero-emission vehicle standard for this reason since 1990, *id.* at 14363, as the Withdrawal Decision acknowledged, 84 Fed. Reg. at 51329.  While California's more recent waiver submissions have relied on the zero-emission vehicle standard to reduce both criteria and greenhouse-gas emissions, since it is undeniably

effective at reducing both, this joint purpose cannot diminish its role as a criteria pollutant measure.  *See* 78 Fed. Reg. at 2114, 2130-31.

The Withdrawal Decision did not find any factual change in the historical nature or effectiveness of California's zero-emission vehicle standard, but merely in how California allocated the anticipated reductions between the coordinated elements of its Advanced Clean Cars program.  *See* 84 Fed. Reg. at 51330, 51349 n.284.  Petitioners thus claim EPA could ignore zero-emission vehicles' effects on criteria pollutants because "California's application did not claim" this standard "would help with local pollution problems."  Fuel Br. 50-51.  But "how California attributes the pollution reductions for accounting purposes from its various standards does not reflect the reality of how the standards deliver emission reductions."  87 Fed. Reg. at 14364; *see id.* at 14343.  California also clarified in comments that its accounting was misconstrued by the Withdrawal Decision.  *Id.* at 14364-65 & n.308.  Neither the Withdrawal Decision nor Petitioners can reasonably assert that a requirement increasing the use of zero-emission vehicles, which entirely eliminate onroad criteria pollutant emissions, is somehow unrelated to criteria pollutant conditions in California.  Thus, neither can reasonably suggest that California's zero-emission vehicle standard failed the second waiver criterion.

In addition, by reducing greenhouse-gas emissions from cars, both the zero-emission vehicle and greenhouse-gas standards reduce upstream criteria emissions

from gas production and oil and gas refineries.  87 Fed. Reg. at 14364.  The

Withdrawal Decision failed to even mention these localized benefits, despite their

appearance in California's waiver request and supplemental comments.  *See* 78

Fed. Reg. at 2122; "CARB Supplemental Comments" at 3-4, EPA-HQ-OAR-2012-

0562-0373, JA876-77; 84 Fed. Reg. at 51337.  Petitioners claim California does

not "need" these emission reductions when it could regulate upstream sources

directly.  Fuel Br. 52.  But there is no textual bar on EPA's or California's

consideration of upstream benefits from vehicles standards, as EPA has previously

explained.  77 Fed. Reg. 62624, 62819 (Oct. 15, 2012); 87 Fed. Reg. at 14363

n.296.  Nor can these emission reductions be dismissed as "trivial," Fuel Br. 52,

where Section 209(b)(1)(B) does not require any particular quantum of emissions

improvement, or any improvement at all, over federal standards.  *See supra*

Argument IV.A.2.

The interrelationship of greenhouse-gas pollution and smog is also well

established.  87 Fed. Reg. at 14353, 14363-64.  "[T]here is general consensus that

temperature increases from climate change will exacerbate the historic climate,

topography, and population factors conducive to smog formation in California."

*Id.* at 14364 n.297 (quoting 74 Fed. Reg. at 32763).  And measures to reduce

greenhouse gases often address smog-forming pollutants like nitrogen oxide as

well.  *See* 79 Fed. Reg. at 46261 (explaining California's projection in a waiver for

heavy-duty vehicles that its greenhouse-gas standards would also reduce nitrogen oxide by 1-3 tons per day through 2020). Consequently, EPA reasonably concluded more than a decade ago that greenhouse-gas measures are relevant to addressing criteria pollutant concerns. 74 Fed. Reg. at 32763.

Unsurprisingly, the Withdrawal Decision's abolition of California's greenhouse-gas and zero-emission vehicle standards was quantified as increasing emissions of nitrogen oxides by 1.24 tons per day in California's South Coast air basin alone. 87 Fed. Reg. at 14338 & n.41; *see* California Comments on Withdrawal Decision at 287, EPA-HQ-OAR-2018-0283-5054 (attachment 2), JA100 (noting that California's state plan to attain ozone standards in the basin required passenger-car nitrogen-oxide reductions of approximately six tons per day). This measurable and significant quantity of emission reduction directed at California's compelling and extraordinary criteria pollutant conditions was unreasonably dismissed by the Withdrawal Decision.

EPA also reasonably concluded here that the Withdrawal Decision misjudged California's need for greenhouse-gas standards, even considering only those greenhouse-gas problems with a "local nexus" to California conditions and harms. Despite the Withdrawal Decision's insistence that greenhouse gases have only global-level effects, the record there – and here – "contain[ed] sufficient and unrefuted evidence that there can be locally elevated carbon dioxide concentrations

90

resulting from nearby carbon dioxide emissions," which "can have local impacts on, for instance, the extent of ocean acidification."  87 Fed. Reg. at 14365-66. Neither the Withdrawal Decision, nor Petitioners, addressed – let alone negated – this evidence of a local nexus sufficient to satisfy even their crabbed reading of Section 209(b)(1)(B).

