ORAL ARGUMENT NOT YET SCHEDULED

No. 22-1081 and consolidated cases

———————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

STATE OF OHIO, et al.,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

—————————————————————————

## FINAL BRIEF OF STATE AND LOCAL GOVERNMENT
## RESPONDENT-INTERVENORS

—————————————————————————

ROB BONTA
Attorney General of California
ROBERT W. BYRNE
EDWARD H. OCHOA
Senior Assistant Attorneys General
MYUNG J. PARK
GARY E. TAVETIAN
Supervising Deputy Attorneys General

JESSICA BARCLAY-STROBEL
KRISTIN MCCARTHY
THEODORE A.B. MCCOMBS
CAITLAN MCLOON
JONATHAN WIENER
M. ELAINE MECKENSTOCK
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 Oakland, CA  94612-0550
 Telephone: (510) 879-0299
 Elaine.Meckenstock@doj.ca.gov

*Attorneys for Respondent-Intervenor State of California, by and through its Governor Gavin Newsom, Attorney General Rob Bonta, and the California Air Resources Board*

*Additional counsel listed in signature block*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel provides the following information for all consolidated cases.

### A.    Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing in these consolidated cases are listed in the Final Brief of Petitioners State of Ohio, et al. (ECF No. 1990758) and the Final Brief of Respondents U.S. Environmental Protection Agency, et al. (ECF No. 1990904), with the exception of the following:

*Amici for Respondents*:

Administrative Law Professors (Professors Todd Aagaard, William Boyd, Alejandro E. Camacho, Robin Craig, Robert Glicksman, Bruce Huber, Sanne Knudsen, David Owen), the American Thoracic Society, American Medical Association, American Association for Respiratory Care, American College of Occupational and Environmental Medicine, American College of Physicians, American College of Chest Physicians, National League for Nursing, American Public Health Association, American Academy of Pediatrics, Academic Pediatric Association, California Climate Scientists (David Dickinson Ackerly, Maximilian Auffhammer, Marshall

i

Burke, Allen Goldstein, John Harte, Michael Mastrandrea, LeRoy

Westerling), Chairman of the U.S. Senate Committee on Environment and

Public Works (Senator Tom Carper), Ranking Member of the U.S. House

Committee on Energy and Commerce (Representative Frank Pallone, Jr.),

Professor Leah M. Litman, and South Coast Air Quality Management

District.

### B.   Rulings Under Review

The agency action under review is entitled, "California State Motor

Vehicle Pollution Control Standards; Advanced Clean Car Program;

Reconsideration of a Previous Withdrawal of a Waiver of Preemption;

Notice of Decision," 87 Fed. Reg. 14332 (Mar. 14, 2022).

### C.   Related Cases

There are no related cases within the meaning of Circuit Rule

28(a)(1)(C).

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................ 1

STATUTES AND REGULATIONS.................................... 4

STATEMENT OF THE CASE ........................................... 4

SUMMARY OF ARGUMENT .......................................... 4

ARGUMENT ..................................................................... 9

I.   Petitioners Lack Standing.......................................... 9

     A.   State Petitioners............................................... 9

     B.   Fuels Petitioners ............................................ 13

II.  Neither Section 209(b) Nor EPA's Restoration Decision
     Violates the Equal Sovereignty Principle.......................... 15

     A.   Section 209(b) Does Not Implicate Equal Sovereignty.......... 15

     B.   Congress's Tradition of Enabling Differential State
          Authority Contradicts Petitioners' Expansive Theory............ 19

     C.   Section 209(b) and the Restoration Decision Both
          Survive Any Heightened Review............................ 23

III. EPA Correctly Reversed the Withdrawal Decision as an
     Improper Exercise of EPA's Authority .......................... 25

     A.   The Withdrawal Decision's Bases Were Impermissible ........ 26

     B.   EPA's Withdrawal of a Six-Year-Old Waiver Was
          Untimely.................................................. 32

IV.  EPA Correctly Rejected Both Bases for Its Withdrawal
     Decision ...................................................... 33

     A.   EPA Correctly Rejected the Withdrawal Decision's
          Section 209(b)(1)(B) Determination......................... 34

          1.   EPA Correctly Concluded that California Needs Its
               Separate Program...................................... 34

iii

## TABLE OF CONTENTS
### (continued)

**Page**

        a.    EPA's Traditional Whole-Program Approach Is the Best Reading of the Text ......... 34

        b.    Petitioners' Manufactured Pollutant-Specific Prohibition Cannot Undermine EPA's Whole-Program Interpretation ........................... 37

    2.    EPA Correctly Found that California Needs These Standards to Address Its Criteria Pollution Conditions .................................................................... 42

    3.    EPA Also Correctly Found that California Needs These Standards to Address Its Climate Change Conditions .................................................................... 43

  B.    EPA Correctly Reversed the Withdrawal Decision's Reliance on NHTSA's Preemption Rule ................................ 45

V.    Petitioners' EPCA Preemption Claims Are Misplaced.................... 46

  A.    This Court Should Not Address EPCA Preemption .............. 46

  B.    EPCA Does Not Preempt California's Standards.................. 47

CONCLUSION ........................................................................ 52

# TABLE OF AUTHORITIES

**Page**

CASES

*Advoc. Health Care Network v. Stapleton*
137 S. Ct. 1652 (2017)....................................................................... 35

*Am. Methyl Corp. v. EPA*
749 F.2d 826 (D.C. Cir. 1984)................................................... 30, 31

*Am. Trucking Ass'n v. Frisco Transp. Co.*
358 U.S. 133 (1958)............................................................................ 27

*Belville Min. Co. v. United States*
999 F.2d 989 (6th Cir. 1993) ............................................................. 28

*Cal. Div. of Labor Stds. Enforc. v. Dillingham Constr., N. A.*
519 U.S. 316 (1997)...................................................................... 49, 51

*Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*
529 F. Supp. 2d 1151 (E.D. Cal. 2007) ............................................ 47

*Chamber of Comm. v. EPA*
642 F.3d 192 (D.C. Cir. 2011)................................................ 9, 13, 14

*Chapman v. El Paso Nat. Gas Co.*
204 F.2d 46 (D.C. Cir. 1953)............................................................. 27

*City of Eugene v. Comcast of Oregon II, Inc.*
263 Or. App. 116 (2014) .................................................................... 20

*Concentric Network Corp. v. Com.*
897 A.2d 6 (Pa. Commw. Ct. 2006) .................................................. 20

*Coyle v. Smith*
221 U.S. 559 (1911)............................................................................ 16

* Authorities chiefly relied upon are marked with an asterisk.

v

## TABLE OF AUTHORITIES
### (continued)

Page

*Crete Carrier Corp. v. EPA*
  363 F.3d 490 (D.C. Cir. 2004)........................................................ 13, 15

*Currin v. Wallace*
  306 U.S. 1 (1939)...................................................................... 17

*DaimlerChrysler Corp. v. Cuno*
  547 U.S. 332 (2006)..................................................................... 9

*Dan's City Used Cars v. Pelkey*
  569 U.S. 251 (2013).................................................................... 51

*DHS v. Regents of the Univ. of Cal.*
  140 S. Ct. 1891 (2020)................................................................ 46

*Energy & Env't Legal Inst. v. Epel*
  793 F.3d 1169 (10th Cir. 2015) ...................................................... 41

*Engine Mfrs. Ass'n v. EPA*
  88 F.3d 1075 (D.C. Cir. 1996)..................................................... 24, 36

*Engine Mfrs. Ass'n. v. South Coast Air Qual. Mgmt. Dist.*
  541 U.S. 246 (2004).................................................................... 50

*Fitzpatrick v. Bitzer*
  427 U.S. 445 (1976).................................................................... 18

*Fort Leavenworth R. Co. v. Lowe*
  114 U.S. 525 (1885).................................................................... 22

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*
  508 F. Supp. 2d 295 (D. Vt. 2007) ...................................... 47, 48, 49, 50

*Gregory v. Ashcroft*
  501 U.S. 452 (1991)................................................................ 18, 40

\* Authorities chiefly relied upon are marked with an asterisk.

vi

# TABLE OF AUTHORITIES
## (continued)

Page

*Gross v. United States*
    771 F.3d 10 (D.C. Cir. 2014)............................................................ 24, 25

*Gun South, Inc. v. Brady*
    877 F.2d 858 (11th Cir. 1989) ................................................................ 29

*H. P. Hood & Sons, Inc. v. Du Mond*
    336 U.S. 525 (1949)................................................................................ 17

*\*Ivy Sports Med., LLC v. Burwell*
    767 F.3d 81 (D.C. Cir. 2014)............................................................. 29, 32

*Maine v. Taylor*
    477 U.S. 131 (1986)................................................................................ 33

*\*Mazaleski v. Treusdell*
    562 F.2d 701 (D.C. Cir. 1977)................................................................ 32

*\*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*
    627 F.2d 1095 (D.C. Cir. 1979) .......... 1, 17, 24, 29, 30, 31, 38, 41, 45, 46

*Motor & Equip. Mfrs. Ass'n v. Nichols*
    142 F.3d 449 (D.C. Cir. 1998)................................................................ 45

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City
    of Jacksonville, Fla.*
    508 U.S. 656 (1993)................................................................................ 10

*New York State Dairy Foods, Inc. v. Ne. Dairy Compact
    Comm'n*
    198 F.3d 1 (1st Cir. 1999)....................................................................... 21

*New York v. United States*
    505 U.S. 144 (1992)................................................................................ 21

\* Authorities chiefly relied upon are marked with an asterisk.

# TABLE OF AUTHORITIES
## (continued)

Page

*Ohio v. Yellen*
    53 F.4th 983 (6th Cir. 2022) ................................................... 10

*Oklahoma v. Castro-Huerta*
    142 S. Ct. 2486 (2022) ............................................................ 20

*Pension Benefit Guaranty Corp. v. LTV Corp.*
    496 U.S. 633 (1990) ................................................................ 46

*Rutledge v. Pharm. Care Mgmt. Ass'n*
    141 S. Ct. 474 (2020) .............................................................. 50

*S. Dakota v. Dole*
    483 U.S. 203 (1987) ................................................................ 22

*\*Shelby County v. Holder*
    570 U.S. 529 (2013) ........................... 2, 5, 6, 10, 15, 16, 18, 19, 23, 24, 25

*State ex rel. Yost v. Volkswagen Aktiengesellschaft*
    165 Ohio St. 3d 213 (2021) ..................................................... 24

*United States v. Louisiana*
    363 U.S. 1 (1960) .................................................................... 20

*United States v. Seatrain Lines*
    329 U.S. 424 (1947) ................................................................ 28

*United States v. Sharpnack*
    355 U.S. 286 (1958) ................................................................ 19

*Virginia v. Tennessee*
    148 U.S. 503 (1893) ................................................................ 21

*West Virginia v. EPA*
    142 S. Ct. 2587 (2022) ....................................................... 41, 45

\* Authorities chiefly relied upon are marked with an asterisk.

