# In the United States Court of Appeals for the District of Columbia Circuit

---

STATE OF OHIO, ET AL.,
*Petitioners,*

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S. REGAN, IN
HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE U.S.
ENVIRONMENTAL PROTECTION AGENCY,
*Respondents,*

ADVANCED ENERGY ECONOMY, ET AL.,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0257)

---

**FINAL REPLY BRIEF FOR PRIVATE PETITIONERS**

---

ERIC D. MCARTHUR
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel &
Petrochemical
Manufacturers, Domestic
Energy Producers Alliance,
Energy Marketers of
America, and National
Association of Convenience
Stores*

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable
Fuels Company, LLC*

(Additional counsel listed on
the following page)

C. Boyden Gray
Jonathan Berry
Michael B. Buschbacher
Boyden Gray & Associates,
PLLC
801 17th Street NW, Suite 350
Washington, DC  20006
(317) 513-0622
buschbacher@boydengray
associates.com

*Counsel for Clean Fuels
Development Coalition, ICM, Inc.,
Illinois Corn Growers Association,
Kansas Corn Growers Association,
Michigan Corn Growers
Association, Missouri Corn
Growers Association, and Valero
Renewable Fuels Company, LLC*

Matthew W. Morrison
Pillsbury Winthrop Shaw
Pittman LLP
1200 17th Street NW
Washington, DC  20036
(202) 663-8036
matthew.morrison@pillsburylaw.com

*Counsel for Iowa Soybean
Association, Minnesota Soybean
Growers Association, South Dakota
Soybean Association, and Diamond
Alternative Energy, LLC*

Brittany M. Pemberton
Bracewell LLP
2001 M Street NW, Suite 900
Washington, DC  20036
(202) 828-5800
brittany.pemberton@bracewell.com

*Counsel for Valero Renewable Fuels
Company, LLC and Diamond
Alternative Energy, LLC*

**TABLE OF CONTENTS**

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ................................1

ARGUMENT .................................................................................................3

I.    Petitioners Are Proper Parties To Bring This Challenge.......................3

      A.    Petitioners Have Article III Standing.............................................3

      B.    Petitioners Are Within The Zone Of Interests................................6

II.   EPA Exceeded Its Statutory Authority In Reinstating
      California's Waiver ...............................................................................10

      A.    Several Clear-Statement Rules Apply ...........................................11

      B.    Section 209 Does Not Permit EPA's "Whole-Program"
            Approach ........................................................................................14

      C.    California Does Not "Need" Its Greenhouse-Gas And
            Zero-Emission-Vehicle Standards To "Meet" "Compelling
            And Extraordinary Conditions".....................................................19

            1.    Global climate change is not a "compelling and
                  extraordinary condition" within California.........................20

            2.    California does not "need" its standards to "meet"
                  climate-change conditions in the State...............................25

            3.    Criteria-pollution benefits cannot justify the waiver .........27

III.  EPA Properly Exercised Its Authority To Reconsider Its Waiver......30

CONCLUSION...........................................................................................35

# TABLE OF AUTHORITIES

Page

**Cases**

*Alabama Ass'n of Realtors* v. *HHS*,
141 S. Ct. 2485 (2021) .................................................................11

*American Fuel & Petrochemical Mfrs.* v. *EPA*,
937 F.3d 559 (D.C. Cir. 2019)......................................................33

*American Trucking Ass'ns* v. *EPA*,
600 F.3d 624 (D.C. Cir. 2010)..................................................18, 19

*Americans for Clean Energy* v. *EPA*,
864 F.3d 691 (D.C. Cir. 2017).......................................................9

*Amgen, Inc.* v. *Smith*,
357 F.3d 103 (D.C. Cir. 2004)....................................................7, 9

*Associated Builders & Contractors Fla. E. Coast Chapter* v.
*Miami-Dade Cnty.*,
594 F.3d 1321 (11th Cir. 2010).....................................................28

*Bell Atl. Tel. Cos.* v. *FCC*,
79 F.3d 1195 (D.C. Cir. 1996)......................................................33

*Bolln* v. *Nebraska*,
176 U.S. 83 (1990)......................................................................14

*Bowen* v. *Georgetown University Hospital*,
488 U.S. 204 (1988)....................................................................35

*CEI* v. *FCC*,
970 F.3d 372 (D.C. Cir. 2020).........................................................4

*Chamber of Com.* v. *EPA*,
642 F.3d 192 (D.C. Cir. 2011)......................................................14

*Delta Constr. Co.* v. *EPA*,
783 F.3d 1291 (D.C. Cir. 2015).......................................................9

*DHS* v. *Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) ..........................................................32

*Energy Future Coal.* v. *EPA*,
793 F.3d 141 (D.C. Cir. 2015)............................................4, 8

*Ethyl Corp.* v. *EPA*,
306 F.3d 1144 (D.C. Cir. 2002)................................................8

*FCC* v. *Fox Television Stations, Inc.*,
556 U.S. 502 (2009)..................................................................23

*Ford Motor Co.* v. *EPA*,
606 F.2d 1293 (D.C. Cir. 1979)..............................................22

*Frito-Lay, Inc.* v. *U.S. Dep't of Lab.*,
20 F. Supp. 3d 548 (N.D. Tex. 2014) .....................................34

*Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)....................................................................28

*Gregory* v. *Ashcroft*,
501 U.S. 452 (1991)..................................................................13

*Grocery Mfrs. Ass'n* v. *EPA*,
693 F.3d 169 (D.C. Cir. 2012)................................................10

*Khodara Envtl., Inc.* v. *Blakely*,
376 F.3d 187 (3d Cir. 2004) ......................................................6

*Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*,
572 U.S. 118 (2014)....................................................................7

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v.
*Patchak*,
567 U.S. 209 (2012)....................................................................6

*Mathews* v. *Eldridge*,
424 U.S. 319 (1976)..................................................................34

*Motor Equip. Mfrs. Ass'n, Inc.* v. *EPA*,
627 F.2d 1095 (D.C. Cir. 1979)..................................7, 15, 17

*National Petrochemical & Refiners Ass'n* v. *EPA*,
287 F.3d 1130 (D.C. Cir. 2002)............................................8

