# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2023          Decided April 9, 2024

No. 22-1081

STATE OF OHIO, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND MICHAEL S.
REGAN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF THE
U.S. ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

ADVANCED ENERGY UNITED, ET AL.,
INTERVENORS

———

Consolidated with 22-1083, 22-1084, 22-1085

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*Jeffrey B. Wall* argued the causes for Fuel Petitioners.
With him on the briefs were *Eric D. McArthur*, *Morgan L.
Ratner*, *C. Boyden Gray*, *Jonathan Berry*, *Michael B.
Buschbacher*, *Matthew W. Morrison*, and *Brittany M.*

2

*Pemberton*. *Shelby L. Dyl* and *Samara L. Kline* entered appearances.

*Benjamin M. Flowers*, Solicitor General, Office of the Attorney General for the State of Ohio, argued the causes for State Petitioners. With him on the briefs were *Dave Yost*, Attorney General, *Sylvia May Mailman*, Deputy Solicitor General, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Edmund G. Lacour Jr.*, Solicitor General, *Tim Griffin*, Attorney General, Office of the Attorney General for the State of Arkansas, *Nicholas J. Bronni*, Solicitor General, *Christopher M. Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Stephen J. Petrany*, Solicitor General, *Theodore E. Rokita*, Attorney General, Office of the Attorney General for the State of Indiana, *Thomas M. Fisher*, Solicitor General, at the time the brief was filed, *Daniel Cameron*, Attorney General, Office of the Attorney General for the State of Kentucky, *Matthew F. Kuhn*, Solicitor General, *Kris Kobach*, Attorney General, Office of the Attorney General for the State of Kansas, *Jeffrey A. Chanay*, Chief Deputy Attorney General, *Anthony J. Powell*, Solicitor General, *Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana, *Elizabeth B. Murrill*, Solicitor General, *J. Scott St. John*, Deputy Solicitor General, *Lynn Fitch*, Attorney General, Office of the Attorney General for the State of Mississippi, *Justin L. Matheny*, Deputy Solicitor General, *Austin Knudsen*, Attorney General, Office of the Attorney General for the State of Montana, *Christian Brian Corrigan*, Solicitor General, *Kathleen L. Smithgall*, Assistant Solicitor General, *Andrew Bailey*, Attorney General, Office of the Attorney General for the State of Missouri, *D. John Sauer*, Solicitor General, *Jeff P. Johnson*, Deputy Solicitor General, *Mike Hilgers*, Attorney General, Office of the Attorney General for the State of Nebraska, *James A. Campbell*, Solicitor General, *Justin D.*

3

*Lavene*, Assistant Attorney General, *Gentner Drummond*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Bryan Cleveland*, Deputy Solicitor General, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *Judd E. Stone II*, Solicitor General, *Ryan S. Baasch*, Assistant Solicitor General, *Katie B. Hobson*, Assistant Attorney General, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *James Emory Smith, Jr.*, Deputy Solicitor General, *Sean Reyes*, Attorney General, Office of the Attorney General for the State of Utah, *Melissa A. Holyoak*, Solicitor General, *Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Lindsay S. See*, Solicitor General, and *Michael R. Williams*, Senior Deputy Solicitor General. *James A. Barta*, Deputy Solicitor General, Office of the Attorney General for the State of Indiana, *Christian B. Corrigan*, Solicitor General, Office of the Attorney General for the State of Montana, *Eric Hamilton*, Solicitor General, Office of the Attorney General for the State of Nebraska, and *Mathura Sridharan*, Deputy Solicitor General, Office of the Attorney General for the State of Ohio, entered appearances.

*Theodore Hadzi-Antich* and *Robert Henneke* were on the brief for *amicus curiae* Western States Trucking Association, Inc. in support of State Petitioners.

*Riddhi Dasgupta* was on the brief for *amici curiae* American Commitment, et al. in support of petitioners.

*Dale Stern* and *Patrick Veasy* were on the brief for *amici curiae* California Business Roundtable and California Manufacturers & Technology Association in support of petitioners.

*Scott A. Keller* and *Michael B. Schon* were on the brief for

4

*amici curiae* Western States Petroleum Association, et al. in support of petitioners.

*Rafe Petersen* was on the brief for *amicus curiae* The Two Hundred for Housing Equity in support of petitioners.

*James K. Vines* was on the brief for *amici curiae* Texas Oil & Gas Association, et al. in support of petitioners.

*Paul D. Cullen, Jr.* and *Kathleen B. Havener* were on the brief for *amicus curiae* Owner-Operator Independent Drivers Association, Inc. in support of petitioners.

*Eric P. Gotting* and *Peter L. de la Cruz* were on the brief for *amicus curiae* The Sulpher Institute in support of petitioners.

*John A. Sheehan* was on the brief for *amicus curiae* ConservAmerica in support of petitioners.

*Chloe H. Kolman* and *Eric G. Hostetler*, Attorneys, U.S. Department of Justice, argued the causes for respondent. With them on the brief were *Todd Kim*, Assistant Attorney General, and *Elisabeth H. Carter*, Attorney.

*M. Elaine Meckenstock*, Deputy Attorney General, Office of the Attorney General for the State of California, argued the causes for State and Local Government respondent-intervenors. With her on the brief were *Rob Bonta*, Attorney General, *Robert W. Byrne*, Senior Assistant Attorney General, *Gary E. Tavetian*, Supervising Deputy Attorney General, *Jessica Barclay-Strobel, Kristin McCarthy*, *Theodore A. B. McCombs*, *Caitlan McLoon*, and *Jonathan Wiener*, Deputy Attorneys General, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *Scott*

5

*Steinbrecher*, Acting Deputy Attorney General, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Christian Douglas Wright*, Director of Impact Litigation, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Matthew I. Levine*, Deputy Associate Attorney General, *Scott N. Koschwitz*, Assistant Attorney General, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Lyle T. Leonard*, Deputy Attorney General, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Matthew J. Dunn*, Chief, Environmental Enforcement/Asbestos Litigation Division, *Elizabeth Dubats*, Assistant Attorney General, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Emma Akrawi*, Assistant Attorney General, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Cynthia M. Weisz*, Assistant Attorney General, *Joshua M. Segal*, Special Assistant Attorney General, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Peter N. Surdo*, Special Assistant Attorney General, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Heidi Parry Stern*, Solicitor General, *Daniel P. Nubel*, Senior Deputy Attorney General, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Lisa J. Morelli*, Deputy Attorney General, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Bill Grantham*, Assistant Attorney General, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Judith N. Vale*, Deputy Solicitor General, *Yueh-Ru Chu*, Chief, Affirmative Litigation Section, Environmental Protection Bureau, *Gavin G. McCabe*, Assistant Attorney General, *Joshua H. Stein*, Attorney General, Office of the Attorney General for the State of North Carolina, *Asher P. Spiller*, Special Deputy Attorney General, *Ellen F.*

6

*Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Paul Garrahan*, Attorney-in-Charge, *Steve Novick*, Special Assistant Attorney General, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Nicholas F. Persampieri*, Assistant Attorney General, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Nicholas M. Vaz*, Special Assistant Attorney General, *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, *Christopher H. Reitz*, Assistant Attorney General, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Seth Schofield*, Senior Appellate Counsel, *Matthew Ireland*, Assistant Attorney General, *Michelle Henry*, Acting Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Ann R. Johnston*, Senior Deputy Attorney General, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Michael J. Bostrom*, and *Christopher G. King*. *Francisco Benzoni*, Special Deputy Attorney General, Office of the Attorney General for the State of North Carolina, and *Michael Fischer*, Executive Deputy General Counsel, entered appearances.

*Sean H. Donahue* was on the brief for respondent-intervenors Public Interest Organizations. With him on the brief were *Joanne Spalding*, *Andrea Issod*, *Josh Berman*, *Vera Pardee*, *Paul Cort*, *Vickie L. Patton*, *Peter Zalzal*, *Andrew P. Su*, *Eric M. Wriston*, *Jessica Anne Morton*, *Sarah Goetz*, *Ian Fein*, *David D. Doniger*, *Emily K. Green*, *Robert Michaels*, *Scott L. Nelson*, *Scott Hochberg*, *Jay Duffy*, and *Ann Brewster Weeks*. *Alice Henderson* and *Sean A. Lev* entered appearances.

*Stacey L. VanBelleghem*, *Devin M. O'Connor*, *Kevin Poloncarz*, *Martin Levy*, *Tim Duncheon*, *Jonathan S. Martel*,

7

*Elizabeth S. Theodore*, *Ethan G. Shenkman*, *Samuel I. Ferenc*, *David M. Lehn*, *Kenneth J. Markowitz*, *Pratik A. Shah*, and *Steven Croley* were on the brief for Industry respondent-intervenors.

*Deborah A. Sivas*, *Matthew J. Sanders*, and *Stephanie L. Safdi* were on the brief for *amicus curiae* California Climate Scientists in support of respondents.

