# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| STATE OF OHIO, STATE OF ALABAMA, STATE OF ARKANSAS, STATE OF GEORGIA, STATE OF INDIANA, STATE OF KANSAS, STATE OF KENTUCKY, STATE OF LOUISIANA, STATE OF MISSISSIPPI, STATE OF MISSOURI, STATE OF MONTANA, STATE OF NEBRASKA, STATE OF OKLAHOMA, STATE OF SOUTH CAROLINA, STATE OF TEXAS, STATE OF UTAH, and STATE OF WEST VIRGINIA, <br><br> Petitioners, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, <br><br> Respondents. | Case No.  22-1081 |

## PETITION FOR REVIEW

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure and section 307(b) of the Clean Air Act, 42 U.S.C. §7607(b), the States of Ohio, Alabama, Arkansas, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia hereby petition the Court for review of a final action of respondents, the U.S. Environmental Protection Agency and Michael S. Regan, Administrator of the U.S. Environmental Protection Agency. This final agency action re-instituted California's waiver of federal preemption under section 209(b)(1) of the Clean Air Act, 42 U.S.C. 7543(b)(1), to allow California to regulate greenhouse gas emissions from motor vehicles under its Advanced Clean Cars program. This agency action was announced on March 14, 2022. *California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision*, 87 Fed. Reg. 14332 (Mar. 14, 2022).

Section 307(b) provides venue exclusively in this Court for review of final agency actions that are "nationally applicable," or based on the agency's published determination of "nationwide scope or effect." 42 U.S.C. § 7607(b)(1); *see also Dalton Trucking v. U.S. Envt'l Protection Agency*, 808 F.3d 875, 877 (D.C. Cir. 2015). The Administrator has determined that the EPA's March 14 decision has "nationwide scope or effect." 87 Fed. Reg. at 14379.

DATED: May 12, 2022

Respectfully submitted,

DAVE YOST
Attorney General of Ohio

/s/ Benjamin M. Flowers
BENJAMIN M. FLOWERS
Ohio Solicitor General
MICHAEL HENDERSHOT
Chief Deputy Solicitor General
MAY MAILMAN
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
(614) 466-8980
(614) 466-5087 fax
benjamin.flowers@ohioago.gov

*Counsel for State of Ohio*

STEVE MARSHALL
Attorney General of Alabama

/s/ Edmund G. LaCour Jr. (BMF per authority)
EDMUND G. LACOUR JR.
Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8400 fax
Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

LESLIE RUTLEDGE
Attorney General of Arkansas

/s/Nicholas J. Bronni (BMF per authority)
NICHOLAS J. BRONNI
Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
Nicholas.Bronni@arkansasag.gov

*Counsel for the State of Arkansas*

CHRISTOPHER M. CARR
Attorney General of Georgia

*/s/ Stephen J. Petrany* (BMF per authority)
STEPHEN J. PETRANY
Solicitor General
Georgia Department of Law
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

THEODORE E. ROKITA
Attorney General of Indiana

*/s/ Thomas M. Fisher* (BMF per authority)
THOMAS M. FISHER
Solicitor General
Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, IN 46204-2770
(317) 232-6255
Tom.Fisher@atg.in.gov

*Counsel for State of Indiana*

DEREK SCHMIDT
Attorney General of Kansas

*/s/ Jeffrey A. Chanay* (BMF per authority)
Jeffrey A. Chanay
Chief Deputy Attorney General
120 S.W. 10th Avenue, 3rd Floor
Topeka, KS 66612
(785) 368-8435
(785) 291-3767 fax
jeff.chanay@ag.ks.gov

*Counsel for State of Kansas*

DANIEL CAMERON
Attorney General of Kentucky

*/s/ Matthew F. Kuhn* (BMF per authority)
MATTHEW F. KUHN
Solicitor General
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5400
Matt.Kuhn@ky.gov

*Counsel for State of Kentucky*

JEFF LANDRY
Attorney General of Louisiana

*/s/ Elizabeth B. Murrill* (BMF per authority)
ELIZABETH B. MURRILL
Solicitor General
J. SCOTT ST. JOHN
Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana 70804
(225) 326-6766
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

*/s/ Justin L. Matheny* (BMF per authority)
JUSTIN L. MATHENY
Deputy Solicitor General
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
(601) 359-3825
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ERIC S. SCHMITT
Attorney General of Missouri

*/s/ D. John Sauer* (BMF per authority)
D. JOHN SAUER
Solicitor General
JEFF P. JOHNSON
Deputy Solicitor General
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
(573) 751-8870
(573) 751-0774 fax
John.Sauer@ago.mo.gov

*Counsel for State of Missouri*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/ David M.S. Dewhirst* (BMF per authority)
DAVID M.S. DEWHIRST
Solicitor General
KATHLEEN L. SMITHGALL
Assistant Solicitor General
Montana Department of Justice
215 N Sanders St
Helena, MT 59601
(406) 444-2026
David.Dewhirst@mt.gov
Kathleen.Smithgall@mt.gov

*Counsel for State of Montana*

DOUGLAS J. PETERSON
Attorney General of Nebraska

*/s/ James A. Campbell* (BMF per authority)
JAMES A. CAMPBELL
Solicitor General
JUSTIN D. LAVENE
Assistant Attorney General
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2682
jim.campbell@nebraska.gov
justin.lavene@nebraska.gov

*Counsel for State of Nebraska*

JOHN M. O'CONNOR
Attorney General of Oklahoma

*/s/ Bryan Cleveland* (BMF per authority)
BRYAN CLEVELAND
Deputy Solicitor General
Oklahoma Attorney General's Office
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
bryan.cleveland@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
Attorney General of South Carolina

*/s/ James Emory Smith, Jr.* (BMF per authority)
JAMES EMORY SMITH
Deputy Solicitor General
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, SC 29211
(803)734-3680
esmith@scag.gov

*Counsel for State of South Carolina*

SEAN D. REYES
Attorney General of Utah

*/s/ Melissa A. Holyoak* (BMF per authority)
MELISSA A. HOLYOAK
Utah Solicitor General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0260
melissaholyoak@agutah.gov

*Counsel for State of Utah*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Judd E. Stone II* (BMF per authority)
JUDD E. STONE II
Solicitor General
RYAN S. BAASCH
Assistant Solicitor General
KATIE B. HOBSON
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700
(512) 474-2697 fax
Ryan.Baasch@oag.texas.gov
Katie.Hobson@oag.texas.gov

*Counsel for State of Texas*

PATRICK MORRISEY
Attorney General of West Virginia

*/s/ Lindsay S. See* (BMF per authority)
LINDSAY S. SEE
Solicitor General
MICHAEL R. WILLIAMS
Senior Deputy Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(682) 313-4550
Lindsay.S.See@wvago.gov

*Counsel for State of West Virginia*

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2022, a copy of the foregoing petition for re-

view has been served by United States first-class mail upon each of the following:

Hon. Michael S. Regan
Office of the Administrator (1101A)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460


Hon. Merrick Garland
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530


Jeffrey Prieto
Office of the General Counsel (2310A)
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20460


Elizabeth Prelogar
Solicitor General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001


*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS
Ohio Solicitor General

ATTACHMENT

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OAR–2021–0257; FRL–9325–01–OAR]

**California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision**

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency (EPA) has completed the reconsideration of its 2019 action withdrawing a 2013 Clean Air Act (CAA) waiver of preemption for California's greenhouse gas (GHG) emission standards and zero emission vehicle (ZEV) sale mandate, which are part of California's Advanced Clean Car (ACC) program. This decision rescinds EPA's 2019 waiver withdrawal, thus bringing back into force the 2013 ACC program waiver, including a waiver of preemption for California's ZEV sales mandate and GHG emissions standards. In addition, EPA is withdrawing the interpretive view of CAA section 177 included in its 2019 action, that States may not adopt California's GHG standards pursuant to section 177 even if EPA has granted California a waiver for such standards. Accordingly, other States may continue to adopt and enforce California's GHG standards under section 177 so long as they meet the requirements of that section.

**DATES:** Petitions for review must be filed by May 13, 2022.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2021–0257. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available electronically through *www.regulations.gov*. After opening the *www.regulations.gov* website, enter EPA–HQ–OAR–2021–0257 in the ''Enter Keyword or ID'' fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. EPA's Office of Transportation and Air Quality (OTAQ) maintains a web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are cited in this notice;

the page can be accessed at *https://www.epa.gov/state-and-local-transportation/vehicle-emissions-california-waivers-and-authorizations*.

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW. Telephone: (202) 343–9256. Email: *Dickinson.David@epa.gov* or Kayla Steinberg, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Ave. NW. Telephone: (202) 564–7658. Email: *Steinberg.Kayla@epa.gov*.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Executive Summary
II. Background
  A. California's Advanced Clean Car (ACC) Program and EPA's 2013 Waiver
  B. Prior Waivers for GHG Standards
  C. SAFE 1 Decision
  D. Petitions for Reconsideration
III. Principles Governing This Review
  A. Scope of Preemption and Waiver Criteria Under the Clean Air Act
  B. Deference to California
  C. Standard and Burden of Proof
IV. EPA did not Appropriately Exercise Its Limited Authority To Reconsider the ACC Program Waiver in SAFE 1
  A. Comments Received
  B. Analysis: EPA Inappropriately Exercised Its Limited Authority To Reconsider
  C. Conclusion
V. The SAFE 1 Interpretation of Section 209(b)(1)(B) was Inappropriate and, in any Event, California met Its Requirements
  A. Historical Practice
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: California Needs the ACC Program GHG Standards and ZEV Sales Mandate to Address Compelling and Extraordinary Conditions Under Section 209(b)(1)(B)
  1. EPA is Withdrawing the SAFE 1 Section 209(b)(1)(B) Interpretation
  2. California Needs the GHG Standards and ZEV Sales Mandate Even Under the SAFE 1 Interpretation
  a. GHG Standards and ZEV Sales Mandates Have Criteria Emission Benefits
  b. California Needs Its Standards To Address the Impacts of Climate Change in California
  3. California's ZEV Sales Mandate as Motor Vehicle Control Technology Development
  E. Conclusion
VI. EPA Inappropriately Considered Preemption Under the Energy and Policy Conservation Act (EPCA) in Its Waiver Decision
  A. Historical Practice and Legislative History
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received

  D. Analysis: EPA is Rescinding its SAFE 1 Actions Related to Preemption Under EPCA
  1. NHTSA Has Since Repealed Its Findings of Preemption Made in SAFE 1
  2. EPA Improperly Deviated From its Historical Practice of Limiting its Review to Section 209(b) Criteria
  E. Conclusion
VII. EPA Inappropriately set Forth an Interpretive View of Section 177 in SAFE 1
  A. SAFE 1 Interpretation
  B. Notice of Reconsideration of SAFE 1 and Request for Comment
  C. Comments Received
  D. Analysis: EPA is Rescinding SAFE 1's Interpretive Views of Section 177
  E. Conclusion
VIII. Other Issues
  A. Equal Sovereignty
  B. CARB's Deemed-to-Comply Provision
IX. Decision
X. Statutory and Executive Order Reviews

## I. Executive Summary

CAA section 209(a) generally preempts states from adopting emission control standards for new motor vehicles. But Congress created an important exception from preemption. Under CAA section 209(b), the State of California[1] may seek a waiver of preemption, and EPA must grant it unless the Agency makes one of three statutory findings. California's waiver of preemption for its motor vehicle emissions standards allows other States to adopt and enforce identical standards pursuant to CAA section 177. Since the CAA was enacted, EPA has granted California dozens of waivers of preemption, permitting California to enforce its own motor vehicle emission standards.

Of particular relevance to this action, in 2013, EPA granted California's waiver request for the state's Advanced Clean Car (ACC) program (ACC program waiver).[2] California's ACC program includes both a Low Emission Vehicle (LEV) program, which regulates criteria pollutants and greenhouse gas (GHG) emissions, as well as a Zero Emission Vehicle (ZEV) sales mandate. These two requirements are designed to control smog- and soot-causing pollutants and GHG emissions in a single coordinated package of requirements for passenger cars, light-duty trucks, and medium-duty passenger vehicles (as well as

---

[1] The CAA section 209(b) waiver is limited ''to any State which has adopted standards . . . for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966,'' and California is the only State that had standards in place before that date. ''California'' and ''California Air Resources Board'' (CARB) are used interchangeably in certain instances in this notice when referring to the waiver process under section 209(b).

[2] 78 FR 2111 (January 9, 2013).

limited requirements related to heavy-duty vehicles). Between 2013 and 2019, twelve States adopted one or both of California's standards as their own. But in 2019, EPA partially withdrew this waiver as part of a final action entitled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program" (SAFE 1), marking the first time the agency withdrew a previously granted waiver.[3] In addition, in the context of SAFE 1, EPA provided an interpretive view of CAA section 177 asserting that other states were precluded from adopting California's GHG standards.

As Administrator of the Environmental Protection Agency (EPA), I am now rescinding EPA's 2019 actions in SAFE 1 that partially withdrew the ACC program waiver for California's ACC program. I am rescinding these actions because (1) EPA's reconsideration of the waiver under the particular facts and circumstances of this case was improper; (2) EPA's reconsideration was based on a flawed interpretation of CAA section 209(b); (3) even under that flawed interpretation, EPA misapplied the facts and inappropriately withdrew the waiver; (4) EPA erred in looking beyond the statutory factors in CAA 209(b) to action taken by another agency under another statute to justify withdrawing the waiver; (5) that agency has also since withdrawn the action EPA relied on in any event; and (6) EPA inappropriately provided an interpretive view of section 177.

As a result of this action, EPA's 2013 waiver for the ACC program, specifically the waiver for California's GHG emission standards and ZEV sales mandate requirements for model years (MYs) 2017 through 2025, comes back into force.[4] I am also rescinding the interpretive view set forth in SAFE 1 that States may not adopt California's GHG standards pursuant to CAA section 177 even if EPA has granted California a section 209 waiver for such standards. Accordingly, States may now adopt and enforce California's GHG standards so long as they meet the requirements of

Section 177, and EPA will evaluate any State's request to include those provisions in a SIP through a separate notice and comment process.

Section II of this action contains a detailed history of EPA's waiver adjudications leading up to this action. In summary, in 2012, CARB submitted the ACC waiver request to EPA, which included ample evidence of the criteria pollution benefits of the GHG standards and the ZEV sales mandate. As it had in all prior waiver decisions with two exceptions (including SAFE 1), in considering the request EPA relied on its "traditional" interpretation of section 209(b)(1)(B), which examines whether California needs a separate motor vehicle program as a whole—not specific standards—to address the state's compelling and extraordinary conditions. In 2013, EPA granted California's waiver request for its ACC program in full. In 2018, however, EPA proposed to withdraw portions of its waiver granted in 2013 based on a new interpretation of section 209(b)(1)(B) that looked at whether the specific standards (the GHG standards and ZEV sales mandate), as opposed to the program as a whole, continued to meet the second and third waiver prongs (found in sections 209(b)(1)(B) and (C)).[5] In addition, EPA proposed to look beyond the section 209(b) criteria to consider the promulgation of a NHTSA regulation and pronouncements in SAFE 1 that declared state GHG emission standards and ZEV sales mandates preempted under EPCA. In 2019, after granting CARB a waiver for its ACC program in 2013 and after 12 states had adopted all or part of the California standards under section 177, EPA withdrew portions of the waiver for CARB's GHG emission standards and ZEV sales mandates. In SAFE 1, EPA cited changed circumstances and was based on a new interpretation of the CAA and the agency's reliance on an action by NHTSA that has now been repealed.[6]

On January 20, 2021, President Biden issued Executive Order 13990, directing the Federal Agencies to "immediately review" SAFE 1 and to consider action "suspending, revising, or rescinding" that action by April 2021. On April 28, 2021, EPA announced its Notice of Reconsideration, including a public hearing and an opportunity for public comment.[7] The Agency stated its belief that there were significant issues regarding whether SAFE 1 was a valid and appropriate exercise of Agency authority, including the amount of time that had passed since EPA's ACC program waiver decision, the approach and legal interpretations used in SAFE 1, whether EPA took proper account of the environmental conditions (*e.g.,* local climate and topography, number of motor vehicles, and local and regional air quality) in California, and the environmental consequences from the waiver withdrawal in SAFE 1. Further, EPA stated it would be addressing issues raised in the related petitions for reconsideration of EPA's SAFE 1 action. In the meantime, having reconsidered its own action, and also in response to Executive Order 13990, NHTSA repealed its conclusion that state and local laws related to fuel economy standards, including GHG standards and ZEV sales mandates, were preempted under EPCA,[8] and EPA revised and made more stringent the Federal GHG emission standards for light-duty vehicles for 2023 and later model years, under section 202(a).[9]

Section III of this action outlines the principles that govern waiver reconsiderations. It sets forth the statutory background and context for the CAA preemption of new motor vehicle emission standards, the criteria for granting a waiver of preemption, and the ability of other States to adopt and enforce California's new motor vehicle emission standards where a waiver has been issued if certain CAA criteria are met. In brief, CAA section 209(a) generally preempts all States or political subdivisions from adopting and enforcing any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines. But section 209(b) contains an important exception that allows only

---

[3] 84 FR 51310 (September 27, 2019).

[4] In SAFE 1, EPA did not withdraw the entire 2013 waiver, but instead only withdrew the waiver as it related to California's GHG emission standards and the ZEV sales mandate. The waiver for the low-emission vehicle (LEV III) criteria pollutant standards in the ACC program remained in place. EPA's reconsideration of SAFE 1 and the impact on the ACC waiver therefore relates only to the GHG emission standards and the ZEV sales mandate, although "ACC program waiver" is used in this document. This action rescinds the waiver withdrawal in SAFE 1. In this decision, the Agency takes no position on any impacts this decision may have on state law matters regarding implementation.

[5] EPA's 2018 proposal was jointly issued with the National Highway Traffic Safety Administration (NHTSA). 83 FR 42986 (August 24, 2018) (the "SAFE proposal"). In addition to partially withdrawing the waiver, that proposal proposed to set less stringent greenhouse gas and CAFE standards for model years 2021–2026. NHTSA also proposed to make findings related to preemption under the Energy Policy and Conservation Act (EPCA) and its relationship to state and local GHG emission standards and ZEV sales mandates.

[6] 84 FR 51310. In SAFE 1, NHTSA also finalized its action related to preemption under EPCA. NHTSA's action included both regulatory text and well as pronouncements within the preamble of SAFE 1. In 2020, EPA finalized its amended and less stringent carbon dioxide standards for the 2021–2026 model years in an action titled "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks" (SAFE 2). 85 FR 24174 (April 30, 2020).

[7] "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Opportunity for Public Hearing and Public Comment." 86 FR 22421 (April 28, 2021).

[8] 86 FR 74236 (December 29, 2021).

[9] 86 FR 74434 (December 30, 2021).

California to submit a request to waive preemption for its standards. Importantly, EPA must grant the waiver unless the Administrator makes at least one of three findings: (1) That California's determination that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards, is arbitrary and capricious (the "first waiver prong," under section 209(b)(1)(A)); (2) that California does not need such State standards to meet compelling and extraordinary conditions (the "second waiver prong," under section 209(b)(1)(B)); or (3) that California standards are not consistent with section 202(a), which contains EPA's authority to regulate motor vehicles (the "third waiver prong," under section 209(b)(1)(C)). In the 1977 amendments to the CAA, section 177 was added to allow other States that may be facing their own air quality concerns to adopt and enforce the California new motor vehicle emission standards for which California has been granted a waiver under section 209(b) if certain criteria are met.

Section III also provides more context to indicate that Congress intended that, when reviewing a request for a waiver, EPA treat with deference the policy judgments on which California's vehicle emission standards are based. It discusses the history of Congress allowing states to adopt more stringent standards. Ultimately, Congress built a structure in section 209(b) that grants California authority to address its air quality problems, and also acknowledges the needs of other states to address their air quality problems through section 177. Lastly, Section III describes the burden and standard of proof for waiver decisions.

Section IV of this action then discusses EPA's first basis for rescinding the SAFE 1 waiver withdrawal: That EPA did not appropriately exercise its limited authority to withdraw a waiver once granted. Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. In the context of reconsidering a waiver grant, that authority may only be exercised sparingly. EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). EPA's reconsideration may not be broader than the limits Congress placed on its ability to deny a waiver in the first place. EPA notes further support for limiting its

exercise of reconsideration authority, relevant in the context of a waiver withdrawal, is evidenced by Congress's creation of a state and federal regulatory framework to drive motor vehicle emissions reduction and technology innovation that depends for its success on the stable market signal of the waiver grant—automobile manufacturers must be able to depend reliably on the continuing validity of the waiver grant in order to justify the necessary investments in cleaner vehicle technology. Accordingly, EPA now believes it may only reconsider a previously granted waiver to address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Even then, as with other adjudicatory actions, when choosing to undertake such a reconsideration EPA believes it should exercise its limited authority within a reasonable timeframe and be mindful of reliance interests. EPA expects such occurrences will be rare. The Agency's waiver withdrawal in SAFE 1 was not an appropriate exercise of EPA's limited authority; there was no clerical error or factual error in the ACC program waiver, and SAFE 1 did not point to any factual circumstances or conditions related to the three waiver prongs that have changed so significantly that the propriety of the waiver grant is called into doubt. Rather, the 2019 waiver withdrawal was based on a change in EPA's statutory interpretation, an incomplete assessment of the record, and another agency's action beyond the confines of section 209(b). EPA erred in reconsidering a previously granted waiver on these bases. Accordingly, EPA is rescinding its 2019 withdrawal of its 2013 ACC program waiver.

Sections V and VI further explain why, even if SAFE 1 were an appropriate exercise of EPA's limited authority to reconsider its previously-granted waiver, the Agency would still now rescind its waiver withdrawal.

As discussed in Section V, the Agency's reinterpretation of the second waiver prong in SAFE 1 was flawed. While EPA has traditionally interpreted the second waiver prong, section 209(b)(1)(B), to require a waiver unless the Agency demonstrates that California does not need its own motor vehicle emissions program, to meet compelling and extraordinary conditions, the SAFE 1 waiver withdrawal decision was based on a statutory interpretation that calls for an examination of the need for the specific standard at issue. Section V

explains why EPA believes that its traditional interpretation is, at least, the better interpretation of the second waiver prong because it is most consistent with the statutory language and supported by the legislative history. Accordingly, we reaffirm the traditional interpretation—in which EPA reviews the need for California's motor vehicle program—in this action.

Additionally, Section V explains why even if the focus is on the specific standards, when looking at the record before it, EPA erred in SAFE 1 in concluding that California does not have a compelling need for the specific standards at issue—the GHG emission standards and ZEV sales mandate. In particular, in SAFE 1, the Agency failed to take proper account of the nature and magnitude of California's serious air quality problems, including the interrelationship between criteria and GHG pollution.[10] Section V further discusses EPA's improper substitution in SAFE 1 of its own policy preferences for California's, and discusses the importance of deferring to California's judgment on "ambiguous and controversial matters of public policy" that relate to the health and welfare of its citizens.[11] Based on a complete review of the record in this action, EPA now believes that, even under the SAFE 1 interpretation, California needs the ZEV sales mandate and GHG standards at issue to address compelling and extraordinary air quality conditions in the state. EPA's findings in SAFE 1, which were based on the Agency's inaccurate belief that these standards were either not intended to or did not result in criteria emission reductions to address California's National Ambient Air Quality Standard (NAAQS) obligations, are withdrawn.

Section VI discusses SAFE 1's other basis for withdrawing the ACC program waiver, EPCA. In SAFE 1, EPA reached beyond the waiver criteria in section 209(b)(1) and considered NHTSA's regulations in SAFE 1 that state or local regulation of carbon dioxide emission from new motor vehicles (including

---

[10] As explained herein, the requirements in the ACC program were designed to work together in terms of the technologies that would be used to both lower criteria emissions and GHG emissions. The standards, including the ZEV sales mandate and the GHG emission standards, were designed to address the short- and long-term air quality goals in California in terms of the criteria emission reductions (including upstream reductions) along GHG emission reductions. The air quality issues and pollutants addressed in the ACC program are interconnected in terms of the impacts of climate change on such local air quality concerns such as ozone exacerbation and climate effects on wildfires that affect local air quality.

[11] 40 FR 23102, 23104 (May 28, 1975); 58 FR 4166 (January 13, 1993).

California's ZEV sales mandate and GHG standards) are related to fuel economy and as such are preempted under EPCA. NHTSA has since issued a final rule that repeals all regulatory text and additional pronouncements regarding preemption under EPCA set forth in SAFE 1.[12] This action by NHTSA effectively removes the underpinning and any possible reasoned basis for EPA's withdrawal decision based on preemption under EPCA in SAFE 1. Additionally, the Agency has historically refrained from consideration of factors beyond the scope of the waiver criteria in section 209(b)(1) and the 2013 ACC program waiver decision was undertaken consistent with this practice. EPA believes that the consideration of EPCA preemption in SAFE 1 led the Agency to improperly withdraw the ACC program waiver on this non-CAA basis. EPA's explanation that withdrawal on this basis was justified because SAFE 1 was a joint action, and its announcement that this would be a single occurrence, does not justify the ACC waiver withdrawal. Thus, EPA is rescinding the withdrawal of those aspects of the ACC program waiver that were based on NHTSA's actions in SAFE 1.

Section VII addresses SAFE 1's interpretive view of section 177 that States adopting California's new motor vehicle emission standards could not adopt California's GHG standards.[13] EPA believes it was both unnecessary and inappropriate in a waiver proceeding to provide an interpretive view of the authority of states to adopt California standards when section 177 does not assign EPA any approval role in states' adoption of the standards. Therefore, as more fully explained in Section VII, the Agency is rescinding the interpretive view on section 177 set out in SAFE 1. Section VIII discusses certain other considerations, including the equal sovereignty doctrine and California's deemed-to-comply provision, and concludes that they do not disturb EPA's decision to rescind the 2019 waiver withdrawal action.

Section IX contains the final decision to rescind the withdrawal of the 2013 ACC program waiver. In summary, I find that although EPA has inherent authority to reconsider its prior waiver decisions, that authority to reconsider is limited and may be exercised only when EPA has made a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated

when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Further, EPA's reconsideration may not be broader than the limits Congress placed on its ability to deny a waiver in the first place. Even where those conditions are met, I believe that any waiver withdrawal decision should consider other factors such as the length of time since the initial decision and California and others' reliance on the initial decision. Because there were no factual or clerical errors or such significantly changed factual circumstances or conditions necessary to trigger EPA's authority to reconsider its previously granted waiver during the SAFE 1 proceeding, I believe SAFE 1 was not an appropriate exercise of EPA's authority to reconsider. In addition, even if it were an appropriate exercise, EPA should not have departed from its traditional interpretation of the second waiver prong (section 209(b)(1)(B)), which is properly focused on California's need for a separate motor vehicle emission program—not specific standards—to meet compelling and extraordinary conditions. And even under EPA's SAFE 1 interpretation of the second waiver prong, a complete review of the factual record demonstrates that California does need the GHG emission standards and ZEV sales mandate to meet compelling and extraordinary conditions in the State. Therefore, EPA should not have withdrawn the ACC program waiver based upon the second waiver prong in SAFE 1 and recission of the withdrawal is warranted. Additionally, I find that EPA inappropriately relied on NHTSA's finding of preemption, now withdrawn, to support its waiver withdrawal, and rescind the waiver withdrawal on that basis as well. Finally, independently in this action, I am rescinding the interpretive views of section 177 that were set forth in SAFE 1, because it was inappropriate to include those views as part of this waiver proceeding.

For these reasons, I am rescinding EPA's part of SAFE 1 related to the CAA preemption of California's standards. This recission has the effect of bringing the ACC program waiver back into force.

## II. Background

This section provides background information needed to understand EPA's decision process in SAFE 1, and this decision. This context includes: A summary of California's ACC program including the record on the criteria pollutant benefits of its ZEV sales mandate and GHG emission standards; a review of the prior GHG emission standards waivers in order to explain

EPA's historical evaluation of the second waiver prong; an overview of the SAFE 1 decision; a review of the petitions for reconsideration filed subsequent to SAFE 1; and a description of the bases and scope of EPA's reconsideration of SAFE 1. EPA's sole purpose in soliciting public comment on its reconsideration was to determine whether SAFE 1 was a valid and appropriate exercise of the Agency's authority. In the Notice of Reconsideration, EPA therefore noted that reconsideration was limited to SAFE 1 and that the Agency was not reopening the ACC program waiver decision.

### A. California's Advanced Clean Car (ACC) Program and EPA's 2013 Waiver

On June 27, 2012, CARB notified EPA of its adoption of the ACC program regulatory package that contained amendments to its LEV III and ZEV sales mandate, and requested a waiver of preemption under section 209(b) to enforce regulations pertaining to this program.[14] The ACC program combined the control of smog- and soot-causing pollutants and GHG emissions into a single coordinated package of requirements for passenger cars, light-duty trucks, and medium-duty passenger vehicles (as well as limited requirements related to heavy-duty vehicles for certain model years).[15]

In its 2012 waiver request, CARB noted that the 2012 ZEV amendments would also result in additional criteria pollutant benefits in California in comparison to the earlier ZEV regulations and would likely provide benefits beyond those achieved by

---

[12] 86 FR 74236.

[13] 84 FR at 51310, 51350.

[14] 2012 Waiver Request, EPA–HQ–OAR–2012–0562–0004 (2012 Waiver Request) at 1, 3–6. CARB's LEV III standards include both its criteria emission standards and its GHG emission standards. SAFE 1 did not address the LEV III criteria emission standards and as such the ACC program waiver remained in place. SAFE 1 did address CARB's GHG emission standards and ZEV sales mandate and this action addresses these two standards as well. As noted in CARB's 2012 Waiver Request, these three standards are interrelated and comprehensive in order to address the State's serious air quality problems including its criteria pollutants and climate change challenges.

[15] As noted in CARB's waiver request, "[a]t the December 2009 hearing, the Board adopted Resolution 09–66, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies. The Board further directed staff to consider shifting the *focus of the ZEV regulation to both GHG and criteria pollutant emission reductions,* commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly." 2012 Waiver Request at 2 (emphasis added). EPA stated in SAFE 1 that California's ZEV standard initially targeted only criteria pollutants. 84 FR at 51329. *See also* 78 FR at 2118.

complying with the LEV III criteria pollutant standard for conventional vehicles only. CARB attributed these benefits not to vehicle emissions reductions specifically, but to increased electricity and hydrogen use that would be more than offset by decreased gasoline production and refinery emissions.[16] CARB's waiver request attributed the criteria emissions benefits to its LEV III criteria pollutant fleet standard and did not include similar benefits from its ZEV sales mandate. According to the request, the fleet would become cleaner regardless of the ZEV sales mandate because the ZEV sales mandate is a way to comply with the LEV III standards and, regardless of the ZEV sales mandate, manufacturers might adjust their compliance response to the standard by making less polluting conventional vehicles. CARB further explained that because upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production.[17]

On August 31, 2012, EPA issued a notice of opportunity for public hearing and written comment on CARB's request and solicited comment on all aspects of a full waiver analysis for such request under the criteria of section 209(b).[18] Commenters opposing the waiver asked EPA to deny the waiver under the second waiver prong, section 209(b)(1)(B), as it applied to the GHG provisions in the ACC Program, calling on EPA to adopt an alternative interpretation of that provision focusing on California's need for the specific standards. Following public notice and comment and based on its traditional interpretation of section 209(b), on January 9, 2013, EPA granted California's request for a waiver of preemption to enforce the ACC program regulations.[19] The traditional interpretation, which EPA stated is the better interpretation of section 209(b)(1)(B), calls for evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary

conditions.[20] As explained, EPA must grant a waiver to California unless the Administrator makes at least one of the three statutorily-prescribed findings in section 209(b)(1). Concluding that opponents of the waiver did not meet their burden of proof to demonstrate that California does not have such need, EPA found that it could not deny the waiver under the second waiver prong.[21]

Without adopting the alternative interpretation, EPA noted that, to the extent that it was appropriate to examine the need for CARB's specific GHG standards to meet compelling and extraordinary conditions, EPA had explained at length in its earlier 2009 GHG waiver decision that California does have compelling and extraordinary conditions directly related to regulation of GHGs. This conclusion was supported by additional evidence submitted by CARB in the ACC program waiver proceeding, including reports that demonstrate record-setting wildfires, deadly heat waves, destructive storm surges, and loss of winter snowpack. Many of these extreme weather events and other conditions have the potential to dramatically affect human health and well-being.[22] Similarly, to the extent

that it was appropriate to examine the need for CARB's ZEV sales mandate, EPA noted that the ZEV sales mandate in the ACC program enables California to meet both its air quality and climate goals into the future. EPA recognized that CARB's coordinated strategies reflected in the ACC program for addressing both criteria pollutants and GHGs and the magnitude of the technology and energy transformation needed to meet such goals.[23] Therefore, EPA determined that, to the extent the second waiver prong should be interpreted to mean a need for the specific standards at issue, CARB's GHG emission standards and ZEV sales mandate satisfy such a finding.

In the context of assessing the need for the specific ZEV sales mandate in the ACC program waiver, EPA noted CARB's intent in the redesign of the ZEV regulation of addressing both criteria pollutants and GHG emissions, and CARB's demonstration of "the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet . . . the goals set forth by California's climate change requirements" and found that the ZEV standards would help California achieve those "long term emission benefits as well as . . . some [short-term] reduction in criteria pollutant emissions." [24]

### B. Prior Waivers for GHG Standards

For over fifty years, EPA has evaluated California's requests for waivers of preemption under section 209(b), primarily considering CARB's motor vehicle emission program for criteria pollutants.[25] More recently, the Agency has worked to determine how

---

[16] 2012 Waiver Request at 6.

[17] *Id.* at 15–16.

[18] 77 FR 53119 (August 31, 2012).

[19] Set forth in the ACC program waiver decision is a summary discussion of EPA's earlier decision to depart from its traditional interpretation of section 209(b)(1)(B) (the second waiver prong) in the 2008 waiver denial for CARB's initial GHG standards for certain earlier model years along with EPA's return to the traditional interpretation of the second prong in the waiver issued in 2009. 78 FR at 2125–31. These interpretations are discussed more fully in Section III.

[20] *Id.* at 2128 ("The better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.").

[21] Because EPA received comment on this issue during the ACC program waiver proceeding, as it pertained to both CARB's GHG emission standards and ZEV sales mandate, the Agency recounted the interpretive history associated with standards for both GHG emissions and criteria air pollutants to explain EPA's belief that section 209(b)(1)(B) should be interpreted the same way for all air pollutants. *Id.* at 2125–31 ("As discussed above, EPA believes that the better interpretation of the section 209(b)(1)(B) criterion is the traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions. Applying this approach with the reasoning noted above, with due deference to California, I cannot deny the waiver.").

[22] *Id.* at 2126–29. Within the 2009 GHG waiver, and again in the 2013 ACC program waiver, EPA explained that the traditional approach does not make section 209(b)(1)(B) a nullity, as EPA must still determine whether California does not need its motor vehicle program to meet compelling and extraordinary conditions as discussed in the legislative history. Conditions in California may one day improve such that it may no longer have a need for its motor vehicle program.

[23] *Id.* at 2131 ("Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions. The ZEV standards are a reasonable pathway to reach the LEV III goals, in the context of California's longer-term goals.").

[24] *Id.* at 2130–31. *See also* 2012 Waiver Request at 15–16); CARB Supplemental Comments, EPA–HQ–OAR–2012–0562–0373 at 4 (submitted November 14, 2012).

[25] EPA notes that the 1990 amendments to the CAA added subsection (e) to section 209. Subsection (e) addresses the preemption of State or political subdivision regulation of emissions from nonroad engines or vehicles. Section 209(e)(2)(A) sets forth language similar to section 209(b) in terms of the criteria associated with EPA waiving preemption, in this instance for California nonroad vehicle and engine emission standards. Congress directed EPA to implement subsection (e). See 40 CFR part 1074. EPA review of CARB requests submitted under section 209(e)(2)(A)(ii) includes consideration of whether CARB needs its nonroad vehicle and engine program to meet compelling and extraordinary conditions. *See* 78 FR 58090 (September 20, 2013).

section 209(b)(1)(B) should be interpreted and applied to GHG standards, including consideration of the relationship of GHG standards to California's historical air quality problems, the public health impacts of GHG emissions on NAAQS pollutants, and the direct impacts of GHG emissions and climate change on California and its inhabitants. While the SAFE 1 withdrawal and revocation of the waiver for CARB's ACC program represents a singular snapshot of this task, it is important to examine EPA's long-standing and consistent waiver practice in general, including EPA's interpretations in prior waiver decisions pertaining to CARB's GHG emission standards, in order to determine whether EPA properly applied the waiver criterion in section 209(b)(1)(B) in SAFE 1.[26]

Historically, EPA has consistently interpreted and applied the second waiver prong by considering whether California needed a separate motor vehicle emission program as compared to the specific standards at issue to meet compelling and extraordinary conditions.[27] At the same time, in response to commenters that have argued that EPA is required to examine the specific standards at issue in the waiver request, EPA's practice has been to nevertheless review the specific standards to determine whether California needs those individual standards to meet compelling and extraordinary conditions.[28] This does not mean that EPA has adopted an ''alternative approach'' and required a demonstration for the need for specific standards; rather, this additional Agency review has been afforded to

address commenters' concerns and this secondary analysis has been done to support the Agency's primary assessment. For example, EPA granted an authorization for CARB's In-use Off-road Diesel Standards (Fleet Requirements) that included an analysis under both approaches.[29] The only two departures from this traditional approach occurred first in 2008 when EPA adopted an ''alternative approach'' to the second waiver prong and second in 2019 when EPA adopted the ''SAFE 1 interpretation'' of the second waiver criterion.

EPA's task of interpreting and applying section 209(b)(1)(B) to California's GHG standards and consideration of the State's historical air quality problems that now include the public health and welfare challenge of climate change began in 2005, with CARB's waiver request for 2009 and subsequent model years' GHG emission standards. On March 6, 2008, EPA denied the waiver request based on a new interpretive finding that section 209(b) was intended for California to enforce new motor vehicle emission standards that address local or regional air pollution problems, and an Agency belief that California could not demonstrate a ''need'' under section 209(b)(1)(B) for standards intended to address global climate change problems. EPA also employed this new alternative interpretation to state a belief that the effects of climate change in California are not compelling and extraordinary in comparison with the rest of the country. Therefore, in the 2008 waiver denial, EPA did not evaluate whether California had a need for its motor vehicle emission program to meet compelling and extraordinary conditions (the traditional interpretation) but rather focused on the specific GHG emission standard in isolation and not in conjunction with the other motor vehicle emission standards for criteria pollutants.

In 2009, EPA initiated a reconsideration of the 2008 waiver denial. The reconsideration resulted in granting CARB a waiver for its GHG emission standards commencing in the

2009 model year.[30] In granting the waiver, EPA rejected the Agency's alternative interpretation of the second waiver prong announced in the 2008 waiver denial. Instead, EPA returned to its traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions because the Agency viewed it as the better interpretation of the second waiver prong. Under the traditional interpretation, EPA found that the opponents of the waiver had not met their burden of proof to demonstrate that California did not need its motor vehicle emission program to meet compelling and extraordinary conditions. In responding to comments on this issue, EPA also determined that, even if the alternative interpretation were to be applied, the opponents of the waiver had not demonstrated that California did not need its GHG emissions standards to meet compelling and extraordinary conditions.[31]

Since EPA's 2009 GHG waiver decision and before SAFE 1 the Agency applied the traditional interpretation of the second waiver prong in its GHG-related waiver proceedings, including the on-going review of California's GHG emission standards for vehicles. In the first instance, in 2009, CARB adopted amendments to its certification requirements that would accept demonstration to the Federal GHG standards as compliance with CARB's GHG program. This provision is known as a ''deemed-to-comply'' provision.[32] In 2011, EPA determined that this deemed-to-comply provision was within-the-scope of the waiver issued in July 2009, relying on the traditional interpretation of the second waiver prong.[33] As such, in the June 14, 2011

---

[26] EPA notes that, in the history of EPA waiver decisions, it has only denied a waiver once (in 2008) and withdrawn a waiver once (in 2019). Each instance was under this second waiver prong in section 209(b)(1)(B).

[27] 49 FR 18887, 18890 (May 3, 1984).

[28] For example, in EPA's 2009 GHG waiver that reconsidered the 2008 GHG waiver denial, the Agency noted that ''Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference. EPA's consistent view is that it should give deference to California's policy judgments, as it has in past waiver decisions, on California's choice of mechanism used to address air pollution problems. EPA does not second-guess the wisdom or efficacy of California's standards. EPA has also considered this approach with respect to the specific GHG standards themselves, as well as California's motor vehicle emissions program.'' 74 FR at 32266 (citing to *Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1110–11 (D.C. Cir. 1979)).

[29] 78 FR at 58090. The United States Court of Appeals for the Ninth Circuit reviewed EPA's grant of a waiver of preemption under the traditional approach, and because of comments seeking an alternative interpretation, an assessment of the need for the standards contained in California's request. *Dalton Trucking* v. *EPA*, No. 13–74019 (9th Cir. 2021) (finding that EPA was not arbitrary in granting the waiver of preemption under either approach). The court opinion noted that ''[t]his disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36–3.''

[30] 74 FR 32743, 32745 (July 8, 2009).

[31] 74 FR at 32759–67. For example, EPA noted that the analysis of the need for CARB's GHG standards in the 2008 waiver denial failed to consider that although the factors that cause ozone are primarily local in nature and that ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. EPA noted that California had made a case that its greenhouse gas standards are linked to amelioration of its smog problems. *See also* 76 FR 34693 (June 14, 2011).

[32] California Code of Regulations, Title 13 1961(a)(1)(B). Under this provision, automakers could comply with the California GHG standards for model years 2017–2025 by meeting Federal GHG standards for the same model years.

[33] 76 FR 34693. EPA's ''within-the-scope'' decisions are generally performed when CARB has amended its regulations that were previously waived by EPA under section 209(b)(1) and include an analysis of whether EPA's prior evaluation of the waiver criteria has been undermined by CARB's amendments. EPA received comment during the
Continued

within-the-scope decision EPA determined that CARB's 2009 amendments did not affect or undermine the Agency's prior determination made in the 2009 GHG waiver decision, including the technological feasibility findings in section 209(b)(1)(C).[34] EPA also acted on two requests for waivers of preemption for CARB's heavy-duty (HD) tractor-trailer GHG emission standards.[35] Once again, EPA relied upon its traditional approach of evaluating California's need for a separate motor vehicle emission program to meet compelling and extraordinary conditions and found that no evidence had been submitted to demonstrate that California no longer needed its motor vehicle emission program to meet compelling and extraordinary conditions.[36] EPA's

second waiver for the HD GHG emission standards made a similar finding that California's compelling and extraordinary conditions continue to exist under the traditional approach for the interpretation of the second waiver criterion.[37]

*C. SAFE 1 Decision*

In 2018, NHTSA issued a proposal for new Corporate Average Fuel Economy (CAFE) standards that must be achieved by each manufacturer for its car and light-duty truck fleet while EPA revisited its light-duty vehicle GHG emissions standards for certain model years in the SAFE Proposal.[38] EPA also proposed to withdraw the waiver for the ACC program GHG emission standards and ZEV sales mandate, referencing both sections 209(b)(1)(B) and (C). EPA posited that since the grant of the initial waiver a reassessment of California's need for its GHG standards and ZEV sales mandate under the second waiver prong, section 209(b)(1)(B), was appropriate. EPA further posited that its own Federal GHG rulemaking in the SAFE proposal raised questions about the feasibility of CARB's standards under the third waiver prong, section 209(b)(1)(C).[39] In addition, EPA reasoned that the SAFE proposal presented a unique situation that required EPA to consider the implications of NHTSA's proposed conclusion that California's GHG emission standards and ZEV sales mandate were preempted by EPCA.[40]

EPA thus also posited that state standards preempted under EPCA cannot be afforded a valid section 209(b) waiver and then proposed that it would be necessary to withdraw the waiver separate and apart from section 209(b)(1)(B) and (C) if NHTSA finalized its interpretation regarding preemption under EPCA.

During the SAFE 1 proceeding, EPA received additional information demonstrating that the ZEV sales mandate plays a role in reducing criteria pollution, including CARB's comments that EPA's prior findings in the ACC program waiver were correct. As noted by a number of States and Cities, "[f]or example, CARB modeled the consequences of the actions proposed in SAFE, which included withdrawing California's waiver for its GHG and ZEV standards and freezing the federal GHG standards at MY 2020 levels. CARB concluded these actions, which would eliminate California's ZEV and GHG standards and leave in place only federal GHG standards at MY 2020 levels, would increase $NO_x$ emissions in the South Coast air basin alone by 1.24 tons per day."[41] The SAFE 1 record also includes information that demonstrates that California is "one of the most climate challenged" regions of North America, and that it is home to some of the country's hottest and driest areas, which are particularly threatened by record-breaking heatwaves, sustained droughts, and wildfire, as a result of GHG emissions.[42] This record also includes information from the United States *Fourth National Climate Assessment* that documents the impact of climate change in exacerbating California's record-breaking fires seasons, multi-year drought, heat waves, and flood risk, and notes that California faces a particular threat from sea-level rise and ocean acidification and that the State has "the most valuable ocean-based economy in the country."[43] EPA

---

reconsideration of SAFE 1 that questioned whether CARB needed its GHG standards if it was otherwise accepting compliance with the Federal GHG standards. EPA addressed the issue in its final decision (76 FR at 34696–98) and continues to believe EPA's analysis applies. The existence of federal emission standards that CARB may choose to harmonize with or deem as compliance with its own State standards (or that CARB may choose to set more stringent standards) does not on its own render California's as not needed. CARB continues to administer an integrated and comprehensive motor vehicle emission program (including its ZEV sales mandate and GHG emission standards and other applicable emission standards for light-duty vehicles) and this program continues to evolve to address California's serious air quality issues. CARB's decision to select some federal emission standards as sufficient to comply with its own State emission standards does not negate the overall design and purpose of section 209 of the CAA. In the within-the-scope decision issued in 2011, EPA agreed with Global Automakers comment that the deemed-to-comply provision renders emission benefits equally protective as between California and Federal programs. *Id.* at 34696.

[34] *Id.* at 34696–97.

[35] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014). In this waiver decision EPA responded to comments regarding whether CARB had quantified how the GHG regulations would contribute to attainment of ozone or particulate matter standards by noting that nothing in section 209(b)(1)(B) calls for California to quantify specifically how its regulations would affect attainment of the NAAQS in the State. Rather, EPA noted, the relevant question is whether California needs its own motor vehicle emission program and not whether there is a need for specific standards. The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

[36] Relatedly, California explained the need for these standards based on projected "reductions in $NO_x$ emissions of 3.1 tons per day in 2014 and one ton per day in 2020 due to the HD GHG Regulations. California state[d] that these emissions reductions will help California in its efforts to attain applicable air quality standards. California further projects that the HD GHG Regulations will reduce GHG emissions in California by approximately 0.7 million metric tons (MMT) of carbon dioxide equivalent emissions ($CO_2$e) by 2020." 79 FR at 46261. *See also* 81 FR at 95982.

[37] 81 FR at 95987. At the time of CARB's Board adoption of the HD Phase I GHG regulation, CARB determined in Resolution 13–50 that California continues to need its own motor vehicle program to meet serious ongoing air pollution problems. CARB asserted that "[t]he geographical and climatic conditions and the tremendous growth in vehicle population and use that moved Congress to authorize California to establish vehicle standards in 1967 still exist today. EPA has long confirmed CARB's judgment, on behalf of the State of California, on this matter." See EPA Air Docket at *regulations.gov* at EPA–HQ–OAR–2016–0179– 0012. In enacting the California Global Warming Solutions Act of 2006, the Legislature found and declared that "Global warming poses a serious threat to the economic well-being, public health, natural resources, and the environment of California. The potential adverse impacts of global warming include the exacerbation of air quality problems, a reduction in the quality and supply of water to the state from the Sierra snowpack, a rise in sea levels resulting in the displacement of thousands of coastal businesses and residences, damage to the marine ecosystems and the natural environment, and an increase in the incidences of infectious diseases, asthma, and other health-related problems."

[38] The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 83 FR at 42986.

[39] As explained below, EPA did not make a determination regarding section 209(b)(1)(C) in SAFE 1.

[40] "To the extent that NHTSA has determined that these standards are void *ab initio* because EPCA

preempts standards that relate to fuel economy, that determination presents an independent basis for EPA to consider the validity of the initial grant of a waiver for these standards, separate and apart from EPA's analysis under the criteria that invalidate a waiver request." 84 FR at 51338.

[41] States and Cities in Support of EPA Reversing Its SAFE 1 Actions (States and Cities), Docket No. EPA–HQ–OAR–2021–0257–0132 at 10 (citing CARB, Docket No. NHTSA–2018–0067–11873 at 287–88, 290–91 (upstream emission impacts), 308).

[42] States and Cities at 43–47 (citing EPA–HQ– OAR–2018–0283–5481, EPA–HQ–OAR–2018– 0283–5683, and EPA–HQ–OAR–2018–0283–5054).

[43] *Id.* at 45 (EPA–HQ–OAR–2018–0283–7447— U.S. Global Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, Chapter 25., 2018). (*E.g.,* "The California coast extends 3,400 miles (5,500 km), 8 with 200,000 people living 3 feet (0.9 m) or less above sea level.9 The seaports of Long

received information during the SAFE 1 public comment period regarding the criteria emission benefits of CARB's ZEV sales mandate and GHG emission standards.[44]

On September 27, 2019, EPA and NHTSA published the final SAFE 1 action that promulgated preemption regulations which supported NHTSA's conclusion that EPCA preempted California's GHG standards and ZEV sales mandate. In the same action, EPA withdrew the waiver of preemption for California to enforce the ACC program GHG and ZEV sales mandate on two grounds.[45]

First, in SAFE 1 the Agency posited that standards preempted under EPCA could not be afforded a valid waiver of preemption under section 209(b). EPA explained that Agency pronouncements in the ACC program waiver decision on the historical practice of disregarding the preemptive effect of EPCA in the context of evaluating California's waiver applications were "inappropriately broad, to the extent it suggested that EPA is categorically forbidden from ever determining that a waiver is inappropriate due to consideration of anything other than the 'criteria' or 'prongs' at section 209(b)(1)(B)(A)–(C).[46] EPA further explained that those pronouncements were made in waiver

proceedings where the Agency was acting solely on its own in contrast to a joint action with NHTSA such as SAFE 1. Additionally, EPA expressed its intention not to consider factors other than statutory criteria set out in section 209(b)(1)(A)–(C) in future waiver proceedings, explaining that addressing the preemptive effect of EPCA and its implications for EPA's waiver for California's GHG standards and ZEV sales mandate was uniquely called for in SAFE 1 because EPA and NHTSA were coordinating regulatory actions in a single notice.[47]

Second, EPA withdrew the waiver for the GHG standards and ZEV sales mandate under the second waiver prong, section 209(b)(1)(B), on two alternative grounds. Specifically, EPA determined first that California does not need the GHG standards "to meet compelling and extraordinary conditions," under section 209(b)(1)(B), and second, even if California does have compelling and extraordinary conditions in the context of global climate change, California does not "need" the specific GHG standards under section 209(b)(1)(B) because they will not meaningfully address global air pollution problems of the type associated with GHG emissions.[48] EPA also reasoned that because CARB had characterized the ZEV sales mandate as a compliance mechanism for GHG standards, both were "closely interrelated" given the overlapping compliance regimes for the ACC program, and as the result the ZEV sales mandate was inextricably interconnected with CARB's GHG standards.[49] In support of its overall determination that the ZEV sales mandate was not needed to meet compelling and extraordinary conditions, EPA relied on a single statement in the ACC program waiver support document where CARB did not attribute criteria emission reductions to the ZEV sales mandate, but rather noted its LEV III criteria pollutant fleet standard was responsible for those emission reductions.[50] Relying on this reasoning, EPA also withdrew the waiver for the ZEV sales mandate under the second waiver prong finding that California had no "need" for its own ZEV sales mandate.

In withdrawing the waiver, EPA relied on an alternative view of the scope of the Agency's analysis of California waiver requests and posited that reading "such State standards" as

requiring EPA to only and always consider California's entire motor vehicle program would limit the application of this waiver prong in a way that EPA did not believe Congress intended.[51] EPA further noted that the Supreme Court had found that CAA provisions may apply differently to GHGs than they do to traditional pollutants in *UARG* v. *EPA*, 134 S. Ct. 2427 (2014) (partially reversing the GHG "Tailoring" Rule on grounds that the CAA section 202(a) endangerment finding for GHG emissions from motor vehicles did not compel regulation of all sources of GHG emissions under the Prevention of Significant Deterioration and Title V permit programs). EPA then interpreted section 209(b)(1)(B) as requiring a particularized, local nexus between (1) pollutant emissions from sources, (2) air pollution, and (3) resulting impact on health and welfare.[52] Interpreting section 209(b)(1)(C) to be limited to the specific standards under the waiver, EPA stated that "such State standards" in sections 209(b)(1)(B) and (C) should be read consistently with each other, which EPA asserted was a departure from the traditional approach where this phrase in section 209(b)(1)(B) is read as referring back to "in the aggregate" in section 209(b)(1).[53]

In the SAFE proposal, as an additional basis for the waiver withdrawal, EPA proposed to find that CARB's ZEV sales mandate and GHG

---

Beach and Oakland, several international airports, many homes, and high-value infrastructure lie along the coast. In addition, much of the Sacramento–San Joaquin River Delta is near sea level. California has the most valuable ocean-based economy in the country, employing over half a million people and generating $20 billion in wages and $42 billion in economic production in 2014.10 Coastal wetlands buffer against storms, protect water quality, provide habitat for plants and wildlife, and supply nutrients to fisheries. Sea level rise, storm surges, ocean warming, and ocean acidification are altering the coastal shoreline and ecosystems."

[44] During the current reconsideration proceeding, EPA received additional comment regarding the criteria pollution benefits of California's GHG and ZEV standards. The States and Cities at 10–11. Likewise, CARB notes this connection in comments on the SAFE proposal. Multi-State SAFE Comments, EPA–HQ–OAR–2018–0283–5481 at 24. The States and Cities provided supplemental information in response to the Notice of Reconsideration by submitting California's latest analyses of the criteria pollutant benefits of its GHG standards. For example, CARB estimated those benefits for calendar years by which the South Coast air basin must meet increasingly stringent NAAQS for ozone: 2023, 2031, and 2037. States and Cities app. A at 2–4, app. C at 8–9.

[45] 84 FR at 51328–29. Parties subsequently brought litigation against EPA on its SAFE 1 decision. *See generally Union of Concerned Scientists, et al.* v. *NHTSA, et al.*, No. 19–1230 (D.C. Cir. filed Oct. 28, 2019) (on February 8, 2021, the D.C. Circuit granted the Agencies' motion to hold the case in abeyance in light of the reconsideration of the SAFE 1 action). EPA also received three petitions for reconsideration of this waiver withdrawal.

[46] 84 FR at 51338.

[47] *Id.*

[48] *Id.* at 51341–42.

[49] *Id.* at 51337.

[50] *Id.* at 51330.

[51] In other words, EPA asserted that once it determines that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the discretion to determine that California did not need any subsequent standards for which it sought a successive waiver. EPA based its reading also on an assertion of ambiguity in the meaning of "such State standards" in section 209(b)(1)(B).

[52] *Id.* at 51339–40.

[53] *Id.* at 51344–45. EPA notes that this SAFE 1 position was taken despite the Agency previously stating in the ACC program waiver that "Similarly, although the Dealers might suggest that EPA only be obligated to determine whether each of CARB's ACC regulatory components, in isolation, is consistent with section 202(a) we believe the better approach is to determine the technological feasibility of each standard in the context of the entire regulatory program for the particular industry category. In this case, we believe CARB has in fact recognized the interrelated, integrated approach the industry must take in order to address the regulatory components of the ACC program. As noted above, the House Committee Report explained as part of the 1977 amendments to the Clean Air Act that California was to be afforded flexibility to adopt a complete program of motor vehicle emission controls (emphasis added). As such, EPA believes that Congress intended EPA to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare.32 EPA believes this intent extends to CARB's flexibility in designing its motor vehicle emission program and evaluating the aggregate effect of regulations within the program." 78 FR at 2217.

standards are not consistent with section 202(a) of the CAA under the third waiver prong, section 209(b)(1)(C).[54] However, in the final SAFE 1 action, EPA and NHTSA explained they were not finalizing the proposed assessment regarding the technological feasibility of the Federal GHG and CAFE standards for MY 2021 through 2025 in SAFE 1, and thus EPA did not finalize any determination with respect to section 209(b)(1)(C).[55]

In justifying the withdrawal action in SAFE 1, EPA opined that the text, structure, and context of section 209(b) supported EPA's authority to reconsider prior waiver grants. Specifically, EPA asserted that the Agency's authority to reconsider the grant of ACC program waiver was implicit in section 209(b) given that revocation of a waiver is implied in the authority to grant a waiver. The Agency noted that further support for the authority to reconsider could be found in a single sentence in the 1967 legislative history of provisions now codified in sections 209(a) and (b) and the judicial principle that agencies possess inherent authority to reconsider their decisions. According to the Senate report from the 1967 CAA amendments, the Administrator has ''the right . . . to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver.''[56] EPA also noted that, subject to certain limitations, administrative agencies possess inherent authority to reconsider their decisions in response to changed circumstances: ''It is well settled that EPA has inherent authority to reconsider, revise, or repeal past decisions to the extent permitted by law so long as the Agency provides a reasoned explanation.''[57] This authority exists in part because EPA's interpretations of the statutes it administers ''are not carved in stone.''[58]

Finally, in SAFE 1, EPA provided an interpretive view of section 177 as not authorizing other states to adopt California's GHG standards for which EPA had granted a waiver of preemption under section 209(b). Although section 177 does not require states that adopt California's emission standards to submit such regulations for EPA review and provides no statutory role for EPA in states' decision to adopt California's standards, EPA chose to nevertheless provide an interpretation that this provision is available only to states with approved nonattainment plans. EPA stated that nonattainment designations exist only as to criteria pollutants and GHGs are not criteria pollutants; therefore, states could not adopt GHG standards under section 177. Notably, California in previous waiver requests addressed the criteria pollutant benefits of GHG emissions reductions, specifically related to ground level ozone.

*D. Petitions for Reconsideration*

After issuing SAFE 1, EPA received three petitions for reconsideration urging the Agency to reconsider the waiver withdrawal of the ACC program's GHG standards and ZEV sales mandate and to rescind part or all of the SAFE 1 action.[59] The first Petition for Clarification/Reconsideration was submitted by the State of California and a number of States and Cities on October 9, 2019 (California Petition for Clarification).[60] These Petitioners sought both clarification and reconsideration of the scope of SAFE 1. Citing somewhat contradictory statements in the action, they claimed that SAFE 1 created confusion regarding which model years of the ACC program were affected by the waiver withdrawal.[61] They based their request for reconsideration of the withdrawal on the grounds that the SAFE 1 action relied on analyses and justifications not presented at proposal and, thus, was beyond the scope of the proposal.

A second Petition for Reconsideration was submitted by several non-governmental organizations on November 25, 2019 (NGOs' Petition).[62] These Petitioners claimed that EPA's reconsideration of the ACC program waiver was not a proper exercise of agency authority because the Agency failed to consider comments submitted after the formal comment period—which they charged as inadequate—and because the EPA's rationale was a pretextual cover for the Administration's political animosity towards California and the oil industry's influence. The late comments summarized in the Petition address SAFE 1's EPCA preemption and second waiver prong arguments. On EPCA preemption, the summarized comments asserted that EPCA does not preempt GHG standards because GHG emission standards are not the ''functional equivalent'' of fuel economy standards, as SAFE 1 claimed. On the second waiver prong, the summarized comments asserted both that GHG and ZEV standards do have criteria pollutant benefits, and that the threat of climate change is compelling and extraordinary and will have California-specific impacts. In addition to objections to SAFE 1's EPCA preemption and second waiver prong arguments, the summarized comments asserted that ZEV standards play a key role in SIPs, which were disrupted by SAFE 1. This disruption, Petitioners claimed, violated ''conformity'' rules prohibiting federal actions from undermining state's air quality plans.[63]

A third Petition for Reconsideration was submitted by several states and cities on November 26, 2019 (States and Cities' Petition).[64] These Petitioners sought reconsideration of the withdrawal on the grounds that EPA failed to provide an opportunity to comment on various rationales and determinations, in particular on its authority to revoke argument, flawed re-interpretation and application of the second waiver prong, its flawed new

[54] 83 FR at 43240.

[55] 84 FR at 51350. EPA explained that it may make a determination in connection with a future final action with regard to Federal standards. EPA's subsequent regulation to issue Federal standards did not address this issue. 85 FR 24174.

[56] 84 FR at 51332 (citing S. Rep. No. 90–403, at 34 (1967)).

[57] *Id.* at 51333.

[58] *Chevron U.S.A. Inc.* v. *NRDC, Inc.,* 467 U.S. 837, 863 (1984).

[59] The California Petition for Clarification only sought reconsideration of SAFE 1 to the extent it withdrew the ACC program waiver for model years outside those proposed. The other two petitions sought reconsideration of the full SAFE 1 action.

[60] EPA–HQ–OAR–2021–0257–0015.

[61] The California Petition for Clarification notes that, ''[i]n the Final Actions, EPA makes statements that are creating confusion, and, indeed, appear contradictory, concerning the temporal scope of its action(s)—specifically, which model years are covered by the purported withdrawal of California's waiver for its GHG and ZEV standards. In some places, EPA's statements indicate that it has limited its action(s) to the model years for which it proposed to withdraw and for which it now claims to have authority to withdraw—namely model years 2021 through 2025. In other places, however, EPA's statements suggest action(s) with a broader scope— one that would include earlier model years.'' *Id.* at 2. In SAFE 1, EPA withdrew the waiver for California's GHG and ZEV standards for model years 2017–2025 on the basis of EPCA preemption and for model years 2021–2025 on the basis of the second waiver prong.

[62] EPA–HQ–OAR–2021–0257–0014. This Petition was joined by The Center for Biological Diversity, Chesapeake Bay Foundation, Environment America, Environmental Defense Fund, Environmental Law & Policy Center, Natural Resources Defense Council, Public Citizen, Inc., Sierra Club, and the Union of Concerned Scientists.

[63] These ''late comments'' can be found in the ''Appendix of Exhibits'' attached to the Petition for Reconsideration. These comments are considered part of EPA's record for purposes of the reconsideration of SAFE 1.

[64] See EPA–HQ–OAR–2021–0257–0029. This Petition was joined by the States of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, Wisconsin, Michigan, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, San Francisco, and San Jose.

rationale for considering factors outside section 209(b) (namely, EPCA preemption), and its determination that states cannot adopt California's GHG standards under section 177. For example, these Petitioners claimed they did not have an adequate opportunity to comment on EPA's use of equal sovereignty or the endangerment finding as rationales for its new "particularized nexus" interpretation of the second waiver prong. These Petitioners also claimed that EPA's statements concerning the burden of proof applicable to a waiver revocation were either unclear or inaccurate, particularly whether the Agency bears the burden of proof in withdrawing a previously granted waiver and, if not, how and why this burden of proof is different from the burden of proof for denying a waiver request.[65] Finally, these Petitioners asserted that the Agency failed to consider comments, submitted after the formal comment period, that challenged EPA's interpretation of the second waiver prong, including new evidence of California's need for its GHG emission standards and ZEV sales mandate, and alleged that EPA's rationale was pretextual and based on the Administration's political animosity towards California and on the oil industry's influence.

EPA notified the petitioners in the above-noted Petitions for Reconsideration that the Agency would be considering issues raised in their petitions as part of the proceeding to reconsider SAFE 1. This action addresses these petitions in the broader context of EPA's adjudicatory reconsideration of SAFE 1 commenced in response to a number of significant issues with SAFE 1.

## III. Principles Governing This Review

The CAA has been a paradigmatic example of cooperative federalism, under which "States and the Federal Government [are] partners in the struggle against air pollution."[66] In Title II, Congress authorized EPA to promulgate emission standards for mobile sources and generally preempted states from adopting their own standards.[67] At the same time, Congress created an important exception for the State of California.

### A. Scope of Preemption and Waiver Criteria Under the Clean Air Act

The legal framework for this decision stems from the waiver provision first adopted by Congress in 1967, and subsequent amendments. In Title II of the CAA, Congress established only two programs for control of emissions from new motor vehicles—EPA emission standards adopted under the CAA and California emission standards adopted under its state law. Congress accomplished this by preempting all state and local governments from adopting or enforcing emission standards for new motor vehicles, while at the same time providing that California could receive a waiver of preemption for its emission standards and enforcement procedures in keeping with its prior experience regulating motor vehicles and its serious air quality problems. Accordingly, section 209(a) preempts states or political subdivisions from adopting or attempting to enforce any standard relating to the control of emissions from new motor vehicles.[68] Under the terms of section 209(b)(1), after notice and opportunity for public hearing, EPA must waive the application of section 209(a) to California unless the Administrator finds at least one of three criteria to deny a waiver in section 209(b)(1)(A)–(C) has been met.[69] EPA may thus deny a waiver only if it makes at least one of these three findings based on evidence in the record, including

arguments that opponents of the waiver have provided. This framework struck an important balance that protected manufacturers from multiple and different state emission standards and preserved a pivotal role for California in the control of emissions from new motor vehicles. Congress intentionally structured this waiver provision to restrict and limit EPA's ability to deny a waiver and did this to ensure that California had broad discretion in selecting the means it determined best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to allow California to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[70] Accordingly, section 209(b) specifies that EPA must grant California a waiver if California determines that its standards are, in the aggregate, at least as protective of the public health and welfare as applicable Federal standards.

EPA has consistently interpreted the waiver provision as placing the burden on the opponents of a waiver and EPA to demonstrate that one of the criteria for a denial has been met. In this context, since 1970, EPA has recognized its limited discretion in reviewing California waiver requests. For over fifty years, therefore, EPA's role upon receiving a request for waiver of preemption from California has been limited and remains only to determine whether it is appropriate to make any of the three findings specified by the CAA. If the Agency cannot make at least one of the three findings, then the waiver must be granted. The three waiver criteria are also properly seen as criteria for a denial. This reversal of the normal statutory structure embodies and is consistent with the congressional intent of providing deference to California to maintain its own new motor vehicle emission program.

The 1970 CAA Amendments strengthened EPA's authority to regulate vehicular "emission[s] of any air pollutant," while reaffirming the corresponding breadth of California's entitlement to regulate those emissions (amending CAA section 202 and recodifying the waiver provision as section 209(b), respectively). Congress also established the NAAQS program,

---

[65] The applicable burden of proof for a waiver withdrawal is discussed in Section III of this decision.

[66] *General Motors Corp.* v. *United States*, 496 U.S. 530, 532 (1990).

[67] "The regulatory difference [between Titles I and II] is explained in part by the difficulty of subjecting motor vehicles, which readily move across state boundaries, to control by individual states." *Engine Mfrs. Ass'n* v. *EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). Congress also asserted federal control in this area to avoid "the specter of an anarchic patchwork of federal and state regulatory

programs" nationwide. *See Motor & Equip. Mfrs. Ass'n, Inc.* v. *EPA*, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (*MEMA I*).

[68] 42 U.S.C. 7543(a)–(a) Prohibition No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

[69] 42 U.S.C. 7543(b)(1):

(1) The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards. No such waiver shall be granted if the Administrator finds that—

(A) the determination of the State is arbitrary and capricious,

(B) such State does not need such State standards to meet compelling and extraordinary conditions, or

(C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

[70] *See, e.g.,* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy); *MEMA I*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).

under which EPA issues air quality criteria and sets standards for so-called "criteria" pollutants, and states with regions that have not "attained" those federal standards must submit SIPs indicating how they plan to attain the NAAQS (which is often a multi-year, comprehensive plan). With the CAA Amendments of 1977, Congress allowed California to consider the protectiveness of its standards "in the aggregate," rather than requiring that each standard proposed by the State be as or more stringent than its federal counterpart.[71] Congress also approved EPA's interpretation of the waiver provision as providing appropriate deference to California's policy goals and consistent with Congress's intent "to permit California to proceed with its own regulatory program" for new motor vehicle emissions.[72]

In previous waiver decisions, EPA has noted that the statute specifies particular and limited grounds for rejecting a waiver and has therefore limited its review to those grounds. EPA has also noted that the structure Congress established for reviewing California's decision-making is deliberately narrow, which further supports this approach. This has led EPA to reject arguments that are not specified in the statute as grounds for denying a waiver:

The law makes it clear that the waiver requests cannot be denied unless the specific findings designated in the statute can properly be made. The issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209, so long as the California requirement is consistent with section 202(a) and is more stringent than applicable Federal requirements in the sense that it may result in some further reduction in air pollution in California. Thus, my consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions that I may consider under section 209(b).[73]

Given the text, legislative history, and judicial precedent, EPA has consistently interpreted section 209(b) as requiring it to grant a waiver unless opponents of a waiver can demonstrate that one of the criteria for a denial has been met.[74]

The 1977 CAA Amendments additionally demonstrated the significance of California's standards to the Nation as a whole with Congress' adoption of a new section 177. Section 177 permits other states addressing their own air pollution problems to adopt and enforce California new motor vehicle standards "for which a waiver has been granted if certain criteria are met."[75] Also known as the "opt-in" provision, section 177 of the Act, 42 U.S.C. 7507, provides:

Notwithstanding section 7543(a) of this title, any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or new motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if—

(1) such standards are identical to the California standards for which a waiver has been granted for such model year, and

(2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

Nothing in this section or in Subchapter II of this chapter shall be construed as authorizing any such State to prohibit or limit, directly or indirectly, the manufacture or sale of a new motor vehicle or motor vehicle engine that is certified in California as meeting California standards, or to take any action of any kind to create, or have the effect of creating, a motor vehicle or motor vehicle engine different that a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such a "third vehicle."

Any state with qualifying SIP provisions may exercise this option and become a "Section 177 State," without first seeking the approval from EPA.[76] Thus, over time, Congress has recognized the important state role, for example, by making it easier (by allowing California to consider its standards "in the aggregate") and by expanding the opportunity (via section 177) for states to adopt standards different from EPA's standards.[77]

## B. Deference to California

EPA has consistently noted that the text, structure, and history of the California waiver provision clearly indicate both congressional intent and appropriate EPA practice of leaving the decision on "ambiguous and controversial matters of public policy" to California's judgment. In waiver decisions, EPA has thus recognized that congressional intent in creating a limited review of California waiver requests based on the section 209(b)(1) criteria was to ensure that the federal government did not second-guess the wisdom of state policy. In an early waiver decision EPA highlighted this deference:

It is worth noting * * * I would feel constrained to approve a California approach to the problem which I might also feel unable to adopt at the federal level in my own capacity as a regulator. The whole approach of the Clean Air Act is to force the development of new types of emission

[71] 42 U.S.C. 7543(b)(1).

[72] H.R. Rep. No. 95–294, at 301 (1977).

[73] 78 FR at 2115 (footnote omitted).

[74] *MEMA I,* 627 F.2d at 1120–21 ("The language of the statute and its legislative history indicate that California's regulations, and California's determination that they comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them."); *Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 462 (D.C. Cir. 1998) (*MEMA II*) ("[S]ection 209(b) sets forth the only waiver standards with which California must comply. . . . If EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application.").

[75] This provision was intended to continue the balance, carefully drawn in 1967, between states' need to meet increasingly stringent federal air pollution limits and the burden of compliance on auto-manufacturers. *See, e.g.,* H.R. Rep. No. 294, 95th Cong., 1st Sess. 309–10 (1977) ("[S]ection 221 of the bill broadens State authority, so that a State other than California . . . is authorized to adopt and enforce new motor vehicle emission standards which are identical to California's standards. Here again, however, strict limits are applied . . . . This new State authority should not place an undue burden on vehicle manufacturers . . . ."); *Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation,* 17 F.3d 521, 527 (2d Cir. 1994) ("Many states, including New York, are in danger of not meeting increasingly stringent federal air pollution limits . . . . It was in an effort to assist those states struggling to meet federal pollution standards that Congress, as noted earlier, directed in 1977 that other states could promulgate regulations requiring vehicles sold in their state to be in compliance with California's emission standards or to "piggyback" onto California's preemption exemption. This opt-in authority, set forth in § 177 of the Act, 42 U.S.C. 7507, is carefully circumscribed to avoid placing an undue burden on the automobile manufacturing industry.").

[76] In 1990 Congress amended the CAA by adding section 209(e) to section 209. Section 209(e) sets forth the terms of CAA preemption for nonroad engines and vehicles and the ability of States to adopt California emissions standards for such vehicles and engines if certain criteria are met. 42 U.S.C. 7543(e)(2)(B) ("Any State other than California which has plan provisions approved under part D of subchapter I may adopt and enforce, after notice to the Administrator, for any period, standards relating to control of emissions from nonroad vehicles or engines . . . if (i) such standards and implementation and enforcement are identical, for the period concerned, to the California standards . . . ."). Courts have interpreted these amendments as reinforcing the important role Congress assigned to California. *See Engine Mfrs. Ass'n* v. *EPA,* 88 F.3d 1075, 1090 ("Given the indications before Congress that California's regulatory proposals for nonroad sources were ahead of the EPA's development of its own proposals and the Congressional history of permitting California to enjoy coordinated regulatory authority over mobile sources with the EPA, the decision to identify California as the lead state is comprehensible. California has served for almost 30 years as a 'laboratory' for motor vehicle regulation."); *MEMA I,* 627 F.2d 1095, 1110 (D.C. Cir. 1979) ("Its severe air pollution problems, diverse industrial and agricultural base, and variety of climatic and geographical conditions suit it well for a similar role with respect to nonroad sources.").

[77] 40 FR at 23104; *see also* LEV I waiver at 58 FR 4166, Decision Document at 64.

control technology where that is needed by compelling the industry to "catch up" to some degree with newly promulgated standards. Such an approach * * * may be attended with costs, in the shape of reduced product offering, or price or fuel economy penalties, and by risks that a wider number of vehicle classes may not be able to complete their development work in time. Since a balancing of these risks and costs against the potential benefits from reduced emissions is a central policy decision for any regulatory agency under the statutory scheme outlined above, I believe I am required to give very substantial deference to California's judgments on this score.[78]

As noted above, Congress amended the CAA in 1977. Within these amendments, Congress had the opportunity to reexamine the waiver provision and elected to expand California's flexibility to adopt a complete program of motor vehicle emission controls. The House Committee Report explained that "[t]he amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.,* to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [79]

SAFE 1 was a departure from congressional intent and EPA's typical practice of deference to California on matters of state public policy regarding how best to address its serious air quality problems. In SAFE 1, EPA adopted a new interpretation of section 209(b)(1)(B) more than five years after the initial grant of the ACC program waiver and applied it to CARB's GHG standards and ZEV sales mandate. Specifically, EPA premised its finding on a consideration of California's "need" for the specific standards, instead of the "need" for a separate motor vehicle emission program to meet compelling and extraordinary conditions, stating that "such State standards" in section 209(b)(1)(B) was ambiguous with respect to the scope of the Agency's analysis. EPA further determined that California did not need the ZEV sales mandate to meet compelling and extraordinary conditions by relying on a single statement in the ACC program waiver support document taken out of context, where it noted that the ZEV sales

mandate had no criteria emissions benefits in terms of vehicle emissions and its LEV III criteria pollutant fleet standard was responsible for those emission reductions. In response to the SAFE 1 proposal, California had provided further context and additional data on net upstream emissions benefits of the ZEV sales mandate, but EPA did not consider them in arriving at the findings and conclusions in SAFE 1. The final decision in SAFE 1 was not based on the third waiver prong.[80] EPA also explained in SAFE 1 that the task of interpreting section 209(b)(1)(B) required no deference to California.[81]

*C. Standard and Burden of Proof*

In *Motor and Equipment Manufacturers' Association* v. *EPA,* 627 F.2d 1095 (D.C. Cir. 1979) (*MEMA I*), the U.S. Court of Appeals for the District of Columbia stated, with regard to the standard and burden of proof, that the Administrator's role in a section 209 proceeding is to "consider all evidence that passes the threshold test of materiality and . . . thereafter assess such material evidence against a standard of proof to determine whether the parties favoring a denial of the waiver have shown that the factual circumstances exist in which Congress intended a denial of the waiver." [82] The court in *MEMA I* considered the standards of proof under section 209 for the two findings necessary to grant a waiver for an "accompanying enforcement procedure" (as opposed to the standards themselves): (1) Protectiveness in the aggregate and (2) consistency with CAA section 202(a) findings. The court instructed that "the standard of proof must take account of the nature of the risk of error involved in any given decision, and it therefore varies with the finding involved. We need not decide how this standard operates in every waiver decision." [83] The court upheld the Administrator's position that to deny a waiver, there must be clear and compelling evidence to show that the proposed procedures undermine the protectiveness of California's standards. The court noted that this standard of proof also accords with the congressional intent to provide California with the broadest possible discretion in setting regulations it finds protective of the public health and

welfare.[84] With respect to the consistency finding, the court did not articulate a standard of proof applicable to all proceedings but found that the opponents of the waiver were unable to meet their burden of proof even if the standard were a mere preponderance of the evidence.

Although *MEMA I* did not explicitly consider the standards of proof under section 209 concerning a waiver request for "standards," as compared to accompanying enforcement procedures, there is nothing in the opinion to suggest that the court's analysis would not apply with equal force to such determinations. EPA's past waiver decisions have consistently made clear that: "[E]ven in the two areas concededly reserved for Federal judgment by this legislation—the existence of compelling and extraordinary conditions and whether the standards are technologically feasible—Congress intended that the standard of EPA review of the State decision to be a narrow one." [85] Although EPA evaluates whether there are compelling and extraordinary conditions in California, the Agency nevertheless accords deference to California on its choices for how best to address such conditions in light of the legislative history of section 209(b).

As noted earlier, the burden of proof in a waiver proceeding is on EPA and the opponents of the waiver. This is clear from the statutory language stating that EPA "shall . . . waive" preemption unless one of three statutory factors is met. This reading was upheld by the D.C. Circuit in *MEMA I,* which concluded that this obligation rests firmly with opponents of the waiver in a section 209 proceeding, holding that: "[t]he language of the statute and its legislative history indicate that California's regulations, and California's determinations that they must comply with the statute, when presented to the Administrator are presumed to satisfy the waiver requirements and that the burden of proving otherwise is on whoever attacks them. California must present its regulations and findings at

[79] *MEMA I,* 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)). Congress amended section 209(b)(1)(A) regarding California's determination that its standards are as at least as protective as applicable Federal standards so that such determination may be done "in the aggregate" looking at the summation of the standards within the vehicle program.

[80] 84 FR at 51322–33. EPA notes that when reviewing California's standards under the third waiver prong, the Agency may grant a waiver to California for standards that EPA may choose not to adopt at the federal level due to different considerations. *See* 78 FR at 2133.

[81] 84 FR at 51339–40.

[82] *MEMA I,* 627 F.2d at 1122.

[83] *Id.*

[84] *Id.*

[85] *See, e.g.,* 40 FR at 23102–03. *See also MEMA I,* 627 F.2d at 1109 ("Congress had an opportunity to restrict the waiver provision in making the 1977 amendments, and it instead elected to expand California's flexibility to adopt a complete program of motor vehicle emissions control. Under the 1977 amendments, California need only determine that its standards will be 'in the aggregate, at least as protective of public health and welfare than applicable Federal standards,' rather than the "more stringent" standard contained in the 1967 Act.") (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977), U.S. Code Cong. & Admin. News 1977, p. 1380).

the hearing and thereafter the parties opposing the waiver request bear the burden of persuading the Administrator that the waiver request should be denied." [86]

The Administrator's burden, on the other hand, is to make a reasonable evaluation of the information in the record in coming to the waiver decision. As the court in *MEMA I* stated, "Here, too, if the Administrator ignores evidence demonstrating that the waiver should not be granted, or if he seeks to overcome that evidence with unsupported assumptions of his own, he runs the risk of having his waiver decision set aside as 'arbitrary and capricious.'" [87] Therefore, the Administrator's burden is to act "reasonably." [88]

In this instance, EPA has withdrawn a previously granted waiver and is now reconsidering whether that withdrawal was an appropriate exercise of authority, whether the reinterpretation of the second waiver prong was appropriate, and whether EPA's evaluation and findings of fact under the second waiver prong meet the applicable burden of proof in the context of deference to California's policy choices. EPA believes that the same burden that is applicable to those opposed to an initial waiver request from CARB (this applies to any party including the Administrator as explained in *MEMA I*) is also applicable to EPA's actions in SAFE 1 (*e.g.*, the burden of proof of whether California does not need its standards to meet compelling and extraordinary conditions rests on those opposing a waiver for California). [89]

[86] *MEMA I*, 627 F.2d at 1121.

[87] *Id.* at 1126.

[88] *Id.*

[89] In EPA's 2009 evaluation of the 2008 GHG waiver denial the Agency applied a similar test. *See* 74 FR at 32745 ("After a thorough evaluation of the record, I am withdrawing EPA's March 6, 2008 Denial and have determined that the most appropriate action in response to California's greenhouse gas waiver request is to grant that request. I have determined that the waiver opponents have not met their burden of proof in order for me to deny the waiver under any of the three criteria in section 209(b)(1)."). In the context of 2009 GHG waiver that reconsidered the Agency's 2008 GHG waiver denial, EPA determined it was appropriate to apply the same burden of proof during the reconsideration as would apply at the time of the initial waiver evaluation. EPA received comment suggesting that the entire burden of proof shifts to California in order for the prior 2008 denial to be reversed. EPA, in response, stated that ". . . regardless of the previous waiver denial, once California makes its protectiveness determination the burden of proof falls on the opponents of the waiver . . . . This is consistent with the legislative history, which indicates that Congress intended a narrow review by EPA and to preserve the broadest possible discretion for California." *Id.* at 32749. EPA acknowledges that in SAFE 1 the Agency not

## IV. EPA Did Not Appropriately Exercise Its Limited Authority To Reconsider the ACC Program Waiver in SAFE 1

The first question this final action tackles is whether the agency properly exercised its reconsideration authority to withdraw its previously-granted waiver in SAFE 1. EPA concludes that it did not, and on that independent basis rescinds SAFE 1's waiver withdrawal.

Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. For several reasons, in the context of reconsidering a waiver grant, that authority may only be exercised sparingly. First, EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). A contrary approach, which treats reconsiderations as more broadly appropriate, would undermine Congress' intent that California be able to exercise its policy judgments and develop motor vehicle controls programs to address California's air pollution problems, and make advances which could be built on by EPA or adopted by other states. Second, EPA believes it may only reconsider a previously granted waiver to address a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. Even when EPA is acting within the appropriate bounds of its authority to reconsider, during that reconsideration EPA should exercise its limited

only adopted an interpretation of the second waiver prong which was similar to the previously rejected interpretation, but that in doing so also questioned its previous position that the burden of proof in evaluating the need for standards at issue resides with those that oppose the waiver, including EPA. *See* 84 FR at 51344 n.268. In this action, however, EPA now finds that the historical deference provided to California regarding its policy choices on how best to address its serious air quality conditions also requires that the burden of proof should reside in those seeking to demonstrate that standards are not needed under the second waiver prong regardless of whether the rationale is characterized as a new interpretation or not. The language of section 209(b)(1) requires California to make a protectiveness finding under the first waiver prong. Moreover, nothing in section 209(b) could be read as support for drawing a distinction between the burden of proof when the Agency considers an initial waiver request and one where the Agency reconsiders a waiver decision based on a new interpretation of the statutory criteria. That burden properly resides with opponents of the waiver.

authority within a reasonable timeframe and be mindful of reliance interests.

The Agency's reconsideration in SAFE 1 was not an appropriate exercise of authority; there was no clerical error or factual error in the ACC program waiver, and SAFE 1 did not point to any factual circumstances or conditions related to the three waiver prongs that had changed so significantly that the propriety of the waiver grant is called into doubt. Rather, the 2019 waiver withdrawal was based on a change in EPA's statutory interpretation, an incomplete and inaccurate assessment of the record, and another agency's action beyond the confines of section 209(b). EPA erred in reconsidering a previously granted waiver on these bases. Moreover, in considering the passage of time between the initial waiver and the SAFE 1 action, and the development of reliance interests based on the waiver, EPA finds those factors do not support the reconsideration of the ACC program waiver that occurred in SAFE 1. Accordingly, as explained in detail below, EPA is rescinding SAFE 1's withdrawal of its 2013 ACC program waiver because it was an inappropriate exercise of reconsideration authority.

### A. Comments Received

EPA received several comments in the reconsideration proceeding on the Agency's authority to reconsider waivers. Comments on explicit authority focused on whether any language in section 209(b)(1), on its face, permits EPA to reconsider a previously granted waiver. Some of these commenters also distinguished between the denial of the 2008 waiver and the reconsideration and grant of the GHG waiver in 2009, and EPA's grant of the ACC program waiver in 2013 and the reconsideration and withdrawal of the ACC program waiver in 2019.

EPA received comments in support of and against the view that EPA has inherent authority to reconsider waivers. As support for EPA's implied authority to reconsider, one commenter cited relevant language from the Senate Committee Report from 1967 that stated, "implicit in [§ 209] is the right of [EPA] to withdraw the waiver [if] at any time after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of that waiver." [90] According to the commenter because "the waiver authorizes *future* regulation, which always remains open to change," EPA must have the authority to reconsider a

[90] Urban Air Initiative (Urban Air), Docket No. EPA–HQ–OAR–2021–0257–0223 at 22 (quoting S. Rep. 90–403, at 34 (1967)).

waiver. Otherwise, EPA would be unable to monitor CARB's continued compliance with the waiver conditions in light of updated information.[91] The same commenter also argued that an agency generally retains the authority to reconsider and correct any earlier decision unless Congress acts to displace the authority with a process to rectify the Agency's mistakes and that explicit statutory authority to withdraw a waiver is therefore not necessary, because "the power to reconsider is inherent in the power to decide." [92] The commenter claimed that, under *Chevron,* "[a]n agency has a 'continuing' statutory obligation to consider the 'wisdom of its policy.' " [93]

In contrast, several commenters maintained that section 209(b) strongly indicates that EPA's authority to withdraw a previously issued waiver is, at most, limited. Several commenters argued that, absent language in a statute, administrative agencies lack inherent authority to reconsider adjudicatory decisions.[94] These commenters noted that courts highly scrutinize administrative revocations and are "unwilling[ ] to wrest a standardless and open-ended revocation authority from a silent statute." [95] Instead, these commenters argued, EPA may act only with the authorities conferred upon it by Congress, and thus the Agency may only act if the CAA explicitly or

implicitly grants it power to do so.[96] According to these commenters, section 209(b) is silent on waiver withdrawal, its text indicates that EPA may only consider 209(b)'s three factors before either granting or denying a waiver, and its purpose and structure affords broad deference to California's standards. "Taken together, these factors indicate that EPA may not withdraw a previously-issued waiver based solely upon a reconsideration of its initial judgment." [97] Commenters suggested that Congress, by listing the three waiver criteria and directing that EPA evaluate such criteria prior to granting the waiver, only authorized EPA to perform the evaluation once and that it "cannot later second-guess the wisdom of legal and policy judgments made as part of that evaluation." [98] Similarly, commenters noted that section 209 does not textually "provide" EPA any authority nor specify any process by which EPA might revoke the rights given by an earlier-granted waiver.[99] In response to SAFE 1's claim of inherent

reconsideration authority and the other commenters' reliance on the relevant excerpt from the 1967 Senate Report, these commenters argued that this "single sentence . . . does not establish any withdrawal authority," either generally or for the SAFE 1 withdrawal specifically.[100] That statement, commenters argued, "predate[s] the creation of the NAAQS program and Congress's invitations to development of numerous state reliance interests." [101] Moreover, according to these commenters, the statement only discusses authority in the case that "California no longer complies with the conditions of the waiver," which commenters believe means California's "compliance with waiver conditions and, specifically, its cooperation with EPA concerning enforcement and certification procedures," not "redefined waiver criteria." [102]

In response to the argument made by EPA in SAFE 1 that, given the "considerable degree of future prediction" required by the third waiver prong, "where circumstances arise that suggest that such predictions may have been inaccurate, it necessarily follows that EPA has authority to revisit those predictions," [103] some commenters claimed that California's standards do not become inconsistent with federal standards simply because they become more stringent than federal standards (in other words, a weakening of the federal standards does not necessarily create an inconsistency). The commenters noted also that EPA did not in fact revise its section 202(a) standards between issuing and withdrawing the waiver at issue, nor did EPA in fact make any final findings under the third waiver prong.[104]

Many commenters stated that in order to exercise any implied or inherent authority, an agency must provide a "detailed justification" when departing from a policy that has "engendered serious reliance interests" and should not "rest on mere 'policy changes' "

---

[91] *Id.* at 21 ("A determination that California's state standards are technologically feasible and appropriate requires complex technical projections at the frontiers of science, which must be continually adjusted 'if the actual future course of technology diverges from expectation.' " (quoting *NRDC Inc.* v. *EPA,* 655 F.2d 318, 329 (D.C. Cir. 1981))).

[92] Urban Air at 20 (citing *Ivy Sports Med., LLC* v. *Burwell,* 767 F.3d 81, 86, 93 (D.C. Cir. 2014)). This commenter also notes that, in EPA's 2009 action to reconsider its prior denial of a GHG waiver in 2008, CARB submitted a letter to EPA stating that "California believes EPA has inherent authority to reconsider the denial and should do so in order to restore the interpretations and applications of the Clean Air Act to continue California's longstanding leadership role in setting emission standards." *Id.*

[93] *Id.* at 21.

[94] Institute for Policy Integrity Amicus Brief at 4 ("Lacking textual support, EPA invokes so-called 'inherent authority'—'more accurate[ly] label[ed] . . . 'statutorily implicit' authority,' *HTH Corp.* v. *NLRB,* 823 F.3d 668, 679 (D.C. Cir. 2016)—to justify its action. 84 FR at 51,331. But this Court is 'unwilling[ ] to wrest a standardless and open-ended revocation authority from a silent statute,' *Am. Methyl,* 749 F.2d 826, 837 (D.C. Cir. 1984), and EPA fails to justify the implicit authority it claims."); Twelve Public Interest Organizations app 1 at 32 (citing *Am. Methyl* for "rejecting 'implied power' as 'contrary to the intention of Congress and the design of the Act and quoting *HTH Corp.*'s statement that agencies, as creatures of statute, lack inherent authority); States and Cities at 16 (also citing *Am. Methyl*).

[95] Institute for Policy Integrity at 1 (citing *Am. Methyl*).

[96] States and Cities at 15 (citing *HTH Corp.* v. *NLRB,* 823 F.3d 668, 679 (D.C. Cir. 2016)); Twelve Public Interest Organizations, Docket No. EPA–HQ–OAR–2021–0257–0277 app. 1 at 28 ("The Clean Air Act preserves state authority to regulate emissions unless expressly 'provided' otherwise. 42 U.S.C. 7416. In statutes like this where preemption is the exception, only Congress's 'precise terms' can produce preemption. *CTS Corp.* v. *Waldburger,* 573 U.S. 1, 12–13 (2014)."); National Coalition for Advanced Transportation (NCAT), Docket No. EPA–HQ–OAR–2021–0257–0131 at 7–8 ; Institute for Policy Integrity at New York University School of Law (Institute for Policy Integrity), Docket No. EPA–HQ–OAR–2021–0257–0115 at 2, citing its Final Brief of the Institute for Policy Integrity at New York University School of Law as Amicus Curiae in Support of Petitioners (Institute for Policy Integrity Amicus Brief) at 4, *Union of Concerned Scientists, et al.* v. *NHTSA, et al.,* Nos. 19–1230 (D.C. Cir. filed Oct. 28, 2019), reprinted in the Institute's comments on the 2021 Notice of Reconsideration.

[97] Institute for Policy Integrity at 2, citing its Amicus Brief at 6–11.

[98] *Id.* at 7. *See also* Twelve Public Interest Organizations app. 1 at 28–29 ("Section 209(b)(1)'s precise terms mandate that EPA "shall" grant California a waiver unless EPA finds one of the three specified bases for denial. This language charges EPA "with undertaking a single review in which [the Administrator] applies the deferential standards set forth in Section 209(b) to California and either grants or denies a waiver." *Ford Motor Co.* v. *EPA,* 606 F.2d 1293, 1302 (D.C. Cir. 1979). It evinces no intent to provide EPA with the different and greater authority to withdraw a previously granted waiver, thereby arresting the State's ongoing implementation of its own laws."])

[99] *See South Coast Air Quality Management District* (SCAQMD), Docket No. EPA–HQ–OAR–2021–0257–0228 at 3. This commenter argued that section 116 of the CAA (which explicitly references section 209) provides that there needs to be a textual basis for any exercise of authority to deny California the right (which it achieved via the 2013 waiver) to enforce its emission standards. Thus, the commenter continued, because there is no language in section 209 that gives any authority nor specifies any process for EPA to revoke the rights/waiver previously granted then EPA may not do so by the terms of section 116.

[100] States and Cities at 16. *See also* Twelve Public Interest Organizations app. 1 at 33–34.

[101] States and Cities at 16; *See also* Twelve Public Interest Organizations app. 1 at 33–34.

[102] Twelve Public Interest Organizations app. 1 at 34. *See also* States and Cities at 16 (arguing that, although EPA proposed to withdraw the waiver on multiple grounds, such as the third waiver prong, "EPA's final action was based entirely on its own changed policy positions, namely its interpretation of Section 209(b)(1) to create a categorical bar against state regulation of vehicular GHG emissions and its decision to rely on another agency's newly articulated views of a different statute [EPCA].").

[103] 84 FR at 51332.

[104] Institute for Policy Integrity at 2.

alone.[105] Thus, supporters and opponents of SAFE 1 also provided comments on whether, assuming EPA did have authority to reconsider the ACC program waiver—either because of language in the CAA or because of its inherent authority to reevaluate decisions because of changed conditions—it was appropriate to exercise that authority in SAFE 1. Some commenters summarized precedent as requiring that the Agency consider reliance interests that have attached to its original decision, that reversals of informal adjudications occur within a reasonable time after the original decision, and that the reversal is not for the sole purpose of applying some change in administrative policy.[106] Opponents and supporters of SAFE 1 did, however, disagree on the significance of each of these factors.[107]

Commenters who argued that reliance interests were relevant to EPA's authority to reconsider also offered evidence of reliance interests that had accrued over the five years the ACC program waiver had been in effect, with several commenters providing specific details regarding their reliance on the GHG and ZEV standards. As commenters noted, California's standards are incorporated into plans and regulations aimed at achieving state and federal air pollution goals. These plans can be complex and cannot "change on a dime." [108] According to one commenter "[w]ithout the full Waiver, past decision-making was blighted and planned-for reductions to meet Air District goals need to be reassessed. The emission reductions are

key to combatting climate change, curbing ozone formation, preventing additional wildlife impacts, and attaining California [air quality goals] and [NAAQS]." [109] Revoking a waiver and disrupting existing air quality plans, they argue, also has "far-reaching ripple effects" because "businesses operating in California base their own long-term plans on the State's policies" and, if California cannot reduce emissions from the automobile sector, it will have to "consider requiring further reductions from other sectors of the economy." [110] Additionally, they said that by the time of the SAFE proposal, twelve states had already adopted at least one or both of the California standards under section 177.[111] Several of these states submitted comments attesting to their need for these standards to achieve both greenhouse gas and criteria emission reductions.[112] Like the reliance interests of Californian air districts, several of these section 177

states and other opponents of SAFE 1 claim that "reliance interests in State Implementation Plans are particularly acute" because "they set expectations for extended periods of time and for many sectors of the economy, making it challenging (if not impossible) to change them quickly." [113] These commenters note that "planning failures can carry significant consequences, including the imposition of federal plans that limit local flexibility and control, as well as penalties such as loss of highway funds." [114] Some automakers and industry groups also discussed their reliance interests.[115] For example, the National Coalition for Advanced

---

[105] States and Cities at 21–22 (quoting *FCC v. Fox*, 556 U.S. 502, 515 (2009)).

[106] *Id.* at 17 (citing *Am. Methyl*, 749 F.2d at 835; *Chapman v. El Paso Nat. Gas Co.*, 204 F.2d 46, 53–54 (D.C. Cir. 1953); *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1914 (2020); *United States v. Seatrain Lines Inc.*, 329 U.S. 424, 429 (1947)).

[107] Urban Air at 21 (arguing that agencies need only provide a "detailed justification" to overcome reliance interests); Competitive Enterprise Institute (CEI), Docket No. EPA–HQ–OAR–2021–0257–0398 (correction to an earlier comment by the same commenter, which can be found at Docket No. EPA–HQ–OAR–2021–0257–0140) at 9 ("As for reliance interests, all costly wasteful, or otherwise defective government programs create reliance interests. Usurpations of power do as well. If the creation of reliance interests is enough to legitimize bad or unlawful policies, anything goes."). *Compare to* States and Cities at 17–18 (citing their comments on SAFE 1 at 130–31 and citing *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (describing reliance interests as "weighty," stating that "[t]he Clean Air Act and long-standing Executive branch policy both place substantial importance on States' interests in implementing the plans and laws they have determined best meet the needs of their States"—plans and laws such as SIPs, which can and do include California standards).

[108] Twelve Public Interest Organizations app. 1 at 29.

[109] Bay Area Air Quality Management District (BAAQMD), Docket No. EPA–HQ–OAR–2021–0257–0278 at 2.

[110] Twelve Public Interest Organizations app. 1 at 29.

[111] States and Cities at 17. With these state adoptions, auto-manufacturers would then need to meet program requirements in these states.

[112] *See, e.g.,* Delaware Department of Natural Resources and Environmental Control (Delaware), Docket No. EPA–HQ–OAR–2021–0257–0109 at 1 ("The GHG program allowed by the waiver is vitally important, as it enables long-term plans and yields critical emission reductions that will contribute significantly to Delaware's ability to attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) for criteria pollutants."); Connecticut Department of Transportation and Connecticut Department of Energy and Environmental Protection (Connecticut), Docket No. EPA–HQ–OAR–2021–0257–0104 at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQS."); Minnesota Pollution Control Agency and Minnesota Department of Transportation (Minnesota), Docket No. EPA–HQ–OAR–2021–0257–0113 at 2 ("The MPCA is in the process of adopting the LEV and ZEV standards in Minnesota as allowed under section 177 of the CAA. These rules are vitally important in helping our state achieve our GHG emission reduction goals and reduce other harmful air pollutants. . . ."); Maine Department of Environmental Protection (Maine), Docket No. EPA–HQ–OAR–2021–0257–0130 at 1, 3 ("While the LEV program was initially created to help attain and maintain the health-based [NAAQS] for criteria pollutants, the California GHG and ZEV standards will contribute significantly to states' abilities to meet their emission reduction goals. . . . [T]he transportation sector is the largest source of ozone forming pollution in Maine . . . and California's ability to set ZEV standards under the [CAA] is an essential tool for addressing both criteria pollutants and GHGs."); Virginia Department of Environmental Quality (Virginia), Docket No. EPA–HQ–OAR–2021–0257–0112 at 2 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements.")

[113] Twelve Public Interest Organizations app. 1 at 30; Delaware at 3 (explaining that, without the California standards, adopted into Delaware's SIP, the State will not be able to meet our air quality goals). These reliance interests, one commenter argued, are another reason to doubt the implicit authority of EPA to reconsider an already granted waiver: "It would be quite surprising, then, for EPA to have implicit authority to upend this multi-actor, multi-step scheme by pulling the rug out from under it after the fact." States and Cities at 16 (citing *Am. Methyl*, 749 F.2d at 840).

[114] Twelve Public Interest Organizations app. 1 at 30–31 (citing 42 U.S.C. 7410(c)(1) (establishing triggers for imposition of federal plan), 7509 (outlining sanctions for state planning failures)).

[115] *See* Ford Motor Company (Ford), Docket No. EPA–HQ–OAR–2021–0257–0028 at 1 ("Ford supports EPA's rescission of its SAFE I action, which withdrew California's waiver for zero emission vehicle (ZEV) mandate and greenhouse gas (GHG) emission standards within California's Advanced Clean Car (ACC) program. Ford does not believe this previous action was appropriate. Ford firmly supports recognition of California's authority to implement ZEV and GHG standards in support of its air quality targets pursuant to its 2012 waiver application. We have relied on California's actions pursuant to the waiver and California's related pronouncements in negotiating and agreeing to the California Framework Agreement, and in the development of our own product and compliance plans. Ultimately, Ford considered EPA's and NHTSA's rationales and California's statements regarding SAFE I and took action in the best interests of the company and of the environment."). *See also* Tesla, Docket No. EPA–HQ–OAR–2021–0257–0136 at 4 ("Because of the sizeable investments required to develop alternative fuel and advanced technology vehicles, regulatory stability is vital for ensuring the level of manufacturer and investor confidence necessary to facilitate innovation.") and at n.5 (quoting comments from several automakers and auto industry groups about reliance interests on the waiver from the MTE). *See also* Toyota, Docket No. EPA–HQ–OAR–2021–0381 ("Should EPA reinstate California's waiver, we request it be reinstated as it was originally granted, including the 'deemed-to-comply' provision that was so important in establishing One National Program (ONP) over a decade ago. . . . Reinstatement of California's waiver for model years 2021 and 2022 poses significant lead time challenges considering that 2021 model year is well underway, and 2022 model year vehicles are generally already designed, sourced, certified to various regulatory requirements, and ready to begin production. Some manufacturers may have already begun production of 2022 model year vehicles. As a result, a reinstatement of California's waiver by EPA should apply prospectively to model years 2023 and later.").

Transportation, an industry coalition group, stated "NCAT members have invested billions of dollars with the well-founded expectation that increased demand for electric vehicles would be propelled by California and the section 177 States' continued ability to drive technology innovation and emission reductions." [116] EPA also received comment from CARB, by and through the comments of the States and Cities, that provided data on manufacturer compliance.[117]

According to commenters, these reliance interests were compounded by the considerable passage of time between the granting of the ACC program waiver in 2013 and SAFE 1's withdrawal in 2019. Commenters also remarked that the more than five years that had passed was too long a delay and well beyond the "weeks, not years" sometimes referenced as guidance for reasonableness.[118] SAFE 1, they noted "comes years after the waiver was granted, years after multiple sovereign States adopted California's standards, and years into long-term plans States developed in reliance on anticipated emission reductions from those standards—including, but not limited to, multiple EPA approved State Implementation Plans." [119]

Other commenters argued that SAFE 1 did not upend reliance interests and was not untimely. They agreed with the SAFE 1 decision that the 2018 Mid-Term Evaluation (MTE), which was agreed to in 2013, prevented any reliance interests from accruing.[120] Although this MTE was for the federal GHG standards for MYs 2022–2025, not the California GHG standards approved under the ACC program waiver, these commenters argued that the two were linked through the "deemed to comply"

provision approved in the ACC program waiver, which allowed manufacturers to comply with the California standards by meeting the federal standards.[121] They also noted that California separately agreed to a 2016 mid-term evaluation of its own state standards for the same model years.[122] Therefore, they argued, because the initial grant of the waiver was contingent on two subsequent mid-term evaluations, no one could have reasonably believed the ACC program waiver was "set in stone." Additionally, at least one commenter argued that California and other states' purported reliance interests were further undermined because they "have known for years that NHTSA's longstanding position is that state carbon dioxide regulations and zero-emissions vehicle mandates are related to average fuel economy standards and therefore preempted by CAFE" and "could not have reasonably believed that EPA would continue to ignore NHTSA's view of the law in perpetuity.[123]

Some commenters also argued that even if reliance interests are relevant, automakers and industry groups have reliance interests of their own affected by CARB's 2018 deemed to comply amendments and the SAFE 1 action itself. One commenter wrote that "CARB tossed automakers' reliance interests out the window when it refused to be bound by the results of the EPA and NHTSA's Mid-Term Evaluation (MTE) . . . and refused to honor its 'deemed to comply' pledge to automakers unless they complied with the standards set by the EPA in 2012 and 2017." [124] Another commenter noted that "[w]hatever 'reliance interests' are disturbed when EPA reverses a waiver grant are no more real, and no more serious for the parties involved, than the reliance interests upended by reversal of a waiver denial." [125]

Some commenters also argued that SAFE 1 was timely, disputing opponents' claims that a "reasonable" amount of time is measured in "weeks, not years." Commenters noted that "courts have not reached consensus on the amount of time that is reasonable." [126] Moreover, one commenter argued that "timeliness depends on reliance interests" and, because those could not have accrued prior to the MTE, the time period at issue is only four months (between the conclusion of the MTE and the reconsideration of the ACC program waiver, starting in 2018).[127] This "short time," the commenter claimed, "lies in the acceptable range given the intervening events." [128] Another commenter argued that, if "time elapsed" is a factor to be considered in the appropriateness of an action, it cuts in favor of SAFE 1, as thirty years passed between EPCA's enactment in 1975 and California's first request for a "waiver implicitly authorizing the State to regulate fuel economy." [129] Even if the time period at issue was nearly six years between the grant of the ACC program and the final SAFE 1 action, that commenter wrote, such a length of time is not unreasonable, since "[i]f six years locks a policy in place and puts it beyond revision or repeal by the next administration, elections no longer matter." [130]

In addition to reliance interests and timeliness, some commenters claimed that EPA's authority to revoke, if it existed, requires the Agency to have a purpose other than "applying some . . . change in administrative policy." [131] SAFE 1, they argued, did not meet this requirement. Instead, in SAFE 1, EPA "chose to *sua sponte* reconsider its 2013 Waiver Grant for the sole purpose of applying new policy determinations," specifically "NHTSA's views of EPCA preemption" and "new interpretations

---

[116] NCAT at 13; Rivian as a member of NCAT (Rivian), Docket No. EPA–HQ–OAR–2021–0135.

[117] States and Cities at 55–57, including app. D and app. E.

[118] *Id.* at 17 (citing *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977)). Twelve Public Interest Organizations app. 1 at 73. In addition, this commenter notes that the time period for seeking judicial review of the ACC program waiver had run long ago and that no one had sought the review (citing *Am. Methyl Corp.,* 749 F.2d at 835); NCAT at 14–15.

[119] Twelve Public Interest Organizations app. 1 at 58.

[120] America Fuel & Petrochemical Manufacturers, EPA–HQ–OAR–2021–0257–0139 (AFPM) at 26 ("And no reliance interests derive from this decision because one could not reasonably expect that the standards approved in that waiver would remain untouched. As part of the 2013 waiver decision, EPA and CARB committed to a 2018 mid-term evaluation of the federal standards for MYs 2022–2025."); Urban Air at 22; NADA at 6 ("as discussed at length repeatedly in EPA's 2013 CAA preemption waiver rule, a coordinated mid-term evaluation (MTE) involving EPA and NHTSA's MY 2022–2025 rules was expected to be conducted.").

[121] AFPM at 26 ("Because California's deemed-to-comply provision linked those standards to compliance with its own state program, any change in federal standards from the mid-term review would have required an equal overhaul of California's emissions program for those future MYs."); Urban Air at 22–23 ("The 2018-re-evaluation is relevant because California's deemed-to-comply provision allowed a manufacturer to satisfy state GHG standards simply by complying with federal standards."); NADA at 6 ("[A]s noted above, CA's GHG mandates included both a 'deem-to-comply' rule enabling vehicle manufacturers to meet those mandates by complying with applicable federal rules, and a commitment on the part of the state to conduct a mid-term evaluation of its own GHG standards.").

[122] AFPM at 26–27; Urban Air at 22; NADA at 6.

[123] Urban Air at 23.

[124] CEI at 9.

[125] AFPM at 27. *See also* Urban Air at 20–21 ("And under the presumption that 'an agency retains authority to reconsider and correct an earlier decision,' the grant of a waiver is as liable to change as the denial of a waiver. No greater reliance interests attach to the grant of a waiver authorizing regulation than to the denial of a waiver preventing regulation, so reliance interests provide no support for California's ratchet argument.").

[126] Urban Air at 23–24.

[127] *Id.* at 24. Another commenter disagreed with this accounting of time, stating that "timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. *E.g., Am. Methyl,* 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision)." Twelve Public Interest Organizations app. 1 at 38.

[128] Urban Air at 23–24.

[129] CEI at 8 (calling "time elapsed" a "frivolous objection.").

[130] *Id.*

[131] States and Cities at 17 (quoting *Chapman* v. *El Paso Nat. Gas Co.,* 204 F.2d 46, 53–54 (D.C. Cir. 1953)).

[of section 209(b)(1)(B)] that served only to categorically bar state standards that reduce vehicular GHG emissions.'' [132] Still, another commenter disagreed, arguing that EPA's reconsideration was an appropriate reevaluation of the legal interpretation and facts upon which the initial waiver determination was based because—''reconsideration determinations do not become 'policy' decisions simply because they address substantive errors.'' [133]

EPA also received comment on whether EPA's actions were inappropriate because the Agency failed to satisfy the ''requirements of reasoned decision-making.'' Some commenters noted that EPA had taken the position in SAFE 1 that ''reducing criteria pollution is of overriding importance'' yet failed to ''consider[ ] the criteria-pollution and SIP consequences of its Waiver Withdrawal and Section 177 Determination.'' [134] Similarly, EPA received comments claiming that the decision to apply a new approach to the ACC program waiver section 209(b)(1)(B) was both unnecessary and unjustified because, as EPA acknowledged in SAFE 1, the Agency has consistently posited that section 209(b)(1)(B) calls for determining whether the State needs its own regulatory program, separate from that of the federal government, not whether the State needs each specific standard or package of standards for which it seeks a waiver.[135] One of these commenters pointed out that EPA also acknowledged that the phrase ''such State standards'' could reasonably remain the program-level interpretation (EPA's traditional interpretation) yet the Agency chose to adopt a new interpretation and apply it to the more than five-year old ACC program waiver, impacting expectations and reliance interests.

The Agency also received comments on whether NHTSA's finding of preemption under EPCA in the joint action granted EPA authority to reconsider the ACC program waiver. Commenters argued that NHTSA is charged with interpreting and

implementing EPCA and that its finding ''that Congress prohibited California's standards'' in the same action cannot be ignored.[136] Still other commenters pointed to the language of section 209(b)(1) itself, where only three criteria are provided by which EPA can deny a waiver. As such, they argued, EPA cannot have broad, implicit authority to revoke a waiver on entirely different grounds than by which it may deny a waiver.[137] The commenters also argued that the joint context of the action did not grant the Agency special authority to reconsider, explaining that ''[w]hat Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency.'' [138] Some commenters also pointedly noted that SAFE 1's distinction between single-agency and joint actions is arbitrary and capricious and therefore not a valid basis for reconsideration because EPA stated it ''does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C),'' [139] and because NHTSA and EPA now consider SAFE 1 as ''two severable actions.'' [140]

### B. Analysis: EPA Inappropriately Exercised Its Limited Authority To Reconsider

EPA finds it does have authority to reconsider waivers, although its reconsideration of previously-granted waivers is limited and circumscribed. In the context of adjudicatory decisions (as contrasted to rulemakings), administrative law principles and case law support limited reconsideration authority for waiver proceedings. For example, in *Ivy Sports Med., LLC* v. *Burwell,* 767 F.3d 81, 86, 93 (D.C. Cir. 2014), the D.C. Circuit noted that where a statute ''does not contain an express provision granting [the agency] authority to reconsider,'' ''administrative agencies are assumed to possess at least some inherent authority to revisit prior decisions, at least if done in a timely fashion,'' noting the baseline limitations of such inherent authority. And in *Chapman* v. *El Paso Nat. Gas Co.,* 204 F.2d 46, 53–54 (D.C. Cir. 1953), the D.C. Circuit made clear that once concluded, an adjudicatory decision

granting a right ''may not be repudiated for the sole purpose of applying some quirk or change in administrative policy.'' [141] These precedents suggest that, while agencies do generally possess some inherent authority to reconsider previous adjudicatory decisions, that authority is limited in scope.

Section 209 does not provide EPA with express authority to reconsider and withdraw a waiver previously granted to California. EPA's authority thus stems from its inherent reconsideration authority. The 1967 legislative history provides some indication of congressional intent to preserve some implied authority for EPA to reconsider previous waiver decisions, but also to place limitations on it. This legislative history explains: ''[i]mplicit in this provision is the right of the [Administrator] to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver.'' [142] Thus, from the earliest days of the program it has been understood that any withdrawal of a waiver should be tied to the statutory criteria and California's compliance with them. This legislative history must be taken into account along with Congress's intent expressed in the 1977 legislative history, which, as discussed previously, sought to ensure deference to California and to strengthen that state's role in driving emissions-reducing technological innovation. Congress was also mindful to ensure the ability of other states to adopt California's standards.[143] Ultimately, EPA concludes it has authority to reconsider previously-granted waivers, but that this authority may only be exercised sparingly. As discussed below, there are several considerations that support narrow authority to reconsider waiver grants.

First and most important, EPA believes its inherent authority to reconsider a waiver decision is

---

[132] *Id.* at 8, 19 (''No statute compelled EPA to reconsider the 2013 waiver at all, let alone to apply new policies to that long-settled decision rather than to new waiver requests.''); Twelve Public Interest Organizations app. 1 at 35 (''EPA relied exclusively on its purported discretion to reinterpret Section 209(b)(1)(B) of the Clean Air Act . . . and its purported discretion to consider factors not enumerated in Section 209(b)(1).''). *See also* SCAQMD at 3 (''Because the 2013 waiver decision was not pending judicial review in 2019 and was a long-closed matter, the EPA could not rightfully reopen its adjudication.'').

[133] Urban Air at 24 (citing *Civil Aeronautics Bd.* v. *Delta Air Lines,* 367 US 316, 321 (1961)).

[134] States and Cities at 8–9, 12.

[135] *Id.* at 22.

[136] *See, e.g.,* CEI at 11.

[137] States and Cities at 16–17.

[138] *Id.* at 20. *See also* Twelve Public Interest Organizations app. 1 64–65.

[139] Northeast States for Coordinated Air Use Management (NESCAUM), Docket No. EPA–HQ–OAR–2021–0257–0126 at 3; Twelve Public Interest Organizations apps. 1 64–65; States and Cities at 20.

[140] SCAQMD at 7 (citing 86 FR at 22439 n.40).

[141] *See also Am. Methyl,* 749 F.2d 826, 835 (D.C. Cir. 1984) (''We have held that agencies have an inherent power to correct their mistakes by reconsidering their decisions within the period available for taking an appeal.''); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) (''We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.'') (quoting *Gratehouse* v. *United States,* 512 F.2d 1104, 1109 (Ct. Cl. 1975)); *Albertson* v. *FCC,* 182 F.2d 397, 399 (D.C. Cir. 1950) (''in the absence of any specific limitation,'' reconsideration available ''within the period for taking an appeal''). *See generally* Daniel Bress, Note, Administrative Reconsideration, 91 VA. L. REV. 1737 (2005).

[142] S. Rep. No. 90–403, at 34 (1967).

[143] *See supra* Section III.B.

constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). It would be inappropriate and inconsistent with congressional intent for EPA to reconsider and withdraw a waiver on a ground outside the limited scope of those which Congress specified for EPA to consider when reviewing a waiver in the first place.[144] In the few instances where the Agency reconsidered prior waiver decisions prior to SAFE 1, EPA focused its review on the section 209(b) statutory waiver criteria.[145]

A circumscribed approach to reconsideration of waivers is consistent with the deference to California's policy judgment that Congress built into the waiver process.[146] Congress explicitly required that EPA "shall" grant the waiver unless one of three limited criteria is met. The use of the word "shall" (versus "may") was heavily debated by the enacting Congress, with the successful proponents of "shall" explaining that such language would "guarantee" that California could regulate with the burden placed on EPA to demonstrate why California should not be allowed to go beyond federal limitations.[147] Congress's legislative enactments since its creation of the waiver program—including adding section 177 to allow other states to adopt California's standards in 1977 and section 209(e)(2)(A) to create parallel deference for nonroad engines and vehicles in 1990—reinforce the important role it envisioned for, and deference it afforded to, California.[148]

In SAFE 1, EPA argued instead that deference to California was not merited where the Agency was interpreting its "own statute."[149] But in Title II of the Clean Air Act, Congress envisioned two standards—California and Federal.[150]

Congress recognized California's early attempts to address motor vehicle emissions intended to address its extraordinary environmental conditions as well as being a laboratory for motor vehicle emissions control.[151] Congress called for EPA deference to California in implementing section 209(b) by not only limiting EPA review of California waiver requests to three specific criteria but also instructing that EPA is "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare."[152] Similarly, "[t]he Administrator, . . . is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State."[153] Additionally, the D.C. Circuit has explained that "Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight" and "[t]he statute does not provide for any probing substantive review of the California standards by federal officials."[154] Further, "[t]here is no indication in either the statute or the legislative history that . . . the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial."[155] Thus, early in the waiver program's history, EPA explained the deference that Congress intended for the Agency's review of waiver requests by noting that it would feel constrained to approve a California approach to a problem that the EPA Administrator might not feel able to adopt at the federal level as a regulator. EPA explained that the balancing of risks and costs against potential benefits from reduced emissions is a central policy decision for any regulatory agency and substantial deference should be provided to California's judgement on such matters.[156]

In addition, limiting reconsideration of waivers undergirds Congress' intent that California would be a laboratory for the country driving emissions-reducing

technological innovation when it created the program in the first place. As the D.C. Circuit explained in *MEMA I*: "The history of congressional consideration of the California waiver provision, from its original enactment up through 1977, indicates that Congress intended the State to continue and expand its pioneering efforts at adopting and enforcing motor vehicle emission standards different from and in large measure more advanced than the corresponding federal program; in short, to act as a kind of laboratory for innovation."[157] Indeed, broad authority to reconsider waiver grants could undermine the very structure that Congress built in Title II. Specifically, while EPA does not consider section 177 when reviewing waiver requests under section 209, Congress built a structure wherein EPA must grant California a waiver under section 209 unless one of the three statutory criteria are met, and then other states may adopt California's standards under section 177 as part of their overall air quality programs. Limited inherent authority to reconsider previously-granted waivers as described in this action is important to the success of Congress's structure.

Finally, even the sentence in the legislative history that suggests EPA has inherent reconsideration authority in the first place, and which SAFE 1 relied on for its assertion of inherent reconsideration authority, lends weight to the view that this authority is limited. According to the Senate report from the 1967 CAA amendments, the Administrator has "the right . . . to withdraw the waiver at any time [if] after notice and an opportunity for public hearing he finds that the State of California no longer complies with the conditions of the waiver."[158] That specific circumstance—where California does not comply with the conditions of a waiver—should not be expanded to include a gaping hole for discretionary administrative policy changes.

Given all of the above considerations, several principles emerge. EPA's authority to reconsider a grant of a waiver, which is an adjudicatory action by the Administrator, is not open-ended. Any reconsideration is constrained to the criteria that Congress set out in section 209(b). Even within those statutory criteria, considering all of the factors that weigh in favor of a narrow interpretation of the Agency's authority and the importance of not disrupting Congress's scheme, EPA believes reconsideration is limited to situations where the Agency has made

---

[144] *See MEMA I*, 627 F.2d at 1115 (noting that section 209(b) creates "a narrowly circumscribed proceeding requiring no broad policy judgments").

[145] EPA initiated reconsideration of certain motorcycle standards, under the third waiver prong, section 209(b)(1)(C), in order to "vacate that portion of the waiver previously granted under section 209(b)." 47 FR 7306, 7309 (February 18, 1982). EPA affirmed the grant of the waiver in the absence of "findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations." *Id.* at 7310.

[146] *See MEMA I*, 627 F.2d at 1124–25 (describing Congress's intent to defer to California's judgments regarding its motor vehicle program).

[147] H.R. Rep. No 90–728 ("Are we now to tell California that we don't quite trust her to run her own program, that big government should do it instead?").

[148] 40 FR 23104; 58 FR 4166.

[149] 84 FR at 51344 n.268.

[150] Motor vehicles are "either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079–80,

1088 (D.C. Cir. 1996) ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards.").

[151] *See, e.g.*, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) [The waiver of preemption is for California's "unique problems and pioneering efforts."); 113 Cong. Rec. 30950, 32478 ("[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.") (Statement of Sen. Murphy).

[152] H.R. Rep. No. 95–294, at 301–02 (1977).

[153] H.R. Rep. No. 95–294, at 302 (1977), reprinted in 1977 U.S.C.C.A.N. at 1381)).

[154] *Ford Motor Co. v. EPA*, 606 F.3d 1293, 1297, 1300 (D.C. Cir. 1979).

[155] *Id.* at 1302.

[156] 40 FR at 23104.

[157] *MEMA I*, 627 F.2d at 110–11.

[158] S. Rep. No. 90–403, at 34 (1967).

a clerical or factual error or mistake, or where information shows that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt.

Even if the bases for EPA's reconsideration did satisfy one of the foregoing conditions such that reconsideration may be appropriate, during that reconsideration EPA believes it should consider the passage of time and reliance interests. In the context of CAA waiver grants in general, and the 2013 ACC program waiver grant in particular, California is relying on its standards to meet short- and long-term emission reduction goals.[159] In addition, by the time the SAFE proposal was published, twelve states had already adopted at least one or both of the GHG and ZEV standards.[160] Several of these states incorporated these adopted standards into their SIPs.[161] Several automakers and industry groups have also indicated reliance on these standards.[162]

Reconsideration thus must carefully consider the factors noted and should not be undertaken where immense degrees of uncertainty are introduced in settled expectations of California, other states, and regulated industry or to allow for the continual questioning of EPA's decisions, thus impairing needed finality. Such reconsideration could frustrate congressional intent in designing the waiver program and ultimately discourage reliance by the recipient of EPA's waiver decision (CARB), states that may have adopted CARB's regulations under the terms of section 177 (and are permitted to enforce the regulations once EPA grants

a waiver to California) as well as the regulated industry.

We now turn to whether the reconsideration in SAFE 1 was a proper exercise of EPA's inherent reconsideration authority. As an initial matter, SAFE 1 did not assert that any clerical or factual error or mistake was made in the 2013 ACC program waiver. Nor did SAFE 1 point to any evidence showing that factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted have changed so significantly that the propriety of the waiver grant is called into doubt. For example, SAFE 1 did not assert that California was not complying with the terms of the waiver. Instead, SAFE 1's reconsideration was premised on retroactive application of discretionary policy changes. Therefore, EPA believes it did not appropriately exercise its inherent authority in SAFE 1 to reconsider the prior ACC program waiver. Upon reconsideration, and as further shown in Sections V and VI, EPA now believes that SAFE 1 amounted to an improper exercise of the Agency's limited inherent authority to reconsider.[163]

SAFE 1 gave two primary reasons for withdrawing the 2013 ACC program waiver. Neither was an appropriate basis for reconsideration. First, SAFE 1 premised the revocation on its interpretation of the second waiver prong, section 209(b)(1)(B), that called for the Agency's scrutiny of specific standards under the waiver rather than California's program as a whole. As explained in detail in Section V of this final action, that statutory interpretation is flawed, and EPA does not believe a new statutory interpretation should be

the basis of reconsidering the grant of a waiver.

SAFE 1 premised the withdrawal of the ACC program waiver under section 209(b)(1)(B) on the perceived lack of record support on the causal link between GHG emission standards and air quality conditions in California.[164] Yet, the underlying record from the ACC program waiver, and the record of SAFE 1, have shown that CARB's ZEV sales mandate and GHG emission standards are designed to address California's serious air quality problems, including both its NAAQS pollutants and a variety of climate impacts from GHG emissions. As discussed in greater detail in Section V, EPA has since at least 2009 recognized that greenhouse gas pollution exacerbates criteria pollution, and climate change impacts on California's air quality conditions (*e.g.*, heat exacerbation of ozone).[165] The ACC program was especially designed to

[159] States and Cities at 17–18.

[160] *Id.* at 17.

[161] *Id.* at 10; Wisconsin Department of Natural Resources (Wisconsin), Docket No. EPA–HQ–OAR–2021–0257–0095 at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQs."); Delaware 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[162] *E.g.*, Ford at 1; Tesla at n.5, and Rivian (as a member of NCAT) at 13–14.

[163] EPA acknowledges that, in the SAFE 1 proceedings, it had noted that at the time of proposal that CARB had given notice that it was considering amending its "deemed to comply" provision and that by the time of SAFE 1, California had entered into agreements with several automobile manufacturers to accept less stringent standards than the California program or the Federal standards as promulgated in 2012. As noted in SAFE 1, EPA believed that neither of these matters were necessary for EPA's action in SAFE 1, but that they provided further support for the action. 84 FR at 51334 n.230. By this action, EPA finds that neither of these matters amounted to a change in circumstances or conditions associated with the three waiver criteria and EPA's evaluation of the criteria in the ACC program waiver. EPA did not predicate its ACC program waiver on CARB's deemed-to-comply provision or any changes to the deemed-to-comply provision. (EPA does not take a position as to whether that provision has changed in its purpose as a result of CARB's 2018 amendment.) To the extent CARB utilized a deemed-to-comply provision or uses non-regulatory mechanisms to achieve its air quality objectives, this had no bearing on EPA's assessment of whether CARB has a need for its standards under the second waiver prong at the time of SAFE 1 or now.

[164] "California's *approach* in its ACC program waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified $NO_X$ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment." 84 FR at 51337 n.252 (citing 79 FR at 46256, 46257 n.15, 46261, 46262 n.75).

[165] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014). CARB projected, for example, "reductions in $NO_X$ emissions of 3.1 tons per day in 2014 and one ton per day in 2020" in California. *Id.* at 46261. The second HD GHG emissions standard waiver related to CARB's "Phase I" regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

CARB also noted the scientific findings since EPA's 2009 GHG waiver including the report titled "Our Changing Climate 2012 Vulnerability &Adaptation to the Increasing Risks from Climate Change in California." The summary report highlights new insights for the energy, water, agriculture, public health, coastal, transportation, and ecological resource sectors that are vital to California residents and businesses. The study also predicts that peak concentrations of dangerous airborne particles will increase in the San Joaquin Valley because of climate change on wind patterns. This study provides further evidence of what is known as the "climate penalty," where rising temperatures increase ground-level ozone and health-damaging particles, despite the reductions achieved by successful programs targeting smog-forming emissions from cars, trucks, and industrial sources. *Id.* at 8–9. *See also* "The Impacts of Climate Change on Human Health in the United States: A Scientific Assessment" Chapter 3 Air Quality Impacts—Key Finding ("Climate change will make it harder for any given regulatory approach to reduce ground-level ozone pollution in the future as meteorological conditions become increasingly conducive to forming ozone over most of the United States. Unless offset by additional emissions reductions, these climate-driven increases in ozone will cause premature deaths, hospital visits, lost school days, and acute respiratory symptoms.") at *https://health2016.globalchange.gov/air-quality-impacts;* Chapter 13: Air Quality, Fourth National Climate Assessment at *https://nca2018.globalchange.gov/chapter/13/.*

address both criteria and GHG pollution, including the effects of GHG pollution on criteria pollution in California.[166] As also further discussed in Section V, in SAFE 1 the Agency dismissed the criteria pollutant benefits of California's ZEV sales mandate requirements based on a snippet from the 2012 waiver request, taken out of context.[167] This was also remarkable considering EPA's prior waivers for ZEV sales mandate requirements that demonstrated criteria pollutant emissions reduction benefits.[168] The record also includes information that demonstrates that a withdrawal of the waiver for the GHG emission standards and ZEV sales mandate (and leaving the Federal GHG standards at the 2020 levels as proposed in SAFE) would increase NOx emissions in the South Coast air basin alone by 1.24 tons per day.[169] In sum, EPA opted to elide the available ample technical support from the ACC program waiver proceedings. EPA's factual predicates in SAFE 1— that there was no criteria pollutant benefit of the GHG standards and ZEV sales mandate—for reconsideration based on the second waiver prong were simply inaccurate and inappropriate. Reconsideration was thus improper on this basis because there were no factual errors in the ACC program waiver and EPA should not be exercising authority to reconsider prior valid waivers that present no factual errors based on different statutory interpretations.

Second, SAFE 1 premised its revocation on NHTSA's finding of preemption under EPCA. This, too, was an inappropriate ground for reconsideration. As earlier noted, EPA believes its inherent authority to reconsider a waiver decision is constrained by the three waiver criteria that must be considered before granting or denying a waiver request under section 209(b). Preemption under EPCA is not one of these criteria and was not considered in CARB's ACC program

waiver request or in EPA's granting of that waiver. In fact, in its waiver grant, the Agency expressly found that consideration of preemption under EPCA would be inappropriate and unnecessary. In SAFE 1, the Agency did not premise its consideration of preemption under EPCA on any of the three statutory criteria. Therefore, EPA believes that SAFE 1 was not a proper exercise of the authority to reconsider on this basis, and any subsequent action in SAFE 1 to withdraw the ACC program waiver was inappropriate.

Although SAFE 1 was an inappropriate exercise of inherent authority given that the Agency did not correct a factual error and there was no change in factual circumstances so significant that the propriety of the waiver would be called into doubt, it is nevertheless relevant to note that SAFE 1 did not give appropriate consideration to the passage of time and the reliance interests that had developed between the granting and the revocation of the ACC program waiver. Several automakers and industry groups have also indicated reliance on these standards, as previously discussed.[170] California and section 177 states have, by the time of the reconsideration, into the long-term plans they had developed relying on the ACC program waiver standards.[171] California and other states

rely on waivers that EPA has approved to meet short- and long-term emission reduction goals.[172] In addition, by the time the SAFE proposal was published, twelve states had already adopted at least one or both of the GHG and ZEV standards.[173] Several of these states incorporated these adopted standards into their SIPs.[174]

SAFE 1 barely mentioned these reliance interests, explaining only that the Agency "will consider whether and how to address SIP implications of this action, to the extent that they exist, in separate actions; EPA believes that it is not necessary to resolve those implications in the course of this action." [175] EPA now believes that,

---

[166] 2012 Waiver Request at 1, 9–11, 15–17 ("[A]s detailed below, the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the federal standards that exist."). 78 FR at 2122 ([T]he ACC program will result in reductions of both criteria pollutants and GHG emissions.").

[167] 84 FR at 51337 (quoting CARB's statement that "[t]here is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions."). As explained in more detail below, this statement merely reflected how CARB attributed pollution reductions between its different standards and compliance mandates, not the reality of how those standards and mandates actually drive pollution reductions.

[168] 58 FR at 4156. 71 FR 78190 (December 28, 2006); 75 FR 11878 (March 12, 2010) and 76 FR 61095 (October 3, 2011).

[169] States and Cities at 10.

[170] *E.g.,* Ford at 1; Tesla at n.5, 4; Rivian (as a member of NCAT) at 13–14. EPA notes that it received limited comment on whether reliance interests had formed since the issuance of SAFE 1 but nothing to demonstrate error in the findings regarding section 209(b)(1)(C) made within the ACC program waiver. *See* Toyota, Docket No. EPA–HQ–OAR–2021–0381 ("Reinstatement of California's waiver for model years 2021 and 2022 poses significant lead time challenges considering that 2021 model year is well underway, and 2022 model year vehicles are generally already designed, sourced, certified to various regulatory requirements, and ready to begin production."). Further, as discussed elsewhere, the short passage of time since the promulgation of SAFE 1 and ongoing litigation over that action has, as automakers have noted in that briefing, prevented automakers from relying on the waiver revocation. *See also* Twelve Public Interest Organizations at 11 (noting filings by automakers suggesting lack of reliance on the waiver withdrawal).

[171] *E.g.,* States and Cities at 17 (the length between the waiver grant and reconsideration was too long "by any measure."); Twelve Public Interest Organizations at app. 36. EPA acknowledges the commenter who argued that "timeliness depends on reliance interests" and, because the standards were not final before the MTE, the time period at issue is the four months between the MTE and the SAFE 1 proposal. Urban Air at 24. EPA also received comment that disagreed with this accounting of time stating that timeliness for reconsidering an adjudication is measured from the date of the agency's decision, not from the date of activity resulting from that decision. *E.g., Am. Methyl,* 749 F.2d at 835 (tethering timeliness to period for appeal of agency decision)." Twelve Public Interest Organizations at app. 1 at 38. EPA believes it is not necessary to resolve the

permissible amount of time, or the existence or lack of a bright line, that may pass before reconsideration of its prior adjudication is no longer appropriate. However, EPA did not "condition" its ACC program waiver on any subsequent action, including the MTE, which explicitly applied to the federal standards. *See* 78 FR at 2137. EPA expects its waiver adjudications to be final and that appropriate reliance may flow to affected parties. Moreover, in this instance EPA did not make any final determination regarding the third waiver prong at section 209(b)(1)(C). EPA notes that it has administered the California waiver program for a number of decades and acknowledges that emission standards continue to evolve at the California and the federal levels. This evolution in the standards has rested on regulatory certainty and the enforceability of CARB's emission standards once a waiver has been issued by EPA under section 209(b) of the CAA. As for the inclusion of the deemed-to-comply provision in the California standards, California provided documentation demonstrating that the deemed-to-comply provision was reliant upon the federal standards having a certain level of stringency, a fact that EPA had recognized. *See* States and Cities at 18–19 n. 14, 57–60. EPA found that the California standards were feasible even without the deemed-to-comply provision, 78 FR at 2138, making it irrelevant to the waiver grant. California's own actions with respect to its standards, such as its independent review of the ACC program, cannot disturb California's or other state's reliance on the federal waiver.

[172] States and Cities at 17–18.

[173] *Id.* at 17.

[174] *Id.* at 10; Wisconsin Department of Natural Resources (Wisconsin), Docket No. EPA–HQ–OAR–2021–0257–0095 at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQs."); Delaware 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards."); Maine at 1 ("[T]he LEV program was initially created to help attain and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[175] *Id.* at 51324 n.167.

when exercising its inherent authority to reconsider the 2013 waiver decision, it was inappropriate to ignore these possible reliance interests and to "resolve" any potential implications at a later time. In the SAFE 1 context, while it was not necessary to resolve the status of every SIP, it was inappropriate to not even consider the reliance interests raised by the adoption of California standards by section 177 states (including, but not limited to, their adoption into SIPs). EPA has consistently recognized the importance of long-term planning in the attainment and maintenance of NAAQS.[176] Given the long-term nature of these plans, it is "challenging (if not impossible) to change them quickly," and any changes in one part of a SIP can affect multiple sectors of the economy.[177]

As noted above, EPA also received other comments regarding reliance interests, including those noting that the midterm evaluation (MTE) was an indication that the technological feasibility of the GHG emission standards was not a settled matter and hence no certainty or reliance could accrue. EPA, however, did not "condition" its ACC program waiver on any subsequent actions, including the MTE.[178] EPA expects its waiver adjudications to be final and that appropriate reliance may flow to affected parties. Moreover, in this instance EPA did not make any final determination regarding the third waiver prong at section 209(b)(1)(C). EPA notes that it has administered the California waiver program for a number of decades and acknowledges that emission standards continue to evolve at the California and the federal levels. This evolution in the standards has rested on regulatory certainty and the enforceability of CARB's emission standards once a waiver has been issued by EPA under section 209(b) of the CAA.

EPA's historic practice of properly affording broad discretion to California has meant that in almost fifty years of administering the California waiver program the Agency had never withdrawn any waiver prior to SAFE 1. And while SAFE 1 cited prior reconsideration actions as support for the Agency's authority to reconsider prior waiver decisions, as previously noted, EPA has historically limited reconsideration of prior waived standards to statutory criteria and most important, none of these prior reconsideration actions resulted in a revocation.[179] As further shown in Sections V and VI, SAFE 1 was the result of a "probing substantive review of the California standards," with the Agency substituting its own judgment for California's contrary to both congressional exhortation of deference to California and the Agency's review practice.

This present reconsideration is an appropriate exercise of the Agency's reconsideration authority. It is not at all clear that the reasons for limiting reconsideration of waiver grants apply to the same degree to reconsideration of waiver denials and withdrawals. However, EPA need not resolve the question in this action, because this action falls well within the bounds of even the limited authority this action concludes the Agency possesses for reconsideration of waiver grants. First, this action corrects factual errors made in the SAFE 1 waiver withdrawal. Specifically, even under SAFE 1's flawed interpretation of section 209(b)(1)(B), SAFE 1 ignored facts demonstrating that California does need the specific standards at issue to meet compelling and extraordinary conditions. Second, in this reconsideration EPA properly constrains its analysis to whether SAFE 1 made one of the three statutory findings necessary to deny a waiver. Third, this reconsideration is timely with respect to the finalization of SAFE 1 and limited, if any, reliance interests have been based as a result of SAFE 1 (which has been subject to judicial review since its promulgation).

*C. Conclusion*

In SAFE 1, EPA inappropriately exercised its limited inherent authority to reconsider the ACC program waiver for several reasons. EPA believes its exercise of reconsideration authority to reinterpret the language of section 209(b)(1)(B) was not taken to correct any factual or clerical error or based upon factual circumstances or conditions related to the waiver criteria evaluated when the waiver was granted that have changed so significantly that the propriety of the waiver grant is called into doubt. Rather, as discussed in detail in Section V, it was based upon a flawed statutory interpretation and a misapplication of the facts under that interpretation. Likewise, EPA's decision to reconsider the ACC program waiver based on NHTSA's rulemaking within SAFE 1, which raised issues beyond the statutory waiver criteria, was inappropriate. For these reasons EPA now believes it is appropriate to rescind its actions within SAFE 1.

**V. The SAFE 1 Interpretation of Section 209(b)(1)(B) Was Inappropriate and, in any Event, California met its Requirements**

Even if SAFE 1's reconsideration of the 2013 program waiver grant was appropriate, EPA concludes for two independent reasons that its waiver withdrawal in SAFE 1 based upon its new statutory interpretation was flawed. First, EPA concludes that the SAFE 1 interpretation of the second waiver prong was not an appropriate reading of that second waiver prong, section 209(b)(1)(B). It bears noting that the traditional interpretation is, at least, the better interpretation. Informed by but separate from the factual analysis discussed next, the Agency finds that the new interpretation set out in SAFE 1 was inconsistent with congressional intent and contrary to the purpose of section 209(b). Under the traditional interpretation of the second waiver prong, California's need for its own motor vehicle program, including its GHG emission standards and ZEV sales mandate, to meet compelling and extraordinary conditions is clear and the

---

[176] EPA is responsible for approving SIPs and SIP amendments, which span years. *See, e.g.,* 82 FR 42233 (September 7, 2017) (approval of Maine's SIP revision including updates to be consistent with California's updated LEV program); 80 FR 13768 (March 17, 2015) (approval of Connecticut's SIP revision, including the adoption of elements of California's LEV program). For example, states with areas that achieve attainment for any air pollutant must submit for EPA approval a revised SIP that sets out the State's plan for maintaining attainment for at least ten years after the redesignation. At the end of that ten-year period, the State must submit another ten-year maintenance plan to EPA for approval. 42 U.S.C. 7505a.

[177] Twelve Public Interest Organizations app. 1 at 29, 30. Several states also commented, during this reconsideration, that they rely on the California GHG standards and ZEV sales mandate to reach their own state emission reduction goals. *E.g.,* Connecticut at 2 ("Reducing GHG emissions from the transportation sector is required to achieve Connecticut's economy-wide targets of at least 45 percent below 2001 levels by 2030 and 80 percent below 2001 levels by 2050, as required by the 2008 Global Warming Solutions Act (GWSA) and the 2018 Act Concerning Climate Change Planning and Resiliency."); Minnesota at 2 ("[California's standards] are vitally important in helping our state achieve our GHG emission reduction goals and reduce other harmful air pollutants, especially in communities of color and lower-income communities, which are disproportionately impacted by vehicle pollution. The MPCA found that these rules are needed to address GHG emissions in our state and take steps towards achieving Minnesota's statutory Next Generation Energy Act GHG reduction goals. On May 7, 2021, an independent Administrative Law Judge affirmed the MPCA findings."); Maine at 1 n.3 ("Maine statute at 38 M.R.S 576–A establishes tiered GHG emission reduction requirements culminating in gross annual reductions of at least 80% from 1990 baseline levels.").

[178] *See* 78 FR at 2137.

[179] *See, e.g.,* 43 FR at 7310 (affirming the grant of the waiver in the absence of "findings necessary to revoke California's waiver of Federal preemption for its motorcycle fill-pipe and fuel tank opening regulations.").

waiver should not have been withdrawn.

Second, even if the interpretation in SAFE 1 were appropriate, EPA concludes that SAFE 1 incorrectly found that California did not have a need for its specific standards. EPA has evaluated California's need for both requirements by applying both the traditional and the SAFE 1 interpretations of section 209(b)(1)(B). In doing so, EPA reviewed the record from the ACC program waiver proceedings, including CARB's ACC program waiver request and supporting documents, as well as the comments received as part of the SAFE 1 proceeding and the comments received under the present reconsideration of SAFE 1.[180] The record review focused on salient pronouncements and findings in the ACC program waiver decision, such as the relationship of both criteria and GHG pollutants and the impacts of climate change on California's serious air quality conditions. For example, the effects of climate change and the heat exacerbation of tropospheric ozone is well established. California's ACC program is established, in part, to address this. California's program, including its GHG emission standards, is also designed to address upstream criteria emission pollutants. The review did so primarily because SAFE 1 premised the withdrawal of the GHG standards at issue on the lack of a causal link between GHG standards and air quality conditions in California. The review included EPA's prior findings regarding heat exacerbation of ozone, a serious air quality issue recognized by EPA as presenting compelling and extraordinary conditions under the second waiver prong.

On completion of this review, EPA finds no basis for discounting the ample record support on California's need for both the GHG standards and the ZEV sales mandate to address compelling and extraordinary conditions in California when using both the traditional and SAFE 1 interpretation to the second waiver prong. Additionally, because of the way CARB's motor vehicle emission standards operate in tandem and are designed to reduce both criteria and GHG pollution and the ways in which GHG pollution exacerbates California's serious air quality problems, including the heat exacerbation of ozone, the Agency in SAFE 1 should not have evaluated California's specific "need" for GHG standards. In sum, in reconsidering SAFE 1, and after having now reviewed and evaluated the complete factual record, EPA reaffirms that California needs the GHG standards and ZEV sales mandate at issue to "meet compelling and extraordinary conditions."

## A. Historical Practice

Under section 209(b)(1)(B), EPA shall not grant a waiver if California "does not need such State standards to meet compelling and extraordinary conditions." For nearly the entire history of the waiver program, EPA has read the phrase "such State standards" in section 209(b)(1)(B) as referring back to standards "in the aggregate," in the root paragraph of section 209(b)(1), which calls for California to make a protectiveness finding for its standards. EPA has interpreted the phrase "in the aggregate" as referring to California's program as a whole, rather than each State standard, and as such not calling for the Agency's standard-by-standard analysis of California's waiver request.[181] EPA has thus reasoned that both statutory provisions must be read together so that the Agency reviews the same standards that California considers in making its protectiveness determination and to afford California discretion.[182] The D.C. Circuit has also stated that "[t]he expansive statutory language gives California (and in turn EPA) a good deal of flexibility in assessing California's regulatory needs. We therefore find no basis to disturb EPA's reasonable interpretation of the second criterion." [183]

In addressing the Agency's reading of section 209(b)(1)(B), for example, in the 1983 LEV waiver request EPA explained that:

This approach to the "need" criterion is also consistent with the fact that because California standards must be as protective as Federal standards in the aggregate, it is permissible for a particular California standard or standards to be less protective than the corresponding Federal standard. For example, for many years, California chose to allow a carbon monoxide standard for passenger cars that was less stringent than the corresponding Federal standard as a "trade-off" for California's stringent nitrogen oxide standard. Under a standard of review like that proposed by MVMA/AIAM, EPA could not approve a waiver request for only a less stringent California standard such a standard, in isolation, necessarily could be found to be contributing to rather than helping, California's air pollution problems.[184]

In 1994, EPA again had cause to explain the Agency's reading of section 209(b)(1)(B) in the context of California's particulate matter standards waiver request:

[T]o find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could 'include some less stringent than the corresponding federal standards.' See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977). Congress could not have given this flexibility to California and simultaneously assigned to the state the

---

[180] EPA notes that it reviewed the factual record within the ACC program waiver proceeding and finds there was no factual error in its evaluation of whether CARB's standards satisfied the second waiver prong. EPA also notes, merely as confirming the finding it made at the time of the ACC program waiver but not for purposes of making a new factual finding from that made at the time of the ACC program waiver decision, that the record and information contained in the SAFE 1 proceeding as well as the record and information contained in the Agency's reconsideration of SAFE 1 (including late comments submitted during the SAFE 1 proceeding and, in some cases, resubmitted during the Agency's reconsideration of SAFE 1) at each point in time clearly demonstrates the need of California's standards (whether evaluated as a program or as specific standards) to meet compelling and extraordinary conditions within California.

[181] "The interpretation that my inquiry under (b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[182] 74 FR at 32751 n. 44;.32761 n.104. EPA cited *Entergy Corp.* v. *Riverkeeper, Inc.,* 129 S. Ct. 1498 (2009) ("That view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed most reasonable by the courts"), and *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–844 (1984).) ("It seems to us, therefore, that the phrase "best available,'" even with the added specification "for minimizing adverse environmental impact,'" does not unambiguously preclude cost-benefit analysis."). *See also* 78 FR at 2126–2127 n. 78.

[183] *Am. Trucking Ass'n* v. *EPA,* 600 F.3d 624, 627 (D.C. Cir. 2010) *(ATA* v. *EPA). See also Dalton Trucking* v. *EPA,* No. 13–74019 (9th Cir. 2021) ("The EPA was not arbitrary and capricious in declining to find that 'California does not need such California standards to meet compelling and extraordinary conditions,' § 7543(e)(2)(A)(ii), under the alternative version of the needs test, which requires 'a review of whether the Fleet Requirements are per se needed to meet compelling and extraordinary conditions,' 78 FR at 58,103. The EPA considered 'the relevant factors,' *Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins. Co., Inc.,* 463 U.S. 29, 42–43 (1983), including statewide air quality, 78 FR 58,104, the state's compliance with federal National Ambient Air Quality standards for ozone and $PM_{2.5}$ on a statewide basis, *id.* at 58,103–04, the statewide public health benefits, *id.* at 58,104, and the utility of the Fleet Requirements in assisting California to meet its goals, *id.* at 58,110. Contrary to Dalton's argument, the EPA did not limit its review to two of California's fourteen air quality regions. The EPA examined the relevant data provided by CARB, and it articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.' *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.,* 463 U.S. at 43, 103 S.Ct. 2856 (cleaned up).").

[184] 58 FR 4166, LEV Waiver Decision Document at 50–51.

seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard.[185]

Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for EPA review of California's whole program. With two noted exceptions described below, EPA has consistently interpreted this provision as requiring the Agency to consider whether California needs a separate motor vehicle emission program as compared to the specific standards in the waiver request at issue to meet compelling and extraordinary conditions.

Congress intended to allow California to address its extraordinary environmental conditions and foster its role as a laboratory for motor vehicle emissions control. The Agency's long-standing practice therefore has been to evaluate CARB's waiver requests with the broadest possible discretion to allow California to select the means it determines best to protect the health and welfare of its citizens in recognition of both the harsh reality of California's air pollution and to serve as a pioneer and a laboratory for the nation in setting new motor vehicle emission standards and developing control technology.[186] EPA notes that ''the statute does not provide for any probing substantive review of the California standards by federal officials.'' [187]

As a general matter, EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[188] As discussed in Section II, there have only been two exceptions to this practice: one in 2008 and one in 2019. In 2008, EPA for the first time analyzed California's waiver request under an alternative approach and denied CARB's waiver request. EPA concluded that section 209(b) was intended to allow California to promulgate state standards applicable to emissions from new motor vehicles to address air pollution problems that are local or regional, but that section 209(b)(1)(B) was not intended to allow California to promulgate state standards for emissions from new motor vehicles designed to address global climate change problems. Or, in the alternative,

EPA concluded that effects of climate change in California were not compelling and extraordinary compared to the effects in the rest of the country.[189] EPA rejected this view a little over a year later in 2009 by applying the traditional interpretation in granting California's waiver request for the same GHG standard, finding no support in the statute or congressional intent for the alternative application of the statute.[190]

In evaluating the ACC program waiver in 2013, EPA applied the traditional interpretation to the ACC program waiver request and found that the Agency could not deny the waiver request under the second waiver prong.[191] Further, without adopting the alternative interpretation that had been applied in the 2008 GHG waiver denial, EPA assessed California's need for the GHG standards at issue and found that the Agency could not deny the ACC program waiver request, even applying the alternative interpretation. EPA noted that to the extent that it was appropriate to examine the CARB's need for the GHG standards at issue to meet compelling and extraordinary conditions, the Agency had discussed at length in the 2009 GHG waiver decision that California has compelling and extraordinary conditions directly related to regulations of GHGs.[192] Similarly,

EPA explained that to the extent it was appropriate to examine California's need for the ZEV sales mandate, these requirements would enable California to meet both air quality and climate goals into the future.[193] Additionally, EPA recognized CARB's coordinated strategies reflected in the technologies envisioned to meet the ACC program requirements and in turn addressing both criteria pollutants and GHGs and the magnitude of the technology and energy transformation needed to meet such goals.[194]

---

[185] 49 FR at 18887, 18890.

[186] *See, e.g.,* S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) (The waiver of preemption is for California's ''unique problems and pioneering efforts.''); 113 Cong. Rec. 30950, 32478 (''[T]he State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.'') (Statement of Sen. Murphy).

[187] *Ford Motor Co.,* v. *EPA,* 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[188] 74 FR at 32763–65; 76 FR 34693; 79 FR 46256; 81 FR 95982.

[189] 73 FR at 12160–64.

[190] 74 FR at 32744, 32746, 32763 (''The text of section 209(b) and the legislative history, when viewed together, lead me to reject the interpretation adopted in the March 6, 2008 Denial, and to apply the traditional interpretation to the evaluation of California's greenhouse gas standards for motor vehicles. If California needs a separate motor vehicle program to address the kinds of compelling and extraordinary conditions discussed in the traditional interpretation, then Congress intended that California could have such a program. Congress also intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems and protect the health and welfare of its citizens. The better interpretation of the text and legislative history of this provision is that Congress did not use this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. EPA concluded that even under this alternative approach California GHG standards were intended at least in part to address a local or regional problem because of the 'logical link between the local air pollution problem of ozone and GHG.''').

[191] 78 FR at 2129 (''CARB has repeatedly demonstrated the need for its motor vehicle program to address compelling and extraordinary conditions in California. As discussed above, the term compelling and extraordinary conditions 'does not refer to the levels of pollution directly.' Instead, the term refers primarily to the factors that tend to produce higher levels of pollution—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. California still faces such conditions.'').

[192] *Id.* at 2129–30.

[193] *Id.* at 2129 (''[A]s EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California. In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California. CARB notes that ''Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems.'' (footnotes omitted)).

[194] *Id.* at 2130–31 (''As CARB notes in its waiver request, the goal of the CARB Board in directing CARB staff to redesign the ZEV regulation was to focus primarily on zero emission drive—that is BEV, FCV, and PHEVs in order to move advanced, low GHG vehicles from demonstration phase to commercialization. CARB also analyzed pathways to meeting California's long term 2050 GHG reduction targets in the light-duty vehicle sector and determined that ZEVs would need to reach nearly 100 percent of new vehicle sales between 2040 and 2050. CARB also notes that the ''critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air) demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements. . . . The Vision for Clean Air effort illustrates that in addition to the cleanup of passenger vehicles (at issue here) as soon as possible as required in the LEV III regulation, transition to zero- and near-zero emission technologies in all on- and off-road engine categories is necessary to achieve the coordinated goals. Therefore, EPA believes that CARB's 2018 and later MY ZEV standards represent a reasonable pathway to reach these longer term goals. Under EPA's traditional practice of affording CARB the broadest discretion possible, and deferring to CARB on its policy choices, we believe there is a rational connection between California ZEV standards and its attainment of long term air quality goals. Whether or not the ZEV standards achieve additional reductions by themselves above and beyond the LEV III GHG and criteria pollutant standards, the LEV III program overall does achieve

The only other exception to the application of the traditional interpretation was in SAFE 1, when EPA again used a standard-specific level of review and focused on California's need for GHG standards at issue under the waiver. There, EPA posited that section 209(b)(1)(B) called for a "particularized nexus" for California's motor vehicle standards: "Congress enacted the waiver authority for California under section 209(b) against the backdrop of traditional, criteria pollutant environmental problems, under which all three links in this chain bear a particularized nexus to specific local California features: (1) Criteria pollutants are emitted from the tailpipes of the California motor vehicle fleet; (2) those emissions of criteria pollutants contribute to air pollution by concentrating locally in elevated ambient levels, which concentration, in turn; (3) results in health and welfare effects (*e.g.,* from ozone) that are extraordinarily aggravated in California as compared to other parts of the country, with this extraordinary situation being attributable to a confluence of California's peculiar characteristics, *e.g.,* population density, transportation patterns, wind and ocean currents, temperature inversions, and topography."[195] As support for the nexus test, EPA, for the first time in waiver decisions, relied on section 202(a) and its own terms of authority to inform interpretation of the second waiver prong.[196] In addition, EPA relied on legislative history to interpret "compelling and extraordinary" conditions as a reference to "peculiar local conditions" and "unique problems" in California.[197]

Accordingly, EPA reasoned that California must demonstrate "compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards."[198]

In SAFE 1, EPA then posited that the nexus test should be applied to California's GHG standards specifically, rather than California's program "as a whole" under the traditional "aggregate" approach, "to ensure that such standard is linked to local conditions that giv[e] rise to the air pollution problem, that the air pollution problem is serious and of a local nature, and that the State standards at issue will meaningfully redress that local problem."[199] As support for the GHG-specific scrutiny, EPA reasoned that "[t]he Supreme Court's opinion in *UARG* v. *EPA,* 134 S. Ct. 2427 (2014), instructs that Clean Air Act provisions cannot necessarily rationally be applied identically to GHG as they are to traditional pollutants."[200]

Applying the nexus test, EPA concluded that California did not need its GHG standards to meet "compelling and extraordinary conditions" because they were missing a particularized nexus to specific local features. EPA in the alternative posited that "even if California does have compelling and extraordinary conditions in the context of global climate change, California does not 'need' these standards under section 209(b)(1)(B) because they will not meaningfully address global air pollution problem of the sort associated with GHG emissions."[201] EPA also dismissed the 2009 GHG waiver conclusion on deleterious effects of GHG emissions on ozone (*e.g.,* how increases in ambient temperature are conducive to ground-level ozone formation), stating that such a relationship "does not satisfy this requirement for a particularized nexus, because to allow such attenuated effects to fill in the gaps would eliminate the function of requiring such a nexus in the first place."[202]

**B. Notice of Reconsideration of SAFE 1 and Request for Comment**

In the Notice of Reconsideration of SAFE 1, EPA noted its interest in any new or additional information or comments regarding whether it

appropriately interpreted and applied section 209(b)(1)(B) in SAFE 1. The Agency noted that EPA's finding in SAFE 1, that such standards were only designed to address climate change and a global air pollution problem, led EPA to a new interpretation of section 209(b)(1)(B). EPA solicited views on whether it was permissible to construe section 209(b)(1)(B) as calling for a consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue as well as California's specific standards where GHG standards are at issue.

The Notice of Reconsideration also set forth that EPA's decision to withdraw the ACC program waiver as it relates to California's ZEV sales mandate was based on the same new interpretation and application of the second waiver prong and rested heavily on the conclusion that California only adopted the ZEV sales mandate requirement for purposes of achieving GHG emission reductions. EPA recognized that this conclusion in turn rested solely on a specific reading of a single sentence in CARB's ACC program waiver request.[203] EPA requested comment on these specific conclusions and readings as well as whether the withdrawal of the ACC program waiver, within the context of California's environmental conditions and as applied to the GHG standards and ZEV sales mandate requirement, was permissible and appropriate.

**C. Comments Received**

EPA received multiple comments on its decision to evaluate California's need for its GHG standards separate from its need for a separate motor vehicle emission program as a whole. Some commenters agreed that EPA could evaluate waiver requests for the specific GHG standards under the waiver along the lines of the Agency's pronouncements in SAFE 1. Additionally, commenters pointed to the method of EPA's review in SAFE 1—evaluating the standards individually, as they are received, rather than in the aggregate—as evidence of the flaw in the traditional interpretation.[204] Some commenters also echoed SAFE 1's concern that "once EPA had determined that California needed its very first set of submitted standards to meet extraordinary and compelling conditions, EPA would never have the

---

such reductions, and EPA defers to California's policy choice of the appropriate technology path to pursue to achieve these emissions reductions." (footnote omitted)).

[195] 84 FR at 51339.

[196] *Id.* at 51339–40.

[197] *Id.* at 51342 (quoting S. Rep. No. 403, 90th Cong. 1st Sess., at 32 (1967)) ("Congress discussed 'the unique problems faced in California as a result of its climate and topography.' H.R. Rep. No. 728, 90th Cong. 1st Sess., at 21 (1967). *See also* Statement of Cong. Holifield (CA), 113 Cong. Rec. 30942–43 (1967). Congress also noted the large effect of local vehicle pollution on such local problems. *See, e.g.,* Statement of Cong. Bell (CA) 113 Cong. Rec. 30946. As explained at proposal, Congress focus was on California's ozone problem, which is especially affected by local conditions and local pollution. *See* Statement of Cong. Smith (CA) 113 Cong. Rec. 30940–41 (1967); Statement of Cong. Holifield (CA), *id.,* at 30942. *See also* MEMA I, 627 F.2d 1095, 1109 (D.C. Cir. 1979) (noting the discussion of California's 'peculiar local conditions' in the legislative history). In sum and as explained at proposal, conditions that are similar on a global scale are not 'extraordinary,' especially where 'extraordinary' conditions are a predicate for a local deviation from national standards, under section 209(b). 83 FR 43247.").

[198] *Id.*

[199] *Id.* at 51345.

[200] *Id.* at 51340.

[201] *Id.* at 51349.

[202] *Id.*

[203] *Id.* at 51330 ("Regarding the ACC program ZEV mandate requirements, CARB's waiver request noted that there was no criteria emissions benefit in terms of vehicle (tank-to-wheel—TTW) emissions because its LEV III criteria pollutant fleet standard was responsible for those emission reductions.").

[204] CEI at 13–14.

discretion to determine that California did not need any subsequent standards." [205]

Under this analysis of the specific standards at issue under the waiver, these commenters continued, California could not demonstrate that its GHG and ZEV standards were, on their own, compelling and extraordinary. These commenters agreed with SAFE 1's "particularized nexus" interpretation of "compelling and extraordinary," arguing that the words required unique consequences in order to give adequate meaning to the words themselves and in order to overcome equal sovereignty implications.[206] Using this interpretation, these commenters concluded that, because "GHG concentrations are essentially uniform throughout the globe, and are not affected by California's topography and meteorology," and because the entire nation would be affected by climate change, neither the effects of the regulations on climate change, nor the impacts of climate change on California could be considered "compelling and extraordinary." [207] Some commenters also argued that these standards were unnecessary given California's "deemed to comply" provision, which would theoretically allow all automobile manufacturers to comply with California's standards by meeting the less stringent Federal GHG standards.[208]

In contrast, other commenters asked that EPA reverse its SAFE 1 section 209(b)(1)(B) determination by reverting to EPA's long-standing "program-level" approach to the "need" inquiry, where "EPA considers California's need for its own mobile-source-emissions program as a whole, not whether California needs a particular standard for which it has requested a waiver." [209] These

commenters noted the long tradition of interpreting California's need in the aggregate, an interpretation that SAFE 1 acknowledged was reasonable.[210] This interpretation, they argued, best aligned with the text, legislative history, and purpose of the waiver program.[211] For example, some commenters argued that, because feasibility was evaluated under an aggregate approach, it would be unreasonable for California's need for the program to be evaluated under a more restrictive approach.[212] These commenters also argued that Congress had expressed approval of this aggregate approach, citing legislative history from 1977 and 1990.[213] This approach, they continued, aligns with the Waiver Program's broad deference to California to create an entire regulatory program, which is comprised of regulations that interact with and affect each other.[214] One commenter also responded directly to the question EPA posed in its Notice of Reconsideration, whether it was "permissible for EPA to construe section 209(b)(1)(B) as calling for consideration of California's need for a separate motor vehicle program where criteria pollutants are at issue and consideration of California's individual standards where GHG standards are at issue." [215] According to the commenter, "The Supreme Court has rejected this 'novel interpretive approach' of assigning different meanings to the same statutory text in the same provision, depending on the application, because it 'would render every statute a chameleon.' " [216]

These commenters also asked EPA to revert to the traditional interpretation of "compelling and extraordinary" instead of SAFE 1's "particularized nexus" formulation. Commenters noted the SAFE 1 requirement appears nowhere in the text of the statute.[217] Because of this absence, they continued, EPA's references to the legislative history from 1967 have no "tether" to the statutory text and cannot justify the nexus requirement.[218] Further, commenters argued that EPA's reliance on the equal sovereignty doctrine improperly informed how EPA should interpret the phrase "compelling and extraordinary conditions" in the second waiver prong, and therefore requiring such conditions to be sufficiently different or unique among states, was inappropriate.[219] Commenters argued that the equal sovereignty doctrine was inapplicable to the second waiver prong. They explained that the Supreme Court has only applied the "rarely invoked" doctrine of equal sovereignty in the "rare instance where Congress undertook 'a drastic departure from basic principles of federalism' by authorizing 'federal intrusion into sensitive areas of state and local policymaking.' " [220] Congress's exercise of its Commerce Clause power in regulating air pollution from new motor vehicles, commenters continued, is not such an "intrusion." Moreover, they wrote, applying the equal sovereignty doctrine in this instance would actually "diminish most States' sovereignty" because it would "reduce the regulatory options available to California and to other [section 177] States." This diminished sovereignty, they argued, would not "enhance[e] the sovereignty of any State" or "alleviate" any unjustified burden because "Section 209(b)(1) imposes no such burden." [221]

[205] 84 FR at 51341. *See, e.g.,* NADA at 5; Urban Air at 25, 29–33; AFPM at 22–23.

[206] AFPM at 12; Urban Air at 4.

[207] CEI at 14–16 ("The resulting "global pool" of GHG emissions is not any more concentrated in California than anywhere else . . . [E]ven if one assumes "compelling and extraordinary conditions" can refer to climate change impacts, such as heat waves, drought, and coastal flooding, California's vulnerability is not "sufficiently different" from the rest of the nation to merit waiving federal preemption of state emission standards. Thus, California is not "extraordinary' in regard to either the "causes" of the "effects" of global climate change."); NADA at 5 ("while vehicle GHG emissions also were, by definition, local, their impact on serious local air quality concerns could not be shown."); AFPM at 11–14 ("Neither the causes nor effects of GHG emissions are compelling and extraordinary conditions, as they are global rather than local conditions, and California's GHG standards and ZEV mandate will not meaningfully address the causes or effects of these GHG emissions.").

[208] NADA at 4–5; Urban Air at 33.

[209] States and Cities at 22 n.16.

[210] Twelve Public Interest Organizations at 7 ("The Trump EPA in turn acknowledged that this longstanding interpretation of Section 209(b)(1)(B) was a reasonable one, 84 FR at 51,341 . . . .").

[211] States and Cities at 22 (citing 84 FR at 51341); Tesla at 11 ("The plural reference to 'such State standards' requires that the standards be considered in the aggregate as a group. This language stands in stark contrast to alternate phrasing that was available to Congress and that would have permitted a non-aggregate determination, such as: 'such State does not need a State standard to meet compelling and extraordinary conditions.' Indeed, alternative language referencing individual standards is present in subsection (b)(2), which references 'each State standard.' ").

[212] States and Cities at 25–26; Twelve Public Interest Organizations at 8 ("An aggregate approach to the consistency inquiry also makes sense under Section 209(b)(1)(C) because technological feasibility is effectively evaluated on a program basis. The feasibility of a new standard cannot be evaluated on its own if there are interactions with pre-existing standards. Such interactions between standards are what prompted Congress to add the "in the aggregate" phrase to section 209 in the first place.").

[213] States and Cities at 26–27; Ozone Transport Commission (OTC), Docket No. EPA–HQ–OAR–2021–0257–0283 at 4.

[214] States and Cities at 27–28.

[215] 86 FR at 22429.

[216] States and Cities at 24 (quoting *Clark* v. *Martinez,* 543 U.S. 371, 382 (2005) and citing *U.S.* v. *Santos,* 553 U.S. 507, 522 (2008); *U.S. Dep't of*

*the Treasury* v. *FLRA,* 739 F.3d 13,21 (D.C. Cir. 2014)). The commenter notes that in the SAFE 1 brief, EPA claimed that its new approach to section 209(b)(1)(B) would apply "for all types of air pollutants" but EPA could point to nowhere in SAFE 1 decision where this was said. *Id.* at 25. And "only two sentences later," EPA acknowledged that its review under this second prong would change "depending upon which 'air quality concerns' were implicated." *Id.*

[217] States and Cities at 34 (noting the lack of the words "nexus," "particularized," "peculiar," and "local" anywhere in sections 209(b) or 202(a)(1)).

[218] *Id.* at 35.

[219] *Id.* at 41–43; Twelve Public Interest Organizations at 4–6.

[220] States and Cities at 42 (quoting *Shelby Cnty.* v. *Holder,* 570 U.S. 529, 535, 545 (2013)).

[221] *Id.* at 43; Twelve Public Interest Organizations at 5 ("Clean Air Act Section 209(b) places no extraordinary burden or disadvantage on one or more States. Rather, the statute benefits California by allowing the exercise of its police power authority to address its particular pollution control needs").

Similarly, commenters rebutted SAFE 1's use of words like "peculiar" and "unique" to further define "compelling and extraordinary." These words, they noted, appear nowhere in the text of section 209(b)(1)(B) and do not align with the plain meaning of the word "extraordinary." [222] Further, they argued, this narrow interpretation "would render the waiver provision unworkable" as, "for any given air pollutant, it is possible to identify other areas of the country that suffer from a similar pollution problem." [223] In fact, they continued, this argument was rejected in the 1967 legislative history and in 1984, "when EPA thoroughly rebutted the assertion that California could not receive a waiver if individual pollutant levels were 'no worse than some other areas of the country.'" [224] Moreover, they argued, the existence of section 177 necessarily acknowledges that other states may have the same or similar air pollution problems as California.[225]

Other commenters argued that California needed GHG standards to address "compelling and extraordinary" conditions in California even under the SAFE 1 interpretation of the second waiver prong. These commenters argued that GHG and ZEV standards produce both GHG and criteria pollution benefits, pointing to language in the ACC program waiver that acknowledged these dual benefits and to subsequent SIP approvals that incorporated the California standards in order to achieve criteria emission reductions.[226] In particular, commenters explained that the 2012 California waiver request established that the ZEV standard would reduce criteria pollution both "by reducing emissions associated with the production, transportation, and distribution of gasoline" and "by driving the commercialization of zero-emission-vehicle technologies necessary to reduce future emissions and achieve California's long-term air quality goals." [227] As for the GHG standards, commenters noted that, as acknowledged in the ACC program waiver, "global warming exacerbates criteria pollution and makes it harder to meet air pollution standards." [228] Thus, they argue, "EPA expressly and improperly limited its Determination to consideration of the 'application of section 209(b)(1)(B) to California's need *for a GHG climate program*." [229] Given EPA's consistent acceptance that "California's criteria pollution 'conditions' are 'extraordinary and compelling' and that the record demonstrates that California's GHG and ZEV standards reduce criteria emissions in California," EPA should "reverse its SAFE 1 section 209(b)(1)(B) determination and the waiver withdrawal that rested on it—regardless of whether EPA reverts to its traditional, program-level approach." [230]

Regardless of the emissions benefits of the standards, some commenters argued that California's plan to address both long-term and short-term climate and criteria pollutant reduction goals is entitled to deference. Thus, even if "the mandate truly added nothing to the emission benefits of California's standards for vehicular emissions of criteria and greenhouse gas pollutants," commenters claimed, "the mandate would simply constitute the State's choice of means for automakers to comply with its standards." [231] These commenters further argued that section 209(b)(1)(B) "does not authorize EPA to inquire into whether the means to comply with California emission standards, as opposed to the actual standards themselves, are needed to meet compelling and extraordinary conditions." [232] Commenters also claimed that EPA's argument, that California cannot need the GHG and ZEV standards because those standards alone would not "meaningfully address global air pollution problems" posed by climate change, "lacks merit" and "is illogical." [233] Such an approach, they

---

[222] States and Cities at 38–39 (explaining that the existence of those words in the legislative history "simply highlight that Congress did *not* codify [them] in Section 209(b)(1)(B)" and that plain meaning of "extraordinary" is "out of the ordinary"); Twelve Public Interest Organizations app. 1 at 49 ("Congress understood, even in 1967, that '[o]ther regions of the Nation may develop air pollution situations related to automobile emissions which will require standards different from those applicable nationally.' S. Rep. No. 90–403, at 33.").

[223] Tesla at 9.

[224] *Id.* (quoting 49 FR at 18887, 18891) (stating that EPA explained that "there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted.")).

[225] Twelve Public Interest Organizations app. 1 at 49; States and Cities at 38–39.

[226] States and Cities at 9–14, 30–31; Center for Biological Diversity, Docket No. EPA–HQ–OAR–2021–0257–0358 at 2 ("The Trump EPA improperly separated California's need for greenhouse gas regulations from its need for criteria pollutant standards. In reality, these two goals are tightly linked, and both are critical to the Clean Air Act's goals of safeguarding public health and welfare."); San Joaquin Valley Air Pollution Control District (SJVAPCD), Docket No. EPA–HQ–OAR–2021–0257–0105 at 3 ("The District's *2016 Plan for the 2009 9-Hour Ozone Standard* adopted June 16, 2016, and *2018 Plan for the 1997, 2006, and 2012 PM 2.5 Standards,* adopted November 15, 2018, both rely on emission reductions from California's Advanced Clean Cars regulation and other mobile source measures to support the Valley's attainment of the federal health-based NAAQS."); NCAT at 11 ("In addition, California's ZEV standards are intended to and do achieve significant incremental reductions of NOx and other non-GHG emissions."); Tesla at 10–11 ("In comments submitted to the EPA in 2009 regarding a preemption waiver, [California] explained that it 'specifically designed its GHG standards for criteria pollutants.' It also emphasized that it has 'frequently referenced the science to support GHG standards as a necessary method for controlling ozone and particulate matter pollution' and has 'consistently recognized that the State's ability to reduce nonattainment days for ozone and wildfire-caused particulate matter depends on its ability to reduce GHG emissions. . . . EPA also has repeatedly expressed its own understanding that GHG standards should be viewed as a strategy to help control criteria pollutants to address National Ambient Air Quality Standards nonattainment.'"); Twelve Public Interest Organizations at 5 ("For example, atmospheric heating due to global warming can increase the production of ground-level ozone in California, which suffers from extraordinary amounts of locally reacting nitrogen oxides and volatile organic compounds.").

[227] Center for Biological Diversity at 2–3. In contrast, some commenters, echoing SAFE 1, argued that these upstream emission benefits should not be considered in determining the criteria pollutant benefits of these standards. CEI at 16 ("Although NHTSA and EPA are required to consider all relevant factors when determining CAFE and tailpipe CO2 standards, it is inappropriate to elevate stationary source criteria pollutant emissions into a make-or-break factor in waivers for mobile source programs. The Clean Air Act already provides the EPA with ample authorities to regulate stationary sources, including the NAAQS program, New Source Performance Standards program, Prevention of Significant Deterioration of Air Quality program, Acid Rain program, and Regional Haze program. If Congress wanted NHTSA's CAFE program and EPA's mobile source program to prioritize reductions of indirect stationary source emissions, it could easily have said so. The indirect effects on stationary source emissions are not even mentioned.").

[228] Center for Biological Diversity at 3.

[229] States and Cities at 28 (citing 84 FR at 51339 (emphasis added)) (limiting section 209(b)(1)(B) consideration to "the case of GHG emissions.").

[230] States and Cities at 29. The commenter notes that EPA never considered whether California needed those criteria emission reductions from its ZEV and GHG standards because it refused to consider those criteria reductions at all: "EPA attempted to justify disregarding record evidence and its own prior findings concerning the criteria emission benefits of these California standards by mischaracterizing CARB's 2012 waiver request. . . . But, having chosen to *sua sponte* reopen the question whether California continues to need standards it has been implementing for six years, . . . , EPA could not limit its consideration to what the standards were intended to achieve when they were originally designed or presented. . . . . CARB (and others) asserted clearly in SAFE 1 comments that both the GHG and ZEV standards produce criteria pollution benefits upon which California and other States rely to improve air quality." *Id.* at 29–30.

[231] Twelve Public Interest Organizations at 9–10.

[232] *Id.* (citing *MEMA I,* 627 F.2d 1095, 1111–14 (D.C. Cir. 1979)).

[233] States and Cities at 40, 49–50; NCAT at 11 ("EPA's argument that California does not 'need' vehicle standards that reduce GHG emissions because such standards alone cannot meaningfully reduce the impacts of climate change in California lacks merit. 84 FR at 51,346–47. EPA's approach in SAFE 1 read requirements into the statute that Congress did not choose to impose: That a single standard be sufficient to resolve an environmental problem caused by multiple and diverse sources. Instead, need should be defined by reference to the underlying problem, and California's standards are
Continued

explained ''amounts to a conclusion that California is forbidden from acting precisely because climate change is a global threat—when in fact the global aspect of this problem demonstrates the need for California to take action,'' a conclusion, they noted, that was rejected by the Supreme Court in *Massachusetts* v. *EPA*.[234] Even if there was some merit to the argument, one commenter argued, SAFE 1's assertion that the regulations ''would have only a *de minimis* effect on climate change understates the impact that collective action by California and the Section 177 states can have on GHG emissions.''[235] The commenter noted that ''[w]ith a total population of over 140 million people, these 19 jurisdictions collectively account for more than 42 percent of the U.S. population . . . and more than 40 percent of the U.S. new car market.''[236]

Finally, these commenters also argued that climate change and its impacts are, themselves, ''extraordinary and compelling'' conditions. They provided evidence of increased weather events, agricultural effects, and wildfires, amongst other impacts of climate change, which have already begun to severely affect California.[237]

[234] Tesla at 8–9 ('Indeed, the Supreme Court rejected this logic in *Massachusetts* v. *EPA*, 549 U.S. 497 (2007), explaining: ''Because of the enormity of the potential consequences associated with man-made climate change, the fact that the effectiveness of a remedy might be delayed during the (relatively short) time it takes for a new motor-vehicle fleet to replace an older one is essentially irrelevant.''); States and Cities at 41.

[235] NESCAUM at 7.

[236] *Id.*

[237] States and Cities at 43–48; Twelve Public Interest Organizations at 5; Center for Biological Diversity at 3; Tesla at 8–9. States and Cities at 43–48; Twelve Public Interest Organizations at 5–6; Center for Biological Diversity at 3 (''California *also* experiences uniquely dangerous effects from increases in greenhouse gases. For example, the California legislature has found that global warming will cause adverse health impacts from increased air pollution and a projected doubling of catastrophic wildfires. Many of the state's most extreme weather events have occurred in the last decade, including a severe drought from 2012– 2016, an almost non-existent Sierra Nevada winter snowpack in 2014–2015, three of the five deadliest wildfires in state history, and back-to-back years of the warmest average temperatures on record. These ongoing disasters demonstrate California's status as 'one of the most 'climate-challenged' regions of North America.' '').

one important element of the broader response.''); Tesla at 8–9 (citing *Massachusetts* v. *EPA*, 549 U.S. 497, 525–26 (2007)] ('' 'Nor is it dispositive that developing countries such as China and India are poised to increase greenhouse gas emissions substantially over the next century.' A reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere.' '').

*D. Analysis: California Needs the ACC Program GHG Standards and ZEV Sales Mandate To Address Compelling and Extraordinary Conditions Under Section 209(b)(1)(B)*

In this action, EPA first finds that the Agency should not have reinterpreted section 209(b)(1)(B) in evaluating California's ''need'' for GHG standards and ZEV sales mandate requirements at issue. The analysis below walks through the statutory language and history associated with this provision. As part of this discussion, the relationship of this provision and California's authority and deference is highlighted. The two interpretations of the waiver prong are then reviewed, presenting the Agency's rationale for its findings of the inappropriate SAFE 1 interpretation and support for its conclusion about the better interpretation. Second, as shown below, the factual record before the Agency at the time of SAFE 1 supports the GHG standards and ZEV sales mandate requirements at issue under either the traditional or SAFE 1 interpretation of section 209(b)(1)(B).

1. EPA Is Withdrawing the SAFE 1 Section 209(b)(1)(B) Interpretation

Except for two short-lived exceptions in the context of the 2008 waiver denial and SAFE 1, EPA has consistently recognized that reading the ''needs'' test of the second waiver prong as calling for a standard-specific evaluation would be inconsistent with congressional intent given the text of section 209(b)(1) legislative history, as well as the way the different standards in the ACC program work together to reduce criteria and GHG pollution and spur innovation. As further explained below, all of these aspects lend support to the Agency practice of not subjecting California's waiver requests to review of the specific standards under the second waiver prong, and we agree that the traditional interpretation of section 209(b) is, at least, the better interpretation.

Under section 209(b)(1)(B), EPA must grant a waiver request unless the Agency finds that California ''does not need such State standards to meet compelling and extraordinary conditions.'' EPA has historically read the phrase ''such State standards'' in section 209(b)(1)(B) as referring back to standards ''in the aggregate'' in section 209(b)(1), which addresses the protectiveness finding that California must make for its waiver requests. In addition, as EPA has explained in the past, reading the provision otherwise would conflict with Congress's 1977 amendment to the waiver provision to allow California's standards to be ''at

least as protective'' as the federal standards ''in the aggregate.'' This amendment must mean that some of California's standards may be weaker than federal standards counterbalanced by others that are stronger. If, however, a waiver can only be granted if each standard on its own meets a compelling need, then California could never have a standard that is weaker than the federal standard, rendering Congress's 1977 amendment inoperative. Congress would not have created the option for California's individual standards to be at least as protective ''in the aggregate'' and then taken that option away in the second waiver prong's ''compelling need'' inquiry.

In addition, EPA has reasoned that giving effect to section 209(b)(1) means that both subparagraph (b)(1)(B) and paragraph (b)(1) must be read together such that the Agency reviews the same standards that California considers in making its protectiveness determination. ''§ 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver of preemption if its standards 'in the aggregate' protected public health at least as well as federal standards.''[238]

EPA has thus explained the reasoning for the reading of ''such State standards'' for instance, as follows:

[I]f Congress had intended a review of the need for each individual standard under (b)(1)(B), it is unlikely that it would have used the phrase ''. . . does not need such state standards,'' which apparently refers back to the phrase ''State standards . . . in the aggregate,'' as used in the first sentence of section 209(b)(1), rather than to the particular standard being considered. The use of the plural, *i.e.*, ''standards,'' further confirms that Congress did not intend EPA to review the need for each individual standard in isolation.[239]

EPA has also explained that ''to find that the 'compelling and extraordinary conditions' test should apply to each pollutant would conflict with the amendment to section 209 made in 1977 allowing California to select standards 'in the aggregate' at least as protective as federal standards. In enacting that change, Congress explicitly recognized that California's mix of standards could include some less stringent than the corresponding federal standards.''[240] This is in accord with *MEMA I*, where the D.C. Circuit explained that:

The intent of the 1977 amendment was to accommodate California's particular concern

[238] *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation*, 17 F.3d 521, 525 (2d Cir. 1994).

[239] 49 FR at 18890.

[240] *Id.* at 18890 n.24.

with oxides of nitrogen, which the State regards as a more serious threat to public health and welfare than carbon monoxide. California was eager to establish oxides of nitrogen standards considerably higher than applicable federal standards, but technological developments posed the possibility that emission control devices could not be constructed to meet both the high California oxides of nitrogen standard and the high federal carbon monoxide standard.[241]

EPA has further explained that the crucial consequence of the 1977 Amendment was to require waiver grants for California's specific standards that are part of the State's overall approach to reducing vehicle emissions to address air pollution even if those specific standards might not be needed to address compelling and extraordinary conditions.[242] For instance, EPA has previously granted a waiver for what was then described as "harmless emissions constituents such as methane" while reminding objectors of "EPA's practice to leave the decisions on controversial matters of public policy, such as whether to regulate methane emissions, to California."[243] Similarly, in the 1984 p.m. standards waiver decision, EPA also discussed California's "need" for its own standards at length in response to comments that California must have worse air quality problems than the rest of the country to qualify for a waiver.[244] There, EPA explained that California need not "have a 'unique' particulate problem, *i.e.,* one that is demonstrably worse than in the rest of the country [because], there is no indication in the language of section 209 or the legislative history that California's pollution problem must be the worst in the country, for a waiver to be granted."[245] Indeed, the word "unique" is not contained in the statutory provision. EPA further explained that "even if it were true that California's total suspended particulate problem is, as certain manufacturers argue, no worse than some other areas of the country, this does not mean that diesel particulates do not pose a special problem in California."[246]

As explained at length earlier, EPA believes Congress intended the Agency to grant substantial deference to California on its choice of standards that are appropriate to meet its needs. EPA has explained that "Congress has made it abundantly clear that the manufacturers would face a heavy burden in attempting to show 'compelling and extraordinary conditions' no longer exist: The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be "clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver."[247] Likewise, the House Committee Report explained for instance that "[t]he [1977] amendment is intended to ratify and strengthen the California waiver provision and to affirm the underlying intent of that provision, *i.e.,* to afford California the *broadest possible discretion* in selecting the best means to protect the health of its citizens and the public welfare."[248] EPA's past practice prior to SAFE 1, except for one instance, was consistent with this deferential stance.

In enacting section 209(b)(1), Congress struck a deliberate balance first in 1967 when it acknowledged California's serious air quality problems as well as its role as a laboratory for emissions control technology for the country,[249] and again, in the 1977 Amendments that allowed for California to seek and obtain waivers for standards that are less stringent than the federal standards (by amending section 209(b)(1)(A)) and also added section 177 to acknowledge that states may have air quality problems similar to California's by allowing states, subject to certain conditions, to adopt California's new motor vehicle standards once waived by EPA.[250] These provisions struck a balance between having only one national standard and having 51 different state standards by settling on two standards—a federal one and a California one that other states may also adopt. Since 1967, in various amendments to section 209, Congress has also not disturbed this reading of section 209(b)(1)(B) as calling for the review of the standards as a whole program. Likewise, Congress has also not placed any additional constraints on California's ability to obtain waivers beyond those now contained in section 209(b)(1). The Agency has thus viewed the text, legislative history, and structure of section 209(b)(1) as support for the program-level review of waiver requests as well for the conclusion that California's air quality need not be worse than the rest of the country for EPA to grant a waiver of preemption. In addition, to the extent that SAFE 1 was intended to preclude California's regulation of all greenhouse gases from light-duty vehicles, the SAFE 1 interpretation creates a structural conflict within the relevant CAA provisions and could also create an inability for California to address GHG emissions and its contribution to the serious air quality problems within the State. There is a fundamental relationship between sections 209(a) and 209(b). Section 209(a) preempts states from adopting or enforcing new motor vehicle emission standards, and section 209(b) calls for EPA to waive that preemption for California vehicular emission standards unless EPA finds that one or more of the waiver criteria set out therein are not met. Nothing on the face of the CAA or applicable legislative history indicates that the scope of section 209(b)—the pollutants for which California may obtain a waiver—is more limited than the scope of section 209(a).[251] The D.C. Circuit has

---

[241] *MEMA I,* 627 F.2d 1095, 1110 n.32 (D.C. Cir. 1979).

[242] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards.'"); "[T]he 1977 amendments significantly altered the California waiver provision." *Ford Motor Co.,* 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[243] 43 FR at 25735.

[244] It bears note that these are the same kinds of comments that EPA received in the context of the ACC program waiver proceedings on California's need for GHG standards.

[245] 49 FR at 18891.

[246] *Id.*

[247] *Id.* at 18890 n.25 (citing H.R. Rep. No. 95–294, 95th Cong., 1st Sess. 302 (1977)).

[248] *MEMA I,* 627 F.2d at 1110 (citing H.R. Rep. No. 294, 95th Cong., 1st Sess. 301–02 (1977)) (emphasis added). Congress amended section 209(b)(1)(A) so that California's determination that its standards are as at least as protective as applicable Federal standards so that such determination may be done "in the aggregate" looking at the summation of the standards within the vehicle program.

[249] The CAA has been a paradigmatic example of cooperative federalism, under which "States and the Federal Government [are] partners in the struggle against air pollution." *General Motors Corp.* v. *United States,* 496 U.S. 530, 532 (1990). Motor vehicles "must be either 'federal cars' designed to meet the EPA's standards or 'California cars' designed to meet California's standards." *Engine Mfrs.,* 88 F.3d at 1079–80, 1088 ("Rather than being faced with 51 different standards, as they had feared, or with only one, as they had sought, manufacturers must cope with two regulatory standards."). *See also MEMA II,* 142 F.3d at 463.

[250] "§ 177 . . . permitted other states to 'piggyback' onto California's standards, if the state's standards 'are identical to the California standards for which a waiver has been granted for such model year.'" *Motor Vehicle Mfrs. Ass'n* v. *New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 525 (2d Cir. 1994).

[251] EPA believes that, to the extent the SAFE 1 interpretation has the practical effect of defining or implementing the scope of section 209(b) differently depending on the pollutants involved, the interpretation is contrary to legislative intent and the Agency's historic practice given the criteria emission benefits of CARB's GHG emission

Continued

already held as much as to section 209(a): "whatever is preempted [by section 209(a)] is subject to waiver under subsection (b)."[252] As demonstrated by EPA's review of the record in this decision, California's GHG emission standards at issue meet the SAFE 1 interpretation of the second waiver prong. Nevertheless, to the extent that SAFE 1 was intended to preclude all California regulation of greenhouse gases, EPA believes it improper to exclude entirely a pollutant from a waiver under section 209(b) that is otherwise preempted by section 209(a).

In addition, Congress has cited California's GHG standards and ZEV sales mandate in subsequent legislation. Federal procurement regulations direct the EPA to issue guidance identifying the makes and models numbers of vehicles that are low GHG emitting vehicles.[253] In a clear reference to California's motor vehicle GHG standards, Congress has required EPA when identifying those vehicles to "take into account the most stringent standards for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers for vehicles sold anywhere in the United States."[254] And in its State Implementation Plan provision regarding fleet programs required for certain non-attainment areas relating to issuing credits for cleaner vehicles, Congress stated that the "standards established by the Administrator under this paragraph . . . shall conform as closely as possible to standards which are established for the State of California for ULEV and ZEV vehicles in the same class."[255] Congress would not likely have adopted California's standards into its own legislation if it believed those standards to be preempted.

EPA also disagrees with SAFE 1's related argument that the statutory criteria must be interpreted in the context of the constitutional doctrine of "equal sovereignty." As explained in detail in Section VIII, waiver requests should be reviewed based solely on the criteria in section 209(b)(1) and the Agency should not consider constitutional issues in evaluating waiver requests.[256] The constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver

requests. However, because the Agency asserted in SAFE 1 that the equal sovereignty doctrine formed a gloss on its statutory interpretation of the three criteria, EPA addresses that argument here briefly. In short, in SAFE 1, EPA stated that because section 209(b)(1) provides "extraordinary treatment" to California, the second waiver prong should be interpreted to require a "state-specific" and "particularized" pollution problem.[257] But section 177's grant of authority to other states to adopt California's standards undermines the notion that the regulatory scheme treats California in an extraordinary manner. Indeed, if section 209(b) is interpreted to limit the types of air pollution that California may regulate, it would diminish the sovereignty of California and the states that adopt California's standards pursuant to section 177 without enhancing any other state's sovereignty. Nor does section 209(b) impose any burden on any state. For these reasons, EPA agrees with commenters who argued that the Supreme Court's decision in *Shelby County* is inapposite. In section 209(b), Congress did not authorize "federal intrusion into sensitive areas of state and local policymaking."[258] Rather, it underscored a foundational principle of federalism—allowing California to be a laboratory for innovation. Nor is section 209(b) an "extraordinary departure from the traditional course of relations between the States and the Federal Government."[259] To the contrary, it is just one of many laws Congress passes that treat States differently, and where, as discussed more fully below, Congress struck a reasonable balance between authorizing one standard and authorizing 51 standards in deciding to authorize two. SAFE 1's invocation of the rarely used equal sovereignty principle as an aid in interpreting the second waiver prong simply does not fit section 209.

SAFE 1 dismissed the Agency's traditional interpretation of the second waiver prong under which EPA reviews the same standards that California considers in making its protectiveness determination, asserting that the practical implications of reviewing standards in the "aggregate" compared to specific standards presented in a waiver request meant that the Agency would never have the discretion to determine that California did not need any subsequent standards. But nothing in section 209(b)(1)(B) can be read as

calling for scrutinizing the specific California standards under the waiver.[260] Under section 209(b)(1)(B), EPA is to grant a waiver unless California does not need "such State standards" (plural). EPA interprets section 209(b)(1)(B) to refer back to the phrase "in the aggregate" in section 209(b)(1), which was added in the 1977 CAA Amendments when Congress removed the stringency requirements for waiver of California standards allowing instead for standards that are not as stringent as comparable federal standards, so long as the standards were "in the aggregate, at least as protective of public health and welfare as applicable Federal standards." EPA believes that referring back to section 209(b)(1) is appropriate given that it precedes the language prior to section 209(b)(1)(B) and is in accord with the deference Congress intended by the 1977 Amendments.[261] Conversely, EPA believes that under the SAFE 1 interpretation California would, of necessity, be required to make a protectiveness finding for each of the specific standards, and the Agency believes this would be an inappropriate outcome from SAFE 1. Under the 1977 Amendments, California can "include some less stringent [standards] than the corresponding federal standards."[262] As previously explained, "Congress could not have given this flexibility to California and simultaneously assigned to the state the seemingly impossible task of establishing that 'extraordinary and compelling conditions' exist for each standard."[263]

SAFE 1 further argued that its interpretation read the use of "such standards" consistently between the second and third waiver prongs,

[260] In the 2009 GHG waiver, and again in the 2013 ACC program waiver, EPA explained that the traditional approach does not make section 209(b)(1)(B) a nullity, as EPA must still determine whether California does not need its motor vehicle program to meet compelling and extraordinary conditions as discussed in the legislative history. Conditions in California may one day improve such that it may no longer have a need for its motor vehicle program, or a program designed for a particular type of air pollution problem, if the underlying specific air pollutant is no longer at issue.

[261] EPA had applied the traditional interpretation of the second waiver prong prior to the 1977 Amendments.

[262] *See* H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977); "In further amendments to the Act in 1977, § 209 (formerly § 208) was amended to require the U.S. Environmental Protection Agency (EPA) to consider California's standards as a package, so that California could seek a waiver from preemption if its standards 'in the aggregate' protected public health at least as well as federal standards." *Motor Vehicle Mfrs. Ass'n v. NYS Dep't of Env't Conservation,* 17 F.3d at 525.

[263] 49 FR at 18890 n.24.

standards and ZEV sales requirements as well as the impacts of climate change on California's local and regional air quality.

[252] *MEMA I,* 627 F.2d 1095, 1106–08 (D.C. Cir. 1979).

[253] 42 U.S.C. 13212(f)(3).

[254] *Id.*

[255] 42 U.S.C. 7586(f)(4).

[256] 78 FR at 2145.

[257] 84 FR 51340, 51347.

[258] *Shelby County* v. *Holder,* 570 U.S. 529, 535, 545 (2013).

[259] *Id.*

sections 209(b)(1)(B) and (C).[264] It is true that section 209(b)(1)(C) employs the same phrase ''such State standards'' as employed in section 209(b)(1)(B), and it similarly uses that phrase to refer to standards in the aggregate. Indeed, section 209(b)(1)(C) involves an analysis of feasibility that can take more than the feasibility and impacts of the new standards into account. The feasibility assessment conducted for a new waiver request focuses on the standards in that request but builds on the previous feasibility assessments made for the standards already in the program and assesses any new feasibility risks created by the interaction between the standards in the petition and the existing standards.[265]

In sum, EPA now views as inconsistent with congressional intent the SAFE 1 interpretation, which was a flawed interpretation and also a significant departure from the traditional interpretation under which the Agency reviews California's need for the same standards as those that the State determines are ''in the aggregate'' as protective of public health and welfare, under section 209(b)(1).[266] EPA

believes the traditional interpretation is, at least, the better reading of the statute.

As previously explained, in reviewing waiver requests EPA has applied the traditional interpretation in the same way for all air pollutants, criteria and GHG pollutants alike.[267] In SAFE 1, however, EPA reinterpreted section 209(b)(1)(B) and further set out a particularized nexus test and applied this test separately to GHG standards at issue. SAFE 1 then concluded that no nexus exists for GHG emissions in California.[268] SAFE 1 further posited that California must demonstrate ''compelling and extraordinary circumstances sufficiently different from the nation as a whole to justify standards on automobile emissions which may, from time to time, need to be more stringent than national standards.''[269] This has resulted in potentially different practical results depending on whether GHG standards or criteria emission pollutants are at issue, a distinction neither found in nor supported by the text of section 209(b)(1)(B) and legislative history. Specifically, SAFE 1 would have the ACC program MYs 2017–2025 criteria pollutants standards subject to review under the traditional interpretation while GHG standards at issue would be subject to review under the SAFE 1 particularized nexus test or individualized scrutiny.[270] This uneven application is even more irreconcilable given that California's motor vehicle emission program includes two GHG standards for highway heavy-duty vehicles that EPA previously reviewed under the traditional approach.[271] EPA

acknowledges that ascribing different meanings to the same statutory text in the same provision here, depending on its application, ''would render every statute a chameleon.''[272] Nothing in either section 209 or the relevant legislative history can be read as calling for a distinction between criteria pollutants and GHG standards and thus, the individualized scrutiny under the SAFE 1 particularized nexus test.[273] Nothing in section 209(b) can be read as calling for EPA to waive preemption only if California seeks to enforce criteria pollutant standards. The Administrator is required to waive the preemption in section 209(a) unless California ''does not need *such State standards to meet compelling and extraordinary conditions.*''[274] This is in stark contrast to, for example, section 211(c)(4)(C), which calls for a waiver of preemption only if a state demonstrates that a fuel program is ''necessary'' to achieve the NAAQS.[275] Moreover, as previously noted, ''[I]f Congress had intended a review of the need for each individual standard under (b)(1)(B), it is unlikely that it would have used the phrase ''. . . does not need *such state standards*'' (emphasis in original), which apparently refers back to the phrase ''State standards . . . in the aggregate as used in the first sentence of section 209(b)(1), rather than the particular standard being considered.''[276] EPA has also explained that an individualized review of standards would mean that Congress ''[gave] flexibility to California and simultaneously assigned to the state the seemingly impossible tasks of establishing that 'extraordinary and compelling conditions' exist for each less stringent standard.''[277]

---

[264] Section 209(b)(1)(C) provides that no such waiver shall be granted if the Administrator finds that ''such State standards and accompanying enforcement procedures are not consistent with section 7521(a) [202(a)] of this title.''

[265] For example, in the 2013 ACC waiver that contains CARB's LEV III criteria pollutant standards and GHG emission standards, as well as the ZEV sales mandate, EPA assessed information submitted by CARB regarding the technological feasibility, lead time available to meet the requirements, and the cost of compliance and the technical and resource challenges manufacturers face in complying with the requirements to simultaneously reduce criteria and GHG emissions. 78 FR at 2131.

[266] 84 FR at 51345. EPA notes that in SAFE 1 the following rationale was used to interpret both 209(b)(1)(B) and then connect it with 209(b)(1)(B): ''[B]ecause both sections 209(b)(1)(B) and (C) employ the term 'such state standards,' it is appropriate for EPA to read the term consistently between prongs (B) and (C). Under section 209(b)(1)(C), EPA conducts review of standards California has submitted to EPA for the grant of a waiver to determine if they are consistent with section 202(a). It follows then that EPA must read 'such state standards' in section 209(b)(1)(B) as a reference to the same standards in subsection (C).'' Although the Agency has not pointed to 209(b)(1)(C) as a basis of statutory construction to support the traditional interpretation of 209(b)(1)(B), EPA nevertheless believes it is supportive. EPA notes that the term ''such state standards'' in 209(b)(1)(C) allows the Agency, in appropriate circumstances, to review the consistency of CARB's suite of standards, for a particular vehicle category, with section 202(a). For example, EPA evaluated all of the standards (LEV III criteria pollutant, ZEV sales mandate, and GHG standards) of the ACC program in recognition of the aggregate costs and lead time associated with CARB's standards as well as technologies that may be employed to meet more than one standard. 78 FR 2131–45. EPA's assessment under 209(b)(1)(C) is not in practice a standard-by-standard review. EPA believes it appropriate to read the entirety of 209 together, along with its purposes, in order to

properly interpret its components such as 209(b)(1)(B).

[267] 74 FR at 32763–65; 76 FR at 34693; 79 FR at 46256; 81 FR at 95982.

[268] SAFE 1 also relied on *UARG* v. *EPA*, 134 S. Ct. 2427 (2014), where the Supreme Court disagreed with the Agency's decision to regulate all sources of GHG under Titles I and V as the consequence of the Agency's section 202(a) endangerment finding for motor vehicle GHG emissions. In EPA's view upon reconsideration of SAFE 1, *UARG* is distinguishable because here the Agency is acting under a specific exemption to section 202(a) that allows for California to set its own standards for motor vehicle GHG standards under California state law, and thus, regulate major sources of GHG emissions within the State. California's authority to promulgate standards is neither contingent nor dependent on the Agency's section 202(a) endangerment finding for GHG. *See* 74 FR at 32778–80; 79 FR at 46262. Moreover, as discussed above, EPA's waiver authority under section 209(b) is coextensive with preemption under section 209(a). *See MEMA I*, 627 F.2d at 1107. UARG is inapplicable to the scope of preemption under section 209(a).

[269] 84 FR at 51341.

[270] *Id.* at 51337.

[271] The first HD GHG emissions standard waiver related to certain new 2011 and subsequent model year tractor-trailers. 79 FR 46256 (August 7, 2014).

The second HD GHG emissions standard waiver related to CARB's ''Phase I'' regulation for 2014 and subsequent model year tractor-trailers. 81 FR 95982 (December 29, 2016).

[272] *See* States and Cities at 24 (quoting *Clark* v. *Martinez*, 543 U.S. 371, 382 (2005) and citing *U.S.* v. *Santos*, 553 U.S. 507, 522 (2008); *U.S. Dep't of the Treasury* v. *FLRA*, 739 F.3d 13, 21 (D.C. Cir. 2014)). The commenter notes that in the SAFE 1 brief, EPA claimed that its new approach to section 209(b)(1)(B) would apply ''for all types of air pollutants'' but EPA could point to nowhere in SAFE 1 decision where this was said. *Id.* at 25. And ''only two sentences later,'' EPA acknowledged that its review under this second prong would change ''depending upon which 'air quality concerns' were implicated.'' *Id.*

[273] H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977); 49 FR at 18890 n.24.

[274] CAA section 209(b)(1)(B) (emphasis added).

[275] Section 211(c)(4)(C) allows EPA to waive preemption of a state fuel program respecting a fuel characteristic or component that EPA regulates through a demonstration that the state fuel program is necessary to achieve a NAAQS.

[276] 49 FR at 18890.

[277] *Id.* at 18890 n.24.

Similarly, nothing in either section 209 or legislative history can be read as requiring EPA to grant GHG standards waiver requests only if California's GHG pollution problem is the worst in the country.[278] "There is no indication in either the statute or the legislative history that . . . the Administrator is supposed to determine whether California's standards are in fact sagacious and beneficial." [279] And most certainly, nothing in either section 209 or the legislative history can be read as calling for EPA to draw a comparison between California's GHG pollution problem and the rest of the country (or world) when reviewing California's need for GHG standards. Instead, the crucial consequence of the 1977 Amendment was to require waiver grants for California's specific standards that are part of the State's overall approach to reducing vehicle emissions to address air pollution even if those specific standards might not be needed to address compelling and extraordinary conditions.[280] Thus, "even if it were true that California's [GHG] problem is, . . . no worse than some other areas of the country, this does not mean that [GHG] do not pose a special problem in California." [281] Rather, "EPA's practice [is] to leave the decisions on controversial matters of public policy, such as whether to regulate [GHG] emissions, to California." [282]

In addition, in Title II, Congress established only two programs for control of emissions from new motor vehicles: EPA emission standards adopted under the Clean Air Act and California emission standards adopted under its state law. And states other than California may not "tak[e] any action that has the effect of creating a car different from those produced to meet either federal or California emission standards, a so-called 'third vehicle.' " [283]

As previously explained, and noted in the Notice of Reconsideration, since the grant of the initial GHG waiver request in 2009, the Agency has applied the traditional interpretation in granting two additional waivers for CARB's Heavy-Duty Vehicle GHG emission standards and these GHG standards are now part of California's motor vehicle program, but EPA did not address these waivers in SAFE 1.[284] It also bears note that, given the limited analysis and application of the SAFE 1 interpretation of the second waiver prong, it is uncertain whether the traditional interpretation remains otherwise applicable to earlier model year GHG standards under prior waivers. Ambiguity also applies to SAFE 1's interpretation of this prong in respect to all criteria pollutant standards in the ACC program. While SAFE 1 stated it was only applicable to the GHG standards at issue, in at least one instance the Agency indicated that the SAFE 1 interpretation could also be applicable to future evaluation of waiver requests for criteria pollutant standards.[285] This uncertainty between these statements in SAFE 1 further highlights the inappropriateness of the new interpretation of the second prong.

In sum, for the reasons noted above, EPA is withdrawing the SAFE 1 interpretation and reinstating certain aspects of the ACC program waiver that were earlier granted under the traditional interpretation and approach. EPA concludes it erred by not properly evaluating the statutory interpretation of section 209, the associated legislative history including the policy deference that should be afforded to California to address its serious air quality problems and to serve as a laboratory for the country, and because the "need" for a motor vehicle emission program and related standards within the program are necessarily better viewed as a comprehensive and interrelated effort to address the range of air quality problems facing California.[286] At the same time, EPA notes that the traditional interpretation is reasonable and consistent with the text, structure and congressional intent and purpose of section 209(b) and EPA is thus confirming that the traditional interpretation of section 209(b)(1)(B) was appropriate and is, at least, the better interpretation.[287]

**2. California Needs the GHG Standards and ZEV Sales Mandate Even Under the SAFE 1 Interpretation**

Even if the SAFE 1 interpretation of section 209(b)(1)(B) was appropriate, the record of both the ACC program waiver and SAFE 1 proceeding demonstrate that California has a need for the GHG standards and ZEV sales mandate at issue under the SAFE 1 interpretation as well. The opponents of the waiver (including EPA in SAFE 1) did not met their burden of proof to demonstrate that California does not need its GHG emission standards and ZEV sales mandate, whether individually or as part of California's motor vehicle emission program, to meet compelling and extraordinary conditions.[288]

---

[278] *Id.* at 18891.

[279] *Ford Motor Co.,* v. *EPA,* 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[280] 74 FR at 32761 ("Congress decided in 1977 to allow California to promulgate individual standards that are not as stringent as comparable federal standards, as long as the standards are 'in the aggregate, at least as protective of public health and welfare as applicable federal standards.' "); "[T]he 1977 amendments significantly altered the California waiver provision." *Ford Motor Co.,* 606 F.2d 1293, 1302 (D.C. Cir. 1979).

[281] 49 FR at 18891.

[282] 43 FR at 25735.

[283] *Motor Vehicle Mfrs. Ass'n* v. *NYS Dep't of Env't Conservation, 17 F.3d 521, 526, 528 (2d Cir. 1994).*

[284] 79 FR 46256 (August 7, 2014); 81 FR 95982 (December 29, 2016).

[285] 84 FR at 51341 n.263. "EPA determines in this document that GHG emissions, with regard to the lack of a nexus between their State-specific sources and their State specific impacts, and California's GHG standard program, are sufficiently distinct from criteria pollutants and traditional, criteria pollutant standards, that it is appropriate for EPA to consider whether California needs its own GHG vehicle emissions program. *EPA does not determine in this document and does not need to determine today how this determination may affect subsequent reviews of waiver applications with regard to criteria pollutant control programs.*" (Emphasis added). *See also id.* at 51344 n.268 ("EPA is adopting an interpretation of CAA section 209(b)(1)(B), specifically its provision that no waiver is appropriate if California does not need standards "to meet compelling and extraordinary conditions," similar to the interpretation that it adopted in the 2008 waiver denial but abandoned in the 2009 and 2013 waiver grants, and applying that interpretation to determine to withdraw the January 2013 waiver for California's GHG and ZEV program for model years 2021 through 2025"), and at 51346 ("EPA therefore views this interpretation and application of CAA section 209(b)(1)(B) set forth here as, at minimum, a reasonable one that gives appropriate meaning and effect to this provision.").

[286] As noted previously, in the context of evaluating the "need" for California's motor vehicle emission standards the Agency is informed by the legislative history from 1967 and 1977, whereby California is properly viewed as a laboratory for the country and that its policy decisions on how best to address its serious air quality issues, and that deference on the question of "need" is in order. Therefore, EPA believes it misapplied the concept of deference in the context of the second waiver prong application in SAFE 1. *See e.g.,* 84 FR at 51344 n.268. While EPA believes it appropriate to not defer when it is interpreting its own statute, the Agency nevertheless determines that California's policy choices in term of its "need" in how best to address compelling and extraordinary conditions in California requires deference by the Agency. This is consistent with EPA's longstanding waiver practice and its integration of the legislative history behind section 209. In any event, EPA would reach the same conclusions regarding the second waiver prong even if it did not defer to California regarding the nature of its air quality problems. 86 FR at 74489 ("The 2009 Endangerment Finding further explained that compared with a future without climate change, climate change is expected to increase tropospheric ozone pollution over broad areas of the U.S., including in the largest metropolitan areas with the worst tropospheric ozone problems, and thereby increase the risk of adverse effects on public health (74 FR 66525)."). *See also* 86 FR at 74492.

[287] "The interpretation that my inquiry under (b)(1)(B) goes to California's need for its own mobile source program is borne out not only by the legislative history, but by the plain meaning of the statue as well." 49 FR at 18890.

[288] EPA notes that by this action it is rescinding the interpretation of section 209(b)(1)(B) as set forth in SAFE 1. Nevertheless, EPA believes it appropriate to address comments received that suggest the SAFE 1 interpretation was not only

As previously explained, the 1977 CAA Amendments allow California to promulgate standards that might not be considered needed to meet compelling and extraordinary circumstances but would nevertheless be part of California's overall approach of reducing vehicle emissions to address air pollution in California.[289] Thus, CARB may now design motor vehicle emission standards, individually, that might sometimes not be as stringent as federal standards but collectively with other standards would be best suited for California air quality problems because under the 1977 Amendments, California can "include some less stringent [standards] than the corresponding federal standards." [290] And EPA is "required to give very substantial deference to California's judgments on this score." [291]

Indeed, as EPA noted in the ACC program waiver, Congress intentionally provided California the broadest possible discretion in adopting the kind of standards in its motor vehicle program that California determines are appropriate to address air pollution problems that exist in California, whether or not those problems are only local or regional in nature, and to protect the health and welfare of its citizens:

Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs.[292]

In the context of implementing section 209(b)(1)(B) and assessing the "need" for California's standards even under the SAFE 1 interpretation, EPA sees no reason to distinguish between "local or regional" air pollutants versus other pollutants that may be more globally mixed. Rather, it is appropriate to acknowledge that all pollutants and their effects may play a role in creating air pollution problems in California and that EPA should provide deference to California in its comprehensive policy choices for addressing them. Again, even if a new interpretation of section 209(b)(1)(B) were appropriate in SAFE 1, and EPA believes it is not, it is important to note that historically, criteria pollutant reductions have been relevant to section 209(b)(1)(B). As previously noted, nothing in section 209(b) can be read as calling for EPA to waive preemption only if California seeks to enforce criteria pollutant standards. The Administrator is required to waive the preemption in section 209(a) unless California "does not need *such State standards to meet compelling and extraordinary conditions.*" [293] As also previously noted this is in stark contrast to, for example, section 211(c)(4)(C), which calls for a waiver of preemption only if a state demonstrates that a fuel program will result in criteria pollutant reductions that will enable achievement of applicable NAAQS.

The first section below focuses on criteria pollution reduction, which has long been relevant to section 209(b)(1)(B). EPA has never put in doubt that California's serious criteria air pollution problems (such as NAAQS nonattainment and the factors that give rise to those conditions, including the geographic and climate conditions in the State, the number of motor vehicles in California, and local and regional air quality) are "compelling and extraordinary," or that California "needs" regulations that address such emissions in order to achieve every fraction of criteria pollutant emissions it can achieve.[294] The factual record before the Agency in 2013 and again in 2019 includes ample documentation of criteria emission reductions from California's GHG standards and ZEV

sales mandate.[295] Nothing in the record is sufficient to demonstrate that California does not need the ACC program (or the motor vehicle emission program) or, in the context of the SAFE 1 interpretation, the specific GHG emission standards and the ZEV sales mandate to meet compelling needs related to criteria pollution. These benefits have a clear connection to California's "need" for its specific GHG standards and ZEV sales mandate, at issue under the waiver. The second section below focuses on the GHG reduction benefits of California's GHG standards and ZEV sales mandate. EPA acknowledges that California is particularly impacted by climate change, including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat, and that climate-change impacts in California are therefore "compelling and extraordinary conditions" for which California needs the GHG standards and ZEV sales mandate.

a. GHG Standards and ZEV Sales Mandates Have Criteria Emission Benefits

As shown below, criteria pollutant reductions are demonstrably connected to California's "need" for its GHG standards and ZEV sales mandate at issue under the waiver.[296] EPA first concluded that there is a "logical link between the local air pollution problem

---

correct, but that the factual record supported the SAFE 1 withdrawal of the ACC waiver based on this interpretation.

[289] *See Ford Motor Co.,* v. *EPA,* 606 F.2d 1293, 1296–97 (D.C. Cir. 1979); See H.R. Rep. No. 294, 95th Cong., 1st Sess. 302 (1977).

[290] 43 FR 25729, 25735 (June 14, 1978). See *Ford Motor Co.,* 606 F.2d at 1296–97.

[291] 40 FR at 23104. See also LEV I (58 FR 4166 (January 13, 1993)) Decision Document at 64.

[292] 78 FR at 2128–29. *See* "Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California." Publication # CEC–500–2012– 007. Posted: July 31, 2012; available at *https://ucanr.edu/sites/Jackson_Lab/files/155618.pdf* at 4 ("Higher temperatures also increase ground-level ozone levels. Furthermore, wildfires can increase particulate air pollution in the major air basins of California. Together, these consequences of climate change could offset air quality improvements that have successfully reduced dangerous ozone concentrations. Given this "climate penalty," as it is commonly called, air quality improvement efforts in many of California's air basins will need to be strengthened as temperatures increase in order to reach existing air quality goals.").

[293] CAA section 209(b)(1)(B) (emphasis added).

[294] In SAFE 1, EPA found that California's criteria pollution conditions remain "compelling and extraordinary and that California needs standards to produce any and all reductions in criteria pollutant emissions." 84 FR at 51344, 51346.

[295] When California originally adopted a ZEV sales mandate into its regulations, a significant factor in support of its action was addressing criteria pollutant emissions. In SAFE 1 EPA acknowledged that California's ZEV mandate initially targeted only criteria pollution. 84 FR at 51329. EPA's 2013 waiver grant recognized that with California's ACC program California had shifted to relying on the ZEV requirements to reduce both criteria and GHG pollution. 78 FR at 2114.

[296] In response to comments arguing that upstream emission benefits should not be considered in determining the criteria pollutant benefits of CARB' standards or that it is inappropriate to elevate stationary source criteria pollutant emissions into a make-or-break factor in waivers for motor vehicle emission programs, EPA believes it appropriate to reiterate the air quality problems facing California, as evidenced by NAAQS attainment challenges. Waiver practice and applicable case law, as previously noted, afford California wide deference in its policy and regulatory approaches in addressing these challenges. Therefore, EPA believes that to the degree a nexus between CARB's standards and addressing its serious air quality problems is required, that it is reasonable to base the need on related criteria emission impacts. EPA notes that, in setting its federal light-duty vehicle GHG standards, it is afforded discretion under the CAA to consider upstream emission impacts and does include such consideration in its own rulemakings. 77 FR 62624, 62819 (October 15, 2012) (taking fuel related upstream GHG emissions into account in setting compliance values for vehicle GHG emissions standards).

of ozone and GHGs'' in the 2009 California GHG waiver by explaining, for instance, that ''the impacts of global climate change can nevertheless exacerbate this local air pollution problem.'' [297] Moreover, as previously explained, in two additional GHG waiver requests and associated EPA waiver decisions since the 2009 GHG waiver, EPA acknowledged that CARB had demonstrated the need for GHG standards to address criteria pollutant concentrations in California. In the 2014 HD GHG waiver request, CARB projected, for example, ''reductions in $NO_X$ emissions of 3.1 tons per day in 2014 and one ton per day in 2020'' in California.[298]

In SAFE 1, EPA distinguished prior GHG waivers from the ACC program GHG waiver solely on grounds of how CARB attributed the pollution benefits in its waiver request. EPA explained that CARB had linked those prior waived GHG standards to criteria pollutant benefits but had not done so in the ACC program waiver request: ''California's *approach* in its ACC program waiver request differed from the state's approach in its waiver request for MY 2011 and subsequent heavy-duty tractor-trailer GHG standards, where California quantified $NO_X$ emissions reductions attributed to GHG standards and explained that they would contribute to PM and ozone NAAQS attainment.'' [299] Moreover, how CARB attributes the pollution reductions for accounting purposes from its various standards does not reflect the reality of how the standards deliver

emissions reductions and should not drive whether or not a waiver can be withdrawn. EPA believes, based on its historical deference to CARB in waiver proceedings, that CARB is entitled to this discretion.

EPA also believes that prior waiver decisions indicate that the ''approach'' taken by California in its waiver requests needs to be carefully assessed and understood by the Agency before discounting the benefits of its mobile source emission standards. The characterization of CARB's ''approach,'' as not calling out criteria emissions benefits (such as upstream criteria emission benefits) of GHG standards, was incorrect and should not have undermined EPA's findings and grant of the initial ACC program waiver request for the following reasons: (1) As previously noted, the ACC program standards are interrelated and all serve to reduce both criteria and GHG pollution; (2) CARB conducted a combined emissions analysis of the elements of the ACC program because the program was designed to work as an integrated whole; and (3) EPA has always considered California's standards as a whole or ''in the aggregate'' under the traditional interpretation of section 209(b)(1)(B).[300] EPA noted the associated criteria pollutant and GHG emissions benefits for the whole ACC program: ''the ACC program will result in reductions of both criteria pollutants and GHG emissions that, in the aggregate, are more protective than the pre-existing federal standards.'' [301] EPA also made the requisite finding that California's protectiveness finding for the ACC program was not arbitrary and capricious, under section 209(b)(1)(A), by explaining that ''California's ZEV and GHG emission standards are an addition to its LEV program.'' [302]

In SAFE 1, EPA further asserted that ''California's responses to the SAFE proposal do not rebut the Agency's views that the ZEV standards for MY 2021–2025 are inextricably interconnected with the design and purpose of California's overall GHG reduction strategy.'' [303] For the following reasons, however, EPA was also incorrect in the assessment of criteria emission benefits of CARB's ZEV sales mandate. EPA focused on only the following snippet from one salient paragraph in CARB's 2012

waiver request as support for the lack of criteria emissions benefits: ''There is no criteria emissions benefit from including the ZEV proposal in terms of vehicle (tank-to-wheel or TTW) emissions. The LEV III criteria pollutant fleet standard is responsible for those emission reductions in the fleet; the fleet would become cleaner regardless of the ZEV regulation because manufacturers would adjust their compliance response to the standard by making less polluting conventional vehicles.'' [304] But, as discussed above, that was merely an attribution of benefits and did not reflect the practical reality of how California's standards work. Moreover, the paragraph in its entirety goes on to explain that CARB's ZEV sales mandate would achieve criteria emission reductions: ''However, since upstream criteria and PM emissions are not captured in the LEV III criteria pollutant standard, net upstream emissions are reduced through the increased use of electricity and concomitant reductions in fuel production.'' [305]

It bears note that this attribution of criteria pollutant reductions was similar to the one that CARB made almost a decade ago for the 2009 GHG waiver request.[306] For example, CARB provided ''extensive evidence of its current and serious air quality problems and the increasingly stringent health-based air quality standards and federally required state planning efforts to meet those standards firmly.'' [307] The States and Cities also commented that ''the attribution CARB made as part of its waiver request was never intended to, and did not, establish the absence of any

---

[297] 74 FR at 32763. According to California, ''California's high ozone levels–clearly a condition Congress considered–will be exacerbated by higher temperatures from global warming . . . [T]here is general consensus that temperature increases from climate change will exacerbate the historic climate, topography, and population factors conducive to smog formation in California, which were the driving forces behind Congress's inclusion of the waiver provision in the Clean Air Act.'' *Id.* (quoting comments submitted by CARB during the 2009 reconsideration). CARB also explained that ''the factors that cause ozone are primarily local in nature and [] ozone is a local or regional air pollution problem, the impacts of global climate change can nevertheless exacerbate this local air pollution problem. Whether or not local conditions are the primary cause of elevated concentrations of greenhouse gases and climate change, California has made a case that its greenhouse gas standards are linked to amelioration of California's smog problems . . . . There is a logical link between the local air pollution problem of ozone and California's desire to reduce GHGs as one way to address the adverse impact that climate change may have on local ozone conditions.'' *Id.*

[298] 79 FR at 46261. See *also* 81 FR at 95985–86 n.27 (referencing Resolution 13–50's statements supporting California's continued need for its own motor vehicle program in order to meet serious ongoing pollution problems).

[299] 84 FR at 51337 n.252 (citing 79 FR at 46256, 46257 n.15, 46261, 46262 n.75).

[300] ZEV ISOR, EPA–HQ–OAR–2012–0562–0008 at 72; CARB Supplemental Comments, EPA–HQ–OAR–2012–0562–0373 at 3.

[301] 74 FR at 2122.

[302] *Id.* at 2125.

[303] 84 FR at 51337.

[304] *Id.* at 51337, 51330, 51337, 51353–54, 51356, 51358.

[305] 2012 Waiver Request at 15–16. CARB also noted that criteria and PM emission benefits will vary by region throughout the State depending on the location of emission sources. Refinery emission reductions will occur primarily in the east Bay Area and South Coast region where existing refinery facilities operate. As refinery operations reduce production and emissions, the input and output activities, such as truck and ship deliveries, will also decline. This includes crude oil imported through the Los Angeles and Oakland ports, as well as pipeline and local gasoline truck distribution statewide. EPA again notes that in its light-duty vehicle GHG rulemaking in 2012 it also noted the upstream emission impacts. 77 FR at 62819.

[306] ''The establishment of greenhouse gas emission standards will result in a reduction in upstream emissions (emission due to the production and transportation of the fuel used by the vehicle) of greenhouse gas, criteria and toxic pollutants due to reduced fuel usage.'' EPA–HQ–OAR–2006–0173–0010.107 at 8.

[307] CARB, EPA–HQ–OAR–2012–0562–0371. CARB estimated benefits of the ZEV and GHG standards for calendar years by which the South Coast air basin must meeting increasingly stringent NAAQS for ozone: 2023, 2031, and 2037. States and Cities app. A at 2–4, app. C at 8–9.

vehicular emission benefits from the ZEV standard." EPA believes that CARB's statement was merely a "simplification that distinguished the standards based on the *primary* objectives of the two, complementary standards." [308] EPA agrees that the record from 2013, and 2019, demonstrates that CARB's attribution of short-term emissions benefits did not undercut the long-term ZEV vehicular emission benefits of the ZEV standards. Thus, regardless of how the emissions reductions are attributed, the GHG standards and ZEV sales mandate drive reductions in criteria pollution.

EPA has consistently explained that "consideration of all the evidence submitted concerning a waiver decision is circumscribed by its relevance to those questions . . . consider[ed] under section 209(b)." [309] And so, as earlier noted, any reconsideration of a prior waiver decision must comport with criteria in section 209(b)(1) as well as have record support. Moreover, in prior waiver requests for ZEV sales mandate requirements, CARB has discussed criteria pollutant emissions reductions because of the mandate for sale of vehicles that have zero emissions. [310] CARB's 2012 waiver request also indicated the clear intent regarding the evolution of the ZEV program and California's decision to focus both on criteria pollutant and GHG reductions. [311] EPA's reading of and reliance on the snippet from CARB's waiver request describing the ZEV sales mandate requirements in the ACC program was both incorrect and improper, as well as contrary to congressional intent and EPA's historic practice of affording broad discretion to California in selecting the best means for addressing the health and welfare of its citizens.

b. California Needs Its Standards To Address the Impacts of Climate Change in California

Under section 209(b)(1)(B), EPA is to grant a waiver request unless California

does not need the standards at issue to address "compelling and extraordinary conditions." In applying the traditional approach, EPA has consistently reasoned that "compelling and extraordinary conditions" refers primarily to the factors that tend to produce higher levels of pollution in California—geographical and climatic conditions (like thermal inversions) that, when combined with large numbers and high concentrations of automobiles, create serious air pollution problems. [312] These conditions continue to exist in California and CARB, since the initial 2009 GHG waiver, has consistently drawn attention to the existential crisis that California faces from climate change and maintained that air quality issues associated with GHG emissions have exacerbated this crisis and have yet to attenuate. [313]

EPA now recognizes that CARB, as part of its original waiver request and in comments in response to SAFE 1, submitted ample evidence of multiple ways California is particularly impacted by climate change, including increasing risks from record-setting fires, heat waves, storm surges, sea-level rise, water supply shortages and extreme heat; in other words that GHG emissions contribute to local air pollution, and that climate-change impacts in California are "compelling and extraordinary conditions." For example, CARB noted that "[r]ecord-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack— California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the State so unique and prosperous—is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems." [314]

Within the ACC waiver request, CARB provided a summary report on the third assessment from the California Climate Change Center (2012), which described dramatic sea level rises and increases in temperatures in California and associated impacts on local air quality and other conditions in California. [315]

To the extent that SAFE 1 relied on the premise that GHG emissions from motor vehicles located in California become globally-mixed as part of global climate change, and therefore do not pose a local air quality issue (placing aside the impacts of heat on ozone as

---

[308] States and Cities at 31 (original emphasis).

[309] 74 FR at 32748. *See also* 78 FR at 2115.

[310] 71 FR 78190 (December 28, 2006); 75 FR 11878 (March 12, 2010) and 76 FR 61095 (October 3, 2011).

[311] *See* 2012 Waiver Request at 2. At the December 2009 hearing, the Board adopted Resolution 09–66, reaffirming its commitment to meeting California's long term air quality and climate change reduction goals through commercialization of ZEV technologies. The Board further directed staff to consider shifting the focus of the ZEV regulation to both GHG and criteria pollutant emission reductions, commercializing ZEVs and PHEVs in order to meet the 2050 goals, and to take into consideration the new LEV fleet standards and propose revisions to the ZEV regulation accordingly.

[312] 49 FR at 18890 (citing legislative history).

[313] 2012 Waiver Request at 1.

[314] CARB supplemental comment at EPA–HQ– OAR–2012–0562–0371. CARB notes that EPA's reasoning that the "compelling and extraordinary conditions" criteria should be viewed as a "program as a whole" was upheld as "eminently reasonable" in *ATA* v. *EPA,* 600 F.3d 624, 627–29 (D.C. Cir. 2010), and that the ACC program appropriately integrates the passenger vehicle program to address multiple pollutant types, which also reflects the intent of Congress in 1977 to broaden California's discretion to adjust its program as needed (*Ford Motor Co.* v. *EPA,* 606 F.2d at

[1294]). This comment extensively lays out the compelling and extraordinary conditions associated with California's air quality challenges and the need to reduce criteria emissions and greenhouse gas emissions associated with CARB's ZEV sale mandate and GHG standards. *Id.* at 5 ("The critical nature of the LEV III regulation is also highlighted in the recent effort to take a coordinated look at strategies to meet California's multiple air quality and climate goals well into the future. This coordinated planning effort, Vision for Clean Air: A Framework for Air Quality and Climate Planning (Vision for Clean Air) demonstrates the magnitude of the technology and energy transformation needed from the transportation sector and associated energy production to meet federal standards and the goals set forth by California's climate change requirements.").

[315] 78 FR at 2129 ("To the extent that it is appropriate to examine the need for CARB's GHG standards to meet compelling and extraordinary conditions, as EPA discussed at length in its 2009 GHG waiver decision, California does have compelling and extraordinary conditions directly related to regulations of GHG. EPA's prior GHG waiver contained extensive discussion regarding the impacts of climate change in California. In addition, CARB has submitted additional evidence in comment on the ACC waiver request that evidences sufficiently different circumstances in California. CARB notes that 'Record-setting fires, deadly heat waves, destructive storm surges, loss of winter snowpack—California has experienced all of these in the past decade and will experience more in the coming decades. California's climate—much of what makes the state so unique and prosperous— is already changing, and those changes will only accelerate and intensify in the future. Extreme weather will be increasingly common as a result of climate change. In California, extreme events such as floods, heat waves, droughts and severe storms will increase in frequency and intensity. Many of these extreme events have the potential to dramatically affect human health and well-being, critical infrastructure and natural systems.") ("Our Changing Climate 2012 Vulnerability & Adaptation to the Increasing Risks from Climate Change in California. Publication # CEC–500–2012– 007. Posted: July 31, 2012; available at *http:// www.climatechange.ca.gov/adaptation/third- assessment*"). EPA also noted that "the better interpretation of the text and legislative history of this provision is that Congress did not intend this criterion to limit California's discretion to a certain category of air pollution problems, to the exclusion of others. In this context it is important to note that air pollution problems, including local or regional air pollution problems, do not occur in isolation. Ozone and PM air pollution, traditionally seen as local or regional air pollution problems, occur in a context that to some extent can involve long range transport of this air pollution or its precursors. This long-range or global aspect of ozone and PM can have an impact on local or regional levels, as part of the background in which the local or regional air pollution problem occurs." 78 FR at 2128.

well as air quality impacts from the dramatic increase in wildfires), EPA notes that in addition to the record from the ACC waiver proceeding noted above, the SAFE 1 record contains sufficient and unrefuted evidence that there can be locally elevated carbon dioxide concentrations resulting from nearby carbon dioxide emissions.[316] This can have local impacts on, for instance, the extent of ocean acidification.[317] Thus, like criteria pollution, emissions of GHGs can lead to locally elevated concentrations with local impacts, in addition to the longer-term global impacts resulting from global increases in GHG concentrations.

Finally, in demonstrating the need for GHG standards at issue, CARB attributed GHG emissions reductions to vehicles in California. For instance, "CARB project[ed] that the standards will reduce car $CO_2$ emissions by approximately 4.9%/year, reduce truck $CO_2$ emissions by approximately 4.1%/year (the truck $CO_2$ standard target curves move downward at

approximately 3.5%/year through the 2016–2021 period and about 5%/year from 2021–2025), and reduce combined light-duty $CO_2$ emissions by approximately 4.5%/year from 2016 through 2025."[318] CARB also projected that its GHG emissions standards for MYs 2017–2025 will reduce fleet average $CO_2$ levels by about 34 percent from MY 2016 levels of 251 g/mile down to about 166 g/mile, based on the projected mix of vehicles sold in California."[319] CARB further noted that there might be a GHG emission deficit if only the Federal GHG standards were implemented in California.[320] The GHG emissions from California cars, therefore, are particularly relevant to both California's air pollution problems and GHG standards at issue.

In SAFE 1, EPA dismissed California's "need" for the GHG standards at issue because their impact on GHG emissions would be too small to "meaningfully address global air pollution problems of the sort associated with GHG emissions": "[T]he most stringent regulatory alternative considered in the 2012 final rule and [Final Regulatory Impact Analysis] . . . , which would have required a seven percent average annual fleetwide increase in fuel economy for MYs 2017–2025 compared to MY 2016 standards, was forecast to decrease global temperatures by only 0.02 °C in 2100."[321] EPA also received similar comments in response to the Notice of Reconsideration. But since the inception of the waiver program, EPA has never applied a test to determine whether a California waiver request under 209(b)(1) would independently solve a pollution problem. EPA has never applied a *de minimis* exemption authority to California waiver request under section 209(b)(1).[322] EPA believes there is no basis for exercise of such a test under section 209(b), considering that CARB continues to maintain that emissions reductions in California are essential for meeting the NAAQS.[323] EPA has reiterated that "California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's

judgment, to great deference."[324] As the Supreme Court has recognized, "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed."[325] And so, in the ACC program waiver decision, EPA also explained that "[t]he issue of whether a proposed California requirement is likely to result in only marginal improvement in air quality not commensurate with its cost or is otherwise an arguably unwise exercise of regulatory power is not legally pertinent to my decision under section 209."[326]

Further, nothing in either section 209 or the legislative history could be read as requiring EPA to grant GHG standards waiver requests only if California's GHG pollution problem is the worst in the country.[327] CARB further demonstrated a "need" for its GHG standards by projecting GHG emissions reductions deficits from implementation of only the Federal GHG program in California. "[I]f a National Program standard was theoretically applied only to California new vehicle sales alone, it might create a GHG deficit of roughly two million tons compared to the California standards."[328]

## 3. California's ZEV Sales Mandate as Motor Vehicle Control Technology Development

Congress also envisioned that California's other role under section 209(b) would be an innovative laboratory for motor vehicle emission

---

[316] CARB comment at EPA–HQ–OAR–2018–0283–5054 at 305–06 (California's Fourth Climate Change Assessment; *https://www.energy.ca.gov/sites/default/files/2019-12/Governance_External_Ekstrom_ada.pdf*).

[317] See, for example, reports from California's Fourth Climate Change Assessment, "California Mussels as Bio-indicators of Ocean Acidification," *available at https://www.energy.ca.gov/sites/default/files/2019-12/Oceans_CCCA4-CNRA-2018-003_ada.pdf* ("Because of the coupling between natural (upwelling-driven) and anthropogenic (CO2 emission-driven) processes, California waters are already experiencing declines in pH that are not expected in other areas of the world's oceans for decades (Feely et al. 2008; Chan et al. 2017). These perturbations to seawater chemistry join others associated with changing seawater temperatures (García-Reyes and Largier 2010) and reductions in ocean oxygenation (Bograd et al. 2008; Chan et al. 2008). Therefore, marine communities along the coast of California are increasingly subjected to a suite of concurrent environmental stressors. Substantial impetus exists to understand, quantify, and project biological and ecological consequences of these stressors, which current work suggests may be pervasive and diverse (Kroeker et al. 2010, 2013; Gaylord et al. 2015)."). Further, evidence in the record from a 2019 study demonstrated that locally enhanced carbon dioxide concentrations above Monterey Bay, California, fluctuate by time of day likely because of the magnitude of nearby urban carbon dioxide pollution and the effects of topography on offshore winds, and that this fluctuation increases the expected rate of acidification of the Bay. *See* Northcott, et al., *Impacts of urban carbon dioxide emissions on sea-air flux and ocean acidification in nearshore waters*, PLoS ONE (2019). For decades, the monthly average carbon dioxide concentrations off California's coast have been consistently higher and more variable than those at Mauna Loa (which are commonly used as the global measurements). In fact, another more recent study shows that the waters of the California Current Ecosystem, off the coast of Southern California, have already acidified more than twice as much as the global average. *E.g.*, Cal. Office of Environmental Health Hazard Assessment, *Atmospheric Greenhouse Gas Concentrations* (Feb. 11, 2019).

[318] 78 FR at 2139.

[319] *Id.* at 2135.

[320] *Id.* at 2122.

[321] 84 FR at 51349.

[322] *See, e.g.*, 74 FR at 32766 ("As noted by the Supreme Court in *Massachusetts* v. *EPA*, while it is true that regulating motor vehicle GHG emissions will not by itself reverse global warming, a reduction in domestic automobile emissions would slow the pace of global emissions increase no matter what happens with regard to other emissions.").

[323] *See Alabama Power Co.* v. *Costle*, 636 F.2d 323, 360–66, n.89 (D.C. Cir. 1979).

[324] 74 FR at 32766 ("Under this approach, there is no need to delve into the extent to which the GHG standards at issue here would address climate change or ozone problems. That is an issue appropriately left to California's judgment. . . . Given the comments submitted, however, EPA has also considered an alternative interpretation, which would evaluate whether the program or standards has a rational relationship to contributing to amelioration of the air pollution problems in California. Even under this approach, EPA's inquiry would end there. California's policy judgment that an incremental, directional improvement will occur and is worth pursuing is entitled, in EPA's judgment, to great deference.").

[325] *Massachusetts* v. *EPA*, 549 U.S. 497, 524 (2007).

[326] 78 FR at 2134.

[327] 49 FR at 18891.

[328] 78 FR at 2122 (citing EPA–HQ–OAR–2012–0562–0374 at 3). CARB also noted that "to the extent a manufacturer chooses not to exercise their National Program compliance option in California this would actually provide additional GHG benefits in California, so compliance in California can never yield fewer cumulative greenhouse gas reductions from the industry wide fleet certified in California." *Id.* at 2122 n.61.

standards and control technology. California is to serve as "a kind of laboratory for innovation" [329] and to "blaze its own trail with a minimum of federal oversight.[330] California's "unique [air pollution] problems and [its] pioneering efforts justifi[ied] a waiver of the preemption section." [331] Congress stressed that California should serve the Nation as a "testing area" for more protective standards." [332] In the 2009 GHG waiver, for example, EPA explained that "the basic nature of the compromise established by Congress [is that] California could act as the laboratory for the nation with respect to motor vehicle emission control, and manufacturers would continue to face just two sets of emissions standards—California's and EPA's." [333] California's ZEV sales mandates have so far supported development of technologies such as battery electric and fuel cell vehicles that embody the pioneering efforts Congress envisaged. EPA acknowledged this important role in the ACC program waiver by explaining that California needs the ZEV sales mandate requirement to ensure the development and commercialization of technology required for the future, deeper vehicular emission reductions California will have to attain to meet its NAAQS obligations as well as achieve other long-term emission goals of new vehicle sales between 2040 and 2050.[334] In SAFE 1, however, EPA did not consider this additional role carved out in section 209(b)(1) for California as a proven ground for motor vehicle control emissions technology.[335]

In sum, while nothing in section 209 or the legislative history limits EPA's waiver authority to standards that reduce criteria pollution,[336] analyses in this section again recognize the way the different requirements in the ACC program work together to reduce criteria

and GHG pollution and spur technological innovation. These analyses conclude that GHG pollution exacerbates tropospheric ozone pollution, worsening California's air quality problems, and the manner in which GHG and criteria pollutant standards work together to reduce both forms of pollution. Ample record support exists on California's need for both GHG standards and ZEV sales mandate at issue to address compelling and extraordinary conditions in California. As noted above, in SAFE 1 EPA, however, relied on an excerpt of the ACC program waiver record to determine the lack of criteria emission benefits of GHG emission standards and ZEV sales mandate at issue. In doing so, EPA did not evaluate the complete record from the ACC waiver proceeding and the nature of California's air quality problem, including the relationship of climate change to California's ability to achieve the ozone NAAQS in the assessment of California's need for these requirements.[337]

As noted above, in SAFE 1, EPA established a new test under section 209, requiring a particularized, local nexus between (1) pollutant emissions from sources, (2) air pollution, and (3) resulting impact on health and welfare, a test that would exclude GHG pollution from the scope of the waiver.[338] But this test is found nowhere in the text of section 209— the statute does not contain this requirement, or even use these terms.

EPA's review of the complete record confirms the Agency's conclusions in the ACC program waiver that California needs the GHG standards at issue to meet a compelling and extraordinary conditions regardless of whether the Agency focuses on criteria or greenhouse gas pollution reduction.

This review also indicates that opponents of the waiver (including EPA in SAFE 1) did not meet the burden of proof necessary to demonstrate that California did not have a need for the GHG standards, including under the nexus test applied in SAFE 1. It also bears note that EPA's longstanding practice, based on the statutory text, legislative history, and precedent calls for deference to California in its approach to addressing the interconnected nature of air pollution within the state and is not limited to criteria pollutant problems. Critically, EPA is not to engage in "probing substantive review" of waiver requests,[339] but rather "afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [340]

*E. Conclusion*

Considering the text, legislative history, and precedent that support the Agency's historical practice of interpreting section 209(b)(1)(B) as calling for a program-level evaluation of waiver requests, as well as the uncertainty in settled expectations created by the SAFE 1 interpretation, EPA rescinds its actions in SAFE 1 regarding both the interpretation of section 209(b)(1)(B) and the findings regarding California's need for the GHG standards and ZEV sales mandate. EPA believes that the burden of proof had not been met in SAFE 1, based on the complete factual record, to demonstrate that California did not have a need for the GHG and ZEV sales mandate under the SAFE 1 interpretation of the second waiver prong nor had the burden been met to support a finding that ample evidence in the record at the time of the ACC waiver decision did not demonstrate that California had a need for its standards to meet compelling and extraordinary conditions. As noted above, the result of the rescission of the SAFE 1 action is the reinstatement of the ACC program waiver. EPA confirms the traditional interpretation of section 209(b)(1)(B) was appropriate and continues to be, at least, a better interpretation regardless of the recission of the SAFE 1 interpretation of this criterion.[341]

---

[329] *MEMA I*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).

[330] *Ford Motor Co.,* v. *EPA*, 606 F.2d 1293, 1297 (D.C. Cir. 1979).

[331] S. Rep. No. 90–403, at 33 (1967).

[332] *Id.*

[333] 74 FR at 32763.

[334] 78 FR at 2123, 2130–31.

[335] 84 FR at 51343 ("[I]n a statute designed to address public health and welfare, it certainly cannot mean standards that allow a state to be "a laboratory for innovation" in the abstract, without any connection to a need to address pollution problems.").

[336] The Agency again notes that, unlike provisions of the CAA such as section 211(c)(4)(C) which allows EPA to waive preemption of a state fuel program respecting a fuel characteristic or component that EPA regulates through a demonstration that the state fuel program is necessary to achieve a NAAQS, section 209(b) makes no mention of NAAQS pollutants or otherwise indicates that air pollutants should be treated differently.

[337] For example, CARB's ISOR for its ZEV standards identifies at Table 6.2 the well to wheel emission benefits of the ZEV program compared to the LEV III program. ZEV ISOR, EPA–HQ–OAR–2012–0562–0008 at 78. *See also* 2012 Waiver Request at 16. CARB noted in its comments on the SAFE proposal that "Rising temperatures exacerbate California's ozone problem by increasing ground-level ozone concentrations." CARB, EPA–HQ–OAR–2018–0283–5054 at 371–72 (citing the 2012 Waiver Request). In addition, "Several studies indicate that a warming climate is expected to exacerbate surface ozone in California's two major air basins: South Coast Air Basin and San Joaquin Valley. *Id.* at 372 (citing Jacob & Winner, *Effect of Climate Change on Air Quality,* 43:1 ATMOS. ENVIRON. 51 (Jan. 2009); Wu, et al., *Effects of 2000–2050 Global Change on Ozone Air Quality in the United States,* 113, D06302, J. GEOPHYS. RES.-ATMOS. (Mar. 19, 2008), *available at https:// doi.org/10.1029/2007JD008917;* Rasmussen, et al., *The Ozone-climate Penalty: Past, Present, and Future,* 47:24 ENVTL. SCI. & TECH. 14258 (Dec. 17, 2013), *available at https://www.ncbi.nlm.nih.gov/ pmc/articles/PMC3990462/*).

[338] 84 FR at 51339–40.

[339] *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1300 (D.C. Cir. 1979).

[340] *MEMA II*, 142 F.3d 449, 453 (D.C. Cir. 1998).

[341] *See* 84 FR at 51344 n.269.

## VI. EPA Inappropriately Considered Preemption Under the Energy Policy and Conservation Act (EPCA) in Its Waiver Decision

SAFE 1's other justification for withdrawing the ACC program waiver was that California's GHG standards and ZEV sales mandate were preempted under EPCA. As explained in detail in Section IV, EPA believes this basis for reconsideration was outside the appropriate bounds of EPA's authority to reconsider previously granted waivers. In particular, if EPA could reconsider and withdraw a waiver based on a factor not contained in the specified criteria for denial in section 209(b)(1), EPA could circumvent the specified criteria for denial via reconsideration of previously granted waiver.

Even if it were appropriate for EPA to reconsider a previously granted waiver based on non-statutory factors, in this action, EPA concludes that it was inappropriate to rely on preemption under EPCA as a basis for withdrawing certain aspects of the ACC program waiver. In SAFE 1, a joint action between NHTSA and EPA, NHTSA concluded that state or local regulations of tailpipe carbon dioxide emissions are "related to fuel economy standards" and are therefore preempted under EPCA.[342] As a direct result of NHTSA's codified text and pronouncements on preemption set forth in SAFE 1, EPA withdrew the ACC program waiver for California's GHG standards and ZEV sales mandate on grounds that they were preempted under EPCA. In SAFE 1, EPA believed it was appropriate to consider the effect of NHTSA's actions, including the view that California cannot enforce standards that are void *ab initio*, and thus EPA stated that "to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis."[343] NHTSA has since issued a new final rule that formally repeals the codified text and pronouncements regarding preemption under EPCA found in SAFE 1. Upon reconsideration, EPA now believes that, given NHTSA's repeal of its regulation and pronouncements in SAFE 1, preemption under EPCA cannot serve as a basis for the withdrawal of the ACC program waiver as it did in SAFE 1—if it could ever legitimately serve as such basis. EPA thus believes it is appropriate to rescind the portion of the waiver withdrawal that was based on preemption under EPCA.

In addition, given the unique consideration of preemption under EPCA in SAFE 1 and its effect on an otherwise validly issued waiver under the CAA, EPA believes it is helpful to provide additional information regarding the Agency's historical practice and views to demonstrate why consideration of preemption under EPCA was inappropriate. Consideration of preemption under EPCA is beyond the statutorily prescribed criteria for EPA in section 209(b)(1). Preemption under EPCA was not a factor that California addressed under the applicable waiver criteria in its initial request nor was it a factor that EPA considered in granting the ACC program waiver. Until SAFE 1, the Agency consistently refrained from reviewing waiver requests against factors beyond the statutorily listed criteria under section 209(b)(1). Thus, EPA also believes that in the reconsideration of a waiver where EPA had previously declined to consider preemption under EPCA, SAFE 1 was contrary to congressional intent and the Agency's historic practice of hewing to section 209(b)(1) statutory criteria in reviewing waiver requests. Given this backdrop, EPA believes that the joint rulemaking context of SAFE 1 was an improper basis to deviate from EPA's long held belief to not consider factors outside the scope of section 209(b)(1), especially given that the Agency indicated it would only be a singular occurrence. EPA continues to view the text and congressional intent of the statute, as well as subsequent case law, as best supporting a limited scope of review for waiver requests under section 209(b)(1)—irrespective of whether a waiver proceeding is undertaken either solely by EPA or in unison with another agency. Therefore, based on EPA's historical practice of not considering factors outside of the section 209(b)(1) criteria and because EPA believes the "joint-action" premise was improper, the Agency is rescinding its withdrawal of the ACC program waiver based on preemption under EPCA.

### A. Historical Practice and Legislative History

Historically, in reviewing California's waiver requests, EPA has refrained from the consideration of factors beyond those criteria set out in section 209(b)(1).[344] EPA has generally explained that the text, structure, and purpose of the California waiver provision indicate congressional intent for EPA to provide significant deference to California's judgment, especially on "ambiguous and controversial matters of public policy."[345] In section 209(a), Congress generally preempted state standards relating to the control of emissions from new motor vehicles and engines, but, in section 209(b), Congress carved out an exception for California, directing EPA to grant California a waiver of section 209(a) unless the Agency can make a finding under section 209(b). Congress recognized that California's "compelling and extraordinary circumstances," and its historical practice of regulating in the area, were sufficient "to justify standards on automobile emissions which may, from time to time, need be more stringent than national standards."[346] In creating the waiver program, Congress intended not only for California to be able to meet its own emission reduction needs, but also for California to act as "a kind of laboratory for innovation" for motor vehicle standards and control technology."[347]

---

[342] 49 U.S.C. 32919(a) ("When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter."). NHTSA noted that a law or regulation having the direct or substantial effect of regulating or prohibiting tailpipe carbon dioxide emissions from automobiles or automobile fuel economy is a law or regulation related to fuel economy standards and expressly preempted under 49 U.S.C. 32919(a). 84 FR at 51317–18. NHTSA's rule was codified at 49 CFR 531.7 ("Preemption") and 533.7 ("Preemption"), as well as Appendix B in 49 CFR part 531 ("APPENDIX B TO PART 531—PREEMPTION") and Part 533 ("APPENDIX B TO PART 533—PREEMPTION").

[343] 84 FR at 51338.

[344] *See, e.g.,* 43 FR at 32184 (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review); 74 FR at 32783 (rejecting comments asking for the consideration of EPCA because it is not one of the three statutorily prescribed criteria); 78 FR at 2145 (again rejecting comments asking for the consideration of EPCA because it is outside the statutory criteria); 79 FR at 46265 (rejecting the argument that the HD GHG Regulations "impermissibly regulate fuel economy" because, like the commerce clause and Federal Aviation Administration Authorization Act of 1994 (FAAAA) issues, this issue is "outside the proper scope of review since it is not among the criteria listed under section 209(b).").

[345] 78 FR at 2112, 2115; 40 FR at 23103–04; 58 FR 4166.

[346] H.R. Rep. No. 90–728, 90th Cong., 1st Sess. 21 (1967); S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967) ("The waiver of preemption is for California's 'unique problems and pioneering efforts.' ").

[347] *MEMA I,* 627 F.2d 1095, 1111 (D.C. Cir. 1979); 113 Cong. Rec. 30950, 32478 (Statement of Sen. Murphy) ("The United States as a whole will benefit by allowing California to continue setting its own more advanced standards for control of motor vehicle emissions. . . [The] State will act as a testing agent for various types of controls and the country as a whole will be the beneficiary of this research.").

Thus "Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight." [348]

Legislative history makes clear that the Administrator must "presume" that the California standards "satisfy the waiver requirements" and that the burden of proving otherwise rests on the Administrator or other parties favoring denial of the waiver. [349] Further, according to the House Committee Report for the 1977 amendments that strengthened California's waiver provisions, EPA is "to afford California the broadest possible discretion in selecting the best means to protect the health of its citizens and the public welfare." [350] According to the House Report, "The Administrator, thus, is not to overturn California's judgment lightly. Nor is he to substitute his judgment for that of the State. There must be "clear and compelling evidence that the State acted unreasonably in evaluating the relative risks of various pollutants in light of the air quality, topography, photochemistry, and climate in that State, before EPA may deny a waiver." [351] EPA's historic practice of considering only listed criteria is thus in keeping with the highly deferential review of waiver requests that Congress intended in carving out the exception from preemption of new motor vehicle and engine standards in section 209(a). [352]

Courts have generally agreed with the Agency's consideration of only listed CAA criteria in reviewing waiver requests, also pointing to the statute's lack of any indication of the ability to consider non-statutory criteria as well as the waiver program's significant deference to California. The D.C. Circuit has stated that, under the text of the statute, the section 209(b) criteria are "the only waiver standards with which California must comply" and that, therefore, "[i]f EPA concludes that California's standards [meet section 209(b)], it is obligated to approve California's waiver application." [353] The D.C. Circuit has repeatedly described EPA's waiver approval role as "limited" and "narrow." In *MEMA I,* for example, the court explained that "the Administrator has consistently held

since first vested with the waiver authority, [that] his inquiry under section 209 is modest in scope. He has no 'broad and impressive' authority to modify California regulations." [354] The court further noted that "there is no such thing as a 'general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider." [355] Similarly, the court has stated that "[t]he statute does not provide for any probing substantive review of the California standards by federal officials" and that "EPA's only role is to review California's proposed rules under a narrowly defined set of statutory criteria." [356] Thus, the court has consistently rejected arguments requiring EPA to consider factors outside of the statutory criteria. In *MEMA I,* the court rejected a constitutional objection to a waiver, explaining that, because "the Administrator operates in a narrowly circumscribed proceeding requiring no broad policy judgments on constitutionally sensitive matters," "[n]othing in section 209 requires him to consider the constitutional ramifications of the regulations for which California requests a waiver . . . although nothing in section 209 categorically forbids" it. [357] In the same case, the court also rejected an antitrust objection as outside the scope of the Administrator's review. [358] The court again upheld EPA's decision to not consider constitutional objections in *American Trucking Association (ATA)* v. *EPA,* stating, "We agree with EPA that ATA is seeking 'improperly to engraft a type of constitutional Commerce Clause analysis onto EPA's [s]ection 7543(e) waiver decisions that is neither present in nor authorized by the statute." [359]

It is against this backdrop that EPA has reviewed waiver requests by evaluating them solely under the criteria of section 209(b). For instance, prior to SAFE 1, EPA had solicited comment, in the context of the 2008 and 2009 EPA notices for comment on CARB's first waiver request for GHG emission

standards, as to whether the EPCA fuel economy preemption provisions were relevant to EPA's consideration of CARB's authority to implement its motor vehicle GHG regulations. [360] In both instances, EPA declined to consider preemption under EPCA. [361] In the 2009 waiver, EPA explained that "section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein." [362] EPA further pointed to its historic practice of "refrain[ing] from denying California's requests for waivers based on any other criteria," which had been reviewed and upheld by the Court of Appeals for the District of Columbia Circuit. [363] In the 2013 review of the ACC program waiver request, the Agency again declined to consider factors outside the statutory criteria, explaining that "EPA may only deny waiver requests based on the criteria in section 209(b), and inconsistency with EPCA is not one of those criteria." [364] A year later, EPA yet again declined to consider constitutionality claims, preemption under EPCA, and the implications of the Federal Aviation Administration Authorization Act of 1994 (FAAAA). [365] EPA explained that section 209(b) limits the Agency's authority to deny California's requests for waivers to the three criteria therein and that the Agency has consistently refrained from denying California's requests for waivers based on any other criteria. [366]

In SAFE 1, EPA changed course, reasoning instead that the Agency pronouncement in the ACC program waiver decision on factors EPA could consider in denying a waiver request "was inappropriately broad, to the extent it suggested that EPA is categorically forbidden from ever determining that a waiver is inappropriate due to consideration of anything other than the 'criteria' or 'prongs' at section 209(b)(1)(B)(A)–

---

[348] *Ford Motor Co.* v. *EPA,* 606 F.2d 1293, 1297 (D.C. Cir. 1979).

[349] *MEMA I,* 627 F.2d at 1121–22 (citing, for example, S. Rep. No. 403, 90th Cong., 1st Sess. 33 (1967)).

[350] *MEMA II,* 142 F.3d 449, 453 (D.C. Cir. 1998) (quoting H.R. Rep. No. 95–294, at 301–02 (1977)).

[351] H.R. Rep. No. 95–294, at 302 (1977), reprinted in 1977 U.S.C.C.A.N. at 1381.

[352] *See, e.g.,* 74 FR at 32783; 78 FR at 2145.

[353] *MEMA II,* 142 F.3d at 463.

[354] *MEMA 1,* 627 F.2d at 1119 (internal citations omitted).

[355] *Id.* at 1116–17.

[356] *Ford Motor Co.* v. *EPA,* 606 F.2d 1293, 1300 (D.C. Cir. 1979), and *ATA* v. *EPA,* 600 F.3d 624, 628 (2010), respectively.

[357] *MEMA I,* 627 F.2d at 1115 (declining to consider whether California standards are constitutional).

[358] *Id.* at 1117 ("[N]othing in section 209 or elsewhere in the Clean Air Act can fairly be read to imply a duty on the Administrator to deny a waiver on the basis of the antitrust implications of California regulations.").

[359] *ATA* v. *EPA,* 600 F.3d at 628.

[360] 73 FR at 12159.

[361] *Id.;* 74 FR at 32783.

[362] 74 FR at 32783.

[363] *Id.* (citing *MEMA I,* 627 F.2d at 1111, 1114–20, and *MEMA II,* 142 F.3d 449, 466–67 (D.C. Cir. 1998)).

[364] 78 FR at 2145.

[365] HD GHG Regulations for certain model year sleeper-cab tractors and dry-van and refrigerated-van trailers. 79 FR at 46256, 46264.

[366] *Id.* In rejecting the commerce clause objection, the decision cited *MEMA I's* statement that "[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims." *Id.* (citing *MEMA I,* 627 F.2d at 1114–20). Thus, the decision concluded, "Constitutional challenges to the HD GHG Regulations [were] more appropriately addressed by a legal challenge directly against the state." *Id.*

(C).'' [367] EPA explained that this statement and EPA's historical practice of not considering preemption under EPCA ''were made in the context of EPA acting on its own to administer section 209(b) in considering such applications.'' [368] Further, EPA distinguished these previous single-agency actions from its SAFE 1 joint action context by explaining that ignoring NHTSA's determination of preemption in the same action, ''would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio*.'' [369] At the same time, EPA expressed intentions not to consider factors outside the statutory criteria in future waiver proceedings.[370] EPA then concluded that NHTSA's determination of preemption in the same action ''renders EPA's prior grant of a waiver for those aspects of California's regulations that EPCA preempts invalid, null, and void'' because ''California cannot enforce standards that are void *ab initio*.'' [371]

*B. Notice of Reconsideration of SAFE 1 and Request for Comment*

In its April 28, 2021, Notice of Reconsideration, EPA acknowledged that SAFE 1's consideration of NHTSA's finding of preemption under EPCA deviated from its historic practice of ''declin[ing] to look beyond the waiver criteria in section 209(b) when deciding the merits of a waiver request from CARB.'' [372] EPA sought comment on whether ''EPA properly considered and withdrew portions of the ACC program waiver pertaining to GHG standards and the ZEV sales mandate based on NHTSA's EPCA preemption action, including whether EPA had the authority to withdraw an existing waiver based on a new action beyond the scope of section 209.'' [373] Given EPA's reliance on NHTSA's preemption findings as a basis of waiver withdrawal in SAFE 1, EPA also sought comment on how the repeal of SAFE 1, should NHTSA take final action to do so, would

affect its own reconsideration of SAFE 1.

*C. Comments Received*

EPA received comments in support of and against the consideration of preemption under EPCA in reviewing requests for waivers by California. Multiple comments related to the Agency's use of the joint action with NHTSA as a justification for deviating from the Agency's practice of reviewing waiver requests under the specific statutory criteria. Some commenters agreed that the context of a joint action necessitated consideration of preemption under EPCA because NHTSA was the agency charged with interpreting and implementing EPCA and so EPA must consider its findings in the same action.[374] One commenter also argued that the joint rulemaking of SAFE 1 would be consistent with pronouncements in *Massachusetts* v. *EPA* (2007) on the agencies' respective statutory obligations and the need to avoid inconsistency and so, ''[o]nce NHTSA proposed to finalize a determination that EPCA preempts California's GHG motor vehicle standards, it would be unreasonable for the EPA to refuse to take NHTSA's action into account.'' [375]

Other commenters argued that the context of the rulemaking, whether joint or not, was irrelevant. One commenter stated emphatically that ''what Congress directed EPA to consider when it wrote Section 209(b)(1) does not change depending on whether EPA acts alone or with another agency.'' [376] Some commenters also argued that the context of the rulemaking was a particularly insufficient justification for revoking the waiver given language in SAFE 1 that allowed for inconsistent consideration of EPCA preemption. Several commenters noted that EPA constrained the future applicability of SAFE 1 by explaining that the Agency would not consider factors outside statutory criteria in future waiver reviews in other subject areas.[377] Another commenter also noted that ''the action purported to be 'joint,' and yet as now acknowledged, SAFE Part 1 'is properly considered as two severable actions, a rulemaking by NHTSA and a final informal adjudication by EPA.' '' [378] These inconsistencies, they argued, made SAFE 1's distinction between single-

agency and joint actions arbitrary and capricious.

Commenters also argued for and against consideration of factors outside the statutory criteria—including, but not limited to, preemption under EPCA—regardless of the kind of agency action, although EPA did not make this argument in SAFE 1. Commenters argued that EPA's authority to look outside the statutory criteria at EPCA was at least permissive, if not mandatory. According to one commenter, ''EPA exaggerates the Court's position'' in *MEMA I* in its Reconsideration notice: ''[T]he court did not say that the EPA is *forbidden* to take constitutional ramifications into consideration, only that it is *not required* to do so.'' [379] Another commenter agreed that *MEMA I* and *MEMA II* ''do not preclude EPA from considering'' preemption under EPCA but then went further, saying that ''EPA is *required* to consider EPCA preemption.'' [380] The commenter argued that *MEMA I* rejected petitioners' constitutional objections to a waiver under an institutional competence line of reasoning, concluding that ''[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims.'' [381] In contrast, they continued, the waiver proceeding is an appropriate forum for determining whether emission standards ''relate to'' fuel economy because this issue is ''within the agency's competence, as this relationship is mathematical and based in science rather than understandings of Constitutional law and precedent.'' [382] However, the other commenter, who agreed that EPA is not ''forbidden'' from considering preemption under EPCA, also noted that EPA ''has no special competence to interpret EPCA.'' [383]

Several commenters also argued that EPA could not reinstate the waiver because NHTSA concluded that EPCA preempts the standards, such standards were void *ab initio*, and therefore ''the state mandates referenced in CA's petition for reconsideration are not even eligible to be considered for a CAA waiver of preemption.'' [384] To ignore

---

[367] A complete discussion of preemption under EPCA in SAFE 1 can be found at 84 FR at 51337–38.

[368] *Id.*

[369] *Id.* Citing *Massachusetts* v. *EPA*, the Agency also asserted that the consideration of EPCA was supported by the Supreme Court's holding because it ensured consistency between NHTSA and EPA's programs. *Id.*

[370] 84 FR at 51338.

[371] *Id.*

[372] 86 FR at 22429.

[373] *Id.*

[374] *See, e.g.,* CEI at 11–12; AFPM at 2, 6.

[375] CEI at 11.

[376] States and Cities at 20. *See also* Twelve Public Interest Organizations app. 1 64–65.

[377] NESCAUM at 3; Twelve Public Interest Organizations at app. 1 64–65; States and Cities at 20.

[378] SCAQMD at 7 (quoting 86 FR at 22439, n.40).

[379] CEI at 10 (original emphasis).

[380] AFPM at 5–6.

[381] *Id.* at 6 (quoting *MEMA I,* 627 F.2d 1095, 1114–15 (DC Cir. 1979)).

[382] *Id.*

[383] CEI at 11.

[384] NADA at 3–4; *See also* AFPM at 3 (''Since California's GHG tailpipe standards and ZEV mandate are related to fuel economy, they are not lawfully adopted and void *ab initio*—and there is nothing for EPA to reinstate.''); Urban Air at 47–48; CEI at 2 (''But EPCA preemption is the proverbial elephant in the room. If SAFE 1's EPCA preemption argument is correct, the EPA could not grant a valid CAA preemption waiver for California's tailpipe

this, they claimed, would violate the Supremacy Clause of the Constitution. EPA, therefore, must look outside the statutory criteria to consider preemption under EPCA because it cannot "reasonably claim that the lawfulness and constitutionality of state actions over which it has supervision are issues outside the scope of its responsibility[.]"[385]

In contrast, other commenters pointed to EPA's historical practice of evaluating waiver requests under the section 209 statutory criteria, the text of the statute, and the policy implications of looking outside the statutory criteria, to support a return to EPA's traditional narrow approach. Most commenters argued that EPA's traditional interpretation was consistent with the text of section 209(b), which has no reference to preemption under EPCA or any other factors outside the three statutory criteria.[386] Not only does EPA have "no grounds to read EPCA preemption considerations into the statute,"[387] these commenters argued, but to consider non-statutory criteria would actually be "arbitrary and capricious"[388] and contrary to "precedent respecting separation of powers and federalism principles."[389] Yet another commenter stated that the narrow interpretation "provides a safeguard from the capricious injection of outside-the-scope argumentation" because "[w]hen the adjudication is permitted to stray from the statutory criteria, prospects for a fair hearing can be derailed, and the EPA Administrator may be more prone to overstep and

exert policy preferences that are impermissible."[390]

Additionally, in their petitions for reconsideration of SAFE 1, several states and cities asserted that EPA unlawfully changed course in SAFE 1 by considering (and relying on) the purported preemptive effect of EPCA, which is outside the confines of section 209(b) and argued that this rationale for withdrawing the waiver was flawed.[391]

### D. Analysis: EPA Is Rescinding Its SAFE 1 Actions Related to Preemption Under EPCA

Since SAFE 1, NHTSA has formally withdrawn its conclusions (and associated regulatory text) that state or local regulations of tailpipe carbon dioxide emissions are related to fuel economy standards and therefore preempted under EPCA.[392] Thus the predicate for EPA's decision to withdraw the ACC waiver on that basis no longer exists. Furthermore, given the context of EPA's reconsideration of the ACC program waiver at the time of SAFE 1, the Agency believes it was inappropriate to reconsider the validity of the waiver against criteria such as preemption under EPCA. In this action, based on the two independent grounds noted above, the Agency is rescinding the portion of SAFE 1 that withdrew the ACC program waiver based on preemption under EPCA.

#### 1. NHTSA Has Since Repealed Its Findings of Preemption Made in SAFE 1

In the Notice of Reconsideration, EPA sought comment on the Agency's reliance on NHTSA's preemption findings as a basis for its withdrawal of the ACC program waiver in SAFE 1. EPA also sought comment on how the repeal of SAFE 1, should NHTSA take final action to do so, would affect its own reconsideration of SAFE 1.[393] NHTSA has since withdrawn its findings of preemption and the preemption basis of withdrawal is no longer applicable. Specifically, NHTSA has issued a new final rule that formally repeals the codified text and additional pronouncements regarding preemption under EPCA found in SAFE 1.[394] In

SAFE 1, EPA stated that it was appropriate to consider the effect of NHTSA's actions, including the view that California cannot enforce standards that are void *ab initio* and thus EPA stated that "to the extent that administrative action is necessary on EPA's part to reflect that state of affairs, EPA hereby withdraws that prior grant of a waiver on this basis."[395] Since this condition no longer exists, EPA believes it is appropriate to rescind the waiver withdrawal that was based on preemption under EPCA. EPA believes that, to the extent it was ever appropriate for the Agency to base its action on NHTSA's finding of preemption under EPCA in SAFE 1, the repeal of the preemption rule makes it likewise appropriate to rescind the Agency's action in SAFE 1. This would also act to minimize regulatory uncertainty as to do otherwise would create further confusion that resulted from the joint action in SAFE 1 and would not appropriately reflect the current state of affairs under the circumstances of a unique federal regulation that had otherwise motivated EPA's actions in SAFE 1. NHTSA's recent action also supports EPA's belief that its practice of limiting its review of section 209(b) criteria, as explained below, remains appropriate in the context of preemption under EPCA.

#### 2. EPA Improperly Deviated From Its Historical Practice of Limiting Its Review to Section 209(b) Criteria

Section 209(b)(1) of the Act limits the Agency's authority to deny California's requests for waivers to the three criteria contained therein and the Agency has consistently refrained from reviewing California's requests for waivers based on any other criteria. EPA acknowledges that California adopts its standards as a matter of law under its state police powers, that the Agency's task in reviewing waiver requests is limited to evaluating California's request according to the criteria in section 209(b), and that it is appropriate to defer to litigation brought by third parties in other courts, such as state or federal district court, for the resolution of any constitutionality claims and assertions of inconsistency with other statutes.

---

$CO_2$ standards and ZEV mandates, because EPCA had already turned those policies into legal phantoms—mere proposals without legal force or effect.").

[385] CEI at 11.

[386] *See, e.g.,* States and Cities at 20 ("EPA's traditional understanding of its limited role is entirely consistent with the text of Section 209(b)(1) and precedent interpreting it."); NCAT at 12 ("As EPA has stated in several prior waiver decisions, there is no reference in Section 209(b) to EPCA preemption nor anything that could be construed to address this issue. Section 209(b) is unambiguous in this regard, and EPA has no grounds to read EPCA preemption considerations into the statute.").

[387] NCAT at 12.

[388] NESCAUM at 7 ("As the D.C. Circuit has explained in the context of Section 209(b), 'there is no such thing as a general duty' on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider.' It is a basic principle of administrative law that an agency action is 'arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider.'").

[389] States and Cities at 20 ("It is likewise entirely consistent with precedent respecting separation of powers and federalism principles and holding that 'a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority.' *Louisiana Pub. Serv. Comm'n* v. *FCC,* 476 U.S. 355, 374 (1986).").

[390] SCAQMD at 7.

[391] 86 FR at 22428.

[392] 86 FR 74236.

[393] 86 FR at 22429.

[394] 86 FR 74236. NHTSA notes in this rulemaking that "the Agency is repealing all regulatory text and appendices promulgated in the SAFE I Rule. In doing so, the Agency underscores that any positions announced in preambulatory statements of prior NHTSA rulemakings, including in the SAFE I Rule, which purported to define the scope of preemption under the Energy Policy and Conservation Act (EPCA), do not reflect the Agency's reconsidered

understanding of its proper role in matters of EPCA preemption."

[395] EPA distinguished these previous single-agency actions from its joint action context by explaining that ignoring NHTSA's determination of preemption in the same action, "would place the United States Government in the untenable position of arguing that one federal agency can resurrect a State provision that, as another federal agency has concluded and codified, Congress has expressly preempted and therefore rendered void *ab initio.*" 84 FR at 51338.

USCA Case #22-1081    Document #1946617    Filed: 05/12/2022    Page 50 of 57

Considering the lack of statutory and precedential support as shown below, even if EPA were to have discretion to consider criteria outside section 209(b), EPA now views the joint-action context of SAFE 1 as an insufficient justification for deviating from its statutory authority and the Agency's historical practice and therefore the Agency rescinds its actions regarding preemption under EPCA in SAFE 1.

Withdrawal of the waiver was premised on NHTSA's preemption regulations in what EPA explained was a joint rulemaking action. But nothing in section 209(b) can be read as calling for consideration of preemption under EPCA in evaluating waiver requests regardless of whether EPA engaged in joint rulemaking with another agency or acted alone. Specifically, under section 209(b), EPA must grant California a waiver of the preemption contained in section 209(a) unless the Administrator makes a finding under any one of the listed criteria: "The Administrator shall . . . waive application of the preemption in section 209(a) if the Administrator finds any of the following: '(A) [California's] determination [that its standards in the aggregate will be at least as protective] is arbitrary and capricious, (B) [California] does not need such State standards to meet compelling and extraordinary conditions, or (C) such State standards and accompanying enforcement procedures are not consistent with section [202(a)].' " [396] Evaluation of preemption under EPCA is not a listed criterion.

Nor did SAFE 1 premise preemption under EPCA on any of the three statutory criteria. In the ACC program waiver request, CARB made a protectiveness finding that, as a quantitative matter, its standards, in the aggregate, were as protective as the Federal standards and did not address preemption under EPCA.[397] In fact, while California might opt to respond to comments on preemption under EPCA, California would not be expected to take it into account in any protectiveness finding made for a waiver request. It bears note that California's practice is not unusual because there are other factors and provisions of the CAA that California does not account for in making its protectiveness finding under section 209(b)(1).[398] In granting the ACC program waiver request, EPA found that California's protectiveness finding was

neither arbitrary nor capricious.[399] EPA also responded to comments on the consideration of preemption under EPCA in granting the waiver but dismissed such objections as outside the scope of its review.[400] Historically, EPA draws a comparison between the numerical stringency of California and federal standards in making the requisite finding as to whether California's protectiveness determination is arbitrary and capricious.[401] Thus, neither California's initial request, nor EPA's waiver grant, considered preemption under EPCA and as previously explained in the ACC program waiver, EPA declined to consider preemption under EPCA viewing it as outside the scope of Agency review.

SAFE 1 made clear that consideration of and reliance on preemption under EPCA was the consequence of regulations promulgated by NHTSA. As SAFE 1 also acknowledged, however, EPA does not "administer" EPCA; that task falls to NHTSA.[402] Instead, "[i]f EPA concludes that California's standards [meet section 209(b)], it is obligated to approve California's waiver application." [403] EPA therefore disagrees with the comment that *Massachusetts* provides the Agency special duty to consider preemption under EPCA in a joint rulemaking action in reviewing waiver requests. In *Massachusetts,* the Supreme Court recognized the potential overlap between NHTSA's and EPA's statutory obligations and concluded that "there is no reason to think the two agencies cannot both administer their obligations yet avoid inconsistency." [404] As one commenter noted, EPA and NHTSA have previously engaged in joint actions that addressed fuel economy and GHG emissions. In those actions, NHTSA's role has been to set national fuel economy standards and EPA's role has been to set national GHG

standards.[405] These roles are complementary, but distinct. The Court acknowledged the independence of these roles in *Massachusetts:* "EPA has been charged with protecting the public's 'health' and 'welfare,' 42 U.S.C. 7521(a)(1), a statutory obligation wholly independent of DOT's mandate to promote energy efficiency. See Energy Policy and Conservation Act, § 2(5), 89 Stat. 874, 42 U.S.C. 6201(5)." [406]

Regarding the Agency's simultaneous pronouncement that reliance on preemption under EPCA would be a singular exercise that would not be repeated, statutory support or past precedent for this singular consideration was also lacking.[407] In fact, this singular exercise would allow for EPA to evaluate the same waiver request differently and depending on EPA's own choice—the choice to act with another agency or not—rather than on the merits of the waiver request itself within specified criteria in section 209(b). Again, the result of this unique application of EPA's authority is unsupported under section 209(b)(1).

As previously noted, EPCA is generally administered by NHTSA and consideration of preemption under EPCA in reviewing waiver requests would for instance call for EPA to resolve the much debated and differing views as to what is a "law or regulation related to fuel economy," as contemplated by 39 U.S.C. 32919(a).[408] Relevant judicial precedent would also appear to call into question whether California's GHG standards and ZEV sales mandates are indeed preempted under EPCA.[409] But as previously explained, EPA does not implement EPCA, and the Agency's review of waiver requests is highly deferential.

EPA also disagrees with comments that the Agency must generally consider factors outside the criteria listed in section 209(b), including preemption under EPCA, regardless of the joint- or single-agency nature of the action. EPA

---

[396] CAA section 209(b)(1)(A)–(C).

[397] 2012 Waiver Request at 15–17.

[398] For example, "California is not required to comply with section 207 to get a waiver." *MEMA II,* 142 F.3d 449, 467 (D.C. Cir. 1989).

[399] 78 FR at 2125.

[400] *Id.* at 2145.

[401] Section 209(b)(2) provides that if each State [California] standard is at least as stringent as comparable applicable Federal standards then such standard shall be deemed to be as protective of public health and welfare as such federal standards for purposes of section 209(b)(1)(A). EPA acknowledges that in 1977 Congress amended the waiver provision to allow for California to address its unique combination of air quality problems and that California only be required to demonstrate stringency in the aggregate and that therefore some pollutant standards may not be as stringent.

[402] 84 FR at 51338 ("EPA agrees with commenters that EPA is not the agency that Congress has tasked with administering and interpreting EPCA. This is especially because '[t]he waiver proceeding produces a forum ill-suited to the resolution of constitutional claims.' *MEMA I,* 627 F.2d at 1115.").

[403] *MEMA II,* 142 F.3d at 463.

[404] *Massachusetts* v. *EPA,* 549 U.S. 497, 532 (2007).

[405] In its most recent rulemaking addressing GHG emissions from light-duty vehicles, EPA extensively coordinated with NHTSA on details of the program but did not conduct it as a joint rulemaking. *See* 86 FR 74434, 74436 (December 30, 2021).

[406] *Massachusetts,* 549 U.S. at 497, 532.

[407] "EPA does not intend in future waiver proceedings concerning submissions of California programs in other subject areas to consider factors outside the statutory criteria in section 209(b)(1)(A)–(C)." 84 FR at 51338.

[408] EPA takes no position on any role NHTSA might play under 42 U.S.C. 32919(a) and acknowledges that NHTSA discusses this in its recent final rulemaking. *See generally* 86 FR 74236.

[409] *See, e.g., Cent. Valley Chrysler-Jeep, Inc.* v. *Goldstene,* 529 F. Supp. 2d 1151, 1153–54 (E.D. Cal. 2007), *as corrected* Mar. 26, 2008; *Green Mountain Chrysler Plymouth Dodge Jeep* v. *Crombie,* 508 F. Supp. 2d 295, 300–01 (D. Vt. 2007).

has never claimed that it has such broad authority to consider factors outside section 209(b) and the decades of waiver practice, as well as judicial precedent, are indicative of the Agency's narrow scope of review for California waiver requests: "[T]he Administrator has consistently held since first vested with the waiver authority, [that] his inquiry under section 209 is modest in scope. He has no 'broad and impressive' authority to modify California regulations." [410] Instead, EPA has consistently declined to consider factors outside the three statutory criteria listed in section 209(b). [411] This limited scope of review has been repeatedly upheld by the courts. For example, in *MEMA I*, the D.C. Circuit stated that "there is no such thing as a "general duty" on an administrative agency to make decisions based on factors other than those Congress expressly or impliedly intended the agency to consider." [412] In *MEMA II*, the D.C. Circuit again rejected consideration of a factor outside the 209(b) statutory criteria because doing so would restrict California's ability to "exercise broad discretion." [413]

Commenters also claim that ignoring NHTSA's finding of preemption would violate the Supremacy Clause of the Constitution because the necessary consequence of NHTSA's conclusion in SAFE 1 is that certain standards were void *ab initio* as preempted under EPCA and as such that "the state mandates referenced in [California's] petition for reconsideration are not even eligible to be considered for a CAA waiver of preemption." [414] EPA disagrees. As the D.C. Circuit has held, "[t]hat [the Administrator] like every other administrative officer owes allegiance to the Constitution does not mean that he is required to issue rulings of constitutional dimension." [415] Thus, "[n]othing in section 209 requires [the Administrator] to consider the constitutional ramifications of the regulations for which California requests a waiver." [416]

Moreover, consideration of factors beyond those set out in section 209(b)(1) would subject California and vehicle and engine manufacturers to changes in regulatory schemes by other federal agencies not acting under the authority of the CAA. [417] SAFE 1 and subsequent events perfectly encapsulate this problem. For instance, NHTSA has since finalized the repeal of the regulatory provisions and pronouncements it made in SAFE 1 that were the underpinnings for EPA withdrawing certain aspects of the ACC program waiver and with that action the Agency's basis for revocation of the waiver under EPCA has now evanesced. [418] Additionally, this is affirmation of EPA's long held view that waiver proceedings are not the appropriate venue for resolving these issues, and the joint-rulemaking context is not and should never have been justification for deviating from statutory authority and the Agency's historical practice.

It also bears note that consideration of factors beyond the criteria contained in section 209(b) would not be limited to preemption under EPCA. Commenters suggested, for instance, that EPA would not be able to "ignore the First Amendment," in the hypothetical situation where California impos[ed] standards on some manufacturers in retaliation for their voiced opposition to California's authority as well as criminality such as "bribery and extortion had been instrumental in assembling the legislative majorities." [419] In short, under the commenter's view, factors for consideration in waiver proceedings would be innumerable. And yet these factors bear little or no relation to specific criteria in section 209(b) that would otherwise warrant the denial of a waiver request. The D.C. Circuit has already, several times, held that EPA is not required to consider factors outside of and unconnected to these statutory criteria, especially constitutional objections. In fact, regarding the commenter's example, the court has already specifically rejected consideration of the First Amendment in waiver evaluations. In *MEMA I*, the court considered and upheld EPA's decision declining to consider a First Amendment objection to a waiver as beyond the scope of agency review. [420] Courts have also rejected objections based on the applicability of CAA section 207 to California waiver requests [421] and the Commerce Clause. [422] EPA is therefore not persuaded by these arguments. Additionally, courts have long held that administrative proceedings for California waiver requests are ill-suited for consideration of constitutional issues. Nothing precludes commenters from challenging California's standards themselves—whether under EPCA, another statute, or the Constitution—in other, better-suited fora. According to the D.C. Circuit, for instance, [w]hile nothing in section 209 categorically forbids the Administrator from listening to constitutionality-based challenges, petitioners are assured through a petition of review . . . that their contentions will get a hearing." [423] The D.C. Circuit has also repeatedly stated that challenges which go to the legality of California's standards themselves, are better addressed directly by either courts or Congress. [424] Challenges based on preemption under EPCA similarly go to the legality of California's standards themselves and are thus more appropriate in court or addressed to Congress.

*E. Conclusion*

Because the landscape of federal law has changed since SAFE 1 due to NHTSA's repeal of its regulatory text, appendix, and pronouncements regarding EPCA preemption in SAFE 1, EPA believes that it is appropriate to rescind its waiver withdrawal actions in SAFE 1 that were predicated on the federal law context created by NHTSA's SAFE 1 action. On separate grounds, EPA also believes that, based on the foregoing, EPA should not have deviated from its practice of limiting its waiver review to the criteria in section

---

[410] *MEMA I*, 627 F.2d 1095, 1119 (D.C. Cir. 1979).

[411] *See, e.g.*, 43 FR at 32184 (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review); 74 FR at 32783 (declining to consider EPCA preemption, stating that "section 209(b) of the Clean Air Act limits our authority to deny California's requests for waivers to the three criteria therein."); 79 FR at 46264 (reiterating that EPA can only deny a waiver request based on the 209(b) statutory criteria, dismissing comments on preemption under EPCA, as well as the Constitution and the implications of the FAAAA).

[412] 627 F.2d at 1116.

[413] 142 F.3d at 464.

[414] NADA at 3.

[415] *MEMA I*, 627 F.2d at 1114–15.

[416] *Id.* at 1115.

[417] "The manufacture of automobiles is a complex matter, requiring decisions to be made far in advance of their actual execution. The ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance so as to permit economies in production." S. Rep. No. 403, 90th Cong., at 730 1st Sess. (1967).

[418] *See* 86 FR 74236.

[419] CEI at 11.

[420] *MEMA I*, 627 F.2d 1095, 1115 (D.C. Cir. 1979).

[421] *MEMA II*, 142 F.3d 449, 467 (D.C. Cir. 1998).

[422] *ATA v. EPA*, 600 F.3d 624, 628 (D.C. Cir. 2010) ("EPA's only role is to review California's proposed rules under a narrowly defined set of statutory criteria."); *OOIDA v. EPA*, 622 Fed. Appx. 4, 5 (D.C. Cir. 2015) (rejecting a challenge for lack of jurisdiction because challengers objected to California's regulations themselves, not EPA's approval of them in a waiver under 209(b)).

[423] *MEMA I*, 627 F.2d at 1115.

[424] *Id.* at 1105. In *ATA v. EPA,* the D.C. Circuit rejected a constitutional challenge to a California waiver, concluding that Congress made the decision to give California "the primary role in regulating certain mobile pollution sources" so the challenger's argument was best directed to Congress. 600 F.3d 624, 628 (D.C. Cir. 2010).

209(b)(1). Thus, for the reasons stated above, EPA is rescinding those portions of SAFE 1 that withdrew the waiver of the ACC program on the basis of preemption under EPCA.

## VII. EPA Inappropriately Set Forth an Interpretive View of Section 177 in SAFE 1

In SAFE 1, EPA provided an interpretive view of section 177 of the CAA, stating that states adopting California's new motor vehicle emission standards (section 177 states) could not adopt California's GHG standards.[425] In this action, EPA determines that it was both inappropriate and unnecessary within a waiver proceeding to provide an interpretive view of the authority of section 177 states to adopt California standards, as EPA plays no statutory approval role in connection with states' adoption of standards identical to those standards for which a waiver has been granted to California.[426] Rather, if a state chooses to submit such standards for inclusion in an SIP, EPA's role with regard to approval of these standards is to review them in the same way that EPA reviews all SIP revisions a state submits, via a notice and comment process, to ensure that the submission meets all statutory and regulatory requirements as part of the Agency's decision whether to approve or disapprove the submission. Therefore, the Agency is rescinding the interpretive views on section 177 set out in SAFE 1.

### A. SAFE 1 Interpretation

In the SAFE proposal, EPA proposed to conclude that "States may not adopt California's GHG standards pursuant to section 177 because the text, context, and purpose of section 177 support the conclusion that this provision is limited to providing States the ability, under certain circumstances and with certain conditions, to adopt and enforce standards designed to control criteria pollutants to address NAAQS nonattainment."[427] Additionally, the proposal noted the title of section 177 ("New motor vehicle emission standards in nonattainment areas") indicates a limited scope of application.[428] The proposal also suggested that, because "[a]reas are only designated nonattainment with respect to criteria pollutants," it would be

"illogical" if states could use their 177 authority "to adopt California standards that addressed environmental problems other than nonattainment of criteria pollutant standards."[429]

In the SAFE 1 decision, EPA finalized its proposed interpretive view, reiterating that "the text (including both the title and main text), structural location, and purpose of the provision confirm that it does not apply to GHG standards."[430] Because section 177's title references nonattainment areas, and because nonattainment designations only exist for criteria pollutants, EPA claimed, states could not adopt standards for purposes of GHG control under section 177.[431]

As evidence for this interpretive view, EPA again pointed to the text and location of the section, which had been the basis for the Agency's interpretation in the SAFE proposal. EPA acknowledged commenters who argued that "CAA section 177 does not contain any text that could be read as limiting its applicability to certain pollutants only" and that EPA had "inappropriately relied on the heading for CAA section 177 to construe a statutory provision as well as arrogated authority to implement an otherwise self-implementing provision," but disagreed with these commenters.[432] In addition to the evidence relied on in the proposal, EPA provided examples of legislative history from the 1977 amendments to support its interpretive view.[433]

### B. Notice of Reconsideration of SAFE 1 and Request for Comment

Acknowledging that "section 177 does not require States that adopt California emission standards to submit such regulations for EPA review" and that "California in previous waiver requests has addressed the benefits of GHG emissions reductions as it relates to ozone," EPA sought comment in the 2021 Notice of Reconsideration on whether EPA had the authority in the

SAFE 1 context to interpret section 177 of the CAA and whether the interpretive view was appropriate.[434] Specifically, EPA sought comment on whether it was appropriate for EPA to provide an interpretive view of section 177 within the SAFE 1 proceeding.[435] To the extent it was appropriate to provide an interpretation, EPA sought comment on whether section 177 was properly interpreted and whether California's motor vehicle emission standards adopted by states pursuant to section 177 may have both criteria emission and GHG emission benefits and purposes.[436]

### C. Comments Received

In response to SAFE 1, EPA received multiple petitions for reconsideration. One petition submitted by several states and cities asserted that, in adopting its interpretation of section 177, EPA "relie[d] on information and reasoning not presented in the SAFE Proposal," particularly the "superseded version of Section 172 . . . and legislative history for that outdated provision."[437] The petition noted that the use of this information and reasoning was used in the SAFE 1 to conclude that "section 177 is in fact intended for NAAQS attainment planning and not to address global air pollution."[438] Petitioners argued that because this information and reasoning was not presented in the proposal, "EPA should withdraw and reconsider its finalization of the Section 177 interpretation and allow for full and fair public comment before proceeding further."[439]

EPA also received many comments in response to the Notice of Reconsideration of SAFE 1, both supporting and opposing EPA's statements regarding section 177 in SAFE 1. Supporters of SAFE 1 reiterated the reasoning from the proposal and final action.[440] For example, one commenter wrote, "In short, 'the text, context, and purpose of Section 177 suggest' that the provision is limited to motor vehicle standards 'designed to control criteria pollutants to address NAAQS nonattainment.' "[441] Like the SAFE proposal and final action, the commenter stated that in addition to the text and context of the section, there is "substantial legislative history showing that Congress's purpose in creating the Section 177 program was to address

---

[425] 84 FR at 51310, 51350.

[426] EPA is aware of instances of States adopting California new motor vehicle emission standards and not subsequently including such standards in their SIP. In these circumstances EPA has not played and would not play an approval role.

[427] 83 FR at 43240.

[428] Id.

[429] Id.

[430] 84 FR at 51350.

[431] Id.

[432] Id.

[433] In particular, EPA cited legislative history on section 172(b), which set forth the "requisite provisions" for state plans for nonattainment areas. Id. at 51350 n.286. According to the legislative history, one of the many factors that must be considered by a state plan is "actual emissions of such pollutant resulting from in-use motor vehicles." Id. (quoting H.R. Rep. No. 294, 95th Cong., 1st Sess. 212 (1977), 1977 U.S.C.C.A.N. 1077, 1291, 1997 WL 16034). Therefore, EPA claimed, this legislative history "identifies section 177 as a means of addressing the NAAQS attainment planning requirements of CAA section 172, including the specific SIP content and approvals criteria for EPA." Id. at 51351.

[434] 86 FR at 22429.

[435] Id.

[436] Id.

[437] See States and Cities' Petition at 27.

[438] Id. (quoting 84 FR at 51351).

[439] Id.

[440] CEI at 17–18; NADA at 6; AFPM at 12–13.

[441] CEI at 18 (quoting heavily from the SAFE proposal and SAFE final action).

non-attainment with NAAQS for criteria pollutants, not to address any global atmospheric phenomenon.'' [442]

Opponents of SAFE 1 argued both that EPA had no authority to issue its 177 statement and that the merits of EPA's argument were wrong. On the issue of authority, opponents of SAFE 1 claimed that SAFE 1 failed to consider the reliance interests of the stakeholders, particularly section 177 states.[443] SAFE 1, they argued, upset this reliance and created uncertainty.[444] A substantial number of commentors also argued that EPA had no authority to make its statements on section 177 because ''Congress gave EPA no role in implementing Section 177 and no authority to constrain States' decisions regarding adoption of California emissions standards.'' [445]

[442] *Id.*

[443] States and Cities at 50–55; Institute for Policy Integrity Amicus Brief at 22–26 (''[T]he fact that California and many other states have detrimentally relied on this waiver to meet federal and state air-pollution mandates resolves any lingering doubt about the lawfulness of EPA's Action. . . . Revoking the preemption waiver . . . jeopardizes the state's ability to meet federal standards for other harmful air pollutants, since the standards covered by the waiver would have reduced—directly and indirectly—nitrogen-oxide, ozone, and particulate-matter pollution. *See* 78 FR 2122, 2129, and 2134.''); Tesla at 11–13; National Association of Clean Air Agencies (NACAA), Docket No. EPA–HQ–OAR–2021–0257–0096 at 3. Many of the 177 states had also provided comments, during the SAFE 1 comment period, explaining that they have adopted the ACC program standards to meet their public health goals. *See, e.g.,* Maryland Department of the Environment, Docket No. EPA–HQ–OAR–2018–0283–5831 at 2–3; Delaware Department of Natural Resources and Environment Control, Docket No. EPA–HQ–OAR–2018–0283–5066 at 3–5; Massachusetts Department of Environmental Protection, Docket No. EPA–HQ–OAR–2018–0283–5476; State of California et al., Docket No. EPA–HQ–OAR–2018–0283–5481 at 130–31 (California was joined by the States of Connecticut, Delaware, Hawaii, Iowa, Illinois, Maine, Maryland, Minnesota, New Jersey, New Mexico, New York, North Carolina, Oregon, Rhode Island, Vermont, Washington, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, the District of Columbia, and the Cities of Los Angeles, New York, Oakland, San Francisco, and San Jose).

[444] *See, e.g.,* States and Cities at 50–55; Tesla at 11–13.

[445] States and Cities at 51. *See also* Tesla at 11–13; Twelve Public Interest Organizations app. 1 at 2; NESCAUM at 8–9; Southern Environmental Law Center (SELC), Docket No. EPA–HQ–OAR–2021–0257–0125 at 2–3; NCAT at 12; Class of '85, Docket No. EPA–HQ–OAR–2021–0257–0454 (correction to an earlier comment by the same commenter, which can be found at Docket No. EPA–HQ–OAR–2021–0257–0388) at 5–6; Maine at 2; OTC at 2. Ironically, one supporter of SAFE 1, while arguing that EPA cannot consider GHG reductions from section 177 states in its second prong analysis, acknowledged EPA's lack of an oversight role under section 177: ''EPA cannot consider GHG reductions, if any, attributable to 'opt-in' states under Section 177, as these are out of the scope of a waiver application. Indeed, EPA has no legal role in reviewing opt-in states, as the statute grants the agency no role in reviewing opt-in by other states.'' AFPM at 15.

On the merits of EPA's SAFE 1 argument, opponents of the action commented that EPA misinterpreted section 177 and that, even if EPA's interpretive view were correct, EPA misapplied it. Multiple commenters wrote that the text of section 177 does not limit the types of pollutants for which motor vehicle emission standards can be authorized.[446] Commenters also noted that the title of section 177 refers to geographic *areas,* not pollutants, and argued that the restriction was therefore on which states could adopt California standards (states with plan provisions approved under Part D) not on the pollutants for which those states could adopt standards.[447] A few commenters also argued that EPA's section 177 interpretive view would create a ''third vehicle'' scenario, in contradiction of section 177's identicality requirement.[448] Even if EPA's interpretation were correct, opponents continued, California's standards have both criteria emission and GHG emission benefits and purposes.[449] Commenters cited the factual record as well as EPA's own past findings as evidence of the connection between GHG standards and NAAQS attainment.

### D. Analysis: EPA Is Rescinding SAFE 1's Interpretive Views of Section 177

EPA is withdrawing its non-regulatory and non-binding interpretation of section 177 set forth in SAFE 1. EPA plays no statutory approval role in connection with states' adoption of standards identical to those standards for which the Agency has granted a waiver to California.[450] Rather, if a state chooses to submit such standards for inclusion in a SIP, EPA's role with regard to approval of these standards is

[446] *See, e.g.,* States and Cities at 53; NESCAUM at 9; NCAT at 12.

[447] *See, e.g.,* States and Cities at 53 (''[T]he reference in the title to 'nonattainment areas' is not a limitation to 'nonattainment (*i.e.,* criteria) pollutants' or standards that target them'' but rather a limitation on the states that can adopt California's standards); NESCAUM at 9; SELC at 2; NCAT at 12.

[448] Commenters feared that EPA's interpretation, which ''prevents Section 177 States from adopting California's GHG standards, but not any other California standards,'' could require states to ''extract just the GHG portion of the Advanced Clean Cars rules from their programs, thus potentially creating type of ''third vehicle'' forbidden by Section 177 (*i.e.,* a vehicle subject to a hybrid combination of the other California standards and the (now weakened) federal GHG standards.'' States and Cities at 54. *See also* NESCAUM at 11–12; SELC at 5.

[449] States and Cities at 31–32, 50–55; NESCAUM at 12–13; SELC at 5; NCAT at 12; Class of '85 at 4–5.

[450] EPA is aware of instances of States adopting California new motor vehicle emission standards and not subsequently including such standards in their SIP. In these circumstances EPA has not played and would not play an approval role.

to review them in the same way that EPA reviews all SIP revisions a state submits, via a notice and comment process, to ensure that the submission meets all statutory and regulatory requirements as part of the Agency's decision whether to approve or disapprove the submission.[451]

In reconsidering SAFE 1, EPA now believes that it was inappropriate to offer an interpretive view of section 177 in the context of that action. EPA believes it acted inappropriately in providing an interpretive view in SAFE 1 and that such action was based on an inaccurate assessment of the factual record. EPA's interpretive view was not compelled by any petition, request, or legislative or judicial mandate and was otherwise not final agency action.[452] EPA is therefore rescinding the interpretive views contained in SAFE 1.

As commenters have noted, section 177 does not describe a direct approval role for EPA. Section 177 says that ''any State which has plan provisions approved under this part may adopt and enforce'' identical California standards and delineates three specific criteria for adoption.[453] Nothing in this language or in the text of the rest of the section requires or allows EPA to approve such adoption and enforcement or directs EPA to implement the section through regulation; EPA plays no statutory approval role in the adoption of California standards by other states other than action on a SIP revision, should those states include the standards in their plans. In fact, there are only three prerequisites to adoption and enforcement by a state: That the state has a federally approved SIP, that the standards are identical (thus the state standards must not create or have the effect of creating a ''third vehicle'') to California standards for which California has received a waiver, and that California and the state adopt the standards with at least two years lead time.[454] This limited role has been

[451] EPA notes that although section 177 states that ''. . . any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles . . .'' the language in section 177 does not require a state to submit its adopted motor vehicle emissions standards for SIP approval.

[452] 84 FR at 51338 n.256 (''EPA acknowledges that its actions in this document may have implications for certain prior and potential future EPA reviews of and actions on state SIPs. . . . EPA will consider whether and how to address those implications, to the that they exist, is separate actions.''). EPA action on a state plan (including application of Section 177) is subject to judicial review. 42 U.S.C. 7607(b)(1).

[453] 42 U.S.C. 7507.

[454] *Id.*

acknowledged by courts and EPA alike.[455] Thus, it is well established that states have broad discretion to adopt California standards without being subject to EPA's approval.[456]

States with approved SIPs that have adopted the waived California standard into state law may submit a SIP revision that includes that adopted standard. In that proceeding, EPA could determine whether the statutory criteria for adoption are met for purposes of approving a SIP revision. Indeed, in the litigation following SAFE 1, EPA acknowledged that its interpretive view of section 177 would have no actual effect until applied in a future SIP context.[457] SIPs are a crucial planning tool in helping states reach attainment for NAAQS and California's standards are key components of many of these SIPs.[458] In a SIP proceeding, these states

and other stakeholders are better able to provide specific and comprehensive comments about the intent and effect of adopting California standards.[459]

For these reasons, EPA believes that it was inappropriate to provide an interpretive view of section 177 in SAFE 1.[460] Therefore, EPA is withdrawing its SAFE 1 interpretive view of section 177.

*E. Conclusion*

EPA determines that it was both inappropriate and unnecessary, within the SAFE 1 waiver proceeding, to provide an interpretive view of the authority of section 177 states to adopt California standards. Therefore, EPA withdraws its interpretive views that had been set forth in SAFE 1.

**VIII. Other Issues**

*A. Equal Sovereignty*

As explained in Section VI, EPA must grant California's waiver request unless the Agency makes one of the specified findings in section 209(b)(1). In this instance, Congress has made multiple determinations through its adoption of section 209 and subsequent amendments, dating from 1967 through the 1990 CAA Amendments, regarding California's role and its relation to federal standard setting for mobile sources. EPA's longstanding waiver practice, consistent with case law, has been to refrain from considering factors beyond section 209(b)(1) criteria as well as constitutional claims in the review of California waiver requests.[461] EPA

acknowledges that California adopts its standards as a matter of law under its police powers,[462] that the Agency's task in reviewing waiver requests is properly limited to evaluating California's request according to the criteria in section 209(b), and that it is appropriate to defer to litigation brought by third parties in other courts, such as state or federal court, for the resolution of constitutionality claims and inconsistency, if any, with other statutes. As further explained this practice flows from the statute and legislative history, which reflect a broad policy deference that is afforded to California to address its serious air quality problems (which are on-going) as well as to drive emission control innovation. And so, EPA has historically declined to consider constitutional issues in evaluating and granting section 209 waivers. In *MEMA I*, the D.C. Circuit rejected a First Amendment challenge to a waiver as outside the scope of review.[463] In 2009, EPA approved a waiver (and authorization) under section 209(e), granting California authority to enforce its Airborne Toxic Control Measure, which established in-use emission performance standards for engines in transport refrigeration units (TRUs) and TRU generator sets.[464] Responding to comments that the waiver reached beyond California's borders in violation of the Dormant Commerce Clause, EPA stated that such considerations are not factors that EPA must consider under section 209(e) because "EPA's review of California's regulations is limited to the criteria that Congress directed EPA to review." [465] This interpretation was upheld by the D.C. Circuit Court of Appeals. The Court agreed with EPA that the commenters had sought to "improperly . . . engraft a type of constitutional Commerce Clause analysis onto EPA's Section 7543(e) waiver decisions that is neither present in nor authorized by the statute." [466]

---

[455] In 1979, for example, only two years after the adoption of section 177, the D.C. Circuit stated that the Act only requires the three listed prerequisites, "not . . . that the EPA administrator conduct a separate waiver proceeding for each state that chooses [to adopt California standards]." *Ford Motor Co.* v. *EPA*, 606 F.2d 1293, 1298 (D.C. Cir. 1979). Similarly, in 1994, while enacting rules implementing section 209(e)(2)(B), the parallel provision for the nonroad vehicle section of the California Waiver program, EPA noted that section 177 states had not "ask[ed] for EPA authorization before they adopted the California standards, nor did EPA or the automobile industry suggest that they needed such authorization." 56 FR 36969, 36983 (1994). *See also* 77 FR 62637 n.54 ("States are not required to seek EPA approval under the terms of section 177.").

[456] EPA also notes that there are ample judicial avenues to directly challenge state adoption of California standards. For example, the First and Second Circuits have already addressed objections to the adoption of California standards under section 177. In both *Am. Auto. Mfrs. Ass'n* v. *Mass. DEP* and *Motor Vehicle Mfrs. Ass'n* v. *NYSDEC*, petitioners argued that the States' adoption of California's low emission vehicles standards without the associated clean fuels plan violated section 177. 31 F.3d 18 (1st Cir. 1994); 17 F.3d 521 (2d Cir. 1994).

[457] Several commenters on the Notice of Reconsideration argued that SAFE 1 violated conformity rules by interfering with already approved SIPs. However, as EPA explained in the litigation over SAFE 1, the action had no actual effect on "either existing approvals of state plans or the plans themselves for criteria pollutants." Final Brief for Respondents at 106, *Union of Concerned Scientists* v. *NHTSA*, No. 19–1230 (D.C. Cir. Oct. 27, 2020). *See also* 84 FR 51338, n.256.

[458] Wisconsin at 1 ("These standards provide important and necessary reductions in both GHG and criteria pollutant emissions needed to meet state and local air quality goals and address federal CAA requirements."); Connecticut at 2 ("These programs enable long-term planning and yield critical emission reductions that are critical to meeting Connecticut's climate goals as well as our statutory obligations to reach attainment with the ozone NAAQS."); Delaware at 2 ("Delaware adopted the California LEV regulation and incorporated the LEV and GHG standards into the State Implementation Plan. . . . Delaware will not meet air quality goals without more protective vehicle emission standards. "); Maine at 1 ("[T]he LEV program was initially created to help attain

and maintain the health-based National Ambient Air Quality Standards (NAAQS) . . . The California ZEV and GHG programs enable long-term planning for both the states and the regulated community and have been drivers of technological change across the industry.").

[459] The Agency has considered whether there may be any reliance interests on EPA's previous interpretive view of section 177 described in the SAFE 1 action. EPA is unaware of any such interests, and none were raised in comments.

[460] To the extent that EPA's reasoning in the SAFE 1 section 177 determination lacked fair notice, as the States and Cities' Petition claimed, such a contention is rendered moot by this action.

[461] EPA has declined to consider constitutional challenges to California Waivers since at least 1976. 41 FR 44212 (Oct. 7, 1976) ("An additional argument against granting the waiver was raised by the Motorcycle Industry Council and Yamaha, who contended that the CARB had violated due process when adopting their standards, by not allowing the manufacturers a fair and full opportunity to present their views at a State hearing. If this argument has any validity, the EPA waiver hearing is not the proper forum in which to raise it. Section 209(b) does not require that EPA insist on any particular procedures at the State level. Furthermore, a complete opportunity was provided at the EPA waiver hearing for the presentation of views."). *See also, e.g.,* 43 FR at 32184 (July 25, 1978) (rejecting objections to the procedures at state level, objections that section 207(c)(3)(A) establishes field protection, and constitutional objections all as beyond the "narrow" scope of the Administrator's review).

[462] *Central Valley Chrysler-Jeep, Inc.* v. *Goldstene,* 529 F.Supp.2d 1151, 1174 ("The waiver provision of the Clean Air Act recognizes that California has exercised its police power to regulate pollution emissions from motor vehicles since before March 30, 1966; a date that predates both the Clean Air Act and EPCA.").

[463] *MEMA I,* 627 F.2d 1095, 1111, 1114–14 (D.C. Cir. 1979).

[464] 74 FR 3030 (January 16, 2009).

[465] Decision Document, EPA–HQ–OAR–2005–0123–0049 at 67.

[466] *ATA* v. *EPA*, 600 F.3d 624, 628 (D.C. Cir. 2010) (quoting the U.S. brief). In a footnote to this statement, the Court said ATA could attempt to bring a constitutional challenge directly (which would argue that the waiver unconstitutionally burdens interstate commerce) but "express[ed] no view on that possibility." *Id.* at n.1. *See also OOIDA* v. *EPA*, 622 Fed. Appx. 4, 5 (D.C. Cir. 2015)

Consistent with the Agency's long standing practice, the decision on whether to grant the ACC program waiver was based solely on criteria in section 209(b) and the Agency did not either interpret or apply the Equal Sovereignty Doctrine or any other constitutional or statutory provision in that waiver decision.[467]

Although EPA specified issues that it was seeking comment on within the Notice of Reconsideration, commenters nevertheless argued that the Equal Sovereignty Doctrine, which was not one of the identified aspects in that notice, preempts reinstitution of the relevant aspects of the ACC program waiver. According to these commenters, "Section 209, by allowing California and only California to retain a portion of its sovereign authority that the Clean Air Act takes from other States, is unconstitutional and thus unenforceable."[468] Other commenters argued that the Equal Sovereignty doctrine does not apply to the California waiver program. One comment maintained that the holding in *Shelby County* v. *Holder* is distinguishable from the CAA.[469] California disagreed with

EPA's characterization of the relevance of the doctrine, commenting that the Supreme Court has only applied the "rarely invoked" doctrine of Equal Sovereignty in the "rare instance where Congress undertook 'a drastic departure from basic principles of federalism' by authorizing 'federal intrusion into sensitive areas of state and local policymaking.' "[470]

As explained in the 2013 ACC program waiver decision, EPA continues to believe that waiver requests should be reviewed based solely on the criteria in section 209(b)(1) and specifically, that the Agency should not consider constitutional issues in evaluating waiver requests.[471] As previously noted in Section VI, the constitutionality of section 209 is not one of the three statutory criteria for reviewing waiver requests, and such objections are better directed to either the courts or Congress. As the D.C. Circuit reasoned in *MEMA I*, "it is generally considered that the constitutionality of Congressional enactments is beyond the jurisdiction of administrative agencies."[472] Although commenters here raise a new constitutional argument—that of Equal Sovereignty rather than the First Amendment or the Dormant Commerce Clause—EPA is no more well-suited to resolve this constitutional objection than it is to resolve previous constitutional objections.[473]

EPA notes that Congress struck a deliberate balance in 1967 when it acknowledged California's serious air quality problems as well as it being a laboratory for the country, and once again in 1977 when Congress continued to acknowledge California's air quality problems as well as problems in other states and decided that California's new motor vehicle standards, once waived by EPA and subject to certain conditions, would be optionally

available for all states under section 177 under specified criteria.[474] In striking a balance between one national standard and 51 different state standards, Congress chose to authorize two standards—the federal standard, and California's standards (which other states may adopt). EPA believes this balance reflected Congress's desire for California to serve as a laboratory of innovation and Congress's understanding of California's extraordinary pollution problems on the one hand, and its desire to ensure that automakers were not subject to too many different standards on the other.

In reconsidering the SAFE 1 action and the appropriateness of reinstating the 2013 ACC program waiver, EPA has not considered whether section 209(a) and section 209(b) are unconstitutional under the Equal Sovereignty Doctrine. As in the 2013 ACC program waiver, the decision on whether to grant the waiver and the consequence of a reinstated waiver is based solely on the criteria in section 209(b) and this decision does not attempt to interpret or apply the Equal Sovereignty Doctrine or any other constitutional or statutory provision.

## *B. CARB's Deemed-To-Comply Provision*

EPA received comments arguing that California's 2018 clarification to its deemed-to-comply provision "changed important underlying requirements of the original 2012 waiver application" and "EPA cannot reinstate a Clean Air Act waiver for a program that no longer exists."[475] These commenters maintain that California has never sought a waiver for the 2018 amendments or a determination that the change is within the scope of the prior waiver. As such, commenters maintain that EPA lacks a necessary predicate to permit California's enforcement of its amended GHG standards.

Other commenters argued that the "deemed to comply" provision was always conditioned on the federal standards providing GHG reductions that were at least equal to or as protective as California's program and so the 2018 amendments did not substantively change the provision or affect any related reliance interests and instead were designed to clarify the

---

[467] 78 FR at 2145.

[468] Ohio and 15 States, Docket No. EPA–HQ– OAR–2021–0257–0124 at 1. This commenter also stated that "The waiver at issue here, allowing only California to regulate carbon emissions, is not sufficiently related to the problem that Section 209(a) targets, Congress enacted that section to permit California to address *local* air pollution. But California seeks special treatment for its proposed greenhouse gas targets . . . designed to mitigate climate change—an inherently global interest." *Id.* at 8–9. EPA notes that this characterization of CARB's standards is addressed in Section V.

[469] Twelve Public Interest Organizations at 5 ("*Shelby County* does not govern here. *See* Amicus Br. of Prof. Leah Litman 12–17, *Union of Concerned Scientists* v. *NHTSA*, No. 19–1230 (July 6, 2020) (A–0384). First, Clean Air Act Section 209(b) places no extraordinary burden or disadvantage on one or more States. Rather, the statute benefits California by allowing the exercise of its police power authority to address its particular pollution control needs. Second, the foundation for reserving California's authority has not waned over time. California had in 1967, and continues to have, the Nation's absolute worst air quality. For example, the South Coast air basin, home to 17 million people, typically leads the Nation in ozone (smog) pollution. The American Lung Association's 2021 'State of the Air' report on national air pollution shows that seven of the ten worst areas for ozone pollution in the country are in California, as are six of the worst ten for small particulate matter. Am. Lung Ass'n, *Most Polluted Cities, https:// www.lung.org/research/sota/city-rankings/most-polluted-cities* (last visited July 2, 2021) (A– 0422).").

[470] States and Cities at 41–42.

[471] 78 FR at 2145.

[472] *MEMA I,* 627 F.2d 1095, 1114–15 (D.C. Cir. 1979) (holding that EPA did not need to consider whether California's standards "unconstitutionally burden[ed] [petitioners'] right to communicate with vehicle purchasers."). *See also* Twelve Public Interest Organizations at 7 ("As regulatory agencies are not free to declare an act of Congress unconstitutional,' *Springsteen-Abbott* v. *SEC,* 989 F.3d 4, 8 (D.C. Cir. 2021), EPA cannot determine whether a statute Congress directed it to implement contravenes the equal-sovereignty principle. Thus, EPA should proceed to rescind the Waiver Withdrawal and leave Ohio's argument for review by an appropriate court.").

[473] *See, e.g., Johnson* v. *Robison,* 415 U.S. 361, 368, (1974) ("Adjudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies"); *Springsteen-Abbott,* 989 F.3d at 8; *Meredith Corp.* v. *FCC,* 809 F.2d 863, 872 (D.C. Cir. 1987).

[474] "§ 177 . . . permitted other states to 'piggyback' onto California 's standards, if the state's standards 'are identical to the California standards for which a waiver has been granted for such model year.' " *Motor Vehicle Mfrs. Ass'n* v. *New York State Dep't of Envtl. Conservation,* 17 F.3d 521, 525 (2d Cir. 1994).

[475] AFPM at 7; Urban Air at 2, 18–19; NADA at 6.

provision.[476] Commenters maintain that CARB adopted ''non-substantive amendments for its LEV III regulations to further clarify that the deemed-to-comply provision would only apply if the federal GHG standards remained substantially as they were as of the date of the 2017 Final Determination.''[477] According to these commenters, California adopted these amendments after EPA's withdrawal of its 2017 Final Determination that had determined that its Federal GHG standards for model years 2022–2025 remained appropriate and instead concluded that the federal standards for model years 2022–2025 may be too stringent and should be revised. EPA notes that after the January 2017 MTE CARB subsequently found that compliance with those federal standards would result in equivalent or greater GHG benefits than originally projected for California.[478] These commenters further maintain that the clarification of the deemed-to-comply provision is immaterial to the reversal of the waiver withdrawal in SAFE 1 because the SAFE 1 action was expressly based on EPA's decision to rely on NHTSA's preemption findings and section 209(b)(1)(B) determination, neither of which was based on CARB's 2018 clarification rulemaking. As such, the commenters maintain that the clarification of the deemed-to-comply provision has no bearing on and does not preclude EPA's SAFE 1 waiver withdrawal.[479]

As previously explained, under section 209(b)(1) EPA is to grant a waiver of preemption for California to enforce its own standards that would otherwise be preempted under section 209(a). This preemption does not extend to federal standards that are adopted under section 202(a). EPA explained this in responding to comments on the deemed-to-comply provision in the ACC program waiver decision. ''[T]he waiver decision affects only California's emission standards, not the federal standards that exist regardless of EPA's decision.''[480] This preemptive effect of section 209(a) does not change even when California chooses to allow for compliance with its standards through federal standards as envisaged by the deemed-to-comply provision.

It also bears note that in SAFE 1, EPA made clear that the 2018 amendment was not a ''necessary part of the basis for the waiver withdrawal and other actions that EPA finalizes in this [SAFE1] document.[481] In the Notice of Reconsideration, EPA neither reopened nor reconsidered elements of the 2013 waiver that were not part of EPA's findings in SAFE 1.[482] As noted in this decision, EPA has evaluated the factual and legal errors that occurred in SAFE 1. As part of this evaluation, EPA believes it has considered all appropriate and relevant information necessary to its review of issues associated with the second waiver prong or consideration of preemption under EPCA. The Agency also recognizes that it received comments from parties that raised non-germane issues to EPA's Notice of Reconsideration. EPA did not conduct an analysis of such comments in the context of reconsidering the specific actions taken in SAFE 1. EPA also makes clear that the result of rescinding its part of SAFE 1 is the automatic reinstatement of the waiver granted to California in 2013 for its ACC program. That is the result of the action taken herein.[483]

## IX. Decision

After review of the information submitted by CARB and other public commenters, the SAFE 1 action, and the record pertaining to EPA's 2013 ACC program waiver, I find that EPA did not appropriately exercise its limited inherent authority to reconsider waiver grants in SAFE 1. SAFE 1 did not correct a clerical or factual error, nor did the factual circumstances and conditions related to the three statutory criteria change prior to SAFE 1, much less change so significantly as to cast the propriety of the waiver grant into doubt. On this basis, I am rescinding the SAFE 1 action.

Furthermore, after review of both the 2013 ACC program waiver record as well as the SAFE 1 record, to the extent that EPA did have authority to reconsider the ACC program waiver, I have determined that the asserted bases were in error and did not justify the waiver withdrawal. With respect to the Agency's first purported basis—its discretionary decision to undertake a reinterpretation of the second waiver prong—I find that the statutory interpretation adopted in SAFE 1 is a flawed reading of the statute, and I hereby return to the traditional interpretation of the second waiver prong, which is, at least, the better interpretation. Under the traditional interpretation, which looks at the program as a whole, California clearly had a compelling need for the ACC program. Even if SAFE 1's statutory reinterpretation, which focuses on California's compelling need for the specific standards, were an appropriate reading, EPA did not perform a reasonable, accurate, and complete review of the factual record in its findings regarding the criteria emission benefits of CARB's ZEV sales mandate and GHG emission regulations. Upon review, I find that SAFE 1's predicate for concluding that California did not have a compelling need for these specific standards was not reasonable given the record at the time of the ACC program waiver and once again during the SAFE 1 proceeding. A reasonable, accurate, and complete review of the record supports the need for California's specific GHG emission standards and ZEV sales mandate to meet compelling and extraordinary conditions in California. This is true whether I look at how these standards reduce criteria pollution, GHG pollution, or both. In

---

[476] States and Cities at 58–61. (''California always intended its standards would 'remain an important backstop in the event the national program is weakened or terminated.' 78 FR at 2,128.'').

[477] *Id.* at 60. ''Final Determination on the Appropriateness of the Model Year 2022–2025 Light-Duty Vehicle Greenhouse Gas Emissions Standards under the Midterm Evaluation'' (2017 Final Determination) at *https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100QQ91.pdf*.

[478] 82 FR 14671 (March 22, 2017) and 83 FR 16077 (April 13, 2018).

[479] States and Cities at 60–62.

[480] 78 FR at 2124.

[481] EPA declined to ''take any position at this point on what effect California's December 2018 amendment to its 'deemed to comply' provision . . . [may] have on the continued validity of the January 2013 waiver.'' 84 FR at 51329, n.208, 51334, n.230. Although EPA claimed in SAFE 1 that the deemed to comply clarification confirmed and provided further support for the SAFE 1 action, EPA no longer makes this claim to the extent it is relevant in its reconsideration and rescission of SAFE 1. The consequence of this action is the reinstatement of the ACC program waiver issued in 2013 and does not extend to other regulatory developments in California or by EPA that occurred subsequent to that waiver decision.

[482] 86 FR at 22423. In addition to declining to take a position on the effect of California's 2018 amendments to its ''deemed to comply'' provision, SAFE 1 did not finalize the withdrawal of the waiver under the first or third waiver prongs. EPA also notes that it has previously responded twice to the comments suggesting that CARB's deemed-to-comply provision demonstrates that California does not have a need for its own standards. *See* 78 FR at 2124–25.

[483] EPA acknowledges that motor vehicle emission standards in California as well as federally are periodically clarified, amended, or revised. For example, after California issued its first deemed-to-comply regulation, EPA determined that the state's GHG standards were within the scope of the 2009 waiver. While EPA believes that Congress intended regulatory certainty to be attached to the Agency's waivers issued under section 209, EPA acknowledges that conditions may change over time so significantly that it could merit a review of California's motor vehicle emission program and applicable standards therein or that would prompt California to submit a related waiver request to EPA. As explained in this decision, the conditions associated with the analysis of the three waiver criteria performed in the ACC waiver decision did not change so as to merit the SAFE 1 action. EPA

recognizes that federal light-duty vehicle GHG emission standards have been modified twice since SAFE 1 was issued; the current standards do not change EPA's conclusion that SAFE 1 should be rescinded.

**Federal Register** / Vol. 87, No. 49 / Monday, March 14, 2022 / Notices **14379**

sum, although I am not adopting the interpretation of the second waiver prong set forth in SAFE 1, I find that the burden of proof necessary to demonstrate that CARB's ZEV sales mandate and GHG emission standards are not needed to meet compelling and extraordinary conditions has not been met under either interpretation of the second waiver prong. Therefore, I rescind the Agency's part of the SAFE 1 action to the extent it relied upon the second waiver prong to withdraw the ACC program waiver.

With regard to the applicability of preemption under EPCA, I find that, to the extent EPA's authority to reconsider the ACC program waiver rested upon NHTSA's joint action at the time as well as the applicability of its EPCA interpretation to EPA's review, this statute falls clearly outside the confines of section 209(b) where EPA's authority to grant, deny, and reconsider waivers resides. In any event, the grounds for such action under SAFE 1 no longer exist given NHTSA's recent final action withdrawing its EPCA preemption rule in its entirety.

Each of the decisions and justifications contained in this final action is severable.

This decision rescinds EPA's SAFE 1 action and therefore, as a result, the waiver of preemption EPA granted to California for its ACC program ZEV sales mandates and GHG emission standards issued in 2013, including for the 2017 through 2025 model years, comes back into force.

*Judicial Review*

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the Court of Appeals for the District of Columbia Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, but "such action is based on

a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).

This final action is "nationally applicable" within the meaning of section 307(b)(1). In the alternative, to the extent a court finds this action to be locally or regionally applicable, the Administrator is exercising the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on a determination of "nationwide scope or effect" within the meaning of section 307(b)(1).[484] This action rescinds EPA's final action in SAFE 1, which withdrew a waiver for new motor vehicle greenhouse gas emission standards and ZEV sales mandate granted to California under section 209(b) of the CAA. In addition to California, sixteen other states and the District of Columbia have already adopted California's motor vehicle greenhouse gas standards. The other states are New York, Massachusetts, Vermont, Maine, Pennsylvania, Connecticut, Rhode Island, Washington, Oregon, Minnesota, New Jersey, Nevada, Maryland, Virginia, Colorado, and Delaware.[485] These jurisdictions represent a wide geographic area and fall within eight different judicial circuits.[486] In addition,

---

[484] In deciding whether to invoke the exception by making and publishing a finding that this final action is based on a determination of nationwide scope or effect, the Administrator has also taken into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[485] The same states have adopted California's ZEV sales mandate regulation with the exception of Pennsylvania, Washington, and Delaware.

[486] In the report on the 1977 Amendments that revised CAA section 307(b)(1), Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a

this action will affect manufacturers nationwide who produce vehicles to meet the emissions standards of these states. For these reasons, this final action is nationally applicable or, alternatively, the Administrator is exercising the complete discretion afforded to him by the CAA and hereby finds that this final action is based on a determination of nationwide scope or effect for purposes of section 307(b)(1) and is hereby publishing that finding in the **Federal Register**.

Under CAA section 307(b)(1), petitions for judicial review of this action must be filed in the United States Court of Appeals for the District of Columbia Circuit within 60 days from the date this final action is published in the **Federal Register**.

## X. Statutory and Executive Order Reviews

As with past waiver decisions, this action is not a rule as defined by Executive Order 12866. Therefore, it is exempt from review by the Office of Management and Budget as required for rules and regulations by Executive Order 12866.

In addition, this action is not a rule as defined in the Regulatory Flexibility Act, 5 U.S.C. 601(2). Therefore, EPA has not prepared a supporting regulatory flexibility analysis addressing the impact of this action on small business entities.

Further, Subtitle E of the Small Business Regulatory Enforcement Fairness Act of 1996, also known as the Congressional Review Act, 5 U.S.C. 801, *et seq.,* does not apply because this action is not a rule for purposes of 5 U.S.C. 804(3).

**Michael S. Regan,**

*Administrator.*

[FR Doc. 2022–05227 Filed 3–11–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323–24, reprinted in 1977 U.S.C.C.A.N. 1402–03.