ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-1081**

Consolidated with Nos. 22-1083, 22-1084, and 22-1085

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF OHIO, *ET AL.*,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,

*Respondents,*

ADVANCED ENERGY ECONOMY, *ET AL.*,

*Intervenors.*

On Petitions for Review of Final Agency Action by the U.S. Environmental Protection Agency

**BRIEF OF *AMICI CURIAE* SENATOR TOM CARPER, CHAIRMAN OF THE U.S. SENATE COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS, AND REPRESENTATIVE FRANK PALLONE, JR., RANKING MEMBER OF THE U.S. HOUSE COMMITTEE ON ENERGY AND COMMERCE, IN SUPPORT OF RESPONDENTS**

CARA A. HOROWITZ
D.C. Circuit Bar No. 56629
DANIEL N. CARPENTER-GOLD
GABRIEL F. GREIF
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
horowitz@law.ucla.edu

January 20, 2023                *Counsel for* Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and *Amici Curiae*

Except for the following, all parties, intervenors, and *amici curiae* appearing before this Court are listed or referenced in the Initial Brief for Respondents U.S. Environmental Protection Agency (ECF No. 1981480) (filed Jan. 13, 2023):

- *Amici* Senator Tom Carper and Representative Frank Pallone, Jr. ("*Amici*");

- *Amici curiae* climate scientists David Dickinson Ackerly, Maximilian Auffhammer, Marshall Burke, Allen Goldstein, John Harte, Michael Mastrandrea, and LeRoy Westerling;

- The American Thoracic Society, American Medical Association, American Association for Respiratory Care, American College of Occupational and Environmental Medicine, American College of Physicians, American College of Chest Physicians, National League for Nursing, American Public Health Association, American Academy of Pediatrics, and Academic Pediatric Association, who have filed a notice of intent to participate as *amici curiae*; and

- Administrative-law professors Todd Aagaard, William Boyd, Alejandro E. Camacho, Robin Craig, Robert Glicksman, Bruce Huber,

Sanne Knudsen, and David Owen, who have also filed a notice of

intent to participate as *amici curiae*.

## B. Rulings Under Review

References to the rulings at issue appear in the Initial Brief for Respondents.

## C. Related Cases

Other than the cases consolidated in this case, earlier challenges to actions

by the U.S. Environmental Protection Agency and the National Highway Traffic

Safety Administration are pending before this Court, consolidated under *Union of*

*Concerned Scientists v. National Highway Traffic Safety Administration*, No. 19-

1230. Counsel for *Amici* are aware of no other related cases.

## D. Corporate Disclosure Statement

Pursuant to Fed. Rs. App. P. 26.1 and 29(a)(4)(A), *Amici* state that no party

to this brief is a publicly held corporation, issues stock, or has a parent corporation.

/s/ Cara A. Horowitz
CARA A. HOROWITZ
January 20, 2023

## RULE 29 STATEMENTS

All parties in the consolidated action have indicated their consent to the filing of this brief. *See* Letter Filed by Diamond Alternative Energy, LLC, Iowa Soybean Association, South Dakota Soybean Association, Minnesota Soybean Growers Association, American Fuel & Petrochemical Manufacturers, Domestic Energy Producers Alliance, Energy Marketers of America and National Association of Convenience Stores, Clean Fuels Development Coalition, ICM, Inc., Illinois Corn Growers Association, Kansas Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, and Valero Renewable Fuels Company, LLC (together, the "Industry Petitioners"), ECF No. 1972549 (filed Nov. 7, 2022); Letter Filed by Center for Biological Diversity, Clean Air Council, Conservation Law Foundation, Environmental Defense Fund, Environmental Law and Policy Center, Natural Resources Defense Council, Public Citizen, National Parks Conservation Association, Sierra Club, and Union of Concerned Scientists, ECF No. 1972783 (filed Nov. 8, 2022). Petitioners the States of Ohio, Alabama, Arkansas, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia (together, the "State Petitioners"), and all other parties, have provided their consent directly to counsel for *Amici*.

Pursuant to Fed. R. App. P. 29(a)(4)(E), undersigned counsel for *Amici* states that no party or party's counsel authored this brief in whole or in part, and no other person besides *Amici* or their counsel contributed money intended to fund preparing or submitting the brief.

Pursuant to D.C. Cir. R. 29(d), undersigned counsel for *Amici* states that a separate brief is necessary due to *Amici*'s distinct expertise and interests. *Amici* are members of Congress with personal experience and expertise regarding legislation and congressional powers that Petitioners have placed at issue in this case. *Amici* are therefore in a unique capacity to aid the Court in interpreting certain statutory provisions referenced in this case. *Amici* likewise have particular insight into the question of equal sovereignty and the authority of Congress to make laws. No other *amici curiae* appearing in this case share these perspectives or expertise, as far as *Amici* are aware. Accordingly, *Amici*, through counsel, certify that filing a joint brief would not be practicable.

*/s/ Cara A. Horowitz*
Cara A. Horowitz
January 20, 2023

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................................. i

Rule 29 Statements ...................................................................................................... iii

Table of Contents ..........................................................................................................v

Table of Authorities ................................................................................................... vi

Glossary .........................................................................................................................x

Statutes and Regulations ..............................................................................................1

Summary of Argument and Identity, Interests, and Source of Authority to File of *Amici Curiae* ...................................................................................................................1

Argument .......................................................................................................................5

   I.  The 1975 Act Does Not Preempt the § 209(b) Standards at Issue in This Case .......................................................................................................................5

     A.  The 1975 Act Does Not Preempt Vehicle-Emissions Standards, It Prioritizes Them. ................................................................................... 6

     B.  Subsequent Legislation Demonstrates a Consistent Understanding that the 1975 Act Does Not Preempt the § 209(b) Standards at Issue. ................ 15

     C.  The Low- and Zero-Emission Vehicle Programs are Not Preempted by the 1975 Act. ............................................................................................ 23

   II.  The Equal-Sovereignty Principle Does Not Limit Congress's Authority to Create Programs Like the § 209(b) Standards ...............................................26

Conclusion ................................................................................................................. 29

# TABLE OF AUTHORITIES

**U.S. Constitution**

U.S. Const. art. VI, cl. 2 ............................................................28

**Cases**

*Cent. Valley Chrysler-Jeep v. Goldstene*,
  529 F. Supp. 2d 1151 (E.D. Cal. 2007) ............................. 12, 15, 17, 18

*Ex parte Endo*,
  323 U.S. 283 (1944) ...............................................................21

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ........................................................ 16, 22

*Garcia v. San Antonio Metro. Transit Auth.*,
  469 U.S. 528 (1985) ...............................................................27

*Gobeille v. Liberty Mut. Ins. Co.*,
  577 U.S. 312 (2016) ...............................................................15

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*,
  508 F. Supp. 2d 295 (D. Vt. 2007) .................................... 12, 15, 17, 18

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...............................................................18

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*,
  627 F.2d 1096 (D.C. Cir. 1979).................................................. 16, 28

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019).......................................................8

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ......................................................... 27, 28

*Shelby Cnty. v. Holder*,
  570 U.S. 529 (2013) .......................................................... 5, 27, 28

*U.S. Term Limits, Inc. v. Thornton*,
  514 U.S. 779 (1995) ...............................................................27

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
   412 U.S. 609 (1973) ...................................................................12

*Wisc. Ctrl. Ltd. v. United States*,
   138 S. Ct. 2067 (2018)...............................................................9

**Federal Statutes**

42 U.S.C. § 7507 ........................................................................28

42 U.S.C. § 7521 ..........................................................................1

42 U.S.C. § 7543(a) ......................................................................1

42 U.S.C. § 7543(b) ........................................................... 1, 3, 28

42 U.S.C. § 17002 .......................................................................20

42 U.S.C. § 13212(f) ...................................................................19

49 U.S.C. § 32901(a) ...................................................................25

49 U.S.C. § 32902(f) ......................................................................9

49 U.S.C. § 32902(h) ...................................................................24

49 U.S.C. § 32905(a) ...................................................................25

49 U.S.C. § 32919(a) ..............................................................6, 24

15 U.S.C. § 2001 (1976) .............................................................25

15 U.S.C. § 2002(a) (1976) .........................................................10

15 U.S.C. § 2002(b) (1976) .........................................................10

15 U.S.C. § 2002(c) (1976) .................................................... 10, 11

15 U.S.C. § 2002(d) (1976) ................................................ 7, 8, 10, 13

15 U.S.C. § 2002(e) (1976) ............................................ 9, 10, 11, 14

15 U.S.C. § 2009(a) (1976)...........................................................7

15 U.S.C. § 2012(b) (1976) .........................................................25

Pub. L. No. 94-163, 89 Stat. 871 (1975)....................................................7

Pub. L. No. 95-95, 91 Stat. 685 (1977)....................................................16

Pub. L. No. 101-549, 104 Stat. 2399 (1990)............................................17

Pub. L. No. 103-272, 108 Stat. 745 (1994)................................................9

Pub. L. No. 110-140, 121 Stat. 1492 (2007)....................................... 19, 20

Pub. L. No. 117-169, 136 Stat. 1818 (2022)............................................21

**Federal Register**

42 Fed. Reg. 13,807 (Mar. 14, 1977)......................................................12

74 Fed. Reg. 32,744 (July 8, 2009)...........................................................2

84 Fed. Reg. 51,310 (Sept. 27, 2019) .......................................................2

87 Fed. Reg. 14,332 (Mar. 14, 2022).....................................................2-3

**Legislative History**

153 Cong. Rec. 34,178 (2007)................................................................20

153 Cong. Rec. 35,833 (2007)................................................................20

153 Cong. Rec. 35,927-28 (2007)...........................................................20

H.R. Rep. No. 94-340 (1975)..................................................................14

H.R. Rep. No. 95-294 (1977)..................................................................16

H.R. Rep. No. 110-297 (2007)........................................................... 18, 20

S. Rep. No. 93-526 (1973).....................................................................14

S. Rep. No. 93-793 (1974).....................................................................14

S. Rep. No. 94-179 (1975)................................................................ 13, 14

S. Rep. No. 94-516 (1975).....................................................................13

## California Code of Regulations

13 Cal. Code Regs. § 1955.1(a) ...............................................................23

## Other Authorities

Greg Dotson, *State Authority to Regulate Mobile Source Greenhouse Gas Emissions, Part 2: A Legislative and Statutory History Assessment*, 32 Geo. Env't L. Rev. 625 (2020)............................................................... 6, 7, 13, 14, 18

Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments of 2022: Clean Air, Climate Change, and the Inflation Reduction Act*, 53 Env't L. Rep. 10,017 (2023).........................................................................................22

Letter from Sens. Tom Carper, Dianne Feinstein & Edward J. Markey to Sec'y Elaine L. Chao & Acting Adm'r Andrew Wheeler (Oct. 25, 2018) https://www.carper.senate.gov/wp-content/uploads/archives/GHG%20Tailpipe%20standards.pdf; https://www.carper.senate.gov/wp-content/uploads/archives/CAFEdocumentsFINAL.pdf .......................................18

# GLOSSARY

| | |
|---|---|
| § 209(b) standards | Vehicle emission standards that have received a waiver pursuant to § 209(b) of the Clean Air Act, 42 U.S.C. § 7543(b) |
| 1975 Act | The Energy Policy and Conservation Act of 1975 |
| 2007 Amendments | The Energy Independence and Security Act of 2007 |
| EPA | The U.S. Environmental Protection Agency |
| NHTSA | The National Highway Traffic Safety Administration |

## STATUTES AND REGULATIONS

Pertinent statutes and regulations not reproduced in the parties' briefs are reproduced in the addendum filed with this brief.

## SUMMARY OF ARGUMENT AND IDENTITY, INTERESTS, AND SOURCE OF AUTHORITY TO FILE OF *AMICI CURIAE*

The Clean Air Act creates a dual system for regulating motor vehicle emissions. One set of regulations applies nationwide and is issued by the U.S. Environmental Protection Agency ("EPA"). 42 U.S.C. § 7521. States sometimes have the option to adopt an alternative set of regulations (here called "§ 209(b) standards" after the authorizing provision in the Clean Air Act). *Id.* §§ 7507, 7543(b). Congress gave the responsibility for crafting these alternative regulations to California—the state that had pioneered early vehicle-emissions regulations—and required EPA to approve these regulations except under narrow circumstances. *Id.* § 7543(a)-(b) (preempting state regulation of new-vehicle emissions, but allowing the "State which has adopted [such] standards (other than crankcase emission standards) . . . prior to March 30, 1966," i.e., California, to apply for a preemption waiver, which must be approved unless any of three limited exceptions is shown to apply).

For over fifty years, California has provided this alternative set of vehicle-emissions regulations. EPA has approved these § 209(b) standards nearly universally, denying California's application only once, and in that case reversing

1

itself almost immediately. *See* Waiver of Clean Air Act Preemption for California's 2009 and Subsequent Model Year Greenhouse Gas Emission Standards for New Motor Vehicles, 74 Fed. Reg. 32,744 (July 8, 2009) (reversing 2008 waiver denial).

The instant petition deals with another temporary—and unlawful—break in EPA's practice. In 2019, the agency ostensibly withdrew an approval that it had previously granted for § 209(b) standards regulating vehicle greenhouse-gas emissions (the "Low-Emission Vehicles" standards) and setting sales requirements for vehicles that emit no pollutants while operating (the "Zero-Emission Vehicles" standards). Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One, 84 Fed. Reg. 51,310 (Sept. 27, 2019). EPA rescinded its withdrawal in 2022, confirming that the Low- and Zero-Emission Vehicles regulations were properly approved as § 209(b) standards and restoring the status quo. California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption, 87 Fed. Reg. 14,332 (Mar. 14, 2022). Petitioners now challenge that rescission.

State Petitioners claim that the Low- and Zero-Emission Vehicles standards are preempted by the Energy Policy and Conservation Act of 1975 (the "1975 Act"). State Pet'rs' Br. 34-41, ECF No. 1971738 (filed Nov. 2, 2022). As an initial matter, preemption under the 1975 Act is not relevant to this case: EPA has no

2

authority to consider whether a § 209(b) standard is preempted when reviewing it and did not purport to do so here. *See* Resp'ts' Br. 94-97, ECF No. 1981480 (filed Jan. 13, 2023); 42 U.S.C. § 7543(b)(1) (limiting EPA's review of a § 209(b) standard to three enumerated criteria, none of which is preemption by another statute). Should the Court decide to reach the issue, however, *Amici*, as leaders of the House and Senate Committees with relevant expertise, offer their insight into the 1975 Act and related legislation as an aid to the Court.

Petitioners also propose a novel interpretation of the equal-sovereignty doctrine that would radically limit Congress's legislative power. *See* State Pet'rs' Br. 28-33; Industry Pet'rs' Br. 53-55. As members of Congress, *Amici* urge the Court to uphold Congress's longstanding power to shape preemptive regimes consistent with our federalist system.

