**ORAL ARGUMENT NOT YET SCHEDULED**
No. 22-1081 (and consolidated cases)

# In the United States Court of Appeals for the District of Columbia Circuit

STATE OF OHIO, ET AL.,
*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Respondents.*

On Petition For Review from the United States
Environmental Protection Agency
(No. EPA-HQ-OAR-2021-0257)

**FINAL BRIEF FOR INDUSTRY RESPONDENT-INTERVENORS**

Stacey L. VanBelleghem
Devin M. O'Connor
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
stacey.vanbelleghem@lw.com

*Counsel for the National Coalition
for Advanced Transportation*

Kevin Poloncarz
Martin Levy
Tim Duncheon
COVINGTON & BURLING LLP
415 Mission Street, 54th Floor
San Francisco, CA 94105-2533
(415) 591-7070
kpoloncarz@cov.com

*Counsel for Advanced Energy United
et al.*

Jonathan S. Martel
Elisabeth S. Theodore
Ethan G. Shenkman
Samuel I. Ferenc
ARNOLD & PORTER KAYE SCHOLER
  LLP
601 Massachusetts Ave. NW
Washington, DC 20001-3743
(202) 942-5000
elisabeth.theodore@arnoldporter.com

*Counsel for Ford Motor Company*

(Additional counsel listed on the
following page)

Robert A. Gorman
BMW GROUP
Corporate Counsel
AJ-NA-4
300 Chestnut Ridge Road
Woodcliff Lake, NJ 07677-7731
(201) 307-3811
robert.gorman@bmwna.com

David M. Lehn
WILMER CUTLER PICKERING HALE &
    DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6000
david.lehn@wilmerhale.com

Benjamin Hanna
Chaz Kelsh
WILMER CUTLER PICKERING HALE &
    DORR LLP
617-526-6000
benjamin.hanna@wilmerhale.com
chaz.kelsh@wilmerhale.com

*Counsel for BMW of North America, LLC*

Kenneth J. Markowitz
Stacey H. Mitchell
Pratik A. Shah
AKIN GUMP STRAUSS HAUER & FELD
2001 K Street NW
Washington, DC 20006-1037
(202) 887-4000
kmarkowitz@akingump.com
shmitchell@akingump.com
pshah@akingump.com

*Counsel for Volkswagen Group of
America*

Steven Croley
Chief Policy Officer and General
Counsel
FORD MOTOR COMPANY
One American Road
Dearborn, MI 48126-2798
(313) 480-8803
scroley@ford.com

Evan Belser
Policy Strategist and Managing
Counsel
Office of General Counsel
FORD MOTOR COMPANY
801 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 997-0217
ebelser1@ford.com

*Counsel for Ford Motor Company*

Michael Thomas
Legal Director and Secretary
Volvo Car USA LLC
1800 Volvo Place
Mahwah, NJ 07430
(201) 981-9486
michael.thomas@volvocars.com

*Counsel for Volvo Car USA LLC*

John W. (Jack) Alden Jr.
Associate General Counsel
American Honda Motor Co., Inc.
1919 Torrance Blvd., MS 300-2-1D
(310) 291-0389
jack_alden@na.honda.com

*Counsel for American Honda Motor
Co., Inc.*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A. Parties**

All parties, intervenors, and amici appearing in these consolidated cases are listed in the briefs of petitioners and respondents except for the following:

*Amici for Respondents*: David Dickinson Ackerly, Maximilian Auffhammer, Marshall Burke, Allen Goldstein, John Harte, Michael Mastrandrea, LeRoy Westerling, Senator Tom Carper, Representative Frank Pallone, Jr., American Thoracic Society, American Medical Association, American Association for Respiratory Care, American College of Occupational and Environmental Medicine, American College of Physicians, American College of Chest Physicians, National League for Nursing, American Public Health Association, American Academy of Pediatrics, Academic Pediatric Association, Todd Aagaard, William Boyd, Alejandro E. Camacho, Robin Craig, Robert Glicksman, Bruce Huber, Sanne Knudsen, David Owen, and Leah M. Litman.

**B. Rulings Under Review**

The agency action under review is entitled "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision," 87 Fed. Reg. 14,332 (Mar. 14, 2022).

**C. Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Respondent-Intervenors respectfully submit the following corporate disclosure statement:

Ford Motor Company states that it has no parent corporation.  As of December 31, 2021, no publicly-traded companies have disclosed that they own 10% or more of Ford's common stock.

Volkswagen Group of America, Inc. is a wholly owned subsidiary of Volkswagen, AG, a publicly traded German corporation ("VWGoA"). VWGoA has no publicly traded subsidiaries.

BMW of North America, LLC, is a wholly owned subsidiary of Bayerische Motoren Werke Aktiengesellschaft ("BMW AG").  No publicly traded company has disclosed that it owns 10% or more of BMW AG's stock.

American Honda Motor Co., Inc. is a wholly-owned subsidiary of Honda Motor Co., Ltd.  No other publicly traded corporation owns 10% or more of the stock of American Honda Motor Co., Inc.

Volvo Car USA LLC is a wholly-owned subsidiary of Volvo Car North America, LLC, which is wholly-owned by Volvo Car Corporation.  Volvo Car Corporation is wholly-owned by Volvo Car AB, a Swedish publicly-traded

company, and ultimately by Zhejiang Geely Holding Group Co., Ltd.  No other publicly traded corporation owns ten percent or more of Volvo Car USA LLC.