Finally, EPA's conclusions concerning California's need for its greenhouse-gas and zero-emission vehicle standards were not undermined by the "deemed-to-comply" provision included in California's standards.  Fuel Br. 43.  Petitioners contend that California could not have "needed" its own standards in 2013 because its Advanced Clean Car program regulations allowed compliance with the contemporaneous federal greenhouse-gas standards to be deemed compliance with California's standards, notwithstanding differences between the two.  *Id.*  But Section 209(b)(1) allows California to set any standards it wishes so long as those standards "will be, in the aggregate, *at least as* protective … as applicable Federal standards."  42 U.S.C. § 7543(b)(1) (emphasis added).  By these terms, there is plainly no error where California adopts, or allows for, standards that are simply equal to federal standards, as it did in 2013.  *See* 78 Fed. Reg. at 2124, 2129-30.

### C.    EPA appropriately rejected the Withdrawal Decision's reliance on EPCA preemption.

Section 209(b) provides that the Administrator "shall" issue a waiver of Section 209(a) unless the Administrator finds that one of three specified statutory

criteria is met.  Congress, therefore, deliberately limited the Administrator's decision whether to grant a waiver to California to consideration of these three criteria.  *See supra* Argument IV.A.1.

Notwithstanding this clear congressional direction, State Petitioners contend that EPA was required to look outside the statutorily prescribed criteria and deny the waiver due to a distinct statute, EPCA, that they claim preempts California's standards.  State Br. 33-41.  The States' argument fails because EPA appropriately determined in the Restoration Decision that its waiver determinations should be limited to consideration of the three statutory criteria specified in Section 209(b)(1), and that the Withdrawal Action's reliance on EPCA was in error.  In any event, the Withdrawal Decision based its consideration of EPCA on a NHTSA interpretation that has been revoked.  EPA's approach is consistent with longstanding Agency practice, the text of Section 209, and applicable case law. This Court should reject the State Petitioners' attempt to expand the scope of the Administrator's waiver consideration under Section 209(b) to matters outside EPA's purview.

### 1.    Congress constrained EPA waiver determinations to the three criteria listed in Section 209(b).

As explained above, EPA's role in reviewing waiver applications is highly deferential and limited to reviewing whether any of the three statutory criteria for denial in Section 209(b)(1)(A)-(C) has been met.  EPA is thus constrained from

"second-guess[ing] the wisdom of state policy" by expanding its waiver consideration outside of the three enumerated criteria in Section 209(b).  87 Fed. Reg. at 14342.

For the 50 years prior to publication of the Withdrawal Decision, EPA consistently construed the scope of its waiver review as limited to the three statutory criteria.  *See, e.g.*, 41 Fed. Reg. 44209, 44210 (Oct. 7, 1976); 49 Fed. Reg. at 18889; 73 Fed. Reg. at 12159; 74 Fed. Reg. at 32783.  This Court has repeatedly upheld that interpretation.  In *MEMA I*, the petitioners alleged that the Administrator erred in declining to consider statutory, constitutional, and antitrust challenges raised in opposition to a California waiver request, which went beyond the specified statutory criteria.  627 F.2d at 1111.  This Court upheld the Administrator's limited scope of waiver review, explaining that "the Administrator operates in a narrowly circumscribed proceeding requiring no broad policy judgments on constitutionally sensitive matters."  *Id.* at 1115.  The Court explained that "there is no such thing as a 'general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider."  *Id.* at 1116.  Because Section 209(b) instructs that the Administrator "shall" issue the waiver *unless* one of the three criteria specified by Congress is met, the Administrator does not err in focusing solely on those criteria.

93

This Court reached the same conclusion in the face of similar challenges in *MEMA II*, explaining that "[S]ection 209(b) sets forth the only waiver standards with which California must comply … . If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application." 142 F.3d at 462-63. In the Restoration Decision, as in *MEMA I* and *II*, the Administrator properly declined to broaden his waiver consideration outside of the criteria specified by Congress.

### 2. The Withdrawal Decision does not compel EPA to consider EPCA preemption in this action.

EPA's consideration in the Withdrawal Decision of a short-lived NHTSA interpretation on the scope of EPCA's preemption provision does not change this analysis. *See* State Br. 33-41. First, the Withdrawal Decision claimed it was only looking beyond Section 209(b)'s statutory criteria because it was issued jointly and simultaneously with a NHTSA conclusion that EPCA preempts California's greenhouse-gas and zero-emission vehicle standards. 84 Fed. Reg. at 51338. But EPA also explained that such a deviation would not be appropriate outside of that context. *Id.*