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Wyeth v. Levine*
    555 U.S. 555 (2009)...................................................................... 45

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Amendment XV, § 2 ................................................ 18

**STATUTES**

15 U.S.C. § 2002(a)(1) (1976)..................................................... 48

15 U.S.C. § 2002(a)(3) (1976)..................................................... 48

15 U.S.C. § 2002(a)(4) (1976)..................................................... 48

15 U.S.C. § 2002(d)(3)(C)(i) (1976) ........................................... 48

15 U.S.C. § 2002(d)(3)(D)(i) (1976) ........................................... 48

15 U.S.C. § 2002(e) (1976).......................................................... 48

16 U.S.C. § 824k(k)(1) ................................................................ 20

16 U.S.C. § 824p(k) ..................................................................... 20

16 U.S.C. § 824q.......................................................................... 20

16 U.S.C. § 824t(f)....................................................................... 20

30 U.S.C. § 1271(b)...................................................................... 31

42 U.S.C. § 6297(d)(1)(C) ........................................................... 39

42 U.S.C. § 7408(a) ....................................................................... 7

42 U.S.C. § 7410........................................................................... 38

42 U.S.C. § 7410(a)(2)(A)............................................................ 40

\* Authorities chiefly relied upon are marked with an asterisk.

# TABLE OF AUTHORITIES
## (continued)

**Page**

42 U.S.C. § 7410(k)(5) .................................................................. 31

42 U.S.C. § 7410(k)(6) .................................................................. 31

42 U.S.C. § 7411(d) ...................................................................... 38

42 U.S.C. § 7506 ........................................................................... 30

42 U.S.C. § 7507 ................................................................ 30, 33, 36

42 U.S.C. § 7521(a) ....................................................................... 37

42 U.S.C. § 7521(a)(1) ................................................................... 40

42 U.S.C. § 7543(b)(1) ............................... 26, 29, 30, 33, 35, 36, 38

42 U.S.C. § 7543(b)(1)(A) .............................................................. 29

42 U.S.C. § 7543(b)(1)(B) ...................................................... 6, 33, 34

42 U.S.C. § 7543(b)(1)(C) .............................................................. 30

42 U.S.C. § 7543(e)(2)(A) .............................................................. 37

42 U.S.C. § 7545(o)(3)(B)(ii) ......................................................... 41

42 U.S.C. § 7607(b) ................................................................ 33, 47

49 U.S.C. § 31113(a) ..................................................................... 20

49 U.S.C. § 32901(a)(2) ................................................................. 50

49 U.S.C. § 32901(a)(10) ............................................................... 50

49 U.S.C. § 32901(a)(11) ............................................................... 50

49 U.S.C. § 32902(h)(1) ................................................................. 50

\* Authorities chiefly relied upon are marked with an asterisk.

x

# TABLE OF AUTHORITIES
## (continued)

**Page**

49 U.S.C. § 32904(a)(2)(B) ................................................ 50

49 U.S.C. § 32905(a) ...................................................... 50

49 U.S.C. § 32919(a) ............................................... 47, 48, 49

Act of Aug. 11, 1790, Chapter 43, 1 Stat. 184 ........................ 21

Act of Mar. 30, 1802, Chapter 13 § 19, 2 Stat. 145................... 21

Act of Mar. 8, 1806, Chapter 14, 2 Stat. 354-55 .................... 22

Cal. Health & Saf. Code § 39038 .................................... 11

Pub. L. No. 95-95 Title II, § 207, 91 Stat. 755 (1977) ............. 35

Pub. L. No. 95-95 Title II, § 221, 91 Stat. 762 (1977) ............. 35

Pub. L. No. 112-55 § 211, 125 Stat. 552, 695 (2011) ............... 20

**FEDERAL REGISTER**

40 Fed. Reg. 23,102 (May 28, 1975)................................. 38

41 Fed. Reg. 44,209 (Oct. 7, 1976) ................................ 37

43 Fed. Reg. 25,729 (June 14, 1978)................................ 38

43 Fed. Reg. 998 (Jan. 5, 1978)................................... 32

47 Fed. Reg. 7306 (Feb. 18, 1982) ................................ 32

49 Fed. Reg. 18,887 (May 3, 1984)................................. 37

58 Fed. Reg. 4166 (Jan. 13, 1993)................................. 27

74 Fed. Reg. 32,744 (July 8, 2009)................................ 32

\* Authorities chiefly relied upon are marked with an asterisk.

# TABLE OF AUTHORITIES
## (continued)

**Page**

77 Fed. Reg. 62,624 (Oct. 15, 2012) ........................................................ 43

78 Fed. Reg. 2112 (Jan. 9, 2013) ........................................................ 11, 42

80 Fed. Reg. 61,752 (Oct. 14, 2015) ........................................................ 43

81 Fed. Reg. 39,424 (June 16, 2016) ........................................................ 43

82 Fed. Reg. 42,233 (Sept. 7, 2017) ........................................................ 43

84 Fed. Reg. 51,310 (Sept. 27, 2019) .................................... 26, 27, 28, 43, 45

86 Fed. Reg. 74,434 (Dec. 30, 2021) ........................................................ 14

87 Fed. Reg. 14,332 (Mar. 14, 2022) ...... 26, 27, 29, 33, 35, 41, 42, 43, 45, 46

## LEGISLATIVE HISTORY

H.R. Rep. 102-474 (1992) ........................................................ 51

H.R. Rep. No. 94-340 (1975) ........................................................ 48

H.R. Rep. No. 95-294 (1977) ........................................................ 37

S. Rep. No. 90-403 (1967) ........................................................ 36

## OTHER

Dotson & Maghamfar, *The Clean Air Act Amendments of 2022*,
    53 ENV. L. REPT'R 10017, 10030-32 (2023) ........................................ 51

\* Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| Admin. Law Profs. Amicus Br. | Brief of Administrative Law Professors As *Amici Curiae*, ECF No. 1982317 |
| Am. Thoracic Society Amicus Br. | Brief of *Amici Curiae* The American Thoracic Society, et al., ECF No. 1982271 |
| Carper-Pallone Amicus Br. | Brief of *Amici Curiae* Senator Tom Carper and Representative Frank Pallone, ECF No. 1982213 |
| Climate Scientists Amicus Br. | Brief of *Amici Curiae* California Climate Scientists, ECF No. 1981964 |
| EPA | U.S. Environmental Protection Agency |
| EPCA | Energy Policy and Conservation Act of 1975 |
| Fuels Br. | Brief of American Fuel & Petrochemical Manufacturers, et al., ECF No. 1970360 |
| Indus. Respond. Br. | Brief for Industry Respondent-Intervenors |
| JA | Joint Appendix |
| Litman Amicus Br. | Brief of Professor Leah M. Litman as Amicus Curiae, ECF No. 1982322 |
| NHTSA | National Highway Traffic Safety Administration |
| Ohio Br. | Brief of State of Ohio, et al., ECF No. 1990758 |
| Restoration Decision | "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision," 87 Fed. Reg. 14332 (Mar. 14, 2022) |
| Section 177 States | States that have adopted California's vehicular emission standards pursuant to 42 U.S.C. § 7507 |

**GLOSSARY**
**(continued)**

| | |
|---|---|
| South Coast Amicus Br. | Brief of *Amicus Curiae* South Coast Air Quality Management District, ECF No. 1982344 |
| Withdrawal Decision | "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program," 84 Fed. Reg. 51310 (Sept. 27, 2019) |

# INTRODUCTION

California experienced its first severe smog event in 1943, when Los Angeles was choked with smoky fog so thick that visibility was limited to three city blocks.  When California scientists eventually discovered that the chemicals in vehicle exhaust were reacting with the State's ample sunshine to create smog, California took action:  it mandated the Nation's first controls on vehicle emissions.  Those new standards spurred technological innovation, including the development of the now-ubiquitous catalytic converter.

When Congress later enacted legislation to launch federal emissions regulations, it recognized that California's "already excellent program" was serving as a "laboratory for innovation" for the Nation, and Congress did not want to stand in its way.  *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA* ("*MEMA I*"), 627 F.2d 1095, 1109-11 (D.C. Cir. 1979).  So Congress allowed California to continue to develop its own program, subject to the approval of federal regulators.  Because automobile manufacturers expressed concerns about a patchwork of too many programs, however, Congress preempted other States from designing distinct regimes and instead allowed them to choose to adopt standards identical to California's.  That balanced approach would let California (and other States that opt in) test out new standards—

1

and require new technologies—in their markets, without requiring deployment of emerging technologies nationwide in one fell swoop, and without subjecting manufacturers to more than two regulatory programs.

For more than fifty years, this design has operated as intended. EPA has granted California more than seventy-five waivers of preemption under Section 209(b) of the Clean Air Act. This has enabled California to combat not only smog, but also other pollutants when scientists later came to understand their dangers as well. California's program has galvanized remarkable innovation in pollution control technologies—including, most recently, vehicles that emit *no* tailpipe pollution of any kind. Seventeen other States (so-called "Section 177 States") have chosen to adopt California's standards as their own, concluding that these standards best protect their residents and natural resources. Other States have made the opposite choice, and EPA's federal standards apply in their jurisdictions.

Now, however, State Petitioners assert that this half-century of law and practice violates the Constitution, pointing to the equal sovereignty principle articulated in *Shelby County v. Holder*, 570 U.S. 529 (2013). But Section 209(b) raises no equal sovereignty concerns because, unlike federal preclearance requirements for state voting laws, Congress's regime for regulating interstate commerce in new motor vehicles does not intrude upon

2

any sensitive area of state policymaking.  Rather, the regulation of interstate commerce has *always* been a paramount federal power not reserved to the States, and Congress has long deployed its commerce power to regulate economic matters differently in different states.  Besides, Congress's decision to allow California's singular and successful state program to continue was amply justified, particularly in light of the State's acute pollution challenges—which continue to this day despite substantial progress.

Petitioners also attack the merits of EPA's 2022 decision to restore a 2013 waiver for California's greenhouse gas and zero-emission-vehicle standards.  But no Petitioner has established an injury traceable to EPA's action, let alone one that can be redressed here.  And EPA had no choice but to restore California's waiver because its 2019 withdrawal exceeded the agency's authority.  EPA properly exercised its authority in 2013, and again in 2022, to allow California to implement innovative standards to control multiple pollutants—including smog, particulate matter, and greenhouse gases—that severely threaten California.  Far from undermining the need for this waiver, the fact that these pollutants also threaten other States, albeit differently, demonstrates the wisdom of Congress's decision to preserve a testing ground for advanced pollution control technologies from which the

whole Nation can ultimately benefit.  EPA has long understood this, and Congress has twice ratified this understanding, expanding California's discretion to design a comprehensive program.  Congress has also repeatedly embraced the very California standards at issue here.  This Court should reject Petitioners' efforts to use the Clean Air Act to halt technological advancement and upend longstanding regulations selected by 18 States as their preferred protection against harmful vehicular pollution.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations not reproduced in the addenda to Petitioners' and Respondents' briefs are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

State Respondent-Intervenors adopt EPA's Statement of the Case.

## SUMMARY OF ARGUMENT

These petitions should be dismissed for lack of standing or denied on their merits.