*Public Emps. Ret. Sys. of Ohio* v. *Betts*,
492 U.S. 158 (1989).....................................................24

*Russello* v. *United States*,
464 U.S. 16 (1983).......................................................16

*Solid Waste Agency of N. Cook Cty.* v. *U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001).....................................................14

*Tennessee Valley Auth.* v. *Hill*, 437 U.S. 153 (1978). ...............24

*Texas* v. *EPA*,
No. 22-1031 (D.C. Cir. Feb. 28, 2022) .................................6

*Tokyo Kikai Seisakusho, Ltd.* v. *United States*,
529 F.3d 1352 (Fed. Cir. 2008) ........................................34

*Twin Rivers Paper Co. LLC* v. *SEC*,
934 F.3d 607 (D.C. Cir. 2019)..........................................10

*U.S. Forest Serv.* v. *Cowpasture River Pres. Ass'n*,
140 S. Ct. 1837 (2020) ............................................11, 35

*United States* v. *Bass*,
404 U.S. 336 (1971)....................................................13

**Statutes**

42 U.S.C. § 7507 .......................................................22

42 U.S.C. § 7543(b)................................3, 10, 15, 16, 19, 35

42 U.S.C. § 7545(c)(4)(B) .............................................24

45 U.S.C. § 7521(a)(2) ................................................16

**Other Authorities**

74 Fed. Reg. 32,744 (July 8, 2009).....................................2

78 Fed. Reg. 2,112 (Jan. 9, 2013) .......................................................2, 33

Allan Erbsen, *Horizontal Federalism*,
    93 Minn. L. Rev. 493 (2008) ............................................................13

Ryan Felton, *The EV Question for Auto Executives:*
    *How Fast To Make the Shift?* Wall St. J. (Feb. 22, 2023) ............................5

## INTRODUCTION AND SUMMARY OF ARGUMENT

In EPA's telling, this case is just business as usual. According to the agency, it has administered California's Clean Air Act preemption waiver consistently "for 55 years." EPA Br. 1. And when EPA recently initiated a multifront push toward the forced electrification of the Nation's vehicle fleet, including by permitting the State of California to attempt to tackle global climate change, it was merely applying a "longstanding" statutory interpretation. *Id.* at 84. Under that interpretation, so long as California's smog-related problems persist, it—alone among the States—has a free pass to enact virtually any otherwise-preempted emission standards it wishes.

EPA's narrative is fiction. For decades, California used its unique ability to obtain a Clean Air Act waiver to pass tailored standards aimed at addressing local air-quality problems. In EPA's own words, California's 2005 preemption-waiver application was fundamentally "different" because it represented the "first" waiver request created to tackle the "global air pollution problem." J.A. 883. As automobile manufacturers then explained, California's initial greenhouse-gas standards were "the most costly and technologically challenging in the history of the federal [Clean Air Act]."

EPA-HQ-OAR-2006-0183-3643, Comment of National Automobile Dealer Ass'n (Oct. 12, 2007).

In the nearly two decades since, EPA has never embraced a consistent understanding of whether California has the sweeping authority under Section 209 to shift the future of the American vehicle and fuel industries as a means of addressing global climate change. It denied California's 2005 application, J.A. 880; then reconsidered and granted the request, 74 Fed. Reg. 32,744 (July 8, 2009) (J.A. 870-893); granted a similar waiver request, 78 Fed. Reg. 2,112 (Jan. 9, 2013); then reconsidered and withdrew the waiver, 84 Fed. Reg. 51,310 (Sept. 27, 2019) (J.A. 489-543); and, most recently, reconsidered its reconsideration and reinstated the same waiver, 87 Fed. Reg. 14,332 (Mar. 14, 2022) (J.A. 1-50). EPA cannot now seek cover for its dubious statutory interpretations by invoking some supposedly longstanding agency practice.

Instead, this Court should look to the Clean Air Act's text. EPA's current interpretation contravenes that text in two ways. First, EPA cannot nullify Section 209's waiver criteria by applying an atextual "whole-program" approach, under which the agency must find only that California needs an emissions program generally, regardless of the specific standards sought in a waiver request. Second, California does not "need" standards aimed at

combatting global climate change to "meet compelling and extraordinary conditions" in the State. 42 U.S.C. § 7543(b)(1)(B). Although EPA briefly argues that it can avoid both textual questions because it failed to adequately assess reliance interests when it withdrew the waiver, its 2019 analysis of reliance was more than adequate.

## ARGUMENT

**I.   Petitioners Are Proper Parties To Bring This Challenge**.

### A.   Petitioners Have Article III Standing.

The State respondents (but not EPA) contend that petitioners lack Article III standing to challenge the waiver reinstatement. In their view, EPA's reinstatement will not influence automobile manufacturers' production and sale decisions and will therefore have no impact on the demand for the fuel that petitioners distribute and produce. This Court should reject the implausible premise that this intensely litigated waiver reinstatement has never had and will never have a single dollar's worth of real-world impact.

1.   The State respondents first suggest that market forces and inertia, rather than California's regulations, are dictating the mix of vehicles that will be sold in California and the 17 States that have adopted its standards. State Resp. Br. 13-15. Although California's regulations might not be the *only* factor in automakers' decision-making, it defies common sense to say that they

are not *a* factor. As this Court has explained, when EPA "prohibits or impedes" the use of fuel, "there is ordinarily little question" that fuel companies have standing to sue, given that a "direct regulatory impediment" stands in the way of their product's use. *Energy Future Coal.* v. *EPA*, 793 F.3d 141, 144 (D.C. Cir. 2015) (quotation marks omitted); *see CEI* v. *FCC*, 970 F.3d 372, 384 (D.C. Cir. 2020) (finding standing based on "reasonably predictable" "third-party conduct").

The State respondents' own representations contradict their current standing argument. They told EPA that reinstating California's greenhouse-gas standards would reduce greenhouse-gas emissions from California vehicles by reducing fuel consumption. J.A. 238. They also told EPA that the zero-emission-vehicle standards are "critical for incentivizing production and deployment of zero-emission vehicles," which do not use liquid fuel at all. J.A. 237. And even now, the State respondents and EPA both argue that California's standards are "necessary" because they will "meaningful[ly]" influence vehicle emissions. EPA Br. 74, 87; State Resp. Br. 45. For any of that to be true, the waiver reinstatement would have to affect manufacturers' behavior.