*Cara A. Horowitz* was on the brief for *amici curiae* Senator Tom Carper, Chairman of the U.S. Senate Committee on Environment and Public Works, et al. in support of respondents.

*Sara A. Colangelo* was on the brief for *amici curiae* The American Thoracic Society, et al. in support of respondents.

*David R. Baake* was on the brief for *amici curiae* Administrative Law Professors in support of respondents.

*Kevin K. Russell* was on the brief for *amicus curiae* Professor Leah M. Litman in support of respondents.

*Bayron T. Gilchrist*, *Barbara Baird*, *Brian Tomasovic*, and *Kathryn Roberts* were on the brief for *amicus curiae* South Coast Air Quality Management District in support of respondents.

Before: WILKINS, CHILDS, and GARCIA, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: These consolidated petitions for review concern a 2022 decision by the Environmental Protection Agency ("EPA") to reinstate the EPA's prior decision, in 2013,

8

to waive federal preemption of two California regulations regarding automobile emissions under the Clean Air Act. The regulations in question are a standard limiting greenhouse gas emissions and a requirement that a certain percentage of new vehicles manufactured in the state each year be zero-emissions vehicles ("ZEV"), *see* 13 Cal. Code Regs. §§ 1961.3, 1962.2, respectively. Two sets of Petitioners challenge the EPA's decision. The first group of Petitioners comprises seventeen states ("State Petitioners").[1] The second group of Petitioners includes entities that produce or sell liquid fuels and the raw materials used to produce those fuels, along with associations whose members include such entities ("Fuel Petitioners").[2] Both State and Fuel Petitioners claim that the EPA was not authorized to grant California the waiver under the Clean Air Act. Fuel Petitioners argue that the EPA exceeded its statutory authority under the Clean Air Act. State Petitioners, meanwhile, contend that the EPA's waiver reinstatement decision was contrary to law because the relevant California regulations are preempted by a separate federal statute, the Energy Policy and Conservation Act of 1975 ("EPCA"), 49

---

[1] State Petitioners are the State of Ohio, State of Alabama, State of Arkansas, State of Georgia, State of Indiana, State of Kansas, Commonwealth of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of Oklahoma, State of South Carolina, State of Texas, State of Utah, and State of West Virginia.

[2] Fuel Petitioners are American Fuel & Petrochemical Manufacturers, Clean Fuels Development Coalition, Diamond Alternative Energy, LLC, Domestic Energy Producers Alliance, Energy Marketers of America, ICM, Inc., Illinois Corn Growers Association, Iowa Soybean Association, Kansas Corn Growers Association, Michigan Corn Growers Association, Minnesota Soybean Growers Association, Missouri Corn Growers Association, National Association of Convenience Stores, South Dakota Soybean Association, and Valero Renewable Fuels Company, LLC.

9

U.S.C. § 32919(a).  State Petitioners also claim that by granting a waiver to California alone, the EPA violated a constitutional requirement that the federal government treat states equally in terms of their sovereign authority.  We hold that Fuel Petitioners lack standing to raise their statutory claim, and that State Petitioners lack standing to raise their preemption claim, because neither set of Petitioners has demonstrated that their claimed injuries would be redressed by a favorable decision by this Court.  While we hold that State Petitioners have standing to raise their constitutional claim, we reject it on the merits.

## I.

### A.

While the Clean Air Act typically grants states broad discretion to meet federal air quality goals, emissions standards for new automobiles are promulgated at the federal level.  The Clean Air Act empowers the EPA to promulgate federal emissions standards for those vehicles, *see* 42 U.S.C. § 7521, and it preempts any corresponding state regulation, expressly preventing the adoption of emissions standards for new vehicles and/or engines as follows:

> (a) Prohibition
>
> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part.  No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale,

10

titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

*Id.* § 7543(a) ("Section 209(a)").  However, the Clean Air Act permits the EPA to waive application of Section 209(a) to any state under certain circumstances:

(b) Waiver

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.  No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,
(B) such State does not need such State standards to meet compelling and extraordinary conditions, or
(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

(2) If each State standard is at least as stringent as the comparable applicable Federal standard, such State standard shall be deemed to be at

11

least as protective of health and welfare as such
Federal standards for purposes of paragraph (1).

(3) In the case of any new motor vehicle or new
motor vehicle engine to which State standards
apply pursuant to a waiver granted under
paragraph (1), compliance with such State
standards shall be treated as compliance with
applicable Federal standards for purposes of
this subchapter.

*Id.* § 7543(b) ("Section 209(b)").  California is the only state
that had adopted standards (other than crankcase emission
standards) for the control of emissions from new motor
vehicles or new motor vehicle engines as of March 30, 1966.
*See Motor & Equip. Mfrs. Ass'n v. EPA*, 627 F.2d 1095, 1100
n.1 (D.C. Cir. 1979).

If California applies to promulgate automobile emissions
standards that it has determined are at least as protective of
public health and welfare as the existing federal regulations,
the Clean Air Act requires the EPA to waive preemption as to
those regulations, unless certain criteria (the "waiver denial
criteria") are met.  42 U.S.C. § 7543(b).  The EPA may refuse
to grant a waiver only if: (1) California's "determination . . . is
arbitrary and capricious," (2) California "does not need such
State standards to meet compelling and extraordinary
conditions," or (3) the "standards and accompanying
enforcement procedures are not consistent with [42 U.S.C.
§ 7521(a)]."  *Id.* § 7543(b)(1)(A)–(C).  In other words, the
federal regulations continue to act as the floor for emissions
regulations, but California can seek to enact its own more
stringent regulatory program above those federal requirements.

12

Sections 209(a) and (b) of the Clean Air Act together make up a statutory compromise between several competing interests. When Congress enacted the Clean Air Act in 1967, California suffered from significant air quality and pollution problems caused by motor vehicle emissions, which federal emissions regulations were unlikely to adequately address. *See* S. Rep. No. 90-403, at 33–34 (1967); H.R. Rep. No. 90-728, at 21–23, 96–97 (1967). California was also the only state with its own motor vehicle emissions standards, and its leadership in automobile emissions regulation had been valuable to the federal government in crafting the Clean Air Act. *See* S. Rep. No. 90-403, at 33–34; H.R. Rep. No. 90-728, at 21–23, 96–97. At the same time, automobile manufacturers were growing concerned that other states might begin regulating automobile emissions, subjecting them to a patchwork of regulatory obligations and significantly increasing manufacturing costs. *See* H.R. Rep. No. 90-728, at 21; *see also Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). Congress enacted Sections 209(a) and (b) to balance the fears of automobile manufacturers, California's need for bespoke regulation, and the federal interest in allowing California to test new emissions regulations. Section 209(a) addresses the fears of automakers and ensures national uniformity in automobile emissions standards by preempting state regulation. *See* 42 U.S.C. § 7543(a). Meanwhile, Section 209(b) grandfathers in California's regulatory program and allows it to continue innovating new solutions to automobile pollution. *See id.* § 7543(b); *see also Engine Mfrs. Ass'n*, 88 F.3d at 1080.

## B.

The D.C. Circuit is familiar with interpreting the Clean Air Act. Shortly following the enactment of Section 209(b), the D.C. Circuit addressed the question of how California should determine that its regulations are more protective than the

13

federal regulations.  *See Motor & Equip. Mfrs. Ass'n*, 627 F.2d at 1095.  California sought to impose regulations on oxides of nitrogen that were significantly more stringent than their federal counterparts.  *Id.* at 1110 n.32.  However, due to technological constraints, emissions control devices could not be constructed to meet both California's oxides of nitrogen standard and a carbon monoxide standard as stringent as the federal standard.  *Id.*  In an effort to impose its high oxides of nitrogen standard, California proposed a carbon monoxide standard that was less stringent than the federal carbon monoxide standard.  *Id.*  The EPA allowed California's stringent oxides of nitrogen standard to make up for its less stringent carbon monoxide standard, as long as its regulatory program as a whole was more protective than the federal regulations.  *Id.*  Dissatisfied with this decision, opponents of California's regulations argued that Section 209(b) required California to show that its carbon monoxide standard was individually more protective than the federal carbon monoxide standard.  In 1977, Congress resolved this dispute by amending Section 209(b).  The new language of Section 209(b) made explicit that California need only determine that its standards are, "in the aggregate, at least as protective of public health and welfare" as the federal standards.  42 U.S.C. § 7543(b)(1).  So long as California has made that determination, the EPA must grant California a waiver unless the EPA finds that any of the waiver denial criteria are met.  *See id.* § 7543(b)(1)(A)–(C).  The amendment ensures that California is not required to determine that each new proposed regulation is more protective than its federal counterpart.  *Id.*  It was intended to give California the "broadest discretion in selecting the best means to protect the health of its citizens and the public welfare." H.R. Rep. No. 95-294, at 301–02 (1977).[3]

---

[3] The 1977 Clean Air Act amendments also empowered other states to choose between adopting the federal standards or the California

14

After Congress amended Section 209(b) to provide that California need only determine that its standards were, "in the aggregate," at least as protective as the federal standards, the EPA decided to apply a similar approach to its analysis of whether California's proposed standards met any of the waiver denial criteria. *See* 42 U.S.C. § 7543(b)(1)(A)–(C). Thus, in examining whether any of the waiver denial criteria applied, the EPA considered only whether California's proposed standards, in the aggregate, met any of the criteria—not whether each individual standard could be denied under any of the criteria. The EPA continued to evaluate California's waiver applications under Section 209(b) using this aggregate method of evaluation for decades. In the fifty-five years since Section 209(b) was originally enacted, the EPA has granted California seventy-five waivers using the aggregate method of evaluation. *See California State Motor Vehicle Pollution Control Standards*; *Advanced Clean Car Program*; *Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14337 (Mar. 14, 2022) ("2022 Waiver Reinstatement Decision"); *see also* EPA, *Vehicle Emissions California Waivers and Authorizations*, https://perma.cc/5T7U-L8GE (last visited Mar. 27, 2024).