*Amici*—Senator Tom Carper, Chairman of the U.S. Senate Committee on Environment and Public Works, and Representative Frank Pallone, Jr., Ranking Member of the U.S. House Committee on Energy and Commerce—therefore submit this brief pursuant to Fed. R. App. P. 29(a)(2), making the following arguments:

*First*, the 1975 Act does not preempt the § 209(b) standards at issue in this case. Nothing in the 1975 Act indicates an intent to invalidate elements of the Clean Air Act. Congress understood that the fuel-economy improvements it sought

3

through the 1975 Act could be affected by the vehicle-emissions standards created under the Clean Air Act, either because emissions-reducing technology might directly impact fuel economy or because some manufacturers might not be able to improve on both fronts simultaneously. But Congress struck the balance between these two aims in favor of public-health and air-quality goals: it made exceptions in the 1975 Act to prioritize Clean Air Act emissions reductions over fuel-economy improvements, not the other way around. In doing so, Congress explicitly required that § 209(b) standards be considered in setting fuel-economy requirements under the 1975 Act. Thus, reading the Act to preempt § 209(b) standards that affect fuel economy both contradicts Congressional intent and makes the Act nonsensical.

Nothing about the particular standards at issue here changes this analysis. Subsequent federal legislation has consistently reaffirmed Congress's intent to preserve § 209(b) standards, specifically including regulations such as the Low- and Zero-Emission Vehicles standards. The Clean Air Act Amendments of 1977 added flexibility to the § 209(b) standards and allowed other states to adopt them, a clear indication that Congress did not believe the 1975 Act had eliminated that program. Further, the Energy Independence and Security Act of 2007, which amended the 1975 Act (the "2007 Amendments"), the Clean Air Act Amendments of 1990, and the Inflation Reduction Act of 2022 all explicitly incorporate state

4

regulation of vehicle greenhouse-gas emissions—regulation that would be preempted if Petitioners' reading of the 1975 Act were correct.

**Second**, the principle of equal sovereignty does not prevent Congress from designing preemption regimes to fit its legislative aims, and Congress's use of that power to enact § 209(b) of the Clean Air Act promotes, rather than degrades, state autonomy. All states, when they entered the Union or ratified the Constitution, consented to the subordination of their sovereignty under the Supremacy and Commerce Clauses. When Congress acts within the bounds of those authorities, it may limit states' sovereignty as necessary to achieve its goals. The jurisprudence applying equal sovereignty to the Voting Rights Act does not say otherwise; in fact, *Shelby County v. Holder* explicitly distinguished Congress's broad preemption powers in applying the equal-sovereignty doctrine to limit the Voting Rights Act. *See* 570 U.S. 529, 542, 545 (2013). Additionally, § 209(b) standards benefit state sovereignty: they create an alternative, state-led set of emissions regulations that states may choose to adopt if the nationwide standards are insufficient for their needs, while preventing a proliferation of standards that would unduly burden the automobile industry.

## ARGUMENT

### I. The 1975 Act Does Not Preempt the § 209(b) Standards at Issue in This Case.

In designing the fuel-economy portions of the 1975 Act, Congress took care

not to interfere with public-health protections, including vehicle-emissions standards. Congress rejected several proposals to remove or delay emissions standards in favor of improved fuel economy, explicitly endorsed prioritizing environmental regulation in committee reports, and incorporated § 209(b) standards into the Act's regulatory structure. *See generally* Greg Dotson, *State Authority to Regulate Mobile Source Greenhouse Gas Emissions, Part 2: A Legislative and Statutory History Assessment*, 32 Geo. Env't L. Rev. 625, 631-42 (2020).

Given the manifest intent of the 1975 Act, it would be surprising to discover in the same Act a provision that *prevents* states from adopting the § 209(b) standards at issue in this case, as State Petitioners claim to have done. *See* State Pet'rs' Br. at 34-41. Indeed, the text and history of the 1975 Act, as well as that of relevant subsequent legislation, confirm that Petitioners' interpretation is incorrect: Congress did not preempt such standards when it passed the 1975 Act, and the Act cannot now be read to do so.

A. *The 1975 Act Does Not Preempt Vehicle-Emissions Standards, It Prioritizes Them.*

The text and legislative history of the 1975 Act indicate Congress's intent to prioritize vehicle-emissions standards, and particularly § 209(b) standards, over the new fuel-economy standards created by the 1975 Act. The 1975 Act's preemption provision does not affect vehicle-emissions standards; rather, it applies to state

6

"law[s] or regulation[s] related to fuel economy standards," 49 U.S.C. § 32919(a); *see also* 15 U.S.C. § 2009(a) (1976) (original language).[1] Further, Congress explicitly subordinated fuel economy requirements to "Federal standards," which include state regulations authorized by § 209(b) of the Clean Air Act. 15 U.S.C. § 2002(d)(1)(D) (1976). The history of the 1975 Act cements this reading: the enacting Congress was legislating to manage the nation's oil resources, but where conflict arose between achieving fuel economy and controlling vehicle emissions, it prioritized the latter. *See generally* Dotson, *supra*, at 631-42.

1. On a Plain Reading, the 1975 Act Shows No Intent to Preempt § 209(b) Standards.

On its face, the 1975 Act's preemption provision does not address vehicle-emissions standards. The 1975 Act preempts state regulations "related to fuel economy standards or average fuel economy standards," with no suggestion that it preempts vehicle-emissions regulations, such as § 209(b) standards. 15 U.S.C. § 2009(a) (1976). Indeed, it would be very strange if it did. The 1975 Act specifically incorporated § 209(b) standards as one of the "Federal standards" that the National Highway Traffic Safety Administration ("NHTSA") must consider in

---

[1] The fuel-economy provisions of the 1975 Act are all contained in a single, undifferentiated section. Pub. L. No. 94-163, § 301, 89 Stat. 871, 901-16 (1975). For readability and precision, *Amici* cite to these provisions as codified in the 1976 U.S. Code rather than the session law.

setting fuel-economy standards. *Id.* § 2002(d)(3)(D)(i) (listing "emissions standards applicable by reason of section 209(b) of [the Clean Air] Act" as "a category of Federal standards"). Reading the Act to preempt § 209(b) regulations would therefore lead to a "statutory contradiction" that Congress would not have intended. *See Mozilla Corp. v. FCC*, 940 F.3d 1, 37 (D.C. Cir. 2019) ("[I]nterpretations needed to avert 'statutory contradiction' (really, self-contradiction) ipso facto have a leg up on reasonableness.").

State Petitioners acknowledge that the 1975 Act "treated California [§ 209(b)] standards as federal standards" when it was passed, but they argue it "no longer does." State Pet'rs' Br. 40. They note that the 1975 Act used the phrase "Federal standards" in modifying the fuel-economy standards that were set by statute for vehicles with model years from 1978 through 1980. 15 U.S.C. § 2002(d) (1976) (giving NHTSA the authority to relax fuel-economy requirements if manufacturers demonstrated that the applicable emissions regulations—the "Federal standards"—were impacting their fuel economy). Since the 1980 model year is long gone, Petitioners argue, § 209(b) standards are no longer used by the 1975 Act and the Act's preemption provision now eliminates them. State Pet'rs' Br. 39-40.

This argument is incorrect for two reasons. First, it does not answer the underlying issue: even if the § 209(b) standards were incorporated into the 1975

Act only for a limited purpose, interpreting that Act as both incorporating and eliminating them still creates a contradiction. For the Act to have made sense at the time it was passed, the Act's preemption provision must not have prohibited § 209(b) standards. And since Congress has not expanded that provision since, it should not now be read to prohibit those standards. *See, e.g.*, *Wisc. Ctrl. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (Since "Congress alone has the . . . authority to revise statutes," the "original meaning of the written law" remains in effect until that law is changed).

Second, it is not true that § 209(b) standards are no longer a part of the 1975 Act; they are still incorporated as a criterion for setting several types of fuel-economy standards. Specifically, the 1975 Act requires NHTSA to use "Federal motor vehicle standards"—together with "technological feasibility," "economic practicability," and "the need for the Nation to conserve energy"—in determining the "maximum feasible average fuel economy level" achievable for a given sector or manufacturer. 15 U.S.C. § 2002(e) (1976).[2] NHTSA must use the "maximum feasible" level in setting several fuel-economy standards, including for non-passenger vehicles such as light-duty trucks or recreational vehicles; manufacturers

---

[2] A 1994 recodification changed this language to "motor vehicle standards of the Government." Revision of Title 49, Pub. L. No. 103-272, § 1(e), 108 Stat. 745, 1060 (codified at 49 U.S.C. § 32902(f)). The change is not substantive. *Id.* § 6(a), 108 Stat. at 1378.

9

producing fewer than 10,000 passenger vehicles a year; and passenger vehicles after model year 1980. *Id.* § 2002(a)(3)-(4), (b)-(c).

While "Federal motor vehicle standards" were not defined in the 1975 Act, it is clear from the Act's structure that they must include § 209(b) standards. "Federal motor vehicle standards" were used in the same section as the "Federal standards" that explicitly incorporated § 209(b) standards. There is no semantic difference between "Federal standards" applied to motor vehicles and "Federal motor vehicle standards," and the two phrases are used for the same purpose: determining the fuel-economy level achievable given existing emissions (and other) standards. *Compare id.* § 2002(d), *with id.* § 2002(a)-(c), (e).

Furthermore, excluding § 209(b) standards from "Federal motor vehicle standards," despite their explicit inclusion in "Federal standards," would lead to incongruous results. As discussed, the 1975 Act allowed passenger-vehicle manufacturers to request individualized adjustments to the statutory fuel-economy standards applicable to the 1978 through 1980 model years, which would relax their statutory requirements to account for the effect of "Federal standards" on their fuel economy. 15 U.S.C. § 2002(d) (1976). By contrast, NHTSA set standards for those same model years for non-passenger vehicles and for small manufacturers, taking account of "Federal motor vehicle standards." *Id.* § 2002(e). Accordingly, excluding § 209(b) standards from the set of "Federal motor vehicle

standards" would have created an illogical discrepancy as to model years 1978-1980: one means of setting fuel-economy requirements—the one used for passenger vehicles—would account for the effects of § 209(b) standards, while those for small manufacturers and non-passenger vehicles would not.

Such a distinction would have made no sense. It is particularly perverse as to small manufacturers, which receive special consideration under the 1975 Act: if the national fuel-economy standard is too onerous, they can petition NHTSA for a separate "maximum feasible average fuel economy" standard designed to fit their particular circumstances, accounting for the impact of "Federal motor vehicle standards." *Id.* § 2002(c), (e)(3). If § 209(b) standards were excluded from "Federal motor vehicle standards" but included in "Federal standards," the small-manufacturer option could be *more stringent* than the adjustment generally available to passenger-vehicle manufacturers, because it would not account for the impact of § 209(b) standards.

Including § 209(b) standards in the category of "Federal standards" while excluding them from "Federal motor vehicle standards" would have created perverse and unintended results. The more natural reading of the statute—in which "Federal motor vehicle standards" includes § 209(b) standards—provides "'the most harmonious, comprehensive meaning possible' in light of the legislative

11

policy and purpose," and is therefore correct. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631-32 (1973) (citation omitted).

It is not surprising, therefore, that both NHTSA and federal courts have read the 1975 Act as incorporating § 209(b) standards into "Federal motor vehicle standards." In setting the first non-passenger fuel-economy standards under the 1975 Act, NHTSA explicitly considered the "[e]ffect of California emissions standards," Average Fuel Economy Standards for Nonpassenger Automobiles, 42 Fed. Reg. 13,807, 13,814-15 (Mar. 14, 1977), and NHTSA has continued to do so across the decades. *See Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 347 n.54 (D. Vt. 2007) (collecting examples). The two federal courts that have issued opinions on this issue have agreed. *See id.* at 346-47 (finding "beyond serious dispute" that § 209(b) standards have "the same stature as a federal regulation with regard" to the 1975 Act); *Cent. Valley Chrysler-Jeep v. Goldstene*, 529 F. Supp. 2d 1151, 1173 (E.D. Cal. 2007) (once "a California regulation is granted waiver of preemption pursuant to section 209 of the Clean Air Act, . . . the Secretary of Transportation must consider [it] in formulating maximum feasible average fuel economy standards under" the 1975 Act). And Congress itself ratified these interpretations in amendments passed immediately after *Green Mountain* and *Central Valley*. *See infra*, Part I.B.3.

2.  The History of the 1975 Act Demonstrates that Congress Had No Intent to Preempt Emissions Regulations.

Congress's manifest objectives in passing the 1975 Act confirm that it intended emissions standards, including § 209(b) standards, to survive preemption. In drafting the 1975 Act, Congress closely considered the question of whether it should limit vehicle-emissions regulation to maximize fuel-economy reductions. The two goals were feared to be incompatible, as new emissions-reduction technologies could reduce vehicle mileage, and manufacturers might not have the resources to advance in both fields simultaneously. Dotson, *supra*, at 631-33; *see also* S. Rep. No. 94-516, at 202-03 (1975) (Conf. Rep.). The White House and some members of Congress pushed to favor fuel economy: President Ford twice proposed language that would have weakened vehicle-emissions standards, and members of Congress raised concerns that California's emissions standards would prevent any gains in fuel economy. *See* Dotson, *supra*, at 636-41 (collecting sources); S. Rep. No. 94-179, at 65 (1975) (separate statement of Sens. Robert P. Griffin and James L. Buckley) (citing EPA report that California's emissions standards for the 1977 model year could reduce fuel economy by 8-24 percent).

But Congress instead prioritized protecting air quality and public health. The 1975 Act excused manufacturers from full compliance with its fuel-economy requirements if emissions-reductions standards—explicitly including California's § 209(b) standards—impacted their fleets' mileage. 15 U.S.C. § 2002(d) (1976).

13

And the Act required NHTSA to incorporate any impact of emissions standards on fuel economy into future fuel-economy standards. *Id.* § 2002(e)(3).

Congress made this choice deliberately, as the legislative record demonstrates. *See, e.g.*, S. Rep. No. 94-179, at 6 (1975) (noting intent to create "the most fuel-efficient new car fleets compatible with safety, damageability, and emission standards"); H.R. Rep. No. 94-340, at 90 (1975) (noting the need for fuel economy standards to "take account of" possible future fuel-economy effects from emissions standards); S. Rep. No. 93-526, at 76-77 (1973) (acknowledging that Clean Air Act standards may have delayed fuel-economy improvements, but arguing that "this fact should certainly not be interpreted as an indictment of the standards"). Congress particularly favored § 209(b) standards, and even proposals to weaken other vehicle-emissions standards would have preserved § 209(b). *See, e.g.*, S. Rep. No. 93-793, at 98 (1974) (Conf. Rep.) (noting that under the Emergency Energy Act, an early bill which would have, *inter alia*, loosened vehicle-emissions standards, "California retains the right under section 209 of the Clean Air Act to seek a waiver for a more stringent standard"); Dotson, *supra*, at 638 (under President Ford's initial proposal, "authority would be retained allowing California to establish more stringent emission standards" (quoting letter from President Gerald Ford to Sen. Nelson Rockefeller, Jan. 30, 1975)).

14

Thus, the text of the 1975 Act and its legislative record demonstrate Congress's intent to preserve emissions-reduction regulations, and particularly the § 209(b) standards. This clear intent is further reason to favor a reading of the Act's preemption provisions that preserves § 209(b) standards. *Cf. Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (considering, in the context of an express preemption provision, "the objectives of the . . . statute as a guide to the scope of the state law that Congress understood would survive").