The National Coalition for Advanced Transportation is an unincorporated association and does not have a parent corporation.  No publicly-held entity owns 10% or more of the National Coalition for Advanced Transportation.  The National Coalition for Advanced Transportation has the following members[1]: Constellation Energy Corporation, Edison International, EVgo, Exelon Corporation and its affiliate operating companies (Atlantic City Electric, Baltimore Gas & Electric, Commonwealth Edison Company, Delmarva Power, PECO, and PEPCO), Lucid USA, Inc., Pacific Gas and Electric Company, Plug In America, Portland General Electric, Rivian Automotive, Sacramento Municipal Utility District, and Tesla, Inc.

Advanced Energy United certifies that Advanced Energy United is a not-for-profit business association dedicated to making energy secure, clean, and affordable.  Advanced Energy United does not have any parent

---

[1] National Coalition for Advanced Transportation member Center for Climate and Energy Solutions is not participating in this litigation as this organization does not participate in litigation as a matter of general practice.

companies or issue stock, and no publicly held company has a 10 percent or greater ownership interest in Advanced Energy United.

Calpine Corporation ("Calpine") certifies that it is a privately held corporation.  CPN Management, LP owns 100 percent of the common stock of Calpine.  Volt Parent GP, LLC is the General Partner of CPN Management, LP.  Energy Capital Partners III, LLC owns the controlling interest in Volt Parent GP, LLC.  Calpine is among America's largest generators of electricity from natural gas and geothermal resources, with 77 power plants in operation or under construction in 16 U.S. states and Canada, amounting to nearly 26,000 megawatts of generating capacity. Calpine also provides retail electric service to customers in competitive markets throughout the United States, including an additional seven states (beyond those in which it operates generation resources), through its subsidiaries Calpine Energy Solutions and Champion Energy Services.

National Grid USA states that it is a holding company with regulated direct and indirect subsidiaries engaged in the transmission, distribution and sale of electricity and natural gas and the generation of electricity.  It is the direct or indirect corporate parent of several subsidiary electric distribution companies, including Massachusetts Electric Company, Nantucket Electric

Company, and Niagara Mohawk Power Corporation.  National Grid USA is also the direct corporate parent of National Grid Generation LLC, which supplies capacity to, and produces energy for, the use of customers of the Long Island Power Authority.  All of the outstanding shares of common stock of National Grid USA are owned by National Grid North America Inc.  All of the outstanding shares of common stock of National Grid North America Inc. are owned by National Grid (US) Partner 1 Limited.  All of the outstanding ordinary shares of National Grid (US) Partner 1 Limited are owned by National Grid (US) Investments 4 Limited.  All of the outstanding ordinary shares of National Grid (US) Investments 4 Limited are owned by National Grid (US) Holdings Limited.  All of the outstanding ordinary shares of National Grid (US) Holdings Limited are owned by National Grid plc.  National Grid plc is a public company organized under the laws of England and Wales, with ordinary shares listed on the London Stock Exchange, and American Depositary Shares listed on the New York Stock Exchange.  No publicly held corporation directly owns more than 10 percent of National Grid plc's outstanding ordinary shares.

New York Power Authority states that it is a New York State public-benefit corporation.  It is the largest state public power utility in the United

States, with 16 generating facilities and more than 1,400 circuit-miles of transmission lines.  New York Power Authority sells electricity to more than 1,000 customers, including local and state government entities, municipal and rural cooperative electric systems, industry, large and small businesses and non-profit organizations.  New York Power Authority has no parent corporation and no publicly held company owns greater than 10 percent ownership interest in it.

Power Companies Climate Coalition states that it is an unincorporated association of companies engaged in the generation and distribution of electricity and natural gas, organized to advocate for responsible solutions to address climate change and reduce emissions of greenhouse gases and other pollutants, including through participation in litigation concerning federal regulation.  Its members include the Los Angeles Department of Water and Power, The City of Seattle, by and through its City Light Department ("Seattle City Light"), as well as the other entities providing disclosures in this disclosure statement.

Los Angeles Department of Water and Power states that it is a vertically integrated publicly-owned electric utility of the City of Los Angeles, serving a population of over 4 million people within a 465 square

mile service territory covering the City of Los Angeles and portions of the Owens Valley.  Los Angeles Department of Water and Power is the third largest electric utility in the state, one of five California balancing authorities, and the nation's largest municipal utility.  Los Angeles Department of Water and Power owns and operates a diverse portfolio of generation, transmission, and distribution assets across several states.  Los Angeles Department of Water and Power's diverse portfolio includes electricity produced from natural gas, hydropower, coal, nuclear, wind, biomass, geothermal, and solar energy resources.  Los Angeles Department of Water and Power owns and/or operates the majority of its conventional generating resources, with a net dependable generating capacity of 7,967 megawatts.  Its transmission system, which includes more than 3,700 circuit-miles of transmission lines, transports power from the Pacific Northwest, Utah, Wyoming, Arizona, Nevada, and elsewhere within California to the City of Los Angeles.  Los Angeles Department of Water and Power's mission is to provide clean, reliable water and power in a safe, environmentally responsible, and cost-effective manner.