On December 29, 2021, NHTSA issued a final rule withdrawing its preemption conclusion. 86 Fed. Reg. at 74238. NHTSA concluded that withdrawal of the interpretation was appropriate in part because the previous interpretation's sweeping, categorical preemption prohibitions were overly broad

94

and restrictive. *Id.* at 74238-39. As a result, there is no longer any existing

NHTSA regulation purporting to define the scope of EPCA preemption. Even if,

under the unique context of the Withdrawal Decision, EPA *could have* looked

outside the three Section 209(b) statutory criteria and rejected a waiver on the basis

of NHTSA's contemporaneous interpretation, there was no longer any basis for

doing so at the time of the Restoration Decision. 87 Fed. Reg. at 14371. EPA was

no longer acting jointly with NHTSA's purported determination of the California

standards' legality, and NHTSA had rescinded the legal interpretation

underpinning the Withdrawal Decision. Therefore, even under the logic of the

Withdrawal Decision, it would have been improper in the Restoration Decision for

EPA to look outside the Section 209(b) criteria.

Nor would it have been appropriate for EPA to adopt its own interpretation

of EPCA preemption in the absence of a NHTSA interpretation. NHTSA, not

EPA, administers EPCA, and EPA has not been delegated authority to interpret

EPCA. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018) ("[O]n no

account might we agree that Congress implicitly delegated to an agency authority

to address the meaning of a second statute it does not administer."). As EPA

pointed out, both courts that have considered the scope of EPCA preemption have

concluded that EPCA does *not* preempt California's greenhouse-gas emission

standards. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F.

95

Supp. 2d 295 (D. Vt. 2007); *Cent. Valley Chrysler-Jeep v. Goldstene*, 529 F. Supp. 2d 1151 (E.D. Cal. 2007). And as the Supreme Court observed regarding the interplay between the Clean Air Act and EPCA, "[t]he two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency." *Massachusetts*, 549 U.S. at 532. In light of NHTSA's withdrawal of its prior preemption interpretation, it would have been particularly inappropriate for EPA to independently adopt the expansive view of EPCA preemption that State Petitioners urge. *See* 86 Fed. Reg. at 74239.

Further, an agency has discretion to determine the scope of its own action. *See, e.g.*, *Taylor v. FAA*, 895 F.3d 56, 68 (D.C. Cir. 2018). State Petitioners' contention that their comments raising EPCA preemption required EPA to rule on its preemptive effect reflects a misunderstanding of the Administrative Procedure Act. State Br. 38-39. The comment process functions to ensure that an agency considers "relevant factors." *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984). In the Restoration Decision, EPA satisfied its duties by explaining that EPCA preemption is not a relevant factor under Section 209(b) of the Clean Air Act. 87 Fed. Reg. at 14368-74. And, as described above, this Court has already recognized that the Administrator may properly determine that the Section 209(b) criteria are the only relevant considerations in a waiver determination. *See MEMA*

*I*, 627 F.2d at 1115-16; *MEMA II*, 142 F.3d at 462-63. State Petitioners' disagreement with EPA's conclusion does not render it arbitrary and capricious.

For the reasons described above, in the Restoration Decision, EPA appropriately executed the limited role that Congress designed for review of waiver requests under Section 209(b). Whether EPCA separately preempts the standards whose Section 209(b) waiver EPA granted, and therefore whether California has authority to enforce them, State Br. 33, is a fact-specific question distinct from the Administrator's decision to grant the waiver. The available forum for injured parties to seek review of preemption arguments would be in an action contesting the California standards directly in district court. *See, e.g.*, *Green Mountain*, 508 F. Supp. 2d 295 (plaintiffs raising EPCA preemption challenge to state standards in district court); *Cent. Valley*, 529 F. Supp. 2d 1151 (same). However, if this Court concludes that EPA erred by not considering EPCA preemption, the Court should remand the question to EPA without vacatur for consideration in the first instance. *See I.N.S. v. Ventura*, 537 U.S. 12, 16 (2002).

## CONCLUSION

For the foregoing reasons, the petitions for review should be denied.

Respectfully submitted,

TODD KIM
Assistant Attorney General

DATE: March 20, 2023                */s/  Chloe H. Kolman*

CHLOE H. KOLMAN
ERIC G. HOSTETLER
ELISABETH H. CARTER
U.S. Department of Justice
Environment & Natural Resources Div.
P.O. Box 7611
Washington, D.C.  20044
(202) 514-9277 (Kolman)
chloe.kolman@usdoj.gov

*Of Counsel:*

WINIFRED OKOYE
U.S. Environmental Protection Agency
Washington, D.C.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify pursuant to Fed. R. App. P. 32(f) and (g) that this brief contains 20,972 words, excluding exempted parts of the brief, according to the count of Microsoft Word, and that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B)(i).

*/s/ Chloe H. Kolman*
CHLOE H. KOLMAN

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Chloe H. Kolman*
CHLOE H. KOLMAN