1.  Petitioners lack standing.

a.  State Petitioners allege a constitutional injury to their sovereignty.  But they identify no way in which Section 209(b) interferes with any state authority they wish to exercise.  And they seek a remedy—the

4

application of *federal* law nationwide—that would decrease the authority of all States, including by stripping away authority other States have been exercising for over half a century. State Petitioners also allege California's zero-emission-vehicle standards will injure them by raising the prices they pay for conventional vehicles. But publicly available information and peer-reviewed economic literature contradict their unsubstantiated assumptions.

b. Fuels Petitioners allege injuries from increased sales of vehicles that use less or no liquid fuel. But they fail to establish that the Restoration Decision—as opposed to surging consumer demand for zero-emission vehicles, long-term plans made in response to the original 2013 waiver, and rigorous federal standards—is the cause of these alleged injuries, much less that automobile manufacturers would sell different vehicles if Petitioners obtain vacatur.

2. Turning to the merits, Section 209(b) does not implicate, let alone violate, the equal sovereignty principle articulated in *Shelby County*. Like numerous other instances where Congress has elected to allow certain States to regulate specific commercial conduct, this regime does not intrude "into sensitive areas of state and local policymaking," 570 U.S. at 545—such as the regulation of state and local elections—that the Constitution's Framers "intended the States to keep for themselves," *id.* at 543. Moreover,

5

Congress's decision to allow California to continue with its own regulatory program for motor vehicle emissions is more than "sufficiently related to the problem that it targets," *id.* at 551, because of California's severe challenges with air pollution and because California was the only State with such a program (and relevant expertise).

3.  As EPA explains, its Restoration Decision should be affirmed because it corrects the Withdrawal Decision's failure to adequately consider the substantial reliance interests that had attached to the 2013 waiver.  EPA Br. 53-58; *see also* Indus. Resp. Br. 13-20.  EPA's Restoration Decision should also be affirmed because the Withdrawal Decision exceeded EPA's authority and was untimely.  Section 209(b) does not permit EPA to withdraw a waiver six years after granting it, particularly in the absence of any changes in factual circumstances undermining the agency's original findings.

4.  If the Court reaches the substantive bases for EPA's Restoration Decision, that decision should be affirmed.

a.  EPA correctly rejected the Withdrawal Decision's determination that, under Section 209(b)(1)(B), California "does not need such State standards to meet compelling and extraordinary conditions," 42

U.S.C. § 7543(b)(1)(B), reaffirming the three contrary determinations it had made in 2013:

      i.  EPA returned to the interpretation it has applied to Section 209(b)(1)(B) determinations from its earliest waiver proceedings—asking whether California still has compelling and extraordinary conditions for which it needs a separate regulatory program—and concluded California does still have that need.  Petitioners' preferred interpretation—under which EPA would consider California's need for each individual standard—ignores Congress's deliberate program-level design, fails to give each of the three Section 209(b)(1) criteria distinct meaning, inserts an atextual pollutant-specific prohibition, and overlooks Congress's ratification of EPA's traditional approach.

      ii.  EPA nonetheless also applied Petitioners' single-standard interpretation and concluded, correctly, that California needs its greenhouse gas and zero-emission-vehicle standards to address compelling and extraordinary criteria pollution conditions.[1]  California has always maintained, and the record has always demonstrated, that zero-emission-vehicle standards are essential for the State's efforts to address its acute

---

[1] Criteria pollutants are those listed by EPA pursuant to 42 U.S.C. § 7408(a), including ozone and particulate matter, EPA Br. 12.

smog and particulate matter challenges.  And while Petitioners claim the criteria pollution benefits of California's greenhouse gas standards are "trivial," those reductions are unequivocally needed by the millions of Californians who experience the worst air quality in the Nation.

iii.  EPA also correctly concluded that, under Petitioners' single-standard interpretation, California needs its greenhouse gas and zero-emission-vehicle standards to address compelling and extraordinary climate change conditions.  The State is already facing extreme wildfires, droughts, and heat events; reduced water supplies for its residents, its farms, and its ecosystems; and air quality impacts that are aggravating the State's already severe challenges to protect public health.  Congress did not design the waiver provision to prevent progress toward addressing these threats simply because that progress is incremental.

b.  EPA also correctly rejected the Withdrawal Decision's reliance on a different agency's (now withdrawn) determination that California's greenhouse gas and zero-emission-vehicle standards are preempted by the Energy Policy and Conservation Act of 1975 (EPCA), reaffirming that waiver decisions should be based only on the three criteria Congress provided in Section 209(b).

8

5.  Finally, this Court should decline to entertain Petitioners' claim that these California standards are preempted by EPCA.  That issue is not properly presented in these petitions for review of EPA's *Clean Air Act* decision.  Any such direct preemption challenge to these state standards must be brought in a proper trial court, if at all.  If the Court does reach this claim here, it should reject it, just as other courts have done.

## ARGUMENT

### I.  PETITIONERS LACK STANDING

Petitioners bear the burden to establish the elements of Article III standing:  a concrete and particularized injury that is both "fairly traceable to the challenged action" (rather than "the result of the independent action of some third party") and redressable by the Court.  *Chamber of Comm. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (cleaned up).  No Petitioner has met these burdens.

#### A.  State Petitioners

State Petitioners allege two forms of injury—constitutional and monetary.  Ohio Br. 14.  Neither theory supports standing for the claim or relief for which it is proffered.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006).

State Petitioners assert that Section 209(b) causes them "constitutional injury," Ohio Br. 15, by allowing only California to set new motor vehicle emissions standards.  But Petitioners fail to clear even the low bar of alleging they would set such standards "were they so able."  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 668 (1993); *see also Ohio v. Yellen*, 53 F.4th 983, 993 (6th Cir. 2022) (rejecting standing because "Ohio never established any particular conduct it wishes to pursue").  Unlike the plaintiff in *Shelby County*, State Petitioners do not claim to be injured by, or seek to remove, a federal barrier to changing their own laws.  570 U.S. at 549.  Instead, they seek to prevent *other States* from adopting and implementing their own laws by making *federal* law exclusive—an outcome that would only *reduce* state power.  Litman Amicus Br. 29-30.

State Petitioners' economic injury claims fare no better.  They allege no injury from California's greenhouse gas standards.  EPA Br. 24.  And their allegations of injuries from California's zero-emission-vehicle standards are both unsubstantiated, *id.* at 24-27, and wrong.

State Petitioners claim that California's zero-emission-vehicle standards will cause them to pay higher prices for conventional vehicles in

10

the future.  Ohio Br. 14-15.[2]  They notably do not describe how or when the

prices for their state-fleet vehicles are determined, and have not, therefore,

established that those prices remain to be negotiated for model years 2024 or

2025.[3]  In any event, Petitioners' theory of generalized price increases rests

on erroneous premises:  (1) California's mandate to sell zero-emission

vehicles demonstrates, by itself, that those sales are unprofitable,

Ohio.Add.41, 42-43; (2) "manufacturers must increase the cost of

conventional vehicles" in California to offset those unprofitable sales, Ohio

Br. 14; and (3) those increases must apply nationwide because vehicle prices

must be the same everywhere, *id.*

Petitioners' standing theory fails from the start because auto dealers in

California (and elsewhere) are selling record numbers of zero-emission

vehicles at profitable prices.  Add87-91.  Indeed, sales in 2022 exceeded

those required by California's standards, indicating that robust consumer

---

[2] State Petitioners allege other economic harms from expanded use of electric vehicles.  Ohio.Add.53; Ohio Br. 15.  But many of these States actively encourage the production and use of electric vehicles, undermining any claims of injury, causation, and redressability.  Add99-103; *see also* EPA Br. 27-28.

[3]  The standards at issue here do not require further increases in sales of zero-emission vehicles after model year 2025, 78 Fed. Reg. 2112, 2114 (Jan. 9, 2013), for which sales can begin as early as January 2, 2024, Cal. Health & Saf. Code § 39038.

11

demand, rather than the mandate, is driving sales (and prices). Add87-88. Moreover, the mere existence of a sales mandate does not prove that required sales are unprofitable. Notably, several parties here attest that they produce and sell renewable fuels "profitably" under a federal mandate. *E.g.*, Fuels.Add.16 ¶ 4; *see also id.* at 19-25, 51 ¶ 9.

And, even if some zero-emission vehicles were sold at a loss, the peer-reviewed economic literature contradicts Petitioners' unsubstantiated assertion that manufacturers would respond by increasing conventional vehicle prices. An automobile manufacturer facing such a loss has several options, and the least expensive (and, thus, most attractive) is to accept a short-run reduction in profits in order to invest in the innovation necessary to produce compliant vehicles consumers want to buy. Add117-118.

Finally, State Petitioners' contention that prices would rise *in their States*—because vehicle prices must be the same nationwide, Ohio.Add.43-44—is belied by both economic theory, Add110-114, and publicly available data. The prices paid for a given vehicle model vary—sometimes by thousands of dollars—within a single State and between different States. Add91-95. And auto dealers, who negotiate the prices for most consumer vehicle purchases, have repeatedly asserted that California's standards drive

12

up prices in States that adopt those standards *but not elsewhere*.  *Chamber of Com.*, 642 F.3d at 201; *see also* Add95-96.

State Petitioners have not plausibly alleged they face price increases, much less shown that any such increases are caused by California's standards or the Restoration Decision.  *Chamber of Com.*, 642 F.3d at 205.  Nor is there any evidence that vacatur would provide relief.  *See* Case No. 19-1230, Dkt. No. 1821514 at 3 (Dec. 24, 2019) (manufacturers asserting theirs is a "long lead-time industry"); Add96-97; *see also Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004).

### B.   Fuels Petitioners

Fuels Petitioners allege that EPA's Restoration Decision will reduce demand for liquid fuels by changing the vehicles sold in California and Section 177 States.  Fuels Br. 16.  Even assuming these allegations suffice for injury-in-fact, Petitioners have not met the "substantially more difficult" challenge to establish causation and redressability based on the decisions of third-parties—i.e., automobile manufacturers.  *Chamber of Com.*, 642 F.3d at 201 (cleaned up).  Indeed, Petitioners provide *no* evidence that the Restoration Decision is the cause of the allegedly injurious manufacturer decisions about which vehicles to offer, much less that vacatur would change those decisions.

13

Automobile manufacturers have been planning to comply with these California standards since at least 2013, when the waiver was originally granted (and went unchallenged). And, in the litigation over the 2019 Withdrawal Decision, manufacturers told this Court they would be "*required*" to continue planning for compliance unless and until the withdrawal was affirmed—an event that never happened. Case No. 19-1230, Dkt. No. 1821514 at 11 (Dec. 24, 2019) (emphasis added); *see also* JA289, 295-297, 300. Since then, in response to surging consumer demand, manufacturers have announced plans to sell even *more* zero-emission vehicles than required by California's standards. Add97-99. They have, in fact, already done so. Add87. Manufacturers are also now preparing to comply with EPA's nationwide greenhouse gas standards. *See* 86 Fed. Reg. 74,434, 74,440 (Dec. 30, 2021) (comparing EPA's current standards to earlier standards (labeled "2012 FRM") roughly equivalent to California's).[4]

Fuels Petitioners "have failed to demonstrate a substantial probability" that the *Restoration Decision*—as distinct from consumer demand and manufacturers' plans in response to the *original waiver* and EPA's new standards—would cause the injury they allege. *Chamber of Com.*, 642 F.3d

---

[4] There is no federal analog to California's zero-emission-vehicle standards.

at 204-06.  Nor have they established any probability that manufacturers would change course if EPA's decision were vacated.  *Crete Carrier Corp.*, 363 F.3d at 494; *see also* Indus. Respond. Br. 12.