The State respondents also have their history wrong. Although California's standards were in place from 2013 through 2019, not all manufacturers irrevocably committed to them. *See* J.A. 477 (explaining that the reinstatement posed "significant lead time challenges" for future model years because Toyota had designed vehicles reflecting the standards' withdrawal). Some manufacturers have announced plans to sell "more zero-emission vehicles than required by California's standards," State Resp. Br. 14, but notably they have intervened in defense of EPA precisely because they believe that their competitors will not follow suit. Vacating the reinstatement, they say, would put them at a "competitive disadvantage" because they have already invested in "electrified vehicle models." Industry Br. 17. The State respondents are simply wrong that automakers are moving in lockstep toward electrification and that the outcome of this litigation cannot possibly make any difference. Ryan Felton, *The EV Question for Auto Executives: How Fast To Make the Shift?* Wall. St. J. (Feb. 22, 2023), http://www.wsj.com/articles/the-ev-question-for-auto-executives-how-fast-to-make-the-shift-37254a44 ("Some companies are racing to convert entirely to electric vehicles, but others see caution flags.").

2. EPA's promulgation of new "nationwide greenhouse gas standards" does not undermine petitioners' standing. State Resp. Br. 14. As the State respondents concede, the federal standards are different from California's. *See id.* at 14 & n.4. Regardless, petitioners have separately challenged those standards. *See Texas* v. *EPA*, No. 22-1031 (D.C. Cir. Feb. 28, 2022). When a party "faces two, independent regulatory obstacles that can only be attacked in separate proceedings," the relevant injury is the one caused by the regulation in the case at hand, "and both the causation and redressability prongs are clearly satisfied." *Khodara Envtl., Inc.* v. *Blakely*, 376 F.3d 187, 194 (3d Cir. 2004) (Alito, J.).

**B. Petitioners Are Within The Zone Of Interests**.

EPA (but not the State respondents) argues that petitioners do not fall within the "zone of interests" protected by Section 209. EPA Br. 29. That is incorrect.

1. The zone-of-interests analysis, particularly in the APA context, is "not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians* v. *Patchak*, 567 U.S. 209, 225 (2012) (citation omitted). There is no requirement of "congressional purpose to benefit the would-be plaintiff," and the "benefit of any doubt goes to the plaintiff." *Id.* In fact, the

"test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (citation omitted).

Petitioners easily satisfy that generous standard. Section 209 seeks to balance California's need for a unique emissions program with Congress's desire to prevent "an anarchic patchwork of federal and state regulatory programs" governing vehicle manufacturers. *Motor Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (*MEMA*). When California wants to deviate from uniform federal standards to aggressively reduce liquid fuel consumption, petitioners' economic interests mean that they "can be expected to police" the countervailing "interes[t]" in national uniformity "that the statute protects." *Amgen, Inc.* v. *Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (citation omitted).

At a minimum, petitioners fall within the zone of interests of Section 209 taken together with other related provisions of the Clean Air Act. The zone-of-interests test does "not look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions

to which it bears an integral relationship." *National Petrochemical & Refiners Ass'n* v. *EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (quotation marks omitted). And this Court has held that the provisions of Title II concerning emission standards (such as Section 209) and those governing fuel regulations are "interdependen[t]." *Ethyl Corp.* v. *EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002).

Given that interdependence, this Court has held that both renewable and traditional fuel producers, who are directly regulated by other provisions of the Clean Air Act, are proper parties to challenge EPA's application of Title II's provisions concerning emission standards. *See Energy Future Coal.* v. *EPA*, 793 F.3d 141, 145 (D.C. Cir. 2015) (biofuel manufacturers could challenge an EPA rule regulating emissions testing in new vehicles); *Ethyl Corp.*, 306 F.3d at 1144 (manufacturer of traditional fuel additives could do the same). There is no reason for a different result here. As in those cases, petitioners' interests are "congruent" with the Act, *Ethyl Corp.*, 306 F.3d at 1144, which "seeks to further clean air while at the same time *still allowing some productive economic activity*, even though that economic activity may result in some emissions of pollutants," *Energy Future Coal.*, 793 F.3d at 145 (emphasis added).

2. EPA's counterarguments lack merit. According to EPA, petitioners are outside the zone of interests because their "pecuniary" interests are "in tension" with the Act's goal of reducing emissions. EPA Br. 30-31. Notably, for many petitioners, California's attempt to mandate electrification is in tension with their ability to operate under the Renewable Fuel Standards program under Title II of the Act, which Congress designed to advance the adoption of "clean renewable fuels" that promote energy security and reduce emissions. *See Americans for Clean Energy* v. *EPA*, 864 F.3d 691, 696-697 (D.C. Cir. 2017). In any event, "parties motivated by purely commercial interests routinely satisfy the zone of interests test." *Amgen*, 357 F.3d at 109. And EPA's contrary view would amount to a one-way ratchet, under which environmental groups could challenge EPA regulatory actions as too lax, but business groups could never challenge actions as too demanding. Petitioners have an interest in the balance Congress struck in Section 209, no less than those who seek more "stringent emission regulation." EPA Br. 31.

EPA mistakenly relies on *Delta Constr. Co.* v. *EPA*, 783 F.3d 1291 (D.C. Cir. 2015), in which this Court found that a manufacturer's interest in "increasing the regulatory burden on *others*" fell outside the Clean Air Act's

zone of interests. *Id.* at 1300 (emphasis added). Here, petitioners are not attempting to increase any competitor's burden but rather are challenging regulations that curtail their own ability to sell their products, including renewable fuels. The other cases on which EPA relies (at 30 n.6) are even further afield. *See Grocery Mfrs. Ass'n* v. *EPA*, 693 F.3d 169, 179 (D.C. Cir. 2012) (food distributors did not fall within Title II's zone of interests because a different statute protected their alleged interests); *Twin Rivers Paper Co. LLC* v. *SEC*, 934 F.3d 607, 618 (D.C. Cir. 2019) (paper manufacturers did not fall within the securities laws' zone of interests given "systemic misalignment with shareholders' preferences").