In the 1960s and 1970s, California's emissions standards focused on ozone-generating pollutants, like nitrogen oxides, but over time, California expanded its regulatory program to restrict a variety of other emissions, such as methane and other greenhouse gases. *See, e.g.*, *California State Motor Vehicle Pollution Control Standards*; *Waiver of Federal Preemption*,

---

standards. 42 U.S.C. § 7507. As of the date of this opinion, seventeen states have chosen to adopt some portion of the California regulations. *See* Cal. Air Res. Bd., *States that Have Adopted California's Vehicle Regulations*, https://perma.cc/HCS4-X7NP (last visited Mar. 27, 2024).

15

43 Fed. Reg. 25729, 25735 (June 14, 1978); *California State Motor Vehicle Pollution Control Standards*; *Waiver of Federal Preemption Notice of Decision*, 49 Fed. Reg. 18887, 18890 (May 3, 1984). In 1993, the EPA approved a waiver of California's first ZEV standard, which required an annually increasing percentage of vehicles sold in California to produce zero tailpipe emissions. *See California State Motor Vehicle Pollution Control Standards*; *Waiver of Federal Preemption*; *Decision*, 58 Fed. Reg. 4166 (Jan. 13, 1993).

**C.**

In recent decades, California has continued to face significant pollution and climate challenges. It contains seven of the ten worst areas for ozone pollution in the country and six of the ten worst areas for small particulate matter. *See* 2022 Waiver Reinstatement Decision, 87 Fed. Reg. at 14377 n.469. It also faces "increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat." *Id.* at 14363; *see also id.* at 14338–39 & nn.37, 43. And these conditions are exacerbated by climate change. *Id.* at 14350 & n.165. Moreover, pollution and climate change have particularly harmful impacts on California due to its large agriculture and ocean-based economies, dependence on an over-stressed water supply, long coastlines, and susceptibility to wildfires. *See California State Motor Vehicle Pollution Control Standards*; *Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 74 Fed. Reg. 32744, 32746 (July 8, 2009).

To combat these challenges, in 2005, California applied for a waiver for a new set of regulations limiting greenhouse gas emissions. *See* Cal. Air Res. Bd., *Low-Emission Vehicle*

16

*Greenhouse Gas Program*, https://perma.cc/VC85-GQ2S (last visited Mar. 27, 2024). The request sparked disagreement among several subsequent presidential administrations. Under President George W. Bush's Administration, the EPA initially denied the waiver on the basis that the standards were not addressing "compelling and extraordinary conditions." *California State Motor Vehicle Pollution Control Standards*; *Notice of Decision Denying a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 73 Fed. Reg. 12156, 12159–63 (Mar. 6, 2008). One year later, under the Obama Administration, the EPA determined that its initial decision to deny the waiver had been based on an incorrect interpretation of Section 209(b), and ultimately granted the waiver. *California State Motor Vehicle Pollution Control Standards*; *Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles*, 74 Fed. Reg. 32744, 32745–46 (July 8, 2009).

In 2012, California applied for the waiver at issue in this case, seeking to promulgate a new set of regulations called the Advanced Clean Car Program. *See California State Motor Vehicle Pollution Control Standards*; *Notice of Decision Granting a Waiver of Clean Air Act Preemption for California's Advanced Clean Car Program and a Within the Scope Confirmation for California's Zero Emission Vehicle Amendments for 2017 and Earlier Model Years*, 78 Fed. Reg. 2112 (Jan. 9, 2013). The new regulations included a Low Emission Vehicle ("LEV") Program, which set emissions requirements for new cars in Model Years 2017 to 2025 with the goal of reducing carbon dioxide emissions by thirty-four percent, and a ZEV Program, which required around fifteen percent of manufacturers' fleets to be electric cars by Model

17

Year 2025. *Id.* The EPA initially granted the waiver in 2013. *Id.* In response, automobile manufacturers in California began making investments to meet both programs' requirements. *See, e.g.*, Industry Resp.-Intervenor Br. 2–4.

In 2018, after car manufacturers had adjusted their fleets to comply with California's Advanced Clean Car Program, the EPA changed its course. It issued a notice of proposed rulemaking to withdraw the portions of the 2013 waiver covering California's LEV and ZEV standards. *See The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks*, 83 Fed. Reg. 42986 (Aug. 24, 2018).

The EPA withdrew the 2013 waiver on September 27, 2019. *The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program*, 84 Fed. Reg. 51310 (Sept. 27, 2019) ("2019 Withdrawal Decision"). The EPA offered three bases for the withdrawal. *Id.* at 51328–41. First, the 2013 waiver conflicted with a recent determination by the National Highway Traffic Safety Administration ("NHTSA") that state greenhouse gas regulations were preempted by a provision of the EPCA that prohibits states from enacting their own fuel economy standards. *Id.* at 51337–38; *see also* 49 U.S.C. § 32902(a), (f) (empowering the NHTSA to set federal fuel economy standards); *id.* § 32919(a) (preempting state fuel economy standards). Second, the EPA had decided that it would no longer follow a "whole program" interpretation of Section 209(b), and instead would evaluate whether each individual California standard met the requirement that it be necessary to "meet compelling and extraordinary conditions." 2019 Withdrawal Decision, 84 Fed. Reg. at 51341 (quoting 42 U.S.C. § 7543(b)(1)). Third, California could not show that its LEV and ZEV regulations were necessary to meet compelling and extraordinary conditions because California could not

18

show a "particularized nexus" between greenhouse gas emissions and California's air pollution problems. *Id.* According to the EPA, because greenhouse gas pollution from global sources is blended in the atmosphere, the consequences of climate change from which California suffered were not "compelling and extraordinary." *Id.* at 51333–34.

Following recission of the 2013 waiver, automobile manufacturers such as Honda, Ford, Volvo, BMW, and Volkswagen entered into independent agreements with California to continue reducing emissions. *See Revised 2023 and Later Model Year Light-Duty Vehicle Greenhouse Gas Emissions Standards*, 86 Fed. Reg. 74434, 74458 (Dec. 30, 2021). Under these agreements, the automakers would continue to meet the LEV and ZEV standards in the California regulations. *Id.* Automakers were motivated to sign these agreements by the investments they had already made in updating their fleets and growing consumer demand for electric vehicles. *See* J.A. 155–57.

In 2021, under the Biden Administration, the EPA revisited its 2019 withdrawal of the 2013 waiver. *California State Motor Vehicle Pollution Control Standards*; *Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption*; *Opportunity for Public Hearing and Public Comment*, 86 Fed. Reg. 22421 (Apr. 28, 2021). On March 14, 2022, the EPA reinstated its 2013 waiver for California's Advanced Clean Car Program. 2022 Waiver Reinstatement Decision, 87 Fed. Reg. at 14332. As a result of that reinstatement, California's LEV and ZEV standards for Model Years 2017 through 2025 came back into force. *Id.* at 14333. The EPA provided three explanations for its 2022 Waiver Reinstatement Decision: the EPA exceeded its inherent authority to revisit its 2013 decision; it improperly rejected the "whole program" approach; and it improperly considered the

19

NHTSA's view of the EPCA, which was beyond the scope of Section 209(b).  *Id.* at 14333–35.

## D.

On May 12, 2022, State Petitioners filed a petition for review in this Court challenging the EPA's decision to reinstate the 2013 waiver (22-1081).  That same day, three groups of Fuel Petitioners filed petitions for review of the same EPA action (22-1083, 22-1084, and 22-1085).  The Court consolidated these cases (22-1081).  California and several other states and cities (collectively, "California"),[4] environmental organizations,[5] and automobile manufacturers[6] have intervened in support of respondents in the consolidated case.

---

[4] The state and city intervenors are the City of Los Angeles, the City of New York, Massachusetts, Pennsylvania, the District of Columbia, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, and Washington.

[5] The environmental organization intervenors are the Center for Biological Diversity, the Clean Air Council, the Conservation Law Foundation, the Environmental Defense Fund, the Environmental Law and Policy Center, the National Parks Conservation Association, the Natural Resources Defense Council, the Public Citizen, the Sierra Club, and the Union of Concerned Scientists.