### B.  *Subsequent Legislation Demonstrates a Consistent Understanding that the 1975 Act Does Not Preempt the § 209(b) Standards at Issue.*

Nearly fifty years of congressional action since the passage of the 1975 Act confirm that § 209(b) standards, including those requiring greenhouse-gas reductions and zero-emissions vehicles, are not preempted. Through amendments to the Clean Air Act in 1977 and 1990, the 2007 Amendments to the 1975 Act, and the Inflation Reduction Act of 2022, Congress has demonstrated its consistent understanding that these standards are not preempted. This understanding aligns with contemporary interpretations from NHTSA, *see Green Mountain*, 508 F. Supp. 2d at 347 n.54 (collecting examples of NHTSA regulations treating § 209(b) standards as incorporated into the Act), and federal courts. *See id.* at 346-47; *Cent. Valley*, 529 F. Supp. 2d at 1173. By repeatedly enacting legislation premised on this clear understanding, Congress has "effectively ratified" NHTSA's and the courts' interpretation that the § 209(b) program is in no way limited by the 1975

15

Act. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000) (finding Congressional ratification of an agency statutory interpretation where Congress had demonstrated an awareness of that interpretation, and enacted legislation premised on that understanding).

      1.   Soon after Passing the 1975 Act, Congress Expanded the § 209(b) Program.

Congress demonstrated its understanding that § 209(b) standards survived the 1975 Act almost immediately after passing the Act. The Clean Air Act Amendments of 1977 amended § 209 of the Clean Air Act, Pub. L. No. 95-95, § 207, 91 Stat. 685, 755 (1977), "confer[ring] broad discretion on the State of California" to develop them. H.R. Rep. No. 95-294, at 23 (1977). The act also allowed states other than California to adopt § 209(b) standards. Pub. L. 95-95, § 129(b), 91 Stat. at 750 (adding § 177 to the Clean Air Act). Indeed, Congress described the 1977 amendment as "ratify[ing] and strengthen[ing]" the waiver provision. H.R. Rep. No. 95-294, at 301-02. In other words, "Congress had an opportunity to restrict" the § 209(b) standards in light of the 1975 Act, but instead expanded and enhanced the program. *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1096, 1110 (D.C. Cir. 1979).

      2.   The 1990 Amendments to the Clean Air Act Explicitly Incorporated § 209(b) Standards Similar to the Low- and Zero-Emission Standards.

In the comprehensive Clean Air Act Amendments of 1990, Congress went

even further, specifically relying on § 209(b) zero-emission standards to create a federal clean-fleet program. These amendments require operators of certain vehicle fleets to add more low-emission vehicles to their fleets, and award transferable credits to operators that add zero-emission vehicles. Pub. L. No. 101-549, § 229(a), 104 Stat. 2399, 2520-23 (1990) (adding § 246 to the Clean Air Act). In setting the standards for zero-emission vehicles, the amendments require EPA to "conform as closely as possible to standards which are established by the State of California for . . . ZEVs [i.e., zero-emission vehicles] in the same class." *Id.*, 103 Stat. at 2523 (adding § 246(f)(4)). By enacting amendments explicitly premised on the existence of § 209(b) standards—and specifically zero-emission standards—Congress endorsed these standards, showing that it did not consider them to be preempted.

3.  The 2007 Amendments to the 1975 Act Ratified the Federal Courts' Interpretation of § 209(b) Standards.

In the Energy Independence and Security Act of 2007, which amended the fuel-economy provisions of the 1975 Act, Congress again ratified an interpretation of the 1975 Act that protects § 209(b) standards. These amendments were passed in the wake of several important judicial decisions, including two holding that § 209(b) standards regulating greenhouse gases specifically were not preempted by the 1975 Act. *Green Mountain*, 508 F. Supp. 2d at 346-47; *Cent. Valley*, 529 F. Supp. 2d at 1173. Congress not only declined the opportunity to rework the 1975 Act to reverse the courts' actions, it incorporated § 209(b) greenhouse-gas

17

standards into the amendments, while favorably noting the "greenhouse gas emissions standards . . . adopted by California and other states." H.R. Rep. No. 110-297, at 17 (2007).

In the first of these judicial decisions, the Supreme Court's landmark opinion in *Massachusetts v. EPA* held that the 1975 Act's fuel-economy standards do not alter EPA's regulatory obligations under the Clean Air Act. 549 U.S. 497, 532 (2007) ("The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency"). Shortly afterward, two district courts published opinions specifically addressing the question of whether § 209(b) standards that regulate greenhouse-gas emissions or require sales of zero-emission vehicles were preempted by the 1975 Act. Both held that they were not. *Green Mountain*, 508 F. Supp. 2d at 353-54; *Cent. Valley*, 529 F. Supp. 2d at 1163.

The relevance of these court cases was not lost on Congress. Several proposals were introduced to eliminate federal greenhouse-gas emissions standards for vehicles, including those adopted through § 209(b). *See generally* Dotson, *supra*, at 652-58 (recounting proposals and collecting sources); Letter from Sens. Tom Carper, Dianne Feinstein & Edward J. Markey to Sec'y Elaine L. Chao & Acting Adm'r Andrew Wheeler (Oct. 25, 2018) (referencing lobbyists' proposals

18

to subordinate greenhouse-gas regulation under the Clean Air Act to the 1975 Act's fuel-economy standards).[3]

But Congress rejected these proposals and did the opposite: it explicitly incorporated California's greenhouse-gas motor vehicle regulations into the legislation, ratifying those regulations. The 2007 Amendments include a requirement that federal agencies purchase only "low greenhouse gas emitting vehicles." Pub. L. No. 110-140, § 141, 121 Stat. 1492, 1517 (2007) (codified at 42 U.S.C. § 13212(f)(2)(A)). The law tasked EPA with identifying "low greenhouse gas emitting vehicles," taking into account "the *most stringent standards* for vehicle greenhouse gas emissions applicable to and enforceable against motor vehicle manufacturers *for vehicles sold anywhere in the United States*." *Id.*, 121 Stat. at 1518 (codified at 42 U.S.C. § 13212(f)(2)(B)) (emphasis added).

Congress's reference to enforceable greenhouse-gas standards "for vehicles sold anywhere in the United States" could only have been a reference to § 209(b) standards. As explained in the committee report on H.R. 2635, the bill where the language originated, "[c]urrently, the only applicable greenhouse gas emissions standards are those adopted by California and other states. Those standards will be

---

[3] *Available at* https://www.carper.senate.gov/wp-content/uploads/archives/GHG%20Tailpipe%20standards.pdf; https://www.carper.senate.gov/wp-content/uploads/archives/CAFEdocumentsFINAL.pdf.

enforceable if and when EPA grants the waiver requested by the state of California under the Clean Air Act." H.R. Rep. No. 110-297, at 17.

To avoid any doubt about its intent, Congress enacted a savings clause preserving, *inter alia*, existing state authority and showing Congress's approval of the *Green Mountain* and *Central Valley* decisions. Pub. L. No. 110-140, § 3, 121 Stat. 1492, 1498 (2007) (codified at 42 U.S.C. § 17002) ("Except to the extent expressly provided," nothing in the amendments to the 1975 Act "supersedes [or] limits the authority provided . . . by . . . any provision of law (including a regulation)"); *see also* 153 Cong. Rec. 35,833, 35,927-28 (statement of Rep. Markey, lead author of the legislation) ("It is the intent of Congress to fully preserve existing federal and State authority under the Clean Air Act," including "the authority affirmed . . . in *Green Mountain* . . . [and] *Central Valley*"); *see also id.* at 34,178 (statement of Sen. Dianne Feinstein, co-sponsor of the legislation) (explaining that the amendments "do[] not impact the authority to regulate tailpipe emissions of the EPA, California, or other States under the Clean Air Act," and citing *Central Valley*).

The 2007 Amendments to the 1975 Act thus provide the clearest possible example of Congressional ratification of state greenhouse-gas standards under § 209(b). Three major court decisions affirmed that § 209(b) greenhouse-gas standards were not preempted by the 1975 Act. Shortly after, Congress overhauled

the 1975 Act, rejecting several attempts to reverse those decisions and instead explicitly incorporating the § 209(b) greenhouse-gas standards into its amendments. The lead authors of the 2007 Amendments made clear that the amendments were intended to ratify the courts' interpretation that states can regulate greenhouse-gas emissions from vehicles.

### 4. The Inflation Reduction Act of 2022 Again Incorporated State Low- and Zero-Emission Vehicle Regulations.

In the Inflation Reduction Act of 2022, Congress again confirmed, through appropriation, that state regulation of vehicle greenhouse-gas emissions under § 209(b) is both legal and in the public interest. Where Congress appropriates funding for an agency to engage in a specific action, that appropriation acts as a ratification from Congress when it "plainly show[s] a purpose to bestow the precise authority which is claimed." *Ex parte Endo*, 323 U.S. 283, 303 n. 24 (1944).

Thus, it is particularly telling that Congress adopted § 60105(g) of the Inflation Reduction Act, which allocates $5 million to EPA to help "States *to adopt and implement greenhouse gas and zero-emission standards for mobile sources* pursuant to section 177 of the Clean Air Act," which is the provision that allows states other than California to adopt § 209(b) standards. Pub. L. No. 117-169, 136 Stat. 1818, 2068-69 (emphasis added). Congress thus has again "ratified" the understanding that § 209(b) standards are not preempted by "affirmatively

21

act[ing]" to "create[] a distinct scheme . . . premised on th[at] belief." *Brown & Williamson*, 529 U.S. at 156; *see also* Greg Dotson & Dustin J. Maghamfar, *The Clean Air Act Amendments of 2022: Clean Air, Climate Change, and the Inflation Reduction Act*, 53 Env't L. Rep. 10,017, 10,030-32 (2023) (noting Congressional ratification of the validity of greenhouse-gas and zero-emission § 209(b) standards via this provision of the Inflation Reduction Act).

 *Amici* are in the best possible position to understand the origin and purpose of this provision. As the Chairs of the Senate and House Committees with jurisdiction over the Clean Air Act, *Amici* collaborated to conceive and draft the language of § 60105(g), which *Amici* included in the bill that was reported from the U.S. House Committee on Energy and Commerce, protected as they shepherded key provisions through the negotiation process, and, along with a majority of their colleagues, passed into law. *Amici* and the enacting Congress intended this provision to provide funding to support state adoption of § 209(b) greenhouse-gas and zero-emission standards; the provision allows for no other use of these funds. Congress understood, and its intent could only be fulfilled if: (1) EPA retained the authority to approve such standards; and (2) the standards were not preempted by the 1975 Act. By enacting § 60105(g) to fund activities that could only occur if NHTSA was correct in withdrawing its determination that § 209(b) standards are preempted, Congress knowingly and deliberately ratified

NHTSA's action and reaffirmed EPA's existing authority to approve state Low- and Zero-Emission Vehicle standards under § 209(b).

### C. The Low- and Zero-Emission Vehicle Programs are Not Preempted by the 1975 Act.

The text and history of the 1975 Act, together with Congress's subsequent legislative enactments, all indicate an unwavering Congressional understanding that the Act does not preempt the § 209(b) standards at issue in this case. None of State Petitioners' arguments attempting to tie the 1975 Act's preemption provisions to specific elements of these standards succeeds in suggesting otherwise.

State Petitioners first argue that the Low-Emission Vehicles standards are preempted because they regulate carbon-dioxide emissions, and that "[t]he more gasoline a vehicle burns to travel a mile, the more carbon dioxide it emits." State Pet'rs' Br. 35. But this is the case for any pollutant emitted by gas-powered vehicles: burning more fuel in the same vehicle always produces more emissions. If this logic applies to preempt carbon-dioxide regulations, then it must, as a corollary, also preempt the hydrocarbon, carbon-monoxide, and nitrogen-oxides regulations in place when the 1975 Act was passed. *See, e.g.*, 13 Cal. Code Regs. § 1955.1(a). And while compliance with the Low-Emission Vehicles standards could affect fuel economy, that fact cannot be determinative here. The 1975 Act anticipates and accommodates effects on fuel economy from compliance with

23

emissions standards and is neutral about whether those effects might improve or hinder fuel economy. In any case, Congress's legislative enactments make clear that § 209(b) standards that regulate greenhouse gases are no more subject to preemption than other § 209(b) standards. *See supra* Part I.B.2-4.

Next, Petitioners make two arguments specific to the Zero-Emissions Vehicles standards. First, they argue that because producing vehicles that conform to those standards will affect the average fuel economy of a manufacturer's fleet, the standards "relate to" the fuel economy of that fleet and are therefore preempted. State Pet'rs' Br. 36-38. But even if the Zero-Emission Vehicle standards were "related to" fuel economy, they would not be "related to . . . fuel economy *standards*," 49 U.S.C. § 32919(a) (emphasis added), because zero-emission vehicles are specifically excluded from the process for setting fuel-economy standards. 49 U.S.C. § 32902(h)(1). In any case, State Petitioners' argument proves too much. As discussed in detail above, *supra* Part I.A.2, Congress assumed that § 209(b) standards would have a significant effect on fuel economy, yet preserved them. Thus, concluding that standards are preempted simply because they have a significant effect on fleetwide fuel economy leads to a contradiction in the statute, and that reading should be rejected.

State Petitioners also appear to craft a daisy-chained argument that zero-emission vehicle mandates must be preempted under the Act because the phrase

"fuel economy" includes the word "fuel," and because "alternative fuel" is elsewhere defined to include electricity—thus, a mandate requiring electric vehicles must relate to a "fuel economy" standard. State Pet'rs' Br. 37-38 (quoting 49 U.S.C. §§ 32901(a)(1), 32905(a)). This is incorrect. The 1975 Act's definition of "fuel economy" does not (and did not) refer to "alternative fuel," only "fuel," which is defined separately and includes only "gaseous" and "liquid" fuels, 49 U.S.C. § 32901(a)(10)-(11); 15 U.S.C. § 2001(5)-(6) (1976). In fact, the 1975 Act explicitly noted that electricity would *not* fall within its definition of "fuel." 15 U.S.C. § 2012(b) (1976) (including "electric vehicles" in the category of "vehicles not consuming fuel (as defined in [15 U.S.C. § 2001(5) (1976)])," and defining "electric vehicle" to include vehicles powered by fuel cells). Moreover, when the preemption provision was first enacted, no part of the 1975 Act used the phrase "alternative fuels." *See generally* Pub. L. No. 94-163, tit. III, pt. A, 89 Stat. 871, 901-16 (1975). Congress had no intent to incorporate "alternative fuels" into its preemption provision when it passed the Act; and, as Congress has not since expanded it, that provision cannot be read now to include "alternative fuels."

In sum, the 1975 Act's text, structure, and history, together with subsequent interpretations that Congress has ratified, demonstrate the impossibility of reading the 1975 Act to preempt the § 209(b) standards at issue here. Such a reading would not only be incompatible with the text, it would be contrary to Congress's manifest

25

intent in crafting and maintaining, for almost fifty years, a motor vehicle emissions

regulatory structure that relies on the continued validity of § 209(b) standards,

including regulations such as the Low- and Zero-Emission Vehicles standards.

## II. The Equal-Sovereignty Principle Does Not Limit Congress's Authority to Create Programs Like the § 209(b) Standards.