Seattle City Light states that it is a municipal electric utility providing retail electricity service to nearly 455,000 customers in the Seattle

metropolitan area serving nearly 1 million Seattle-area residents.  Seattle's
power resources are over 90 percent hydropower, much of which is owned
and operated by Seattle.  Additionally, Seattle operates its hydroelectric
projects to support flood control, instream flows for fish, and reservoir
recreation.  As of 2016, Seattle's total system generation capability was
2,014.1 MW.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................................................................................ i

CORPORATE DISCLOSURE STATEMENT ................................................ iii

TABLE OF AUTHORITIES ............................................................................. xi

GLOSSARY ........................................................................................................ xiii

INTRODUCTION ..............................................................................................1

STATEMENTS OF JURISDICTION AND THE ISSUES ...........................2

STATUTES AND REGULATIONS ..................................................................2

STATEMENT OF THE CASE .........................................................................2

SUMMARY OF ARGUMENT ..........................................................................5

ARGUMENT .......................................................................................................6

I.     The Restoration Decision is Lawful ...........................................................6

       A.     California's Advanced Clean Cars Program Is an Incremental Step in a Decades-Long Regulatory Effort to Reduce Vehicle Emissions ...........................................................7

       B.     Market Forces Also Support the Electrification of the Automobile Industry.........................................................................11

II.    EPA's Restoration Decision Is Correct in Light of Industry Reliance ........................................................................................................14

       A.     EPA's Restoration Decision Was Justified by the Withdrawal's Failure to Consider Reliance Interests.................15

       B.     Reliance Was Reasonable Because the 2013 Waiver Was Correct, Was Never Challenged, and Was in Effect for Six Years ................................................................................................19

CONCLUSION...................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Methyl Corp. v. EPA,*
   749 F.2d 826 (D.C. Cir. 1984)................................................................20, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ........................................................................15, 18

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ...............................................................................15

*Ky. Mun. Energy Agency v. FERC,*
   45 F.4th 162 (D.C. Cir. 2022) ....................................................................15

*Mazaleski v. Treusdell,*
   562 F.2d 701 (D.C. Cir. 1977)....................................................................20

*Motor & Equip. Mfrs. Ass'n, Inc. v. EPA,*
   627 F.2d 1095 (D.C. Cir. 1979)..................................................................19

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014)....................................................................................10

*Verizon Tel. Cos. v. FCC,*
   269 F.3d 1098 (D.C. Cir. 2001)..................................................................21

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ...............................................................................13

*Whitman v. Am. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001)....................................................................................19

**Statutes**

Infrastructure Investment and Jobs Act, Pub. L. No. 117-58,
   135 Stat. 429 (2021)...................................................................................14

Inflation Reduction Act, Pub. L. No. 117-169,
  136 Stat. 1818 (2022) ............................................................................14

**Regulations**

77 Fed. Reg. 62,624 (Oct. 15, 2012) .........................................................16

84 Fed. Reg. 51,310 (Sept. 27, 2019) ........................................................18

86 Fed. Reg. 74,434 (Dec. 30, 2021) ...................................................4, 10

87 Fed. Reg. 14,332 (Mar. 14, 2022)...............................................1, 9, 18

Cal. Code Regs. tit. 13, § 1962.2 ...............................................................16

**Legislative Materials**

H.R. Rep. No. 95-294 (1977) .....................................................................19

**Other Authorities**

Aaron Gregg & Faiz Siddiqui, *Ford Building Massive Electric
  Vehicle and Battery Plants with $11.4 Billion Investment*,
  WASH. POST (Sept. 28, 2021)...............................................................17

# GLOSSARY

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| EPA Br. | Brief of Respondents U.S. Environmental Protection Agency and Michael S. Regan |
| Fuel Br. | Brief of Private Petitioners |
| J.A. | Joint Appendix |
| Private Petitioners | American Fuel & Petrochemical Manufacturers, Domestic Energy Producers Alliance, Energy Marketers of America, National Association of Convenience Stores, Valero Renewable Fuels Company, LLC, Clean Fuels Development Coalition, IMC, Inc., Illinois Corn Growers Association, Kansas Corn Growers Association, Michigan Corn Growers Association, Missouri Corn Growers Association, Iowa Soybean Association, Minnesota Soybean Growers Association, South Dakota Soybean Association, Diamond Alternative Energy, LLC |
| Restoration Decision | "California State Motor Vehicle Pollution Control Standards; Advanced Clean Car Program; Reconsideration of a Previous Withdrawal of a Waiver of Preemption; Notice of Decision," 87 Fed. Reg. 14,332 (Mar. 14, 2022) |
| State Br. | Brief of State Petitioners |
| State Petitioners | Ohio, Alabama, Arkansas, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, West Virginia |

**INTRODUCTION**

Congress empowered EPA to grant California the ability to set its own vehicle emissions standards over a half-century ago. Since then, EPA has fulfilled its statutory obligations, properly granting California dozens of preemption waivers. This includes the 2013 waiver for California's Advanced Clean Cars program that aimed to reduce both conventional pollutants and greenhouse-gas emissions. *See* 87 Fed. Reg. 14,332, 14,335-36 (Mar. 14, 2022). As market and regulatory forces have caused a broadscale shift toward electric vehicles, the vehicle and electric power industries have invested billions shaped in part by the unchallenged 2013 waiver. But in 2019, EPA purported to partially withdraw the waiver, exceeding its statutory authority. In 2022, EPA recognized its error and reversed the withdrawal, consistent with the Clean Air Act.