## II.  NEITHER SECTION 209(b) NOR EPA'S RESTORATION DECISION VIOLATES THE EQUAL SOVEREIGNTY PRINCIPLE

### A.  Section 209(b) Does Not Implicate Equal Sovereignty

Seeking to end state pollution control programs that have operated for more than half a century, and with no explanation for their delay, State Petitioners claim *Shelby County*'s equal sovereignty principle invalidates the balance Congress struck between federal and state regulation of new motor vehicle emissions.  Ohio Br. 23-25.  But equal sovereignty is not implicated by Congress's conclusion, under the Commerce Clause, that California's program should serve as a limited-market alternative to the federal program.  Rather, the "fundamental principle of equal sovereignty among the States" is implicated only by federal intrusion into the "sensitive areas of state and local policymaking"—such as the power to regulate state and local elections—that the "the Framers … intended the States to keep for themselves, as provided in the Tenth Amendment."  *Shelby Cnty.*, 570 U.S. at 543-45 (cleaned up).

15

Petitioners assert that the equal sovereignty principle constrains *every* Congressional action, *e.g.*, Ohio Br. 12, but no court has ever adopted this view, EPA Br. 38.  Petitioners purport to rely on equal footing doctrine cases, but those cases concern only conditions on state admission into the Union, and are, thus, inapplicable here.  EPA Br. 47-48.  In any event, that doctrine, too, protects only against Congress's intrusion into the powers that were "exclusively within the sphere of state power" at the Framing—such as the power to choose the location of a State's capital.  *Coyle v. Smith*, 221 U.S. 559, 568, 574 (1911).  Congress may, therefore, impose conditions on a State's admission where its power "extend[s] to the subject"—as with the "regulation of commerce"—even though such conditions apply to a single State.  *Id.* at 574; *see also* Litman Amicus Br. 8-11.

*Shelby County* applied the equal sovereignty principle to Congress's 2006 reenactment of Section 4 of the Voting Rights Act because it required certain States—with particular histories of discrimination—to obtain federal preclearance before they could exercise their reserved sovereign power to regulate elections.  570 U.S. at 543.  By contrast, Section 209(b) does not intrude on any such sensitive state power, much less "punish" disfavored States "for the past."  *See id*. at 553.  Section 209(b) concerns only interstate commerce—the regulation of which was the federal power most "universally

16

assumed to be necessary," and most "readily relinquished" by the States.  *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534 (1949).

The Commerce Clause grants Congress the powers to "choose the commodities and places to which its regulation shall apply," to "consider and weigh relative situations and needs," and to determine that "limited applications" of its regulations will benefit the Nation.  *Currin v. Wallace*, 306 U.S. 1, 14 (1939).  Having chosen to regulate the emissions of new motor vehicles, Congress weighed manufacturers' fears of facing fifty-one different regulatory programs against the risks of snuffing out the state "laboratory for innovation" upon which the federal government had already "drawn heavily."  *MEMA I*, 627 F.2d at 1109-11.  Congress chose not to shutter that laboratory so that manufacturers, States, and the Nation could continue to benefit from pilot-testing of new technologies.  *Id*.[5]  Far from intruding into any sensitive area of reserved state sovereignty, Congress stayed squarely on its side of the line that "divid[es] sovereign authority between the States and the federal government."  *See* Ohio Br. 18.

---

[5] California's program has, in fact, continued to spur significant innovation in emission-control technologies, providing precisely the benefits Congress intended.  JA340-361.

Petitioners argue that *Shelby County*'s application of its equal sovereignty principle to Fifteenth Amendment legislation demonstrates that the principle "retains all its strength" against all exercises of Congress's other powers.  Ohio Br. 25.  To the contrary, *Shelby County* demonstrates that the Fifteenth Amendment's "expansion of federal power," *Gregory v. Ashcroft*, 501 U.S. 452, 468 (1991), enables precisely the intrusion into "spheres of autonomy previously reserved to the States," *Fitzpatrick v. Bitzer*, 427 U.S. 445, 455 (1976), that can implicate the equal sovereignty principle.  Because the Fifteenth Amendment opened *new* doors for Congress to intrude into the States' core sovereignty, Congress must meet a higher bar—enacting only "appropriate" enforcement legislation—when doing so.  U.S. Const. amend. XV, § 2; *see also* Ohio Br. 24.[6]  Nothing in *Shelby County* suggests that States are "entitle[d] to complete sovereign equality," Ohio Br. 25, with respect to subjects that were never reserved to the States in the first place.

Finally, Petitioners do not explain how federalism, generally, or state sovereignty, specifically, would be enhanced by terminating regulatory

---

[6] The Commerce Clause contains no similar limitation, or, indeed, any uniformity constraint of the kind imposed on certain other Article I powers. EPA Br. 33-34.

18

programs operating in 18 States or by requiring that States yield all regulation to the *federal* government.[7]  *See* Litman Amicus Br. 22.  By seeking to *extend* the scope of federal preemption, Petitioners concede that Congress holds the paramount power to preempt, or not, in this area.  *E.g.*, Ohio Br. 28.  That should end the matter.  *See Shelby Cnty.*, 570 U.S. at 543 ("*Outside the strictures of the Supremacy Clause*, States retain broad autonomy in structuring their governments and pursuing legislative objectives.") (emphasis added).

## B.  Congress's Tradition of Enabling Differential State Authority Contradicts Petitioners' Expansive Theory

Congress's history and tradition of using its Article I powers to permit some, but not all, States to regulate specified commercial conduct further confirms that *Shelby County*'s equal sovereignty principle does not have the sweeping application Petitioners posit.

When Congress decides to preempt state law, it frequently allows existing state programs to remain in place, as it did in 1967 with California's vehicular emissions program.  EPA Br. 34; *see also United States v. Sharpnack*, 355 U.S. 286, 290-92 (1958) (describing long history of

---

[7] *See* https://ww2.arb.ca.gov/sites/default/files/2022-05/%C2%A7177_states_05132022_NADA_sales_r2_ac.pdf, last visited Jan. 19, 2023.

Assimilative Crimes Act permitting application of state laws in federal enclaves only if state laws existed when Act was passed).  This necessarily results in early regulators exercising authority that other States lack.  *Compare Concentric Network Corp. v. Com.*, 897 A.2d 6, 15 (Pa. Commw. Ct. 2006), *aff'd,* 922 A.2d 883 (2007) (preexisting state law exempt from preemption under Internet Tax Freedom Act), *with City of Eugene v. Comcast of Oregon II, Inc.*, 263 Or. App. 116, 145 (2014), *aff'd,* 375 P.3d 446 (2016) (rejecting application of same exemption to later-enacted law).

Congress has also "affirmatively grant[ed] certain States broad jurisdiction to prosecute state-law offenses committed by or against Indians in Indian country," while allowing other States to "opt in" only with "tribal consent."  *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2499 (2022) (citing 25 U.S.C. § 1321).  And Congress has allowed Texas alone to keep its electric grid largely disconnected from the rest of the Nation and to exercise authority over aspects of its grid that other States lack.  16 U.S.C. §§ 824k(k)(1), 824p(k), 824q, 824t(f).  *See also United States v. Louisiana*, 363 U.S. 1, 35, 65 (1960) (upholding Congress's decision to authorize Texas to "exercise jurisdiction and control" over more submerged lands than other States); 49 U.S.C. § 31113(a) (preempting all States but Hawaii from regulating commercial motor vehicle widths on federal highways); Pub. L.

20

No. 112-55 § 211, 125 Stat. 552, 695 (2011) (granting four jurisdictions the option to govern public housing differently than all others); EPA Br. 35 (providing other examples); Litman Amicus Br. 23 (same).

The Constitution also explicitly gives Congress the power to approve interstate compacts that increase signatories' "political power." *Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). Thus, Congress regularly assents to compacts that provide authority—including the authority to override otherwise applicable federal rules—to some, but not all, States. For example, Congress consented to a multi-state compact with "[t]he primary purpose" of superseding federally proscribed dairy prices. *New York State Dairy Foods, Inc. v. Ne. Dairy Compact Comm'n*, 198 F.3d 1, 4 (1st Cir. 1999). Congress also assented to compacts authorizing certain States to discriminate against waste from non-compacting States—"an unexceptionable exercise of Congress' power to authorize the [selected] States to burden interstate commerce." *New York v. United States*, 505 U.S. 144, 150-52, 171 (1992). *See also* Litman Amicus Br. 25-27.

None of this is new. Early Congresses frequently assented to exercises of authority by one or more States without extending the same privileges to others. *E.g.*, Act of Aug. 11, 1790, ch. 43, 1 Stat. 184 (consenting to state tonnage fees); Act of Mar. 30, 1802, ch. 13 § 19, 2 Stat. 145 (authorizing

21

Tennessee to maintain a road on Native American tribal lands "under the direction or orders of the governor"); Act of Mar. 8, 1806, ch. 14, 2 Stat. 354-55 (authorizing New York and Pennsylvania courts to handle "complaints and prosecutions for fines, penalties, and forfeitures" under federal law); *see also Fort Leavenworth R. Co. v. Lowe*, 114 U.S. 525, 528 (1885) (upholding Congressional commitment allowing Kansas, but not other States, to "tax railroad, bridge, and other corporations" within Native American reservation); Litman Amicus Br. 24-25.

As these examples illustrate, State Petitioners err when they claim that Congress must ensure all States have equal authority whenever "it acts pursuant to its enumerated powers." Ohio Br. 12. And neither of Petitioners' limiting principles provides a fix. They first assert it is "critical" that differential treatment must be "*unrelated to sovereign authority*." Ohio Br. 25-26. But this fails to explain any of the examples described above. It also fails to explain Petitioners' concession that Congress may constitutionally "direct[] funding to projects in particular States," Ohio Br. 25, given that Congress may condition such funding "upon compliance … with federal statutory and administrative directives" which can constrain or enhance state authority. *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (cleaned up). State Petitioners then narrow their theory further,

acknowledging that Congress may "empower[] a single State to regulate an issue of unique concern to that State." Ohio Br. 27. They fail to explain why this exception does not cover Section 209(b) itself, EPA Br. 50-51, much less why Congress has never provided—and the Court has never required—any such justification for other examples of differential state authority, including those described above.

State Petitioners cannot locate a meaningful and workable line that supports their theory. But the Constitution supplies a line: the one the Framers drew when they conferred certain powers upon Congress and reserved others to the States. The equal sovereignty principle simply has no role to play where, as here, Congress has not crossed that line.

**C.    Section 209(b) and the Restoration Decision Both Survive Any Heightened Review**

Even if equal sovereignty were implicated here, Section 209(b) and the Restoration Decision are "sufficiently related to the problem" targeted. *Shelby Cnty.*, 570 U.S. at 551. Petitioners have forfeited any contrary argument, EPA Br. 40, and, regardless, such an argument would fail.