## II. EPA Exceeded Its Statutory Authority In Reinstating California's Waiver.

EPA lacks authority under Section 209(b) to grant California a preemption waiver for emission standards devised to address global climate change because California does not "need" such separate standards "to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b)(1)(B). EPA's contrary reading is wrong, or at a minimum is not clearly correct, as it must be to justify the unprecedented delegation of authority claimed here.

**A.     Several Clear-Statement Rules Apply**.

The major-questions doctrine, federalism canon, and constitutional-avoidance canon all require EPA to identify "exceedingly clear language" delegating the power to regulate global climate change. *U.S. Forest Serv.* v. *Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849-1850 (2020). EPA's attempts to escape those clear-statement rules fall short.

1.     EPA's application of Section 209 implicates the major-questions doctrine because it concerns issues of "vast economic and political significance." *Alabama Ass'n of Realtors* v. *HHS*, 141 S. Ct. 2485, 2489 (2021); *see* Pet. Br. 22-26. EPA contends that the major-questions doctrine does not apply because Section 209 does not concern the "relationship between federal legislative and federal administrative power," and because California's waiver application for greenhouse-gas and zero-emission-vehicle standards "does not represent an expansion of California's influence over the vehicle industry." EPA Br. 77, 79. EPA is wrong on both points.

First, this case does implicate a legislative delegation of authority to a federal agency. The question is the scope of authority Congress delegated to EPA in Section 209. On EPA's view, Section 209 transformed the *agency* into the arbiter of preemption on global environmental issues, and gave the *agency*

the authority to determine when and how California can impose emission standards to tackle climate change. And Congress did so with respect to a subject—vehicle electrification—that has long been hotly debated in Congress itself.

Second, using the waiver program to combat global climate change represents a dramatic "expansion" of California's emissions program. EPA Br. 79. As EPA previously made clear, for the first 40 years after Section 209(b)'s enactment, "California's motor vehicle program ha[d] addressed air pollution problems that [were] generally local or regional in nature." J.A. 884. But the decision in question embodies a "qualitatively new objective of addressing global climate change." *Id.* at 12,158. This new objective significantly expands the scope of the waiver program, from a local-conditions-focused exception to a single-State partnership with EPA on national and international issues.

2. The federalism canon also requires a clear statement in EPA's favor. *See* Pet. Br. 20-21. EPA claims that the federalism canon has no bearing here because it is "directed at ensuring appropriate limits on federal (not state) authority." EPA Br. 82. Although that is part of its function, the federalism canon speaks more generally to the proper "*balance*" of power

between the States and the federal government. *United States* v. *Bass*, 404 U.S. 336, 349 (1971) (emphasis added); cf. Allan Erbsen, *Horizontal Federalism*, 93 Minn. L. Rev. 493, 494 (2008) ("Both vertical and horizontal federalism are fundamental elements of U.S. government."). Granting California alone the authority to attempt to combat global climate change departs from that "usual … balance," *Gregory* v. *Ashcroft*, 501 U.S. 452, 460 (1991), because it neither preempts all States from acting nor allows all States to set their own policy. Federalism does not mean that one favored State—and only that State—may act as a laboratory.

EPA further contends that "the balance of federal and state power under Section 209 already includes California regulation of vehicle greenhouse gases," and petitioners have acquiesced to this "re-balancing" by failing to challenge "multiple waiver grants." EPA Br. 82-83. EPA glosses over nearly two decades of legal challenges and administrative reversals surrounding California's use of the waiver program to regulate greenhouse-gas emissions. EPA also omits that, until 2018, *all* of California's greenhouse-gas regulations included a "deemed to comply" provision permitting manufacturers to comply with federal standards instead of California's. According to this Court, that provision rendered any challenge to California's waiver—including the 2013

waiver—nonjusticiable because manufacturers would "have to comply with the national standards whether [the Court] vacate[d] the waiver decision or not." *Chamber of Com.* v. *EPA*, 642 F.3d 192, 206 (D.C. Cir. 2011). Petitioners cannot be faulted for failing to pursue legal challenges that this Court has held could not be brought.

3.     At a minimum, constitutional avoidance counsels against EPA's reading of Section 209(b), which deviates from the "fundamental principle of equality of the states under the Constitution." *Bolln* v. *Nebraska*, 176 U.S. 83, 89 (1900); *see* Pet. Br. 53-55. As the State petitioners' arguments make clear, State Pet. Reply Br. 10-15—and as EPA's 22 pages of counterarguments underscore—the constitutional question whether Congress can grant a single State the authority to regulate global climate change is at the very least a "serious" one. *Solid Waste Agency of N. Cook Cty.* v. *U.S. Army Corps of Eng'rs*, 531 U.S. 159, 160 (2001).

**B.     Section 209 Does Not Permit EPA's "Whole-Program" Approach**.

EPA devotes most of its merits discussion to arguing that the Section 209 waiver criteria are irrelevant. According to EPA, Section 209(b)(1)(B) is satisfied so long as "California needs its *program as a whole* to meet compelling and extraordinary conditions." EPA Br. 84 (emphasis added). In

EPA's view, California can tack on any emission standards it likes, "so long as" the State's criteria-pollutant problems "persist." EPA Br. 66. The text, history, and purpose of Section 209(b) foreclose that illogical result.

1.     Most critically, EPA misreads the plain text of Section 209(b). Section 209(b) first requires that California "determine[] that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable [federal] standards." 42 U.S.C. § 7543(b)(1). EPA then has a separate duty in Section 209(b)(1)(B) to determine whether California "need[s] such State standards to meet compelling and extraordinary conditions." *Id.* § 7543(b)(1)(B). According to EPA, it should determine need just as California determines protectiveness—in the aggregate, not standard by standard.