[6] The automobile manufacturer intervenors are Ford Motor Company, Volkswagen Group of America, Inc., BMW of North America, LLC, American Honda Motor Co., Inc., Volvo Car USA LLC, the National Coalition for Advanced Transportation, Advanced Energy Economy, Calpine Corporation, National Grid USA, the New York Power Authority, and the Power Companies Climate Coalition.

20

In their petition, Fuel Petitioners argue that the 2022 decision was arbitrary and capricious and exceeded the EPA's authority under Section 209(b) because climate change is not a "compelling and extraordinary condition," and California does not "need" its standards to "meet" its climate conditions. *See, e.g.*, Fuel Pet. Br. 10–11. In challenging the EPA's determination of California's "need," Fuel Petitioners argue that the EPA's aggregate approach is wrong. *Id.* Meanwhile, State Petitioners claim that by granting a waiver to California, but not to any other state, the EPA has violated State Petitioners' constitutional right to equal sovereignty. *See* State Pet. Br. 28–33. State Petitioners also claim that the waiver is contrary to the preemption of state fuel economy standards set out in the EPCA. *See* State Pet. Br. 33–41.

We hold that neither Fuel Petitioners as to their statutory claims nor State Petitioners as to their EPCA claims establish standing to bring suit, and thus we do not reach the merits of their claims. We reject State Petitioners' constitutional claim on the merits.

## II.

### A.

We begin with the question whether either State or Fuel Petitioners have standing based on their assertions that the waiver will cause them economic injury. Fuel Petitioners premise their standing as to the entirety of their petition for review on their claimed economic injury. State Petitioners, meanwhile, premise their standing for their claim that the waiver is preempted by the EPCA on their alleged economic injury.

21

A "showing of standing is 'an essential and unchanging' predicate to any exercise of our jurisdiction." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[S]tanding is assessed as of the time a suit commences." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). The "irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First, the plaintiff must have suffered an injury-in-fact—an "invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Bennett v. Spear*, 520 U.S. 154, 167 (1997). Second, there must be a "causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 43 (1976)).

"A petitioner bears the burden of establishing each" of the elements of standing. *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011). To meet that burden, a petitioner must "show a 'substantial probability' that it has been injured, that the defendant caused its injury, and that the court could redress that injury." *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002) (quoting *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 63 (D.C. Cir. 2000)). And a petitioner may not wait to attempt to meet its burden of demonstrating standing until after the respondent contests the issue. Rather, absent "good cause shown," a petitioner whose standing is not readily apparent must show that it has standing in "its opening brief." *Id.* at 900–01. A petitioner may carry this "burden of

22

production by citing any record evidence relevant to its claim of standing and, if necessary, appending to its filing additional affidavits or other evidence sufficient to support its claim." *Id.*; *see also* D.C. Cir. R. 28(a)(7).

Whether a petitioner has standing to challenge a particular government action depends, in part, upon whether the petitioner is "an object of the action" at issue. *Lujan*, 504 U.S. at 561. When a petitioner is an object of the action it seeks to challenge, causation and redressability are usually easy to demonstrate. *Id.* But when, as here, the petitioner "is not [it]self the object of the government action or inaction he challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish." *Id.* at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). Because any injury to petitioners "hinges on actions taken by manufacturers, the petitioners carry 'the burden of adduc[ing] facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury.'" *Chamber of Com.*, 642 F.3d at 201 (alterations in original) (quoting *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009)).

As we will explain, these principles compel the conclusion that both State and Fuel Petitioners lack standing premised on their claimed economic injuries because neither group of Petitioners has met their burden of demonstrating that those injuries are redressable.

**B.**

Fuel Petitioners argue that, by requiring vehicle manufacturers to sell vehicles that use less or no liquid fuel, California's LEV and ZEV requirements depress the demand

23

for liquid fuels.[7]  Fuel Petitioners and their members, who produce and sell liquid fuels and the raw materials used to produce those fuels, are thereby financially injured by the reduction in demand for those products.  Fuel Pet. Br. 16; Fuel Pet. Reply Br. 3–4.  In support of Fuel Petitioners' contention that they are economically injured by the waiver, Fuel Petitioners offer over a dozen declarations by individuals who are affiliated with Fuel Petitioner entities and organizations; the individuals explain that the entity or organization is involved with producing or selling fuel and that the waiver causes Fuel Petitioners economic injury by reducing the demand for fuel and related products.

State Petitioners, meanwhile, allege three financial injuries that they contend are caused by the waiver.  First, the waiver causes manufacturers to increase the cost of conventional vehicles elsewhere in the country in order to account for the cost of meeting the requirements imposed on manufacturers by the waiver granted to California.  State Petitioners explain that because they purchase conventional vehicles, the increase in the prices for those vehicles that results from the waiver causes State Petitioners financial harm.  State Pet. Br. 14–15.  Second, State Petitioners contend that the greater shift to electric vehicles that results from the waiver will cause State Petitioners to generate less fuel-tax revenue.  *Id.*  Finally, State Petitioners argue that the increase in electric vehicles caused by the waiver will affect the States' electrical grids.  In support of their standing claims, State Petitioners offer a declaration

---

[7] Fuel Petitioners include both associations and individual entities. Fuel Pet. Br. 16.  Because, as we explain, we conclude that all Fuel Petitioners have failed to establish redressability, we need not address whether any of the Fuel Petitioner associations have established organizational standing. *Cf. Sierra Club*, 292 F.3d at 898 (laying out the requirements for establishing organizational standing).

24

from each individual State Petitioner and a declaration from an economist, Benjamin Zycher, Ph.D. Each State Petitioner's declaration states that the state purchases conventional (that is, gas- or diesel-powered) vehicles. State Pet. Add. 6–36. In his declaration, Dr. Zycher contends that California's ZEV requirement will have several economic impacts on State Petitioners, including an increase in the cost of conventional vehicles nationwide, a "decline in the quality of delivered state services," a reduction in "fuel tax revenues available for the provision of highway and road services," and an "increase in the costs and prices of delivering electric power services." State Pet. Add. 38–39.

The EPA and California both dispute that State and Fuel Petitioners' allegations and evidence establish injury and causation sufficient to support standing. EPA Br. 23–28 (arguing State Petitioners fail to demonstrate standing); California Br. 9–15 (arguing both State and Fuel Petitioners fail to demonstrate standing). For example, as to causation, California argues that both groups of Petitioners fail to demonstrate that their alleged injuries are caused by the 2022 waiver reinstatement, rather than the original 2013 waiver or rising consumer demand for electric vehicles more generally. California Br. 11, 14. But this Court need not definitively decide whether either set of Petitioners has established injury or causation. However robust their claims of injury and causation are, State and Fuel Petitioners spend considerably less time explaining how those injuries are redressable. Indeed, even assuming that both sets of Petitioners have established injury and causation sufficient for standing, Petitioners' standing arguments fail for the same reason: Both groups of Petitioners fall far short of meeting their burden of demonstrating a "substantial probability" that their alleged injuries would be redressed by a favorable decision by this

25

Court.  *Am. Petroleum*, 216 F.3d at 63; *see also Sierra Club*, 292 F.3d at 899–900.

Fuel Petitioners assert in their opening brief—without explanation or citation—that this Court could redress their injuries "by setting aside the action."  Fuel Pet. Br. 16.  Fuel Petitioners' declarations offer little more; to the extent that Fuel Petitioners' declarations discuss redressability at all, the declarations state that the injuries discussed therein "would be substantially ameliorated if EPA's decision were set aside."  State Petitioners' opening brief is similarly conclusory regarding redressability.  State Petitioners assert that their "injuries are redressable because a judgment setting aside the waiver would eliminate the source of their injuries."  State Pet. Br. 16.  However, none of the declarations submitted by State Petitioners with their opening brief addresses redressability at all.

The difficulty for Fuel and State Petitioners is that their claimed injuries "hinge[] on" the actions of third parties—the automobile manufacturers who are subject to the waiver.  *Chamber of Com.*, 642 F.3d at 201.  Redressability, too, "hinge[s] on the response of" those same automobile manufacturers.  *Lujan*, 504 U.S. at 562.  Both groups of Petitioners' injuries would be redressed only if automobile manufacturers responded to vacatur of the waiver by producing and selling fewer non-conventional vehicles or by altering the prices of their vehicles such that fewer non-conventional vehicles—and more conventional vehicles—were sold.

And, aside from turning on the actions of the automobile manufacturers subject to the waiver, redressability is further complicated by the relatively short duration of the waiver that Petitioners challenge.  These petitions for review concern only the EPA's decision, in March 2022, to reinstate the waiver it

26

had previously granted California as to Model Years 2017 through 2025. *See* 2022 Waiver Reinstatement Decision, 87 Fed. Reg. 14337. Thus, to meet their burden of demonstrating redressability, both sets of Petitioners must demonstrate a "substantial probability" not only that automobile manufacturers are likely to respond to a decision by this Court by changing their fleets in a way that alleviates their injuries in some way, but also that automobile manufacturers would do so relatively quickly—by Model Year 2025. *Am. Petroleum*, 216 F.3d at 63.