State Petitioners assert a novel reading of the equal-sovereignty principle,

claiming that "laws passed pursuant to Congress's Article I powers violate the

Constitution if they withdraw sovereign authority from some States but not

others." State Pet'rs' Br. at 12. *Amici* urge the Court to reject this artificial and

unprecedented limitation on Congress's powers. Article I and the Supremacy

Clause authorize Congress to shape preemption to fit the needs of the particular

field in which it legislates—as it did in enacting § 209(b) of the Clean Air Act—

and the equal-sovereignty principle has never been applied to limit this authority.

*See* Resp'ts' Br. 34-35. The state-led regulatory program that § 209(b) creates does

not undermine "a federalist system." *Contra* State Pet'rs' Br. at 29-30. Rather, it

promotes state authority by giving states the flexibility to adopt an alternative set

of regulations in lieu of the national standards if needed, while preventing an

unduly burdensome proliferation of vehicle-emissions standards.

Each state, when it ratified the Constitution or when it joined the Union,

agreed to subordinate its sovereignty to Congress's authority under Article I of the

Constitution and the Supremacy Clause. Within the scope of those powers,

Congress is free to act as it chooses unless constrained by another provision of the Constitution. *See, e.g.*, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801-02 (1995) ("As we have frequently noted, '[t]he States unquestionably do retain a significant measure of sovereign authority. They do so, however, *only to the extent that the Constitution has not divested them of their original powers* and transferred those powers to the Federal Government.'" (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 549 (1985))). The recent Supreme Court jurisprudence regarding the Voting Rights Act, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193 (2009); *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013), does not change this analysis. Neither of these opinions addresses Congress's power under the Commerce Clause, and both make clear that the principle of equal sovereignty does not prevent Congress from creating differentiated statutory regimes. *Nw. Austin*, 557 U.S. at 203 ("Distinctions can be justified in some cases."); *Shelby Cnty*, 570 U.S. at 542 (noting that the Supreme Court has "rejected the notion that the principle [of equal sovereignty] operated as a *bar* on differential treatment").

*Shelby County* does address the Supremacy Clause, but only to disclaim any effect on Congress's preemption power. The opinion distinguishes preemption under the Supremacy Clause from the Voting Rights Act's requirement that certain state laws be reviewed by the Attorney General before they take effect. 570 U.S. at 542 ("The Constitution and laws of the United States are 'the supreme Law of the

27

Land.' U.S. Const., Art. VI, cl. 2. State legislation may not contravene federal law. The Federal Government does not, however, have a general right to review and veto state enactments"). It goes on to discuss the state powers that remain "[o]utside the strictures of the Supremacy Clause," including the power to regulate elections, *id.* at 543, and closes by emphasizing the unique character of the Voting Rights Act, which was "extraordinary legislation otherwise unfamiliar to our federal system." *Id.* at 545 (quoting *Nw. Austin*, 557 U.S. at 211). Thus, *Shelby County* emphasizes the limitations of the equal-sovereignty doctrine, and specifically distinguishes Congress's exercise of its ordinary preemption powers— at issue here—from "extraordinary legislation" such as the Voting Rights Act.

Finally, contrary to State Petitioners' argument, the design of the § 209(b) standards promotes, rather than detracts from, state autonomy. State Pet'rs' Br. 29-30. Through this program, Congress has authorized California to "act as a . . . . laboratory for innovation" by creating alternatives to the nationwide vehicle-emissions regulations, which other states may then adopt. *Motor & Equip. Mfrs. Ass'n*, 627 F.2d at 1111; *see also* 42 U.S.C. §§ 7543(b), 7507. This system showcases the best elements of federalism. By creating an alternative set of regulatory standards available to states, Congress has provided those states greater flexibility than they otherwise would have. By allowing a state, rather than EPA, to design these standards, Congress has ensured that they will reflect state

perspectives and needs. And, by limiting the system to two alternatives—one federally-led, one state-led—Congress has protected against a proliferation of standards that would be unworkable for the automotive industry.

## CONCLUSION

*Amici* urge the Court to reject State Petitioners' interpretation of the 1975 Act and to decline to impose new, unfounded constraints on Congress's lawmaking power.

Respectfully submitted,

*/s/ Cara A. Horowitz*
CARA A. HOROWITZ
D.C. Circuit Bar No. 56629
DANIEL N. CARPENTER-GOLD
GABRIEL F. GREIF
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
horowitz@law.ucla.edu

*Counsel for* Amici Curiae

January 20, 2023

CONFIDENTIAL ATTORNEY WORK PRODUCT | DRAFT NOT FOR DISTRIBUTION

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in D.C. Cir. R. 32(e)(3), Fed. R. App. P. 29(a)(5), and the Court's Scheduling Order, ECF No. 1965631 (filed Sept. 20, 2022), because this brief contains 6496 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1). The foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Cara A. Horowitz*
CARA A. HOROWITZ
January 20, 2023

CONFIDENTIAL ATTORNEY WORK PRODUCT | DRAFT NOT FOR DISTRIBUTION

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of January, 2023, I caused to be electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the Court's CM/ECF system, which constitutes service on all parties and parties' counsel who are registered ECF filers.

*/s/ Cara A. Horowitz*
CARA A. HOROWITZ
January 20, 2023

ORAL ARGUMENT NOT YET SCHEDULED

**No. 22-1081**

Consolidated with Nos. 22-1083, 22-1084, and 22-1085

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

STATE OF OHIO, *ET AL.*,

*Petitioners,*

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL S. REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency,**

*Respondents,*

ADVANCED ENERGY ECONOMY, *ET AL.*,

*Intervenors.*

---

On Petitions for Review of Final Agency Action by the U.S.
Environmental Protection Agency

---

**STATUTORY AND REGULATORY ADDENDUM OF *AMICI CURIAE*
SENATOR TOM CARPER, CHAIRMAN OF THE SENATE
ENVIRONMENT AND PUBLIC WORKS COMMITTEE, AND
REPRESENTATIVE FRANK PALLONE, JR., RANKING MEMBER OF
THE HOUSE COMMITTEE ON ENERGY AND COMMERCE**

---

CARA A. HOROWITZ
D.C. Circuit Bar No. 56629
DANIEL N. CARPENTER-GOLD
GABRIEL F. GREIF
Frank G. Wells Environmental Law
Clinic, UCLA School of Law
405 Hilgard Avenue
Los Angeles, CA 90095
Tel: (310) 206-4033
horowitz@law.ucla.edu

January 20, 2023                *Counsel for* Amici Curiae

# TABLE OF CONTENTS

*Statutes*

42 U.S.C. § 17002 ............................................................................. A-001

49 U.S.C. § 32901 ............................................................................. A-002

15 U.S.C. §§ 2001-2012 (1976)........................................................ A-007

Pub. L. No. 103-272, § 6, 108 Stat. 745, 1378-79 ........................... A-018

Pub. L. No. 117-169, § 60105, 136 Stat. 1818, 2067-69 ................. A-020

*Regulations*

13 Cal. Code Regs. § 1955.1............................................................. A-023

§ 17002. Relationship to other law, 42 USCA § 17002

---

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 152. Energy Independence and Security

42 U.S.C.A. § 17002

§ 17002. Relationship to other law

Effective: December 20, 2007

Currentness

Except to the extent expressly provided in this Act or an amendment made by this Act, nothing in this Act or an amendment made by this Act supersedes, limits the authority provided or responsibility conferred by, or authorizes any violation of any provision of law (including a regulation), including any energy or environmental law or regulation.

**CREDIT(S)**

(Pub.L. 110-140, § 3, Dec. 19, 2007, 121 Stat. 1498.)

42 U.S.C.A. § 17002, 42 USCA § 17002
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

§ 32901. Definitions, 49 USCA § 32901

🚩 KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

United States Code Annotated
  Title 49. Transportation (Refs & Annos)
    Subtitle VI. Motor Vehicle and Driver Programs
      Part C. Information, Standards, and Requirements (Refs & Annos)
        Chapter 329. Automobile Fuel Economy (Refs & Annos)

49 U.S.C.A. § 32901

§ 32901. Definitions

Effective: December 19, 2014

Currentness

**(a) General.**--In this chapter--

  **(1)** "alternative fuel" means--

    **(A)** methanol;

    **(B)** denatured ethanol;

    **(C)** other alcohols;

    **(D)** except as provided in subsection (b) of this section, a mixture containing at least 85 percent of methanol, denatured ethanol, and other alcohols by volume with gasoline or other fuels;

    **(E)** natural gas;

    **(F)** liquefied petroleum gas;

    **(G)** hydrogen;

    **(H)** coal derived liquid fuels;

**(I)** fuels (except alcohol) derived from biological materials;

**(J)** electricity (including electricity from solar energy); and

**(K)** any other fuel the Secretary of Transportation prescribes by regulation that is not substantially petroleum and that would yield substantial energy security and environmental benefits.

**(2)** "alternative fueled automobile" means an automobile that is a--

**(A)** dedicated automobile; or

**(B)** dual fueled automobile.

**(3)** except as provided in section 32908 of this title, "automobile" means a 4-wheeled vehicle that is propelled by fuel, or by alternative fuel, manufactured primarily for use on public streets, roads, and highways and rated at less than 10,000 pounds gross vehicle weight, except--

**(A)** a vehicle operated only on a rail line;

**(B)** a vehicle manufactured in different stages by 2 or more manufacturers, if no intermediate or final-stage manufacturer of that vehicle manufactures more than 10,000 multi-stage vehicles per year; or

**(C)** a work truck.

**(4)** "automobile manufactured by a manufacturer" includes every automobile manufactured by a person that controls, is controlled by, or is under common control with the manufacturer, but does not include an automobile manufactured by the person that is exported not later than 30 days after the end of the model year in which the automobile is manufactured.

**(5)** "average fuel economy" means average fuel economy determined under section 32904 of this title.

**(6)** "average fuel economy standard" means a performance standard specifying a minimum level of average fuel economy applicable to a manufacturer in a model year.

**(7)** "commercial medium- and heavy-duty on-highway vehicle" means an on-highway vehicle with a gross vehicle weight rating of 10,000 pounds or more.

**(8)** "dedicated automobile" means an automobile that operates only on alternative fuel.

**(9)** "dual fueled automobile" means an automobile that--

**(A)** is capable of operating on alternative fuel or a mixture of biodiesel and diesel fuel meeting the standard established by the American Society for Testing and Materials or under section 211(u) of the Clean Air Act (42 U.S.C. 7545(u)) for fuel containing 20 percent biodiesel (commonly known as "B20") and on gasoline or diesel fuel;

**(B)** provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the United States Government, when operating on alternative fuel as when operating on gasoline or diesel fuel;

**(C)** for model years 1993-1995 for an automobile capable of operating on a mixture of an alternative fuel and gasoline or diesel fuel and if the Administrator of the Environmental Protection Agency decides to extend the application of this subclause, for an additional period ending not later than the end of the last model year to which section 32905(b) and (d) of this title applies, provides equal or superior energy efficiency, as calculated for the applicable model year during fuel economy testing for the Government, when operating on a mixture of alternative fuel and gasoline or diesel fuel containing exactly 50 percent gasoline or diesel fuel as when operating on gasoline or diesel fuel; and

**(D)** for a passenger automobile, meets or exceeds the minimum driving range prescribed under subsection (c) of this section.

**(10)** "fuel" means--

**(A)** gasoline;

**(B)** diesel oil; or

**(C)** other liquid or gaseous fuel that the Secretary decides by regulation to include in this definition as consistent with the need of the United States to conserve energy.

**(11)** "fuel economy" means the average number of miles traveled by an automobile for each gallon of gasoline (or equivalent amount of other fuel) used, as determined by the Administrator under section 32904(c) of this title.

**(12)** "import" means to import into the customs territory of the United States.

**(13)** "manufacture" (except under section 32902(d) of this title) means to produce or assemble in the customs territory of the United States or to import.

§ 32901. Definitions, 49 USCA § 32901

**(14)** "manufacturer" means--

**(A)** a person engaged in the business of manufacturing automobiles, including a predecessor or successor of the person to the extent provided under regulations prescribed by the Secretary; and

**(B)** if more than one person is the manufacturer of an automobile, the person specified under regulations prescribed by the Secretary.

**(15)** "model" means a class of automobiles as decided by regulation by the Administrator after consulting and coordinating with the Secretary.

**(16)** "model year", when referring to a specific calendar year, means--

**(A)** the annual production period of a manufacturer, as decided by the Administrator, that includes January 1 of that calendar year; or

**(B)** that calendar year if the manufacturer does not have an annual production period.

**(17)** "non-passenger automobile" means an automobile that is not a passenger automobile or a work truck.

**(18)** "passenger automobile" means an automobile that the Secretary decides by regulation is manufactured primarily for transporting not more than 10 individuals, but does not include an automobile capable of off-highway operation that the Secretary decides by regulation--

**(A)** has a significant feature (except 4-wheel drive) designed for off-highway operation; and

**(B)** is a 4-wheel drive automobile or is rated at more than 6,000 pounds gross vehicle weight.

**(19)** "work truck" means a vehicle that--

**(A)** is rated at between 8,500 and 10,000 pounds gross vehicle weight; and

**(B)** is not a medium-duty passenger vehicle (as defined in section 86.1803-01 of title 40, Code of Federal Regulations, as in effect on the date of the enactment of the Ten-in-Ten Fuel Economy Act).

§ 32901. Definitions, 49 USCA § 32901

**(b) Authority to change percentage.--**The Secretary may prescribe regulations changing the percentage referred to in subsection (a)(1)(D) of this section to not less than 70 percent because of requirements relating to cold start, safety, or vehicle functions.

**(c) Minimum driving ranges for dual fueled passenger automobiles.--(1)** The Secretary shall prescribe by regulation the minimum driving range that dual fueled automobiles that are passenger automobiles must meet when operating on alternative fuel to be dual fueled automobiles under sections 32905 and 32906 of this title. A determination whether a dual fueled automobile meets the minimum driving range requirement under this paragraph shall be based on the combined Agency city/highway fuel economy as determined for average fuel economy purposes for those automobiles.

**(2)(A)** The Secretary may prescribe a lower range for a specific model than that prescribed under paragraph (1) of this subsection. A manufacturer may petition for a lower range than that prescribed under paragraph (1) for a specific model.

**(B)** The minimum driving range prescribed for dual fueled automobiles (except electric automobiles) under subparagraph (A) of this paragraph or paragraph (1) of this subsection must be at least 200 miles, except that beginning with model year 2016, alternative fueled automobiles that use a fuel described in subparagraph (E) of subsection (a)(1) shall have a minimum driving range of 150 miles.

**(C)** If the Secretary prescribes a minimum driving range of 200 miles for dual fueled automobiles (except electric automobiles) under paragraph (1) of this subsection, subparagraph (A) of this paragraph does not apply to dual fueled automobiles (except electric automobiles). Beginning with model year 2016, if the Secretary prescribes a minimum driving range of 150 miles for alternative fueled automobiles that use a fuel described in subparagraph (E) of subsection (a)(1), subparagraph (A) shall not apply to dual fueled automobiles (except electric automobiles).

**(3)** In prescribing a minimum driving range under paragraph (1) of this subsection and in taking an action under paragraph (2) of this subsection, the Secretary shall consider the purpose set forth in section 3 of the Alternative Motor Fuels Act of 1988 (Public Law 100-494, 102 Stat. 2442), consumer acceptability, economic practicability, technology, environmental impact, safety, drivability, performance, and other factors the Secretary considers relevant.