Industry respondent-intervenors agree with respondents' arguments regarding the constitutionality of Clean Air Act Section 209(b), the unlawfulness of EPA's 2019 waiver withdrawal, and the Restoration Decision's lawful reinstatement of the 2013 waiver. Respondent-intervenors address two additional points: (1) California's program presents no "major question"; and (2) given significant reliance interests, including by industry

respondent-intervenors, it would have been arbitrary in these circumstances for EPA not to have reinstated California's 2013 waiver.

## STATEMENTS OF JURISDICTION AND THE ISSUES

Industry respondent-intervenors adopt respondents' Statements of Jurisdiction and of the Issues.

## STATUTES AND REGULATIONS

Industry respondent-intervenors adopt respondents' Statutory and Regulatory Addendum.

## STATEMENT OF THE CASE

Industry respondent-intervenors adopt respondents' Statement of the Case, and add the following.  Industry respondent-intervenors Ford Motor Company ("Ford"), Volkswagen Group of America, Inc. ("VWGoA"), BMW of North America, LLC ("BMW Group"), American Honda Motor Co., Inc. ("Honda"), and Volvo Car USA LLC ("Volvo Car USA") sold millions of cars in the United States in 2022.  Each is committed to reducing greenhouse-gas emissions in its fleet.

Ford has committed to invest more than $50 billion through 2026 to put electric vehicles on the road across the world.  By the end of 2026, Ford expects to produce more than 2 million electric vehicles annually.  Ford is committed to achieving carbon neutrality and expects that, by 2030, electric

vehicles will represent half of its global volume. Similarly, VWGoA is in the midst of deploying a $40 billion electrification development plan to introduce an increasingly broad range of electrified vehicles globally, and plans to invest $7.1 billion in North America over the next five years to make 55% of U.S. sales fully electric by 2030. By 2030, VWGoA anticipates having over 75 electric vehicle models and projects a cumulative volume of 26 million electrified vehicles produced, globally. BMW Group announced in August 2020 its intent to have more than 7 million vehicles with electrified drive systems on the road worldwide by 2030 (two-thirds of them all-electric), making electric vehicles half of its global volume and reducing its fleet's emissions per mile by around 40%. Honda has announced that 100% of its vehicles worldwide will be electrified by 2040, with plans to launch more than 30 different electric vehicle models by 2030, anticipating sales of over 2 million electric vehicles that year. Volvo Car USA is committed to becoming a leader in the fast-growing premium electric car market. By 2025, it aims to sell 1.2 million cars globally, with at least half being fully electric. By 2030, it plans to become a fully electric car company.

Ford, VWGoA, BMW Group, Honda, and Volvo Car USA are committed to working with California (and all states) to combat climate change.  In 2020, after EPA relaxed some greenhouse-gas emissions standards, each company individually agreed with California, consistent with each company's business plan, to commit to greenhouse-gas emission reductions.  Each did so to mitigate risks created by litigation over EPA's actions rolling back its standards and in light of potential obligations to comply with California's Advanced Clean Cars program.  *See* 86 Fed. Reg. 74,434, 74,458 (Dec. 30, 2021); J.A.156.  With these historic "California Framework Agreements," Ford, VWGoA, BMW Group, Honda, and Volvo Car USA each demonstrated commitments to work with California to reduce emissions despite an uncertain regulatory environment.

The National Coalition for Advanced Transportation, Advanced Energy United, Calpine Corporation, National Grid USA, New York Power Authority, and Power Companies Climate Coalition have collectively invested billions to manufacture electric vehicles, support the infrastructure and technology needed to bring electric vehicles to market, integrate electric vehicles to the grid, and support the widespread adoption of such electric vehicles by consumers.  They made these investments with the well-founded

expectation that increased demand for electric vehicles would be boosted by a stable and predictable regulatory program and California's continued ability, through EPA's preemption waivers, to drive technology innovation and emission reductions. They publicly supported the Restoration Decision and challenged EPA's unlawful rescission of the 2013 waiver in *Union of Concerned Scientists v. NHTSA*, No. 19-1230 (D.C. Cir.).

## SUMMARY OF ARGUMENT

I. Contrary to private petitioners' argument, California's Advanced Clean Cars program does not implicate the "major questions" doctrine because (in addition to reasons given by respondents, EPA Br. 77-79) the program represents an incremental step in a multi-decade regulatory effort to reduce vehicle emissions, improve California's air quality, and mitigate the state's contribution to climate change. Given that California's program broadly aligns with consumer demand and other regulatory and market forces spurring electrification of the automobile industry, it does not represent a "wholesale shift" in the nationwide vehicle fleet. The Restoration Decision is consistent with EPA's prior implementation of its statutory waiver authority and is lawful.

5

II.  Industry respondent-intervenors reasonably relied on EPA's unchallenged 2013 waiver to plan multi-billion-dollar investments in developing and manufacturing transportation and energy technology and supporting infrastructure.  EPA's Restoration Decision is justified because it remedies the 2019 withdrawal's unlawful failure to consider these and other reliance interests.

## ARGUMENT

## I.     The Restoration Decision is Lawful

Private petitioners wrongly claim that California's Advanced Clean Cars program implicates the major questions doctrine because it "force[s]" a "wholesale shift" in the country's vehicle fleet and "would fundamentally transform the automobile industry."  Fuel Br. 1.  Unlike private petitioners, respondent-intervenors include the automobile manufacturers who are actually regulated by California's program.  Petitioners' alarmist rhetoric obscures the actual nature of California's program: a set of incremental yet important advancements in California's more than half-century framework for regulating vehicle emissions.  Advanced Clean Cars is just the latest phase of California's program for reducing both criteria and greenhouse-gas emissions, under which automakers have operated successfully for decades.  Moreover, both internal sustainability goals and external market forces,

6

including surging consumer demand and the limitations of existing technology, are further prompting automakers to transition toward electric vehicles.