The Clean Air Act serves the core federalism interests of local control and accountability by minimally preempting state regulation of motor vehicle emissions. Congress expressly left *all* States free "to adopt in-use

23

regulations"—like carpool lanes and idling restrictions—that control the emissions of vehicles *after* their sale. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1094 (D.C. Cir. 1996) (citing 42 U.S.C. § 7543(d)); *see also State ex rel. Yost v. Volkswagen Aktiengesellschaft*, 165 Ohio St. 3d 213, 217 (2021), *cert. denied*, 142 S. Ct. 515 (2021).  For *new* motor vehicles, Congress tailored preemption to balance manufacturers' fears of "51 different standards," *Engine Mfrs.*, 88 F.3d at 1080, with the benefits, for the Nation, of an alternative regulatory program.  Petitioners identify no regime that would impose lower "federalism costs." *Shelby Cnty.*, 570 U.S. at 549 (cleaned up).  Rather, they seek to impose an *exclusive* federal program, which would simultaneously eliminate the benefits provided by a limited-market testing ground and reduce state authority and accountability. *See* Litman Amicus Br. 29-31.

Congress's decision to authorize EPA to waive preemption for California was also sufficiently related to the targeted problem:  California has long faced particularly severe air pollution challenges and had already designed a program to address those challenges.  EPA Br. 40-41; *MEMA I*, 627 F.2d at 1108-09.  No one disputes that those were the "'current conditions' … before Congress when it enacted the statute." *Gross v.*

*United States*, 771 F.3d 10, 15 (D.C. Cir. 2014) (quoting *Shelby Cnty.*, 570 U.S. at 553).

Finally, State Petitioners attempt an "as applied" challenge to the Restoration Decision—and the particular California standards it enables—based on claims about present conditions in California.  Ohio Br. 31-33.  But the relevant conditions for an equal sovereignty challenge are those when *Congress* acted.  *Gross*, 771 F.3d at 15.  Moreover, where the equal sovereignty principle applies, it constrains Congress's selection of certain States for differential treatment, not the State's exercise of federally sanctioned authority.  *Shelby Cnty.*, 570 U.S. at 554 (focusing on "how [Congress] selects the jurisdictions subjected to preclearance").  In any event, EPA correctly found that California needs its program, and these particular standards, to address compelling and extraordinary conditions in California, EPA Br. 42, 84-91; *infra* Argument IV.A, confirming that the Restoration Decision is sufficiently related to the problem Congress targeted.

## III.  EPA CORRECTLY REVERSED THE WITHDRAWAL DECISION AS AN IMPROPER EXERCISE OF EPA'S AUTHORITY

Turning to the bases for the Restoration Decision, EPA correctly concluded that:  (1) the Withdrawal Decision exceeded the agency's limited

authority to revoke a previously granted waiver; (2) even if the Withdrawal Decision were authorized, it was untimely; and (3) EPA had failed to properly consider reliance interests in the 2013 waiver. 87 Fed. Reg. 14,332, 14,344 (Mar. 14, 2022). Each of these threshold conclusions is an independent ground for denying these petitions. When, how, and on what bases EPA may withdraw a waiver are distinct questions from the merits of any bases EPA might select. *See* Fuels Br. 56-58.

By its terms, Section 209(b) only empowers EPA to grant or deny waivers requested by California. 42 U.S.C. § 7543(b)(1). This provision does not implicitly authorize EPA's withdrawal of a six-year-old waiver— and the disruption of multiple States' long-range pollution-control plans— simply because EPA chose to reject "the wisdom of its [previous] policy." *See* 84 Fed. Reg. 51,310, 51,333 (Sept. 27, 2019) (cleaned up). EPA and Industry Respondent-Intervenors explain the Withdrawal Decision's failure to properly consider reliance interests. EPA Br. 53-58; Indus. Resp. Br. 13-20. The Withdrawal Decision was also *ultra vires* and untimely.

### A.    The Withdrawal Decision's Bases Were Impermissible

EPA now expressly recognizes what precedent, the statute's text and structure, and agency practice already established: EPA "may only reconsider a previously granted waiver" where it discovers "a clerical or

factual error or mistake, or where … factual circumstances … have changed so significantly that the propriety of the waiver grant is called into doubt." 87 Fed. Reg. at 14,344.  The Withdrawal Decision exceeded EPA's authority because it was not prompted by recognition of a factual error or any changes in factual circumstances.  *Id.*; *see also* 84 Fed. Reg. at 51,350 (declining to finalize proposed factual finding).  Rather, it "was premised on retroactive application of discretionary policy changes."  87 Fed. Reg. at 14,350.

As Congress was well aware when it enacted the waiver provision, agencies cannot reverse an adjudicatory grant of rights or privileges simply "to execute a subsequently adopted policy."  *Am. Trucking Ass'n v. Frisco Transp. Co.*, 358 U.S. 133, 146 (1958); *see also Chapman v. El Paso Nat. Gas Co.*, 204 F.2d 46, 53-54 (D.C. Cir. 1953).[8]  Petitioners try to work around this limitation by contending that the Withdrawal Decision executed no change in policy, but, rather, corrected "an erroneous statutory interpretation."  Fuels Br. 59.  That effort fails.

For the first time in fifty years of waiver proceedings, EPA chose to rely on a factor outside the three Section 209(b) criteria:  the National

---

[8] Petitioners do not challenge EPA's longstanding position that its Section 209(b) waiver decisions are adjudications.  87 Fed. Reg. at 14,333; *see also, e.g.*, 58 Fed. Reg. 4166 (Jan. 13, 1993); Fuels Br. at 58, 60-61 (relying on adjudication cases).

Highway Traffic Safety Administration's (NHTSA's) preemption rule. 84

Fed. Reg. at 51,337-38. That involved no interpretation of Section 209(b),

much less an error-correcting one. EPA also relied on a new policy

determination that Section 209(b) forecloses state regulation of vehicular

greenhouse gas emissions. *Id.* at 51,347.[9] While this new policy included a

reinterpretation of Section 209(b)(1)(B), EPA itself described its traditional

interpretation—the one it was choosing to reject—as *reasonable*. 84 Fed.

Reg. at 51,341. As one of Petitioners' own cases indicates, this adoption of

"one legally supportable position rather than another," "based only on policy

reasons," is precisely the sort of policy shift that cannot support a

withdrawal. *Belville Min. Co. v. United States*, 999 F.2d 989, 999 (6th Cir.

1993); *see also United States v. Seatrain Lines*, 329 U.S. 424, 429 (1947)

(reinterpretation of legal term "commodities generally" constituted "new

policy" that could not be retroactively applied); Admin. Law Profs. Amicus

Br. 25-27. And, notably, none of Petitioners' other cases, Fuels Br. 59,

supports the withdrawal of adjudicated privileges based on an agency's new

---

[9] Confirming the policy change underlying its withdrawal, EPA chose
to reconsider only standards that reduce greenhouse gas emissions, *id.* at
51,329, and expressly disavowed application of its newly adopted
interpretation to other standards, *id.* at 51,341 n.263.

legal position. *Gun South, Inc. v. Brady*, 877 F.2d 858, 866 (11th Cir. 1989) (reconsideration based on "sufficient evidence" undermining initial *factual finding*); *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 85 (D.C. Cir. 2014) (same).[10]

In any event, it is undisputed that the Withdrawal Decision was *not* based on changes in factual circumstances. It was, therefore, *ultra vires* because the statute's text and structure constrain withdrawals to factual grounds, as EPA correctly recognized here. 87 Fed. Reg. at 14,344. Under Section 209(b)(1), California makes the policy decisions about whether and how to regulate pollutants from new vehicles sold in the State, determines that its program is "at least as protective" as EPA's, and requests waivers. 42 U.S.C. § 7543(b)(1). EPA's role is "sharply restricted" to granting California's requests unless the record establishes "one of the *factual circumstances* set out in section 209(b)(1)(A)-(C)." *MEMA I*, 627 F.2d at 1121 (emphasis added). EPA reviews California's protectiveness determination under the "arbitrary and capricious" standard, 42 U.S.C.

---

[10] This does not mean EPA's interpretations are "carved in stone." Fuels Br. 59 (citing *rulemaking* cases) (cleaned up). To the extent the statute leaves anything open to interpretation, EPA can apply new interpretations *prospectively* to new waiver requests.

§ 7543(b)(1)(A), and assesses record-based issues like technological feasibility, *id.* § 7543(b)(1)(C).[11]  Limiting EPA's role in this way was deliberate.  After vigorous debate, Congress chose the mandatory "*shall … waive,*" 42 U.S.C. § 7543(b)(1) (emphasis added), specifically to avoid placing California's program at the mercy of the federal government, *MEMA I*, 627 F.2d at 1120-21.  Congress did not implicitly extend EPA's withdrawal authority beyond factual grounds, much less provide the "standardless and openended" withdrawal authority EPA claimed in 2019.  *See Am. Methyl Corp. v. EPA*, 749 F.2d 826, 837 (D.C. Cir. 1984).

Moreover, Congress would not have explicitly invited California and other States to build their air pollution control programs around granted waivers, 42 U.S.C. § 7507, while simultaneously, and *implicitly*, permitting EPA to withdraw waivers absent significant evidence that it should do so.  To the contrary, Congress expressly prohibits EPA, and all federal agencies, from engaging in, or supporting, "any activity which does not conform to" EPA-approved state implementation plans to achieve or maintain federal air quality standards, 42 U.S.C. § 7506—plans that frequently include state

---

[11] While the parties here dispute *which* facts EPA should find under one of the criterion (Section 209(b)(1)(B)), EPA's determination under that criterion is also a factual one.

emission standards for which a waiver has been granted, EPA Br. 55.

Indeed, Congress is generally reluctant to empower agencies to upend

previously authorized state programs unless warranted by *facts* on the

ground. *E.g.*, 42 U.S.C. § 7410(k)(5) (EPA may require state plan revisions

only when plan is "substantially inadequate"); 30 U.S.C. § 1271(b) (agency

may supplant previously authorized state mining regulations only when the

State fails to adequately enforce its program); Admin. Law Profs. Amicus

Br. 14-15.[12]  Nothing in Section 209(b) suggests Congress granted EPA

greater power here.

To the contrary, firm limits on EPA's withdrawal authority are

necessary to one of the "benefits" Congress intended to obtain from the

waiver provision—the development of "new control systems" for vehicular

emissions. *MEMA I*, 627 F.2d at 1110; *see also* Indus. Respond. Br. 18-20.

If EPA did possess "unguided and open-ended power to revoke waivers,"

manufacturers might delay investing in new technologies to see if a waiver

would be withdrawn—or even seek such a withdrawal themselves. *Am.*

*Methyl Corp.*, 749 F.2d at 839-40.

---

[12] Congress even considered it necessary to *expressly* authorize EPA
to correct mistakes in its approvals of state implementation plans.  42 U.S.C.
§ 7410(k)(6).

31

Finally, contrary to Petitioners' claims, Fuels Br. 61, EPA's prior practice is entirely consistent with the position it took here. In the only prior proceeding where EPA considered withdrawing a waiver, it did so because of new information related to its *factual findings*. 47 Fed. Reg. 7306 (Feb. 18, 1982). Neither of Petitioners' examples demonstrates otherwise, Fuels Br. 61, because neither involved the withdrawal of a previously granted waiver, 74 Fed. Reg. 32,744, 32,757 (July 8, 2009) (reconsidering decision *not* to grant a waiver); 43 Fed. Reg. 998, 999 (Jan. 5, 1978) (considering whether amendments to California's standards required *new* waiver).