That is not the right way to read Section 209(b). As this Court has recognized, the phrase "State standards" typically refers to the *individual* standards for which California seeks a waiver. *See MEMA*, 627 F.2d at 1110 n.32. When Congress asks an agency to determine whether a State's standards meet a federal threshold, the normal meaning is that *each* standard must pass the test, not merely one among the bunch. Congress modified that directive for California's protectiveness determination, permitting California

15

to assess protectiveness "in the aggregate," 42 U.S.C. § 7543(b)(1), but it did not give that same instruction to EPA. Congress told EPA to determine whether California "need[s] such State standards to meet compelling and extraordinary conditions," without saying that need should be determined on an aggregate or programmatic basis. *Id.* § 7543(b)(1)(B). Congress's choice to include the "in the aggregate" language in one provision and not the other should be given meaning. *See Russello* v. *United States*, 464 U.S. 16, 23 (1983).

If there were any ambiguity, the very next subsection resolves it. EPA also must find that "such State standards" are consistent with federal emission standards. 42 U.S.C. § 7543(b)(1)(C). Subsection (b)(1)(C) thus uses the same exact phrase as subsection (b)(1)(B): "such State standards." EPA admits that it does *not* apply a whole-program approach to California's standards under that identical language, unless a "new waiver might affect previous assessments." EPA Br. 65-66 n.10. Whatever EPA means by that, a "whole-program" approach would be incoherent in subsection (b)(1)(C), which requires EPA to ensure that manufacturers have sufficient lead time to meet the standards given "requisite technology" and "cost of compliance." 45 U.S.C. § 7521(a)(2). It would make no sense for EPA to review those standards as "a whole" and find that because manufacturers have more than

enough time to comply with some standards, it does not matter if they cannot comply with others.  Pet. Br. 47.

Finally, EPA's reading would make the agency's "need" determination meaningless.  Congress already determined that California "need[s]" its own emissions *program* by creating the preemption exception in the first place.  On EPA's view, subsection (b)(1)(B) serves no purpose so long as California has any air-quality issues.  The *other* waiver criteria remain meaningful:  under subsection (b)(1)(A), the Administrator must determine that California's protectiveness determination is not arbitrary; and under subsection (b)(1)(C), he must review California's standards—individually—for consistency with federal emission standards.  But the second of the three criteria results in the same answer every time.

2.    The statutory history of Section 209(b) further undermines EPA's "whole-program" approach.  EPA acknowledges that the phrase "in the aggregate" was incorporated into Section 209 via a 1977 amendment to give California additional flexibility in making its own "*protectiveness* analysis." EPA Br. 67 (emphasis added); *see MEMA*, 627 F.2d at 1110 n.32.  That amendment was necessary because, without adding "in the aggregate," the reference to "State standards" by itself would have meant that each California

standard needed to be more protective than its federal counterpart. *Id.* In granting more flexibility to California, Congress did nothing to change the way that EPA should apply the federal waiver criteria.

3.   With no hook in the statutory text or history, EPA turns to legislative purpose.  It argues that the "whole-program" approach comports with Congress's general desire to "permit California to blaze its own trail with a minimum of federal oversight."  EPA Br. 61 (citation omitted).  But when Congress intended for EPA to defer to California, it said so expressly—as in subsection (b)(1)(A), where it permitted EPA to reject California's protectiveness determination only if it is "arbitrary and capricious."  Under subsection (b)(1)(B), by contrast, EPA is not reviewing any determination by California; it is making its *own* determination whether California "need[s]" its standards "to meet compelling and extraordinary conditions."  EPA may not abdicate its responsibility under the guise of deference to California.

4.   EPA finally contends that its "whole-program" approach accords with this Court's precedent.  EPA Br. 63.  There is no such precedent.  This Court has never passed on the soundness of the whole-program interpretation. EPA cites *American Trucking Ass'ns* v. *EPA*, 600 F.3d 624 (D.C. Cir. 2010), but it quotes its *own brief* in that case.  EPA Br. 63.  The Court itself did not

address the validity of EPA's whole-program approach, but instead found that EPA's approval of a waiver under a similar statutory provision was lawful because "California need[ed] the specific . . . rule at issue" "to meet compelling and extraordinary conditions." *American Trucking*, 600 F.3d at 627.

The absence of precedent on this question underscores the novel way in which EPA seeks to rely on its whole-program approach in this case. When EPA has (inconsistently) employed that approach, it has always conducted an alternative analysis to determine whether California needs the individual standards under consideration to meet "compelling and extraordinary conditions." Pet. Br. 49. EPA has identified no waiver request for which it concluded that the individual standards could not satisfy Section 209(b)(1)(B) but authorized a waiver anyway. The agency's supposedly "traditional" approach thus has never made a difference.

## C. California Does Not "Need" Its Greenhouse-Gas And Zero-Emission-Vehicle Standards To "Meet" "Compelling And Extraordinary Conditions."

To qualify for a waiver, Section 209 requires that California "need" its standards "to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b)(1)(B). California's standards do not satisfy either half of that test.

1. **Global climate change is not a "compelling and extraordinary condition" within California.**

The phrase "compelling and extraordinary conditions" refers to California's *distinct* and *localized* pollution conditions, not to conditions like climate change with global causes and effects. Pet. Br. 27-37.

a.    Even if California's climate-change conditions are sufficiently serious to be "compelling," those conditions are not "extraordinary" within the statute's meaning. Pet. Br. 28-30. EPA rightly concedes that to qualify for a waiver California must suffer from pollution conditions "*sufficiently different from the Nation as a whole.*" EPA Br. 70 (quoting H.R. Rep. No. 90-728, at 21; S. Rep. No. 90-403, at 33). After all, Section 209(b) is an exception from uniform federal regulation. It would make little sense to permit California to deviate from a national regulatory framework to address conditions that, even if severe, are broadly shared throughout the Nation.