The record evidence provides no basis for us to conclude that manufacturers would, in fact, change course with respect to the relevant model years if this Court were to vacate the waiver. To begin, Petitioners fail to point to any evidence affirmatively demonstrating that vacatur of the waiver would be substantially likely to result in any change to automobile manufacturers' vehicle fleets by Model Year 2025. The only evidence points in the opposite direction, indicating that automobile manufacturers need years of lead time to make changes to their future model year fleets. In a comment submitted to the EPA during the rulemaking process regarding the EPA's 2019 recission of the 2013 waiver, for example, Ford Motor Company stated that its product cycle requires several years of lead time for planning, and that its "regulatory lead time (i.e., awareness of future regulatory requirements)" is seven years. J.A. 637. Ford explained that, as a result, if the regulatory landscape shifted in some way, "little or nothing could be done to re-optimize the company's product plans, which are largely fixed for the next few years." *Id.* Further, the record indicates that other automobile manufacturers would also require years of lead time to alter their product plans. In comments submitted to the EPA during the EPA's rulemaking process regarding the 2022 waiver reinstatement, Tesla, Inc. and Toyota Motor North America, Inc., explained that their

27

vehicle product cycles, too, can also begin years before a vehicle is launched.   J.A. 371, 477; *see also* J.A. 370 n.5 (summarizing similar statements from Chrysler Group LLC, Hyundai America Technical Center, Inc., and Mitsubishi Motors North America).     Thus, even if automobile manufacturers were inclined to change course so as to alleviate the Petitioners' injuries within the given model years, it is far from clear that they could do so within the model years covered by the waiver.[8]   To be sure, it is possible that manufacturers could change their prices without modifying their production cycles, which may redress Petitioners' injuries because pricing could affect the mix of conventional and electric vehicles purchased.   But Petitioners point us to no evidence that manufacturers would change their prices by Model Year 2025 either.

Despite the paucity of evidence in the record regarding the redressability of their injuries, neither group of Petitioners attempts to explain in any detail how their injuries are redressable, let alone to "cit[e] any record evidence" or to file "additional affidavits or other evidence sufficient to support" redressability.  *Sierra Club*, 292 F.3d at 900–01.  Nor, for that matter, does either set of Petitioners grapple with the relatively short nature of the waiver they challenge.     Rather, all Petitioners seem to have treated redressability as a foregone conclusion.  *See Crete Carrier Corp. v. EPA*, 363 F.3d 490, 494 (D.C. Cir. 2004) (petitioners lacked standing where they failed to produce "actual evidence" regarding how the regulated parties "would respond" to vacatur); *Branton v. FCC*,

---

[8]  We also note that several automobile manufacturers have intervened in support of the EPA in this case.  Those manufacturers explain in their brief in support of the EPA that "both internal sustainability goals and external market forces" are prompting manufacturers to transition toward electric vehicles, irrespective of California's regulations.  Industry Resp.-Intervenor Br. 6–7.

28

993 F.2d 906, 912 (D.C. Cir. 1993) ("A court is rightly reluctant to enter a judgment which may have no real consequence, depending upon the putative cost-benefit analyses of third parties over whom it has no jurisdiction and about whom it has almost no information.").

When asked about redressability at oral argument, counsel for Fuel Petitioners emphasized that redressability—as with each prong of standing—is assessed when a lawsuit is first filed. Oral Argument Transcript 74; *see also Del Monte*, 570 F.3d at 325 ("[S]tanding is assessed as of the time a suit commences."). True enough. But that does not help Fuel Petitioners: Even "as of the time" this lawsuit commenced, Fuel Petitioners had failed to point to any evidence in the record showing that their alleged injuries were redressable. *Del Monte*, 570 F.3d at 325. Put differently, the flaw in Fuel Petitioners' standing arguments is not—as counsel for Fuel Petitioners contended at oral argument, Oral Argument Transcript 74–75—that their standing arguments were sufficient when originally filed, but that their claims have been mooted by the passage of time. Fuel Petitioners' standing arguments were deficient from the start.

State Petitioners, meanwhile, argue that, to the extent that there is any doubt that they have met their burden of demonstrating causation and redressability, this Court should resolve it in their favor given the "special solicitude" to which states are entitled when they seek to protect their "quasi-sovereign interests." *Massachusetts v. EPA*, 549 U.S. 497, 518–20 (2007); *see also* State Pet. Br. 16. We disagree. The "special solicitude" afforded to states can relax standing requirements only so far. *Massachusetts*, 549 U.S. at 520. Even the "greater leeway" afforded to states seeking to protect quasi-sovereign interests cannot save defective standing claims when, as here, the record is "almost completely silent" with

29

respect to an element of a state's standing. *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1230 (D.C. Cir. 2021).

State and Fuel Petitioners' sparse treatment of redressability is particularly surprising because, in a previous case, this Court noted that it could not presume redressability in essentially the same circumstances. In *Chamber of Commerce of the United States v. EPA*, the Chamber of Commerce and the National Automobile Dealers Association, on behalf of their automobile dealer members, petitioned for review in this Court of the EPA's decision to grant California a waiver, under Section 209(b), with respect to automobile Model Years 2009 through 2016. 642 F.3d at 196–97. There, the petitioners—automobile dealers who, like the Petitioners in this case, were not directly subject to the waiver—explained that automobile manufacturers' responses to the waiver injured them in two ways. First, automobile manufacturers would respond to the waiver by altering the mix of vehicles they sold in California and other states; as a result, vehicle dealers would be injured because they would be unable to obtain specific vehicles that their customers wanted to buy. *Id.* at 201. And second, the California standards would increase automobile manufacturers' costs and, in turn, increase the prices of the automobiles they manufactured. *Id.* The automobile dealers believed they would be injured by those increased vehicle costs because they would have to choose whether to keep their prices the same, and accordingly lower their profit margins, or to increase their prices to account for the increased vehicle costs, at the risk of turning away customers. *Id.*

The *Chamber of Commerce* Court ultimately resolved petitioners' claims on mootness grounds, not standing. *Id.* at 204, 206. But before reaching that conclusion, the Court expressed serious doubts that the petitioners had met their burden of demonstrating redressability. *Id.* at 205. The record

30

before the Court indicated that vacatur of the challenged waiver may not result in any change on the part of automobile manufacturers. And, the Court noted, "Petitioners ha[d] offered no evidence to the contrary, and no evidence that, if the waiver were vacated, [automobile manufacturers] would proceed on a different course more favorable to the petitioners." *Id.* at 205–06. So even if petitioners' claims were not moot, their failure to introduce redressability evidence made it—at a minimum—rather unclear whether their claims were redressable.

As the EPA and intervenors correctly recognize, State and Fuel Petitioners' standing submissions run into precisely the same problem here. In its response brief, the EPA explains in some detail how State Petitioners have failed to substantiate the redressability of their injuries. EPA Br. 26. California, meanwhile, argues that neither group of Petitioners has provided any evidence that vacatur would remedy their injuries. California Br. 13. Further underlining the point, California offers an expert declaration by Joshua M. Cunningham, the Chief of the Advanced Clean Cars Branch of the California Air Resources Board, who explains in specific terms why the Petitioners' claims are unlikely to be redressed by a favorable decision by this Court. California Add. 84–85; 96–99. Cunningham explains that automobile manufacturers have already made a number of public commitments regarding both vehicle pricing and availability with respect to the remaining model years covered by the challenged waiver; those public commitments would tend to suggest that neither group of Petitioners' claims are redressable. As Cunningham puts it, "manufacturers have likely already made pricing decisions for" the remaining model years. California Add. 96. Cunningham also states that "manufacturers are already selling *more* qualifying vehicles in California than the State's standards require," suggesting that vacatur of the zero-emission vehicle

31

mandate would not redress Petitioners' injuries.  California Add. 98.  Indeed, record evidence supports the fact that manufacturers already exceed California's ZEV requirements.  *See* J.A. 300–02.  Yet despite these arguments against their theory of redressability, neither State nor Fuel Petitioners meaningfully addressed the redressability of their economic injuries in their reply briefs.[9]  State Pet. Reply Br. 3, Fuel Pet. Reply Br. 3–6.

Ultimately, the record evidence, coupled with the filings of the EPA and intervenors, provide this Court with no basis to conclude that Petitioners' claims are redressable—a necessary element of standing that Petitioners bear the burden of establishing.  As in *Chamber of Commerce*, "Petitioners have offered no evidence to the contrary, and no evidence that, if the waiver were vacated, [automobile manufacturers] would proceed on a different course more favorable to the petitioners."  642 F.3d at 205.  Rather, both State and Fuel Petitioners "offer only assertions, not facts, to support their claims about the likely response" of automobile manufacturers to a favorable decision by this Court.  *Crete Carrier Corp.*, 363 F.3d at 494.  But "[s]peculative and unsupported assumptions regarding the future actions of third-party market participants are insufficient to establish Article III standing."  *Id.*[10]

---

[9] This Court denied a motion by State Petitioners to file with their reply brief new evidence regarding their standing.  Per Curiam Order, Aug. 9, 2023.  That proposed supplemental evidence, however, concerned only State Petitioners' allegations of economic injuries stemming from the waiver, not the redressability of those injuries.  ECF 2019756.  At any rate, the evidence was too late.  *See* D.C. Cir. R. 28(a)(7).