**CREDIT(S)**

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1056; Pub.L. 110-140, Title I, § 103(a), Dec. 19, 2007, 121 Stat. 1501; Pub.L. 113-291, Div. A, Title III, § 318(b), Dec. 19, 2014, 128 Stat. 3341.)

49 U.S.C.A. § 32901, 49 USCA § 32901
Current through P.L. 117-262. Some statute sections may be more current, see credits for details.

WESTLAW     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

such inspections. For the purposes of this section, the term "probable cause" means a valid public interest in the effective enforcement of this subchapter or regulations issued thereunder sufficient to justify administrative inspections of the area, factory, warehouse, establishment, premises, or motor vehicle, or contents thereof, in the circumstances specified in the application for the warrant.

(2) A warrant shall be issued only upon an affidavit of an officer or employee having knowledge of the facts alleged, sworn to before the judge or magistrate and establishing the grounds for issuing the warrant. If the judge or magistrate is satisfied that grounds for the application exist or that there is a reasonable basis for believing they exist, he shall issue a warrant identifying the area, factory, warehouse, establishment, premises, or motor vehicle to be inspected, the purpose of such inspection, and, where appropriate, the type of property to be inspected, if any. The warrant shall—

(A) identify the items or type of property to be impounded, if any;

(B) be directed to a person authorized under section 1990d of this title to execute it;

(C) state the grounds for its issuance and the name of the person or persons whose affidavit has been taken in support thereof;

(D) command the person to whom it is directed to inspect the area, factory, warehouse, establishment, premises, or motor vehicle identified for the purpose specified, and, where appropriate, shall direct the impoundment of the property specified;

(E) direct that it be served during the hours specified in it; and

(F) designate the judge or magistrate to whom it shall be returned.

(3) A warrant issued pursuant to this section must be executed and returned within 10 days of its date unless, upon a showing by the Secretary of a need therefor, the judge or magistrate allows additional time in the warrant. If property is impounded pursuant to a warrant, the person executing the warrant shall give the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken. The return of the warrant shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the person executing the warrant and of the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the person making such inventory, and shall be verified by the person executing the warrant. The judge or magistrate, upon request, shall deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

(4) The judge or magistrate who has issued a warrant under this section shall attach to the warrant a copy of the return and all papers filed in connection therewith and shall file them with the clerk of the district court of the United States for the judicial district in which the inspection was made.

(Pub. L. 92-513, title IV, § 415, as added Pub. L. 94-364, title IV, § 408(2), July 14, 1976, 90 Stat. 987.)

### § 1990f. Compliance with inspection and investigation requirements

No person shall fail to comply with the requirements of section 1990d of this title to maintain records, make reports, provide information, permit access to or copying of records, permit entry or inspection, or permit impounding.

(Pub. L. 92-513, title IV, § 416, as added Pub. L. 94-364, title IV, § 408(2), July 14, 1976, 90 Stat. 988.)

### § 1990g. Authorization of appropriations

There are authorized to be appropriated to carry out this subchapter $450,000 for the fiscal year ending June 30, 1976; $100,000 for the period beginning July 1, 1976, and ending September 30, 1976; $650,000 for the fiscal year ending September 30, 1977; and $562,000 for the fiscal year ending September 30, 1978.

(Pub. L. 92-513, title IV, § 417, as added Pub. L. 94-364, title IV, § 408(2), July 14, 1976, 90 Stat. 989.)

### § 1991. State odometer requirements

This subchapter does not—

(1) annul, alter, or affect the laws of any State with respect to the disconnecting, altering, or tampering with odometers with the intent to defraud, or

(2) exempt any person subject to the provisions of this subchapter from complying with such laws,

except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

(Pub. L. 92-513, title IV, § 418, formerly § 411, Oct. 20, 1972, 86 Stat. 963, renumbered Pub. L. 94-364, title IV, § 408(1), July 14, 1976, 90 Stat. 984.)

## SUBCHAPTER V—IMPROVING AUTOMOTIVE EFFICIENCY

### PART A [1]—AUTOMOTIVE FUEL ECONOMY

#### PART REFERRED TO IN OTHER SECTIONS

This part is referred to in section 1901 of this title.

### § 2001. Definitions

For purposes of this part:

(1) The term "automobile" means any 4-wheeled vehicle propelled by fuel which is manufactured primarily for use on public streets, roads, and highways (except any vehicle operated exclusively on a rail or rails), and

(A) which is rated at 6,000 lbs. gross vehicle weight or less, or

---

[1] So in original. There are no other parts in this subchapter.

§ 2002                    TITLE 15—COMMERCE AND TRADE                    Page 1470

(B) which—
    (i) is rated at more than 6,000 lbs. gross vehicle weight but less than 10,000 lbs. gross vehicle weight,
    (ii) is a type of vehicle for which the Secretary determines, by rule, average fuel economy standards under this part are feasible, and
    (iii) is a type of vehicle for which the Secretary determines, by rule, average fuel economy standards will result in significant energy conservation, or is a type of vehicle which the Secretary determines is substantially used for the same purposes as vehicles described in subparagraph (A) of this paragraph.

The Secretary may prescribe such rules as may be necessary to implement this paragraph.

(2) The term "passenger automobile" means any automobile (other than an automobile capable of off-highway operation) which the Secretary determines by rule is manufactured primarily for use in the transportation of not more than 10 individuals.

(3) The term "automobile capable of off-highway operation" means any automobile which the Secretary determines by rule—
    (A) has a significant feature (other than 4-wheel drive) which is designed to equip such automobile for off-highway operation, and
    (B) either—
        (i) is a 4-wheel drive automobile, or
        (ii) is rated at more than 6,000 pounds gross vehicle weight.

(4) The term "average fuel economy" means average fuel economy, as determined under section 2003 of this title.

(5) The term "fuel" means gasoline and diesel oil. The Secretary may, by rule, include any other liquid fuel or any gaseous fuel within the meaning of the term "fuel" if he determines that such inclusion is consistent with the need of the Nation to conserve energy.

(6) The term "fuel economy" means the average number of miles traveled by an automobile per gallon of gasoline (or equivalent amount of other fuel) consumed, as determined by the EPA Administrator in accordance with procedures established under section 2003(d) of this title.

(7) The term "average fuel economy standard" means a performance standard which specifies a minimum level of average fuel economy which is applicable to a manufacturer in a model year.

(8) The term "manufacturer" means any person engaged in the business of manufacturing automobiles. The Secretary shall prescribe rules for determining, in cases where more than one person is the manufacturer of an automobile, which person is to be treated as the manufacturer of such automobile for purposes of this part.

(9) The term "manufacturer" (except for purposes of section 2002(c) of this title) means to produce or assemble in the customs territory of the United States, or to import.

(10) The term "import" means to import into the customs territory of the United States.

(11) The term "model type" means a particular class of automobile as determined, by rule, by the EPA Administrator, after consultation and coordination with the Secretary.

(12) The term "model year", with reference to any specific calendar year, means a manufacturer's annual production period (as determined by the EPA Administrator) which includes January 1 of such calendar year. If a manufacturer has no annual production period, the term "model year" means the calendar year.

(13) The term "Secretary" means the Secretary of Transportation.

(14) The term "EPA Administrator" means the Administrator of the Environmental Protection Agency.

(Pub. L. 92–513, title V, § 501, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 901.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 2004, 2006, 2012 of this title; title 42 section 6291.

§ 2002. Average fuel economy standards

(a) Standards for passenger vehicles manufactured after 1977; review of standards; report to Congress; standards for passenger automobiles manufactured from 1981 through 1984; amendment of standards

(1) Except as otherwise provided in paragraph (4) or in subsection (c) or (d) of this section, the average fuel economy for passenger automobiles manufactured by any manufacturer in any model year after model year 1977 shall not be less than the number of miles per gallon established for such model year under the following table:

| Model year: | Average fuel economy standard (in miles per gallon) |
|---|---|
| 1978 | 18.0. |
| 1979 | 19.0. |
| 1980 | 20.0. |
| 1981 | Determined by Secretary under paragraph (3) of this subsection. |
| 1982 | Determined by Secretary under paragraph (3) of this subsection. |
| 1983 | Determined by Secretary under paragraph (3) of this subsection. |
| 1984 | Determined by Secretary under paragraph (3) of this subsection. |
| 1985 and thereafter... | 27.5. |

(2) Not later than January 15 of each year, beginning in 1977, the Secretary shall transmit to each House of Congress, and publish in the Federal Register, a review of average fuel economy standards under this part. The review required to be transmitted not later than January 15, 1979, shall include a comprehensive analysis of the program required by this part. Such analysis shall include an assessment of the ability of manufacturers to meet the average fuel economy standard for model year 1985 as specified in paragraph (1) of this subsection, and any legislative recommendations the Secretary

A-008

USCA Case #22-1081     Document #1982213          Filed: 01/20/2023     Page 53 of 68

or the EPA Administrator may have for improving the program required by this part.

(3) Not later than July 1, 1977, the Secretary shall prescribe, by rule, average fuel economy standards for passenger automobiles manufactured in each of the model years 1981 through 1984. Any such standard shall apply to each manufacturer (except as provided in subsection (c) of this section), and shall be set for each such model year at a level which the Secretary determines (A) is the maximum feasible average fuel economy level, and (B) will result in steady progress toward meeting the average fuel economy standard established by or pursuant to this subsection for model year 1985.

(4) The Secretary may, by rule, amend the average fuel economy standard specified in paragraph (1) for model year 1985, or for any subsequent model year, to a level which he determines is the maximum feasible average fuel economy level for such model year, except that any amendment which has the effect of increasing an average fuel economy standard to a level in excess of 27.5 miles per gallon, or of decreasing any such standard to a level below 26.0 miles per gallon, shall be submitted to the Congress in accordance with section 551 of the Energy Policy and Conservation Act [42 U.S.C. 6421], and shall not take effect if either House of the Congress disapproves such amendment in accordance with the procedures specified in such section.

(5) For purposes of considering any modification which is submitted to the Congress under paragraph (4), the 5 calendar days specified in section 551(f)(4)(A) of the Energy Policy and Conservation Act [42 U.S.C. 6421(f)(4)(A)] shall be lengthened to 20 calendar days, and the 15 calendar days specified in section 551(c) and (d) of such Act [42 U.S.C. 6421(c) and (d)] shall be lengthened to 60 calendar days.

**(b) Standards for other than passenger automobiles**

The Secretary shall, by rule, prescribe average fuel economy standards for automobiles which are not passenger automobiles and which are manufactured by any manufacturer in each model year which begins more than 30 months after December 22, 1975. Such rules may provide for separate standards for different classes of such automobiles (as determined by the Secretary), and shall[1] be set at a level which the Secretary determines is the maximum feasible average fuel economy level which such manufacturers are able to achieve in each model year to which this subsection applies. Any standard applicable to a model year under this subsection shall be prescribed at least 18 months prior to the beginning of such model year.

**(c) Exemptions for manufacturers of limited number of cars**

On application of a manufacturer who manufactured (whether or not in the United States) fewer than 10,000 passenger automobiles in the second model year preceding the model year for which the application is made, the Secretary may, by rule, exempt such manufacturer from subsection (a) of this section. An application for such an exemption shall be submitted to the Secretary, and shall contain such information

[1] So in original. Probably should be "such standards shall".

as the Secretary may require by rule. Such exemption may only be granted if the Secretary determines that the average fuel economy standard otherwise applicable under subsection (a) of this section is more stringent than the maximum feasible average fuel economy level which such manufacturer can attain. The Secretary may not issue exemptions with respect to a model year unless he establishes, by rule, alternative average fuel economy standards for passenger automobiles manufactured by manufacturers which receive exemptions under this subsection. Such standards may be established for an individual manufacturer, for all automobiles to which this subsection applies, or for such classes of such automobiles as the Secretary may define by rule. Each such standard shall be set at a level which the Secretary determines is the maximum feasible average fuel economy level for the manufacturers to which the standard applies. An exemption under this subsection shall apply to a model year only if the manufacturer manufactures (whether or not in the United States) fewer than 10,000 passenger automobiles in such model year.

**(d) Application for modification of standards**

(1) Any manufacturer may apply to the Secretary for modification of an average fuel economy standard applicable under subsection (a) of this section to such manufacturer for model year 1978, 1979, or 1980. Such application shall contain such information as the Secretary may require by rule, and shall be submitted to the Secretary within 24 months before the beginning of the model year for which such modification is requested.

(2)(A) If a manufacturer demonstrates and the Secretary finds that—

(i) a Federal standards fuel economy reduction is likely to exist for such manufacturer for the model year to which the application relates, and

(ii) such manufacturer applied a reasonably selected technology,

the Secretary shall, by rule, reduce the average fuel economy standard applicable under subsection (a) of this section to such manufacturer by the amount of such manufacturer's Federal standards fuel economy reduction, rounded off to the nearest one-tenth mile per gallon (in accordance with rules of the Secretary). To the maximum extent practicable, prior to making a finding under this paragraph with respect to an application, the Secretary shall request, and the EPA Administrator shall supply, test results collected pursuant to section 2003(d) of this title for all automobiles covered by such application.

(B)(i) If the Secretary does not find that a Federal standards fuel economy reduction is likely to exist for a manufacturer who filed an application under paragraph (1), he shall deny the application of such manufacturer.

(ii) If the Secretary—

(I) finds that a Federal standards fuel economy reduction is likely to exist for a manufacturer who filed an application under paragraph (1), and

(II) does not find that such manufacturer applied a reasonably selected technology,

the average fuel economy standard applicable under subsection (a) of this section to such manufacturer shall, by rule, be reduced by an amount equal to the Federal standards fuel economy reduction which the Secretary finds would have resulted from the application of a reasonably selected technology.

(3) For purposes of this subsection:

(A) The term "reasonably selected technology" means a technology which the Secretary determines it was reasonable for a manufacturer to select, considering (i) the Nation's need to improve the fuel economy of its automobiles, and (ii) the energy savings, economic costs, and lead-time requirements associated with alternative technologies practicably available to such manufacturer.

(B) The term "Federal standards fuel economy reduction" means the sum of the applicable fuel economy reductions determined under subparagraph (C).

(C) The term "applicable fuel economy reduction" means a number of miles per gallon equal to—

(i) the reduction in a manufacturer's average fuel economy in a model year which results from the application of a category of Federal standards applicable to such model year, and which would not have occurred had Federal standards of such category applicable to model year 1975 remained the only standards of such category in effect, minus

(ii) 0.5 mile per gallon.

(D) Each of the following is a category of Federal standards;

(i) Emissions standards under section 202 of the Clean Air Act [42 U.S.C. 1857f–1] and emissions standards applicable by reason of section 209(b) of such Act [42 U.S.C. 1857f–6a(b)].

(ii) Motor vehicle safety standards under the National Traffic and Motor Vehicle Safety Act of 1966 [15 U.S.C. 1381 et seq.].

(iii) Noise emission standards under section 6 of the Noise Control Act of 1972 [42 U.S.C. 4905].

(iv) Property loss reduction standards under subchapter I of this chapter.

(E) In making the determination under this subparagraph,[1] the Secretary (in accordance with such methods as he shall prescribe by rule) shall assume a production mix for such manufacturer which would have achieved the average fuel economy standard for such model year had standards described in subparagraph (D) applicable to model year 1975 remained the only standards in effect.