Petitioners' attempts to cast automakers as victims of unlawful agency overreach accordingly fall flat. Although automakers relied on the regulations enabled by the 2013 waiver in making near-term investment decisions, *see infra*, not one automaker has appeared in this litigation, in any capacity, to back up petitioners' claim that approving the waiver will require some wholesale upheaval of the auto industry or send it in a direction it would not otherwise have gone. Innovation has always left behind older technologies. That does not mean that facilitating innovation or failing to shield legacy technologies gives rise to questions of economic and political significance beyond EPA's regulatory reach.

### A. California's Advanced Clean Cars Program Is an Incremental Step in a Decades-Long Regulatory Effort to Reduce Vehicle Emissions

Contrary to Petitioners' exaggerated portrayal, the Advanced Clean Cars program authorized by the Restoration Decision consists of updates to California's longstanding regulatory frameworks for criteria and greenhouse-gas emissions. Far from an unprecedented "mandate to shift the

7

Nation's automobile fleet to electric vehicles," Fuel Br. 4, the program builds on a regulatory structure begun in the 1950s, J.A.58, and the components approved in the Restoration Decision update two regulations first promulgated in 1990, J.A.137-38, 143.  First, the Restoration Decision approved amendments to California's Low-Emission Vehicles program, which sets emission standards for criteria pollutants and, beginning with model year 2009, greenhouse gases.  J.A.86-87; J.A.145-47.  The approved revisions reduce criteria and greenhouse-gas emissions limits, among other updates.  J.A.145-47.

Second, EPA approved amendments to California's Zero-Emission Vehicle program, which since 1990 has required that a percentage of each manufacturer's passenger cars and light-duty trucks have no exhaust or evaporative emissions.  J.A.86.  The Zero-Emission Vehicle program has evolved in response to manufacturer input and technological progress, and the amendments gradually increase the minimum Zero-Emission Vehicle percentage.  J.A.93-94; J.A.137-39; *see* EPA Br. 14.

The Low- and Zero-Emission Vehicle programs, including the updates at issue in the Restoration Decision, are similar in kind to preceding California programs that have received dozens of EPA waivers spanning five

8

decades. 87 Fed. Reg. at 14,332. These earlier programs spurred emission-reducing technology breakthroughs, including novel engine modifications in the 1960s, catalytic converters in the 1970s, nitrogen oxide and particulate matter control systems in the 1980s, and on-board diagnostic systems in the 1980s and 1990s. J.A.62, 70-71, 79-80, 83. Further, along with granting waivers, EPA has consistently adopted major elements of California's regime into federal emissions control programs. J.A.85.

Automakers have offered extensive input on development of both the California and EPA programs throughout. *See* J.A.62-85; *see also* Br. for Intervenors All. of Auto. Mfrs. et al., No. 10-1092 (D.C. Cir. Sept. 30, 2011), Doc. 1332738. Industry and regulatory bodies have been especially aligned over the past fifteen years, beginning with the 2009 agreements between EPA, the National Highway Traffic Safety Administration, California, and manufacturers to support regulation of fuel-economy and greenhouse-gas emissions through a unified national program. *See* J.A.479; J.A.761. Ford, VWGoA, BMW Group, Honda, and Volvo Car USA, which together represent nearly 30 percent of annual U.S. vehicle sales, each entered into a 2020 California Framework Agreement, committing to achieve agreed-upon

emissions reductions during the period when California's waiver was withdrawn. *See* 86 Fed. Reg. at 74,458; J.A.156.[2]

Petitioners ignore this history and the automobile industry's role in it to spin up a "major question" where none exists. As noted, no automaker has appeared in this litigation to support petitioners' "major questions" theory. Petitioners' claim that the Advanced Clean Cars program will "substantially restructure the American automobile market" misapprehends the incremental nature of the program and ignores the perspective of the regulated industry. Fuel Br. 23. The major questions doctrine is inapplicable in this context for reasons EPA explains. EPA Br. 77-81. In any event, for the reasons explained here, even if the doctrine were applicable, the impacts on industry of the Advanced Clean Cars program are familiar in scope and well in line with decades of precedent—far from novel matters of "vast economic and political significance." Fuel Br. 22 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

---

[2] State petitioners' claim that these companies engaged in "secret negotiations" to "secure desired treatment under California's regulations" is inaccurate. State Br. 29. Each company acted in light of litigation and uncertainty over federal actions, its own business plans, and its commitment to combatting climate change. *See* Statement of the Case, *supra*.

**B.     Market Forces Also Support the Electrification of the Automobile Industry**

Petitioners similarly err in claiming that "California's [emissions] standards may well dictate the future of the automobile … industr[y]" and are "forcing manufacturers to produce electric vehicles instead of traditional vehicles" over the industry's objections.  Fuel Br. 23-25.  Just as with the history underlying the Advanced Clean Cars program, petitioners ignore real-world context: automakers have been producing electric vehicles for years and that transition is accelerating for numerous reasons beyond compliance with California's regulatory program.