## B.    EPA's Withdrawal of a Six-Year-Old Waiver Was Untimely

Even if the Withdrawal Decision's bases were somehow permissible, any "inherent power to reconsider and change" privileges afforded through adjudications must be exercised "within a reasonable period of time." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977), with reasonableness generally "measured in weeks, not years," *id.* Readjudicating the 2013 waiver *six years* later was not reasonable. *Ivy Sports*, 767 F.3d at 86 (collecting cases on timeliness).

Petitioners contend that "timing is no barrier to reconsideration" here because Section 209(b) waivers are granted to a State, rather than a private

party, Fuels Br. 60, and because "the Section 209(b) waiver process is effectively an ongoing proceeding," *id.* at 61.[13]  But States have "legitimate interest[s] in the continued enforceability" of their own laws, *Maine v. Taylor*, 477 U.S. 131, 137 (1986), and Petitioners cannot explain why those interests warrant *less* protection than those of private parties.  Moreover, there was nothing "ongoing" about the 2013 waiver proceeding in 2019.  The waiver was final agency action when granted and became unreviewable when no one challenged it within sixty days.  42 U.S.C. § 7607(b).  EPA's Withdrawal Decision exceeded any measure of reasonable timeliness.

## IV.  EPA CORRECTLY REJECTED BOTH BASES FOR ITS WITHDRAWAL DECISION

In its Restoration Decision, EPA correctly rejected the two bases for its Withdrawal Decision:  (1) EPA's conclusion that California no longer "need[s] such State standards" under Section 209(b)(1)(B), 42 U.S.C. § 7543(b)(1)(B); and (2) its reliance on NHTSA's EPCA preemption rule.  87 Fed. Reg. at 14,352, 14,374.

---

[13] Petitioners also attempt to conflate reversing a *denial* with withdrawing a *grant*.  Fuels Br. 55, 61.  But the former results in a waiver—an action *expressly* authorized by Congress—whereas the latter is neither a waiver nor a denial of a request.  42 U.S.C. § 7543(b)(1).  The consequences of these actions are also substantially different, given that Congress invited States to build long-term pollution control programs on top of waiver grants, not denials.  *Id.* § 7507; *see also* Admin. Law Profs. Amicus Br. 15-17, 22.

### A. EPA Correctly Rejected the Withdrawal Decision's Section 209(b)(1)(B) Determination

Section 209(b)(1)(B) permits EPA to deny California a waiver if the State does not "need such State standards to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b)(1)(B). EPA's Withdrawal Decision rejected EPA's traditional interpretation of this criterion and disregarded the significant record evidence underlying its 2013 findings. Correcting course, here EPA carefully reviewed the record and reaffirmed the three determinations it made in 2013—one applying its longstanding interpretation and two others applying the novel interpretation Petitioners prefer. Those three determinations are well founded, and each is independently sufficient to affirm the Restoration Decision (along with EPA's proper rejection of its EPCA preemption rationale, *see infra* Argument IV.B).

#### 1. EPA Correctly Concluded that California Needs Its Separate Program

##### a. EPA's Traditional Whole-Program Approach Is the Best Reading of the Text

In the Restoration Decision, EPA concluded that California continues to have the kind of extraordinary and compelling conditions that led Congress to conclude the State needs its own vehicular emissions control

program.  87 Fed. Reg. at 14,358-14,362.  Fuels Petitioners do not dispute

that California has such conditions (or that it has some of the worst air

quality in the nation); instead, they contend that it is improper to examine

California's need at the program level.

Petitioners' contention conflicts with EPA's longstanding interpretation

that "such State standards" refers to California's standards "in the

aggregate"—*i.e.*, to California's whole program.  *See* 42 U.S.C.

§ 7543(b)(1).  This traditional interpretation best comports with the statute's

text, its underlying intent, and judicial precedent.  EPA Br. 58-68.  There is

simply "[n]o antecedent . . . in the text for the phrase '*such* State standards'

in Section 209(b)(1)(B) except the *aggregate* State standards discussed in

Section 209(b)(1)."  EPA Br. 60.  Nor is this textual link an accident;

Congress enacted the two phrases simultaneously.  Pub. L. No. 95-95, title

II, §§ 207, 221, 91 Stat. 755, 762 (1977).

Petitioners posit that "such State standards" instead means "the

particular standards for which [California] seeks a waiver."  Fuels Br. 45-46.

But they disregard that the waiver is granted "to [the] State," not to

individual standards, 42 U.S.C. § 7543(b)(1), and they give no plausible

meaning to the word "such," EPA Br. 64.  Moreover, Petitioners "offer no

account of what function" would be served, *Advoc. Health Care Network v.*

35

*Stapleton*, 137 S. Ct. 1652, 1659 (2017), by California's determination that its program is adequately protective "in the aggregate," 42 U.S.C. § 7543(b)(1), if, as Petitioners contend, the very next criterion permits EPA to reject any individual standard it deems "ineffectual," Fuels Br. 46.

EPA's approach, in contrast, gives all three criteria in Section 209(b)(1) distinct functions: Section 209(b)(1)(A) safeguards public health and welfare by requiring a minimum level of protection; Section 209(b)(1)(B) allows for the withholding of additional waivers if California's conditions no longer warrant extending a separate state program; and Section 209(b)(1)(C) protects manufacturers against an infeasible program. Far from rendering Section 209(b)(1)(B) meaningless, Fuels Br. 46, EPA's traditional interpretation ensures that the specific burden about which manufacturers complained to Congress—the requirement to design both "federal cars" and "California cars," *Engine Mfrs. Ass'n*, 88 F.3d at 1080—lasts only so long as needed. *See* S. Rep. No. 90-403, at 33 (1967). Thus, Section 209(b)(1)(B) addresses the number of different *programs* manufacturers may be subject to—not the number of standards in a given program. *See also* 42 U.S.C. § 7507 (prohibiting "third vehicle"). Section 209(b)(1)(C)'s feasibility inquiry then ensures that the number and nature of standards in California's

36

program are, collectively, achievable and not unduly "disruptive." *See* Fuels Br. 46.

Finally, Congress has resolved any doubt about the whole-program interpretation by ratifying it twice, H.R. Rep. No. 95-294, at 301 (1977), 42 U.S.C. § 7543(e)(2)(A), while well aware that EPA had consistently rejected the single-standard approach. *See* 41 Fed. Reg. 44,209, 44,210, 44,213 (Oct. 7, 1976) (rejecting single-standard interpretation prior to 1977 amendments); 49 Fed. Reg. 18,887, 18,889-90 (May 3, 1984) (same, prior to Section 209(e)(2)(A)(ii)'s 1990 enactment).

### b. Petitioners' Manufactured Pollutant-Specific Prohibition Cannot Undermine EPA's Whole-Program Interpretation

Petitioners contend that EPA's whole-program approach must be wrong because it would override a purported prohibition against individual standards that reduce greenhouse gases. Fuels Br. 27-34; *see also id.* at 45. There is no such categorical bar.

The interplay of Section 209(b) with Section 202(a)—under which EPA regulates vehicular greenhouse gas emissions—demonstrates there is no pollutant-specific bar. Section 209(a) preempts States from promulgating standards that EPA may prescribe under Section 202(a), 42 U.S.C. § 7521(a), and Section 209(b) empowers EPA to waive Section 209(a)'s

37

preemption for California. *MEMA I*, 627 F.2d at 1107; *see also* 49 U.S.C. § 7543(b)(1). Section 209(b) is not, therefore, *categorically* narrower than Section 202(a). This was intentional: Congress intended EPA to continue "draw[ing] heavily on the California experience to fashion and to improve the national efforts at emissions control." *MEMA I*, 627 F.2d at 1110.

In contrast with other parts of the Act where state programs are evaluated against federal standards, *e.g.*, 42 U.S.C. §§ 7410, 7411(d), here Congress explicitly left it to California to determine not only which pollutants to regulate but how stringently to do so, *id.* § 7543(b)(1) (*California* determines protectiveness). *See also MEMA I*, 627 F.2d at 1112 (Congress permitted California to evaluate "the relative risks of various pollutants"); 43 Fed. Reg. 25,729, 25,735 (June 14, 1978) (describing EPA's "practice to leave the decisions on controversial matters of public policy, such as *whether to regulate methane emissions*, to California") (emphasis added). Accordingly, from the beginning, EPA has declined to "second-guess the wisdom of state policy," *e.g.*, 40 Fed. Reg. 23,102, 23,103 (May 28, 1975), and Congress has endorsed that view, even "*expand[ing]* California's flexibility to adopt a complete program of motor vehicle emissions control," *MEMA I*, 627 F.2d at 1110 (emphasis added).

38

Congress has also repeatedly embraced the California standards at issue here:  in 1990 it instructed EPA to incorporate elements of California's zero-emission-vehicle standards into federal regulations; in 2007, it directed EPA to look to California's greenhouse gas standards when setting federal procurement requirements; and just last year, it provided for EPA to support States in adopting and implementing greenhouse gas and zero-emission-vehicle standards.  EPA Br. 74, 76.

The words "extraordinary," "need," and "meet" cannot supply Petitioners' categorical bar, much less overcome Congress's repeated embrace of these standards.  EPA Br. 68-76.  The plain meaning of the term "extraordinary" does not require that California is *sui generis*, and Congress's invitation to other States to adopt California's standards would make no sense if it did.  *See* EPA Br. 70.  Nor does "extraordinary" require a showing of unusualness "*as compared to other States*."  Fuels Br. 29. Congress understands that conditions can be unusual in myriad ways, and when it intends to limit such terms as Petitioners suggest, it does so expressly.  42 U.S.C. § 6297(d)(1)(C) (defining "unusual and compelling State … interests" in part as those "substantially different" than "those prevailing in the United States generally").  Inserting such a meaning in Section 209(b), where Congress did not, would artificially constrain the

range of benefits California's successful experiments could provide to the
Nation.

Congress likewise understands, "[i]t is perfectly ordinary English to say
some effort is 'needed' to 'meet' a problem if that effort contributes to the
solution."  EPA Br. 73.  The Act requires EPA to regulate vehicular
emissions that "cause, *or contribute to*, [harmful] air pollution."  42 U.S.C.
§ 7521(a)(1).  Congress did not hide a higher bar for California's program—
one that requires California greenhouse-gas-reducing standards to lower
global temperatures—in the words "need" and "meet."  Fuels Br. 51-52.
Nor did Congress intend those words to preclude incremental progress on air
pollution problems that it knows can be intractable and require multi-faceted
efforts.  *E.g.*, *id.* § 7410(a)(2)(A) (anticipating long-term state plans
containing myriad "enforceable emission limitations and other control
measures, means, or techniques").