For their part, the State respondents disagree that the term "extraordinary" requires that California's conditions be unusual "*as compared to other states.*" State Resp. Br. 39. But they offer no coherent alternative interpretation. The term cannot, as they argue, refer to conditions that are "severe," "extreme," or "devastating." *Id.* at 44. If it did, then "extraordinary"

would do no work that "compelling" does not, as even EPA recognizes. EPA Br. 71; Pet. Br. 30.

b.     Despite conceding that California's standards must target conditions that are "sufficiently different from the nation as a whole," EPA insists that California's climate-change standards qualify for a waiver. According to EPA, "record evidence" demonstrates that "California is 'particularly impacted by climate change,'" and therefore the State merits a waiver even under petitioners' reading of "compelling and extraordinary conditions." EPA Br. 85-86. That is wrong as a matter of both law and fact.

i.     As a matter of law, Congress never authorized California to regulate vehicle emissions to target a phenomenon with global cause and effect like climate change. Instead, as the surrounding statutory terms make clear, California's "compelling and extraordinary conditions" must not only be sufficiently different, but also "have their basic cause, and therefore their solution, *locally in California*." J.A. 887 (emphasis added). When EPA withdrew the waiver, it correctly concluded that "globally elevated atmospheric concentrations of [greenhouse gases] and their environmental effects are not the kind of local or regional air pollution problems that fall

within the scope of" Section 209(b). J.A. 529. No amount of "record evidence," EPA Br. 85, undermines that legal conclusion.

Interpreting Section 209(b) to permit California to target conditions with global cause and effect would make nonsense of Section 177. That provision authorizes other States to adopt California's standards, but only if those States have problems attaining *local* air-quality standards. *See* 42 U.S.C. § 7507. If Congress had authorized EPA to grant California a waiver for standards aimed at global conditions like climate change, then why would it have conditioned other States' ability to adopt California's standards on the existence of local attainment problems? EPA does not say.

EPA also never engages with the historical backdrop of Section 209(b), which confirms that the provision empowers California to address its "local air quality problems … that may differ substantially from those in other parts of the nation." *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1303 (D.C. Cir. 1979). Congress identified "peculiar" *local* conditions in California that combined to create acute *local* pollution problems like smog. Pet. Br. 32-33. "Congress clearly did not have in view pollution problems of a more national or global nature." J.A. 527.

ii.　EPA is also factually incorrect that climate-change conditions are sufficiently distinct in California to justify separate legal regimes.　EPA found that such conditions were not sufficiently distinct in both 2008 and 2019. J.A. 522-523, 528; J.A. 892.　In reinstating the waiver, EPA did not grapple with its prior findings that other regions of the country will experience similar, and in some cases *worse*, impacts from global climate change.　*See* Pet. Br. 33-34.　EPA's failure to explain why it rejected those findings was arbitrary and capricious.　*See FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (requiring "a more detailed justification" when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy").

c.　EPA has no persuasive response.　It wrongly insists that Section 209(b) must permit California to regulate greenhouse-gas emissions because the provision is not "pollutant-specific."　EPA Br. 68.　Section 209(b) forbids a waiver for standards aimed at climate change not because the provision distinguishes among pollutants but because it distinguishes between types of conditions:　those with distinctive local causes and effects and those with similar causes and effects across the globe.　That statutory distinction is not specific to greenhouse gases.　It would also preclude a waiver, for example, for

standards addressing emissions, like chlorofluorocarbons, that become well mixed in the global atmosphere and deplete the stratospheric ozone layer.

EPA also cannot support its reading by pointing to Congress's intent to allow California to serve as a "'laboratory' for vehicle policy and technology." EPA Br. 68 (citation omitted). That argument is divorced from the statutory text and has no limiting principle. Unlike other provisions of the Clean Air Act, such as the fuel-waiver provision, Section 209(b) does not authorize a blanket waiver for any and all emission standards California wishes to enact. *See* 42 U.S.C. § 7545(c)(4)(B) (exempting all of California's fuel regulations from preemption, without a showing of ongoing need).

EPA is likewise wrong that subsequent federal laws "affir[m]" its current interpretation. EPA Br. 76. In addition to the provisions already addressed, *see* Pet. Br. 36-37, EPA now cites the Inflation Reduction Act (IRA), an appropriations reconciliation bill which appropriates 0.001% of its funds for other States to adopt California's standards. EPA Br. 76. The Supreme Court has cautioned against reading too much into "appropriations measures," which "have the limited and specific purpose of providing funds." *Tennessee Valley Auth.* v. *Hill*, 437 U.S. 153, 190 (1978). The IRA did not change the meaning of Section 209(b)—nor could it have. *See Public Emps.*

*Ret. Sys. of Ohio* v. *Betts*, 492 U.S. 158, 168 (1989) ("[T]he interpretation given by one Congress … to an earlier statute is of little assistance in discerning the meaning of that statute.").

### 2. California does not "need" its standards to "meet" climate-change conditions in the State.

a.    Even if California's climate-change conditions were "compelling and extraordinary conditions" within the statute's meaning, the waiver still would be unlawful because California does not "need" its standards to "meet" those conditions. Pet. Br. 38-44. In restoring the waiver, EPA did not disturb its prior finding that the waiver would likely produce "no change in temperatures or physical impacts resulting from anthropogenic climate change in California." J.A. 521. That undisputed factual finding forecloses a determination that California "need[s]" its standards to "meet" climate-change conditions in the State.

Remarkably, EPA never once mentions this dispositive finding. EPA instead bizarrely relies on a different finding that "even standards much *more stringent* than" California's "would only reduce global temperature by 0.02 degrees Celsius in *2100*." J.A. 520 (emphasis added); EPA Br. 74 n.15. If standards *more stringent* than California's will barely reduce temperatures in 75 years, it is self-evident that California's actual standards will have no impact

whatsoever.  Unsurprisingly, then, as to the actual California standards at issue, EPA found that they "would result in an indistinguishable change in global temperatures" and "no change" to conditions on the ground in California.  J.A. 521.

EPA tries to change the subject and contends that California's standards would reduce greenhouse-gas emissions from California vehicles.  EPA Br. 74.  Local emission reductions do not equate to changes in local climate conditions.  Indeed, "[t]he [greenhouse-gas] emissions from California cars are no more relevant to the pollution problem at issue … than are the [greenhouse-gas] emissions from cars being driven in New York, London, Johannesburg, or Tokyo" because they mix globally.  J.A. 510.  Moreover, EPA's California-specific figures arbitrarily "ignor[e] likely offsetting effects on out-of-state emissions," J.A. 447, and total lifecycle impacts, J.A. 381-382, and thus do not show that the waiver will reduce nationwide greenhouse-gas emissions, let alone change any conditions in California.

b.  Hemmed in by its prior findings, EPA says that the statute "does not require any particular quantum of improvement."  EPA Br. 72.  The statute, however, does require at least *some* improvement; otherwise the "need to meet" requirement would be surplusage.  *See* Pet. Br. 41.  And here,

EPA's own undisturbed findings establish that California's standards will not "contribut[e] to the solution," even "incremental[ly]," as EPA now argues would be sufficient. EPA Br. 73. California thus plainly does not "need" its standards to "meet" climate-change conditions.