[10] We conclude that Petitioners have failed to introduce sufficient evidence to raise a dispute of fact as to whether changes to the remaining model year fleets are substantially likely if vacatur were to occur, so we have no need to refer this to a district judge or special

32

Petitioners may not proclaim that their injuries are redressable and expect this Court to take them at their word. On this record, redressability poses a "fatal stumbling block" for both sets of Petitioners. *Cato Institute v. SEC*, 4 F.4th 91, 95 (D.C. Cir. 2021). We accordingly hold that both State and Fuel Petitioners lack standing premised on their economic injuries because they have failed to meet their burdens of demonstrating that their claims are redressable.

## C.

After oral argument, Fuel Petitioners filed a motion to supplement the record and to file a supplemental brief regarding their standing. Fuel Pet. Mot. to Supp. 1. Fuel Petitioners contend that the EPA and California raised for the first time at oral argument the question whether Fuel Petitioners' claims could be redressed within the relevant model years—an issue Fuel Petitioners argue pertains to mootness, not the redressability of their claims. Fuel Pet. Mot. to Supp. 1–2. Fuel Petitioners argue that they should be allowed to file new evidence with this Court to "address that new argument." Fuel Pet. Mot. to Supp. 1.

We deny Fuel Petitioners' motion to supplement the record and to file a supplemental brief. As we have explained, a petitioner must generally demonstrate standing in its opening brief, either by "citing any record evidence relevant to its claim of standing" or, where necessary, by "appending to its filing additional affidavits or other evidence." *Sierra Club*, 292 F.3d at 900–01. This Court has, on rare occasion, accepted late affidavits or other evidence in support of standing for "good

---

master as a disputed factual issue for resolution before making our ruling on redressability. *See FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 469 (1984) (citing 28 U.S.C. § 2347(b)(3)); Fed. R. App. R. 48(a).

33

cause" shown. *Am. Libr. Ass'n v. FCC,* 401 F.3d 489, 495–96 (D.C. Cir. 2005) (quoting *Sierra Club*, 292 F.3d at 900); *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 112 (D.C. Cir. 2021). We have found "good cause" when, for example, "'the parties reasonably, but mistakenly, believed' that they 'sufficiently demonstrated standing' or when they 'reasonably assumed that their standing was self-evident.'" *Nat'l Council for Adoption*, 4 F.4th at 111 (quoting *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 614 (D.C. Cir. 2019)).

No such good cause exists here. We do not think Fuel Petitioners could have reasonably believed that they had adequately demonstrated standing or that their standing was "self-evident" from the record when they filed their opening brief. *Twin Rivers*, 934 F.3d at 614. As this Court and the Supreme Court have repeatedly explained, redressability is "'substantially more difficult' to establish" when, as here, Petitioners are not directly regulated by the government action they seek to challenge. *Lujan*, 504 U.S. at 562 (quoting *Allen*, 468 U.S. at 758). Indeed, as noted above, this Court has previously expressed doubt that petitioners seeking to challenge a Section 209 waiver had demonstrated redressability where they had failed to put any such evidence in the record. *Chamber of Com.*, 642 F.3d at 205. And Fuel Petitioners should have been aware that redressability may pose a particularly challenging obstacle here, considering the relatively narrow timeframe of the particular waiver Petitioners challenge and the evidence in the record showing that automobile manufacturers generally require years of lead time to make changes to their future model year fleets. Yet Fuel Petitioners failed to meaningfully address redressability in their opening brief at all, either by "identify[ing] . . . record evidence" or by offering the Court evidence of their own. *Sierra Club*, 292 F.3d at 899.

34

Second, even if Fuel Petitioners reasonably believed that their standing was "self-evident" when they filed their opening brief, Petitioners offer no explanation for having failed to address redressability in their reply brief after California raised the issue in its opposition brief. *Twin Rivers*, 934 F.3d at 614. In this respect, Fuel Petitioners' motion relies on a false premise: Oral argument was plainly not the first time that California argued that Fuel Petitioners had failed to demonstrate redressability. Rather, as we have explained, California explicitly argued that Fuel Petitioners had offered no evidence regarding the redressability of their injuries, and California provided the Court with a declaration that addressed the point. Having failed even to attempt to respond to California's arguments regarding redressability at the reply stage, Fuel Petitioners provide this Court with no reason to allow them to do so now.

## III.

State Petitioners also argue that the EPA's 2022 decision is "contrary to constitutional right" under 5 U.S.C. § 706(2)(B) because Section 209(b) of the Clean Air Act is unconstitutional. They rely on the equal sovereignty principle, which the Supreme Court applied in *Shelby County v. Holder*, 570 U.S. 529 (2013), to hold that Fifteenth Amendment legislation that disparately impacts states' control over voting procedures must be "sufficiently related to the problem it targets." *Id.* at 542 (quoting *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)). State Petitioners argue that this principle also categorically prohibits Congress from using its Commerce Clause power in a way that withdraws sovereign authority from some states but not others. And Section 209(b), they say, violates that principle by preempting the authority of every state but California to regulate motor vehicle emissions. We conclude that State

35

Petitioners have standing to raise this constitutional claim, but we join the two other circuits to have considered the issue in rejecting State Petitioners' request to extend the equal sovereignty principle in this fashion. *See NCAA v. Governor of New Jersey*, 730 F.3d 208, 239 (3d Cir. 2013), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018); *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014).

**A.**

To assess State Petitioners' standing for this constitutional claim, we again "assume that on the merits" petitioners "would be successful." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). Assuming State Petitioners' constitutional theory is correct, Section 209(b) and the EPA's 2022 decision violate their constitutionally protected interest in equal sovereignty by leaving them with less regulatory authority over vehicle emissions than California. This claimed injury is akin to the type of dignitary injury recognized in equal protection cases. *Heckler v. Matthews*, 465 U.S. 728, 739–40 (1984). And, State Petitioners argue, invalidating the decision would redress that injury and restore their sovereign equality by removing California's greater authority.

Respondents resist that analysis on the ground that State Petitioners do not ask this court to increase their own sovereign authority over motor vehicle emissions. The States instead seek to reduce California's authority.

The Supreme Court has repeatedly held, however, that this type of "leveling down" remedy is sufficient to support standing when a party asserts a constitutional right to equality. As the Court has put it, "when the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of

36

benefits to the excluded class." *Heckler*, 465 U.S. at 740 (quoting *Iowa-Des Moines Nat'l Bank v. Bennett*, 284 U.S. 239, 247 (1931)); *see also Sessions v. Morales-Santana*, 582 U.S. 47, 72–73 (2017). That principle developed in cases applying the Fourteenth Amendment's Equal Protection Clause. But Respondents have not identified—and we do not perceive—any material reason to treat the right to equal sovereignty claimed here any differently for standing purposes.[11] And under the logic of the Equal Protection cases, holding Section 209(b) unconstitutional and vacating the waiver would redress the claimed constitutional injury by leaving all states equally positioned, in that none could regulate vehicle emissions. Accordingly, unlike with their asserted economic injuries, State Petitioners' asserted constitutional injury can be redressed even absent evidence that manufacturers will change their plans before the waiver expires.[12]

---

[11] Although we find State Petitioners' claimed dignitary harm sufficiently analogous in kind for purposes of standing, we do not suggest that this harm is commensurate with equal protection injuries based on the perpetuation of "archaic and stereotypic notions" and stigmatization of members "of [a] disfavored group as 'innately inferior.'" *Heckler*, 465 U.S. at 739 (quoting *Miss. Univ. for Women v. Hogan*, 468 U.S. 718, 725 (1982)).

[12] State Petitioners' standing for their constitutional claim under 5 U.S.C. § 706(2)(B) does not revive their statutory preemption claim under § 706(2)(A). As the Supreme Court has repeatedly held, standing "is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see also, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008). We are aware of no precedent or rationale that would allow parties to bring claims over which we otherwise would lack

37

**B.**

Turning to the merits, we reject State Petitioners' theory. The Supreme Court has held that the Constitution contains a "fundamental principle of equal sovereignty." *Shelby County*, 570 U.S. at 544. But neither the Supreme Court nor any other court has ever applied that principle as a limit on the Commerce Clause or other Article I powers. As explained below, the rationale of *Shelby County* and the cases on which it relied in fact suggests that the principle imposes no such limit. The parties' remaining arguments confirm that conclusion. We therefore hold that Section 209(b) is subject to traditional rational basis review for Commerce Clause legislation and—as no one disputes—that it is constitutional under that standard.