(4) The Secretary may, for the purposes of conducting a proceeding under this subsection, consolidate one or more applications filed under this subsection.

(e) Determination of maximum feasible average fuel economy

For purposes of this section, in determining maximum feasible average fuel economy, the Secretary shall consider—

(1) technological feasibility;

(2) economic practicability;

(3) the effect of other Federal motor vehicle standards on fuel economy; and

(4) the need of the Nation to conserve energy.

(f) Amendment of average fuel economy standards

(1) The Secretary may, by rule, from time to time, amend any average fuel economy standard prescribed under subsection (a)(3), (b), or (c) of this section, so long as such standard, as amended, meets the requirements of subsection (a)(3), (b), or (c) of this section, as the case may be.

(2) Any amendment prescribed under this section which has the effect of making any average fuel economy standard more stringent shall be—

(A) promulgated, and

(B) if required by paragraph (4) of subsection (a) of this section, submitted to the Congress,

at least 18 months prior to the beginning of the model year to which such amendment will apply.

(g) Application of other laws

Proceedings under subsection (a)(4) or (d) of this section shall be conducted in accordance with section 553 of title 5 except that interested persons shall be entitled to make oral as well as written presentations. A transcript shall be taken of any oral presentations.

(Pub. L. 92–513, title V, § 502, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 902.)

REFERENCES IN TEXT

The National Traffic and Motor Vehicle Safety Act of 1966, referred to in subsec. (d)(3)(D)(ii), is Pub. L. 89–563, Sept. 9, 1966, 80 Stat. 718, which is classified to chapter 38 (§ 1381 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1381 of this title and Tables volume.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 2001, 2003, 2004, 2005, 2007, 2008, 2010 of this title.

§ 2003. Calculation of average fuel economy

(a) Method of calculation

(1) Average fuel economy for purposes of section 2002(a) and (c) of this title shall be calculated by the EPA Administrator by dividing—

(A) the total number of passenger automobiles manufactured in a given model year by a manufacturer, by

(B) a sum of terms, each term of which is a fraction created by dividing—

(i) the number of passenger automobiles of a given model type manufactured by such manufacturer in such model year, by

(ii) the fuel economy measured for such model type.

(2) Average fuel economy for purposes of section 2002(b) of this title shall be calculated in accordance with rules of the EPA Administrator.

(b) Automobile categories

(1) In calculating average fuel economy under subsection (a)(1) of this section, the EPA Administrator shall separate the total number of

───────────
[1] So in original, probably should be "subsection,".

passenger automobiles manufactured by a manufacturer into the following two categories:

(A) Passenger automobiles which are domestically manufactured by such manufacturer (plus, in the case of model year 1978 and model year 1979, passenger automobiles which are within the includable base import volume of such manufacturer).

(B) Passenger automobiles which are not domestically manufactured by such manufacturer (and which, in the case of model year 1978 and model year 1979, are not within the includable base import volume of such manufacturer).

The EPA Administrator shall calculate the average fuel economy of each such separate category, and each such category shall be treated as if manufactured by a separate manufacturer for purposes of this part.

(2) For purposes of this subsection:

(A) The term "includable base import volume", with respect to any manufacturer in model year 1978 or 1979, as the case may be, is a number of passenger automobiles which is the lesser of—

(i) the manufacturer's base import volume, or

(ii) the number of passenger automobiles calculated by multiplying—

(I) the quotient obtained by dividing such manufacturer's base import volume by such manufacturer's base base[1] production volume, times

(II) the total number of passenger automobiles manufactured by such manufacturer during such model year.

(B) The term "base import volume" means one-half the sum of—

(i) the total number of passenger automobiles which were not domestically manufactured by such manufacturer during model year 1974 and which were imported by such manufacturer during such model year, plus

(ii) 133 percent of the total number of passenger automobiles which were not domestically manufactured by such manufacturer during the first 9 months of model year 1975 and which were imported by such manufacturer during such 9-month period.

(C) The term "base production volume" means one-half the sum of—

(i) the total number of passenger automobiles manufactured by such manufacturer during model year 1974, plus

(ii) 133 percent of the total number of passenger automobiles manufactured by such manufacturer during the first 9 months of model year 1975.

(D) For purposes of subparagraphs (B) and (C) of this paragraph any passenger automobile imported during model year 1976, but prior to July 1, 1975, shall be deemed to have been manufactured (and imported) during the first 9 months of model year 1975.

(E) An automobile shall be considered domestically manufactured in any model year if at least 75 percent of the cost to the manufacturer of such automobile is attributable to value added in the United States or Canada,

unless the assembly of such automobile is completed in Canada and such automobile is not imported into the United States prior to the expiration of 30 days following the end of such model year. The EPA Administrator may prescribe rules for purposes of carrying out this subparagraph.

(F) The fuel economy of each passenger automobile which is imported by a manufacturer in model year 1978 or 1979, as the case may be, and which is not domestically manufactured by such manufacturer, shall be deemed to be equal to the average fuel economy of all such passenger automobiles.

(c) Definition of "automobiles manufactured"

Any reference in this part to automobiles manufactured by a manufacturer shall be deemed—

(1) to include all automobiles manufactured by persons who control, are controlled by, or are under common control with, such manufacturer; and

(2) to exclude all automobiles manufactured (within the meaning of paragraph (1)) during a model year by such manufacturer which are exported prior to the expiration of 30 days following the end of such model year.

(d) Testing and calculation procedures

(1) Fuel economy for any model type shall be measured, and average fuel economy of a manufacturer shall be calculated, in accordance with testing and calculation procedures established by the EPA Administrator, by rule. Procedures so established with respect to passenger automobiles (other than for purposes of section 2006 of this title) shall be the procedures utilized by the EPA Administrator for model year 1975 (weighted 55 percent urban cycle, and 45 percent highway cycle), or procedures which yield comparable results. Procedures under this subsection, to the extent practicable, shall require that fuel economy tests be conducted in conjunction with emissions tests conducted under section 206 of the Clean Air Act [42 U.S.C. 1857f-5]. The EPA Administrator shall report any measurements of fuel economy and any calculations of average fuel economy to the Secretary.

(2) The EPA Administrator shall, by rule, determine that quantity of any other fuel which is the equivalent of one gallon of gasoline.

(3) Testing and calculation procedures applicable to a model year, and any amendment to such procedures (other than a technical or clerical amendment), shall be promulgated not less than 12 months prior to the model year to which such procedures apply.

(e) Rounding off of measurements of fuel economy

For purposes of this part (other than section 2006 of this title), any measurement of fuel economy of a model type, and any calculation of average fuel economy of a manufacturer, shall be rounded off to the nearest one-tenth mile per gallon (in accordance with rules of the EPA Administrator).

(f) Consultation and coordination by Administrator with Secretary

The EPA Administrator shall consult and coordinate with the Secretary in carrying out his duties under this section.

---

[1] So in original.

(Pub. L. 92–513, title V, § 503, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 906.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 2001, 2002, 2004, 2005, 2008 of this title.

§ 2004. Judicial review

(a) Review of rules in courts of appeals

Any person who may be adversely affected by any rule prescribed under section 2001, 2002, 2003, or 2006 of this title may, at any time prior to 60 days after such rule is prescribed (or in the case of an amendment submitted to each House of the Congress under section 2002(a)(4) of this title, at any time prior to 60 days after the expiration of the 60-day period specified in section 2002(a)(5) of this title), file a petition in the United States Court of Appeals for the District of Columbia, or for any circuit wherein such person resides or has his principal place of business, for judicial review of such rule. A copy of the petition shall be forthwith transmitted by the clerk of such court to the officer who prescribed the rule. Such officer shall thereupon cause to be filed in such court the written submissions and other materials in the proceeding upon which such rule was based. Upon the filing of such petition, the court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5 and to grant appropriate relief as provided in such chapter. Findings of the Secretary under section 2002(d) of this title shall be set aside by the court on review unless such findings are supported by substantial evidence.

(b) Additional submissions

If the petitioner applies to the court in a proceeding under subsection (a) of this section for leave to make additional submissions, and shows to the satisfaction of the court that such additional submissions are material and that there were reasonable grounds for the failure to make such submissions in the administrative proceeding, the court may order the Secretary or the EPA Administrator, as the case may be, to provide additional opportunity to make such submissions. The Secretary or the EPA Administrator, as the case may be, may modify or set aside the rule involved or prescribe a new rule by reason of the additional submissions, and shall file any such modified or new rule in the court, together with such additional submissions. The court shall thereafter review such new or modified rule.

(c) Finality of determination; review by United States Supreme Court

The judgment of the court affirming or setting aside, in whole or in part, any such rule shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

(d) Remedy in addition to other remedies provided by law

The remedies provided for in this section shall be in addition to, and not in lieu of, any other remedies provided by law.

(Pub. L. 92–513, title V, § 504, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 908.)

§ 2005. Information and reports

(a) Reports by manufacturers; time; contents

(1) Each manufacturer shall submit a report to the Secretary during the 30-day period preceding the beginning of each model year after model year 1977, and during the 30-day period beginning on the 180th day of each such model year. Each such report shall contain (A) a statement as to whether such manufacturer will comply with average fuel economy standards under section 2002 of this title applicable to the model year for which such report is made; (B) a plan which describes the steps the manufacturer has taken or intends to take in order to comply with such standards; and (C) such other information as the Secretary may require.

(2) Whenever a manufacturer determines that a plan submitted under paragraph (1) which he stated was sufficient to insure compliance with applicable average fuel economy standards is not sufficient to insure such compliance, he shall submit a report to the Secretary containing a revised plan which specifies any additional measures which such manufacturer intends to take in order to comply with such standards, and a statement as to whether such revised plan is sufficient to insure such compliance.

(3) The Secretary shall prescribe rules setting forth the form and content of the reports required under paragraphs (1) and (2).

(b) Hearings; evidence

(1) For the purpose of carrying out the provisions of this part, the Secretary or the EPA Administrator, or their duly designated agents, may hold such hearings, take such testimony, sit and act at such times and places, administer such oaths, and require, by subpena, the attendance and testimony of such witnesses and the production of such books, papers, correspondence, memorandums, contracts, agreements, or other records as the Secretary, the EPA Administrator, or such agents deem advisable. The Secretary or the EPA Administrator may require, by general or special orders that any person—

(A) file, in such form as the Secretary or EPA Administrator may prescribe, reports or answers in writing to specific questions relating to any function of the Secretary or the EPA Administrator under this part, and

(B) provide the Secretary, the EPA Administrator, or their duly designated agents, access to (and for the purpose of examination, the right to copy) any documentary evidence of such person which is relevant to any function of the Secretary or the EPA Administrator under this part.

Such reports and answers shall be made under oath or otherwise, and shall be filed with the Secretary or the EPA Administrator within such reasonable period as either may prescribe.

(2) The district courts of the United States for a judicial district in the jurisdiction of which an inquiry is carried on may, in the case of contumacy or refusal to obey a duly authorized subpena or order of the Secretary, the

A-012

EPA Administrator, or a duly designated agent of either, issued under paragraph (1), issue an order requiring compliance with such subpena or order. Any failure to obey such an order of the court may be treated by such court as a contempt thereof.

(3) Witnesses summoned pursuant to this subsection shall be paid the same fees and mileage that are paid witnesses in the courts of the United States.

**(c) Tests, reports, etc., which may be required of manufacturers**

(1) Every manufacturer shall establish and maintain such records, make such reports, conduct such tests, and provide such items and information as the Secretary or the EPA Administrator may, by rule, reasonably require to enable the Secretary or the EPA Administrator to carry out their duties under this part and under any rules prescribed pursuant to this part. Such manufacturer shall, upon request of a duly designated agent of the Secretary or the EPA Administrator who presents appropriate credentials, permit such agent, at reasonable times and in a reasonable manner, to enter the premises of such manufacturer to inspect automobiles and appropriate books, papers, records, and documents. Such manufacturer shall make available all of such items and information in accordance with such reasonable rules as the Secretary or the EPA Administrator may prescribe.

(2) The district courts of the United States may, if a manufacturer refuses to accede to any rule or reasonable request made under paragraph (1), issue an order requiring compliance with such requirement or request. Any failure to obey such an order of the court may be treated by such court as a contempt thereof.

**(d) Disclosure of information to public**

(1) The Secretary and the EPA Administrator shall each disclose any information obtained under this part (other than section 2003(d) of this title) to the public in accordance with section 552 of title 5, except that information may be withheld from disclosure under subsection (b)(4) of such section only if the Secretary or the EPA Administrator, as the case may be, determines that such information, if disclosed, would result in significant competitive damage. Any matter described in section 552(b)(4) [of title 5] relevant to any administrative or judicial proceeding under this part may be disclosed in such proceeding.

(2) Measurements and calculations under section 2003(d) of this title shall be made available to the public in accordance with section 552 of title 5 without regard to subsection (b) of such section.

(Pub. L. 92-513, title V, § 505, as added Pub. L. 94-163, title III, § 301, Dec. 22, 1975, 89 Stat. 908.)

**§ 2006. Labeling**

**(a) Label required on automobile; contents**

(1) Except as otherwise provided in paragraph (2), each manufacturer shall cause to be affixed, and each dealer shall cause to be maintained, on each automobile manufactured in any model year after model year 1976, in a prominent place, a label—

(A) indicating—
(i) the fuel economy of such automobile,
(ii) the estimated annual fuel cost associated with the operation of such automobile, and
(iii) the range of fuel economy of comparable automobiles (whether or not manufactured by such manufacturer),

as determined in accordance with rules of the EPA Administrator,

(B) containing a statement that written information (as described in subsection (b)(1) of this section) with respect to the fuel economy of other automobiles manufactured in such model year (whether or not manufactured by such manufacturer) is available from the dealer in order to facilitate comparison among the various model types, and

(C) containing any other information authorized or required by the EPA Administrator which relates to information described in subparagraph (A) or (B).

(2) With respect to automobiles—

(A) for which procedures established in the EPA and FEA Voluntary Fuel Labeling Program for Automobiles exist on December 22, 1975, and

(B) which are manufactured in model year 1976 and at least 90 days after December 22, 1975,

each manufacturer shall cause to be affixed, and each dealer shall cause to be maintained, in a prominent place, a label indicating the fuel economy of such automobile, in accordance with such procedures.

(3) The form and content of the labels required under paragraphs (1) and (2), and the manner in which such labels shall be affixed, shall be prescribed by the EPA Administrator by rule. The EPA Administrator may permit a manufacturer to comply with this paragraph by permitting such manufacturer to disclose the information required under this subsection on the label required by section 3 of the Automobile Information Disclosure Act (15 U.S.C. 1232).

**(h) Booklet containing fuel economy data; distribution by administrator**

(1) The EPA Administrator shall compile and prepare a simple and readily understandable booklet containing data on fuel economy of automobiles manufactured in each model year. Such booklet shall also contain information with respect to estimated annual fuel costs, and may contain information with respect to geographical or other differences in estimated annual fuel costs. The Administrator of the Federal Energy Administration shall publish and distribute such booklets.

(2) The EPA Administrator, not later than July 31, 1976, shall prescribe rules requiring dealers to make available to prospective purchasers information compiled by the EPA Administrator under paragraph (1).