First, criteria-pollutant and greenhouse-gas emissions from internal combustion engines can be reduced only so much.  J.A.570; J.A.624.  There are diminishing returns on investment in reducing emissions from such engines, compared to eliminating emissions with electric power.[3]  Second, consumer demand for electric vehicles has grown dramatically and continues

---

[3] Greenhouse-gas reduction efforts, including the Advanced Clean Cars program, also reduce criteria emissions.  *See* J.A.596-97 ("Electric and other zero emission vehicles are a critically important, cost-effective strategy to reduce [criteria] pollution … .  These vehicles … can reduce both conventional air pollution and carbon emissions by as much as 70 percent relative to gasoline-fueled vehicles."); *see also* J.A.174-76, 182-83, 185; J.A.375-77; J.A.547.  Petitioners' claims that programs targeting greenhouse gases are unrelated to criteria emissions are inaccurate.

11

to increase nationwide.  *See* J.A.574, 577, 585; J.A.378.  Consumers derive numerous benefits from electric vehicles besides emissions reductions, including lower lifetime operating costs and maintenance requirements and ready integration with other consumer technology.  J.A.581-83.  Automakers are committed to serving the large and growing segment of drivers ready to embrace these innovations.  Third, the Advanced Clean Cars program is just one of myriad regulatory programs across the world for reducing emissions of both criteria pollutants and greenhouse gases.  *See* J.A.546 & n.1.  Broad-scale decisionmaking for multinational automakers is not based simply on a single domestic policy program.

For these reasons and others, makers of internal combustion vehicles have invested billions in electric vehicles, and some industry respondent-intervenors were founded solely to produce electric vehicles.  *See* J.A.574, 578-80; J.A.156; J.A.177, 184; J.A.363; J.A.367-68; J.A.546; J.A.623-24; J.A.631-32; J.A.634; J.A.766.  Global automakers have no plans to abandon their extensive and growing financial commitments to electric vehicles.  *See, e.g.*, J.A.370-71, 370 n.5.  While respondent-intervenors have relied on California's waiver in important near-term planning and investments, *see infra*, California and EPA are not "dictat[ing]" or "forcing" long-term, world-

wide, industry-transformative planning, which is already well underway. Fuel Br. at 23-25.

Petitioners misapprehend or disregard the industry's actual posture when they claim that EPA is permitting California "to substantially restructure the American automobile market … at enormous cost and risk." *Id.* at 23.  If anything, California's program *mitigates* competitive disadvantage risks by helping ensure a level playing field for manufacturers aiming to make long-term electric vehicle investments during periods of regulatory uncertainty. *See, e.g.*, J.A.639; J.A.769.  The Clean Air Act plainly enables EPA to approve California to play this regulatory role, including with respect to the ongoing electric transition; this is no assertion by EPA of "extravagant statutory power over the national economy."  Fuel Br. 22 (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)).

The fact that the electric vehicle transition is reducing demand for conventional fuels and prompting evolution in energy infrastructure does not mean that the Restoration Decision implicates "major questions."  *See* EPA Br. 77-81.  Reduced interest in legacy products due to technology advancements and consumer preference shifts are an inevitable reality of the market and occur in all sectors of the economy.  Nor is electrification

13

inconsistent with national policy: Congress itself has encouraged the transition by including tax credits and grant programs for retail and commercial electric vehicles, electric vehicle charging infrastructure, and domestic battery production in the Infrastructure Investment and Jobs Act and the Inflation Reduction Act of 2022.  Pub. L. No. 117-58, §§ 11401, 40207-40209, 135 Stat. 429, 546-53, 963-78 (2021); Pub. L. No. 117-169, §§ 13401-13404, 13502, 136 Stat. 1818, 1954-69, 1971-81 (2022).[4]

## II.    EPA's Restoration Decision Is Correct in Light of Industry Reliance

The Restoration Decision logically followed years of related regulatory and industry developments.  In 2013, EPA followed a half-century of precedent in waiving preemption for California's Advanced Clean Cars program.  Industry respondent-intervenors reasonably relied on that uncontroversial *and unchallenged* waiver as they developed and planned multi-billion-dollar investments.  Although the Advanced Clean Cars program is not fundamentally transforming the automobile industry, like most regulations it engendered significant reliance interests: industry respondent-intervenors decided how best and how fast to facilitate

---

[4] The statutory Renewable Fuel Standard invoked by petitioners is not in conflict.  *See* EPA Br. 79 n.17.

14

electrification in reliance on California's rules.  Nonetheless, six years later,

EPA purported to withdraw the waiver, exceeding its statutory authority,

flouting precedent, destabilizing a level playing field, and ignoring these

reliance interests.  The Restoration Decision then reinstated the waiver,

properly examining those interests.  The waiver was correct in 2013 and,

given industry's legitimate reliance, is even more justified today.

### A.     EPA's Restoration Decision Was Justified by the Withdrawal's Failure to Consider Reliance Interests

Since 2013, industry respondent-intervenors have made major

investments in reliance on the regulatory stability California's standards

provided.  "[I]nvest[ing] hundreds of millions of dollars" after an agency

decision is "substantial evidence of reliance."  *Ky. Mun. Energy Agency v.*

*FERC*, 45 F.4th 162, 182 (D.C. Cir. 2022).  The waiver withdrawal was flawed

in multiple ways,[5] but the failure to consider these long-standing, significant

reliance interests *alone* made it unlawful and warranted reconsideration.  *See*

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-

14 (2020); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016)

---

[5] *See* Final Brief of Pet'rs Nat'l Coal. for Advanced Transp., et al., No. 19-1230 (D.C. Cir. Oct. 27, 2020), Doc. 1868422.