Petitioners' resort to the federalism canon and major questions doctrine
cannot save their meritless statutory argument.  Fuels Br. 19-27; *see also*
EPA Br. 77-83.  Far from limiting which pollutants or technologies States
can regulate in their own markets, the federalism canon *protects States* from
certain forms of "Congressional interference," *Gregory*, 501 U.S. at 460;
and the major questions doctrine protects one branch of the *federal*

40

government from overreach by another, *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *see also id.* at 2618 (Gorsuch, J., concurring) (lauding the benefits of "States … serv[ing] as laboratories.") (cleaned up).  It is Petitioners, not EPA, who seek a judicially mandated expansion of Executive Branch authority—at the expense of the States.  Fuels Br. 26.  EPA properly *constrained* its authority here.  87 Fed. Reg. at 14,334.  And there is nothing "unprecedented," *West Virginia*, 142 S. Ct. at 2612, about States regulating the emissions of products sold within their borders.  *E.g.*, *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169 (10th Cir. 2015); *see also* Indus. Respond. Br. 7-8.[14]  Moreover, there is no ambiguity about Congress's intent "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare," *MEMA I*, 627 F.2d at 1110 (cleaned up), or its repeated embrace of these California standards, *supra* 39.

---

[14] Petitioners' preemption theories, Fuels Br. 25-26, are not properly presented here, *infra* Argument V.A, and, regardless, raise no "major question."  Moreover, California's standards are no obstacle to the Renewable Fuels Standard—an issue never raised before EPA.  That program's volume mandates adjust with the "percentage[s] of transportation fuel sold . . . in the United States."  42 U.S.C. § 7545(o)(3)(B)(ii).

### 2. EPA Correctly Found that California Needs These Standards to Address Its Criteria Pollution Conditions

EPA correctly found that even applying Petitioners' atextual single-standard approach, California needs these standards to address its criteria pollution conditions. 87 Fed. Reg. at 14,362-65; EPA Br. 87-91. No one disputes that California's criteria pollution conditions remain "compelling and extraordinary," despite decades of effort and substantial improvement. *See, e.g.*, Am. Thoracic Society Amicus Br. 11-17; South Coast Amicus Br. 10-12. Instead, Petitioners mistakenly question the criteria pollution benefits of these standards.

California's zero-emission-vehicle standards extend and strengthen a program that began two decades ago as *a criteria pollution reduction program*. 78 Fed. Reg. 2112, 2118 (Jan. 9, 2013). California made the program's continued importance to air quality clear in the 2013 waiver proceeding,[15] and EPA agreed, *id.* at 2113-2114, 2131, finding California had "reasonably refute[d]" arguments that these zero-emission-vehicle standards do not reduce criteria pollutant emissions, *id.* at 2125. EPA has

---

[15] *E.g.*, JA151-152; JA876-877 ("ZEVs are an investment in the future. … [W]e need these technologies to be commercialized by 2025 to reach smog forming and [greenhouse gas] emission reduction targets long term.")

42

also approved incorporation of these standards into California's State

Implementation Plan (and other States' plans), designed to achieve or

maintain federal air quality standards for criteria pollutants. *E.g.*, 84 Fed.

Reg. at 51,337; 81 Fed. Reg. 39,424, 39,425 (June 16, 2016). And the

record now contains even more evidence of these benefits—none of which

Petitioners acknowledge, let alone refute. JA240-243, 268-272.

California's greenhouse gas standards likewise produce important

criteria emission reductions, JA101, 121; JA611; JA277-278, as EPA has

recognized both here and in state plan approvals, *see, e.g.*, 87 Fed. Reg. at

14,363-14,365; 82 Fed. Reg. 42,233 (Sept. 7, 2017) (Maine); 80 Fed. Reg.

61,752 (Oct. 14, 2015) (Delaware); *see also* 77 Fed. Reg. 62,624, 62,899

(Oct. 15, 2012) (describing criteria benefits of analogous federal standards).

### 3. EPA Also Correctly Found that California Needs These Standards to Address Its Climate Change Conditions

EPA properly found that California additionally needs these standards

to address its compelling and extraordinary climate conditions. California is

on the front line of climate change: "[w]ith its extensive coastline, fire-

prone ecosystems, mountainous topography, and water-intensive agriculture,

California is already suffering exceptional and singular impacts from a

warmer climate." Climate Scientists Amicus Br. 5. Over the last decade,

California has suffered natural events more severe than any in its history: an extreme and persistent drought, increasingly large and devastating wildfires, the loss of snowpack on which the state's water systems depend, and the warmest temperatures on record.  JA321; *accord* JA810 (predicting effects).  California is projected to see a 77 percent increase in land destroyed by wildfires, placing millions of people at risk, and threatening air quality for millions more.  JA812; Climate Scientists Amicus Br. 8-10.  California's water supply is extraordinarily vulnerable to climate change, with sweeping impacts on aquatic ecosystems, hydropower, basic human needs, and the nation's largest agricultural economy.  JA815-819; Climate Scientists Amicus Br. 14-18.  California also faces an increase in severe floods, JA810, and acute economic disruption from rising seas and ocean acidification, JA815.  The State will see exacerbation of its smog conditions, already the worst in the Nation, JA811-812, and a corresponding decline in human health.  The severity of each individual impact, and their aggregate effects, constitute "extraordinary and compelling conditions" under any reasonable definition of that phrase.

California's zero-emission-vehicle and greenhouse gas standards result in significant reductions in greenhouse gas emissions.  *See* JA127; JA146, 152-153; JA280-286.  These reductions are critical to mitigating climate

44

impacts and to avoiding climate "tipping points."  The technologies the standards demand will also facilitate greater emission reductions in the future.  JA138, 140-141; JA130.

### B.    EPA Correctly Reversed the Withdrawal Decision's Reliance on NHTSA's Preemption Rule

The Restoration Decision's reversal of the Withdrawal Decision's other basis—EPA's reliance on NHTSA's (now-repealed) EPCA preemption rule—is equally justified.[16]  For 50 years, EPA has consistently limited the scope of its waiver reviews to Section 209(b)'s three statutory criteria—none of which involves EPCA preemption.  EPA Br. 91-94.  This Court has repeatedly upheld EPA's position.  *MEMA I*, 627 F.2d at 1111; *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 462-63 (D.C. Cir. 1998).  EPA correctly returned to this longstanding position here.  87 Fed. Reg. at 14,373-74; *see* EPA Br. 94-97.

"Agencies have only those powers given to them by Congress," *W. Virginia*, 142 S. Ct. at 2609, and have "no special authority to pronounce on pre-emption absent delegation by Congress," *Wyeth v. Levine*, 555 U.S. 555, 577 (2009).  Congress did not give EPA the authority to base its Clean Air

---

[16] On its own, this reversal required restoration of the waiver for model years 2017-2020.  *See* 84 Fed. Reg. at 51,328.

Act waiver decisions on an interpretation of another statute's preemption regime, and EPA did not "contravene the law" by declining to do so.  Ohio Br. 39.

## V.    PETITIONERS' EPCA PREEMPTION CLAIMS ARE MISPLACED

In reviewing EPA's action, this Court should also decline to take up Petitioners' meritless EPCA preemption claim.

### A.    This Court Should Not Address EPCA Preemption

Because EPA did not pass upon the merits of Petitioners' EPCA preemption arguments in its Restoration Decision, 87 Fed. Reg. at 14,335, 14,368, this Court should not do so either.  "[J]udicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quotation omitted); *see also Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 646 (1990) (Courts should not disturb agency action based on "public policies that derive from federal statutes other than the agency's enabling Act.").  The "modest scope" of this Court's review of EPA waiver decisions concerns only "whether a federal officer properly discharged his responsibilities under a federal statute," *MEMA I*, 627 F.2d at 1105, i.e., whether EPA's decision complied with the Clean Air Act.

46

Petitioners remain free to press their EPCA preemption claims against California's standards in an appropriate state or federal district court. EPA Br. 97; *see also Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 302 (D. Vt. 2007) (rejecting EPCA preemption claims after sixteen-day trial); *Cent. Valley Chrysler-Jeep, Inc. v. Goldstene*, 529 F. Supp. 2d 1151, 1189 (E.D. Cal. 2007) (same, after resolving evidentiary disputes). But this Court, in evaluating a "petition for review of final action of the Administrator" under the Clean Air Act, 42 U.S.C. § 7607(b), cannot declare the laws of 18 States preempted under a different statute.

## B.   EPCA Does Not Preempt California's Standards

If the Court nonetheless addresses Petitioners' improperly presented EPCA preemption claims, it should reject them. EPCA's preemption provision, 49 U.S.C. § 32919(a), does not preempt any emission standards for which California has a waiver, far less these emission standards, which Congress has repeatedly embraced.

1. When Congress enacted EPCA in 1975, it did not impliedly repeal or otherwise disturb the Clean Air Act's 1967 waiver provision. Instead, Congress designed EPCA's fuel-economy program to accommodate all emission standards authorized by the Clean Air Act—including California

47

standards for which EPA waives preemption—an accommodation that would make no sense if those standards were preempted as "related to fuel economy standards," 49 U.S.C. § 32919(a). *Green Mountain*, 508 F. Supp. 2d at 345-46.

For the first three years, Congress itself set fuel-economy standards for passenger cars, 15 U.S.C. § 2002(a)(1) (1976), at levels reflecting the anticipated fuel-economy effects of emission standards and other motor vehicle laws, H.R. Rep. No. 94-340, at 86-90 (1975). Congress also directed NHTSA to grant variances to manufacturers for whom these other "Federal standards"—which expressly included all emission standards for which California had a Clean Air Act waiver—impeded compliance with EPCA's fuel-economy standards. 15 U.S.C. § 2002(d)(3)(C)(i), (D)(i) (1976). For later years, Congress directed NHTSA to set the fuel-economy standards and to account for the effects of "federal motor vehicle standards" on fuel economy when doing so. 15 U.S.C. § 2002(a)(3), (a)(4), (e) (1976).[17]

Petitioners suggest this change in process—from after-the-fact variances accommodating "federal standards" to front-end standard-setting

---

[17] A 1994 non-substantive recodification replaced "Federal motor vehicle standards" with the current phrase "motor vehicle standards of the Government." *Green Mountain*, 508 F. Supp. 2d at 306-07.

48

accommodating "federal motor vehicle standards"—reflects a hidden desire to stop accommodating California emission standards, and instead subject them to preemption, Ohio Br. 40.  That is nonsensical, Carper-Pallone Amicus Br. 9-11, and belied by the absence of "any positive indication that Congress" intended to preempt the very laws it "previously sought to foster" under the Clean Air Act and initially accommodated in EPCA.  *Cal. Div. of Labor Stds. Enforc. v. Dillingham Constr., N. A.,* 519 U.S. 316, 331 n.7 (1997).  Accordingly, NHTSA for decades consistently read EPCA as continuing to accommodate all Clean Air Act emissions standards, including California's.  *Green Mountain*, 508 F. Supp. 2d at 347 n.54 (compiling rules).

2.  Even if they were not categorically accommodated, California's greenhouse gas and zero-emission-vehicle standards would still not be "related to fuel economy standards." *See* 49 U.S.C. § 32919(a).  California's standards target emissions.  They are not fuel-economy standards on their face or in disguise.  And they do not rely on, conflict with, or require any particular strategy for compliance with, fuel-economy standards.