Contrary to EPA's argument, there is nothing "illogical" about that result. EPA Br. 73. Given the implications of allowing California to have its own emissions regime, it was perfectly sensible for Congress to require a federal finding that California's standards will *actually address* the problem they target. Standards aimed at California's "intractable [local] air quality problem," *id.*, will often meet that requirement, because reducing emissions that concentrate locally will, almost by definition, improve California's air quality. Not so with greenhouse-gas emissions, which "become one part of the global pool of [greenhouse-gas] emissions that affect the atmosphere globally and are distributed throughout the world." J.A. 511.

### 3. **Criteria-pollution benefits cannot justify the waiver**.

Finally, EPA resorts to arguing that California may impose its greenhouse-gas and zero-emission-vehicle standards because of their purported effects on local pollution conditions. EPA Br. 87-90; State Resp. Br.

42-43.  That rearguard action to justify the waiver again runs headlong into the law and the facts.

a.     For starters, EPA cannot change the outcome of the preemption analysis by recasting what California has done.  Everyone agrees that the express purpose of California's greenhouse-gas and zero-emission-vehicle regulations is to regulate global climate change.  *See* EPA Br. 87-88; State Resp. Br. 43.    Standards with that impermissible objective are *always* preempted because they fall outside the scope of Section 209(b).  *See* Pet. Br. 50.    EPA cannot sidestep that result by now claiming that California's standards perform a "joint purpose"—reducing both greenhouse gases and criteria pollution.  EPA Br. 88.

Even if this Court were to credit EPA's newly discovered rationale, an otherwise-preempted regulation is not "saved from pre-emption simply because the State can demonstrate some additional," permissible purpose. *Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106-107 (1992).  In other words, even where, unlike here, a regulation has *always* served a "dual purpose"—one goal preempted, the other permissible—the regulation is still preempted.  *Associated Builders & Contractors Fla. E. Coast Chapter* v.

*Miami-Dade Cty.*, 594 F.3d 1321, 1324 (11th Cir. 2010) (quotation marks omitted).

b.      Regardless, EPA's determination that the waiver is justified by the purported criteria-pollution benefits of California's greenhouse-gas and zero-emission-vehicle standards was arbitrary and capricious.    In the reinstatement, EPA suggested that ozone levels are generally "exacerbated" by higher temperatures caused by global climate change. J.A. 34.  That theory is irrelevant because EPA found in its withdrawal decision and did not dispute in its reinstatement decision that California's standards will likely produce "no change in temperatures" (or other climate impacts) in California, so they would not logically influence ozone either.  J.A. 521.

In a related vein, EPA contends that "measures to reduce greenhouse gases often address" criteria pollution as well.  EPA Br. 89.  That possible correlation, even if true, does not mean that the distinctive California standards at issue reduce criteria pollutants.  To the contrary, in its waiver application California affirmatively stated that its zero-emission-vehicle mandate had "*no criteria emissions benefit*," J.A. 151 (emphasis added), which EPA attempts to shrug off as an "accounting" gimmick.  EPA Br. 88.  And while EPA itself purported to find a criteria-emissions benefit, it in fact merely

applied its flawed whole-program approach to conclude that all California emission "standards are interrelated and all serve to reduce both criteria and GHG pollution." J.A. 34.

To be sure, California later attempted to promote the criteria-pollutant benefits of its standards. But California conceded that its standards' impact on criteria pollutants was at best "uncertain." J.A. 873. Moreover, California's new evidence again improperly focused on upstream emission reductions, *see* Pet. Br. 52, and ignored that electric vehicles "cause criteria pollutant … impacts throughout their life cycle," J.A. 381. EPA properly declined to consider California's unsubstantiated, post hoc claim. J.A. 529.

## III. EPA Properly Exercised Its Authority To Reconsider Its Waiver.

The State respondents try to end-run Section 209 altogether. In their view, EPA had no authority to withdraw the waiver in 2019; and so EPA had to reinstate the waiver in 2022, regardless of whether California's standards complied with Section 209(b). EPA makes the narrower argument that the 2019 withdrawal was procedurally flawed because the agency failed to sufficiently consider reliance interests and timeliness. All of the respondents' arguments are wrong, and none provides an independent basis for the waiver reinstatement.

1. The State respondents argue that EPA lacks the authority to withdraw a preemption waiver under the Clean Air Act absent a factual error or changed factual circumstances. State Resp. Br. 26-27. But as petitioners have explained, unless Congress says otherwise, agencies have inherent authority to reconsider their decisions. Pet. Br. 58-62. In response, the State respondents simply say that the 2019 withdrawal was not a permissible reconsideration because it was a pure "policy" decision rather than a legal correction. State Resp. Br. 27. Even if there were a line between policy withdrawals and legal ones, the 2019 withdrawal was expressly grounded in the agency's interpretation of Section 209's waiver criteria. J.A. 513-514 (rejecting claim that the withdrawal was "based on a change in Presidential Administration" and explaining that it rested on "the meaning of [the Section 209 criteria] as they are used in the statute").

Even under the State respondents' mistaken standard, EPA's 2019 withdrawal passes muster because there *was* a critical factual change: California "unilaterally amended its 'deemed to comply' provision." J.A. 491. That amendment meant that automakers no longer had the option to comply with federal standards as opposed to California's, which transformed

California's standards from optional criteria to binding requirements. That watershed change in the status quo amply justified EPA's reconsideration.