*Shelby County* addressed the constitutionality of the Voting Rights Act's ("VRA") coverage formula, which required some but not all states to obtain approval from federal authorities before enacting voting-related laws, a process known as preclearance. *Id*. at 536–37. The Court did not disturb *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), which held that the coverage formula in the Voting Rights Act of 1965 was constitutional because it was "rational in both practice and theory." *Shelby County*, 570 U.S. at 550 (quoting *Katzenbach*, 383 U.S. at 330); *see also id.* at 550–51 (discussing the exceptional circumstances that supported *Katzenbach*'s conclusion). Instead, the core question in *Shelby County* was whether Congress had sufficient justification for continuing to subject those states to the preclearance requirement in its 2006 reauthorization of the Voting Rights Act. *Id*. The Supreme Court relied in part on the "fundamental principle of equal sovereignty," *id*. at 544, to hold that the

_____

jurisdiction—such as State Petitioners' statutory preemption claim—by appending another claim subject to a different standing analysis.

38

VRA's coverage formula was unconstitutional because it was founded on "decades-old data and eradicated practices," *id*. at 551, instead of being tailored to "current conditions," *id*. at 557. The Court did not outright reject the coverage formula for treating states differently; instead, it held that the formula's "disparate geographic coverage" was not "sufficiently related to the problem that it targets." *Id*. at 550–51 (quoting *Nw. Austin*, 557 U.S. at 203).

State Petitioners do not ask us to apply *Shelby County*'s test that a statute's "disparate geographic coverage" must be "sufficiently related to the problem that it targets." State Pet. Reply Br. 13 ("*Shelby County* never suggested this test applies in other contexts."). Indeed, they forfeited any argument that the waiver here fails *Shelby County*'s "sufficiently related" test by raising that argument for the first time in their reply brief. State Pet. Reply Br. 14–15. Instead, State Petitioners rely on *Shelby County* to argue that the equal sovereignty principle operates as a categorical bar on Congress's Commerce Clause authority—that is, that the principle prohibits Congress from enacting Commerce Clause legislation that leaves some states with more sovereign authority than others, regardless of Congress's reasons for doing so. State Pet. Br. 24–25, 28–29 ("Section 209(b) violates the equal-sovereignty doctrine by allowing California to exercise sovereign authority that § 209(a) takes from every other State."); State Pet. Reply Br. 10, 12.[13]

---

[13] State Petitioners half-heartedly suggest that "Congress *arguably* complies with the equal-sovereignty doctrine when it empowers only a single State (or a single subset of States) to regulate a matter of unique concern to that State (or that subset of States)," such as if Congress were to allow just one state to regulate a mineral that exists only in that state. State Pet. Br. 26–27. Such a law would fit with State Petitioners' categorical theory because it would not "deny sovereign authority to any State capable of exercising it." State Pet.

39

For several reasons, *Shelby County* does not support State Petitioners' request that we apply the equal sovereignty principle as a categorical limit on Congress's authority over interstate commerce.  First, the central debate in *Shelby County* was the scope of Congress's power to enforce the Fifteenth Amendment "by appropriate legislation."  570 U.S. at 536 (quoting U.S. Const. amend. XV).  The Court used equal sovereignty as a background principle in applying that phrase. *Id.* at 544–45.  State Petitioners confirm that textual link in their brief to us, arguing that *Shelby County* means that "in deciding whether such legislation was 'appropriate,' courts must consult the background principle of equal sovereignty."  State Pet. Br. 24.

But unlike the Fifteenth Amendment, Congress's Commerce Clause power is not limited to "appropriate legislation."   The Commerce Clause instead declares unconditionally that Congress has the power "to regulate commerce with foreign nations, among states, and with the Indian tribes."  U.S. Const. art. I § 8, cl. 3.  As the Supreme Court has explained, the Commerce Clause is "a grant of plenary authority to Congress," *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981), and "acknowledges no limitations" other than those "prescribed in the constitution" and "expressed in plain terms," *Gibbons v. Ogden*, 22 U.S. 1, 196 (1824).

Second, in requiring that the VRA's coverage formula be sufficiently related to the problem it targets, *Shelby County* repeatedly emphasized that the VRA was "extraordinary," 570 U.S. at 536, because it intruded on states' power to regulate

---

Reply Br. 14.  As the example indicates, this suggestion is not substantively different from the theory that the equal sovereignty principle imposes a categorical limit on Congress's Commerce Clause authority, and we therefore do not address it separately.

40

elections, a "sensitive area of state and local policymaking," *id*. at 545 (quoting *Lopez v. Monterey County*, 535 U.S. 266, 282 (1999)), which "the Framers of the Constitution intended the States to keep for themselves," *id*. at 543 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991)). The VRA was therefore a "drastic departure from basic principles of federalism." *Id.* at 535. Because the VRA departed from the traditional balance of state and federal power over elections, the Court required a heightened showing that subjecting specific states to the preclearance requirement was still "appropriate" considering the nation's current conditions. *Id*. at 555.

Section 209(b) is not "extraordinary" in that way. The Constitution places regulation of all matters affecting interstate commerce—including vehicle emissions—squarely within Congress's domain, not that of the states. *See Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 180–83 (D.C. Cir. 2015); *see also Massachusetts*, 549 U.S. at 528–29. Indeed, in discussing the Constitution's assignment to Congress of control over interstate commerce the Court has stressed that "[n]o other federal power was so universally assumed to be necessary" and "no other state power was so readily relinquished." *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534 (1949). Accordingly, no one questions that Congress could readily preempt all states from regulating motor vehicle emissions, or that Congress itself could set different vehicle emissions standards for different regions of the country. *See Sec'y of Agric. v. Cent. Roig Refin. Co*., 338 U.S. 604, 616 (1950) (recognizing Congress's authority to "devise . . . a national policy with due regard for the varying and fluctuating interests of different regions"); *Hodel v. Indiana*, 452 U.S. 314, 332 (1981). *Shelby County* does not support requiring a heightened justification for disparate intrusions into areas over which the Constitution grants Congress such comprehensive control. As the Third Circuit put it, "there is nothing in *Shelby County* to indicate that the equal sovereignty principle is meant

41

to apply with the same force outside the context of 'sensitive areas of state and local policymaking.'" *NCAA*, 730 F.3d at 239 (quoting *Shelby County*, 570 U.S. at 545).

Further, State Petitioners ask us not only to venture beyond the bounds *Shelby County* set for the equal sovereignty principle but also to dramatically increase its force. Recall that *Shelby County* did not establish a categorical bar against Congress leaving states with different levels of sovereign authority even in the traditionally state-dominated context of voting; it required only that Congress show the disparate treatment is "sufficiently related to the problem that it targets." 570 U.S. at 550–51 (quoting *Nw. Austin*, 557 U.S. at 204). Indeed, the Court reaffirmed *Katzenbach*'s holding that Congress could do so with sufficient evidence. *Id.* Yet State Petitioners ask us to hold that the equal sovereignty principle operates as a categorical bar against treating states differently in the context of Commerce Clause legislation. State Pet. Br. 28–29; State Pet. Reply Br. 10–11. Given that the Constitution grants Congress primacy over interstate commerce, that would be a highly counterintuitive conclusion.

State Petitioners also rely on a series of cases known as the equal footing cases, which *Shelby County* cited as applying the equal sovereignty principle. *See* 570 U.S. at 544. Those cases involved congressional attempts to place limits on new states as a condition of admission to the Union and identified "equal sovereignty" as an "attribute . . . guaranteed to" each state "upon admission." *United States v. Louisiana*, 363 U.S. 1, 16 (1960), *supplemented sub nom. United States v. Louisiana*, 382 U.S. 288 (1965). For example, *Coyle v. Smith*, 221 U.S. 559 (1911), held that Congress had no authority to prohibit Oklahoma from moving its state capital as a condition of admission into the United States. *Id.* at 567–68. The Court's opinion addressed whether Congress's power to admit new states into the Union allowed such a condition, which was

42

concededly beyond any of Congress's other enumerated powers. *Id.* The Court explained that Congress could not use its admission power to require a new state to give up an aspect of sovereignty that the thirteen original states retained. *Id*. To do so, the Court concluded, would create a "union of states unequal in power, as including states whose powers were restricted only by the Constitution, with others whose powers had been further restricted by an act of Congress accepted as a condition of admission." *Id*. at 567. State Petitioners here seize on that and similar language to support their argument that the equal sovereignty principle must mean Congress generally has no power to legislate in ways that leave the states with unequal sovereign authority.

The equal footing cases, however, do not directly apply either outside of the admission context or to Article I powers like the Commerce Clause. *Shelby County* itself reaffirmed prior holdings that the doctrine is not a "*bar* on differential treatment outside th[e] context" of states' admission into the Union. 570 U.S. at 544. *Shelby County*, of course, drew on the equal footing cases and concluded that the principle of equal sovereignty they discuss remained "highly pertinent" in the context of that case. *Id.* But for all the reasons explained above, *Shelby County* does not extend the principle even further to any (let alone all) Article I legislation.