**(c) Violations**

(1) A violation of subsection (a) shall be treated as a violation of section 3 of the Automobile Information Disclosure Act (15 U.S.C. 1232). For purposes of the Federal Trade Commission Act [15 U.S.C. 41 et seq.] (other than sections

5(m) and (18) [15 U.S.C. 45(m) and 57a], a violation of subsection (a) shall be treated as an unfair or deceptive act or practice in or affecting commerce.

(2) As used in this section, the term "dealer" has the same meaning as such term has in section 2(e) of the Automobile Information Disclosure Act (15 U.S.C. 1231(e)) except that in applying such term to this section, the term "automobile" has the same meaning as such term has in section 2001(1) of this title.

(d) Creation of warranties

Any disclosure with respect to fuel economy or estimated annual fuel cost which is required to be made under the provisions of this section shall not create an express or implied warranty under State or Federal law that such fuel economy will be achieved, or that such cost will not be exceeded, under conditions of actual use.

(e) Consultation by Administrator with other agency personnel

In carrying out his duties under this section, the EPA Administrator shall consult with the Federal Trade Commission, the Secretary, and the Federal Energy Administrator.

(Pub. L. 92–513, title V, § 506, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 910.)

REFERENCES IN TEXT

The Federal Trade Commission Act, referred to in subsec. (c)(1), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§ 41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables volume.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 2003, 2004, 2007, 2009 of this title.

§ 2007. Unlawful conduct

The following conduct is unlawful:

(1) the failure of any manufacturer to comply with any average fuel economy standard applicable to such manufacturer under section 2002 of this title (other than section 2002(b) of this title),

(2) the failure of any manufacturer to comply with any average fuel economy standard applicable to such manufacturer under section 2002(b) of this title, or

(3) the failure of any person (A) to comply with any provision of this part applicable to such person (other than section 2002, 2006(a), 2010, or 2011 of this title), or (B) to comply with any standard, rule, or order applicable to such person which is issued pursuant to such a provision.

(Pub. L. 92–513, title V, § 507, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 911.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 2008 of this title.

§ 2008. Civil penalty

(a) Penalty for violations; credit against penalty

(1) If average fuel economy calculations reported under section 2003(d) of this title indicate that any manufacturer has violated section 2007(1) or (2) of this title, then (unless further measurements of fuel economy, further calculations of average fuel economy, or other information indicates there is no violation of section 2007(1) or (2) of this title) the Secretary shall commence a proceeding under paragraph (2) of this subsection. The results of such further measurements, further calculations, and any such other information, shall be published in the Federal Register.

(2) If, on the record after opportunity for agency hearing, the Secretary determines that such manufacturer has violated section 2007(1) or (2) of this title, or that any person has violated section 2007(3) of this title, the Secretary shall assess the penalties provided for under subsection (b) of this section. Any interested person may participate in any proceeding under this paragraph.

(3)(A)(i) Whenever the average fuel economy of the passenger automobiles manufactured by a manufacturer in a particular model year exceeds an applicable average fuel economy standard established under section 2002(a) or (c) of this title (determined without regard to any adjustment under section 2002(d) of this title), such manufacturer shall be entitled to a credit, calculated under clause (ii), which shall be—

(I) deducted from the amount of any civil penalty which has been or may be assessed against such manufacturer for a violation of section 2007(1) of this title occurring in the model year immediately prior to the model year in which such manufacturer exceeds such applicable average fuel economy standard, and

(II) to the extent that such credit is not deducted pursuant to subclause (I), deducted from the amount of any civil penalty assessed against such manufacturer for a violation of section 2007(1) of this title occurring in the model year immediately following the model year in which such manufacturer exceeds such applicable average fuel economy standard.

(ii) The amount of credit to which a manufacturer is entitled under clause (i) shall be equal to—

(I) $5 for each tenth of a mile per gallon by which the average fuel economy of the passenger automobiles manufactured by such manufacturer in the model year in which the credit is earned pursuant to clause (i) exceeds the applicable average fuel economy standard established under section 2002(a) or (c) of this title, multiplied by

(II) the total number of passenger automobiles manufactured by such manufacturer during such model year.

(B)(i) Whenever the average fuel economy of a class of automobiles which are not passenger automobiles and which are manufactured by a manufacturer in a particular model year exceeds an average fuel economy standard applicable to automobiles of such class under section 2002(b) of this title, such manufacturer shall be entitled to a credit, calculated under clause (ii), which shall be—

(I) deducted from the amount of any civil penalty which has been or may be assessed

A-014

against such manufacturer for a violation of section 2007(2) of this title, occurring in the model year immediately prior to the model year in which such manufacturer exceeds such applicable average fuel economy standard, and

(II) to the extent that such credit is not deducted pursuant to subclause (I), deducted from the amount of any such civil penalty assessed against such manufacturer for a violation of section 2007(2) of this title occurring in the model year immediately following the model year in which such manufacturer exceeds such applicable average fuel economy standard.

(ii) The amount of credit to which a manufacturer is entitled under clause (i) shall be equal to—

(I) $5 for each tenth of a mile per gallon by which the average fuel economy of the automobiles of such class manufactured by such manufacturer in the model year in which the credit is earned pursuant to clause (i) exceeds the applicable average fuel economy standard established under section 2002(b) of this title, multiplied by

(II) the total number of automobiles of such class manufactured by such manufacturer during such model year.

(C) Whenever a civil penalty has been assessed and collected under this section from a manufacturer who is entitled to a credit under this paragraph with respect to such civil penalty, the Secretary of the Treasury shall refund to such manufacturer the amount of credit to which such manufacturer is so entitled, except that the amount of such refund shall not exceed the amount of the civil penalty so collected.

(D) The Secretary may prescribe rules for purposes of carrying out the provisions of this paragraph.

(b) Amount of penalty; compromise or modification

(1)(A) Any manufacturer whom the Secretary determines under subsection (a) of this section to have violated a provision of section 2007(1) of this title,[1] shall be liable to the United States for a civil penalty equal to (i) $5 for each tenth of a mile per gallon by which the average fuel economy of the passenger automobiles manufactured by such manufacturer during such model year is exceeded by the applicable average fuel economy standard established under section 2002(a) and (c) of this title, multiplied by (ii) the total number of passenger automobiles manufactured by such manufacturer during such model year.

(B) Any manufacturer whom the Secretary determines under subsection (a) of this section to have violated section 2007(2) of this title shall be liable to the United States for a civil penalty equal to (i) $5 for each tenth of a mile per gallon by which the applicable average fuel economy standard exceeds the average fuel economy of automobiles to which such standard applies, and which are manufactured by such manufacturer during the model year in which the violation occurs, multiplied by (ii) the total number of automobiles to which such

standard applies and which are manufactured by such manufacturer during such model year.

(2) Any person whom the Secretary determines under subsection (a) of this section to have violated a provision of section 2007(3) of this title shall be liable to the United States for a civil penalty of not more than $10,000 for each violation. Each day of a continuing violation shall constitute a separate violation for purposes of this paragraph.

(3) The amount of such civil penalty shall be assessed by the Secretary by written notice. The Secretary shall have the discretion to compromise, modify, or remit, with and without conditions, any civil penalty assessed under this subsection against any person, except that any civil penalty assessed for a violation of section 2007(1) or (2) of this title may be so compromised, modified, or emitted only to the extent—

(A) necessary to prevent the insolvency or bankruptcy of such manufacturer,

(B) such manufacturer shows that the violation of section 2007(1) or (2) of this title resulted from an act of God, a strike, or a fire, or

(C) the Federal Trade Commission has certified that modification of such penalty is necessary to prevent a substantial lessening of competition, as determined under paragraph (4).

The Attorney General shall collect any civil penalty for which a manufacturer is liable under this subsection in a civil action under subsection (c)(2) of this section (unless the manufacturer pays such penalty to the Secretary).

(4) Not later than 30 days after a determination by the Secretary under subsection (a)(2) of this section that a manufacturer has violated section 2007(1) or (2) of this title, such manufacturer may apply to the Federal Trade Commission for a certification under this paragraph. If the manufacturer shows and the Federal Trade Commission determines that modification of the civil penalty for which such manufacturer is otherwise liable is necessary to prevent a substantial lessening of competition in that segment of the automobile industry subject to the standard with respect to which such penalty was assessed, the Commission shall so certify. The certification shall specify the maximum amount that such penalty may be reduced. To the maximum extent practicable, the Commission shall render a decision with respect to an application under this paragraph not later than 90 days after the application is filed with the Commission. A proceeding under this paragraph shall not have the effect of delaying the manufacturer's liability under this section for a civil penalty for more than 90 days after such application is filed, but any payment made before a decision of the Commission under this paragraph becomes final shall be paid to the court in which the penalty is collected, and shall (except as otherwise provided in paragraph (5)), be held by such court, until 90 days after such decision becomes final (at which time it shall be paid into the general fund of the Treasury).

(5) Whenever a civil penalty has been assessed and collected from a manufacturer under this section, and is being held by a court

[1] The words "in a model year" probably should appear immediately preceding the comma.

in accordance with paragraph (4), and the Secretary subsequently determines to modify such civil penalty pursuant to paragraph (3)(C) the Secretary shall direct the court to remit the appropriate amount of such penalty to such manufacturer.

(6) A claim of the United States for a civil penalty assessed against a manufacturer under subsection (b)(1) of this section shall, in the case of the bankruptcy or insolvency of such manufacturer, be subordinate to any claim of a creditor of such manufacturer which arises from an extension of credit before the date on which the judgment in any collection action under this section becomes final (without regard to paragraph (4)).

(c) Review of penalty by interested person

(1) Any interested person may obtain review of a determination (A) of the Secretary pursuant to which a civil penalty has been assessed under subsection (b) of this section, or (B) of the Federal Trade Commission under subsection (b)(4) of this section, in the United States Court of Appeals for the District of Columbia, or for any circuit wherein such person resides or has his principal place of business. Such review may be obtained by filing a notice of appeal in such court within 30 days after the date of such determination, and by simultaneously sending a copy of such notice by certified mail to the Secretary or the Federal Trade Commission, as the case may be. The Secretary or the Commission, as the case may be, shall promptly file in such court a certified copy of the record upon which such determination was made. Any such determination shall be reviewed in accordance with chapter 7 of title 5.

(2) If any person fails to pay an assessment of a civil penalty after it has become a final and unappealable order, or after the appropriate court of appeals has entered final judgment in favor of the Secretary, the Attorney General shall recover the amount for which the manufacturer is liable in any appropriate district court of the United States. In such action, the validity and appropriateness of the final order imposing the civil penalty shall not be subject to review.

(Pub. L. 92–513, title V, § 508, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 911.)

§ 2009. State laws

(a) Fuel economy standards

Whenever an average fuel economy standard established under this part is in effect, no State or political subdivision of a State shall have authority to adopt or enforce any law or regulation relating to fuel economy standards or average fuel economy standards applicable to automobiles covered by such Federal standard.

(b) Fuel economy disclosures

Whenever any requirement under section 2006 of this title is in effect with respect to any automobile, no State or political subdivision of a State shall have authority to adopt or enforce any law or regulation with respect to the disclosure of fuel economy of such automobile, or of fuel cost associated with the operation of such automobile, if such law or regulation is not identical with such requirement.

(c) State or political subdivision automobiles

Nothing in this section shall be construed to prevent any State or political subdivision thereof from establishing requirements with respect to fuel economy of automobiles procured for its own use.

(Pub. L. 92–513, title V, § 509, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 914.)

§ 2010. Use of fuel efficient passenger automobiles by Federal Government

(a) The President shall, within 120 days after December 22, 1975, promulgate rules which shall require that all passenger automobiles acquired by all executive agencies in each fiscal year which begins after December 22, 1975, achieve a fleet average fuel economy for such year not less than—

(1) 18 miles per gallon, or

(2) the average fuel economy standard applicable under section 2002(a) of this title for the model year which includes January 1 of such fiscal year,

whichever is greater.

(b) As used in this section:

(1) The term "fleet average fuel economy" means (A) the total number of passenger automobiles acquired in a fiscal year to which this section applies by all executive agencies (excluding passenger automobiles designed to perform combat related missions for the Armed Forces or designed to be used in law enforcement work or emergency rescue work), divided by (B) a sum of terms, each term of which is a fraction created by dividing—

(i) the number of passenger automobiles so acquired of a given model type, by

(ii) the fuel economy of such model type.

(2) The term "executive agency" has the same meaning as such term has for purposes of section 105 of title 5.

(3) The term "acquired" means leased for a period of 60 continuous days or more, or purchased.

(Pub. L. 92–513, title V, § 510, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 915.)

DELEGATION OF FUNCTIONS

Functions of the President under this section delegated to the Administrator of General Services, see Section 1(a) of Ex. Ord. No. 11912, Apr. 13, 1976, 41 F.R. 15825, set out as a note under section 6201 of Title 42, The Public Health and Welfare.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 2007 of this title.

§ 2011. Retrofit devices

(a) Examination of fuel economy representations

The Federal Trade Commission shall establish a program for systematically examining fuel economy representations made with respect to retrofit devices. Whenever the Commission has reason to believe that any such representation may be inaccurate, it shall request

the EPA Administrator to evaluate, in accordance with subsection (b) of this section, the retrofit device with respect to which such representation was made.

**(b) Evaluation of retrofit devices**

(1) Upon application of any manufacturer of a retrofit device (or prototype thereof), upon the request of the Federal Trade Commission pursuant to subsection (a) of this section, or upon his own motion, the EPA Administrator shall evaluate, in accordance with rules prescribed under subsection (d) of this section, any retrofit device to determine whether the retrofit device increases fuel economy and to determine whether the representations (if any) made with respect to such retrofit device are accurate.

(2) If under paragraph (1) the EPA Administrator tests, or causes to be tested, any retrofit device upon the application of a manufacturer of such device, such manufacturer shall supply, at his own expense, one or more samples of such device to the Administrator and shall be liable for the costs of testing which are incurred by the Administrator. The procedures for testing retrofit devices so supplied may include a requirement for preliminary testing by a qualified independent testing laboratory, at the expense of the manufacturer of such device.

**(c) Results of tests; publication in Federal Register**

The EPA Administrator shall publish in the Federal Register a summary of the results of all tests conducted under this section, together with the EPA Administrator's conclusions as to—

(1) the effect of any retrofit device on fuel economy;

(2) the effect of any such device on emissions of air pollutants; and

(3) any other information which the Administrator determines to be relevant in evaluating such device.

Such summary and conclusions shall also be submitted to the Secretary and the Federal Trade Commission.

**(d) Rules establishing tests and procedures for evaluation of retrofit devices**

Within 180 days after December 22, 1975, the EPA Administrator shall, by rule, establish—

(1) testing and other procedures for evaluating the extent to which retrofit devices affect fuel economy and emissions of air pollutants, and

(2) criteria for evaluating the accuracy of fuel economy representations made with respect to retrofit devices.

**(e) Definitions**

For purposes of this section the term "retrofit device" means any component, equipment, or other device—

(1) which is designed to be installed in or on an automobile (as an addition to, as a replacement for, or through alteration or modification of, any original component, equipment, or other device); and

(2) which any manufacturer, dealer, or distributor of such device represents will provide higher fuel economy than would have resulted with the automobile as originally equipped,

as determined under rules of the Administrator. Such term also includes a fuel additive for use in an automobile.