(agency must consider "that longstanding policies may have engendered serious reliance interests" (quotation marks and citation omitted)).

As noted above, consumer demand and technological innovation have been steering the transportation industry toward electrification. *See supra* at 11-12. Consumer demand for electric vehicles has increased rapidly, and electric vehicle sales may overtake traditional vehicles by 2033. J.A.474; J.A.378. The electricity to power electric vehicles is also becoming cleaner as power generation shifts toward renewable sources. J.A.176-77.

But the regulatory backdrop has substantially influenced the pace of the electric transition. Transportation and energy companies have relied significantly on regulatory stability to support major investments. Stable rules "facilitate long-term planning by manufacturers and suppliers." 77 Fed. Reg. 62,624, 62,631 (Oct. 15, 2012). Because the vehicle product cycle begins years before the vehicle is launched, a sudden change in the regulatory framework can have an immediate negative impact on a company's product planning and investments. *See* J.A.371. Further, automakers that out-perform standards rely on a consistent regulatory regime to earn and sell tradeable compliance credits. J.A.184; *see, e.g.*, Cal. Code Regs. tit. 13, § 1962.2(d). Regulatory stability also helps developing

16

energy companies to plan and build long-lived infrastructure to accommodate increased demand from electric vehicles.  J.A.486.

Relying on the regulatory stability the 2013 waiver provided, respondent-intervenors have invested billions.  J.A.177.  As outlined above, California's program has mitigated competitive disadvantage risks by helping ensure a level playing field for these investments.  Ford has relied in part on California's standards to invest $50 billion through 2026 to put electrified vehicle models on the road, including $17.6 billion in the United States since fall 2021.  This includes a multi-billion dollar investment for new electric vehicle and battery production complexes in Kentucky and Tennessee.[6]

Tesla also relied on the standards, devoting $1.1 billion to research and development in 2021 alone and some $10 billion to develop its new manufacturing facility in Texas.  Mot. to Intervene of Nat'l Coal. for Advanced Transp., Mendelson Decl., ¶¶ 10-11 (D.C. Cir. June 13, 2022), Doc. 1950413.  Electric utilities and charging infrastructure companies have

---

[6] *See* Aaron Gregg & Faiz Siddiqui, *Ford Building Massive Electric Vehicle and Battery Plants with $11.4 Billion Investment*, WASH. POST (Sept. 28, 2021), https://www.washingtonpost.com/business/2021/09/28/ford-jobs-electric-batteries/.

also relied on the California standards to make major investments to integrate electric vehicles to the grid. *See, e.g.*, J.A.486-87 (National Grid, PG&E, Exelon, and others have invested hundreds of millions); Mot. to Intervene of Nat'l Coal. for Advanced Transp., Backstrom Decl., ¶¶ 7-8.

In purporting to withdraw the 2013 waiver, EPA failed to acknowledge the compelling industry reliance interests that had accrued over six years backed by billions of dollars in investments. *See, e.g.*, J.A.550-57; J.A.573-620; J.A.559-67. EPA inexplicably reasoned that, because EPA planned to revisit federal standards, "no cognizable reliance interests have accrued sufficient to foreclose EPA's ability" to revoke the waiver. 84 Fed. Reg. 51,310, 51,331, 51,335 (Sept. 27, 2019). The failure to consider industry's investment-backed reliance interests alone made the withdrawal unlawful. *See Regents*, 140 S. Ct. at 1913-14.

EPA properly considered these reliance interests in the Restoration Decision. EPA emphasized the "uncertainty in settled expectations created by the SAFE 1 interpretation." 87 Fed. Reg. at 14,367. It noted that "[s]everal automakers and industry groups have … indicated reliance on [California's] standards" over the past decade. 87 Fed. Reg. at 14,350-51 (citing comments). Industry reliance and market forces help explain why *not*

18

*one* automaker supports petitioners.  Both law and economic reality compel the Restoration Decision.

### B. Reliance Was Reasonable Because the 2013 Waiver Was Correct, Was Never Challenged, and Was in Effect for Six Years

The Clean Air Act was "expressly designed to force regulated sources to develop pollution control devices that *might at the time appear to be economically or technologically infeasible.*"  *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 491 (2001) (Breyer, J., concurring) (citation omitted).  Section 209 furthers that objective and reflects Congress's cooperative-federalist vision that California is "to act as a kind of laboratory for innovation."  *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1111 (D.C. Cir. 1979).  Congress "ratif[ied] and strengthen[ed]" that approach in 1977 by amending the waiver provision to "afford California the broadest possible discretion" to design and implement its own standards.  H.R. Rep. No. 95-294, at 301-02 (1977); *see* EPA Br. 8, 61-62.

Industry reliance was reasonable because the 2013 waiver promoted innovation in line with this goal and judicial precedent.  Applying settled law, EPA properly found that California met the conditions for granting the waiver.  *See* EPA Br. 58-91.  Reliance was particularly reasonable because

19

the waiver went unchallenged and *six* years passed before EPA purported to reconsider it.  Reconsideration of an adjudication, such as the 2013 waiver, must occur within "a reasonable period of time," which, "absent unusual circumstances," "would be measured in weeks, not years." *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (citation omitted); *see Am. Methyl Corp. v. EPA*, 749 F.2d 826, 839-40 (D.C. Cir. 1984) (holding EPA lacks an "open-ended power to revoke waivers," which "ensure[s] that entities subject to regulation … know what is expected of them").