Petitioners assert, incorrectly, that California's standards require improvements to the fuel economy of gas-powered vehicles.  Ohio Br. 36.  But manufacturers have significantly reduced emissions by other means,

49

including improvements to air-conditioning systems. *Green Mountain*, 508 F. Supp. 2d at 381. Moreover, Petitioners ignore that manufacturers are selling increasing numbers of electric and hydrogen vehicles to comply with California's standards, JA306-307, and these vehicles do not even use "fuel," let alone have "fuel economy," under EPCA. 49 U.S.C. § 32901(a)(10), (a)(11).

These "alternative fueled vehicle[s]" do have calculated "fuel economy values," enabling manufacturers to count them toward compliance with federal fuel-economy standards. *Id.* §§ 32901(a)(2), 32904(a)(2)(B), 32905(a). But, in part because the standards at issue here all apply on a *fleetwide* basis, California's standards do not "bind" manufacturers "to any particular choice" of strategy to comply with federal fuel-economy standards. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 141 S. Ct. 474, 480 (2020) (cleaned up). The fact that a manufacturer's decisions about how to comply with California's standards might also facilitate its compliance with federal fuel-economy standards does not establish that the *standards* are "related to" each other.[18] *See id.; see also Engine Mfrs. Ass'n. v. South*

---

[18] Underscoring the point, when NHTSA sets standards, it must determine what "maximum feasible" improvements in fuel economy to require without regard to electric or hydrogen vehicles. 49 U.S.C. § 32902(h)(1).

*Coast Air Qual. Mgmt. Dist.*, 541 U.S. 246, 253-54 (2004) (distinguishing standards from means of ensuring compliance).  "'[R]elated to' does not mean the sky is the limit." *Dan's City Used Cars v. Pelkey*, 569 U.S. 251, 260 (2013).  Indeed, far from expressing intent to preempt California's standards, Congress praised those standards when it decided to allow zero-emission vehicles to count toward compliance with the fuel-economy standards, H.R. Rep. 102-474, pt. 1, at 137; pt. 2, at 87, 90-91 (1992).  *See Dillingham*, 519 U.S. at 331, n.7.

3.  Finally, Petitioners' preemption claims cannot plausibly be reconciled with Congress's repeated embrace of state greenhouse gas and zero-emission-vehicle standards.  EPA Br. 74-76.  It would be pointless—even nonsensical—for Congress to have directed EPA to rely on these California standards and to support their adoption and implementation—if these standards were preempted.  Indeed, Congress was well aware of the argument that EPCA preempts these standards and embraced California's standards nonetheless.  Carper-Pallone Amicus Br. 18-22; Dotson & Maghamfar, *The Clean Air Act Amendments of 2022*, 53 ENV. L. REPT'R 10017, 10030-32 (2023).

## CONCLUSION

These petitions for review should be dismissed for lack of standing.  If the Court reaches the merits, the petitions should be denied.

Dated:  March 20, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
ROBERT W. BYRNE
EDWARD H. OCHOA
Senior Assistant Attorneys General
MYUNG J. PARK
GARY E. TAVETIAN
Supervising Deputy Attorneys General

*/s/ M. Elaine Meckenstock*
M. ELAINE MECKENSTOCK
Deputy Attorney General
*Attorneys for Respondent-Intervenor State of California, by and through its Governor Gavin Newsom, Attorney General Rob Bonta, and the California Air Resources Board*

52

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General

*/s/ Scott Steinbrecher*
SCOTT STEINBRECHER
Acting Deputy Attorney General
DAVID A. BECKSTROM
Assistant Attorney General
Natural Resources and Environment
Section
Ralph C. Carr Colorado Judicial
Center
1300 Broadway, Seventh Floor
Denver, Colorado 80203
Telephone: (720) 508-6287
scott.steinbrecher@coag.gov

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General
MATTHEW I. LEVINE
Deputy Associate Attorney General

*/s/ Scott N. Koschwitz*
SCOTT N. KOSCHWITZ
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5250
Fax: (860) 808-5386
Scott.Koschwitz@ct.gov

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General

*/s/ Christian Douglas Wright*
CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation
RALPH K. DURSTEIN III
JAMESON A.L. TWEEDIE
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
Telephone: (302) 683-8899
Christian.Wright@delaware.gov
Ralph.Durstein@delaware.gov
Jameson.Tweedie@delaware.gov

FOR THE STATE OF HAWAII

ANNE E. LOPEZ
Attorney General

*/s/ Lyle T. Leonard*
LYLE T. LEONARD
Deputy Attorney General
465 S. King Street, #200
Honolulu, Hawaii 96813
Telephone: (808) 587-3050
Lyle.T.Leonard@hawaii.gov

53

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General
MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division

*/s/ Elizabeth Dubats*
ELIZABETH DUBATS
JASON E. JAMES
Assistant Attorneys General
Office of the Attorney General
69 W. Washington St., 18th Floor
Chicago, IL 60602
Telephone: (312) 814-3000
Elizabeth.Dubats@ilag.gov

FOR THE STATE OF MAINE

AARON M. FREY
Attorney General

*/s/ Emma Akrawi*
EMMA AKRAWI
Assistant Attorney General
6 State House Station
Augusta, ME 04333
Telephone: (207) 626-8800
Emma.Akrawi@maine.gov

54

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General

*/s/ Cynthia M. Weisz*
CYNTHIA M. WEISZ
Assistant Attorney General
Office of the Attorney General
Maryland Department of the
Environment
1800 Washington Blvd.
Baltimore, MD 21230
Telephone: (410) 537-3014
Cynthia.Weisz2@maryland.gov

JOSHUA M. SEGAL
Special Assistant Attorney General
Office of the Attorney General
200 St. Paul Place
Baltimore, MD  21202
Telephone: (410) 576-6446
JSegal@oag.state.md.us

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General

*/s/ Peter Surdo*
PETER N. SURDO
Special Assistant Attorney General
445 Minnesota Street, Suite 1400
St. Paul, Minnesota 55101-2127
Telephone: (651) 757-1061
Peter.Surdo@ag.state.mn.us

55

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN
Solicitor General
DANIEL P. NUBEL
Senior Deputy Attorney General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

FOR THE STATE OF NEW
JERSEY

MATTHEW J. PLATKIN
Acting Attorney General

*/s/ Lisa J. Morelli*
LISA J. MORELLI
RACHEL MANNING
NELL HRYSHKO
Deputy Attorneys General
New Jersey Division of Law
25 Market Street
Trenton, New Jersey 08625
Tel: (609) 376-2745
Lisa.Morelli@law.njoag.gov

FOR THE STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General

*/s/ Bill Grantham*
BILL GRANTHAM
Assistant Attorney General
Attorney General of New Mexico
408 Galisteo St.
Villagra Bldg.
Sante Fe, NM 87501
Tel: (505) 717-3520
wgrantham@nmag.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General
JUDITH N. VALE
Deputy Solicitor General
ELIZABETH A. BRODY
Assistant Solicitor General
YUEH-RU CHU
Chief, Affirmative Litigation Section
Environmental Protection Bureau

*/s/ Gavin G. McCabe*
GAVIN G. MCCABE
ASHLEY M. GREGOR
Assistant Attorneys General
28 Liberty Street, 19th Floor
New York, NY 10005
Telephone: (212) 416-8469
Gavin.McCabe@ag.ny.gov

56

FOR THE STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General
DANIEL S. HIRSCHMAN
Senior Deputy Attorney General

*/s/ Asher P. Spiller*
ASHER P. SPILLER
Special Deputy Attorney General
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
Telephone: (919) 716-6400
ASpiller@ncdoj.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General

*/s/ Paul Garrahan*
PAUL GARRAHAN
Attorney-in-Charge
STEVE NOVICK
Special Assistant Attorney General
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.state.or.us
Steve.Novick@doj.state.or.us

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General

*/s/ Nicholas M. Vaz*
NICHOLAS M. VAZ
Special Assistant Attorney General
Office of the Attorney General
Environmental and Energy Unit
150 South Main Street
Providence, Rhode Island 02903
Telephone: (401) 274-4400 ext. 2297
NVaz@riag.ri.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General

*/s/ Nicholas F. Persampieri*
NICHOLAS F. PERSAMPIERI
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
Telephone: (802) 828-3171
Nick.Persampieri@vermont.gov

57

FOR THE STATE OF
WASHINGTON

ROBERT W. FERGUSON
Attorney General

*/s/ Christopher H. Reitz*
CHRISTOPHER H. REITZ
Assistant Attorney General
Office of the Attorney General
P.O. Box 40117
Olympia, WA 98504
Telephone: (360) 586-4614
Chris.Reitz@atg.wa.gov

FOR THE COMMONWEALTH
OF MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General
SETH SCHOFIELD
Senior Appellate Counsel

*/s/ Matthew Ireland*
MATTHEW IRELAND
Assistant Attorney General
Office of the Attorney General
Energy and Environment Bureau
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (617) 727-2200
Matthew.Ireland@mass.gov

FOR THE COMMONWEALTH OF
PENNSYLVANIA

MICHELLE HENRY
Acting Attorney General
JILL GRAZIANO
Chief Deputy Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Senior Deputy Attorney General
Office of Attorney General
Strawberry Square
14th Floor
Harrisburg, PA 17120
Telephone: (717) 497-3678
AJohnston@attorneygeneral.gov

FOR THE DISTRICT OF
COLUMBIA

BRIAN L. SCHWALB
Attorney General

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the
District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
Telephone: (202) 724-6609
Fax: (202) 741-0649
Caroline.VanZile@dc.gov

FOR THE CITY OF LOS
ANGELES

HYDEE FELDSTEIN SOTO
City Attorney

*/s/ Michael J. Bostrom*
MICHAEL J. BOSTROM
Senior Assistant City Attorney
200 N. Main Street, 6th Floor
Los Angeles, CA 90012
Telephone: (213) 978-1867
Fax: (213) 978-2286
Michael.Bostrom@lacity.org

FOR THE CITY OF NEW YORK

HON. SYLVIA O. HINDS-RADIX
New York City Corporation Counsel
ALICE R. BAKER
Senior Counsel

*/s/ Christopher G. King*
CHRISTOPHER G. KING
Senior Counsel
New York City Law Department
100 Church Street
New York, NY 10007
Telephone: (212) 356-2074
cking@law.nyc.gov

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of the applicable rules and this Court's briefing format order dated September 22, 2022 (ECF No. 1965631).  According to Microsoft Word, the portions of this document not excluded by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1) contain 10,244 words.  Combined with the word count of the other Respondent-Intervenors briefs, this does not exceed the 14,700 words the Court allocated to all Respondent-Intervenors.

I further certify that this brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using a proportionally spaced typeface (Times New Roman) in 14-point font.

Dated:      March 20, 2023

/s/ M. Elaine Meckenstock
M. ELAINE MECKENSTOCK
*Attorney for Respondent-Intervenor*
*State of California, by and through its*
*Governor Gavin Newsom, Attorney*
*General Rob Bonta, and the California*
*Air Resources Board*

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2023 I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system.

I further certify that all parties are participating in the Court's CM/ECF system and will be served electronically by that system.

Dated:     March 20, 2023

> /s/ M. Elaine Meckenstock
> M. ELAINE MECKENSTOCK
> *Attorney for Respondent-Intervenor*
> *State of California, by and through its*
> *Governor Gavin Newsom, Attorney*
> *General Rob Bonta, and the California*
> *Air Resources Board*