2. EPA correctly has abandoned the argument that it lacked authority in 2019 to revisit the meaning of Section 209(b) and in the process California's then-existing waiver. *See* J.A. 18. EPA instead argues more narrowly that the 2019 withdrawal decision was procedurally flawed. At the outset, that argument is not an independent basis for the 2022 reinstatement decision, because it does not explain why EPA reinstated the waiver rather than fixing the procedural flaws it perceived. Indeed, EPA in 2022 found that any procedural flaws in 2019 were merely "relevant to note." J.A. 21; *see DHS* v. *Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("An agency must defend its actions based on the reasons it gave when it acted."). In any event, EPA's current argument is wrong. The 2019 withdrawal decision took into account reliance interests and timeliness, and was not impermissibly retroactive.

a. Reliance interests are an important factor an agency must "consider" in "chang[ing] course." *Regents of the Univ. of California*, 140 S. Ct. at 1913. But EPA did consider them during the 2019 withdrawal. EPA found that, in the six years since the waiver had been granted in 2013, no

"cognizable" reliance interests had "accrued." J.A. 511. That was so for two reasons. First, until 2018, California deemed federal compliance to be an adequate substitute for compliance with California's standards. *See* Pet. Br. 9. Second, as part of the 2013 waiver decision, EPA and California committed to a 2018 reevaluation of the federal emission standards for model years 2022 to 2025. *See* 78 Fed. Reg. at 2,137. Thus, from 2013 to 2018, automakers did not have to comply with California's standards, and they knew that the mid-term review in 2018 could result in changes to the standards for future model years. *See* J.A. 514-515.

EPA argues that some industry members had assumed that California's standards for model years 2022-2025 would not change. EPA Br. 56. But even if true, they had done so at their own peril: the possibility of change was baked into the waiver. EPA reasonably determined in 2019 that, whatever this reliance interest, it was not entitled to significant weight in the analysis. *See American Fuel & Petrochemical Mfrs.* v. *EPA*, 937 F.3d 559, 577-578 (D.C. Cir. 2019) (reliance interests did not "merit special consideration" because there was no indication limits "would be enforced without modification"); *Bell Atl. Tel. Cos.* v. *FCC*, 79 F.3d 1195, 1205 (D.C. Cir. 1996) (regulated entities

"could not have reasonably assumed that the price cap index would not be altered" because they had been warned of an upcoming agency review).

b. EPA is also wrong to suggest that the reconsideration was untimely. EPA Br. 57. EPA rescinded the waiver within four months of the mid-term review deadline and within a year of California's removal of its deemed-to-comply provision. Such time periods fall comfortably within the range courts have recognized as permissible for an agency to reconsider a decision. *See, e.g.*, *Frito-Lay, Inc.* v. *U.S. Dep't of Lab.*, 20 F. Supp. 3d 548, 556 (N.D. Tex. 2014) (20 months reasonable); *Tokyo Kikai Seisakusho, Ltd.* v. *United States*, 529 F.3d 1352, 1361 (Fed. Cir. 2008) (seven years reasonable). Regardless, timeliness principally matters when—unlike here—private rights are at issue because "official action" that invades private rights triggers more severe due-process concerns. *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).

3. Finally, EPA incorrectly argues that the 2019 withdrawal was impermissibly retroactive. EPA Br. 57. The withdrawal was not retroactive: it changed the rules for *future* years. Certainly agency action "with exclusively future effect ([*e.g.*,] taxation of future trust income) can … *affect* past transactions ([*e.g.*,] rendering the previously established trusts less desirable in the future)," but this "is what has been characterized as secondary

retroactivity," subject to the ordinary standards of the APA. *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 219-220 (1988) (Scalia, J. concurring) (quotation marks omitted).

*     *     *

EPA and the State respondents cannot hide behind putative flaws in the withdrawal decision. They must defend the reinstatement decision on its own merits. And that decision does not comply with Section 209(b) because California does not "need" its greenhouse-gas and zero-emission-vehicle standards "to meet compelling and extraordinary conditions." 42 U.S.C. § 7543(b)(1)(B). At a bare minimum, there is no "exceedingly clear language" in Section 209(b) that would permit EPA to delegate to a single State the authority to address global climate change in ways that would upend the country's transportation and energy sectors. *Cowpasture River Pres. Ass'n*, 140 S. Ct. at 1849-1850.

## CONCLUSION

For the foregoing reasons, the Court should set aside EPA's action rescinding the withdrawal of California's preemption waiver.

MARCH 20, 2023

Respectfully submitted,

s/ Jeffrey B. Wall
JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Washington, DC 20006-5215
(202) 956-7500
wallj@sullcrom.com

*Counsel for Valero Renewable Fuels Company, LLC*

MATTHEW W. MORRISON
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
(202) 663-8036
matthew.morrison@
pillsburylaw.com

*Counsel for Iowa Soybean Association, Minnesota Soybean Growers Association, South Dakota Soybean Association, and Diamond Alternative Energy, LLC*

BRITTANY M. PEMBERTON
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20036
(202) 828-5800
brittany.pemberton@bracewell.com
*Counsel for Valero Renewable*

ERIC D. MCARTHUR
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8000
emcarthur@sidley.com

*Counsel for American Fuel & Petrochemical Manufacturers, Domestic Energy Producers Alliance, Energy Marketers of America, and National Association of Convenience Stores*

C. BOYDEN GRAY
JONATHAN BERRY
MICHAEL B. BUSCHBACHER
BOYDEN GRAY & ASSOCIATES, PLLC
801 17th Street NW, Suite 350
Washington, DC 20006
(317) 513-0622
buschbacher@boydengrayassociates.com

*Counsel for Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Kansas Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, and Valero Renewable Fuels, LLC*

*Fuels Company, LLC and Diamond Alternative Energy, LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's September 20, 2022 Order, because it contains 6,908 words.

This brief also complies with the requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5) and (6) because it was prepared in 14-point font using a proportionally spaced typeface.

s/ Jeffrey B. Wall
JEFFREY B. WALL

MARCH 20, 2023

**CERTIFICATE OF SERVICE**

I hereby certify that, on this twentieth day of March, 2023, I electronically filed the foregoing Final Brief for Petitioners with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

s/ Jeffrey B. Wall
JEFFREY B. WALL

MARCH 20, 2023