The equal footing cases themselves also support that conclusion. Those cases contemplated—though, to be sure, only in *dicta*—that even if Congress treated states differently at the time of admission, it would not violate the equal footing guarantee so long as it acted within the scope of its plenary powers over interstate commerce. The Court suggested in *Coyle* that Congress could treat states differently if—instead of using its admission power—it enacted "legislation intended as a regulation of commerce," because to do that would be acting "within the sphere of the plain power of Congress." 221 U.S.

43

at 574; *see also id*. at 572–74; *Pollard v. Hagan*, 44 U.S. 212, 229–30 (1845). Such a condition would not put states on an impermissibly unequal footing because it "would not operate to restrict the state's legislative power in respect of any matter which was not plainly within the regulating power of Congress." *Coyle*, 221 U.S. at 574. Accordingly, the equal footing cases fit neatly with the conclusion that the equal sovereignty principle is not a categorical bar on Congress deploying its plenary power over interstate commerce in ways that differentially affect states' legislative power.

The parties also debate whether State Petitioners' theory is supported by the Constitution's text, founding era history, and law of nations principles. We address each in turn and conclude these other indicators of constitutional meaning do not support State Petitioners' theory.

The Constitution does not contain any textual provision suggesting an equal sovereignty limit on Congress's Article I powers generally or on the Commerce Clause in particular. As already discussed, the Commerce Clause is a plenary grant of authority to regulate interstate commerce which the Supreme Court has held is subject only to those limitations "prescribed in the constitution" and "expressed in plain terms." *Gibbons*, 22 U.S. at 196.

To the extent the Constitution's text sheds light on the question, it appears to cut against State Petitioners, because the Constitution does impose certain equality-based limitations on other Article I powers. For example, the text of Article I, Section 8 states that laws concerning bankruptcy, naturalization, and duties shall be "uniform." *See* U.S. Const. art. I, § 8, cl. 1, cl. 4. Similarly, Article I, Section 9 prohibits "[p]reference . . . given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." U.S. Const. art. I, § 9, cl. 6. State Petitioners argue that these textual

44

provisions do not suggest the absence of a general equal sovereignty limit on Article I.  As they point out, these provisions speak only to whether Congress can treat states differently when Congress itself does the legislating, not whether Congress can allow some but not other states to exercise the sovereign authority to legislate on an issue.  That is, the provisions guarantee the states equal *treatment* for only specific subjects rather than equal *sovereignty* for only those subjects.  The key for present purposes, however, is that even though the Founders plainly knew how to include equality-based protections for states in Article I when they wished to, they did not include any mention of State Petitioners' broad equal sovereignty principle.  The fact that some constitutional clauses explicitly contain an equality-based guarantee therefore supports a negative inference—though perhaps only a mild one—that the Commerce Clause is not so constrained.

There are, of course, "constitutional doctrines that are not spelled out in the Constitution but are nevertheless implicit in its structure and supported by historical practice," such as the doctrine of state sovereign immunity.  *Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1498–99 (2019).  That category also includes limits on the Commerce Clause, such as the Tenth Amendment anticommandeering doctrine, which are supported by the historical context in which our federal structure was created.  *See New York v. United States*, 505 U.S. 144, 163–66 (1992) (discussing founding era debates supporting the anticommandeering doctrine).  The evidence the parties provide from the founding era, however, does not show that State Petitioners' version of the equal sovereignty principle has a comparable historical pedigree.  It is true, as State Petitioners urge, that the general subject of state sovereignty and the states' relation to each other and the new federal government was a core focus at the founding.  Despite that focus, however, State Petitioners have identified no evidence that the Founders

45

contemplated the *type* of inviolable equal state sovereignty State Petitioners ask us to announce.

The equal sovereignty debate at the founding centered on how states would be represented in Congress, with the smaller states arguing for equal representation for each state and the larger states seeking "equality for each voter" in the form of proportional representation. *See Wesberry v. Sanders*, 376 U.S. 1, 11–14 (1964) (summarizing the Great Compromise debates); Letter from James Madison to Thomas Jefferson (Oct. 24, 1787), *in* 12 The Papers of Thomas Jefferson 270, 279 (Julian P. Boyd ed., 1955) (discussing how the "little States insisted on retaining their equality in both branches" while the "large states . . . urged that as the new Government was to be drawn principally from the people immediately"). For example, New Jersey delegate William Paterson used the concept of "equal sovereignty" to support his argument for a single legislative chamber with an equal vote for each state. *Wesberry*, 376 U.S. at 11 (citing 3 The Records of the Federal Convention of 1787, at 251 (Max Farrand ed., 1911)). Eventually, these debates led to the Great Compromise, which established two forms of equality central to Article I: "equal sovereignty" in the Senate in the form of equal representation for each state and equal representation for each voter in the House in the form of proportional representation. U.S. Const. art. I, §§ 2, 3; *see also* The Federalist No. 39, at 255 (James Madison) (Jacob E. Cooke ed., 1961). The Founders' preoccupation with the manner and extent of state equality under the Constitution also appears to have yielded the specific equality-based limits on Congress's legislative authority discussed above. If the Constitution also contained State Petitioners' fundamental yet unstated limit on Congress's authority to legislate, one would expect ample historical evidence of that limit at the founding. State Petitioners point us to none. *Cf. New York*, 505 U.S. at 163–66.

46

In fact, as State Petitioners admit, the Constitution includes one provision that expressly allows Congress to enhance the sovereign authority of some states without granting that authority equally to all states.  State Pet. Reply Br. 10.  Article I, Section 10 provides that "No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power."  U.S. Const. art. I, § 10, cl. 3.  That is, Congress has the power to grant individual states greater authority to, for example, assess taxes and even enter compacts with foreign powers—indisputably elements of "sovereignty"—without extending the same authority to other states.  *See Wheeling, P. & C. Transp. Co. v. City of Wheeling*, 99 U.S. 273, 283 (1878) ("Taxation, beyond all doubt, is the exercise of a sovereign power . . . ."); *Cuyler v. Adams*, 449 U.S. 433, 440 (1981) (compacts necessarily "tend[] to the increase of political power" for the states (quoting *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 468 (1978))).  Early Congresses used Article I, Section 10 in this very manner, granting specific states legislative authority to impose tonnage duties.  *See, e.g.*, Act of Feb. 9, 1791, ch. 5, 1 Stat. 190 (consenting to Maryland statute imposing duty at Port of Baltimore); Act of Aug. 11, 1790, ch. 43, 1 Stat. 184 (consenting to Georgia, Maryland, and Rhode Island statutes imposing tonnage duties).  If this provision were—as State Petitioners would have it—a limited exception to an otherwise generally applicable equal sovereignty guarantee implicit in the Constitution, we would expect to see some founding era discussion of how the provision interacts with that broader equal sovereignty principle.  Yet State Petitioners identify no evidence of that either.

The only affirmative support State Petitioners identify for their theory comes from law of nations principles.  They argue that the Founders expected international law of nations

47

principles to govern the states and that those principles included a notion of equal sovereignty that would render federal legislation unconstitutional if it treated states differently. State. Pet. Br. 18; State Pet. Reply Br. 12 ("At the founding, the law of nations entitled all sovereigns to perfect equality." (internal quotation marks omitted)). That argument is unpersuasive. International law contained no analog for the relation in our constitutional system between the federal government and the states, and so it would be surprising if the law of nations dictated limits on Congress's authority in relation to the states. And, as it turns out, the Supreme Court has effectively explained that the Constitution's Supremacy Clause defeats State Petitioners' reasoning. In *Gibbons*, the Court held that while states may have equal sovereign authority to regulate commerce in the absence of federal action, that authority is "subjected . . . to the superior power of Congress" when Congress acts. 22 U.S. at 70. Indeed, the *Gibbons* Court cited the very same law of nations principles that State Petitioners rely on, but only to describe the relationship between the states when Congress has *not* acted pursuant to its commerce power. *Id*. at 69–70. No case since *Gibbons* has said otherwise.

The nature and extent of equality between the states has been a central debate throughout our country's history, from the founding to the admission of new states and beyond. But State Petitioners point us to no meaningful support for their novel request to apply the equal sovereignty principle as a categorical limit on Congress's power to regulate interstate commerce. The First and Third Circuits—the only appellate courts to have considered similar arguments—have found *Shelby County*'s discussion of the equal sovereignty principle inapplicable to Commerce Clause and Spending Clause legislation for similar reasons. *See NCAA*, 730 F.3d at 238–39 (Commerce Clause); *Mayhew*, 772 F.3d at 95 (Spending Clause).

48

Section 209(b) is subject to the rational basis review normally applied to Commerce Clause legislation. *See Hodel*, 452 U.S. at 276–77. And because State Petitioners present no argument that Section 209(b) or the waiver at issue cannot survive that review, we reject their constitutional challenge.

State Petitioners' request to set aside the Administrator's decision on these grounds is denied.

*So ordered.*