(Pub. L. 92–513, title V, § 511, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 915.)

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 2007 of this title.

**§ 2012. Reports to Congress**

(a) Within 180 days after December 22, 1975, the Secretary shall prepare and submit to the Congress and the President a comprehensive report setting forth findings and containing conclusions and recommendations with respect to (1) a requirement that each new automobile be equipped with a fuel flow instrument reading directly in miles per gallon, and (2) the most feasible means of equipping used automobiles with such instruments. Such report shall include an examination of the effectiveness of such instruments in promoting voluntary reductions in fuel consumption, the cost of such instruments, means of encouraging automobile purchasers to voluntarily purchase automobiles equipped with such instruments, and any other factor bearing on the cost and effectiveness of such instruments and their use.

(b)(1) Within 180 days after December 22, 1975, the Secretary shall prepare and submit to the Congress and the President a comprehensive report setting forth findings and containing conclusions and recommendations with respect to whether or not electric vehicles and other vehicles not consuming fuel (as defined in the first sentence of section 2001(5) of this title) should be covered by this part. Such report shall include an examination of the extent to which any such vehicle should be included under the provisions of this part, the manner in which energy requirements of such vehicles may be compared with energy requirements of fuel-consuming vehicles, the extent to which inclusion of such vehicles would stimulate their production and introduction into commerce, and any recommendations for legislative action.

(2) As used in this subsection, the term "electric vehicle" means a vehicle powered primarily by an electric motor drawing current from rechargeable batteries, fuel cells, or other portable sources of electrical current.

(Pub. L. 92–513, title V, § 512, as added Pub. L. 94–163, title III, § 301, Dec. 22, 1975, 89 Stat. 916.)

**CHAPTER 47—CONSUMER PRODUCT SAFETY**

Sec.
2051. Congressional findings and declaration of purpose.
2052. Definitions.
2053. Consumer Product Safety Commission.
    (a) Establishment; Chairman.
    (b) Term; vacancies.
    (c) Restrictions on Commissioner's outside activities.

(A) in paragraph (D)(ii), insert "App." immediately after "(46" wherever it appears; and

(B) in paragraph (E), strike "(46 U.S.C. 801 et seq.)" and "(46 U.S.C. 843–848)" and substitute "(46 App. U.S.C. 801 et seq.)" and "(46 App. U.S.C. 843 et seq.)", respectively.

(22) In section 10721(a)(1), strike "Section 5 of title 41" and substitute "Section 3709 of the Revised Statutes (41 U.S.C. 5)".

(23) In section 10735(b)(1), strike "under this title" and substitute "under this subtitle".

(24) In section 10903(b)(2), strike "section 11347 of this title and section 405(b) of the Rail Passenger Service Act (45 U.S.C. 565(b))" and substitute "sections 11347 and 24706(c) of this title".

(25) In section 10922—

(A) in subsection (c)(1)(E), strike "provisions of section 12(f) of the Urban Mass Transportation Act of 1964" and substitute "section 10531 of this title";

(B) in subsection (c)(2)(D), strike "subtitle" wherever it appears and substitute "title";

(C) in subsection (c)(4)(C) and (j)(1), strike "subchapter" wherever it appears and substitute "title"; and

(D) in subsection (j)(2)(C), strike "subtitle" and substitute "title".

(26) In section 10927(a)(1), insert "section" before "10923".

(27) In section 10935(a) and (e)(3), strike "subchapter" and substitute "title".

(28) In section 11125(b)(2)(A), strike "the Federal Railroad Safety Act of 1970 (45 U.S.C. 431 et seq.)" and substitute "chapter 201 of this title".

(29) In section 11126(a), strike "11501(c)" and substitute "11501(f)".

(30) In section 11303(a), strike "the Ship Mortgage Act, 1920" wherever it appears and substitute "chapter 313 of title 46".

(31) In section 11347, strike "section 405 of the Rail Passenger Service Act (45 U.S.C. 565)" and substitute "sections 24307(c), 24312, and 24706(c) of this title".

(32) In section 11348(a), strike "section 504(f)," and substitute "sections 504(f) and".

(33) In section 11504(b)(2), strike "section 204 of the Motor Carrier Safety Act of 1984 (49 App. U.S.C. 2503)" and substitute "section 31132 of this title".

(34) In section 11701(a), strike "section 10530 of this subtitle" and substitute "section 10530 of this title".

LEGISLATIVE PURPOSE AND CONSTRUCTION

49 USC prec. 101 note.

SEC. 6. (a) Sections 1–4 of this Act restate, without substantive change, laws enacted before July 1, 1993, that were replaced by those sections. Those sections may not be construed as making a substantive change in the laws replaced. Laws enacted after June 30, 1993, that are inconsistent with this Act supersede this Act to the extent of the inconsistency.

(b) A reference to a law replaced by sections 1–4 of this Act, including a reference in a regulation, order, or other law, is deemed to refer to the corresponding provision enacted by this Act.

PUBLIC LAW 103–272—JULY 5, 1994        108 STAT. 1379

(c) An order, rule, or regulation in effect under a law replaced by sections 1–4 of this Act continues in effect under the corresponding provision enacted by this Act until repealed, amended, or superseded.

(d) An action taken or an offense committed under a law replaced by sections 1–4 of this Act is deemed to have been taken or committed under the corresponding provision enacted by this Act.

(e) An inference of legislative construction is not to be drawn by reason of the location in the United States Code of a provision enacted by this Act or by reason of a caption or catch line of the provision.

(f) If a provision enacted by this Act is held invalid, all valid provisions that are severable from the invalid provision remain in effect. If a provision enacted by this Act is held invalid in any of its applications, the provision remains valid for all valid applications that are severable from any of the invalid applications.

REPEALS

SEC. 7. (a) The repeal of a law by this Act may not be construed as a legislative implication that the provision was or was not in effect before its repeal.

49 USC prec. 101 note.

(b) The laws specified in the following schedule are repealed, except for rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act:

49 USC prec. 101 note.

Schedule of Laws Repealed

Statutes at Large

| Date | Chapter or Public Law | Section | Statutes at Large | | U.S. Code | |
|---|---|---|---|---|---|---|
| | | | Volume | Page | Title | Section |
| 1864 July 2 | 216 ............ | 15 .......................................... | 13 | 362 .............. | 45 | 83 |
| 1873 Mar. 3 | 226 ............ | 2(words after 2d semicolon). | 17 | 508 .............. | ........ | ........................ |
| 1874 June 20 June 22 | 331 ............ 414 ............ | .......................................... .......................................... | 18 18 | 111 .............. 200 .............. | 45 45 | 83 89 |
| 1879 Mar. 3 | 183 ............ | 1(4th par. on p. 420) ........ | 20 | 420 .............. | 45 | 90 |
| 1887 Feb. 4 | 104 ............ | 25 .......................................... | 24 | 379 .............. | 49 App. | 26 |
| Mar. 3 | 345 ............ | .......................................... | 24 | 488 .............. | 45 | 94, 95 |
| 1893 Mar. 2 | 196 ............ | .......................................... | 27 | 531 .............. | 45 | 1–7 |
| 1896 Apr. 1 | 87 .............. | .......................................... | 29 | 85 ................ | 45 | 6 |
| 1897 Mar. 3 | 386 ............ | (proviso under heading "Transportation and Recruiting, Marine Corps"). | 29 | 663 .............. | 45 | 91 |

PUBLIC LAW 117–169—AUG. 16, 2022          136 STAT. 2067

support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects at the State, local, territorial, or Tribal level or in the District of Columbia, including community- and low-income-focused lenders and capital providers.

"(c) DEFINITIONS.—In this section:

"(1) ELIGIBLE RECIPIENT.—The term 'eligible recipient' means a nonprofit organization that—

"(A) is designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low- and zero-emission products, technologies, and services;

"(B) does not take deposits other than deposits from repayments and other revenue received from financial assistance provided using grant funds under this section;

"(C) is funded by public or charitable contributions; and

"(D) invests in or finances projects alone or in conjunction with other investors.

"(2) GREENHOUSE GAS.—The term 'greenhouse gas' means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

"(3) QUALIFIED PROJECT.—The term 'qualified project' includes any project, activity, or technology that—

"(A) reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector; or

"(B) assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution.

"(4) ZERO-EMISSION TECHNOLOGY.—The term 'zero-emission technology' means any technology that produces zero emissions of—

"(A) any air pollutant that is listed pursuant to section 108(a) (or any precursor to such an air pollutant); and

"(B) any greenhouse gas.".

## SEC. 60104. DIESEL EMISSIONS REDUCTIONS.

(a) GOODS MOVEMENT.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $60,000,000, to remain available until September 30, 2031, for grants, rebates, and loans under section 792 of the Energy Policy Act of 2005 (42 U.S.C. 16132) to identify and reduce diesel emissions resulting from goods movement facilities, and vehicles servicing goods movement facilities, in low-income and disadvantaged communities to address the health impacts of such emissions on such communities.

(b) ADMINISTRATIVE COSTS.—The Administrator of the Environmental Protection Agency shall reserve 2 percent of the amounts made available under this section for the administrative costs necessary to carry out activities pursuant to this section.

## SEC. 60105. FUNDING TO ADDRESS AIR POLLUTION.

(a) FENCELINE AIR MONITORING AND SCREENING AIR MONITORING.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury

not otherwise appropriated, $117,500,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) to deploy, integrate, support, and maintain fenceline air monitoring, screening air monitoring, national air toxics trend stations, and other air toxics and community monitoring.

(b) MULTIPOLLUTANT MONITORING STATIONS.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $50,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405)—

(1) to expand the national ambient air quality monitoring network with new multipollutant monitoring stations; and

(2) to replace, repair, operate, and maintain existing monitors.

(c) AIR QUALITY SENSORS IN LOW-INCOME AND DISADVANTAGED COMMUNITIES.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $3,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) to deploy, integrate, and operate air quality sensors in low-income and disadvantaged communities.

(d) EMISSIONS FROM WOOD HEATERS.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $15,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) for testing and other agency activities to address emissions from wood heaters.

(e) METHANE MONITORING.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $20,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405) for monitoring emissions of methane.

(f) CLEAN AIR ACT GRANTS.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $25,000,000, to remain available until September 30, 2031, for grants and other activities authorized under subsections (a) through (c) of section 103 and section 105 of the Clean Air Act (42 U.S.C. 7403(a)–(c), 7405).

(g) GREENHOUSE GAS AND ZERO-EMISSION STANDARDS FOR MOBILE SOURCES.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the

PUBLIC LAW 117–169—AUG. 16, 2022        136 STAT. 2069

Treasury not otherwise appropriated, $5,000,000, to remain available until September 30, 2031, to provide grants to States to adopt and implement greenhouse gas and zero-emission standards for mobile sources pursuant to section 177 of the Clean Air Act (42 U.S.C. 7507).

(h) DEFINITION OF GREENHOUSE GAS.—In this section, the term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

### SEC. 60106. FUNDING TO ADDRESS AIR POLLUTION AT SCHOOLS.

(a) IN GENERAL.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $37,500,000, to remain available until September 30, 2031, for grants and other activities to monitor and reduce greenhouse gas emissions and other air pollutants at schools in low-income and disadvantaged communities under subsections (a) through (c) of section 103 of the Clean Air Act (42 U.S.C. 7403(a)–(c)) and section 105 of that Act (42 U.S.C. 7405).

(b) TECHNICAL ASSISTANCE.—In addition to amounts otherwise available, there is appropriated to the Administrator of the Environmental Protection Agency for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, $12,500,000, to remain available until September 30, 2031, for providing technical assistance to schools in low-income and disadvantaged communities under subsections (a) through (c) of section 103 of the Clean Air Act (42 U.S.C. 7403(a)–(c)) and section 105 of that Act (42 U.S.C. 7405)—

(1) to address environmental issues;

(2) to develop school environmental quality plans that include standards for school building, design, construction, and renovation; and

(3) to identify and mitigate ongoing air pollution hazards.

(c) DEFINITION OF GREENHOUSE GAS.—In this section, the term "greenhouse gas" means the air pollutants carbon dioxide, hydrofluorocarbons, methane, nitrous oxide, perfluorocarbons, and sulfur hexafluoride.

### SEC. 60107. LOW EMISSIONS ELECTRICITY PROGRAM.

The Clean Air Act is amended by inserting after section 134 of such Act, as added by section 60103 of this Act, the following:

### "SEC. 135. LOW EMISSIONS ELECTRICITY PROGRAM.

42 USC 7435.

"(a) APPROPRIATION.—In addition to amounts otherwise available, there is appropriated to the Administrator for fiscal year 2022, out of any money in the Treasury not otherwise appropriated, to remain available until September 30, 2031—

"(1) $17,000,000 for consumer-related education and partnerships with respect to reductions in greenhouse gas emissions that result from domestic electricity generation and use;

"(2) $17,000,000 for education, technical assistance, and partnerships within low-income and disadvantaged communities with respect to reductions in greenhouse gas emissions that result from domestic electricity generation and use;

"(3) $17,000,000 for industry-related outreach, technical assistance, and partnerships with respect to reductions in

§ 1955.1. Exhaust Emission Standards and Test..., 13 CA ADC § 1955.1

---

Barclays California Code of Regulations
  Title 13. Motor Vehicles (Refs & Annos)
    Division 3. Air Resources Board
      Chapter 1. Motor Vehicle Pollution Control Devices
        Article 2. Approval of Motor Vehicle Pollution Control Devices (New Vehicles)

13 CCR § 1955.1

§ 1955.1. Exhaust Emission Standards and Test Procedures--1975 Through 1978 Model-Year Passenger Cars.

Currentness

(a) The exhaust emissions from new 1975 through 1978 model-year gasoline-fueled passenger cars having an engine displacement of 50 cubic inches or greater, subject to registration and sold and registered in this state, shall not exceed:

Exhaust Emission Standards
(grams per mile)

| Model Year | Hydrocarbons | Carbon Monoxide | Oxides of Nitrogen |
|---|---|---|---|
| 1975 | 0.9 [*] | 9.0 | 2.0 |
| 1976 | 0.9 [*] | 9.0 | 2.0 |
| 1977 | 0.41 | 9.0 | 1.5 |
| 1978 | 0.41 | 9.0 | 1.5 |

[*] Hydrocarbon emissions from limited-production passenger cars shall not exceed 1.5 grams per mile.

(b) The test procedures for determining compliance with these standards are set forth in "California Exhaust Emission Standards and Test Procedures for 1975 through 1978 Model Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles," adopted by the State Board, February 19, 1975, as last amended June 8, 1977.

(c) This regulation shall remain in effect until December 31, 1983, and as of that date is repealed unless a later regulation deletes or extends that date. Notwithstanding the repeal or expiration of this regulation on December 31, 1983, the provisions of the regulation as they existed prior to such repeal or expiration shall continue to be operative and effective for those events occurring prior to the repeal or expiration.

**Credits**
NOTE: Authority cited: Sections 39600 and 39601, Health and Safety Code. Reference: Sections 39002, 39003, 43000, 43100 and 43104, Health and Safety Code.

---

§ 1955.1. Exhaust Emission Standards and Test..., 13 CA ADC § 1955.1

This database is current through 12/30/22 Register 2022, No. 52.

Cal. Admin. Code tit. 13, § 1955.1, 13 CA ADC § 1955.1

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.