Private petitioners assert (without support) that reliance interests are "of lesser concern" when the new decision "reduces regulatory obligations and thereby provides affected parties with *more* flexibility."  Fuel Br. 63.  But once an affected party has made major investments in reasonable reliance on a longstanding regulatory regime, there is no "flexibility."  Petitioners' implicit theory seems to be that regulatory action is categorically disfavored and that reliance on such action is disfavored too, but that is not the law, and regulatory action can provide significant value to companies by mitigating the risks of investing in new technologies.  Under private petitioners' made-up rule, an investment in a legacy technology is *ipso facto* more cognizable than an investment in an advanced one.  That rule flouts the

20

Clean Air Act's innovation-focused design, black-letter administrative law, and "basic fairness."[7] *Am. Methyl Corp.*, 749 F.2d at 839.

Companies do not lightly make billion-dollar investments. The waiver was correct in 2013, and given significant investment-backed reliance interests, it is even more justified today.

**CONCLUSION**

For these reasons, the petitions should be denied.

---

[7] Industry respondent-intervenors also disagree with commenters who suggested that reliance on the waiver withdrawal might also be reasonable. *See* J.A.407; J.A.433-34. The waiver was in effect for over six years, whereas its purported withdrawal lasted just two years. And the waiver was never challenged, whereas the withdrawal was immediately challenged in multiple lawsuits highlighting its severe legal flaws. *Cf. Verizon Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001) (reliance on agency decision was "something short of reasonable" because it was "perpetually enmeshed in litigation").

Dated: March 20, 2023

/s/ Stacey L. VanBelleghem
Stacey L. VanBelleghem
Devin M. O'Connor
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
stacey.vanbelleghem@lw.com

*Counsel for the National Coalition
for Advanced Transportation*

/s/ Kevin Poloncarz
Kevin Poloncarz
Martin Levy
Tim Duncheon
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, 54th Floor
San Francisco, CA 94105-2533
(415) 591-7070
kpoloncarz@cov.com
MaLevy@cov.com
TDuncheon@cov.com

*Counsel for Advanced Energy
United, Calpine Corporation,
National Grid USA, New York Power
Authority, and Power Companies
Climate Coalition*

Robert A. Gorman
BMW GROUP
Corporate Counsel
AJ-NA-4
300 Chestnut Ridge Road

Respectfully submitted,

/s/ Elisabeth S. Theodore
Jonathan S. Martel
Elisabeth S. Theodore
Ethan G. Shenkman
Samuel I. Ferenc
ARNOLD & PORTER KAYE SCHOLER
   LLP
601 Massachusetts Ave. NW
Washington, DC 20001-3743
(202) 942-5000
jonathan.martel@arnoldporter.com
elisabeth.theodore@arnoldporter.com
ethan.shenkman@arnoldporter.com
sam.ferenc@arnoldporter.com

Steven Croley
Chief Policy Officer and General
Counsel
FORD MOTOR COMPANY
One American Road
Dearborn, MI 48126-2798
(313) 480-8803
scroley@ford.com

Evan Belser
Policy Strategist and Managing
Counsel
Office of General Counsel
FORD MOTOR COMPANY
801 Pennsylvania Ave NW, Suite 400
Washington, DC 20004
(202) 997-0217
ebelser1@ford.com

*Counsel for Ford Motor Company*

22

Woodcliff Lake, NJ 07677-7731
(201) 307-3811
robert.gorman@bmwna.com

David M. Lehn
WILMER CUTLER PICKERING HALE &
  DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6000
david.lehn@wilmerhale.com

Benjamin Hanna
Chaz Kelsh
WILMER CUTLER PICKERING HALE &
  DORR LLP
617-526-6000
benjamin.hanna@wilmerhale.com
chaz.kelsh@wilmerhale.com

*Counsel for BMW of North America,*
  *LLC*

John W. (Jack) Alden Jr.
Associate General Counsel
American Honda Motor Co., Inc.
1919 Torrance Blvd., MS 300-2-1D
(310) 291-0389
jack_alden@na.honda.com

*Counsel for American Honda Motor*
*Co., Inc.*

Michael Thomas
Legal Director and Secretary
Volvo Car USA LLC
1800 Volvo Place
Mahwah, NJ 07430
(201) 981-9486
michael.thomas@volvocars.com

*Counsel for Volvo Car USA LLC*

Kenneth J. Markowitz
Stacey H. Mitchell
Pratik A. Shah
AKIN GUMP STRAUSS HAUER & FELD
2001 K Street NW
Washington, DC 20006-1037
(202) 887-4000
kmarkowitz@akingump.com
shmitchell@akingump.com
pshah@akingump.com

*Counsel for Volkswagen Group of*
  *America*

23

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(f) and (g), along with the Court's September 20, 2022 Order, because it contains 3,844 words.

This Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Century 14-point font.

Dated:  March 20, 2023                    */s/Elisabeth S. Theodore*
                                          Elisabeth S. Theodore

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2023, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the District of Columbia Circuit using the appellate CM/ECF

system. The participants in the case are registered CM/ECF users and

service will be accomplished by the appellate CM/ECF system.


Dated:  March 20, 2023                     */s/Elisabeth S. Theodore*
                                           Elisabeth S. Theodore